

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| KAREEM TORAIN                  : | |
|       **Plaintiff**        : | **JURY TRIAL** |
|       vs.          : | **DEMAND** |
| THE CITY OF PHILADELPHIA, PHILADELPHIA  : | |
| POLICE OFFICER WALKER, BADGE # 3730;   : | |
| PHILADELPHIA POLICE OFFICER REYNOLDS,  : | C.A. #14- |
| BADGE # 4268; PHILADELPHIA POLICE OFFICER : | |
| MONAGHAN, BADGE # 6061, individually and in  : | |
| their capacity as police officers         : | |
|       **Defendants**     : | |

**14    1643**

## COMPLAINT

### I. PRELIMINARY STATEMENT

1.  Plaintiff brings this action under 42 U.S.C. §1983 seeking redress for the extraordinary misconduct of several Philadelphia police officers who used improper and unconstitutional means to secure search warrants by deception and misrepresentation, search persons and property, and subject citizens to unlawful arrest, detention and prosecution. The actions and conduct of the Defendant police officers were the result of policies, practices, customs, and deliberate indifference on the part of Defendant City of Philadelphia, including the failure to take disciplinary and remedial action against the Defendant officers and other Philadelphia police officers despite documented records of misconduct and abuses of authority.

### II. JURISDICTION

2.  This action is brought pursuant to 42 U.S.C. §§ 1331 and 1343(1), (3), (4) and the aforementioned statutory provision.

## III. PARTIES

3. Plaintiff, Kareem Torain is an adult male who was at all times relevant to its Complaint, a resident of Philadelphia, Pennsylvania.

4. Defendant City of Philadelphia is a City of the First Class in the Commonwealth of Pennsylvania and at all times relevant hereto operated under the color of state law in creating and maintaining a Police Department, was the employer of all Defendants and had the responsibility of adopting policies, implementing procedures and practices which would create an environment whereby citizens would be safe from police abuse.

5. Defendant Walker, Badge number 3730, is a former police officer and was at all times relevant to this Complaint, a police officer for the City of Philadelphia and acting under the color of state law. He is being sued in both his individual and official capacities.

6. Defendant Reynolds, Badge number 4268, is and was at all times relevant to this Complaint, a police officer for the City of Philadelphia and acting under the color of state law. He is being sued in both his individual and official capacities.

7. Defendant Monaghan, Badge number 6061, is and was at all times relevant to this Complaint, a police officer for the City of Philadelphia and acting under the color of state law. He is being sued in both his individual and official capacities.

## IV. FACTS

8. For more than twenty years, Philadelphia police officers assigned to various narcotics units have engaged in a pattern and practice of securing search warrants based on fraud and misrepresentation, the misuse of informants, the improper

execution of search warrants, the falsification of evidence, the destruction and theft of personal property, and related misconduct.

9. The City of Philadelphia has failed to take appropriate remedial measures to prevent misconduct of this nature.

10. In or around January, 2001, Defendant Monaghan, a member of the Narcotics Field Unit received information from a confidential source regarding narcotic activity in the area of 5600 block of West Master Street, Philadelphia, Pennsylvania. *See* a copy of the Affidavit of Probable Cause attached hereto as Exhibit "1". Defendant Monaghan was the Affiant of the Affidavit of Probable Cause. *Id.*

11. According to the confidential source, a property located at 5609 West Master Street was being used to package narcotics; a property located at 5607 West Master Street was being used as a stash house and sales of narcotics were being made from a front porch of a property located at 5605 West Master Street. According to the Affidavit of Probable Cause two black males identified as "Al" and "Pud" were involved in the narcotic activity. *Id.*

12. On January 3, 2001 and January 4, 2001, members of the Narcotics Field Unit, including Defendants Monaghan, Walker and Reynolds set up surveillance at the locations of 5605, 5607 and 5609 West Master Street and allegedly observed the exchange of small items between several individuals the police believed to be engaging in illegal activity. *Id.*

13. According to the Affidavit of Probable Cause, on January 4, 2001, Defendant Walker followed a Green Bonneville driven by Plaintiff Kareem Torain.

from 56th and Master to a property located at 1621 North Conestoga Street where Defendant Walker observed Plaintiff exit his vehicle and enter the property. Police did not observe Plaintiff engage in any illegal activity. *Id*.

14. The Affidavit of Probable Cause further swears that approximately 20 minutes later Defendant Reynolds observed Plaintiff exit 1621 S. Conestoga Street and drive to the 1600 block of North 55th Street, exit his vehicle and enter the front door of the property located at 1628 South 55th Street with a key. *Id*. This building consists of several apartments.[1]

15. The Affidavit of Probable Cause further swears that a short time later Defendant Walker followed three individuals to 1628 S. 55th Street and observed the individuals exit their vehicle and entered the property. *Id*.

16. Twenty minutes later the three individuals exited 1628 S. 55th Street and drove from the scene, followed by Defendant Reynolds. Defendant Walker remained at the scene continuing his surveillance of 1628 S. 55th Street. *Id*.

17. At 2:58 p.m. Plaintiff left 1628 N. 55th Street followed by Defendant Reynolds. Plaintiff's vehicle was stopped by Defendant Reynolds and Plaintiff was placed under arrest. No narcotics or contraband was confiscated from Plaintiff. According to Defendant Reynolds, a key was recovered from Plaintiff that was used later that day to enter Apartment #2 at 1628 S. 55th Street, before police procured a search warrant. *Id*.

---

[1] The Affidavit of Probable Cause makes references to "South" 55th Street and "North" 55th Street interchangeably. Moreover, the Affidavit of Probable Cause also makes the same references from "South" to "North" with respect to Conestoga Street.

18. The Affidavit of Probable Cause contained allegations that were false and the affiant and the other Defendant officers knew or had reason to know of the falsity of these allegations.

19. The misrepresentations contained in the Affidavit of Probable Cause sworn to by Defendant Monaghan were material to the probable cause determination made by the judicial officer who authorized the search; indeed, without these allegations, the Affidavit of Probable Cause contain no cause or reason to search 1628 North 55th Street. Further, the misrepresentations by Defendants Walker and Reynolds were material to the probable cause to arrest and prosecute Plaintiff.

20. As a result of Plaintiff's arrest, a trial was held whereby Defendants Walker and Reynolds provided false testimony regarding their alleged observations of Plaintiff falsely substantiating the cause to arrest Plaintiff for narcotics violations.

21. On May 6, 2002, at Plaintiff's Motion to Suppress, Defendant Walker testified that he was the officer who observed Plaintiff enter and exit 1621 Conestoga Street and thereafter followed the Plaintiff to 1628 North 55th Street. *See* a copy of excerpts from Trial Transcript, dated May 6, 2002 attached hereto as Exhibit "2".

22. The Affidavit of Probable Cause and the 75-49 both allege that it was Defendant Reynolds and not Defendant Walker who observed and followed Plaintiff to 1628 North 55th Street. *See* Exhibit "1"; *see also* a copy of the 75-49 attached hereto as Exhibit "3".

23. Defendant Walker provided further false testimony when he testified at the Preliminary Hearing that he saw Plaintiff enter the front door of 1628 North 55th Street with a key, whereby Defendant Walker exited his vehicle and conducted a foot

surveillance of 1628 North 55th Street. Defendant Walker testified that he then saw Plaintiff through a window go into the middle first floor unit. *See* a copy of excerpts from the Preliminary Hearing, dated October 23, 2001 attached hereto as Exhibit "4".

24. At that same hearing defendant Walker testified that he later observed three (3) individuals that were previously identified as engaging in narcotic activity arrive at 1628 North 55th Street and enter the property. After twenty minutes he observed the three men leave the property and observed one of the individuals carrying a bag he believed to contain narcotics. *See* Exhibit "2".

25. At 2:58 p.m. Defendant Reynolds observed Plaintiff leave 1628 North 55th Street get in his vehicle and drive away. Defendant Reynolds followed Plaintiff and arrested him. No narcotics or contraband were confiscated from the Plaintiff. *See* Exhibit "1".

26. At trial Defendant Reynolds testified that he recovered a key from Plaintiff that was later found to open the front door of 1628 North 55th Street. Defendant Walker falsely testified that he was present when Defendant Reynolds confiscated the key from Plaintiff. *See* Exhibit "4".

27. Using this false and misleading information, a search warrant was issued by a Philadelphia Bail Commissioner and was predicated on an Affidavit of Probable Cause sworn to by Defendant Monaghan for 1628 North 55th Street. *See* a copy of Search and Seizure Warrant # 99028 attached hereto as Exhibit "5". According to the warrant, the date and time of the execution was January 5, 2000 at 1:00 a.m. *Id.*

28. However, the property receipt for the seized items from that apartment is dated the day before the execution of the warrant on January 4, 2000 at 3:30 p.m. This

date and time is at or near the date and time Defendant Monaghan entered Apartment #2 with the key that was allegedly recovered from the Plaintiff at the time of his arrest earlier that day. *See* a copy of Property Receipt #22308224 attached hereto as Exhibit "6".

29. On January 4, 2000, Plaintiff was arrested and charged with possession with intent to deliver a controlled substance, weapon charges, conspiracy and other related offenses.

30. On May 7, 2002, following a bench trial, Petitioner was convicted of possession with intent to deliver a controlled substance, knowing and intentional possession of a controlled substance, possession of an instrument of crime, possession of drug paraphernalia, and criminal conspiracy.

31. The verdict in Plaintiff's criminal trial hinged in large part on the false and misleading testimony of Officer Walker and Officer Reynolds regarding Plaintiff's arrest.

32. The verdict in Plaintiff's criminal trial hinged in large part on the false and misleading information contained in the Affidavit of Probable Cause.

33. On September 26, 2003, Plaintiff was sentenced to a mandatory term of five to ten years in prison on the drug charge, a consecutive term of five to ten years for criminal conspiracy, and a consecutive term of two and one-half years for possession of an instrument of crime.

34. On October 7, 2002, Plaintiff filed post-sentence motions. Petitioner's post-sentence motions were denied on March 6, 2003.

35. Petitioner filed a direct appeal to the Superior Court of Pennsylvania.

36. The Superior Court affirmed Plaintiff's judgment of sentence on September 6, 2005. The Pennsylvania Supreme Court denied further review on March 31, 2006.

37. On October 6, 2006, Plaintiff filed a petition under the Post-Conviction Relief Act (PCRA). On December 28, 2007, an Amended PCRA was filed followed by two supplemental petitions on December 12, 2008 and July 16, 2009, respectively.

38. Plaintiff filed a notice of appeal to the Superior Court. The Superior Court affirmed the PCRA court's dismissal on April 26, 2011. Plaintiff then filed a request of allowance of appeal to the Pennsylvania Supreme Court, which was denied on September 14, 2011.

39. Plaintiff then filed a Writ of Habeas Corpus in federal court.

40. In December 2012, the Philadelphia District Attorney's Office informed Philadelphia Police Commissioner Ramsey that Defendant Reynolds would no longer be permitted to be a witness in narcotic cases due to an ongoing investigation regarding his credibility as a police officer. Defendant Reynolds was transferred out of the narcotic unit and is currently on restrictive duty.

42. On May 22, 2013, Defendant Walker was arrested and charged with for falsely arresting, planting cocaine and stealing money from citizens.

43. On June 19, 2013, Plaintiff filed a pro-se Motion for Judgment on the Pleadings Based on After/Newly Discovered Evidence. The motion addressed the arrest and federal criminal prosecution of Defendant Walker.

44. On February 24, 2014, Defendant Walker plead guilty to robbery and weapons charges. He is currently cooperating with federal authorities regarding corruption within the police department.

45. On February 28, 2014, after remaining incarcerated for over thirteen (13) years, Plaintiff's May 7, 2002 conviction was reversed as a result of Defendant Walker's arrest and Defendant Reynolds' creditability issues.

46. The Defendant officers, acting in concert and conspiracy, caused the Plaintiff to be unlawfully arrested, subjected to false criminal charges, malicious prosecution and prolonged incarceration by falsifying information in the search warrant affidavit, the 75-49 and at trial; failing to disclose to prosecutors the fact that the information provided to the judicial officer in support of the search warrant was false and misleading, the information in supporting police documents was false and misleading and their testimony at trial was false and misleading; fabricating evidence to support the claim that the Plaintiff was involved in criminal activity, and failing to disclose other exculpatory evidence regarding these criminal charges.

47. The only evidence leading to Plaintiff's conviction was derived from the false and misleading information provided by the Defendant officers.

48. Plaintiff did not commit any offenses against the laws of the Commonwealth of Pennsylvania, the United States or the City of Philadelphia, or engage in any conduct which justified the actions of all Defendants.

49. The unlawful arrest, detention and malicious prosecution in this case were the direct result of all Defendants' pattern, practice and custom of subjecting citizens such as the Plaintiff to arrest, prosecution and incarceration in the absence of probable cause.

50. The Defendant officers acted willfully, deliberately, maliciously or with reckless disregard of the Plaintiff's constitutional and statutory rights.

51. As a direct and proximate result of the actions of all Defendants, the Plaintiff suffered and continues to suffer physical and psychological harms, pain and suffering, damage to reputation, some or all of which may he permanent, as well as financial losses.

52. As a direct and proximate result of the actions of all Defendants, the Plaintiff suffered his loss of liberty by being incarcerated for over 13 years.

53. All Defendants engaged in the aforesaid conduct for the purpose of violating the Plaintiff's constitutional rights by subjecting the Plaintiff to unlawful arrest, malicious prosecution, and prolonged incarceration.

54. The actions and conduct of the Defendant officers were caused by a policy, practice and custom of Defendant City of Philadelphia of failing, with deliberate indifference, to supervise, monitor, and properly train narcotics officers with respect to (a) their duty to provide only truthful information in securing search and arrest warrants, (b) their duty to ensure that relationships and dealings with confidential informants and/or sources are in accord with Police Department policy and constitutional commands, (c) their duty to disclose exculpatory evidence in criminal cases, (d) their duty not to undertake arrests in the absence of lawful grounds, (e) their duty to provide accurate and truthful information to the prosecutor's office, (f) their duty to report and disclose misconduct and illegal actions of other police officers, (g) the proper execution of search warrants, and in particular prohibitions on searches that go beyond those authorized by the warrant, and/or involve the destruction or theft of property or evidence, and (h) the fabrication of evidence against an accused to justify their illegal actions and conduct.

55. Defendant City of Philadelphia has failed to properly discipline the Defendant officers and other officers in the Police Department in cases involving violations of rights of civilians, including cases of improper searches, seizures, arrests, and prosecutions, thereby causing the violations in this case.

56. The above described actions of all of the Defendants caused the violations of the Plaintiff's rights under the Fourth and Fourteenth Amendment as alleged in this Complaint.

## FIRST CAUSE OF ACTION
## FEDERAL CIVIL RIGHTS VIOLATIONS

57. The allegations set forth in paragraphs 1-56 inclusive, are incorporated herein as if fully set forth.

58. As a direct and proximate result of Defendants' above described unlawful and malicious conduct, committed under the color of state law, and while acting in that capacity, the Defendants deprived Plaintiff of the equal protection of the laws and Plaintiff's rights, privileges and immunities under the laws and the Constitution of the United States. Plaintiff's right to be free from false arrest, false imprisonment, malicious prosecution, to be secure in one's person and property, to access to the Courts, and to due process and equal protection of the law, all to Plaintiff's great detriment and loss. As a result, Plaintiff suffered grievous harm, in violation of his rights under the laws and Constitution of the United States in particular the Fourth and Fourteenth Amendments thereof, and 42 U.S.C. § 1983.

59. As a direct and proximate result of the acts and omissions of Defendants, Plaintiff was forced to endure great pain and mental suffering, and was deprived of physical liberty, all to Plaintiff's great detriment and loss.

60. The City of Philadelphia permitted, encouraged, tolerated, ratified and was deliberately indifferent to a pattern, practice and custom of:

  a. Unjustified, unreasonable and illegal use of process by police officers;
  b. Abuse of police powers, including false arrest, malicious prosecution, harassment and improper searches;
  c. Misrepresenting facts in order to establish probable cause where none would otherwise exist;
  d. Arresting and incarcerating citizens without probable cause solely for the purpose of committing citizens to prison with no intention of seeking criminal prosecutions;
  e. Psychologically or emotionally unfit persons serving as police officers; and
  f. Failure of police officers to prevent, deter, report or take action against the unlawful conduct of police officers under such circumstances as presented herein.

61. Defendant City of Philadelphia has encouraged, tolerated, ratified and has been deliberately indifferent to the following patterns, practices and customs and to the need for more or different training, supervision, investigation or discipline in the areas of:

  a. Unlawful detentions and unlawful arrests by police officers;
  b. The proper exercise of police powers, including but not limited to the use of false information to obtain search warrants, fabrication of evidence, unlawful arrest, malicious prosecution and unlawful detention;
  c. The monitoring of officers whom it knew or should have known were suffering from emotional and/or psychological problems that impaired their ability to function as officers;
  d. The failure to identify and take remedial or disciplinary action against police officers who were the subject of prior civilian or internal complaints of misconduct;
  e. Police officers' use of their status as police officers to employ the use of unlawful search and/or arrest, or to achieve ends not reasonably related to their police duties;

f. Police officers' use of their status as police officers to employ the use of unlawful arrest, invoke the Code of Silence, or to achieve ends not reasonably related to police duties;

g. The failure of police officers to follow established policies, procedures, directives and instructions regarding the securing of search warrants and the use of arrest powers under such circumstances as presented in this case;

h. The refusal of police officers to intervene when other officers violate the rights of citizens in their presence;

i. The failure to identify and take remedial or disciplinary action against units of officers assigned to narcotics investigations in light of repeated instances of misconduct over a period of many years as alleged in this Complaint; and

j. The refusal of police officers to report or provide information concerning the misconduct of other police officers, a custom or practice known as the "Code of Silence."

62. Defendant City of Philadelphia failed to properly train, supervise or discipline officers assigned to narcotics units of the Philadelphia Police Department who have engaged over a period of many years in systematic abuses of authority, including but not limited to: (a) the duty to provide only truthful information in securing search and arrest warrants, (b) the duty to ensure that relationships and dealings with confidential informants are in accord with Police Department policy and constitutional commands, (c) the duty to disclose exculpatory evidence in criminal cases, (d) their duty not to undertake arrests in the absence of lawful grounds, (e) the duty to provide accurate and truthful information to the prosecutor's office, (f) the duty to report and disclose misconduct and illegal actions of other police officers, (g) the improper execution of search warrants, and in particular prohibitions on searches that go beyond those authorized by the warrant, and/or involve the destruction or theft of property or evidence, and (h) the fabrication of evidence against an accused to justify their illegal actions and conduct.

63. Defendant City of Philadelphia failed to properly sanction or discipline officers, who are aware of and conceal and/or aid and abet violations of constitutional rights of individuals by other Philadelphia Police Officers, thereby causing and encouraging Philadelphia police, including the Defendant officers in this case, to violate the rights of citizens such as the Plaintiff.

64. Defendant City of Philadelphia is deliberately indifferent to the need to train, supervise and discipline police officers. The Internal Affairs Division (IAD) of the Philadelphia Police Department (PPD) fails to provide an internal disciplinary mechanism that imposes meaningful disciplinary and remedial actions in the following respects:

a. There are excessive and chronic delays in resolving disciplinary complaints;
b. There is a lack of consistent, rational and meaningful disciplinary and remedial actions;
c. There is a failure to effectively discipline substantial numbers of officers who were found to have engaged in misconduct.
d. The PPD's internal investigatory process has fallen below accepted practices and is arbitrary and inconsistent;
e. The PPD discipline, as practiced, is incident based rather than progressive. Thus, repeat violators are not being penalized in proportion to the number of violations.
f. The conduct of IAD investigations demonstrates that PPD internal affairs personnel are not adequately trained and supervised in the proper conduct of such investigations;
g. A global analysis of IAD's investigatory procedures indicates a pattern of administrative conduct where the benefit of the doubt is given to the officer rather than the complainant;
h. There are serious deficiencies in the quality of IAD investigations and the validity of the IAD findings and conclusions;
i. The PPD lacks an effective early warning system to identify, track and monitor "problem" officers.
j. Despite the fact that several of the Defendant officers had amassed an exceptionally large number of serious misconduct complaints, the officers stayed well below the radar of an early warning system;
k. Despite numerous prior complaints against several of the Defendant officers, the PPD took no meaningful disciplinary or remedial actions;

l. Despite numerous prior complaints against several of the Defendant officers, the PPD took no meaningful steps to more closely monitor, retrain and supervise the officers;

m. IAD frequently fails to interview available eyewitnesses to incidents involving citizen complaints of misconduct. The interviews that are conducted by IAD are below acceptable standards of police practice and fail to address key issues in the cases; and

n. IAD fails to acknowledge the disproportionate and extreme use of force used by police officers in the investigation of citizen complaints and fails to properly categorize the police officers' misconduct in those cases as an impermissible use of force.

65. The City of Philadelphia was deliberately indifferent to the need for more or different training, supervision, investigation or discipline in the areas of:

a. Use of information in obtaining probable cause;

b. Exercise of police powers;

c. Police officers with emotional or psychological problems;

d. Police officers use of their status as police officers to have persons falsely arrested and maliciously prosecution and unlawfully searched or to achieve ends not reasonably related to their police duties; and

e. False arrest, malicious prosecution and evidence planting of citizens.

66. The City of Philadelphia failed to properly sanction or discipline officers, who are aware of and conceal and/or aid and abet violations of constitutional rights of citizens by other police officers, thereby causing and encouraging police officers, including Defendant Police Officers Monaghan and Reynolds, and former Police Officer Walker in this case, to violate the rights of citizens such as Plaintiff.

67. The City of Philadelphia failed to properly sanction or discipline officers and acquiesced to the Defendant officers' unlawful conduct after becoming aware that these particular officers engaged in the aforementioned conduct in cases dating back to 2002 while concealing and/or aiding and abetting in the violations of constitutional rights of citizens by these police officers, thereby causing and encouraging police

officers, including Defendant officers in this case, to violate the rights of citizens such
as Plaintiff.

68. The City of Philadelphia was aware and was deliberately indifferent to the
unconstitutional acts and omissions of the Defendant officers when:

    a. Beginning in 2001, several legal complaints alleging civil and constitutional
       rights of false arrests, malicious prosecutions, falsifying documents and
       testimony alleging the violations of the constitutional rights of citizens by the
       Defendant officers were filed;

    b. In 2005, former Philadelphia Police Commissioner Sylvester Johnson
       testified at trial in the case of *Arnold Randall v City of Philadelphia, et al.*,
       C.A. No. 04-1081 regarding the customs, policies and procedures with
       respect to the narcotics units generally and specifically with regards to
       allegations that the Defendant officers engaged in false arrests, malicious
       prosecutions and fabrication of evidence;

    c. In 2005, IAD was authorized by the City of Philadelphia to investigate the
       numerous allegations of false arrests, malicious prosecution and
       fabrication claims against the Defendant officers, as well as other members
       of the narcotics units;

    d. In 2005 and later, the Philadelphia City Solicitor's Office was authorized by
       the City of Philadelphia to investigate the numerous allegations of false
       arrests, malicious prosecution and fabrication claims against the Defendant
       officers, as well as other members of the narcotics units;

    e. The City of Philadelphia was also aware that the federal authorities were
       investigating these same Defendant officers for several years for the
       violations of citizens' civil and constitutional rights during this period of
       time;

    f. In 2007, the City of Philadelphia was aware of the constitutional violations
       by these same officers and other officers in the narcotics units when the
       Third Circuit Court of Appeals denied the Defendant officers claim of
       Qualified Immunity due to their unlawful and unconstitutional actions in a
       case averring the same claims as this case – false arrest, malicious
       prosecution and falsification of documents. *See Andre Blaylock v City of*
       *Philadelphia, et al.* 504 F.3d 405 (3d Cir. 2007); and

    g. In December 2012, the Philadelphia District Attorney's Office informed
       Philadelphia Police Commissioner Ramsey that the Defendant officers would
       no longer be permitted to be witnesses in narcotic cases.

69. Defendant City of Philadelphia continued to permit, acquiesce, encourage,
tolerate, ratify and has been deliberately indifferent to the unconstitutional acts and

omissions by the Defendant officers despite the aforementioned allegations, investigations and Court holdings for years.

70. The foregoing acts, omissions, systemic deficiencies and deliberate indifference to the danger or harm to citizens like the Plaintiff and the need for more or different training, investigation and discipline are policies and customs of the City of Philadelphia and have caused police officers, including Defendant Police Officers Monaghan and Reynolds, and former Police Officer Walker in this case, to believe that they can violate the rights of citizens, with impunity, including the use of fraud and falsehood and to believe that such conduct would be honestly and properly investigated, all with the foreseeable result that officers are more likely to violate the constitutional rights of citizens.

71. The actions of all Defendants, acting under the color of state law and/or in concert or conspiracy with each other, deprived Plaintiff of his rights, privileges and immunities under the laws and Constitution of the United States, in particular, the rights to be secure in one's person and property, to be free from unlawful searches, from false arrest, malicious prosecution and to due process of law.

72. Defendants, City of Philadelphia and Defendant Police Officers Monaghan and Reynolds, and former Police Officer Walker, acting in concert and conspiracy with each other, have by the aforementioned actions deprived Plaintiff of his constitutional and statutory rights.

73. By these actions, all Defendants have deprived Plaintiff of his rights secured by the Fourth and Fourteenth Amendments to the United States Constitution in violation of 42 U.S.C. § 1983.

## PUNITIVE DAMAGES

74. Plaintiff re-alleges paragraphs 1-73 of this complaint as though fully set forth herein.

75. The conduct of Defendant Police Officers Monaghan and Reynolds, and former Police Officer Walker were outrageous, malicious, wanton, willful, reckless and intentionally designed to inflict harm upon Plaintiff.

76. As a result of the acts of Defendant Police Officers Monaghan and Reynolds, and former Police Officer Walker alleged in the preceding paragraphs, Plaintiff is entitled to punitive damages as to each cause of action.

## JURY DEMAND

77. Plaintiff demands a jury trial as to each Defendant and as to each count.

WHEREFORE, Plaintiff requests the following relief:

a. Compensatory damages;

b. Punitive damages;

c. A declaratory judgment that the practices and policies complained of are unconstitutional;

d. Reasonable attorney's fees and costs; and

e. Such other and further relief as appears reasonable and just.

DATED: March 20, 2014                    /s/Michael Pileggi_____
                                         MICHAEL PILEGGI, ESQUIRE
                                         303 Chestnut Street
                                         Philadelphia, PA 19106
                                         Counsel for Plaintiff

EXHIBIT "1"

| ☐ CONTINUATION (51) | 1 | 1. | | 698 | 1/4/01 | Page 1 of 4 |
|---|---|---|---|---|---|---|
| P/O BRIAN MONAGHAN #6061 | | | NARCOTICS | | | 1807 |
| P/O BRIAN MONAGHAN | | | 6061 | 201073 | | |

## CONTINUATION OF SEARCH AND SEIZURE WARRANT #99028

/O Monaghan #6061, Received Detailed Information From A Confidential Source A:
9th District Police Officers,P/O Ronald Cain #4959 & P/O Joseph Goglielmucci
2460, Refering To Drug Activity Involving The 5600 Blk Of W. Master St. Liste
ocations 5609 W. Master St, Abandoned Property Narcotics Being Packaged In Th
ocation. 5607 W. Master St Being Used As A Stash House, Containing Marijuana,
rack, And Weapons. 5605 W. Master St, Narcotics Sold From Front Porch Area.
lso A B/M Name "Al", And A B/M By The Name Of "Pud".

n Tuesday, 1-2-01,At Approximately 3:45 Pm, P/O Monaghan #6061 & P/O Kelly
7126, Set Up A Surveillance In The Area Of 5600 W. Master St. P/O Monaghan
6061 Observed #1 B/M (later I'd as Anthony Hodge)Wearing A Blk Down Jacket &
rey/Black B/B Cap 5'8 Med Compl 20's, And #2 B/M (Later I'd as Darnell DeLEE)
lk Jacket W/Fur Around Hood, 5'8 Med Compl 20's W/Red Wool Knit Skull Cap,
tanding On The Porch Of 5605 W. Master St. At Approx: 3:45 Pm HODGE Knocked O
he Front Door Of 5605 W. Master St, Unk B/M Opened The Door And Handed HODGE
olf Ball Size Object, HODGE Then Handed DeLEE Objects From The Golf Ball Sei
bject. Between 3:45 Pm & 5:30 Pm, HODGE and DeLEE On Different Occassions Wou
ccept Unk Amounts Of Usc From Unk B/M's & Unk B/F's In Exchanged For Small
ackets They Retreived From Their Persons. At Approximately 5:12 Pm A Grey Old
eh Stopped In The 5500 Blk Of W. Master St, And Passenger Exited The Veh And
alked Towards The N/W Corner Of 56 & Master St, After A Breif Conversation Wit
oth HODGE and DeLEE They Walked The Unk B/M Into 5607 W. Master St. After Abo
0 Minutes The Unk B/M  Exited The Location, P/O Monaghan #6061 Observed The B
lace A Large Clear Bag Containg A Grn Weed Substance Into A Blk Bag He Was!
arrying. At This Time #2 B/M Went To 5609 W. Master St Removed Usc From His
acket Pocket, Opened The Front Door And Placed The Usc Into That Property. The
nk B/M Walked To The Corner Where The Olds Veh Picked Him Up And Then Left The
rea. The Veh Was Followed By Members From The Nfu To 4700 Blk Of Merion Ave.2
nk B/M Occupants Exited The Veh, Passenger Carrying The Blk Bag They Entered
710 Merion Ave.HODGE Then Entered 5605 W. Master St.

n Wednesday, 1-3-01 At Approximately 11:00 Am, P/O Monaghan #6061 & P/O Kelly
7126, Set Up A Surveillance For The Locations Of 5605, 5607 & 5609 W. Master
t.At Approx. 11:31am Police Observed A Dark Colored Buick Pa Tag Dkd2171 (
hich Is Registered To Glenn Lee Wearing Bl
own Jkt, W/Red Wool Knit Skull Cap, Park In Front Of 5605 Master St. At Appro
1:52 Am DeLEE Received A A Golf Ball Size Object  Cont Dark Colored Objects O
he Front Door Of 5605 Master St.Between 11:30 Am And 11:58am B/M #2 Gives
umerous B/M s And Female Small Dark Objects From Inside Of A Clear Baggie That
e Was Holding On His Person Inexchange For Usc.

t Approx 11:58am A B/M (Later I'd As Migel MOON PPN#8j7626) Wearing Dark
acket, Blue & White Titans Ball Cap Exits 5605 Master St And Hands Small
bjects To A B/M Wearing A Tan Jacket In Exchange For Usc. MOON Then Goes Onto
he Porch Of 5605 Master St And Counts Green Packets That Are Inside A Clear Baggie That
e Retrieved From His Person. MOON Then Gives Numerous Of These Packets To 2

Males And 1 Female In Exchange For Use.MOON Then Pla   The Bundle In His Right Pocket.

At Approx.2:22pm HODGE Wearing A Blk Averix Jkt Exited 5607 Master St And Gives A B/M Wearing Black Jacket , Blue And White Plaid Shirt Small Object In Exchange For Use. .

At Approx. 2:26pm MOON Takes From His Person The Clear Baggie Mentioned Earlier That Cont Green Packets And Hands Them To B/M #2  MOON Then Gets Into The Passenger Side Of A Dark Colored Olds Pa Tag Bzr 4983( Which Comes Back To A Mazda) And Leave N/B On 56th St. XXXXX

Between 2-3:00Pm A B/M Wearing A Balck Jacket , Red Shirt And Base Ball Cap Parked A Older Model Subaru Staton Wagon Pa Tag CDP3560 On The N/W Corner Of 56th And Master. This B/M Exited Carring A Green Timberland Shoe Box And Went I: 5603 Master St.  This B/M Exited A Short Jme Later And Left In The Subaru.

At Approx. 3:56pm B/M #2 Was Observed Giving (2) B/F's Small Objects In Exchange For Use In The Rear Of The Store On The N/E Corner Of 56th And Master St .
At Approx. 3:58pm P/O Mitchell#4145 Went To That Corner To Attempt To Make A Contrelled Narcotics Purchase From B/M#2 P/O Mitchell Met That B/M Inside Of Th Store And Engaged In Narcotics Related Conversation After Which B/M#2 Told P/O Mitchell To Stay Inside . B/M #2 Exited The Store Walked To The Rear Of The Store And Removed Small Objects From His Person . B/M #2 Then Opened The Backdoo Of The Store And Called P/O Mitchell#4145 Outsid. B/M #2 Handed P/O Mitchell Theses Small Object In Exhcnage For 20.00 Pre-Recorded Buy Money. P/O Mitchell Left And Turned Items Purchased(4 Black Tinted Heat Sealed Packets Cont A White Chunky Substance) To Over To P/O Monaghan ..A Majority Of Observation On 1/3/0: Were Video Taped By P/O Kelly #7126 And P/O Monaghan #6061.

ON 1/4/00 P/O KELLY #7126 AND P/O MONAGHAN SET UP A SURVIELLANCE OF 56TH AND MASTER ST. AT APPROX. 1:41 Pm Police Observed A Green Bonneville Pa Tag DKC331( ( Registered Carolyn Gillis) Travel N/B On 56th St To The Intersection Of 56th And Master.  At This Time Delee Who Was Standing On Steps Of 5605 Master St Mac A Hand Gesture Toward The Bonneville And Yelled ,"Yo". At This Time The Bonneville Traveled W/B On Master St And Turned N/B Onto Ithan St.At This Time Delee Ran W/B To Ithan St And Entered The Passenger Side Of The Bonneville. Delee Exited After Approx 2-3 Mins And Ran Back To The Corner Of-56th And Master. The Bonneville Who Was Being Operated By A B/M Later I'd As Kareem Torian Was Followed Back To 1621 N. Conestoga St By P/O Walker #3730 Where Police Observed Torain Exit His Vehicle And Enter 1621 Conestoga.Police Observe Delee Go Immediately Go Back To The Corner Of 56th And Master And Give Small Objects Which He Retrieved From His Pocket To Numerous Males And Females In Exchange For Use.
At Approx. 1:43 PM Police Observed The Sebring Travel W/B On Master St Being Operated By Christina Brax Stop In Front Of 5607 Master St. Anthony Hodge Exite The Passenger Side And Entered Into 5607 Master St With A Key. Hodge Was Observed On Numerous Occasions Entering And Exiting 5607 Master St With A Key.C 1/4/01.
At Approx. 1:55Pm P/O Kelly Overheard Delee Who Was Standing On The Southeast Corner Of 56th And Master St  Tell Kabeyn DIGGS That Kareem ( Operator Of The Green Bonneville) Only Had A Bundle On Him And Would Call When The Rest Was Ready.
At Approx. 2:00PM P/O Reynolds #4268 Observed TORAIN Exit 1621 S. Conestoga And Travel W/B On Hunter St In The Bonneville Io The S/W Corner Of 55th And Hunter

St. At This Point TORAL   ited His Vehicle And Ent   d Into 1628 N 55th St Wi
A Key.

At Approx. 2:05PM Police Observed Delee Answer The Pay Phone On The N/W Corne
Of 56th And Master St The Jog To The Buick ( Mentioned On 1/3/00) Along With
DIGGS And ATHUR TILMAN. P/O Walker Followed Them To 55th And Hunter St. Where
They Parked The Car On 55th St. All These Males Exited The Buick And Were
Admitted Into 1628 S. 55th St By TORAIN. After Approx. 20 Mins All Three Males
Delee, TILLMAN,DIGGS Exited 55th St, With Delee Placing A Clear Bag Inside Of
His Jacket. All Three Males Go Into The Buick And Were Followed Back To 56th A
Master By P/O Reynolds. P/O Walker Remained At 55th And Hunter Watching 1628 5
St.

At Approx. 2:35PM Police Observed HODGE Exit 5607 Master St And Go Into A Red
Plymouth Breeze Delaware Tag D4398 And Take Unknown Objects From Inside Of The
Car And The Trunk.HODGE Then Walked Back To Into 5607 Master St.

At Approx. 2:37Pm Police Observed The Buick Park On The East Side Of 56th St
Just North Of Master. All Three Males Exited The Vehicle And Walked To The Po:
Of 5605 Master St.

At Approx. 2:37PM Police Observed Delee Hand Bundles To MOON, FREEMAN,HODGE Ar
DIGGS.

Delee Then Placed A Clear Baggie Cont Numerous Green Tinted Packets In His Ric
Jacket Pocket. Delee Then Was Observed Giving These Small Green Packets To
Numerous People In Exchange For Usc.Police Observed MOON, FREEMAN, HODGE, DIGG
And DELEE Were Observed Giving Males And Females Small Objects In Exchange For
Usc.

At Approx. 2:58PM TORAIN Left 1628 N. 55th St And Left The Area In His
Bonneville. P/O Reynolds #4268 Followed This Vehicle Out Of The Area And With
The Aid Of Uniform Vehicles Stopped TORAIN At 61st And Nassau St And Placed Hi:
Under Arrest. Recovered From Him Was (1) Pager, (1) Nextel Cell Phone, (1)
Cancer Key Ring Cont 5 Keys, (1) Black Key Ring Cont 3 Keys( One Was Later
Determined To Work The Door Of 1628 N. 55th St And Apt #2 Inside), 250.00 USC.

At Approx. 3:05PM A Green Bonneville Pa Tag DNZ7857  Operated By Raymond Howar
And In The Passenger Seat Was A B/M Later I'd As Maurice Grey , Parked On The
East Side Of 56th St Just North Of Master St. Both Males Exited The Vehicle And
Walked To The Porch Of 5605 Master St, Where Delee Handed HOWARD A Large Amoun
Of USC. All Males Walked To The N/W Corner Of 56th And Master St.

At Approx. 3:13PM DELEE, FREEMAN Got Into The Buick ( Mentioned Earlier )And
Left The Area N/B On 56th St.

At Approx. 3:17PM A Marked Police Vehicle Stopped In The Middle Of 56th And
Master St And Activated Lights And Sirens On The Vehicle . At This Time GREY,
HOWARD, DIGGS Got Into The Bonneville And Left N/B At A High Rate Of Speed.
HODGE And A B/F Got Into The BREEZE And Left The Area S/B On 56th St At A High
Rate Of Speed. P/O Kelly Notified Backup As To Description And Direction Of
These Vehicles And Occupants. P/O Fitzgerald #2228 And P/O Francis #3981 Stopp
The Bonneville On 1400 N Alison St. Recovered From HOWARD Was (2) Bundles Of
Money One Was 585.00 Usc And The Other Was 553.00 Usc.Recovered From DIGGS Was
(1) Cell Phone, 313.00 USC, (14) Blue Oval Pills( Alleged Xanax), Recovered Fr
GREY Was (1) Clear Bag Cont (112) Blue Oval Pills (Alleged Xanax) ,(1) Clear
Ziplock Packet Cont (14) Yellow Tinted Ziplock Packets Cont A White Chunky
Substance, 58.00 Usc

P/O Reynolds #4268 And P/O Walker #3730 Stopped The Breeze At 56th And Market
St. Hodge Was Placed Under Arrest And Recovered From Him Was (5) Blue Tinted
Ziplock Packets Cont A Green Weed Substance And (1) Key Ring With(3) Keys One
Which Was Later Determined To Work The Door At 5607 Master St.

Investigation Report                          Philadelphia Police Department

At Approx. 3:27Pm Darnell Delee And Anthony FREEMAN Ran S/B Down 56th St From
Media And Onto The Porch Of 5605 Master St And Yelled "YO THE COPS GOT THEM AND
THERE COMING" At This Time MOON, BICHONOT And TILLMAN Ran Out The Front Door Of
5605 Master St. All Five( MOON, BICHONOT,TILLMAN,FREEMAN,And DELEE) Then
Preceded To Run N/B On Ithan St.P/O Kelly Notified Backup As To Description And

Direction Of All 5 Males. P/O WALKER #3730 STOPPED FREEMAN And BICHONOT At
Frazier And Media St. Recovered From Freeman Was 106.00 Usc And His Black Jacke
With Fur Collar, Recovered From Bichonot Was His Red Leather Jacket With
"PLAYER" Written On The Front. P/O FITZGERALD #2228 Stopped TILLMAN, And Delee
On Frazier And Media St. Recovered From Delee Was (1) Key Ring That Cont (7)
Keys, One Of Which Worked The Front Door Of 5705 Master ST And Another Worked
The Padlock On The Door Going Into The Second Floor Rear Bedroom And 2 Bundles
Of Money Ons Cont 850.00 And The Other Cont 281.00 Usc.MOON Was Lost In Area.

At Approx. 3:50PM Members Of Narcotics Went To 1628 N. 55th St To Attempt To
Secured The Apartment That TORAIN Went Into. P/O Kelly Spoke With The Manager O
The Property Vincent Saunders In Reference To A B/M Who Rented A Room Inside. M
Saunders Stated That He Knew A B/M Light Complexion, Heavy Build And Light Bear
Who Drove A Green Bonneville With Tinted Windows And Shinny Rims Lived In Apt
#2. This Male Had Young Males Entering And Exiting His Room Frequently. At This
Point The Owner Of The Property Vincent Saunders Showed Up And Stated That No
One Had Rented Apt #2 And No One Had Permission To Be Inside Of The Property.)
P/O Monaghan #6061 Tried One Of The Keys From TORAINS Key Ring In The Lock At
Apt #2 And It Opened The Lock. The Owner Again Stated That No One Had Rented Th
Apt And No One Had Permission To Be Inside. The Apt Was Secured Pending Search
And Seizure Warrant.

I P/O Monaghan #6061 Performed B&D Test "G" On One Of The Items Purchased By P/
Mitchell #4145 And Recovered From Grey.Based Upon Information Received,
Surveillance, And P/O Mitchell's Purchase And the fact that I believe other
people have access to this one room apt & the fact that I believe evidence woul
be lost or destroyed if not recovered.I Your Affiant Respectfully Request A
Nighttime Search Be Approved For Above 1628 N. 55th St Apt #2.

SIGNATURE OF AFFIANT              BADGE      DIST/UNIT

SWORN TO(OR AFFIRM) AND SUBSCRIBED BEFORE ME THIS _____ DAY OF _____ 200_.

SIGNATURE OF ISSUING AUTHORITY                    DATE: COMMISSION EXPIRES

EXHIBIT "2"



---

### First Judicial District of Pennsylvania

*01101488*
*Kareem Torain*

---

*Trial (Jury) Volume 1*
*May 06, 2002*



---

*First Judicial District of Pennsylvania*
*100 South Broad Street, Second Floor*
*Philadelphia, PA 19110*
*(215) 683-8000   FAX:(215) 683-8005*

Original File 56126cha.v1, 96 Pages
CRS Catalog ID  01052181

---

01101488                                                         Trial (Jury) Volume 1
Kareem Torain                                                    May 06, 2001

**Page 61**

[1]
[2]    excited. If he was just selling packets he
[3]    would have put it right in his pocket before he
[4]    walked out of the vehicle.
[5] BY MS. ROBINSON:
[6] Q.  And Mr. Campbell asked you about buy money.
[7] No buy money was recovered from the defendant
[8] Hodges. Was the buy money that Officer Brad
[9] Mitchell used on January 3rd recovered, do you
[10] remember or do you need to —
[11] A.  I don't believe so. I'm not really positive.
[12] Q.  And the —
[13]       MS. ROBINSON:  At this time, Your
[14] Honor, again having been advised that counsel
[15] is not moving to suppress the narcotics that
[16] were recovered from each of those locations,
[17] the Commonwealth will now call its next
[18] witness.
[19]       THE COURT:  Well, there may be some
[20] recross. We still have rules of procedure.
[21]       Recross.
[22]       RECROSS-EXAMINATION
[23] BY MR. MEEHAN:
[24] Q.  Officer, how late in the process was it that
[25] Officer Walker gave you this description

**Page 62**

[1]
[2] A.  I believe it was when Torain exited that
[3] vehicle and walked into his house on Conestoga
[4] Street.
[5] Q.  Okay. And —
[6]       MR. MEEHAN:  Actually I have no other
[7] questions.
[8]       THE COURT:  Thank you.
[9]       Anything else?
[10]       MR. CAMPBELL:  I have nothing
[11] further.
[12]       THE COURT:  Okay. Officer, thank
[13] you.
[14]       MS. ROBINSON:  The Commonwealth calls
[15] Officer Jeffrey Walker.
[16]       THE COURT:  Very well.
[17]       ...OFFICER JEFFREY WALKER, Badge
[18] Number 3730, Narcotics Field Unit, sworn...
[19]       THE COURT:  You may proceed.
[20]       MS. ROBINSON:  Thank you.
[21]       DIRECT EXAMINATION
[22] BY MS. ROBINSON:
[23] Q.  Officer, how long have you been a
[24] police officer?

**Page 64**

[1]
[2] Q.  And how long have you been assign...
[3] narcotics?
[4] A.  Two and a half years.
[5] Q.  Directing your attention to January 4th, 2001,
[6] did you have occasion to be working in a backup
[7] surveillance capacity to Officer Monaghan as he had
[8] set up a surveillance in the area of 56th and
[9] Master Streets?
[10] A.  That's correct.
[11] Q.  And in that afternoon did you have occasion to
[12] observe anyone whom you see here today in court?
[13] A.  That's correct.
[14] Q.  Would you point to that individual.
[15] A.  Defendant with the red shirt.
[16]       MS. ROBINSON:  May the record reflect
[17] that the witness has identified the defendant
[18] Kareem Torain sitting to the left of his
[19] counsel.
[20]       THE COURT:  Very well.
[21] BY MS. ROBINSON:
[22] Q.  Officer Walker, what time did you first
[23] observe the defendant and where was he?
[24] A.  When I first observed defendant, he was on
[25] Conestoga Street. He was coming out of a vehicle.

[2] vehicle was it?
[3] ...c with a PA tag of DKC3310.
[e] Q.  And where had you first seen that Bonneville?
[6]       THE COURT:  He said Pontiac, did you
[6] not?
[7]       THE WITNESS:  I said Bonneville.
[8]       THE COURT:  Oh.
[9]       THE WITNESS:  Green Bonneville.
[10]       THE COURT:  I thought you said
[11] Pontiac. I realize Pontiac and Bonneville is a
[12] model, but, okay, all right.
[13] BY MS. ROBINSON:
[14] Q.  And, Officer Walker, where had you first seen
[15] that Bonneville during the course of your
[16] surveillance?
[17] A.  At Ithan and Master.
[18] Q.  And where is Ithan, what kind of street is
[19] that in relationship to the corner of 56th and
[20] Master?
[21] A.  It's a small street just west of 56th Street.
[22] Q.  And when you saw it where were you watching
[23] it from?
[24] A.  My vehicle. I was pulling behind the vehicle.
[25] As a result of information from Police Officer

01101-188
Kareem Torain

Page 85

[1]
[2] Monaghan to take the area, I was turning onto Ithan
[3] Street to Master Street and I observed the vehicle
[4] parked.
[5] Q.   And it was parked?
[6] A.   Yes.
[7] Q.   Which side of the street?
[8] A.   East side of Ithan.
[9] Q.   And when you saw the car parked, did you see
[10] any other individual at or near the car?
[11] A.   I observed another individual later identified
[12] as Darnell Delee exit the passenger side of that
[13] vehicle.
[14] Q.   And what, if anything, did you see in Darnell
[15] Delee's possession at the time he exited?
[16] A.   A clear plastic bag the size of a golf ball.
[17] Q.   And what, if anything, did it appear to
[18] contain?
[19] A.   I couldn't tell at that particular time.
[20] Q.   And based upon your experience as a
[21] Philadelphia narcotics officer what did you
[22] it i contain?
[23] A.   Narcotics.
[24] Q.   And at that time could you tell how many
[25] occupants there were in the Bonneville?

Page 86

[1]
[2] A.   No.
[3] Q.   And then what happened to Delee, where did he
[4] go to?
[5] A.   He walked, that would be south down Ithan
[6] passing me and I lost sight of him once he got onto
[7] Master Street.
[8] Q.   Were you in communication with Officer
[9] Monaghan?
[10] A.   Yes.
[11] Q.   Did you relate that to him that you saw this
[12] individual later identified as Darnell Delee with
[13] the baggie that you believed to contain narcotics?
[14] A.   That's correct.
[15] Q.   And based on the way he came out of the car
[16] what, if anything, did you conclude about how he
[17] came to be in possession of it based on your
[18] experience?
[19]            MR. MEEHAN:  I'm going to object.
                  THE COURT:  I'm going to sustain that
       objection.
       BY MS. RE        ON:
[     ]          you see Delee do with that
[     ]             d be put it, if anywhere, on his

Page 87

[1]
[2] A.   At that time he had it in his hand, he w
[3] quickly walking around the corner.
[4] Q.   And how much later did the Bonneville take
[5] off?
[6] A.   Less than a minute. Maybe 10 seconds.
[7] Q.   And what did you do?
[8] A.   I continued following the vehicle.
[9] Q.   And where did it go to?
[10] A.   1621 North Conestoga.
[11] Q.   And at that time did the car park, stop, what
[12] happened?
[13] A.   Parked.  He entered the property with a key.
[14] Q.   And was anyone else in the vehicle at that
[15] time?
[16] A.   No.
[17] Q.   And how far away were you when you saw the
[18] defendant go into 1621 Conestoga?
[19] A.   About 30 feet.  I was parked along Hunter
[20] Street.
[21] Q.   And how long was the defendant inside that
[22] location?
[23] A.   From 1:41 to maybe 2 o'clock, so 20 minutes.
[24] Q.   And then what happened?
[25] A.   He left the location, I followed him to 1628

Page 88

[     ]                       way is that from the address of
[     ] 605, 5607 Master Street?
[5] A.   That street would be just west of it, it's
[6] like a park, I believe it's a park there,
[7] something, recreation area there, about a block
[8] away from it.
[9] Q.   And then where did the defendant park his car?
[10] A.   He parked it in front of the location.
[11] Q.   And then what did you do?  Did you see where
[12] he went?
[13] A.   At that time he parked I was still in my
[14] vehicle.  I was still parked along Hunter Street.
[15] He exit the vehicle and entered the property with a
[16] key.  I immediately exited my vehicle, began a foot
[17] surveillance of the property.  I knew because the
[18] way the property was shaped it had to be apartment.
[19] I walked alongside of the property, I observed a
[20] light go on I believe to be the middle room, I
[21] found to be the middle apartment on the first
[22] floor.  Once I found out the light came on, then I
[23] went back into my vehicle.
[24] Q.   And how long did you wait there until you saw
[25] anyone else arrive?

6110145&
Kareem Torain

Page 69.

[1]
[2] A. : stayed there the whole time until another
[3] vehicle pulled up.
[4] Q. And had you received any further information
[5] from Officer Menaghan with respect to another
[6] vehicle might show up?
[7] A. No. I relayed information of description of
[8] the individual getting out of the Bonneville back
[9] to him. From there, you know, I stayed at the
[10] location on 1620 North 55th Street.
[11] Q. And then what happened, did you see anyone
[12] arrive?
[13] A. Yes, a dark color Buick.
[14] Q. And who got out of that?
[15] A. A defendant by the last name of Delee, Diggs,
[16] and Tilman.
[17] Q. And where did they go?
[18] A. Into the property.
[19] Q. And could you tell which room they went into?
[20] A. No, at that time. I was still sitting in my
[21] car
[22] Q. And then what was the next thing you
[23] saw?
[24] A. After 20 minutes later the two – the
[25] individuals left the location. I observed

Page 70

[1]
[2] a guy carrying a clear plastic baggie the size of a
[3] golf ball. He was coming out of the property. He
[4] placed this item into his jacket and they got back
[5] into the Buick and left the location.
[6] Q. And based upon your seeing him the second time
[7] with a golf ball size bag what did you believe had
[8] occurred?
[9] A. Narcotics.
[10] Q. And when you say narcotics what did you
[11] believe had occurred?
[12] A. He was in possession of narcotics.
[13] Q. And what did you believe about where he had
[14] gotten this narcotics from?
[15] A. From that location.
[16] Q. And did you relay that information to Officer
[17] Menaghan?
[18] A. That's correct.
[19] Q. And where did Delee and the other two males
[20] go? Did they get back in the Buick?
[21] A. All three males got back into the Buick.
[22] Q. And where they proceed to go, though?
[23] A. ... cation.
[24] Q. ... you stay where you were?

Page 72

[1]
[2] Q. What happened next?
[3] A. Approximately 2:58 p.m. I observed this
[4] defendant exit the property.
[5]       THE COURT: This defendant meaning.
[6]       THE WITNESS: Kareem.
[7]       MS. ROBINSON: Kareem Torain.
[8]       THE COURT: Thank you.
[9] BY MS. ROBINSON:
[10] Q. And where did he go?
[11] A. I stayed at the location. I relayed
[12] information to Police Officer Reynolds, told him he
[13] was leaving that property
[14] Q. And did you identify the defendant later on
[15] that afternoon as the individual you had seen going
[16] into that property?
[17] A. That's correct.
[18] Q. Did you have --
[19]       MS. ROBINSON: I have no more
[20] questions.
[21]       THE COURT: Cross.
[22]       MR. MEEHAN: Thank you, Judge.
[23]       CROSS-EXAMINATION
[24] BY MR. MEEHAN:
[25] Q. First off, you never saw Mr. Torain actually

[3] ... of that first floor, did
[4] A. No. I saw the light come on.
[5] Q. Well, it was about 3 o'clock, 2:30, 3 o'clock
[6] when that happened; right?
[7] A. That's correct.
[8] Q. Okay. And there were a number of apartments
[9] in the building; correct?
[10] A. That's correct.
[11] Q. Okay. And at that location you never saw Mr.
[12] Delee or the other gentleman have any contact with
[13] my client, did you?
[14] A. No.
[15] Q. You never saw them enter that middle room that
[16] you believe my client had guns into; correct?
[17] A. That's correct.
[18] Q. When you were out at the location when you
[19] were making observations of the green Bonneville,
[20] you didn't see Mr. Torain exchange any money or
[21] receive any drugs or money from Mr. Delee, did you?
[22] A. No, I didn't see it.
[23] Q. Okay. You saw Mr. Delee leave the car with
[24] s – holding a plastic bag; correct?
[25] A. That's correct.

Page 73

[1]
[2] Q. With something approximately the size of a
[3] golf ball shape in it; correct?
[4] A. That's correct.
[5] Q. And you were unable to identify what, if
[6] anything, that item was; correct?
[7] A. That's correct.
[8] Q. Okay. And then shortly thereafter you left
[9] that location because Officer Monaghan instructed
[10] you, or asked you to follow the green Bonneville?
[11] A. That's correct.
[12]       MR. MEEHAN: Okay. If I could just
[13] have one moment.
[14]       THE COURT: No problem.
[15] BY MR. MEEHAN:
[16] Q. Now, when Mr. Torain leaves the location on
[17] 55th Street, you start following him again;
[18] correct?
[19] A. Who leaves the location?
[20] Q. Leaves the location on 55th Street. Wasn't it
[21] on 55th Street?
[22] A. No.
[23] Q. Okay. You initially started at Conestoga;
[24] right?
[25] A. Following your client?

Page 74

[1]
[2] Q. Right.
[3] A. From Ithan and Master.
[4] Q. Okay. And where did he go?
[5] A. He went to Conestoga.
[6] Q. Did he stay at Conestoga?
[7] A. He stayed there for a few minutes, about maybe
[8] 10 minutes.
[9] Q. And then he left that location?
[10] A. Left the location and went up to 1628 North
[11] 55th street.
[12] Q. That's what I'm talking about, my apologies.
[13] Then when he left the North 55th Street location
[14] you then followed him; correct?
[15] A. No, I stayed there.
[16] Q. You stayed there?
[17] A. Yes.
[18] Q. Okay. Were you present when my client was
[19] stopped and arrested?
[20] A. No, I don't think so, no.
[21] Q. So you weren't the individual who stopped and
[22] placed him under arrest?
[23] A. ...
[24] MR. MEEHAN: Thank you.
[25] THE COURT: Mr. Campbell, do you have

Page 75

[1]
[2] any questions?
[3]       MR. CAMPBELL: I have no questions.
[4]       MS. ROBINSON: Judge, I have no more
[5] questions of this witness. I have Officer
[6] Reynolds who actually did the actual arrest
[7] given that my understanding is that counsel is
[8] moving to suppress the keys
[9]       THE COURT: Okay. Officer Reynolds.
[10]       MS. ROBINSON: Officer Reynolds.
[11] ...OFFICER BRIAN REYNOLDS, Badge
[12] Number 4268, Narcotics Field Unit, sworn...
[13]       MS. ROBINSON: May I proceed?
[14]       THE COURT: You may proceed.
[15]       DIRECT EXAMINATION
[16] BY MS. ROBINSON:
[17] Q. Officer Reynolds, did you have occasion to
[18] participate in the arrest of any person or persons
[19] whom you see here today in court?
[20] A. Yes, Kareem Torain and Anthony Hodges.
[21] Q. And who did you participate in the arrest of
[22] first?
[23] A. Kareem Torain.
[24] Q. And at approximately what time did that occur?
[25] A. Approximately 2:58 p.m., Your Honor, 3 o'clock

Page 76

[1]
[2] ... Road.
[3] ... Your Honor what were the facts
[4] ... and circumstance surrounding your arresting the
[5] ... defendant?
[6] A. Yes. Based on him leaving the property at
[7] 55th Street, I followed him out of the area, he was
[8] inside the green Pontiac Bonneville. I then went
[9] over police radio with the aid of marked units,
[10] followed the defendant to 61st Street and Nassau
[11] Road where we then stopped the car. At this time
[12] myself and uniformed officers stopped him. He was
[13] placed under arrest by myself. Recovered from him
[14] was a pager, a Nextel cell phone, one cancer key
[15] ring with five keys on it, one black key ring with
[16] three keys on it. One of those keys worked the
[17] front door to the apartment 1628 North 55th Street.
[18] Q. What did you do with those keys?
[19] A. Those were turned over to Officer Monaghan and
[20] placed on property receipt 2308207. Also recovered
[21] from him was $250 USC and that was placed on
[22] property receipt 2308208.
[23] Q. After you had uniform take the defendant into
[24] custody, at what time did you have or participate
[25] in the arrest of Anthony Hodges?

EXHIBIT "3"

...IGATION REPORT                                          PHILADELPHIA POLICE DEPARTMENT

| ...TRICT OF OCCURRENCE | DOC. NUMBER | REPORTED TYPE | | | DISTRICT | SECTOR |
|---|---|---|---|---|---|---|
| 19 | 698 | INITIAL (49) | | | Sheet 1 of 6 | 19 | R |
| ...POSE OF REPORT CODE | DATE | INVESTIGATING OFFICER | PAYROLL | DIST PREPARING | | UNIT |
| | | P/O MONAGHAN | 6061 | 201073 | Narcotics | 7405 | 1/4/01 |
| ...NARCOTICS | CODE | PLACE OF OCCURRENCE | | | | |
| | 1807 | 5600 W. MASTER ST. | ☒ Male | ☒ Female | ☒ Adult Offenders | |
| ...ELATED | | | COMPANY | | | |
| P/O MONAGHAN | | | | | | MALE |
| ...APPLICANT (LAST, FIRST, M.I.) | | | AGE | RACE | | TELEPHONE NO. |
| 7801 ESSINGTON AVE. | | | | | | 685-4135 |
| TIME REPORTED | DAY REPORTED | TIME REPORTED | REPORTED BY | | ADDRESS | |
| 1/4/01 | | 3:30 PM | P/O MONAGHAN #6061 | | 7801 ESSINGTON AVE. | |

| TIME OF OCCURRENCE | DAY OF OCCUR | TIME | IS FOUNDED | STATUS | | | UNIT |
|---|---|---|---|---|---|---|---|
| /4/01 | 4 | 3:30 PM | ☒ Yes ☐ No | 1. ☐ Active  2. ☐ Inactive - not cleared | 3. ☒ Arrest - cleared  4. ☐ Exceptionally cleared | | 7405 |
| ...CTHOEFT | | | | PROPERTY VALUE | RECOVERED VALUE | ARM/AND | OCCURRENCE |
| Miscellaneous | | | | 0 | 0 | ☐ Yes ☐ No | ☐ Inside ☒ Outside |

NARCOTICS CASE NUMBER SF-01-007                NARCOTICS FIELD UNIT TWO PLATOON

1. **ORIGINS AND DETAILS OF COMPLAINT:** ON THURSDAY, 01/04/01 AT APPROX. 3:30PM THE BELOW
DEFENDANT'S WAS ARRESTED FOR NARCOTICS VIOLATIONS.
   A. DARNELL DELEE 19 B/M 5605 W. MASTER ST. DOB/ 7-11-81
   B. ANTHONY HODGES 20 B/M 5607 W. MASTER ST. DOB/ 7-9-80
   C. KABIYAN DIGGS 19 B/M 5531 OSAGE AVE DOB/ 5-25-81
   D. RONALD FREEMAN 16 B/M 135 N. 61TH ST. DOB/ 5-10-84
   E. ARTHUR TILLMAN 21 B/M 1513 N. FRAZIER ST. DOB/ 12-19-79 *tossed out*
   F. MARK PICHONOT 15 B/M #19 N. 52ND ST. DOB/5-1-85
   G. NAREEN TORAIN 23 B/M 1621 N. CONESTOGA ST. DOB/ 6-28-77 *tossed out*
   H. RAYMOND HOWARD 26 B/M 1752 ABERDEEN ST. DOB/11-18-74
   I. MAURICE GREY 20 B/M 5256 PARKSIDE AVE DOB/ 1-2-81 *tossed out*
   J. GLEN DELEE 43 B/M 5605 W. MASTER ST. DOB/11-8-57
   K. EILEEN HODGES 54 B/F 5607 W. MASTER ST. DOB/ 1-15-46
   L. MIGEL MOON 21 B/M 1143 E. PRICE ST. DOB/ 8-29-79 (ARRESTED 1-10-01)
   ASSIGNED: P/O BRIAN MONAGHAN #6061 FRS 201073, 2EPU/SW, 2 PLTN

2. **INTERVIEWS AND INTERROGATIONS:**
P/O Monaghan #6061, Received Detailed Information From A Confidential Source And 19th District
...ice Officers, P/O Ronald Cain #4959 & P/O Joseph Goglielmucci #2460, Refering To Drug
...tivity Involving The 5600 Blk Of W. Master St. Listed Locations 5609 W. Master St. Abandoned
...operty Narcotics Being Packaged In This Location. 5607 W. Master St Being Used As A Stash
...use, Containing Marijuana, Crack, And Weapons. 5305 W. Master St, Narcotics Sold From Front
...rch Area. Also A B/M By The Name Of "Al", And A B/M By The Name Of "Pud".

...uesday, 1-2-01, At Approximately 3:45 Pm, P/O Monaghan #6061 & P/O Kelly #7126, Set Up A
...eillance In The Area Of 5600 W. Master St. P/O Monaghan #6061 Observed #1 B/M (Later I'd As
...ony Hodges)Wearing A Blk Down Jacket & Grey/Black 8/B Cap 5'8 Med Compl 20's, And #2 B/M
...er I'd As Darnell Delee) Blk Jacket W/Fur Around Hood, 5'8 Med Compl 20's W/Red Wool Knit
... Cap, Standing On The Porch Of 5605 W. Master St. At Approx. 3:45 Pm HODGE Knocked On The
...Door Of 5605 W. Master St, Unk B/M Opened The Door And Handed HODGE A Golf Ball Sieze
...t. HODGES Then Handed Delee Objects From The Golf Ball Seize Object. Between 3:45 Pm &
... Pm, HODGE And Delee On Different Occasions Would Accept Unk Amounts Of Usc From Unk B/M's
... P/F's In Exchanged For Small Packets They Received From Their Persons. At Approximately
...Pm A Grey Olds Veh Stopped In The 5500 Blk Of W. Master St. And Passenger Exited The Veh
...alked Towards The N/W Corner Of 56 & Master St. After A Breif Conversation With Both
...GE And Delee They Walked The Unk B/M Into 5607 W. Master St. After About 10 Minutes The Unk
... Exited The Location. P/O Monaghan #6061 Observed The B/M Place A Large Clear Bag Containig
...orn Weed Substance Into A Blk Bag He Was Carrying. At This Time #2 B/M Went To 5609 W. Master
...Removed Usc From His Jacket Pocket, Opened The Front Door And Placed The Usc Into That
...operty. The Unk B/M Walked To The Corner Where The Olds Veh Picked Him Up And Then Left The
...rea. The Veh Was Followed By Members From The N&U To 4700 Blk Of Merion Ave.2 Unk B/M
...ccupants Exited The Veh, Passenger Carrying The Blk Bag Then Entered 4710 Merion Ave.HODGE
...hen Entered 5605 W. Master St.

EXHIBIT "A"

INVESTIGATION REPORT   Exhibit (A)     PHILADELPHIA POLICE DEPARTMENT

| YEAR | DISTRICT | DC NUMBER | CONTROL NUMBER | PAGE 2 |
|------|----------|-----------|----------------|--------|
| 01 | 19 | 698 | SF-01-007 | |

On Wednesday, 1-3-01 At Approximately 11:00 Am, P/O Monaghan #6061 & P/O Kelly #715°, Set Up A
Surveillance For The Locations Of 5605, 5607 & 5503 W. Master St.At Approx. 11:31am Police
Observed A Dark Colored Buick Pa Tag Dkd217. ( Which Is Registered To Glenn Lee 5607 Master St.
Operated By A Delee Wearing Blk Down Jkt, W,Red Wool Knit Skull Cap, Park In Front Of 5605
Master St. At Approx. 11:52 Am Delee Received A A Golf Ball Size Object   Cont Dark Colored
Objects Out The Front Door Of 5605 Master St.Between 11:30 Am And 11:58am B/M #2 Gives Numerous
B/M's And Female Small Dark Objects From Inside Of A Clear Baggie That He Was Holding On His
Person Inxxchange For Use.

At Approx.11:58am A B/M (Later I'd As Miguel MOON PPN#817626) Wearing Dark Jacket, Blue & White
Titans Ball Cap Exits 5605 Master St And Hands Small Objects To A B/M Wearing A Tan Jacket In
Exchange For Use. MOON Then Goes Onto The Porch Of 5607 And Counts Green Packets That Are
Inside A Clear Baggie That He Retrieved From His Person. MOON Then Gives Numerous Of These
Packets To 2 Males And 1 Female In Exchange For Use.MOON Then Places The Bundle In His Right
Pocket.
At Approx.2:22pm RODGM Wearing A Blk Averix Jkt Exited 5607 Master St And Gives A B/M Wearing
Black Jacket , Blue And White Plaid Shirt Small Object In Exchange For Use.

At Approx. 2:24pm MOON Takes From His Person The Clear Baggie Mentioned Earlier That Cont Green
Packets And Hands Them To B/M #2, MOON Then Gets Into The Passenger Side Of A Dark Colored Olds
Pa Tag Bxr 4983( Which Comes Back To A Manns) And Leave W/B On 56th St.

Between 2-3:00Pm Kabryn DIGGS Wearing A Black Jacket, Red Shirt And Base-Ball Cap Parked A
Older Model Subaru Staton Wagon Pa Tag CDP3580 On The N/W Corner Of 56th And Master. This B/M
Exited Carring A Green Timberland Shoe Box And Went In 5605 Master St. This B/M Exited A Shor
Ime Later And Left In The Subaru.

At Approx 3:04pm Delee Was Observed Giving (2) B/M's Small Objects In Exchange For Use In The
Rear Of The Store On The N/E Corner Of 56th And Master St.
At Approx. 3:53pm P/O Mitchell #1416 Went To That Corner To Attempt To Make A Controlled
Narcotics Purchase From Delee, P/O Mitchell Met Delee Inside The Store And Engaged In
Narcotics Related Conversation After Which Delee Told P/O Mitchell To Stay Inside I Delee
Exited The Store Walked To The Rear Of The Store And Removed Small Objects From His Person
Delee Then Opend The Backdoor Of The Store And called P/O Mitchell #1416 Outsid. Delee Handed
P/O Mitchell#xxx Small Object In Exchange For 20:00 Pre-Recorded Buy Money. P/Omitchell Left
And Turned Items Purchased(4 Black Tinted Heat Sealed Packets Cont A White Chunky Substance)
Over To P/O Monaghan. A Majority Of Observation On 1/3/01 Were Video Taped By P/O Kelly #715
And P/O Monaghan #6061.

On 1/4/01 P/O Kelly #7123K And P/O Monaghan Set Up A Surveillance Of 56th And Master St. At
Approx. 1:41 Pm Police Observed A Green Bonneville Pa Tag Dkg3310. ( Registered Carolyn Gill)
Travel N/B On 56th St. To The Intersection Of 56th And Master. At This Time Delee Who Was
Standing On Steps Of 5605 Master St Made A Hand Gesture Toward The Bonneville And Yelled , "?
At This Time The Bonneville Traveled W/B On Master St And Turned N/B Onto Ithan St. At This
Delee Ran W/B To Ithan St And Entered The Passenger Side Of The Bonneville. Delee Exited Aft
Approx 2-3 Mins And Ran Back To The Corner Of 56th And Master. The Bonneville Who Was Being
Operated By A B/M Later I'd As Kareem Toriam Was Followed Back To 1621 N. Conestoga St By P/O
Walker #3730 Where Police Observed Torain Exit His Vehicle And Enter 1621 Conestoga.Police
Observed Delee Go Immediately Go Back To The Corner Of 56th And Master And Give Small Objects
Which He Retrieved From His Pocket To Numerous Males And Females In Exchange For Use.
At Approx. 1:43 Pm Police Observed The Sebring Travel W/B On Master St Being Operated By
Christian Braxton Stop In Front Of 5607 Master St. Anthony Hodge Exited The Passenger Side And
Entered Into 5607 Master St With A Key. Hodge Was Observed On Numerous Occasions Entering And
Exiting 5607 Master St With A Key On 1/4/01.
At Approx. 1:55pm P/O Kelly Overheard Delee Who Was Standing On The Southeast Corner Of 56th An
Master St. Tell Kabryn Diggs That Kareem ( Operator Of The Green Bonneville) Only Had A Bundle
On Him And Would Call When The Rest Was Ready.
At Approx 2:00pm P/O Reynolds #4268 Observed Torain Exit 1621 N. Conestoga And Travel W/B On
Hunter St In The Bonneville To The S/W Corner Of 55th And Hunter St. At This Point Torain Exite
His Vehicle And Entered Into 1628 N 55th St With A Key.

| P/O Brian Monahan #6061 | W Stearns #8771 | | |

INVESTIGATION REPORT                                    PHILADELPHIA POLICE DEPARTMENT

| YEAR | DISTRICT | DC NUMBER | CONTROL NUMBER | PAGE 3 |
|------|----------|-----------|----------------|--------|
| 01   | 19       | 698       | SF-01-007      |        |

At Approx. 2:05pm Police Observed Delee Answer The Pay Phone On The N/W Corner Of 56th And Master St The Jog To The Buick ( Mentioned On 1/3/00) Along With Diggs And Arthur Tillman. P/O Walker Followed Them To 55th And Hunter St. Where They Parked The Car On 55th St. All These Males Exited The Buick And Were Admitted Into 1628 N. 55th St By Toxain. After Approx. 20 Mins All Three Males ( Delee, Tillman,Diggs) Exited 55th St, With Delee Placing A Clear Bag Inside Of His Jacket. All Three Males Go Into The Buick And Were Followed Back To 56th And Master By P/O Reynolds. P/O Walker Remained At 55th And Hunter Watching 1628 55th St.

At Approx. 2:35pm Police Observed Hodge Exit 5607 Master St And Go Into A Red Plymouth Breeze Delaware Tag D4398 And Take Unknown Objects From Inside Of The Car And The Trunk.Hodge Then Walked Back To Into 5607 Master St.

At Approx. 2:37pm Police Observed The Buick Park On The East Side Of 56th St Just North Of Master. All Three Males Exited The Vehicle And Walked To The Porch Of 5605 Master St.

At Approx. 2:37pm Police Observed Delee Hand Bundles To Moon, Freeman,Hodge And Diggs. Delee Then Placed A Clear Baggie Cont Numerous Green Tinted Packets In His Right Jacket Pocket. Delee Then Was Observed Giving These Small Green Packets To Numerous People In Exchange For Usc.Police Observed Moon, Freeman, Hodge.

Diggs, And Delee Were Observed Giving Males And Females Small Objects In Exchange For Usc.

At Approx. 2:58pm Toxain Left 1628 N. 55th St And Left The Area In His Bonneville. P/O Reynolds #4268 Followed This Vehicle Out Of The Area And With The Aid Of Uniform Vehicles Stopped Toxain At 61st And Nassau St And Placed Him Under Arrest. Recovered From Him Was (1) Pager, (1) Nextel Cell Phone, (1) Cancer Key Ring Cont 5 Keys, (1) Black Key Ring Cont 3 Keys( One Was Later Determined To Work The Door Of 1628 N. 55th St And Apt #2 Inside), (2308207) 250.00 Usc. (2308208).

At Approx. 3:09pm A Green Bonneville Pa Tag Dxn7857 Operated By Raymond Howard And In The Passenger Seat Was A B/M Later I'd As Maurice Grey , Parked On The East Side Of 56th St Just North Of Master St. Both Males Exited The Vehicle And Walked To The Porch Of 5605 Master St, Where Delee Handed Howard A Large Amount Of Usc. All Males Walked To The N/W Corner Of 56th And Master St.

At Approx. 3:13pm Delee, Freeman Got Into The Buick ( Mentioned Earlier )And Left The Area N/ On 56th St.

At Approx. 3:17pm A Marked Police Vehicle Stopped In The Middle Of 56th And Master St and Activated Lights And Sirens On The Vehicle . At This Time Grey, Howard, Diggs Got Into The Bonneville And Left S/B At A High Rate Of Speed. Hodge And A B/F Got Into The Breeze And Left The Area S/B On 56th St At A High Rate Of Speed. P/O Kelly Notified Backup As To Description And Direction Of These Vehicles And Occupants. P/O Fitzgerald #2228 And P/O Francis #3961 Stopped The Bonneville On 1400 N Alison St. Recovered From Howard Was (2) Bundles Of Money One Was $85.00 Usc And The Other Was $53.00 Usc.(2308202).Recovered From Diggs Was (2) Cell Phone,(2298598) 313.00 Usc,(2298597) (14) Blue Oval Pills( Alleged Xanax),(2298596) . Recovered From Grey Was (1) Clear Bag Cont (112) Blue Oval Pills (Alleged Xanax),(1) Clear Ziplock Pack Cont (14) Yellow Tinted Ziplock Packets Cont A White Chunky Substance,(2308219) 68.00 Usc. (2308220).(GREY) WHILE IN CUSTODY AT THE 19th DIST,(GREY) WAS INADVERTENLY RELEASED FROM CUSTODY. AT 10PM INSIDE OF 7801 ESSINGTON AVE, (GREY) WAS TAKEN BACK INTO CUSTODY, FOR NARCOTICS VIOLATIONS.

P/O Reynolds #4268 And P/O Walker #3730 Stopped The Breeze At 56th And Market St. Hodge Was Placed Under Arrest And Recovered From Him Was (5) Blue Tinted Ziplock Packets Cont A Green Weed Substance, ALLEGED (MARIJUANA)(2308205) And (1) Key Ring With(3) Keys One Of Which Was Later Determined To Work The Door At 5607 Master St.(2308222).

At Approx. 3:17pm Darnell Delee Ronald Freeman Run N/B Down 56th St From Media And Onto The Pch Of 5505 Master St And Yelled "Yo The Cops Get Them And There Coming" At This Time Moon, Pichonot And Tillman Ran Out The Front Door Of 5605 Master St. All Five( Moon, Pichonot,Tillman,Freeman,And Delee) Then Preceded To Run N/B On Ithan St.P/O Kelly Notified Backup As To Description And

Direction Of All 5 Males. P/O Walker #3730 Stopped Freeman And Pichonot At Frazier And Media St. Recovered From Freeman Was 106.00 Usc(2298599) And His Black Jacket With Fur Collar,(2298600) Recovered Was His Red Leather Jacket With "Player" Written On The Front.(2308201) P/O Fitzgerald #2228 Stopped Tillman, And Delee On Frazier And Media St. Recovered From Delee Was (1) Key Ring That Cont (7) Keys, (Two Of Which Worked The Front Door Of 5705 Master St And Another Worked The Padlock On The Door Going Into The Second Floor Rear

EXHIBIT "4"

PRE LIMINARY HEARING NOTES

COURT OF COMMON PLEAS - MINUSCRIPT

SHEET 1   PAGE 1

IN THE COURT OF COMMON PLEAS
FIRST JUDICIAL DISTRICT OF PENNSYLVANIA
PHILADELPHIA MUNICIPAL COURT

| | | |
|---|---|---|
| COMMONWEALTH | : | M.C. 0101-0590 |
| vs. | : | |
| ANTHONY HODGES | : | |
| COMMONWEALTH | : | M.C. 0101-0591 |
| vs. | : | |
| KAREEM TORAIN | : | |
| COMMONWEALTH | : | M.C. 0101-0592 |
| vs. | : | |
| ARTHUR TILLMAN | : | |
| COMMONWEALTH | : | M.C. 0101-0594 |
| vs. | : | |
| KABIYAN DIGGS | : | |
| COMMONWEALTH | | M.C. 0101-0648 |
| vs. | : | |
| RAYMOND HOWARD | : | |
| COMMONWEALTH | : | M.C. 0101-0711 |
| vs. | : | |
| MAURICE GREY | : | |

PRELIMINARY HEARING

OCTOBER 23, 2001
COURTROOM 1003, CRIMINAL JUSTICE CENTER
PHILADELPHIA, PENNSYLVANIA

BEFORE:  THE HONORABLE MARSHA N. NEIFIELD, J.

Bonnie Smith, RPR, Official Court Reporter
(215) 683-8045

COURT OF COMMON PLEAS - MINUSCRIPT

SHEET 16 PAGE 58

58

MR. MC MONAGLE: THAT'S BEEN TESTIFIED TO.

MS. ROBINSON: AND OFFICER WALKER CAN SEE IN AND SEE HE'S GOING TO THE MIDDLE APARTMENT OF THE FIRST FLOOR, APARTMENT NO. 2. THAT IS THE LOCATION WHERE ALL THOSE INDIVIDUALS ARE, AND THAT HE SEES MR. TORAIN USE A KEY IN ORDER TO ACCESS THAT LOCATION, AND, IN FACT, WHEN HE'S ARRESTED, MR. TORAIN HAS A KEY TO 1628 NORTH 55TH STREET.

MR. SCIOLLA: FOR PURPOSES OF THIS HEARING, JUDGE, I'LL STIPULATE THAT'S WHAT OFFICER — WHAT'S HIS NAME?

MS. ROBINSON: JEFF WALKER.

MR. SCIOLLA: -- WOULD TESTIFY.

THE COURT: JUST MR. TORAIN ENTERED THAT PROPERTY WITH USE OF THE KEY, OR DOES HE SEE THE OTHER TWO INDIVIDUALS?

MR. SCIOLLA: RIGHT.

MS. ROBINSON: NO. HE SEES HIM ENTER 1628 NORTH —

THE COURT: ONLY TORAIN.

MS. ROBINSON: ONLY SEES TORAIN.

PAGE 59

59

THE COURT: OKAY.

MS. ROBINSON: AND THEN — IF I MAY JUST HAVE ONE MINUTE. HE ALSO ARRESTS HIM, RECOVERS THE PAGER, THE KEY, AND $250 ON HIM, AND ALL THREE OF THOSE MALES WENT INTO THAT LOCATION. IF I COULD JUST HAVE A MOMENT TO CLARIFY.

MR. SCIOLLA: THE QUESTION IS, DID THEY GO INTO THE APARTMENT OR JUST INTO THAT PROPERTY.

THE COURT: THAT'S CORRECT. BRING HIM IN. ALLISON CAN GET HIM.

MS. ROBINSON: OH, OKAY.

THE COURT: JUST HAVE HIM STAND RIGHT THERE NEXT TO YOU AND I'LL ASK HIM.

MS. ROBINSON: DO YOU WANT HIM SWORN?

THE COURT: POLICE OFFICER JEFFREY WALKER.

---

POLICE OFFICER JEFFREY WALKER, BADGE NO. 3730, NARCOTICS UNIT, PHILADELPHIA POLICE DEPARTMENT, CALLED AS A WITNESS ON BEHALF OF THE COMMONWEALTH, HAVING BEEN DULY SWORN, WAS EXAMINED AND TESTIFIED AS FOLLOWS:

---

PAGE 60

60

THE COURT: OFFICER, FOR PURPOSES OF THIS HEARING, LOOKS LIKE MOST OF YOUR TESTIMONY IS BEING STIPULATED TO. THERE'S ONLY ONE QUESTION, I GUESS, THAT WE'RE NOT REAL CLEAR ON, AND THAT'S, WHEN YOU SEE MR. TORAIN ENTER THE PROPERTY ON NORTH 55TH STREET, I UNDERSTAND WHEN YOU WENT TO THAT LOCATION HE WAS WITH MR. DIGGS AND MR. DE LEE; IS THAT CORRECT?

OFF. WALKER: YES.

THE COURT: AND HE ENTERED THE PROPERTY WITH THE KEY AND YOU OBSERVED HIM ACTUALLY GOING INTO THE MIDDLE FIRST FLOOR UNIT?

OFF. WALKER: FIRST I OBSERVED MR. TORAIN ENTER THE PROPERTY BY HIMSELF.

THE COURT: OKAY.

THE WITNESS: LATER I OBSERVED THREE MALES ENTER THE PROPERTY OF 1628 NORTH 55TH STREET.

THE COURT: DO YOU ACTUALLY --

THE WITNESS: THREE MALES WERE ALL TOGETHER.

THE COURT: TORAIN ENTERED THE PROPERTY BY HIMSELF FIRST. THE QUESTION, I GUESS, WE HAD IS, COULD YOU TELL, ONCE YOU SEE THEM ENTER

PAGE 61

61

THAT PROPERTY, WHERE THEY GO IN THE PROPERTY?

OFF. WALKER: WHEN TORAIN ENTERED THE PROPERTY, I EXITED THE VEHICLE, CONDUCTED A FOOT SURVEILLANCE OF THE APARTMENT, I OBSERVED A LIGHT GOING ON AS WELL AS I OBSERVED HIM IN THROUGH THE WINDOW.

THE COURT: THE ONLY ONE YOU ACTUALLY SAW INSIDE THAT PROPERTY WAS MR. TORAIN?

OFF. WALKER: THAT'S CORRECT.

THE COURT: YOU NEVER ACTUALLY SAW DIGGS OR DE LEE IN THAT PROPERTY?

OFF. WALKER: I SAW THEM GOING —

THE COURT: IN THAT PARTICULAR UNIT?

OFF. WALKER: THAT'S CORRECT.

THE COURT: YOU HAVE NO WAY OF KNOWING WHETHER THEY WENT INTO THAT INDIVIDUAL UNIT WE'RE TALKING ABOUT OR THEY DIDN'T?

OFF. WALKER: NO. I HAVE NO WAY OF KNOWING.

MR. SCIOLLA: IF I MAY.

---

CROSS-EXAMINATION

---



BY MR. SCIOLLA:

Q. YOU ACTUALLY SAW THREE PEOPLE ENTER THE PROPERTY?

A. YES. ALL AT THE SAME TIME. WOULD BE DARRELL OR LEE, TILLMAN, AND -- REFER TO MY NOTES?

Q. DIGGS?

A. TILLMAN, DIGGS AND DE LEE.

Q. AND WHEN THEY WENT INTO THE PROPERTY, HOW DID THEY GET IN THE FRONT DOOR?

A. THEY JUST WALKED -- I DON'T KNOW IF THEY ENTERED WITH A KEY OR NOT.

Q. DID YOU SEE MR. TILLMAN -- EXCUSE ME. DID YOU SEE MR. TORAIN USE A KEY TO ENTER 1620 NORTH 55TH STREET?

A. THAT'S CORRECT.

Q. SO HE OPENED THE DOOR TO 1620 55TH STREET WITH A KEY, AND THEN ABOUT HOW MANY MINUTES LATER DID YOU SAY YOU SAW THESE THREE MEN IN THE PROPERTY?

A. MAYBE ABOUT, TEN, TEN OR FIFTEEN MINUTES LATER.

Q. HOW DID THEY GET IN?

A. THEY JUST WALKED INTO THE PROPERTY. I DON'T KNOW IF THEY ENTERED WITH A KEY OR NOT.

Q. YOU DIDN'T SEE THEM USE A KEY ON THE FRONT DOOR?

A. NO.

Q. NOW, THEY'RE IN THE FRONT AND YOU HAVE NO IDEA WHERE THEY GO ONCE THEY'RE IN THE PROPERTY?

A. NO. THEY'RE IN THE PROPERTY FOR APPROXIMATELY ABOUT 20 MINUTES.

Q. AND WHEN THEY EXITED, MR. TORAIN EXIT WITH THEM?

A. NO, HE DIDN'T.

MR. SCIOLLA: NO FURTHER QUESTIONS, YOUR HONOR.

MR. MC MONAGLE: NO QUESTIONS.

---

REDIRECT EXAMINATION

---

BY MS. ROBINSON:

Q. YOU WERE PRESENT WHEN OFFICER REYNOLDS TOOK THE KEY OFF OF TORAIN?

A. YES.

THE COURT: OKAY. I THINK THAT COVERS OFFICER WALKER'S TESTIMONY.

THANK YOU.

---

(WITNESS EXCUSED.)

---

MS. ROBINSON: YOUR HONOR, THE COMMONWEALTH WOULD CALL OFFICER FITZGERALD GRAY.

MR. MC MONAGLE: OFFER.

MS. ROBINSON: TWO SEPARATE BUNDLES FROM THE DEFENDANT HOWARD, THE AMOUNT, $585, ONE BUNDLE, $553 IN ANOTHER, FOR A TOTAL OF $1138, AND HE ALSO OBTAINED THE KEY TO 5705, FROM THE CO-DEFENDANT DE LEE, WHICH OPERATED THE FRONT DOOR AND THE KEY TO THE PADLOCK.

THE COURT: OKAY.

MR. CAMPBELL: 5605.

MS. ROBINSON: 5705.

MR. CAMPBELL: 5605.

THE COURT: YOU'RE SAYING 57.

MS. ROBINSON: OH, I'M SORRY. IT'S 5605. THANK YOU, MR. CAMPBELL. I'M SORRY. RIGHT, 5605 PROPERTY. HE DID THE ARREST OF DE LEE.

MS. ROBINSON: MR. SPINA MIGHT HAVE SOME QUESTIONS FOR HIM BECAUSE HE RECOVERED THE --

MR. SPINA: ONLY THING I'M READING FROM THE '49, WHEN HE ARRESTED MR. DE LEE, HE ALSO RECOVERED $850 FROM HIS POSSESSION. THAT'S STIPULATED TO. THAT'S WHAT IT READS HERE.

THEN I WOULD AGREE THAT HE RECOVERED MONEY FROM MY CLIENT AS WELL.

MS. ROBINSON: RIGHT. AND HE ALSO RECOVERED THE $20 BUY MONEY OFF OF DE LEE.

MR. SPINA: RIGHT.

MS. ROBINSON: BRAD MITCHELL, OFFICER BRAD MITCHELL.

IS THAT STIPULATED TO, GENTLEMEN?

MR. SPINA: YES.

MS. ROBINSON: COMMONWEALTH WOULD CALL OFFICER JEFF GALAXIA.

MR. MC MONAGLE: OFFER.

MS. ROBINSON: OKAY. HE DID 5607 MASTER STREET, AND WOULD TESTIFY HE ARRESTED --.

MR. CAMPBELL: 56. THERE'S A TYPO.

MS. ROBINSON: -- EILEEN HODGES, THE MOTHER OF ANTHONY HODGES, AND INSIDE A DRAWER IN THE LIVING ROOM HE RECOVERS $240. HE ALSO RECOVERS THREE WEAPONS AND SOME LIVE ROUNDS, WHICH ARE DELINEATED IN THE '49, AND HE ALSO RECOVERS FROM ANTHONY HODGES' SECOND FLOOR, MIDDLE BEDROOM, A BAGGIE THAT CONTAINS 76 PACKETS OF MARIJUANA AND ONE CHUNK OF CRACK, WHICH WAS PLACED ON PROPERTY RECEIPT 2298586,





EXHIBIT "5"

SEARCH WARRANT
AND AFFIDAVIT

CITY AND COUNTY OF PHILADELPHIA

99028

NARCOTICS

being duly sworn (or affirmed) before me according to law, deposes and says that there is probable cause to believe that certain property is evidence of or the fruit of a crime or is contraband or is unlawfully in the possession of a person or subject to seizure, and is located at particular premises or in the possession of particular person as described below.

TO BE SEARCHED FOR STREET CONTRABAND AND IDENTIFIED AS ILLEGAL NARCOTICS, DOCUMENTS AND RECORDS OF A DRUG BUSINESS, OPERATIONS OWNERSHIP OF RESIDENCE, JEWELRY, USC, WEAPONS, AMMUNITIONS AND PROCEEDS FROM ILLEGAL (VICE).

CO-PTROLLED SUBSTANCE ACT OF 35 13/780

IN REFERENCE TO CONTINUATION OF PROBABLE CAUSE OF 75451

P/O Liu Moyl   6061
P/O Cunningham   6061   Narcotics

CJC

TIME AND DATE OF SEARCH   1-5-01   1 Am

1- SENTRY FIRE SAFE
3- CLEAR GREEN SOFT TOP
2- AMBER PLASTIC PILL BOTTLE W/WHITE CAP

TO LAW ENFORCEMENT OFFICER: WHEREAS, facts have been sworn to or affirmed before me by written affidavit(s) attached hereto from which I have found probable cause, I do authorize you to search the above described premises or person, and to seize, secure, inventory, and make return according to the Pennsylvania Rules of Criminal Procedure, the described property there.

CJC

Date Commission Expires   2-24-01

EXHIBIT "6"

| AT AND FOUND | Inside    3 N. 55th St. | | | | |
| OR INVESTIGATION | same as above | | | | |
| PERSONAL PROPERTY FOR SAFEKEEPING | same as above | | | | |
| EVIDENCE | same as above | | | | |
| | 1628 N. 55th St. | | | | |

. EVIDENCE: (2) Amber pill bottles w/ white caps and (1) Sentry 1130 safe.

. CIRCUMSTANCES: Above items was confiscated at time of execution of S&S warrant #99028 at 5600 Master St.
. N/A
. CHARGES: N1316M, N1330F, 903F
. NARC. CASE #: SP-01-07
. CO-DEFENDANTS: YES
. ADD. PROP REC #: REFER TO 75-49
. N/A

| person from whom the above amount of money and/or perty was taken does not sign below, state reason why: | RECEIVED BY POLICE DEPARTMENT |
| | Arresting or Receiving Officer: |

TRANSFERRED TO EVIDENCE CUSTODIAN/COLLECTOR

hereby acknowledge receipt of the above listed items.

| (Date) | (Time) | |

RELEASE FROM CUSTODY OR POLICE DEPARTMENT

This will acknowledge the receipt from the Police Department of the City of Philadelphia of the property or money listed above, and will constitute the release of the City of Philadelphia and its agencies from any further responsibility therefor.

- Returned to Owner or Agent
- Confiscated by Court
- Destroyed by Order of Court
    Petition No. _____
- Escheat to State
    Escheat List No. _____
- To Department of Collections
- Other Disposition (Explain): _____

(Rev. 6/93)