## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **KAREEM TORAIN** | : |
| **Plaintiff** | : **C.A. #14-1643** |
| **vs.** | : |
| **THE CITY OF PHILADELPHIA, et al.** | : **LEAD DOCKET NO.** |
| **Defendants** | : **13-2773** |

## ORDER

AND NOW, this _____ day of _____, 2022, upon

consideration of Defendants' Motion for Summary Judgment, and Plaintiff Kareem

Torain's Opposition thereto, it is hereby ORDERED that the Defendants' Motion for

Summary Judgment is DENIED.

BY THE COURT:

_____
The Honorable R. Barclay Surrick

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **KAREEM TORAIN** | : |
| **Plaintiff** | : **C.A. #14-1643** |
| **vs.** | : |
| **THE CITY OF PHILADELPHIA, et al.** | : **LEAD DOCKET NO.** |
| **Defendants** | : **13-2773** |

## PLAINTIFF KAREEM TORAIN'S OPPOSITION TO
## <u>DEFENDANTS' MOTION FOR SUMMARY JUDGMENT</u>

Michael Pileggi, Esquire
303 Chestnut Street
Philadelphia, Pa 19106
(215) 627-8516
*Attorney for Plaintiff, Kareem Torain*

## INTRODUCTION

Kareem Torain spent 13 years in prison for a crime he did not commit. The Defendant police officers fabricated material evidence and concealed evidence that exculpated Mr. Torain in the conspiracy to distribute narcotics. The liability of the City of Philadelphia ("City") is shown by evidence that these unlawful practices have long been tolerated by municipal policymakers, and that the City has failed to take measures to remedy the misconduct. Indeed, the dysfunctional disciplinary system of the Philadelphia Police Department ("PPD") led police officers to believe that they could violate constitutional rights and accepted police practices without fear of any disciplinary action.

Defendants' Motion for Summary Judgment is the latest chapter in its attempt to avoid the same fate as the lead Narcotic Field Unit ("NFU") case of *James McIntyre v. Thomas Liciardello* when the Honorable Paul S. Diamond denied summary judgment on Plaintiff's *Monell* claims for the same police officers (Defendants Brian Reynolds and Jeffrey Walker) alleged to have engaged in similar unlawful conduct, resulting in 13 years of a young man's life wasted in jail – conduct that compelled the City to pay a large settlement to settle over 200 consolidated cases.

The City makes four arguments to avoid the same result in this case. First, the Defendants argue that Mr. Torain's claims against Defendants Brian Monaghan, Sean Kelly and Corporeal Gary Sinclair are time barred but ignore that this issue was already fully litigated when Plaintiff filed his Amended Complaint. ECF Doc. No. 18.

Second, Defendants argue that the Plaintiff has failed to establish his claim of violations of Due Process, Access to Courts and Equal Protection of the Laws.[1] With respect to Plaintiff's Due Process claim, the record, detailed below, shows that all Defendants conspired to present false and misleading facts in support of the arrest and subsequent prosecution of Mr. Torain and that his conviction was product of the fabrication of evidence by the Defendants.

Third, Defendants Kelly and Sinclair argue that they are entitled to qualified immunity ignoring clearly establish jurisprudence that qualified immunity is not available to those who knowingly violate the law, a claim that Plaintiff makes against these Defendants here.

Finally, with respect to the *Monell* claim, the motion for summary judgment fails to come to grips with overwhelming evidence that the City failed for decades to properly monitor, supervise, and take necessary remedial action with respect to the practices of narcotic officers and other PPD officers that were knowingly and intentionally used to secure wrongful arrests, prosecutions, and incarceration of innocent people. The City's deliberate indifference allowed officers – Defendants Brian Monaghan, Brian Reynolds, Jeffrey Walker, Sean Kelly and Corporeal Gary Sinclair in particular – to violate citizens' Fourth and Fourteenth Amendment rights by fabricating and concealing evidence, and submitting false and misleading affidavits of probable cause and other supporting police documents. In addition, as documented by Plaintiff's expert, the former Director of the Integrity and Accountability Office ("IAO") and the factual and legal findings in *McIntyre v Liciardello*, 2020 WL 605717 (E.D. Pa., Feb. 7, 2020), the City tolerated a

---

[1] Plaintiff withdraws the Access to Courts and Equal Protection claims.

dysfunctional internal disciplinary system that leads officers to believe they can engage in misconduct without fear of adverse consequences.

## FACTUAL BACKGROUND

### Kareem Torain

On May 7, 2002, Kareem Torain was convicted of delivering a controlled substance, possession of an instrument of a crime, possession of drug paraphernalia and criminal conspiracy and was sentenced to a term of 5 to 10 years' incarceration on the drug charge, a consecutive term of 5 to 10 years for the conspiracy charge and another consecutive term of 2 ½ to 5 years for the possession of an instrument of crime. (Plaintiff's Counterstatement of Undisputed Material Facts ("Pltf's SUMF") at ¶ 187-188). As a result, he served over 13 years of incarceration for a crime he did not commit in various state penitentiaries before his case was reversed and *nolle prossed* on February 28, 2014. (*Id*. at ¶ 203).

When he was arrested, Torain was living with his mother, Carolyn Torain, his two sisters, Tamika and Margaret and a niece, Kareema Baker at 1621 North Conestoga, Philadelphia. (Ex. 1, Dep. of Kareem Torain, 8: 4-13, 71: 4-6). He also lived with a brother prior to his incarceration – Talib Torain, who was murdered in 2006 while Plaintiff was incarcerated. (Ex. 1, 10:19-21). Mr. Torain presently owns Lock the Globe Cleaning, LLC; a company formed in 2018 that performs commercial cleaning services. (Ex. 1, 13:1-22, 14:2-3). While incarcerated on this case, he started a book publishing company called Lock the Globe Publishing, and wrote and published two books. (Ex. 1, 18:12-18).

## I. The Arrest of Kareem Torain

### A. Prior to the Arrest

On January 4, 2001, the day of Mr. Torain's arrest, he stayed at his house until the early afternoon eating breakfast and watching television. (Pltf's SUMF ¶ 1). Sometime after 11:00 a.m., he called a friend of his – Kena Hall with a cell phone that he had just activated that day. (*Id.* ¶ 2). Plaintiff intended to take Ms. Hall, who lived down the street from him, out that evening on a date. (*Id.* ¶ 3). Plaintiff did not own a vehicle, so he called his friend Derrick – "D Rock", to ask if he could borrow Derrick's green Bonneville for his date that night. (*Id.* ¶ 4). A short time later, Plaintiff left his house and walked around the corner to the next block where he met Derrick in front of a barber shop located at 55th and Lansdowne Avenue. (*Id.* ¶ 5). Torain got into Derrick's car and the two drove to Derrick's home at 61st and Nassau Avenue. (*Id.* ¶ 6). At 61st and Nassau, Derrick got out of the car and went inside the apartment building. Plaintiff then drove off in the green Bonneville. (*Id.* ¶ 7).

Torain drove to his grandmother's house at 1655 North 55th Street, parked the car, went inside, spoke to his grandmother momentarily, hug her and left. (*Id.* ¶ 8). He then walked down the street one block to his house at 1621 North Conestoga Street. (*Id.* ¶ 9). When he got home, he called Kena Hall, who did not answer her telephone. (*Id.* ¶ 10). He then called Derrick, informed him that Ms. Hall did not answer her telephone, he was not going out with her that night and was bringing Derrick's car back. (*Id.* ¶ 11). Torain walked back to the parked car and drove to Derrick's house on Nassau Street. (*Id.* ¶ 12). When he arrived, he parked, started to get out of the car

when he was arrested by Defendant Brian Reynolds and two uniformed police officers. (*Id.* ¶ 13).

### B. Surveillance of 5600 Block of West Master Street

According to the Defendants' arrest report, in or around January, 2001, Defendant Monaghan, a member of the NFU received information from a "confidential source" regarding narcotic activity in the area of 5600 block of West Master Street, Philadelphia, Pennsylvania. (*Id.* ¶ 14). Defendant Monaghan testified at deposition that the source was "someone he knew from the neighborhood" when he worked as a police officer in the 19th District before being assigned to the NFU in the latter part of 2000. (*Id.* ¶ 15). Although, he had used this source in the past when he was a patrol officer in the 19th District, he just happened to run into him on that day and the source told him that drugs were being sold on the 5600 block of Master Street. (*Id.* ¶ 16). Defendant Monaghan also claims that about the same time, he spoke to two police officers who informed him that a property located at 5609 West Master Street was being used to package narcotics; a property located at 5607 West Master Street was being used as a stash house and sales of narcotics were being made from a front porch of a property located at 5605 West Master Street. (*Id.* ¶ 17). The report states that one of the police officers identified two black males named "Al" and "Pud" as individuals that were involved in the narcotic activity. (*Id.* ¶ 18). Defendant Monaghan became the lead investigator and was in charge of all the paperwork, PAR reports, affidavits and search warrants. (*Id.* ¶ 19).

On January 2, 2001, at 3:45 p.m., Defendant Monaghan and his partner Defendant Sean Kelly set up surveillance while sitting in a van in the area of 5600

block of West Master Street. (*Id.* ¶ 20). On that day, the Defendant officers observed two individuals – Anthony Hodges and Darnell Delee engage in numerous narcotic transactions with both males and females from the porch area of the house at 5605 West Master Street. (*Id.* ¶ 21). No buyers or sellers were followed or arrested that day. (*Id.* ¶ 22). Defendants did not see Torain on that day. (*Id.* ¶ 23).

The next day, January 3, 2001, Defendants Monaghan and Kelly again set up surveillance on that same block from 11:00 a.m. to 4:00 p.m. (*Id.* ¶ 24). This time they observed Delee and two other individuals, Miguel Moon and Kabeyn Diggs engage in numerous narcotic transactions on the street. (*Id.*). The officers videotaped the majority of the observations that day of surveillance. (*Id.* ¶ 25). At 3:58 p.m., Police Officer Bradford Mitchell was sent in to make a controlled narcotics buy and was videotaped buying crack cocaine from Delee. (*Id.* ¶ 26). Again, Defendants never saw Torain on that day nor were they told by anyone that Mr. Torain was involved in this drug organization. (*Id.* ¶ 27). No buyers or sellers were arrested that day. (*Id.*).

On January 4, 2001, the last day of surveillance and the day of Plaintiff's arrest, at about 1:35 p.m. according to Defendant Monaghan, a green Bonneville, with Pennsylvania license plate number DKC 3310 (registered to Carolyn Gillis) was videotaped by Defendants traveling northbound to the intersection of 56th and Master Streets. (*Id.* ¶ 28). *Defendant Monaghan was unable to hear anything in the surveillance van nor is there any audio on the videotape.* (*Id.* ¶ 29). The report states that Defendant Monaghan then observed Delee make a hand gesture to the Bonneville and yelled "Yo" at which time the Bonneville pulled over on the 1400 block of Ithan Street. (*Id.* ¶ 30). He then claims in the same report that he saw Delee exit the vehicle

after 2 to 3 minutes and run back to the corner of 56th and Master. (*Id.* ¶ 31). He later claims at deposition that he saw Delee take small objects out of his pocket and hand the objects to males and females in exchange for U.S. Currency. (*Id.* ¶ 32). But then Defendant Monaghan contradicts himself when he later testified at deposition that it was actually Defendant Jeffrey Walker, and not Defendant Monaghan, who observed Delee emerge from the Bonneville taking the small objects from his pocket. (*Id.* ¶ 33). Although Defendant Monaghan "couldn't tell who the driver was", he radioed Defendant Walker to let him know "what was going on", whereby Defendant Walker followed the Bonneville out of the area. (*Id.* ¶ 34). Over the course of three days of heavy drugs sales, no buyers or sellers were arrested. Despite this fact, according to Defendant Monaghan, he wanted Walker to follow the Bonneville because police "were getting ready to do [our] takedowns and [he] wanted to make sure [they] had everyone who [they] wanted to get ID'd or to stop". (*Id.* ¶ 35).

At Mr. Torain's preliminary hearing, Defendant Monaghan falsely testified that after Delee got out of the car, he was heard by Defendant Monaghan to yell "Kareem had one bundle on him, that he would call and come back when the rest was ready." (*Id,* ¶ 36). Yet at trial, Defendant Monaghan again changed his testimony by eliminating the name "Kareem" from Delee's statement and instead testified that Delee hollered "*he* only had a bundle, he's going to call me when the rest is done". (*Id.* ¶ 37). Then again at deposition, Defendant Monaghan changed the context of the statement yet again when he admitted that it was actually his partner Defendant Kelly who heard the statement. ("Officer Kelly overheard it, who later relayed it to me, that Delee just mentioned to somebody that he - - the person in - - Kareem in the

Bonneville or Kareem only had one bundle and he was going to get the rest and he was going to call the pay phone."). (*Id.* ¶ 38).

The arrest report then states that Defendant Walker followed the Bonneville to 1621 North Conestoga Street where Mr. Torain exited the vehicle and entered the premises. (*Id.* ¶ 39). Defendant Walker, in turn testified at deposition that he did not recall that observation. (*Id.* ¶ 40). After about 20 minutes, Defendant Brian Reynolds then observed the Plaintiff exit Conestoga Street and drive one block to the corner of 55th and Hunter Street, where Defendant Reynolds claims he saw Mr. Torain enter 1628 North 55th Street with a key. (*Id.* ¶ 41). This building consists of several apartments. (*Id.* ¶ 42). Defendants Monaghan, Reynolds and Walker all agree that at this juncture, Mr. Torain was not observed engaging in any criminal activity giving rise to probable cause to arrest him. (*Id.* ¶ 43).

The arrest report further states that Defendant Monaghan then informed Defendant Walker that the three individuals that Defendants Monaghan and Kelly had observed engaged in multiple drug transactions – Delee, Diggs and Arthur Tillman were on their way to the 55th Street and to "keep an eye out in case the vehicle pulled up to the location" at 1628 North 55th Street. (*Id.* ¶ 44). Defendant Walker followed their car to 1628 North 55th Street and saw them enter the property. (*Id.* ¶ 45). Twenty minutes later Delee and company exited 1628 North 55th Street and drove from the scene, followed by Defendant Reynolds. (*Id.* ¶ 46). According to Defendant Monaghan, he was notified by Walker that that Delee was seen placing a clear baggie inside his jacket pocket upon leaving 1628 North 55th Street. (*Id.* ¶ 47). Defendant Monaghan then informed Defendant Reynolds to arrest Kareem Torain because he

believed that Mr. Torain "may have just re-upped one of the dealers [Delee]". (*Id.* ¶ 48).

### C. Mr. Torain Is Arrested by Defendant Reynolds

Defendant Reynolds testified that at 2:58 p.m. Plaintiff left 1628 N. 55th Street and was followed by Defendant Reynolds. (*Id.* ¶ 49). After several blocks, Plaintiff was arrested by Defendant Reynolds when he parked the car in front of Derrick's house at 61st and Nassau Avenue. (*Id.* ¶ 51). Defendant Reynolds testified at deposition that he confiscated from Mr. Torain a pager, a Nextel cell phone, a Cancer key ring containing 5 keys; a black key ring containing 3 keys and $250.00 dollars at the time of Kareem Torain's arrest. (*Id.* ¶ 52). The property receipt from the arrest containing the items confiscated from Mr. Torain that was generated, however, reflects that in addition to the above items, Defendant Reynolds also confiscated a letter from the Commonwealth of Pennsylvania Board of Probation and Parole in Mr. Torain's name. (Ex. 9, Property Receipt # 2308207, "Item # 1-(1) KEY RING CONT. (3) SILVER KEYS-(1) KEY WORKED THE DOOR TO 1628 S. 55TH ST. APT. "2".; ITEM #2-(1) CANCER KEY RING CONT. (5) KEYS; ITEM #3- PHILIPS PAGE MART PAGER; ITEM #4- MOTOROLA NEXTEL CELL PHONE; **ITEM #5- COMMONWEALTH OF PA BOARD OF PROBATIONS & PAROLE IN THE NAME OF DEF.**") (*Id.* ¶ 52). Defendant Reynolds is adamant that he never confiscated the letter from Probation and Parole and is mystified as to how it was listed as something confiscated on the property receipt. (*Id.* ¶ 53). What Defendant Reynolds is certain of however, no narcotics or contraband were confiscated from Mr. Torain. (*Id.* ¶ 53). Nevertheless, even though Plaintiff was never observed to have

engaged in any criminal activity and did not possess any contraband when arrested, Mr. Torain was transported from 61st and Nassau to 55th and Pine, processed and placed in a cell. (*Id.* ¶ 54). Defendant Reynolds claims that he turned over all the confiscated items from Mr. Torain to Defendant Monaghan. (*Id.* ¶ 55).

## II. Searches and Arrests at 5609, 5607 and 5605 West Master Street

On the same day of Mr. Torain's arrest at 3:30 p.m., police raided the three properties on West Master Street that had been under surveillance for 3 days and arrested the following individuals: Darnell Delee, Anthony Hodges, Kabiyan Diggs, Ronald Freeman, Arthur Tillman, Mark Pichonot, Raymond Howard, Maurice Grey, Glen Delee, Eileen Hodges and Migel Moon. (*Id.* ¶ 56). Confiscated from the Master Street houses and the above individuals was a large amount of crack cocaine, marijuana, Xanax pills, assault rifles, handguns, ammunition, a bullet-proof vest and U.S. currency. (*Id.* ¶ 57). As lead investigator, Defendant Monaghan was at Master Street to coordinate the executions of the warrants, confiscation of the evidence and the arrests. (*Id.* ¶ 58).

During the activities surrounding the searches and arrests on Master Street, Defendants Monaghan and Kelly proceeded to 1628 North Master Street to meet Defendants Reynolds, Walker and other unidentified police officers. (*Id.* ¶ 59). Defendant Monaghan believed that it was important for him to go to 1628 North 55th Street during this massive roundup on Master Street to "secure the property", and to "get an observation" after police secured it so that he could "go back and do an affidavit for a search warrant". (*Id.* ¶ 60). While enroute to 55th Street, Defendant Monaghan claims that Walker "came over the radio and said - - he said he was on

foot and he saw a light come on in an apartment". (*Id.* ¶ 61). Defendant Walker later testified at the preliminary hearing that he conducted a foot surveillance and saw a light go on in apartment # 2 at the 55ᵗʰ Street rooming house and saw Mr. Torain through the window. (*Id.* ¶ 62).

## III. Search of 1628 North 55ᵗʰ Street

When Defendants Monaghan and Kelly arrived, they met Defendants Reynolds and Walker (who was already in the hallway of the property) and Defendant Reynolds gave Defendant Monaghan a key that was confiscated from Mr. Torain earlier that day that fit the lock of the front door of 1628 North 55ᵗʰ Street. (*Id.* ¶ 63). A supervisor, either Defendant Corporeal Gary Sinclair or Sergeant Gessner (deceased) was also present. (*Id.* ¶ 64). According to Defendant Reynolds, the officers' intention was to enter the premises only to secure it so evidence would not be destroyed. (*Id.* ¶ 65). However, Defendant Walker at deposition gave a more nefarious reason; they went there to "steal". (*Id.* ¶ 66). At 3:50 p.m. all the Defendants were present when Defendants Monaghan and Kelly entered the premises *without a warrant* and seized: "(2) Amber pill bottles w/ white caps and (1) Sentry 1150 safe". (*Id.* ¶ 67).

On the basis of Defendant Reynolds false testimony that he saw Mr. Torain enter 1628 N. 55ᵗʰ Street with a key, Defendant Reynolds and/or Defendant Walker's false information that three individuals were seen leaving the rooming house examining a "golf-ball" sized bag of drugs and Defendant Walker's false testimony that he saw a light go on in the bedroom, a search warrant was issued for the next morning. (*Id.* ¶ 68). Defendant Monaghan requested a "nighttime search" to be

approved based on "information received, surveillance, and P/O Mitchell's purchase" as well as the fact that more than one person had access to the room and that evidence could be lost or destroyed. (*Id.* ¶ 69). The warrant was allegedly executed at 1:00 a.m. on January 5, 2000 and according to Defendant Monaghan and his supervisor, Defendant Corporeal Sinclair, a safe was recovered yielding 17 grams of crack cocaine and 2 amber plastic pill bottles. (*Id.* ¶ 70). The property receipt reflecting what was confiscated from that room, however, indicates that the seizure occurred the day before at 3:50 p.m. (while the Defendants entered with a key). Moreover, the property receipt reflects that only a safe and pill bottles were confiscated and not the 17 grams of crack cocaine that the warrant attests as confiscated. (*Id.* ¶ 71).

During the execution of the search of 1628 North 55th Street, Defendant Monaghan fails to recall what other officers assisted in the search, nor does the search warrant reflect that any police officers assisted Defendant Monaghan in the 1:00 a.m. search. (No badge numbers of officers present appear on the warrant). (*Id.* ¶ 72). Defendant Monaghan has no answer on that point. He claims that the crack cocaine was found in the safe that was confiscated, acknowledged that none of the keys confiscated from Mr. Torain fit the safe and does not know how the safe was opened. (*Id.* ¶ 73). In fact, he never saw drugs taken out of the safe, but instead was informed by some unidentified officer that drugs were removed from the safe. (*Id.* ¶ 74). There was no packaging material, scales or paraphernalia found in the room that would otherwise indicate the distribution of drugs from that room. (*Id.* ¶ 75).

## IV. Search of 1621 North Conestoga Street

After Mr. Torain was arrested and in custody at 55th and Pine and following the meeting with Defendants Monaghan and Kelly at 1628 North 55th Street, Defendants Reynolds and Walker proceeded over to Plaintiff's home at 1621 North Conestoga and conducted another warrantless search. The officers simply walked in the house while Mr. Torain's mother Carolyn Torain and his sister Tamika were cooking in the kitchen. (*Id.* ¶ 76). Defendant Reynolds searched the entire house. (*Id.* ¶ 77). When he went into the middle bedroom, Plaintiff's bedroom, Defendant Reynolds saw an ankle monitor box.[2] (*Id.* ¶ 78). Defendant Reynolds then informed Carolyn Torain that her son was going back to jail. (*Id.* ¶ 79).

During the search, Defendant Reynolds opened a dresser drawer and confiscated a letter from Pennsylvania Board of Probation and Parole. After this, Defendant Reynolds was talking to someone on the phone and then quickly left the house. (*Id.* ¶¶ 80-82).

Although Defendant Reynolds cannot account for the fact that the Probation and Parole letter is listed on Property Receipt # 2308207 and is dated January 4, 2001 with the time of 3:50 p.m. and despite testimony that he actually took the letter from Mr. Torain's room, he insists that the accusation that he was in Torain's home searching after the arrest, is a lie. (*Id.* ¶ 83).

## V. The Relationship With the Torain Arrest and Prosecution to the Dennis Freeman Arrest and Prosecution

It has been uncovered that the investigation conducted by the Defendants in

---

[2] Kareem Torain had just been released from prison on December 12, 2000, was on parole and was required to wear an ankle monitor. (Ex. 1, 48: 15-19); *see also* (Ex. 14).

this case (*Torain* case) and the circumstances which ultimately led to Plaintiff's arrest

was the continuation of a prior investigation, arrest and prosecution of Dennis

Freeman. *See* (*U.S. v Dennis Freeman*, 2-00-cr-00692-001, Honorable Robert F.

Kelly) (*Freeman* case). (*Id.* ¶ 84).

## A. Defendant Walker's Testimony Relating to the "Concerned Citizen"

On August 30, 2000, Dennis Freeman and several other individuals were

arrested and prosecuted after a "concerned citizen" provided information to

Defendant Reynolds that Dennis Freeman and others were involved in narcotic

activity on the highway of 5500 Lansdowne Avenue. (*Id.* ¶ 85). Defendant Reynolds

was the affiant on the *Freeman* case. He was also the surveilling officer. (*Id.* ¶ 86).

Defendants Walker and Kelly were involved as well in the arrest and prosecution of

Mr. Freeman. (*Id.* ¶ 87). The Freeman investigation was initiated by the Defendants

after a "concerned citizen" informed Defendant Reynolds of heavy drug sales on the

highway of 5500 Lansdowne Avenue.[3] (*Id.* ¶ 88). Seventeen years later and during

the pendency of the *Torain* litigation, Defendant Walker identified this "concerned

citizen" as an individual named "Al".[4] (*Id.* ¶ 89). Defendants Walker, Reynolds,

Kelly and others in the Narcotic Field Unit had been using Al as an unregistered

informant and a source of information regarding narcotic sales in that and other

neighborhoods many times. (*Id.* ¶ 90).

In relation to the *Freeman* case, Defendant Walker attests in his affidavit that

his longtime partner Defendant Reynolds gave "false testimony" about Al, who they

---

[3] 5500 Lansdowne Avenue is one block from the site of the arrests on 5600 block of Master Street in the *Torain* case.

[4] Discovery has disclosed that "Al" is Robert Morris ("R.M.").

had "used several times prior to the Freeman investigation as an unregistered informant". (*Id.* ¶ 91). Defendant Walker further attests that "Al assisted us in supplying information in order to set up drug dealers for arrest so that Al could take over that particular dealer's business". (*Id.* ¶ 92). The officers "tipped Al off about other law enforcement investigations" that Al was a target of. (*Id.* ¶ 93). Moreover, Al had a "criminal history of drug dealing, robbing drug dealers, as well as being involved in shootouts with other drug dealers". (*Id.* ¶ 94). Defendant Walker concludes that using Al as an "unregistered informant" violated the PPD's Policies and Procedures relating to informants. (*Id.* ¶ 95). Lastly, Defendant Reynolds' use of Al in the Freeman investigation was to "make his information more reliable or credible and to appear that he was someone living in the neighborhood who was concerned about stopping drug activity". (*Id.* ¶ 96).

Defendant Walker was aware that during the pendency of Mr. Freeman's prosecution in federal court for narcotic violations, Defendant Reynolds registered Al as a confidential informant in order to defray any inquiry into the use of Al as a source of information and to conceal that Al was being used in violation of the PPD's Policies and Procedures. (*Id.* ¶ 97).

## B. Defendant Reynolds' Testimony Relating the "Concerned Citizen"

Defendant Reynolds recalls the Dennis Freeman arrest and prosecution. (*Id.* ¶ 98). He was the Affiant, the assigned investigator, as well as the surveilling officer and had used Al while designating Al as a "concerned citizen". (*Id.* ¶ 99). He had used Al often in the past even though he knew Al had a criminal history. (*Id.* ¶ 100). He believes that Al is now deceased and heard that Al committed suicide in jail. (*Id.* ¶

101). Finally, he does not recall whether Al was ever signed up as a confidential informant during the pendency of the criminal trial, however, he later admits at his second deposition[5] that he read some notes that suggested that Al "went from the concerned citizen to an informant" during the *Freeman* trial. (*Id.* ¶ 102). Defendant Reynolds states that once Al was signed up as a confidential informant, forms would have to be filled out, a records check would have to be completed and then all the information would be turned over to the Integrity Control Unit Office (ICU), and in turn, ICU would issue that individual a confidential informant number. (*Id.* ¶ 103). He knew Al had a criminal record, but never did a criminal records check.[6] Defendant Reynolds does not recall what Al's real name is or his confidential informant number. (*Id.* ¶ 104).

## C. Defendant Reynolds' Testimony Concerning the Green Pontiac Bonneville

Defendant Reynolds also recalls testifying at Dennis Freeman's trial, including pretrial matters. (*Id.* ¶ 105). He testified that on August 31, 2000, at approximately 3:45 p.m., he observed "an unknown black male" exit a location he had under surveillance, get into a "green Pontiac Bonneville" license plate number "DCK-3310" and leave the area. (*Id.* ¶ 106). At 3:55 p.m. he observed the "same green Pontiac Bonneville" return back to the location and pick up Mr. Freeman and drive away. (*Id.*

---

[5] Defendant Reynolds abruptly walked out of the first deposition when he was confronted with the Affidavit of Defendant Jeffrey Walker. The second deposition was continued where Defendant Reynolds' memory, in part, seemed to return.

[6] It turns out that Al was arrested in 1997 and charged with Possession with Intent to Deliver and he was also charged in 1999 for Failure to Appear. A bench warrant was issued in that case and was pending at the time of the *Freeman* and *Torain* prosecutions. *See* (Pltf's SUMF ¶ 104, footnote 6, Letter to Anne Taylor). He was also arrested again in 2001, charged with Simple Possession of narcotics, and Theft by Unlawful Taking. See *MC-51-CR-0461701-2001* and *MC-51-CR-0461711-2001*.

¶ 107). At 4:45 p.m. Defendant Reynolds observed an unknown "B/M #5 exit 5412 Jefferson St." and leave the area. (*Id.* ¶ 108). Black male #5 who was driving the green Bonneville was never identified in the *Freeman* case and was the only individual who was not apprehended. (*Id.* ¶ 109). The green Bonneville was never seen again, *until* Defendant Reynolds observed that same green Bonneville, license plate number "DCK-3310" four months later when he arrested Kareem Torain. (*Id.* ¶ 110). Defendant Reynolds however disingenuously testified that he does not recall that the green Bonneville that he arrested Torain driving was the same vehicle being operated by unknown black male #5 in the *Freeman* case. (*Id.* ¶ 111).

## VI. Defendant Walker's Testimony

Starting on September 15, 2016, followed by a total of four additional days ending on October 13, 2016, Defendant Walker testified at deposition that he was assigned to the NFU in 1999 until his arrest in 2013. (*Id.* ¶ 112). He began working with Defendant Reynolds in the NFU in 1999. (*Id.* ¶ 113). Defendant Walker described how he and his colleagues, including Defendants, fabricated probable cause, stole drugs and money, committed perjury, beat people to extract information, engaged in side deals with suspects and Defendants, conducted searches absent search warrants, misused confidential sources and allowed confidential informants to commit criminal acts, oftentimes participating in these illegal acts with Defendant Reynolds. (*Id.* ¶ 114). This misconduct was committed by Defendants Reynolds and Walker since they began working together in 1999. They were partners even before they transferred into the NFU and were known on the street as "Batman and Robin". (*Id.* ¶ 115). Defendant Walker gives a reason for his willingness to speak out about

corruption in the police department following his own arrest and conviction for corrupt practices. He provides that his continued cooperation is in accordance with the terms of his 5K1.1 agreement and his desire to "continue to tell the truth, the full truth". (*Id.* ¶ 116).

On May, 15, 2017, Defendant Walker attested to following facts specific to Dennis Freeman's arrest, prosecution and conviction:

> (1) that he has personal knowledge of the details regarding Mr. Freeman's arrest and prosecution and was personally involved in the investigation of Dennis Freeman and testified on behalf of the prosecution in convicting Mr. Freeman;
>
> (2) that Brian Reynolds lied about the status of the person giving the information initially, *e.g.*, that this person was a "concerned citizen", when this individual was actually acting as an unregistered informant in violation of the laws of the Commonwealth, as well as the Philadelphia Police Department's policies and procedures;
>
> (3) that the "concerned citizen" had actually committed robberies, was a known drug dealer and had been involved in shootouts with other drug dealers;
>
> (4) that Reynolds lied about the surveillances and Mr. Freeman's involvement in criminal activity;
>
> (5) that there was no probable cause to search [Freeman's] home, but rather, the search was based solely on "articulation" [fabrication]; and that neither Officers Reynolds nor Walker independently corroborated the information that Mr. Freeman was engaged in criminal activity given to Reynolds by the "concerned citizen".

(*Id.* ¶ 117).

## VII. The Conspiracy to Frame Kareem Torain

The beginning of a 22-year nightmare (13 years of incarceration and 8 years of litigation) that Mr. Torain has endured first began when the unidentified black male # 5 driving the same green Bonneville Mr. Torain was driving when he was arrested, escaped arrest in the Dennis Freeman investigation. Four months later that same

green Bonneville was spotted during the surveillance of the 3 drug houses on 5500 block of Master Street. Defendant Reynolds falsely testified that he did not know that the Bonneville Mr. Torain was arrested in was the same vehicle he spotted in the *Freeman* case. Defendant Reynolds knew that it was the same vehicle and believed he was arresting the unknown black male # 5 that got away in Freeman.[7]

According to Defendants Monaghan and Walker, an unidentified person, who Defendant Monaghan later claimed was Kareem Torain, was seen driving at the scene of the surveillance of these properties on Master Street. Defendant Monaghan first testified that he overheard Delee call out to Diggs that "Kareem" was going to retrieve more drugs and would return. He later admitted that he did not hear what Delee allegedly said, but rather it was heard and relayed to him by his partner Defendant Kelly.

Defendant Monaghan states in his report that the green Bonneville was followed to Mr. Torain's house at 1621 North Conestoga and later to 1628 North 55th Street. According to Defendant Reynolds, Mr. Torain was then seen using a key to gain entrance to the 55th Street rooming house followed by Delee, Diggs and Tillman who are also observed by Defendant Reynolds being admitted to that property by Mr. Torain. Twenty minutes later, first Defendant Walker, then Defendant Reynolds falsely claim that Delee, Diggs and Tillman were seen leaving the property looking at a bag of drugs. Instead of arresting these individuals, Defendant Reynolds waited for Mr. Torain to leave 55th Street, followed him and arrested him at 61st and Nassau. No

---

[7] Defendant Reynolds realized this when he seized the Parole and Probation letter at Mr. Torain house which documented Plaintiff's release date from prison as December 12, 2000, almost four months after Dennis Freeman was arrested and definitely knew at that point that it could not have been Mr. Torain driving that car during the Freeman investigation.

narcotics or contraband were confiscated from Mr. Torain, nor had Defendants observed him engage in any illegal activity.

Still lacking probable cause, Defendant Reynolds claims that he confiscated a key from Mr. Torain that fit both the front door to the rooming house and apartment # 2 inside. Defendant Reynolds testified that he gave the key to Defendant Monaghan at 1628 North 55th Street and Defendant Monaghan entered apartment # 2. Defendant Monaghan testified that Defendant Kelly spoke to the manager of the property, Vincent Saunders Sr. Defendant Monaghan claims in the arrest report that Mr. Saunders stated that no one had rented apartment # 2 and no one had permission to be in there. What Defendant Monaghan omitted in his report is that Vincent Saunders Jr., who owned the property, spoke to either Monaghan or Kelly on the telephone and informed them that police were not allowed in that room unless they possessed a search warrant. Regrettably, this telephone conversation was after the Defendants had already seized the safe and amber pill bottles that were listed on the property receipt at 3:50 p.m. While the seized items were still in the police custody, Defendant Monaghan obtained a search warrant which was allegedly executed over 9 hours later at 1:00 a.m. the next morning. The warrant had no other police officers as participating in the search. However, according to Defendant Monaghan, the seizure of the safe and pills actually occurred at 1:00 a.m. and not at 3:50 p.m. the previous day, as the property receipt reflects. More importantly, the Defendants lied about how and when they entered the apartment and how and when they seized the items.

After the Defendants arrested Mr. Torain without probable cause, the Defendants had to, in the words of Defendant Walker, "articulate", which means

fabricate the facts in order to establish probable cause. After Defendant Monaghan conducted a warrantless search at 1628 North 55th Street, the officers huddled together and fabricated a story about the light going on in apartment # 2 to link Mr. Torain to the room. Defendant Monaghan included this in his report and Defendant Walker testified to it at trial. To connect Torain to the room further, Defendant Monaghan unabashedly claims that Defendant Kelly heard a drug dealer on the street who was standing next to the van that Defendants Monaghan and Kelly were in, yell the name "Kareem".

To perpetrate this injustice even further, Defendants Reynolds and Walker proceeded over to 1621 North Conestoga and conducted a second warrantless search. While Defendant Reynolds searched the house, he looked into Kareem Torain's bedroom and spotted an ankle monitor box and confiscated the Parole and Probation letter, which he now claims he never saw. Even though the letter is listed on the property receipt, Defendant Reynolds cannot account for where, when or how it was confiscated. Defendant Monaghan, the lead investigator admits that it was seized, but also does not know where, when, or how it was seized. Defendant Reynolds simply states that the allegation that he searched Conestoga Street and seized the letter, is a "lie". Defendant Walker admits that he lied when he testified about the light at 55th Street and that the Defendants fabricated the evidence throughout the entire investigation and prosecution. He testified that Mr. Torain was wrongfully convicted.

Next, Reynolds claims that he did not know who Defendant Monaghan was referring to as the "confidential source" that Defendant Monaghan claims provided him information regarding the Master Street properties that is included in his report.

Although Defendant Reynolds recalls using Al as his "concerned citizen" in the *Freeman* case, he does not know if Al was used in Mr. Torain. The evidence, however, proves otherwise. The Defendants had been illegally using Al as an unregistered informant over the course of several years. Defendant Monaghan claims that he received information that ultimately led to Mr. Torain's arrest from a person he knew "from the neighborhood' when he was patrol officer. He misrepresented this fact. Al *a.k.a.* R.M. was the "concerned citizen" in the Dennis Freeman investigation and the "confidential source" in the Torain investigation. Defendant Monaghan admits as much when he testified that this person who he happened to run into told him before initiating the Mr. Torain investigation "yo, you know 56th and Master there's a lot of drugs out there *still*"; insinuating that he had provided similar information in the past about this same area. (Ex. 3, 240: 13-15) (Emphasis added). In addition, Defendant Walker's testimony will reveal that Defendants misused Al as a source of information in both the Freeman and Torain investigations. The record demonstrates ample evidence that the individual defendants conspired to wrongfully convict Mr. Torain and the misuse of the source of information obtained in the *Freeman* case ultimately led to Mr. Torain's arrest 4 months later. These are material facts in dispute.

**VIII. The Trial**

After a 2-day bench trial, Kareem Torain was convicted of possession with the intent to deliver a controlled substance, knowing and intentional possession of a controlled substance, possession of an instrument of crime, possession of drug paraphernalia, and criminal conspiracy and was sentenced to a period of incarceration

in a state prison. On September 26, 2003, Mr. Torain was sentenced to a mandatory term of five to ten years in prison on the drug charge, a consecutive term of five to ten years for criminal conspiracy, and a consecutive term of two and one-half years for possession of an instrument of crime.

Prior to his trial, all those individuals arrested at the West Master Street properties, Darnell Delee, Kabeyn Diggs, Ronald Freeman, Arthur Tillman, Mark Pichonot, Raymond Howard, Maurice Grey, Glen Delee, Eileen Hodges and Miguel Moon's cases were either dismissed at the preliminary hearing or in the case of two of these individuals; those persons received a sentence of 3 to 6 years' incarceration.

## IX. The District Attorney's Office Vacates Kareem Torain's Conviction and Dismisses the Case

On February 28, 2014, after remaining incarcerated for over thirteen (13) years, the Philadelphia District Attorney's moved to vacate Kareem Torain's May 7, 2002 conviction and Mr. Torain was released from prison. The Philadelphia District Attorney agreed to vacate Mr. Torain's conviction as a result of Defendant Walker's arrest and Defendants Reynolds, Monaghan, Kelly, Gessner and Sinclair's creditability issues.

## X. Facts Related to *Monell* Claims

### A. The Ellen Ceisler Report

A series of police misconduct events in the late 1980s and early 1990s— known as the 39th District Scandal — led to hundreds of arrests and prosecutions based on fabricated evidence, false police testimony, and falsified probable cause affidavits. Thereafter, the District Attorney agreed to vacate hundreds of convictions, the City agreed to compensate those wrongfully accused, and a number of officers

faced federal indictments. A 1996 class action lawsuit brought by the NAACP led to a settlement agreement requiring the City to implement policy and training initiatives to ensure that police officers abide by restrictions on their investigative powers. *See NAACP et al. v. City of Phila.*, E.D. Pa. No. 96-6045. As part of the settlement agreement, the City agreed to appoint an Integrity Accountability Office ("IAO") to assess and monitor the City's compliance. *See Thomas v. City of Philadelphia, et al.*, 2019 WL 4039575 * 16 (E.D. Pa., August 23, 2019).

Ellen Green-Ceisler served as Deputy Director of the IAO for the PPD from 1997 to April 2000 before being promoted to Director which she served from April 2000 to March 2005.[8] In July, 2002, Ms. Green-Ceisler submitted a report (4th Report), titled *Enforcement of Narcotics Laws.*[9] (*Id.* ¶ 209). In drafting her report, Ms. Green-Ceisler's objective was to examine "the policies and practices of the narcotics enforcement operations of the Philadelphia Police Department to ensure that these efforts are conducted legally, ethically and within Departmental guidelines". (*Id.* ¶ 210). She began complying her information for the report when she became Director in 2000. (*Id.* ¶ 211). The following are excerpts from Ms. Ceisler's report which are relevant to matters in this case:

---

[8] The IAO was created by a settlement agreement approved by Judge Dalzell in the matter of *NAACP v. City of Philadelphia*, Civil Action No. 96-6045. The IAO was created "to ensure appropriate *external* monitoring of practices and policies of the Police Department" in order to reduce the incidence of police misconduct. (Pltf's SUMF ¶¶ 206-210).

[9] Ms. Green-Ceisler became a Philadelphia Court of Common Pleas Judge in 2008 and in 2018 became Judge in the Commonwealth Court of Pennsylvania. After stepping down as Director of the IAO and before becoming a judge, Ms. Green-Ceisler served as Plaintiff's expert witness in the case of *Brian Randall v City of Philadelphia, et al.*, C.A. # 04-3983. Ms. Green-Ceisler used the *Enforcement of Narcotics Laws* report as a basis for her opinion that some of these same police officers (Defendants Reynolds and Walker) "failed to follow established guidelines regarding the use and monitoring of confidential informants", and failed "to properly discipline" the officers. (*Id.* ¶ 209, *Expert Report of Ellen Green-Ceisler*)

Director Green-Ceisler examined the motivational and/or attitudinal factors which may contribute to officers "cutting constitutional corners" in the enforcement of narcotics laws.

(1) Philadelphia police officers are rewarded in a variety of different ways, based on an officer's "activity/arrests" statistics. For example, the number of arrests an officer makes is positively correlated with the amount of overtime pay an officer can accumulate. This approach encourages the vigorous pursuit of possible suspects for arrest and, at the same time, increases the likelihood of carelessness or the tendency to "cut corners". It is therefore important to eliminate officers' personal financial gain as an incentive to enforcing narcotics laws. (DEA agents beginning salaries are $45,000 to 46,000 plus guaranteed twenty-five percent overtime.)

Additionally, assignments in the Department, including the Narcotics Bureau, are also based in large part on an officer's "activity/arrest" statistics. However, this is a quantitative versus qualitative assessment. Thus, officers with higher rates of arrests that are problematic, weak, and ultimately thrown out in the courts, are evaluated more favorably and have a greater chance of obtaining desirable assignments than officers whose arrest rates are significantly lower, but the quality of the investigation and arrest, and the rate of conviction are more successful. Such heavy reliance on a simplistic quantitative incentive system may have the unintended effect of causing officers to become careless or prompting officers to cut corners. (Ex. 21, p. 58).

(3) The social, economic, psychological, and health issues surrounding drug trafficking and substance abuse are extraordinarily complex and cannot be resolved by law enforcement efforts alone. IAO interviews with police personnel have revealed that incessant and unrealistic political and community demands on the police to "solve" the drug problem compel officers to "do what it takes" to meet these demands and expectations — even if that requires circumventing the law or Departmental policies. (Ex. 21, p. 59).

(5) The Department's failure to consistently and effectively address identified violations of policies designed to safeguard citizen's civil rights sends the message that such misconduct is not regarded as serious and may in fact be tolerable. (Ex. 21, p. 59).

On January 14, 2006, Ms. Green-Ceisler was retained as an expert in the case

of *Brian Randall v. City of Philadelphia, et al.*, C.A. # 04-3983. (*Id.* ¶ 213). In *Randall*

she was deposed and asked, "whether the Philadelphia Police Department narcotics

units were properly utilizing confidential informants and she stated the following;

What my audit found was that policies that had been established to guard against abuses of the use of confidential informants were being violated - - well, not being violated, but that there was very little oversight and review of confidential

informants. Confidential informants, because of the fact that they are providing information of criminal activities, their - - their safety, their personal safety, could be pretty severely affected. And so they have to remain confidential.

Because of that, in litigation people aren't usually Plaintiffs' attorneys and whatever and Defense attorneys, they're not aware of who these people are. And so there have to be really rigorous safeguards to ensure that the use of these confidential - - exist and that they're being used properly because there's a tremendous amount of room for abuse. That's what happened in the 39th Police District scandal.

So what I did is I looked at the policies and guidelines to protect against abuses in the use of confidential informants, and I found a lot of problems. (Ex. 23, 25:21-24, 26:1-24, 27:1-6).

She concludes the following;

So what I did in reviewing the files of the confidential informants, I was actually given access to the confidential informant files. I was actually able to - - I was actually able to know who the confidential informants were. What I found was, for example, they were supposed to conduct quarterly reviews of the use of confidential informants. And these quarterly reviews were either not being conducted, or they were being conducted in such a shallow way that really no clear information was coming out of it. A lot of the - - some of the confidential informant files were haphazard. Some of the confidential informants had never been identified. Some of the confidential informants that were being used were not even properly registered and not in the database that was maintained to keep track of these confidential informants. Some of the confidential informants did not have signatures of commanding officers. Therefore, you couldn't - - actually whether - - you couldn't actually determine whether they had been approved by the Department.

So as a general matter, there was - - the Department was doing - - the Narcotics Bureau was doing virtually nothing in terms of monitoring the use of these confidential informants to be sure that they were being used properly or that they were actually - - you know, that they actually existed, and it was very problematic. . . .

And that's important because when they fill out their voucher forms, when they get their money, they sign for it. That's really the only truth that you have that that confidential informant was actually - - you know, had received money and was part of the process. That's the real only direct proof except for the statements of the officers.

And what I did is I compared voucher forms signed by confidential informants with the actual signature cards that were maintained in the confidential informant files to make sure that they looked the same.

I found some examples where they - - the signatures did not appear to look the same at all. (Ex. 23, 30:19-24, 31:1-24, 32:1-2, 33:1-13,16-18).

Ms. Green-Ceisler prophetically summarizes the same pattern of misconduct which occurred in this case. (*Id.* ¶¶ 217-218). Specifically, her investigation uncovered the misuse of CI's by failing to properly register them; the use of CI's who have active outstanding criminal bench warrants; CI Payment Voucher's could not be verified, and the existence of no supervisory oversight. (Ex. 21, p. XX).

Yet despite all of this information that was available to the PPD at the time of Plaintiff's arrest, the culture for corruption has never changed. (Ex. 8, pp. 41-50). (The supervisors knew about stealing among members of the NFU – it was "acceptable behavior") (Ex. 8, 159:11-24). Ms. Green-Ceisler found in her expert report in 2005 that supervisory review was wholly lacking when she found "Inadequate corruption controls, oversight, and monitoring of narcotics operations" – "During the time period relevant to this case, the PPD substantially increased its narcotics enforcement operations without correspondingly increasing appropriate and effective controls, oversight (both supervisory and independent), and monitoring mechanisms designed to detect potential abuses by officers. This is evident in the failure of the PPD or the narcotics supervisors to conduct regular and meaningful investigations into violations of Directive 7 and 15 related to Search Warrants and the use and monitoring of confidential informants"). (Ex. 22, p. 5). Of course, this expert opinion rendered in the *Randall* case post-dates Torain's arrest, but her similar findings in the *Enforcement of Narcotics Laws*, do not. Her findings and conclusions date back to 2000 and the PPD was aware of this conduct by its Narcotic Field Unit officers.

## B. Report Of Expert Joseph Pollini

On January 3, 2022, in accordance with the Court's case management order,
Plaintiff served on Defendants the report of Joseph Pollini. Mr. Pollini is a full-time
tenured faculty member, Lecturer and Deputy Chair Person in Law/Police
Science/Criminal Justice Administration of John Jay College of Criminal Justice, a
former New York City patrol officer, undercover narcotics investigator, homicide
investigator, precinct detective squad commander, commander of the Cold Case
Homicide Squad and in other capacities for the New York Police Department for over
33 years. (*Id.* ¶ 230). Mr. Pollini has testified as an expert on numerous occasions in
Federal and State courts as a police officer and has testified as an expert on police
practice and procedure in the Eastern District Federal Court, New York and New
York State Supreme Civil Court. (*Id.*)

Mr. Pollini reviewed the Complaint and depositions and accompanying
exhibits for Defendants Monaghan, Reynolds and Walker, the deposition of Ellen
Green- Ceisler, Expert Report of Ellen Green-Ceisler and *Enforcement of Narcotics
Laws* Report and *Disciplinary System* Report, as well as the Expert Report of R. Paul
McCauley.[10] (*Id.* ¶ 231). Mr. Pollini also reviewed PPD files, policies and procedures
and testimony from *U.S. v. Dennis Freeman* case, court documents in *McIntyre v.
Thomas Liciardello, et al.*, 2020 WL 605717 (Lead Docket, 13-2773) (E.D. Pa.,
February 7, 2020) and various Philadelphia Police Department documents and reports
specific to the Torain investigation, arrest and conviction. (*Id.* ¶ 232).

---

[10] Mr. McCauley submitted his expert report in the lead NFU case of *James McIntyre v. Thomas
Liciardello, et al.*, 2020 WL 605717 (Diamond, J. February 7, 2020, C.A. 13-2773).

From his review of the foregoing, Mr. Pollini offers the following opinions about Defendants' conduct:

1. The Defendants, in this case, were not properly disciplined for committing acts that violated the policies and procedures of the PPD.

2. There were inadequate corruption controls, oversight and monitoring of narcotics operations.

3. There were no routine integrity tests implemented to test the integrity of narcotic investigators. Investigators were permitted to remain in narcotics enforcement assignments for extended periods of time (more than 5 years).

4. The Defendants failed to follow established guidelines regarding the use and monitoring of confidential informants.

5. The supervisors failed to monitor the dispositions of narcotics arrests.

6. The harm suffered by Kareem Torain was the foreseeable consequence of Defendants' actions/inactions as well as the prior deficient investigations, supervision, and discipline, as discussed in this report.

7. Mr. Torain's unlawful arrest was the foreseeable consequence of the misuse of R.M. by the Defendants in providing information about illegal activity without signing him up as an informant.

8. Defendants' actions/inactions, including the misuse of the source of information in both the Mr. Torain investigation and prosecution and the Freeman investigation and prosecution was contrary to accepted police practices, and constitute a violation of accepted municipal practices and a deliberate disregard of the legal protections of suspects and citizens generally.

9. The PPD's failure to adhere to *Brady* requirements and properly supervise, monitor, and take corrective actions, including discipline, under the circumstances, were substantial factors that lead to the arrest, prosecution, and harm suffered by Mr. Torain.

10. The City's failure to have appropriate training, operational directives, remedial measures, and supervision regarding reasonable suspicion, probable cause, use of confidential informants, confidential sources and concerned citizens and search warrants represent a violation of generally accepted police and municipal practices.

11. The PPD's actions/inactions, as discussed in this report, were contrary to accepted police practice and procedures, including PPD's Directive D-9, and

reflect a deliberate indifference and disregard for the legal protections of
suspects and citizens generally.

12. The PPD's longstanding failures to reasonably direct, supervise, investigate,
discipline, and correct police misconduct were contrary to accepted police
practices and procedures and were substantial factors causing the violations
of Mr. Torain's civil rights.

13. The above-described policies, practices, and customs in the PPD relating to
fabrication, unlawful searches and seizures, misuse of informants and a
deficient disciplinary system were widespread in the 1990s and 2000s and
known to the PPD and City officials as well as the general public. The failure
of responsible officials to remedy these improper policies, practices, and
customs were contrary to generally accepted police and municipal practices
and caused the improper arrest and prosecution of Kareem Torain.

(*Id.* ¶ 233).

## C. Judge Diamond's Findings and Opinions in the Lead NFU Case of *James McIntyre v. Thomas Liciardello*

On February 7, 2020, the Honorable Paul S. Diamond presiding over pretrial

matters in 275 NFU cases that were filed against Defendants Reynolds, Walker and

other members of the NFU whom Defendants were partnered with since 1999, issued

an opinion denying Defendants' Motions for Summary Judgment. *McIntyre v*

*Liciardello*, 2020 WL 605717 (E.D. Pa., Feb. 7, 2020).[11] (Id. ¶¶ 225-227). The

Defendant City moved for dismissal on Plaintiff's *Monell* claims asserting

unconstitutional policy or custom liability and a failure to supervise and discipline its

police officers. (*Id.*). Specifically, Mr. McIntyre alleged that the City: "(1)

inadequately investigated citizen complaints against PPD Officers and,

correspondingly, failed to intervene to stop police misconduct; and (2) allowed police

---

[11] The Court denied the individual police officers' motion in its entirety; denied the City's motion in
part (Policy and Custom), and granted in part the City's motion with respect to a Failure to Train,
Supervise of Discipline claim. (*McIntyre*, 2:13-cv-02773-PD; ECF Doc. No. 215).

illegalities to persist by refusing to implement corrective policies." (ECF Doc. 215, p.

13).

This Court should adopt the following findings and conclusions of the

*McIntyre* Court:

(1) Liciardello [Reynolds and Walker's partner] was known to make improper arrangements with his "reliable sources." When an Officer uses a "reliable source" without first formally enrolling him as a criminal informant, the PPD and District Attorney's Office cannot determine whether he is "reliable": whether the source is receiving an appropriate level of compensation or leniency; and whether the source's "tips" are truthful. Regular use of such off-the-books "reliable sources" is thus contrary to PPD policy. (*Id.* at 2) (citations omitted).

(2) "Defendants were protected from IAB investigations by their superiors, and had inside sources inside IAB that divulged confidential information to them in order to stymie the investigations." Former NFU Officer Jeffrey Walker testified that information reported confidentially to an IAB investigator was leaked to the subject Officer, Liciardello. (*Id.* at 4) (citations omitted).

(3) NFU Officer Reggie Graham similarly testified about Defendants' misconduct and outsized influence, noting that his attempts to report them to the City Solicitor's Office and the PPD were rebuffed. (*Id.* at 5) (citations omitted).

(4) Jeffrey Walker, an NFU Officer who pled guilty to corruption charges, testified for the Government at Defendant Officers' criminal trial, offered deposition testimony of Defendants' wrongdoing. Walker described how he and his NFU colleagues, including Defendants, fabricated probable cause, stole drugs and money, and engaged in illicit side deals with suspects and defendants. Walker confirmed that Liciardello improperly kept informants outside the PPD's criminal informant system. (*Id.* at 6) (citations omitted).

(5) The City all but concedes that summary judgment is inappropriate. It notes that Plaintiff has marshaled enough evidence to create a factual issue in "certain circumstances," yet insists that the City's deference to the "ongoing FBI investigation" relieves it of any responsibility. I disagree. The City cites no authority (and I have found none) supporting the counterintuitive suggestion that a municipality is relieved of responsibility to prevent ongoing constitutional violations by its police because federal authorities are investigating those abuses. (*Id.* at 13) (citations omitted).

(6) To the extent the City suggests that it was unaware of NFU misconduct, the

record shows just the opposite. Indeed, as have discussed at length, the record abounds with such evidence. Liciardello was found responsible for misconduct nine times, including once for stealing money and five times for executing unlawful searches or seizures. See *Beck v. City of Pittsburgh*, 89 F.3d 966, 973 (3d Cir. 1996) (pattern of written complaints sufficient for reasonable jury to conclude policymaker knew or should have known of violations). Walker testified that it was well known within the PPD that NFU Officers, including Defendants: misused "reliable sources," reaching side deals by which they corruptly profited; falsely averred to probable cause; stole money recovered from crime scenes; and targeted suspects based on opportunity to steal. Walker further testified that an NFU Sergeant rebuffed his efforts to report misconduct. Graham testified that Defendants were known—on the street, in court, and among their fellow Officers—for corrupt and criminal practices. (*Id.* at 14) (citations omitted).

(7) There is additional evidence that the City knew of this misconduct: McCann, Douglas, and Graham testified that PPD officials, including Deputy Commissioner Blackburn, had reason strongly to suspect corruption and criminality within the NFU, yet refused to take any corrective action. Graham recounted an instance in which an NFU Sergeant ignored Graham's report that Officers had improperly and suspiciously counted cash. Commissioner Ramsey acknowledged receiving regular FBI briefings detailing NFU criminality and corruption, yet he closed the superficial IAB investigation of Officer Defendants' without taking any action. Chief Inspector Flacco, with whom McCann spoke shortly after the Williams Letter, said that "[w]hat [McCann] related to [him about NFU corruption] was nothing new." (*Id.* at 14) (citations omitted).

(8) Worse, there is evidence that Defendant Officers (with help from their supervisors) manipulated the IAB to insulate themselves from oversight. Defendants received "leaks" of confidential information, were protected by "connections," and even threatened colleagues who reported misconduct. (*Id.* at 14) (citations omitted).

(9) There is additional evidence that the City turned a blind eye to the IAB's complete ineffectiveness. For eight years before the Williams Letter, the DAO knew that the United States Attorney had stopped adopting cases involving Liciardello and other NFU Officers. Even when federal charges were anticipated, the City went no further than issuing the Levins Report, which was prepared in violation of accepted practices, and perfunctorily closed the investigation of the NFU Officers placed on a do-not-call list. The Commissioner—who inexplicably closed the IAB Investigation of NFU Supervisor McCloskey—raised no protest. (*Id.* at 14) (citations omitted).

(10) Plaintiff has produced evidence to support each element of causation. First, as

I have discussed at length, the record shows that the City's "policymakers were aware of similar unlawful conduct" as that Plaintiff alleges here. *Id.*; see also *City of Saint Louis v. Praprotnik*, 485 U.S. 112, 124-26 (1988) (plurality op.); *Estate of Roman*, 914 F.3d at 798. Second, the City took no action until the DAO finally issued the Williams Letter, thus allowing Defendant Officers' unconstitutional conduct to persist. Finally, Plaintiff offers evidence that Defendant Officers unlawfully searched and arrested him—the very wrongs that the City deficiently failed to prevent or correct. See *Bielevicz*, 915 F.3d at 851 ("[I]t is logical to assume that continued official tolerance of repeated misconduct facilitates similar unlawful actions in the future."). (*Id.* at 15).

## LEGAL STANDARD

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). A genuine issue is one in which the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). A fact is "material" only if it might affect the outcome of the suit under applicable rule of law. *Id.* When the Defendant is the moving party on claims where the Plaintiff bears the burden of proof, its summary judgment burden is "to show that the Plaintiff has failed to establish one or more essential elements of her case." *Burton v. Teleflex Inc.*, 707 F.3d 417, 425 (3d Cir. 2013).

The party moving for summary judgment may satisfy Rule 56's burden of production in either of two ways. First, the moving party may submit affirmative evidence that negates an essential element of the nonmoving party's claim. Second, the moving party may demonstrate to the Court that the nonmoving party's evidence is insufficient to establish an essential element of the nonmoving party's claim . . . "

*Celotex Corp. v. Catrett,* 477 U.S. 317, 331-332 (1986). The "reviewing court should view the facts in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor." *Burton, supra,* 707 F.3d at 425.[12]

## ARGUMENT

At issue are the Defendants' Monaghan, Kelly and Sinclair, as well as the City's arguments regarding claims against the Defendants Kelly and Sinclair that are untimely, and whether they are entitled to qualified immunity, and the City of Philadelphia's argument regarding the sufficiency of evidence of a custom or practice (or its failure to train, supervise, or control defendants) which caused Plaintiff's injuries.

### A. Claims Against All Defendants Are Not Untimely

Defendants Monaghan, Kelly and Sinclair's argument that the statute of limitations had expired when Plaintiff was granted leave to amend his complaint by the Court is fundamentally flawed and a weak attempt to re-litigate a matter that was already decided by the Court. On August 8, 2016, Plaintiff sought leave to file an Amended Complaint adding Kelly and Sinclair as Defendants in this matter. ECF Doc. No. 18. Plaintiff's motion was *unopposed* by the City, who has been

---

[12] In supporting a motion for summary judgment by merely cherry-picking evidence (without regard for genuine issues of material fact) or the conclusory declaration that there is no evidence, a defendant not only fails to meet its burden, but risks asking the court "to commit an obvious legal error" by urging the court "to grant summary judgment based on their version of the disputed facts." *Littler v. Martinez,* 2019 WL 1043256, at *3 (S.D. Ind., March 5, 2019). Such is the case here, where all Defendants have moved for summary judgment by cherry-picking evidence in their favor and disregarding evidence which establishes a genuine issue of fact, or by the unsubstantiated incantation that there is no evidence to support Plaintiff's claims. For example, Defendants Kelly and Sinclair ask the Court to grant summary judgment because the Plaintiff has adduced no evidence that the Defendant officers were personally involved in the actions that allegedly violated Mr. Torain's constitutional rights, while the Defendants wholly rely on the very documents which Plaintiff claims are fraudulent, and in several instances fail to cite to any evidence in the record.

representing these Defendants since the amendment. See ECF Doc. No. 19. Plaintiff's Amended Complaint was filed on September 27, 2016 and the Defendants answered the Amended Complaint on January 16, 2017. See ECF Doc. No. 154.[13]

Pursuant to the Federal Rules, a party may amend the party's pleading by leave of court or consent of the adverse parties. Fed.R.Civ.Proc. 15(a). Rule 15 (a) provides that "leave [of the court] shall be freely given when justice so requires." Fed.R.Civ.Proc. 15(a). The Supreme Court has cautioned that although "the grant or denial of an opportunity to amend is within the discretion of the District Court . . . outright refusal to grant the leave without any justifying reason appearing for the denial is not an exercise of discretion; it is merely an abuse of that discretion and inconsistent with the spirit of the Federal Rules." *Foman v. Davis*, 371 U.S. 178, 182 (1962). Among the grounds that could justify a denial of leave to amend are undue delay, bad faith, dilatory motive, prejudice, and futility. *Id.*

Rule 15(a) of the Federal Rules of Civil Procedure provides that "leave to amend shall be freely given when justice so requires." Fed.R.Civ.P. 15(a). However, because the Plaintiff's amendment added new parties, Rule 15(c) provides for amendment because the claims against these police officers "relates back".

Rule 15(c)(1) applies in three situations:

> (1) **When an Amendment Relates Back.** An amendment to a pleading relates back to the date of the original pleading when:
>> (A) the law the provides the applicable statute of limitations allows relation back;
>> (B) the amendment asserts a claim or defense that arose out of the conduct, transaction, or occurrence set out—or attempted to be set out—in the original pleading; or
>> (C) the amendment changes the party or the naming of the party

---

[13] This docket appears under the Lead Case Docket, *McIntyre v. Liciardello*, C.A. No. 13-2773.

against whom a claim is asserted, if Rule 15(c)(1)(B) is satisfied and if, within the period provided by Rule 4(m) for serving the summons and complaint, the party to be brought in by amendment:

    (i) received such notice of the action that it will not be prejudiced in defending on the merits; and

    (ii) knew or should have known that the action against it, but for a mistake concerning the proper party's identity.

*Fed.R.Civ.P. 15(c).*

Here, Defendants Kelly and Sinclair received notice of the institution of this action within 120 days following the filing of the lawsuit, the period provided for service of the complaint by Rule 4(m) of the Federal Rules of Civil Procedure. Since the amendment related back to the date of the filing of the original complaint, the amended complaint was treated, for statute of limitations purposes, as if it had been filed at that time. *Singletary,* 266 F.3d at 189. Notice under Rule 15(c) can be actual or constructive.

There are two possible methods of imputing notice under Rule 15(c)(3). *Singletary,* 266 F.3d at 196. The first is the "shared attorney" method, which is based on the theory that when the originally named party and the parties sought to be added are represented by the same attorney, "the attorney is likely to have communicated to the latter party that he may very well be joined in the action." *Id.* The second is the "identity of interest" method, and is related to the shared attorney method. "Identity of interest generally means that the parties are so closely related in their business operations or other activities that the institution of an action against one serves to provide notice of the litigation to the other." *Id.* at 197 (quoting 6A Charles Alan Wright et al., Federal Practice & Procedure § 1499, at 146 (2d ed.1990)). Here, both methods applied in imputing notice on the City Defendant.

a. *Shared Attorney*

In analyzing the shared attorney method of imputing notice, the Court stated that "[t]he relevant inquiry under this method is whether notice of the institution of this action can be imputed to [the defendant sought to be named] within the relevant 120 day period ... by virtue of representation [he] shared with a defendant originally named in the lawsuit." *Id.* at 196. The "fundamental issue" is whether the attorney's "later relationship with the newly named defendant gives rise to the inference that the attorney, within 120 day period, had some communication or relationship with, and thus gave notice of the action to, the newly named defendant." *Id.*

In this case, Defendants Kelly and Sinclair can be imputed to have had notice of this lawsuit through their shared counsel, City Solicitor Armando Brigandi,[14] who entered his appearance on behalf of both the City of Philadelphia, as well as Defendant Monaghan identified in the Plaintiff's initial complaint. This imputed notice through shared counsel is further bolstered by the fact that Defendant Monaghan is lead investigator, the affiant of the warrant and the officer who received the information from the confidential source. (Pltf's SUMF ¶ 19). In addition, Defendant Sinclair was a supervisor and thus responsible in supervising the arrest, execution of the search warrant and prosecution of Plaintiff. Defendant Sinclair also signed off on the property receipt. (*Id.* ¶ 67). Defendant Kelly participated in the investigation leading to the Plaintiff's arrest and prosecution. These facts give rise to the inference that the City Solicitor had some communication or relationship with these Defendants, and thus gave notice of the action to, the newly named Defendants.

---

[14] Armando Brigand was Chief Deputy City Solicitor when Plaintiff filed his Motion for Leave to Amend.

*Id.* Moreover, it has been held that notice may be imputed where shared counsel files pleadings which make factual averments that reflected matters known by the previously unnamed Defendant; counsel's representations relating to factual matters that are peculiarly within the knowledge of the unnamed party permit an inference of communications between counsel and the previously unnamed party. *See Moreno v. City of Pittsburgh*, 2013 WL 3816666 (W.D. Pa. July 22, 2013).

After the City received notice of Mr. Torain's suit, City Solicitor Brigandi entered his appearance solely on behalf of the City of Philadelphia and Defendant Monaghan. Since Defendant Sinclair was a supervisor of the originally named Defendants – Monaghan, Walker and Reynolds – it is highly probable that the City of Philadelphia would also represent the added Defendants, which in fact the City did.

b. *Identity of Interest*

Courts also will impute notice if the parties are so closely related in their business operations or other activities that filing suit against one serves to provide notice to the other of the pending litigation. However, as in *Singletary*, it was held that "absent other circumstances that permit the inference that notice was actually received, a non-management employee ... does not share a sufficient nexus of interests with his or her employer so that notice given to the employer can be imputed to the employee for Rule 15(c)(3) purposes." *Singletary*, 266 F.3d at 200.

Here, Defendants Kelly and Sinclair had sufficient identity of interests with Defendants Monaghan, Walker and Reynolds, to impute notice for Rule 15(c) purposes. In contrast to *Singletary*, Defendant Sinclair is in a supervisory position. Indeed, it is because of his position and conduct as a supervisor that Plaintiff

sought to add him as a Defendant. Moreover, Defendants Monaghan, Walker, Reynolds and Kelly are of a lower rank, Defendants Monaghan, Walker, Reynolds and Kelly and Defendant Sinclair have essentially identical interests. Courts have found adequate notice and a lack of prejudice where the newly named party shares the same attorneys as, and has an identity of interests with, the existing parties. *Smith v. City of Phila.,* 363 F.Supp.2d 795, 801 (E.D. Pa. 2005) (discussing the "identity of interests" and "shared attorney" tests).

In *Smith,* this Court determined that a civil rights Plaintiff alleging excessive force by the Philadelphia Police Department properly replaced "John Does" with the parties' real names because the newly named parties held supervisory positions in the police department, such that they had a "sufficient nexus" with the existing Defendants, and because the newly named and existing parties shared an attorney. *Id.* at 801.

Plaintiff's request for leave to file an Amended Complaint was not untimely and therefore, was not prejudicial to the Defendants. For delay, to become a legal ground for denying a motion to amend, the delay must result in prejudice to the party opposing the amendment, and it is the opposing party's burden to prove that such prejudice will occur. *Kiser v. General Elec. Corp.,* 831 F.2d 423, 427-28 (3d Cir. 1987). Moreover, prejudice must be evidenced by showing that Defendants were unfairly disadvantaged or deprived of the opportunity to present facts or evidence which it would have offered had the amendment been timely. *Dole v. Arco Chemical Co.,* 921 F.2d 484, 488 (3d. Cir. 1990).

In this case Defendants have not been unfairly disadvantaged or deprived of the opportunity to present facts or evidence which they could have offered. All the Defendant police officers were in the case from its inception. Moreover, Plaintiff has not added any new claims in the Amended Complaint and thus asserts the same claims for Fourth and Fourteenth Amendment violations. Therefore, Defendants were fully apprised of the claims that Plaintiff averred and will have every opportunity to present evidence. The Amended Complaint will not affect Defendants' right in presenting an adequate defense. Thus, the Defendants have not been prejudiced by this minor delay.

A Court may deny a motion to amend on grounds of bad faith or dilatory motive. *Foman*, 371 U.S. at 182. Amending a complaint to plead with more specificity is not an act of bad faith. On the contrary, at a minimum, the Defendants will be on notice as to basis of Plaintiff's claims. Similarly, amending a complaint to add an exhibit which is central to the claims being made by the Plaintiff is not an act of bad faith. Any delay does not prejudice Defendants and does not rise to the level of bad faith. Thus, there is no basis for the Court to deny Plaintiff's request based upon bad faith.

Lastly, a Court may deny a motion to amend on the grounds that the amendment would be futile. "Futility" challenges an amendment's legal sufficiency. In assessing futility, the court applies the same standard of legal sufficiency as it would apply under Fed.R.Civ.Proc. 12(b)(6). *In re Burlington Coat Factory Securities Litigation*, 114 F.3d 1410, 1434 (3d Cir. 1997). In deciding whether an amendment is futile, a Court must take all well pleaded facts in the complaint as true

and view them in the light most favorable to the Plaintiff. *Id.* Similarly, leave to file an amendment should be denied if "it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations." *Hishon v. King & Spalding*, 467 U.S. 69, 73 (1984) (standard for motion to dismiss).

## B. Due Process and the Individual Defendants Personal Involvement

Where a criminal Defendant "has been convicted at a trial at which the prosecution has used fabricated evidence, the Defendant has a stand-alone claim under § 1983 based on the Fourteenth Amendment if there is a reasonable likelihood that, without the use of that evidence, the Defendant would not have been convicted." *Halsey v. Pfeiffer*, 750 F.3d 273, 294 (3d Cir. 2014). The Due Process Clause of the Fourteenth Amendment prohibits the states from depriving any person of life, liberty, or property without due process of law. U.S. CONST. amend. XIV, § 1. "[A] criminal defendant has been denied due process of law if he is convicted on the basis of fabricated evidence." *Halsey*, 750 F.3d at 289-90. And "the Constitution forbids prosecutors from knowingly using perjured testimony to secure a criminal conviction." *Id.* at 295-96. This is because "[f]abricated" evidence is an affront to due process of law, and state actors seeking to frame citizens undermine fundamental fairness and are responsible for 'corruption of the truth-seeking function of the trial process.'" *Black v. Montgomery Cnty*, 835 F.3d 358, 370 (3d Cir. 2016) (quoting *United States v. Agurs*, 427 U.S. 97, 104 (1976)).

Mr. Torain contends that all the Defendants fabricated evidence in obtaining his conviction in violation of his Due Process rights under the Fourteenth Amendment. *See Halsey v. Pfeiffer*, 750 F.3d 273, 29 (3d Cir. 2014) ("[a] police

officer who fabricates evidence against a criminal defendant to obtain his conviction violates the defendant's constitutional right to due process of law."). When falsified evidence is used as a basis to initiate the prosecution of a Defendant, or is used to convict him, the Defendant has been injured regardless of whether the totality of the evidence, excluding the fabricated evidence, would have given the state actor a probable cause defense in a malicious prosecution action that a Defendant later brought against him. *Id.* at 289. Plaintiff has presented overwhelming evidence that Defendants Monaghan, Reynolds, Walker, Kelly and Sinclair conspired with Defendant Sinclair and deliberately fabricated, suppressed, and destroyed evidence from the inception of their investigation through trial of the criminal case against him.

The Third Circuit has ruled that to succeed on a fabrication of evidence claim, a Plaintiff must show: (1) persuasive evidence that the evidence in question was fabricated, *i.e.*, "persuasive evidence that the proponents of the evidence are aware that evidence is incorrect or that the evidence is offered in bad faith," and (2) that the fabricated evidence was so significant that it could have affected the outcome of the criminal case. *Black*, 835 F.3d at 372; see also *Halsey*, 750 F.3d at 295.

### 1. Mr. Torain Satisfies the Two Elements of a Fabrication of Evidence Claim

Mr. Torain has presented persuasive evidence that each Defendant personally participated in the fabrication that adversely affected the outcome of his criminal trial. See *Halsey*, 750 F.3d at 295; *Black*, 835 F.3d at 372.

### a. Defendant Walker

Defendants relied heavily upon Defendant Walker's claims of seeing a light

go on in apartment # 2 while observing Mr. Torain through the window to "perpetrate" probable cause in order to "substantiate the arrest of Mr. Torain." (Pltf's SUMF ¶¶ 62, 124, 154, 174). This false evidence was not just utilized as a basis to arrest Plaintiff, but also the false testimony made at trial to convict Mr. Torain. (*Id.* ¶¶ 156, 174). Defendant Walker now claims that this information was false, and that he contrived this information in order to link Mr. Torain to that bedroom, and conspired with Defendants Monaghan, Reynolds and Kelly to wrongfully convict Plaintiff for all the narcotics and weapons found at properties on West Master Street. (*Id.* ¶¶ 125, 155, 158, 177).

Defendant Walker also fabricated evidence when he testified that he observed Delee, Diggs and Tillman being admitted to 1628 North 55th Street by Mr. Torain, and then leaving that property a short time later looking at a bag of drugs. (*Id.* ¶¶ 124, 138, 175). He also concealed exculpatory evidence regarding the true motive for entering the apartment at 1628 North 55th Street without a warrant – the real reason was to steal. (*Id.* ¶ 66). At a minimum, Defendant Walker's declarations that he lied, misused confidential informants, secured houses without warrants, engaged in misconduct with his partners in the NFU, and that his supervisors were well aware of the stealing in the NFU squad, and violated the PPD's Policies and Procedures "thousands of times" over the period of time from 1999 until he was arrested in 2013 are credibility issues. (*Id.* ¶¶ 114, 205). The issue of credibility of all of the parties is one for the jury, thus "[c]redibility determinations ... are jury functions, not those of a judge." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250-51 (1986)).

### b. Defendant Monaghan

Defendant Monaghan, the lead investigator and affiant, was responsible to ensure that all the police documents, *i.e.*, Affidavit of Probable Cause for the search warrant, PARS Report were true and correct. (*Id.* ¶ 58). Here, according to Defendant Walker's testimony, Defendant Monaghan knew that the most material facts supporting the probable cause to arrest Mr. Torain were false. (*Id.* ¶ 155). In fact, the Defendants do not even challenge the probable cause determination, undoubtedly, because false assertions could never form the basis of probable cause. See *Franks v Delaware*, 438 U.S. 154, (1978) (A criminal Defendant has the right to challenge the truthfulness of factual statements asserted in an affidavit of probable cause in support of a search warrant application after the ex parte issuance of the warrant).

Defendant Monaghan provided false information contained in the PARS report, the Affidavit of Probable Cause for the search warrant and trial testimony that Darnell Delee was overheard yelling the name "Kareem" in order to implicate Torain in the crime, (*Id.* ¶ 120); that Delee, Diggs and Tillman were seen leaving the property looking at a bag of drugs, (*Id.* ¶ 124); that Defendant Monaghan, concealed from the police paperwork that the items listed on the property receipt as confiscated from 1628 North 55ᵗʰ Street were actually seized when they committed a warrantless search earlier that day. (*Id.* ¶¶ 129-130). In addition, Defendant Monaghan concealed that Defendant Reynolds and Walker conducted a warrantless search at 1621 North Conestoga and confiscated the Parole and Probation letter. (*Id.* ¶¶ 76-83, 133). Finally, Defendant Monaghan failed to disclose that the "confidential source", a person who provided information to the Defendants in the past was an individual who

was being used as an unregistered informant in violation of the PPD's Policies and Procedures. (*Id.* ¶¶ 117, 127)

### c. Defendant Reynolds

Defendant Reynolds was the arresting officer who had followed Kareem Torain to 61st and Nassau Street before arresting him. (*Id.* ¶ 139). According to Defendant Reynolds, Defendant Monaghan ordered Reynolds to arrest Mr. Torain because Defendant Monaghan informed Defendant Reynolds that Monaghan believed that Mr. Torain "may have re-upped one of the dealers". (*Id.* ¶ 48). Upon Torain's arrest, Defendant Reynolds confiscated 2 key rings (with a total of 8 keys) a pager, a cellphone and a letter from Parole and Probation in Mr. Torain's name. (*Id.* ¶ 52). No drugs or other contraband were confiscated. (*Id.* ¶ 54). A property receipt was generated with these items listed on it as retrieved from Mr. Torain by Defendant Reynolds. (*Id.* ¶ 52). Defendant Reynolds falsely testified that he never confiscated the letter from Parole and Probation and is clueless as to how it could be listed on the property receipt. (*Id.* ¶ 53). Carolyn Torain, Plaintiff's mother testified that this letter was confiscated by Defendant Reynolds while Defendants Reynolds and Walker later conducted a warrantless search at 1621 North Conestoga Street. (*Id.* ¶¶ 76-80, 85).

Defendant Reynolds then took the keys off of Mr. Torain and instead of logging in the items confiscated from Mr. Torain, Defendant Reynolds gave Defendant Monaghan the keys in order to illegally enter 1628 North 55th Street. (*Id.* ¶ 142). Defendant Reynolds also claims that the supervisor on the scene – either Defendant Sinclair or Sergeant Gessner gave approval as well as supervised the unlawful entry into 1628 North 55th Street. (*Id.* ¶¶ 142-143). Defendant Reynolds was

present when Defendant Monaghan went into the unit and was present and participated in the group discussion about how the officers were going to "articulate" the purpose of which was to fabricate evidence in order to conceal Mr. Torain's unlawful arrest. (*Id.* ¶ 155).

Dissatisfied with being denied access to apartment # 2 by the owner of the building, Defendant Reynolds walked down the street to Mr. Torain's house and conducted another warrantless search. (*Id.* ¶¶ 76-83). Defendant Reynolds denies that he searched 1621 North Conestoga Street, claiming that this allegation is a "lie". (*Id.* ¶ 83).

Defendant Reynolds also concealed that he had been using an unregistered informant and a source of information regarding narcotic sales in the same neighborhood as the West Master Street drug organization. (*Id.* ¶¶ 90-97). Discovery has disclosed that Defendant Reynolds gave false testimony in a criminal case directly linked to the West Master Street drug operation that was dismantled 4 months prior to Mr. Torain's arrest.[15] (*Id.* ¶ 91). Defendant Reynolds also disingenuously testified that he did not recognize the vehicle that Mr. Torain was arrested in as the

---

[15] Plaintiff recognizes that the Court has denied Plaintiff's Motion to Compel the confidential informant file of R.M. and vouchers finding that "Plaintiff fails to demonstrate that the confidential informant file or vouchers are in any way 'essential to a fair determination of [his] claims'". ECF Doc. No. 57. However, the fact that R.M. provided information in the *Torain* case, if proven, is a material factual dispute properly within the province of the jury, and particularly relevant to Defendants claims that Mr. Torain conspired with those individuals that were arrested at the West Master Street properties. Defendant Walker's deposition was taken in September 2016, long before Plaintiff discovered this information and was unable to depose him further on this issue because discovery closed. In addition, during Defendant Monaghan's deposition in January 2017, Plaintiff attempted to inquire about the source of information in this case and Defendant Monaghan refused to answer questions and the Defendants immediately moved to seal Defendant Monaghan's deposition. Defendant Monaghan's deposition is currently sealed by Order of the Court. ECF Doc. No. 156. However, Defendant Walker, who has personal knowledge of the use of R.M. in the *Torain* case, as well as in the *Freeman* case and provides sufficient evidence that creates a genuine issue of material fact and in viewing the facts in a light most favorable to the Plaintiff, these material facts are in dispute.

same vehicle – a green Bonneville, license plate number DKC 3310 being driven by an unidentified individual who got away in the prior investigation and arrests that R.M. was falsely labeled as a "concern citizen" by Defendant Reynolds in. (*Id.* ¶¶ 98-111).

### d. Defendant Kelly

Defendant Kelly claims not to remember anything about the Mr. Torain investigation and arrest. In fact, in his deposition testimony he responds that he does not "recall" his and his cohorts' actions 69 times. Unfortunately for Defendant Kelly, Defendants Monaghan and Walker offer testimony as to Defendant Kelly's role in this conspiracy to convict Mr. Torain. Defendant Kelly with his partner Defendant Monaghan that day was working the camera that videotaped the surveillance on January 3 and 4 on the 5600 block of West Master Street. (*Id.* ¶¶ 20-25). On January 4, 2001, Defendant Kelly allegedly videotaped an unknown person driving a green Bonneville approach the West Master Street properties and engage in a drug transaction with Darnell Delee. (*Id.* ¶ 28-34). Even though the videotapes were moved into evidence at trial and on appeal, the videotapes are now missing. *Id.* ¶¶ 179-186). It was also Defendant Kelly who allegedly heard Darnell Delee yell out that "Kareem had one bundle on him, that he would call and come back when the rest was ready." (*Id.* ¶¶ 36-38). Further, Defendant Kelly was present at 1628 North 55th Street during the search and was the officer who spoke with Vincent Saunders, the manager of the building. (*Id.* ¶¶ 131, 144-145). Lastly, Defendant Kelly was present when the officers fabricated the evidence about Mr. Torain's presence in apartment # 2. (*Id.* ¶¶ 155-156).

### e. Defendant Sinclair

Defendant Corporeal Sinclair was the supervising police officer during this investigation and was responsible to ensure that the investigation and prosecution were done consistent with the law. He was the supervisor who personally signed off on the fraudulent property receipt of the confiscated items taken from 1628 North 55th Street at 3:50 p.m. (*Id.* ¶ 67). There is also evidence from Defendant Monaghan that Defendant Sinclair was present at the scene of the illegal search of 1628 North 55th Street. (*Id.* ¶ 64).

With regard to Defendants personal involvement, it is well settled in the Third Circuit that personal involvement of Defendants in alleged constitutional deprivations is a requirement in a civil rights case. *Sutton v. Rasheed*, 323 F.3d 236, 249-50 (3d Cir. 2003). "[P]ersonal involvement can be shown through allegations of personal direction or of actual knowledge and acquiescence." *Rode v. Dellarciprete*, 845 F.2d 1195, 1207 (3d Cir. 1998).

Defendants argue that Plaintiff has failed to establish personal involvement of Defendants Kelly and Sinclair. (Defs. Motion for Summary Judgment, ECF Doc. No. 59 at 13). Defendants claim that although Defendant Kelly participated in the surveillance of the West Master Street properties, he was not responsible for identifying the Bonneville, and according to Defendant Walker did not participate in the discussion about falsifying the probable cause after the search of 1628 North 55th Street. As set forth more fully *supra* and *infra*, not so. Here the record supports the conclusion that <u>all</u> the Defendants agreed to include Mr. Torain in the West Master

Street narcotics operation by contriving the evidence that put Mr. Torain in apartment #2, engaged in narcotic transactions with Darnell Delee both at the West Master Street properties and 1628 North 55th Street in order to cast Plaintiff as a supplier of narcotics. (*Id.* ¶¶ 154, 158). Once Mr. Torain was accused of a crime, Defendants Monaghan, Reynolds and Walker gave false testimony to further perpetuate criminal proceedings. Defendant Monaghan, in his own testimony, could only offer the insufficient rationale that the multitude of misrepresentations, errors and omissions in the paperwork were inconsequential to probable cause and did not contribute "to his prosecution and conviction".

Further, there is evidence which bolsters these conclusions. Defendant Walker testified that, "articulation" – the fabrication of probable cause was routine for the NFU squad. See Fed.R.Evid. 404(b)(2) (prior "bad acts" admissible to show motive, intent, or plan).

These admissions by Defendants, which, together with other evidence, show that Mr. Torain has raised genuine issues of material fact regarding whether Defendants Monaghan, Reynolds, Walker, Kelly and Sinclair, jointly and individually fabricated evidence that led to Mr. Torain's wrongful conviction.

The record clearly demonstrates that Torain's conviction was based on multiple claims of fabricated evidence by the Defendants which resulted in an unfair trial and his wrongful conviction that, in turn, led to his incarceration. He supports these allegations opposing the summary judgment motions with evidence that he had no connection with the apartment at 1628 North 55th Street and no connection to the drug operation on West Master Street, and that these were the key ingredients to

securing his indictment and conviction, and that it was the reason he spent over 13 years in prison of which he served after his wrongful conviction.

### C. Qualified Immunity

"Qualified immunity shields officials from civil liability so long as their conduct does not violate clearly established . . . constitutional rights which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009). When a Defendant raises the affirmative defense of qualified immunity, he or she bears the burden of establishing its application. *Burns v. PA Dep't of Corrections*, 642 F.3d 163, 176 (3d Cir. 2011).

A Defendant who knowingly violates the law is not entitled to qualified immunity. *Malley v. Briggs*, 475 U.S. 335, 341 (1986).

To determine that the law is clearly established, it is not necessary that the exact conduct as alleged here "has previously been held unlawful so long as the 'contours of the right' are sufficiently clear such that a 'general constitutional rule already identified in the decisional law' applies with 'obvious clarity.'" *Kedra v. Schroeter*, 876 F.3d 424, 450 (3d Cir. 2017), *cert. denied*, 138 S.Ct. 1990, 201 L. Ed. 2d 249 (2018) (*quoting Anderson v. Creighton*, 483 U.S. 635, 640 (1987) and *Hope v. Pelzer*, 536 U.S. 730, 741 (2002)). "If the unlawfulness of the defendant's conduct would have been apparent to a reasonable official based on the current state of the law, it is not necessary that there be binding precedent from this circuit so advising." *Id.* (*quoting Brown v. Muhlenberg Twp.*, 269 F.3d 205, 211 n. 4 (3d Cir. 2001)). "[O]fficials can still be on notice that their conduct violates established law even in novel factual circumstances," because the relevant question is whether the state of the

law even at the time of the events gave the officer "fair warning." Id. (*citing Hope, supra*, 536 U.S. at 741).

Defendants argue that "there is nothing to suggest that any actions taken by" Defendants Kelly or Sinclair violated clearly established right when Mr. Torain was arrested. That statement is a gross overreach. Defendants, of course, do not argue they encountered a novel factual circumstance not before the subject of any court decision, such that the state of the law at the time applicable to their interaction with the Plaintiff was not clearly established. Moreover, qualified immunity is not available to those who "knowingly violate the law," which is precisely what plaintiff contends here. See *Anderson v. Creighton*, 483 U.S. 635, 638 (1987).

More importantly, there are material factual disputes about whether Defendants fabricated evidence in order to arrest and convict Plaintiff. Those disputes go to the very heart of the case, as Plaintiff alleges that he was the victim of a tainted prosecution. Defendant Walker has confirmed as much when he testified that Mr. Torain was "wrongfully convicted." (*Id.* ¶¶ 124, 159). Where there are factual disputes to be resolved regarding the facts confronting a Defendant officer in a civil rights action, qualified immunity cannot be granted at summary judgment. *See Groman v. Twp. Of Manalapan*, 47 F.3d 628, 634 (3d Cir. 1995) (observing credibility determinations cannot be resolved on summary judgment); *Bradford v. City of Seattle*, 557 F.Supp. 1189, 1201 (W.D. Wa. 2008) ("[C]redibility determinations . . . are the province of the jury, not the court.")

### D. *Monell* Claims Against the City of Philadelphia

In moving for summary judgment on the *Monell* claims, the City ignores

evidence of longstanding and widespread misconduct in the Narcotic Units and systemic deficiencies in the PPD's internal disciplinary system, all of which caused the wrongful arrest and 13-year incarceration of Kareem Torain. The City, does not take issue with the multitude of evidence of widespread misconduct in the Narcotics Units dating back to the 1980's, the egregious history of these particular NFU officers or does the City take into account the Ellen Ceisler-Green reports, her expert report of misconduct by Defendants Reynolds and Walker, Judge Diamond's preclusive decision denying summary judgment on *Monell* claims in *McIntyre v Liciardello*, 2020 WL 605717 (E.D. Pa., Feb. 7, 2020), or the Plaintiff's expert report and findings of Joseph Pollini.

The City claims that it cannot be found liable because the policy, practice or custom, or a failure to train, or a failure to discipline, was the moving force behind the constitutional violations in this case. The City argues that it indeed has policies that prohibit "blatant falsification of evidence". Parenthetically, the City alleges that there is no custom or practice that the policymaker was aware and ignored and even if the City had such a policy, practice or custom, it was not the moving force behind the Plaintiff's injury. See *Lesher v. Zimmerman*, 822 F. App'x 116, 121 (3d Cir. 2020) (quoting *Bd. of Cnty. Comm'rs v. Brown*, 520 U.S. 397, 397 (1997)). The City is wrong on the facts and the law.

In this case there are three critical areas in which the City failed to properly train and supervise: 1) the fabrication and concealment of evidence; 2) the misuse of confidential sources/informants; and 3) the intentional suppression of evidence that negated probable cause to arrest and prosecute. The combination of the IAO's and

*Enforcement of Narcotics Laws* and *Disciplinary System* reports of Ellen Ceisler-

Green, her expert report in *Brian Randall v. City of Philadelphia, et al.*, C.A. # 04-

3983, Plaintiff's expert report of Joseph Pollini and Judge Diamond's opinion in

*McIntyre v. Liciardello,* is overwhelming evidence that not only have such

unconstitutional customs or practices existed, but that the City has acquiesced to such

misconduct. Thus, the City was aware "of similar unlawful conduct in the past", it

failed "to take precautions against future violations" and "this failure, at least in part,

led to [Torain's] injury." *Bielevicz v. Dubinon*, 915 F.2d 845, 851 (3d Cir. 1990).

    A recent decision of the Third Circuit clarified the applicable legal standard

for municipal liability in § 1983 claims:

> As we recently reiterated, a § 1983 claim against a municipality may
> proceed in two ways. A plaintiff may put forth that an unconstitutional policy
> or custom of the municipality led to his or her injuries, or that they were caused
> by a failure or inadequacy by the municipality that "reflects a deliberate or
> conscious choice," The latter avenue arose in the failure-to-train context, but
> applies to other failures and inadequacies by municipalities, including those
> related to supervision and discipline of its police officers.
>     Plaintiffs that proceed under a municipal policy or custom theory must
> make showings that are not required of those who proceed under a failure or
> inadequacy theory, and vice versa. Notably, an unconstitutional municipal
> policy or custom is necessary for the former theory, but not for the latter,
> failure or inadequacy theory. This difference can be significant because a
> plaintiff presenting an unconstitutional policy must point to an official
> proclamation, policy or edict by a decisionmaker possessing final authority
> to establish municipal policy on the relevant subject. And, if alleging a custom,
> the plaintiff must evince a given course of conduct so well-settled and permanent
> as to virtually constitute law. On the other hand, one whose claim is predicated
> on a failure or inadequacy has the separate, but equally demanding requirement
> of demonstrating a failure or inadequacy amounting to deliberate indifference on
> the part of the municipality. This consists of a showing as to whether (1)
> municipal policymakers know that employees will confront a particular
> situation, (2) the situation involves a difficult choice or a history of employees
> mishandling, and (3) the wrong choice by an employee will frequently cause
> deprivation of constitutional rights.
>     Although we have acknowledged the close relationship between policy-and-
> custom claims and failure-or-inadequacy claims, the avenues remain distinct: a

plaintiff alleging that a policy or custom led to his or her injuries must be referring to an unconstitutional policy or custom, and a plaintiff alleging failure-to-supervise, train, or discipline must show that said failure amounts to deliberate indifference to the constitutional rights of those affected. That is not to say that the plaintiffs cannot be one and the same, with claims sounding in both. They can.

*Forrest v. Parry*, 930 F.3d 93, 105-106 (3d Cir. 2019) (citations omitted).

Police officers' "patterns of unconstitutional conduct in their encounters with suspects, arrestees, persons in custody and others involved in law enforcement situations, [i]f . . . sufficiently widespread . . . may assume the quality of "custom or usage." *Spell v. McDaniel*, 824 F.2d 1380, 1390 (4th Cir. 1987). Or, the City's adoption of a custom may be shown by its actual or constructive knowledge of the custom. *Silva v. Worden*, 130 F.3d 26, 31 (1st Cir. 1997) (stating custom is demonstrated by showing "practice is so well settled and widespread that the policymaking officials have either actual or constructive knowledge of it"). "Constructive knowledge may be inferred from the widespread extent of the practices, general knowledge of their existence, manifest opportunities and official duty of responsible policymakers to be informed, or combinations of these. The inculpating knowledge, whether actual or constructive, may be either that of the municipal governing body itself, or of municipal officials having final policymaker authority in municipal law enforcement matters." *Spell, supra*, 824 F.2d at 1391. This proof also satisfies the requirement that the offending custom be the proximate cause of the Plaintiff's injuries. See *Estate of Roman v. City of Newark*, 914 F.3d 789, 798 (3d Cir. 2019) (stating that proof of proximate cause of a Plaintiff's injuries can be demonstrated by showing the municipality had "knowledge of 'similar unlawful

conduct in the past, . . . failed to take precautions against future violations, and that [its] failure, at least in part, led to [his] injury." (*quoting Bielevicz*, 915 F.2d at 851).

### 1. Evidence of Unconstitutional Policies and Customs in the Philadelphia Police Department

Plaintiff's claim is rooted in the principle that where training, supervision, and discipline is necessary to avoid constitutional violations, and the municipality is deliberately indifferent to the need to do so, a cause of action is stated under § 1983. See *City of Canton v. Harris*, 489 U.S. 378, 387 (1989). In *Monell v. Department of Social Services*, 436 U.S. 658 (1978), the Supreme Court held that when a municipal policy or practice is the cause of unconstitutional actions by its employees, the municipality is liable under § 1983. To establish a *Monell* claim, it is not necessary to prove that the municipal policymakers actually knew of unconstitutional policies or practices. Rather, the acquiescence of municipal officials to unconstitutional policies and practices permits the *inference of constructive knowledge* where the practice is significant or widespread. See *Jeffes v. Barnes*, 208 F.3d 49, 64 (2d Cir. 2000); *Gentile v. Cnty. Of Suffolk*, 926 F.2d 142, 152-53 (2d Cir. 1991).

Here, there is evidence that at least since the late 1990's, when the IAO was established, the City became aware of the systemic problems within all the Narcotic Units, including the elite NFU within the PPD. (Pltf's SUMF ¶¶ 206-211). When the Director of the IAO published an investigative report exposing a broad range of unlawful practices in the Narcotic Unit, City policymakers knew about the widespread unconstitutional customs and practices in the operation of the Narcotic Units and the lack of monitoring and disciplining of PPD officers, and failed to take remedial action. (*Id.* ¶ 212). As a result of the City's deliberate indifference to known

patterns of serious misconduct, Defendants Monaghan, Reynolds, Walker, Kelly and Sinclair and many other Narcotics officers with whom they worked, continued to engage in the very same misconduct. These officers were able to do so because they knew that the Philadelphia Police Department's internal disciplinary system was dysfunctional and that they faced no adverse consequences.

The failure to provide adequate training and supervision to Narcotics officers on the proper exercise of investigative powers and in making lawful arrest is a paradigmatic example of a policy for which the City may be held liable if a constitutional violation results. *City of Canton*, 489 U.S. at 390n.10 (the absence of training or the failure to provide further training despite violations of constitutional rights by officers amounts to deliberate indifference). A municipality is liable where it fails to implement more thorough or comprehensive training in the wake of constitutional violation was a "highly predictable consequence" of an inadequate training program. *Berg v. Allegheny Cnty.*, 219 F.3d 261, 276 (3d Cir. 2000) (citing *Bd. Of Cnty. Comm'rs v. Brown*, 520 U.S. 397, 408-09 (1997)).

## IV. CONCLUSION

For the foregoing reasons, Defendants' motion should be denied.


Respectfully submitted,


/s/Michael Pileggi
MICHAEL PILEGGI, ESQUIRE
Attorney for Plaintiff, Kareem Torain