**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **KAREEM TORAIN** | : |
| **Plaintiff** | : **C.A. #14-1643** |
| **vs.** | : |
| **THE CITY OF PHILADELPHIA, et al.** | : **LEAD DOCKET NO.** |
| **Defendants** | : **13-2773** |

### PLAINTIFF'S COUNTERSTATEMENT OF
### UNDISPUTED MATERIAL FACTS

In accordance with the Court's pretrial policies and procedures, Plaintiff

Kareem Torain submits the following Counterstatement of Material Facts and

Response to Defendants' Statement of Undisputed Facts in Support of Motion for

Summary Judgment.

**I. The Arrest of Kareem Torain**

**A. Prior to the Arrest**

1. On January 4, 2001, the day of Kareem Torain's arrest, he stayed at his

house until the early afternoon eating breakfast and watching television. (Ex. 1, Dep.

of Kareem Torain, 74:18-21).

2. Shortly after 11:00 a.m., he called a friend of his – Kena Hall with a cell

phone that he had just activated that day. (Ex. 1 at 75:4-14, 78:10-19).

3. Mr. Torain intended to take Ms. Hall, who lived down the street from him,

out that evening on a date. (Ex. 1 at 79:2-10).

4. Because Mr. Torain did not own his own vehicle, he called his friend

Derrick – "D Rock", to ask if he could borrow Derrick's green Bonneville for his date

that night. (Ex. 1 at 62:5-22, 79:2-10).

5. A short time later, he left his house and walked around the corner to the next block where he met Derrick in front of a barber shop located at 55th and Lansdowne Avenue. (Ex. 1 at 65:2-3, 20-24, 66:1-15).

6. Mr. Torain got into Derrick's car and the two drove to Derrick's home at 61st and Nassau Avenue. (Ex. 1 at 88:3-4, 89:1-2).

7. At 61st and Nassau, Derrick got out of the car and went inside the apartment building. Mr. Torain then drove off in Derrick's green Bonneville. (Ex. 1 at 89:3-13).

8. Mr. Torain drove to his grandmother's house at 1655 North 55th Street, parked the car, went inside, spoke to his grandmother momentarily, hug her and left. (Ex. 1 at 93:2-9, 98:6-8, 99:10-21).

9. He then walked down the street one block to his house at 1621 North Conestoga Street and went inside. (Ex. 1 at 101:3-12).

10. When Mr. Torain got home, he called Kena Hall, who did not answer her telephone. (Ex. 1 at 105:12-19).

11. Mr. Torain then called Derrick, informed him that Ms. Hall did not answer her telephone, he was not going out with her that night and was bringing Derrick's car back. (Ex. 1 at 105:21-24, 106:1-4).

12. After a short period of time, Mr. Torain then walked back to the parked car and drove to Derrick's house on Nassau Street. (Ex. 1 at 106:5-6).

13. When he arrived at 61st and Nassau Avenue, he parked, started to get out of the car when he was arrested by Defendant Brian Reynolds and two uniformed police officers. (Ex. 1 at 121:3-24, 122:1-20).

**B. Surveillance of 5600 Block of West Master Street**

14. According to the Defendants' arrest report, in or around January, 2001, Defendant Monaghan, a member of the Narcotics Field Unit (NFU) received information from a "confidential source" regarding narcotic activity in the area of 5600 block of West Master Street, Philadelphia, Pennsylvania. (Ex. 2, PARS Report, p. 1).

15. Defendant Monaghan testified at deposition that the confidential source was "someone he knew from the neighborhood" when he worked as a police officer in the 19th District before being assigned to the NFU in the latter part of 2000. (Ex. 3, Dep. of Monaghan, 15:14-16, 30:3-4).

16. Although, he had used this confidential source in the past when he was a patrol officer in the 19th District; he just happened to run into him on that day and the source told him that drugs were being sold on the 5600 block of Master Street. (Ex. 3 at 31:1-6).

17. Defendant Monaghan also claims that about the same time, he spoke to two police officers who informed him that a property located at 5609 West Master Street was being used to package narcotics; a property located at 5607 West Master Street was being used as a stash house and sales of narcotics were being made from a front porch of a property located at 5605 West Master Street. (Ex. 3 at 32:4-23; Ex. 2, p. 2).

18. The report states that one of the police officers identified two black males named "Al" and "Pud" as individuals that were involved in the narcotic activity. (Ex. 3 at 32:14-17; Ex. 2, p. 2)[1].

19. Defendant Monaghan became the lead investigator and was responsible for compiling and maintaining all the police paperwork associated with the investigation including the PAR reports, affidavits and search warrants. (Ex. 3 at 28:15-24).

20. On January 2, 2001, at 3:45 p.m., Defendant Monaghan and his partner Defendant Sean Kelly set up surveillance while sitting in a van in the area of 5600 block of West Master Street. (Ex. 2, p. 2).

21. On that day, the Defendant officers observed two individuals – Anthony Hodges and Darnell Delee engage in numerous narcotic transactions with both males and females from the porch area of the house at 5605 West Master Street. (Ex. 2, p. 2; Ex. 3 at 53:19-24, 54:1).

22. No buyers or sellers were followed or arrested that day. (Ex. 3, 78:14-20; Ex. 4, Dep. of Brian Reynolds, 64:12-14, 16-24, 65:1-2).

23. Defendants did not see Mr. Torain on that day. (Ex. 2, p. 2).

24. The next day, January 3, 2001, Defendants Monaghan and Kelly again set up surveillance on that same block from 11:00 a.m. to 4:00 p.m. (Ex. 2, p. 2; Ex. 3 at 58:6-9, 60:11-12). On that day, the Defendants observed Darnell Delee and two other individuals, Miguel Moon and Kabeyn Diggs engage in numerous narcotic transactions on the street. (Ex. 2, p. 2; Ex. 3 at 58:20-24, 59:1-3).

---

[1] "Al" or "Pud" were never identified or arrested. (Ex. 3 at 35:8-18).

25. The Defendants videotaped the majority of the observations that day of surveillance. (Ex. 3 at 44:7-14, 58:14-16, 60:5-9).

26. At 3:58 p.m., Police Officer Bradford Mitchell was sent in to make a controlled narcotics buy and was videotaped buying crack cocaine from Darnell Delee. (Ex. 2, p. 2; Ex. 3 at 59:14-24, 60:1-8).

27. Defendants admit that they never saw Mr. Torain on that day nor were they told by anyone that Mr. Torain was involved in this drug organization. (Ex. 3 at 60:24, 61:1-8). No buyers or sellers were arrested that day. *Id.*

28. On January 4, 2001, the last day of surveillance and the day of Mr. Torain's arrest, at about 1:35 p.m. according to Defendant Monaghan, a green Bonneville, with Pennsylvania license plate number DKC 3310 (registered to Carolyn Gillis) was videotaped by Defendants traveling northbound to the intersection of 56th and Master Streets. (Ex. 3 at 66:10-22).

29. Monaghan testified at Mr. Torain's criminal trial that Defendants were unable to hear anything in the surveillance van nor is there any audio on the videotape. (Ex. 5, Trial Transcript, May 6, 2002, 29:24-25, 30:2-8).

30. The Investigation Report states that Defendant Monaghan then observed Darnell Delee make a hand gesture to the green Bonneville and yelled "Yo" at which time the Bonneville pulled over on the 1400 block of Ithan Street. (Ex. 2; Ex. 3, 71:1-12).

31. Defendant Monaghan claims in that same Investigation Report that Monaghan saw Darnell Delee exit the vehicle after 2 to 3 minutes and run back to the corner of 56th and Master. (Ex. 2, p. 2).

32. Defendant Monaghan later claims at deposition that he saw Darnell Delee take small objects out of his pocket and hand the objects to males and females in exchange for U.S. Currency. (Ex. 6, Preliminary Hearing Transcript, October 23, 2001, 16:14-17).

33. But then Defendant Monaghan contradicts himself when he later testified at deposition that it was actually Defendant Jeffrey Walker, and not Defendant Monaghan, who observed Darnell Delee emerge from the green Bonneville taking the small objects from his pocket. (Ex. 3 at 70:4-8, 77:7-9).

34. Although Defendant Monaghan "couldn't tell who the driver was", he radioed Defendant Walker to let him know "what was going on". Defendant Walker then followed the green Bonneville out of the area. (Ex. 3 at 31:16-20); Ex. 6 at 15:23-25, 16:2).

35. Over the course of three days of heavy drugs sales, no buyers or sellers were arrested. Despite this fact, according to Defendant Monaghan, he wanted Defendant Walker to follow the green Bonneville because police "were getting ready to do [our] takedowns and [he] wanted to make sure [they] had everyone who [they] wanted to get ID'd or to stop". (Ex. 3 at 77:20-22).

36. At Mr. Torain's preliminary hearing, Defendant Monaghan falsely testified that after Darnell Delee got out of the car, he was heard by Defendant Monaghan to yell "Kareem had one bundle on him, that he would call and come back when the rest was ready." (Ex. 6 at 17:17-19).

37. Yet at trial, Defendant Monaghan again changed his testimony by eliminating the name "Kareem" from Darnell Delee's statement and instead testified

that Darnell Delee hollered "*he* only had a bundle, he's going to call me when the rest is done". (Ex. 5 at 32:14-20).

38. Then again at deposition, Defendant Monaghan changed the context of the statement yet again when he admitted that it was actually his partner Defendant Kelly who heard the statement. ("Officer Kelly overheard it, who later relayed it to me, that Delee just mentioned to somebody that he - - the person in - - Kareem in the Bonneville or Kareem only had one bundle and he was going to get the rest and he was going to call the pay phone."). (Ex. 3 at 81:13-23).

39. The Investigation Report then states that Defendant Walker followed the green Bonneville to 1621 North Conestoga Street where Mr. Torain exited the vehicle and entered the premises. (Ex. 2, p. 2).

40. Defendant Walker, in turn testified at deposition that he did not recall that observation. (Ex. 7, Dep. of Jeffrey Walker, 99:23-24, 100:1-4).

41. After about 20 minutes, Defendant Reynolds then observed Mr. Torain exit the Conestoga Street residence and drive one block to the corner of 55th and Hunter Street, where Defendant Reynolds claims he saw Mr. Torain enter 1628 North 55th Street with a key. (Ex. 2, pp. 2-3; Ex. 4 at 175:5-12).

42. The 1628 North 55th Street building consists of several apartments. (Ex. 3 at 99:6-18).

43. Defendants Monaghan, Reynolds and Walker all agree that at this juncture, Torain was not observed having engaged in any criminal activity giving rise to the probable cause to arrest him. (Ex. 3 at 69:9-10; Ex. 4 at 111:22-24, 112:1-10); Ex. 7 at 121:17-24, 122:1-11, 129:8-12).

44. The Investigation Report states that Defendant Monaghan then informed Defendant Walker that the three individuals that Monaghan and Defendant Kelly had observed engaged in multiple drug transactions – Mr. Delee, Mr. Diggs and Arthur Tillman were on their way to the 55th Street and to "keep an eye out in case the vehicle pulled up to the location" at 1658 North 55th Street. (Ex. 2, p. 3; Ex. 3 at 80:23-24, 81:1).

45. Defendant Walker followed their car to 1628 North 55th Street and saw them enter the property. (Ex. 2, p. 3).

46. Twenty minutes later Darnell Delee and company exit 1628 North 55th Street and drive from the scene, followed by Defendant Reynolds. (Ex. 2, p. 3).

47. According to Defendant Monaghan, he was notified by Defendant Walker that Darnell Delee was seen placing a clear baggie inside his jacket pocket upon leaving 1628 North 55th Street. (Ex. 3 at 43:10-15).

48. Defendant Monaghan informed Defendant Reynolds to arrest Mr. Torain because he believed Torain "may have just re-upped one of the dealers [Delee]". (Ex. 3 at 65:6-8).

### C. Kareem Torain Is Arrested by Officer Reynolds

49. Defendant Reynolds testified that at 2:58 p.m. Mr. Torain left 1628 N. 55th Street and who he followed in his vehicle. (Ex. 2, p. 3; Ex. 4 at 70:12-14).

50. Defendant Monaghan ordered Defendant Reynolds to arrest Mr. Torain. (Ex. 4 at 67:14-18).

51. After several blocks, Kareem Torain was arrested by Defendant Reynolds when he parked the car in front of Derrick's house at 61st and Nassau Avenue. (Ex. 2, p. 3).

52. Defendant Reynolds testified at deposition that at the scene of the arrest, Defendant Reynolds confiscated from Mr. Torain a pager, a Nextel cell phone, a Cancer key ring containing 5 keys; a black key ring containing 3 keys and $250.00 dollars. (Ex. 4 at 73:22-24, 74:1-2; Ex. 2, p. 2). The property receipt from the arrest containing the items confiscated from Mr. Torain that was generated, however, reflects that in addition to the above items, Defendant Reynolds also confiscated a letter from the Commonwealth of Pennsylvania Board of Probation and Parole in Torain's name. Ex. 8, Property Receipt # 2308207, "Item # 1-(1) KEY RING CONT. (3) SILVER KEYS-(1) KEY WORKED THE DOOR TO 1628 S. 55TH ST. APT. "2".; ITEM #2-(1) CANCER KEY RING CONT. (5) KEYS; ITEM #3- PHILIPS PAGE MART PAGER; ITEM #4- MOTOROLA NEXTEL CELL PHONE; **ITEM #5- COMMONWEALTH OF PA BOARD OF PROBATIONS & PAROLE IN THE NAME OF DEF**.") (Emphasis Added).

53. At deposition, Defendant Reynolds is adamant that he never confiscated the letter from Probation and Parole and has no answer as to how it was listed as an item confiscated on the property receipt. (Ex. 4 at 77:24, 78:1-24, 79:1, 80:16-24, 81:1; Ex. 8). Defendant Reynolds confirms that no narcotics or contraband were confiscated from Mr. Torain. (Ex. 4 at 74:11-19).

54. Nevertheless, even though Mr. Torain was never observed to have engaged in any criminal activity and did not possess any contraband when arrested,

he was transported from 61st and Nassau to 55th and Pine, processed and placed in a cell. (Ex. 4 at 83: 20-23).

55. Defendant Reynolds claims that he turned over all of the items confiscated from Mr. Torain to Defendant Monaghan. (Ex. 4 at 85:18-20).

**II. Searches and Arrests at 5609, 5607 and 5605 West Master Street**

56. On the same day of Kareem Torain's arrest at 3:30 p.m., police raided the three properties on West Master Street that had been under surveillance for 3 days and arrested the following individuals: Darnell Delee, Anthony Hodges, Kabeyn Diggs, Ronald Freeman, Arthur Tillman, Mark Pichonot, Raymond Howard, Maurice Grey, Glen Delee, Eileen Hodges and Miguel Moon. (Ex. 2, p. 1).

57. Confiscated from the Master Street houses and the above individuals was a large amount of crack cocaine, marijuana, Xanax pills, assault rifles, handguns, ammunition, a bullet-proof vest and U.S. currency. (Ex. 2, p. 5).

58. As lead investigator, Defendant Monaghan was at West Master Street to coordinate the executions of the warrants, confiscation of the evidence and the arrests. (Ex. 3 at 139:4-21).

59. During the activities surrounding the searches and arrests on Master Street, Defendants Monaghan and Kelly proceeded to 1628 North Master Street to meet Defendants Reynolds, Walker and other unidentified police officers. (Ex. 3 at 140:23-24, 141:1-3, 143:19-24,144: 1-8).

60. Defendant Monaghan believed that it was important for him to go to 1628 North 55th Street during this massive roundup on West Master Street to "secure the

property", and to "get an observation" after police secured it so that he could "go back and do an affidavit for a search warrant". (Ex. 3 at 143:24, 144:1-8, 145:20-23).

61. While enroute to North 55th Street, Defendant Monaghan claims that Defendant Walker "came over the radio and said - - he said he was on foot and he saw a light come on in an apartment". (Ex. 3 at 146:17-19).

62. Defendant Walker later testified at the preliminary hearing that he conducted a foot surveillance and saw a light go on in apartment 2 at the North 55th Street rooming house and saw Mr. Torain through the window. (Ex. 6, 61:3-7).

## III. Search of 1628 North 55th Street

### A. Defendants First Conduct a Warrantless Search

63. When Defendants Monaghan and Kelly arrived at 1628 North 55th Street, they met Defendants Reynolds and Walker (who was already in the hallway of the property) and Defendant Reynolds gave Defendant Monaghan a key that was confiscated from Mr. Torain at the time of his arrest that fit the lock of the front door of 1628 North 55th Street. (Ex. 3 at 84:20-24, 129:3-16).

64. A supervisor, either Defendant Sinclair or Sergeant Gessner (deceased) was also present. (Ex. 3 at 127:9-14).

65. According to Defendant Reynolds, the Defendants' intention was to enter the premises only to secure it so evidence would not be destroyed. (Ex. 4 at 86:23-24, 87:1-10).

66. However, Defendant Walker at deposition gave a more nefarious reason; the Defendants went there to "steal". (Ex. 7 at 105:10-24).

67. At 3:50 p.m. all the Defendants were present when Defendants Monaghan and Kelly entered the premises *without a warrant* and seized: "(2) Amber pill bottles w/ white caps and (1) Sentry 1150 safe". (Ex. 9, Property Receipt # 22308224).

### B. Defendant Monaghan Obtains a Search Warrant 9 1/2 Hours Later

68. On the basis of Defendant Reynolds' false testimony that he saw Mr. Torain enter 1628 N. 55th Street with a key; Defendants Reynolds and/or Walker's false information that three individuals were seen leaving the rooming house examining a "golf-ball" sized bag of drugs and Defendant Walker's false testimony that he saw a light go on in the bedroom, a search warrant was issued for the next morning. (Ex. 10, Search Warrant and Affidavit No. 99028).

69. Defendant Monaghan requested a "nighttime search" to be approved based on "information received, surveillance, and P/O Mitchell's purchase" (on West Master Street). (Ex. 10).

70. The search warrant is recorded as being executed at 1:00 a.m. on January 5, 2000 and according to Defendant Monaghan and his supervisor, Defendant Sinclair, a safe was recovered yielding 17 grams of crack cocaine and 2 amber plastic pill bottles. (Ex. 10).

71. The property receipt reflecting what was confiscated from that room, however, indicates that the seizure occurred the day before at 3:50 p.m. (While the Defendants entered with a key). Moreover, the property receipt reflects that only a safe and pill bottles were confiscated and not the 17 grams of crack cocaine that the warrant attested to by Defendant Monaghan as confiscated. (Ex. 10).

72. During the execution of the search of 1628 North 55th Street, Defendant Monaghan fails to recall what other officers assisted in the search, nor does the search warrant reflect that any police officers assisted him in the 1:00 a.m. search. (No badge numbers of officers present appear on the warrant). (Ex. 10; Ex. 3 at 194:1-18).

73. Defendant Monaghan has no answer on this point. He claims that the crack cocaine was found in the safe that was confiscated from the 1:00 a.m. search, acknowledges that none of the keys confiscated from Mr. Torain fit the safe and does not know how the safe was opened. (Ex. 3 at 197:6; Ex. 11, Trial Transcript, May 7, 2002, 40:14-24; Ex. 3 at 187:9-11).

74. In fact, Defendant Monaghan never saw drugs taken out of the safe, and instead was informed by some unidentified officer that drugs were removed from the safe. (Ex. 3 at 197:6-24, 198:1-3).

75. There was no packaging material, scales or paraphernalia found in the room that would otherwise indicate the distribution of drugs from that room. (Ex. 11 at 42:7-11).

**IV. Warrantless Search of 1621 North Conestoga Street**

76. After Mr. Torain was arrested and in custody at 55th and Pine and following the meeting with Defendants Monaghan and Kelly at 1628 North 55th Street, Defendants Reynolds and Walker proceeded over to Mr. Torain's home at 1621 North Conestoga and conducted another warrantless search. (Ex. 12, Dep. of Carolyn Torain, 45:23-24, 46:1-4). The Defendants simply walked in the house while Mr. Torain's mother Carolyn Torain and his sister Tamika were cooking in the kitchen. *Id.*

77. Defendant Reynolds searched the entire house. (Ex. 12 at 53:5-24, 54:1-11).

78. When he went into the middle bedroom, Kareem's bedroom, Defendant Reynolds saw an ankle monitor box.[2] (Ex. 12 at 54:3-22).

79. Defendant Reynolds then informed Carolyn Torain that her son was going back to jail. (Ex. 12 at 51:24, 52:1-3, 21-22).

80. During the search of Kareem Torain's room, Defendant Reynolds opened a dresser drawer and confiscated a letter from Pennsylvania Board of Probation and Parole. (Ex. 14, Letter from Executive Department – Division of Parole - Certificate of Release to Parole Supervision; Ex. 12 at 45:18-24, 46:1-4, 51:24, 53:6-22, 54:3-22, 55:5-23).

81. This is the same letter that is listed on the Property Receipt #2308207 generated for Mr. Torain's arrest and the same letter that Defendant Reynolds claims he never confiscated from Mr. Torain at the time of his arrest. (Ex. 8)

82. After this, Reynolds was talking to someone on the telephone and then Defendants Reynolds and Walker quickly left the house. (Ex. 15, Affidavit of Carolyn Torain ¶ 15; Ex. 12 at 56:23 -24, 57:1).

83. Although Defendant Reynolds cannot account for the fact that the Probation and Parole letter is listed on Property Receipt # 2308207 (Ex. 8) and is dated January 4, 2001 with the time of 3:50 p.m. and despite testimony that he actually took the letter from Mr. Torain's room, he insists that the accusation that he was in Mr. Torain's home searching after the arrest, is a "lie". (Ex. 4 at 220-224).

---

[2] Kareem Torain had just been released from prison on December 12, 2000, was on parole and was required to wear an ankle monitor. (Ex. 1, 48:15-19); see also (Ex. 13 Criminal Extract).

## V. The Relationship of the Kareem Torain's Arrest and Prosecution to the Arrest and Prosecution of Dennis Freeman

84. It has been revealed that the investigation conducted by the Defendants in this case (*Torain* case) and the circumstances which ultimately led to plaintiff's arrest was the continuation of a prior investigation, arrest and prosecution of Dennis Freeman. *See* (*U.S. v Dennis Freeman*, 2-00-cr-00692-001, Honorable Robert F. Kelly) (*Freeman* case).

### A. Defendant Walker's Testimony Relating to the "Concerned Citizen"

85. On August 30, 2000, Dennis Freeman and several other individuals were arrested and prosecuted after a "concerned citizen" provided information to Defendant Reynolds that Freeman and others were involved in narcotic activity on the highway of 5500 Lansdowne Avenue. (Ex. 16, Dennis Freeman Investigation Report).

86. Defendant Reynolds was the affiant on the *Freeman* case. He was also the surveilling officer. (Ex. 16, p. 1).

87. Defendants Walker and Kelly were involved as well in the arrest and prosecution of Mr. Freeman. (Ex. 16).

88. The Freeman investigation was initiated by the Defendants after a "concerned citizen" informed Defendant Reynolds of heavy drug sales on the highway of 5500 Lansdowne Avenue. (Ex. 16).[3]

89. Seventeen years later and during the pendency of the *Torain* litigation, Defendant Walker identified this "concerned citizen" as an individual named "Al".[4]

---

[3] 5500 Lansdowne Avenue is one block from the site of the arrests on 5500 block of Master Street in the *Torain* case.

90. Defendants Walker, Reynolds, Kelly and others in the Narcotic Field Unit had been using Al as an unregistered informant and a source of information regarding narcotic sales in that and other neighborhoods many times previous to and after Mr. Torain's arrest. (Ex. 17, Affidavit of Jeffrey Walker, ¶ 15).

91. In relation to the *Freeman* case, Defendant Walker attests in his affidavit that his longtime partner Defendant Reynolds gave "false testimony" in the Freeman case about Al, who they had "used several times prior to the Freeman investigation as an unregistered informant". Ex. 17, ¶ 14).

92. Defendant Walker further attests that "Al assisted us in supplying information in order to set up drug dealers for arrest so that Al could take over that particular dealer's business". (Ex. 17, ¶ 15).

93. Further, Defendant Walker also states that the Defendants "tipped Al off about other law enforcement investigations" that Al was a target of. (Ex. 17, ¶ 15).

94. Moreover, Al had a "criminal history of drug dealing, robbing drug dealers, as well as being involved in shootouts with other drug dealers". (Ex. 17, ¶ 16).

95. Defendant Walker concludes that using Al as an "unregistered informant" violated the Philadelphia Police Department Policies and Procedures relating to informants. (Ex. 17, ¶ 18).

96. Lastly, Defendant Walker attests that Defendant Reynolds' use of Al in the Freeman investigation was to "make his information more reliable or credible and to appear that he was someone living in the neighborhood who was concerned about stopping drug activity". (Ex. 17, ¶ 17).

---

[4] Discovery has disclosed that "Al" is Robert Morris. Mr. Morris is now deceased.

97. Defendant Walker was aware that during the pendency of the Freeman prosecution in federal court for narcotic violations, Defendant Reynolds registered Al as a confidential informant in order to defray any inquiry into the use of Al as a source of information and to conceal that Al was being used in violation of the Philadelphia Police Department Policies and Procedures. (Ex. 17, ¶¶ 18, 25-27).

### B. Defendant Reynolds' Testimony Relating to the "Concerned Citizen"

98. Defendant Reynolds recalls the Dennis Freeman arrest and prosecution. (Ex. 4 at 119:3-21, 23-24, 120:1).

99. Defendant Reynolds was the Affiant, the assigned investigator, as well as the surveilling officer and had used Al while designating Al as a "concerned citizen". (Ex. 4 at 121:12-14, 122:23-24, 123:7-9, 163:9-13).

100. He had used Al often in the past even though he knew Al had a criminal history. (Ex. 4 at 124:6-8, 124:16-18).

101. Defendant Reynolds believes that Al is now deceased and heard that Al hung himself in jail. (Ex. 4 at 123:11-12, 142:10-11).

102. Finally, he does not recall whether Al was ever signed up as a confidential informant during the pendency of the criminal trial, however, he later admits at his second deposition[5] that he read some notes that suggested that Al "went from the concerned citizen to an informant" during the trial. (Ex. 4 at 125:14-24, 126:1-9, 142:22-24, 143:1, 144:6-15, 150:11-19).

103. Defendant Reynolds states that once Al was signed up as a confidential

---

[5] Reynolds abruptly walked out of the first deposition when he was confronted with the Affidavit of Jeffrey Walker. The second deposition was continued where Reynolds' memory, in part, seemed to return.

informant, forms would have to be filled out, a records check would have to be completed and then all the information would be turned over to the Integrity Control Unit Office (ICU), and in turn, ICU would issue that individual a confidential informant number. (Ex. 4 at 152:18-24).

104. Defendant Reynolds knew Al had a criminal record, but never did a criminal records check. (Ex. 4 at 157:6-15).[6] Reynolds does not recall what Al's real name is or his confidential informant number. (Ex. 4, 186: 8-16).

### C. Defendant Reynolds' Testimony Concerning the Green Pontiac Bonneville

105. Defendant Reynolds also recalls testifying at Dennis Freeman's trial, including pretrial matters. (Ex. 4 at 121: 21-24).

106. He recalls testifying that on August 31, 2000, at approximately 3:45 p.m., he observed "an unknown black male" exit a location he had under surveillance, get into a "green Pontiac Bonneville" license plate number "DCK-3310" and leave the area. (Ex. 19, Pretrial Motions Hearing, *U.S. v Dennis Freeman*, 2-00-cr-00692-001, 13: 15-17; Ex. 16, p. 2).

107. At 3:55 p.m. Defendant Reynolds observed the "same green Pontiac Bonneville" return back to the location and pick up Mr. Freeman and drive away. (Ex. 19 at 13:18-25; Ex. 16, p. 2).

---

[6] It turns out that Al was arrested in 1997 and charged with Possession with Intent to Deliver and he was also charged in 1999 for Failure to Appear in court. A bench warrant was issued in that case and was pending at the time of the *Freeman* and *Torain* prosecutions. *See* (Ex. 18, Letter to Anne Taylor, dated November 1, 2021). He was also arrested again in 2001, charged with Simple Possession of narcotics, and Theft by Unlawful Taking. See *MC-51-CR-0461701-2001* and *MC-51-CR-0461711-2001*.

108. At 4:45 p.m. Defendant Reynolds observed an unknown "B/M #5 exit 5412 Jefferson St." and leave the area. (Ex. 4 at 168:18-24, 169:1-18; Ex. 16, p.2).

109. Black male #5 who was driving the green Bonneville was never identified in the Freeman case and was the only individual who was not apprehended. (Ex. 4 at 169:23-24, 170:1-5).

110. The green Bonneville was never seen again, *until* Defendant Reynolds observed that same green Bonneville, license plate number "DCK-3310" four months later when he arrested Mr. Torain. (Ex. 4 at 172:2-24).

111. At deposition Defendant Reynolds falsely testified that he does not recall that the green Bonneville that he arrested Mr. Torain driving was the same vehicle being operated by unknown black male #5 in the *Freeman* case. (Ex. 4 at 180: 24, 181:1-18).

**VI. Defendant Walker's Testimony**

112. Starting on September 15, 2016, followed by a total of four additional days ending on October 13, 2016, Defendant Walker testified at deposition that he was assigned to the NFU in 1999 until his arrest in 2013. (Ex. 7 at 20:3-5, 24:24, 25: 1-3).

113. He began working with Defendant Reynolds in the NFU in 1999. (Ex. 7 at 21:18).

114. Defendant Walker described how he and his colleagues, including the Defendants in this matter, fabricated probable cause, stole drugs and money, committed perjury, beat people to extract information, engaged in side deals with suspects and defendants, conducted searches absent search warrants, misused

confidential sources and allowed confidential informants to commit criminal acts, oftentimes participating in these illegal acts with Defendant Reynolds. (Ex. 7 at 43: 24-44:7, 45-51, 53, 63, 81, 86, 88-90:7-15, 92-93, 121-124, 142:1-24, 167, 199-201, 204 234, 288, 704:12-705:12, 715:17-716:24, 756:4-763:14).

115. These acts were done by Defendants Reynolds and Walker since they began working together in 1999. They were partners even before they transferred into the NFU and were known on the street as "Batman and Robin". (Ex. 7 at 202:13-24, 203:1-4).

116. Defendant Walker gives a reason for his willingness to speak out about corruption in the police department following his own arrest and conviction for corrupt practices. He provides that his continued cooperation is in accordance with the terms of his 5K1.1 agreement and his desire to "continue to tell the truth, the full truth". (Ex. 17, ¶ 7; Ex. 7 at 67:8-9).

117. On May, 15, 2017, Defendant Walker attested to following facts specific to Dennis Freeman's arrest, prosecution and conviction:

> (1) that he has personal knowledge of the details regarding Mr. Freeman's arrest and prosecution and was personally involved in the investigation of Dennis Freeman and testified on behalf of the prosecution in convicting Mr. Freeman, (Ex. 17, ¶ 11);
> (2) that Brian Reynolds lied about the status of the person giving the information initially, *e.g.*, that this person was a "concerned citizen", when this individual was actually acting as an unregistered informant in violation of the laws of the Commonwealth, as well as the Philadelphia Police Department's policies and procedures, (Ex. 17, ¶¶ 14-18);
> (3) that the "concerned citizen" had actually committed robberies, was a known drug dealer and had been involved in shootouts with other drug dealers, (Ex. 17, ¶¶ 15-16);
> (4) that Reynolds lied about the surveillances and Mr. Freeman's involvement in criminal activity, (Ex. 17, ¶ 25);

(5) that there was no probable cause to search [Freeman's] home, but rather, the search was based solely on "articulation" [fabrication], (Ex. 17, ¶ 25); and that neither Officers Reynolds nor Walker independently corroborated the information that Mr. Freeman was engaged in criminal activity given to Reynolds by the "concerned citizen" (Ex. 17, ¶ 25).

## VII. The Material Facts of the Conspiracy to Unlawfully Arrest and Prosecute Mr. Torain

### A. Defendant Monaghan Prepared an Affidavit of Probable Cause and Submitted the Affidavit to a Magistrate on January 5, 2001

118. On January 5, 2001, while Mr. Torain had been in police custody for approximately 8 hours, Defendant Monaghan submitted a warrant and an affidavit of probable cause for the search of Apartment #2 of the rooming house located at 1628 North 55th Street to a bail commissioner ("issuing authority") and did not include any exculpatory information in the affidavit of probable cause, but instead Defendant Monaghan put enough inculpatory information in the affidavit to convince the magistrate to issue the warrant. (Ex. 10).

119. The affidavit of probable cause that Defendant Monaghan prepared and submitted to the issuing authority on January 5, 2001 and other police documents submitted as a result of Mr. Torain's arrest cited to the false information provided by Defendants Monaghan, Walker, Reynolds, Kelly and Sinclair in which the Defendants claim that Mr. Torain was observed engaging in narcotic activity at the site of the police surveillance at the 5600 Block of West Master Street. (Ex. 10; Ex. 11 at 31: 11-14; Ex. 3, 71:1-12).

120. The affidavit of probable cause that Defendant Monaghan prepared and submitted to the issuing authority on January 5, 2001 and other police documents submitted as a result of Mr. Torain's arrest cited to the false information provided by

Defendants Monaghan, Walker, Reynolds, Kelly and Sinclair in which the
Defendants claim that Defendant Monaghan testified that he overheard Darnell Delee
call out to Kabeyn Diggs that "Kareem" was going to retrieve more drugs and would
return. (Ex. 10).

121. The affidavit of probable cause that Defendant Monaghan prepared and
submitted to the issuing authority on January 5, 2001 and other police documents
submitted as a result of Mr. Torain's arrest cited to the false information provided by
Defendants Monaghan, Walker, Reynolds, Kelly and Sinclair in which the
Defendants claim that the green Bonneville was followed to Mr. Torain's house at
1621 North Conestoga and later to 1628 North 55th Street; (Ex. 10; Ex. 2).

122. The affidavit of probable cause that Defendant Monaghan prepared and
submitted to the issuing authority on January 5, 2001 and other police documents
submitted as a result of Mr. Torain's arrest cited to the false information provided by
Defendants Monaghan, Walker, Reynolds, Kelly and Sinclair in which the
Defendants claim that Mr. Torain was observed entering 1628 North 55th Street with
a key that fit both the outer door and the door to apartment #2. (Ex. 10; Ex. 3 at
84:20-24, 129:3-16).

123. The affidavit of probable cause that Defendant Monaghan prepared and
submitted to the issuing authority on January 5, 2001 and other police documents
submitted as a result of Mr. Torain's arrest cited to the false information provided by
Defendants Monaghan, Walker, Reynolds, Kelly and Sinclair in which the
Defendants claim that Mr. Torain was seen using a key to gain entrance to the 55th
Street rooming house followed by Darnell Delee, Kabeyn Diggs and Arthur Tillman

who are also observed by Defendant Reynolds being admitted to that property by Mr. Torain; (Ex. 10; Ex. 2).

124. The affidavit of probable cause that Defendant Monaghan prepared and submitted to the issuing authority on January 5, 2001 and other police documents submitted as a result of Mr. Torain's arrest cited to the false information provided by Defendants Monaghan, Walker, Reynolds, Kelly and Sinclair in which the Defendants claim that Defendant Walker lied about seeing a light go on in apartment #2. (Ex. 7 at 121:17-24, 122:1-24, 123:1-24, 124:1-5); (Defendant Walker testified that "Monaghan needed me to say he seen a light come on, because that ties a knot from the street to the room. Also I had to articulate [fabricate] the drug activity coming from the house with the bundle. A golf ball size object relates to drug activity, that's another knot, males coming out of the house that were seen prior doing some type of activity while I was in observation of that, these two main things they needed for me to do to actually obtain the search warrant for the location after they had gone in there". Moreover, Defendant Walker stated that it was his role in this conspiracy, to "perpetrate this probable cause so that [he] could substantiate the arrest of Mr. Torain"). (Ex. 10; Ex. 7 at 104:12-24, 105:1-4).

125. The affidavit of probable cause that Defendant Monaghan prepared and submitted to the issuing authority on January 5, 2001 and other police documents submitted as a result of Mr. Torain's arrest cited to the false information provided by Defendants Monaghan, Walker, Reynolds, Kelly and Sinclair in which the Defendants claim that information about Darnell Delee, Kabeyn Diggs and Arthur Tillman "coming out of the house and Mr. Delee putting drugs in his pocket and

seeing the light come on in the bedroom was false" because 1628 North 55[th] Street "was not in the loop" with the houses on West Master Street. (Ex. 7 at 104:12-24, 105:1-4).

126. The affidavit of probable cause that Defendant Monaghan prepared and submitted to the issuing authority on January 5, 2001 and other police documents submitted as a result of Mr. Torain's arrest cited to the false information provided by Defendants Monaghan, Walker, Reynolds, Kelly and Sinclair in which the Defendants claim that Defendant Reynolds falsely testified that he did not know that the green Bonneville Mr. Torain was arrested in was the same vehicle he spotted in the Freeman case. (Ex. 10; Ex. 4 at 183:14-24).

127. The affidavit of probable cause and other police documents submitted as a result of Mr. Torain's arrest that Defendant Monaghan prepared and submitted to the issuing authority on January 5, 2001 failed to disclose exculpatory information that Defendant Monaghan received detailed information from a confidential source and failed to disclose that the "confidential source" was a convicted felon, had an outstanding warrant for his arrest during the pendency of the Torain investigation, had made narcotic buys for police and was paid by police since 1998 in violation of Philadelphia Police Directive 5.9. (Ex. 18; Ex. 20, Philadelphia Police Department Directive 5.9).

128. The affidavit of probable cause and other police documents submitted as a result of Mr. Torain's arrest that Defendant Monaghan prepared and submitted to the issuing authority on January 5, 2001 failed to disclose exculpatory information

that the real motive for entering 1628 North 55th Street was to steal. (Ex. 7 at 105:10-24).

129. The affidavit of probable cause and other police documents submitted as a result of Mr. Torain's arrest that Defendant Monaghan prepared and submitted to the issuing authority on January 5, 2001 failed to disclose exculpatory information that Defendants Reynolds and Walker had already entered 1628 North 55th Street before Defendant Reynolds gave Defendant Monaghan the keys that he confiscated from Mr. Torain upon his arrest. (Ex. 6 at 30:12-22).

130. The affidavit of probable cause and other police documents submitted as a result of Mr. Torain's arrest that Defendant Monaghan prepared and submitted to the issuing authority on January 5, 2001 failed to disclose exculpatory information that Defendant Monaghan claims he conducted a search and seizure upon issuance of the 1:00 a.m. January 5, 2001 search warrant when the items were actually seized at the time of the warrantless search 9 ½ hours earlier at 3:50 p.m. on January 4, 2001. (Ex. 10; Ex. 6 at 30:23-25, 31:1-17; Ex. 9) (Defendant Walker testified at deposition to the following: "I'm aware that things were placed on the property receipts prior to doing the warrant based on how the property receipt was prepared at the time it was prepared" . . . "the property receipt clearly shows that the items were taken prior to the warrant". (Ex. 7 at 106:23-25, 107:1-2, 108:10-13).

131. The affidavit of probable cause and other police documents submitted as a result of Mr. Torain's arrest that Defendant Monaghan prepared and submitted to the issuing authority on January 5, 2001 failed to disclose exculpatory information that Defendant Kelly spoke to the manager of 1628 North 55th Street property,

Vincent Saunders Sr. but omitted the fact that Mr. Saunders told the Defendants that police were not allowed in that room unless they possessed a search warrant after Defendants had already entered the property. (Ex. 10).

132. The affidavit of probable cause and other police documents submitted as a result of Mr. Torain's arrest that Defendant Monaghan prepared and submitted to the issuing authority on January 5, 2001 failed to disclose exculpatory information that Defendants Reynolds and Walker conducted a warrantless search of Mr. Torain's home at 1621 North Conestoga after the search of 1628 North 55th Street. (Ex. 10; Ex. 12 at 53:5-24, 54:1-11).

133. The affidavit of probable cause and other police documents submitted as a result of Mr. Torain's arrest that Defendant Monaghan prepared and submitted to the issuing authority on January 5, 2001 failed to disclose exculpatory information that Defendant Reynolds confiscated a Parole and Probation letter at Mr. Torain's home at 1621 North Conestoga Street. (Ex. 10; Ex. 12 at 45:18-24, 46:1-4, 51:24, 53:6-22, 54:3-22, 55:5-23; Ex. 14).

134. The affidavit of probable cause and other police documents submitted as a result of Mr. Torain's arrest that Defendant Monaghan prepared and submitted to the issuing authority on January 5, 2001 failed to disclose exculpatory information that Mr. Torain was arrested because Defendant Reynolds believed that the unidentified person driving the green Bonneville, with Pennsylvania license plate number DKC 3310 that Defendant Reynolds had spotted during the surveillance of the 3 drug houses on 5500 block of Master Street four months prior to Torain's arrest and had got away, was actually Mr. Torain. (Ex. 10).

135. The affidavit of probable cause and other police documents submitted as a result of Mr. Torain's arrest that Defendant Monaghan prepared and submitted to the issuing authority on January 5, 2001 failed to disclose exculpatory information that Defendants did not observe Mr. Torain engage in any illegal activity. (Ex. 10).

**B. Material Facts Relating to a Conspiracy to Link Kareem Torain to the Narcotic Organization at the 5600 Block of West Master Street**

136. Defendant Monaghan states in the Investigation Report that the green Bonneville was followed to Mr. Torain's house at 1621 North Conestoga by Defendant Walker and later to 1628 North 55th Street by Defendant Reynolds. (Ex. 2, p. 2; Ex. 4 at 173:14-24, 174:1).

137. According to Defendant Reynolds, he observed Mr. Torain use a key to gain entrance to 1628 North 55th Street rooming house. (Ex. 4 at 175:5-12).

138. The Investigation Report further states that Defendant Walker followed Darnell Delee, Kabeyn Diggs and Arthur Tillman from the 5600 block of West Master Street to 1628 North 55th Street where Defendant Walker observed them being admitted to that property by Mr. Torain. (Ex. 2, p. 3; Ex. 3 at 86:11-18).

139. Defendant Reynolds admits that he did not see Mr. Torain do anything illegal, but was ordered by Defendant Monaghan to arrest Mr. Torain based on Monaghan's observations of the green Bonneville at the 5600 block of West Master Street and Defendant Walker observation of Darnell Delee, Kabeyn Diggs and Arthur Tillman exiting the 1628 North 55th Street residence. (Ex. 4 at 67:7-22).

138. The Investigation Report states that twenty minutes later, Defendant Walker observes Darnell Delee, Kabeyn Diggs and Arthur Tillman leaving 1628 North 55th Street looking at a bag of drugs. (Ex. 2, p. 3).

139. Defendant Reynolds then followed Darnell Delee, Kabeyn Diggs and Arthur Tillman back to the 5600 block of West Master Street. (Ex. 2, p.3; Ex. 4 at 68:20-24). Defendant Walker remained at 1628 North 55th Street. (Ex. 4 at 69:16-19).

139. Instead of arresting these individuals, Defendant Reynolds inexplicably went back to 1628 North 55th Street, waited for Mr. Torain to leave and followed him before arresting him at 61st and Nassau. (Ex. 4 at 70:12-14).

140. No narcotics or contraband were confiscated from Mr. Torain, nor had Defendants observed him engage in any illegal activity. (Ex. 4 at 63:21-24; 66:1-12; 73:21-24; 74:1-19).

141. Still lacking probable cause, Defendant Reynolds claims that he confiscated a key from Mr. Torain that fit both the front door to the rooming house and apartment # 2 inside. (Ex. 4 at 105:7-13).

142. Defendant Reynolds testified that he gave the key to Defendant Monaghan at 1628 North 55th Street and Defendant Monaghan with approval from a supervisor decided to enter apartment # 2. (Ex. 4 at 90:21-24; 91:1-5; 92:1-24).

143. Present at the time of the search at 1628 North 55th Street were Defendants Monaghan, Walker, Reynolds, Kelly and a supervisor – either "Sinclaire [sic] or Gessner". (Ex. 3 at 126:22-24; 127:1-14; Ex. 4 at 102:4-6).

144. Defendant Monaghan testified that Defendant Kelly spoke to the manager of the property, Vincent Saunders Sr. Monaghan claims in the arrest report that Mr. Saunders stated that no one had rented apartment # 2 and no one had permission to be in there. (Ex. 2, p. 3; Ex. 4 at 101:2-4).

145. According to the Investigation Report, Vincent Saunders Jr., the owner the property appeared and informed the Defendants that no one had rented that room nor was anyone allowed in that room. Defendant Monaghan tried one of the keys that fit the lock and secured the apartment "pending search and seizure warrant". (Ex. 2, p. 4).

146. According to the Investigation Report and Defendant Monaghan's testimony, Defendants and several officers entered Apartment #2 to make sure no one was hiding in there, looked under the bed and left. (Ex. 3 at 174-178).

147. The property receipt for the items confiscated from that room clearly shows that the Defendants seized the items when they entered the room with the key immediately following Mr. Torain's arrest and not when the warrant was issued the next day. (Ex. 9).

148. While the seized items were already in the police custody, Defendant Monaghan obtained a search warrant to conceal the fact that Defendants had already conducted a warrantless search and seizure. The search warrant was allegedly executed over 9 1/2 hours later at 1:00 a.m. the next morning. (Ex. 2, p. 4; Ex. 3 at 181-186; Ex. 7 at 105:5-24).

150. The warrant had no other police officers as participating in the search. (Ex. 10).

151. However, according to Defendant Monaghan, the seizure of the safe and pills actually occurred at 1:00 a.m. and not at 3:50 p.m. the previous day, as the property receipt reflected. (Ex. 3 at 181-186).

152. The Defendants lied about how and when they entered the apartment and how and when they seized the items. (Ex. 7 at 106:23-25, 107:1-2, 108:10-13).

153. After the Defendants arrested Kareem Torain without probable cause, the Defendants had to, in the words of Defendant Walker, "articulate", which means fabricate the facts in order to establish probable cause. (Ex. 7 at 104:12-24, 105:1-4).

154. All of the Defendants participated in this fabrication to "perpetrate the probable cause" in order to "substantiate the arrest of Mr. Torain". (Ex. 7 at 104:12-24, 105:1-4).

155. After Defendant Monaghan conducted a warrantless search at 1628 North 55th Street, the officers huddled together and fabricated a story about the light going on in apartment # 2 to link Mr. Torain to the room. (Ex. 7 at 104:12-24, 105:1-4).

156. Defendant Monaghan included this in his report and Defendant Walker falsely testified to it at trial. (Ex. 2; Ex. 6 at 60:14-15, 61:3-7, 62:3-23; Ex. 7 at 104:12-24, 105:1-4).

156. To connect Mr. Torain to the room further, Defendant Monaghan falsely claims that Defendant Kelly heard a drug dealer on the street who was standing next to the van that Defendants Monaghan and Kelly were in, yell the name "Kareem". (Ex. 3 at 81:13-23).

154. To perpetrate this injustice even further, Defendants Reynolds and Walker proceeded over to 1621 North Conestoga and executed a second warrantless search. (Ex. 12 at 53:5-24, 54:1-11).

155. While Defendant Reynolds searched the house, he looked into Kareem Torain's bedroom and spotted an ankle monitor box and confiscated the Parole and Probation letter, which Defendant Reynolds now claims he never saw. (Ex. 12 at 54:3-22).

156. Even though the letter is listed on the property receipt, Defendant Reynolds cannot account for where, when or how it was confiscated. (Ex. 4 at 220-224).

157. Defendant Reynolds simply states that the allegation that he searched Conestoga Street and seized the letter, is a "lie". (Ex. 4 at 222:14-22).

158. Defendant Walker admits that he lied when he testified about the light at 55th Street and also admits that all the Defendants fabricated the evidence throughout the entire investigation and prosecution. (Ex. 7 at 121-125).

159. Defendant Walker testified that Mr. Torain was wrongfully convicted. (Ex. 7 at 129:8-13).

**VIII. The Preliminary Hearing**

160. On October 23, 2001, Kareem Torain and co-Defendants Anthony Hodges, Arthur Tillman, Kabeyn Diggs, Raymond Howard and Maurice Grey proceeded before the Honorable Marsha Neifield in the Philadelphia Court of Common Pleas. (Ex. 6).

161. Defendant Monaghan testified regarding his 3 days of observations of various drug activity involving Anthony Hodges, Arthur Tillman, Kabeyn Diggs, Raymond Howard and Maurice Grey at the 3 properties located on the 5600 block of West Master Street. (Ex. 6 at 1-15).

162. Defendant Monaghan testified that on the last day of surveillance, at 1:41 p.m., Defendant Monaghan and his partner Defendant Kelly observed Darnell Delee standing on the porch of 5605 West Master when the green Bonneville license plate DKC-3110 traveling westbound on 56th Street slowed down in front of the house. (Ex. 6 at 15:3-12).

163. Defendant Monaghan testified that he observed Darnell Delee holler at the driver of the Bonneville and then pointed to the corner of Master and Ithan Street. (Ex. 6 at 15:13-18).

164. The Bonneville stopped at the corner and Darnell Delee got into the Bonneville for about three minutes before exiting the vehicle while "putting something into his jacket pocket". (Ex. 6 at 15:18-22).

165. Defendant Monaghan radioed Defendant Walker and instructed him to follow the Bonneville as it left the area. (Ex. 6 at 16:4-7).

166. Neither Defendants Monaghan nor Kelly could identify the driver of the Bonneville. (Ex. 6 at 15:23-25, 16:1-2).

167. Defendant Monaghan then observed Darnell Delee return back to 56th and Master Street whereby Mr. Delee took numerous small objects from his pocket and distribute these items to black males and females in exchange for U.S. Currency. (Ex. 6 at 16:7-17).

168. Defendant Walker followed the Bonneville to 1621 North Conestoga Street. (Ex. 6 at 16:4-7).

169. Defendant Monaghan falsely testified that at 1:55 p.m., as Defendants Monaghan and Kelly sat in their surveillance van, Defendant Monaghan overheard a

discussion between Darnell Delee and Kabiyan Diggs "that Kareem had one bundle on him, that he was coming back, [and] he would call and come back when the rest was ready". (Ex. 6 at 17:5-19).

170. At 2:00 p.m., Defendant Monaghan "found out" that Mr. Torain had exited 1621 North Conestoga Street, drove to 1628 North 55th Street and was observed by Defendant Reynolds entering the front door using a key. (Ex. 2 at 2; Ex. 4 at 63:14-19).

171. Defendant Monaghan falsely testified that Defendants Reynolds and Walker both observed Darnell Delee, Kabeyn Diggs and Arthur Tillman enter 1628 North 55th Street. (Ex. 6 at 19:6-19). After about 20 minutes they left 1628 North 55th Street and returned back to the 5600 block of West Master Street. (Ex. 6 at 19:6-19).

172. At 2:37 p.m., Defendant Monaghan observed Darnell Delee, Kabeyn Diggs and Arthur Tillman return back to the porch area of 5606 West Master Street where he saw Darnell Delee remove from his pocket a clear baggie with golf ball sized objects. (Ex. 6 at 21:8-17).

173. Defendant Walker falsely testified that he actually observed Mr. Torain using a key to enter 1628 North 55th Street. (Ex. 6 at 60:14-15, 62:13-23).

174. Defendant Walker falsely testified that when he initially saw Mr. Torain enter the property, Defendant Walker exited his vehicle and conducted a foot surveillance whereby he observed a light go on in apartment #2 and saw Mr. Torain through the window. (Ex. 6 at 61:3-7).

175. Defendant Walker falsely testified that he also observed "3 males" enter the property about 15 to 20 minutes later. (Ex. 6 at 62:3-12).

176. Defendant Walker falsely testified that he was present when Defendant Reynolds arrested Mr. Torain and confiscated his keys. (Ex. 6 at 63:17-19).

177. Defendant Walker testified at deposition that Defendant Monaghan needed Walker to fabricate this information to "substantiate the arrest of Mr. Torain". (Ex. 7 at 104:12-24, 105:1-4).

178. Relying on the false testimony of the Defendants, the Court held Mr. Torain on all charges including all the narcotics, weapons, bullet proof vests and paraphernalia confiscated from the 3 properties on West Master Street, as well as the drugs confiscated from apartment #2 at 1628 North 55th Street. (Ex. 2 at 5).

**IX. The Missing Surveillance Videotapes**

179. On May 6, 2002, the first day of Mr. Torain's bench trial, the Court heard Mr. Torain and co-Defendant Anthony Hodges' motion to suppress for lack of probable cause to stop and arrest Mr. Torain and Mr. Hodges. (Ex. 5, Trial Transcript, May 6, 2002).

180. The District Attorney moved into evidence videotape surveillance from the 2 days of surveillance (January 3 and 4, 2001 designated as Exhibit C-1 and C-2, respectively) of numerous narcotic sales made at 5600 block of Master Street before all the arrests made on January 4, 2001. (Ex. 5 at 15:25, 16:1-14).

181. Defendant Monaghan, the police officer who created the videotapes testified extensively about what he observed at the time of surveillance. (Ex. 5 at 16-61)

182. The prosecution relied on the videotapes in conjunction with Defendant Monaghan's testimony at the motion to suppress in convicting Mr. Torain. (Ex. 5).

183. Defendant Monaghan testified that he could not identify the driver of the green Bonneville. (Ex. 5 at 31:16-20).

184. Mr. Torain repeatedly requested copies of the surveillance videotapes in discovery.

185. Counsel for Mr. Torain moved to compel production of the surveillance videotapes and has been informed that the surveillance videotapes are missing.

186. As a result, the Honorable Paul S. Diamond issued an Order reserving a decision as to whether the City could be precluded from presenting evidence concerning the contents of the videotapes and whether it would be subject to sanctions for spoliation of evidence. (Ex. 21, ECF Doc. No. 23 Order of the Honorable Paul S. Diamond).

**X. The Trial**

187. After a 2-day bench trial, Kareem Torain was convicted of possession with the intent to deliver a controlled substance, knowing and intentional possession of a controlled substance, possession of an instrument of crime, possession of drug paraphernalia, and criminal conspiracy and was sentenced to a period of incarceration in a state prison.

188. On September 26, 2003, Mr. Torain was sentenced to a mandatory term of five to ten years in prison on the drug charge, a consecutive term of five to ten years for criminal conspiracy, and a consecutive term of two and one-half years for possession of an instrument of crime. (Amended Complaint ¶ 36).

189. Prior to his trial, all those individuals arrested at the West Master Street properties, Darnell Delee, Kabeyn Diggs, Ronald Freeman, Arthur Tillman, Mark

Pichonot, Raymond Howard, Maurice Grey, Glen Delee, Eileen Hodges and Migel Moon's cases were either dismissed at the preliminary hearing or in the case of two of these individuals, those persons received a sentence of 3 to 6 years' incarceration.

190. Mr. Torain and Mr. Hodges proceeded to trial.

191. At trial, Defendants Monaghan, Reynolds, Walker and Kelly provided false testimony that the Court relied on in convicting Kareem Torain.

192. Anthony Hodges was also convicted and was sentenced to a period of incarceration of 3 to 6 years. See *Commonwealth v Anthony Hodges*, *CP-51-CR-1014882-2001*.

## XI. Post-Trial

193. On October 7, 2002, Mr. Torain filed post-sentence motions. Mr. Torain's post-sentence motions were denied on March 6, 2003. (Amended Complaint ¶ 37).

194. Mr. Torain filed a direct appeal to the Superior Court of Pennsylvania. (Amended Complaint ¶ 38).

195. The Superior Court affirmed Mr. Torain's judgment of sentence on September 6, 2005. The Pennsylvania Supreme Court denied further review on March 31, 2006. (Amended Complaint ¶ 39).

196. On October 6, 2006, Mr. Torain filed a petition under the Post-Conviction Relief Act (PCRA). On December 28, 2007, an Amended PCRA was filed followed by two supplemental petitions on December 12, 2008 and July 16, 2009, respectively. (Amended Complaint ¶ 40).

197. Mr. Torain filed a notice of appeal to the Superior Court. The Superior Court affirmed the PCRA court's dismissal on April 26, 2011. He then filed a request of allowance of appeal to the Pennsylvania Supreme Court, which was denied on September 14, 2011. (Amended Complaint ¶ 41).

198. Mr. Torain then filed a Writ of Habeas Corpus in federal court. (Amended Complaint ¶ 42).

199. In December 2012, the Philadelphia District Attorney's Office informed Philadelphia Police Commissioner Ramsey that Defendant Reynolds would no longer be permitted to be a witness in narcotic cases due to an ongoing investigation regarding his credibility as a police officer. Defendant Reynolds was transferred out of the narcotic unit and is currently on restrictive duty. (Amended Complaint ¶ 43).

200. On May 22, 2013, Defendant Walker was arrested and charged with falsely arresting an individual, planting cocaine and stealing money from citizens. (Amended Complaint ¶ 43).

201. On June 19, 2013, Mr. Torain filed a pro-se Motion for Judgment on the Pleadings Based on After/Newly Discovered Evidence. The motion addressed the arrest and federal criminal prosecution of Defendant Walker. (Amended Complaint ¶ 44).

202. On February 24, 2014, Defendant Walker plead guilty to robbery and weapons charges. After cooperating with federal authorities regarding corruption within the police department in general and in particular to corruption of Defendant Reynolds and other fellow Narcotic Field Unit Defendant police officers, Defendant Walker was sentenced to 3 years of incarceration in a federal prison.

## XII. The District Attorney's Office Vacates Kareem Torain's Conviction and Dismisses the Case

203. On February 28, 2014, after remaining incarcerated for over thirteen (13)

years, the Philadelphia District Attorney's moved to vacate Kareem Torain's May 7,

2002 conviction and Mr. Torain was released from prison. (Amended Complaint ¶

47).

204. The Philadelphia District Attorney agreed to vacate Mr. Torain's

conviction as a result of Defendant Walker's arrest and Defendants Reynolds,

Monaghan, Kelly, Gessner and Sinclair's creditability issues. (Amended Complaint

¶¶ 43-46).

### THE MATERIAL FACTS RELATING TO *MONELL* CLAIMS

### A. Facts Related to Unlawful Practices in the Narcotics Field Unit

205. There is evidence that at least from the 1980's and continuing well

beyond Mr. Torain's arrest, police officers assigned to Philadelphia Police

Department's Narcotics units in general and the Narcotics Field Unit in particular

engaged in widespread unlawful practices, including arrest without probable cause,

the use of coercion, threats, and physical abuse during investigations of witnesses and

drug suspects, the fabrication and deliberate concealment of material evidence, the

denial of the right to a fair trial. The City of Philadelphia and its policymakers failed

to take action to control, remediate or reduce these unconstitutional practices. (Ex. 7

at 42 [custom to lie, misuse confidential informants, securing houses without

warrants, stealing]; 43 [engaged in misconduct with partners]; 45 [lying and stealing

when he was in the 16th District but that did not get out of hand until Walker went to

the NFU]; 46-48 [various ways of stealing in the NFU]; 49-52 [supervisors were

aware of the stealing in the NFU]; 69-70 [supervisors were aware Walker was stealing after he got transferred out of the NFU]; 74 [Walker was violating the Philadelphia Policies and Procedures with supervisors "thousands of times"]; 79 [misuse of confidential sources].

206. In the late 1980's and early 1990's, a series of police misconduct incidents led to hundreds of arrests and prosecutions based on fabricated evidence, false police testimony, and false or concealed evidence. Ultimately, the District Attorney of Philadelphia agreed to vacate hundreds of convictions, the City of Philadelphia agreed to compensate those wrongfully accused in an amount exceeding $6 million, and a number of officers faced federal indictments. The practices prompted a class action lawsuit, *NAACP, et al. v. City of Philadelphia*, E.D. Pa. No. 96-6045, alleging that chronic and widespread deficiencies in the Philadelphia Police Department resulting in the widespread violations of citizens civil rights. (Ex. 22, Expert Report of Ellen Green-Ceisler, *Brian Randall vs. City of Philadelphia C.A. #04-3983*).

207. The litigation led to a Settlement Agreement requiring the City of Philadelphia to implement policy and training initiatives to ensure that police officers abide by restrictions on their investigative powers under the U.S. Constitution. Many of these reform initiatives specifically addressed defects and problems in the management, operations, and culture of the Philadelphia Police Department that enabled the illegal activities like those of the 39th District Officers to continue unchecked for years. (Ex. 22, p. 1)

208. As a result of the Settlement Agreement, the City of Philadelphia agreed to establish an Integrity and Accountability Office ("IAO") in the Philadelphia Police Department, which acted as an independent auditor's office that would audit, analyze, and critique Philadelphia Police Department policies, practices, and operations as they related to the detection and control of misconduct, corruption, and the excessive use of force, and to make recommendations for change as appropriate. The goal of the IAO was to minimize and deter police corruption and misconduct to the greatest extent possible, and thereby enhance public confidence in the integrity of its police force. (Ex. 22, p. 1).

209. Ellen Green-Ceisler served as Deputy Director of the IAO for the Philadelphia Police Department from 1997 to April 2000 and from April 2000 to March 2005, she served as Director of IAO. In July, 2002, Ms. Green-Ceisler submitted a report (4th Report), titled *Enforcement of Narcotics Laws.*[7] (Ex. 23, *Enforcement of Narcotics Laws*).

210. In drafting the IAO report, Ms. Green-Ceisler's objective was to examine "the policies and practices of the narcotics enforcement operations of the Philadelphia Police Department to ensure that these efforts are conducted legally, ethically and within Departmental guidelines". (Ex. 23, p. 1).

211. Ms. Green-Ceisler began complying her information for the report when she became Director in 2000. (Ex. 24, Dep. of Ellen Green-Ceisler at 13-15, 51, 66).

---

[7] Ms. Green-Ceisler became a Philadelphia Court of Common Pleas Judge in 2008 and in 2018 became Judge in the Commonwealth Court of Pennsylvania. Before becoming judge, Ms. Green-Ceisler served as an expert witness in the case of *Brian Randall v City of Philadelphia, et al.*, C.A. # 04-3983, after stepping down as Director of the IAO. Ms. Green-Ceisler used the *Enforcement of Narcotics Laws* report as a basis for her opinion that Officers Reynolds and Walker, as well as other police officers and supervisors in the narcotics units, "failed to follow established guidelines regarding the use and

212. The IAO report states that "[i]t is incontrovertible that officers do violate civil rights in the enforcement of narcotics laws . . . Evidence of such misconduct is found in the [internal affairs] investigations and civil rights lawsuits where allegations of excessive force and illegal detentions, searches and arrests are documented and proven". Ex. 23, p. 35).

213. In September 2005, Ms. Green-Ceisler was retained as an expert to render an opinion regarding the misconduct of Defendants Reynolds and Walker in a similar case as this case of *Brian Randall v City of Philadelphia, et al*. #04-3983 and found that "the Search Warrant Affidavit of Probable Cause prepared by Officer Reynolds contained false and misleading information". (Ex. 22, p. 2).

214. Ms. Green-Ceisler opined "that several PPD policies and practices that fueled the 39th District scandal persisted during the time period relevant to the current case. Had these 'conditions' been appropriately addressed and rectified by the PPD, there would have been greater assurance that the harms caused to the Plaintiffs would not have occurred". (Ex. 22, p. 4).

215. Ms. Green-Ceisler's review of the *Randall* case, as well as hundreds of narcotics cases during her tenure as Director of the IAO found the following:

- That these same officers were involved in a prior narcotics operation which presented facts and circumstances that were nearly identical to the facts in the current case and which resulted in the improper imprisonment of other individuals in unrelated cases. The PPD and Narcotics Bureau supervisors were therefore on notice that Defendant Officers had a history of obtaining warrants based on inaccurate information and flawed investigations, and of failing to follow Departmental Directives regarding obtaining search warrants and the use of confidential informants. Despite these problems, there is little or no evidence that the PPD conducted timely and meaningful investigations into the improper and troubling conduct of these officers; imposed appropriate

---

monitoring of confidential informants", and failed "to properly discipline" narcotics police officers. (Ex. 23, pp. 4-5)

discipline on the officers or supervisors; compelled further training; assessed the adequacy of the supervision in the Narcotics Bureau South Field Unit; or removed these Defendant's and supervisors from this sensitive and corruption prone unit. (Ex. 22, p. 3).

- The Defendants further violated PPD Directive 7, Section V ("Search Warrants") by using repetitive "boiler-plate" language and failing to include sufficient facts and details in their Affidavit of Probable Cause regarding their use of confidential informants. (Ex. 22, p. 3).

- The IAO identified inconsistent enforcement of Departmental policies created to ensure that citizen's civil rights are protected, particularly in the context of narcotics enforcement activities. (Ex. 22, p. 4).

- In the 39th District scandal, officers routinely fabricated the existence of, and the information provided by, confidential informants as the basis of probable cause for search warrants. These illegal acts went undetected, in part, because the officers did not adhere to existing Departmental directives nor did the PPD have necessary safeguards in place to prevent and detect abuses. While some additional procedural safeguards were established after the 39th District scandal, there is clear evidence in this case that the Defendants failed to follow some Departmental policies regarding confidential informants. Rather than provide specific details regarding the confidential informant as required by Directives 7 and 15, Officer Reynolds used "boilerplate", vague, and uninformative language, making it virtually impossible to assess the informant's reliability or trustworthiness. These violations and lack of appropriate inquiry further calls into question the adequacy of supervisory accountability in the Narcotics Bureau South Field Unit. (Ex. 21, p. 6).

- The PPD does not monitor or analyze the disposition of narcotics arrests, which hinders its ability to assess the integrity and effectiveness of its narcotics enforcement operations and the actions of the individual officers. (Ex. 22, p. 6).

216. In forming her opinion in that case she relied on seven years of experience at the IAO, and in particular, on four discrete audits/studies including:

- Report on the PPD "Disciplinary System," submitted by the IAO during March, 2001;
- Report by the "Task Force on Police Discipline" submitted to Mayor John Street during November, 2001;
- Report on "Enforcement of Narcotics Laws," submitted by the IAO during July, 2002; and Report on the "Disciplinary System," submitted by the IAO during December. (Ex. 22, p. 3).

217. Ms. Green-Ceisler's review of the numerous narcotics cases and investigations dating from 1997 to 2005 show that the City of Philadelphia long tolerated recurring and widespread police misconduct in the narcotics units, often of the same nature as had been committed by Defendants Monaghan, Reynolds, Walker, Kelly and Sinclair's in the investigation of Mr. Torain.

218. Defendant Walker confirms in his deposition that over years' members of the NFU were allowed to engage in the same or similar misconduct in which Ms. Green-Ceisler warned about during her tenure as Director of the IAO.

219. In May 2007, the FBI Public Corruption Squad began an investigation of the NFU misconduct after receiving information that that an NFU officer was falsifying police reports. The investigation resulted in no charges being filed. *McIntyre v Liciardello*, 2020 WL 605717 * 7 (E.D. Pa., Feb. 7, 2020).

220. The investigation was reopened in November 2010 which resulted in a July 29, 2014 indictment charging Defendant Reynolds and other NFU officers with RICO conspiracy relating to robberies and extortions that were carried out "while cloaked in state authority". *Id.*

221. Defendant Walker was a government witness against his former partners and testified that the NFU had engaged in numerous forms of misconduct while acting in their capacity as police officers since he was first admitted to the NFU in 2000. *Id.*; Ex. 7 at 64:13-24, 65:1-24)

222. On May 14, 2015, a jury acquitted the Defendants on all charges. *Id.*

223. Hundreds of civil rights lawsuits were filed as a result of the arrests of Jeffrey Walker and Brian Reynolds, as well as 5 other NFU police for various corrupt practices these officers engaged in for years. *Id.*

224. Plaintiffs' counsel in these cases selected 13 Bellwether cases to be tried first while innumerable related cases remained in suspense. *McIntyre*, 2020 WL 605717 * 1. Mr. Torain's case was one of the cases chosen as a Bellwether case.

225. The *McIntyre* case was the first case to proceed in litigation and the only Bellwether case where the City of Philadelphia moved for summary judgment on the *Monell* claims. *McIntyre*, 2020 WL 605717 * 13-16.

226. Discovery was conduct in the *McIntyre* case, numerous depositions with regard to the *Monell* claims were taken, the expert opinion by Plaintiff's expert Paul McCauley was rendered and an opinion authored by the Honorable Paul S. Diamond was issued denying summary judgment on Mr. McIntyre's *Monell* claim of a "custom of municipal acquiescence in misconduct". The *McIntyre* Court did however dismiss Plaintiff's *Monell* claim based on a failure to train, supervise, or discipline theory. *Id.*

227. The parties settled all claims shortly following the Court's opinion.

228. On February 24, 2021, the Honorable Paul S. Diamond lifted the stay to the remaining Bellwether cases, the Torain case being one of the four. ECF Doc. No. 32.

229. The case was then reassigned to the Honorable R. Barclay Surrick.

230. On January 3, 2022, in accordance with the Court's case management Order, Mr. Torain served on Defendants the Expert Report of Joseph Pollini. (Ex. 25).

231. Mr. Pollini reviewed the Complaint and depositions and accompanying exhibits for Defendants Monaghan, Reynolds and Walker, the deposition of Ellen Green- Ceisler, Expert Report of Ellen Green-Ceisler in the *Randall* case, the IAO's and *Enforcement of Narcotics Laws* Report and *Disciplinary System* Report, as well as the Expert Report of R. Paul McCauley.[8] (Ex. 25, p. 2).

232. Mr. Pollini also reviewed Philadelphia Police Department files, policies and procedures and testimony from *U.S. v. Dennis Freeman* case, court documents in *McIntyre v. Liciardello, et al.*, 2020 WL 605717 (E.D. Pa., Feb. 7, 2020) and various Philadelphia Police Department documents and reports specific to the Torain investigation, arrest and conviction. (Ex. 25, pp. 1-2).

233. From his review of the foregoing, Mr. Pollini offers the following opinions about Defendants' conduct:

1. The defendants, in this case, were not properly disciplined for committing acts that violated the policies and procedures of the Philadelphia Police Department.

2. There were inadequate corruption controls, oversight and monitoring of narcotics operations.

3. There were no routine integrity tests implemented to test the integrity of narcotic investigators. Investigators were permitted to remain in narcotics enforcement assignments for extended periods of time (more than 5 years).

4. The defendants failed to follow established guidelines regarding the use and monitoring of confidential informants.

5. The supervisors failed to monitor the dispositions of narcotics arrests.

6. The harm suffered by Kareem Torain was the foreseeable consequence of defendants' actions/inactions as well as the prior deficient investigations, supervision, and discipline, as discussed in this report.

---

[8] Mr. McCauley submitted his expert report in the lead NFU case of *McIntyre v. Liciardello, et al.*, 2020 WL 605717 (Feb. 7, 2020, Lead Docket C.A. 13-2773).

7. Mr. Torain's unlawful arrest was the foreseeable consequence of the misuse of Robert Morris by the defendants in providing information about illegal activity without signing him up as an informant.

8. Defendants' actions/inactions, including the misuse of the source of information in both the Torain investigation and prosecution and the Freeman investigation and prosecution were contrary to accepted police practices, and constitute a violation of accepted municipal practices and a deliberate disregard of the legal protections of suspects and citizens generally.

9. The Philadelphia Police Department's failure to adhere to *Brady* requirements and properly supervise, monitor, and take corrective actions, including discipline, under the circumstances, were substantial factors that lead to the arrest, prosecution, and harm suffered by Mr. Torain.

10. The City of Philadelphia's failure to have appropriate training, operational directives, remedial measures, and supervision regarding reasonable suspicion, probable cause, use of confidential informants, confidential sources and concerned citizens and search warrants represent a violation of generally accepted police and municipal practices.

11. The Philadelphia Police Department's actions/inactions, as discussed in this report, were contrary to accepted police practice and procedures, including Philadelphia Police Department Directive D-9, and reflect a deliberate indifference and disregard for the legal protections of suspects and citizens generally.

12. The Philadelphia Police Department's longstanding failures to reasonably direct, supervise, investigate, discipline, and correct police misconduct were contrary to accepted police practices and procedures and were substantial factors causing the violations of Mr. Torain's civil rights.

13. The above-described policies, practices, and customs in the Philadelphia Police Department relating to fabrication, unlawful searches and seizures, misuse of informants and a deficient disciplinary system were widespread in the 1990s and 2000s and known to the Philadelphia Police Department and City officials as well as the general public. The failure of responsible officials to remedy these improper policies, practices, and customs were contrary to generally accepted police and municipal practices and caused the improper arrest and prosecution of Kareem Torain.

(Ex. 25, pp. 34-35).

234. Mr. Pollini's global analysis of the Philadelphia Police Department found

evidence of widespread fabrication and deliberate concealment of evidence in the

Philadelphia Police Department. These findings parallel the patterns of misconduct in this case, as well as the findings and conclusions in Ms. Green-Ceisler's audits, expert reports and the *McInytre* case, including: the misuse of sources of information; the Defendants disregard of information that showed that Mr. Torain could not have committed the crime, Defendants failure to make any effort to follow-up on this evidence, and never disclosed the information to the prosecution or defense; provided a false story to contrive probable cause; failed to reveal that the "confidential source" was actually a convicted felon, was known by the Defendants to have had an open warrant for his arrest and was being used in violation of the Philadelphia Police Department policies and procedures; and that Defendants' supervisors failure to properly monitor the Defendants acts, all of which led the Trial Judge to believe that Mr. Torain was a conspirator in the narcotic enterprise at 5600 block of West Master Street. (Ex. 25)

235. Mr. Pollini concluded that the Philadelphia Police Department had a longstanding custom and practice of internal investigations and a defective disciplinary system. The Philadelphia Police department's failure to take reasonable actions to address these problems, as discussed in the Green-Ceisler reports, the *McIntyre* opinion, the Expert Report of Paul McCauley in the *McIntyre* case and as discussed in his report, were contrary to accepted police practices and procedures and reflects the City of Philadelphia's deliberate indifference to the need for proper training, supervision, and discipline to ensure the safety of civilians and offices alike, and the integrity of poling practices in the Philadelphia Police Department. (Ex. 25).

Respectfully submitted,

*/s/ Michael Pileggi*
Michael Pileggi
303 Chestnut Street
Philadelphia, Pa 19106
(215) 627 8516
*Attorney for Plaintiff Kareem Torain*