EXHIBIT "3"



## Compressed Transcript of the Testimony of
# BRIAN MONAGHAN, 1/17/17

**Case:** McIntyre v. Liciardello, et al./Torain v. The City of Phila., et al.

Summit Court Reporting, Inc.
Phone: 215.985.2400
Fax: 215.985.2420
Email: depo@summitreporting.com
Internet: www.summitreporting.com

Case 2:14-cv-01643-RBS   Document 61-5   Filed 06/29/22   Page 3 of 102
McIntyre v. Liciardello, et al./Torain v. The City of Phila., et al.

BRIAN MONAGHAN, 1/17/17

## Page 1

IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF PENNSYLVANIA

- - -

JAMES McINTYRE,          : CIVIL ACTION
   Plaintiff,   :
   vs.           : LEAD DOCKET
POLICE OFFICER           :
LICIARDELLO, et al.,  :
       : NO. 13-2773
   Defendants.  :
------------------------:------------------

KAREEM TORAIN,           :
   Plaintiff,   :
   vs.           : CIVIL ACTION
       :
THE CITY OF              :
PHILADELPHIA;            :
PHILADELPHIA POLICE   :
OFFICER WALKER, BADGE  :
# 3730; PHILADELPHIA  :
POLICE OFFICER           :
REYNOLDS, BADGE # 4268;:
PHILADELPHIA POLICE   :
OFFICER MONAGHAN,     : No. 14-1643
BADGE # 6061,            :
Individually and in   :
their capacity as     :
police officer,          :
   Defendants.  :

- - -

ORAL DEPOSITION OF BRIAN MONAGHAN
January 17, 2017

- - -

SUMMIT COURT REPORTING, INC.
Certified Court Reporters and Videographers
1500 Walnut Street, Suite 1610
Philadelphia, Pennsylvania 19102
424 Fleming Pike, Hammonton, New Jersey 08037
(215) 985-2400 * (800) 447-8648 * (609) 567-3315
www.summitreporting.com

## Page 2

```
 1
 2
 3
 4              Oral deposition of BRIAN MONAGHAN,
 5     taken at the James Byrne Courthouse, 601 Market
 6     Street, Courtroom 6B, Philadelphia, Pennsylvania,
 7     taken on Tuesday, January 17, 2017, beginning at
 8     approximately 10:05 a.m., before Donna M. Ray,
 9     Registered Professional Reporter, Certified Court
10     Reporter and Notary Public in and of the
11     Commonwealth of Pennsylvania.
12
13
14
15
16
17
18
19
20
21
22
23
24
```

## Page 3

```
 1     APPEARANCES:
 2     MICHAEL PILEGGI, ATTORNEY AT LAW
       BY: MICHAEL PILEGGI, ESQUIRE
 3     303 Chestnut Street
       Philadelphia, Pennsylvania 19106
 4     (215) 627-8516
       pil423@aol.com
 5     Counsel for Plaintiff Kareem Torain
 6     POPPER & YATVIN
       BY: HOWARD D. POPPER, ESQUIRE
 7     230 South Broad Street
       Suite 503
 8     Philadelphia, Pennsylvania 19102
       (215) 546-5700
 9     popper.yatvin@verizon.net
       Counsel for Plaintiff Justin Mirraglia and Helen
10     Guyon
11     CITY OF PHILADELPHIA LAW DEPARTMENT
       BY: ARMANDO M. BRIGANDI, ESQUIRE
12     1515 Arch Street
       14th Floor
13     Philadelphia, Pennsylvania 19102
       (215) 683-5381
14     armando.brigandi@phila.gov
       Counsel for Defendant City of Philadelphia
15
       JEFFREY WALKER, Pro Se
16
       MARSHALL, DENNEHEY, WARNER, COLEMAN & GOGGIN
17     BY: DIANA CORTES, ESQUIRE
       2000 Market Street
18     Philadelphia, Pennsylvania 19103
       (215) 575-2626
19     Counsel for Defendants Sergeant Michael Spicer,
       Police Officer John Speiser, Police Officer Linwood
20     Norman, Police Officer Brian Reynolds, Police
       Officer Thomas Liciardello and Police Officer Perry
21     Betts
22
23
24
```

## Page 4

```
 1     APPEARANCES (Continued):
 2
       CHRISTIE & YOUNG PC
 3     BY: JAMES W. CHRISTIE, ESQUIRE
       1880 John F. Kennedy Boulevard
 4     10th Floor
       Philadelphia, Pennsylvania 19103
 5     (215) 587-1678
       jwchristie@christieyoung.com
 6     Counsel for Defendants Lieutenant Joseph McCloskey
       and Lieutenant Robert Otto
 7
       ALSO PRESENT:
 8
 9     POLICE OFFICER BRIAN REYNOLDS
       MARK FAZLOLLAH - The Inquirer
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

1 (Pages 1 to 4)

Case 2:14-cv-01643-RBS    Document 61-5    Filed 06/29/22    Page 4 of 102

McIntyre v. Liciardello, et al./Torain v. The City of Phila., et al.

BRIAN MONAGHAN, 1/17/17

Page 5

1    INDEX
2
     WITNESS                        PAGE
3    BRIAN MONAGHAN
4      By Mr. Pileggi              9, 284
5      By Mr. Walker               241
6      By Mr. Brigandi             289
7                --- 
8          EXHIBITS
9    NUMBER      DESCRIPTION    PAGE FIRST REFERENCED
10   Monaghan-1  Investigation Report    25
11   Monaghan-2  Search Warrant        124
12   Monaghan-3  Preliminary Hearing Notes   128
13   Monaghan-4  Photograph            169
14   Monaghan-5  Photograph            171
15   Monaghan-6  Photograph            171
16   Monaghan-7  Photograph            173
17   Monaghan-8  Photograph            173
18   Monaghan-9  Photograph            173
19   Monaghan-10 Property Receipt      181
20   Monaghan-11 Three Property Receipts   191
21   Monaghan-12 Property Receipt      200
22   Monaghan-13 Motion to Suppress Testimony 218
23   Monaghan-14 Affidavit of Probable Cause  235
24

Page 6

1          (It is hereby stipulated and agreed
2    by and among counsel for the respective
3    parties that reading, signing, sealing,
4    filing and certification are waived; and
5    that all objections, except as to the form
6    of the question, are reserved to the time
7    of trial.)
8                --- 
9          BRIAN MONAGHAN, after having been
10   duly sworn, was examined and testified as
11   follows:
12                --- 
13         MR. BRIGANDI:  Thank you.  My name
14   is Armando Brigandi.  I'm here
15   representing Officer Monaghan for purposes
16   of this deposition.
17         Just a short statement on the record
18   in regards to the ongoing objection to the
19   venue of these depositions being at the
20   courthouse.
21         Defendants -- co-defendants will be
22   filing a motion shortly with Judge Diamond
23   in regards to our objection to having
24   every single deposition here at the

Page 7

1    courthouse, and the reasons for that will
2    be outlined in the motion.  I agreed to
3    have this deposition here today without
4    waiving that objection because Mr. Pileggi
5    represented to me that he has some
6    scheduling issues in late July.  So I --
7    late January.  So I promised him that I
8    would produce Officer Monaghan this week.
9    I did not have time to file the motion
10   because of that.
11         Secondly, Mr. Pileggi indicated to
12   me in an E-mail sent to me last week that
13   he would not be going into private and
14   personal financial information regarding
15   Officer Monaghan.
16         Is that accurate, Mr. Pileggi?
17         MR. PILEGGI:  That's correct.
18         MR. BRIGANDI:  Okay.  Thirdly, there
19   doesn't seem to be any press corps here at
20   the moment, but that certainly would be
21   one of the reasons why we're filing the
22   motion to change the venue from out of the
23   courthouse.
24         MR. PILEGGI:  This is Michael

Page 8

1    Pileggi on behalf of some of the
2    Bellwether plaintiffs.  We anticipate that
3    the motion will be filed.  We'll respond.
4    When I say "we," I'm referring to all
5    Bellwether plaintiffs.
6         We will articulate what our response
7    is, but one of the major concerns with
8    regards to the depositions taking place at
9    the courthouse was for the safety and
10   welfare of former Police Officer Jeffrey
11   Walker who is present today.  So with that
12   being said...
13         MR. BRIGANDI:  Just one final thing.
14   In addition to Officer Monaghan and former
15   Officer Walker, the only other law
16   enforcement officer here in the room is
17   Brian Reynolds, who is sitting in the back
18   just for the record.
19         MR. PILEGGI:  Who -- you may want to
20   put this -- is part of the Torain case.
21         MR. BRIGANDI:  Correct.  He's a
22   party in the Torain case.
23         MR. WALKER:  I'd like to put on the
24   record my name is Jeffrey Walker.  I'd

SUMMIT COURT REPORTING, INC.
215.985.2400 * 609.567.3315 * 800.447.8648 * www.summitreporting.com

Case 2:14-cv-01643-RBS    Document 61-5    Filed 06/29/22    Page 5 of 102

McIntyre v. Liciardello, et al./Torain v. The City of Phila., et al.

BRIAN MONAGHAN, 1/17/17

## Page 9

1   like to put on the record that I will be
2   attending all depositions because I am a
3   defendant in these cases and I am
4   representing myself.
5        Based on recent events of
6   intimidation, I feel as though it's fair
7   for me for my safety to have everything in
8   the courtroom.
9        MR. PILEGGI:  Ready to proceed?
10       MR. BRIGANDI:  Ready.
11            - - -
12       (EXAMINATION)
13            - - -
14   BY MR. PILEGGI:
15       Q.  Good morning.  May I call you officer or
16   agent?
17       A.  Officer.
18       Q.  Officer.  Good morning, Officer Monaghan.
19       A.  Good morning.
20       Q.  Officer, just for the record, could you
21   spell your name?
22       A.  Yes.  Brian, B-R-I-A-N, Monaghan,
23   M-O-N-A-G-H-A-N.
24       Q.  Officer, my name is Michael Pileggi, and I

## Page 10

1   am plaintiff's counsel in what we call the
2   Bellwether cases.  In particular, I'm going to be
3   asking you questions today about the arrest and
4   prosecution of Kareem Torain.
5       A.  Yes.
6       Q.  That's T-O-R-A-I-N.  Officer, before we
7   begin, let me just give you some of the ground
8   rules we're going to be proceeding with today.
9        I'm going to be asking you a series
10  of questions.  If you don't know the question --
11  the answer, you can so indicate.  If I ask a
12  confusing question, which I've been known to do,
13  just have me rephrase it or repeat it.  Whatever I
14  need to do to get you to understand.
15       Okay?
16       A.  Okay.
17       Q.  When you respond, I'm going to assume that
18  you understood the question.  Now, one thing.
19  There's one caveat.  If we have to take a break --
20  I don't think we're going to be here that long, but
21  if you have to take a break at any time you can do
22  so.  Just let me know.  You just can't do it when
23  there is a pending question.
24       Okay?

## Page 11

1       A.  Sure.
2       Q.  Of course, you're under oath.
3        Do you have any questions at this
4   point?
5       A.  No, not right now.
6       Q.  Okay.  As I stated, I'm going to be asking
7   you questions concerning a job that you worked on
8   when you were lead investigator when you were at
9   the Philadelphia Police Department.
10      A.  Yes.
11      Q.  Before we get into those questions,
12  specific questions about the case, I want to ask
13  you some of your background.
14       Do you recall when you became a
15  Philadelphia Police Officer?
16      A.  Yes.  I became a police officer -- I
17  started at the academy November 14, 1988.
18      Q.  Okay.  I'm assuming you graduated from the
19  academy?
20      A.  Yes, I did.
21      Q.  Okay.  What was your first assignment as a
22  Philadelphia Police Officer?
23      A.  The 19th District, which is in West
24  Philly.

## Page 12

1       Q.  A patrol officer?
2       A.  Yes.
3       Q.  Do you recall how long you were in the
4   19th District for?
5       A.  Ten years.
6       Q.  Did you maintain patrol officer status or
7   at any time were you promoted?
8       A.  No.  I maintained police officer status.
9       Q.  Okay.  So that took you up to about 1998?
10      A.  '99.
11      Q.  '99?
12      A.  Yes.
13      Q.  What happened then?
14      A.  I was transferred to the narcotics strike
15  force.
16      Q.  And just how did you become a member of
17  the narcotics strike force?
18      A.  I put in a transfer to be transferred out
19  of the 19th District to go to a special unit, and I
20  was approved to go to that unit.
21      Q.  Did you have to undergo any training prior
22  to getting that position?
23      A.  Yes, narcotics field training.
24      Q.  Do you recall how long that was?

3  (Pages 9 to 12)

Case 2:14-cv-01643-RBS    Document 61-5    Filed 06/29/22    Page 6 of 102

McIntyre v. Liciardello, et al./Torain v. The City of Phila., et al.

BRIAN MONAGHAN, 1/17/17

Page 13

1    A. Just -- it was probably in-house training.
2    Departmental training. How to field test drugs.
3    Stuff like that.
4    Q. Is it along the same lines as MPO
5    training?
6    A. It's similar to it, yes.
7    Q. Okay. So you go into the narcotics strike
8    force -- by the way, in the narcotics strike force,
9    what were some of your duties?
10    A. Well, it was a uniform and plainclothes
11    job. We did street corner narcotics
12    investigations.
13    Q. Short-term investigations?
14    A. Yes.
15    Q. Takedowns?
16    A. Takedowns.
17    Q. Did you participate -- as a narcotics
18    strike force member, did you participate in
19    searches?
20    A. Yes, I did.
21    Q. Did you participate in searches where
22    there was more of the long-term investigations,
23    searches of houses?
24    A. Towards the last couple months that I was

Page 14

1    in the strike force we were able to do search
2    warrants on houses, yes.
3    Q. Okay. As a strike force member, were you
4    the one actually executing the searches and seizure
5    warrants or were you just on the team that was
6    going into the houses and searching?
7    A. It all depended. Mostly on the team.
8    Q. But there was times where you would -- you
9    or other members of the strike force would actually
10    execute the searches and seizures?
11    A. Yes.
12    Q. Okay. And am I correct that part of that
13    training to become a narcotics strike force member
14    you had to familiarize yourself with the policies
15    and procedures, Philadelphia Police Department
16    policies and procedures?
17    A. Yes, I did.
18    Q. All right. And specifically with regards
19    to searches and seizure warrants?
20    A. That's correct.
21    Q. All right. Anything else you recall as a
22    strike force member that you -- any other policy
23    that you had to familiarize yourself with?
24    A. Well, use of force policies and stuff like

Page 15

1    that.
2    Q. How about informants, whether they're
3    confidential informants or sources?
4    A. In the strike force we didn't use
5    confidential informants or sources.
6    Q. So you -- it was more on takedowns on the
7    street corners, short-term investigations, and
8    maybe searches and seizures?
9    A. That's correct.
10    Q. Okay. How long were you in the strike
11    force for?
12    A. I would say about a year and a half.
13    Q. And then what happened?
14    A. I think it was around 2000, maybe the end
15    of 2000, I went to the narcotics field unit,
16    Southwest Division.
17    Q. Okay. And how did you get that promotion?
18    Was that a promotion?
19    A. It was kind of like a lateral transfer.
20    Q. How did you get that?
21    A. I was asked by the captain if I was
22    willing -- if I wanted to come to the field unit,
23    and I said yeah. It's kind of like the step up for
24    some officers of being a strike force, which is a

Page 16

1    uniform narcotics detail to a plainclothes detail
2    undercover capacity.
3    Q. Okay. Who was the captain?
4    A. David Testa.
5    Q. Is he still there?
6    A. He's still living, but he's not on the job
7    anymore.
8    Q. Am I correct that this lateral move into
9    the narcotics field -- narcotics field unit?
10    A. Yes.
11    Q. You take on greater responsibilities,
12    correct?
13    A. Correct.
14    Q. And that's more long-term investigations?
15    A. Yes.
16    Q. Am I correct that not only are you also
17    doing the search and -- searches in homes and
18    taking down buyers/sellers on the street corner,
19    but you also extend those duties to the use of CIs,
20    correct?
21    A. Correct.
22    Q. Executing searches and seizure warrants?
23    A. Correct.
24    Q. Anything else? Surveillance?

4 (Pages 13 to 16)

McIntyre v. Liciardello, et al./Torain v. The City of Phila., et al.

BRIAN MONAGHAN, 1/17/17

Page 17

1      A. Surveillance.
2      Q. Did you do surveillance in the narcotics
3   strike force?
4      A. Yes, I did.
5      Q. Okay. And, again, was that more
6   surveillance of the street corner-type
7   transactions?
8      A. Yes, it was. Yes.
9      Q. Did that extend to surveillance of homes
10  when you became a field -- a narcotics field
11  member?
12     A. Yes, it did.
13     Q. Was there any other set of policies and
14  procedures that you had to familiarize yourself
15  with when you became a field unit member as opposed
16  to when you were in the strike force?
17     A. No. I would say about the same. Same set
18  of policies.
19     Q. And just so we're clear, you had to still
20  undergo your MPO training every year?
21     A. That is correct.
22     Q. Was Captain Testa -- was he the -- how was
23  he affiliated with the field unit at the time?
24     A. He was a captain of the South Division,

Page 18

1   which took care of South, Southwest and West
2   Division.
3      Q. When you became a field unit member, how
4   did you -- how were the field units broken up at
5   that time?
6      A. I believe at that time it was broken up in
7   two different divisions, North Division and South
8   Division.
9      Q. Okay. And that was towards the end of
10  2000?
11     A. Yes, it was. Yes.
12     Q. All right. At some point later on did
13  they break it up differently, the field units?
14     A. Yes. They disbanded the Southwest
15  Division probably around 2004. I had already just
16  left when they disbanded.
17     Q. All right. What did they -- how was --
18  when they re-made it up, what were the divisions?
19     A. I believe it was North and South, but they
20  came out of different buildings. I believe at that
21  time we were losing our building to the City, and
22  that's why they relocated us.
23     Half the officers in the field unit
24  South went to 17th and Montgomery to work North

Page 19

1   Division and then you kind of were able to go down
2   into South Philly, Southwest still. Then other
3   officers went to G and Hunting Park, around that
4   area. They became East and the Northeast
5   Divisions.
6      Q. Okay. So when was that? What year was
7   that?
8      A. I would say about the end of 2004
9   possibly.
10     Q. Now, what was your understanding as to why
11  they re-created the divisions?
12     A. Well, everybody heard rumors about that
13  they -- it wasn't a City-owned building at the
14  time. It was a state-funded building, which I
15  believed. The City losing the building itself. So
16  they had to relocate everybody.
17     Q. And am I correct that there -- as a field
18  unit member, you could go City wide? I mean, there
19  was no boundaries limiting your abilities to go to
20  say South Philadelphia or North Philadelphia,
21  correct?
22     A. Yeah. As long as you were able to
23  articulate why you were going into another
24  division, our supervisors let us go anywhere we

Page 20

1   wanted to go.
2      Q. And am I correct that the two divisions --
3   after it was broken up the two divisions would work
4   together in certain cases?
5      A. Yes.
6      Q. Okay. When they reconstructed the
7   divisions, did they also change the manpower? In
8   other words, if you were in the South Division and
9   working with a certain set of officers, did you
10  work with a new set of officers when they
11  re-created it and made it the North Division and
12  the East Division?
13     A. I wasn't there at the time. I was
14  detailed out.
15     Q. Okay. When were you detailed out?
16     A. I believe it was August 14, 2004.
17     Q. Okay. So when they re-created the
18  divisions, you were detailed out?
19     A. Yes.
20     Q. All right. So is it fair to say that you
21  were in the narcotics field unit from the end of
22  2000 to 2004?
23     A. Yes.
24     Q. Okay. Where were you detailed out to?

5 (Pages 17 to 20)

Case 2:14-cv-01643-RBS    Document 61-5    Filed 06/29/22    Page 8 of 102
McIntyre v. Liciardello, et al./Torain v. The City of Phila., et al.

BRIAN MONAGHAN, 1/17/17

Page 21

1    A. Alcohol, Tobacco, Firearms and Explosives.
2    Q. How long were you there for?
3    A. I'm still there.
4    Q. That's federal?
5    A. Yes, it is.
6    Q. When you say "detailed out," was that --
7    that's not a lateral move, is it?
8    A. No. I'm on the task force. So I'm still
9    a Philadelphia Police Officer, but I'm on a federal
10   task force.
11   Q. And who pays you?
12   A. The City.
13   Q. The City?
14   A. Yes. The police department.
15   Q. Am I correct that there's different
16   officers on the ATF, right?
17   A. Yes.
18   Q. The different officers on the ATF, some
19   are from Philadelphia Police Department and some
20   are from the feds? There are different officers
21   that create that division?
22   A. Task force, yes.
23   Q. So let's -- I want to focus on your -- the
24   period of time that you served as a field unit

Page 22

1    member.
2    A. Sure.
3    Q. Officer, do you recall the Kareem Torain
4    case?
5    A. Yes, I do.
6    Q. Okay. This is what I wanted to ask you
7    before we get started into the specifics of the
8    case. Did you have an opportunity prior to today's
9    testimony to review any documents with regards to
10   the Kareem Torain case?
11   A. Yes, I did.
12   Q. All right. When did you review those
13   documents?
14   A. Mostly within the last couple days. I
15   also reviewed it once I received the letter from
16   the City Solicitor's office.
17   Q. Okay.
18   A. I brought up the PARS and looked it over.
19   Q. Fair enough. Do you recall what you
20   reviewed?
21   A. Yes. I reviewed the PARS report, which is
22   the arrest report, the 49.
23   Q. Okay.
24   A. And within the last couple days, the

Page 23

1    transcripts.
2    Q. Okay. When you say "the transcripts,"
3    which transcripts?
4    A. From the preliminary hearing, the notes
5    from the suppression hearing and the trial.
6    Q. Okay. Now, did you have any discussions
7    -- and you don't have to tell me what the
8    discussions are -- but, obviously, you had
9    discussions with the City Solicitor --
10   A. Yes.
11   Q. -- with regards to this case?
12   A. Yes.
13   Q. All right. Did you have any discussions
14   with anyone else other than your attorney with
15   regards to the circumstances of the Torain case?
16   A. Yes, I did.
17   Q. Who you have discussions with?
18   A. I believe Attorney Joseph Grogan.
19   Q. Santarone? Joseph Santarone?
20   A. Is it Santarone?
21       MR. BRIGANDI: Are you talking about
22   an attorney that was at the meeting?
23       THE WITNESS: Yes.
24       MR. BRIGANDI: Santarone.

Page 24

1        THE WITNESS: Sorry. Santarone.
2    Sorry about that.
3    BY MR. PILEGGI:
4  * Q. What was the subject of the discussions?
5        MR. BRIGANDI: Well --
6        MR. PILEGGI: You waived it.
7        MR. BRIGANDI: No. We have a joint
8    defense agreement.
9        MR. PILEGGI: You can have a joint
10   defense agreement all you want. He
11   doesn't represent them.
12       MR. BRIGANDI: No. That's
13   privileged.
14       MR. PILEGGI: I would disagree. You
15   can put that on the record.
16       MR. BRIGANDI: I'm going to order
17   him not to answer that. That's
18   privileged.
19       MR. PILEGGI: Mark that record.
20   Mark the record.
21   BY MR. PILEGGI:
22   Q. All right. So at the time of the
23   discussion, did you have an opportunity to look at
24   the documents also?

6  (Pages 21 to 24)

McIntyre v. Liciardello, et al./Torain v. The City of Phila., et al.                                    BRIAN MONAGHAN, 1/17/17

Page 25

1    A. Yes, I did.
2    Q. Okay. Let's go into the case. I'm going
3  -- what I'm going to do is -- I guess the easiest
4  way to do this is to show you -- let's start with
5  the -- by the way, while I'm doing this, you
6  mentioned the PARS report, the 49.
7         Did you have an opportunity to see
8  the affidavit?
9    A. Yes, I did. I'm sorry.
10   Q. All right. Let's do this. Let's start
11  with -- let's mark this.
12             - - -
13        (Whereupon, Exhibit Monaghan-1 was
14         marked for identification.)
15             - - -
16  BY MR. PILEGGI:
17    Q. Officer, you've just been handed what has
18  been marked as Monaghan-1 for identification.
19         First of all, do you know what that
20  is?
21    A. Yes, I do.
22    Q. What is it?
23    A. It's the investigation report, the 49.
24    Q. When you say "49," 7549?

Page 26

1    A. 7549, yes.
2    Q. Now, this report -- well, tell me in the
3  scheme of an arrest when this report is created.
4    A. This report is created after the arrest,
5  after the PARS report. We have so many days to get
6  the 49 in.
7        MR. BRIGANDI: Is there a Bates
8        stamp on this?
9        MR. PILEGGI: Yeah. Down at the
10       bottom.
11       MR. BRIGANDI: Okay. Thanks.
12  BY MR. PILEGGI:
13    Q. We'll identify it by Bates stamp. Let's
14  do that. You'll see down at the bottom right-hand
15  corner this is Bates-stamped NFU07423. You don't
16  have to comment on that.
17    A. Okay.
18    Q. Now, Officer, you said this is created
19  after the arrest, correct?
20    A. That's correct.
21    Q. And this is created in anticipation of
22  future litigation, correct?
23    A. That is correct.
24    Q. Is this created after the affidavit of

Page 27

1  probable cause?
2    A. Yes, it is.
3    Q. All right. Now, in this case, and just
4  generally, am I correct that this was a case that
5  involved the issuances and the executions of
6  several affidavits of probable cause, correct?
7    A. Yes.
8    Q. And this was -- there were several
9  individuals arrested, correct?
10   A. Correct.
11   Q. And is it fair to say that at least
12  initially the investigation focused on a narcotics
13  organization? Is that fair to say?
14   A. Fair to say, yes, sir.
15   Q. This wasn't similar to what you would have
16  investigated in the strike force, correct?
17   A. Correct.
18   Q. This was more of a long-term
19  investigation?
20   A. Yes, it was.
21   Q. All right. Now, in the first paragraph --
22  and sometimes I'll read it so it can be clear and
23  other times -- because we're going to attach this
24  to the record.

Page 28

1    A. Sure.
2    Q. Sometimes I may just ask you generally
3  what the content of what the paragraph says.
4    A. That's fine.
5    Q. It appears that in this first paragraph
6  you received information with regards to an
7  organization that was -- the individuals that were
8  running it was an Al and a Pud.
9         Do you see that?
10   A. Yes, I do.
11   Q. Do you recall -- by the way, I don't know
12  if this was clear. This was -- this investigation
13  was while you were a field unit member, correct?
14   A. Correct.
15   Q. All right. You were the lead investigator
16  on this?
17   A. Yes, I was.
18   Q. What does that mean?
19   A. It means that -- kind of I took over -- it
20  was a job that I initiated. I did the
21  investigation for the job. I was the assigned. So
22  I was -- I had all the paperwork, the PARS reports
23  and the affidavits, the search warrants. That was
24  all under me.

7 (Pages 25 to 28)

Case 2:14-cv-01643-RBS    Document 61-5    Filed 06/29/22    Page 10 of 102
McIntyre v. Liciardello, et al./Torain v. The City of Phila., et al.
BRIAN MONAGHAN, 1/17/17

Page 29

1    Q.  So you're running the show on this
2    investigation?
3    A.  Pretty much, yes.
4    Q.  You're the supervisor.
5    Is it part of your duties to insure
6    that whoever is involved in this, whatever other
7    officers are involved in this, are following your
8    directions, correct?
9    A.  Correct.
10   Q.  Now, it appears that -- from reading this
11   it says that you received detailed information from
12   a confidential source, as well as 19th District
13   officers Ronald Cain and Joseph Goglielmucci.
14   A.  Yes.
15   Q.  Is that correct?
16   A.  That's correct.
17   Q.  Do you recall the circumstances?
18   A.  Just that they told me about the different
19   houses in the 5600 block of Master Street.  5605,
20   5607, 5609.
21   Q.  Who is "they"?
22   A.  The two officers, Cain and Goglielmucci.
23   Q.  What did the source tell you?
24   A.  Just that there's narcotics sales coming

Page 30

1    out of the corner of 56th and Master Street.
2    Q.  Do you recall who the source was?
3    A.  Just somebody I knew from the neighborhood
4    from when I worked out there.
5    Q.  When you say that you worked out there,
6    you worked out there when you were in strike force
7    or worked out there as a narcotics field unit
8    member?
9    A.  Worked out there as a uniformed officer.
10   Also when I was in the strike force we were out
11   there also.
12   Q.  I see here this was the 19th District.
13   This is where you worked for ten years?
14   A.  Yes.
15   Q.  Had you ever used this source before in
16   your capacity when you were stationed there in the
17   ten-year period as a patrol officer?
18   A.  Just talking to him.
19   Q.  Okay.  Had they ever provided you
20   information before?
21   A.  Yes.
22   Q.  When I say "information," meaning about
23   illegal activity?
24   A.  That's correct.

Page 31

1    Q.  So you had used this source before?
2    A.  Yes, I had.
3    Q.  Okay.  Under these circumstances, did that
4    source contact you or did you contact the source
5    after you talked to the two officers?
6    A.  Just ran into him one day.
7    Q.  Was it after you talked to the two
8    officers?
9    A.  Probably about the same time we were in
10   contact with the officers.
11   Q.  Was it before or after?
12   A.  I don't recall if it was before or after.
13   Q.  Did these two officers inform you that
14   this source had given them information in the past?
15   A.  I never asked them.
16   Q.  So you actually talked to the source
17   independently from talking to the two officers?
18   A.  That's correct.
19   Q.  Those two officers were not present?
20   A.  No, they were not.
21   Q.  Did you ask the source if they had any
22   information about Master Street, these locations at
23   Master Street?
24   A.  The source told me about Master Street.

Page 32

1    Q.  So the source came forward and informed
2    you?
3    A.  Yes.
4    Q.  And it was right around the same time that
5    these two officers informed you?
6    A.  Yes.
7    Q.  All right.  What did the source tell you?
8    A.  That there's a lot of sales going on on
9    the corner of 56th and Master Street.
10   Q.  At the corner, but they didn't tell you --
11   they didn't give you the specific addresses of
12   5605, 5607 and 5609?
13   A.  The source didn't, no.
14   Q.  All right.  Who gave you the name of Al
15   and Pud?
16   A.  One of the officers.  I'm not sure which
17   one.
18   Q.  And did you interview the officers to
19   determine how they knew that?
20   A.  It was just general conversation.  They
21   were telling me about the different houses.  They
22   just asked me to take a look at it if I had a
23   chance.
24   Q.  And these were the two officers, 19th

8  (Pages 29 to 32)

Case 2:14-cv-01643-RBS    Document 61-5    Filed 06/29/22    Page 11 of 102

McIntyre v. Liciardello, et al./Torain v. The City of Phila., et al.                    BRIAN MONAGHAN, 1/17/17

Page 33

1    District police officers at the time?
2        A. Yes, they were.
3        Q. All right. So is it fair to say they
4    contacted you knowing you were in the field unit,
5    knowing that you used to work in the 19th District,
6    and told you to take a look at these places?
7        A. That's correct.
8        Q. Is that why you became the lead
9    investigator, because really the job initiated with
10   you?
11       A. I would say so, yes.
12       Q. Who makes that determination as to who's
13   going to be the lead investigator?
14       A. Well, what I would do is after I would
15   talk to the officers, I would go to a supervisor
16   and ask the supervisor can I start a job. I'd like
17   to look at 56th and Master, in that area.
18       Q. And who was that supervisor that you did
19   that to in this case?
20       A. Sergeant Gessner, Jeannie Gessner.
21       Q. Just for the record, Miss Gessner is
22   deceased?
23       A. I just heard that. I didn't know that,
24   yes.

Page 34

1            MR. PILEGGI: Is that your
2    understanding, Armando?
3            MR. BRIGANDI: I got that
4    understanding from you.
5            MR. PILEGGI: No. I got it from
6    you.
7            MR. BRIGANDI: I thought you told me
8    initially that you thought she was
9    deceased.
10           MR. PILEGGI: No. You told me that.
11           MR. BRIGANDI: I did?
12           MR. PILEGGI: Yeah. Why don't we
13   find out.
14           THE WITNESS: Like I said, I just
15   heard that.
16   BY MR. PILEGGI:
17       Q. You heard it from counsel?
18       A. Yes.
19           MR. PILEGGI: I thought I heard it
20   from counsel, too. Just for the record,
21   could you check that out?
22           MR. BRIGANDI: Yes.
23           THE WITNESS: That's who I got --
24           MR. BRIGANDI: Now -- I think when

Page 35

1    you first served the stuff we did a check
2    to see, and it came back that she was
3    deceased.
4            It's a female, correct?
5            THE WITNESS: Yes.
6            MR. BRIGANDI: Okay.
7    BY MR. PILEGGI:
8        Q. Now, did you ever make a determination --
9    prior to or at the initiation of the investigation,
10   did you ever make a determination as to who Al and
11   Pud were?
12       A. Not at that time, no.
13       Q. At any time?
14       A. I never found out who they were, no.
15       Q. That would have been an important piece of
16   information with regards to the investigation,
17   correct?
18       A. Well, yes, it would have been.
19       Q. Okay. Did you attempt to find out who
20   they were?
21       A. Well, I was hoping that based on the 229s
22   that we got that we would have seen -- somebody
23   would have gave us a name of Pud, but it never
24   occurred.

Page 36

1        Q. When you say "229s," you mean the
2    biographical reports?
3        A. Yes.
4        Q. That's a report that is created after an
5    individual is arrested?
6        A. That is correct.
7        Q. Am I correct that you would agree that the
8    two names would be extremely important later on
9    with regards to whether you had at least a
10   suspicion to initiate the investigation in the
11   first place, correct?
12       A. Can you repeat that?
13       Q. Yeah. It was a little unclear.
14           In other words, obviously, you put
15   it in the report because you believed it was an
16   important piece of information, correct?
17       A. At that time it was, yeah.
18       Q. Okay. Did it at any time become an
19   unimportant piece of information?
20       A. Well, not really, but it wasn't important
21   to me because of what we observed in that area.
22       Q. Okay. So, in other words, at least from
23   the initiation of the investigation it may have
24   been important, but after you corroborated what the

Case 2:14-cv-01643-RBS    Document 61-5    Filed 06/29/22    Page 12 of 102

McIntyre v. Liciardello, et al./Torain v. The City of Phila., et al.

BRIAN MONAGHAN, 1/17/17

Page 37

1    source and what the two officers told you, then it
2    became an unimportant --
3        A. That's correct.
4        Q. Okay. Without going through the whole
5    7549, am I correct that there was a series of three
6    days where you and your fellow officers surveilled
7    what you believed to be several drug transactions?
8        A. That's correct.
9        Q. All right. And, specifically, did you
10   recall seeing any transactions from these -- any of
11   these houses that you've identified, 5605, 5607 and
12   5609?
13       A. Yes.
14       Q. All right. When you say from the houses,
15   what do you mean?
16       A. Money being placed inside properties.
17   Drugs being handed from inside the property outside
18   to one of the dealers.
19       Q. Okay. Did you determine there was any
20   buys made out of the property?
21       A. No, no buys. Everything was done on the
22   porches.
23       Q. Now, just going back to this first
24   paragraph, it says, "5609 West Master is an

Page 38

1    abandoned property."
2            At what point did you determine
3    that?
4        A. That's what I was told, that it was
5    abandoned.
6        Q. So everything that you put in this first
7    paragraph was something that was told to you? It
8    wasn't something that you determined later on,
9    correct?
10       A. Correct.
11       Q. All right. And then on -- it says, "5607
12   West Master was being used as a stash house
13   containing marijuana, crack and weapons."
14           Do you see that?
15       A. Yes, I do.
16       Q. That was also told to you?
17       A. Yes, it was.
18       Q. All right. And then, "5605 West Master,
19   the narcotics were sold from the front porch area."
20           Do you see that?
21       A. Yes, I do.
22       Q. All right. And that you later determined
23   was incorrect because you said there was no
24   narcotics sold from any of the units, correct?

Page 39

1        A. No. It says from the porch area, and that
2    is correct because there was numerous narcotics
3    sales on the porch of 5605.
4        Q. Maybe I was unclear. Okay. So I said
5    from the house, but you did see several
6    transactions from the porch?
7        A. Yes.
8        Q. That was attached to the house, obviously?
9        A. Yes. It was an open porch.
10       Q. I see. And how would that work? You saw
11   the drugs pass from the house to the dealer and
12   then the dealer would sell to the buyer on the
13   porch?
14       A. I would see a package being transferred
15   from inside the house by somebody at the door,
16   which was one of the dealers. He would stand on
17   the porch. Sometimes he would hide the package
18   that he was given on the porch or he would put it
19   on his person.
20           During this time certain
21   individuals, males and females, would come up,
22   brief conversation. They would hand an unknown
23   amount of US currency in exchange for small objects
24   either from the package or what was on his person.

Page 40

1        Q. By the way, Officer, I forgot to ask this
2    in the beginning.
3            Did you have any discussions about
4    this case with Officer Reynolds?
5        A. Yes. Yes.
6        Q. What did you discuss with Officer
7    Reynolds?
8            MR. BRIGANDI: I'm going to parse
9        this out. Were they discussions that were
10       at the meeting or were they discussions
11       outside the meeting?
12           THE WITNESS: At the meetings.
13           MR. BRIGANDI: At the meetings I'm
14       going to --
15   BY MR. PILEGGI:
16       Q. So you never had any discussions outside
17   of the meeting that counsel has instructed you not
18   to discuss with Officer Reynolds?
19       A. Other than just laughing because it's a
20   2001 job. Other than that, that's about it.
21       Q. Why was that funny?
22       A. Well, it happened back in 2001. Now it's
23   coming around to where we have to look over our
24   notes again to re-testify. We were just saying

10  (Pages 37 to 40)

Case 2:14-cv-01643-RBS    Document 61-5    Filed 06/29/22    Page 13 of 102

McIntyre v. Liciardello, et al./Torain v. The City of Phila., et al.                    BRIAN MONAGHAN, 1/17/17

Page 41

1    that's a long time, 15, 16 years.
2        Q.  I may be obtuse, but I still -- what is
3    funny about that?
4        A.  Just that it is a long time.
5        Q.  Was it also -- you were aware that the
6    individual that you arrested did 13 years?
7        A.  Yes, I was.
8        Q.  Was that funny?
9        A.  No.
10       Q.  When I say "did 13 years," I meant
11   incarcerated for 13 years.
12       A.  Yes.
13       Q.  Other than that, other than laughing about
14   the age of the job, did you have any other
15   discussions about what -- in other words, what went
16   down on the job?
17       A.  Not really.
18       Q.  Well, you say "not really."
19           What do you mean?
20       A.  Well, I did know that Jeff Walker gave a
21   deposition and different things like that.
22       Q.  Did you have an opportunity to see -- to
23   review Jeffrey Walker's deposition?
24       A.  No, I did not.

Page 42

1        Q.  Did anyone tell you what he testified to?
2        A.  No.
3        Q.  So you have no idea what Jeffrey Walker
4    testified about the particulars of this case or
5    what the contents of the --
6            MR. BRIGANDI:  I think -- the
7        objection here is you're getting into now
8        privileged content between conversations
9        between myself and Officer Monaghan.
10           MR. PILEGGI:  Well, he didn't say
11       you told him.
12           MR. BRIGANDI:  But you're getting
13       into that is what I'm telling you.
14           MR. PILEGGI:  Let me ask him.
15   BY MR. PILEGGI:
16       Q.  Did counsel inform you what Jeffrey Walker
17   testified to?
18       A.  He told me he gave a deposition.
19       Q.  And when you say "he," who do you mean?
20       A.  Armando.
21       Q.  This was during your discussion when Mr.
22   Santarone was in the room?
23       A.  That's correct.
24       Q.  All right.  Was there any other attorneys

Page 43

1    other than Mr. Santarone, excluding the Solicitor's
2    office, in that room?
3        A.  Yes.  The person sitting down at the end.
4        Q.  Miss Cortes?
5        A.  Miss Cortes.
6        Q.  Okay.  Anyone else?
7        A.  No.
8        Q.  Was Officer Reynolds there?
9        A.  Yes, he was.
10       Q.  Was Officer Liciardello there?
11       A.  No, he was not.
12       Q.  How about Officer Norman?
13       A.  No.
14       Q.  Speiser?
15       A.  No.
16       Q.  Spicer?
17       A.  No.
18       Q.  Okay.  Did you have any discussions with
19   any of those other officers other than Officer
20   Reynolds who I just mentioned?
21       A.  No, I did not.
22       Q.  Okay.  About anything?
23       A.  No.
24       Q.  So one other thing before we get into the

Page 44

1    facts of this case.
2            Am I correct that these at least two
3    days of the three-day investigation were
4    videotaped?
5        A.  Yes, they were.
6        Q.  Why did you do that?
7        A.  Because we were in a search vehicle, which
8    is our search vehicle.  It's a van.  We were able
9    to videotape.  The last two days I videotaped.  One
10   that I wanted to tape was on the last day of the
11   takedown, which was the 4th.  I wanted to videotape
12   that with the takedown.  The other day we were
13   going to do an undercover narcotics with an
14   undercover officer.  I wanted to film that.
15       Q.  Okay.  Well, that was on the first day?
16       A.  No.  That was on the second day.
17       Q.  Okay.  You wanted to film that.
18           In other words, you were the one
19   that authorized the videotape?
20       A.  Well, being I was the lead investigator,
21   we took a video recorder out with us to videotape
22   it.
23       Q.  Why didn't you want to do the first day?
24       A.  The first day we went out mostly just for

Case 2:14-cv-01643-RBS   Document 61-5   Filed 06/29/22   Page 14 of 102

McIntyre v. Liciardello, et al./Torain v. The City of Phila., et al.                    BRIAN MONAGHAN, 1/17/17

Page 45

1    general information.
2        Q.  But am I correct that the general
3    information turned into being very detailed
4    information about several narcotics sales?
5        A.  Yes, it did.
6        Q.  And individuals coming out of the -- some
7    of the houses and passing drugs and hand-to-hand
8    transactions on the porch and things like that,
9    correct?
10       A.  Yes.
11       Q.  Okay.  You did go out on that first day,
12   and that was January 2, 2001, correct?
13       A.  That's correct.
14       Q.  And you were out there with your partner
15   Officer Kelly?
16       A.  Yes, I was.
17       Q.  Shawn Kelly?
18       A.  Yes.
19       Q.  How long had you worked with Shawn Kelly
20   prior to this investigation?
21       A.  Since the first day I got into the field
22   unit.  About a year.
23       Q.  You said the end of 2000 is when you got
24   in there?

Page 46

1        A.  Yes.
2        Q.  This job was on January 2, 2001.
3            So you weren't there maybe a couple
4    months?
5        A.  A couple months, I would say, yeah.
6        Q.  All right.  Was this your first
7    investigation as a lead investigator?
8        A.  No, it was not.
9        Q.  You had other ones?
10       A.  Yes, I did.
11       Q.  So you had been working with Shawn Kelly
12   for about three months; is that fair to say?
13       A.  I think a little bit longer.
14       Q.  By the way, when you were a 19th -- when
15   you were in strike force, did you work out of the
16   19th District then?
17       A.  We were in the 19th.  We did jobs in the
18   19, yes.
19       Q.  So is it fair to say that you pretty much
20   -- up until this investigation, whatever your
21   position was, you were stationed out of the 19th
22   District?  You knew it very well?
23       A.  Yes, I did.
24       Q.  You knew all the players in the 19th

Page 47

1    District?
2        A.  Not all of them.
3        Q.  A great deal of them?
4        A.  I would say so.
5        Q.  Did you know Torain, Kareem Torain, at
6    that time while you were in the 19th District?
7        A.  I don't believe so, no.
8        Q.  Well, I mean, do you recall -- by the way,
9    let me give you this instruction.  If you don't
10   recall something or if you're not sure, make sure
11   the record is clear.  Forgive me.  I forgot to give
12   you that instruction.  Let me rephrase it.
13           Were you aware of Kareem Torain as a
14   player?  When I say "player," meaning involved in
15   narcotics while you were in the 19th District.
16       A.  No.  I wasn't aware of it.
17       Q.  Okay.  So is it fair to say that prior to
18   this investigation you had no idea who he was?
19       A.  That would be fair to say, yes.
20       Q.  Maybe you didn't know who he was, but do
21   you think you knew him by if you saw him?  In other
22   words, did he seem familiar, his appearance?
23       A.  I can't say if I would know or not.  I
24   didn't know him.

Page 48

1        Q.  How about any of the other individuals
2    that were arrested on this day?  Do you recall any
3    -- knowing any of these people prior to this
4    investigation?
5        A.  Not really, no.
6        Q.  And there is a list of about ten people,
7    correct --
8        A.  Yes.
9        Q.  -- in your report?  All right.
10           In fact, some of them lived at the
11   addresses?  Darnell Delee, who's a 19-year-old
12   black male, lived at 5605 West Master?
13       A.  Correct.
14       Q.  Anthony Hodges, 5607 West Master, correct?
15       A.  Correct.
16       Q.  All right.  Did you do background checks
17   on these addresses before you were -- or during
18   this investigation?
19       A.  Yes, we did.
20       Q.  When?
21       A.  Probably right before I started the
22   affidavit.  I did a real estate check, voter's
23   register check.
24       Q.  Other than a real estate check prior to

12  (Pages 45 to 48)

McIntyre v. Liciardello, et al./Torain v. The City of Phila., et al.

BRIAN MONAGHAN, 1/17/17

Page 49

1    the affidavit, any of the affidavits, did you do
2    real estate checks? In other words, when you got
3    this information from these two officers and a
4    source that there was drug activity out of 5609,
5    5607 and 5605 West Master, did you do any kind of
6    background check on those addresses to see if any
7    of the individuals came up as players?
8        A.  Other than voters and registration,
9    property registration, no. That was it.
10       Q.  Okay. So am I correct that you knew that
11   this Darnell Delee or at least the Delee family
12   lived at 5605 West Master?
13       A.  Not at that time, no.
14       Q.  All right. All right. So the first day
15   you go out -- one other thing. When you went out
16   each day, you had -- it appears from the report you
17   had a periscope.
18           Like the kind in the submarine?
19       A.  No. What it is it's a -- you're in a
20   van and you're sitting in the back of the van.
21   It's kind of like a periscope to where on the top
22   of the van there is a vent and there is a mirror,
23   which you're able to focus on what you want to look
24   at. We call it a periscope because you're kind of

Page 50

1    looking into it and it goes up through the mirror
2    and out.
3        Q.  I got you. Can you move that around?
4        A.  Yes, you can.
5        Q.  So you can see -- can you see 360 degrees?
6        A.  Yeah. It goes in a full circle.
7        Q.  Am I correct that Officer Kelly is white?
8        A.  Yes.
9        Q.  Is it fair to say that you're in a drug
10   neighborhood, two white guys in a drug
11   neighborhood? It's kind of hard not to stick out,
12   correct?
13       A.  True. Correct.
14       Q.  Can't leave your van, can you?
15       A.  Yes, you can.
16       Q.  You can?
17       A.  Yes.
18       Q.  Without being made?
19       A.  Well, it all depends on if you're going to
20   drive up when there's a bunch of guys standing on
21   the corner or if you're going to try to drive up
22   and park it real fast without anybody noticing you.
23       Q.  But, I mean, can you actually emerge from
24   the van?

Page 51

1        A.  Oh, no.
2        Q.  That's what I meant.
3            Why?
4        A.  Because of the part of the City you're in
5    and two white officers getting out of that vehicle.
6        Q.  In fact, it's actually dangerous, correct?
7        A.  I would say so, yeah.
8        Q.  So the whole time that you set up
9    surveillance on the first day, on the 2nd, you were
10   inside the van looking through the periscope,
11   correct?
12       A.  Through the windows and the periscope,
13   yes.
14       Q.  That's what I was going to ask you. When
15   you videotaped, you can't videotape through the
16   periscope, correct?
17       A.  Correct.
18       Q.  You have to videotape through the front
19   window?
20       A.  No. Through the back window if you can,
21   yes.
22       Q.  So is it fair to say you can only see what
23   is going on in the back of the van?
24       A.  You can see on the side because there is a

Page 52

1    window on the side doors. There is a window on the
2    two back doors.
3        Q.  So if you had to estimate how much -- what
4    you could videotape, and, again, using 360 as a
5    full circle, how much would you estimate?
6        A.  Maybe -- if you are able to look out of
7    the front, maybe about 200.
8        Q.  That's 200 percent, let's say?
9        A.  Yes.
10       Q.  So you see several transactions the first
11   day, correct?
12       A.  Correct.
13       Q.  We don't have to go through that, but it's
14   fair to say, am I correct, that at no time during
15   that first day did you ever see my client, Kareem
16   Torain?
17       A.  That's correct.
18       Q.  Were you able to identify any of the other
19   individuals that day?
20       A.  No, not at that time.
21       Q.  Okay. So that first day you said you were
22   just checking it out.
23           Were you just checking it out to see
24   if there was general drug sales?

13 (Pages 49 to 52)

Page 53

1    A.  Correct.
2        Q.  In order to corroborate what you've been
3    told through the source and the two officers?
4        A.  That's correct.
5        Q.  Okay.  There were several drug sales,
6    correct?
7        A.  Yes, there was.
8        Q.  Were you able to link up any of those
9    properties on that first day?
10       A.  I believe I had enough for at least one or
11   two of the properties, yes.
12       Q.  When you say "enough," you mean enough
13   probable cause that you could have issued a warrant
14   or had a warrant issued and executed at those two
15   properties on that day?
16       A.  Yes.  That's correct.
17       Q.  Why?  What did you see that indicated to
18   you --
19       A.  I believe it was 5605.  The males were
20   standing on the porch of 5605.  Darnell Delee and I
21   believe his name was Hodges, first name Anthony,
22   they received an object which I believed to be
23   narcotics coming out from the property.  And they
24   sold to numerous males and females coming up to the

Page 54

1    porch.
2        Q.  Okay.  Now, by the way -- I'm sorry.  I
3    should have asked you this before.
4            At no time during this whole
5    investigation or prosecution of my client did you
6    ever determine that my client was Al or Pud,
7    correct?
8        A.  That's correct.
9        Q.  Okay.  So you felt at least on that first
10   day that there was sufficient probable cause to hit
11   the houses, correct, not just arrest the dealers
12   who you believed were dealers or buyers, but to
13   also hit the houses?
14       A.  I believe so, yes.
15       Q.  And there is a distinction, am I correct,
16   between probable cause to issue a search and
17   seizure warrant as opposed to probable cause to
18   arrest somebody, correct?
19       A.  Yes.
20       Q.  What is the distinction?
21       A.  Well, probable cause for a search and
22   seizure you need the individuals either receiving
23   something from inside that property or going in and
24   out throughout the property.  To arrest that person

Page 55

1    you have to make sure that they were involved in
2    narcotics transactions.
3        Q.  Okay.  So you need something that connects
4    them to the property, the drug sales?
5        A.  Correct.
6        Q.  Okay.  And with respect to arresting
7    someone for what you believe to be narcotics
8    transactions, whether they're a seller or a buyer,
9    you would actually have to witness some kind of
10   drug activity --
11       A.  Correct.
12       Q.  -- between those individuals, correct?
13       A.  Yes.
14       Q.  Is there a different level of probable
15   cause that you need for an arrest warrant as
16   opposed to a search warrant?
17       A.  No, not that I believe.
18       Q.  All right.  By the way, you cannot --
19   anything short of probable cause you cannot go into
20   a property, correct?  You cannot execute a search
21   and seizure warrant?
22       A.  Without probable cause, yes.
23       Q.  There is some exceptions to that rule?
24       A.  There is, yes.

Page 56

1        Q.  What are they?
2        A.  Your exception would be like you pull up
3    and you have your dealer in the house -- I mean,
4    he's outside on the porch.  He runs into the house.
5        Q.  Exigent circumstances?
6        A.  Exigent circumstances.
7        Q.  Okay.
8        A.  Also, you can go into a property if you
9    believe that the drugs are going to be -- which
10   would be exigent circumstances also.  They were
11   going to be destroyed and also for your safety.
12       Q.  But how do you determine if the drugs are
13   going to be destroyed?
14       A.  Well, if the person runs in the house and
15   you're in hot pursuit after them, you believe or
16   you think he's going to flush the drugs or
17   whatever.
18       Q.  But am I correct that at that point you
19   would have to have seen this individual engage in
20   some kind of criminal activity in order to chase
21   them into the unit, correct?
22       A.  Yes.
23       Q.  Any other exceptions to the rule of going
24   into a house and searching without a search

14  (Pages 53 to 56)

Page 57

1  warrant?
2      A.  I don't believe so.
3      Q.  All right.  Am I correct -- let me just
4  ask you this.
5          Pursuant to your understanding of
6  the policies and procedures that you would have to
7  have a search warrant other than aside from the
8  fact of exigent circumstances in order to go into a
9  house and search under any circumstance?
10         MR. BRIGANDI:  Objection.  This
11     calls for legal conclusions, but to the
12     extent that he knows, he can answer.
13         THE WITNESS:  I would believe.
14  BY MR. PILEGGI:
15     Q.  Am I correct that aside from the policies
16  and procedures, that would be unlawful to go into a
17  house and search without a search and seizure
18  warrant?
19         MR. BRIGANDI:  Same objection.  You
20     can answer.
21         THE WITNESS:  Yes.
22  BY MR. PILEGGI:
23     Q.  Okay.  By the way, if there is exigent
24  circumstances, can you go in and search the whole

Page 58

1  house?
2      A.  No, you cannot.
3      Q.  Where can you search?
4      A.  The immediate area where you located the
5  person.
6      Q.  Okay.  Now, let's go to the second day.
7  The second day was January 3rd.  That's the day you
8  also setup surveillance, along with your partner
9  Officer Kelly, correct?
10     A.  That's correct.
11     Q.  All right.  It looks like you setup
12  surveillance about 11 a.m.?
13     A.  Yes, it was.
14     Q.  All right.  And this day you actually have
15  the video recorder, correct?
16     A.  Yes.  That's correct.
17     Q.  And, again, you see a series of what you
18  believe to be narcotics transactions?
19     A.  Yes, we did.
20     Q.  Anything in particular that you saw that
21  came from one of those units that were identified,
22  5605, 5607 or 5609 Master?
23     A.  Yes.  Again, we saw Darnell Delee receive
24  objects from 5605 Master Street, which he started

Page 59

1  to sell to numerous people.  Also, we observed
2  Migel Moon come out of that property, 5605, and
3  sold to a couple males and females on the porch.
4      Q.  Okay.  Now, am I correct that it appears
5  that on the first day you saw you were able to
6  identify Darnell Delee?  Did you identify Delee?
7      A.  No.  I stated we weren't able to ID
8  anybody on the first two days.
9      Q.  Okay.  But the second day when you get
10  there you see some of the same players, right?
11     A.  Right.
12     Q.  But you also see additional people?
13     A.  That's correct.
14     Q.  And on that day you see several
15  transactions, and at some point you send in Police
16  Officer Mitchell to go make a controlled buy,
17  right?
18     A.  Yes, we did.
19     Q.  Police Officer Mitchell is black?
20     A.  Yes, he is.
21     Q.  Did you actually witness that buy?
22     A.  Yes, I did.
23     Q.  And he had prerecorded buy money and he
24  went and made a controlled buy, came back to you

Page 60

1  and he had purchased what looked like four black
2  tinted, heat-sealed packets of what you later
3  determined to be crack cocaine, correct?
4      A.  Yes.  That's correct.
5      Q.  And the last statement says, "On that day
6  the majority of the observations on 1301 were
7  videotaped by Police Officer Kelly and Police
8  Officer Monaghan," correct?
9      A.  Correct.
10     Q.  All right.  What was not videotaped?
11     A.  Well, the whole time.  We were there from
12  11 o'clock until about 4:00.  You know, off and on.
13  The videotape only runs a certain amount of time.
14  So we were trying to not secure it, but we were
15  trying to keep the battery alive in the video
16  recorder.
17     Q.  Let me ask you this.  Did you just try to
18  videotape what you believed to be drug
19  transactions?  In other words, turning off the tape
20  or the recorder when you didn't see any activity?
21     A.  Yes.  We videotaped what the properties
22  looked like, different things.  People coming to
23  the corner.
24     Q.  All right.  At any time on that day did

15  (Pages 57 to 60)

Case 2:14-cv-01643-RBS    Document 61-5    Filed 06/29/22    Page 18 of 102

McIntyre v. Liciardello, et al./Torain v. The City of Phila., et al.                     BRIAN MONAGHAN, 1/17/17

Page 61

1    you see what you later determined to be Kareem
2    Torain?
3        A.   Not that I believe, no.
4        Q.   Okay.  Did you receive any information
5    that day that -- from any other fellow officers
6    involved in this investigation that Kareem Torain
7    was involved somehow in this organization?
8        A.   No, I did not.
9        Q.   All right.  So let's go to the last day.
10   The last day is January 4th.
11           So you really did it three days,
12   consecutive days; is that correct?
13       A.   Yes.  That's correct.
14       Q.   Do you recall what days of the week they
15   were?
16       A.   I believe -- no.  I'm going to be guessing
17   if I say.  I see here the 3rd was Wednesday.  So
18   the 2nd would have been Tuesday and the last day
19   was a Thursday, yes.
20       Q.   Just for the record, you have here on
21   1/4/2000.
22           That's incorrect, right?
23       A.   Yes, it is.  That's a typographical error.
24       Q.   It really was 1/4/2001?

Page 62

1        A.   Yes, it was.
2        Q.   Now, do you create this report yourself?
3        A.   Yes, I did.
4        Q.   When I say "created," I mean do you type
5    it out at all?
6        A.   Yes.
7        Q.   Do you recall exactly when you did this
8    report?
9        A.   I would say no more than a week after the
10   4th.  Within a week.
11       Q.   Well, is there a date on here?
12       A.   There should be.  No, I don't see one.
13       Q.   You should have had a date on here,
14   correct?
15       A.   Yeah.  That's correct.
16       Q.   Do you know any reason why you left out a
17   date?
18       A.   No.  Sometimes we date next to our names.
19   Some days if we get the paperwork in late we don't
20   date it.  So I don't recall why we didn't date it.
21       Q.   Am I correct pursuant to the policies and
22   procedures you're required to have this report
23   submitted within a certain amount of time, correct?
24       A.   That's correct, because of the rules of

Page 63

1    discovery to get our discovery paperwork.
2        Q.   What is the date?
3        A.   I think it's ten days.
4        Q.   Are you sure?
5        A.   I believe it's ten days.  I could be
6    wrong.  At one point it was ten to get the
7    paperwork in.
8        Q.   All right.  When you say the rules of
9    discovery, do you mean the Philadelphia Police
10   Department's policies and procedures or is this
11   something that you believe is part of criminal
12   procedures?
13       A.   It would be both, but...
14       Q.   Okay.
15           (Mr. Popper entered the courtroom.)
16   BY MR. PILEGGI:
17       Q.   So your recollection is you got this
18   within ten days?
19       A.   I believe it was, yes.
20       Q.   So now let's go to the 4th.  So the 4th,
21   again, you set up surveillance at approximately
22   1:41.  Again, you have the -- I'm sorry.  Yeah.
23           Is that when you set up
24   surveillance?

Page 64

1        A.   It was before that.  I didn't put no date
2    on that day.  I think it was like about 1:30 we set
3    up by the time we were able to park.
4        Q.   Were you rolling the camera or the video
5    nonstop on that day or did you also stop to try to
6    preserve the battery?
7        A.   We also stopped it.
8        Q.   So do you think you stopped the tape and
9    missed what you would have -- what you believed to
10   be criminal activity?  In other words, did you not
11   film some of the criminal activity that you
12   personally observed?
13       A.   Yeah.  We could have missed it, yes.
14       Q.   Who was working the video that day?
15       A.   Both of us.  Me and Shawn Kelly.
16       Q.   You would alternate?
17       A.   Yes.
18       Q.   Whoever was not working the videotape,
19   what would be their responsibilities?
20       A.   Make sure nobody was coming near the van
21   for our security reasons.
22       Q.   All right.  It's fair to say that you were
23   concerned at least on the third day that somebody
24   had made you?  When I say "made you," meaning that

Case 2:14-cv-01643-RBS   Document 61-5   Filed 06/29/22   Page 19 of 102

McIntyre v. Liciardello, et al./Torain v. The City of Phila., et al.                    BRIAN MONAGHAN, 1/17/17

Page 65

1    they had identified you as police officers,
2    correct?
3        A.  No.
4        Q.  Why did you have somebody watching out to
5    make sure nobody came to the van?
6        A.  Well, we always did even on the first day
7    and the second day.  You make sure nobody is
8    messing with the van, nobody is coming over to
9    check out the van.
10       Q.  Am I correct that you do everything in
11   pairs?  I mean, if nothing else, for security
12   reasons you and Officer Kelly as your partner,
13   whatever was conducted, whatever you did, whether
14   it was surveillance or anything else, you would do
15   together, correct?
16       A.  This particular job or every job?
17       Q.  Well, let's just keep with this particular
18   job.
19       A.  Okay.  On this particular job, yes.
20       Q.  Okay.
21           (Mr. Fazlollah entered the
22           courtroom.)
23   BY MR. PILEGGI:
24       Q.  In fact, it would be impermissible for you

Page 66

1    to do something on your own, right, without your
2    partner?  When I say "something," I mean take some
3    kind of police activity, if nothing else for the
4    safety of the officers, right?
5        A.  They always wanted us to work in pairs,
6    yes.
7        Q.  You certainly would not conduct a search
8    alone, correct?
9        A.  That's correct.
10       Q.  All right.  So on this day you set up
11   surveillance.  You don't know who's working the
12   camera, but at some point it says that you observed
13   a green Bonneville with a PA tag DKC3310.  It says
14   it's registered to Carolyn Gillis.  It traveled
15   northbound on 56th Street to the intersection of
16   56th and Master, correct?
17       A.  Yes.
18       Q.  All right.  Now, you're looking out the
19   back of the van.  You actually saw the car pull up
20   traveling northbound on 56th Street until it got to
21   the intersection of 56th and Master?
22       A.  Saw it come to the intersection, yes.
23       Q.  Okay.  But you didn't see it traveling
24   northbound?

Page 67

1        A.  I saw when -- it was facing northbound
2    when it got to the corner.
3        Q.  So when you were looking out the back of
4    your van, the car would have been coming towards
5    the back of the van --
6        A.  Correct.
7        Q.  -- or would it have been going the other
8    way?
9        A.  No.  Towards the back of the van.
10       Q.  Okay.  Was that videotaped?
11       A.  I don't recall.
12       Q.  Well, you reviewed the transcripts,
13   correct?
14       A.  Correct.
15       Q.  And you know that during one of the
16   proceedings you actually gave a blow-by-blow
17   account of what happened on the videotape, correct?
18       A.  Yes.  That is correct.
19       Q.  Do you recall testifying that you -- from
20   the videotape when the videotape was playing that
21   you saw this vehicle approach the intersection?
22       A.  I recall testifying to the video, but I'm
23   not sure exactly what all I testified to.
24       Q.  All right.  Do you recall that you could

Page 68

1    not identify who the driver of that vehicle was?
2        A.  Yes.
3        Q.  All right.  At what point did you become
4    aware that it was registered to a Carolyn Gillis?
5        A.  Probably later on that day after we got
6    back to the headquarters.
7        Q.  When you say "probably," I don't want you
8    to guess.
9        A.  After he was arrested and we got
10   everything back to headquarters.
11       Q.  When you say "he" was arrested --
12       A.  Torain.
13       Q.  Did you know Torain was connected to this
14   car at the time of your surveillance?
15       A.  No, I did not.
16       Q.  Did you determine at any point that Torain
17   was connected to this car after he was arrested?
18       A.  Yes, that he was driving the vehicle.
19       Q.  Well, you said -- all right.  Fair enough.
20           Did you ever make a determination
21   that Torain had some kind of relationship with
22   Carolyn Gillis, the owner of this vehicle, after he
23   was arrested?
24       A.  No, I did not.

17 (Pages 65 to 68)

Case 2:14-cv-01643-RBS    Document 61-5    Filed 06/29/22    Page 20 of 102

McIntyre v. Liciardello, et al./Torain v. The City of Phila., et al.                    BRIAN MONAGHAN, 1/17/17

Page 69

1       Q.  Okay.  Why did you put it registered to
2   Carolyn Gillis?
3       A.  Because that's who the car came back to,
4   the tag.
5       Q.  Was she arrested?
6       A.  No, she was not.
7       Q.  Why?
8       A.  I never seen her do anything.
9       Q.  Did you ever see Torain do anything?
10      A.  I didn't, no.
11      Q.  Okay.  Did anyone tell you that Carolyn
12  Gillis did anything?
13      A.  No.
14      Q.  Okay.  Did anyone tell you that Torain did
15  anything?
16      A.  Yes.
17      Q.  When I say "anything" I'm talking about
18  illegal activity, of course.
19      A.  Not at this time, no.
20      Q.  At any time?
21      A.  Other than what Jeff told me what was
22  going on.
23      Q.  When you say "Jeff," you're referring to
24  Jeffrey Walker?

Page 70

1       A.  Yes, I am.
2       Q.  And when did Jeffrey Walker tell you that
3   Torain did something illegal?
4       A.  When he first pulled up he said he saw --
5   well, Delee he saw getting out of the vehicle,
6   putting a clear baggie in his pocket.  That's all
7   he said when he first pulled up behind him on Ithan
8   and Master.
9       Q.  When who first pulled up?
10      A.  Jeff pulled behind Torain in the vehicle.
11      Q.  How did you know Torain was in the
12  vehicle?
13      A.  Well, the driver of the vehicle.  I'm
14  sorry.
15      Q.  I'm going to ask you again.  How do you
16  know -- at what point did Jeffrey Walker tell you
17  that Torain did something illegal?  He didn't tell
18  you then because you didn't know who the driver
19  was, right?
20      A.  No.
21      Q.  For all you knew the driver was Carolyn
22  Gillis?
23      A.  For all I knew at that time, yes.
24      Q.  Now, it goes on to say -- and this is your

Page 71

1   report -- "At this time Delee who was standing on
2   the steps at 5605 Master made a hand gesture toward
3   the Bonneville and yelled yo."  At this time the
4   Bonneville -- "yo."
5           Did you actually witness that?
6       A.  Yes, I did.
7       Q.  You did?
8       A.  Yes.
9       Q.  Do you know if that was on the videotape?
10      A.  I'm not sure.
11      Q.  Okay.  You actually heard him say "yo"?
12      A.  Yes.
13      Q.  Now, am I correct -- again, you reviewed
14  your testimony during the preliminary hearing and
15  the trial as well as the motion to suppress.
16          Am I correct that you testified that
17  you could not hear anything on the street from
18  inside that van?
19      A.  No.  Incorrect.
20      Q.  You could?
21      A.  Yes, we could.
22      Q.  Okay.  Am I correct the video did not have
23  any sound?
24      A.  Yes, you're correct.

Page 72

1       Q.  But you distinctly heard "yo."  Okay.
2           Were you looking out the front
3   window or the back window or the periscope at that
4   time?
5       A.  I don't recall, but I was able to look
6   out.
7       Q.  Okay.  What did "yo" mean to you?  I mean,
8   why was that significant?
9       A.  Well, it could mean anything.  It was
10  significant because he yelled towards the vehicle.
11      Q.  Okay.  So.  He said "yo."
12          Was that illegal?
13      A.  No, not at all.
14      Q.  Okay.  What was the significance within
15  the context of your investigation that he yelled
16  "yo" and made a hand gesture towards the
17  Bonneville?
18      A.  The Bonneville then went to Ithan Street,
19  made a turn and stopped.
20      Q.  But you did not witness that, correct?
21      A.  I witnessed it stopped, yes.
22      Q.  But did you not witness -- did you see
23  Delee get into the car?
24      A.  Yes.

18  (Pages 69 to 72)

McIntyre v. Liciardello, et al./Torain v. The City of Phila., et al.                    BRIAN MONAGHAN, 1/17/17

Page 73

1    Q.  Could you see inside the car?
2    A.  No.
3    Q.  It was out of your view at that time,
4    correct?
5    A.  Yes.  That's correct.
6    Q.  Okay.  So although you saw him get in the
7    car, I'm assuming he got in the car when it
8    stopped, right?
9    A.  That's correct.
10    Q.  You just said you couldn't see?
11    A.  He might have pulled up.  I don't know.
12    Q.  What do you mean?  It might have pulled up
13    where?
14    A.  He pulled away out of my view for a
15    second.  It was out of my view once he got in.
16    Q.  So it's your testimony that once he got
17    in, you see him yell "yo," made a hand gesture.
18    The car pulls over and parks.  You see Delee get in
19    and then it pulled off and it was out of your view?
20    A.  He double-parked right on Ithan Street
21    right at the corner.  Delee got in and then it was
22    out of my view.
23    Q.  Where did the car go?
24    A.  Somewhere on Ithan Street.

Page 74

1    Q.  Okay.  Did anyone witness -- any officer
2    involved in this investigation witness where that
3    car went and what happened in the car, if anything?
4        MR. BRIGANDI:  Objection.  I don't
5    know how he can answer as to any officer.
6        MR. PILEGGI:  Yeah.  Any officer
7    with the investigation.
8        MR. BRIGANDI:  If you know.
9        MR. PILEGGI:  He was supervising
10    them.
11        MR. BRIGANDI:  If you know the
12    answer.
13        THE WITNESS:  I was later told by
14    police radio that Jeff Walker -- I asked
15    somebody to see what this car is doing and
16    he pulled onto the block.
17    BY MR. PILEGGI:
18    Q.  I don't understand.  You heard from radio
19    that you asked Jeff Walker to follow the car?
20    A.  No.  I went over police radio and gave out
21    the description of the car, the location of where I
22    believed it was at that time for somebody to come
23    to see where the car is.  That's when Jeff came
24    around the corner and onto Ithan Street.

Page 75

1    Q.  Did you see Jeff Walker come around the
2    corner?
3    A.  Yes.
4    Q.  How long was it after you went over police
5    radio?
6    A.  About a minute.  He must have been in the
7    area, close to the area.
8    Q.  In fact, you were supervising Jeffrey
9    Walker that day, correct?
10    A.  No.  I wouldn't say -- I'm not a
11    supervisor.
12    Q.  Well, you were the lead investigator?  You
13    were directing him and the other officers that were
14    on your team investigating this drug organization?
15    You were the one directing the show, correct?
16    A.  At that time, yeah, I would say so.
17    Q.  All right.  Why didn't you just tell Jeff
18    Walker to -- why did you go over police radio?
19    A.  Because that's our contact, that we were
20    in contact through police radio from our
21    surveillance van.
22    Q.  So if you wanted to talk to other members
23    of your team that day, you would have to go over
24    police radio and they would contact a particular

Page 76

1    officer?
2    A.  No.  We're in a secured surveillance van,
3    and it was just our group that was out there using
4    this secured surveillance van.
5    Q.  In other words, when you use the radio
6    with your group, would it just go to the group
7    members?
8    A.  Yes.
9    Q.  So you went over the police radio, and it
10    just so happened that Jeffrey Walker happened to be
11    the closest?
12    A.  Yes.
13    Q.  And then he showed up.
14        Did he drive past you, Jeffrey
15    Walker?
16    A.  Yes, he did.
17    Q.  Okay.  And you recall it about a minute
18    after you went over radio?
19    A.  A minute after I talked to him, yes.
20    Q.  Do you know what he was driving that day?
21    A.  An unmarked vehicle.  I'm not sure.  We
22    had so many types of vehicles.
23    Q.  That's fine.  Did you see him follow that
24    vehicle?

19  (Pages  73  to  76)

Page 77

1    A. No, I did not.
2    Q. And did you have a discussion with Officer
3 -- former Officer Walker about what happened with
4 that vehicle after you saw him a minute later?
5    A. Yes, I did.
6    Q. What did he say?
7    A. He followed the vehicle -- well, he said
8 that he observed Delee get out and put an object, a
9 clear baggie, into his jacket pocket.
10    Q. Where? When?
11    A. When he was getting out of the passenger
12 side of the vehicle.
13    Q. Okay. Where? On Ithan Street?
14    A. On Ithan. I'm sorry.
15    Q. How far away was it from when it went out
16 of your view?
17    A. I never asked him.
18    Q. Okay. By the way, why did you want
19 someone to follow this car in particular?
20    A. Because we were getting ready to do our
21 takedowns and I wanted to make sure we had
22 everybody who we wanted to get ID'd or to stop. At
23 that time being Delee -- at that time I wasn't sure
24 if he was a buyer or a seller.

Page 78

1    Q. Okay. But the prior two days you must
2 have seen -- and I'm just estimating -- 20 to 30
3 buys, right?
4    A. Close to it, yes.
5    Q. Many of them you filmed?
6    A. Yes.
7    Q. You never followed one buyer, correct?
8    A. We did have a -- which we believed on the
9 first day to be a buyer, but he was lost in the
10 area of the 4700 block of Merion.
11    Q. Who followed that buyer?
12    A. Somebody from our unit. I'm not sure
13 exactly who it was.
14    Q. Okay. Other than that, the 19 or 29 other
15 buys that were made, you did not ever instruct any
16 of your members of your team to follow that car and
17 arrest that individual?
18    A. No. That's correct.
19    Q. Why?
20    A. I can't tell you. I don't know.
21    Q. Well, you were running the show?
22    A. Yes, I was.
23    Q. Was it an important to -- buyers are
24 arrested all the time, aren't they?

Page 79

1    A. Yeah. If you're going to do a job with a
2 buyer and you stop a buyer during your
3 investigation -- now, I know this was going to be a
4 couple-day investigation. If I would have stopped
5 any buyers on the first day, our whole
6 investigation would have been jeopardized.
7    Q. Come on, Officer. You do this all the
8 time, long-term investigations. Buyers are
9 arrested all the time, aren't they?
10    MR. BRIGANDI: Objection. You're
11 arguing with the witness.
12    Do you have a question?
13 BY MR. PILEGGI:
14    Q. Am I correct?
15    A. Some jobs, yes. Some jobs, no.
16    Q. In fact, you get a uniformed officer to
17 make the stop, correct?
18    A. Correct.
19    Q. So that you don't jeopardize the
20 investigation?
21    A. It's -- it has been done, yes.
22    Q. All right. At this time when you saw the
23 Bonneville drive up and you couldn't identify the
24 driver, did you believe that driver was part of

Page 80

1 this organization, in other words, a seller?
2    A. At that time I wasn't sure what he was.
3    Q. You were not sure?
4    A. Yes.
5    Q. At what point did you make a determination
6 that whoever was driving this Bonneville was part
7 of this organization; a seller, a player, however
8 you want to term it?
9    A. After I was instructed by Jeff Walker that
10 three of my individuals who were on the corner went
11 to the location of 1628 North 55th Street and
12 entered after Torain let them into the property.
13    Q. So Jeffrey Walker informed you that three
14 individuals who we had previously identified as
15 Delee, Diggs and Tillman, these were individuals
16 that you surveilled for two days straight seeing
17 them involved in drug activity, correct?
18    A. Correct.
19    Q. These three individuals -- well, you were
20 informed by Jeffrey Walker that these three
21 individuals were leaving Master Street and went
22 over to 1658 North 55th Street, correct?
23    A. I informed Jeff that they were leaving the
24 area, to keep an eye out in case the vehicle pulled

Page 81

1    up to that location.
2        Q.  Okay.  Why did you come up with 55th
3    Street?
4        A.  What --
5        Q.  You told Jeff Walker to keep an eye out
6    for a vehicle in case it goes to 1658 -- 1628 North
7    55th Street, right?
8        A.  Um-hmm.
9        Q.  Where did you get 1628 North 55th Street?
10       A.  North 55th Street.
11       Q.  Yeah.  How did you come up with that
12   address?
13       A.  Because I know he was looking -- he was
14   keeping a surveillance on that property, and we
15   overheard Delee on the corner -- Officer Kelly
16   overheard it, who later relayed it to me, that
17   Delee just mentioned to somebody that he -- the
18   person in -- Kareem in the Bonneville or Kareem
19   only had one bundle and he was going to get the
20   rest and he was going to call the pay phone.  A
21   short time later is when Delee went to the pay
22   phone, got in the vehicle with the two other males
23   who left the area.
24       Q.  This is all information that Officer Kelly

Page 82

1    told you he overheard?
2        A.  Yes.  That's correct.
3        Q.  Did you actually personally observe Delee
4    go to a pay phone?
5        A.  Yes, I did.
6        Q.  Did you film it?
7        A.  I don't believe we were filming at that
8    time, no.
9        Q.  Why?  Wasn't that important?
10       A.  Yes, it was, but we just didn't have a
11   chance to get the video up because of how fast it
12   was.
13       Q.  Okay.  So at the point that those
14   individuals left the area to go to 1628 North 55th
15   Street, am I correct that you believe that whoever
16   was driving that green Bonneville was a player?
17       A.  At that time, yes.
18       Q.  You did?
19       A.  Yes, I did.
20       Q.  Okay.  And am I correct that at that point
21   you would have had the sufficient probable cause to
22   arrest that individual who was driving the green
23   Bonneville?
24       A.  Not at that time, no.

Page 83

1        Q.  Why?
2        A.  Well, I didn't see him do anything.  So I
3    -- all I knew is he went to Conestoga Street first
4    and was in Conestoga Street for about 20 minutes.
5    If you want me to give you the address, it's on the
6    paperwork.
7        Q.  It's okay.
8        A.  I was instructed he went to Conestoga
9    Street.  After about 20 minutes he left Conestoga
10   Street, which I later found out to be his home
11   address.  He went to the property of 55th Street.
12       Q.  But my question was different.  My
13   question was do you believe you had probable
14   cause --
15           MR. BRIGANDI:  Mike, he answered
16       your question.
17           MR. PILEGGI:  No, he did not.
18           MR. BRIGANDI:  Yes, he did.
19           MR. PILEGGI:  I'll ask it again.
20       Maybe he misunderstood.
21           MR. BRIGANDI:  Maybe you
22       misunderstood him.
23           MR. PILEGGI:  Okay.
24   BY MR. PILEGGI:

Page 84

1        Q.  So is it your testimony -- let me ask you.
2    Do you feel that you have the probable cause when
3    these individuals left the area, the three
4    individuals, Diggs, Delee and Tillman, you believe
5    you had the probable cause to arrest whoever was
6    driving that green Bonneville?
7        A.  Like I stated, no, not at that time.
8        Q.  Okay.  Do you believe or did you base the
9    probable cause to arrest Torain solely on Jeffrey
10   Walker's information provided to you?
11       A.  That's correct.
12       Q.  With everything?  The whole job?
13       A.  With Torain?
14       Q.  Yes.
15       A.  Just what Torain did, yes.
16       Q.  So you believe that you had the probable
17   cause to get a search warrant to search 1628 North
18   55th Street based solely on what Officer Walker
19   told you?
20       A.  No.  It was based on us having the keys
21   after Torain was stopped.  We had -- two sets of
22   keys was recovered from Torain for the front door
23   of the property and also the door that opened up
24   the second apartment.

21  (Pages 81 to 84)

Page 85

1    Q. So? Why is the key probable cause?
2    A. Well, it's not probable cause, but we had
3  probable cause based on that we thought that if --
4  the time Torain was taken down on the arrest and
5  the lapse between the time Officer Walker had left
6  1628 North 55th Street and the time we came back,
7  which was about 20 to maybe half hour later to that
8  property. We were worried that drugs were going to
9  be destroyed. We didn't know who was in the
10  property at the time.
11       Based on using the two keys to
12  secure the evidence, if there was evidence in the
13  house, that we were not aware of at that time.
14    Q. Okay. Just so I'm clear with this, you're
15  saying that you based the probable cause to get a
16  search warrant for 1628 North 55th Street based on
17  the fact of the time period from when these
18  individuals left or Torain left the area and came
19  back 20 minutes later and the fact that after
20  Torain was arrested you obtained keys to fit the
21  door of that property? That's your sufficient
22  probable cause?
23    A. Yes, it is.
24    Q. And is there anything else that gave you

Page 86

1  the probable cause? Anything else in that formula?
2    A. No, not that I put down on my paperwork.
3  No.
4    Q. Okay. So, again, let's break it down.
5       So your probable cause to arrest
6  Torain and prosecute Torain was based on the fact
7  that Delee, Diggs and Tillman left the area where
8  you were surveilling and came back 20 minutes later
9  and they were seen by Officer Walker coming out of
10  1628 North 55th Street, correct?
11    A. No. After Delee, Tillman and Diggs left
12  56th and Master, within a few minutes they pulled
13  up to the area of -- I believe it would be 55th
14  Street to where Jeff Walker observed them get out
15  of their vehicle and meet Torain at the front door
16  who -- Torain let them in. They were in there for
17  a couple minutes. If I can refer to my notes, I'm
18  going to say ten minutes maybe. I'm not positive.
19    Q. When you say you're referring to your
20  notes, you're referring to the report?
21    A. The report, yes.
22    Q. By the way, do you have notes on this job?
23    A. Not on me, no.
24    Q. Well, do you have them? Did you make

Page 87

1  notes?
2    A. Yeah. Well, I have a copy of the PARS and
3  I just jotted down some notes that was on the PARS
4  report so I knew about what happened this day.
5    Q. Well, when you were at trial and you
6  testified at trial, you were specifically asked
7  whether you had notes?
8    A. Yes, I was.
9    Q. A summary sheet? Do you believe there was
10  a summary sheet created with this job?
11    A. No. I'm not sure if there was a summary.
12  I think I was referring to -- my notes was the 49,
13  I believe, I was reading from.
14    Q. Well, you said that you didn't have the
15  notes. They would have had the 49, correct?
16    A. Yes, but I didn't have them while I was up
17  on the stand.
18    Q. Do you recall writing down what Jeffrey
19  Walker informed you with regards to Torain's part
20  of this case in your report?
21    A. No. Just what Jeffrey told me when we
22  went back to do the arrest paperwork.
23    Q. Where does it say in this report that
24  Torain let these three individuals in the front

Page 88

1  door?
2    A. On page number three at the top.
3    Q. Okay. Read the Bates stamp page.
4    A. Yes. It's 07425.
5    Q. Okay.
6    A. All right. At approximately 2:05 p.m.
7  police observed Delee answer the pay phone on the
8  northwest corner of 56th and Master Street. Jogged
9  to the Buick. Mentioned on 1/3 -- which should be
10  2001. I have 2000. Typographical error. Along
11  with Diggs and Arthur Tillman. Police Officer
12  Walker followed them to 55th and Hunter Street
13  where he was actually in a stationary position I
14  later found out. They parked the car on 55th
15  Street. All three males exited the Buick and were
16  admitted into 6828 South 55th by Torain.
17    Q. Now, let me ask you a question. Am I
18  correct that Torain was not identified at this
19  point?
20    A. No, he was not.
21    Q. Okay. At most, he was identified -- or
22  was he even identified as the driver of the
23  Bonneville vehicle?
24    A. Yes, he was.

22 (Pages 85 to 88)

McIntyre v. Liciardello, et al./Torain v. The City of Phila., et al.

BRIAN MONAGHAN, 1/17/17

Page 89

1    Q. He was?  Where is that?
2    A. It's not on there, but --
3    Q. It's not on where?
4    A. No paperwork at this time because Officer
5 Walker observed him get out of that Bonneville.
6    Q. Okay.  How do you know it's not on this
7 paperwork?
8    A. It could be somewhere.  Police Officer
9 Reynolds also observed him exit -- one second.
10   Q. Go ahead.  You can read that.
11   A. Yeah.  Observed Torain exit.  He exited
12 westbound on Hunter Street in the Bonneville.
13 Police Officer Reynolds saw him driving the
14 Bonneville.
15   Q. So Police Officer Reynolds was already
16 there, correct?
17   A. He went up to Conestoga Street, yes.
18   Q. Well, how did he know to go to Conestoga
19 Street if he wasn't following them?
20   A. Because that's where -- oh, let's see.
21 Let me go back.  On 7424, last paragraph, middle.
22   Q. If you could read it.
23   A. I'm going to. "Delee exited after
24 approximately two to three minutes and ran back to

Page 90

1 the corner of 56th and Master.  The Bonneville who
2 was being operated by a black male, who I later
3 ID'd as Kareem Torain, was followed back to 1621
4 West Conestoga Street by Police Officer Walker at
5 that time."
6    Q. Okay.  So I just want to read this back.
7 "The Bonneville who was being operated by a black
8 male" -- is it ID'd?
9    A. "Later ID'd as."
10   Q. Who ID'd him as Kareem Torain?
11   A. Police Officer Reynolds when he was
12 arrested.
13   Q. Okay.  So he didn't know the identity when
14 he went into 1621 North Conestoga Street?
15   A. No.
16   Q. How do you know?
17   A. Well, I don't know for sure if he knew of
18 him before, but I never knew him.
19   Q. Well, it says here -- it says that the
20 Bonneville who was being operated by a black male,
21 later ID'd as Kareem Torain, was followed back to
22 1621 North Conestoga by Police Officer Walker where
23 police observed Torain exited his vehicle and
24 enters 1621 Conestoga.  I'm confused.

Page 91

1       I thought it was Reynolds who
2 followed him to Conestoga?
3    A. No.  Reynolds went to Conestoga Street,
4 but Reynolds saw him exit Conestoga and get into
5 the Bonneville and go back -- and go to the area of
6 1600 North 55th Street.
7    Q. Okay.  So Walker followed him back to
8 Conestoga and then Reynolds picked him up and
9 followed him from Conestoga to North 55th?  Is that
10 the testimony?
11   A. To the area of 55th and Hunter to the
12 corner.
13   Q. Okay.  Is that correct, though?
14   A. Yeah.  Correct.
15   Q. All right.  So were they working in
16 conjunction, do you know?
17   A. Yes.  They were separate vehicles and they
18 were working as my roving surveillance vehicles.
19   Q. So is it fair to say that it was Reynolds
20 who observed Torain going to 55th Street?
21   A. I believe at that time that both Reynolds
22 and Walker both observed him go into 55th Street.
23   Q. What are you basing that belief on?
24   A. Because they both were there.

Page 92

1    Q. Okay.  How do you know who observed what?
2    A. Well, I know Police Officer Reynolds
3 observed him go into that property.
4    Q. Okay.  That was my question.  Is it fair
5 to say --
6    A. Are we talking about Conestoga or 55th
7 Street?
8    Q. No.  We're talking 55th Street.
9       Am I correct that it was Police
10 Officer Reynolds who observed Torain go into 55th
11 Street initially?
12   A. That's what was relayed back to me.
13   Q. And then you called Officer Walker and
14 told him to keep his eye out for Delee, Tillman and
15 Diggs because you thought they were going to go to
16 55th Street, correct?
17   A. Yeah.  Well, it wasn't just Jeff Walker
18 that I notified.  It was my roving surveillance.
19 Whoever could come pick up the vehicle -- to come
20 down to the area and try to pick up the vehicle.
21   Q. But your understanding, based on the
22 paperwork that you submitted, it was actually
23 Officer Reynolds who saw Torain go in and it was
24 also actually both officers who would have got the

23  (Pages 89 to 92)

Page 93

1    radio call to expect this vehicle that was coming
2    down to 55th Street, correct?
3        A. Correct.
4        Q. Which officer did you get the information
5    from that Torain went into 55th Street to even tell
6    them to expect a vehicle driven by Delee, Tillman
7    and Diggs?
8        A. Brian Reynolds.
9        Q. Brian Reynolds?
10       A. Yes.
11       Q. So wasn't that part of the probable cause
12   consideration, the information, not just that
13   Jeffrey Walker gave you, but what Officer Reynolds
14   gave you?
15       A. Yes.
16       Q. In fact, wasn't that the most important
17   piece of getting the warrant to go into 55th
18   Street, 1628 North 55th Street, was the fact that
19   Officer Reynolds reported to you that he saw Torain
20   go into that property?
21       A. No. Also Police Officer Walker said that
22   he went into that property too. So it was both of
23   them.
24       Q. He did? Where does it say that in the

Page 94

1    statement?
2        A. It didn't put down, which I believe -- let
3    me read it. 07425. I have Walker watching 1628
4    North 55th Street.
5        Q. Okay.
6        A. That's when Walker observed Delee and them
7    guys pull up to the location and was -- he was met
8    by Torain who let them into the property.
9        Q. Okay. That would have had to have been
10   observed by Officer Reynolds, correct, maybe also
11   Officer Walker, but certainly by Officer Reynolds
12   because he was the one that went in and observed
13   Torain go in?
14       A. He might have still been in the area. I'm
15   not sure where exactly he was located.
16       Q. When Torain left at 2:58 -- and I'm
17   referring to the second paragraph -- at
18   approximately 2:58 p.m. Torain left 1628 North 55th
19   Street and left the area in his Bonneville. Police
20   Officer Reynolds, 4268, followed this vehicle out
21   of the area and with the aid of uniformed vehicles
22   stopped Torain?
23       A. Yes, he did.
24       Q. All right. Did you -- am I correct that

Page 95

1    you directed Officer Reynolds specifically to
2    arrest Torain?
3        A. To stop him, yes.
4        Q. To stop him? You didn't tell him to
5    arrest him?
6        A. Well, I didn't come right out and say
7    arrest him. I said to stop him.
8        Q. Well, a big difference?
9        A. No. He knew what I meant when I said it.
10   I believe he knew what I meant when I said it.
11       Q. You said to stop him, but what you really
12   meant was for him to stop him and arrest him and he
13   knew that?
14       A. I believe he did at that time, yes.
15       Q. But is that what you meant, to stop him?
16   You meant stopping as synonymous with --
17       A. Yes. I wanted him arrested.
18       Q. You wanted him arrested. So, in other
19   words, you told -- you directed Police Officer
20   Reynolds to arrest Torain, correct, at that time?
21       A. To stop him, which meant to arrest him, if
22   you want to put it in them words.
23       Q. Is that a fair statement?
24       A. Yes. If you want to put it in them words.

Page 96

1        Q. So is it fair to say that the reason why
2    you were directing Police Officer Reynolds to
3    arrest him at that point was based on the
4    observations by Police Officer Reynolds as well as
5    Police Officer Walker?
6        A. That's correct.
7        Q. All right. So is it fair to say that you
8    were in communication with Police Officer Reynolds?
9    At least he provided you some information in this
10   arrest, right?
11       A. Yes. Correct.
12       Q. Or prior to the arrest?
13       A. Prior to the arrest. Sorry.
14       Q. And isn't it fair to also say that he
15   provided you with information which was embodied in
16   your affidavit of probable cause to search 1628
17   North 55th Street?
18       A. Yes.
19       Q. Okay. And a big part of that was the fact
20   that you had to put Torain in that premises in
21   order to arrest him, correct?
22       A. Correct.
23       Q. And you had to put Torain in that premises
24   engaging in criminal activity in order to arrest

24   (Pages 93 to 96)

Page 97

1   him, correct?
2       A.  Correct.
3       Q.  Okay.  Because is it fair to say that had
4   you not had the information that Torain was at
5   North 55th Street, he would have never have been
6   arrested under any circumstances?
7       A.  Yes.
8       Q.  Okay.  Now, at what point did you direct
9   Officer Reynolds to go to 1621 -- it says South
10  Conestoga, but it's North Conestoga -- to search
11  that unit?
12      A.  We never searched that property.
13      Q.  Who is "we"?
14      A.  Nobody in my unit searched that property.
15      Q.  Are you sure about that?
16      A.  Yeah.  Not that I'm aware of.  We didn't
17  have a search warrant for that property.  That was
18  the property that he listed -- that Torain listed
19  on the 229, the biographical information.
20      Q.  Understood, but it was also the property
21  that Officer Reynolds and Officer Walker saw him go
22  into first before he went into North 55th, correct?
23      A.  That's correct.
24      Q.  All right.  And you didn't believe that

Page 98

1   that was -- could have been -- somehow that
2   property could have been harboring criminal
3   evidence?
4       A.  Nothing was seen from that other than him
5   going in and Torain coming out.
6       Q.  And what was seen at North 55th that
7   indicated to you that Torain was engaged in any
8   criminal activity?
9       A.  Based on Jeff Walker telling me that Delee
10  came out placing a baggie in his pocket, which he
11  believed to be narcotics.
12      Q.  Okay.  So?  What does that have to do with
13  Torain?
14      A.  He was leaving that property.
15      Q.  Torain was leaving that property.
16          So what?
17      A.  No.  Delee was leaving that property
18  placing the bag into his pocket.
19      Q.  Torain was leaving placing a bag into his
20  pocket?
21      A.  Delee was leaving the property placing the
22  baggie into his pocket.
23      Q.  What did that have to do with Torain?
24      A.  We believed that he received the drugs

Page 99

1   from inside that property.
2       Q.  Who is "we"?
3       A.  Officer Walker.
4       Q.  But he didn't get the affidavit; you did?
5       A.  Yes.
6       Q.  So you were aware at some point that that
7   was a rooming house, correct?
8       A.  I believe there was three apartments in
9   there.
10      Q.  What made you believe that?  You were
11  there, right?
12      A.  Yes.
13      Q.  Did you check out to make sure that there
14  was three apartments?
15      A.  I don't remember exactly how many
16  apartments.  I thought there was three, but I'm not
17  sure how it was laid out, how the apartments were
18  laid out.
19      Q.  Nevertheless, you believed that there was
20  other individuals living there, correct?
21      A.  Yes.
22      Q.  You knew there was other individuals
23  present when you stated that Officer Walker
24  informed you that Delee, Tillman and -- Delee was

Page 100

1   seen putting drugs in his pocket coming out of that
2   unit, correct?
3       A.  Correct.
4       Q.  Why didn't you have Delee, Tillman and
5   Diggs stopped at that point?
6       A.  Because I wanted to see what they did once
7   they came back to the area.
8       Q.  Why?  You knew what they were doing.  You
9   seen them over a period of three days repeatedly
10  engaged in drug activity.
11          What exactly did you want to see?
12      A.  To see where they went, if they went into
13  a property or if they came back to the property,
14  and what they were going to do once they came back
15  to the area.
16      Q.  So you wanted to see if they were going to
17  go to some other property other than 5605, 5607 and
18  5609?
19      A.  Well, I didn't know what other properties
20  they were going back to.  We actually had in our
21  hand at that time search warrants for 5605, 07, and
22  trying to get all of them officers together to
23  execute the warrants at one given time, we were
24  trying to instruct that.  Our sergeants, the

25 (Pages 97 to 100)

Case 2:14-cv-01643-RBS   Document 61-5   Filed 06/29/22   Page 28 of 102

McIntyre v. Liciardello, et al./Torain v. The City of Phila., et al.                     BRIAN MONAGHAN, 1/17/17

Page 101

1    captain, everybody was going over radio saying is
2    everybody ready.
3           So at that time we didn't have
4    enough manpower to stop them when they came back.
5    So I wanted to see where they came back to and what
6    they did. We were hoping to get everybody inside
7    the properties so when we hit it wasn't mass
8    confusion, which it was mass confusion once we
9    tried to come on location.
10       Q. Well, correct me if I'm wrong, but it
11   would have been an easy call to just arrest them
12   right there and then you just eliminate three out
13   of the ten guys right there and then? You already
14   had the warrants to hit the house. So you didn't
15   need anything more to hit the houses, right?
16       A. It could have been easier, yes.
17       Q. Did you instruct any of your officers or
18   even uniformed officers to arrest these individuals
19   once Officer Walker reported back to you that he
20   saw Delee put drugs in his pocket?
21       A. No.
22       Q. Why?
23       A. Wasn't ready to arrest them yet.
24       Q. Let's go back to 1621 Conestoga.

Page 102

1        A. Sure.
2        Q. So is it fair to say that Torain was not
3    identified when he went into Conestoga, which was
4    observed by both Police Officer Walker and
5    Reynolds?
6        A. Yes, it would be fair to say.
7        Q. Okay. And is it fair to say that when he
8    went to North 55th Street, he was not identified as
9    Kareem Torain?
10       A. Yes. Correct.
11       Q. So why didn't you hit Conestoga also?
12   Didn't you believe that since he went into that
13   property later on you found out or you believed
14   that he is engaged in drug activity? Why didn't
15   you hit the Conestoga property?
16       A. I didn't feel like we needed to hit it.
17       Q. Okay. It's your testimony that no one
18   searched that unit?
19       A. Yeah. I'm under the impression nobody
20   searched that property.
21       Q. Why are you under that impression, because
22   of what you're reading?
23       A. I don't think I have anything down on
24   paperwork. I don't recall anybody ever going to

Page 103

1    that property.
2        Q. Am I correct that if someone searched that
3    property, they would have to have a warrant, right?
4        A. Yes.
5        Q. There was no exigent circumstances when he
6    went into that property, right?
7        A. Not at all.
8        Q. Okay. And the person doing the warrant
9    would be you, right?
10       A. Yes, it would have been.
11       Q. Did anyone inform you on your team that
12   they went over to Conestoga Street to search?
13       A. Like I said, I don't believe so.
14       Q. I will submit to you that there's nothing
15   in this paperwork that suggests that.
16       A. No.
17       Q. But independent of what is in the
18   paperwork, do you recall anyone informing you that
19   they were in Conestoga Street?
20       A. No.
21       Q. And if I told you I had evidence that
22   there was a search by Officer Reynolds in Conestoga
23   Street, that would be illegal, wouldn't it?
24       A. If it happened, yes, but that didn't

Page 104

1    happen.
2        Q. It would be illegal? It would be
3    impermissible --
4        A. If it happened.
5        Q. -- under the policies and also --
6           MR. BRIGANDI: Mike, do you have the
7           evidence that you can show him?
8           MR. PILEGGI: I'm just asking him.
9           It's a hypothetical question.
10   BY MR. PILEGGI:
11       Q. Correct?
12       A. If it happened --
13          MR. BRIGANDI: Do you have the
14          evidence here to show him?
15          MR. PILEGGI: I don't have the
16          evidence here, no.
17   BY MR. PILEGGI:
18       Q. Is that correct, though?
19       A. What is that?
20       Q. If there was a search, that would be
21   illegal as well as impermissible under the policies
22   and procedures?
23          MR. BRIGANDI: This is a
24          hypothetical you're giving him, correct?

26  (Pages 101 to 104)

Case 2:14-cv-01643-RBS    Document 61-5    Filed 06/29/22    Page 29 of 102

McIntyre v. Liciardello, et al./Torain v. The City of Phila., et al.                    BRIAN MONAGHAN, 1/17/17

Page 105

1          MR. PILEGGI: Yes.
2          THE WITNESS: Yes.
3      BY MR. PILEGGI:
4          Q.   Okay.
5          MR. BRIGANDI: Can we take a break?
6          MR. PILEGGI: Yeah.
7          (There was a brief recess taken at
8      this time.)
9          MR. PILEGGI: If we can go back on
10         the record.
11     BY MR. PILEGGI:
12         Q.   All right. Officer, when we left off we
13     were talking about Conestoga Street.
14             Now, just so we're clear, you never
15     directed any of the officers to go over to
16     Conestoga to do anything, correct?
17         A.   Correct.
18         Q.   And the only reason that you found out
19     that Torain was even connected to Conestoga was in
20     the 229?
21         A.   Well, other than him going into Conestoga
22     Street and coming out and through the 229, yes.
23         Q.   Okay. But you're -- the 7549 says that he
24     actually went in with a key.  Why was that

Page 106

1      significant?  I'm referring to Conestoga Street.
2      I'm referring to the page 07424.  It says that at
3      approximately 2:00 p.m. Police Officer Reynolds
4      observed Torain exit 1621 South Conestoga, but it's
5      North, and travel westbound on Hunter Street in the
6      Bonneville to the southwest corner of 55th and
7      Hunter.  At this point Torain exited his vehicle
8      and entered 1628 North 55th with a key.
9          A.   Yes.
10         Q.   So there's no mention of Torain using a
11     key to get into Conestoga?
12         A.   No.
13         Q.   All right.  What is the significance of
14     entering with a key anywhere?
15         A.   Well, if he doesn't, he kicks the door in,
16     he's -- you know.  He uses a key to open the door.
17     The door was locked.  He used a key that he
18     retrieved from his person.
19         Q.   I understand that, but what is the
20     significance with regards to probable cause whether
21     an individual uses a key or not to get into a unit?
22         A.   Well, he has -- he has control of that
23     door by him using the key that is on his person.
24         Q.   Okay.  So you're using a legal term.

Page 107

1      Dominion and control?
2          A.   Is that what it is?  Yes.
3          Q.   Is that why that's in your report with
4      regards to North 55th Street?
5          A.   Yes.
6          Q.   Who told you that Torain used a key at
7      North 55th Street?
8          A.   I believe --
9          Q.   Which one of the officers?
10         A.   Reynolds.
11         Q.   All right.  Actually, it's on 424 at the
12     bottom.  All right.  Let's go back to North 55th
13     Street.
14             So do you know which officer gave
15     you the information that Delee, Tillman and Diggs
16     went into North 55th Street?
17         A.   Yes.  Walker did, I believe.  Well, he
18     said the three males went into the property, yes.
19         Q.   You would agree, would you not, that just
20     because they went into the unit, which at least had
21     three apartments at least, that wouldn't
22     necessarily mean that there was a specific place
23     that they went, correct?
24             I mean, in other words, you didn't

Page 108

1      have any information at that point as to where
2      those individuals went when they entered that
3      building, did you?
4          A.   Officer Walker broadcast it over the
5      radio.  Well, not broadcast it, but he said that
6      earlier he observed a light go on when he went
7      inside that property.
8          Q.   Okay.  And that's while he was at the
9      scene surveilling?
10         A.   He later told me he was actually at the
11     scene surveilling.  He was on foot.
12         Q.   Okay.  But he drove to the scene and then
13     he got out of his vehicle and went on foot?
14         A.   Yes.
15         Q.   All right.  And am I correct that that's
16     also something that Officer Reynolds would have
17     observed also being at the scene when he saw these
18     three individuals go into the unit, correct?
19         A.   I can't say what Officer Reynolds would
20     have or could have seen.  I'm not sure where
21     exactly he was.  He might have been -- had to be on
22     foot if he did observe it.  I don't know.  I know
23     he couldn't walk around that neighborhood.
24         Q.   So is that where you got the probable

McIntyre v. Liciardello, et al./Torain v. The City of Phila., et al.

BRIAN MONAGHAN, 1/17/17

Page 109

1    cause to search that specific room that we'll get
2    into in a second, but specifically the second
3    bedroom?  Is that where you got the probable cause
4    was from Officer Walker?
5        A.   Probable cause that I got was from using
6    the key that opened the front door and that
7    apartment door.
8        Q.   Okay.  And it was the same key that opened
9    the front door as that particular number two
10   apartment door, correct?
11       A.   They were separate keys.
12       Q.   Well, according to your report, it was the
13   same key.  I'm sorry.  It was according to your
14   testimony, but I'll bring that out later, but you
15   recall it being two separate keys?
16       A.   Yes, I do.  I believe it was.
17       Q.   And how do you know that key opened up the
18   bedroom number two?
19       A.   I used the key to open it up that was
20   given to me by Police Officer Reynolds.
21       Q.   Okay.  And that was before you actually
22   executed the search and seizure warrant, correct?
23       A.   Yes.
24       Q.   And in order to get to that bedroom, am I

Page 110

1    correct that you have to get into the building
2    first?
3        A.   Yes.
4        Q.   And you used one of those keys to get into
5    that building that would then let you into the
6    second bedroom?
7        A.   Yes.
8        Q.   You didn't have a warrant at that time,
9    did you?
10       A.   For getting in the front door?
11       Q.   Yes.
12       A.   No.
13       Q.   It was an illegal entry, wasn't it?
14       A.   No, it was not.
15       Q.   Why?
16       A.   We went in there to secure the property in
17   case there was any narcotics if anybody was in
18   there being that we just conducted a major takedown
19   in that area.  We were worried that drugs would be
20   destroyed if there was anybody in that apartment.
21       Q.   So you believed that there was exigent
22   circumstances to go into that unit with the key
23   that you confiscated off the individual arrested to
24   get into a second bedroom to further investigate

Page 111

1    whether that was the bedroom that drugs were stored
2    in?
3        A.   It's not a bedroom.  It's an apartment.
4        Q.   Okay.  Let me rephrase the question.  So
5    you believed that there was exigent circumstances
6    to go into the building to get to that particular
7    apartment by using the key prior to getting a
8    warrant because it was exigent circumstances?
9        A.   That's correct.
10       Q.   Okay.  What is your definition of exigent
11   circumstances?
12       A.   Well, in that case, we didn't know --
13   being the time lapse between anybody observing the
14   property and being that we just conducted a major
15   takedown in the area, we didn't know if anybody was
16   able to get back to the property or if anybody was
17   in that property at the time.
18       Q.   Wait a minute.  Correct me if I'm wrong.
19   I'm going to read from your report.  You already --
20   someone, either Reynolds or Walker, observed Delee,
21   Tillman and Diggs leave, right?
22       A.   Yes.
23       Q.   In fact, one of them reported to you that
24   they saw Delee put what they thought appeared to be

Page 112

1    drugs in his pocket, correct?
2        A.   Correct.
3        Q.   And then Officer Walker -- Officer
4    Reynolds followed Torain out of that property and
5    arrested him about nine or ten or twelve blocks
6    away, correct?
7        A.   Correct.
8        Q.   So this was long after these three
9    individuals left, correct?
10       A.   A couple minutes.
11       Q.   All right.  So what was the exigent
12   circumstances?
13       A.   Well, then Officer Walker left the area,
14   and Officer Reynolds, who were involved with
15   takedown of certain individuals.
16       Q.   Okay.  So it's your testimony that Officer
17   Walker as well as Officer Reynolds left the area to
18   arrest Torain?
19       A.   Not Torain but other individuals.
20       Q.   Wait a minute.
21       A.   Reynolds arrested along with a marked
22   vehicle.
23       Q.   So Reynolds arrested Torain, right?
24       A.   Yes.

28  (Pages 109 to 112)

Page 113

1    Q.   And Walker went and arrested someone else?
2    A.   A short time later, yes.  He was involved
3    with the arrest.
4    Q.   Who was that?
5    A.   After Torain was secured, it looks like
6    Brian Reynolds and Walker, Jeff, they stopped the
7    Sebring or the Breeze at 56th and Market Street.
8    Q.   At 3:17, correct?
9    A.   Yeah.  Even though they were in separate
10   vehicles they arrested Hodge.
11   Q.   But let me ask a question.  Reynolds had
12   already arrested Torain at 2:58, right?
13   A.   Yes.
14   Q.   According to your report it says that at
15   approximately 2:58 Torain left 1628 North 55th
16   Street and left the area in his Bonneville.  Police
17   Officer Reynolds followed this vehicle out of the
18   area and with the aid of uniformed vehicles stopped
19   Torain.
20        Right?
21   A.   Yes.
22   Q.   Okay.  At 61st and Nassau, which is
23   several blocks away, right?
24   A.   A couple blocks away, yes.

Page 114

1    Q.   And then recovered from Torain was one
2    pager, one Nextel cell phone, one cancer key ring
3    containing five keys, one black key ring containing
4    three keys, one later determined to work the door
5    of 1628 North 55th Street and apartment number two
6    inside?
7    A.   Yes.
8    Q.   So, according to your report, one key fit
9    both doors, right?
10   A.   That's what it says, yes.  I don't recall
11   at this time if it was one or two keys.
12   Q.   And also recovered was $250, right?
13   A.   Yes.
14   Q.   Nothing illegal about any of those items,
15   are there?
16   A.   No.
17   Q.   Okay.  And when Delee was arrested, did
18   you find on him the drugs that one of the officers
19   informed you he was putting in his pocket when he
20   was leaving 55th Street?
21   A.   No.  I don't believe anything was
22   recovered from Delee at the time.
23   Q.   And, in fact, you observed him go back to
24   56th and Master and engage in several drug

Page 115

1    transactions, right?
2    A.   Yes.  And then he went back into 5605
3    Master Street and then they all came running out of
4    that property.
5    Q.   Okay.  The point being is that other than
6    what either Reynolds or Walker told you with
7    respect to Delee putting drugs in his pocket, you
8    never recovered any of those drugs that were
9    allegedly observed, correct?
10   A.   Correct.
11   Q.   And Torain had nothing on him, nothing
12   whatsoever, no type of contraband or drugs or
13   anything of the sort, no marked money, that would
14   link him to this organization, correct?
15   A.   Correct.
16   Q.   Nevertheless, after apparently -- by the
17   way, where does it say that Walker and Reynolds
18   arrested another individual?  I believe it was
19   Hodges.  I'm sorry.  Let me read it to you.  It's
20   in the middle of the paragraph.  This is on page
21   07425.
22        It says that at approximately 3:17 a
23   marked police vehicle stopped in the middle of 56th
24   -- here it is.  Police Officer Reynolds, 4268, and

Page 116

1    Police Officer Walker, 3730, stopped the Breeze at
2    56th and Market.  Hodge was placed under arrest and
3    recovered from him was five blue tinted ziplock
4    packets containing a green weed substance, correct?
5    A.   Yes.
6    Q.   And a key ring, three keys, one which
7    later was determined to work the door at 5607
8    Master Street, right?
9    A.   Correct.
10   Q.   But you already had enough on Master
11   Street, 5607 Master Street, to serve the search
12   warrant anyway, correct?
13   A.   Yeah.  We didn't -- well, the key came in
14   handy.  I'm not sure if we took -- well, I'm not
15   sure if the officers took the door by force or if
16   they used a key.  I believe they entered by force,
17   but I'm not sure.
18   Q.   But the key comes in handy in order to
19   link him to that particular unit, correct?
20   A.   Well, yes, it does.
21   Q.   Okay.  And that's what you're intending to
22   do when Reynolds came back to the area, North 55th
23   Street, and when you arrived he gave you the set of
24   keys that he took off of Torain, correct?

29  (Pages 113 to 116)

Page 117

1   A. Yes.
2   Q. And you tried those keys to determine
3   whether they fit the door so you could link Torain
4   to that unit, correct?
5   A. Yeah. Also during that time we were back
6   at 1628 55th Street. Officer Kelly had a
7   conversation with a male who was either the owner
8   or the manager who gave us a description of a male
9   using that apartment.
10  Q. We'll get to that.
11  A. That's fine.
12  Q. I'm just asking about the key, what the
13  purpose of taking the keys off of Torain was.
14      What was the purpose of that?
15  A. To try to see if they worked the doors.
16  Q. Okay. Did you instruct Reynolds to bring
17  the key to you?
18  A. He met me back at the property. So we all
19  met back at the property, a lot of us.
20  Q. Did Reynolds tell you that he confiscated
21  keys off of him?
22  A. Yes.
23  Q. And Reynolds was -- just for clarity's
24  sake, Reynolds was the one that told you that he

Page 118

1   used the key to get into that door in the first
2   place, right?
3   A. Yes.
4   Q. Not Walker, but Reynolds?
5   A. Correct.
6   Q. Okay. Now, am I correct that you went
7   back to the apartment at 3:50 approximately?
8   A. 3:58 was it?
9   Q. 3:50 it says. This is on page 07426.
10  A. Okay. Yes. 3:50. I'm sorry.
11  Q. Okay. It says that at 3:50 members of
12  narcotics went to 1628 North 55th Street to attempt
13  to secure the apartment that Torain went into.
14      Is that what your intent was, to
15  secure that apartment?
16  A. Yes.
17  Q. Okay. I'm a little confused. He left at
18  2:58, almost an hour before.
19      What were the exigent circumstances?
20  A. That being the time lapse between the time
21  he was stopped and during -- between the time all
22  the arrests were made in the area and at that --
23  the property wasn't being watched at that time. We
24  went back to secure the property to make sure

Page 119

1   nobody came in to destroy any evidence or anything
2   that was in there or if any of our guys were hiding
3   in the apartment.
4   Q. Do you recall testifying that Officer
5   Walker had actually met you at the property and he
6   had secured the property since Torain left?
7   A. Yes.
8   Q. You recall that?
9   A. I recall that.
10  Q. So the property was secured. So there was
11  no fear that drugs were going to be destroyed
12  because Walker was at the property for close to an
13  hour before you arrived?
14  A. No, not the whole time. Like I stated,
15  Walker was involved in the takedown of certain
16  individuals. That property was not being kept a --
17  surveillance on it during that time.
18  Q. Okay. So when you arrived Walker was
19  inside the property, right?
20  A. No.
21  Q. He was in the hallway, according to your
22  testimony?
23  A. He went in the hallway. We met outside
24  and we tried the door and we went into the hallway.

Page 120

1   Walker didn't have a key. So there was no way of
2   Walker getting into that hallway.
3   Q. Officer, do you recall your testimony that
4   when you got to the property, Officer Walker was
5   waiting for you in the hallway?
6   A. I don't recall that.
7   Q. Okay. And you would -- if I point that
8   out to you, that would be illegal, wouldn't it,
9   because you had one of your officers go into a
10  property without any probable cause at that point
11  or any suspicion whatsoever?
12  A. No, but I don't know how he would have got
13  into that property without using the key.
14  Q. That's not my question. If he was in that
15  property, that would be illegal, wouldn't it?
16      MR. BRIGANDI: Mike, do you have the
17      testimony to show him?
18      MR. PILEGGI: Yes, I do.
19      MR. BRIGANDI: Can you do that?
20      MR. PILEGGI: I'll get to it.
21  BY MR. PILEGGI:
22  Q. Am I correct?
23  A. No, it wouldn't be illegal because we were
24  going to that property to secure it.

Case 2:14-cv-01643-RBS    Document 61-5    Filed 06/29/22    Page 33 of 102

McIntyre v. Liciardello, et al./Torain v. The City of Phila., et al.                    BRIAN MONAGHAN, 1/17/17

Page 121

1    Q. So if you go in to secure it, an officer
2    can go in without a warrant to secure it? Is that
3    your understanding?
4    A. Yes, it is.
5    Q. Okay. So what would prevent a police
6    officer to say he was going to secure a property
7    and just go in there and search without a warrant?
8    A. It all depends on who the officer is.
9    Q. Okay. But you would agree that all that
10   would be premised, a warrantless search, on the
11   fact that you believed you had exigent
12   circumstances, right?
13   A. True.
14   Q. Because that's the only time you can do a
15   warrantless search, correct?
16   A. What is that?
17   Q. Exigent circumstances.
18   A. I believe there's other ways, but I'm not
19   sure of what the other ways are right now.
20   Q. Why don't you tell me. You've been a
21   police officer for how long?
22         MR. BRIGANDI: This isn't a trivia
23   contest for his legal knowledge.
24         MR. PILEGGI: Sure, it is.

Page 122

1          MR. BRIGANDI: No, it's not.
2          MR. PILEGGI: Yes, it is. He's the
3    lead investigator.
4          MR. BRIGANDI: Give me a break. Ask
5    your next question.
6    BY MR. PILEGGI:
7    Q. How long have you been a police officer?
8    A. For 28 years.
9          MR. BRIGANDI: We're not getting
10   into this. He's already answered this
11   question.
12         MR. PILEGGI: Are you instructing
13   him not to answer?
14         MR. BRIGANDI: Yes. He's already
15   answered this question like five times.
16         MR. PILEGGI: Are you instructing
17   him not to answer?
18         MR. BRIGANDI: Yes. He's not a
19   lawyer. We're not here to quiz him on his
20   legal knowledge.
21   BY MR. PILEGGI:
22   Q. What are the other ways that you've
23   testified are the exceptions other than exigent
24   circumstances? You're looking at counsel.

Page 123

1          MR. BRIGANDI: If you can recall.
2    You're asking him throughout his whole
3    career?
4          MR. PILEGGI: No.
5    BY MR. PILEGGI:
6    Q. You've been a police officer for over 20
7    years?
8    A. Yes, I have.
9    Q. Okay. Have you ever gone into a property
10   and done a warrantless search when you didn't
11   believe you had exigent circumstances?
12   A. Are we talking search warrant or arrest
13   warrant?
14   Q. Search warrant.
15   A. Okay. In my career, I don't recall other
16   than with exigent circumstances.
17   Q. I'm going to go back to my original
18   question.
19         That would be illegal, wouldn't it,
20   assuming there was no exigent circumstances to
21   conduct a warrantless search?
22   A. True.
23   Q. And a search would -- it would be a
24   warrantless search if you went into an apartment

Page 124

1    building, if you broke the front door, in other
2    words, you went into the front door? That would be
3    a search, wouldn't it? You would need a warrant?
4    A. Not if you're -- no. You're not
5    searching. If you go in there and lift things up,
6    move things, that's searching. If you just go in
7    and stand there, you're not searching.
8    Q. So it's your testimony that you can go
9    into a building without a warrant pursuant to an
10   investigation and so long as you don't search, lift
11   things, that that's legal?
12   A. A vestibule is common ground. Anybody can
13   go into a vestibule. It's common ground.
14   Q. Okay. So it's your testimony that you're
15   getting the search warrant for the second
16   apartment?
17   A. Yes, we did.
18   Q. Let's look at the search warrant.
19              - - -
20         (Whereupon, Exhibit Monaghan-2 was
21   marked for identification.)
22              - - -
23   BY MR. PILEGGI:
24   Q. Officer Monaghan, you've been given what

31  (Pages 121 to 124)

Case 2:14-cv-01643-RBS    Document 61-5    Filed 06/29/22    Page 34 of 102

McIntyre v. Liciardello, et al./Torain v. The City of Phila., et al.                    BRIAN MONAGHAN, 1/17/17

Page 125

1   has been marked as Monaghan-2 for identification.
2   That is the search warrant for 1628 North 55th
3   Street, correct?
4       A.  Yes.
5       Q.  All right.
6       A.  That's what it looks like.
7       Q.  Now, a couple general questions.  This was
8   a search warrant that appears was
9   conducted/executed on January 5th, and it says
10  2000, but that's a typo, correct?
11      A.  No.  Date of application up in the
12  right-hand corner underneath the control number,
13  which would be the warrant control number,
14  1/5/2001.
15      Q.  That's when you applied for it?
16      A.  Yes.
17      Q.  But you executed the warrant -- and I'm
18  going to refer to you to the middle of the page.
19      A.  I see it, yes.
20      Q.  It says 1/5/2000, right?
21      A.  Yes.
22      Q.  That's a mistake?
23      A.  Yes.
24      Q.  It says 1:00 a.m., correct?

Page 126

1       A.  Yes.
2       Q.  So is it fair to say that you executed
3   this search warrant at 1:00 a.m. on -- it's a
4   little bit difficult to see, but if you look at
5   third box down it says 1628 North 55th Street,
6   correct?
7       A.  Yes.
8       Q.  It says a three-story corner row, I guess
9   that's conventional/apartment building, masonry,
10  first floor, apartment two, correct?
11      A.  Correct.
12      Q.  And it says the name of owner or occupant,
13  and it's a little difficult to see also, but it
14  says somebody Waites and Vincent Saunders, correct?
15      A.  Yes.
16      Q.  We'll get into this again, but Vincent
17  Saunders was an individual you had a discussion
18  with, correct?
19      A.  Kelly did, yes.
20      Q.  Officer Kelly?
21      A.  Yes.
22      Q.  And Officer Kelly was present -- we're
23  going to go back a little bit.  I'm sorry to keep
24  shifting, but Officer Kelly was also present when

Page 127

1   Officer Reynolds gave you the key that he
2   confiscated off of Torain?
3       A.  Yes.
4       Q.  And Walker was there?
5       A.  Yes.
6       Q.  So it was yourself, Kelly, Walker,
7   Reynolds.
8           Anyone else?
9       A.  I believe there was a few of us.  Off the
10  top of my head, I'm not sure who, but I believe
11  there was a supervisor there.
12      Q.  Who would that supervisor be?
13      A.  Either Corporal Sinclair or Sergeant
14  Gessner.
15      Q.  Okay.  And this is at the point where you
16  -- at 3:50 when you tried the key, correct?
17      A.  Yes.
18      Q.  All right.  Do you recall when you arrived
19  at the scene Officer Walker was in the hallway,
20  correct?
21      A.  I'm not positive.  I believe he was on the
22  porch.
23      Q.  Well, okay.  Let me get to the testimony.
24  Give me one second.  Let me refer to my notes.

Page 128

1       A.  Mr. Pileggi, can I ask what notes you're
2   referring to?
3       Q.  Sure.  Those are my own notes.
4       A.  Okay.  That you received off of what
5   paperwork?
6       Q.  No.  These are my own personal notes after
7   reviewing all the paperwork.
8       A.  Okay.
9       Q.  Okay.  I'm going to give you a copy of
10  this so we can go over it together.  We'd better
11  mark it.
12          MR. PILEGGI:  Mark this as
13      Monaghan-3.
14                -  -  -
15          (Whereupon, Exhibit Monaghan-3 was
16      marked for identification.)
17                -  -  -
18  BY MR. PILEGGI:
19      Q.  Officer Monaghan, I'm going to -- this is
20  the preliminary hearing notes/transcript of a
21  preliminary hearing for the Torain case.  There was
22  other cases consolidated with it, but this was a
23  preliminary hearing on October 23, 2001.  You were
24  one of the officers who testified.  If you could

32  (Pages 125 to 128)

McIntyre v. Liciardello, et al./Torain v. The City of Phila., et al.                    BRIAN MONAGHAN, 1/17/17

Page 129

1    refer to page 30.
2        A.  Okay.
3        Q.  On page 30 -- and let me just read it.
4    This is the question by the district attorney.
5            "Now, did you have occasion to
6    receive information from Officer Reynolds and any
7    physical property in relation to the address 1628
8    North 55th Street, apartment two?"
9            Your answer was: "Yes.  About 3:55
10   I went to that area with Police Officer Kelly, 1658
11   North 55th Street.  The middle bedroom apartment
12   was being secured by Police Officer Walker, Your
13   Honor.  He was standing in the hallway of that
14   property, Your Honor."  Okay.
15           Does that refresh your recollection?
16       A.  Yes, it does.
17       Q.  That Officer Walker was in the hallway
18   when you arrived with Officer Kelly?
19       A.  Yes.
20       Q.  Okay.  Do you recall when you arrived that
21   the corporal or whoever the supervisor was was
22   already there?
23       A.  I don't recall.
24       Q.  Am I correct that whatever happened from

Page 130

1    here a supervisor would have to be present pursuant
2    to the policies and procedures?
3        A.  Would have to be on his way, yes, or
4    present, yes.
5        Q.  Especially if you're going to go into a
6    building without a warrant, that supervisor would
7    have to be there, correct?
8        A.  Yes, if we were going to go in.
9        Q.  And you seem to recall it was Corporal
10   Sinclair?
11           MS. CORTES:  I just want to make a
12       note for the record that we had someone
13       enter the courtroom.
14           MR. BRIGANDI:  I want to know is
15       that a witness in the back?
16           MR. PILEGGI:  Yes.
17           MR. BRIGANDI:  Who?  Is he a witness
18       in this case?
19           MR. PILEGGI:  Oh, no.  He's not a
20       witness.  He's an observer.
21           MR. BRIGANDI:  Do you know him?
22           MR. PILEGGI:  No.
23           MR. BRIGANDI:  As long as he has no
24       connection to this case, he can sit there

Page 131

1    all he wants.  I'm sorry.
2            Sir, do you have any connection with
3        this case?
4            OBSERVER:  Me personally?
5            MR. BRIGANDI:  Yes.
6            OBSERVER:  No.
7            MR. BRIGANDI:  Okay.
8    BY MR. PILEGGI:
9        Q.  Should I repeat it?
10       A.  Yes.  A supervisor should be -- if we were
11   going to go into a property to secure it, we should
12   have a supervisor there, yes.
13       Q.  Okay.  I think my question was do you
14   recall the supervisor being Sinclair?
15       A.  I don't remember who was there.
16       Q.  Could it have been Jeannie Gessner?
17       A.  Yes.  As I said, it could have been either
18   Jeannie or Sinclair.
19       Q.  Now, why would a supervisor have to be
20   there?
21       A.  Departmental reasons.  They always want a
22   supervisor to go into a property if -- unless it's
23   very exigent circumstances to where like if you had
24   to chase somebody into a property.  Most of the

Page 132

1    times when we secure properties we always had a
2    supervisor come to our location.
3        Q.  Well, you said "very exigent
4    circumstances."
5            What does that mean?
6        A.  Say, like you're chasing somebody into a
7    house.  He shoots somebody and then he runs into a
8    house and you're running in a house after him.  I'm
9    not going to stop at the front door and call for a
10   supervisor.
11       Q.  I agree.  That's exigent circumstances,
12   correct?
13       A.  Yes, very exigent.
14       Q.  Why is it "very" as opposed to just
15   exigent?
16       A.  Well, because you don't have time to stop
17   and call for a supervisor.  In this case we did
18   have time to stop and say we're going to meet here.
19   Can I have a supervisor come up here?
20       Q.  Again, I don't want to split hairs here,
21   but isn't that the point that makes it exigent?
22       A.  What?
23       Q.  That you don't have time --
24       A.  Yeah.

33  (Pages 129 to 132)

Page 133

1    Q.  -- to secure a warrant.
2    A.  Well, we did have time to secure a
3  warrant.
4    Q.  I understand that.  That's my point.
5      So why is it very exigent?
6    A.  I just gave you that as a shooting
7  scenario.
8    Q.  Okay.  So do you know how Walker got in
9  there?
10    A.  No, I do not.
11    Q.  You mentioned he didn't have the key?
12    A.  No.
13    Q.  How do you know he didn't have the key?
14    A.  Because Officer Reynolds gave me the key.
15    Q.  When you arrived was Officer Reynolds
16  there?
17    A.  We might have just been getting there at
18  the same time.  I don't recall who got there when.
19    Q.  Do you think Officer Walker broke in?
20    A.  No.
21    Q.  Do you think he climbed in the window?
22    A.  No.
23    Q.  Do you think he was with Officer Reynolds
24  when you arrived?

Page 134

1    A.  Like I said, I'm not positive who was all
2  there.  Officer Reynolds could have been there.
3    Q.  Okay.  But, nevertheless, when you arrived
4  Officer Reynolds gave you a key?
5    A.  Yes.
6    Q.  Did Officer Reynolds inform you that they
7  were in that second bedroom prior to you arriving?
8    A.  No.
9    Q.  Did you ask him?
10    A.  No, because the door was locked.  He had
11  the keys.  He was standing outside.  I opened the
12  front door.  Then I opened the apartment door.
13    Q.  What do you mean, Officer Reynolds was
14  standing outside?
15    A.  Yes.
16    Q.  I thought you said you didn't know if he
17  was with Walker or not.
18      Walker was inside, right?
19    A.  I stated that in my testimony.  I'm not
20  positive where Walker was standing.  He could have
21  been standing right there at the front door.  To
22  the best of my knowledge, I can't remember where he
23  was when we pulled up.
24    Q.  You testified under oath that he was in

Page 135

1  the hallway.
2      Were you not telling the truth when
3  you testified?
4    A.  Oh, no.  I was telling the truth.  I'm not
5  sure where exactly he was standing.
6    Q.  Okay.  Is it fair to say that your memory
7  was better back then in 2001 than it is today?
8    A.  Oh, definitely.  Absolutely, it would have
9  been.
10    Q.  Would that have been something you would
11  have to put in the paperwork that Officer Walker
12  was there when you arrived at the property already
13  inside the property?
14    A.  No.  I wouldn't have had to put it in
15  there.
16    Q.  Do you know if the supervisor, whoever it
17  was, was inside the property with Officer Walker or
18  was that supervisor outside the property with
19  Officer Reynolds?
20    A.  I don't recall.
21    Q.  Going back to this, did you ask Officer
22  Reynolds or Officer Walker if they were in that
23  room prior to you arriving?
24    A.  I don't believe I did, no.

Page 136

1    Q.  That would have been impermissible and
2  illegal, correct?
3    A.  No.  They could have secured the property
4  as long -- before me, but, no, I didn't ask them.
5    Q.  Well, what do you mean, they could have
6  went in the room to secure it?
7    A.  They could have opened it up with the keys
8  and secured it, but I don't think that happened.  I
9  didn't ask anybody if they were in that property.
10    Q.  Wouldn't that be a search?
11    A.  No.  We would secure the property.
12    Q.  Okay.  All right.  So why did you go and
13  get a warrant in this case?  Why didn't you just go
14  in at 3:50?  Why did you wait until 1 o'clock in
15  the morning to get a warrant?
16    A.  Because we didn't know what we had in
17  there being that we never searched the property.
18    Q.  Isn't it true that you had a discussion
19  with the owner of the property, Mr. Saunders, and
20  he informed you that you were not allowed to go in
21  there without a warrant?  Do you recall that?
22    A.  No, I don't recall that.
23    Q.  Do you recall having any discussions with
24  the owner of the property, Vincent Saunders?

34  (Pages 133 to 136)

Page 137

1    A.  Officer Kelly did.

2    Q.  Well, that was a different Vincent

3  Saunders.  That was the father who was the manager.

4    A.  Okay.

5    Q.  Do you recall having a telephone

6  discussion with the owner who later came down and

7  met with you and Officer Kelly?

8    A.  I don't recall that, no.

9    Q.  Okay.  After Officer Walker -- when you

10  arrived there, Officer Walker stayed there securing

11  the property while you went and got a search

12  warrant, correct?

13    A.  I'm not sure.  We did have officers there

14  standing by.

15    Q.  Uniformed officers or part of the team?

16    A.  I would say, to the best of my knowledge,

17  we would have had a uniformed officer there, but it

18  would be probably two or three people from my unit.

19    Q.  That's something you would have to put in

20  your report, correct?

21    A.  No.  If I wanted to I could have, but, no,

22  there's nothing I would have to put in a report for

23  that.

24    Q.  So there's nothing in your report that you

Page 138

1  would have to indicate that you secured a property

2  while you went and got a search warrant?

3    A.  Yes, secured it, but how we secured it, I

4  didn't put that in my paperwork.

5    Q.  Where is it in your paperwork that you

6  even secured it pending getting a search warrant?

7    A.  I don't see it in the 49.  The only thing

8  I said is I obtained a search and seizure warrant,

9  and that's it.

10    Q.  So it's your testimony that you

11  independently recollect that there was some police

12  officers securing the property while you got a

13  search warrant, correct?

14    A.  Correct.

15    Q.  So it's your testimony that from about 4

16  o'clock p.m. until 1:00 o'clock a.m. there was

17  officers in that building securing the property or

18  in the room?

19    A.  Yes.  Correct.

20    Q.  And you don't have it anywhere in your

21  report nor do you have the circumstances of

22  actually who secured it?

23    A.  No, I don't.

24    Q.  How do you know it wasn't Jeffrey Walker?

Page 139

1    A.  It could have been.  I'm not sure.

2    Q.  Let me ask you a question.

3    A.  Sure.

4    Q.  At 3:30 there was the execution of the

5  other search warrants at 5605, 5607 and 5609,

6  right?

7    A.  Yes.

8    Q.  And you coordinated those -- the execution

9  of those search warrants, correct?

10    A.  Along with the supervisor.  We were in

11  radio contact.

12    Q.  So you were -- as the lead investigator,

13  you were the one that was going to coordinate

14  hitting those houses, right?

15    A.  Well, each house that was hit was hit by a

16  different group.  So each group had a supervisor.

17  The supervisors were in contact with, I guess, the

18  captain and the lieutenant, whoever was out there

19  for the execution of the warrants.  So they were

20  done simultaneously.  I don't know who made the

21  call to hit the houses.

22    Q.  But the point is that these houses were

23  next to each other, right?

24    A.  Yes, they were.

Page 140

1    Q.  So it's your testimony that there were

2  three separate supervisors out there?

3    A.  There could have been, yes.

4    Q.  Who do you recall being out there, because

5  you were out there, right?

6    A.  Yes.  I could give you who the supervisors

7  were that were working with that group.  I don't

8  know if they were working that day, but, you know.

9    How would you like me to answer

10  that?

11    Q.  Well, maybe --

12    A.  Who did I see hit the house?

13    Q.  I could help you out.

14    A.  Okay.

15    Q.  We had Corporal Sinclair working that day.

16  We know that because you said that he was probably

17  -- or could have been at 55th Street, right?

18    A.  Yes.

19    Q.  We have also Jeannie Gessner who was

20  working that day because she could have been also

21  one of the supervisors at 55th Street, correct?

22    A.  Correct.

23    Q.  All right.  And 55th Street you went over

24  there about 25 minutes after -- 20 minutes after

Case 2:14-cv-01643-RBS    Document 61-5    Filed 06/29/22    Page 38 of 102

McIntyre v. Liciardello, et al./Torain v. The City of Phila., et al.                    BRIAN MONAGHAN, 1/17/17

Page 141

1    the coordination of the other three houses at 5605,
2    5607 and 5609?
3        A. Correct.
4            MR. BRIGANDI: Are you asking -- my
5        client has said in trying to answer your
6        question that he doesn't know, but are you
7        telling him -- asking him to assume based
8        on the stuff you're telling him?
9            MR. PILEGGI: No. I'm just telling
10       him that we -- yes.
11           MR. BRIGANDI: You're asking him to
12       make assumptions?
13           MR. PILEGGI: Based on his testimony
14       that there could have been two supervisors
15       there, either Jeannie Gessner or Corporal
16       Sinclair, at 55th Street.
17           MR. BRIGANDI: Could have been?
18           MR. PILEGGI: Could have been.
19           MR. BRIGANDI: You're asking him to
20       guess then? I just want to be clear.
21       You're asking him to guess?
22           MR. PILEGGI: Yes. That was his
23       testimony, could have been.
24   BY MR. PILEGGI:

Page 142

1        Q. I'm saying we can include those two
2    officers, correct, that could have been the
3    officers at 5605, 5607 and 5609?
4        A. At one time, yes.
5        Q. As supervisors?
6        A. As supervisors.
7        Q. But you were certainly there, correct?
8        A. I was there, yes.
9        Q. And the warrants were executed at 3:30,
10   right?
11       A. Close, yes.
12       Q. And you actually participated in the
13   searches in two of the units, 5605 and 5609, right?
14       A. I was instructed by the officers who
15   observed the stuff in there -- they showed me where
16   it was. I didn't participate in the search itself.
17   I was the assigned -- they instructed me this is
18   what was located. I went into the property. This
19   is what we found. This is where we found it. That
20   was about it.
21       Q. Let me clarify. You were actually in
22   these properties while the search was going on?
23       A. Yes.
24       Q. And these officers, whoever discovered

Page 143

1    contraband, drugs or whatever, you were shown or
2    informed where these drugs were found, correct?
3        A. Yes.
4        Q. And, in fact, guns and bulletproof vests
5    and drugs and old money were all found on all these
6    properties, correct?
7        A. Correct.
8        Q. All right. How long did that take, those
9    three warrants? It takes some time?
10       A. Yes. It takes time to execute a warrant.
11       Q. So, I mean, hours, right?
12       A. It could. It depends on who's searching
13   and it depends on what you're finding.
14       Q. Do you recall how long these three
15   searches took?
16       A. No, I don't recall.
17       Q. More than a half hour, though, wasn't it?
18       A. For them to be -- yeah. Yeah.
19       Q. So while they were searching those units
20   you went over to 55th Street, right?
21       A. A short time later.
22       Q. Well, 20 minutes later?
23       A. Yeah.
24       Q. So while the searches were still being

Page 144

1    conducted, you left as the lead investigator to go
2    over to 55th Street?
3        A. Correct.
4        Q. Why?
5        A. To meet up with the other officers that
6    were there.
7        Q. Okay. For what purpose?
8        A. To secure the property.
9        Q. Jeffrey Walker, according to your
10   testimony, had already secured it?
11       A. Yep. Being that I was the assigned, I had
12   to go to the property also.
13       Q. In order to try to determine whether
14   Torain was linked to that particular bedroom?
15       A. Well, being that he had the key, we knew
16   he was linked to that room.
17       Q. Okay. So what did you need to go over
18   there to do?
19       A. I was the assigned.
20       Q. I understand that. So it was more
21   important to go over to 55th Street on a wild-goose
22   chase than to stay where you were searching and
23   finding drugs, guns, bulletproof vests, rounding up
24   ten other individuals that you had seen on a video

36 (Pages 141 to 144)

McIntyre v. Liciardello, et al./Torain v. The City of Phila., et al.                    BRIAN MONAGHAN, 1/17/17

---

Page 145

1      over the course of two or three days engaged in
2      drug activity?
3          A.   The other officers that we were working
4      with were very capable of doing their own search
5      warrants.
6          Q.   More capable than Officer Walker and
7      Officer Reynolds?
8          A.   No.  No.  But they were assigned to that
9      specific property.  So they were very capable of
10     recovering the drugs, putting down whose drugs it
11     was, where the drugs were recovered, what was
12     recovered.
13              Each officer -- in each group you
14     have your confiscating officer and if we
15     photographed -- I doubt that we photographed the
16     evidence that was recovered that day, but they
17     would do it themselves.  I just went to the
18     location just to get a look of what the location
19     looked like.
20              Also, I went to the location of 1628
21     to get an observation after we secured it of what
22     the property looks like so I can go back and do an
23     affidavit for a search warrant.
24          Q.   Based on the information provided by

---

Page 146

1      Officer Reynolds and Officer Walker?
2          A.   With the keys that opened up both
3      properties -- both doors, yes.
4          Q.   Okay.  Well, no, not just the keys that
5      opened it up, but also the light going on and all
6      that, right?
7          A.   Yeah.  I was instructed about a light,
8      yes.
9          Q.   Well, let me ask you this, because there
10     was testimony by yourself that Officer Walker
11     provided information to you that when Torain went
12     into the unit observed by Reynolds, Officer Walker
13     observed a light go on in one of the bedrooms.
14              Do you recall that?
15          A.   Yes.
16          Q.   What was the significance of that?
17          A.   He came over the radio and said -- he said
18     he was on foot and he saw a light come on in an
19     apartment.
20          Q.   So?  What did that indicate to you?  Why
21     was that part of the probable cause issue with
22     respect to the arrest of Torain?
23          A.   Well, it wasn't because I never put it
24     down on any affidavit or anything.  I never

---

Page 147

1      recorded it on any type of paperwork.
2          Q.   Okay.  So you're saying that it wasn't
3      part of the probable cause?
4          A.   No.  The probable cause that I believed
5      was the keys opened up the door.
6          Q.   But you didn't know that until after
7      Torain was arrested, right?
8          A.   Know what?
9          Q.   That the keys fit the door.
10          A.   Yes.  That's correct.
11          Q.   So you were trying to establish the
12     probable cause after my client was arrested; is
13     that fair to say?
14          A.   That gave us more probable cause to get in
15     there to get the warrant.
16          Q.   That wasn't my question.  Am I correct
17     that you were trying to establish the probable
18     cause -- in other words, justify Torain's arrest by
19     going back to the property, confiscating the key
20     off of him at his arrest, going back to the
21     property to see if the key fit?
22          A.   Torain was being arrested regardless.  The
23     probable cause of us going back to that property
24     was because of the keys that opened that door.

---

Page 148

1          Q.   Torain was being arrested regardless why?
2      I thought you just told me that the reason why that
3      you believed that you had probable cause to arrest
4      him was because the key fit the door.
5          A.   He was arrested before the keys -- before
6      we went back to the property.
7          Q.   Obviously.  I'm going to ask you again.
8              So part of your probable cause
9      consideration or your probable cause consideration
10     was the fact that the key fit the door, right?
11          A.   That and what Police Officer Walker at
12     that time told me that he observed.
13          Q.   What did he say he observed?
14          A.   Delee walking out, putting a bag in his
15     pocket.  Delee getting out of the vehicle in which
16     Torain was driving -- at that time a black male was
17     driving the Bonneville.  Getting out and placing a
18     clear baggie in his pocket.
19          Q.   Officer, you didn't know it was Torain at
20     the time until after he was arrested?
21          A.   That's correct.  I stated that numerous
22     times.
23          Q.   I'm going to ask it one more time.
24              So you arrested Torain and then you

---

Page 149

1    got your probable cause?
2         A.  Went back to secure the property, yes.
3         Q.  So Torain was arrested without probable
4    cause, which you established after his arrest?  Is
5    that fair to say?
6         A.  No.  The probable cause was -- we
7    established to get into the property.  Torain was
8    already arrested.  We had enough probable cause at
9    that time to believe that he was involved with the
10   organization and he was involved with narcotics
11   transactions.
12        Q.  What made you believe he was part of the
13   organization prior to his arrest?
14        A.  Three of the guys -- three of my dealers
15   went to his area.  Also, when Delee told Diggs that
16   Kareem only had a bundle, he's going to call and
17   we're going -- he got more.  That was enough.
18        Q.  You didn't hear that?
19        A.  I didn't hear that.  Officer Kelly did.
20        Q.  So you relied on Officer Kelly with that
21   information, you relied on Officer Walker or
22   Reynolds with the Delee, and the only thing that
23   you had any personal knowledge with as the affiant
24   of the probable cause was the fact that you went

Page 150

1    back after he was arrested to try the key to see if
2    it fit, right?
3         A.  That's correct.
4              MR. BRIGANDI:  Mike, as far as
5         logistically, are we going to be done in
6         the next 45 minutes or do we take a lunch
7         break?
8              MR. PILEGGI:  I'll be done in the
9         next hour.
10             (There was a discussion held off the
11        record.)
12   BY MR. PILEGGI:
13        Q.  So let's get back to -- let me ask you a
14   question, though.
15             Kind of going back to Conestoga
16   Street, why didn't you send an officer over there
17   to secure it if you saw him go in with a key?
18   Wasn't there a concern that maybe the drugs were
19   stashed in there?
20        A.  No paperwork says he used a key to get in
21   there.
22        Q.  But however he got in, wasn't there a
23   concern -- you knew when he went into Conestoga,
24   which was before 55th, that he was going into that

Page 151

1    property, however he got in?
2         A.  Right.
3         Q.  Wasn't there a concern on your part that
4    perhaps he was engaged in some kind of illegal
5    activity in that unit?
6         A.  No.  I didn't believe so.  I wasn't told
7    anything about the property other than he went in.
8    I don't know.
9         Q.  So is it fair to say that you had not even
10   a suspicion at that point that whoever was driving
11   that Bonneville, because he still wasn't
12   identified --
13        A.  Exactly.
14        Q.  -- was engaged in any criminal activity
15   was not part of this organization, at least at that
16   point?
17        A.  At least at that point, yes.
18        Q.  And it's only until later when he was at
19   55th Street that you believed that he -- in other
20   words, that he became a player in this
21   organization?
22        A.  Well, after being met -- earlier he was
23   met by Delee that got in his car, but that was --
24   and then after Delee, Tillman and Diggs, I believe,

Page 152

1    went to the property and met him and they went
2    inside the property.
3         Q.  And also don't forget Officer Kelly is
4    hearing them say, yo, Kareem is going to --
5         A.  Yes.  It's in my paperwork.
6         Q.  I'm going to ask you again.
7              Based on at least those two -- the
8    observation of Delee getting out of the car and
9    putting drugs in his pocket at Master Street and
10   the statement that Kareem is going to go back and
11   get more drugs or whatever, that didn't strike you
12   as important that if he went into 1621 Conestoga
13   that perhaps he was engaged in criminal activity?
14        A.  Not at that time, no.
15        Q.  So your suspicion only became aroused when
16   he got to 55th Street; is that fair to say?
17        A.  Yes.  And when the three males met up with
18   him, yes.
19        Q.  And am I correct that even when you
20   informed Officer Reynolds and Officer Walker that
21   this Buick was going to come their way, which -- I
22   meant to ask you that.
23             How did you know that?  Was that a
24   guess?

Case 2:14-cv-01643-RBS    Document 61-5    Filed 06/29/22    Page 41 of 102

McIntyre v. Liciardello, et al./Torain v. The City of Phila., et al.                    BRIAN MONAGHAN, 1/17/17

Page 153

1    A. Yeah.
2    Q. Pretty good guess?
3    A. Well, I said that it could be coming their
4  way. So, yeah. You know, sometimes you have a
5  feeling, I guess.
6    Q. Okay. Let me ask you this. Who informed
7  you that Torain was at 55th Street?
8    A. Either Brian Reynolds or Jeff Walker.
9    Q. Well, it had to be Brian Reynolds because
10  he's the one that saw him go in with a key?
11    A. Yeah. And Jeff had followed him to
12  Conestoga, and then, I believe, Jeff followed him
13  to 55th Street also.
14    Q. Okay. So at what point did these -- one
15  of those officers tell you that he was at 55th
16  Street?
17    A. I believe they possibly said that they
18  were setting up a surveillance. I don't know
19  exactly what time it was, but it was between the
20  time that he left Conestoga to the time Delee and
21  them pulled up. They were set up on a surveillance
22  of that property.
23    Q. Officer, I'm confused. You just told me
24  you didn't have any suspicions whatsoever until

Page 154

1  these individuals left that unit and one of the
2  officers said they saw him put drugs in his pocket,
3  right?
4    A. Yes.
5    Q. It sounds like you were suspicious of them
6  before Diggs and Delee and Tillman ever left Master
7  Street to go over to 55th, weren't you?
8    A. Yes. I wanted to see what that was about.
9    Q. So whoever was driving the Bonneville was
10  on your radar at that point, weren't they?
11    A. Oh, yeah. Absolutely.
12    Q. And he was certainly on your radar when
13  you told -- instructed Officer Reynolds to stop
14  him, which really meant arrest him, right?
15    A. Yes.
16    Q. Did you mean just for him to stop him just
17  to --
18        MR. BRIGANDI: Are we going to
19    rehash everything that he's testified to?
20        MR. PILEGGI: Yes, I am.
21        MR. BRIGANDI: Why are we rehashing
22    everything?
23        MR. PILEGGI: Because his testimony
24    is rather incongruent and inconsistent.

Page 155

1        MR. BRIGANDI: No, it's not.
2    According to you maybe.
3        MR. PILEGGI: Is that your
4    objection?
5        MR. BRIGANDI: I'm not having my
6    client rehash every answer that he's
7    already answered.
8        MR. PILEGGI: Is that your
9    objection?
10        MR. BRIGANDI: Yes.
11        MR. PILEGGI: All right. Are you
12    instructing him not to answer?
13        MR. BRIGANDI: No, but this isn't
14    going to continue.
15  BY MR. PILEGGI:
16    Q. Officer, when you told Reynolds to stop
17  him, did you want him to stop him to investigate
18  him or stop him to arrest him?
19        MR. BRIGANDI: Answer that for the
20    fifth time.
21        THE WITNESS: Stop him to arrest
22    him.
23  BY MR. PILEGGI:
24    Q. And what was your probable cause at that

Page 156

1  point?
2    A. I believe he was engaged in a drug
3  transaction.
4    Q. Okay. Because you saw the individuals
5  leaving the unit, correct?
6    A. Because of what they were -- leaving the
7  property, putting it in his pocket, that was
8  relayed back to me by Police Officer Walker.
9    Q. But at that point you did not know -- am I
10  correct that Officer Walker had not told you about
11  the light going on, right?
12    A. I don't recall when exactly he came over
13  to the radio and said that.
14    Q. Okay. Well, do you recall him coming over
15  the radio?
16    A. Yes.
17    Q. Or do you recall him saying it at some
18  other point?
19    A. I recall him coming over the radio with
20  that.
21    Q. But you just don't know when?
22    A. Yes.
23    Q. Do you think it was after the arrest of
24  Torain or before?

39  (Pages 153 to 156)

Case 2:14-cv-01643-RBS    Document 61-5    Filed 06/29/22    Page 42 of 102

McIntyre v. Liciardello, et al./Torain v. The City of Phila., et al.                    BRIAN MONAGHAN, 1/17/17

Page 157

1    A. Before, I believe.

2    Q. I will tell you this. Officer Walker

3  testified -- you're aware that he sat for a

4  deposition?

5    A. Yes.

6    Q. I already asked you previously if you

7  reviewed his deposition, and you said no?

8    A. Right.

9    Q. But you did have discussions about what

10  the context of his deposition was, didn't you?

11    A. A little bit, yes.

12    Q. All right. Were you aware that Officer

13  Walker testified that he had a meeting with

14  yourself, Kelly, Reynolds and Walker at 55th Street

15  at the time when you showed up and you got the key

16  from Reynolds?

17    A. Okay.

18    Q. Were you aware of that?

19    A. If that's what he said, okay.

20    Q. And he said you walked on the side of the

21  building and the discussion was about linking

22  Torain to that middle bedroom that you eventually

23  searched?

24    A. That never happened.

Page 158

1    Q. Okay. So he was lying?

2    A. It never happened.

3    Q. He didn't have a discussion about the

4  light going on?

5    A. No. If that would have been, I would have

6  put that in my paperwork, but no.

7    Q. But you didn't put in the paperwork the

8  fact that he told you over the radio that he saw

9  the light go on?

10    A. True. Yeah. I didn't think I needed it.

11    Q. Okay. Well, you knew you would need it

12  when you went to court for prosecution, didn't you?

13    A. No, but that's what he said over the

14  radio.

15    Q. Well, you knew that you would have to show

16  -- and I'm going to use your words -- dominion and

17  control of that middle bedroom if you confiscated

18  drugs to show that Torain had dominion and control

19  of that particular bedroom and not somebody else

20  living in that house?

21    A. Based on the keys being used.

22    Q. Okay. Officer Walker also testified that

23  there were many times where they would go into

24  units with keys to see if there was anything to

Page 159

1  steal.

2      Were you aware of that testimony?

3    A. No, I was not.

4    Q. And he testified that repeatedly these

5  officers, himself as well as Officer Reynolds,

6  would go into a unit before anybody knew with keys

7  and steal?

8    A. Was I mentioned?

9    Q. No. Actually, he also mentioned that he

10  never stole with you, but he did steal with

11  others --

12      MR. BRIGANDI: Is there a question?

13  BY MR. PILEGGI:

14    Q. -- on your team.

15      MR. PILEGGI: Well, he asked me the

16    question.

17      MR. BRIGANDI: Is there a question?

18    You're the one asking the questions.

19      MR. PILEGGI: Yeah.

20      MR. BRIGANDI: Ask him a question.

21      MR. PILEGGI: Thanks.

22  BY MR. PILEGGI:

23    Q. Were you aware of that testimony?

24    A. I heard similar things to it.

Page 160

1    Q. And he mentioned that he stole with Kelly,

2  your partner?

3    A. I don't believe that.

4    Q. You may not believe it, but that was his

5  testimony. He stole with Reynolds.

6    A. I don't believe that.

7    Q. Okay. So Jeffrey Walker lied about all

8  that?

9    A. I don't know what he did.

10    Q. I mean, if he testified to that, that

11  would be a lie?

12    A. During the deposition, yes, it would be.

13  Yes.

14    Q. Well, under any circumstances.

15    A. It would be a lie, yeah.

16    Q. Now, if Jeffrey Walker said that he

17  participated with Reynolds in a search at Conestoga

18  that would be a lie too?

19    A. Yeah, because I don't recall any search

20  being done at Conestoga.

21    Q. You may not recall. Wouldn't you be

22  required to know that?

23    A. Yes, I would be.

24    Q. Okay.

40  (Pages 157 to 160)

Page 161

1    A. And if it was done, I would have been
2    aware of it, but I was not aware of it because it
3    wasn't done.
4    Q. And if it was done and you were aware of
5    it, knowing that there was no warrant, what would
6    you have done?
7    A. If I was aware of it, I would have been
8    there, you know -- that's hard to say. I wasn't
9    there. I don't believe it happened.
10    Q. So if you -- if it was done and you were
11    aware of it, you would have went over there and
12    participated with them in a warrantless search? Is
13    that what you're saying?
14    A. No. I'm not saying that.
15    Q. Would you have stopped them?
16    A. If they were over there and I didn't send
17    them over there, yes. I would have stopped them
18    and said I didn't instruct you to go here, which I
19    don't believe they did go there.
20    Q. Would you have informed someone, a
21    supervisor or a judge or someone of authority, that
22    there was a warrantless search conducted?
23    A. I would have brought it up with a
24    supervisor. Yes, I would have.

Page 162

1    Q. In this case you did not, correct?
2    A. Because it didn't happen.
3    Q. Okay. Now, at 1 o'clock -- at some point
4    you went back to process the paperwork with regards
5    to 5605, 5607, 5609 as well as to procure a search
6    warrant for 55th Street, right?
7    A. Yes.
8    Q. All right. Am I correct that the 55th
9    Street warrant was not originally part of this job?
10    Is that fair to say?
11    A. Yes, it is.
12    Q. Because you had already observed the
13    search warrants before you even knew anything about
14    55th Street?
15    A. Yes.
16    Q. So you go back and part of your
17    responsibilities is to go back and process all the
18    evidence that was recovered out of these units as
19    well as other officers, but you are in charge of
20    marshalling all that paperwork, correct?
21    A. That and preparing the PARS report, which
22    is the arrest report, within a certain amount of
23    time, yes.
24    Q. So you have a lot of responsibilities when

Page 163

1    you go back, correct?
2    A. Yes.
3    Q. And this case is a pretty big case. There
4    was a lot of paperwork to prepare?
5    A. Yes, there was.
6    Q. I think there was close to probably 20
7    property receipts, cars were confiscated, drugs,
8    guns, and you're going to refer to the -- the last
9    page, correct?
10    A. Yes. There's a lot. There's a lot of
11    prop receipts.
12    Q. First of all, what was your shift that
13    day?
14    A. I actually think we might have had court.
15    I'm not positive. We probably came in right after
16    court.
17    Q. Well, you did testify -- and I'm going to
18    tell you this and you dispute me if I'm wrong --
19    but you testified that you actually wanted to
20    conduct or execute the warrants on those three
21    properties on Master Street at 2 o'clock, but you
22    had to wait for personnel to come back from court.
23        Do you recall that?
24    A. No, I don't recall that.

Page 164

1    Q. But do you recall wanting to execute the
2    warrants at 2 o'clock for whatever reason?
3    A. I'm not exactly sure what time we wanted
4    to, but we would have had to wait until everybody
5    came back to work.
6    Q. Right. Is it fair to say that you were at
7    55th Street from 3:50 for at least a half hour?
8    A. Yeah. I don't think I was there a lot
9    longer, but I'm not -- I don't know exactly how
10    long, but I didn't spend a lot of time there.
11    Q. All right. When you were at 55th Street,
12    you went in, you see Walker in the property, maybe
13    somebody else. You're not sure. You go in.
14        Do you open up the front door with
15    the key? I mean the outer door.
16    A. I believe I did, yes.
17    Q. It wasn't open?
18    A. I don't recall.
19    Q. Okay. So, pursuant to your testimony, if
20    Walker was in the hallway, the door was closed and
21    he was just standing in the hallway securing it?
22    A. I don't recall where he was standing at.
23    Q. Nevertheless, you go inside and you don't
24    have a warrant at that point, correct?

41 (Pages 161 to 164)

Case 2:14-cv-01643-RBS Document 61-5 Filed 06/29/22 Page 44 of 102

McIntyre v. Liciardello, et al./Torain v. The City of Phila., et al.                BRIAN MONAGHAN, 1/17/17

Page 165

1     A.  Correct.
2     Q.  You used the key to get into the building?
3     A.  Yes.
4     Q.  You go inside and you go to the second
5  bedroom, right?
6     A.  Apartment, yes.
7     Q.  How did you know to go to that apartment,
8  or did you try the keys in other apartments?
9     A.  Police Officer Kelly had talked to one of
10  the Saunders or Sanders, and he gave him a
11  description of a male he thought was using that and
12  with the key opened up that apartment.
13     Q.  Where did Officer Kelly talk to this
14  Saunders?
15     A.  I believe either on the porch or on the
16  vestibule.
17     Q.  But it was in the presence --
18     A.  Yes.
19     Q.  It wasn't on the telephone?
20     A.  I don't recall where exactly.
21     Q.  How did he -- Officer Kelly arrived with
22  you, right?
23     A.  About the same time, yes.
24     Q.  Where did this Saunders come from?

Page 166

1     A.  I don't recall.
2     Q.  Wouldn't you as the lead investigator talk
3  to Saunders?
4     A.  No.  Officer Kelly was my partner.  I
5  could have been talking to other officers on the
6  scene.  I could have been talking to the
7  supervisor.  I don't recall the exact time that we
8  got into the property or how we did it.
9     Q.  Did anyone ask Mr. Saunders what his title
10  was, what his involvement with this property was?
11     A.  That I'm not sure.
12     Q.  Well, how did you even know who he was?
13  How did you know he wasn't some guy off the street?
14     A.  In the conversation Officer Kelly had with
15  him he said he was the owner or manager of the
16  property.
17     Q.  Okay.  And was this before you tried the
18  key or after?
19     A.  I think it was about the same time we were
20  trying the key.
21     Q.  So you were trying to determine -- again,
22  you were doing an investigation by questioning this
23  individual whether Torain was somehow linked to
24  that property, correct?

Page 167

1     A.  Correct.
2     Q.  Was that individual asked specifically
3  about the middle bedroom?
4     A.  I don't recall.
5     Q.  How did you know where to go?
6     A.  After Shawn Kelly was talking to the
7  individual and the key that he had.
8     Q.  That who had?
9     A.  That Torain had that we had in our
10  possession at the time.
11     Q.  Right.  The one that Reynolds gave you.
12     A.  And Officer Walker at the time told us
13  that the light came on, and that's where the light
14  came on.  We knew that was the apartment.
15     Q.  Wait a minute.  Officer, you're going to
16  say I'm going to rehash this, but I must.
17          You just testified repeatedly that
18  you didn't know when Officer Walker told you when
19  the light went on.
20     A.  I said he came over police radio and he
21  said the light came on.
22     Q.  Okay.  Where?
23     A.  One of the rooms.  He didn't tell me what
24  rooms.

Page 168

1     Q.  My question is how did you determine which
2  room, because there's many rooms in there -- which
3  room to try the key?
4     A.  When Officer Kelly was talking to the
5  manager who pointed to that room, we went over and
6  opened up the door.
7     Q.  So it's your testimony that whatever the
8  manager told Officer Kelly he relayed that to you
9  and then you tried the key in the door?
10     A.  Well, the vestibule.  If I remember, it
11  was a congested area that we were in, and it was
12  kind of like a gesture.  We walked over with the
13  key and opened up the apartment.
14     Q.  Let me -- actually, let's look at a
15  picture of it.  This is -- you're talking about the
16  hallway, right?
17     A.  I believe, yeah.
18          MR. PILEGGI:  If we can mark this as
19  four.
20          MR. BRIGANDI:  What are we looking
21  at?  Have these been produced?  Are these
22  from my file?
23          MR. PILEGGI:  No.  I went and took
24  these pictures.

42  (Pages 165 to 168)

Page 169

1      MR. BRIGANDI: When?
2           MR. PILEGGI: About two weeks ago.
3           MR. BRIGANDI: How do we know what
4      the hell these are? Have you produced
5      them?
6           MR. PILEGGI: No.
7           MR. BRIGANDI: I'm not letting him
8      answer questions about pictures that you
9      took.
10          MR. PILEGGI: Are you kidding me?
11          MR. BRIGANDI: You've got to be
12     kidding me.
13          MR. PILEGGI: Let's see if he
14     recognizes it.
15          MR. BRIGANDI: Black-and-white
16     photos?
17          MR. PILEGGI: Yeah. Let's see if he
18     recognizes it. If he doesn't recognize
19     it, we'll go from there.
20          MR. BRIGANDI: Fair enough.
21               - - -
22          (Whereupon, Exhibit Monaghan-4 was
23     marked for identification.)
24               - - -

Page 170

1      BY MR. PILEGGI:
2      Q.  Officer, you've been shown what has been
3      marked as Monaghan-4.
4      A.  Yes.
5      Q.  Now, we were discussing the hallway, the
6      congested area.
7           Does that refresh your recollection
8      as to the hallway?
9      A.  Not at all.
10     Q.  Of course it doesn't.
11          MR. BRIGANDI: Because it's so
12     obvious what it is.
13          THE WITNESS: I don't remember.
14          MR. PILEGGI: Let's do this. Let me
15     show you this.
16          MR. BRIGANDI: It could be the
17     hallway to your bathroom.
18          MR. PILEGGI: Let's mark this
19     Monaghan-5.
20          MR. BRIGANDI: This is another
21     picture taken by you?
22          MR. PILEGGI: That is correct.
23          MR. BRIGANDI: Recently?
24          MR. PILEGGI: Same time. Two weeks

Page 171

1      ago. Actually, let's do five and six so
2      we can make it clear because there is an
3      address on there if you want to say I put
4      that address on there.
5           MR. BRIGANDI: 1628 North 55th
6      Street?
7           MR. PILEGGI: Yes.
8               - - -
9           (Whereupon, Exhibits Monaghan-5 and
10     Monaghan-6 were marked for
11     identification.)
12               - - -
13     BY MR. PILEGGI:
14     Q.  Officer Monaghan, I'm showing you what has
15     been marked as Monaghan-5 and 6.
16          Does that refresh your recollection
17     as to the unit that you went to on North 55th on
18     that day?
19     A.  Yeah. It could have been.
20     Q.  Okay.
21     A.  It's been 16 years.
22     Q.  If you can read for the record -- it has
23     an address, right?
24     A.  Yes.

Page 172

1      Q.  Now, I will submit to you as an officer of
2      the court that this is a picture of the hallway on
3      the first floor.
4           Does that refresh your recollection
5      as to the hallway that you were in in North 55th
6      Street, the property in Monaghan-5 and 6?
7      A.  Honestly, I don't remember the hallway.
8      Q.  That's fair enough.
9           Now, you do remember -- when you say
10     congested, you remember that it was a small
11     hallway, right? It wasn't like a big hall,
12     correct?
13     A.  I thought it was kind of bigger, but, you
14     know, it could have been a small hallway. I'm not
15     sure.
16     Q.  You actually went into the bedroom,
17     correct, at some point?
18     A.  Yes, I did.
19          MR. PILEGGI: We might as well mark
20     these. These were also taken about two
21     weeks ago. Monaghan-7 and Monaghan-8.
22     There's one more picture that I'm marking
23     as Monaghan-9.
24               - - -

43  (Pages 169 to 172)

Case 2:14-cv-01643-RBS   Document 61-5   Filed 06/29/22   Page 46 of 102

McIntyre v. Liciardello, et al./Torain v. The City of Phila., et al.                    BRIAN MONAGHAN, 1/17/17

Page 173

1       (Whereupon, Exhibits Monaghan-7,
2.      Monaghan-8 and Monaghan-9 were marked for
3       identification.)
4       - - -
5  BY MR. PILEGGI:
6       Q.  Let me just -- let's look at nine first.
7  That's the last one.
8       A.  Yes.
9       Q.  Does that refresh your recollection as to
10 the side of the building?  It's a corner property,
11 right?
12      A.  Yes.
13      Q.  Does that appear to be the side of 1628
14 North 55th Street?
15      A.  It appears to be.
16      Q.  Okay.  Now, can you point out which window
17 -- which apartment -- from looking at that
18 side-view of the building where you allege Torain
19 was in or where you confiscated the drugs from?
20      A.  I can't point it out.  I'm not sure which
21 one it is.
22      Q.  Okay.  Did Walker -- whatever Walker
23 informed you over the radio that he saw the light
24 · go on, did he indicate from looking at that picture

Page 174

1  which window it was?
2       A.  Not to me, no.
3       Q.  So it's your testimony that when you went
4  inside that you knew what door to try based on
5  Walker saying the light as well as the landlord or
6  the manager who was talking to Kelly?
7       A.  Yes.
8       Q.  Okay.  And then simultaneous with that at
9  some point you tried a key that fit the door?
10      A.  Correct.
11      Q.  Okay.  It was a different key from what
12 fit the front door, correct?
13      A.  I believe it was.
14      Q.  All right.  And that wouldn't make sense,
15 would it, if you were a drug dealer, you wouldn't
16 have the same key, would you?
17      A.  Yes.
18      Q.  Anybody could get in there?
19 ·     A.  Yes.
20      Q.  Nevertheless, you tried the key and you
21 opened the door, right?
22      A.  Yes.
23      Q.  Meaning not only do you open it, but the
24 door is ajar?

Page 175

1       A.  Yeah.  We opened it.
2       Q.  And you go into the bedroom, right?
3       A.  Yes.
4       Q.  Okay.  Why were you going into the
5  bedroom?
6       A.  To make sure nobody was in there hiding,
7  for our safety.
8       Q.  Well, wait a minute.  Correct me if I'm
9  wrong.  The bedroom was maybe a little bit bigger
10 than a closet?
11      A.  I forget what it looks like.  I have no
12 clue what this is.
13      Q.  Fair enough.  Let's refresh your
14 recollection.
15          MR. PILEGGI:  Can we mark this as
16      ten.  I'm sorry.  We did mark it.
17 BY MR. PILEGGI:
18      Q.  We'll go back to Monaghan-6 and
19 Monaghan-7.
20      A.  No.  Seven and eight.
21      Q.  Seven and eight.  I'll submit to you that
22 that's a picture of the bedroom.
23          Does that refresh your recollection
24 of what you saw when you executed or when you went

Page 176

1  into the unit?
2       A.  Not one bit.  I don't know.
3       Q.  But you did testify -- you recall
4  testifying that all that was in the room was a bed,
5  a bureau and a radio.
6          Do you recall that?
7       A.  Not offhand, no.
8       Q.  When you went into the unit, did you look
9  under the bed?
10      A.  Under the bed, yes.
11      Q.  Did you see anything?
12      A.  No.  I didn't look under.  Somebody had to
13 look under for our safety.
14      Q.  So it wasn't just one officer, you
15 yourself who opened the door, it was several
16 officers that went in that room?
17      A.  I don't remember how many.
18      Q.  Do you know who did it?
19      A.  No, I do not.
20      Q.  You would agree that that would be a
21 search, wouldn't you?
22      A.  Not if we're looking for anybody hiding in
23 there, no.
24      Q.  Isn't that what you get an arrest warrant

44  (Pages 173 to 176)

Page 177

1    for?
2        A.  Well --
3        Q.  In other words, you thought there was a
4    body in there?
5        A.  Well, you never know.  Somebody could be
6    hiding in there to ambush you when you go in.  We
7    didn't know.  So we go in there to secure the
8    property to keep it safe for us being in there.
9        Q.  Okay.  But you would agree if you look
10   under the bed that would be a search, wouldn't you?
11   Whatever the reason was you were searching or
12   whatever you were searching for it's still a
13   search, right, whether it's for a body --
14       A.  Yes.  We're searching if anybody is hiding
15   in there.
16       Q.  Did you look in the drawers?
17       A.  No.
18       Q.  How do you know?
19       A.  Because I didn't, no.
20       Q.  Well, you didn't, but did any of the other
21   officers that were in that room look in the
22   drawers?
23       A.  I didn't see anybody look in the drawers,
24   no.

Page 178

1        Q.  When you eventually went in there, there
2    was a safe found underneath the bed.  Nobody saw
3    that?
4        A.  On the 5th we saw it, but not on the 4th.
5        Q.  So you think somebody went in there from
6    the 4th to the 5th and put a safe under that bed so
7    you could find it later?
8        A.  No.  I believe it was there.
9        Q.  It was there.  Just no one saw it.  They
10   were just looking for a body, but they didn't see
11   the safe?
12       A.  Yes.
13       Q.  Okay.  Isn't it correct that you actually
14   confiscated a safe on the 4th?
15       A.  Yes, we did.
16       Q.  You did.  You took it out of the unit, the
17   safe?
18       A.  No.  I'm sorry.  On the 5th.
19       Q.  I'm asking you didn't you actually
20   confiscate the safe on the 4th?
21       A.  No.
22       Q.  That's what the paperwork says?
23       A.  No, it does not.
24       Q.  It does not?

Page 179

1        A.  No.
2        Q.  Are you sure?
3        A.  I don't believe it does, no.
4            MR. PILEGGI:  Let's mark this as 10.
5    I want to give a copy to --
6            MR. BRIGANDI:  Sir, could you
7    identify yourself for the record?
8            OBSERVER:  Why is that?
9            MR. BRIGANDI:  Why are you here?
10   What is your name, sir?
11           OBSERVER:  I just showed my ID at
12   the desk.  I don't need to give it again.
13           MR. BRIGANDI:  Could you tell me
14   your name?
15           OBSERVER:  Charles.
16           MR. BRIGANDI:  What is your last
17   name, Charles?
18           OBSERVER:  That's all you're
19   getting.
20           MR. BRIGANDI:  Mike, do you know who
21   he is?
22           MR. PILEGGI:  No.
23           MR. BRIGANDI:  Why are you here,
24   sir?

Page 180

1.           OBSERVER:  I'm observing.
2            MR. BRIGANDI:  Do you know Mr.
3    Walker?
4            OBSERVER:  No.
5            MR. BRIGANDI:  Do you know Mr.
6    Torain, Kareem Torain?
7            OBSERVER:  I know a family member of
8    his.
9            MR. BRIGANDI:  Okay.  Why are you
10   here, sir?
11           OBSERVER:  I'm just here to observe.
12           MR. BRIGANDI:  Sir, I'd ask you to
13   be removed from the courtroom.
14           OBSERVER:  What is your name?
15           MR. BRIGANDI:  My name is Armando
16   Brigandi.  I'm the chief for the Civil
17   Rights Unit for the City of Philadelphia.
18           OBSERVER:  Okay.
19           MR. BRIGANDI:  You're related to
20   Kareem Torain?
21           OBSERVER:  No.  I'm not related to
22   Kareem Torain.
23           MR. BRIGANDI:  You're a friend of
24   Kareem Torain?

45  (Pages 177 to 180)

Case 2:14-cv-01643-RBS    Document 61-5    Filed 06/29/22    Page 48 of 102

McIntyre v. Liciardello, et al./Torain v. The City of Phila., et al.                    BRIAN MONAGHAN, 1/17/17

Page 181

1     OBSERVER: I'm not a friend.
2         MR. BRIGANDI: How do you know
3   Kareem Torain?
4         OBSERVER: I know a family member of
5   his.
6         MR. BRIGANDI: I'd ask that he be
7   removed from the courtroom.
8         (Observer escorted from courtroom.)
9             - - -
10        (Whereupon, Exhibit Monaghan-10 was
11  marked for identification.)
12            - - -
13  BY MR. PILEGGI:
14    Q.   I'm showing you what has been marked as
15  Monaghan-10 for identification.
16        What is that?
17    A.   It's the prop receipt.
18    Q.   When you say the property receipt, there
19  were many property receipts on this job?
20    A.   Yes.
21    Q.   Is it a property receipt for 55th Street?
22    A.   Yes, it is.
23    Q.   What is the date?
24    A.   It's kind -- honestly, it's kind of hard.

Page 182

1     Q.   Well, doesn't it say 1/4/01? It's circled
2   1/4 and it says 3:30, correct?
3     A.   That's a four?
4     Q.   That's a four.
5     A.   Okay. I guess it does. It's hard.
6     Q.   It's your property receipt, right?
7     A.   I didn't prepare this.
8     Q.   You did not?
9     A.   No.
10    Q.   May I see it again?
11    A.   Yes.
12    Q.   It's got your name on it?
13    A.   Yes.
14    Q.   You signed off on it?
15    A.   Yes, I did, because I'm the assigned
16  investigator.
17    Q.   Right. You're the one responsible for
18  this, correct?
19    A.   But everybody in our unit would do
20  property receipts.
21    Q.   But it's also signed off by Corporal
22  Sinclair, correct?
23    A.   Yes, that's correct.
24    Q.   And that refreshes your recollection that

Page 183

1   Corporal Sinclair was involved in this particular
2   case? Whether he was at the unit is another story,
3   but he was one of the supervisors, right?
4     A.   Yes. He should have been.
5     Q.   Now, what is the time on that, 3:30?
6     A.   Yes, 3:30.
7     Q.   That's the time of all the other property
8   receipts and search warrants for 5605, 5607 and
9   5609, right?
10    A.   Yes, it is.
11    Q.   Now, what does it say was confiscated --
12  first of all, what is the address?
13    A.   Kind of blurred out, but it says -- it
14  looks like 8 North 55th Street, but I'll go with
15  1628.
16    Q.   1628 North 55th Street?
17    A.   The defendant's name and 1628 North 55th
18  Street.
19    Q.   Is there any dispute that that is a
20  property receipt of items that were confiscated on
21  Thursday, January 4th, at 3:30 when you were over
22  at that unit for a safe and it looks like two empty
23  amber pill bottles?
24    A.   Yes. There was a dispute because it

Page 184

1   wasn't recovered then. It was recovered at 1
2   o'clock the following day, which is the 5th.
3     Q.   So more mistakes?
4     A.   Yes.
5     Q.   And that's your responsibility? In fact,
6   you signed off on it? Didn't you pick up on that?
7     A.   Yes, I did. No, I did not.
8     Q.   It's pretty serious, isn't it?
9     A.   A lot of times what we do is being it was
10  -- we did all the takedowns on the 4th, we tried to
11  keep all the paperwork uniform even with the
12  property receipts. Whoever filled this out tried
13  to keep it -- now, they might have been given
14  information to put this time down on the property
15  receipts. I don't know. I didn't fill this out.
16    Q.   Okay. But you would agree that that's a
17  pretty serious miscalculation because it suggests
18  -- it doesn't even suggest -- it says that you
19  confiscated the safe when you went in with the key
20  without a warrant, right?
21    A.   Well, the paperwork-wise, but it's not
22  very serious because we can justify it by above
23  items were -- was confiscated at the time of
24  execution of search and seizure warrant.

46 (Pages 181 to 184)

Case 2:14-cv-01643-RBS   Document 61-5   Filed 06/29/22   Page 49 of 102

McIntyre v. Liciardello, et al./Torain v. The City of Phila., et al.                    BRIAN MONAGHAN, 1/17/17

Page 185

1      Q.  Okay.  We'll get to that, but the point is
2   that a judicial officer looking at that would say
3   that's when it's confiscated, right?
4      A.  Yeah.  It would have been.
5      Q.  Okay.  And we don't want to lie to a
6   tribunal, do we?
7      A.  No, not at all.
8      Q.  That's a big mistake, isn't it?
9      A.  It's a mistake, yes.
10     Q.  In fact, it's a critical mistake that
11  could jeopardize the whole prosecution, couldn't
12  it?
13     A.  I believe it could.
14     Q.  And it also suggests that you went into a
15  property without a warrant and confiscated items
16  illegally, wouldn't it?
17     A.  Other than just the date on there, that's
18  -- the only thing would be the date, yes.
19     Q.  Really?  And not the address or the time
20  that you were there without a warrant?
21     A.  The date and time, yes.
22     Q.  All right.  So you're saying that this is
23  not the right property receipt, correct?
24     A.  No.  It's the right property receipt of

Page 186

1   what was recovered, but the date and time is wrong.
2      Q.  All right.  I don't see anywhere on here
3   about drugs, right?
4      A.  They would be on a separate property
5   receipt.
6      Q.  Okay.  When you eventually confiscated the
7   safe, none of the keys that you had from -- that
8   were already confiscated from Torain opened that
9   safe, right?
10     A.  I don't believe we recovered keys.
11     Q.  It wasn't a combination safe, right?
12     A.  No.
13     Q.  It was a key safe?
14     A.  Yes, it was.
15     Q.  And none of those keys opened that safe,
16  right?
17     A.  I believe so, yes.
18     Q.  Did that indicate to you -- did that
19  eviscerate in any way the probable cause against
20  Torain that he had dominion and control of any
21  illegal items confiscated out of that property?
22        MR. BRIGANDI:  Objection.  You're
23     asking for a legal conclusion, but you can
24     answer.

Page 187

1        THE WITNESS:  No.
2   BY MR. PILEGGI:
3      Q.  No?
4      A.  No.
5      Q.  You didn't even take that into
6   consideration?
7      A.  We didn't find a key.  So that's the only
8   thing I can consider, is the key wasn't located.
9      Q.  How did you get the safe open?
10     A.  I'm not sure.  I don't know who opened it,
11  how it was opened.
12     Q.  Did you get a locksmith?
13     A.  Most likely, it was probably forced open.
14     Q.  Okay.  When was it forced open?
15     A.  Probably after we got back to the office.
16     Q.  I don't want you to guess.
17     A.  I'm not sure.
18     Q.  Well, did you bust it open when you
19  confiscated it at the property?
20        MR. BRIGANDI:  He just said he
21     wasn't sure, Mike.
22        MR. PILEGGI:  I'm trying to narrow
23     him down.
24  BY MR. PILEGGI:

Page 188

1      Q.  Do you think you broke it open at the
2   unit?
3      A.  I don't believe I did.  I don't know who
4   did.
5      Q.  Well, who was with you when you conducted
6   the search of that unit?
7      A.  Everybody in my squad.
8      Q.  When I say "the search," I mean when you
9   executed the warrant at 1 o'clock in the morning.
10     A.  Yes.
11     Q.  Everyone from your squad was there?
12     A.  Most likely, yes.
13     Q.  Are they on the search warrant?
14     A.  I don't know what I put on the search
15  warrant.
16     Q.  Well, you're supposed to, right?  Isn't
17  that proper protocol?
18     A.  Yes.
19     Q.  In fact, you did it with all the other
20  search warrants that were conducted at 5605, 5607
21  and 5609?  There's nothing on this warrant.  Let me
22  be fair about it and give you the warrant.
23        What is that, Monaghan --
24     A.  It's two.

47  (Pages 185 to 188)

McIntyre v. Liciardello, et al./Torain v. The City of Phila., et al.                    BRIAN MONAGHAN, 1/17/17

---

Page 189

1    Q.  Monaghan-2.  Tell me where -- in that box
2  where it says other officers participating in
3  search, what badges do you have?
4    A.  I can't tell if there's any badges.
5    Q.  There's no badges I'll submit to you.
6    A.  Do you have the original copy of the
7  search warrant?
8    Q.  I do not.
9        MR. BRIGANDI:  What is the Bates
10       number?
11       MR. PILEGGI:  Two.  It's the actual
12     -- you gave it to Jim, I think.
13  BY MR. PILEGGI:
14    Q.  Am I correct, Officer Monaghan, that you
15  would absolutely have to have badges in there as to
16  who also participated in the search pursuant to the
17  policies and procedures?
18    A.  Yes.  We're supposed to put down the
19  badges.
20    Q.  Why didn't you do that?
21    A.  I don't know.
22    Q.  How do you recall who was with you?
23    A.  Well, by knowing who was there when I
24  executed the warrant?

---

Page 190

1    Q.  Yeah.
2        You don't recall, do you?
3    A.  No, I don't recall who was there.
4    Q.  Could it have been yourself?
5    A.  No.
6    Q.  How do you know?
7    A.  Because I know it wasn't myself.
8    Q.  Why wouldn't you put down the numbers?
9        MR. BRIGANDI:  I'm going to object
10       just in the fact that this copy is
11       terrible.  I can't tell what's in there or
12       not in there.
13       MR. PILEGGI:  There's nothing in
14       there.
15       MR. BRIGANDI:  How do you know?
16       MR. PILEGGI:  Let's do this.  I'll
17       give him the other search warrants, which
18       are just as bad copies, and we'll see.
19       There's a million badge numbers in there.
20       I'm asking him on his own recollection.
21       MR. BRIGANDI:  It very well is
22       possible that they aren't in there, but
23       this copy is very bad.
24       MR. PILEGGI:  Let's do this.

---

Page 191

1        MS. CORTES:  Actually, when you look
2  at a lot of other search warrants there
3  are badge numbers in there.
4        MR. BRIGANDI:  But I'm wondering if
5  we have another copy of this search
6  warrant.  I may have produced one.
7        MR. PILEGGI:  You did.  That's what
8  you produced.
9        MR. BRIGANDI:  This was attached to
10  your complaint.
11       MR. PILEGGI:  That's what you
12  produced.  I got that off of the system.
13       MR. BRIGANDI:  Mine are Bates
14  stamped, Mike.
15       MR. PILEGGI:  Let's do this.  I'm
16  going to do these collectively as
17  Monaghan-11.  It's three --
18       MR. BRIGANDI:  Is this 99028?  Is
19  that what this is?
20       MR. PILEGGI:  Correct.
21                - - -
22       (Whereupon, Exhibit Monaghan-11 was
23  marked for identification.)
24                - - -

---

Page 192

1  BY MR. PILEGGI:
2    Q.  Officer Monaghan, I'm showing you what has
3  been collectively given to you as Monaghan-11.
4    A.  Yes.
5    Q.  I'll submit to you these are the three
6  actual search warrants for 5605, 5607, 5609, right?
7    A.  Yes.
8    Q.  Do you see in the same box where -- in
9  Monaghan-2 where it has several badge numbers,
10  correct?
11   A.  Yes.
12   Q.  Can you see those badge numbers?
13   A.  Yes.
14   Q.  Pretty clearly, right?
15   A.  Yes.
16   Q.  In fact, one of the badge numbers is
17  Walker's badge number, right, 3730?
18   A.  Yes.
19   Q.  Another one is Reynolds' badge number,
20  correct?
21   A.  Yes.
22   Q.  I thought they were at the other unit at
23  55th Street?
24   A.  They were.

---

48  (Pages 189 to 192)

Case 2:14-cv-01643-RBS    Document 61-5    Filed 06/29/22    Page 51 of 102

McIntyre v. Liciardello, et al./Torain v. The City of Phila., et al.                    BRIAN MONAGHAN, 1/17/17

Page 193

1       Q.  Why do you have their badge numbers as
2   officers executing warrants as 5605, 5607 and 5609?
3   They weren't even close to that --
4       A.  I believe I just went off the op plans and
5   I just put the badges down.  That looks like mostly
6   our unit, and that's what I went by.  Probably just
7   the op plans and I put down the badge numbers.
8       Q.  Why isn't Corporal Sinclair or Jeannie
9   Gessners' badge in there?
10      A.  I didn't use them.  I put NFU south one
11  and west one, I believe.
12      Q.  Well, is there any supervisor's badge
13  numbers in there?  You said there had to be at
14  least -- at least one supervisor, but maybe as many
15  as three.
16          You didn't put them in there either,
17  did you?
18      A.  I don't see the supervisor's badge
19  numbers.
20      Q.  So you just put down people conducting the
21  search -- even if they weren't conducting it, you
22  put down their badge numbers because they were on
23  the team, correct?
24      A.  Yes.

Page 194

1       Q.  You put nothing in the Torain affidavit,
2   right?
3       A.  Yes.
4       Q.  Okay.  Do you think that was a mistake or
5   was that intentional?
6       A.  No, it was not intentional.  It was a
7   mistake.
8       Q.  You don't recall who went back to the unit
9   with you at 1 o'clock to execute that search and
10  seizure warrant?
11      A.  No, I don't.  I don't recall who was all
12  there, no.
13      Q.  I'm going to ask you again.  Do you think
14  it could have been just yourself?
15      A.  No.
16      Q.  Why?
17      A.  Because I know I wasn't the only one
18  there.
19      Q.  Were you the one that confiscated the
20  safe?
21      A.  I don't believe I grabbed the safe out,
22  but I was at that location when it was recovered.
23      Q.  And you were not the one that broke open
24  the safe?

Page 195

1       A.  I don't believe I was.  I was probably
2   doing paperwork, to the best of my knowledge.
3       Q.  You keep saying "probably."
4       A.  To the best of my knowledge.
5       Q.  You were doing paperwork at 1 o'clock in
6   the morning?
7       A.  I was doing paperwork until about late in
8   the afternoon that day.
9       Q.  What paperwork did you do at 1 o'clock in
10  the morning in conjunction to the Torain case?
11      A.  Recoveries of what we recovered.  Probably
12  filling out biographical information of what I have
13  to fill out.  I had a lot of paperwork still to do.
14  I wouldn't be surprised if I still had a couple
15  PARS I had to do.
16      Q.  So it's your testimony that you go back at
17  some point after you're at 55th Street, you meet
18  with the manager, you go into the property with the
19  key.  At some point you go back to process all the
20  arrestees and all the paperwork.  You leave
21  somebody there to secure the unit at 55th Street,
22  right?  Then you go and work on getting an
23  affidavit of probable cause for a warrant for 55th
24  Street that is later executed at 1 o'clock.

Page 196

1          By the way, that warrant -- it looks
2   like it's approved by the DA and also by Jeannie
3   Gessner, right?
4       A.  Bail commissioner.
5       Q.  Well, it's also -- on the side, if you
6   look at Monaghan-2, it appears that Jeannie Gessner
7   actually approved --
8       A.  No.  That's Monaghan-11.
9       Q.  Okay.  Monaghan-2.  Does it appear that
10  the DA Albright approved it as well as Jeannie
11  Gessner?
12      A.  Yes.  Jeannie Gessner puts her approval on
13  there.
14      Q.  So that warrant was done sometime before 1
15  o'clock, right?
16      A.  For 55th Street?
17      Q.  Correct.
18      A.  Yes.
19      Q.  Is it fair to say that Jeannie Gessner was
20  -- at least at that point when it was approved was
21  at headquarters or wherever you're processing the
22  paperwork?
23      A.  Yes.  It appears that way.
24      Q.  So after that you get -- the bail

SUMMIT COURT REPORTING, INC.
215.985.2400 * 609.567.3315 * 800.447.8648 * www.summitreporting.com

Page 197

1　commissioner approves the warrant and then you go
2　back at 1 o'clock and search the unit and
3　confiscate a safe. You bring the safe back -- and,
4　by the way, did you find drugs independent of the
5　safe?
6　　A. No. The drugs were inside the safe.
7　　Q. Are you sure?
8　　A. Yes.
9　　Q. Do you recall your testimony that the
10　drugs were found inside the bed frame?
11　　A. Inside the safe, I believe.
12.　　Q. Do you recall your testimony being that
13　you found the drugs inside the bed frame?
14　　A. No.
15　　Q. But you recall specifically that the drugs
16　were in the safe?
17　　A. Yes, I do.
18　　Q. Do you recall seeing the drugs in the
19　safe?
20　　A. Being told that the drugs were in the
21　safe.
22　　Q. That's different. You didn't see the
23　drugs in the safe? Someone else told you that they
24　found drugs in the safe?

Page 198

1　　A. Yes.
2　　Q. Who told you that?
3　　A. I'm not sure.
4　　Q. Do you think it's the same person that
5　broke open the safe?
6　　A. Most likely.
7.　　Q. Was Officer Kelly working at that time at
8　one -- after 1 o'clock in the morning? I'm going
9　to say approximately 2 o'clock in the morning.
10　　A. Yes, he was.
11　　Q. Was he working on the same paperwork you
12　were working on?
13　　A. He probably was and, most likely, he drove
14　me down to get the search warrant signed, affidavit
15　signed.
16　　Q. Do you know if Officer Walker was working
17　at that time?
18　　A. I believe so.
19　　Q. And Officer Reynolds?
20　　A. I believe so.
21　　Q. And the other members of your team?
22　　A. Yes.
23　　Q. Okay. So once you get the drugs out of
24　the safe, they're tested, of course, correct?

Page 199

1　　A. Yes.
2　　Q. At what point did you tell the officers
3　who were securing the unit, whoever they were, from
4　4 o'clock in the morning until 1 o'clock in the
5　morning that they could leave?
6　　A. Repeat that.
7　　Q. At what point did you tell the officers
8　that were securing the unit from 4 o'clock in the
9　afternoon until 1 o'clock in the morning that they
10　could leave?
11　　A. After we executed the warrant.
12　　Q. Who were those officers?
13　　A. I don't recall who exactly was all there.
14　　Q. Well, do you think they were part of your
15　team or uniformed officers?
16　　A. I believe they were part of our team.
17　　Q. Again, wouldn't you have to put that in
18　your paperwork, at least with respect to once you
19　confiscated the safe, that you had had officers
20　securing that unit from the period of time of 4:00
21　o'clock when you were there the first time to 1:00
22　o'clock when you finally confiscated it?
23　　A. I didn't put it in the paperwork.
24　Something like that should go in, but I didn't put

Page 200

1　it in.
2　　Q. Officer, would you agree with me that
3　based just on the paperwork that it appears that
4　you actually confiscated the safe at 4:00 o'clock
5　in the afternoon when you went over there and then
6　backdated everything to appear that you went back
7　with a search warrant and confiscated the items
8　then?
9　　A. Absolutely not.
10　　Q. It doesn't. Okay. Let me show you --
11　give me one second.
12　　　MR. PILEGGI: Let's mark this as 12.
13　　　　- - -
14　　　(Whereupon, Exhibit Monaghan-12 was
15　　　marked for identification.)
16　　　　- - -
17　BY MR. PILEGGI:
18　　Q. Officer Monaghan, I'm showing you what has
19　been marked as Monaghan-12 for identification.
20　　A. Yes.
21　　Q. That's a property receipt, am I correct,
22　for -- it says inside -- we don't know what the
23　number is -- but it says South 55th Street,
24　apartment two?

McIntyre v. Liciardello, et al./Torain v. The City of Phila., et al.                    BRIAN MONAGHAN, 1/17/17

| | Page 201 |
|---|---|
| 1 | A. Yes. |
| 2 | Q. Can we all agree that that is 1628 North |
| 3 | 55th? |
| 4 | A. Yes. |
| 5 | Q. I don't want to belabor this, but another |
| 6 | mistake? |
| 7 | A. Yes. I wasn't the one who prepared this. |
| 8 | Q. Fair enough. Now, what is the date on |
| 9 | that one? |
| 10 | A. 1/5/01. |
| 11 | Q. Right. 1:00 a.m., correct? |
| 12 | A. 1:00 a.m., yes. |
| 13 | Q. And it says, "Confiscated three ripped |
| 14 | clear plastic baggies containing alleged crack |
| 15 | cocaine, approximately of all three clear bags is |
| 16 | 17 grams"? |
| 17 | A. Yes. |
| 18 | Q. It says, "Circumstances on 1/5/01 at |
| 19 | approximately 1:00 a.m. the above items were |
| 20 | confiscated from the above location after NFU, |
| 21 | narcotics field unit, southwest executed search and |
| 22 | seizure warrant 99028," correct? |
| 23 | A. Yes. |
| 24 | Q. It says it was field tested. "Police |

| | Page 202 |
|---|---|
| 1 | Officer Monaghan conducted a B&D test on the sample |
| 2 | of the above which tested positive for presence of |
| 3 | cocaine base," right? |
| 4 | A. Yes. |
| 5 | Q. Now, you would agree that this -- first of |
| 6 | all, do you know what all that dark color is with |
| 7 | the dates? It looks like somebody was trying to |
| 8 | erase the date? |
| 9 | A. I don't know what it is. |
| 10 | Q. Is that what it looks like to you? Do you |
| 11 | think you were the one who was erasing that date? |
| 12 | MR. BRIGANDI: Objection. This is a |
| 13 | typed thing. It could be a highlight. |
| 14 | It's ridiculous. |
| 15 | MR. PILEGGI: Okay. It is |
| 16 | ridiculous. I agree. |
| 17 | MR. BRIGANDI: It's ridiculous that |
| 18 | you are implying that someone tried to |
| 19 | erase this. |
| 20 | MR. PILEGGI: It's ridiculous. |
| 21 | MR. BRIGANDI: It is. |
| 22 | BY MR. PILEGGI: |
| 23 | Q. Whatever this is, the highlight, do you -- |
| 24 | well, let's do this. It seems like this highlight |

| | Page 203 |
|---|---|
| 1 | is only on the two property receipts for North 55th |
| 2 | Street, right? |
| 3 | A. What do you mean? |
| 4 | Q. I use the word "highlighted" because I'm |
| 5 | trying to be fair about it. |
| 6 | A. Yeah. |
| 7 | Q. Okay. Does it appear that it looks like |
| 8 | it's erased and that there was a different date put |
| 9 | in? |
| 10 | A. It could be, yes. |
| 11 | Q. Would you -- do you recall doing that? |
| 12 | A. No, I did not. |
| 13 | Q. You did sign it though, right? |
| 14 | A. Yes, I did. |
| 15 | Q. Okay. And on this particular property |
| 16 | receipt the -- the supervisor who signed off on it |
| 17 | was Sergeant Gessner, right? |
| 18 | A. Yes. |
| 19 | Q. And on the other property receipt for the |
| 20 | safe dated 1/4 at 3:30, it was signed off by |
| 21 | Corporal Sinclair, right? |
| 22 | A. Yes. |
| 23 | Q. But it's your testimony that these |
| 24 | property receipts were done at the same time |

| | Page 204 |
|---|---|
| 1 | because when you confiscated the safe and it was |
| 2 | opened you found the drugs inside the safe? When I |
| 3 | say "you," I'm meaning another member of the -- |
| 4 | A. On the 5th, yes. |
| 5 | Q. Correct? |
| 6 | A. Yes. |
| 7 | Q. Do you know why Sergeant Gessner signed |
| 8 | this property receipt for the drugs and not the |
| 9 | property receipt for the safe that was confiscated |
| 10 | at the same time? |
| 11 | A. No. Either supervisor could have signed |
| 12 | it. Whoever was sitting at the desk, you walk in |
| 13 | with the property receipts and the -- many a times, |
| 14 | a couple hundred times, I would walk in and say, |
| 15 | Jean, Gary, can you sign this so I can get the |
| 16 | signs real fast. It all depended on who you wanted |
| 17 | to give it to to sign it. |
| 18 | Q. Okay. But you were doing -- |
| 19 | A. I'm not saying I did. I'm saying that |
| 20 | somebody came up to me and handed me the prop |
| 21 | receipt. I signed it and then they take it to a |
| 22 | supervisor. It all depends on who wanted to go to |
| 23 | which supervisor to sign it. |
| 24 | Q. Let me ask you this. Do you recall |

51 (Pages 201 to 204)

Case 2:14-cv-01643-RBS    Document 61-5    Filed 06/29/22    Page 54 of 102

McIntyre v. Liciardello, et al./Torain v. The City of Phila., et al.                    BRIAN MONAGHAN, 1/17/17

Page 205

1    actually doing this property receipt? When I refer
2    to "this property receipt," I'm referring to
3    2308223, which is the drugs.
4        A.  No. That's not one of my property
5    receipts.
6        Q.  Okay.  Is it fair to say that these
7    property receipts would have been done at the same
8    time? And when I say "these," I mean 2308223 and
9    then the property receipt for the safe, which was
10   2308224.
11       A.  Yeah, but from the way this is typed, two
12   different individuals typed this.
13       Q.  I was going to ask you that.
14       A.  Yeah.
15       Q.  It looks like two different typewriters?
16       A.  Yeah. Two different typewriters, what's
17   typed. We used to go by a format. Obviously,
18   different ways of doing the format.
19       Q.  Now, you would agree, though, that whoever
20   did this -- first of all, you're responsible for
21   whoever did this ultimately, correct?
22       A.  I would say I am, yes.
23       Q.  If there was a mistake done, you're aware
24   that once it's put into the system that you have to

Page 206

1    do another memorandum to correct the mistake once
2    it's put into the system, right?
3        A.  No. I'm not aware of that.
4        Q.  So is it your testimony that if you do
5    paperwork and there is a mistake, a different date
6    or maybe the wrong person, that you don't have to
7    correct it in any way?
8        A.  Obviously, it looks like one -- it looks
9    like they were trying to correct something on this,
10   but there's no paperwork you have to do if you mess
11   up on paperwork.
12       Q.  I guess my question is if there is a
13   mistake in any part of the job, whether it's the
14   property receipt, whether it's a search warrant,
15   whether it's part of the surveillance, aren't you
16   required to notify someone -- a supervisor that you
17   made a mistake? I mean, doesn't that all go to the
18   probable cause and whether you can prosecute
19   someone?
20       A.  If you catch it in time. If you don't
21   catch it, you really can't go to a supervisor. If
22   you make a mistake on paperwork, you would try to
23   rectify it yourself.
24       Q.  Let me ask you this. This is a

Page 207

1    hypothetical.  Let's assume that you made a mistake
2    with regards to the involvement of Kareem Torain.
3            Is it your testimony that then you
4    would have to come forward if he's sitting in jail
5    to rectify that mistake?
6        A.  If you honestly and truly made a mistake?
7        Q.  Yeah.
8        A.  And you're saying that you should go to
9    somebody and say it? Yeah. Hypothetically, if you
10   made a mistake, yes, but in this case, there was
11   not a mistake made.
12       Q.  Well, we just went over there was repeated
13   mistakes being made.
14       A.  With him being incarcerated.
15       Q.  So you're saying that none of the
16   paperwork that you made a mistake on contributed to
17   his incarceration?
18           MR. BRIGANDI: You're going to have
19       to repeat that.  I don't understand the
20       question.
21           MR. PILEGGI: It only matters if he
22       understands it.
23           MR. BRIGANDI: Do you understand the
24       question?

Page 208

1            THE WITNESS: No.
2            MR. PILEGGI: Of course he doesn't.
3    BY MR. PILEGGI:
4        Q.  Officer, are you saying that you don't
5    have to correct -- that any of these mistakes that
6    were made on this paperwork didn't contribute to
7    his prosecution and his conviction?
8        A.  The mistakes didn't contribute to it. The
9    paperwork all contributed to it.
10       Q.  Well, mistakes on the paperwork. That's
11   what I mean.
12       A.  Well, I noticed, yeah, some mistakes.
13       Q.  And what I'm asking you is looking at this
14   as a neutral detached authority, wouldn't you have
15   to point out to somebody that there was mistakes
16   made in the paperwork that could ultimately lead to
17   whether this person is convicted or not?
18           MR. BRIGANDI: Objection to the
19       form.  You can answer it.
20           THE WITNESS: Everybody makes
21       mistakes on paperwork.  Typing.  It could
22       be a typographical mistake.  It could be a
23       human mistake.
24   BY MR. PILEGGI:

SUMMIT COURT REPORTING, INC.
215.985.2400 * 609.567.3315 * 800.447.8648 * www.summitreporting.com

Case 2:14-cv-01643-RBS    Document 61-5    Filed 06/29/22    Page 55 of 102

McIntyre v. Liciardello, et al./Torain v. The City of Phila., et al.                    BRIAN MONAGHAN, 1/17/17

Page 209

1    Q.  Let me rephrase the question.  So it's
2    your testimony that none of the mistakes that were
3    made in the paperwork contributed in any way to the
4    probable cause?
5        A.  I don't believe so, no.
6        Q.  And the fact that the paperwork appears
7    that you confiscated items out of a unit without a
8    search warrant, a/k/a probable cause, didn't
9    contribute in any way to Mr. Torain sitting in jail
10   for 13 years?
11       A.  It might appear that way, but no.
12       Q.  Appear to who, to a judge?
13       A.  The mistakes in the paperwork.
14       Q.  But aren't these your certifications?
15   Isn't this like testifying under oath?
16       A.  Yeah.
17       Q.  The paperwork?
18       A.  Yes.
19       Q.  In fact, didn't you rely on your paperwork
20   when you testified in court in prosecuting Mr.
21   Torain?
22       A.  Yes.
23       Q.  Okay.  And didn't you -- you didn't point
24   out to anybody in court that you made any mistakes,

Page 210

1    did you?
2        A.  I believe it was pointed out about that
3    property receipt, I believe.
4        Q.  Where?
5        A.  At one of the hearings.
6        Q.  At one of the hearings?
7        A.  Yes.
8        Q.  Okay.  Were you aware that the videotapes
9    that you took for two days, over the course of two
10   days, were missing in this case?
11       A.  I am aware of that.
12       Q.  Do you think that's important?
13       A.  Well, the videotapes were given to the
14   district attorney.  What the district attorney's
15   office did with them tapes, I have no clue.
16       Q.  Not my question.  Don't you think those
17   tapes are important to the prosecution or the
18   innocence of Mr. Torain?
19       MR. BRIGANDI:  Well, they were
20       available for the prosecution of Mr.
21       Torain.  I think the record makes that
22       clear.
23       MR. PILEGGI:  Okay.  I'm talking
24       about now.

Page 211

1    THE WITNESS:  I can't make them
2        appear.  I don't know where they're at.
3    BY MR. PILEGGI:
4        Q.  Let me ask you.  Mr. Torain didn't appear
5    on any of those tapes, did he?
6        A.  I'm not sure.  I would have to review the
7    tapes.
8        Q.  Well, do you recall when you reviewed your
9    testimony you testified that you did not identify
10   Mr. Torain while the videotapes were rolling?
11       A.  I forget.
12       Q.  Well, you agree, would you not, that if
13   you did not identify Mr. Torain on those tapes,
14   that you certainly at that point did not have
15   probable cause that he was involved or even a
16   reasonable suspicion that he was involved in this
17   drug organization?
18       A.  Just because he wasn't on the tape -- like
19   I said, we didn't video the whole time.
20       Q.  But you had not seen him even off the
21   tape, did you?
22       A.  What do you mean?
23       Q.  You didn't pick him up -- you didn't even
24   know he was involved in any way until you saw the

Page 212

1    Bonneville?
2        MR. BRIGANDI:  Are we going to
3        rehash this all again for the fifth time?
4        MR. PILEGGI:  Yes.  I'm going to do
5        it actually for the sixth time.
6        THE WITNESS:  Yes, I didn't know.
7    BY MR. PILEGGI:
8        Q.  And you didn't know he was involved when
9    he was followed to Conestoga Street, right?
10       A.  Right.
11       Q.  And you didn't know he was involved when
12   he was followed to 55th Street, right?
13       A.  Right.
14       Q.  And, in fact, according to you, you didn't
15   even think you had probable cause until you saw
16   three individuals leaving that rooming house, that
17   apartment house, right?
18       A.  Yes.
19       Q.  Okay.  Then later on when you tried the
20   key, that's when you put it all together that
21   Torain was the individual in that middle bedroom
22   based on the key and based on Officer Walker
23   telling you that he saw a light go on?
24       A.  True.

53  (Pages 209 to 212)

Case 2:14-cv-01643-RBS   Document 61-5   Filed 06/29/22   Page 56 of 102

McIntyre v. Liciardello, et al./Torain v. The City of Phila., et al.                    BRIAN MONAGHAN, 1/17/17

Page 213

1      Q.  And you don't ever recall having a
2   discussion prior to trial or any proceeding,
3   preliminary hearing, with Officer Walker about the
4   light going on, right?
5      A.  I said that Officer Walker came over the
6   radio.
7      Q.  Right, other than that.
8          But you don't remember any
9   discussion after that about the light going on?
10     A.  I don't remember that.  We could have had
11  a discussion sitting in a room before the
12  preliminary hearing.  I'm not sure.
13     Q.  Okay.  In fact, isn't that the way it
14  goes?  You sit down with all the officers and they
15  all go over what they're going to testify to?
16     A.  Well, yeah, you review your notes.
17     Q.  And, lastly, you had no idea that
18  Conestoga Street was searched?
19     A.  Yes.  Correct.
20     Q.  And that certainly wasn't part of the
21  probable cause, correct?
22     A.  Correct.
23     Q.  By the way, did you have any discussions
24  with Kareem Torain after his arrest?

Page 214

1      A.  I don't recall.
2      Q.  Would you have discussed that with him
3   after his arrest?
4      A.  No.  I don't think I would have had any
5   discussion with him.
6      Q.  Do you know if Officer Reynolds did?
7      A.  Officer Reynolds placed him under arrest.
8   So he had to talk to him in order to get the
9   biographical information out of him.
10     Q.  Well, don't you just get his license?
11     A.  I don't believe he had a license on him.
12     Q.  How do you know?  Did Officer Reynolds
13  tell you that?
14     A.  We would have confiscated it.  We never
15  confiscated a license.  So I don't know what he had
16  on him.
17     Q.  Only keys?
18     A.  Money.
19     Q.  Cell phone?
20     A.  I believe there was paperwork recovered
21  too from the Commonwealth of Pennsylvania for
22  something.
23     Q.  Where was that recovered?
24     A.  That -- I'm not sure if it was on him or

Page 215

1   inside the vehicle.  I'm not sure.
2      Q.  Do you think that was confiscated out of
3   Conestoga Street?
4      A.  I don't think so.
5      Q.  Could it have been?
6      A.  I don't know.
7      Q.  But on the 229, the biographical
8   information, what is his address listed as, do you
9   recall?
10     A.  I don't recall.
11     Q.  Conestoga.  If I told you Conestoga, would
12  that surprise you?
13     A.  No.
14     Q.  Okay.  And there was no independent
15  investigation to see if he actually lived at
16  Conestoga?
17     A.  Just from what he said then.  If he said
18  he lived at Conestoga, but he has keys that opens
19  the door into 55th Street.
20     Q.  Officer, do you think any officers went
21  into 55th Street to steal at any time?
22     A.  I don't believe it, no.
23     Q.  Officer Walker testified that he stole
24  repeatedly.

Page 216

1          Do you not believe that he maybe
2   went in there to steal?
3      A.  I don't believe so.  I never seen Police
4   Officer Walker steal anything.  If he did, I would
5   have notified a supervisor.
6      Q.  But he's admitted to that repeatedly.
7          Do you say that you don't have
8   personal knowledge of that?
9      A.  I do not have personal knowledge.  No, I
10  do not.
11     Q.  In your testimony you said that you later
12  found out that Torain resided at 1621 North
13  Conestoga.
14          Do you know how you later found that
15  out?
16     A.  Probably from the 229, the biographical
17  sheet.
18     Q.  Okay.  And you think that that's something
19  that he informed Officer Reynolds when he was
20  arrested?
21     A.  It might have been, yes, or the uniformed
22  officers.  I'm not sure who filled out the
23  biographical information.
24     Q.  You also testified -- and this was -- and

54  (Pages 213 to 216)

Case 2:14-cv-01643-RBS    Document 61-5    Filed 06/29/22    Page 57 of 102

McIntyre v. Liciardello, et al./Torain v. The City of Phila., et al.          BRIAN MONAGHAN, 1/17/17

Page 217

1  just let me ask you the question first. Then we'll
2  go over where it is. I believe this is the May 6th
3  testimony. This is the motion to suppress.
4       You also testified that Officer
5  Reynolds gave you a description of the individual
6  who went into Conestoga Street as a tall male,
7  light-skinned.
8       Do you recall that?
9       A.  No, I don't recall that.
10      Q.  What was -- if someone gave you -- that
11  would be the normal process, right, that you would
12  want to have a description so if you needed to
13  arrest that person, you would know who you're
14  arresting?
15      A.  Well, if you wanted to give it, yes, the
16  description of the male getting out of the vehicle.
17      Q.  But -- right. This was the person that
18  was getting out of the vehicle, right?
19      A.  Okay.
20      Q.  So is it fair to say that at least when he
21  went into Conestoga he was under investigation and
22  you had some suspicion because you've testified
23  repeatedly that he wasn't under investigation?
24      A.  He was a person of interest at that time.

Page 218

1       Q.  Person of interest?
2       A.  Yes.
3       Q.  Okay. You testified -- this was your
4  testimony. This, again, was on May 6th. Actually,
5  let me read it to you to be fair about this.
6            - - -
7            (Whereupon, Exhibit Monaghan-13 was
8            marked for identification.)
9            - - -
10  BY MR. PILEGGI:
11      Q.  All right. Officer Monaghan, I'm showing
12  you what has been marked as Monaghan-13. I'll
13  submit to you that is the first day of the trial,
14  but it was really actually a motion to suppress I
15  believe it was the arrest of Torain. It wasn't
16  dealing with the unit. It was dealing more with
17  the arrest, I believe.
18      A.  Okay.
19      Q.  If you could turn to page 53. Actually,
20  I'm sorry. Let's start with 52. Down at the
21  bottom it says -- this is a question.
22       "Okay. We get to the person then
23  goes in the green --
24      A.  Now, who's testifying here?

Page 219

1       Q.  It's not supposed to be testifying. It is
2  a question from the DA, but it does sound like
3  testimony. Here's the question from the DA.
4       "Okay. We get to the person. Then
5  goes in the green Bonneville. Then goes to 1628 --
6  is it South 55th or North 55th Street?" Then you
7  respond --
8       MR. BRIGANDI:  Is this his
9  testimony? Do we know that?
10      MR. PILEGGI:  Yes, this is his.
11  BY MR. PILEGGI:
12      Q.  It says, "It's North 55th.
13       Question: "North 55th, okay. The
14  person then goes into that location, correct?"
15       Then you answer, "That's correct."
16       Question: "All right. Now, Officer
17  Walker sees the person enter the location,
18  correct?"
19       "That's correct."
20       But we know that's not correct? It
21  was actually Officer Reynolds that saw him go in
22  that location, right?
23      A.  Yes.
24      Q.  So that's incorrect, not only paperwork,

Page 220

1  but now we have incorrect testimony, right?
2       A.  That was a question. So I didn't --
3       Q.  But you agreed with it?
4       A.  Okay. Yeah.
5       Q.  It's your testimony, right?
6       A.  Yes.
7       Q.  So it's incorrect, right?
8       A.  Right.
9       Q.  Do you think that has anything to do with
10  the probable cause?
11      A.  No, because we didn't do anything for
12  1621.
13      Q.  Fine. Then it says, "Okay. Is watching
14  them from his car; is that correct?"
15       "I'm not sure where he's watching
16  them from."
17       Question: "Sees a person enter and
18  then sees a light come on in the middle bedroom at
19  the location; is that right?"
20       "I believe so, yes. That's what he
21  related back to me."
22       Question: "I take it to mean that,
23  and correct me if I'm wrong, but he didn't see the
24  person enter a particular room, but he believed the

Case 2:14-cv-01643-RBS    Document 61-5    Filed 06/29/22    Page 58 of 102

McIntyre v. Liciardello, et al./Torain v. The City of Phila., et al.                    BRIAN MONAGHAN, 1/17/17

Page 221

1    person went onto that room that had the light go
2    on."
3            Then you say, "I believe so. I'm
4    not sure what room he believes they went into at
5    that time."
6        A.  Yeah. I wasn't sure.
7        Q.  Okay. But in all of the other paperwork
8    and all of the other testimony it says he went into
9    the middle bedroom, right?
10       A.  Yeah. After we knew what bedroom it was,
11   yes.
12       Q.  Okay. In other words, after you went in
13   with the key, you were trying to establish the
14   probable cause for that bedroom, right?
15       A.  With the key, yes.
16       Q.  So is it fair to say at least at the time
17   of Mr. Torain's arrest that you did not even know
18   what bedroom he went into? Is that fair to say?
19       A.  I didn't know. Not that the time.
20       Q.  No one knew according to your testimony?
21       A.  Well, Jeff is the one that saw the light
22   turn on. So I'm not sure which room he thought it
23   was.
24       Q.  But didn't you need to ascertain that

Page 222

1    before you went over there after he was arrested?
2        A.  To who?
3        Q.  Didn't you need to ascertain that Torain
4    went into the middle bedroom where you eventually
5    said you found drugs before his arrest and not
6    after?
7        A.  No. We ascertained that once we got there
8    to secure it.
9        Q.  After he was arrested, right?
10       A.  Yes.
11       Q.  But didn't you need to know that for the
12   probable cause to arrest him in the first place?
13       A.  No.
14       Q.  Just the mere fact that he went into any
15   building was enough?
16       A.  I believe that we had enough probable
17   cause to arrest him at the time.
18       Q.  My question is just by the mere fact of
19   him going into a building according to Officer
20   Reynolds?
21       A.  And what was seen by Police Officer Walker
22   at the time.
23       Q.  That he went into a bedroom?
24       A.  And when the three guys came out, yes.

Page 223

1        Q.  Okay. On page 55 of that same transcript
2    -- I'm sorry. It starts on 54 is the question.
3    Well, let me clarify something. I said it was the
4    DA questioning you. It was not. It was the
5    defense attorney, Mr. Torain's attorney.
6            But on page 54 it starts, "And from
7    what Officer Walker has told you at this point he
8    hasn't seen that person receive any drugs either,
9    correct?" I'm sorry. Let me back up.
10           It says, "Okay. You tell Officer
11   Walker to stop the person who was driving the green
12   Bonneville, right?"
13           "That's correct."
14           Well, that is incorrect, right,
15   because it was actually Officer Reynolds who you
16   told to stop the car, right?
17       A.  Yes.
18       Q.  Another mistake, right?
19       A.  Typographical mistake. I don't know.
20       Q.  Typographical. This is a transcript, an
21   official transcript, from the court?
22       A.  You're saying they never make a mistake on
23   this?
24       Q.  You're saying you didn't testify to that?

Page 224

1        A.  I don't remember. I don't remember, but,
2    like I said, I instructed over radio to stop the
3    vehicle. Officer Reynolds went down and stopped
4    the vehicle.
5        Q.  No. You specifically told Officer
6    Reynolds to stop the vehicle, which was synonymous
7    with you with arresting him, right?
8        A.  It says that here, but I don't remember.
9        Q.  It says it also in your paperwork that you
10   told Reynolds to stop him, not Walker?
11       A.  Yes.
12       Q.  Okay. "At this point, again, you've not
13   seen that person in the green Bonneville have any
14   drugs or receive any drugs or give any drugs or
15   even receive or give any money at this point,
16   correct?"
17           "I did not."
18           "And from what Officer Walker has
19   told you, at this point he hasn't seen that person
20   receive any drugs either, correct?"
21           "To the best of my knowledge, no,
22   not at this time."
23           "Well, it's fair to say he would
24   have said something to you if he had seen that?"

56 (Pages 221 to 224)

Case 2:14-cv-01643-RBS   Document 61-5   Filed 06/29/22   Page 59 of 102

McIntyre v. Liciardello, et al./Torain v. The City of Phila., et al.                                    BRIAN MONAGHAN, 1/17/17

Page 225

1        "Yes, he would have."
2            Okay.  So based on that, you didn't
3    see Torain engage in any criminal activity.  Walker
4    didn't see Torain engage in any activity.  So that
5    only leaves Reynolds.
6            Did Reynolds tell you anything --
7        A.  That was somebody handing Torain
8    something.  Torain -- I never said anybody handed
9    him anything.
10        Q.  No.  No.  Let me read it again.  It
11   says --
12            MR. BRIGANDI:  What page are you on?
13            MR. PILEGGI:  This is page 54 at the
14   bottom, line 20.
15   BY MR. PILEGGI:
16        Q.  "At this point, again, you've not seen
17   that person in the green Bonneville," meaning
18   Torain, who you later found out was Torain, "have
19   any drugs or receive any drugs or give any drugs or
20   even receive or give any money at this point,
21   correct?"
22            Do you see that?  I think he covered
23   all bases, that attorney, with that question.
24            MR. BRIGANDI:  What is the answer,

Page 226

1    because I can't read it on mine?
2            MR. PILEGGI:  "I did not."
3            MR. BRIGANDI:  May I see yours?
4            THE WITNESS:  Yeah.
5    BY MR. PILEGGI:
6        Q.  So, in other words, Officer Monaghan, you
7    or Officer Walker did not see Torain engage in any
8    criminal activity, whether it was drugs, accepting
9    money, giving money, receiving drugs, giving drugs?
10   You didn't see him doing any of that, right?
11       A.  Like I stated earlier, Walker saw Delee
12   coming out, placing a bag out of the property into
13   his jacket, which he believed to be narcotics.  I
14   didn't say that Torain handed the drugs.  Walker
15   didn't say Torain handed the drugs to him.
16       Q.  So you would agree with me that at that
17   point either yourself or Officer Walker had not
18   seen Torain engage in any criminal activity?
19       A.  Yes.
20       Q.  I'm not talking about Delee or Tillman.
21       A.  Yes.
22       Q.  That's fair to say?
23       A.  Sure.
24       Q.  So what did Officer Reynolds tell you that

Page 227

1    got you over that hump that Torain was engaged in
2    any criminal activity, if anything?
3        A.  He didn't tell me.  He arrested him at
4    61st and Nassau.
5        Q.  Again, is it a fair statement to say that
6    he was arrested on mere speculation?
7        A.  No.
8        Q.  No.  You had concrete facts?
9        A.  Not concrete.  We had facts.
10       Q.  Okay.  Not according to your testimony,
11   though, right?
12            MR. BRIGANDI:  That is your opinion,
13   Mike.  Don't answer that.
14            MR. PILEGGI:  No.  No.  That's what
15   the testimony says.
16            MR. BRIGANDI:  Don't ask him opinion
17   questions.
18   BY MR. PILEGGI:
19       Q.  You didn't even know he was Kareem Torain
20   until after he was arrested; is that correct?
21       A.  Yes, as I stated.
22       Q.  You didn't know that he lived at Conestoga
23   until after he was arrested, right?
24       A.  True.

Page 228

1        Q.  Let me give you another opportunity.  You
2    do not have any information that Conestoga was ever
3    searched by any officer?
4        A.  Yes.  Correct.
5            MR. PILEGGI:  Just give me one
6    second.  I think I may be done.
7    BY MR. PILEGGI:
8        Q.  Again, you weren't privy to this, but I
9    will represent to you that Officer Walker testified
10   that -- first of all, he testified that he gave
11   false testimony at trial with regards to Torain's
12   prosecution and conviction.
13            Were you aware of that?
14       A.  No, I was not.
15       Q.  Okay.  And he said that he was instructed
16   to lie about the light coming on to link Torain in
17   the middle bedroom by you.
18            Were you aware of that?
19       A.  Yes.
20       Q.  Okay.  And you've already testified that's
21   incorrect.  He lied about that.
22            Do you know what incentive Mr.
23   Walker, former Officer Walker, would have to lie
24   about that now?

Page 229

1    A.  No.
2    Q.  Okay.  Were you also aware that he
3  testified that Torain's arrest was illegal even
4  just based on the paperwork, meaning all the
5  mistakes in the paperwork?
6        MR. BRIGANDI:  Is there a question?
7        MR. PILEGGI:  Yes.
8  BY MR. PILEGGI:
9    Q.  Were you aware of that?
10    A.  No, I wasn't.
11    Q.  Would you agree with that?
12    A.  No.
13    Q.  You would agree, however, if Officer
14  Walker lied about the light coming on -- had he
15  done so, that it would be an illegal arrest of
16  Torain?
17    A.  If he had lied about what he told us,
18  yeah, it would.
19  *  Q.  Who was the confidential source?
20        MR. BRIGANDI:  No.  Mike, you know
21  better than that.  You can't give out the
22  identity of the confidential source.
23  That's subject to a confidentiality order.
24  You can't put that on the record.  You

Page 230

1  should know better than that.
2        MR. PILEGGI:  Let's go off the
3  record.
4        MR. BRIGANDI:  No.
5        MR. PILEGGI:  Why not?  This is
6  discovery.  Armando, are you kidding me?
7        MR. BRIGANDI:  There is a
8  confidentiality order.
9        MR. PILEGGI:  So.  That just means
10  it can't be released.
11        MR. BRIGANDI:  You cannot divulge
12  the identity.  File a motion.
13        MR. PILEGGI:  I'm asking him the
14  question.  If you're going to instruct him
15  not to answer, then that's fine.  It's a
16  source, number one.  It's not even an
17  informant.
18        MR. BRIGANDI:  You should know
19  better than that.  Talk to plaintiffs'
20  counsel.
21  BY MR. PILEGGI:
22    Q.  The question is posed to you.  If he
23  instructs you not to answer, don't answer.
24        MR. BRIGANDI:  We'd be violating a

Page 231

1  court order if he answered it.
2        MR. PILEGGI:  No, we wouldn't.
3        MR. BRIGANDI:  Yes, we would.  Read
4  the docket.  Learn the case.
5  BY MR. PILEGGI:
6  *  Q.  Okay.  I'm asking you the question.  I'm
7  going to ask it again -- if he wants to instruct
8  you not to answer -- who the confidential source
9  was.
10        MR. BRIGANDI:  Don't answer it.
11        MR. PILEGGI:  Okay.  Again, I'm
12  going to invite you to go off the record.
13        MR. BRIGANDI:  Not here.
14        MR. PILEGGI:  What do you mean not
15  here?
16        MR. BRIGANDI:  We're in open court.
17  There is a marshal in the courtroom.  No.
18        MR. PILEGGI:  I would ask the
19  marshal, would you step out of the
20  courtroom, please, for a second.
21        MR. BRIGANDI:  No.  If you can give
22  me something in writing -- if you think
23  you're in the right, you submit to me
24  something in writing and we'll answer it.

Page 232

1        MR. PILEGGI:  This is discovery.  If
2  you want to do a protective order, you can
3  do a protective order.
4        MR. BRIGANDI:  We have already done
5  that.  Look at it.
6        MR. PILEGGI:  I know what it is, but
7  it's not all inclusive, Armando.  Come on.
8  That's why you had to give the
9  confidentiality --
10        MR. BRIGANDI:  Am I wrong here?  Are
11  we allowed to give out the identity of the
12  confidential sources and informants?
13        MR. PILEGGI:  You already gave the
14  identities.
15        MR. BRIGANDI:  No, I have not.
16        MR. PILEGGI:  You'd better look at
17  your discovery.  Maybe you need to do your
18  homework.
19        MR. BRIGANDI:  Well, it's subject to
20  a confidentiality order.
21        MR. PILEGGI:  Okay.  So would this
22  be.  So what's the difference?  It just
23  means that I can't disclose it.  I just
24  offered to go off the record.

Case 2:14-cv-01643-RBS   Document 61-5   Filed 06/29/22   Page 61 of 102

McIntyre v. Liciardello, et al./Torain v. The City of Phila., et al.                    BRIAN MONAGHAN, 1/17/17

Page 233

1    MR. BRIGANDI: All right. Are you
2  all right with that?
3    MS. CORTES: According to Judge
4  Diamond, it's the City who has to
5  designate that particular law enforcement
6  privilege as to confidentiality.
7    Also, Mike, just to be clear, one of
8  the reasons, I think as Armando stated at
9  the beginning of the deposition, that we
10  continued with the deposition today was
11  because you promised that you wouldn't go
12  into any personal, private, financial or
13  go into the confidentiality sources. That
14  was one of the things that we understood
15  from your E-mails.
16    So based on that representation, I
17  think there might be another ground for
18  him to object to this questioning here in
19  open court that we just saw earlier today
20  was open to the public to someone who had
21  some type of relation to this case.
22    MR. PILEGGI: Okay. So what is
23  going to happen is I'm going to ask for
24  discovery and --

Page 234

1    MR. BRIGANDI: Submit to me a
2  question in writing. You are right that I
3  did -- I do believe I produced a chart
4  with numbers under a confidentiality
5  order, not in open court.
6    MR. PILEGGI: I'm not disputing
7  that.
8    MR. BRIGANDI: You give me something
9  in writing, and we'll answer it for you.
10    Why don't you ask him if he knows
11  who it is. Do you know who it is?
12    THE WITNESS: I don't know his name.
13  Just somebody in the neighborhood out
14  there.
15    MR. PILEGGI: Wait a minute. Then
16  I'm going to explore that.
17    MR. BRIGANDI: I still think if you
18  ask him about physical characteristics and
19  stuff --
20    MR. PILEGGI: Come on Armando,
21  please.
22    MR. BRIGANDI: I'm going to object.
23  You can ask these questions in writing in
24  an interrogatory form, and I will answer

Page 235

1  them.
2    MR. PILEGGI: Why? What is the
3  confidentiality of a person he doesn't
4  even know that he knows from the
5  neighborhood?
6    MR. BRIGANDI: They can still be
7  identified by other information.
8    MR. PILEGGI: Okay. I'm going to
9  ask the question. If you want to instruct
10  him not to answer, go ahead.
11  BY MR. PILEGGI:
12    Q. Officer, you testified previously that --
13  in fact, in the paperwork it says you received --
14  I'm referring to -- actually, I want to mark this
15  anyway. This is the affidavit of probable cause.
16    MR. PILEGGI: Monaghan-14.
17        - - -
18    (Whereupon, Exhibit Monaghan-14 was
19  marked for identification.)
20        - - -
21  BY MR. PILEGGI:
22    Q. Officer Monaghan, I am showing you what
23  has been marked as Monaghan-14. This is the
24  continuation of search and seizure warrant, but

Page 236

1  it's an affidavit of probable cause, correct?
2    A. Yes.
3    Q. In the first paragraph it says, "Police
4  Officer Monaghan, 6061, received detailed
5  information from a confidential source and 19th
6  District police officers Cain and Goglielmucci,"
7  correct?
8    A. Yes.
9    Q. Now, my understanding from your testimony
10  is that you -- this confidential source, although
11  you know the person from the neighborhood, you
12  don't know a name or anything?
13    A. Yes.
14    Q. Wouldn't you have -- when you interviewed
15  this individual and got the detailed information,
16  wouldn't that be information that you would write
17  down?
18    A. I didn't interview this person. We had a
19  general conversation who stated drug sales --
20  there's drug sales being conducted at 56th and
21  Master. All the other information came from the
22  police officers from the 19th District.
23    Q. But that is an interview, isn't it?
24    A. No. No. Nothing was memorialized in

Case 2:14-cv-01643-RBS    Document 61-5    Filed 06/29/22    Page 62 of 102

McIntyre v. Liciardello, et al./Torain v. The City of Phila., et al.                    BRIAN MONAGHAN, 1/17/17

Page 237

1    writing. It was just face-to-face saying -- it
2    could have been like a captain's complaint or a
3    roll call complaint.
4        Q. But it wasn't? I was somebody from the
5    neighborhood?
6        A. Yes. I was talking to somebody. They
7    said at 56th and Master there's drugs being sold.
8        Q. So it could have been an irate neighbor?
9        A. I even knew there was a lot of drugs being
10   sold there from working there for over 12 or 13
11   years.
12       Q. So these are units that you identified
13   when you were a patrol officer for ten years from
14   1988 to 1998 and you knew that these houses were
15   drug houses?
16       A. At the corner at 56th and Master. It was
17   always big for drugs sales.
18       Q. But you didn't know particularly 5605,
19   5607 and 5609, did you?
20       A. Not at that time.
21       Q. Did this confidential source reach out to
22   you or did you talk to them -- did you go to them?
23       A. No. I talked to them on the street. Just
24   ran into them.

Page 238

1        Q. So you were walking along the street?
2        A. No, I wasn't walking along the street.
3    Like I said, I spent time out there. I made
4    acquaintances out there.
5        Q. So let me get this straight. So you get
6    this information from these two officers and then
7    you go out on the street and whatever -- made
8    contact with this confidential source who confirms
9    what the officers already told you; is that
10   correct?
11       A. No. I found out from the source about the
12   drug sales, at which time I got in contact with
13   Cain and Goglielmucci, who I knew was working a
14   tactical team there, and asked them questions about
15   the area.
16       Q. Did this source tell you that 5609 was an
17   abandoned property and 5607 was the stash house and
18   5605 was the place where they were selling the
19   drugs from?
20       A. Heavy drug sales 56th and Master.
21       Q. Is that what the source told you?
22       A. Yes.
23       Q. Did the source tell you that Al and Pud
24   were the individuals involved in this?

Page 239

1        A. No, they did not.
2        Q. Who told you that?
3        A. Cain or Goglielmucci. One of them.
4        Q. When you interviewed Cain and
5    Goglielmucci, did you write any of that down?
6        A. I don't believe -- maybe I wrote that down
7    on a piece of paper.
8        Q. So you don't know who gave you what
9    information with respect to whether the source told
10   you one thing and the officers told you another?
11       A. The police officers told me that about Al
12   and Pud.
13       Q. Who told you first? That's what I'm
14   trying to determine.
15       A. The source was the first person I talked
16   to.
17       Q. Okay. Were you just in the neighborhood
18   visiting or how did you bump into this source?
19       A. Working. Maybe stopped in -- the source
20   on the street. We work that area.
21       Q. Stopped in where?
22           MR. BRIGANDI: I'm going to object
23       to that. Now I'm going to object because
24       when you give a location and you give a

Page 240

1        description, then you can figure out who
2        it is.
3    BY MR. PILEGGI:
4        Q. Did you talk to this source in a building
5    or was it on the street?
6        A. It was on the street.
7        Q. Okay.
8        A. I was going to say inside I talked to
9    Goglielmucci and Cane.
10       Q. One other question with regard to this
11   source. Did you bring up the subject of these drug
12   sales or did the source just say, hey, by the way?
13       A. The source just said, yo, you know 56th
14   and Master there's a lot of drugs out of there
15   still.
16       Q. And then simultaneously these officers
17   happened to come forward and put the other puzzles
18   -- pieces to the puzzle?
19       A. You do know officers talk and -- we do
20   talk.
21           MR. PILEGGI: I have no further
22       questions.
23           MR. BRIGANDI: Let's take a short
24       break.

Page 241

1          (There was a brief recess taken at
2      this time.)
3      BY MR. WALKER:
4          Q.  You know I've been doing this job as long
5      as you've been doing this job.  I'm not going to go
6      through a lot of questions and take you back
7      because you've already answered those questions
8      already.  I do want to discuss the beginning of
9      your job --
10         A.  Yes.
11         Q.  -- where you go into where you got the
12     information from.  I already know that.  I know you
13     got some of it from a source of information.  I'm
14     going to ask you specific questions, direct
15     questions.  Just give me direct answers.
16         The first question is the source of
17     information.  Where you got it from we already
18     know.  The question I'm asking you was the source
19     of information involved in this job in any type of
20     way other than giving you the information?
21         A.  No.
22         Q.  If the source of information was involved
23     in this job as far as him giving you information,
24     would that be right or wrong?

Page 242

1          A.  It would be wrong.  I would have to put
2      them down on the paperwork.
3          Q.  You have to put them down on the
4      paperwork?
5          A.  Yes.
6          Q.  If they got involved in this job in any
7      type of way, that would make them an informant,
8      correct?
9          A.  True.
10         Q.  Now we go into the information received.
11     You know what probable cause is and you know what
12     reasonable suspicion is, right?
13         A.  Right.
14         Q.  Would you agree with me when I say this to
15     you, reasonable suspicion is, basically, someone
16     telling you something, you're going out there and
17     looking at it but you don't have any factual
18     evidence; am I correct?
19         A.  Correct.
20         Q.  I'm looking at your warrant.  You have
21     three houses.  You had Officer Mitchell, which I
22     know very well.  The source of information gave his
23     information.  Along with the police officers, you
24     went out to the location and you did surveillance?

Page 243

1          A.  Yes.
2          Q.  You're, basically, corroborating what the
3      two officers said and the source of information
4      said, correct?
5          A.  Yes.
6          Q.  Based on your observations, Police Officer
7      Mitchell -- what did he do next?  He went out to
8      make buys, correct?
9          A.  True.
10         Q.  And that established what?
11         A.  Probable cause.
12         Q.  What was that probable cause?
13         A.  That Delee was selling drugs.
14         Q.  He was selling drugs, but what -- you have
15     physical evidence, correct?
16         A.  Yeah.  He bought four packets of crack, I
17     believe.
18         Q.  Involved in the surveillance of who was
19     touching those objects which you believed to be
20     drugs?
21         A.  Right.
22         Q.  But at the end result you had drugs,
23     right?
24         A.  After field-testing them, yes.

Page 244

1          Q.  Now, you put these drugs on the prop
2      receipt?
3          A.  Correct.
4          Q.  Within those two days you've established a
5      warrant for three locations; am I correct?
6          A.  Correct.
7          Q.  Did you see Kareem Torain -- I know you
8      answered this before.  You said you didn't see him
9      within the two days at all.  No observation.  No
10     getting out of the car, passing someone bundles and
11     from those bundles, he would give them to another
12     individual and Mitchell would make a buy.
13         None of that happened, correct?
14         A.  Right.
15         Q.  So you had the warrants already done.
16     You're ready to go.  You go out there on, what, the
17     third day?
18         A.  Yes.
19         Q.  And what do you see without going through
20     it?  You, basically, see the same individuals out
21     there, correct?
22         A.  Yes, most of them.
23         Q.  I was out there with you too?
24         A.  Yes.

McIntyre v. Liciardello, et al./Torain v. The City of Phila., et al.                    BRIAN MONAGHAN, 1/17/17

Page 245

1    Q. Along with Police Officer Reynolds,
2  correct?
3    A. Yes.
4    Q. Based on your observations, we all know
5  what you told me to do. I went around the corner.
6  He actually pulled up to the corner, which you
7  believed was the Bonneville.
8        You don't know who's in it, correct?
9    A. Right.
10   Q. Now, as a result of that, I relayed some
11 information back to you, correct?
12   A. Yes.
13   Q. We still didn't know who he was, right?
14   A. Exactly.
15   Q. He left the location. I gave you some
16 more information, correct?
17   A. Yes.
18   Q. What was that information I gave you?
19   A. About Delee getting out and putting a bag
20 in his jacket.
21   Q. Bag in his jacket. At that point, which I
22 believed to be narcotics, correct?
23   A. Correct.
24   Q. Was any buys made after my observations

Page 246

1  and the information I gave you?
2    A. I believe there was, yes.
3    Q. What buy was made off that individual that
4  was stopped and we recovered drugs?
5    A. I believe Delee did go back to the corner
6  and sell. Let me just make sure. No, nobody was
7  stopped.
8    Q. So is it fair to say from observations --
9  we can go with my belief because I've been doing
10 this job as long as you, but at the end of your
11 belief you need some type of probable cause; is
12 that correct?
13   A. Yes.
14   Q. So the point I'm saying to you is when
15 Delee got out of that green Bonneville and what I
16 saw that I believed to be drugs and relayed the
17 information back to you, you made no further
18 action --
19   A. When Delee got out.
20   Q. I just said Delee. We didn't know it was
21 Torain in the car yet?
22   A. Yes.
23   Q. So when Delee got out of the car and I saw
24 what I believed to be drugs, that's my belief,

Page 247

1  correct?
2    A. True.
3    Q. And it's still my belief until we get some
4  factual evidence and that would be, what, drugs,
5  correct?
6    A. Yes.
7    Q. So is it fair to say after he got out of
8  that car, if he interacted with anybody and gave
9  them drugs, that person was never stopped?
10   A. Right.
11   Q. Mitchell never did a buy?
12   A. He did a buy on the second day. Nothing
13 on the third day.
14   Q. Nothing on the third day?
15   A. Right.
16   Q. So all my observations is, basically,
17 falling under reasonable suspicion, correct?
18   A. Yes.
19   Q. Now reasonable suspicion. We got that
20 right. The kid got out of the car. He did what he
21 did.
22        What did I do next?
23   A. Followed the Bonneville.
24   Q. Followed the Bonneville where?

Page 248

1    A. Up to Conestoga, around Conestoga.
2    Q. Where he entered Conestoga, correct?
3    A. Yes.
4    Q. What happened from that point?
5    A. Then he exited Conestoga and went to 55th
6  Street.
7    Q. 55th Street. Who was with me when he went
8  to 55th Street?
9    A. Brian joined in on the roving
10 surveillance.
11   Q. That's what we do all the time. You
12 assign an investigator and you count on people
13 giving you this information?
14   A. Exactly.
15   Q. Because you can't be in a thousand places
16 at one time?
17   A. Correct.
18   Q. So you rely on the trust that we have on
19 each other to give you the right information
20 because you're assigned to the investigation?
21   A. Correct.
22   Q. When we got there, what happened at that
23 point? I'm not going to revisit what was done
24 there. What happened at that point?

Page 249

1    A.  I relayed information to you that another
2  car might be coming to that area and look out for
3  the car and possibly three males.
4    Q.  Three males?
5    A.  And you observed them pull up around the
6  block or on the corner.
7    Q.  What happened with that?
8    A.  You observed them go in with Torain
9  opening up the door.
10    Q.  Myself and Brian Reynolds out there,
11  correct?
12    A.  Yes.
13    Q.  So if I'm seeing the exact same thing,
14  he's seeing the exact same thing?
15    A.  I'm not sure exactly where Brian was.  I
16  can't --
17    Q.  You can't tell where another man was?
18         MR. PILEGGI:  You can't talk
19      together.
20         THE WITNESS:  I don't know where
21      exactly he was sitting with his vehicle
22      and what he could observe at that time.
23  BY MR. WALKER:
24    Q.  I agree with you on that because you can

Page 250

1  only be accountable for what I say?
2    A.  Or what I know.
3    Q.  Now, the three males entered the location
4  and came back out.
5      What happened next?
6    A.  Right.  You relayed back to me that Delee
7  was putting a clear baggie in his pocket, which you
8  believed to be narcotics.
9    Q.  Let me stop right there.  Would that fall
10  under reasonable suspicion?
11    A.  Yes, because you didn't have nothing
12  recovered.
13    Q.  I'm not going to ask you the question why
14  you didn't follow him.  I'm not going to revisit
15  that no more.
16      At that point you agree with me all
17  you had was reasonable suspicion at that point?
18    A.  True.
19    Q.  Now, what else happened next?
20    A.  They came back to the area at 56th and
21  Master.
22    Q.  Who came back?
23    A.  The three guys in the vehicle; Delee
24  Tillman and Diggs.

Page 251

1    Q.  Came back to the location?
2    A.  Came back to the location.
3    Q.  What happened next on 55th Street after
4  that?
5    A.  Nobody -- no buyers were stopped.  No
6  undercover buys.  Next thing you relayed that
7  Torain or the individual driving the Bonneville was
8  leaving 55th Street in the car.
9    Q.  What happened after that?
10    A.  I instructed over radio to stop that
11  vehicle, at which time Brian stopped him at 61st
12  and Nassau.
13    Q.  Was he supposed to arrest him or stop him?
14    A.  Arrest him.  He was stopping him to arrest
15  him.
16    Q.  Now, I go back to the beginning of this.
17  What do you need for an arrest?  Do you need
18  reasonable suspicion for an arrest or probable
19  cause?
20    A.  Probable cause.
21    Q.  Now, I'm not going to go through this
22  again.  I'm going by what you just said.
23      What makes probable cause at the end
24  of your observations?  It means evidence; am I

Page 252

1  correct?
2    A.  Not always seizing evidence, no.  Evidence
3  that you believe you see.
4    Q.  Evidence that you believe you see?
5    A.  Yeah.  How many times have you said, okay,
6  he's handing small objects to that person?
7    Q.  I do agree.
8    A.  You say, okay.  Another sale.  We as
9  narcotics officers go by our instinct.  We know by
10  our investigative skills what we believe to be
11  narcotics even though nothing is being recovered at
12  the time.
13    Q.  I understand that.  That would fall under
14  reasonable suspicion, but at the end of all of
15  that, do you feel you need probable cause?  If you
16  would have went to Master Street to do your
17  investigation and the only thing you saw was what
18  you believe to be sales with no buy from Police
19  Officer Mitchell, would you believe that you have
20  probable cause to go in those three houses?
21         MR. BRIGANDI:  Objection to form.
22      Calls for a legal conclusion.  All these
23      questions call for a legal conclusion, but
24      you can answer.

63  (Pages 249 to 252)

Page 253

1          THE WITNESS: I would have tried to
2     at least pick off a couple buyers if I
3     could.
4     BY MR. WALKER:
5          Q.  If you didn't pick off any buyers, would
6     you believe you had probable cause to go into the
7     house?
8          A.  It all depends on how I articulate what I
9     saw.
10         Q.  What form of articulation are we talking
11    about?
12         A.  Trying to articulate what I saw and how
13    the narcotics transaction went down.
14         Q.  Is it fair to say you're, basically,
15    describing a story of what you see?
16         A.  What I see.  It's not a story because a
17    story can be made up.  It's what I see.
18         Q.  Okay.
19         A.  What I saw.
20         Q.  So back to what I said before.  If you go
21    into that location based on the information given
22    to you and you saw what you believed to be
23    transactions, you didn't do an undercover buy, you
24    didn't have a CI go up there, you didn't stop no

Page 254

1     buyers, none of that, do you believe that you had
2     enough probable cause to do an affidavit, get it
3     approved by a DA, signed by a bail commissioner or
4     a judge, to do a warrant on those locations?
5          MR. BRIGANDI:  Again, same
6     objection.  Calls for a legal conclusion,
7     but you can answer.
8          THE WITNESS:  It all depends on the
9     circumstances.
10    BY MR. WALKER:
11         Q.  What is the circumstances?
12         A.  It depends on what you can articulate that
13    you observed.
14         Q.  Again, articulate would be what?
15         A.  What you observed.
16         Q.  A story?
17         A.  Okay.  We'll go with a story.
18         Q.  A story which you actually put on the
19    paperwork?
20         A.  But something like that, that case we
21    would go with a buyer and try to pick off a couple
22    buyers.
23         Q.  We already put that to the side.  We
24    didn't do none of that.

Page 255

1          You went there and you looked and
2     you saw -- exclude stopping people, the CI buy,
3     your undercover buy.  Exclude all of that.  Just
4     your observations.  What I said before -- and he's
5     going to say the exact same thing.
6          Do you believe you had strong enough
7     evidence to do warrants on those locations?
8          A.  Not without the buy.
9          Q.  So, basically, your answer to the question
10    again, you need some type of physical evidence to
11    show probable cause; am I correct?
12         A.  Yeah, on different circumstances.
13         Q.  What is the other circumstances?
14         A.  Well, you ask me the next question.
15         Q.  I'm asking you other than stopping
16    somebody, undercover buy, CI buy, what other
17    circumstances other than that?
18         A.  Somebody telling me that they observed him
19    with narcotics, not just saying that he sold to
20    somebody or something.
21         Q.  I understand that.  How would you
22    corroborate that if someone told you something?
23    Wouldn't you have to get the physical evidence to
24    know?

Page 256

1          For example, you're telling me right
2     now that if someone told me somebody was selling
3     some drugs without even stopping them with drugs,
4     I'm going to go lock them up?
5          A.  No, you can't do that.  You need
6     observation on what he was doing.
7          Q.  You need observation and you need some
8     type of evidence, right?
9          A.  True.
10         Q.  To corroborate what you're doing, right?
11         A.  Yeah.
12         Q.  So we know by looking -- I know by looking
13    at your paperwork as far as the first two days you
14    went out there, someone gave you some information,
15    you went out there with buys.  Police Officer
16    Mitchell was doing the buys off of individuals.
17    You gathered evidence.  That would be drugs.  You
18    tested those drugs.  You placed them on prop
19    receipts.
20         Based on that, your story was in
21    line.  You went to the supervisor, they read it,
22    signed her signature on it.  Went to the DA's
23    office.  They sent it over there.  They looked at
24    it and put their signature on it.  Then it went to

Page 257

1  a magistrate, which you did the following day
2  before you did the warrants; am I correct?
3      A. Went to a bail commissioner.
4      Q. Sorry. Within those two days Kareem
5  Torain was not even mentioned or seen or operated
6  any vehicle on those first two days; am I correct?
7      A. Correct.
8      Q. Now we go into the third day, which you,
9  basically, went out there to do -- see any drug
10 activity, make arrests, if need be. Basically,
11 locate all your targets; am I correct?
12     A. Correct.
13     Q. The green Bonneville pulls up to the
14 corner?
15     A. Yes.
16     Q. Delee gets in the green Bonneville; am I
17 correct?
18     A. Correct.
19     Q. Gets out?
20     A. Correct.
21     Q. I said it was drugs. There's no evidence
22 there; am I correct?
23     A. Nothing was recovered.
24     Q. Because there was no evidence?

Page 258

1      A. Nothing was recovered.
2      Q. Right?
3      A. Yes.
4      Q. So you can't tie Kareem Torain in for
5  selling any drugs because you didn't stop the
6  individual coming out of the car to get any drugs
7  off of them, correct?
8      A. Correct.
9      Q. So it's fair to say that you had no proof
10 Kareem Torain was selling drugs at that point; am I
11 correct?
12     A. True.
13     Q. Then he goes to Conestoga; am I correct?
14     A. Correct.
15     Q. He comes out of that location but he was
16 never stopped. So, again, there's no proof that he
17 was selling any drugs; am I correct?
18     A. Correct.
19     Q. He goes to 55th Street.
20     A. 1628.
21     Q. 1628 55th Street?
22     A. Yes.
23     Q. He goes in that location?
24     A. True.

Page 259

1      Q. He comes out of that location. He's
2  stopped by Police Officer Reynolds, correct?
3      A. No. He comes out after three of the males
4  went inside from my corner that I was watching.
5      Q. He comes out of the house?
6      A. At one time he comes out.
7      Q. Does he have any drugs on him?
8      A. No.
9      Q. No drugs on him?
10     A. Right.
11     Q. So you feel as though that was a lawful
12 arrest to stop him even though he had no drugs on
13 him?
14     A. I believe it was.
15     Q. So the individuals that came out of the
16 house, which, again, something appeared to be drugs
17 and relayed the information back to you, they were
18 never stopped?
19     A. Later on they were.
20     Q. Did the individuals that allegedly had the
21 bundle, was he stopped with the drugs? That was
22 soon after he came out?
23     A. No. They went into 5605 Master Street and
24 then they came running out after we were starting

Page 260

1  to execute the warrants.
2      Q. So is it fair to say from my observation
3  and Police Officer Reynolds' observations, you
4  didn't stop no one coming out of there with any
5  drugs on 55th Street?
6      A. No. We found drugs inside --
7      Q. We didn't get to that part yet. No one
8  came out of there with drugs?
9      A. Not that I recall.
10     Q. Let me remind you. You just said it.
11 Kareem Torain --
12     A. Oh, out of 55th Street, yes.
13     Q. Kareem Torain didn't come out with any
14 drugs?
15     A. Yeah.
16     Q. The three individuals, which I believed to
17 have drugs, they were never stopped. So you can't
18 say they had drugs because, again, at the end of
19 the day, you've got to have the evidence; am I
20 correct?
21     A. Yes.
22     Q. So Kareem Torain was arrested by Police
23 Officer Brian Reynolds?
24     A. Yes, he was.

65  (Pages 257 to 260)

Case 2:14-cv-01643-RBS   Document 61-5   Filed 06/29/22   Page 68 of 102

McIntyre v. Liciardello, et al./Torain v. The City of Phila., et al.                    BRIAN MONAGHAN, 1/17/17

Page 261

1       Q. No drugs were confiscated from him?
2       A. Correct.
3       Q. So at that point from -- I'll revisit this
4    all over again. You said he had no proof -- from
5    the first time you saw the green Bonneville, you
6    couldn't say Kareem Torain was selling drugs?
7    That's what you just said.
8       A. Right.
9       Q. Coming out of the house, stop Kareem
10   Torain and he had no drugs. Still no proof he had
11   any drugs; am I correct?
12      A. Correct.
13      Q. The individuals coming out of the
14   location, they were never stopped. No proof that
15   they had drugs?
16      A. Correct.
17      Q. So I will ask you this question. How do
18   you feel as though -- how do you come to an opinion
19   that Kareem Torain was selling drugs?
20      A. I base it on I believed he was part of the
21   conspiracy. He was part of the job.
22      Q. How was that?
23      A. Meeting up with three of my sellers.
24   Also, one of the guys on the corner said that

Page 262

1    Kareem was going to call when it was ready, and as
2    soon as that phone rang, he answered it. Seconds
3    later he jumped in the car and went right up to
4    55th Street.
5          Did they come out with something?
6    I'm basing it on what you saw.
7       Q. I understand that. Again, we'll keep
8    going over and over.
9       A. I believe I had enough probable cause to
10   have him arrested.
11      Q. How? You have no drugs.
12         MR. BRIGANDI: He's answered that
13      question. I mean, I know you don't like
14      the answer, but he answered it.
15         MR. WALKER: Well, he's telling me
16      he arrested someone on reasonable
17      suspicion and there's probable cause.
18         MR. BRIGANDI: That's your opinion.
19      Do you have another question?
20   BY MR. WALKER:
21      Q. The second question is who ordered me to
22   go into the hallway of 55th Street?
23      A. I don't recall that.
24      Q. You don't recall?

Page 263

1       A. No.
2       Q. I was in the hallway.
3       A. Okay. I don't recall.
4       Q. Do you remember if Brian Reynolds was at
5    that location?
6       A. Yeah. He might have been. I thought we
7    all pulled up together with Shawn Kelly and me.
8       Q. Who pulled up together?
9       A. Me and Shawn Kelly.
10      Q. Who else?
11      A. I thought it was almost at the same time.
12      Q. Me?
13      A. No. I don't remember you being in the
14   hallway. I thought you were by the doorway. I'm
15   not sure. You might have came out and met us.
16      Q. Do you agree I was there when you got
17   there?
18      A. I believe you were, yes.
19      Q. You don't know who told me to go there?
20      A. No.
21      Q. We'll go to another topic. Exigent
22   circumstances. Before I talk about that, all the
23   individuals that you mentioned in this
24   investigation, were they all in custody?

Page 264

1       A. No. No. Migel Moon wasn't arrested until
2    the following day. He was actually -- he got away.
3    Maybe somebody else. I forget. Not everybody that
4    I saw out there participating in the open drug
5    sales were arrested at that time.
6       Q. Everyone you saw participating on that day
7    was arrested?
8       A. Everyone that was arrested that day except
9    for Migel Moon. I'm not sure -- there could have
10   been guys that I never ID'd that maybe handed a
11   packet here and there to somebody. I don't know.
12      Q. But you didn't see anyone else go into the
13   house but the three --
14      A. There was people in and out.
15      Q. Are you talking about 55th Street?
16      A. Not 55th Street. At 55th Street you had
17   Delee, Tillman and Diggs and Torain.
18      Q. That's four. You've got the three males
19   and you've got Kareem Torain.
20         That's the only individuals you saw
21   going into that location?
22      A. Yes.
23      Q. So you had no other proof or any factual
24   evidence that someone else other than those four

66 (Pages 261 to 264)

Page 265

1    people went to that location?
2       A.  I don't know.  I don't know because we had
3    a lapse in time.  I don't know who could have went
4    to that property.
5       Q.  Okay.  So it's fair to say that you feel
6    as though someone else was going to come to that
7    location?
8       A.  Is it fair to say that you weren't there
9    the whole time?
10      Q.  I'm going to get to that part.
11      A.  Yeah.  It's fair to say that I don't know
12   who could have came to that location.  I don't know
13   if anybody did.  I don't know.
14      Q.  Okay.  I will say this.  How would you
15   know -- do you have any evidence to say that
16   someone was destroying evidence inside that
17   location, because your testimony is four
18   individuals left that location?  The three males
19   left first.  Then Kareem Torain left.
20      A.  Yes.
21      Q.  Let's say the light was on and came off.
22   I'm telling you that was a lie.  It shows no one is
23   in that location.  So we know no one is there.
24           So at this point what gives you

Page 266

1    enough probable cause if you feel the evidence was
2    going to be destroyed to go back and secure that
3    house instead of putting somebody in front of that
4    house?
5       A.  Because, like I said, there was a lapse in
6    time.  I don't know if anybody went there or if
7    anybody was hiding out in there that we didn't know
8    of.
9       Q.  You had no evidence for that.  You had no
10   evidence.  You're just going off of belief again
11   that someone would go back to the location?
12      A.  Well, that's why we secure the property to
13   make sure there's nobody in there.
14      Q.  We secured properties countless times, and
15   the reason why we secure properties -- there's only
16   one way you can secure a property, which is exigent
17   circumstances.  That's, what, someone running in
18   the house; am I correct?
19      A.  Going in for your safety.  Fearing that
20   drugs are going to be destroyed.  That's another
21   way.
22      Q.  That's the other way.  Did that happen in
23   this case?
24      A.  Not that I'm aware of.

Page 267

1       Q.  Did someone run into 55th Street?
2       A.  I don't know.
3       Q.  You don't know?
4       A.  I don't know.
5       Q.  Do you believe from some type of --
6    someone out front that someone ran in the house and
7    you believe evidence was being destroyed?
8       A.  No, but we had a lapse in time.
9       Q.  You believe that to be exigent
10   circumstances?
11      A.  I believe so, yes, to secure the property
12   and make sure that evidence wasn't -- or nobody was
13   in there to destroy anything.
14      Q.  Whose job was it to secure the house, the
15   property on 55th Street?
16      A.  Who was left there?
17      Q.  Who did you tell to secure the location?
18      A.  I forget.  I don't think I would have told
19   them.  It would have been a supervisory decision,
20   and you know that.
21      Q.  I understand that.  Again, you have me in
22   the hallway.
23           Did I remain there?
24      A.  I don't know if you remained there the

Page 268

1    rest of the night.  I'm not sure who was there.  It
2    was so busy, and you realize this, when we got back
3    and my main focus was to prepare the affidavit, get
4    the search warrant approved.
5       Q.  I understand.
6       A.  So my thing was, and you know this, I
7    never liked that anybody had to sit in them rooms
8    or a house that's not their house for a long period
9    of time.  I hated that.
10      Q.  I understand.  So the question I'm asking
11   you is, would it be fair to say you don't know who
12   secured the house?
13      A.  Yes.
14      Q.  If someone secured the location, they
15   would be on the warrant; am I correct, as a badge
16   number?
17      A.  They would have been there when I executed
18   the warrant, yes.
19      Q.  They would have been already sitting there
20   when you came in?
21      A.  I said that's my mistake.  I didn't put no
22   badge numbers on the warrant.
23      Q.  Okay.  Who was the supervisor that went
24   there with you or did you go by yourself?

67  (Pages 265 to 268)

Page 269

1    A.  No.  I'm not sure who was there, but there
2  definitely would have been a supervisor.
3    Q.  A supervisor.  Is it fair to say while
4  you're collecting the evidence at a location you
5  have a supervisor there?
6    A.  Yeah, it's fair to say.
7    Q.  Would it be fair to say after you collect
8  the evidence you put it on a search warrant and the
9  supervisor will sign it?
10   A.  No.  The supervisor doesn't sign it.  You
11  put it on there and you leave a copy of the
12  warrant.
13   Q.  Well, did the supervisor sign the warrant?
14   A.  I think at the end after it's all done
15  they sign off on it.
16   Q.  Do you see this on the bottom of there?
17  Do you see a supervisor's signature on that?  Right
18  at the bottom.  You know where it's at.  Do you see
19  a supervisor's signature on there?
20   A.  No.
21   Q.  Would a supervisor --
22   A.  I don't know if that is the original copy.
23  The warrant is bigger than that.
24        MR. WALKER:  Do you have a copy?

Page 270

1        MR. BRIGANDI:  There's 500,000
2     documents.  I don't know.
3        MR. WALKER:  Come on.  Stop it.
4  BY MR. WALKER:
5    Q.  The prop receipts.
6    A.  Now, do you want to get into the prop
7  receipts?
8    Q.  Yes, I do.
9        MR. BRIGANDI:  Brian, let him ask
10     the questions.
11       THE WITNESS:  Okay.
12  BY MR. WALKER:
13   Q.  You know as the assigned investigator you
14  control a lot of stuff that goes on.  You know
15  about call-in sheets.  It's broken down per house.
16  You will have -- really, you would have four
17  call-in sheets.  A call-in sheet -- you have Master
18  Street houses.  That would be three.
19   A.  What do you mean call-in sheets?
20   Q.  I mean the summary sheets.  The sheets you
21  come in and you write the stuff down where you do
22  the warrants and everything.
23        Am I saying that right?
24   A.  Yeah.

Page 271

1    Q.  Who was arrested at the location, the
2  search warrant number, items recovered.  Along with
3  that you have the prop receipts.  On every location
4  you will have that.
5        Okay?
6    A.  Yeah.
7    Q.  And in this case you will have four unless
8  you -- let me put it this way.  You're putting
9  Kareem Torain to 55th Street, correct?
10   A.  Yes.
11   Q.  So would you have a summary sheet with
12  Kareem Torain on it connected to 55th Street?
13   A.  I don't recall.  It might have just had
14  the -- usually on the summary you put -- being that
15  he wasn't arrested inside the property, you would
16  just put execute a search warrant at that property.
17  I'm not sure if he would have been put on a summary
18  or not.
19   Q.  Do you have any documents -- he was
20  stopped by myself and members of the unit.  The
21  paperwork that you would have to write down the
22  location we stopped, the prop receipt numbers, like
23  items that were taken from them with the prop
24  receipt numbers.

Page 272

1        Would you have that?
2    A.  There was prop receipts prepared, yeah.
3    Q.  But you didn't give me a prop receipt.
4  You, basically, had wrote something down, right, so
5  I know what items were taken from Kareem Torain?
6    A.  I might have gave you a piece of paper
7  with Kareem's name on it, his date of birth and
8  what time this stuff was recovered from him.  You
9  wouldn't have had the summary by then because that
10  summary was probably one of the last pieces of
11  paperwork.
12   Q.  We know the computer summary.  I'm talking
13  about the paperwork summary which actually shows
14  the person you arrested and what was taken from him
15  at the time you're taking it from him and their
16  location.
17        Would you agree with me on that?
18   A.  It could have been a 48.  I don't know.
19  It could have been just jotted down.
20   Q.  A 48?
21   A.  Yeah.
22   Q.  Okay.  A person in the squad you would
23  give a prop receipt number?
24   A.  Yes.

Case 2:14-cv-01643-RBS    Document 61-5    Filed 06/29/22    Page 71 of 102

McIntyre v. Liciardello, et al./Torain v. The City of Phila., et al.                BRIAN MONAGHAN, 1/17/17

Page 273

1    Q.   They would fill out a prop receipt number,
2  correct?
3    A.   Yes.
4    Q.   You review the prop receipt?
5    A.   After it's done, yes.
6    Q.   You review and make sure everything is
7  right and then you sign?
8    A.   Yeah.
9    Q.   Am I correct?
10    A.   Sometimes -- yeah.
11    Q.   Is that yes or no?
12    A.   Yes.
13    Q.   When you give the prop receipt, you give
14  it to who?  It's a supervisor, right?
15    A.   Yes.
16    Q.   They review it?
17    A.   Yes.
18    Q.   They review it to make sure everything is
19  right on that prop receipt?
20    A.   They review it.  I don't know how much
21  they make -- they look it over.
22    Q.   It's very important that you get the
23  evidence right at the location and time; am I
24  correct?

Page 274

1    A.   Yes.
2    Q.   Because it can affect the case down the
3  line; am I correct?
4    A.   True.
5    Q.   That's everything?
6    A.   Yes.
7    Q.   Everything that is taken from an
8  individual at the time of his arrest; am I correct?
9  You definitely want to make sure all that's right?
10    A.   Well, how many prop receipts have you done
11  in your career where they were wrong?
12    Q.   You ain't asking me the questions.  I'm
13  asking you the questions.
14    A.   Well, I just asked you.
15    Q.   I ain't answering your questions.
16       MR. BRIGANDI:  Brian, just answer
17       his questions.
18       THE WITNESS:  You know, Jeff, you're
19       doing paperwork.  Sometimes paperwork gets
20       messed up.  You put the wrong date.  You
21       put the wrong time.
22  BY MR. WALKER:
23    Q.   I understand.  What happens if you find
24  out -- and this happens to me to a certain point --

Page 275

1  but there's corrections you have to go about; am I
2  correct?
3       If you find out through your
4  discovery and you say, you know what, I got a wrong
5  date on here, I better do something about this,
6  what would you do?
7    A.   Let the ADA know.
8    Q.   Before letting the ADA know, what would
9  you do?
10    A.   You would probably testify at the
11  preliminary hearing and the ADA would bring up
12  about your paperwork.  You would say, yes, it's a
13  typed error or it's the wrong date and time that
14  was put down there.
15    Q.   The question is this, when did you know
16  there was a mistake on these prop receipts?
17    A.   I don't recall that.  I don't know.
18    Q.   Would it be in your testimony where you
19  talked to the ADA?
20    A.   It might have been at the suppression
21  hearing.  I'm not sure.  I believe we did catch
22  something to do with a wrong date, but I am not
23  sure where and when it was.
24    Q.   Would that be in testimony if you

Page 276

1  testified in court and you told the DA?
2    A.   I think it was.
3    Q.   That would be in testimony?
4    A.   Yes.
5    Q.   Prior to you testifying, if you would have
6  knew the prop receipt was wrong, say, by the end of
7  the night, what would you do?  Say, if I did this
8  prop receipt and we were still working and you knew
9  it was wrong, what would you do?
10    A.   Have you go back in there and fix it.
11    Q.   How would I fix it?
12    A.   White it out and put the right date and
13  time or the right name down and X it out.
14    Q.   What if it was entered in the computer?
15    A.   I don't know what date was entered in the
16  computer for the search warrant.  Most likely, they
17  went off the search warrant -- I mean the prop
18  receipt.  They looked at the prop receipt and saw
19  the date and time.
20       No.  You would just leave that go
21  because all that does is generate where that
22  property receipt is, if it's still in custody, the
23  receipt date and the disposal date.  You put down a
24  date when it's being entered.  So you might put

Case 2:14-cv-01643-RBS    Document 61-5    Filed 06/29/22    Page 72 of 102

McIntyre v. Liciardello, et al./Torain v. The City of Phila., et al.                    BRIAN MONAGHAN, 1/17/17

Page 277

1    down the property receipt. If you do a property
2    receipt like on the 3rd and I'm not taking the
3    drugs right down to the chem lab, I might take it
4    down on the 5th. I'm entering that PFRQ on the 5th
5    because I'm taking it down on that day.
6        Q. So you're telling me if you confiscate any
7    type of evidence, you put it on the prop receipt,
8    the supervisor signs it, you don't enter that prop
9    receipt until the following day?
10       A. You should enter it that day. As soon as
11   you're done with a property receipt and it gets
12   signed and you're getting ready to take the drugs,
13   you should enter it, yes. It should be done that
14   way.
15       Q. It should be done that way?
16       A. Sure.
17       Q. So what you're saying is I do this prop
18   receipt and say there's drugs. I don't put it in
19   the computer until the day I'm taking it down?
20       A. No. I said you should do it that day.
21   You know sometimes it doesn't get put in until the
22   following day, but in this case I think we tried to
23   get all the drugs down at the same time the
24   following day.

Page 278

1        Q. I hear what you're saying, but I'm a
2    little bit confused because you know and I know
3    that when you do this prop receipt on the date and
4    time the supervisor signs it, you sign it, like I
5    said before. You enter it into the computer
6    because everything has to generate for what happens
7    that day; am I correct? You get a printout of the
8    PRFQ?
9        A. Yes.
10       Q. It's entered that day you do the prop
11   receipt?
12       A. Yes.
13       Q. What happens next is at the end of the
14   night the supervisor does his package and it goes
15   to specific parts in the department like the
16   captain's office or ICO and stuff down there; am I
17   correct?
18       A. Yes.
19       Q. Why would you say if I do a prop receipt
20   and I enter it the day I'm taking the drugs down is
21   it in the computer the day I'm taking the drugs
22   down?
23       A. I said it's happened before. Like I said,
24   you know it's happened that you don't get a chance

Page 279

1    -- you type the property receipt up that night.
2    You know you're not taking it down tomorrow. I'm
3    coming back the next day to finish the property
4    receipt. You do the PRFQ in the computer and you
5    ship it down.
6            Now, you can predate that. You can
7    put -- say up on the 4th that just means that that
8    is the receipt date and people go by what's on the
9    property receipt. When you're typing the PRFQ
10   you're looking at this real fast up here, the
11   number up there and the date. That's what you're
12   typing in.
13       Q. So is it fair to say when you're doing a
14   prop receipt and you put it in the computer, the
15   computer has to match up with the prop receipt?
16       A. Yes.
17       Q. It comes out on the printout on the
18   computer as the date and time entered?
19       A. It should.
20       Q. So you're doing something like drugs. You
21   mean to tell me that you are not going to finish
22   the prop receipt with drugs and come back the next
23   day and enter it into the computer?
24       A. That's why some districts have safes and

Page 280

1    we put it in the safe.
2        Q. Again, Monaghan, when you put them drugs
3    in the safe, those prop receipts are prepared,
4    meaning they're typed up and the supervisor signs
5    and they're entered into the computer? So, again,
6    it goes back to when the prop receipt is completed,
7    it's entered in the computer on that date and time?
8        A. It should be, yes.
9        Q. That's how everything goes together
10   because you can't hold on to a prop receipt because
11   paperwork needs to go down to the appropriate
12   places at the right time?
13       A. Right. Yeah.
14       Q. Am I right?
15       A. Yes.
16       Q. So if a prop receipt was entered on the
17   date that it was confiscated, that means if someone
18   is looking at it and they go to the computer and
19   say such and such drugs was purchased on this date
20   or something was confiscated on this date and they
21   go to the computer and they say this is the date
22   and time and place in the computer, their
23   assumption is this is the date and time it was
24   confiscated?

SUMMIT COURT REPORTING, INC.
215.985.2400 * 609.567.3315 * 800.447.8648 * www.summitreporting.com

Case 2:14-cv-01643-RBS   Document 61-5   Filed 06/29/22   Page 73 of 102

McIntyre v. Liciardello, et al./Torain v. The City of Phila., et al.                    BRIAN MONAGHAN, 1/17/17

Page 281

1    A. That they believe it is, yeah.
2    Q. Am I correct?
3    A. Yes.
4    Q. If you made a mistake in that situation,
5 would you try to correct it knowing -- before going
6 to court and testifying but that night if you would
7 catch it?
8    A. If you catch it, yeah, but there's -- I
9 don't know how you would catch it on a PRFQ because
10 you can't go back in and change that.
11    Q. Yes, you can, Monaghan. You know that.
12         MR. BRIGANDI: No. You can't
13      testify. You can ask questions. You
14      can't testify.
15         MR. WALKER: Sorry. No problem.
16 BY MR. WALKER:
17    Q. You can't go back and correct it?
18    A. On an PRFQ?
19    Q. Yes. Wouldn't you want to notify evidence
20 and they would take it out for you?
21    A. You would have them -- you can't do it.
22 They have to do it. They --
23    Q. You would notify --
24         MR. PILEGGI: One at a time. She's

Page 282

1         having a hard time.
2         THE WITNESS: We can't do it. We
3      would notify evidence.
4 BY MR. WALKER:
5    Q. Was that done in this situation? Was that
6 done in this situation?
7    A. I don't know. I don't think so.
8    Q. And you don't remember if you testified --
9 when you testified to let the DA know the evidence
10 that was collected was on the wrong day? You
11 didn't let no one know?
12    A. I'm not sure. I don't remember.
13         MR. WALKER: Give me one second.
14 BY MR. WALKER:
15    Q. The paperwork. Based on the paperwork,
16 again, with all the mistakes in this paperwork, you
17 feel as though Kareem Torain was justifiably
18 arrested?
19    A. Yes, I do.
20    Q. Even though the drugs had been confiscated
21 on the wrong day?
22    A. No, they were not.
23    Q. Well, looking at the paperwork, that's
24 what -- I'm looking at the paperwork.

Page 283

1         MR. BRIGANDI: Objection to the form
2      of the question. He did not testify, nor
3      has anyone testified, that the drugs were
4      confiscated on the 4th. He's testified
5      that there was a mistake on the property
6      receipt.
7 BY MR. WALKER:
8    Q. But the mistake wasn't rectified, and he
9 doesn't remember if the mistake was corrected. So
10 I'm going back to the beginning.
11         If I'm looking at the paperwork from
12 what your testimony says and what I'm seeing, the
13 drugs was confiscated on the wrong day?
14    A. Based on the paperwork?
15    Q. Yes.
16    A. Because the date and time is wrong, yes.
17    Q. The date and time is wrong?
18    A. Yes.
19    Q. You don't know if you corrected it or not?
20    A. I'm not sure.
21         MR. WALKER: I'm done.
22         MR. BRIGANDI: I just had a few
23      follow-ups.
24         MR. PILEGGI: I have some too.

Page 284

1         MR. BRIGANDI: Go ahead.
2 BY MR. PILEGGI:
3    Q. Officer Monaghan, this is Michael Pileggi
4 again on behalf of Mr. Torain. Two questions. You
5 had mentioned on both the examination and also in
6 the paperwork that someone heard -- and I believe
7 you said Officer Kelly -- heard someone mention
8 that Kareem is going -- basically, go re-up. He
9 only has a bundle or something to that extent.
10         This was out on Master Street,
11 correct?
12    A. Yes.
13    Q. Did you know who he meant by Kareem at
14 that point?
15    A. No. I -- no.
16    Q. So why was that in the formula of the
17 probable cause? I mean, you didn't even know who
18 he was talking about. It could have been Kareem
19 anybody, right?
20    A. It could have been. I didn't know who
21 Kareem was at the time.
22    Q. Nor did you even know who the driver was
23 at that point?
24    A. No, I did not.

71 (Pages 281 to 284)

Page 285

1    Q. Second, something we really didn't get
2    into. Do you recall having a conversation or
3    anyone that was at the unit -- this was the first
4    time when you went out at 3:50 at 55th Street.
5         Do you recall -- I know you recall
6    Officer Kelly having a discussion with the manager,
7    right, Mr. Saunders?
8    A. Yes.
9    Q. Do you recall either yourself or any of
10   the fellow officers talking to the actual owner who
11   was Mr. Saunders' son who was also a Mr. Saunders?
12   A. I don't recall who it was, but I believe
13   it was Saunders, Sanders. I don't know if it was
14   the father or son.
15   Q. I know you testified that Officer Kelly --
16   while you were simultaneously with the key at the
17   unit, that Officer Kelly had a discussion with
18   someone you believe that was on the porch?
19   A. Yeah. I think you asked me earlier about
20   a phone call, that somebody called on the phone.
21   Q. That's what I'm referring to.
22   A. I don't recall.
23   Q. Do you recall speaking to anyone other
24   than Mr. Saunders who spoke with Officer Kelly?

Page 286

1    A. No. I don't recall.
2    Q. On the warrant -- and I think this is
3    Monaghan-2, I believe; am I correct?
4    A. Yes.
5    Q. On the warrant it says the name of the
6    owner, occupant or -- I can't read the rest, but in
7    that box there you're supposed to put whoever the
8    target of the search is, correct?
9    A. No. The owner of the property.
10   Q. How did you determine that the owner of
11   the property was an R. Waits and Vincent Saunders?
12   A. We did a property check and that comes
13   back on the property check.
14   Q. When did you do the property check?
15   A. Probably when I went back to headquarters.
16   Q. I don't want you to guess. Do you recall
17   when you did it?
18   A. Definitely when I went back to
19   headquarters.
20   Q. But it was somewhere between the time of
21   4:00 o'clock when you left the premises and -- but
22   before you actually got the warrant, correct?
23   A. Yes.
24   Q. Why didn't you put Kareem Torain at that

Page 287

1    point? You knew who he was?
2    A. Because he wasn't the listed owner of the
3    property.
4    Q. So? But he was the target, right?
5    A. Yes, but he wasn't the listed owner.
6    Q. But, according to you, he was the occupant
7    of bedroom two, correct?
8    A. Yes.
9    Q. And that's where the warrant was directed
10   to? In fact, it says the first floor, apartment
11   two, right?
12   A. Yes.
13   Q. Why didn't you put Kareem Torain's name on
14   it?
15   A. I didn't know he was the owner.
16   Q. You didn't know he was the owner of
17   bedroom number two, right?
18   A. He wasn't the listed owner on the
19   property.
20   Q. That's not my question. You didn't know
21   he was the occupant of apartment two?
22   A. The owner of apartment two.
23   Q. But did you know if he was the occupant of
24   apartment two? That's my question.

Page 288

1    A. Other than him having the keys, that's how
2    I found out he was the occupant, him having the
3    keys to that property, to that apartment.
4    Q. Okay. And also Officer Walker's testimony
5    that the light went on?
6    A. Yes.
7    Q. Did you have any information whatsoever
8    that these three individuals actually went into the
9    second floor bedroom -- I'm sorry -- first floor,
10   number two bedroom?
11   A. No. I was never told.
12   Q. So for all you knew those three
13   individuals went upstairs and got drugs?
14   A. They could have. I don't know -- I
15   couldn't see inside there.
16   Q. So, again, what linked Torain to those
17   three individuals?
18   A. Meeting them at the door. Opening up the
19   door and meeting them and bringing them inside the
20   property.
21   Q. That was information provided by Officer
22   Reynolds, not Officer Walker, correct?
23   A. I believe so.
24       MR. PILEGGI: All right. I have

72  (Pages 285 to 288)

Case 2:14-cv-01643-RBS    Document 61-5    Filed 06/29/22    Page 75 of 102

McIntyre v. Liciardello, et al./Torain v. The City of Phila., et al.                    BRIAN MONAGHAN, 1/17/17

Page 289

1    nothing further.
2        MR. BRIGANDI: I just have a few
3    follow-up questions.
4    BY MR. BRIGANDI:
5        Q. Officer, do you have the 49 in front of
6    you, which starts with 7423?
7        A. Yes, I do.
8        Q. I want you to take a look and turn to the
9    Bates stamp 7424.
10       A. Got it.
11       Q. I want to go down to the last paragraph
12   there where it says 1/4/2000, but it should be
13   2001, correct?
14       A. Yes.
15       Q. I know that we have gone over this. I
16   just want to get some clarification for my own
17   understanding.
18       On that date you and Officer Kelly
19   set up a surveillance at 56th and Master and that
20   police observed a green Bonneville registered to
21   Carolyn Gillis.
22       Now, did you yourself observe the
23   green Bonneville?
24       A. Yes.

Page 290

1        Q. That's from the van?
2        A. Yes, it was.
3        Q. And you observed it traveling northbound
4    at 56th Street to the intersection of 56th and
5    Master; is that correct?
6        A. That's correct.
7        Q. Next it says that at this time Delee, who
8    was standing on the steps of 5605 Master Street,
9    made a hand gesture toward the Bonneville and
10   yelled "yo."
11       Now, is that something you observed,
12   Delee waiving to the Bonneville and saying "yo"?
13       A. Yes, we heard it. Yeah.
14       Q. Okay. Next it says that at this time the
15   Bonneville traveled westbound on Master Street and
16   turned onto -- turned northbound onto Ithan Street.
17   At this time Delee -- Delee being the same guy that
18   yelled "yo" at the Bonneville, correct?
19       A. Yes.
20       Q. He ran westbound to Ithan Street and
21   entered the passenger side of the Bonneville.
22       Now, is that the same green
23   Bonneville that you saw where he was yelling "yo"
24   at?

Page 291

1        A. Yes, it is.
2        Q. Did you observe that?
3        A. I observed him get in and then it kind of
4    went out of my sight.
5        Q. But you observed Delee get in the
6    Bonneville?
7        A. Yes.
8        Q. It says here next that Delee exited after
9    approximately two to three minutes and ran back to
10   the corner of 56th and Master.
11       Now, where it says here that he
12   exited after two or three minutes, did you observe
13   that?
14       A. No. I observed him come back, come back
15   onto Master Street.
16       Q. But you did observe him get in the
17   Bonneville?
18       A. Yes.
19       Q. And after two to three minutes you saw him
20   come back to 56th and Master?
21       A. Yes, I did.
22       Q. You saw that with your own eyes?
23       A. Yes.
24       Q. Next it says that the Bonneville was being

Page 292

1    operated by a black male.
2        Now, at this time you didn't know it
3    was Kareem Torain, but you knew it was being
4    operated by somebody?
5        A. True.
6        Q. You saw the Bonneville was moving?
7        A. Yes.
8        Q. And it had a driver inside of it?
9        A. Yes.
10       Q. Did you know at that time whether the
11   individual was a black male or a white male or
12   Hispanic? Could you tell if it was a black male?
13       A. No, I couldn't because of how he pulled
14   away.
15       Q. Okay.
16           MR. PILEGGI: Or a female.
17           MR. BRIGANDI: Or a female.
18   BY MR. BRIGANDI:
19       Q. The Bonneville -- next it says that the
20   Bonneville, which was being operated by a black
21   male later identified as Kareem Torain, was
22   followed back to 1621 North Conestoga Street by
23   Police Officer Walker where police observed Torain
24   exit his vehicle and enter 1621 Conestoga.

73 (Pages 289 to 292)

Page 293

1       Now, that's information that you
2  would have gotten from Walker?
3     A.  Yes.
4     Q.  Police observed Delee go immediately back
5  to the corner of 56th and Master and give small
6  objects which he retrieved from his pocket to
7  numerous males and females in exchange for U.S.
8  currency.
9       Now, did you observe that with your
10  own eyes?
11     A.  Yes.
12     Q.  At approximately 1:43 p.m. police observed
13  the Sebring traveling westbound on Master Street
14  being operated by a Christina Braxton stop in front
15  of 5607 Master.
16       Now, is that the same area where
17  Delee was located?
18     A.  He was on the corner back and forth.
19     Q.  Now, I'm going to skip a sentence. I want
20  to start where it says that at approximately 1:55
21  p.m. Kelly -- your partner, right?
22     A.  Yes.
23     Q.  He overheard Delee who was standing on the
24  southeast corner of 56th and Master tell Kabiyan

Page 294

1  Diggs that Kareem, operator of the green
2  Bonneville, only had a bundle on him and would call
3  him when the rest was ready?
4     A.  Yes.
5     Q.  Now, you didn't hear that, but Officer
6  Kelly overheard that?
7     A.  Yes.
8     Q.  And he overheard Delee saying that?
9     A.  Yes.
10     Q.  Delee was the same individual who went up
11  to the green Bonneville, got in and later you saw
12  him in appeared to be what -- in what appeared to
13  be narcotics transactions on the corner shortly
14  after exiting the green Bonneville?
15     A.  Yes.
16     Q.  Then at approximately 2:00 o'clock
17  Reynolds, Police Officer Reynolds, observed Torain
18  exit 1621 North Conestoga Street and travel
19  westbound on Hunter Street in the Bonneville to the
20  southwest corner of 56th and Hunter Street.
21       Now, that's something you didn't
22  observe, but you were told that by Officer
23  Reynolds?
24     A.  Yes.

Page 295

1     Q.  At this point Torain exited his vehicle
2  and entered into 1628 North 55th Street with a key.
3  Again, you didn't observe that? That would have
4  been Officer Reynolds?
5     A.  Yes.
6     Q.  On the next page it says that at
7  approximately 2:05 police observed Delee answer the
8  pay phone on the northwest corner of 56th and
9  Master Street and jog to the Buick which was
10  mentioned on the day before, which was January 3,
11  2001; is that correct?
12     A.  That's correct.
13     Q.  Now, did you observe that or did someone
14  tell you that?
15     A.  No. I saw him jog to it.
16     Q.  This was all from your van?
17     A.  Yes.
18     Q.  Along with Diggs and Arthur Tillman,
19  Police Officer Walker followed them to 55th and
20  Hunter Street where they parked the car on 55th
21  Street. All these males exited the Buick and were
22  admitted into 1628 South 55th Street by Torain.
23       Now, is that something you observed
24  or is that something you got from another police

Page 296

1  officer?
2     A.  I got from another police officer.
3     Q.  Who would that have been?
4     A.  I'm not sure who said it, but somebody
5  came over the radio and said that they were let in
6  by the male.
7     Q.  Because it says -- in the sentence before
8  it says that Police Officer Walker followed them to
9  55th and Hunter Street where they parked the car on
10  55th Street.
11       Now, could it have been Officer
12  Walker, could it have been Officer Reynolds or you
13  just don't remember?
14     A.  I don't remember.
15     Q.  Fair enough. It says that after
16  approximately 20 minutes all three males; Delee,
17  Tillman and Diggs, exited 55th Street with Delee
18  placing a clear bag inside of his jacket.
19       Now, who saw that?
20     A.  Police Officer Walker.
21     Q.  All three males go into the Buick and were
22  followed back to 56th and Master by Police Officer
23  Reynolds. Police Officer Walker remained at 55th
24  and Hunter watching 1628 55th Street. At

74  (Pages 293 to 296)

McIntyre v. Liciardello, et al./Torain v. The City of Phila., et al.                    BRIAN MONAGHAN, 1/17/17

Page 297

1    approximately 2:35 police observed Hodge exit 5607
2    Master Street and go into a red Plymouth Breeze
3    with Delaware tag D4398 and take unknown objects
4    from inside the car and the trunk. Hodge then
5    walked back into 5607 Master Street.
6           Now, is that all things that you
7    observed or you were told that?
8       A.  No. I observed them from within the van.
9       Q.  Now, on the next paragraph I'm going to
10   skip down to where it says "All three males
11   exited."
12          Do you see that?
13      A.  Yes.
14      Q.  It says that all three males exited the
15   vehicle and walked to the porch of 5605 Master
16   Street. At approximately 2:37 p.m. police observed
17   Delee hand bundles to Moon, Freeman, Hodge and
18   Diggs. Delee then placed a clear baggie containing
19   numerous green tinted packets in his right jacket
20   pocket. Delee was then observed giving these small
21   green packets to numerous people in exchange for
22   U.S. currency.
23          Is that something you observed?
24      A.  Yes, it was.

Page 298

1           MR. PILEGGI: Can I ask something?
2    Is Daylee and Delee the same?
3           MR. BRIGANDI: Yes. I'm not sure
4    what the correct pronunciation is.
5    BY MR. BRIGANDI:
6       Q.  Finally, in the next paragraph it says
7    that at approximately 2:58 Torain left 1628 North
8    55th Street and left the area in his Bonneville.
9           Is that something you observed?
10      A.  No, I did not.
11      Q.  Do you know who observed that?
12      A.  Reynolds.
13      Q.  Okay. Police Officer Reynolds followed
14   this vehicle out of the area and with the aid of
15   uniformed vehicles stopped Torain at 61st and
16   Nassau Street and placed him under arrest.
17          Now, that would have been at your
18   direction, correct?
19      A.  Yes, it was.
20      Q.  Now, in all the things that I just went
21   over from the bottom of the first page, which was
22   7424, until the top and middle of this page, 7425,
23   are those things that you considered in
24   establishing the -- are those things that went into

Page 299

1    your thinking in justifying the order to have
2    Reynolds stop and arrest Mr. Torain?
3       A.  Yes, they were.
4           MR. BRIGANDI: Mr. Walker, you
5    showed him a search warrant and you were
6    asking him about a supervisor's signature.
7           Was it this page here?
8           MR. WALKER: It's a different one.
9           MR. BRIGANDI: Do we know which one
10   it was?
11          MR. PILEGGI: It's Monaghan-2.
12          MR. BRIGANDI: That's all I have.
13   (Deposition concluded at 3:40 p.m.)
14
15
16
17
18
19
20
21
22
23
24

Page 300

1
2               CERTIFICATION
3
4                  - - -
5
6        I hereby certify that the testimony and
7    the proceedings in the aforegoing matter are
8    contained fully and accurately in the
9    stenographic notes taken by me, and that the
10   copy is a true and correct transcript of the
11   same.
12
13
14
                _____
15       DONNA M. RAY, R.P.R., C.C.R.
            License No. XI 02161
16
17
18        The foregoing certification does not apply to
19   any reproduction of the same by any means unless
20   under the direct control and/or supervision of the
21   certifying shorthand reporter.
22                 - - -
23
24

Case 2:14-cv-01643-RBS    Document 61-5    Filed 06/29/22    Page 78 of 102

McIntyre v. Liciardello, et al./Torain v. The City of Phila., et al.                                    BRIAN MONAGHAN, 1/17/17

**A**
a.m 2:8 58:12
125:24 126:3
138:16 201:11,12
201:19
a/k/a 209:8
abandoned 38:1,5
238:17
abilities 19:19
able 14:1 19:1,22
44:8 49:23 52:6
52:18 53:8 59:5,7
64:3 72:5 111:16
absolutely 135:8
154:11 189:15
200:9
academy 11:17,19
accepting 226:8
account 67:17
accountable 250:1
accurate 7:16
accurately 300:8
acquaintances
238:4
action 1:3,8 246:18
activity 30:23 49:4
55:10 56:20 60:20
64:10,11 66:3
69:18 80:17 96:24
98:8 100:10
102:14 145:2
151:5,14 152:13
225:3,4 226:8,18
227:2 257:10
actual 189:11 192:6
285:10
ADA 275:7,8,11,19
addition 8:14
additional 59:12
address 81:12 83:5
83:11 129:7 171:3
171:4,23 183:12
185:19 215:8
addresses 32:11
48:11,17 49:6
admitted 88:16
216:6 295:22
affect 274:2
affiant 149:23
affidavit 5:23 25:8
26:24 48:22 49:1
96:16 99:4 145:23
146:24 194:1
195:23 198:14
235:15 236:1
254:2 268:3

affidavits 27:6
28:23 49:1
affiliated 17:23
aforegoing 300:7
afternoon 195:8
199:9 200:5
age 41:14
agent 9:16
ago 169:2 171:1
172:21
agree 36:7 107:19
121:9 132:11
176:20 177:9
184:16 200:2
201:2 202:5,16
205:19 211:12
226:16 229:11,13
242:14 249:24
250:16 252:7
263:16 272:17
agreed 6:1 7:2
220:3
agreement 24:8,10
ahead 89:10 235:10
284:1
aid 94:21 113:18
298:14
ain't 274:12,15
ajar 174:24
al 1:5 28:8 32:14
35:10 54:6 238:23
239:11
Albright 196:10
Alcohol 21:1
alive 60:15
allege 173:18
alleged 201:14
allegedly 115:9
259:20
allowed 136:20
232:11
alternate 64:16
amber 183:23
ambush 177:6
amount 39:23
60:13 62:23
162:22
and/or 300:20
answer 10:11 24:17
57:12,20 74:5,12
88:7 122:13,17
129:9 140:9 141:5
155:6,12,19 169:8
186:24 208:19
219:15 225:24
227:13 230:15,23
230:23 231:8,10

231:24 234:9,24
235:10 252:24
254:7 255:9
262:14 274:16
295:7
answered 83:15
122:10,15 155:7
231:1 241:7 244:8
262:2,12,14
answering 274:15
answers 241:15
Anthony 48:14
53:21
anticipate 8:2
anticipation 26:21
anybody 50:22 59:8
102:24 110:17,20
111:13,15,16
124:12 136:9
159:6 174:18
176:22 177:14,23
209:24 225:8
247:8 265:13
266:6,7 268:7
284:19
anymore 16:7
anyway 116:12
235:15
apartment 84:24
109:7,10 110:20
111:3,7 114:5
117:9 118:7,13,15
119:3 123:24
124:6 126:10
129:8,11 134:12
146:19 165:6,7,12
167:14 168:13
173:17 200:24
212:17 287:10,21
287:22,24 288:3
apartments 99:8,14
99:16,17 107:21
165:8
apparently 115:16
appear 173:13
196:9 200:6 203:7
209:11,12 211:2,4
appearance 47:22
**APPEARANCES**
3:1 4:1
appeared 111:24
259:16 294:12,12
appears 28:5 29:10
49:16 59:4 125:8
173:15 196:6,23
200:3 209:6
application 125:11

applied 125:15
apply 300:18
approach 67:21
appropriate 280:11
approval 196:12
approved 12:20
196:2,7,10,20
254:3 268:4
approves 197:1
approximately 2:8
63:21 88:6 89:24
94:18 106:3
113:15 115:22
118:7 198:9
201:15,19 291:9
293:12,20 294:16
295:7 296:16
297:1,16 298:7
**Arch** 3:12
area 19:4 33:17
36:21 38:19 39:1
58:4 75:7,7 78:10
80:24 81:23 82:14
84:3 85:18 86:7
86:13 91:5,11
92:20 94:14,19,21
100:7,15 110:19
111:15 112:13,17
113:16,18 116:22
118:22 129:10
149:15 168:11
170:6 238:15
239:20 249:2
250:20 293:16
298:8,14
arguing 79:11
**Armando** 3:11 6:14
34:2 42:20 180:15
230:6 232:7 233:8
234:20
armando.brigand...
3:14
aroused 152:15
arrest 10:3 22:22
26:3,4,19 54:11
54:18,24 55:15
78:17 82:22 84:5
84:9 85:4 86:5
87:22 95:2,5,7,12
95:20,21 96:3,10
96:12,13,21,24
101:11,18,23
112:18 113:3
116:2 123:12
146:22 147:18,20
148:3 149:4,13
154:14 155:18,21

156:23 162:22
176:24 213:24
214:3,7 217:13
218:15,17 221:17
222:5,12,17 229:3
229:15 251:13,14
251:14,17,18
259:12 274:8
298:16 299:2
arrested 27:9 36:5
41:6 48:2 68:9,11
68:17,23 69:5
78:24 79:9 85:20
90:12 95:17,18
97:6 110:23 112:5
112:21,23 113:1
113:10,12 114:17
115:18 147:7,12
147:22 148:1,5,20
148:24 149:3,8
150:1 216:20
222:1,9 227:3,6
227:20,23 260:22
262:10,16 264:1,5
264:7,8 271:1,15
272:14 282:18
arrestees 195:20
arresting 55:6
217:14 224:7
arrests 118:22
257:10
arrived 116:23
119:13,18 127:18
129:18,20 133:15
133:24 134:3
135:12 137:10
165:21
arriving 134:7
135:23
**Arthur** 88:11
295:18
articulate 8:6 19:23
253:8,12 254:12
254:14
articulation 253:10
ascertain 221:24
222:3
ascertained 222:7
aside 57:7,15
asked 15:21 31:15
32:22 54:3 74:14
74:19 77:17 87:6
157:6 159:15
167:2 238:14
274:14 285:19
asking 10:3,9 11:6
104:8 117:12

Case 2:14-cv-01643-RBS    Document 61-5    Filed 06/29/22    Page 79 of 102

McIntyre v. Liciardello, et al./Torain v. The City of Phila., et al.                    BRIAN MONAGHAN, 1/17/17

123:2 141:4,7,11
141:19,21 159:18
178:19 186:23
190:20 208:13
230:13 231:6
241:18 255:15
268:10 274:12,13
299:6
**assign** 248:12
**assigned** 28:21
142:17 144:11,19
145:8 182:15
248:20 270:13
**assignment** 11:21
**assume** 10:17
141:7 207:1
**assuming** 11:18
73:7 123:20
**assumption** 280:23
**assumptions**
141:12
**ATF** 21:16,18
**attach** 27:23
**attached** 39:8 191:9
**attempt** 35:19
118:12
**attending** 9:2
**attorney** 3:2 23:14
23:18,22 129:4
210:14 223:5,5
225:23
**attorney's** 210:14
**attorneys** 42:24
**August** 20:16
**authority** 161:21
208:14
**authorized** 44:19
**available** 210:20
**aware** 41:5 47:13
47:16 68:4 85:13
97:16 99:6 157:3
157:12,18 159:2
159:23 161:2,2,4
161:7,11 205:23
206:3 210:8,11
228:13,18 229:2,9
266:24

**B**

**B-R-I-A-N** 9:22
**B&D** 202:1
**back** 8:17 35:2
37:23 40:22 49:20
51:20,23 52:2
59:24 66:19 67:3
67:5,9 68:6,10
69:3 72:3 85:6,19

86:8 87:22 89:21
89:24 90:3,6,21
91:5,7 92:12
100:7,13,14,20
101:4,5,19,24
105:9 107:12
111:16 114:23
115:2 116:22
117:5,18,19 118:7
118:24 123:17
126:23 130:15
135:7,21 145:22
147:19,20,23
148:6 149:2 150:1
150:13,15 152:10
156:8 162:4,16,17
163:1,22 164:5
175:18 187:15
194:8 195:16,19
197:2,3 200:6
220:21 223:9
241:6 245:11
246:5,17 250:4,6
250:20,22 251:1,2
251:16 253:20
259:17 266:2,11
268:2 276:10
279:3,22 280:6
281:10,17 283:10
286:13,15,18
291:9,14,14,20
292:22 293:4,18
296:22 297:5
**backdated** 200:6
**background** 11:13
48:16 49:6
**bad** 190:18,23
**badge** 1:11,12,14
190:19 191:3
192:9,12,16,17,19
193:1,7,9,12,18
193:22 268:15,22
**badges** 189:3,4,5
189:15,19 193:5
**bag** 98:18,19
148:14 226:12
245:19,21 296:18
**baggie** 70:6 77:9
98:10,22 148:18
250:7 297:18
**baggies** 201:14
**bags** 201:15
**bail** 196:4,24 254:3
257:3
**base** 84:8 202:3
261:20
**based** 9:5 35:21

84:18,20 85:3,11
85:15,16 86:6
92:21 96:3 98:9
141:7,13 145:24
152:7 158:21
174:4 200:3
212:22,22 225:2
229:4 233:16
243:6 245:4
253:21 256:20
282:15 283:14
**bases** 225:23
**basically** 242:15
243:2 244:20
247:16 253:14
255:9 257:9,10
272:4 284:8
**basing** 91:23 262:6
**Bates** 26:7,13 88:3
189:9 191:13
289:9
**Bates-stamped**
26:15
**bathroom** 170:17
**battery** 60:15 64:6
**bed** 176:4,9,10
177:10 178:2,6
197:10,13
**bedroom** 109:3,18
109:24 110:6,24
111:1,3 129:11
134:7 144:14
157:22 158:17,19
165:5 167:3
172:16 175:2,5,9
175:22 212:21
220:18 221:9,10
221:14,18 222:4
222:23 228:17
287:7,17 288:9,10
**bedrooms** 146:13
**beginning** 2:7 40:2
233:9 241:8
251:16 283:10
**behalf** 8:1 284:4
**belabor** 201:5
**belief** 91:23 246:9
246:11,24 247:3
266:10
**believe** 18:6,19,20
20:16 23:18 47:7
53:10,19,21 54:14
55:7,17 56:9,15
57:2,13 58:18
61:3,16 63:5,11
63:19 79:24 82:7
82:15 83:13 84:4

84:8,16 86:13
87:9,13 91:21
94:2 95:10,14
97:24 99:8,10
102:12 103:13
107:8,17 109:16
114:21 115:18
116:16 121:18
123:11 127:9,10
127:21 135:24
149:9,12 151:6,24
153:12,17 156:2
157:1 160:3,4,6
161:9,19 164:16
165:15 168:17
174:13 178:8
179:3 185:13
186:10,17 188:3
193:4,11 194:21
195:1 197:11
198:18,20 199:16
209:5 210:2,3
214:11,20 215:22
216:1,3 217:2
218:15,17 220:20
221:3 222:16
234:3 239:6
243:17 246:2,5
252:3,4,10,18,19
253:6 254:1 255:6
259:14 262:9
263:18 267:5,7,9
267:11 275:21
281:1 284:6
285:12,18 286:3
288:23
**believed** 19:15
36:15 37:7 53:22
54:12 60:18 64:9
74:22 78:8 98:11
98:24 99:19
102:13 110:21
111:5 121:11
147:4 148:3
151:19 220:24
226:13 243:19
245:7,22 246:16
246:24 250:8
253:22 260:16
261:20
**believes** 221:4
**Bellwether** 8:2,5
10:2
**best** 134:22 137:16
195:2,4 224:21
**better** 128:10 135:7
229:21 230:1,19

232:16 275:5
**Betts** 3:21
**big** 95:8 96:19
163:3 172:11
185:8 237:17
**bigger** 172:13
175:9 269:23
**biographical** 36:2
97:19 195:12
214:9 215:7
216:16,23
**birth** 272:7
**bit** 46:13 126:4,23
157:11 175:9
176:2 278:2
**black** 48:12 59:19
60:1 90:2,7,20
114:3 148:16
292:1,11,12,20
**Black-and-white**
169:15
**block** 29:19 74:16
78:10 249:6
**blocks** 112:5
113:23,24
**blow-by-blow**
67:16
**blue** 116:3
**blurred** 183:13
**body** 177:4,13
178:10
**Bonneville** 66:13
71:3,4 72:17,18
79:23 80:6 81:18
82:16,23 84:6
88:23 89:5,12,14
90:1,7,20 91:5
94:19 106:6
113:16 148:17
151:11 154:9
212:1 219:5
223:12 224:13
225:17 245:7
246:15 247:23,24
251:7 257:13,16
261:5 289:20,23
290:9,12,15,18,21
290:23 291:6,17
291:24 292:6,19
292:20 294:2,11
294:14,19 298:8
**bottles** 183:23
**bottom** 26:10,14
107:12 218:21
225:14 269:16,18
298:21
**bought** 243:16

Case 2:14-cv-01643-RBS    Document 61-5    Filed 06/29/22    Page 80 of 102

McIntyre v. Liciardello, et al./Torain v. The City of Phila., et al.                                    BRIAN MONAGHAN, 1/17/17

**Boulevard** 4:3
**boundaries** 19:19
**box** 126:5 189:1
   192:8 286:7
**Braxton** 293:14
**break** 10:19,21
   18:13 86:4 105:5
   122:4 150:7
   240:24
**Breeze** 113:7 116:1
   297:2
**Brian** 1:18 2:4 3:20
   4:9 5:3 6:9 8:17
   9:22 93:8,9 113:6
   153:8,9 248:9
   249:10,15 251:11
   260:23 263:4
   270:9 274:16
**brief** 39:22 105:7
   241:1
**Brigandi** 3:11 5:6
   6:13,14 7:18 8:13
   8:21 9:10 23:21
   23:24 24:5,7,12
   24:16 26:7,11
   34:3,7,11,22,24
   35:6 40:8,13 42:6
   42:12 57:10,19
   74:4,8,11 79:10
   83:15,18,21 104:6
   104:13,23 105:5
   120:16,19 121:22
   122:1,4,9,14,18
   123:1 130:14,17
   130:21,23 131:5,7
   141:4,11,17,19
   150:4 154:18,21
   155:1,5,10,13,19
   159:12,17,20
   168:20 169:1,3,7
   169:11,15,20
   170:11,16,20,23
   171:5 179:6,9,13
   179:16,20,23
   180:2,5,9,12,15
   180:16,19,23
   181:2,6 186:22
   187:20 189:9
   190:9,15,21 191:4
   191:9,13,18
   202:12,17,21
   207:18,23 208:18
   210:19 212:2
   219:8 225:12,24
   226:3 227:12,16
   229:6,20 230:4,7
   230:11,18,24

231:3,10,13,16,21
232:4,10,15,19
233:1 234:1,8,17
234:22 235:6
239:22 240:23
252:21 254:5
262:12,18 270:1,9
274:16 281:12
283:1,22 284:1
289:2,4 292:17,18
298:3,5 299:4,9
299:12
**bring** 109:14
   117:16 197:3
   240:11 275:11
**bringing** 288:19
**Broad** 3:7
**broadcast** 108:4,5
**broke** 124:1 133:19
   188:1 194:23
   198:5
**broken** 18:4,6 20:3
   270:15
**brought** 22:18
   161:23
**Buick** 88:9,15
   152:21 295:9,21
   296:21
**building** 18:21
   19:13,14,15 108:3
   110:1,5 111:6
   124:1,9 126:9
   130:6 138:17
   157:21 165:2
   173:10,18 222:15
   222:19 240:4
**buildings** 18:20
**bulletproof** 143:4
   144:23
**bump** 239:18
**bunch** 50:20
**bundle** 81:19
   149:16 259:21
   284:9 294:2
**bundles** 244:10,11
   297:17
**bureau** 176:5
**bust** 187:18
**busy** 268:2
**buy** 59:16,21,23,24
   244:12 246:3
   247:11,12 252:18
   253:23 255:2,3,8
   255:16,16
**buyer** 39:12 55:8
   77:24 78:7,9,11
   79:2,2 254:21

**buyers** 54:12 78:23
   79:5,8 251:5
   253:2,5 254:1,22
**buyers/sellers**
   16:18
**buys** 37:20,21 78:3
   78:15 243:8
   245:24 251:6
   256:15,16
**Byrne** 2:5

**C**

**C.C.R** 300:14
**Cain** 29:13,22 236:6
   238:13 239:3,4
**call** 9:15 10:1 49:24
   81:20 93:1 101:11
   132:9,17 139:21
   149:16 237:3
   252:23 262:1
   285:20 294:2
**call-in** 270:15,17,17
   270:19
**called** 92:13 285:20
**calls** 57:11 252:22
   254:6
**camera** 64:4 66:12
**cancer** 114:2
**Cane** 240:9
**capable** 145:4,6,9
**capacity** 1:15 16:2
   30:16
**captain** 15:21 16:3
   17:22,24 101:1
   139:18
**captain's** 237:2
   278:16
**car** 66:19 67:4
   68:14,17 69:3
   72:23 73:1,7,7,18
   73:23 74:3,3,15
   74:19,21,23 77:19
   78:16 88:14
   151:23 152:8
   220:14 223:16
   244:10 246:21,23
   247:8,20 249:2,3
   251:8 258:6 262:3
   295:20 296:9
   297:4
**care** 18:1
**career** 123:3,15
   274:11
**Carolyn** 66:14 68:4
   68:22 69:2,11
   70:21 289:21
**cars** 163:7

**case** 8:20,22 11:12
   22:4,8,10 23:11
   23:15 25:2 27:3,4
   33:19 40:4 42:4
   44:1 80:24 81:6
   87:20 110:17
   111:12 128:21
   130:18,24 131:3
   132:17 136:13
   162:1 163:3,3
   183:2 195:10
   207:10 210:10
   231:4 233:21
   254:20 266:23
   271:7 274:2
   277:22
**cases** 9:3 10:2 20:4
   128:22
**catch** 206:20,21
   275:21 281:7,8,9
**cause** 5:23 27:1,6
   53:13 54:10,16,17
   54:21 55:15,19,22
   82:21 83:14 84:2
   84:5,9,17 85:1,2,3
   85:15,22 86:1,5
   93:11 96:16
   106:20 109:1,3,5
   120:10 146:21
   147:3,4,12,14,18
   147:23 148:3,8,9
   149:1,4,6,8,24
   155:24 186:19
   195:23 206:18
   209:4,8 211:15
   212:15 213:21
   220:10 221:14
   222:12,17 235:15
   236:1 242:11
   243:11,12 246:11
   251:19,20,23
   252:15,20 253:6
   254:2 255:11
   262:9,17 266:1
   284:17
**caveat** 10:19
**cell** 114:2 214:19
**certain** 20:4,9 39:20
   60:13 62:23
   112:15 119:15
   162:22 274:24
**certainly** 7:20 66:7
   94:11 142:7
   154:12 211:14
   213:20
**certification** 6:4
   300:2,18

**certifications**
   209:14
**Certified** 1:21 2:9
**certify** 300:6
**certifying** 300:21
**chance** 32:23 82:11
   278:24
**change** 7:22 20:7
   281:10
**characteristics**
   234:18
**charge** 162:19
**Charles** 179:15,17
**chart** 234:3
**chase** 56:20 131:24
   144:22
**chasing** 132:6
**check** 34:21 35:1
   48:22,23,24 49:6
   65:9 99:13 286:12
   286:13,14
**checking** 52:22,23
**checks** 48:16 49:2
**chem** 277:3
**Chestnut** 3:3
**chief** 180:16
**CHRISTIE** 4:2,3
**Christina** 293:14
**CI** 253:24 255:2,16
**circle** 50:6 52:5
**circled** 182:1
**circumstance** 57:9
**circumstances**
   23:15 29:17 31:3
   56:5,6,10 57:8,24
   97:6 103:5 110:22
   111:5,8,11 112:12
   118:19 121:12,17
   122:24 123:11,16
   123:20 131:23
   132:4,11 138:21
   160:14 201:18
   254:9,11 255:12
   255:13,17 263:22
   266:17 267:10
**Cls** 16:19
**City** 1:9 3:11,14
   18:21 19:15,18
   21:12,13 22:16
   23:9 51:4 180:17
   233:4
**City-owned** 19:13
**Civil** 1:3,8 180:16
**clarification** 289:16
**clarify** 142:21 223:3
**clarity** 117:23
**clear** 17:19 27:22

Case 2:14-cv-01643-RBS    Document 61-5    Filed 06/29/22    Page 81 of 102

McIntyre v. Liciardello, et al./Torain v. The City of Phila., et al.                                    BRIAN MONAGHAN, 1/17/17

28:12 47:11 70:6
77:9 85:14 105:14
141:20 148:18
171:2 201:14,15
210:22 233:7
250:7 296:18
297:18
**clearly** 192:14
**client** 52:15 54:5,6
141:5 147:12
155:6
**climbed** 133:21
**close** 75:7 78:4
119:12 142:11
163:6 193:3
**closed** 164:20
**closest** 76:11
**closet** 175:10
**clue** 175:12 210:15
**co-defendants** 6:21
**cocaine** 60:3
201:15 202:3
**COLEMAN** 3:16
**collect** 269:7
**collected** 282:10
**collecting** 269:4
**collectively** 191:16
192:3
**color** 202:6
**combination**
186:11
**come** 15:22 39:21
59:2 66:22 74:22
75:1 79:7 81:2,11
92:19,19 95:6
101:9 132:2,19
146:18 152:21
163:22 165:24
207:4 220:18
232:7 234:20
240:17 260:13
261:18 262:5
265:6 270:3,21
279:22 291:14,14
291:20
**comes** 116:18
258:15 259:1,3,5
259:6 279:17
286:12
**coming** 29:24 40:23
45:6 53:23,24
60:22 64:20 65:8
67:4 86:9 93:1
98:5 100:1 105:22
153:3 156:14,19
226:12 228:16
229:14 249:2

258:6 260:4 261:9
261:13 279:3
**comment** 26:16
**commissioner**
196:4 197:1 254:3
257:3
**common** 124:12,13
**Commonwealth**
2:11 214:21
**communication**
96:8
**complaint** 191:10
237:2,3
**completed** 280:6
**computer** 272:12
276:14,16 277:19
278:5,21 279:4,14
279:15,18,23
280:5,7,18,21,22
**concern** 150:18,23
151:3
**concerned** 64:23
**concerning** 11:7
**concerns** 8:7
**concluded** 299:13
**conclusion** 186:23
252:22,23 254:6
**conclusions** 57:11
**concrete** 227:8,9
**conduct** 66:7
123:21 163:20
**conducted** 65:13
110:18 111:14
144:1 161:22
188:5,20 202:1
236:20
**conducted/execu...**
125:9
**conducting** 193:20
193:21
**Conestoga** 83:3,4,8
83:9 89:17,18
90:4,14,22,24
91:2,3,4,8,9 92:6
97:10,10 101:24
102:3,11,15
103:12,19,22
105:13,16,19,21
106:1,4,11 150:15
150:23 152:12
153:12,20 160:17
160:20 212:9
213:18 215:3,11
215:11,16,18
216:13 217:6,21
227:22 228:2
248:1,1,2,5

258:13 292:22,24
294:18
**confidential** 15:3,5
29:12 229:19,22
231:8 232:12
236:5,10 237:21
238:8
**confidentiality**
229:23 230:8
232:9,20 233:6,13
234:4 235:3
**confirms** 238:8
**confiscate** 178:20
197:3 277:6
**confiscated** 110:23
117:20 127:2
158:17 163:7
173:19 178:14
183:11,20 184:19
184:23 185:3,15
186:6,8,21 187:19
194:19 199:19,22
200:4,7 201:13,20
204:1,9 209:7
214:14,15 215:2
261:1 280:17,20
280:24 282:20
283:4,13
**confiscating**
145:14 147:19
**confused** 90:24
118:17 153:23
278:2
**confusing** 10:12
**confusion** 101:8,8
**congested** 168:11
170:6 172:10
**conjunction** 91:16
195:10
**connected** 68:13
68:17 105:19
271:12
**connection** 130:24
131:2
**connects** 55:3
**consecutive** 61:12
**consider** 187:8
**consideration**
93:12 148:9,9
187:6
**considered** 298:23
**consolidated**
128:22
**conspiracy** 261:21
**contact** 31:4,4,10
75:19,20,24
139:11,17 238:8

238:12
**contacted** 33:4
**contained** 300:8
**containing** 38:13
114:3,3 116:4
201:14 297:18
**content** 28:3 42:8
**contents** 42:5
**contest** 121:23
**context** 72:15
157:10
**continuation**
235:24
**continue** 155:14
**continued** 4:1
233:10
**contraband** 115:12
143:1
**contribute** 208:6,8
209:9
**contributed** 207:16
208:9 209:3
**control** 106:22
107:1 125:12,13
158:17,18 186:20
270:14 300:20
**controlled** 59:16,24
**conventional/apa...**
126:9
**conversation** 32:20
39:22 117:7
166:14 236:19
285:2
**conversations** 42:8
**convicted** 208:17
**conviction** 208:7
228:12
**coordinate** 139:13
**coordinated** 139:8
**coordination** 141:1
**copies** 190:18
**copy** 87:2 128:9
179:5 189:6
190:10,23 191:5
269:11,22,24
300:10
**corner** 13:11 16:18
26:15 30:1 32:9
32:10 50:21 60:23
67:2 73:21 74:24
75:2 80:10 81:15
88:8 90:1 91:12
106:6 125:12
126:8 173:10
237:16 245:5,6
246:5 249:6
257:14 259:4

261:24 291:10
293:5,18,24
294:13,20 295:8
**corner-type** 17:6
**corners** 15:7
**corporal** 127:13
129:21 130:9
140:15 141:15
182:21 183:1
193:8 203:21
**corps** 7:19
**correct** 7:17 8:21
14:12,20 15:9
16:8,12,13,16,20
16:21,23 17:21
19:17,21 20:2
21:15 26:19,20,22
26:23 27:4,6,9,10
27:16,17 28:13,14
29:8,9,15,16
30:24 31:18 33:7
35:4,17 36:6,7,11
36:16 37:3,5,8
38:9,10,24 39:2
42:23 44:2 45:2,9
45:12,13 48:7,13
48:14,15 49:10
50:7,12,13 51:6
51:11,16,17 52:11
52:12,14,17 53:1
53:4,6,16 54:7,8
54:11,15,18 55:5
55:11,14,20 56:18
56:21 57:3,15
58:9,10,15,16
59:4,13 60:3,4,8,9
61:12,13 62:14,15
62:21,23,24 65:2
65:10,15 66:8,9
66:16 67:6,13,14
67:17,18 71:13,16
71:22,24 72:20
73:4,5,9 75:9,15
78:7,18 79:14,17
79:18 80:17,18,22
82:2,15,20 84:11
86:10 87:15 88:18
89:16 91:13,14
92:9,16 93:2,3
94:10,24 95:20
96:6,11,21,22
97:1,2,22,23 99:7
99:20 100:2,3
101:10 102:10
103:2 104:11,18
104:24 105:16,17
107:23 108:15,18

Case 2:14-cv-01643-RBS    Document 61-5    Filed 06/29/22    Page 82 of 102

McIntyre v. Liciardello, et al./Torain v. The City of Phila., et al.                    BRIAN MONAGHAN, 1/17/17

109:10,22 110:1
111:9,18 112:1,2
112:6,7,9 113:8
115:9,10,14,15
116:4,9,12,19,24
117:4 118:5,6
120:22 121:15
125:3,10,24 126:6
126:10,11,14,18
127:16,20 129:24
130:7 132:12
136:2 137:12,20
138:13,14,19
139:9 140:21,22
141:3 142:2,7
143:2,6,7 144:3
147:10,16 148:21
150:3 152:19
156:5,10 162:1,8
162:20 163:1,9
164:24 165:1
166:24 167:1
170:22 172:12,17
174:10,12 175:8
178:13 182:2,18
182:22,23 185:23
189:14 191:20
192:10,20 193:23
196:17 198:24
200:21 201:11,22
204:5 205:21
206:1,7,9 208:5
213:19,21,22
219:14,15,18,19
219:20 220:14,23
223:9,13 224:16
224:20 225:21
227:20 228:4
236:1,7 238:10
242:8,18,19 243:4
243:8,15 244:3,5
244:6,13,21 245:2
245:8,11,16,22,23
246:12 247:1,5,17
248:2,17,21
249:11 252:1
255:11 257:2,6,7
257:11,12,17,18
257:20,22 258:7,8
258:11,13,14,17
258:18 259:2
260:20 261:2,11
261:12,16 266:18
268:15 271:9
273:2,9,24 274:3
274:8 275:2 278:7
278:17 281:2,5,17

284:11 286:3,8,22
287:7 288:22
289:13 290:5,6,18
295:11,12 298:4
298:18 300:10
**corrected** 283:9,19
**corrections** 275:1
**corroborate** 53:2
255:22 256:10
**corroborated** 36:24
**corroborating**
243:2
**Cortes** 3:17 43:4,5
130:11 191:1
233:3
**counsel** 3:5,9,14,19
4:6 6:2 10:1 34:17
34:20 40:17 42:16
122:24 230:20
**count** 248:12
**countless** 266:14
**couple** 13:24 22:14
22:24 46:3,5 59:3
86:17 112:10
113:24 125:7
195:14 204:14
253:2 254:21
**couple-day** 79:4
**course** 11:2 69:18
145:1 170:10
198:24 208:2
210:9
**court** 1:1,21,21 2:9
158:12 163:14,16
163:22 172:2
209:20,24 223:21
231:1,16 233:19
234:5 276:1 281:6
**courthouse** 2:5
6:20 7:1,23 8:9
**courtroom** 2:6 9:8
63:15 65:22
130:13 180:13
181:7,8 231:17,20
**covered** 225:22
**crack** 38:13 60:3
201:14 243:16
**create** 21:21 62:2
**created** 26:3,4,18
26:21,24 36:4
62:4 87:10
**criminal** 56:20
63:11 64:10,11
96:24 98:2,8
151:14 152:13
225:3 226:8,18
227:2

**critical** 185:10
**currency** 39:23
293:8 297:22
**custody** 263:24
276:22

---

**D**

**D** 3:6
**D4398** 297:3
**DA** 196:2,10 219:2
219:3 223:4 254:3
276:1 282:9
**DA's** 256:22
**dangerous** 51:6
**dark** 202:6
**Darnell** 48:11 49:11
53:20 58:23 59:6
**date** 62:11,13,17,18
62:20,20 63:2
64:1 125:11
181:23 185:17,18
185:21 186:1
201:8 202:8,11
203:8 206:5 272:7
274:20 275:5,13
275:22 276:12,15
276:19,23,23,24
278:3 279:8,11,18
280:7,17,19,20,21
280:23 283:16,17
289:18
**dated** 203:20
**dates** 202:7
**David** 16:4
**day** 31:6 44:10,12
44:15,16,23,24
45:11,21 48:2
49:14,16 51:9
52:11,15,19,21
53:9,15 54:10
58:6,7,7,14 59:5,9
59:14 60:5,24
61:5,9,10,18 64:2
64:5,14,23 65:6,7
66:10 68:5 75:9
75:23 76:20 78:9
79:5 87:4 140:8
140:15,20 145:16
163:13 171:18
184:2 195:8
218:13 244:17
247:12,13,14
257:1,8 260:19
264:2,6,8 277:5,9
277:10,19,20,22
277:24 278:7,10
278:20,21 279:3

279:23 282:10,21
283:13 295:10
**Daylee** 298:2
**days** 22:14,24 26:5
37:6 44:3,9 59:8
61:11,12,14 62:19
63:3,5,18 78:1
80:16 100:9 145:1
210:9,10 244:4,9
256:13 257:4,6
**deal** 47:3
**dealer** 39:11,12
56:3 174:15
**dealers** 37:18 39:16
54:11,12 149:14
**dealing** 218:16,16
**deceased** 33:22
34:9 35:3
**decision** 267:19
**defendant** 3:14 9:3
**defendant's** 183:17
**Defendants** 1:6,16
3:19 4:6 6:21
**defense** 24:8,10
223:5
**definitely** 135:8
269:2 274:9
286:18
**definition** 111:10
**degrees** 50:5
**Delaware** 297:3
**Delee** 48:11 49:11
49:11 53:20 58:23
59:6,6 70:5 71:1
72:23 73:18,21
77:8,23 80:15
81:15,17,21 82:3
84:4 86:7,11 88:7
89:23 92:14 93:6
94:6 98:9,17,21
99:24,24 100:4
101:20 107:15
111:20,24 114:17
114:22 115:7
148:14,15 149:15
149:22 151:23,24
152:8 153:20
154:6 226:11,20
243:13 245:19
246:5,15,19,20,23
250:6,23 257:16
264:17 290:7,12
290:17,17 291:5,8
293:4,17,23 294:8
294:10 295:7
296:16,17 297:17
297:18,20 298:2

**DENNEHEY** 3:16
**department** 3:11
11:9 14:15 21:14
21:19 278:15
**Department's**
63:10
**Departmental** 13:2
131:21
**depended** 14:7
204:16
**depends** 50:19
121:8 143:12,13
204:22 253:8
254:8,12
**deposition** 1:18 2:4
6:16,24 7:3 41:21
41:23 42:18 157:4
157:7,10 160:12
233:9,10 299:13
**depositions** 6:19
8:8 9:2
**describing** 253:15
**description** 5:9
74:21 117:8
165:11 217:5,12
217:16 240:1
**designate** 233:5
**desk** 179:12 204:12
**destroy** 119:1
267:13
**destroyed** 56:11,13
85:9 110:20
119:11 266:2,20
267:7
**destroying** 265:16
**detached** 208:14
**detail** 16:1,1
**detailed** 20:14,15
20:18,24 21:6
29:11 45:3 236:4
236:15
**determination**
33:12 35:8,10
68:20 80:5
**determine** 32:19
37:19 38:2 54:6
56:12 68:16 117:2
144:13 166:21
168:1 239:14
286:10
**determined** 38:8,22
60:3 61:1 114:4
116:7
**Diamond** 6:22
233:4
**DIANA** 3:17
**difference** 95:8

Case 2:14-cv-01643-RBS    Document 61-5    Filed 06/29/22    Page 83 of 102

McIntyre v. Liciardello, et al./Torain v. The City of Phila., et al.                    BRIAN MONAGHAN, 1/17/17

232:22
different 18:7,20
  21:15,18,20 29:18
  32:21 41:21 55:14
  60:22 83:12 137:2
  139:16 174:11
  197:22 203:8
  205:12,15,16,18
  206:5 255:12
  299:8
differently 18:13
difficult 126:4,13
Diggs 80:15 84:4
  86:7,11 88:11
  92:15 93:7 100:5
  107:15 111:21
  149:15 151:24
  154:6 250:24
  264:17 294:1
  295:18 296:17
  297:18
direct 97:8 241:14
  241:15 300:20
directed 95:1,19
  105:15 287:9
directing 75:13,15
  96:2
direction 298:18
directions 29:8
disagree 24:14
disbanded 18:14
  18:16
disclose 232:23
discovered 142:24
discovery 63:1,1,9
  230:6 232:1,17
  233:24 275:4
discuss 40:6,18
  241:8
discussed 214:2
discussing 170:5
discussion 24:23
  42:21 77:2 126:17
  136:18 137:6
  150:10 157:21
  158:3 213:2,9,11
  214:5 285:6,17
discussions 23:6,8
  23:9,13,17 24:4
  40:3,9,10,16
  41:15 43:18
  136:23 157:9
  213:23
disposal 276:23
dispute 163:18
  183:19,24
disputing 234:6

distinction 54:15
  54:20
distinctly 72:1
district 1:1,1 11:23
  12:4,19 29:12
  30:12 33:1,5
  46:16,22 47:1,6
  47:15 129:4
  210:14,14 236:6
  236:22
districts 279:24
division 15:16
  17:24 18:2,7,8,15
  19:1,24 20:8,11
  20:12 21:21
divisions 18:7,18
  19:5,11 20:2,3,7
  20:18
divulge 230:11
DKC3310 66:13
docket 1:4 231:4
documents 22:9,13
  24:24 270:2
  271:19
doing 16:17 25:5
  74:15 100:8 103:8
  145:4 166:22
  195:2,5,7 203:11
  204:18 205:1,18
  226:10 241:4,5
  246:9 256:6,10,16
  274:19 279:13,20
dominion 107:1
  158:16,18 186:20
Donna 2:8 300:14
door 39:15 84:22
  84:23 85:21 86:15
  88:1 106:15,16,17
  106:23 109:6,7,9
  109:10 110:10
  114:4 116:7,15
  117:3 118:1
  119:24 124:1,2
  132:9 134:10,12
  134:12,21 147:5,9
  147:24 148:4,10
  164:14,15,20
  168:6,9 174:4,9
  174:12,21,24
  176:15 215:19
  249:19 288:18,19
doors 52:1,2 114:9
  117:15 146:3
doorway 263:14
double-parked
  73:20
doubt 145:15

drawers 177:16,22
  177:23
drive 50:20,21
  76:14 79:23
driven 93:6
driver 68:1 70:13
  70:18,21 79:24,24
  88:22 284:22
  292:8
driving 68:18 76:20
  80:6 82:16,22
  84:6 89:13 148:16
  148:17 151:10
  154:9 223:11
  251:7
drove 108:12
  198:13
drug 37:7 49:4 50:9
  50:10 52:24 53:5
  55:4,10 60:18
  75:14 80:17
  100:10 102:14
  114:24 145:2
  156:2 174:15
  211:17 236:19,20
  237:15 238:12,20
  240:11 257:9
  264:4
drugs 13:2 37:17
  39:11 45:7 56:9
  56:12,16 85:8
  98:24 100:1
  101:20 110:19
  111:1 112:1
  114:18 115:7,8,12
  119:11 143:1,2,5
  144:23 145:10,10
  145:11 150:18
  152:9,11 154:2
  158:18 163:7
  173:19 186:3
  197:4,6,10,13,15
  197:18,20,23,24
  198:23 204:2,8
  205:3 222:5 223:8
  224:14,14,14,20
  225:19,19,19
  226:8,9,9,14,15
  237:7,9,17 238:19
  240:14 243:13,14
  243:20,22 244:1
  246:4,16,24 247:4
  247:9 256:3,3,17
  256:18 257:21
  258:5,6,10,17
  259:7,9,12,16,21
  260:5,6,8,14,17

260:18 261:1,6,10
  261:11,15,19
  262:11 266:20
  277:3,12,18,23
  278:20,21 279:20
  279:22 280:2,19
  282:20 283:3,13
  288:13
duly 6:10
duties 13:9 16:19
  29:5

_____ E _____

E-mail 7:12
E-mails 233:15
earlier 108:6
  151:22 226:11
  233:19 285:19
easier 101:16
easiest 25:3
East 19:4 20:12
EASTERN 1:1
easy 101:11
eight 175:20,21
either 39:24 54:22
  111:20 115:6
  117:7 127:13
  131:17 141:15
  153:8 165:15
  193:16 204:11
  223:8 224:20
  226:17 285:9
eliminate 101:12
embodied 96:15
emerge 50:23
empty 183:22
enforcement 8:16
  233:5
engage 56:19
  114:24 225:3,4
  226:7,18
engaged 98:7
  100:10 102:14
  145:1 151:4,14
  152:13 156:2
  227:1
engaging 96:24
enter 130:13 219:17
  220:17,24 277:8
  277:10,13 278:5
  278:20 279:23
  292:24
entered 63:15
  65:21 80:12 106:8
  108:2 116:16
  248:2 250:3
  276:14,15,24

278:10 279:18
  280:5,7,16 290:21
  295:2
entering 106:14
  277:4
enters 90:24
entry 110:13
erase 202:8,19
erased 203:8
erasing 202:11
error 61:23 88:10
  275:13
escorted 181:8
Especially 130:5
ESQUIRE 3:2,6,11
  3:17 4:3
establish 147:11,17
  221:13
established 149:4,7
  243:10 244:4
establishing
  298:24
estate 48:22,24
  49:2
estimate 52:3,5
estimating 78:2
et 1:5
events 9:5
eventually 157:22
  178:1 186:6 222:4
everybody 19:12
  19:16 77:22 101:1
  101:2,6 164:4
  182:19 188:7
  208:20 264:3
evidence 85:12,12
  98:3 103:21 104:7
  104:14,16 119:1
  145:16 162:18
  242:18 243:15
  247:4 251:24
  252:2,2,4 255:7
  255:10,23 256:8
  256:17 257:21,24
  260:19 264:24
  265:15,16 266:1,9
  266:10 267:7,12
  269:4,8 273:23
  277:7 281:19
  282:3,9
eviscerate 186:19
exact 166:7 249:13
  249:14 255:5
exactly 62:7 67:23
  78:13 94:15 99:15
  100:11 108:21
  135:5 151:13

Case 2:14-cv-01643-RBS    Document 61-5    Filed 06/29/22    Page 84 of 102

McIntyre v. Liciardello, et al./Torain v. The City of Phila., et al.                    BRIAN MONAGHAN, 1/17/17

153:19 156:12
164:3,9 165:20
199:13 245:14
248:14 249:15,21
**examination** 9:12
284:5
**examined** 6:10
**example** 256:1
**exception** 56:2
**exceptions** 55:23
56:23 122:23
**exchange** 39:23
293:7 297:21
**exclude** 255:2,3
**excluding** 43:1
**execute** 14:10
55:20 100:23
143:10 163:20
164:1 194:9 260:1
271:16
**executed** 53:14
109:22 125:17
126:2 142:9
175:24 188:9
189:24 195:24
199:11 201:21
268:17
**executing** 14:4
16:22 193:2
**execution** 139:4,8
139:19 184:24
**executions** 27:5
**Exhibit** 25:13
124:20 128:15
169:22 181:10
191:22 200:14
218:7 235:18
**Exhibits** 5:8 171:9
173:1
**exigent** 56:5,6,10
57:8,23 103:5
110:21 111:5,8,10
112:11 118:19
121:11,17 122:23
123:11,16,20
131:23 132:3,11
132:13,15,21
133:5 263:21
266:16 267:9
**exit** 89:9,11 91:4
106:4 292:24
294:18 297:1
**exited** 88:15 89:11
89:23 90:23 106:7
248:5 291:8,12
295:1,21 296:17
297:11,14

**exiting** 294:14
**expect** 93:1,6
**explore** 234:16
**Explosives** 21:1
**extend** 16:19 17:9
**extent** 57:12 284:9
**extremely** 36:8
**eye** 80:24 81:5
92:14
**eyes** 291:22 293:10

_____
**F**
_____

**F** 4:3
**face-to-face** 237:1
**facing** 67:1
**fact** 48:10 51:6 57:8
65:24 75:8 79:16
85:17,19 86:6
93:16,18 96:19
111:23 114:23
121:11 143:4
148:10 149:24
158:8 184:5
185:10 188:19
190:10 192:16
209:6,19 212:14
213:13 222:14,18
235:13 287:10
**facts** 44:1 227:8,9
**factual** 242:17
247:4 264:23
**fair** 9:6 20:20 22:19
27:11,13,14 33:3
46:12,19 47:17,19
50:9 51:22 52:14
64:22 68:19 91:19
92:4 95:23 96:1,7
96:14 97:3 102:2
102:6,7 126:2
135:6 147:13
149:5 151:9
152:16 162:10
164:6 169:20
172:8 175:13
188:22 196:19
201:8 203:5 205:6
217:20 218:5
221:16,18 224:23
226:22 227:5
246:8 247:7
253:14 258:9
260:2 265:5,8,11
268:11 269:3,6,7
279:13 296:15
**fall** 250:9 252:13
**falling** 247:17
**false** 228:11

**familiar** 47:22
**familiarize** 14:14,23
17:14
**family** 49:11 180:7
181:4
**far** 77:15 150:4
241:23 256:13
**fast** 50:22 82:11
204:16 279:10
**father** 137:3 285:14
**Fazlollah** 4:9 65:21
**fear** 119:11
**Fearing** 266:19
**federal** 21:4,9
**feds** 21:20
**feel** 9:6 84:2 102:16
252:15 259:11
261:18 265:5
266:1 282:17
**feeling** 153:5
**fellow** 37:6 61:5
285:10
**felt** 54:9
**female** 35:4 292:16
292:17
**females** 39:21
53:24 59:3 293:7
**field** 12:23 13:2
15:15,22 16:9,9
17:10,10,15,23
18:3,4,13,23
19:17 20:21 21:24
28:13 30:7 33:4
45:21 201:21,24
**field-testing** 243:24
**fifth** 155:20 212:3
**figure** 240:1
**file** 7:9 168:22
230:12
**filed** 8:3
**filing** 6:4,22 7:21
**fill** 184:15 195:13
273:1
**filled** 184:12 216:22
**filling** 195:12
**film** 44:14,17 64:11
82:6
**filmed** 78:5
**filming** 82:7
**final** 8:13
**finally** 199:22 298:6
**financial** 7:14
233:12
**find** 34:13 35:19
114:18 178:7
187:7 197:4
274:23 275:3

**finding** 143:13
144:23
**fine** 28:4 76:23
117:11 220:13
230:15
**finish** 279:3,21
**Firearms** 21:1
**first** 5:9 11:21 25:19
27:21 28:5 35:1
36:11 37:23 38:6
44:15,23,24 45:11
45:21 46:6 49:14
51:9 52:10,15,21
53:9,21 54:9 59:5
59:8 65:6 70:4,7,9
78:9 79:5 83:3
97:22 110:2 118:1
126:10 163:12
172:3 173:6
183:12 199:21
202:5 205:20
217:1 218:13
222:12 228:10
236:3 239:13,15
241:16 256:13
257:6 261:5
265:19 285:3
287:10 288:9
298:21
**fit** 85:20 114:8
117:3 147:9,21
148:4,10 150:2
174:9,12
**five** 114:3 116:3
122:15 171:1
**fix** 276:10,11
**Fleming** 1:23
**floor** 3:12 4:4
126:10 172:3
287:10 288:9,9
**flush** 56:16
**focus** 21:23 49:23
268:3
**focused** 27:12
**follow** 74:19 76:23
77:19 78:16
250:14
**follow-up** 289:3
**follow-ups** 283:23
**followed** 77:7 78:7
78:11 88:12 90:3
90:21 91:2,7,9
94:20 112:4
113:17 153:11,12
212:9,12 247:23
247:24 292:22
295:19 296:8,22

298:13
**following** 29:7
89:19 184:2 257:1
264:2 277:9,22,24
**follows** 6:11
**foot** 108:11,13,22
146:18
**force** 12:15,17 13:8
13:8,18 14:1,3,9
14:13,22,24 15:4
15:11,24 17:3,16
21:8,10,22 27:16
30:6,10 46:15
116:15,16
**forced** 187:13,14
**foregoing** 300:18
**forget** 152:3 175:11
211:11 264:3
267:18
**Forgive** 47:11
**forgot** 40:1 47:11
**form** 6:5 208:19
234:24 252:21
253:10 283:1
**format** 205:17,18
**former** 8:10,14 77:3
228:23
**formula** 86:1
284:16
**forth** 293:18
**forward** 32:1 207:4
240:17
**found** 35:14 83:10
88:14 102:13
105:18 142:19,19
143:2,5 178:2
197:10,13,24
204:2 216:12,14
222:5 225:18
238:11 260:6
288:2
**four** 60:1 168:19
182:3,4 243:16
264:18,24 265:17
270:16 271:7
**frame** 197:10,13
**Freeman** 297:17
**friend** 180:23 181:1
**front** 38:19 51:18
52:7 72:2 84:22
86:15 87:24 109:6
109:9 110:10
124:1,2 132:9
134:12,21 164:14
174:12 266:3
267:6 289:5
293:14

Case 2:14-cv-01643-RBS Document 61-5 Filed 06/29/22 Page 85 of 102

McIntyre v. Liciardello, et al./Torain v. The City of Phila., et al.                    BRIAN MONAGHAN, 1/17/17

full 50:6 52:5
fully 300:8
funny 40:21 41:3,8
further 110:24
    240:21 246:17
    289:1
future 26:22

**G**

G 19:3
Gary 204:15
gathered 256:17
general 32:20 45:1
    45:2 52:24 125:7
    236:19
generally 27:4 28:2
generate 276:21
    278:6
Gessner 33:20,20
    33:21 127:14
    131:16 140:19
    141:15 196:3,6,11
    196:12,19 203:17
    204:7
Gessners' 193:9
gesture 71:2 72:16
    73:17 168:12
    290:9
getting 12:22 42:7
    42:12 51:5 70:5
    77:11,20 93:17
    110:10 111:7
    120:2 122:9
    124:15 133:17
    138:6 148:15,17
    152:8 179:19
    195:22 217:16,18
    244:10 245:19
    277:12
Gillis 66:14 68:4,22
    69:2,12 70:22
    289:21
give 10:7 32:11
    47:9,11 83:5
    122:4 127:24
    128:9 140:6 179:5
    179:12 188:22
    190:17 200:11
    204:17 217:15
    224:14,15 225:19
    225:20 228:1,5
    229:21 231:21
    232:8,11 234:8
    239:24,24 241:15
    244:11 248:19
    272:3,23 273:13
    273:13 282:13

293:5
given 31:14 39:18
    100:23 109:20
    124:24 184:13
    192:3 210:13
    253:21
gives 265:24
giving 104:24 226:9
    226:9 241:20,23
    248:13 297:20
go 12:19,20 13:7
    19:1,18,19,24
    20:1 25:2 33:15
    45:11 49:15 52:13
    55:19 56:8 57:8
    57:16,24 58:6
    59:16 61:9 63:20
    73:23 75:18,23
    76:6 82:4,14
    89:10,18,21 91:5
    91:5,22 92:3,10
    92:15,23 93:17,20
    94:13 97:9,21
    100:17 101:24
    105:9,15 107:12
    108:6,18 110:22
    111:6 114:23
    120:9 121:1,2,7
    123:17 124:5,6,8
    124:13 126:23
    128:10 130:5,8
    131:11,22 136:12
    136:13,20 144:1
    144:12,17,21
    145:22 146:13
    150:17 152:10
    153:10 154:7
    158:9,23 159:6
    161:18,19 162:16
    162:17 163:1
    164:13,23 165:4,4
    165:7 167:5
    169:19 173:24
    175:2,18 177:6,7
    183:14 195:16,18
    195:19,22 197:1
    199:24 204:22
    205:17 206:17,21
    207:8 212:23
    213:15 217:2
    219:21 221:1
    230:2 231:12
    232:24 233:11,13
    235:10 237:22
    238:7 241:5,11
    242:10 244:16,16
    246:5,9 249:8

251:16,21 252:9
    252:20 253:6,20
    253:24 254:17,21
    256:4 257:8
    262:22 263:19,21
    264:12 266:2,11
    268:24 275:1
    276:10,20 279:8
    280:11,18,21
    281:10,17 284:1,8
    289:11 293:4
    296:21 297:2
goes 50:1,6 70:24
    81:6 213:14
    218:23 219:5,5,14
    258:13,19,23
    270:14 278:14
    280:6,9
GOGGIN 3:16
Goglielmucci 29:13
    29:22 236:6
    238:13 239:3,5
    240:9
going 7:13 10:2,8,9
    10:17,20 11:6
    14:6 19:23 24:16
    25:2,3 27:23 32:8
    33:13 37:4,23
    40:8,14 44:13
    50:19,21 51:14,23
    54:23 56:9,11,13
    56:16,23 61:16
    67:7 69:22 70:15
    79:1,3 81:19,20
    85:8 86:18 89:23
    91:20 92:15 98:5
    100:14,16,20
    101:1 102:24
    105:21 111:19
    119:11 120:24
    121:6 123:17
    125:18 126:23
    128:9,19 130:5,8
    131:11 132:9,18
    135:21 139:13
    142:22 146:5
    147:19,20,23
    148:7,23 149:16
    149:17 150:5,15
    150:24 152:4,6,10
    152:21 154:18
    155:14 156:11
    158:4,16 163:8,17
    167:15,16 175:4
    190:9 191:16
    194:13 198:8
    205:13 207:18

212:2,4 213:4,9
    213:15 222:19
    230:14 231:7,12
    233:23,23 234:16
    234:22 235:8
    239:22,23 240:8
    241:5,14 242:16
    244:19 248:23
    250:13,14 251:21
    251:22 255:5
    256:4 262:1,8
    264:21 265:6,10
    266:2,10,19,20
    279:21 281:5
    283:10 284:8
    293:19 297:9
good 9:15,18,19
    153:2
gotten 293:2
grabbed 194:21
graduated 11:18
grams 201:16
great 47:3
greater 16:11
green 66:13 82:16
    82:22 84:6 116:4
    218:23 219:5
    223:11 224:13
    225:17 246:15
    257:13,16 261:5
    289:20,23 290:22
    294:1,11,14
    297:19,21
Grogan 23:18
ground 10:7 124:12
    124:13 233:17
group 76:3,6,6
    139:16,16 140:7
    145:13
guess 25:3 68:8
    126:8 139:17
    141:20,21 152:24
    153:2,5 182:5
    187:16 206:12
    286:16
guessing 61:16
guns 143:4 144:23
    163:8
guy 166:13 290:17
Guyon 3:10
guys 50:10,20 94:7
    101:13 119:2
    149:14 222:24
    250:23 261:24
    264:10

**H**

hairs 132:20
half 15:12 18:23
    85:7 143:17 164:7
hall 172:11
hallway 119:21,23
    119:24 120:2,5
    127:19 129:13,17
    135:1 164:20,21
    168:16 170:5,8,17
    172:2,5,7,11,14
    262:22 263:2,14
    267:22
Hammonton 1:23
hand 39:22 71:2
    72:16 73:17
    100:21 290:9
    297:17
hand-to-hand 45:7
handed 25:17 37:17
    204:20 225:8
    226:14,15 264:10
handing 225:7
    252:6
handy 116:14,18
happen 104:1 162:2
    233:23 266:22
happened 12:13
    15:13 40:22 67:17
    74:3 76:10,10
    77:3 87:4 103:24
    104:4,12 129:24
    136:8 157:24
    158:2 161:9
    240:17 244:13
    248:4,22,24 249:7
    250:5,19 251:3,9
    278:23,24
happens 274:23,24
    278:6,13
harboring 98:2
hard 50:11 161:8
    181:24 182:5
    282:1
hated 268:9
head 127:10
headquarters 68:6
    68:10 196:21
    286:15,19
hear 71:17 149:18
    149:19 278:1
    294:5
heard 19:12 33:23
    34:15,17,19 71:11
    72:1 74:18 159:24
    284:6,7 290:13
hearing 5:12 23:4,5
    71:14 128:20,21

Case 2:14-cv-01643-RBS    Document 61-5    Filed 06/29/22    Page 86 of 102

McIntyre v. Liciardello, et al./Torain v. The City of Phila., et al.                    BRIAN MONAGHAN, 1/17/17

128:23 152:4
213:3,12 275:11
275:21
hearings 210:5,6
heat-sealed 60:2
Heavy 238:20
held 150:10
Helen 3:9
hell 169:4
help 140:13
hey 240:12
hide 39:17
hiding 119:2 175:6
176:22 177:6,14
266:7
highlight 202:13,23
202:24
highlighted 203:4
Hispanic 292:12
hit 54:10,13 101:7
101:14,15 102:11
102:15,16 139:15
139:15,21 140:12
hitting 139:14
Hodge 113:10
116:2 297:1,4,17
Hodges 48:14
53:21 115:19
hold 280:10
home 83:10
homes 16:17 17:9
homework 232:18
honestly 172:7
181:24 207:6
Honor 129:13,14
hoping 35:21 101:6
hot 56:15
hour 85:7 118:18
119:13 143:17
150:9 164:7
hours 143:11
house 38:12 39:5,8
39:11,15 56:3,4
56:14,24 57:9,17
58:1 85:13 99:7
101:14 132:7,8,8
139:15 140:12
158:20 212:16,17
238:17 253:7
259:5,16 261:9
264:13 266:3,4,18
267:6,14 268:8,8
268:12 270:15
houses 13:23 14:2
14:6 29:19 32:21
37:11,14 45:7
54:11,13 101:15

139:14,21,22
141:1 237:14,15
242:21 252:20
270:18
HOWARD 3:6
human 208:23
hump 227:1
hundred 204:14
Hunter 88:12 89:12
91:11 106:5,7
294:19,20 295:20
296:9,24
Hunting 19:3
hypothetical 104:9
104:24 207:1
Hypothetically
207:9

I

ICO 278:16
ID 59:7 179:11
ID'd 77:22 90:3,8,9
90:10,21 264:10
idea 42:3 47:18
213:17
identification 25:14
25:18 124:21
125:1 128:16
169:23 171:11
173:3 181:11,15
191:23 200:15,19
218:8 235:19
identified 37:11
58:21 65:1 80:14
88:18,21,22 102:3
102:8 151:12
235:7 237:12
292:21
identify 26:13 52:18
59:6,6 68:1 79:23
179:7 211:9,13
identities 232:14
identity 90:13
229:22 230:12
232:11
illegal 30:23 69:18
70:3,17 72:12
103:23 104:2,21
110:13 114:14
120:8,15,23
123:19 136:2
151:4 186:21
229:3,15
illegally 185:16
immediate 58:4
immediately 293:4
impermissible

65:24 104:3,21
136:1
implying 202:18
important 35:15
36:8,16,20,24
78:23 82:9 93:16
144:21 152:12
210:12,17 273:22
impression 102:19
102:21
in-house 13:1
incarcerated 41:11
207:14
incarceration
207:17
incentive 228:22
include 142:1
inclusive 232:7
incongruent 154:24
inconsistent
154:24
incorrect 38:23
61:22 71:19
219:24 220:1,7
223:14 228:21
independent
103:17 197:4
215:14
independently
31:17 138:11
INDEX 5:1
indicate 10:11
138:1 146:20
173:24 186:18
indicated 7:11
53:17 98:7
individual 36:5 41:6
56:19 78:17 82:22
106:21 110:23
115:18 126:17
166:23 167:2,7
212:21 217:5
236:15 244:12
246:3 251:7 258:6
274:8 292:11
individually 1:14
individuals 27:9
28:7 39:21 45:6
48:1 49:7 52:19
54:22 55:12 80:10
80:14,15,19,21
82:14 84:3,4
85:18 87:24 99:20
99:22 101:18
108:2,18 112:9,15
112:19 119:16

144:24 154:1
156:4 205:12
212:16 238:24
244:20 256:16
259:15,20 260:16
261:13 263:23
264:20 265:18
288:8,13,17
inform 31:13 42:16
103:11 134:6
informant 230:17
242:7
informants 15:2,3,5
232:12
information 7:14
28:6 29:11 30:20
30:22 31:14,22
35:16 36:16,19
45:1,3,4 49:3 61:4
81:24 84:10 93:4
93:12 96:9,15
97:4,19 107:15
108:1 129:6
145:24 146:11
149:21 184:14
195:12 214:9
215:8 216:23
228:2 235:7 236:5
236:15,16,21
238:6 239:9
241:12,13,17,19
241:20,22,23
242:10,22,23
243:3 245:11,16
245:18 246:1,17
248:13,19 249:1
253:21 256:14
259:17 288:7,21
293:1
informed 32:1,5
80:13,20,23 87:19
99:24 114:19
136:20 143:2
152:20 153:6
161:20 173:23
216:19
informing 103:18
initially 27:12 34:8
92:11
initiate 36:10
initiated 28:20 33:9
initiation 35:9
36:23
innocence 210:18
Inquirer 4:9
inside 37:16,17
39:15 51:10 54:23

71:18 73:1 99:1
101:6 108:7 114:6
119:19 134:18
135:13,17 152:2
164:23 165:4
174:4 197:6,10,11
197:13 200:22
204:2 215:1 240:8
259:4 260:6
265:16 271:15
288:15,19 292:8
296:18 297:4
instinct 252:9
instruct 78:15
100:24 101:17
117:16 161:18
230:14 231:7
235:9
instructed 40:17
80:9 83:8 142:14
142:17 146:7
154:13 224:2
228:15 251:10
instructing 122:12
122:16 155:12
instruction 47:9,12
instructs 230:23
insure 29:5
intending 116:21
intent 118:14
intentional 194:5,6
interacted 247:8
interest 217:24
218:1
interrogatory
234:24
intersection 66:15
66:21,22 67:21
290:4
interview 32:18
236:18,23
interviewed 236:14
239:4
intimidation 9:6
investigate 110:24
155:17
investigated 27:16
investigating 75:14
investigation 5:10
25:23 27:12,19
28:12,21 29:2
35:9,16 36:10,23
44:3 45:20 46:7
46:20 47:18 48:4
48:18 54:5 61:6
72:15 74:2,7 79:3
79:4,6,20 124:10

Case 2:14-cv-01643-RBS    Document 61-5    Filed 06/29/22    Page 87 of 102

McIntyre v. Liciardello, et al./Torain v. The City of Phila., et al.

BRIAN MONAGHAN, 1/17/17

166:22 215:15
217:21,23 248:20
252:17 263:24
**investigations**
13:12,13,22 15:7
16:14 79:8
**investigative**
252:10
**investigator** 11:8
28:15 33:9,13
44:20 46:7 75:12
122:3 139:12
144:1 166:2
182:16 248:12
270:13
**invite** 231:12
**involved** 27:5 29:6
29:7 47:14 55:1
61:6,7 74:2 80:17
112:14 113:2
119:15 149:9,10
183:1 211:15,16
211:24 212:8,11
238:24 241:19,22
242:6 243:18
**involvement**
166:10 207:2
**irate** 237:8
**issuances** 27:5
**issue** 54:16 146:21
**issued** 53:13,14
**issues** 7:6
**items** 114:14
183:20 184:23
185:15 186:21
200:7 201:19
209:7 271:2,23
272:5
**Ithan** 70:7 72:18
73:20,24 74:24
77:13,14 290:16
290:20

_____ J _____

**jacket** 177:9 226:13
245:20,21 296:18
297:19
**jail** 207:4 209:9
**James** 1:3 2:5 4:3
**January** 1:19 2:7
7:7 45:12 46:2
58:7 61:10 125:9
183:21 295:10
**Jean** 204:15
**Jeannie** 33:20
131:16,18 140:19
141:15 193:8

196:2,6,10,12,19
**Jeff** 41:20 69:21,23
70:10 74:14,19,23
75:1,17 80:9,23
81:5 86:14 92:17
98:9 113:6 153:8
153:11,12 221:21
274:18
**Jeffrey** 3:15 8:10,24
41:23 42:3,16
69:24 70:2,16
75:8 76:10,14
80:13,20 84:9
87:18,21 93:13
138:24 144:9
160:7,16
**jeopardize** 79:19
185:11
**jeopardized** 79:6
**Jersey** 1:23
**Jim** 189:12
**job** 11:7 13:11 16:6
28:20,21 33:9,16
40:20 41:14,16
46:2 65:16,16,18
65:19 79:1 84:12
86:22 87:10 162:9
181:19 206:13
241:4,5,9,19,23
242:6 246:10
261:21 267:14
**jobs** 46:17 79:15,15
**jog** 295:9,15
**Jogged** 88:8
**John** 3:19 4:3
**joined** 248:9
**joint** 24:7,9
**Joseph** 4:6 23:18
23:19 29:13
**jotted** 87:3 272:19
**judge** 6:22 161:21
209:12 233:3
254:4
**judicial** 185:2
**July** 7:6
**jumped** 262:3
**justifiably** 282:17
**justify** 147:18
184:22
**justifying** 299:1
**Justin** 3:9
**jwchristie@chris...**
4:5

_____ K _____

**Kabiyan** 293:24
**Kareem** 1:7 3:5

10:4 22:3,10 47:5
47:13 52:15 61:1
61:6 81:18,18
90:3,10,21 102:9
149:16 152:4,10
180:6,20,22,24
181:3 207:2
213:24 227:19
244:7 257:4 258:4
258:10 260:11,13
260:22 261:6,9,19
262:1 264:19
265:19 271:9,12
272:5 282:17
284:8,13,18,21
286:24 287:13
292:3,21 294:1
**Kareem's** 272:7
**keep** 60:15 65:17
80:24 81:5 92:14
126:23 177:8
184:11,13 195:3
262:7
**keeping** 81:14
**Kelly** 45:15,17,19
46:11 50:7 58:9
60:7 64:15 65:12
81:15,24 117:6
126:19,20,22,24
127:6 129:10,18
137:1,7 149:19,20
152:3 157:14
160:1 165:9,13,21
166:4,14 167:6
168:4,8 174:6
198:7 263:7,9
284:7 285:6,15,17
285:24 289:18
293:21 294:6
**Kennedy** 4:3
**kept** 119:16
**key** 85:1 105:24
106:8,11,14,16,17
106:21,23 107:6
109:6,8,13,17,19
110:22 111:7
114:2,3,8 116:6
116:13,16,18
117:12,17 118:1
120:1,13 127:1,16
133:11,13,14
134:4 144:15
147:19,21 148:4
148:10 150:1,17
150:20 153:10
157:15 164:15
165:2,12 166:18

166:20 167:7
168:3,9,13 174:9
174:11,16,20
184:19 186:13
187:7,8 195:19
212:20,22 221:13
221:15 285:16
295:2
**keys** 84:20,22
85:11,20 109:11
109:15 110:4
114:3,4,11 116:6
116:24 117:2,13
117:21 134:11
136:7 146:2,4
147:5,9,24 148:5
158:21,24 159:6
165:8 186:7,10,15
214:17 215:18
288:1,3
**kicks** 106:15
**kid** 247:20
**kidding** 169:10,12
230:6
**kind** 15:19,23 19:1
28:19 49:5,18,21
49:24 50:11 55:9
56:20 66:3 68:21
150:15 151:4
168:12 172:13
181:24,24 183:13
291:3
**knew** 30:3 32:19
46:22,24 47:21
49:10 70:21,23
79:3 83:3 87:4
90:17,18 95:9,10
95:13 99:22 100:8
144:15 150:23
158:11,15 159:6
162:13 167:14
174:4 221:10,20
237:9,14 238:13
276:6,8 287:1
288:12 292:3
**know** 10:10,22
25:19 28:11 33:23
41:20 47:5,20,23
47:24 60:12 62:16
66:11 67:15 68:13
70:11,16,18 71:9
73:11 74:5,8,11
76:20 78:20 81:13
85:9 89:6,18
90:13,16,17 91:16
92:1,2 100:19
106:16 107:14

108:22,22 109:17
111:12,15 120:12
130:14,21 133:8
133:13 134:16
135:16 136:16
138:24 139:20
140:8,8,16 141:6
147:6,8 148:19
151:8 152:23
153:4,18 156:9,21
160:9,22 161:8
164:9 165:7
166:12,13 167:5
167:18 169:3
172:14 176:2,18
177:5,7,18 179:20
180:2,5,7 181:2,4
184:15 187:10
188:3,14 189:21
190:6,7,15 194:17
198:16 200:22
202:6,9 204:7
211:2,24 212:6,8
212:11 214:6,12
214:15 215:6
216:14 217:13
219:9,20 221:17
221:19 222:11
223:19 227:19,22
228:22 229:20
230:1,18 232:6
234:11,12 235:4
236:11,12 237:18
239:8 240:13,19
241:4,12,12,18
242:11,11,22
244:7 245:4,8,13
246:20 249:20
250:2 252:9
255:24 256:12,12
262:13 263:19
264:11 265:2,2,3
265:11,12,13,15
265:23 266:6,7
267:2,3,4,20,24
268:6,11 269:18
269:22 270:2,13
270:14 272:5,12
272:18 273:20
274:18 275:4,7,8
275:15,17 276:15
277:21 278:2,2,24
279:2 281:9,11
282:7,9,11 283:19
284:13,17,20,22
285:5,13,15
287:15,16,20,23

Case 2:14-cv-01643-RBS    Document 61-5    Filed 06/29/22    Page 88 of 102

McIntyre v. Liciardello, et al./Torain v. The City of Phila., et al.                    BRIAN MONAGHAN, 1/17/17

288:14 289:15
292:2,10 298:11
299:9
**knowing** 33:4,5
48:3 161:5 189:23
281:5
**knowledge** 121:23
122:20 134:22
137:16 149:23
195:2,4 216:8,9
224:21
**known** 10:12
**knows** 57:12
234:10 235:4

___
**L**

**lab** 277:3
**laid** 99:17,18
**landlord** 174:5
**lapse** 85:5 111:13
118:20 265:3
266:5 267:8
**lastly** 213:17
**late** 7:6,7 62:19
195:7
**lateral** 15:19 16:8
21:7
**laughing** 40:19
41:13
**law** 3:2,11 8:15
233:5
**lawful** 259:11
**lawyer** 122:19
**lead** 1:4 11:8 28:15
33:8,13 44:20
46:7 75:12 122:3
139:12 144:1
166:2 208:16
**Learn** 231:4
**leave** 50:14 111:21
195:20 199:5,10
269:11 276:20
**leaves** 225:5
**leaving** 80:21,23
98:14,15,17,19,21
114:20 156:5,6
212:16 251:8
**left** 18:16 62:16
81:23 82:14 83:9
84:3 85:5,18,18
86:7,11 94:16,18
94:19 105:12
112:9,13,17
113:15,16 118:17
119:6 144:1
153:20 154:1,6
245:15 265:18,19

265:19 267:16
286:21 298:7,8
**legal** 57:11 106:24
121:23 122:20
124:11 186:23
252:22,23 254:6
**let's** 21:23 25:2,4
25:10,10,11 26:13
52:8 58:6 61:9
63:20 65:17 86:4
89:20 101:24
107:12 124:18
150:13 168:14
169:13,17 170:14
170:18 171:1
173:6 175:13
179:4 190:16,24
191:15 200:12
202:24 207:1
218:20 230:2
240:23 265:21
**letter** 22:15
**letting** 169:7 275:8
**level** 55:14
**license** 214:10,11
214:15 300:15
**Liciardello** 1:5 3:20
43:10
**lie** 160:11,15,18
185:5 228:16,23
265:22
**lied** 160:7 228:21
229:14,17
**lieutenant** 4:6,6
139:18
**lift** 124:5,10
**light** 108:6 146:5,7
146:13,18 156:11
158:4,9 167:13,13
167:19,21 173:23
174:5 212:23
213:4,9 220:18
221:1,21 228:16
229:14 265:21
288:5
**light-skinned** 217:7
**liked** 268:7
**limiting** 19:19
**line** 225:14 256:21
274:3
**lines** 13:4
**link** 53:8 115:14
116:19 117:3
228:16
**linked** 144:14,16
166:23 288:16
**linking** 157:21

**Linwood** 3:19
**list** 48:6
**listed** 97:18,18
215:8 287:2,5,18
**litigation** 26:22
**little** 36:13 46:13
118:17 126:4,13
126:23 157:11
175:9 278:2
**lived** 48:10,12
49:12 215:15,18
227:22
**living** 16:6 99:20
158:20
**locate** 257:11
**located** 58:4 94:15
142:18 187:8
293:17
**location** 74:21
80:11 81:1 94:7
101:9 132:2
145:18,18,20
194:22 201:20
219:14,17,22
220:19 239:24
242:24 245:15
250:3 251:1,2
253:21 258:15,23
259:1 261:14
263:5 264:21
265:1,7,12,17,18
265:23 266:11
267:17 268:14
269:4 271:1,3,22
272:16 273:23
**locations** 31:22
244:5 254:4 255:7
**lock** 256:4
**locked** 106:17
134:10
**locksmith** 187:12
**logistically** 150:5
**long** 10:20 12:3,24
15:10 19:22 21:2
41:1,4 45:19 75:4
112:8 121:21
122:7 124:10
130:23 136:4
143:8,14 164:10
241:4 246:10
268:8
**long-term** 13:22
16:14 27:18 79:8
**longer** 46:13 164:9
**look** 24:23 32:22
33:6,17 40:23
49:23 52:6 72:5

124:18 126:4
145:18 168:14
173:6 176:8,12,13
177:9,16,21,23
191:1 196:6 232:5
232:16 249:2
273:21 289:8
**looked** 22:18 60:1
60:22 145:19
255:1 256:23
276:18
**looking** 50:1 51:10
66:18 67:3 72:2
81:13 122:24
168:20 173:17,24
176:22 178:10
185:2 208:13
242:17,20 256:12
256:12 279:10
280:18 282:23,24
283:11
**looks** 58:11 113:5
125:6 145:22
175:11 183:14,22
193:5 196:1 202:7
202:10 203:7
205:15 206:8,8
**losing** 18:21 19:15
**lost** 78:9
**lot** 32:8 117:19
162:24 163:4,10
163:10 164:8,10
184:9 191:2
195:13 237:9
240:14 241:6
270:14
**lunch** 150:6
**lying** 158:1

___
**M**

**M** 2:8 3:11 300:14
**M-O-N-A-G-H-A-N**
9:23
**magistrate** 257:1
**main** 268:3
**maintain** 12:6
**maintained** 12:8
**major** 8:7 110:18
111:14
**majority** 60:6
**male** 48:12 90:2,8
90:20 117:7,8
148:16 165:11
217:6,16 292:1,11
292:11,12,21
296:6
**males** 39:21 53:19

53:24 59:3 81:22
88:15 107:18
152:17 249:3,4
250:3 259:3
264:18 265:18
293:7 295:21
296:16,21 297:10
297:14
**man** 249:17
**manager** 117:8
137:3 166:15
168:5,8 174:6
195:18 285:6
**manpower** 20:7
101:4
**marijuana** 38:13
**mark** 4:9 24:19,20
25:11 128:11,12
168:18 170:18
172:19 175:15,16
179:4 200:12
235:14
**marked** 25:14,18
112:21 115:13,23
124:21 125:1
128:16 169:23
170:3 171:10,15
173:2 181:11,14
191:23 200:15,19
218:8,12 235:19
235:23
**Market** 2:5 3:17
113:7 116:2
**marking** 172:22
**marshal** 231:17,19
**MARSHALL** 3:16
**marshalling** 162:20
**masonry** 126:9
**mass** 101:7,8
**Master** 29:19 30:1
31:22,23,24 32:9
33:17 37:24 38:12
38:18 48:12,14
49:5,12 58:22,24
66:16,21 70:8
71:2 80:21 86:12
88:8 90:1 114:24
115:3 116:8,10,11
152:9 154:6
163:21 236:21
237:7,16 238:20
240:14 250:21
252:16 259:23
270:17 284:10
289:19 290:5,8,15
291:10,15,20
293:5,13,15,24

Case 2:14-cv-01643-RBS   Document 61-5   Filed 06/29/22   Page 89 of 102

McIntyre v. Liciardello, et al./Torain v. The City of Phila., et al.                    BRIAN MONAGHAN, 1/17/17

295:9 296:22
297:2,5,15
**match** 279:15
**matter** 300:7
**matters** 207:21
**McCloskey** 4:6
**McINTYRE** 1:3
**mean** 19:18 28:18
36:1 37:15 41:19
42:19 47:8 50:23
53:12 56:3 62:4
63:9 65:11 66:2
72:7,7,9 73:12
107:22,24 132:5
134:13 136:5
143:11 154:16
160:10 164:15
188:8 203:3 205:8
206:17 208:11
211:22 220:22
231:14 262:13
270:19,20 276:17
279:21 284:17
**meaning** 30:22
47:14 64:24
174:23 204:3
225:17 229:4
280:4
**means** 28:19 230:9
232:23 251:24
279:7 280:17
300:19
**meant** 41:10 51:2
95:9,10,12,15,16
95:21 152:22
154:14 284:13
**meet** 86:15 132:18
144:5 195:17
**meeting** 23:22
40:10,11,17
157:13 261:23
288:18,19
**meetings** 40:12,13
**member** 12:16
13:18 14:3,13,22
17:11,15 18:3
19:18 22:1 28:13
30:8 180:7 181:4
204:3
**members** 14:9
75:22 76:7 78:16
118:11 198:21
271:20
**memorandum**
206:1
**memorialized**
236:24

**memory** 135:6
**mention** 106:10
284:7
**mentioned** 25:6
43:20 81:17 88:9
133:11 159:8,9
160:1 257:5
263:23 284:5
295:10
**mere** 222:14,18
227:6
**Merion** 78:10
**mess** 206:10
**messed** 274:20
**messing** 65:8
**met** 94:7 117:18,19
119:5,23 137:7
151:22,23 152:1
152:17 263:15
**Michael** 3:2,2,19
7:24 9:24 284:3
**middle** 89:21
115:20,23 125:18
129:11 157:22
158:17 167:3
212:21 221:18
221:9 222:4
228:17 298:22
**Migel** 59:2 264:1,9
**Mike** 83:15 104:6
120:16 150:4
179:20 187:21
191:14 227:13
229:20 233:7
**million** 190:19
**mine** 191:13 226:1
**minute** 75:6 76:17
76:19 77:4 111:18
112:20 167:15
175:8 234:15
**minutes** 83:4,9
85:19 86:8,12,17
86:18 89:24
112:10 140:24,24
143:22 150:6
291:9,12,19
296:16
**Mirraglia** 3:9
**mirror** 49:22 50:1
**miscalculation**
184:17
**missed** 64:9,13
**missing** 210:10
**mistake** 125:22
185:8,9,10 194:4
194:7 201:6
205:23 206:1,5,13

206:17,22 207:1,5
207:6,10,11,16
208:22,23 223:18
223:19,22 268:21
275:16 281:4
283:5,8,9
**mistakes** 184:3
207:13 208:5,8,10
208:12,15,21
209:2,13,24 229:5
282:16
**misunderstood**
83:20,22
**Mitchell** 59:16,19
242:21 243:7
244:12 247:11
252:19 256:16
**moment** 7:20
**Monaghan** 1:13,18
2:4 5:3 6:9,15 7:8
7:15 8:14 9:18,22
42:9 60:8 124:24
128:19 171:14
188:23 189:14
192:2 200:18
202:1 218:11
226:6 235:22
236:4 280:2
281:11 284:3
**Monaghan-1** 5:10
25:13,18
**Monaghan-10** 5:19
181:10,15
**Monaghan-11** 5:20
191:17,22 192:3
196:8
**Monaghan-12** 5:21
200:14,19
**Monaghan-13** 5:22
218:7,12
**Monaghan-14** 5:23
235:16,18,23
**Monaghan-2** 5:11
124:20 125:1
189:1 192:9 196:6
196:9 286:3
299:11
**Monaghan-3** 5:12
128:13,15 .
**Monaghan-4** 5:13
169:22 170:3
**Monaghan-5** 5:14
170:19 171:9,15
172:6
**Monaghan-6** 5:15
171:10 175:18
**Monaghan-7** 5:16

172:21 173:1
175:19
**Monaghan-8** 5:17
172:21 173:2
**Monaghan-9** 5:18
172:23 173:2
**money** 37:16 59:23
115:13 143:5
214:18 224:15
225:20 226:9,9
**Montgomery** 18:24
**months** 13:24 46:4
46:5,12
**Moon** 59:2 264:1,9
297:17
**morning** 9:15,18,19
136:15 188:9
195:6,10 198:8,9
199:4,5,9
**motion** 5:22 6:22
7:2,9,22 8:3 71:15
217:3 218:14
230:12
**move** 16:8 21:7
50:3 124:6
**moving** 292:6
**MPO** 13:4 17:20

_____

**N**

_____

**name** 6:13 8:24
9:21,24 32:14
35:23 53:21,21
126:12 179:10,14
179:17 180:14,15
182:12 183:17
234:12 236:12
272:7 276:13
286:5 287:13
**names** 36:8 62:18
**narcotics** 12:14,17
12:23 13:7,8,11
13:17 14:13 15:15
16:1,9,9 17:2,10
20:21 27:12 29:24
30:7 38:19,24
39:2 44:13 45:4
47:15 53:23 55:2
55:7 58:18 98:11
110:17 118:12
149:10 201:21
226:13 245:22
250:8 252:9,11
253:13 255:19
294:13
**narrow** 187:22
**Nassau** 113:22
227:4 251:12

298:16
**near** 64:20
**necessarily** 107:22
**need** 10:14 54:22
55:3,15 101:15
124:3 144:17
158:11 179:12
221:24 222:3,11
232:17 246:11
251:17,17 252:15
255:10 256:5,7,7
257:10
**needed** 102:16
158:10 217:12
**needs** 280:11
**neighbor** 237:8
**neighborhood** 30:3
50:10,11 108:23
234:13 235:5
236:11 237:5
239:17
**neutral** 208:14
**never** 31:15 35:14
35:23 40:16 69:8
77:17 78:7 90:18
97:5,12 105:14
115:8 136:17
146:23,24 157:24
158:2 159:10
177:5 214:14
216:3 223:22
225:8 247:9,11
258:16 259:18
260:17 261:14
264:10 268:7
288:11
**nevertheless** 99:19
115:16 134:3
164:23 174:20
**new** 1:23 20:10
**Nextel** 114:2
**NFU** 193:10 201:20
**NFU07423** 26:15
**night** 268:1 276:7
278:14 279:1
281:6
**nine** 112:5 173:6
**nonstop** 64:5
**normal** 217:11
**Norman** 3:20 43:12
**North** 18:7,19,24
19:20 20:11 80:11
80:22 81:6,9,10
82:14 84:17 85:6
85:16 86:10 90:14
90:22 91:6,9
93:18 94:4,18

Case 2:14-cv-01643-RBS    Document 61-5    Filed 06/29/22    Page 90 of 102

McIntyre v. Liciardello, et al./Torain v. The City of Phila., et al.                                    BRIAN MONAGHAN, 1/17/17

96:17 97:5,10,22
98:6 102:8 106:5
106:8 107:4,7,12
107:16 113:15
114:5 116:22
118:12 125:2
126:5 129:8,11
171:5,17 172:5
173:14 183:14,16
183:17 201:2
203:1 216:12
219:6,12,13
292:22 294:18
295:2 298:7
**northbound** 66:15
66:20,24 67:1
290:3,16
**Northeast** 19:4
**northwest** 88:8
295:8
**Notary** 2:10
**note** 130:12
**notes** 5:12 23:4
40:24 86:17,20,22
87:1,3,7,12,15,20
127:24 128:1,3,6
213:16 300:9
**notes/transcript**
128:20
**noticed** 208:12
**noticing** 50:22
**notified** 92:18
216:5
**notify** 206:16
281:19,23 282:3
**November** 11:17
**number** 5:9 88:2
109:9,18 114:5
125:12,13 189:10
192:17,19 200:23
230:16 268:16
271:2 272:23
273:1 279:11
287:17 288:10
**numbers** 190:8,19
191:3 192:9,12,16
193:1,7,13,19,22
234:4 268:22
271:22,24
**numerous** 39:2
53:24 59:1 148:21
293:7 297:19,21

**O**

**o'clock** 60:12
136:14 138:16,16
162:3 163:21

164:2 184:2 188:9
194:9 195:5,9,24
196:15 197:2
198:8,9 199:4,4,8
199:9,21,22 200:4
286:21 294:16
**oath** 11:2 134:24
209:15
**object** 53:22 77:8
190:9 233:18
234:22 239:22,23
**objection** 6:18,23
7:4 42:7 57:10,19
74:4 79:10 155:4
155:9 186:22
202:12 208:18
252:21 254:6
283:1
**objections** 6:5
**objects** 39:23 58:24
243:19 252:6
293:6 297:3
**observation** 145:21
152:8 244:9 256:6
256:7 260:2
**observations** 60:6
96:4 243:6 245:4
245:24 246:8
247:16 251:24
255:4 260:3
**observe** 82:3
108:22 180:11
249:22 289:22
291:2,12,16 293:9
294:22 295:3,13
**observed** 36:21
59:1 64:12 66:12
77:8 86:14 88:7
89:5,9,11 90:23
91:20,22 92:1,3
92:10 94:6,10,12
102:4 106:4 108:6
108:17 111:20
114:23 115:9
142:15 146:12,13
148:12,13 162:12
249:5,8 254:13,15
255:18 289:20
290:3,11 291:3,5
291:14 292:23
293:4,12 294:17
295:7,23 297:1,7
297:8,16,20,23
298:9,11
**observer** 130:20
131:4,6 179:8,11
179:15,18 180:1,4

180:7,11,14,18,21
181:1,4,8
**observing** 111:13
180:1
**obtained** 85:20
138:8
**obtuse** 41:2
**obvious** 170:12
**obviously** 23:8
36:14 39:8 148:7
205:17 206:8
**occasion** 129:5
**occupant** 126:12
286:6 287:6,21,23
288:2
**occurred** 35:24
**October** 128:23
**offered** 232:24
**offhand** 176:7
**office** 22:16 43:2
187:15 210:15
256:23 278:16
**officer** 1:4,11,12,13
1:15 3:19,19,20
3:20,20 4:9 6:15
7:8,15 8:10,14,15
8:16 9:15,17,18
9:18,20,24 10:6
11:15,16,22 12:1
12:6,8 21:9 22:3
25:17 26:18 30:9
30:17 40:1,4,6,18
42:9 43:8,10,12
43:19 44:14 45:15
50:7 58:9 59:16
59:19 60:7,8
65:12 74:1,5,6
76:1 77:2,3 79:7
79:16 81:15,24
84:18 85:5 86:9
88:11 89:4,8,13
89:15 90:4,11,22
92:2,10,13,23
93:4,13,19,21
94:10,11,11,20
95:1,19 96:2,4,5,8
97:9,21,21 99:3
99:23 101:19
102:4 103:22
105:12 106:3
107:14 108:4,16
108:19 109:4,20
112:3,3,13,14,16
112:17 113:17
115:24 116:1
117:6 119:4 120:3
120:4 121:1,6,8

121:21 122:7
123:6 124:24
126:20,22,24
127:1,19 128:19
129:6,10,12,17,18
133:14,15,19,23
134:2,4,6,13
135:11,17,19,21
135:22 137:1,7,9
137:10,17 145:6,7
145:13,14 146:1,1
146:10,12 148:11
148:19 149:19,20
149:21 150:16
152:3,20,20
153:23 154:13
155:16 156:8,10
157:2,12 158:22
159:5 165:9,13,21
166:4,14 167:12
167:15,18 168:4,8
170:2 171:14
172:1 176:14
185:2 189:14
192:2 198:7,16,19
200:2,18 202:1
208:4 212:22
213:3,5 214:6,7
214:12 215:20,23
216:4,19 217:4
218:11 219:16,21
222:19,21 223:7
223:10,15 224:3,5
224:18 226:6,7,17
226:24 228:3,9,23
229:13 235:12,22
236:4 237:13
242:21 243:6
245:1 252:19
256:15 259:2
260:3,23 284:3,7
285:6,15,17,24
288:4,21,22 289:5
289:18 292:23
294:5,17,22 295:4
295:19 296:1,2,8
296:11,12,20,22
296:23 298:13
**officers** 15:24
18:23 19:3 20:9
20:10 21:16,18,20
29:7,13,22 31:5,8
31:10,13,17,19
32:5,16,18,24
33:1,15 37:1,6
43:19 49:3 51:5
53:3 61:5 65:1

66:4 75:13 92:24
100:22 101:17,18
105:15 107:9
114:18 116:15
120:9 128:24
137:13,15 138:12
138:17 142:2,3,14
142:24 144:5
145:3 153:15
154:2 159:5
162:19 166:5
176:16 177:21
189:2 193:2 199:2
199:7,12,15,19
213:14 215:20
216:22 236:6,22
238:6,9 239:10,11
240:16,19 242:23
243:3 252:9
285:10
**official** 223:21
**oh** 51:1 89:20
130:19 135:4,8
154:11 260:12
**okay** 7:18 10:15,16
10:24 11:6,18,21
12:9 13:7 14:3,12
15:10,17 16:3
17:5 18:9 19:6
20:6,15,17,24
22:6,17,23 23:2,6
25:2 26:11,17
30:19 31:3 35:6
35:19 36:18,22
37:4,19 39:4 43:6
43:18,22 44:15,17
45:11 47:17 49:10
52:21 53:5 54:2,9
55:3,6 56:7 57:23
58:6 59:4,9 61:4
63:14 65:19,20
66:23 67:10 69:1
69:11,14 71:11,22
72:1,7,11,14 73:6
74:1 76:17 77:13
77:18 78:1,14
81:2 82:13,20
83:7,23 84:8
85:14 86:4 88:3,5
88:21 89:6 90:6
90:13 91:7,13
92:1,4 94:5,9
96:19 97:3,8
98:12 102:7,17
103:8 105:4,23
106:24 108:8,12
109:8,21 111:4,10

Case 2:14-cv-01643-RBS    Document 61-5    Filed 06/29/22    Page 91 of 102

McIntyre v. Liciardello, et al./Torain v. The City of Phila., et al.                    BRIAN MONAGHAN, 1/17/17

112:16 113:22
114:17 115:5
116:21 117:16
118:6,10,11,17
119:18 120:7
121:5,9 123:9,15
124:14 127:15,23
128:4,8,9 129:2
129:14,20 131:7
131:13 133:8
134:3 135:6
136:12 137:4,9
140:14 144:7,17
146:4 147:2 153:6
153:14 156:4,14
157:17,19 158:1
158:11,22 160:7
160:24 162:3
164:19 166:17
167:22 171:20
173:16,22 174:8
174:11 175:4
177:9 178:13
180:9,18 182:5
184:16 185:1,5
186:6 187:14
194:4 196:9
198:23 200:10
202:15 203:7,15
204:18 205:6
209:23 210:8,23
212:19 213:13
215:14 216:18
217:19 218:3,18
218:22 219:4,13
220:4,13 221:7,12
223:1,10 224:12
225:2 227:10
228:15,20 229:2
231:6,11 232:21
233:22 235:8
239:17 240:7
252:5,8 253:18
254:17 263:3
265:5,14 268:23
270:11 271:5
272:22 288:4
290:14 292:15
298:13
**old** 143:5
**once** 22:15 73:15
73:16 100:6,14
101:8,19 198:23
199:18 205:24
206:1 222:7
**ones** 46:9
**ongoing** 6:18

**op** 193:4,7
**open** 39:9 106:16
109:19 164:14,17
174:23 187:9,13
187:14,18 188:1
194:23 198:5
231:16 233:19,20
234:5 264:4
**opened** 84:23 109:6
109:8,17 134:11
134:12 136:7
146:2,5 147:5,24
165:12 168:6,13
174:21 175:1
176:15 186:8,15
187:10,11 204:2
**opening** 249:9
288:18
**opens** 215:18
**operated** 90:2,7,20
257:5 292:1,4,20
293:14
**operator** 294:1
**opinion** 227:12,16
261:18 262:18
**opportunity** 22:8
24:23 25:7 41:22
228:1
**opposed** 17:15
54:17 55:16
132:14
**Oral** 1:18 2:4
**order** 24:16 53:2
56:20 57:8 96:21
96:24 109:24
116:18 144:13
214:8 229:23
230:8 231:1 232:2
232:3,20 234:5
299:1
**ordered** 262:21
**organization** 27:13
28:7 61:7 75:14
80:1,7 115:14
149:10,13 151:15
151:21 211:17
**original** 123:17
189:6 269:22
**originally** 162:9
**Otto** 4:6
**outer** 164:15
**outlined** 7:2
**outside** 37:17 40:11
40:16 56:4 119:23
134:11,14 135:18
**overheard** 81:15,16
82:1 293:23 294:6

294:8
**owner** 68:22 117:7
126:12 136:19,24
137:6 166:15
285:10 286:6,9,10
287:2,5,15,16,18
287:22

---

**P**

**p.m** 88:6 94:18
106:3 138:16
293:12,21 297:16
299:13
**PA** 66:13
**package** 39:14,17
39:24 278:14
**packet** 264:11
**packets** 60:2 116:4
243:16 297:19,21
**page** 5:2,9 88:2,3
106:2 115:20
118:9 125:18
129:1,3 163:9
218:19 223:1,6
225:12,13 295:6
298:21,22 299:7
**pager** 114:2
**pairs** 65:11 66:5
**paper** 239:7 272:6
**paperwork** 28:22
62:19 63:1,7 83:6
86:2 87:22 89:4,7
92:22 102:24
103:15,18 128:5,7
135:11 138:4,5
147:1 150:20
152:5 158:6,7
162:4,20 163:4
178:22 184:11
195:2,5,7,9,13,20
196:22 198:11
199:18,23 200:3
206:5,10,11,22
207:16 208:6,9,10
208:16,21 209:3,6
209:13,17,19
214:20 219:24
221:7 224:9 229:4
229:5 235:13
242:2,4 254:19
256:13 271:21
272:11,13 274:19
274:19 275:12
280:11 282:15,15
282:16,23,24
283:11,14 284:6
**paperwork-wise**

184:21
**paragraph** 27:21
28:3,5 37:24 38:7
89:21 94:17
115:20 236:3
289:11 297:9
298:6
**park** 19:3 50:22
64:3
**parked** 88:14
295:20 296:9
**parks** 73:18
**PARS** 22:18,21
25:6 26:5 28:22
87:2,3 162:21
195:15
**parse** 40:8
**part** 8:20 14:12 29:5
51:4 63:11 79:24
80:6 87:19 93:11
96:19 137:15
146:21 147:3
148:8 149:12
151:3,15 162:9,16
199:14,16 206:13
206:15 213:20
260:7 261:20,21
265:10
**participate** 13:17
13:18,21 142:16
**participated** 142:12
160:17 161:12
189:16
**participating** 189:2
264:4,6
**particular** 10:2
58:20 65:16,17,19
75:24 77:19 109:9
111:6 116:19
144:14 158:19
183:1 203:15
220:24 233:5
**particularly** 237:18
**particulars** 42:4
**parties** 6:3
**partner** 45:14 58:8
65:12 66:2 160:2
166:4 293:21
**parts** 278:15
**party** 8:22
**pass** 39:11
**passenger** 77:11
290:21
**passing** 45:7
244:10
**patrol** 12:1,6 30:17
237:13

**pay** 81:20,21 82:4
88:7 295:8
**pays** 21:11
**PC** 4:2
**pending** 10:23
138:6
**Pennsylvania** 1:1
1:22 2:6,11 3:3,8
3:13,18 4:4
214:21
**people** 48:3,6 59:1
59:12 60:22
137:18 193:20
248:12 255:2
264:14 265:1
279:8 297:21
**percent** 52:8
**period** 21:24 30:17
85:17 100:9
199:20 268:8
**periscope** 49:17,21
49:24 51:10,12,16
72:3
**Perry** 3:20
**person** 39:19,24
43:3 54:24 56:14
58:5 81:18 103:8
106:18,23 198:4
206:6 208:17
217:13,17,24
218:1,22 219:4,14
219:17 220:17,24
221:1 223:8,11
224:13,19 225:17
235:3 236:11,18
239:15 247:9
252:6 272:14,22
**personal** 7:14
128:6 149:23
216:8,9 233:12
**personally** 64:12
82:3 131:4
**personnel** 163:22
**PFRQ** 277:4
**Philadelphia** 1:10
1:10,11,13,22 2:6
3:3,8,11,13,14,18
4:4 11:9,15,22
14:15 19:20,20
21:9,19 63:9
180:17
**Philly** 11:24 19:2
**phone** 81:20,22
82:4 88:7 114:2
214:19 262:2
285:20,20 295:8
**Photograph** 5:13

Case 2:14-cv-01643-RBS   Document 61-5   Filed 06/29/22   Page 92 of 102

McIntyre v. Liciardello, et al./Torain v. The City of Phila., et al.

BRIAN MONAGHAN, 1/17/17

5:14,15,16,17,18
**photographed**
145:15,15
**photos** 169:16
**physical** 129:7
234:18 243:15
255:10,23
**pick:** 92:19,20 184:6
211:23 253:2,5
254:21
**picked** 91:8
**picture** 168:15
170:21 172:2,22
173:24 175:22
**pictures** 168:24
169:8
**piece** 35:15 36:16
36:19 93:17 239:7
272:6
**pieces** 240:18
272:10
**Pike** 1:23
**pil423@aol.com**
3:4
**Pileggi** 3:2,2 5:4 7:4
7:11,16,17,24 8:1
8:19 9:9,14,24
24:3,6,9,14,19,21
25:16 26:9,12
34:1,5,10,12,16
34:19 35:7 40:15
42:10,14,15 57:14
57:22 63:16 65:23
74:6,9,17 79:13
83:17,19,23,24
104:8,10,15,17
105:1,3,6,9,11
120:18,20,21
121:24 122:2,6,12
122:16,21 123:4,5
124:23 128:1,12
128:18 130:16,19
130:22 131:8
141:9,13,18,22,24
150:8,12 154:20
154:23 155:3,8,11
155:15,23 159:13
159:15,19,21,22
168:18,23 169:2,6
169:10,13,17
170:1,14,18,22,24
171:7,13 172:19
173:5 175:15,17
179:4,22 181:13
187:2,22,24
189:11,13 190:13
190:16,24 191:7

191:11,15,20
192:1 200:12,17
202:15,20,22
207:21 208:2,3,24
210:23 211:3
212:4,7 218:10
219:10,11 225:13
225:15 226:2,5
227:14,18 228:5,7
229:7,8 230:2,5,9
230:13,21 231:2,5
231:11,14,18
232:1,6,13,16,21
233:22 234:6,15
234:20 235:2,8,11
235:16,21 240:3
240:21 249:18
281:24 283:24
284:2,3 288:24
292:16 298:1
299:11
**pill** 183:23
**place** 8:8 36:11
107:22 118:2
222:12 238:18
280:22
**placed** 37:16 116:2
214:7 256:18
297:18 298:16
**places** 33:6 248:15
280:12
**placing** 98:10,18,19
98:21 148:17
226:12 296:18
**plainclothes** 13:10
16:1
**Plaintiff** 1:3,8 3:5,9
**plaintiff's** 10:1
**plaintiffs** 8:2,5
**plaintiffs'** 230:19
**plans** 193:4,7
**plastic** 201:14
**player** 47:14,14
80:7 82:16 151:20
**players** 46:24 49:7
59:10
**playing** 67:20
**please** 231:20
234:21
**Plymouth** 297:2
**pocket** 70:6 77:9
98:10,18,20,22
100:1 101:20
112:1 114:19
115:7 148:15,18
152:9 154:2 156:7
250:7 293:6

297:20
**point** 11:4 18:12
38:2 56:18 59:15
63:6 66:12 68:3
68:16 70:16 80:5
82:13,20 88:19
96:3 97:8 99:6
100:5 106:7 108:1
115:5 120:7,10
127:15 132:21
133:4 139:22
151:10,16,17
153:14 154:10
156:1,9,18 162:3
164:24 172:17
173:16,20 174:9
185:1 195:17,19
196:20 199:2,7
208:15 209:23
211:14 223:7
224:12,15,19
225:16,20 226:17
245:21 246:14
248:4,23,24
250:16,17 258:10
261:3 265:24
274:24 284:14,23
287:1 295:1
**pointed** 168:5
210:2
**police** 1:4,10,12,13
1:15 3:19,19,20
3:20,20 4:9 8:10
11:9,15,16,22
12:8 14:15 21:9
21:14,19 33:1
59:15,19 60:7,7
63:9 65:1 66:3
74:14,20 75:4,18
75:20,24 76:9
88:7,11 89:8,13
89:15 90:4,11,22
90:23 92:2,9
93:21 94:19 95:19
96:2,4,5,8 102:4
106:3 109:20
113:16 115:23,24
116:1 121:5,21
122:7 123:6
129:10,12 138:11
148:11 156:8
165:9 167:20
201:24 216:3
222:21 236:3,6,22
239:11 242:23
243:6 245:1
252:18 256:15

259:2 260:3,22
289:20 292:23,23
293:4,12 294:17
295:7,19,24 296:2
296:8,20,22,23
297:1,16 298:13
**policies** 14:14,16
14:24 17:13,18
57:6,15 62:21
63:10 104:5,21
130:2 189:17
**policy** 14:22
**Popper** 3:6,6 63:15
**popper.yatvin@v...**
3:9
**porch** 38:19 39:1,3
39:6,9,13,17,18
45:8 53:20 54:1
56:4 59:3 127:22
165:15 285:18
297:15
**porches** 37:22
**posed** 230:22
**position** 12:22
46:21 88:13
**positive** 86:18
127:21 134:1,20
163:15 202:2
**possession** 167:10
**possible** 190:22
**possibly** 19:9
153:17 249:3
**predate** 279:6
**preliminary** 5:12
23:4 71:14 128:20
128:21,23 213:3
213:12 275:11
**premised** 121:10
**premises** 96:20,23
286:21
**prepare** 163:4
182:7 268:3
**prepared** 201:7
272:2 280:3
**preparing** 162:21
**prerecorded** 59:23
**presence** 165:17
202:2
**present** 4:7 8:11
31:19 99:23
126:22,24 130:1,4
**preserve** 64:6
**press** 7:19
**pretty** 29:3 46:19
153:2 163:3 184:8
184:17 192:14
**prevent** 121:5

**previously** 80:14
157:6 235:12
**PRFQ** 278:8 279:4
279:9 281:9,18
**printout** 278:7
279:17
**prior** 12:21 22:8
35:9 45:20 47:17
48:3,24 78:1
96:12,13 111:7
134:7 135:23
149:13 213:2
276:5
**private** 7:13 233:12
**privilege** 233:6
**privileged** 24:13,18
42:8
**privy** 228:8
**Pro** 3:15
**probable** 5:23 27:1
27:6 53:13 54:10
54:16,17,21 55:14
55:19,22 82:21
83:13 84:2,5,9,16
85:1,2,3,15,22
86:1,5 93:11
96:16 106:20
108:24 109:3,5
120:10 146:21
147:3,4,12,14,17
147:23 148:3,8,9
149:1,3,6,8,24
155:24 186:19
195:23 206:18
209:4,8 211:15
212:15 213:21
220:10 221:14
222:12,16 235:15
236:1 242:11
243:11,12 246:11
251:18,20,23
252:15,20 253:6
254:2 255:11
262:9,17 266:1
284:17
**probably** 13:1
18:15 31:9 48:21
68:5,7 137:18
140:16 163:6,15
187:13,15 193:6
195:1,3,11 198:13
216:16 272:10
275:10 286:15
**problem** 281:15
**procedures** 14:15
14:16 17:14 57:6
57:16 62:22 63:10

Case 2:14-cv-01643-RBS Document 61-5 Filed 06/29/22 Page 93 of 102

McIntyre v. Liciardello, et al./Torain v. The City of Phila., et al.                    BRIAN MONAGHAN, 1/17/17

63:12 104:22
130:2 189:17
**proceed** 9:9
**proceeding** 10:8
213:2
**proceedings** 67:16
300:7
**process** 162:4,17
195:19 217:11
**processing** 196:21
**procure** 162:5
**produce** 7:8
**produced** 168:21
169:4 191:6,8,12
234:3
**Professional** 2:9
**promised** 7:7
233:11
**promoted** 12:7
**promotion** 15:17,18
**pronunciation**
298:4
**proof** 258:9,16
261:4,10,14
264:23
**prop** 163:11 181:17
204:20 244:1
256:18 270:5,6
271:3,22,23 272:2
272:3,23 273:1,4
273:13,19 274:10
275:16 276:6,8,17
276:18 277:7,8,17
278:3,10,19
279:14,15,22
280:3,6,10,16
**proper** 188:17
**properties** 37:16
53:9,11,15 60:21
100:19 101:7
132:1 142:22
143:6 146:3
163:21 266:14,15
**property** 5:19,20,21
37:17,20 38:1
49:9 53:23 54:23
54:24 55:4,20
56:8 59:2 80:12
81:14 83:11 84:23
85:8,10,21 92:3
93:20,22 94:8
97:12,14,17,18,20
98:2,14,15,17,21
99:1 100:13,13,17
102:13,15,20
103:1,3,6 107:18
108:7 110:16

111:14,16,17
112:4 115:4
117:18,19 118:23
118:24 119:5,6,10
119:12,16,19
120:4,10,13,15,24
121:6 123:9 129:7
129:14 131:11,22
131:24 135:12,13
135:17,18 136:3,9
136:11,17,19,24
137:11 138:1,12
138:17 142:18
144:8,12 145:9,22
147:19,21,23
148:6 149:2,7
151:1,7 152:1,2
153:22 156:7
163:7 164:12
166:8,10,16,24
172:6 173:10
177:8 181:18,19
181:21 182:6,20
183:7,20 184:12
184:14 185:15,23
185:24 186:4,21
187:19 195:18
200:21 203:1,15
203:19,24 204:8,9
204:13 205:1,2,4
205:7,9 206:14
210:3 226:12
238:17 265:4
266:12,16 267:11
267:15 271:15,16
276:22 277:1,1,11
279:1,3,9 283:5
286:9,11,12,13,14
287:3,19 288:3,20
**prosecute** 86:6
206:18
**prosecuting** 209:20
**prosecution** 10:4
54:5 158:12
185:11 208:7
210:17,20 228:12
**protective** 232:2,3
**protocol** 188:17
**provided** 30:19
84:10 96:9,15
145:24 146:11
288:21
**public** 2:10 233:20
**Pud** 28:8 32:15
35:11,23 54:6
238:23 239:12
**pull** 56:2 66:19 94:7

249:5
**pulled** 70:4,7,9,10
73:11,12,14,19
74:16 80:24 86:12
134:23 153:21
245:6 263:7,8
292:13
**pulls** 73:18 257:13
**purchased** 60:1
280:19
**purpose** 117:13,14
144:7
**purposes** 6:15
**pursuant** 57:5
62:21 124:9 130:1
164:19 189:16
**pursuit** 56:15
**put** 8:20,23 9:1
12:18 24:15 36:14
38:6 39:18 64:1
69:1 77:8 86:2
94:2 95:22,24
96:20,23 101:20
111:24 135:11,14
137:19,22 138:4
146:23 154:2
158:6,7 171:3
178:6 184:14
188:14 189:18
190:8 193:5,7,10
193:16,20,22
194:1 199:17,23
199:24 203:8
205:24 206:2
212:20 229:24
240:17 242:1,3
244:1 254:18,23
256:24 268:21
269:8,11 271:8,14
271:16,17 274:20
274:21 275:14
276:12,23,24
277:7,18,21 279:7
279:14 280:1,2
286:7,24 287:13
**puts** 196:12
**putting** 70:6 100:1
114:19 115:7
145:10 148:14
152:9 156:7
245:19 250:7
266:3 271:8
**puzzle** 240:18
**puzzles** 240:17

**Q**

**question** 6:6 10:10

10:12,18,23 79:12
83:12,13,16 88:17
92:4 104:9 111:4
113:11 120:14
122:5,11,15
123:18 129:4
131:13 139:2
141:6 147:16
150:14 159:12,16
159:17,20 168:1
206:12 207:20,24
209:1 210:16
217:1 218:21
219:2,3,13,16
220:2,17,22
222:18 223:2
225:23 229:6
230:14,22 231:6
234:2 235:9
240:10 241:16,18
250:13 255:9,14
261:17 262:13,19
262:21 268:10
275:15 283:2
287:20,24
**questioning** 166:22
223:4 233:18
**questions** 10:3,10
11:3,7,11,12
125:7 159:18
169:8 227:17
234:23 238:14
240:22 241:6,7,14
241:15 252:23
270:10 274:12,13
274:15,17 281:13
284:4 289:3
**quiz** 122:19

**R**

**R** 286:11
**R.P.R** 300:14
**radar** 154:10,12
**radio** 74:14,18,20
75:5,18,20,24
76:5,9,18 93:1
101:1 108:5
139:11 146:17
156:13,15,19
158:8,14 167:20
173:23 176:5
213:6 224:2
251:10 296:5
**ran** 31:6 89:24
237:24 267:6
290:20 291:9
**rang** 262:2

**Ray** 2:8 300:14
**re-created** 19:11
20:11,17
**re-made** 18:18
**re-testify** 40:24
**re-up** 284:8
**reach** 237:21
**read** 27:22 88:3
89:10,22 90:6
94:3 111:19
115:19 129:3
171:22 218:5
225:10 226:1
231:3 256:21
286:6
**reading** 6:3 29:10
87:13 102:22
**ready** 9:9,10 77:20
101:2,23 244:16
262:1 277:12
294:3
**real** 48:22,24 49:2
50:22 204:16
279:10
**realize** 268:2
**really** 33:9 36:20
41:17,18 48:5
61:11,24 95:11
154:14 185:19
206:21 218:14
270:16 285:1
**reason** 62:16 96:1
105:18 148:2
164:2 177:11
266:15
**reasonable** 211:16
242:12,15 247:17
247:19 250:10,17
251:18 252:14
262:16
**reasons** 7:1,21
64:21 65:12
131:21 233:8
**recall** 11:14 12:3,24
14:21 22:3,19
28:11 29:17 30:2
31:12 37:10 47:8
47:10 48:2 61:14
62:7,20 67:11,19
67:22,24 72:5
76:17 87:18
102:24 103:18
109:15 114:10
119:4,8,9 120:3,6
123:1,15 127:18
129:20,23 130:9
131:14 133:18

Case 2:14-cv-01643-RBS    Document 61-5    Filed 06/29/22    Page 94 of 102

McIntyre v. Liciardello, et al./Torain v. The City of Phila., et al.    BRIAN MONAGHAN, 1/17/17

135:20 136:21,22
136:23 137:5,8
140:4 143:14,16
146:14 156:12,14
156:17,19 160:19
160:21 163:23,24
164:1,18,22
165:20 166:1,7
167:4 176:3,6
189:22 190:2,3
194:8,11 197:9,12
197:15,18 199:13
203:11 204:24
211:8 213:1 214:1
215:9,10 217:8,9
260:9 262:23,24
263:3 271:13
275:17 285:2,5,5
285:9,12,22,23
286:1,16
**receipt** 5:19,21
181:17,18,21
182:6 183:20
185:23,24 186:5
200:21 203:16,19
204:8,9,21 205:1
205:2,9 206:14
210:3 244:2
271:22,24 272:3
272:23 273:1,4,13
273:19 276:6,8,18
276:18,22,23
277:1,2,7,9,11,18
278:3,11,19 279:1
279:4,8,9,14,15
279:22 280:6,10
280:16 283:6
**receipts** 5:20 163:7
163:11 181:19
182:20 183:8
184:12,15 203:1
203:24 204:13
205:5,7 256:19
270:5,7 271:3
272:2 274:10
275:16 280:3
**receive** 58:23 61:4
129:6 223:8
224:14,15,20
225:19,20
**received** 22:15 28:6
29:11 53:22 98:24
128:4 235:13
236:4 242:10
**receiving** 54:22
226:9
**recess** 105:7 241:1

**recognize** 169:18
**recognizes** 169:14
169:18
**recollect** 138:11
**recollection** 63:17
129:15 170:7
171:16 172:4
173:19 175:14,23
182:24 190:20
**reconstructed** 20:6
**record** 6:17 8:18,24
9:1,20 24:15,19
24:20 27:24 33:21
34:20 47:11 61:20
105:10 130:12
150:11 171:22
179:7 210:21
229:24 230:3
231:12 232:24
**recorded** 147:1
**recorder** 44:21
58:15 60:16,20
**recovered** 84:22
114:1,12,22 115:8
116:3 145:11,12
145:16 162:18
184:1,1 186:1,10
194:22 195:11
214:20,23 246:4
250:12 252:11
257:23 258:1
271:2 272:8
**Recoveries** 195:11
**recovering** 145:10
**rectified** 283:8
**rectify** 206:23 207:5
**red** 297:2
**refer** 86:17 125:18
127:24 129:1
163:8 205:1
**REFERENCED** 5:9
**referring** 8:4 69:23
86:19,20 87:12
94:17 106:1,2
128:2 205:2
235:14 285:21
**refresh** 129:15
170:7 171:16
172:4 173:9
175:13,23
**refreshes** 182:24
**regard** 240:10
**regarding** 7:14
**regardless** 147:22
148:1
**regards** 6:18,23 8:8
14:18 22:9 23:11

23:15 28:6 35:16
36:9 87:19 106:20
107:4 162:4 207:2
228:11
**register** 48:23
**registered** 2:9
66:14 68:4 69:1
289:20
**registration** 49:8,9
**rehash** 154:19
155:6 167:16
212:3
**rehashing** 154:21
**related** 180:19,21
220:21
**relation** 129:7
233:21
**relationship** 68:21
**relayed** 81:16 92:12
156:8 168:8
245:10 246:16
249:1 250:6 251:6
259:17
**released** 230:10
**relied** 149:20,21
**relocate** 19:16
**relocated** 18:22
**rely** 209:19 248:18
**remain** 267:23
**remained** 267:24
296:23
**remember** 99:15
131:15 134:22
168:10 170:13
172:7,9,10 176:17
213:8,10 224:1,1
224:8 263:4,13
282:8,12 283:9
296:13,14
**remind** 260:10
**removed** 180:13
181:7
**repeat** 10:13 36:12
131:9 199:6
207:19
**repeated** 207:12
**repeatedly** 100:9
159:4 167:17
215:24 216:6
217:23
**rephrase** 10:13
47:12 111:4 209:1
**report** 5:10 22:21
22:22 25:6,23
26:2,3,4,5 36:4,15
48:9 49:16 62:2,8
62:22 71:1 86:20

86:21 87:4,23
107:3 109:12
111:19 113:14
114:8 137:20,22
137:24 138:21
162:21,22
**reported** 93:19
101:19 111:23
**reporter** 2:9,10
300:21
**Reporters** 1:21
**REPORTING** 1:21
**reports** 28:22 36:2
**represent** 24:11
228:9
**representation**
233:16
**represented** 7:5
**representing** 6:15
9:4
**reproduction**
300:19
**required** 62:22
160:22 206:16
**reserved** 6:6
**resided** 216:12
**respect** 55:6 115:7
146:22 199:18
239:9
**respective** 6:2
**respond** 8:3 10:17
219:7
**response** 8:6
**responsibilities**
16:11 64:19
162:17,24
**responsibility**
184:5
**responsible** 182:17
205:20
**rest** 81:20 268:1
286:6 294:3
**result** 243:22
245:10
**retrieved** 106:18
293:6
**review** 22:9,12
41:23 211:6
213:16 273:4,6,16
273:18,20
**reviewed** 22:15,20
22:21 67:12 71:13
157:7 211:8
**reviewing** 128:7
**revisit** 248:23
250:14 261:3
**Reynolds** 1:12 3:20

4:9 8:17 40:4,7,18
43:8,20 89:9,13
89:15 90:11 91:1
91:3,4,8,19,21
92:2,10,23 93:8,9
93:13,19 94:10,11
94:20 95:1,20
96:2,4,8 97:9,21
102:5 103:22
106:3 107:10
108:16,19 109:20
111:20 112:4,14
112:17,21,23
113:6,11,17 115:6
115:17,24 116:22
117:16,20,23,24
118:4 127:1,7
129:6 133:14,15
133:23 134:2,4,6
134:13 135:19,22
145:7 146:1,12
149:22 152:20
153:8,9 154:13
155:16 157:14,16
159:5 160:5,17
167:11 198:19
214:6,7,12 216:19
217:5 219:21
222:20 223:15
224:3,6,10 225:5
225:6 226:24
245:1 249:10
259:2 260:23
263:4 288:22
294:17,17,23
295:4 296:12,23
298:12,13 299:2
**Reynolds'** 192:19
260:3
**ridiculous** 202:14
202:16,17,20
**right** 11:5 14:18,21
18:12,17 20:20
21:16 22:12 23:13
24:22 25:10 27:3
27:21 28:15 32:4
32:7,14 33:3 37:9
37:14 38:11,18,22
42:24 46:6 48:9
48:16,21 49:14,14
55:18 57:3 58:11
58:14 59:10,11,17
60:10,24 61:9,22
63:8 64:22 66:1,4
66:10,18 67:24
68:3,19 70:19
73:8,20,21 75:17

Case 2:14-cv-01643-RBS    Document 61-5    Filed 06/29/22    Page 95 of 102

McIntyre v. Liciardello, et al./Torain v. The City of Phila., et al.                    BRIAN MONAGHAN, 1/17/17

78:3 79:22 81:7
88:6 91:15 94:24
95:6 96:7,10
97:24 99:11
101:12,13,15
103:3,6,9 105:12
106:13 107:11,12
108:15 111:21
112:11,23 113:12
113:20,23 114:9
114:12 115:1
116:8 118:2
119:19 121:12,19
125:5,20 127:18
134:18,21 136:12
139:6,14,23 140:5
140:17,23 142:10
142:13 143:8,11
143:20 146:6
147:7 148:10
150:2 151:2 154:3
154:14 155:11
156:11 157:8,12
162:6,8 163:15
164:6,11 165:5,22
167:11 168:16
171:23 172:11
173:11 174:14,21
175:2 177:13
182:6,17 183:3,9
184:20 185:3,22
185:23,24 186:2,3
186:9,11,16
188:16 192:6,14
192:17 194:2
195:22 196:3,15
201:11 202:3
203:2,13,17,21
206:2 212:9,10,12
212:13,17 213:4,7
217:11,17,18
218:11 219:16,22
220:1,5,7,8,19
221:9,14 222:9
223:12,14,16,18
224:7 226:10
227:11,23 231:23
233:1,2 234:2
241:24 242:12,13
243:21,23 244:14
245:9,13 247:10
247:15,20 248:19
250:6,9 256:1,8
256:10 258:2
259:10 261:8
262:3 269:17
270:23 272:4

273:7,14,19,23
274:9 276:12,13
266:19
277:3 280:12,13
280:14 284:19
285:7 287:4,11,17
288:24 293:21
297:19
**right-hand** 26:14
125:12
**Rights** 180:17
**ring** 114:2,3 116:6
**ripped** 201:13
**Robert** 4:6
**roll** 237:3
**rolling** 64:4 211:10
**Ronald** 29:13
**room** 8:16 42:22
43:2 109:1 135:23
136:6 138:18
144:16 168:2,3,5
176:4,16 177:21
213:11 220:24
221:1,4,22
**rooming** 99:7
212:16
**rooms** 167:23,24
168:2 268:7
**rounding** 144:23
**roving** 91:18 92:18
248:9
**row** 126:8
**rule** 55:23 56:23
**rules** 10:8 62:24
63:8
**rumors** 19:12
**run** 267:1
**running** 28:8 29:1
78:21 115:3 132:8
259:24 266:17
**runs** 56:4,14 60:13
132:7

_____
**S**
_____
**safe** 177:8 178:2,6
178:11,14,17,20
183:22 184:19
186:7,9,11,13,15
187:9 194:20,21
194:24 197:3,3,5
197:6,11,16,19,21
197:23,24 198:5
198:24 199:19
200:4 203:20
204:1,2,9 205:9
280:1,3
**safes** 279:24
**safety** 8:9 9:7 56:11

66:4 175:7 176:13
266:19
**sake** 117:24
**sale** 252:8
**sales** 29:24 32:8
39:3 45:4 52:24
53:5 55:4 236:19
236:20 237:17
238:12,20 240:12
252:18 264:5
**sample** 202:1
**Sanders** 165:10
285:13
**Santarone** 23:19,19
23:20,24 24:1
42:22 43:1
**sat** 157:3
**Saunders** 126:14
126:17 136:19,24
137:3 165:10,14
165:24 166:3,9
285:7,11,13,24
286:11
**Saunders'** 285:11
**saw** 39:10 47:21
58:20,23 59:5
66:19,22 67:1,21
70:4,5 73:6 77:4
79:22 89:13 91:4
92:23 93:19 97:21
101:20 108:17
111:24 146:18
150:17 153:10
154:2 156:4 158:8
173:23 175:24
178:2,4,9 211:24
212:15,23 219:21
221:21 226:11
233:19 246:16,23
252:17 253:9,12
253:19,22 255:2
261:5 262:6 264:4
264:6,20 276:18
290:23 291:19,22
292:6 294:11
295:15 296:19
**saying** 40:24 85:15
101:1 142:1 147:2
156:17 161:13,14
174:5 185:22
195:3 204:19,19
207:8,15 208:4
223:22,24 237:1
246:14 255:19
270:23 277:17
278:1 290:12
294:8

**says** 28:3 29:11
37:24 38:11 39:1
60:5 66:12,13
90:19,19 97:9
105:23 106:2
113:14 114:10
115:22 118:9,11
125:9,20,24 126:5
126:8,12,14
150:20 178:22
182:2 183:13
184:18 189:2
200:22,23 201:13
201:18,24 218:21
219:12 220:13
221:8 223:10
224:8,9 225:11
227:15 235:13
236:3 283:12
286:5 287:10
289:12 290:7,14
291:8,11,24
292:19 293:20
295:6 296:7,8,15
297:10,14 298:6
**scenario** 133:7
**scene** 108:9,11,12
108:17 127:19
166:6
**scheduling** 7:6
**scheme** 26:3
**Se** 3:15
**sealing** 6:3
**search** 5:11 14:1
16:17 28:23 44:7
44:8 54:16,21
55:16,20 56:24
57:7,9,17,17,24
58:3 66:7 84:17
84:17 85:16 96:16
97:10,17 100:21
103:12,22 104:20
109:1,22 116:11
121:7,10,15
123:10,12,14,21
123:23,24 124:3
124:10,15,18
125:2,8 126:3
136:10 137:11
138:2,6,8,13
139:5,9 142:16,22
145:4,23 160:17
160:19 161:12,22
162:5,13 176:21
177:10,13 183:8
184:24 188:6,8,13
188:14,20 189:3,7

189:16 190:17
191:2,5 192:6
193:21 194:9
197:2 198:14
200:7 201:21
206:14 209:8
235:24 268:4
269:8 271:2,16
276:16,17 286:8
299:5
**searched** 97:12,14
102:18,20 103:2
136:17 157:23
213:18 228:3
**searches** 13:19,21
13:23 14:4,10,19
15:8 16:17,22
142:13 143:15,24
**searching** 14:6
56:24 124:5,6,7
143:12,19 144:22
177:11,12,14
**Sebring** 113:7
293:13
**second** 44:16 58:6
58:7 59:9 65:7
73:15 84:24 89:9
94:17 109:2,2
110:6,24 124:15
127:24 134:7
165:4 200:11
228:6 231:20
247:12 262:21
282:13 285:1
288:9
**Secondly** 7:11
**Seconds** 262:2
**secure** 60:14 85:12
110:16 118:13,15
118:24 120:24
121:1,2,6 131:11
132:1 133:1,2
136:6,11 144:8
149:2 150:17
177:7 195:21
222:8 266:2,12,15
266:16 267:11,14
267:17
**secured** 76:2,4
113:5 119:6,10
129:12 136:3,8
138:1,3,3,6,22
144:10 145:21
266:14 268:12,14
**securing** 137:10
138:12,17 164:21
199:3,8,20

Case 2:14-cv-01643-RBS    Document 61-5    Filed 06/29/22    Page 96 of 102

McIntyre v. Liciardello, et al./Torain v. The City of Phila., et al.                    BRIAN MONAGHAN, 1/17/17

security 64:21
65:11
see 25:7 26:14 28:9
30:12 35:2 38:14
38:20 39:5,10,14
41:22 49:6 50:5,5
51:22,24 52:10,15
52:23 53:17 58:17
59:10,12,14 60:20
61:1,17 62:12
66:23 69:9 72:22
73:1,10,17,18
74:15,23 75:1
76:23 83:2 89:20
100:6,11,12,16
101:5 117:15
125:19 126:4,13
138:7 140:12
147:21 150:1
154:8 158:24
164:12 169:13,17
176:11 177:23
178:10 182:10
186:2 190:18
192:8,12 193:18
197:22 215:15
220:23 225:3,4,22
226:3,7,10 244:7
244:8,19,20 252:3
252:4 253:15,16
253:17 257:9
264:12 269:16,17
269:18 288:15
297:12
seeing 37:10 80:16
197:18 249:13,14
283:12
seen 35:22 56:19
69:8 78:2 86:9
98:4,6 100:1,9
108:20 144:24
211:20 216:3
222:21 223:8
224:13,19,24
225:16 226:18
257:5
sees 219:17 220:17
220:18
seizing 252:2
seizure 14:4,19
16:22 54:17,22
55:21 57:17
109:22 138:8
184:24 194:10
201:22 235:24
seizures 14:10 15:8
sell 39:12 59:1

246:6
seller 55:8 77:24
80:1,7
sellers 261:23
selling 238:18
243:13,14 256:2
258:5,10,17 261:6
261:19
send 59:15 150:16
161:16
sense 174:14
sent 7:12 256:23
sentence 293:19
296:7
separate 91:17
109:11,15 113:9
140:2 186:4
Sergeant 3:19
33:20 127:13
203:17 204:7
sergeants 100:24
series 10:9 37:5
58:17
serious 184:8,17,22
serve 116:11
served 21:24 35:1
set 17:13,17 20:9
20:10 51:8 63:21
63:23 64:2 66:10
116:23 153:21
289:19
sets 84:21
setting 153:18
setup 58:8,11
Seven 175:20,21
Shawn 45:17,19
46:11 64:15 167:6
263:7,9
sheet 87:9,10
216:17 270:17
271:11
sheets 270:15,17
270:19,20,20
shift 163:12
shifting 126:24
ship 279:5
shooting 133:6
shoots 132:7
short 6:17 55:19
81:21 113:2
143:21 240:23
short-term 13:13
15:7
shorthand 300:21
shortly 6:22 294:13
show 25:4 29:1
75:15 78:21 104:7

104:14 120:17
158:15,18 170:15
200:10 255:11
showed 76:13
142:15 157:15
179:11 299:5
showing 171:14
181:14 192:2
200:18 218:11
235:22
shown 143:1 170:2
shows 265:22
272:13
side 51:24 52:1
77:12 157:20
173:10,13 196:5
254:23 290:21
side-view 173:18
sight 291:4
sign 203:13 204:15
204:17,23 269:9
269:10,13,15
273:7 278:4
signature 256:22
256:24 269:17,19
299:6
signed 182:14,21
184:6 198:14,15
203:16,20 204:7
204:11,21 254:3
256:22 277:12
significance 72:14
106:13,20 146:16
significant 72:8,10
106:1
signing 6:3
signs 204:16 277:8
278:4 280:4
similar 13:6 27:15
159:24
simultaneous
174:8
simultaneously
139:20 240:16
285:16
Sinclair 127:13
130:10 131:14,18
140:15 141:16
182:22 183:1
193:8 203:21
single 6:24
sir 27:14 131:2
179:6,10,24
180:10,12
sit 130:24 213:14
268:7
sitting 8:17 43:3

49:20 204:12
207:4 209:9
213:11 249:21
268:19
situation 281:4
282:5,6
six 171:1
sixth 212:5
skills 252:10
skip 293:19 297:10
small 39:23 172:10
172:14 252:6
293:5 297:20
sold 38:19,24 53:24
59:3 237:7,10
255:19
solely 84:9,18
Solicitor 23:9
Solicitor's 22:16
43:1
somebody 30:3
35:22 39:15 54:18
64:23 65:4 74:15
74:22 78:12 81:17
126:14 131:24
132:6,7 158:19
164:13 176:12
177:5 178:5
195:21 202:7
204:20 207:9
208:15 225:7
234:13 237:4,6
255:16,18,20
256:2 264:3,11
266:3 285:20
292:4 296:4
son 285:11,14
soon 259:22 262:2
277:10
sorry 24:1,2 25:9
54:2 63:22 70:14
77:14 96:13
109:13 115:19
118:10 126:23
131:1 175:16
178:18 218:20
223:2,9 257:4
281:15 288:9
sort 115:13
sound 71:23 219:2
sounds 154:5
source 29:12,23
30:2,15 31:1,4,4
31:14,16,21,24
32:1,7,13 37:1
49:4 53:3 229:19
229:22 230:16

231:8 236:5,10
237:21 238:8,11
238:16,21,23
239:9,15,18,19
240:4,11,12,13
241:13,16,18,22
242:22 243:3
sources 15:3,5
232:12 233:13
south 3:7 17:24
18:1,7,19,24 19:2
19:20 20:8 88:16
97:9 106:4 193:10
200:23 219:6
295:22
southeast 293:24
southwest 15:16
18:1,14 19:2
106:6 201:21
294:20
speaking 285:23
special 12:19
specific 11:12
32:11 107:22
109:1 145:9
241:14 278:15
specifically 14:18
37:9 87:6 95:1
109:2 167:2
197:15 224:5
specifics 22:7
speculation 227:6
Speiser 3:19 43:14
spell 9:21
spend 164:10
spent 238:3
Spicer 3:19 43:16
split 132:20
spoke 285:24
squad 188:7,11
272:22
stamp 26:8,13 88:3
289:9
stamped 191:14
stand 39:16 87:17
124:7
standing 50:20
53:20 71:1 129:13
134:11,14,20,21
135:5 137:14
164:21,22 290:8
293:23
start 25:4,10 33:16
218:20 293:20
started 11:17 22:7
48:21 58:24
starting 259:24

Case 2:14-cv-01643-RBS    Document 61-5    Filed 06/29/22    Page 97 of 102

McIntyre v. Liciardello, et al./Torain v. The City of Phila., et al.                    BRIAN MONAGHAN, 1/17/17

**starts** 223:2,6 289:6
**stash** 38:12 238:17
**stashed** 150:19
**state-funded** 19:14
**stated** 11:6 59:7
  84:7 99:23 119:14
  134:19 148:21
  226:11 227:21
  233:8 236:19
**statement** 6:17
  60:5 94:1 95:23
  152:10 227:5
**STATES** 1:1
**stationary** 88:13
**stationed** 30:16
  46:21
**status** 12:6,8
**stay** 144:22
**stayed** 137:10
**steal** 159:1,7,10
  215:21 216:2,4
**stenographic** 300:9
**step** 15:23 231:19
**steps** 71:2 290:8
**stick** 50:11
**stipulated** 6:1
**stole** 159:10 160:1
  160:5 215:23
**stop** 64:5 77:22
  79:2,17 95:3,4,7
  95:11,12,15,21
  101:4 132:9,16,18
  154:13,16 155:16
  155:17,18,21
  223:11,16 224:2,6
  224:10 250:9
  251:10,13 253:24
  258:5 259:12
  260:4 261:9 270:3
  293:14 299:2
**stopped** 64:7,8
  72:19,21 73:8
  79:4 84:21 94:22
  100:5 113:6,18
  115:23 116:1
  118:21 161:15,17
  224:3 239:19,21
  246:4,7 247:9
  251:5,11 258:16
  259:2,18,21
  260:17 261:14
  271:20,22 298:15
**stopping** 95:16
  251:14 255:2,15
  256:3
**stored** 111:1
**story** 183:2 253:15

253:16,17 254:16
  254:17,18 256:20
**straight** 80:16
  238:5
**street 1**:22 2:6 3:3,7
  3:12,17 13:11
  15:7 16:18 17:6
  29:19 30:1 31:22
  31:23,24 32:9
  58:24 66:15,20
  71:17 72:18 73:20
  73:24 74:24 77:13
  80:11,21,22 81:3
  81:7,9,10 82:15
  84:18 85:6,16
  86:10,14 88:8,12
  88:15 89:12,17,19
  90:4,14 91:3,6,20
  91:22 92:7,8,11
  92:16 93:2,5,18
  93:18 94:4,19
  96:17 97:5 102:8
  103:12,19,23
  105:13,22 106:1,5
  107:4,7,13,16
  113:7,16 114:5,20
  115:3 116:8,11,11
  116:23 117:6
  118:12 125:3
  126:5 129:8,11
  140:17,21,23
  141:16 143:20
  144:2,21 150:16
  151:19 152:9,16
  153:7,13,16 154:7
  157:14 162:6,9,14
  163:21 164:7,11
  166:13 171:6
  172:6 173:14
  181:21 183:14,16
  183:18 192:23
  195:17,21,24
  196:16 200:23
  203:2 212:9,12
  213:18 215:3,19
  215:21 217:6
  219:6 237:23
  238:1,2,7 239:20
  240:5,6 248:6,7,8
  251:3,8 252:16
  258:19,21 259:23
  260:5,12 262:4,22
  264:15,16,16
  267:1,15 270:18
  271:9,12 284:10
  285:4 290:4,8,15

290:16,20 291:15
  292:22 293:13
  294:18,19,20
  295:2,9,20,21,22
  296:9,10,17,24
  297:2,5,16 298:8
  298:16
**strike** 12:14,17 13:7
  13:8,18 14:1,3,9
  14:13,22 15:4,10
  15:24 17:3,16
  27:16 30:6,10
  46:15 152:11
**strong** 255:6
**stuff** 13:3 14:24
  35:1 141:8 142:15
  234:19 270:14,21
  272:8 278:16
**subject** 24:4 229:23
  232:19 240:11
**submarine** 49:18
**submit** 103:14
  172:1 175:21
  189:5 192:5
  218:13 231:23
  234:1
**submitted** 62:23
  92:22
**substance** 116:4
**sufficient** 54:10
  82:21 85:21
**suggest** 184:18
**suggests** 103:15
  184:17 185:14
**Suite 1**:22 3:7
**summary** 87:9,10
  87:11 270:20
  271:11,14,17
  272:9,10,12,13
**SUMMIT 1**:21
**supervising** 74:9
  75:8
**supervision** 300:20
**supervisor** 29:4
  33:15,16,18 75:11
  127:11,12 129:21
  130:1,6 131:10,12
  131:14,19,22
  132:2,10,17,19
  135:16,18 139:10
  139:16 161:21,24
  166:7 193:14
  203:16 204:11,22
  204:23 206:16,21
  216:5 256:21
  268:23 269:2,3,5
  269:9,10,13,21

273:14 277:8
  278:4,14 280:4
**supervisor's**
  193:12,18 269:17
  269:19 299:6
**supervisors** 19:24
  139:17 140:2,6,21
  141:14 142:5,6
  183:3
**supervisory** 267:19
**supposed** 188:16
  189:18 219:1
  251:13 286:7
**suppress** 5:22
  71:15 217:3
  218:14
**suppression** 23:5
  275:20
**sure** 11:1 22:2 28:1
  32:16 47:10,10
  55:1 63:4 64:20
  65:5,7 67:23
  71:10 76:21 77:21
  77:23 78:12 80:2
  80:3 87:11 90:17
  94:15 97:15 99:13
  99:17 102:1
  108:20 116:14,15
  116:17 118:24
  121:19,24 127:10
  128:3 135:5
  137:13 139:1,3
  164:3,13 166:11
  172:15 173:20
  175:6 179:2
  187:10,17,21
  197:7 198:3 211:6
  213:12 214:24
  215:1 216:22
  220:15 221:4,6,22
  226:23 246:6
  249:15 263:15
  264:9 266:13
  267:12 268:1
  269:1 271:17
  273:6,18 274:9
  275:21,23 277:16
  282:12 283:20
  296:4 298:3
**surprise** 215:12
**surprised** 195:14
**surveillance** 16:24
  17:1,2,6,9 51:9
  58:8,12 63:21,24
  65:14 66:11 68:14
  75:21 76:2,4
  81:14 91:18 92:18

119:17 153:18,21
  206:15 242:24
  243:18 248:10
  289:19
**surveilled** 37:6
  80:16
**surveilling** 86:8
  108:9,11
**suspicion** 36:10
  120:11 151:10
  152:15 211:16
  217:22 242:12,15
  247:17,19 250:10
  250:17 251:18
  252:14 262:17
**suspicions** 153:24
**suspicious** 154:5
**sworn** 6:10
**synonymous** 95:16
  224:6
**system** 191:12
  205:24 206:2

_____

**T**

**T-O-R-A-I-N** 10:6
**tactical** 238:14
**tag** 66:13 69:4
  297:3
**take** 10:19,21 16:11
  32:22 33:6 66:2
  105:5 143:8 150:6
  187:5 204:21
  220:22 240:23
  241:6 277:3,12
  281:20 289:8
  297:3
**takedown** 44:11,12
  110:18 111:15
  112:15 119:15
**takedowns** 13:15
  13:16 15:6 77:21
  184:10
**taken** 2:5,7 85:4
  105:7 170:21
  172:20 241:1
  271:23 272:5,14
  274:7 300:9
**takes** 143:9,10
**talk** 33:15 75:22
  165:13 166:2
  214:8 230:19
  237:22 240:4,19
  240:20 249:18
  263:22
**talked** 31:5,7,16
  76:19 165:9
  237:23 239:15

Case 2:14-cv-01643-RBS    Document 61-5    Filed 06/29/22    Page 98 of 102

McIntyre v. Liciardello, et al./Torain v. The City of Phila., et al.                    BRIAN MONAGHAN, 1/17/17

240:8 275:19
**talking** 23:21 30:18
31:17 69:17 92:6
92:8 105:13
123:12 166:5,6
167:6 168:4,15
174:6 210:23
226:20 237:6
253:10 264:15
272:12 284:18
285:10
**tall** 217:6
**tape** 44:10 60:19
64:8 211:18,21
**tapes** 210:15,17
211:5,7,13
**target** 286:8 287:4
**targets** 257:11
**task** 21:8,10,22
**team** 14:5,7 75:14
75:23 78:16
103:11 137:15
159:14 193:23
198:21 199:15,16
238:14
**telephone** 137:5
165:19
**tell** 23:7 26:2 29:23
32:7,10 42:1
69:11,14 70:2,16
70:17 75:17 78:20
93:5 95:4 117:20
121:20 153:15
157:2 163:18
167:23 179:13
189:1,4 190:11
199:2,7 214:13
223:10 225:6
226:24 227:3
238:16,23 249:17
267:17 279:21
292:12 293:24
295:14
**telling** 32:21 42:13
98:9 135:2,4
141:7,8,9 212:23
242:16 255:18
256:1 262:15
265:22 277:6
**ten** 12:5 30:13 48:6
63:3,5,6,18 86:18
101:13 112:5
144:24 175:16
237:13
**ten-year** 30:17
**term** 80:8 106:24
**terrible** 190:11

**test** 13:2 202:1
**Testa** 16:4 17:22
**tested** 198:24
201:24 202:2
256:18
**testified** 6:10 42:1,4
42:17 67:23 71:16
87:6 122:23
128:24 134:24
135:3 154:19
157:3,13 158:22
159:4 160:10
163:19 167:17
209:20 211:9
215:23 216:24
217:4,22 218:3
228:9,10,20 229:3
235:12 276:1
282:8,9 283:3,4
285:15
**testify** 163:17 176:3
213:15 223:24
275:10 281:13,14
283:2
**testifying** 67:19,22
119:4 176:4
209:15 218:24
219:1 276:5 281:6
**testimony** 5:22
22:9 71:14 73:16
84:1 91:10 102:17
109:14 112:16
119:22 120:3,17
124:8,14 127:23
134:19 138:10,15
140:1 141:13,23
144:10 146:10
154:23 159:2,23
160:5 164:19
168:7 174:3
195:16 197:9,12
203:23 206:4
207:3 209:2 211:9
216:11 217:3
218:4 219:3,9
220:1,5 221:8,20
227:10,15 228:11
236:9 265:17
275:18,24 276:3
283:12 288:4
300:6
**Thank** 6:13
**Thanks** 26:11
159:21
**thing** 8:13 10:18
43:24 49:15 138:7
149:22 185:18

187:8 202:13
239:10 249:13,14
251:6 252:17
255:5 268:6
**things** 41:21 45:8
60:22 124:5,6,11
159:24 233:14
297:6 298:20,23
298:24
**think** 10:20 15:14
34:24 42:6 46:13
47:21 56:16 63:3
64:2,8 87:12
102:23 131:13
133:19,21,23
136:8 156:23
158:10 163:6,14
164:8 166:19
178:5 188:1
189:12 194:4,13
198:4 199:14
202:11 210:12,16
210:21 212:15
214:4 215:2,4,20
216:18 220:9
225:22 228:6
231:22 233:8,17
234:17 267:18
269:14 276:2
277:22 282:7
285:19 286:2
**thinking** 299:1
**third** 64:23 126:5
244:17 247:13,14
257:8
**Thirdly** 7:18
**Thomas** 3:20
**thought** 34:7,8,19
85:3 91:1 92:15
99:16 111:24
134:16 148:2
165:11 172:13
177:3 192:22
221:22 263:6,11
263:14
**thousand** 248:15
**three** 5:20 37:5
46:12 61:11 80:10
80:13,19,20 84:3
87:24 88:2,15
89:24 99:8,14,16
100:9 101:12
107:18,21 108:18
112:8 114:4 116:6
137:18 140:2
141:1 143:9,14
145:1 149:14,14

152:17 163:20
191:17 192:5
193:15 201:13,15
212:16 222:24
242:21 244:5
249:3,4 250:3,23
252:20 259:3
260:16 261:23
264:13,18 265:18
270:18 288:8,12
288:17 291:9,12
291:19 296:16,21
297:10,14
**three-day** 44:3
**three-story** 126:8
**Thursday** 61:19
183:21
**tie** 258:4
**Tillman** 80:15 84:4
86:7,11 88:11
92:14 93:6 99:24
100:4 107:15
111:21 151:24
154:6 226:20
250:24 264:17
295:18 296:17
**time** 6:6 7:9 10:21
12:7 17:23 18:5,6
18:21 19:14 20:13
21:24 24:22 31:9
32:4 33:1 35:12
35:13 36:17,18
39:20 41:1,4 47:6
49:13 51:8 52:14
52:20 54:4 60:11
60:13,24 62:23
64:3 68:14 69:19
69:20 70:23 71:1
71:3 72:4 73:2
74:22 75:16 77:23
77:23 78:24 79:8
79:9,22 80:2
81:21 82:8,17,24
84:7 85:4,5,6,10
85:13,17 89:4
90:5 91:21 95:14
95:20 100:21,23
101:3 105:8 110:8
111:13,17 113:2
114:11,22 117:5
118:20,20,21,23
119:14,17 121:14
132:16,18,23
133:2,18 142:4
143:9,10,21
148:12,16,20,23
149:9 152:14

153:19,20,20
155:20 157:15
162:23 164:3,10
165:23 166:7,19
167:10,12 170:24
183:5,7 184:14,23
185:19,21 186:1
198:7,17 199:20
199:21 203:24
204:10 205:8
206:20 211:19
212:3,5 215:21
217:24 221:5,16
221:19 222:17,22
224:22 237:20
238:3,12 241:2
248:11,16 249:22
251:11 252:12
259:6 261:5
263:11 264:5
265:3,9 266:6
267:8 268:9 272:8
272:15 273:23
274:8,21 275:13
276:13,19 277:23
278:4 279:18
280:7,12,22,23
281:24 282:1
283:16,17 284:21
285:4 286:20
290:7,14,17 292:2
292:10
**times** 14:8 27:23
122:15 132:1
148:22 158:23
184:9 204:13,14
252:5 266:14
**tinted** 60:2 116:3
297:19
**title** 166:9
**Tobacco** 21:1
**today** 7:3 8:11 10:3
10:8 135:7 233:10
233:19
**today's** 22:8
**told** 29:18 31:24
33:6 34:7,10 37:1
38:4,7,16 42:11
42:18 53:3 69:21
74:13 81:5 82:1
84:19 87:21 92:14
95:19 103:21
107:6 108:10
115:6 117:24
148:2,12 149:15
151:6 153:23
154:13 155:16

Case 2:14-cv-01643-RBS    Document 61-5    Filed 06/29/22    Page 99 of 102

McIntyre v. Liciardello, et al./Torain v. The City of Phila., et al.                    BRIAN MONAGHAN, 1/17/17

156:10 158:8
167:12,18 168:8
197:20,23 198:2
215:11 223:7,16
224:5,10,19
229:17 238:9,21
239:2,9,10,11,13
245:5 255:22
256:2 263:19
267:18 276:1
288:11 294:22
297:7
**tomorrow** 279:2
**top** 49:21 88:2
127:10 298:22
**topic** 263:21
**Torain** 1:7 3:5 8:20
8:22 10:4 22:3,10
23:15 47:5,5,13
52:16 61:2,6
68:12,13,16,21
69:9,14 70:3,10
70:11,17 80:12
84:9,13,15,21,22
85:4,18,20 86:6,6
86:15,16 87:24
88:16,18 89:11
90:3,10,21,23
91:20 92:10,23
93:5,19 94:8,13
94:16,18,22 95:2
95:20 96:20,23
97:4,18 98:5,7,13
98:15,19,23 102:2
102:9 105:19
106:4,7,10 107:6
112:4,18,19,23
113:5,12,15,19
114:1 115:11
116:24 117:3,13
118:13 119:6
127:2 128:21
144:14 146:11,22
147:7,22 148:1,16
148:19,24 149:3,7
153:7 156:24
157:22 158:18
166:23 167:9
173:18 180:6,6,20
180:22,24 181:3
186:8,20 194:1
195:10 207:2
209:9,21 210:18
210:21 211:4,10
211:13 212:21
213:24 216:12
218:15 222:3

225:3,4,7,8,18,18
226:7,14,15,18
227:1,19 228:16
229:16 244:7
246:21 249:8
251:7 257:5 258:4
258:10 260:11,13
260:22 261:6,10
261:19 264:17,19
265:19 271:9,12
272:5 282:17
284:4 286:24
288:16 292:3,21
292:23 294:17
295:1,22 298:7,15
299:2
**Torain's** 87:19
147:18 221:17
223:5 228:11
229:3 287:13
**touching** 243:19
**training** 12:21,23
13:1,2,5 14:13
17:20
**transaction** 156:3
253:13
**transactions** 17:7
37:7,10 39:6 45:8
52:10 55:2,8
58:18 59:15 60:19
115:1 149:11
253:23 294:13
**transcript** 223:1,20
223:21 300:10
**transcripts** 23:1,2,3
67:12
**transfer** 12:18
15:19
**transferred** 12:14
12:18 39:14
**travel** 106:5 294:18
**traveled** 66:14
**traveling** 66:20,23
290:3 293:13
**trial** 6:7 23:5 71:15
87:5,6 213:2
218:13 228:11
**tribunal** 185:6
**tried** 101:9 117:2
119:24 127:16
166:17 168:9
174:9,20 184:10
184:12 202:18
212:19 253:1
277:22
**trivia** 121:22

**true** 50:13 121:13
123:22 136:18
158:10 212:24
227:24 242:9
243:9 247:2
250:18 256:9
258:12,24 274:4
292:5 300:10
**truly** 207:6
**trunk** 297:4
**trust** 248:18
**truth** 135:2,4
**try** 50:21 60:17 64:5
92:20 117:15
144:13 150:1
165:8 168:3 174:4
206:22 254:21
281:5
**trying** 60:14,15
100:22,24 141:5
147:11,17 166:20
166:21 187:22
202:7 203:5 206:9
221:13 239:14
253:12
**Tuesday** 2:7 61:18
**turn** 72:19 218:19
221:22 289:8
**turned** 45:3 290:16
290:16
**turning** 60:19
**twelve** 112:5
**two** 18:7 20:2,3
29:22 31:5,7,13
31:17,19 32:5,24
36:8 37:1 44:2,9
49:3 50:10 51:5
52:2 53:3,11,14
59:8 78:1 80:16
81:22 84:21 85:11
89:24 109:9,15,18
114:5,11 126:10
129:8 137:18
141:14 142:1,13
145:1 152:7 169:2
170:24 172:20
183:22 188:24
189:11 200:24
203:1 205:11,15
205:16 210:9,9
238:6 243:3 244:4
244:9 256:13
257:4,6 284:4
287:7,11,17,21,22
287:24 288:10
291:9,12,19
**type** 62:4 115:12

147:1 233:21
241:19 242:7
246:11 255:10
256:8 267:5 277:7
279:1
**typed** 202:13
205:11,12,17
275:13 280:4
**types** 76:22
**typewriters** 205:15
205:16
**typing** 208:21 279:9
279:12
**typo** 125:10
**typographical**
61:23 88:10
208:22 223:19,20

_____

**U**
**U.S** 293:7 297:22
**ultimately** 205:21
208:16
**Um-hmm** 81:8
**unclear** 36:13 39:4
**undercover** 16:2
44:13,14 251:6
253:23 255:3,16
**undergo** 12:21
17:20
**underneath** 125:12
178:2
**understand** 10:14
74:18 106:19
133:4 144:20
207:19,23 252:13
255:21 262:7
267:21 268:5,10
274:23
**understanding**
19:10 34:2,4 57:5
92:21 121:3 236:9
289:17
**understands**
207:22
**understood** 10:18
97:20 233:14
**uniform** 13:10 16:1
184:11
**uniformed** 30:9
79:16 94:21
101:18 113:18
137:15,17 199:15
216:21 298:15
**unimportant** 36:19
37:2
**unit** 12:19,20 15:15
15:22 16:9 17:15

17:23 18:3,23
19:18 20:21 21:24
28:13 30:7 33:4
45:22 56:21 78:12
97:11,14 100:2
102:18 106:21
107:20 108:18
110:22 116:19
117:4 137:18
146:12 151:5
154:1 156:5 159:6
171:17 176:1,8
178:16 180:17
182:19 183:2,22
188:2,6 192:22
193:6 194:8
195:21 197:2
199:3,8,20 201:21
209:7 218:16
271:20 285:3,17
**UNITED** 1:1
**units** 18:4,13 38:24
58:21 142:13
143:19 158:24
162:18 237:12
**unknown** 39:22
297:3
**unlawful** 57:16
**unmarked** 76:21
**upstairs** 288:13
**use** 14:24 15:4
16:19 76:5 158:16
193:10 203:4
**uses** 106:16,21
**usually** 271:14

_____

**V**
**van** 44:8 49:20,20
49:22 50:14,24
51:10,23 64:20
65:5,8,9 66:19
67:4,5,9 71:18
75:21 76:2,4
290:1 295:16
297:8
**vehicle** 44:7,8 51:5
67:21 68:1,18,22
70:5,10,12,13
72:10 76:21,24
77:4,7,12 80:24
81:6,22 86:15
88:23 90:23 92:19
92:20 93:1,6
94:20 106:7
108:13 112:22
113:17 115:23
148:15 215:1

SUMMIT COURT REPORTING, INC.
215.985.2400 * 609.567.3315 * 800.447.8648 * www.summitreporting.com

Case 2:14-cv-01643-RBS Document 61-5 Filed 06/29/22 Page 100 of 102

McIntyre v. Liciardello, et al./Torain v. The City of Phila., et al.

BRIAN MONAGHAN, 1/17/17

217:16,18 224:3,4
224:6 249:21
250:23 251:11
257:6 292:24
295:1 297:15
298:14
**vehicles** 76:22
91:17,18 94:21
113:10,18 298:15
**vent** 49:22
**venue** 6:19 7:22
**vestibule** 124:12,13
165:16 168:10
**vests** 143:4 144:23
**video** 44:21 58:15
60:15 64:4,14
67:22 71:22 82:11
144:24 211:19
**Videographers**
1:21
**videotape** 44:9,11
44:19,21 51:15,18
52:4 60:13,18
64:18 67:17,20,20
71:9
**videotaped** 44:4,9
51:15 60:7,10,21
67:10
**videotapes** 210:8
210:13 211:10
**view** 73:3,14,15,19
73:22 77:16
**Vincent** 126:14,16
136:24 137:2
286:11
**violating** 230:24
**visiting** 239:18
**voter's** 48:22
**voters** 49:8
**vs** 1:4,8

_____ W _____

**W** 4:3
**wait** 111:18 112:20
136:14 163:22
164:4 167:15
175:8 234:15
**Waites** 126:14
**waiting** 120:5
**Waits** 286:11
**waived** 6:4 24:6
**waiving** 7:4 290:12
**walk** 108:23 204:12
204:14
**walked** 157:20
168:12 297:5,15
**Walker** 1:11 3:15

5:5 8:11,15,23,24
41:20 42:3,16
69:24 70:2,16
74:14,19 75:1,9
75:18 76:10,15
77:3 80:9,13,20
81:5 84:18 85:5
86:9,14 87:19
88:12 89:5 90:4
90:22 91:7,22
92:13,17 93:13,21
94:3,6,11 96:5
97:21 98:9 99:3
99:23 101:19
102:4 107:17
108:4 109:4
111:20 112:3,13
112:17 113:1,6
115:6,17 116:1
118:4 119:5,12,15
119:18 120:1,2,4
127:4,6,19 129:12
129:17 133:8,19
134:17,18,20
135:11,17,22
137:9,10 138:24
144:9 145:6 146:1
146:10,12 148:11
149:21 152:20
153:8 156:8,10
157:2,13,14
158:22 160:7,16
164:12,20 167:12
167:18 173:22,22
174:5 180:3
198:16 212:22
213:3,5 215:23
216:4 219:17
222:21 223:7,11
224:10,18 225:3
226:7,11,14,17
228:9,23,23
229:14 241:3
249:23 253:4
254:10 262:15,20
269:24 270:3,4,12
274:22 281:15,16
282:4,13,14 283:7
283:21 288:22
292:23 293:2
295:19 296:8,12
296:20,23 299:4,8
**Walker's** 41:23
84:10 192:17
288:4
**walking** 148:14
238:1,2

**Walnut** 1:22
**want** 8:19 11:12
21:23 24:10 44:23
49:23 68:7 77:18
80:8 83:5 90:6
95:22,24 100:11
130:11,14 131:21
132:20 141:20
155:17 171:3
179:5 185:5
187:16 201:5
217:12 232:2
235:9,14 241:8
270:6 274:9
281:19 286:16
289:8,11,16
293:19
**wanted** 15:22 20:1
22:6 44:10,11,14
44:17 66:5 75:22
77:21,22 95:17,18
100:6,16 101:5
137:21 154:8
163:19 164:3
204:16,22 217:15
**wanting** 164:1
**wants** 131:1 231:7
**WARNER** 3:16
**warrant** 5:11 53:13
53:14 54:17 55:15
55:16,21 57:1,7
57:18 84:17 85:16
93:17 97:17 103:3
103:8 109:22
110:8 111:8
116:12 121:2,7
123:12,13,14
124:3,9,15,18
125:2,8,13,17
126:3 130:6 133:1
133:3 136:13,15
136:21 137:12
138:2,6,8,13
143:10 145:23
147:15 161:5
162:6,9 164:24
176:24 184:20,24
185:15,20 188:9
188:13,15,21,22
189:7,24 191:6
194:10 195:23
196:1,14 197:1
198:14 199:11
200:7 201:22
206:14 209:8
235:24 242:20
244:5 254:4 268:4

268:15,18,22
269:8,12,13,23
271:2,16 276:16
276:17 286:2,5,22
287:9 299:5
**warrantless** 121:10
121:15 123:10,21
123:24 161:12,22
**warrants** 14:2,5,19
16:22 28:23
100:21,23 101:14
139:5,9,19 142:9
143:9 145:5
162:13 163:20
164:2 183:8
188:20 190:17
191:2 192:6 193:2
244:15 255:7
257:2 260:1
270:22
**wasn't** 19:13 20:13
27:15 36:20 38:8
47:16 77:23 80:2
82:9 89:19 92:17
93:11,16 101:7,23
110:13 118:23
138:24 143:17
146:23 147:2,16
150:18,22 151:3,6
151:11 161:3,8
164:17 165:19
166:13 172:11
176:14 184:1
186:11 187:8,21
190:7 194:17
201:7 211:18
213:20 217:23
218:15 221:6
229:10 237:4
238:2 264:1
267:12 271:15
283:8 287:2,5,18
**watched** 118:23
**watching** 65:4 94:3
220:13,15 259:4
296:24
**way** 13:8 25:4,5
28:11 40:1 46:14
47:8 54:2 55:18
57:23 67:8 77:18
86:22 115:17
120:1 130:3
152:21 153:4
186:19 196:1,23
197:4 205:11
206:7 209:3,9,11
211:24 213:13,23

240:12 241:20
242:7 266:16,21
266:22 271:8
277:14,15
**ways** 121:18,19
122:22 205:18
**we'll** 8:3 26:13
109:1 117:10
126:16 169:19
175:18 185:1
190:18 217:1
231:24 234:9
254:17 262:7
263:21
**we're** 7:21 10:8,20
17:19 27:23 76:2
92:8 105:14 122:9
122:19 126:22
132:18 149:17
176:22 177:14
189:18 231:16
**weapons** 38:13
**Wednesday** 61:17
**weed** 116:4
**week** 7:8,12 61:14
62:9,10
**weeks** 169:2
170:24 172:21
**welfare** 8:10
**went** 15:15 18:24
19:3 41:15 44:24
49:15 59:24 72:18
74:3,20 75:4 76:9
76:18 77:15 80:10
80:21 81:21 83:3
83:8,11 87:22
89:17 90:14 91:3
93:5,22 94:12
97:22 100:12,12
102:3,8,12 103:6
103:12 105:24
107:16,18,20,23
108:2,6,13 110:16
113:1 115:2 118:6
118:12,13,24
119:23,24 123:24
124:2 129:10
136:6 137:11
138:2 140:23
142:18 143:20
145:17,20 146:11
148:6 149:2,15,24
150:23 151:7
152:1,1,12 158:12
161:11 162:4
164:12 167:19
168:5,23 171:17

Case 2:14-cv-01643-RBS   Document 61-5   Filed 06/29/22   Page 101 of 102

McIntyre v. Liciardello, et al./Torain v. The City of Phila., et al.                    BRIAN MONAGHAN, 1/17/17

172:16 174:3
175:24 176:8,16
178:1,5 184:19
185:14 193:4,6
194:8 200:5,6
207:12 215:20
216:2 217:6,21
221:1,4,8,12,18
222:1,4,14,23
224:3 242:24
243:7 245:5 248:5
248:7 252:16
253:13 255:1
256:14,15,21,22
256:24 257:3,9
259:4,23 262:3
265:1,3 266:6
268:23 276:17
285:4 286:15,18
288:5,8,13 291:4
294:10 298:20,24
**weren't** 46:3 59:7
154:7,10 193:3,21
228:8 265:8
**west** 11:23 18:1
37:24 38:12,18
48:12,14 49:5,12
90:4 193:11
**westbound** 89:12
106:5 290:15,20
293:13 294:19
**whatsoever** 115:12
120:11 153:24
288:7
**white** 50:7,10 51:5
276:12 292:11
**wide** 19:18
**wild-goose** 144:21
**willing** 15:22
**window** 51:19,20
52:1,1 72:3,3
133:21 173:16
174:1
**windows** 51:12
**witness** 5:2 23:23
24:1 34:14,23
35:5 40:12 55:9
57:13,21 59:21
71:5 72:20,22
74:1,2,13 79:11
105:2 130:15,17
130:20 155:21
170:13 187:1
208:1,20 211:1
212:6 226:4
234:12 249:20
253:1 254:8

270:11 274:18
282:2
**witnessed** 72:21
**wondering** 191:4
**word** 203:4
**words** 20:8 36:14
36:22 41:15 44:18
47:22 49:2 60:19
64:10 76:5 80:1
95:19,22,24
107:24 124:2
147:18 151:20
158:16 177:3
221:12 226:6
**work** 18:24 20:3,10
33:5 39:10 46:15
66:5 114:4 116:7
164:5 195:22
239:20
**worked** 11:7 30:4,5
30:6,7,9,13 45:19
117:15
**working** 20:9 46:11
64:14,18 66:11
91:15,18 140:7,8
140:15,20 145:3
198:7,11,12,16
237:10 238:13
239:19 276:8
**worried** 85:8
110:19
**wouldn't** 75:10
103:23 107:21
120:8,15,23
123:19 124:3
135:14 136:10
160:21 166:2
174:14,15 176:21
177:10 185:16
190:8 195:14
199:17 208:14
231:2 233:11
236:14,16 255:23
272:9 281:19
**write** 236:16 239:5
270:21 271:21
**writing** 87:18
231:22,24 234:2,9
234:23 237:1
**wrong** 63:6 101:10
111:18 163:18
175:9 186:1 206:6
220:23 232:10
241:24 242:1
274:11,20,21
275:4,13,22 276:6
276:9 282:10,21

283:13,16,17
**wrote** 239:6 272:4
**www.summitrep...**
1:24

**X**

**X** 276:13
**XI** 300:15

**Y**

**YATVIN** 3:6
**yeah** 15:23 19:22
26:9 34:12 36:13
36:17 46:5 50:6
51:7 62:15 63:22
64:13 74:6 75:16
79:1 81:11 87:2
89:11 91:14 92:17
97:16 102:19
105:6 113:9
116:13 117:5
132:24 143:18,18
143:23 146:7
153:1,4,11 154:11
158:10 159:19
160:15,19 164:8
168:17 169:17
171:19 175:1
185:4 190:1 203:6
205:11,14,16
207:7,9 208:12
209:16 213:16
220:4 221:6,10
226:4 229:18
243:16 252:5
255:12 256:11
260:15 263:6
265:11 269:6
270:24 271:6
272:2,21 273:8,10
280:13 281:1,8
285:19 290:13
**year** 15:12 17:20
19:6 45:22
**years** 12:5 30:13
41:1,6,10,11
122:8 123:7
171:21 209:10
237:11,13
**yell** 73:17
**yelled** 71:3 72:10
72:15 290:10,18
**yelling** 290:23
**Yep** 144:11
**yo** 71:3,4,11 72:1,7
72:11,16 73:17
152:4 240:13

290:10,12,18,23
**YOUNG** 4:2

**Z**

**ziplock** 116:3

**0**

**02161** 300:15
**07** 100:21
**07424** 106:2
**07425** 88:4 94:3
115:21
**07426** 118:9
**08037** 1:23

**1**

**1** 136:14 162:3
184:1 188:9 194:9
195:5,9,24 196:14
197:2 198:8 199:4
199:9
**1/3** 88:9
**1/4** 182:2 203:20
**1/4/01** 182:1
**1/4/2000** 61:21
289:12
**1/4/2001** 61:24
**1/5/01** 201:10,18
**1/5/2000** 125:20
**1/5/2001** 125:14
**1:00** 125:24 126:3
138:16 199:21
201:11,12,19
**1:30** 64:2
**1:41** 63:22
**1:43** 293:12
**1:55** 293:20
**10** 179:4
**10:05** 2:8
**10th** 4:4
**11** 58:12 60:12
**12** 200:12 237:10
**124** 5:11
**128** 5:12
**13** 41:6,10,11
209:10 237:10
**13-2773** 1:5
**1301** 60:6
**14** 11:17 20:16
**14-1643** 1:13
**14th** 3:12
**15** 41:1
**1500** 1:22
**1515** 3:12
**16** 41:1 171:21
**1600** 91:6
**1610** 1:22

**1621** 90:3,14,22,24
97:9 101:24 106:4
152:12 216:12
220:12 292:22,24
294:18
**1628** 80:11 81:6,9
82:14 84:17 85:6
85:16 86:10 93:18
94:3,18 96:16
106:8 113:15
114:5 117:6
118:12 125:2
126:5 129:7
145:20 171:5
173:13 183:15,16
183:17 201:2
219:5 258:20,21
295:2,22 296:24
298:7
**1658** 80:22 81:6
129:10
**169** 5:13
**17** 1:19 2:7 201:16
**171** 5:14,15
**173** 5:16,17,18
**17th** 18:24
**181** 5:19
**1880** 4:3
**19** 46:18 78:14
**19-year-old** 48:11
**191** 5:20
**19102** 1:22 3:8,13
**19103** 3:18 4:4
**19106** 3:3
**1988** 11:17 237:14
**1998** 12:9 237:14
**19th** 11:23 12:4,19
29:12 30:12 32:24
33:5 46:14,16,17
46:21,24 47:6,15
236:5,22

**2**

**2** 45:12 46:2 163:21
164:2 198:9
**2:00** 106:3 294:16
**2:05** 88:6 295:7
**2:35** 297:1
**2:37** 297:16
**2:58** 94:16,18
113:12,15 118:18
298:7
**20** 78:2 83:4,9 85:7
85:19 86:8 123:6
140:24 143:22
163:6 225:14
296:16

Case 2:14-cv-01643-RBS    Document 61-5    Filed 06/29/22    Page 102 of 102

McIntyre v. Liciardello, et al./Torain v. The City of Phila., et al.                    BRIAN MONAGHAN, 1/17/17

**200** 5:21 52:7,8
**2000** 3:17 15:14,15
  18:10 20:22 45:23
  88:10 125:10
**2001** 40:20,22
  45:12 46:2 88:10
  128:23 135:7
  289:13 295:11
**2004** 18:15 19:8
  20:16,22
**2017** 1:19 2:7
**215** 1:23 3:4,8,13
  3:18 4:5
**218** 5:22
**229** 97:19 105:20
  105:22 215:7
  216:16
**229s** 35:21 36:1
**23** 128:23
**230** 3:7
**2308223** 205:3,8
**2308224** 205:10
**235** 5:23
**241** 5:5
**25** 5:10 140:24
**250** 114:12
**28** 122:8
**284** 5:4
**289** 5:6
**29** 78:14
**2nd** 51:9 61:18

**3**

**3** 295:10
**3:17** 113:8 115:22
**3:30** 139:4 142:9
  182:2 183:5,6,21
  203:20
**3:40** 299:13
**3:50** 118:7,9,10,11
  127:16 136:14
  164:7 285:4
**3:55** 129:9
**3:58** 118:8
**30** 78:2 129:1,3
**303** 3:3
**360** 50:5 52:4
**3730** 1:11 116:1
  192:17
**3rd** 58:7 61:17
  277:2

**4**

**4** 138:15 199:4,8
**4:00** 60:12 199:20
  200:4 286:21
**424** 1:23 107:11

**4268** 1:12 94:20
  115:24
**447-8648** 1:23
**45** 150:6
**4700** 78:10
**48** 272:18,20
**49** 22:22 25:6,23,24
  26:6 87:12,15
  138:7 289:5
**4th** 44:11 61:10
  62:10 63:20,20
  178:4,6,14,20
  183:21 184:10
  279:7 283:4

**5**

**500,000** 270:1
**503** 3:7
**52** 218:20
**53** 218:19
**54** 223:2,6 225:13
**546-5700** 3:8
**55** 223:1
**55th** 80:11,22 81:2
  81:7,9,10 82:14
  83:11 84:18 85:6
  85:16 86:10,13
  88:12,14,16 91:6
  91:9,11,20,22
  92:6,8,10,16 93:2
  93:5,17,18 94:4
  94:18 96:17 97:5
  97:22 98:6 102:8
  106:6,8 107:4,7
  107:12,16 113:15
  114:5,20 116:22
  117:6 118:12
  125:2 126:5 129:8
  129:11 140:17,21
  140:23 141:16
  143:20 144:2,21
  150:24 151:19
  152:16 153:7,13
  153:15 154:7
  157:14 162:6,8,14
  164:7,11 171:5,17
  172:5 173:14
  181:21 183:14,16
  183:17 192:23
  195:17,21,23
  196:16 200:23
  201:3 203:1
  212:12 215:19,21
  219:6,6,12,13
  248:5,7,8 251:3,8
  258:19,21 260:5
  260:12 262:4,22

**264:**15,16,16
  267:1,15 271:9,12
  285:4 295:2,19,20
  295:22 296:9,10
  296:17,23,24
  298:8
**5600** 29:19
**5605** 29:19 32:12
  37:11 38:18 39:3
  48:12 49:5,12
  53:19,20 58:22,24
  59:2 71:2 100:17
  100:21 115:2
  139:5 141:1 142:3
  142:13 162:5
  183:8 188:20
  192:6 193:2
  237:18 238:18
  259:23 290:8
  297:15
**5607** 29:20 32:12
  37:11 38:11 48:14
  49:5 58:22 100:17
  116:7,11 139:5
  141:2 142:3 162:5
  183:8 188:20
  192:6 193:2
  237:19 238:17
  293:15 297:1,5
**5609** 29:20 32:12
  37:12,24 49:4
  58:22 100:18
  139:5 141:2 142:3
  142:13 162:5
  183:9 188:21
  192:6 193:2
  237:19 238:16
**567-3315** 1:23
**56th** 30:1 32:9
  33:17 66:15,16,20
  66:21 86:12 88:8
  90:1 113:7 114:24
  115:23 116:2
  236:20 237:7,16
  238:20 240:13
  250:20 289:19
  290:4,4 291:10,20
  293:5,24 294:20
  295:8 296:22
**575-2626** 3:18
**587-1678** 4:5
**5th** 125:9 178:4,6
  178:18 184:2
  204:4 277:4,4

**6**

**6** 171:15 172:6

**601** 2:5
**6061** 1:14 236:4
**609** 1:23
**61st** 113:22 227:4
  251:11 298:15
**627-8516** 3:4
**6828** 88:16
**683-5381** 3:13
**6B** 2:6
**6th** 217:2 218:4

**7**

**7423** 289:6
**7424** 89:21 289:9
  298:22
**7425** 298:22
**7549** 25:24 26:1
  37:5 105:23

**8**

**8** 183:14
**800** 1:23

**9**

**9** 5:4
**985-2400** 1:23
**99** 12:10,11
**99028** 191:18
  201:22