EXHIBIT "4"



Transcript of the Testimony of

# BRIAN REYNOLDS

July 28, 2021

# KAREEM TORAIN

*- vs -*

# CITY OF PHILADELPHIA

Reliable Court Reporting

Phone – 215-563-3363

Fax – 215-563-8839

www.reliable-co.com

1          IN THE UNITED STATES DISTRICT COURT
       FOR THE EASTERN DISTRICT OF PENNSYLVANIA
2

3    KAREEM TORAIN,
                                  :
4                    Plaintiff,:        Civil Action
                                  :     No. 14-1643
5        - vs -                   :
                                  :
6    CITY OF PHILADELPHIA, et :          Lead Docket No.
     al.                          :          13-2773
7                                 :
                 Defendants.:
8    ------------------------

9

10          TRANSCRIPT OF DEPOSITION, taken by and

11   before KIMBERLY CHATBURN, Professional Court

12   Reporter and Notary Public, at the Law Offices of

13   Michael Pileggi, 303 Chestnut Street, Philadelhia,

14   Pennsylvania 19103, on Wednesday, July 28, 2021,

15   commencing at 10:20 a.m.

16

17

18                       - - -

19

20                       ┌─────────────────┐
                         │     COPY        │
21                       └─────────────────┘

22

23              RELIABLE COURT REPORTING
                   1650 Arch Street
                     Suite 2210
24              Philadelphia, PA   19103

Page 2

```
 1  A P P E A R A N C E S
 2
 3
 4            LAW OFFICE OF MICHAEL PILEGGI
             BY: MICHAEL PILEGGI, ESQUIRE
 5           303 Chestnut Street
             Philadelphia, Pennsylvania 19103
 6           Attorneys for the Plaintiff
 7
 8
 9            MARSHALL, DENNEHEY, WARNER, COLEMAN &
             GOGGIN
             BY: JOHN P. GONZALES, ESQUIRE
10           2000 Market Street
             Suite 2300
11           Philadelphia, Pennsylvania [!ZIP2]
             Attorneys for Police Officer Reynolds
12
13
14            CITY OF PHILADELPHIA LAW DEPARTMENT
             BY:  JOSEPH SENGOBA, ESQUIRE
15           1515 Arch Street
             14th Floor
16           Philadelphia, Pennsylvania [!ZIP3]
             Attorneys for City of Philadelphia
17
18
19
20  A L S O   P R E S E N T
21  Jeffrey Walker - pro se
22
23
24
```

Page 3

```
 1              I N D E X
 2
 3  WITNESS                           PAGE
 4  BRIAN REYNOLDS
 5
 6    By:  Attorney Pileggi              4
 7
 8
 9              - - -
10
11
12
13
14
15              E X H I B I T S
16
                                   PAGE
17  NUMBER       DESCRIPTION        MARKED
18  Reynolds-1   Warrant              16
19  Reynolds-2   Property Receipts    79
20  Reynolds-3   Warrant             113
21  Reynolds-4   Sworn Statement Of J. Walker  129
22
              - - -
23
24
```

Page 4

```
 1          (By agreement of counsel, the
 2  sealing, filing and certification of the
 3  transcript has been waived; and all
 4  objections, except as to the form of the
 5  question, have been reserved until the time
 6  of trial.)
 7
 8          BRIAN REYNOLDS, after having been
 9  duly sworn, was examined and testified as
10  follows:
11          ATTORNEY PILEGGI:  Before we
12  begin let's put on the record that this is
13  the deposition of Brian Reynolds.  All
14  parties were noticed.  Specifically I
15  noticed Mr. Gonzales with respect to his
16  client, Officer Reynolds, who is present.
17  Also present is Jeffrey Walker, defendant
18  Jeffrey Walker.
19  And I also noticed the City defendants who
20  are represented by the City solicitor's
21  office, Jonathan Cooper and Joe Sengoba.
22          The deposition was supposed to
23  begin at 10:00.  It is now 10:20.  The City
24  defendants are not present.  We are going
```

Page 5

```
 1  to commence the deposition.  If they come
 2  in we will put on the record then when they
 3  come in.
 4          ATTORNEY GONZALES:  The witness
 5  is going to read and sign.  And just as a
 6  dove tail to what Mr. Pileggi said as far
 7  as notice, et cetera, I note in the email
 8  sending the Notice of Deposition for
 9  Officer Reynold's deposition that
10  Mr. Walker was not included on that email
11  and nor did I receive any other
12  notification that Mr. Walker had been
13  notified about the deposition.
14  So if there was another communication with
15  Mr. Walker --
16          ATTORNEY PILEGGI:  And let me
17  just say for the record, pursuant to the
18  Judge's order that Mr. Walker was to be
19  involved and was representing himself pro
20  se, I did send a notice to Mr. Walker with
21  regards to today's deposition and evidently
22  he obviously he appeared.
23          ATTORNEY GONZALES:  Okay.  I
24  would just ask moving forward that any
```

KAREEM TORAIN - vs -
CITY OF PHILADELPHIA

BRIAN REYNOLDS

Page 6

1  communication with any of the parties that
2  the other parties be notified of those
3  communications.
4           ATTORNEY PILEGGI:  And I believe
5      I did.  I will look on a break.
6  BY ATTORNEY PILEGGI:
7  Q.    Ready to begin?
8  A.    Sure.
9  Q.    Can you state your full name for the
10 record, please.
11 A.    Police Officer Brian Reynolds,
12 R-E-Y-N-O-L-D-S, badge 4268.
13 Q.    And you're a Philadelphia police officer,
14 correct?
15 A.    Yes.
16 Q.    And how long have you been a Philadelphia
17 police officer?
18 A.    28 years next month.
19 Q.    Right now what are your duties?
20 A.    I'm assigned to the traffic district
21 administrative duties.
22 Q.    How long have you been in traffic?
23 A.    2012 with a year off and then I was
24 reassigned back there.

Page 7

1  Q.    In 2013?
2  A.    2015 I believe it was that I was reassigned
3  back there.
4  Q.    You also said you're in an administrative
5  capacity.  What does that mean?
6  A.    I handle paperwork that deals with sporting
7  event details.  There's also as well construction
8  details and also truck escort details.
9  Q.    Okay.
10        Just as an aside, I think I actually saw you
11 on TV at the ESPN event of the NFL draft.  Was that
12 you?
13 A.    NFL draft?  Could've been.  I did work the
14 draft on the Parkway, though.
15 Q.    All right.
16        Prior to 2012, what was your capacity as a
17 police officer?
18 A.    I was in narcotics field unit.
19 Q.    How long were you in the narcotics field
20 unit?  And let's just for the record, can we say
21 NFU?
22 A.    Sure.
23 Q.    How long were you in the NFU?
24 A.    I'd go from like 1999 to 2012.

Page 8

1  Q.    Just briefly what were some of your -- what
2  were some of your duties in the NFU?
3  A.    We would surveil drug dealers, we would
4  arrest drug dealers, conduct search warrants, we
5  would do buys.
6  Q.    Am I correct that you were more long-term
7  investigations as opposed to perhaps those in the
8  strike force that are more short-term?
9  A.    Correct.  We did long term as well as short
10 term investigations there.
11 Q.    Okay.
12        Am I correct in the majority of your time in
13 the NFU you worked with Jeffrey Walker?
14 A.    Somewhat, yes.
15 Q.    When you say somewhat, what do you mean?
16 A.    I worked with him.
17 Q.    Well, he was your partner, correct?
18 A.    There was a group of us that worked
19 together, yes.
20 Q.    Okay.
21 A.    He worked alongside myself and Officer
22 Luciatello (ph).
23 Q.    You mentioned Officer Luciatello.  Do you
24 know when he came into the NFU?

Page 9

1  A.    I do not.
2  Q.    Did you work with Officer Walker, former
3  Officer Walker, up until 2012 when you left the NFU?
4  A.    He had went to a different squad prior to
5  that.  I'm not exactly sure of the time frame.
6  Q.    You worked with Officer Luciatello then?
7  A.    Yes.
8  Q.    You also worked with an Officer Sean Kelly,
9  correct?
10 A.    Correct.  That's when I first went to the
11 NFU.
12 Q.    Do you know when Officer Kelly left the
13 unit?
14 A.    I do not.
15 Q.    You also worked with an Officer Brian
16 Monaghan, correct?
17 A.    Correct.
18 Q.    Was that in 1999 until some future date?
19 A.    I'm not sure when I started to work with
20 Officer Monaghan, but at some point I did work with
21 him.
22 Q.    Okay.
23           ATTORNEY GONZALES:  Hold on.  Can
24      you just wait one second?  I just was

Page 10

1    notified by the City Law Department that an
2    attorney would like to join.
3            THE COURT REPORTER:  Are we going
4    off the record?
5            ATTORNEY GONZALES:  We are going
6    off the record so I can call him and have
7    him join.
8            (At this time, a short break was
9    taken.)
10  BY ATTORNEY PILEGGI:
11  Q.    Officer Reynolds, let's go back to 2000.
12  Do you recall who was in the NFU squad at that time?
13  What other officers?
14  A.    I know it was Officer Kelly, Officer
15  Monaghan, Walker may have been there.  I'm not
16  exactly sure of the other officers.  Not sure if it
17  was Brad Mitchell, Jimmy Johnson.
18  Q.    Who was your supervising officer at that
19  time in 2000?
20  A.    That would have been Sergeant Gessner, I
21  believe, and Corporal Sinclaire.
22  Q.    Okay.
23      Are you aware, I believe Sergeant Gessner is
24  deceased; is that correct?

Page 11

1    A.    I did hear that.
2    Q.    Okay.
3        Corporal Sinclaire, is he still with the
4    department?
5    A.    No.
6    Q.    Do you know when he retired?
7    A.    No.
8    Q.    Any other supervising officers?  I
9    understand there was a sergeant, a corporal, um --
10  A.    We had a lieutenant.  I don't remember who
11  the lieutenant was.
12  Q.    Okay.
13  A.    We also had a captain.  I don't remember
14  who that was.
15  Q.    Okay.  All right.
16      So I am going to -- at least the next set of
17  questions I want to keep it to 2000, the early part
18  of your tenure in the NFU.
19      Do you recall the Kareem Torain grab which
20  you're here to testify about today?
21  A.    I read the paperwork on it, yes.
22  Q.    When was the last time you were able to
23  review the paperwork?
24  A.    Just before we got here I went over it with

Page 12

1    my attorney.
2    Q.    Okay.
3        Do you recall what you reviewed?
4    A.    We reviewed what I did; my part of the
5    investigation.
6    Q.    Was that the 48?
7    A.    It would be the PARS report that my
8    attorney showed me.
9    Q.    Did you review any property receipts?
10  A.    Did not.
11  Q.    All right.
12      Pursuant to your review of the PARS report,
13  after you reviewed that, did that refresh your
14  recollection as to what your role was in that
15  arrest?
16  A.    Yes.
17  Q.    Okay.
18      I am going to give you an opportunity, so
19  let's do that now, based on your review and based on
20  your recollection of what happened, what happened?
21  A.    There was some observations that were made
22  of Torain at 56th and Master.  He was then followed
23  over to a house on Conestoga Street.
24  Q.    Let me stop you and ask some questions.

Page 13

1    You said there were some observations made?
2            ATTORNEY GONZALES:  Do you want
3        him to answer your first question before
4        you interrupt him and ask the second
5        question or --
6            ATTORNEY PILEGGI:  I want to ask
7        him as we go along because I want to have a
8        full record and I want to make sure that he
9        has every opportunity to testify.
10      So, yes, I do want to ask questions as we
11      go along.
12  BY ATTORNEY PILEGGI:
13  Q.    You said there were observations made.  Who
14  made the observations?
15  A.    Officers Kelly and Monaghan.  They were
16  conducting surveillance on the 5600 of Master
17  Street.
18  Q.    Now, had there been -- prior to those
19  observations, was there any information provided by
20  anyone that there was potential drug sales from
21  those units?  It was three units, correct?
22  A.    Correct.  You'd have to talk to Officer
23  Monaghan.  I believe he received some information
24  about that.  He was the assigned investigator.

KAREEM TORAIN - vs -
CITY OF PHILADELPHIA

BRIAN REYNOLDS

Page 14

1  Q.      Do you know, and this is based on your
2  review, do you know where he received that
3  information?
4  A.      I do not.  I did not review that part of
5  it.
6  Q.      Would it refresh your recollection if I
7  told you that pursuant to what Officer Monaghan
8  testified to and based on what the PARS report said,
9  a concerned citizen provided information about those
10 three houses?
11 A.      If that's what it says, I believe you.
12 Q.      Okay.
13         Did you have any discussions with Officer
14 Monaghan with respect to that concerned citizen?
15 A.      I did not.
16 Q.      What exactly does that mean?  A concerned
17 citizen.
18 A.      It means a concerned citizen gave him
19 information about drug sales that were occurring at
20 5600 Master Street.
21 Q.      And with respect to when a concerned
22 citizen gives you information, does a police officer
23 have responsibility to record that information in
24 any way?

Page 15

1  A.      He probably wrote it down, I'm sure.  It's
2  in his report.
3  Q.      Would you have to identify that concerned
4  citizen to one of the supervisors or other police
5  officers involved in the investigation?
6  A.      No, that concerned citizen probably doesn't
7  want to be identified.  That's why it is just a
8  concerned citizen.
9  Q.      So the concerned citizen gave information
10 to Officer Monaghan, correct?
11 A.      Correct.  If that's what the report says,
12 yes.
13 Q.      Do you know if the concerned citizen also
14 gave information to Officer Kelly?
15 A.      They worked together, so I'm sure Kelly was
16 there also for it.
17         ATTORNEY GONZALES:  Well,
18         objection --
19         THE WITNESS:  Can I see the
20         report?  That would help me out.
21         ATTORNEY GONZALES:  Sure.  But
22         answer his question.  He wants to know if
23         you know that today.
24         THE WITNESS:  Oh, I don't know

Page 16

1  that for a fact, no.
2         ATTORNEY PILEGGI:  Okay.
3         ATTORNEY GONZALES:  I have an
4  extra copy of the PARS report.  Is it okay
5  if I hand that to the Officer?
6         ATTORNEY PILEGGI:  Sure.  Well,
7  let's make sure we have the same report.
8         ATTORNEY GONZALES:  Sure.
9         ATTORNEY PILEGGI:  Well, actually
10 let's do one better.  I'm going to -- we
11 will mark this.  Let's mark this as
12 Reynold's-1.
13         (At this time, a document was
14 marked for identification as Reynolds-1.)
15 BY ATTORNEY PILEGGI:
16 Q.      Officer, I'm showing you what's been marked
17 as Reynolds-1 for identification.  Do you know what
18 that is?
19 A.      Yes, it's a search warrant.
20 Q.      And a search warrant specifically with
21 regards to the three units that were being
22 surveilled by your team?
23 A.      By Officers Monaghan and Kelly, yes.  It
24 actually doesn't say a concerned citizen.  It says a

Page 17

1  confidential source.  As well as Officers Ronald
2  Cain and Joseph Goglielmucci.
3  Q.      Okay.
4         So what exactly is a confidential source?
5  A.      It's a person that wants to remain
6  confidential that provides police with information.
7  Q.      How does a confidential source and a
8  concerned citizen differ, if any?
9  A.      They really don't.  They are basically the
10 same.  One could be a concerned citizen.  To me this
11 would mean that Officer Monaghan had used this
12 confidential source before for other information.
13 That's why he said confidential source.
14 Q.      Now, am I correct that Officer Monaghan was
15 relatively new to your NFU team at that time in
16 2000?
17 A.      What is this -- if you're referring to
18 this, this is 2001, I believe.  That's what it says.
19 Q.      2001?
20 A.      2001 is the year.  Doesn't that say 2001?
21 Q.      So I'm asking you --
22 A.      I don't know how long he was with my team
23 at that point.
24 Q.      Okay.

KAREEM TORAIN - vs -
CITY OF PHILADELPHIA

BRIAN REYNOLDS

Page 18

1         And by the way, just for the record, it's
2   actually January of 2001, right?
3   A.        Correct.
4   Q.        Okay.
5         So, a source and a confidential -- sorry a
6   confidential source and a concerned citizen could be
7   the same and it could differ?
8   A.        It could differ, yes.
9   Q.        Could you use a confidential -- strike
10  that.
11        Could you use a concerned citizen more than
12  once?
13  A.        Sure. If they continue to call you with
14  information, yes.
15  Q.        Okay.
16        Is that how it works? They call you?
17  A.        They would call the Officer that they're
18  dealing with.
19  Q.        Okay.
20        Now it also says in here, am I correct, and
21  I am going to read it. It says Monaghan 6061; that
22  is Officer Brian Monaghan, correct?
23  A.        Yes.
24  Q.        All right.

Page 19

1         Received detailed information from a
2   confidential source and 19th District police
3   officers, Police Officer Ronald Cain 4959 and Police
4   Officer Joseph Goglielmucci 2460; is that correct?
5   A.        Yes.
6   Q.        Now, how does that work? I mean, it says
7   that there was detailed information from the
8   confidential source. Yet they also, it appears from
9   this affidavit, that they also -- Monaghan also
10  talked to Police Officers Cain and Goglielmucci.
11            ATTORNEY GONZALES: Objection.
12        What do you mean by how does this work?
13        The witness already testified this was not
14        him. He wasn't involved with this. He
15        also testified he doesn't remember talking
16        to Monaghan about this. So what do you
17        mean by how does this work?
18            ATTORNEY PILEGGI: Okay.
19  BY ATTORNEY PILEGGI:
20  Q.        In other words, why would a police officer,
21  if he already had detailed information from a
22  confidential source or a concerned citizen, why
23  would that police officer go and also talk to other
24  police officers?

Page 20

1             ATTORNEY GONZALES: Objection.
2         That's not what this says, but is that what
3         you're asking?
4             ATTORNEY PILEGGI: Yeah.
5             ATTORNEY GONZALES: Because this
6         doesn't say that he got the information
7         from the confidential source and then went
8         to the officers. It just says he obtained
9         the information from a confidential source
10        and the officers.
11            ATTORNEY PILEGGI: Okay.
12            ATTORNEY GONZALES: So your
13        question is different. Under what
14        circumstance would you get information from
15        a confidential source --
16            ATTORNEY PILEGGI: Okay.
17            ATTORNEY GONZALES: You know what
18        I mean?
19            ATTORNEY PILEGGI: Fair enough.
20  BY ATTORNEY PILEGGI:
21  Q.        Do you know with any of your discussions
22  with Monaghan or even reading this report, why
23  Monaghan got this detailed information from the
24  sources as well as evidently additional information

Page 21

1   from these particular police officers?
2             ATTORNEY GONZALES: Objection to
3         the form. You can answer.
4             THE WITNESS: I do not.
5   BY ATTORNEY PILEGGI:
6   Q.        Okay.
7         Do you recall speaking with Officer Cain and
8   or Officer Goglielmucci with reference to this
9   particular job?
10  A.        No.
11  Q.        Were they on your team at this time?
12  A.        They were assigned to the 19th District, so
13  no.
14  Q.        So they were not with the NFU?
15  A.        They were not.
16  Q.        But you utilized district police officers
17  on other jobs, correct?
18  A.        What do you mean by utilized? I don't
19  understand that question.
20  Q.        You used them to help you with searches --
21  A.        They provide --
22  Q.        To make buys?
23  A.        No, they don't make buys.
24  Q.        But you used them if you were going to

KAREEM TORAIN - vs -
CITY OF PHILADELPHIA

BRIAN REYNOLDS

Page 22

1 search a house, for instance, correct?
2 A.       They could be called in for back up
3 capacity, yes.
4 Q.       And they could be called in to make arrests
5 of potential buyers, right?
6 A.       If they were there assisting in back up
7 capacity, then, yes, they could make arrests.
8 Q.       Do you know if these officers were there in
9 a back up capacity?
10 A.       I do not.
11          ATTORNEY GONZALES:  When you say
12          there, what are you referring to because in
13          this job there's, like, multiple theres.
14          ATTORNEY PILEGGI:  Yeah.  Any of
15          the take downs that were eventually made,
16          arrests that were eventually made in the
17          5600 block of Master Street and there was
18          three units in particular.
19 BY ATTORNEY PILEGGI:
20 Q.       Were these officers utilized on any of the
21 searchs, any of the arrests, et cetera?
22 A.       I have no idea.
23          ATTORNEY GONZALES:  I was going
24          to object to the form but let him answer

Page 23

1          and he did.
2          ATTORNEY PILEGGI:  Okay.
3 BY ATTORNEY PILEGGI:
4 Q.       So reading on it says -- I'm skipping a
5 little bit.  It says that there was three houses,
6 5609 West Master which was an abandoned property,
7 5607 and 5605.
8          5607 and 5605 West Master were used as
9 storage houses; is that fair enough?
10 A.       That's what it says.
11 Q.       Okay.
12          Do you recall, your personal, do you recall
13 doing any surveillance on those houses during this
14 period of time?
15 A.       I did not do surveillance.
16 Q.       Okay.
17          But you would have participated, am I
18 correct?  I understand you don't recall
19 specifically, but normally you would participate in
20 the surveillance of a job this big?
21          ATTORNEY GONZALES:  Objection.  I
22          don't know what you mean by that, but if
23          you understand it you can answer.
24          THE WITNESS:  I don't understand

Page 24

1          it.  I was in a back-up capacity to these
2          officers that were doing the surveillance.
3 BY ATTORNEY PILEGGI:
4 Q.       What does that mean?
5 A.       I was there on scene in the area in a
6 back-up capacity.  If these officers needed anyone
7 followed, I would do that.  If they needed buyers
8 stopped, I would participate in that.
9 Q.       Okay.
10          Do you recall stopping any buyers in this
11 case?
12 A.       I do not.
13 Q.       Do you recall following anyone in this
14 case?
15 A.       I do.
16 Q.       Okay.
17          Well let's do this, it appears that based on
18 this affidavit that it was three days of
19 surveillance; does that sound right?
20 A.       You got the 2nd, the 3rd, and the 4th.
21 Q.       Three days, right?
22 A.       Yes.
23 Q.       Okay.
24          And on the third day, they obtained search

Page 25

1 warrants.  Other members of your team obtained
2 search warrants and eventually searched and arrested
3 individuals out of these three units, correct?
4 A.       Correct.  Officer Monaghan would obtain the
5 search warrants.  He was the assigned investigator.
6 Q.       When you say assigned investigator, can you
7 explain that?
8 A.       It is his investigation.
9 Q.       Who assigned him?
10 A.       He assigned himself.  He got the
11 information so he was the assigned investigator.
12 Q.       Okay.
13          And that would -- you would kind of
14 alternate with the different members of your team as
15 to who the assigned investigator would be, correct?
16 A.       Usually it would go whoever the officer who
17 got the information would be the assigned or whoever
18 made observations of the job would be the assigned.
19 Q.       Okay.
20          So it appears, again, from this paperwork
21 that Officer Monaghan, who was the assigned, and
22 Officer Kelly were the surveilling officers, the
23 eyes?
24 A.       Yes.

KAREEM TORAIN - vs -
CITY OF PHILADELPHIA

BRIAN REYNOLDS

Page 26

1  Q.      You were in a back-up capacity, right?
2  A. .    Yes.
3  Q.      Officer Walker was there.  He was in what
4  capacity; do you recall?
5  A.      I do not.  Probably a back-up capacity.
6  Q.      Okay.
7          And you usually were partnered up with
8  Officer Walker at that time, right?
9  A.      It all depends.  We would take separate
10 cars if we needed to.  It all depends.
11 Q.      It also appears from this paperwork that
12 Officer Mitchell was also involved in making a buy
13 or at least handling a CI; is that -- I am referring
14 to the second page.  This is down the second
15 paragraph from the bottom.
16 A.      On the second page?  No, I see the fourth
17 paragraph down where Mitchell went in to make a buy.
18 Q.      Right.
19 A.      He didn't use an informant.  He made the
20 buy himself.
21 Q.      So Mitchell was there.  You were there?
22 A.      I was not there for the buy.  Mitchell was
23 there for the buy.
24 Q.      When I say there, you were part of this

Page 27

1  job?
2  A.      Correct.
3  Q.      Mitchell was part of this job?
4  A.      Correct.
5  Q.      Monaghan?
6  A.      Correct.
7  Q.      And Kelly?
8  A.      Correct.
9  Q.      And it looks like Cain and Goglielmucci,
10 although you don't know if they were present, they
11 at some point provided information to Officer
12 Monaghan?
13 A.      Yes.
14 Q.      Anyone else you recall being part of that
15 team?
16             ATTORNEY GONZALES:  Objection.
17 BY ATTORNEY PILEGGI:
18 Q.      Sorry.  Officer Walker as well?
19             ATTORNEY GONZALES:  Hold on.
20          Hold on.  Objection.  No one -- and this
21          witness never said that Cain and
22          Goglielmucci were part of any team
23          whatsoever.
24             ATTORNEY PILEGGI:  I didn't say

Page 28

1          that.
2             ATTORNEY GONZALES:  Yes, you did.
3             ATTORNEY PILEGGI:  I said that
4          they provided information.
5             ATTORNEY GONZALES:  But then you
6          said were they all part of the team, so
7          objection.
8  BY ATTORNEY PILEGGI:
9  Q.      So let me, just for clarification, part of
10 the actual team that worked this particular job was
11 Officer Monaghan the assigned, right?
12 A.      Correct.
13 Q.      Kelly, Sean Kelly?
14 A.      Correct.
15 Q.      He was in a surveillance capacity?
16 A.      They were both together in a van.
17 Q.      Okay.
18          Officer Walker, and you don't know what his
19 role was, right?
20 A.      Do not.
21 Q.      Okay.
22          Yourself?
23 A.      Correct.
24 Q.      Officer Mitchell who made a buy?

Page 29

1  A.      Correct.
2  Q.      Okay.
3          Do you recall anyone else?
4  A.      I do not.
5  Q.      All right.
6          Now, do you remember any of the officers
7  that were on the search team?
8  A.      I do not.
9  Q.      What district was this?
10 A.      19th District.
11 Q.      All right.
12          Where would they normally, and I understand
13 you don't know who exactly was there, normally would
14 it be officers from the 19th District that would
15 assist in or from whatever district would assist in
16 the searchs of units or would it be strike force
17 officers or both?
18 A.      I know strike force was out there on the
19 4th with us.  Then it would be other members
20 probably of the narcotics field unit.
21 Q.      Who were the strike force officers you
22 recall being there on the 4th?
23 A.      I have no idea.
24 Q.      How do you remember they were there?

KAREEM TORAIN - vs -
CITY OF PHILADELPHIA

BRIAN REYNOLDS

Page 30

1  A.        Because it says when we went to stop Torain
2  at 61st and Nassau with the aid of uniformed
3  officers.
4  Q.        That wasn't at 56th and Master?
5  A.        It was not.
6  Q.        Far from 55th and Master, correct?
7  A.        It was at 61st and Nassau.
8  Q.        How far is that?
9  A.        Not exactly sure each block.
10  Q.       How far?
11  A.       I'm not sure.  It's not that far.
12  Q.       Mile?  Two miles?
13  A.       I'm not even sure.
14  Q.       Okay.
15           So strike force officers assisted you in
16  arresting Mr. Torain?
17  A.       Correct.  With the take down, yes, stopping
18  the vehicle.
19  Q.       Okay.
20           Do you know how they arrived?
21  A.       They were probably notified by one of our
22  supervisors to see if they could come down and
23  assist us or maybe Officer Monaghan notified them.
24  I'm not exactly sure.

Page 31

1  Q.        You said assist us.  Who arrested
2  Mr. Torain?
3  A.        I did.
4  Q.        Was Officer Monaghan with you?
5  A.        No.
6  Q.        Well, it was you that arrested him,
7  correct?  Other than yourself and strike force
8  officers, was there any other officer from this NFU
9  team who was working this job with you?
10  A.       Walker could have been there.  I'm not 100
11  percent sure though.
12  Q.       Okay.  All right.
13           Did you at any time participate in any of
14  the surveillances over the three-day period?
15  A.       No, just the observations that I made on
16  the 4th.
17  Q.       Okay.
18           Do you recall where you were situated when
19  surveillance was being conducted at those three
20  units.
21  A.       I do not.
22  Q.       I mean, were you near the scene?
23  A.       Probably, yeah.  I don't remember exactly
24  where I was though.  It's 20 years ago.

Page 32

1  Q.        Do you recall making any arrests of any
2  potential buyers or?
3  A.        Not that I recall.  It's not in the
4  paperwork anywhere.
5  Q.        Did you arrest anyone other than Torain in
6  the job?
7  A.        I think I was involved in another arrest of
8  another individual at 56th and Market.
9  Q.        Okay.
10           Was that before or after the Torain arrest?
11  A.       Give me a second.  I have to look and try
12  to find it.  The last paragraph of page 3, it says
13  myself and Walker stopped a Breeze, which is a
14  vehicle, at 56th and Market.
15  Q.       Who did you place under arrest?  It doesn't
16  say.
17  A.       I can't really see it.
18  Q.       Is there any reason that that doesn't say?
19  A.       No, but I think it says it in this report
20  here.  If you let me see it.
21           ATTORNEY GONZALES:  He is
22       referring to the PARS report which I have
23       and am showing the witness.
24           THE WITNESS:  It says Hodge was

Page 33

1       placed under arrest.  Recovered from him
2       was five bags of marijuana.
3  BY ATTORNEY PILEGGI:
4  Q.        Now, do you know any reason why it's not in
5  the Affidavit of Probable Cause?
6  A.        I'm sure it is.  You probably got copies
7  and it was cut off.  It would definitely be in the
8  Affidavit of Probable Cause.  You got a bad copy.
9  Q.        I'm looking at it and I see Reynolds badge
10  number 4268 --
11  A.       You don't even see Reynolds.  The only
12  thing you see is O-L-D-S 4268.
13  Q.       All right.  Fair enough.
14  A.       It's obvious whoever made the copies didn't
15  make them properly.
16  Q.       All right.
17           Now let's do this, am I correct that you
18  were aware that these on all three days, January 2nd
19  2001, January 3rd 2001, and January 4th 2001,
20  Officer Monaghan and Officer Kelly, the surveilling
21  officers, filmed several buys being made either from
22  those units or close to those units?
23  A.       I was aware of that.
24  Q.       Okay.

KAREEM TORAIN - vs -
CITY OF PHILADELPHIA

BRIAN REYNOLDS

Page 34

1  A.        It just says that a majority of the
2  observations on 1/3 were videotaped by Kelly and
3  Monaghan.  It doesn't mention the 2nd or the 4th.
4  It just says on 1/3.
5  Q.        Okay.
6            Do you recall how many of those buyers were
7  arrested?
8  A.        I do not.
9  Q.        Well, you didn't make any arrests, correct?
10 A.        I did not.
11 Q.        Was anyone else in a back-up capacity with
12 yourself?
13 A.        I'm sure there was.
14 Q.        Who would it be?
15 A.        I have no idea.
16 Q.        Okay.
17           Well we have Officer Monaghan and Officer
18 Kelly at the scene making surveillance, correct?
19 A.        Correct.
20 Q.        You're in a back-up capacity.  The only
21 other police officers are Officer Walker and Officer
22 Mitchell.
23 A.        Mitchell wouldn't have been stopping people
24 because he was going to make the buy.  I'm sure

Page 35

1  there were other members of our unit out there,
2  though.  I don't know who they are, though.
3  Q.        All right.
4            Would their badge number -- wouldn't they be
5  reported on the warrants that were issued?
6  A.        Sure.  Whoever participated in the searches
7  of those units their badge numbers would be on
8  there, yes.
9  Q.        Okay.
10           So would there be any documentation of who
11 the other officers were in a back-up capacity in any
12 of the paperwork that was completed in this job?
13 A.        I don't believe so, no.
14 Q.        Wouldn't that be necessary?
15 A.        For what?
16 Q.        For court.
17 A.        If they did -- if they made an arrest, made
18 observations, then it would all be documented in the
19 police report.
20 Q.        Okay.
21 A.        If they're out there and they participate
22 and -- if they're out there participating and they
23 don't make an arrest or make any observations then
24 why would their name be mentioned in a report?

Page 36

1  Q.        What would they be participating in?
2  A.        Exactly.  If they don't do nothing or stop
3  anybody or arrest anybody, then there's no need to
4  mention them.
5  Q.        You're saying you don't recall anyone
6  making any arrests of any buyers?
7  A.        I do not.
8  Q.        If they did, it would be in some kind of a
9  report?
10 A.        It would.
11 Q.        Not only the person arrested, but also the
12 arresting officer?
13 A.        Correct.
14 Q.        And all the details of how that arrest came
15 about?
16 A.        Yes.
17 Q.        I would submit to you that there is no
18 other officers in this Affidavit of Probable Cause
19 or also in the PARS Report that made any other
20 arrest as a back-up capacity other than yourself.
21 A.        Correct.
22 Q.        And Officer Walker with respect to
23 Mr. Hodge.
24 A.        Correct.

Page 37

1  Q.        Okay.
2            So --
3  A.        But if -- I did see one thing.  I believe I
4  seen it in here.  Not exactly sure if I could breeze
5  through this again.  I believe it does mention an
6  Officer Fitzgerald and Francis which is on the third
7  page second to the last paragraph all the way down.
8  So they also arrested someone.
9  Q.        I see that.  Officer Fitzgerald 2228 and
10 Officer Francis 3981?
11 A.        Yeah.  So they were also out there that day
12 as a back-up capacity.
13 Q.        It looks like they made a recovery?
14 A.        Yes.
15 Q.        Okay.  All right.  Fair enough.
16           Now let's go back to the information in the
17 first paragraph.  This is the information that
18 Monaghan obtained from this confidential source.
19           The source told him that the narcotics are
20 being sold out of these properties, at least out of
21 5605 Master Street, and that the participants in
22 this drug ring is an Al and Pud; do you see that?
23 A.        Correct.
24 Q.        Do you know who Al or Pud was?

Page 38

1  A.      I do not.

2  Q.      Okay.

3          Just so we are clear, Al and Pud are

4  participants in the drug ring.  They're not

5  individuals that gave the information, correct?

6  A.      Correct.  That's what it says.

7  Q.      Explain to me what is the difference

8  between a confidential source and a confidential

9  informant?

10 A.      Confidential informant is one that signs up

11 through the police department.  They know the

12 identity of that person and it's to remain

13 confidential.  They also are paid for doing drug

14 buys or information.

15 Q.      Okay.

16         And a confidential informant can participate

17 in the investigation itself making buys or whatever?

18 A.      Correct.

19 Q.      Okay.

20         Can a confidential source participate in the

21 investigation in any way?

22 A.      No.  Usually a confidential source is just

23 providing information.

24 Q.      You say usually.  Has a confidential source

Page 39

1  ever been allowed to participate in an

2  investigation?

3  A.      No, as I stated, they just provide the

4  information about the investigation.

5  Q.      Why can't a confidential source

6  participate?

7  A.      Because they are not signed up through the

8  Philadelphia police department.

9  Q.      So?

10 A.      So what?

11         They have to be signed up in order to

12 participate and make a buy using that confidential

13 informant.  Sources usually just provide information

14 only.

15 Q.      Is that pursuant to what?  A law?  Or a

16 policy?

17 A.      That is just the way it's done if you're in

18 narcotics.  Back then there was no policy on

19 confidential sources.

20 Q.      Are you sure about that?

21 A.      I'm not sure, but if you show me something,

22 then I'll be able to take a look at it.

23 Q.      Well, you're a police officer.  You've been

24 a police officer for 28 years.  You participated

Page 40

1  with a lot of confidential sources and a lot of

2  confidential informants.  Is it your testimony that

3  you're not sure if that's a Philadelphia Police

4  policy?

5              ATTORNEY GONZALES:  Objection.

6          He testified so you're asking him to answer

7          the same question again, which is asked and

8          answered, that he does not recall if 20

9          years ago there was a policy on

10         confidential sources.

11         He's already answered that question.

12 BY ATTORNEY PILEGGI:

13 Q.      Is there a policy now?

14 A.      On confidential sources?

15 Q.      Yes.

16 A.      I don't know.  I'm not in narcotics

17 anymore.

18 Q.      Was there a policy when you left in 2012?

19 A.      Not sure.  If there was and you have it, I

20 would like to see it.

21 Q.      Okay.

22         How about confidential --  sorry.  Strike

23 that.

24         How about concerned citizens?  Are they

Page 41

1  allowed to participate in an investigation in any

2  way?

3  A.      No, they're basically just a person that

4  provides information.

5  Q.      What's the authority on that?

6  A.      What do you mean?

7  Q.      Is that a policy or procedure?

8  A.      It's just someone that -- there is no

9  policy on that either.  They are just providing you

10 with information.

11 Q.      Was that the way you were trained?  I mean,

12 what are you basing this on?  You said we usually

13 don't do this.  We usually don't to that.  I asked

14 you if it was pursuant to a policy and you don't

15 know.

16         Why are you answering now that confidential

17 sources are not allowed to participate?  What are

18 you basing that on?

19             ATTORNEY GONZALES:  Objection.

20         Now that's argumentative.  Walking down the

21         street a person can come up to a police

22         officer and say, hey, I saw something

23         happen around the corner.  You don't need a

24         written policy that says a police officer

KAREEM TORAIN - vs -
CITY OF PHILADELPHIA

BRIAN REYNOLDS

Page 42

```
1   needs to do anything with respect to that
2   information. It's a police officer. They
3   can use common sense.
4       This witness has already answered about his
5   memory and knowledge about the use of
6   confidential sources 20 years ago in 2001
7   when this incident occurred.
8       What else do you want?
9           ATTORNEY PILEGGI: I want to know
10  what he is basing his knowledge on.
11          ATTORNEY GONZALES: He doesn't
12  have knowledge. He doesn't recall because
13  it was 20 years ago.
14          ATTORNEY PILEGGI: He already
15  testified that a confidential source is not
16  allowed to participate in an investigation.
17  I am asking him what he is basing that
18  answer on. What he is basing that
19  knowledge on. Is it experience? Is it a
20  policy? Is it a law?
21          THE WITNESS: It's my experience
22  that confidential sources and concerned
23  citizen are only used for information.
24  They do not participate in buys. They do
```

Page 43

```
1           not participate in taking people down for
2   you.
3   BY ATTORNEY PILEGGI:
4   Q.      And is that something that you recall
5   learning in the police academy?
6   A.      No, that's basically what we learned going
7   to the Narcotics Field Unit.
8   Q.      Okay.
9       And let me ask you, before you were in the
10  NFU, you were in the district? You worked in the
11  district?
12  A.      I was. I was in the 16th District.
13  Q.      In the 16th District did you ever use
14  condition sources? You personally?
15  A.      I don't remember if I did or not.
16  Q.      Okay.
17      Could you as a district police officer?
18  A.      Sure. They could -- like Mr. Gonzales
19  said, anyone can give you information.
20  Q.      Okay.
21      What if it -- when you were in the 16th
22  District, did you ever use confidential informants?
23  A.      I did not. Not to make buys.
24  Q.      Were you allowed?
```

Page 44

```
1   A.      No, you're not allowed to. Uniformed
2   officers are not allowed.
3   Q.      So you could use a source as a district
4   officer. You could use a concerned citizen, but you
5   could not use a confidential informant?
6   A.      Correct.
7   Q.      Because they're actually allowed to
8   participate in investigations?
9   A.      Usually an informant would make buys for
10  you, yes.
11  Q.      Okay.
12      And do you recall ever using yourself,
13  personally, ever using a concerned citizen in any
14  case?
15  A.      I probably have, yes. I don't remember
16  what cases, but I'm sure I have.
17  Q.      Okay.
18      Did you ever allow those concerned citizens
19  in those cases that you recall participate in the
20  investigation in any way?
21  A.      What do you mean by participating? As I
22  stated, they usually just give the information and
23  that's it.
24  Q.      I know.
```

Page 45

```
1       Other than giving the information, did you
2   ever use a concerned citizen to participate other
3   than giving you information? Make calls? Make
4   buys? Point out people? Anything like that?
5   A.      There would be times they would point out
6   people, yes. I mean, it all depends on what the
7   investigation entails and what investigation you're
8   referring to.
9   Q.      Wouldn't that be participating in the
10  investigation if they pointed out what they
11  suspected was a drug dealer?
12  A.      There's been times they pointed out people
13  or houses or you show them photos that you got
14  through the police photo imaging, yes.
15  Q.      And based on your experience, that would
16  not be participating in a drug investigation?
17  A.      They're giving you the information and
18  you're trying to verify the information that they
19  gave you. So if them pointing out a house and
20  saying, hey, that house over there is selling and
21  you do observations on it and then them saying, hey,
22  there is Jam al. He is part of that investigation.
23  If you call that participating, then, yes, that's
24  participating.
```

KAREEM TORAIN - vs -
CITY OF PHILADELPHIA

BRIAN REYNOLDS

Page 46

1  Q.      Okay.
2          And isn't it correct that if they give you
3  information that you have to independently go out
4  and verify whether that information is correct or
5  not?
6  A.      Correct, which we always did.
7  Q.      And you're saying that if you had a
8  confidential source or concerned citizen, that you
9  would bring them out to the site and say point out a
10 house or point out Jam al and to you that is not
11 participating in an investigation?
12                ATTORNEY GONZALES:  Objection.
13         No.
14                ATTORNEY PILEGGI:  And the
15         objection?
16                ATTORNEY GONZALES:  Yeah, the
17         objection is you're twisting the words.
18         You've asked the question over and over
19         again.
20         You originally asked the question can you
21         use a confidential source.  Can a
22         confidential source participate in an
23         investigation.  The Officer said no.
24         Then you asked followup questions and tried

Page 47

1          to have the Officer define IDing someone or
2          providing additional information as
3          participating.
4          Now I understand you're trying to get the
5          witness to say he was wrong when he
6          originally said confidential sources can't
7          participate in an investigation.  But as
8          the witness said, if you call that
9          participating, then I guess it's
10         participating.
11         You have asked the witness the same
12         question over and over again.  He has
13         answered it.  I don't now what else you
14         went.  Now you're just getting
15         argumentative and repetitive.
16                ATTORNEY PILEGGI:  I just don't
17         know what the source of the objection is.
18         Because it was unclear?
19                ATTORNEY GONZALES:  A, unclear.
20         B, asked and answered and repetitive.  C,
21         argumentative.
22 BY ATTORNEY PILEGGI:
23 Q.      Did you understand the question?
24 A.      I did not.

Page 48

1  Q.      Okay.
2          Of course you didn't.  All right.  So let's
3  move on to your role in this.
4                ATTORNEY GONZALES:  Just
5          providing the witness the PARS.
6                ATTORNEY PILEGGI:  Sure.  Why?  I
7          didn't show him.
8                ATTORNEY GONZALES:  Well, the
9          witness has already testified he doesn't
10         remember he would have to refer to the
11         PARS.
12                ATTORNEY PILEGGI:  I know.  I
13         gave him the Affidavit of Probable Cause.
14         I don't want the witness to see the PARS.
15                ATTORNEY GONZALES:  Okay.  That's
16         his right.  He doesn't have to show you
17         anything.  You can answer from your memory.
18 BY ATTORNEY PILEGGI:
19 Q.      All right.
20         So, why don't you explain the circumstance
21 leading up to Mr. Torain's arrest?  You made the
22 arrest, correct?
23 A.      Correct.
24 Q.      You're not sure if Walker was with you or

Page 49

1  not?
2  A.      I'm not.
3  Q.      All right.
4          And you do know that there was some strike
5  force officers there.  You don't know who they were?
6  A.      Correct.
7  Q.      Do you know how many were there?
8  A.      I do not.
9  Q.      Okay.
10         You don't recall being alone do you?
11 A.      I do not.
12 Q.      All right.  Go ahead.
13                ATTORNEY GONZALES:  Go ahead
14         what?
15 BY ATTORNEY PILEGGI:
16 Q.      Explain the details of the arrest.
17 A.      Based on information from him leaving the
18 property at 55th and Hunter --
19 Q.      Who gave you that information?
20 A.      Walker.
21 Q.      Okay.
22 A.      I then followed him out of the area with
23 the aid of a marked unit.  He was then arrested at
24 61st and Nassau.

Page 50

1  Q.        And you're referring to the affidavit,
2  correct, to refresh your recollection?
3  A.        Actually I was going off memory from the
4  PARS with that.
5  Q.        Okay.
6            So do you know why -- did Officer Walker
7  tell you why he wanted you to follow Mr. Torain?
8  A.        There was earlier observations of him over
9  on Master and Ithan by Officers Kelly and Monaghan
10 at which time Torain was in the green Bonneville.
11 He was followed to Conestoga Street where he went
12 inside a property, I believe it was 1621 North
13 Conestoga Street.  He then exited that property and
14 went to the property on 55th and Hunter.
15 Q.        Okay.
16           Monaghan and Kelly gave you information
17 about the green Bonneville, by the way the tag
18 number is DKC-3310, correct?
19 A.        (No response.)
20 Q.        And I'm referring to page 2 under 1/4/2000?
21 A.        Can you just tell me what paragraph because
22 I don't see the tag.
23 Q.        Where it say 1/4?
24 A.        1/4 okay --

Page 51

1  Q.        And by the way --
2  A.        Can I answer that question first?
3  Q.        Yeah.  Sure.
4  A.        I see it over here, DKC-3310, yes.
5  Q.        Okay.
6            It says 1/4/00.  That's January 4, 2000?
7  A.        That's correct.  That says 2000.
8  Q.        You had mentioned 2001.  In fact throughout
9  the report it says 2001.  I'm a little confused.
10 A.        I didn't prepare the report.
11 Q.        I understand.
12           This is not a report.  This is an affidavit.
13 This goes to the court, correct?
14 A.        Correct.
15 Q.        It goes to an Magistrate or a Judge who
16 will determine whether there's probable cause to
17 make arrest or to search houses, right?
18 A.        It does.
19 Q.        Okay.
20           You would agree -- well, I'm a little
21 confused as to when this job actually happened.
22 Now, you mentioned 2001 and that was probably based
23 on your review of the PARS report, but this report
24 says 2000.

Page 52

1            ATTORNEY GONZALES:  I don't
2  understand.  You're confused because of a
3  typo in a police report?  What's the point
4  of the question?
5            ATTORNEY PILEGGI:  It's not a
6  police report.
7            ATTORNEY GONZALES:  What is the
8  point of that question other than to simply
9  argue with the witness?  He does not
10 recall.
11           ATTORNEY PILEGGI:  Because I
12 don't know when the job was.  I'm asking.
13           ATTORNEY GONZALES:  You have
14 represented this client for years.  You
15 know everything about this case.  You have
16 -- really, give me a break.  That is
17 argumentative.  It's a typo on a police
18 report.
19           ATTORNEY PILEGGI:  It's not a
20 police report.  It is an affidavit.
21           ATTORNEY GONZALES:  Regardless.
22 There's a typo on an Affidavit of Probable
23 Cause.
24           ATTORNEY PILEGGI:  Well, let me

Page 53

1            just point out that --
2            ATTORNEY GONZALES:  That this
3            witness, by the way, that this witness did
4            not prepare.
5            ATTORNEY PILEGGI:  I understand
6            that.  I agree with that.  I didn't say he
7            did.
8  BY ATTORNEY PILEGGI:
9  Q.        I'm just saying on page 1 it keeps saying
10 2001.  Then on every other page it says 2000.  I'm
11 just trying to determine when this job was.
12 A.        I don't --
13 Q.        And the timing is important.  So do you
14 know based on any review of the documents that you
15 reviewed for today's deposition or recollect when
16 exactly whether this was in 2000 or 2001?
17 A.        I believe it was 2001.
18 Q.        Why do you say that?
19 A.        Because if you go back to the first page it
20 has report date as 1/4/01.
21 Q.        Okay.
22           ATTORNEY GONZALES:  I also want
23           to point out for the record that at the
24           preliminary hearing there was testimony

Page 54

1    from Officer Monaghan and --
2              ATTORNEY PILEGGI:  Are you
3    testifying?
4              ATTORNEY GONZALES:  No, I'm
5    pointing out for the record --
6              ATTORNEY PILEGGI:  He didn't do
7    the report.  I'm not arguing with him.
8              ATTORNEY GONZALES:  You're making
9    a mountain out of nothing.
10             ATTORNEY PILEGGI:  No, I'm not.
11             ATTORNEY GONZALES:  At the
12   preliminary hearing the district attorney
13   asked -- the district attorney asked:  I'd
14   like to direct your attention to January
15   6th 2001.
16             ATTORNEY PILEGGI:  Okay.  Maybe
17   he made a mistake.  I don't know.  Should
18   we question him?
19   I'm just simply pointing out that there's
20   different dates in here and I'm trying to
21   determine exactly whether it was in 2000 or
22   2001.
23   If he doesn't know, he doesn't know.  The
24   report speaks for itself -- not the report;

Page 55

1              the affidavit.
2              ATTORNEY GONZALES:  Right.  But
3              you keep making comments like I'm confused,
4              I don't know.
5              ATTORNEY PILEGGI:  Well, I am
6              confused.
7              ATTORNEY GONZALES:  It is
8              argumentative.
9              ATTORNEY PILEGGI:  It wasn't a
10             question.
11   BY ATTORNEY PILEGGI:
12   Q.    So you think based on your reading of the
13   first page that it's 2001, right?
14   A.    Correct.
15   Q.    Okay.
16         However, according to the affidavit, you
17   made the arrest on January 4th 2000.  Which
18   according to your attorney is a typo.
19   A.    Correct.
20   Q.    Okay.
21         I realize that you did not do this.
22   However, you provided information during the arrest
23   to Officer Monaghan who eventually prepared this
24   affidavit; correct?

Page 56

1    A.    Correct.
2    Q.    All right.
3          You don't think you gave him that date; do
4    you?
5    A.    That year, you mean?
6    Q.    Yeah, the date 1/4/00?
7    A.    I don't believe I gave him that.
8    Q.    All right.
9    A.    I would hope he would know the date and the
10   year.
11   Q.    All right.
12         Now, it says -- I'm going to read this and
13   I'm going to ask you some questions on this.  I am
14   referring to the fourth paragraph.  It looks like on
15   or in January 4th 2000 Police Officer Kelly 7126 and
16   Police Officer Monaghan set up surveillance at 56th
17   and Master Street.
18         At approximately 1:41 p.m. police observed a
19   green Bonneville, Pa tag DKC-3310, registered
20   Carolyn Gillis traveling northbound on 56th Street
21   to intersection of 56th and Master.
22         So is that the information that you got from
23   Monaghan to stop that vehicle?
24   A.    No, it would be further down after they

Page 57

1    radioed.  Not to stop the vehicle but to follow the
2    vehicle.
3    Q.    Okay.
4          You followed the vehicle as you testified
5    previously to 1621 North Conestoga Street, correct?
6    A.    Well, that was -- if I read it real quick
7    here -- it was followed back by Walker.
8    Q.    To Conestoga?
9    A.    To Conestoga.
10   Q.    Where were you at this point?
11   A.    I don't know.
12   Q.    Well, do you think you were with Walker?
13   A.    We were in separate cars.  I know that.
14   Q.    How do you know that?
15   A.    Because we are out there in back-up
16   capacity.  If people needed to be followed or
17   stopped, we would do it separately.
18   Q.    You previously testified you don't know
19   what Walker was doing.  How do you know he was in
20   back up?
21   A.    He was out there in back up.
22   Q.    How do you know that?
23   A.    It clearly says it here in the report.
24   Q.    Where does it say that?

KAREEM TORAIN - vs -
CITY OF PHILADELPHIA

BRIAN REYNOLDS

Page 58

1  A.       It says was followed back to 1621 North
2  Conestoga by Walker 3730.
3  Q.       If you read this report and review of the
4  PARS report prior to testifying today, wasn't Walker
5  the one that observed the Bonneville, the green
6  Bonneville, at the scene, Master Street, originally?
7  A.       I don't see that.  If you show that to me,
8  I'll gladly look at it.
9  Q.       Okay.
10         All right.  Strike that.  Strike that.
11         It is your testimony based on this report
12 that Walker followed him to Conestoga?
13 A.       Yes.
14 Q.       You previously testified that Mr. Torain
15 went into Conestoga, came out some period of time
16 later, and went down to another unit, correct?
17 A.       Correct.
18 Q.       How do you know that?
19         Is that based on this reading or were you
20 involved at that point?
21 A.       Well, it says at approximately 2:00 p.m. I
22 observed Torain exit Conestoga Street 1621.
23 Q.       Okay.
24 A.       And travel westbound on Hunter in the

Page 59

1  Bonneville to the conner of 55th and Hunter Street.
2  Q.       All right.
3  A.       At this point Torain exited the vehicle and
4  entered 1628 North 55th Street.
5  Q.       All right.
6         So if I read this report correctly, Walker
7  followed him from the Master Street properties where
8  there was surveillance set up to 1621 North
9  Conestoga.  Then when Torain came out of Conestoga,
10 you followed him over to the other unit; does that
11 sound right?
12 A.       Correct.
13 Q.       How far was the other unit?  This is 56th
14 and Master, correct?
15 A.       Correct.
16 Q.       How far was that unit from 1621 Conestoga?
17 A.       Couple blocks.
18 Q.       Did you follow him on foot or in a vehicle?
19 A.       Vehicle.
20 Q.       How do you know?
21 A.       Because I'm telling you I was in a vehicle.
22 I couldn't be on foot in that area.
23 Q.       Why?
24 A.       Because it's predominantly a black

Page 60

1  neighborhood.  I would stick out like a sore thumb.
2  Q.       Correct me if I'm wrong, isn't the Master
3  Street properties a predominantly black
4  neighborhood?
5  A.       Correct.
6  Q.       Monaghan's white?
7  A.       Correct.
8  Q.       Kelly's white?
9  A.       Correct.  But if they're in a surveillance
10 van they don't know they're there being watched.
11 Q.       How do you know they were in a surveillance
12 van?
13 A.       Because they videotaped it.  They were in
14 what was called a surgey (ph) van.
15 Q.       Is that a van provided by the police
16 department?
17 A.       It is.
18 Q.       Did you see them in that van?
19 A.       I know they were in the van.
20 Q.       How do you know?
21 A.       Because they were in the van.  I seen them
22 in the van and that's how they were doing their
23 surveillance.
24 Q.       Did you actually see them go in the van?

Page 61

1  That's my question.
2  A.       Well, probably Kelly had to pick the van up
3  on his way into work at the arsenal which is on
4  Tioga Street --
5  Q.       I don't want you to guess.  You said
6  probably.
7  A.       I'm not guessing.  He --
8  Q.       Well --
9               ATTORNEY GONZALES:  Whoa.  He is
10         answering.  Don't interrupt.  Let him
11         answer the question.
12 BY ATTORNEY PILEGGI:
13 Q.       Go ahead.
14 A.       They utilized the surgey van for this
15 operation because they videotaped the one day.
16 Q.       Okay.
17         What does that van look like?  Can you
18 describe it?
19 A.       It's a van.  I don't know exactly what it
20 looked like.  We're going back 20 years.
21 Q.       How did they videotape?  I mean, they sit
22 in a van?
23 A.       That van is equipped with a video camera
24 and that's probably how they taped it.

KAREEM TORAIN - vs -
CITY OF PHILADELPHIA

BRIAN REYNOLDS

Page 62

1   Q.      Okay.
2           Do you know if both Monaghan and Kelly were
3   both in that van?
4   A.      Yes.
5   Q.      Okay.
6           And that van was parked right outside of
7   those properties?  Those three properties?
8   A.      I believe the van was parked across the
9   street.  These properties are situated on the -- it
10  would be the northwest corner.  I believe they were
11  sitting on the southeast corner.
12  Q.      Okay.
13          You think they would stick out like a sore
14  thumb at that property?
15  A.      Not if no one knows they're in the back of
16  the van.
17  Q.      Okay.
18          So you follow Torain to the 56th and Master
19  property, right?
20  A.      Correct.
21  Q.      How far is that Master Street property from
22  where Monaghan and Kelly were surveilling?
23  A.      A couple blocks.
24  Q.      When you say a couple?

Page 63

1   A.      Three to six.  Two to seven.  I'm not
2   exactly sure.  It is not that far though.
3   Q.      Okay.
4           When you followed Torain, tell us in detail
5   what happened.  What did you see?
6   A.      At which point are you talking about,
7   Counsel?
8   Q.      Well, you're reading from the affidavit,
9   correct?
10  A.      Correct.
11          Are you talking about when he left Conestoga
12  Street?
13  Q.      Yes.
14  A.      He left Conestoga Street.  Got back into
15  the Bonneville and went to the property at 1628 55th
16  Street where he entered with a key.
17  Q.      Now, did you see him from the time he left
18  Conestoga to the time he entered, and maybe I
19  shouldn't assume this, did he enter?
20  A.      Correct.  He did enter.
21  Q.      From the time he left Conestoga to the time
22  he entered 55th Street, did you see him do anything
23  illegal?
24  A.      Did not.

Page 64

1   Q.      Okay.
2           What was your information as to why you were
3   following him?
4   A.      Because Officer Kelly and Monaghan saw some
5   interactions with him and one of the dealers that
6   was at 56th and Master Street.
7   Q.      So was he determined to be a buyer at that
8   point?
9   A.      I'm not sure what they determined him to
10  be.
11  Q.      All right.
12          Just for clarification, there was no buyers
13  ever arrested during this investigation, correct?
14  A.      Correct.
15  Q.      Okay.
16          Were any of the buyers over the three-day
17  period of time -- and by the way, they saw many,
18  many, many buys, correct?
19  A.      Correct.
20  Q.      Were any of the buyers ever followed or
21  arrested?
22  A.      I don't believe so.
23  Q.      Why Torain?  Why was he special?
24  A.      You would have to ask Monaghan and Kelly

Page 65

1   because they were the ones doing the observations,
2   Counsel.
3   Q.      Okay.
4           But neither Monaghan nor Kelly ever told you
5   why exactly you were following Torain?
6   A.      They came over the air said follow this
7   car.  We believe he may have just re-upped one of
8   the dealers.
9   Q.      He what?
10  A.      Re-upped one of the dealers.
11  Q.      What does that mean?
12  A.      Gave them drugs to go sell.
13  Q.      That is what Monaghan or Kelly told you?
14  A.      I don't remember the exact wording.  They
15  jut told us to follow the Bonneville out because he
16  just had an interaction with one of the dealers from
17  Master Street.
18  Q.      So you didn't think he was a buyer.  You
19  thought he was a dealer?
20  A.      Correct, based --
21  Q.      Based on what Monaghan or Kelly told you?
22  A.      Yes.
23  Q.      And which one of them told you that,
24  Monaghan or Kelly?

Page 66

1  A.     Not sure.

2  Q.     Okay.

3         So you were following him to see what?

4  A.     To see what he did.

5  Q.     Okay.

6         And he didn't do anything from the time you

7  left Conestoga that you followed him until he went

8  into Master Street, correct?

9  A.     Correct.

10  Q.    When we say did, we both mean anything

11  illegal, right?

12  A.     Correct.

13  Q.     What did you see him do illegal once he

14  went into Master Street, sorry, 55th Street?

15  A.     I didn't see him do anything.

16  Q.     Did anyone see him?  Any police officer?

17  A.     There was an observation that was made by

18  Walker over at 55th Street.

19  Q.     What observation was that?

20  A.     Said Walker followed three individuals,

21  Delee and two other individuals, Tillman back to

22  55th and Hunter where -- it's cut off, like I said,

23  once again, where the car on 55th Street all these

24  males exited the Buick were in the 1628 58th let

Page 67

1  into by Torain.

2         Twenty minutes later all three of those

3  males exit.  Walker observed Delee place a clear bag

4  inside his pocket.  All three males go into the

5  Buick and were followed back to 56th and Master

6  Street by myself.  He remained at 1628 North 55th.

7  Q.     So it's your testimony that Walker observed

8  something illegal with respect to Torain or with

9  respect to the unit at 55th Street?

10  A.     Based on this report.

11  Q.    You did not, correct?

12  A.     I did not.

13  Q.     Okay.

14         But you arrested Torain eventually, right?

15  A.     Correct.

16  Q.     Who gave you the order to arrest him?

17  A.     I believe it would have been Officer

18  Monaghan.

19  Q.     Did he tell you why he wanted you to arrest

20  him?

21  A.     Based on the observations made on Ithan and

22  Master and then based on what Walker seen.

23  Q.     Okay.

24         Did you know what Walker saw other than

Page 68

1  reading this affidavit?

2  A.     I'm sure he said it over radio what he saw.

3  Q.     But he was on the scene with you, wasn't

4  he?

5  A.     No.  I said we were in separate vehicles.

6  Q.     Okay.

7         But he was in the area at Conestoga, right?

8  He followed him to Conestoga and then you followed

9  him from Conestoga to 55th, right?

10  A.     Correct.

11         I don't know exactly where he was at in the

12  area.  He was in the area, yes.

13  Q.     You do know that he was at some point at

14  55th Street because according to the affidavit, he

15  observed something?

16  A.     Correct.

17  Q.     All right.

18         Where were you when Torain went into 55th

19  Street?

20  A.     Probably -- well, it says here that Torain

21  was in there and then the three males showed up and

22  they were in there for 20 minutes.  Then I followed

23  those three individuals back to 55th and Master

24  Street.  I don't know exactly where I was.  I'm sure

Page 69

1  I was still in the area.

2  Q.     You were still in a back-up capacity?

3  A.     Still in the area, yes.

4  Q.     But you did not observe these three

5  individuals, did you?

6  A.     I did not.

7  Q.     You did not observe any of these three

8  individuals putting drugs in their pocket?

9  A.     Did not.

10  Q.    Did you observe Torain leave 55th at some

11  point?

12  A.     No, that was based on the information I

13  received from Walker, I believe.  If I could see

14  that report?

15  Q.     So --

16  A.     Yeah, it was based on because when those

17  three individuals left they went back to Master

18  Street.  I followed them and it clearly states

19  Walker remained at 55th and Hunter watching 1628.

20  Q.     Okay.

21         Did you arrest those three individuals?

22  A.     I believe they were arrested.  I'm not sure

23  if I did or not.

24  Q.     Well, you followed them back, correct?

KAREEM TORAIN - vs -
CITY OF PHILADELPHIA

BRIAN REYNOLDS

Page 70

1  A.      Yes, and then once back there Officer Kelly
2  and Monaghan would then take over surveilling those
3  individuals.
4  Q.      And you went from following them back to
5  Master Street to arresting Torain maybe nine, 10
6  blocks away from 55th Street?
7              ATTORNEY GONZALES:  Objection.  I
8          think some things happened in between, but
9          go ahead.  You can answer.
10             ATTORNEY PILEGGI:  We'll get to
11         it.
12             THE WITNESS:  Yeah, eventually he
13         left 1628 North 55th Street and I followed
14         him out of the area and arrested him, yes.
15 BY ATTORNEY PILEGGI:
16 Q.      You must have gone back to that area of
17 55th Street after you followed the other three
18 individuals back to Master Street?
19         Does that sound right?
20 A.      I probably -- it's really not that far
21 away.  I was probably still in the area, yes.
22 Q.      Okay.
23         And do you know why you were supposed to be
24 the arresting officer of Torain and not Walker who

Page 71

1  actually observed allegedly observed these
2  narcotics?
3  A.      I have no idea.  It's just the way things
4  transpired that day.
5  Q.      Nevertheless, you did -- did you follow
6  Torain from 55th Street to wherever he was arrested?
7  A.      Yes to 61st and Nassau.
8  Q.      And how many blocks is that?
9  A.      Not exactly sure.
10 Q.      If you had to guess?  Ten maybe?
11 A.      Well 55th to 61st is six blocks.
12 Q.      Okay.  Nassau?
13 A.      I'm not sure.  Maybe anywhere from 1 to 20
14 blocks, maybe.
15 Q.      All right.
16         Then you made the arrest based on the
17 information that either Monaghan or Kelly provided
18 you; is that correct?
19 A.      As well as Walker, yes.
20 Q.      Do you ever recall talking to Officer
21 Walker before you made the arrest of Torain as to
22 what Torain exactly did that was illegal?
23 A.      I don't recall if I did or not.  As I
24 stated, I'm sure he probably put it out over police

Page 72

1  radio.
2              ATTORNEY GONZALES:  Can we take
3          five minutes?  Joe, are you there?  We're
4          going to take five minutes.
5              ATTORNEY SENGOBA:  Okay.
6              (At this time, a short break was
7          taken.)
8  BY ATTORNEY PILEGGI:
9  Q.      Okay.
10         At some point, and it looks like around
11 3:00 p.m., 2:58 p.m., you stopped Torain's vehicle,
12 the green Bonneville, correct?
13 A.      Correct.  The 2:58 is when he left the
14 area.  Then I stopped him at 61st and Nassau, yes.
15 Q.      By the way, did you have any information on
16 Torain prior to this job that he was involved in any
17 illegal activity?
18 A.      I did not.  The only information that I
19 stated that I had was probably from Monaghan and
20 Kelly about the observations they made of him over
21 at Ithan or 5600 Master and then probably the
22 information that Walker seen him at 55th Street.
23 Q.      Before you stopped him, had you determined
24 who he was?  In other words, what his name was?

Page 73

1  A.      I did not, no.
2  Q.      Okay.
3          Was he described other than the vehicle?
4  Was there flash information?
5  A.      I'm sure there was.  I don't remember
6  exactly what the information was though.
7  Q.      Okay.
8          Nevertheless, you were told to stop, by
9  somebody, to stop the green Bonneville?
10 A.      Correct.
11 Q.      All right.
12         That's the same vehicle that you saw him
13 drive from Conestoga Street to 55th Street, correct?
14 A.      Yes.
15 Q.      All right.
16         You do not recall seeing him leave 55th
17 Street, but you do recall the stop that you made at
18 61st and Nassau?
19 A.      Yes.
20 Q.      All right.
21         What happened?
22 A.      He was stopped.  Recovered from him was a
23 pager, a cell phone and five keys, a black key ring
24 and one of them was later determined to work the

KAREEM TORAIN - vs -
CITY OF PHILADELPHIA

BRIAN REYNOLDS

Page 74

1  door to 1628 55th Street at Apartment 2 inside, and
2  $250 USC.
3              ATTORNEY GONZALES:  Is this based
4         on your review of the Affidavit of Probable
5         Cause?
6              THE WITNESS:  It is.
7  BY ATTORNEY PILEGGI:
8  Q.       I'm not trying to be smart, but keys
9  meaning real keys to open a door.  Not kilos?
10 A.       No.  Keys.
11 Q.       Was there anything illegal taken from him
12 at that time?  Any contraband?
13 A.       No.
14 Q.       Anything that you later determined was
15 contraband after he was arrested?
16 A.       From him?
17 Q.       Yeah.
18 A.       No.  As it states, it was just the keys,
19 the phone, the pager, and the money.
20 Q.       Okay.
21           I'm saying did you look in the pager somehow
22 or the cell phone and determine that he was somehow
23 involved in any illegal activity?
24 A.       No.

Page 75

1  Q.       You didn't look or you looked and you
2  didn't find anything?
3  A.       I didn't look.
4  Q.       Okay.
5           Would that be something you would normally
6  do?
7  A.       No.
8  Q.       Okay.
9           Is it fair to say that his stop and arrest
10 was based solely on what Monaghan or Kelly told you
11 as well as some information that Walker informed you
12 about at 55th Street?
13 A.       Yes.
14 Q.       Okay.
15           Was there anything about the 55th Street
16 unit that in your mind was illegal?  In other words,
17 was Torain doing anything that you determined later
18 on -- anything illegal in 55th Street?
19 A.       There was a safe that was recovered in
20 there.
21 Q.       Okay.
22 A.       With some crack cocaine in it.
23 Q.       And let's talk about that.
24           You confiscated keys as the affidavit

Page 76

1  states, correct?
2  A.       Correct.
3  Q.       Specifically, it's kind of cut off, but it
4  says something ring containing five keys, right?
5  A.       Yes.
6  Q.       And one black key ring containing three
7  keys.  One later to work the door at 1628 North 55th
8  Street and Apartment 2 inside, right?
9  A.       Right.
10 Q.       Okay.
11           So you confiscated those items?
12 A.       Correct, and they were turned over to
13 Monaghan.
14 Q.       And when you arrested Mr. Torain, you put
15 those on property receipts, correct?
16 A.       They would've all been turned over to
17 Officer Monaghan and then put on a property receipt,
18 yes.  Not when we got back at headquarters.
19 Q.       Well, when you arrested him where was he
20 transported to?
21 A.       I believe it would have been 55th and Pine,
22 not 100 percent sure, because that's the holding
23 facility for that area.
24 Q.       Did you transport him?

Page 77

1  A.       I don't believe I did.
2  Q.       Because you went back to arrest Mr. Hodge,
3  correct?
4  A.       Correct.
5  Q.       All right.
6           So whoever the strike force guys who were
7  there were the ones that transported him?
8  A.       Yes.
9  Q.       Is that in any of the paperwork who they
10 were?
11 A.       No, I don't believe so.  I haven't seen it.
12 Q.       Wouldn't that have to be in an arrest
13 report?
14 A.       You would have to take that up with Officer
15 Monaghan.  I didn't prepare this report.
16 Q.       Well, you were the one that did the arrest.
17 Wouldn't you have to be the one to prepare the
18 arrest report?
19 A.       No.
20 Q.       You would not?
21 A.       I did the arrest.  Everything that I did
22 was told to Monaghan who's the assigned investigator
23 who would do all the paperwork.
24 Q.       So in other words, you at some point went

KAREEM TORAIN - vs -
CITY OF PHILADELPHIA

BRIAN REYNOLDS

Page 78

1  back and told Officer Monaghan that you confiscated
2  a key ring containing three silver keys, one that
3  worked the door at 55th Street, one Cancer key ring
4  containing five keys, Phillips market pager,
5  Motorola Nextell cell phone, and a Commonwealth of
6  Pennsylvania board of probation and parole in the
7  name of the defendant.
8           You told them that they were the items that
9  you confiscated off of Mr. Torain at the time?
10 A.       I don't remember the parole paperwork that
11 you're talking about.
12 Q.       Well, you were the one that confiscated
13 whatever was confiscated, correct?
14                  ATTORNEY GONZALES:  Wait a
15              minute.  That's argumentative.  You asked
16              him.  He answered it.  He doesn't remember
17              it.  You can't just keep saying but.
18                  ATTORNEY PILEGGI:  No, I'm just
19              asking him.
20 BY ATTORNEY PILEGGI:
21 Q.       You're the one that confiscated those
22 items, correct?
23 A.       The cell phone, the pager, the keys, the
24 money.  I don't remember that piece of paperwork

Page 79

1  that you're talking about or it doesn't say it.
2           If you show me what you're looking at?
3  Q.       Sure.
4  A.       I'll be able to --
5                  ATTORNEY PILEGGI:  Let's mark
6              that as Reynolds-2.
7                  (At this time, documents were
8              marked for identification as Reynolds-2.)
9                  ATTORNEY GONZALES:  Do yo have
10             extra copies?
11                  ATTORNEY PILEGGI:  I do not.  I
12             just want to do this collectively.  This is
13             property receipts 2308-207, 2308-208 and
14             2308-210.
15                  ATTORNEY GONZALES:  You don't
16             have copies?
17                  ATTORNEY PILEGGI:  I do not.
18                  ATTORNEY GONZALES:  Can you make
19             some?
20 BY ATTORNEY PILEGGI:
21 Q.       All right.  Do you see these property
22 receipts collectively the last numbers are 07, 08
23 and 10?
24                  ATTORNEY GONZALES:  For the

Page 80

1  record they're marked NFU 7462, 63 and 64,
2  Bates numbered.
3                  ATTORNEY PILEGGI:  Which were
4              provided by the City, correct?
5                  ATTORNEY GONZALES:  Yup.
6                  ATTORNEY PILEGGI:  All right.
7  BY ATTORNEY PILEGGI:
8  Q.       Do you see those property receipts,
9  Officer?
10 A.       Correct.
11 Q.       The property receipts representing what was
12 ever -- whatever was confiscated from Mr. Torain,
13 right?
14 A.       Correct.
15 Q.       Okay.
16         I want to read 07.  Do you see there
17 where it says there was a Pennsylvania looks like a
18 parole some kind of notice?
19 A.       Correct.
20 Q.       You don't recall confiscating that?
21 A.       I do not.
22 Q.       Okay.
23         Do you recall confiscating the keys,
24 correct?

Page 81

1  A.       Correct.
2  Q.       Both set of keys?
3  A.       Correct.
4  Q.       You recall confiscating the phone, right?
5  A.       Correct.
6  Q.       You also recall confiscating the pager,
7  right?
8  A.       Correct.
9  Q.       But you do not recall --
10 A.       I do not.
11 Q.       -- that notice?
12 A.       Do not.
13 Q.       Do you know who would have put that on
14 there?
15 A.       I do not.
16 Q.       Do you think that that's not something that
17 was confiscated off him a the time?
18 A.       If it's on here someone had to confiscate
19 it.  I just don't remember doing it.
20 Q.       You were the confiscating officer, right?
21                  ATTORNEY GONZALES:  You have
22              asked that question.  Every time he answers
23              something and you're not satisfied with the
24              answer you go but you were the officer --

KAREEM TORAIN - vs -
CITY OF PHILADELPHIA

BRIAN REYNOLDS

Page 82

1    ATTORNEY PILEGGI:  I'm very
2        satisfied with that answer.
3            ATTORNEY GONZALES:  Fine.  Then
4        don't argue with the witness.
5    BY ATTORNEY PILEGGI:
6    Q.    Do you know who would have put that on the
7    property receipt of the items that you confiscated
8    off of Mr. Torain?
9            ATTORNEY GONZALES:  Objection to
10        the form of the question.  Asked and
11        answered.  You can answer it again.
12            THE WITNESS:  I do not.
13    BY ATTORNEY PILEGGI:
14    Q.    Okay.
15        And these are all items, whether you don't
16    recall them being confiscated at the time or whether
17    you do recall it being confiscated at the time,
18    these are all items that you informed Officer
19    Monaghan that you confiscated off of Mr. Torain?
20    A.    Correct.
21    Q.    Okay.
22        When was that?
23    A.    Probably when he -- before he went back to
24    type up the search warrant for 1628 55th Street.

Page 83

1    Q.    Well, I don't want you to guess.  You said
2    probably.  Do you recall specifically?
3    A.    I don't remember exactly, no, because as I
4    stated it's 20 years ago.
5    Q.    Well, do you see there what the time of the
6    arrest was?
7    A.    I do.  It says 3:30.
8    Q.    Okay.
9        Look at some of the other property receipts.
10    See if there's a different time?
11    A.    3:05, 3:30.
12    Q.    Can you explain that?
13    A.    No, I can't.
14    Q.    Do you know when the actual arrest was?
15    Was it 3:30 or 3:05?
16    A.    I would say it was probably 3:05 because it
17    wouldn't take a half an hour to get from 1628 North
18    55th to 61st and Nassau.
19    Q.    Okay.
20        So Mr. Torain was transported, you think, to
21    55th and Pine and was placed under arrest and put in
22    a cell?
23    A.    Yes.
24    Q.    Okay.

Page 84

1    He was being arrested based on the
2    observations of Monaghan, Kelly and Walker.
3            ATTORNEY GONZALES:  Objection.
4        Asked ans answered multiple, multiple
5        times.  You can answer again.
6            THE WITNESS:  Yes.
7    BY ATTORNEY PILEGGI:
8    Q.    All right.
9        Now you actually -- do you recall at the
10    preliminary hearing testifying to the circumstances
11    of the arrest?
12    A.    I do not.  Do you have a copy?  I'd like to
13    take a look at it.
14    Q.    Do you recall testifying to anything at the
15    preliminary hearing?
16    A.    No.
17    Q.    Okay.
18        How about at trial?
19    A.    I don't recall.
20    Q.    Okay.
21        But wouldn't you be the officers, the
22    arresting officer, that would be the one that would
23    have to testify as to whether there was sufficient
24    probable cause to arrest that particular person?

Page 85

1    A.    Well, I wouldn't testify to the probable
2    cause.  I would just basically say based on the
3    information from Monaghan and Kelly and what
4    Walker observed, the defendant Kareem Torain was
5    followed out of the area and arrested by myself.
6    Other officers could do that if it was done in their
7    presence.  Not sure if that was done in the case or
8    not.
9    Q.    Okay.
10        Now, some of these items, and I will give
11    you an opportunity to tell us which ones, some of
12    these items were actually given to another police
13    officer after you made the arrest and after you made
14    the confiscations, right?
15        In other words -- let me rephrase that.
16        Did you recall taking the items down to 55th
17    and Pine to be processed?
18    A.    I don't recall.  I know I turned the items
19    at some point over to Monaghan and Kelly or Monaghan
20    because he would be the assigned, not Kelly.
21    Q.    So you recall all the items or some of the
22    I items?
23    A.    Just on property receipt 2308-207 I
24    remember items one, two, three and four being turned

Page 86

1  over to Officer Monaghan.
2  Q.       What are one, two, three and four?
3  A.       The keys, the other set of keys, the pager
4  and the cell phone.
5  Q.       How about the money?  Did you keep that?
6  A.       No, that was turned over to Officer
7  Monaghan also.
8  Q.       As well?  At the same time as the keys?
9  A.       Probably, yes.
10 Q.       You said probably.  Do you recall
11 specifically?
12 A.       Yeah, it would have been turned over.
13 Q.       You wouldn't have carried that around with
14 you, would you?
15 A.       No.
16 Q.       Anything else turned over to them?
17 A.       That's all that I recall I did.
18 Q.       Okay.
19          You keep saying turned over perhaps either
20 to Monaghan or Kelly --
21 A.       It would have been Monaghan not Kelly.
22 Monaghan was the assigned.
23 Q.       Am I correct that at some point you were
24 present when Officer Monaghan, yourself and perhaps

Page 87

1  other officers went back to 55th Street to enter
2  that unit?
3  A.       Correct.
4  Q.       Okay.
5           Why did you do that?
6  A.       It was determined to go back to secure that
7  property where Torain went to.
8  Q.       Secure it for what?
9  A.       So that evidence would no be destroyed or
10 lost.
11 Q.       What evidence?
12 A.       Obviously there was crack cocaine in there.
13 Q.       Well, how did you know there was crack
14 cocaine in there?
15 A.       After there was a warrant done it was
16 confiscated.
17 Q.       Wait a minute.  After a warrant was done
18 you knew there was crack cocaine.  I'm asking you
19 what was the probable cause at that point to go into
20 that unit?
21 A.       Based on the observation that was made out
22 front by Walker and based on what Kareem Torain was
23 seen doing over on Master Street.  That was all
24 basis for following him to 55th Street as well as

Page 88

1  securing the property.
2  Q.       What did Master Street have anything to do
3  with 55th Street?  In other words, how did that fit
4  into the probable cause of going into 55th Street?
5  A.       He was seen leaving there and going over to
6  Conestoga --
7  Q.       So?
8  A.       -- then Master Street.
9  Q.       So?
10          We already determined that he didn't do
11 anything illegal all that period of time.
12 A.       Well, no, he did some transaction over on
13 Master Street with one of the dealers from over
14 there, correct?
15 Q.       Who told you that?
16 A.       Monaghan and Kelly.  It's in the police
17 report.
18 Q.       Well, it is in the police report.  Did they
19 tell you that before you arrested Torain?
20 A.       Sure.
21 Q.       When?
22 A.       Over police radio.  That's why they had us
23 follow him.
24 Q.       When before he went into 55th Street?

Page 89

1  A.       Probably --
2  Q.       Or before he went into --
3  A.       -- he --
4                   ATTORNEY GONZALES:  Whoa.  Whoa.
5                   THE COURT REPORTER:  Hold on.
6                   ATTORNEY PILEGGI:  I have to
7           finish the question.
8                   ATTORNEY GONZALES:  We have gone
9           over this.
10                  ATTORNEY PILEGGI:  No, we
11          haven't.
12                  ATTORNEY GONZALES:  Absolutely.
13          You asked him why did you arrest him and he
14          told you he is not sure but he remembered
15          he got information from the officers.
16          You've asked this question at least five or
17          six times.
18                  ATTORNEY PILEGGI:  I didn't.
19                  ATTORNEY GONZALES:  What's the
20          question?  I want to hear the question that
21          hasn't been answered.
22                  ATTORNEY PILEGGI:  You didn't let
23          me finish.
24 BY ATTORNEY PILEGGI:

KAREEM TORAIN - vs -
CITY OF PHILADELPHIA

BRIAN REYNOLDS

Page 90

1  Q.      Did they -- did you give -- did they give
2  you that information before he went into Conestoga
3  or before he went into Master, okay?
4  A.      That's why we --
5  Q.      I'm sorry, 55th Street?
6  A.      When he left Master Street the reason they
7  told us to follow him was because he did an
8  interaction with one of the dealers that was out
9  there.  That's why he was then followed to
10 Conestoga.  Then we continued to surveil that and
11 then he was followed to 55th Street where you had
12 three individuals where Walker made observations
13 from.
14 Q.      Okay.
15 A.      Based on that is why I followed him out of
16 the area and arrested him.
17 Q.      Okay.  So --
18 A.      I would have had to have that information
19 in order the place him under arrest.
20 Q.      Okay.
21         So I'm asking you what was the probable
22 cause to take the key that you gave to Monaghan and
23 at least yourself and Monaghan go back to 55th
24 Street and go in that unit?

Page 91

1  A.      It was to secure it so that evidence
2  wouldn't be lost or destroyed.
3  Q.      Okay.
4  A.      Monaghan and the supervisor made that
5  decision to do that.
6  Q.      Okay.
7          This is what I am going to ask you now:  So
8  in order to enter a unit, am I correct, in your
9  experience as a police officer, 28 years, in order
10 to enter a unit you have to have probable cause,
11 correct?
12 A.      Correct.
13 Q.      All right.
14         And is it your testimony that the probable
15 cause to go into that unit is to secure it to make
16 sure that evidence wouldn't be destroyed?
17 A.      Yes.
18 Q.      And that evidence that you think was in
19 that unit was based on what Walker told you or came
20 over the police radio and what Monaghan told you
21 when he was surveilling at the scene at Master
22 Street?
23 A.      Correct.  That's why Monaghan along with a
24 supervisor determined to go secure the property.

Page 92

1  Q.      Let me ask you a question.  How did you
2  know which keys?  Did you take all the keys?  I see
3  two sets of keys and there has got to be in both
4  sets 10 keys or maybe eight keys.  Did you go try
5  them all?
6  A.      I did not.  Monaghan would have done that.
7  Q.      Well, you gave the keys to Monaghan right?
8  A.      Correct, but I wouldn't --
9  Q.      Well, would you --
10 A.      Hold on.  I'm answering your question.
11 Q.      Okay.
12 A.      I wouldn't have tried it.  Everything was
13 turned over to Monaghan.  The property was then
14 secured once determined that the keys that were
15 taken from Torain worked 1628 55th Street as well as
16 the apartment door.
17 Q.      And you were there though, right?
18 A.      I was there, yes.
19 Q.      With Monaghan.  Did you go right from the
20 scene of the arrest back to 55th Street to meet
21 Monaghan there?
22 A.      I'm not sure when we went back.  We did go
23 back, yes.
24 Q.      Okay.

Page 93

1          Now, am I correct at least at this point
2  when you went back to the 55th Street, there still
3  had not been any arrest made other than Mr. Torain?
4  A.      I think it was all transpiring as it was
5  going along.  So there was arrests that were made
6  after the fact.
7  Q.      Yeah, after Torain was arrested?
8  A.      Correct.
9  Q.      And after you went to 55th Street, correct?
10 A.      No, we wouldn't have went to 55 Street
11 until after everything was under control and
12 everyone was arrested.
13 Q.      So is there anywhere in this document that
14 says anything about when you went back to 55th
15 Street?  At what time?
16 A.      It says 3:50.
17 Q.      3:50, okay.
18         Am I correct that based on this document,
19 that most of the arrests of the other individuals at
20 Master Street was about 3:30?
21 A.      There was one at 3:17, 3:27, yeah.
22 Q.      Okay.
23         So let me get this straight.  You arrest him
24 at 3:05.  And then you go take the keys, meet

KAREEM TORAIN - vs -
CITY OF PHILADELPHIA

BRIAN REYNOLDS

Page 94

1  Monaghan and go into the unit at 3:50 55th Street.
2  A.      That's what the paperwork says.
3  Q.      What did you do from 3:05 to 3:50?
4  A.      I have no idea.
5  Q.      Well, we know that you made another arrest
6  at some point, tight?
7  A.      Yeah, I made another arrest.
8  Q.      Was that before or after the Torain arrest?
9  A.      That one was after, I believe, correct.
10 Q.      Okay.
11         Was it before or after the arrest at Master
12 Street?
13 A.      What arrest at Master Street.
14 Q.      Okay.  Let's look at it.
15         Looks like they --
16 A.      I didn't participate --
17 Q.      Hold on.  You asked me and I will clarify
18 it for you.  It looks like they hit the houses at
19 3:30, 5605, 5607 and 5609.  I think we can all agree
20 they're houses that are side by side.
21              ATTORNEY GONZALES:  What are you
22         reading?  Because that's not what it says
23         in the PARS.
24              ATTORNEY PILEGGI:  I don't know

Page 95

1         why you keep reading the PARS, John.  I
2         know you want me to use the PARS.  I would
3         rather use the affidavit.
4              ATTORNEY GONZALES:  Can you
5         please point out where it says 3:30?
6              ATTORNEY PILEGGI:  Second to the
7         last page.
8              ATTORNEY GONZALES:  What's the
9         Bates number?
10             ATTORNEY PILEGGI:  479.
11             ATTORNEY GONZALES:  479, all
12        right.  Where are you reading that says
13        3:30 p.m.
14             ATTORNEY PILEGGI:  1/4 at
15        approximately 3:30 p.m. members of the
16        narcotics executed search and seizure
17        warrants 99025, 99026, 99027 at 5605, 5607,
18        5609 Master Street and had to forcibly gain
19        entry into all the properties.  You see
20        that?
21 BY ATTORNEY PILEGGI:
22 Q.      So based on that is it fair to say that
23 they hit all these houses at 3:30?
24 A.      Yeah, it wouldn't be just us hitting the

Page 96

1  houses though.  It would be other members of the
2  unit.
3  Q.      But that wasn't my question.
4          My question was what did you do -- let me
5  ask you, did you participate in those search and
6  seizures at 3:30?
7  A.      I'm not sure if I did or not.  If you show
8  the search warrants I will see if my badge number is
9  on there.  I could tell you if I participated in any
10 of the searches.
11 Q.      Well, let me ask you this -- we'll get to
12 that in a second.
13         Did you participate in the search of 55th
14 Street at 3:50?
15 A.      No.
16 Q.      How do you know?
17 A.      Because that wasn't done until after the
18 warrant was done.
19 Q.      Are you sure about that?
20 A.      Yes.  Positive.
21 Q.      Okay.
22         So what do you mean?  When was the warrant
23 done?
24 A.      Well, once the property is secured you

Page 97

1  leave officers there.  Monaghan goes back, types up
2  a warrant for that, and then the evidence is seized.
3  Q.      Okay.
4          But you were present when Monaghan tried the
5  keys and secured the unit, correct?
6  A.      Yes.
7  Q.      Okay.
8          And it's your testimony that someone was
9  left there to secure the property?
10 A.      Yes.
11 Q.      Who was that?  Was that yourself?
12 A.      I have no idea.
13 Q.      Would it be NFU Officers or would you use
14 other officers?
15 A.      It would be an NFU Officer.
16 Q.      Okay.
17         Would that be memorialized somewhere.
18 A.      I'm not sure.  You would have to ask
19 Monaghan that.
20 Q.      Okay.
21         So when they went into the property, you
22 were there when they used the key, did it open the
23 front door?
24 A.      Yes.

KAREEM TORAIN - vs -
CITY OF PHILADELPHIA

BRIAN REYNOLDS

Page 98

1   Q.      Okay.

2           Am I correct that we now know or maybe you

3   don't, that it was a rooming house?

4   A.      Yes.

5   Q.      A boarding house, whatever they call it?

6   A.      Yes.

7   Q.      In other words, there were several

8   apartments in there?

9   A.      Several rooms in there, yes.

10  Q.      Okay.

11          Did you go try the keys in all the different

12  rooms or did the one key just open up the front

13  door?

14              ATTORNEY GONZALES:  Objection.

15          The witnessed has already answered he

16          didn't do the key for any of the doors.

17          You keep saying you and --

18              ATTORNEY PILEGGI:  He was on the

19          scene.  All right.  Let me rephrase.

20  BY ATTORNEY PILEGGI:

21  Q.      When you gave the key to Monaghan and

22  Monaghan tried the keys, did the key open the front

23  door?

24  A.      Yes, one of the keys did.

Page 99

1   Q.      And you're looking at this document.  I

2   will submit to you there is nowhere on the document

3   that says anything about this, so I mean.

4   A.      I understand, do you have a question?

5   Q.      It opens up the front door, one of the

6   keys?

7   A.      Yes.

8   Q.      Do you go in with Monaghan?

9   A.      Yes.

10  Q.      So you break the barrier of the outside

11  door?

12  A.      We walk in.  We don't break nothing.

13  Q.      I mean you walk in.

14  A.      Yes.

15  Q.      Is there a hallway?

16  A.      Yes.

17  Q.      And you go upstairs?

18  A.      No, the apartment -- that apartment, I

19  believe, was right there as soon as you go in to the

20  right.

21  Q.      What that apartment?

22  A.      I didn't say that apartment.  I said the

23  apartment where the other key worked.  Apartment 2

24  where it was determined that Torain was, was right

Page 100

1   there.

2   Q.      This is what I'm trying to ask you.

3           Did Monaghan with you in tow go and check

4   every apartment to see if the key fit or did you

5   know where you were going?

6   A.      I think Monaghan knew where we were

7   going --

8   Q.      How did he know that?

9   A.      Based on where Walker made observations.

10  Q.      Of what?

11  A.      Seeing Torain in a room.

12  Q.      He actually saw Torain in that room?

13  A.      I believe it's somewhere in the police

14  paperwork, yes.

15  Q.      Okay.

16          Well, do you recall Officer Walker

17  testifying to that at trial?

18  A.      I do not know.  I don't know what Walker

19  testified to.

20  Q.      All right.

21          Let me read you this.  I'm referring to the

22  fourth page again.

23          It says at approximately 3:50 members of the

24  narcotics went to 1628 North 55th Street to attempt

Page 101

1   to secure the apartment that Torain went in to.

2           Police officer Kelly spoke with the manager

3   of the property, Vincent Saunders in reference to a

4   black male who rented a room inside.

5           Let me stop there.  So Officer Kelly was

6   also on the scene.

7   A.      Correct.

8   Q.      Do you recall that?

9   A.      I don't recall -- I mean, I recall speaking

10  to someone.  I don't remember the gist of it.  I

11  wasn't there listening.

12  Q.      You recall Kelly speaking to someone or

13  yourself?

14  A.      It says Kelly, correct?

15  Q.      Right.

16              ATTORNEY GONZALES:  The question

17          is do you recall Kelly being there.

18              ATTORNEY PILEGGI:  Right.

19              THE WITNESS:  I recall Kelly

20          being there, yeah.  I answered that.

21              ATTORNEY PILEGGI:  Well, that's

22          what I asked you.

23              ATTORNEY GONZALES:  It's just the

24          same questions over and over.

KAREEM TORAIN - vs -
CITY OF PHILADELPHIA

BRIAN REYNOLDS

Page 102

1  BY ATTORNEY PILEGGI:
2  Q.      Do you recall any other officers other than
3  yourself Monaghan and Kelly?
4  A.      There would have been a supervisor with us
5  also.  It would have either been Sinclaire or
6  Gessner.
7  Q.      Why would there be a supervisor there?
8  A.      Because you need a supervisor in order to
9  go in to secure a property.  You have to inform them
10 on what you want to do and make sure they're there
11 with you.
12 Q.      Do you recall who called the supervisor?
13 A.      I do not.
14 Q.      Do you recall which supervisor?
15 A.      As I stated, it probably would have been
16 either Sinclaire or Gessner.
17 Q.      And do you recall someone speaking to a
18 manager of the property, Vincent Saunders?
19 A.      Based on reading, it says Kelly spoke to
20 him.
21 Q.      I want to know if you have an independent
22 recollection of that?
23 A.      No.
24 Q.      But you were in there, right?

Page 103

1  A.      Correct.
2  Q.      It was a pretty small unit; do you recall
3  that?
4  A.      It was also 20 years ago.
5  Q.      Okay.
6          It was a pretty small unit, correct?
7  A.      Correct.  It was a three-story unit, I
8  believe.
9  Q.      Okay.
10         I am going to ask this again because it was
11 never answered.  Do you recall Monaghan or any other
12 Officer trying the keys in any other room?
13 A.      I do not, no.
14 Q.      Okay.
15         But you think Monaghan knew that Torain was
16 in room number 2, right?
17 A.      Correct.
18 Q.      Okay.
19         Was that door opened?  Room number 2?
20 A.      Yes, it would have been opened to determine
21 the key worked there.  Then it was secured.
22 Q.      You said the key worked the outer door.
23         ATTORNEY GONZALES:  He said the
24     key worked the outer and the --

Page 104

1          ATTORNEY PILEGGI:  No, he did
2      not, John.
3          ATTORNEY GONZALES:  He just did.
4          ATTORNEY PILEGGI:  Please.
5          ATTORNEY GONZALES:  He just did.
6          THE WITNESS:  It says it right
7      here in the paperwork.
8          ATTORNEY GONZALES:  It's in the
9      report.  He just did.
10         ATTORNEY PILEGGI:  I'm asking him
11     his independent -- I don't want him to read
12     from a report?
13         ATTORNEY GONZALES:  He doesn't
14     remember.  He said that over and over
15     again.
16 BY ATTORNEY PILEGGI:
17 Q.      Okay.
18         So you recall --
19         ATTORNEY GONZALES:  Look, do you
20     want to do the whole deposition with him
21     not reviewing a document and not having
22     anything in front of him?  He's going to
23     say I don't recall 150 times.  It's up to
24     you how you want to do it.

Page 105

1          ATTORNEY PILEGGI:  I don't.
2      John, this is my deposition.  Please.
3  BY ATTORNEY PILEGGI:
4  Q.      All right.
5          So, based on this reading of the document,
6  all right, we'll do it your way.
7          Based on that, you're saying that one key
8  fit both the outer door and the inner door?  Is that
9  what you're saying?
10 A.      I don't know if it was one key or if it was
11 two separate keys.  It says one was later to work
12 the door at 1628 North 55th Street and apartment 2
13 inside.
14 Q.      Okay.  All right.
15 A.      I'm not sure if it was the same key or two
16 separate keys.
17 Q.      So when the door was opened by Monaghan,
18 right, did he go inside?
19 A.      It was a room, you --
20 Q.      I don't care.  Did he go inside?
21         ATTORNEY GONZALES:  He wants.
22     Hold on.  I got it.
23         THE WITNESS:  Why is he getting
24     so angry?

KAREEM TORAIN - vs -
CITY OF PHILADELPHIA

BRIAN REYNOLDS

Page 106

1          ATTORNEY GONZALES:  I don't know
2    why he's getting angry.
3          He wants to know whether Officer Monaghan,
4    after he opened the door with the key,
5    stepped foot inside the room.
6          Is that what you're trying to ask?
7          ATTORNEY PILEGGI:  I wasn't
8    trying.  I did ask that.
9          ATTORNEY GONZALES:  Do you
10   understand the question?
11         THE WITNESS:  Yeah, I understand
12   the question.
13         ATTORNEY GONZALES:  All right.
14   BY ATTORNEY PILEGGI:
15   Q.     Did someone -- did an Officer break the
16   barrier of that door?  I don't mean physically.
17   A.     He probably opened the door, looked into
18   the room, then we secured it.
19   Q.     You saw that?
20   A.     Yes.
21   Q.     What did you do to secure it?
22   A.     Had an Officer stay there while he went and
23   typed the search warrant.
24   Q.     He looked in the room.  What was he looking

Page 107

1    for?
2    A.     You would have to ask Monaghan that.
3    Q.     Okay.  I did.
4    A.     Okay.
5    Q.     Now, did you look in the room?
6    A.     I probably looked in the room.
7    Q.     What were you looking for?
8    A.     I just looked in the room.  I wasn't
9    looking for nothing.
10   Q.     Well, why would you look in the room then?
11   A.     To see what it was.
12   Q.     Were you looking to see if anything was in
13   plain sight?
14   A.     There was nothing in plain sight, if that's
15   what you're asking.
16         ATTORNEY GONZALES:  That wasn't
17   his question.  He just asked you if that
18   was the purpose of you looking in --
19         THE WITNESS:  Sure.  Probably.
20   BY ATTORNEY PILEGGI:
21   Q.     Probably.  Okay.
22         Do you think you broke the barrier of the
23   door?
24         ATTORNEY GONZALES:  When you say

Page 108

1    break the barrier, do you mean step inside?
2    Cross the threshold?
3          ATTORNEY PILEGGI:  Okay.
4    BY ATTORNEY PILEGGI:
5    Q.     Did you go in and cross the --
6    A.     I stated we stepped in.
7    Q.     Was that door locked?
8    A.     I believe it was because he had to unlock
9    it with the key, yes.
10   Q.     When that door -- when you broke the
11   threshold of that door, stepped inside, looked
12   inside, whatever, was the supervisor there?
13   A.     Sure.
14   Q.     Okay.
15         Do you remember having any interaction with
16   the supervisor?
17   A.     I wouldn't have had.  It would have been
18   Officer Monaghan.  He was the assigned investigator.
19   Q.     Then you leave there.  You don't see
20   anything in the room, right?
21   A.     Correct.
22   Q.     Okay.
23         You leave there, but you leave somebody at
24   the door to secure it?

Page 109

1    A.     Correct.
2    Q.     You don't recall who that was?
3    A.     I do not.
4    Q.     What was the point of that?
5    A.     To make sure the evidence, if there was any
6    evidence in there, didn't get lost or destroyed
7    because Monaghan was typing up a search warrant.  We
8    are not just going to leave the property at that
9    point.  The people know we're there.  If there's
10   anything in there people could go in there and try
11   to destroy the evidence.
12   Q.     And it's your testimony you didn't go into
13   any drawers or anything to look for evidence at that
14   time?
15   A.     I did not.  I don't recall anybody else
16   either.
17   Q.     Do you recall the size of the room?
18   A.     Smaller than this, I believe.
19   Q.     Probably the size of the bathroom in there?
20   A.     Could be.  If you have pictures of it I'd,
21   you know.
22   Q.     Was there a bed in there?  Do you recall
23   that?
24   A.     I believe so, yes.

KAREEM TORAIN - vs -
CITY OF PHILADELPHIA

BRIAN REYNOLDS

Page 110

1  Q.        There was a bureau?
2  A.        I believe so, yes.
3  Q.        Anything else?
4  A.        Not that I recall.
5  Q.        Okay.
6            Did you observe a safe in there?
7  A.        There was a safe that was recovered, yes.
8  Q.        That's not what I asked you.
9  A.        I didn't observe it at that point.
10 Q.        Do you know if Monaghan observed the safe
11 at that point?
12 A.        You would have to ask Monaghan.
13 Q.        I did. I'm asking you.
14 A.        I don't know what Monaghan observed.
15 Q.        Okay.
16           Did Monaghan say I see something in there.
17 We gotta secure it?
18 A.        I don't remember what Monaghan said.
19 Q.        All right.
20           Do you remember a safe being confiscated at
21 that time at 3:50?
22 A.        I don't know.
23 Q.        Taken back to 55th and Pine?
24 A.        I don't remember that, no.

Page 111

1  Q.        You do not?
2  A.        I do not.
3  Q.        You don't remember a safe being taken back
4  and being pried open after the 3:50 search?
5  A.        I don't remember that, no.
6            ATTORNEY GONZALES:  I'm sorry.
7  I'm lost.  You're talking about before or
8  after the search warrant?
9            ATTORNEY PILEGGI:  I'm talking
10 about at 3:50 when they went there, looked
11 in the room --
12           ATTORNEY GONZALES:  Okay.
13           ATTORNEY PILEGGI:  -- and used
14 the key to open the room and went in.
15           ATTORNEY GONZALES:  Okay.  Before
16 the --
17 BY ATTORNEY PILEGGI:
18 Q.        You do not recall a safe being confiscated
19 at that time?
20 A.        I do not.
21 Q.        Okay.
22           Is it fair to say at that point Mr. Torain
23 has still not done anything illegal that you have
24 any proof that he did anything illegal other than

Page 112

1  the observations of Monaghan and perhaps Walker?
2  A.        Based on what Monaghan and Walker told me
3  is the --
4  Q.        Right.  Other than that?
5  A.        Other than that, no.
6  Q.        There was no physical evidence confiscated,
7  nothing that he did illegal confiscated from him
8  when you stopped him, and nothing in this room at
9  this point at 3:50?
10 A.        Correct.
11 Q.        All right.
12           So at some point you go back to -- and,
13 again, this is based on what you said, I guess 55th
14 and Pine.  You think that is where the job was
15 written up?
16 A.        I don't know where he typed it up at.
17 Q.        Whatever.
18           Do you recall going back to that place and
19 preparing the paperwork, typing up, doing whatever
20 you needed to do to complete this job?
21 A.        Correct.  They did go back with a warrant.
22 I'm not sure if I was back there or not, but it
23 clearly states here there was a warrant that was
24 done at 1:00 am.

Page 113

1  Q.        1:00 a.m.
2  A.        Correct.
3  Q.        So you went there at 4:00, approximately
4  4:00, 3:50 p.m.  Then some police officers probably
5  Monaghan at least, right?
6            ATTORNEY GONZALES:  If you know.
7            THE WITNESS:  Monaghan what?
8            ATTORNEY GONZALES:  I don't know.
9            ATTORNEY PILEGGI:  Reynolds-3.
10           (At this time, a document was
11 marked for identification as Reynolds-3.)
12           ATTORNEY GONZALES:  Do you have
13 an extra copy?
14           ATTORNEY PILEGGI:  I do not.  You
15 can look off of that one.
16 BY ATTORNEY PILEGGI:
17 Q.        Okay.
18           Does that look like the warrant that was
19 prepared for 55th Street?
20 A.        Yes.
21 Q.        Okay.
22           What's the time on that?
23 A.        It says 1:00 a.m.
24 Q.        What's the date?

Page 114

1  A.        1/5.

2  Q.        1/5 what?

3  A.        00.

4  Q.        Okay.

5            We are back to 2000?

6  A.        Yeah, I guess so.

7  Q.        Okay.

8                    ATTORNEY GONZALES:  It also has

9            as time stamp from the approval of the

10           court of 2001.

11                   ATTORNEY PILEGGI:  I realize

12           that.

13                   ATTORNEY GONZALES:  Okay.

14  BY ATTORNEY PILEGGI:

15  Q.        Nevertheless, the warrant itself says 2000?

16  A.        It does.

17  Q.        And Monaghan signed off on that or prepared

18  that?

19  A.        Yes.

20  Q.        What does it say was confiscated?

21  A.        Sentry fire safe, clear bag containing 17

22  grams of crack and an amber plastic pill bottle with

23  white cap.

24  Q.        So you don't know who was securing that

Page 115

1  unit from 4:00 p.m. to 1:00?

2                   ATTORNEY GONZALES:  Objection.

3            Asked and answered.  You can answer it

4            again.

5                   THE WITNESS:  I do not.

6  BY ATTORNEY PILEGGI:

7  Q.        Okay.

8            But it would probably be somebody from the

9  NFU?

10                  ATTORNEY GONZALES:  Objection.

11           Asked and answered.  You can answer it

12           again.

13                  THE WITNESS:  Yes.

14  BY ATTORNEY PILEGGI:

15  Q.        Okay.

16           Would that be standard practice to have

17  someone stand there or sit there, whatever they're

18  doing, that period of time while you get a warrant?

19  A.        Yes.

20  Q.        Okay.

21           Is there any reason why they waited until

22  1:00 in the morning?  Seven hours later.

23  A.        Well, he would have to go back, prepare the

24  report, then the warrant has to get approved by the

Page 116

1  district attorney, then you have to call the bail

2  commissioner.  They were probably in the middle of

3  shift change.  Then you have to wait for the bail

4  commissioner to be available and then go down and

5  sign it.

6  Q.        Is there anywhere on there that determines

7  the probable cause to search that house?

8  A.        There should be another attachment to this.

9  Q.        There should, but based on that document

10  itself?

11  A.        This is just the front page of the warrant.

12  There should be another affidavit.

13  Q.        Shouldn't there also be badge numbers on

14  there as to who participated in the search?

15  A.        Looks like there are, but you can't figure

16  out who it was.  You can tell there's something

17  there, but you can't make it out though.

18                  ATTORNEY GONZALES:  Because of

19           the poor quality of --

20                  THE WITNESS:  Because of the poor

21           quality, yes.

22                  ATTORNEY PILEGGI:  There's

23           nothing in there.  I'm look at it.  John,

24           please.  There's no badge numbers in there.

Page 117

1                   THE WITNESS:  Because you can't

2            make them out.

3                   ATTORNEY GONZALES:  I can't tell

4            one way or the other.  It's a bad copy.

5                   THE WITNESS:  Horrible.

6  BY ATTORNEY PILEGGI:

7  Q.        But you don't recall being there yourself?

8  A.        I don't know if I was there or not.

9  Q.        All right.

10           Now, am I correct that Mr. Torain eventually

11  went to trial and was tried with all these other

12  individuals where they made these seizures from the

13  Master Street; do you recall that?

14  A.        I don't recall if he was tried with all --

15  who was all tried together.  I don't recall exactly.

16  Q.        Well, do you remember him being in the same

17  trial with all the individuals that were arrested at

18  5605 Master, 5607 Master, 5609 Master?

19  A.        I don't recall it, but like I said, I'm

20  sure he was because it was a criminal conspiracy

21  charge.

22  Q.        Okay.

23           There was guns, bullet proof vests, several

24  guns, assault rifles, bullets, drugs.  I mean, there

Page 118

1  was a ton of illegal contraband taken from those
2  units, right?
3           ATTORNEY GONZALES:  I am going to
4      object.  You can answer if you know what
5      was confiscated.
6           THE ATTORNEY:  I know there was
7      stuff that was recovered.  I don't exactly
8      remember what was recovered from each
9      property, though.
10 BY ATTORNEY PILEGGI:
11 Q.    But the point is that he was charged along
12 with those other individuals that were arrested out
13 of those properties, right?
14 A.    Yes.
15 Q.    When I say he, I mean Mr. Torain?
16 A.    Yes.
17 Q.    Okay.
18      Now, I want to take you back.  This case was
19 actually, and I say this case meaning the Torain
20 case, was actually a continuation from another case
21 from one of the -- at least one of the same units on
22 Master Street.  Do you recall that?  A job that you
23 actually did?
24 A.    I do not.

Page 119

1  Q.    Okay.
2        Do you recall Mr. Freedman?  Dennis Freedman
3  case?
4  A.    I do, yes.
5  Q.    Okay.
6        That was involving 5607 Master Street?
7  A.    If you're telling me that, yes.
8  Q.    Okay.
9           ATTORNEY GONZALES:  Well, do you
10     recall as you sit here today?
11          THE WITNESS:  I remember the name
12     Dennis Freedman.  I don't remember where we
13     did the warrants at.
14          ATTORNEY GONZALES:  Just answer
15     what he is asking.  Don't assume anything
16     that's in the paperwork.
17 BY ATTORNEY PILEGGI:
18 Q.    So you recall Mr. Freedman because he filed
19 a complaint, right?  Internal Affairs.
20 A.    I recall Mr. Freedman because it was a
21 largely upscale investigation that was done.
22 Q.    Okay.
23        You were the assigned investigator on that
24 case, right?

Page 120

1  A.    I was.
2  Q.    You recall that case because that involved
3  a concerned citizen, in fact, the same individual
4  who was identified by Officer Monaghan as the
5  confidential source, right?
6  A.    I don't know what Officer Monaghan did.  I
7  know who that concerned citizen is.
8           ATTORNEY GONZALES:  Well, hold
9      on.  Let's make sure who the record is
10     clear.  Did you know who the concerned
11     citizen was for Monaghan?
12          THE WITNESS:  No.
13          ATTORNEY GONZALES:  Okay.  But
14     you knew who the concerned citizen was for
15     your -- for the Freedman job, correct?
16          THE WITNESS:  Yes.
17          ATTORNEY GONZALES:  Just so we
18     are clear.
19          ATTORNEY PILEGGI:  He wasn't a
20     concerned citizen.  Confidential source is
21     --
22          THE WITNESS:  If you show me what
23     you have, Counsel, I would be able to tell
24     you.

Page 121

1  BY ATTORNEY PILEGGI:
2  Q.    No.
3        In the Monaghan job it was a confidential
4  source, right?
5  A.    That's what Monaghan said, yes.
6  Q.    Do you recall the confidential source in
7  Monaghan's job being the same person as the
8  concerned citizen in your job?
9  A.    I don't know who Monaghan's confidential
10 source is.  You'd have to ask him.  But I remember
11 that Freedman job.
12 Q.    Do you remember the concerned citizen in
13 the Freedman job?
14 A.    I do.
15 Q.    Okay.
16      This individual gave the same property 5607
17 Master Street, at least one of them, right, as
18 illegal drug activity?
19 A.    If you're telling me that, then yes.
20 Q.    Okay.
21      Now, do you remember you had a very lengthy
22 testimony that you gave with regards to the Freedman
23 case in federal court; do you recall that?
24 A.    I remember that, yes.

KAREEM TORAIN - vs -
CITY OF PHILADELPHIA

BRIAN REYNOLDS

Page 122

1   Q.      Do you remember some of the testimony
2   focused on who the concerned citizen was; do you
3   recall that?
4   A.      I don't remember exactly what the testimony
5   focussed on.
6   Q.      Today as we sit here, do you recall who the
7   concerned citizen was in your case, in the Freedman
8   case?
9   A.      I believe I do, yes.
10  Q.      And that was about four months before this
11  Monaghan job, right?
12  A.      If you're telling me that.  I don't
13  remember the exact date.
14  Q.      Okay.
15          Well, it was August of 2000.
16  A.      Okay.
17  Q.      Okay.
18          In that case, do you recall that that
19  concerned citizen during the whole proceedings all
20  the sudden became a confidential informant?  Do you
21  recall doing that?
22  A.      I don't remember that, no.
23  Q.      You were the assigned investigator, right?
24  A.      I was.

Page 123

1   Q.      Okay.
2           And you were the one handling the
3   information from the concerned citizen, correct?
4   A.      Correct.
5   Q.      You recall that?
6   A.      Correct.
7   Q.      Do you recall the concerned citizen being
8   Al?
9   A.      Correct.
10  Q.      Okay.
11          Al is deceased now, correct?
12  A.      I believe so, yes.
13  Q.      There was extensive testimony about how you
14  used Al in the drug investigation to assist police
15  officers in arresting Mr. Freedman; do you recall
16  that?
17  A.      If you're telling me there was you would
18  have to show it to me.
19  Q.      Well --
20  A.      I don't remember --
21  Q.      Do you know as we sit here today, that
22  Monaghan used Al?  In other words, the Al gave the
23  information on the Torain job was the same Al that
24  gave you information on the Freedman job about the

Page 124

1   same unit at 5607 Master?
2   A.      I did not know that.
3   Q.      You did not know that?
4   A.      If it's true.
5   Q.      Okay.
6           Am I correct that Al was an individual that
7   you used often?
8   A.      Correct.  He provided me with information.
9   Q.      In fact, he would provide you with
10  information then you would reward Al for the
11  information by giving him the drug corner after you
12  arrested the individuals?
13  A.      By giving him the drug corners?
14  Q.      Yeah.  Letting him operate and sell drugs.
15  A.      I would not do that, no.
16  Q.      Well, Al was an a known criminal; wasn't
17  he?
18  A.      I know he was arrested before.
19  Q.      Well, he was a shooter; wasn't he?
20  A.      I don't know.  Show he his criminal record
21  and I'll be able to tell you.
22  Q.      Al committed suicide, didn't he?
23  A.      I heard something along those lines.
24  Q.      You never provided Al, during the Freedman

Page 125

1   job, did you?
2           ATTORNEY GONZALES:  Never
3           provided?  What do you mean provided?
4   BY ATTORNEY PILEGGI:
5   Q.      Al went in along with yourself and sat
6   along with Mr. Douglas; remember Curtis Douglas was
7   trying the case?
8   A.      If you tell me that's who it was, then yes.
9   Q.      Do you recall going in with Al because the
10  court ordered that Al had to give information with
11  regards to the Freedman arrest; do you recall that?
12  A.      I don't recall that, but if it happened and
13  you're telling me it happened then it happened.
14  Q.      Do you recall signing Al up as a
15  confidential informant after the Monaghan case but
16  before the Freedman case went to trial somewhere in
17  2001/2002?
18  A.      If you're telling me he was signed up, then
19  I would have to see the document to see if it is
20  true or not.
21          ATTORNEY GONZALES:  The question
22          is do you remember.
23          THE WITNESS:  I don't remember if
24          he was signed up.

KAREEM TORAIN - vs -
CITY OF PHILADELPHIA

BRIAN REYNOLDS

**Page 126**

1          ATTORNEY GONZALES:  That's fine.
2      That's your answer.  You don't remember.
3  BY ATTORNEY PILEGGI:
4    Q.      You don't recall him being signed up at any
5  time?
6    A.      After this case?
7    Q.      Any time.
8    A.      I don't remember.  You would have to show
9  me the paperwork.
10   Q.      Well, that's just it.  We don't have any.
11  You don't recall Al being signed up at any point?
12   A.      I don't remember that.
13   Q.      Okay.
14          Do you recall the court telling you you had
15  to produce Al?
16   A.      I don't remember that either.  If you're
17  telling me it happened, then --
18   Q.      Okay.
19          And Al helped you participate in drug
20  investigations, correct?
21   A.      He gave information, yes.
22   Q.      No, not just gave investigation.  He
23  actually participated.
24   A.      I don't understand what you mean by

**Page 127**

1  participate.
2    Q.      Do you recall using Al's van to do
3  surveillance?
4    A.      I don't recall that, no.
5    Q.      That would be illegal; wouldn't it?
6    A.      I don't know if it's illegal.  I don't
7  recall it.
8    Q.      It would be violating the police policies;
9  wouldn't it?
10   A.      Policies as far as what?
11   Q.      Officer?
12   A.      I'm asking you what policy.
13   Q.      Can you use a citizen's van to do police
14  investigations?
15   A.      I don't remember doing that.
16   Q.      Could you use a citizen's telephone to call
17  perspective dealers?
18   A.      If that person was participating in an
19  investigation and they wanted to make a phone call
20  to get a dealer to a location, then, yeah, you can
21  do it.  It's been done before.
22   Q.      You could use -- that's not what I'm asking
23  you?
24   A.      Not me use it.  The individual whose phone

**Page 128**

1  it is used it to order up drugs.
2    Q.      But I'm asking you a different question.
3  Could you use?
4    A.      Me?  Myself?
5    Q.      Yes.
6    A.      No, I would never do that.
7    Q.      Well, that's not what I asked you.
8          ATTORNEY GONZALES:  He said no, I
9  would never do that.
10          ATTORNEY PILEGGI:  Okay.  That
11  would be illegal, right?
12          ATTORNEY GONZALES:  The answer
13  was no, I would never do that.
14  BY ATTORNEY PILEGGI:
15   Q.      That would be illegal, right?
16   A.      I don't know if it's illegal, but I would
17  never do that.
18   Q.      You've never been trained to do that,
19  right?
20   A.      Trained to do what?  Use a phone?
21   Q.      No, to use a citizen's phone, van, whatever
22  you want --
23   A.      I would never do that, no.
24   Q.      -- in a police investigation?

**Page 129**

1    A.      Correct.
2    Q.      And it's your testimony that you never had
3  Al participate in any way other than give you
4  information?
5    A.      Correct.
6    Q.      All right.
7          ATTORNEY PILEGGI:  I want to note
8  for the record that Mr. Walker is sitting
9  here.  I will provide you -- give me a
10  second.
11          If we could mark this as Reynolds-4.
12          (At this time, a document was
13  marked for identification as Reynolds-4.)
14  BY ATTORNEY PILEGGI:
15   Q.      All right.
16          Officer, I want to show you what has been
17  marked as Reynolds-4.  I will submit to you that's
18  an affidavit from Jeffrey Walker.  Jeffrey Walker
19  was involved in the Torain case.
20          By the way, do you recall Jeffrey Walker
21  being involved in the Freedman case?
22   A.      I don't know if he was or not.
23   Q.      Okay.
24          If you want to take a second to review that.

KAREEM TORAIN - vs -
CITY OF PHILADELPHIA

Page 130

1    I don't know if you have seen that before.  Have you
2    ever seen that document before?
3    A.    I have not.
4    Q.    All right.
5          ATTORNEY GONZALES:  This is a
6    case number.  What case is that?
7          ATTORNEY PILEGGI:  Freedman case.
8          ATTORNEY GONZALES:  Can we go off
9    the record for a second.
10         (At this time, a discussion was
11   held off the record.)
12         ATTORNEY GONZALES:  Back on the
13   record.
14   So we had a little conversation off the
15   record.  This document which has been
16   marked Reynolds-4 is an affidavit purported
17   to be signed by Jeffrey Walker in a federal
18   criminal case.
19   The affidavit is dated May 15th 2017.  It
20   pertains to my client.  It also pertains to
21   this Freedman that plaintiff's counsel has
22   been asking questions about.
23   Apparently based on those questions it
24   appears that counsel thinks there's some

Page 131

1    link between this Freedman case and
2    Mr. Torain's case.
3    I have never been provided with a copy of
4    this affidavit.  Mr. Walker certainly never
5    provided it to me and he is a party in this
6    case.
7    Plaintiff's counsel has had possession of
8    this document but has not provided me a
9    copy of it.  He is now attempting to ask
10   the witness questions.
11   We have a couple options here.  We can
12   adjourn the deposition and allow me to
13   review this affidavit with my client at
14   which time we will decide whether we will
15   continue or we will move on.
16   I've given you a lot of leeway on asking
17   about this other Freedman case.  But it's
18   not relevant to this case.  It is not
19   germane.
20   Mr. Freedman is not a plaintiff in this
21   case.  And this case was not Officer
22   Reynold's case.  It's Officer Monaghan's
23   case.  So the more questions we're asking
24   about another case, I think it's

Page 132

1    irrelevant.
2    It is served only for the purpose of
3    harassing this witness and I think it's
4    inappropriate.
5          ATTORNEY PILEGGI:  Okay.
6          ATTORNEY GONZALES:  Do you intend
7    to ask him questions about the affidavit?
8          ATTORNEY PILEGGI:  Yes.
9          ATTORNEY GONZALES:  All right.
10   We will adjourn and I will talk to my
11   client and we will decide what we are going
12   to do next.
13   I'll call you back, Joe.
14         ATTORNEY SENGOBA:  All right.
15         (At this time, a discussion was
16   held off the record.)
17         ATTORNEY GONZALES:  We can go
18   back on the record.
19   We took a break off the record.  I reviewed
20   this affidavit that was provided to me for
21   the first time by plaintiff's counsel in
22   this case and I have concerns about the
23   contents of the affidavit which was
24   apparently submitted by Jeffrey Walker.

Page 133

1    We are going to adjourn the deposition at
2    this time.  I asked counsel if there are
3    any other documents or materials he has
4    that were not produced in discovery that he
5    intends to use in deposing my client.
6    If he has any I ask he provide them to me.
7    Otherwise we will provide additional dates
8    to reschedule the deposition.
9    We are adjourned.
10
11         (Deposition adjourned at
12   12:43 p.m.)
13
14
15
16
17
18
19
20
21
22
23
24

KAREEM TORAIN - vs -
CITY OF PHILADELPHIA

BRIAN REYNOLDS

Page 134

```
 1          C E R T I F I C A T I O N
 2
 3
 4
 5          I, KIMBERLY CHATBURN, Professional Court
 6    Reporter and Notary Public, do hereby certify that
 7    the foregoing is a true and accurate transcript of
 8    the stenographic notes taken by me in the
 9    aforementioned matter.
10
11
12              - - -
13
14
15
16
17
18
19
20
21
22
23          Kimberly Chatburn
24    DATE:        KIMBERLY CHATBURN
                   Pa Notary No. 1266273
```

Page 135

```
 1          INSTRUCTIONS TO WITNESS
 2
 3
 4          Please read your deposition over carefully
 5    and make any necessary corrections.  You should
 6    state the reason in the appropriate space on the
 7    errata sheet for any corrections that are made.
 8          After doing so, please sign the errata
 9    sheet and date it.
10          You are signing same subject to the changes
11    you have noted on the errata sheet, which will be
12    attached to your deposition.
13          It is imperative that you return the
14    original errata sheet to deposing attorney within
15    thirty (30) days of receipt of the deposition
16    transcript by you.  If you fail to do so, the
17    deposition transcript may be deemed to be accurate
18    and may be used in court.
19
20
21
22
23
24
```

Page 136

```
 1          ACKNOWLEDGMENT OF DEPONENT
 2
 3
 4          I, BRIAN REYNOLDS, do hereby certify that I
 5    have read the foregoing pages, and that the same is
 6    a correct transcription of the answers given by me
 7    to the questions therein propounded, except for the
 8    corrections or changes in form or substance, if any,
 9    noted in the attached Errata Sheet.
10
11          _____
12    DATE              SIGNATURE
13
14
15
16    Subscribed and sworn to before me.
17    My commission expires March 23, 2024.
18
19
20
21    Kimberly Chatburn
22    Notary Public
23
24
```

Page 137

```
 1          - - - - - - -
 2          ERRATA SHEET
 3          - - - - - - -
 4
 5    PAGE    LINE      CHANGE
 6    ---     ---       _____
 7
 8    ---     ---       _____
 9
10    ---     ---       _____
11
12    ---     ---       _____
13
14    ---     ---       _____
15
16    ---     ---       _____
17
18    ----    ---       _____
19
20    ---     ---       _____
21
22    ---     ---       _____
23
24    ---     ---       _____
```

KAREEM TORAIN - vs -
CITY OF PHILADELPHIA

### Exhibits

**Reynolds-1** 3:18 16:14,17

**Reynolds-2** 3:19 79:6,8

**Reynolds-3** 3:20 113:9,11

**Reynolds-4** 3:21 129:11,13,17 130:16

### $

**$250** 74:2

### 0

**00** 114:3

**07** 79:22 80:16

**08** 79:22

### 1

**1** 53:9 71:13

**1/3** 34:2,4

**1/4** 50:23,24 95:14

**1/4/00** 51:6 56:6

**1/4/01** 53:20

**1/4/2000** 50:20

**1/5** 114:1,2

**10** 70:5 79:23 92:4

**100** 31:10 76:22

**10:00** 4:23

**10:20** 4:23

**150** 104:23

**15th** 130:19

**1621** 50:12 57:5 58:1,22 59:8,16

**1628** 59:4 63:15 66:24 67:6 69:19 70:13 74:1 76:7 82:24 83:17 92:15 100:24 105:12

**16th** 43:12,13,21

**17** 114:21

**1999** 7:24 9:18

**19th** 19:2 21:12 29:10,14

**1:00** 112:24 113:1,23 115:1,22

**1:41** 56:18

### 2

**2** 50:20 74:1 76:8 99:23 103:16,19 105:12

**20** 31:24 40:8 42:6,13 61:20 68:22 71:13 83:4 103:4

**2000** 10:11,19 11:17 17:16 51:6,7,24 53:10,16 54:21 55:17 56:15 114:5,15 122:15

**2001** 17:18,19,20 18:2 33:19 42:6 51:8,9,22 53:10,16,17 54:15,22 55:13 114:10

**2001/2002** 125:17

**2012** 6:23 7:16,24 9:3 40:18

**2013** 7:1

**2015** 7:2

**2017** 130:19

**2228** 37:9

**2308-207** 79:13 85:23

**2308-208** 79:13

**2308-210** 79:14

**2460** 19:4

**28** 6:18 39:24 91:9

**2:00** 58:21

**2:58** 72:11,13

**2nd** 24:20 33:18 34:3

### 3

**3** 32:12

**3730** 58:2

**3981** 37:10

**3:00** 72:11

**3:05** 83:11,15,16 93:24 94:3

**3:17** 93:21

**3:27** 93:21

**3:30** 83:7,11,15 93:20 94:19 95:5,13, 15,23 96:6

**3:50** 93:16,17 94:1,3 96:14 100:23 110:21 111:4,10 112:9 113:4

**3rd** 24:20 33:19

### 4

**4** 51:6

**4268** 6:12 33:10,12

**479** 95:10,11

**48** 12:6

**4959** 19:3

**4:00** 113:3,4 115:1

**4th** 24:20 29:19,22 31:16 33:19 34:3 55:17 56:15

### 5

**55** 93:10

**55th** 30:6 49:18 50:14 59:1,4 63:15,22 66:14,18,22,23 67:6,9 68:9,14,18,23 69:10,19 70:6,13,17 71:6,11 72:22 73:13,16 74:1 75:12,15,18 76:7,21 78:3 82:24 83:18,21 85:16 87:1,24 88:3,4,24 90:5,11,23 92:15,20 93:2,9, 14 94:1 96:13 100:24 105:12 110:23 112:13 113:19

**5600** 13:16 14:20 22:17 72:21

**5605** 23:7,8 37:21 94:19 95:17 117:18

**5607** 23:7,8 94:19 95:17 117:18 119:6 121:16 124:1

**5609** 23:6 94:19 95:18 117:18

**56th** 12:22 30:4 32:8,14 56:16,20,21 59:13 62:18 64:6 67:5

**58th** 66:24

### 6

**6061** 18:21

**61st** 30:2,7 49:24 71:7,11 72:14 73:18 83:18

**63** 80:1

**64** 80:1

*Reliable Court Reporting*

**6th** 54:15

**7**

**7126** 56:15
**7462** 80:1

**9**

**99025** 95:17
**99026** 95:17
**99027** 95:17

**A**

**a.m.** 113:1,23
**abandoned** 23:6
**Absolutely** 89:12
**academy** 43:5
**activity** 72:17 74:23 121:18
**actual** 28:10 83:14
**additional** 20:24 47:2
**administrative** 6:21 7:4
**Affairs** 119:19
**affidavit** 19:9 24:18 33:5,8 36:18
    48:13 50:1 51:12 52:20,22 55:1,16,24
    63:8 68:1,14 74:4 75:24 95:3 116:12
    129:18 130:16,19
**agree** 51:20 53:6 94:19
**agreement** 4:1
**ahead** 49:12,13 61:13 70:9
**aid** 30:2 49:23
**air** 65:6
**Al's** 127:2
**allegedly** 71:1
**allowed** 39:1 41:1,17 42:16 43:24
    44:1,2,7
**alongside** 8:21
**alternate** 25:14
**amber** 114:22
**angry** 105:24 106:2

**ans** 84:4
**answering** 41:16 61:10 92:10
**answers** 81:22
**anymore** 40:17
**apartment** 74:1 76:8 92:16 99:18,21,
    22,23 100:4 101:1 105:12
**apartments** 98:8
**Apparently** 130:23
**appeared** 5:22
**appears** 19:8 24:17 25:20 26:11
    130:24
**approval** 114:9
**approved** 115:24
**approximately** 56:18 58:21 95:15
    100:23 113:3
**area** 24:5 49:22 59:22 68:7,12 69:1,3
    70:14,16,21 72:14 76:23 85:5 90:16
**argue** 52:9 82:4
**arguing** 54:7
**argumentative** 41:20 47:15,21 52:17
    55:8 78:15
**arrest** 8:4 12:15 32:5,7,10,15 33:1
    35:17,23 36:3,14,20 48:21,22 49:16
    51:17 55:17,22 67:16,19 69:21 71:16,
    21 75:9 77:2,12,16,18,21 83:6,14,21
    84:11,24 85:13 89:13 90:19 92:20
    93:3,23 94:5,7,8,11,13 125:11
**arrested** 25:2 31:1,6 34:7 36:11 37:8
    49:23 64:13,21 67:14 69:22 70:14
    71:6 74:15 76:14,19 84:1 85:5 88:19
    90:16 93:7,12 117:17 118:12 124:12,
    18
**arresting** 30:16 36:12 70:5,24 84:22
    123:15
**arrests** 22:4,7,16,21 32:1 34:9 36:6
    93:5,19
**arrived** 30:20
**arsenal** 61:3
**assault** 117:24
**assigned** 6:20 13:24 21:12 25:5,6,9,
    10,11,15,17,18,21 28:11 77:22 85:20
    86:22 108:18 119:23 122:23
**assist** 29:15 30:23 31:1 123:14

**assisted** 30:15
**assisting** 22:6
**assume** 63:19 119:15
**attachment** 116:8
**attempt** 100:24
**attention** 54:14
**attorney** 4:11 5:4,16,23 6:4,6 9:23
    10:2,5,10 12:1,8 13:2,6,12 15:17,21
    16:2,3,6,8,9,15 19:11,18,19 20:1,4,5,
    11,12,16,17,19,20 21:2,5 22:11,14,19,
    23 23:2,3,21 24:3 27:16,17,19,24
    28:2,3,5,8 32:21 33:3 40:5,12 41:19
    42:9,11,14 43:3 46:12,14,16 47:16,19,
    22 48:4,6,8,12,15,18 49:13,15 52:1,5,
    7,11,13,19,21,24 53:2,5,8,22 54:2,4,6,
    8,10,11,12,13,16 55:2,5,7,9,11,18
    61:9,12 70:7,10,15 72:2,5,8 74:3,7
    78:14,18,20 79:5,9,11,15,17,18,20,24
    80:3,5,6,7 81:21 82:1,3,5,9,13 84:3,7
    89:4,6,8,10,12,18,19,22,24 94:21,24
    95:4,6,8,10,11,14,21 98:14,18,20
    101:16,18,21,23 102:1 103:23 104:1,
    3,4,5,8,10,13,16,19 105:1,3,21 106:1,
    7,9,13,14 107:16,20,24 108:3,4 111:6,
    9,12,13,15,17 113:6,8,9,12,14,16
    114:8,11,13,14 115:2,6,10,14 116:1,
    18,22 117:3,6 118:3,6,10 119:9,14,17
    120:8,13,17,19 121:1 125:2,4,21
    126:1,3 128:8,10,12,14 129:7,14
    130:5,7,8,12

**August** 122:15
**authority** 41:5
**aware** 10:23 33:18,23

**B**

**back** 6:24 7:3 10:11 22:2,6,9 37:16
    39:18 53:19 57:7,20,21 58:1 61:20
    62:15 63:14 66:21 67:5 68:23 69:17,
    24 70:1,4,16,18 76:18 77:2 78:1 82:23
    87:1,6 90:23 92:20,22,23 93:2,14 97:1
    110:23 111:3 112:12,18,21,22 114:5
    115:23 118:18 130:12
**back-up** 24:1,6 26:1,5 34:11,20 35:11
    36:20 37:12 57:15 69:2
**bad** 33:8 117:4
**badge** 6:12 33:9 35:4,7 96:8 116:13,
    24

KAREEM TORAIN - vs -
CITY OF PHILADELPHIA

BRIAN REYNOLDS Index: bag..confidential

**bag** 67:3 114:21

**bags** 33:2

**bail** 116:1,3

**barrier** 99:10 106:16 107:22 108:1

**based** 12:19 14:1,8 24:17 45:15 49:17 51:22 53:14 55:12 58:11,19 65:20,21 67:10,21,22 69:12,16 71:16 74:3 75:10 84:1 85:2 87:21,22 90:15 91:19 93:18 95:22 100:9 102:19 105:5,7 112:2,13 116:9 130:23

**basically** 17:9 41:3 43:6 85:2

**basing** 41:12,18 42:10,17,18

**basis** 87:24

**Bates** 80:2 95:9

**bathroom** 109:19

**bed** 109:22

**begin** 4:12,23 6:7

**big** 23:20

**bit** 23:5

**black** 59:24 60:3 73:23 76:6 101:4

**block** 22:17 30:9

**blocks** 59:17 62:23 70:6 71:8,11,14

**board** 78:6

**boarding** 98:5

**Bonneville** 50:10,17 56:19 58:5,6 59:1 63:15 65:15 72:12 73:9

**bottle** 114:22

**bottom** 26:15

**Brad** 10:17

**break** 6:5 10:8 52:16 72:6 99:10,12 106:15 108:1

**breeze** 32:13 37:4

**Brian** 4:8,13 6:11 9:15 18:22

**briefly** 8:1

**bring** 46:9

**broke** 107:22 108:10

**Buick** 66:24 67:5

**bullet** 117:23

**bullets** 117:24

**bureau** 110:1

**buy** 26:12,17,20,22,23 28:24 34:24 39:12

**buyer** 64:7 65:18

**buyers** 22:5 24:7,10 32:2 34:6 36:6 64:12,16,20

**buys** 8:5 21:22,23 33:21 38:14,17 42:24 43:23 44:9 45:4 64:18

**C**

**Cain** 17:2 19:3,10 21:7 27:9,21

**call** 10:6 18:13,16,17 45:23 47:8 98:5 116:1 127:16,19

**called** 22:2,4 60:14 102:12

**calls** 45:3

**camera** 61:23

**Cancer** 78:3

**cap** 114:23

**capacity** 7:5,16 22:3,7,9 24:1,6 26:1, 4,5 28:15 34:11,20 35:11 36:20 37:12 57:16 69:2

**captain** 11:13

**car** 65:7 66:23

**care** 105:20

**Carolyn** 56:20

**carried** 86:13

**cars** 26:10 57:13

**case** 24:11,14 44:14 52:15 85:7 118:18,19,20 119:3,24 120:2 121:23 122:7,8,18 125:7,15,16 126:6 129:19, 21 130:6,7,18

**cases** 44:16,19

**cell** 73:23 74:22 78:5,23 83:22 86:4

**certification** 4:2

**cetera** 5:7 22:21

**change** 116:3

**charge** 117:21

**charged** 118:11

**check** 100:3

**CI** 26:13

**circumstance** 20:14 48:20

**circumstances** 84:10

**citizen** 14:9,14,17,18,22 15:4,6,8,9,13 16:24 17:8,10 18:6,11 19:22 42:23 44:4,13 45:2 46:8 120:3,7,11,14,20 121:8,12 122:2,7,19 123:3,7

**citizen's** 127:13,16 128:21

**citizens** 40:24 44:18

**City** 4:19,20,23 10:1 80:4

**clarification** 28:9 64:12

**clarify** 94:17

**clear** 38:3 67:3 114:21 120:10,18

**client** 4:16 52:14 130:20

**close** 33:22

**cocaine** 75:22 87:12,14,18

**collectively** 79:12,22

**commence** 5:1

**comments** 55:3

**commissioner** 116:2,4

**committed** 124:22

**common** 42:3

**Commonwealth** 78:5

**communication** 5:14 6:1

**communications** 6:3

**complaint** 119:19

**complete** 112:20

**completed** 35:12

**concerned** 14:9,14,16,18,21 15:3,6, 8,9,13 16:24 17:8,10 18:6,11 19:22 40:24 42:22 44:4,13,18 45:2 46:8 120:3,7,10,14,20 121:8,12 122:2,7,19 123:3,7

**condition** 43:14

**conduct** 8:4

**conducted** 31:19

**conducting** 13:16

**Conestoga** 12:23 50:11,13 57:5,8,9 58:2,12,15,22 59:9,16 63:11,14,18,21 66:7 68:7,8,9 73:13 88:6 90:2,10

**confidential** 17:1,4,6,7,12,13 18:5,6,

KAREEM TORAIN - vs -
CITY OF PHILADELPHIA

BRIAN REYNOLDS Index: confiscate..drugs

9 19:2,8,22 20:7,9,15 37:18 38:8,10,
13,16,20,22,24 39:5,12,19 40:1,2,10,
14,22 41:16 42:6,15,22 43:22 44:5
46:8,21,22 47:6 120:5,20 121:3,6,9
122:20 125:15

**confiscate** 81:18

**confiscated** 75:24 76:11 78:1,9,12,
13,21 80:12 81:17 82:7,16,17,19
87:16 110:20 111:18 112:6,7 114:20
118:5

**confiscating** 80:20,23 81:4,6,20

**confiscations** 85:14

**confused** 51:9,21 52:2 55:3,6

**conner** 59:1

**conspiracy** 117:20

**construction** 7:7

**continuation** 118:20

**continue** 18:13

**continued** 90:10

**contraband** 74:12,15 118:1

**control** 93:11

**conversation** 130:14

**Cooper** 4:21

**copies** 33:6,14 79:10,16

**copy** 16:4 33:8 84:12 113:13 117:4

**corner** 41:23 62:10,11 124:11

**corners** 124:13

**corporal** 10:21 11:3,9

**correct** 6:14 8:6,9,12,17 9:9,10,16,17
10:24 13:21,22 15:10,11 17:14 18:3,
20,22 19:4 21:17 22:1 23:18 25:3,4,15
27:2,4,6,8 28:12,14,23 29:1 30:6,17
31:7 33:17 34:9,18,19 36:13,21,24
37:23 38:5,6,18 44:6 46:2,4,6 48:22,
23 49:6 50:2,18 51:7,13,14 55:14,19,
24 56:1 57:5 58:16,17 59:12,14,15
60:2,5,7,9 62:20 63:9,10,20 64:13,14,
18,19 65:20 66:8,9,12 67:11,15 68:10,
16 69:24 71:18 72:12,13 73:10,13
76:1,2,12,15 77:3,4 78:13,22 80:4,10,
14,19,24 81:1,3,5,8 82:20 86:23 87:3
88:14 91:8,11,12,23 92:8 93:1,8,9,18
94:9 97:5 98:2 101:7,14 103:1,6,7,17
108:21 109:1 112:10,21 113:2 117:10
120:15 123:3,4,6,9,11 124:6,8 126:20

129:1,5

**correctly** 59:6

**Could've** 7:13

**counsel** 4:1 63:7 65:2 120:23 130:21,
24

**couple** 59:17 62:23,24

**court** 10:3 35:16 51:13 89:5 114:10
121:23 125:10 126:14

**crack** 75:22 87:12,13,18 114:22

**criminal** 117:20 124:16,20 130:18

**cross** 108:2,5

**Curtis** 125:6

**cut** 33:7 66:22 76:3

**D**

**date** 9:18 53:20 56:3,6,9 113:24
122:13

**dated** 130:19

**dates** 54:20

**day** 24:24 37:11 61:15 71:4

**days** 24:18,21 33:18

**dealer** 45:11 65:19 127:20

**dealers** 8:3,4 64:5 65:8,10,16 88:13
90:8 127:17

**dealing** 18:18

**deals** 7:6

**deceased** 10:24 123:11

**decision** 91:5

**defendant** 4:17 78:7 85:4

**defendants** 4:19,24

**define** 47:1

**Delee** 66:21 67:3

**Dennis** 119:2,12

**department** 10:1 11:4 38:11 39:8
60:16

**depends** 26:9,10 45:6

**deposition** 4:13,22 5:1,8,9,13,21
53:15 104:20 105:2

**describe** 61:18

**destroy** 109:11

**destroyed** 87:9 91:2,16 109:6

**detail** 63:4

**detailed** 19:1,7,21 20:23

**details** 7:7,8 36:14 49:16

**determine** 51:16 53:11 54:21 74:22
103:20

**determined** 64:7,9 72:23 73:24 74:14
75:17 87:6 88:10 91:24 92:14 99:24

**determines** 116:6

**differ** 17:8 18:7,8

**difference** 38:7

**direct** 54:14

**discussion** 130:10

**discussions** 14:13 20:21

**district** 6:20 19:2 21:12,16 29:9,10,
14,15 43:10,11,12,13,17,22 44:3
54:12,13 116:1

**DKC-3310** 50:18 51:4 56:19

**document** 16:13 93:13,18 99:1,2
104:21 105:5 113:10 116:9 125:19
129:12 130:2,15

**documentation** 35:10

**documented** 35:18

**documents** 53:14 79:7

**door** 74:1,9 76:7 78:3 92:16 97:23
98:13,23 99:5,11 103:19,22 105:8,12,
17 106:4,16,17 107:23 108:7,10,11,24

**doors** 98:16

**Douglas** 125:6

**dove** 5:6

**downs** 22:15

**draft** 7:11,13,14

**drawers** 109:13

**drive** 73:13

**drug** 8:3,4 13:20 14:19 37:22 38:4,13
45:11,16 121:18 123:14 124:11,13
126:19

**drugs** 65:12 69:8 117:24 124:14
128:1

duly 4:9

duties 6:19,21 8:2

---

**E**

earlier 50:8

early 11:17

email 5:7,10

entails 45:7

enter 63:19,20 87:1 91:8,10

entered 59:4 63:16,18,22

entry 95:19

equipped 61:23

escort 7:8

ESPN 7:11

event 7:7,11

eventually 22:15,16 25:2 55:23 67:14 70:12 117:10

evidence 87:9,11 91:1,16,18 97:2 109:5,6,11,13 112:6

evidently 5:21 20:24

exact 65:14 122:13

examined 4:9

executed 95:16

exit 58:22 67:3

exited 50:13 59:3 66:24

experience 42:19,21 45:15 91:9

explain 25:7 38:7 48:20 49:16 83:12

extensive 123:13

extra 16:4 79:10 113:13

eyes 25:23

---

**F**

facility 76:23

fact 16:1 51:8 93:6 120:3 124:9

fair 20:19 23:9 33:13 37:15 75:9 95:22 111:22

federal 121:23 130:17

---

field 7:18,19 29:20 43:7

figure 116:15

filed 119:18

filing 4:2

filmed 33:21

find 32:12 75:2

fine 82:3 126:1

finish 89:7,23

fire 114:21

fit 88:3 100:4 105:8

Fitzgerald 37:6,9

flash 73:4

focused 122:2

focussed 122:5

follow 50:7 57:1 59:18 62:18 65:6,15 71:5 88:23 90:7

followup 46:24

foot 59:18,22 106:5

force 8:8 29:16,18,21 30:15 31:7 49:5 77:6

forcibly 95:18

form 4:4 21:3 22:24 82:10

forward 5:24

fourth 26:16 56:14 100:22

frame 9:5

Francis 37:6,10

Freedman 119:2,12,18,20 120:15 121:11,13,22 122:7 123:15,24 124:24 125:11,16 129:21 130:7,21

front 87:22 97:23 98:12,22 99:5 104:22 116:11

full 6:9 13:8

future 9:18

---

**G**

gain 95:18

gave 14:18 15:9,14 38:5 45:19 48:13 49:19 50:16 56:3,7 65:12 67:16 90:22 92:7 98:21 121:16,22 123:22,24 126:21,22

---

Gessner 10:20,23 102:6,16

Gillis 56:20

gist 101:10

give 12:18 32:11 43:19 44:22 46:2 52:16 85:10 90:1 125:10 129:3,9

giving 45:1,3,17 124:11,13

gladly 58:8

Goglielmucci 17:2 19:4,10 21:8 27:9,22

Gonzales 4:15 5:4,23 9:23 10:5 13:2 15:17,21 16:3,8 19:11 20:1,5,12,17 21:2 22:11,23 23:21 27:16,19 28:2,5 32:21 40:5 41:19 42:11 43:18 46:12, 16 47:19 48:4,8,15 49:13 52:1,7,13,21 53:2,22 54:4,8,11 55:2,7 61:9 70:7 72:2 74:3 78:14 79:9,15,18,24 80:5 81:21 82:3,9 84:3 89:4,8,12,19 94:21 95:4,8,11 98:14 101:16,23 103:23 104:3,5,8,13,19 105:22 106:1,9,13 107:16,24 111:6,12,15 113:6,8,12 114:8,13 115:2,10 116:18 117:3 118:3 119:9,14 120:8,13,17 125:2,21 126:1 128:8,12 130:5,8,12

gotta 110:17

grab 11:19

grams 114:22

green 50:10,17 56:19 58:5 72:12 73:9

group 8:18

guess 47:9 61:5 71:10 83:1 112:13 114:6

guessing 61:7

guns 117:23,24

guys 77:6

---

**H**

half 83:17

hallway 99:15

hand 16:5

handle 7:6

handling 26:13 123:2

happen 41:23

happened 12:20 51:21 63:5 70:8 73:21 125:12,13 126:17

**headquarters** 76:18

**hear** 11:1 89:20

**heard** 124:23

**hearing** 53:24 54:12 84:10,15

**held** 130:11

**helped** 126:19

**hey** 41:22 45:20,21

**hit** 94:18 95:23

**hitting** 95:24

**Hodge** 32:24 36:23 77:2

**hold** 9:23 27:19,20 89:5 92:10 94:17 105:22 120:8

**holding** 76:22

**hope** 56:9

**Horrible** 117:5

**hour** 83:17

**hours** 115:22

**house** 12:23 22:1 45:19,20 46:10 98:3,5 116:7

**houses** 14:10 23:5,9,13 45:13 51:17 94:18,20 95:23 96:1

**Hunter** 49:18 50:14 58:24 59:1 66:22 69:19

---

**I**

**idea** 22:22 29:23 34:15 71:3 94:4 97:12

**identification** 16:14,17 79:8 113:11 129:13

**identified** 15:7 120:4

**identify** 15:3

**identity** 38:12

**IDING** 47:1

**illegal** 63:23 66:11,13 67:8 71:22 72:17 74:11,23 75:16,18 88:11 111:23,24 112:17 118:1 121:18 127:5,6 128:11,15,16

**imaging** 45:14

**important** 53:13

**incident** 42:7

---

**included** 5:10

**independent** 102:21 104:11

**independently** 46:3

**individual** 32:8 120:3 121:16 124:6 127:24

**individuals** 25:3 38:5 66:20,21 68:23 69:5,8,17,21 70:3,18 90:12 93:19 117:12,17 118:12 124:12

**inform** 102:9

**informant** 26:19 38:9,10,16 39:13 44:5,9 122:20 125:15

**informants** 40:2 43:22

**information** 13:19,23 14:3,9,19,22, 23 15:9,14 17:6,12 18:14 19:1,7,21 20:6,9,14,23,24 25:11,17 27:11 28:4 37:16,17 38:5,14,23 39:4,13 41:4,10 42:2,23 43:19 44:22 45:1,3,17,18 46:3,4 47:2 49:17,19 50:16 55:22 56:22 64:2 69:12 71:17 72:15,18,22 73:4,6 75:11 85:3 89:15 90:2,18 123:3,23,24 124:8,10,11 125:10 126:21 129:4

**informed** 75:11 82:18

**inside** 50:12 67:4 74:1 76:8 101:4 105:13,18,20 106:5 108:1,11,12

**instance** 22:1

**interaction** 65:16 90:8 108:15

**interactions** 64:5

**Internal** 119:19

**interrupt** 13:4 61:10

**intersection** 56:21

**investigation** 12:5 15:5 25:8 38:17, 21 39:2,4 41:1 42:16 44:20 45:7,10, 16,22 46:11,23 47:7 64:13 119:21 123:14 126:22 127:19 128:24

**investigations** 8:7,10 44:8 126:20 127:14

**investigator** 13:24 25:5,6,11,15 77:22 108:18 119:23 122:23

**involved** 5:19 15:5 19:14 26:12 32:7 58:20 72:16 74:23 120:2 129:19,21

**involving** 119:6

**issued** 35:5

---

**items** 76:11 78:8,22 82:7,15,18 85:10, 12,16,18,20,21,22,24

**Ithan** 50:9 67:21 72:21

---

**J**

**Jam** 45:22 46:10

**January** 18:2 33:18,19 51:6 54:14 55:17 56:15

**Jeffrey** 4:17,18 8:13 129:18,20 130:17

**Jimmy** 10:17

**job** 21:9 22:13 23:20 25:18 27:1,3 28:10 31:9 32:6 35:12 51:21 52:12 53:11 72:16 112:14,20 118:22 120:15 121:3,7,8,11,13 122:11 123:23,24 125:1

**jobs** 21:17

**Joe** 4:21 72:3

**John** 95:1 104:2 105:2 116:23

**Johnson** 10:17

**join** 10:2,7

**Jonathan** 4:21

**Joseph** 17:2 19:4

**Judge** 51:15

**Judge's** 5:18

**jut** 65:15

---

**K**

**Kareem** 11:19 85:4 87:22

**Kelly** 9:8,12 10:14 13:15 15:14,15 16:23 25:22 27:7 28:13 33:20 34:2,18 50:9,16 56:15 61:2 62:2,22 64:4,24 65:4,13,21,24 70:1 71:17 72:20 75:10 84:2 85:3,19,20 86:20,21 88:16 101:2, 5,12,14,17,19 102:3,19

**Kelly's** 60:8

**key** 63:16 73:23 76:6 78:2,3 90:22 97:22 98:12,16,21,22 99:23 100:4 103:21,22,24 105:7,10,15 106:4 108:9 111:14

**keys** 73:23 74:8,9,10,18 75:24 76:4,7 78:2,4,23 80:23 81:2 86:3,8 92:2,3,4, 7,14 93:24 97:5 98:11,22,24 99:6

---

103:12 105:11,16

**kilos** 74:9

**kind** 25:13 36:8 76:3 80:18

**knew** 87:18 100:6 103:15 120:14

**knowledge** 42:5,10,12,19

---

**L**

**largely** 119:21

**law** 10:1 39:15 42:20

**leading** 48:21

**learned** 43:6

**learning** 43:5

**leave** 69:10 73:16 97:1 108:19,23 109:8

**leaving** 49:17 88:5

**left** 9:3,12 40:18 63:11,14,17,21 66:7 69:17 70:13 72:13 90:6 97:9

**lengthy** 121:21

**Letting** 124:14

**lieutenant** 11:10,11

**lines** 124:23

**listening** 101:11

**location** 127:20

**locked** 108:7

**long** 6:16,22 7:19,23 8:9 17:22

**long-term** 8:6

**looked** 61:20 75:1 106:17,24 107:6,8 108:11 111:10

**lost** 87:10 91:2 109:6 111:7

**lot** 40:1

**Luciatello** 8:22,23 9:6

---

**M**

**made** 12:21 13:1,13,14 22:15,16 25:18 26:19 28:24 31:15 33:14,21 35:17 36:19 37:13 48:21 54:17 55:17 66:17 67:21 71:16,21 72:20 73:17 85:13 87:21 90:12 91:4 93:3,5 94:5,7 100:9 117:12

**Magistrate** 51:15

**majority** 8:12 34:1

**make** 13:8 16:7 21:22,23 22:4,7 26:17 33:15 34:9,24 35:23 39:12 43:23 44:9 45:3 51:17 79:18 91:15 102:10 109:5 116:17 117:2 120:9 127:19

**making** 26:12 32:1 34:18 36:6 38:17 54:8 55:3

**male** 101:4

**males** 66:24 67:3,4 68:21

**manager** 101:2 102:18

**marijuana** 33:2

**mark** 16:11 79:5 129:11

**marked** 16:14,16 49:23 79:8 80:1 113:11 129:13,17 130:16

**market** 32:8,14 78:4

**Master** 12:22 13:16 14:20 22:17 23:6, 8 30:4,8 37:21 50:9 56:17,21 58:6 59:7,14 60:2 62:18,21 64:6 65:17 66:8,14 67:5,22 68:23 69:17 70:5,18 72:21 87:23 88:2,8,13 90:3,6 91:21 93:20 94:11,13 95:18 117:13,18 118:22 119:6 121:17 124:1

**meaning** 74:9 118:19

**means** 14:18

**meet** 92:20 93:24

**members** 25:1,14 29:19 35:1 95:15 96:1 100:23

**memorialized** 97:17

**memory** 42:5 48:17 50:3

**mention** 34:3 36:4 37:5

**mentioned** 8:23 35:24 51:8,22

**middle** 116:2

**Mile** 30:12

**miles** 30:12

**mind** 75:16

**minute** 78:15 87:17

**minutes** 67:2 68:22 72:3,4

**mistake** 54:17

**Mitchell** 10:17 26:12,17,21,22 27:3 28:24 34:22,23

**Monaghan** 9:16,20 10:15 13:15,23 14:7,14 15:10 16:23 17:11,14 18:21, 22 19:9,16 20:22,23 25:4,21 27:5,12 28:11 30:23 31:4 33:20 34:3,17 37:18 50:9,16 54:1 55:23 56:16,23 62:2,22 64:4,24 65:4,13,21,24 67:18 70:2 71:17 72:19 75:10 76:13,17 77:15,22 78:1 82:19 84:2 85:3,19 86:1,7,20,21, 22,24 88:16 90:22,23 91:4,20,23 92:6, 7,13,19,21 94:1 97:1,4,19 98:21,22 99:8 100:3,6 102:3 103:11,15 105:17 106:3 107:2 108:18 109:7 110:10,12, 14,16,18 112:1,2 113:5,7 114:17 120:4,6,11 121:3,5 122:11 123:22 125:15

**Monaghan's** 60:6 121:7,9

**money** 74:19 78:24 86:5

**month** 6:18

**months** 122:10

**morning** 115:22

**Motorola** 78:5

**mountain** 54:9

**move** 48:3

**moving** 5:24

**multiple** 22:13 84:4

---

**N**

**narcotics** 7:18,19 29:20 37:19 39:18 40:16 43:7 71:2 95:16 100:24

**Nassau** 30:2,7 49:24 71:7,12 72:14 73:18 83:18

**needed** 24:6,7 26:10 57:16 112:20

**neighborhood** 60:1,4

**Nextell** 78:5

**NFL** 7:11,13

**NFU** 7:21,23 8:2,13,24 9:3,11 10:2 11:18 17:15 21:14 31:8 43:10 80:1 97:13,15 115:9

**North** 50:12 57:5 58:1 59:4,8 67:6 70:13 76:7 83:17 100:24 105:12

**northbound** 56:20

**northwest** 62:10

**note** 5:7 129:7

**notice** 5:7,8,20 80:18 81:11

**noticed** 4:14,15,19

**notification** 5:12

**notified** 5:13 6:2 10:1 30:21,23

**number** 33:10 35:4 50:18 95:9 96:8 103:16,19 130:6

**numbered** 80:2

**numbers** 35:7 79:22 116:13,24

---

**O**

**O-L-D-S** 33:12

**object** 22:24 118:4

**objection** 15:18 19:11 20:1 21:2 23:21 27:16,20 28:7 40:5 41:19 46:12, 15,17 47:17 70:7 82:9 84:3 98:14 115:2,10

**objections** 4:4

**observation** 66:17,19 87:21

**observations** 12:21 13:1,13,14,19 25:18 31:15 34:2 35:18,23 45:21 50:8 65:1 67:21 72:20 84:2 90:12 100:9 112:1

**observe** 69:4,7,10 110:6,9

**observed** 56:18 58:5,22 67:3,7 68:15 71:1 85:4 110:10,14

**obtain** 25:4

**obtained** 20:8 24:24 25:1 37:18

**obvious** 33:14

**occurred** 42:7

**occurring** 14:19

**office** 4:21

**officer** 4:16 5:9 6:11,13,17 7:17 8:21, 23 9:2,3,6,8,12,15,20 10:11,14,18 13:22 14:7,13,22 15:10,14 16:5,16 17:11,14 18:17,22 19:3,4,20,23 21:7,8 25:4,16,21,22 26:3,8,12 27:11,18 28:11,18,24 30:23 31:4,8 33:20 34:17, 21 36:12,22 37:6,9,10 39:23,24 41:22, 24 42:2 43:17 44:4 46:23 47:1 50:6 54:1 55:23 56:15,16 64:4 66:16 67:17 70:1,24 71:20 76:17 77:14 78:1 80:9 81:20,24 82:18 84:22 85:13 86:1,6,24 91:9 97:15 100:16 101:2,5 103:12 106:3,15,22 108:18 120:4,6 127:11

129:16

**officers** 10:13,16 11:8 13:15 15:5 16:23 17:1 19:3,10,24 20:8,10 21:1,16 22:8,20 24:2,6 25:22 29:6,14,17,21 30:3,15 31:8 33:21 34:21 35:11 36:18 44:2 49:5 50:9 84:21 85:6 87:1 89:15 97:1,13,14 102:2 113:4 123:15

**open** 74:9 97:22 98:12,22 111:4,14

**opened** 103:19,20 105:17 106:4,17

**opens** 99:5

**operate** 124:14

**operation** 61:15

**opportunity** 12:18 13:9 85:11

**opposed** 8:7

**order** 5:18 39:11 67:16 90:19 91:8,9 102:8 128:1

**ordered** 125:10

**originally** 46:20 47:6 58:6

**outer** 103:22,24 105:8

---

**P**

**p.m.** 56:18 58:21 72:11 95:13,15 113:4 115:1

**Pa** 56:19

**pager** 73:23 74:19,21 78:4,23 81:6 86:3

**paid** 38:13

**paperwork** 7:6 11:21,23 25:20 26:11 32:4 35:12 77:9,23 78:10,24 94:2 100:14 104:7 112:19 119:16 126:9

**paragraph** 26:15,17 32:12 37:7,17 50:21 56:14

**parked** 62:6,8

**Parkway** 7:14

**parole** 78:6,10 80:18

**PARS** 12:7,12 14:8 16:4 32:22 36:19 48:5,11,14 50:4 51:23 58:4 94:23 95:1,2

**part** 11:17 12:4 14:4 26:24 27:3,14,22 28:6,9 45:22

**participants** 37:21 38:4

**participate** 23:19 24:8 31:13 35:21 38:16,20 39:1,6,12 41:1,17 42:16,24 43:1 44:8,19 45:2 46:22 47:7 94:16 96:5,13 126:19 127:1 129:3

**participated** 23:17 35:6 39:24 96:9 116:14 126:23

**participating** 35:22 36:1 44:21 45:9, 16,23,24 46:11 47:3,9,10 127:18

**parties** 4:14 6:1,2

**partner** 8:17

**partnered** 26:7

**Pennsylvania** 78:6 80:17

**people** 34:23 43:1 45:4,6,12 57:16 109:9,10

**percent** 31:11 76:22

**period** 23:14 31:14 58:15 64:17 88:11 115:18

**person** 17:5 36:11 38:12 41:3,21 84:24 121:7 127:18

**personal** 23:12

**personally** 43:14 44:13

**perspective** 127:17

**pertains** 130:20

**ph** 8:22 60:14

**Philadelphia** 6:13,16 39:8 40:3

**Phillips** 78:4

**phone** 73:23 74:19,22 78:5,23 81:4 86:4 127:19,24 128:20,21

**photo** 45:14

**photos** 45:13

**physical** 112:6

**physically** 106:16

**pick** 61:2

**pictures** 109:20

**piece** 78:24

**Pileggi** 4:11 5:6,16 6:4,8 10:10 13:6, 12 16:2,6,9,15 19:18,19 20:4,11,16, 19,20 21:5 22:14,19 23:2,3 24:3 27:17,24 28:3,8 33:3 40:12 42:9,14 43:3 46:14 47:16,22 48:6,12,18 49:15 52:5,11,19,24 53:5,8 54:2,6,10,16 55:5,9,11 61:12 70:10,15 72:8 74:7

78:18,20 79:5,11,17,20 80:3,6,7 82:1,
5,13 84:7 89:6,10,18,22,24 94:24
95:6,10,14,21 98:18,20 101:18,21
102:1 104:1,4,10,16 105:1,3 106:7,14
107:20 108:3,4 111:9,13,17 113:9,14,
16 114:11,14 115:6,14 116:22 117:6
118:10 119:17 120:19 121:1 125:4
126:3 128:10,14 129:7,14 130:7

**pill** 114:22

**Pine** 76:21 83:21 85:17 110:23 112:14

**place** 32:15 67:3 90:19 112:18

**plain** 107:13,14

**plaintiff's** 130:21

**plastic** 114:22

**pocket** 67:4 69:8

**point** 9:20 17:23 27:11 45:4,5 46:9,10
52:3,8 53:1,23 57:10 58:20 59:3 63:6
64:8 68:13 69:11 72:10 77:24 85:19
86:23 87:19 93:1 94:6 95:5 109:4,9
110:9,11 111:22 112:9,12 118:11
126:11

**pointed** 45:10,12

**pointing** 45:19 54:5,19

**police** 6:11,13,17 7:17 14:22 15:4
17:6 19:2,3,10,20,23,24 21:1,16 34:21
35:19 38:11 39:8,23,24 40:3 41:21,24
42:2 43:5,17 45:14 52:3,6,17,20
56:15,16,18 60:15 66:16 71:24 85:12
88:16,18,22 91:9,20 100:13 101:2
113:4 123:14 127:8,13 128:24

**policies** 127:8,10

**policy** 39:16,18 40:4,9,13,18 41:7,9,
14,24 42:20 127:12

**poor** 116:19,20

**Positive** 96:20

**potential** 13:20 22:5 32:2

**practice** 115:16

**predominantly** 59:24 60:3

**preliminary** 53:24 54:12 84:10,15

**prepare** 51:10 53:4 77:15,17 115:23

**prepared** 55:23 113:19 114:17

**preparing** 112:19

**presence** 85:7

**present** 4:16,17,24 27:10 86:24 97:4

**pretty** 103:2,6

**previously** 57:5,18 58:14

**pried** 111:4

**prior** 7:16 9:4 13:18 58:4 72:16

**pro** 5:19

**probable** 33:5,8 36:18 48:13 51:16
52:22 74:4 84:24 85:1 87:19 88:4
90:21 91:10,14 116:7

**probation** 78:6

**procedure** 41:7

**proceedings** 122:19

**processed** 85:17

**produce** 126:15

**proof** 111:24 117:23

**properly** 33:15

**properties** 37:20 59:7 60:3 62:7,9
95:19 118:13

**property** 12:9 23:6 49:18 50:12,13,14
62:14,19,21 63:15 76:15,17 79:13,21
80:8,11 82:7 83:9 85:23 87:7 88:1
91:24 92:13 96:24 97:9,21 101:3
102:9,18 109:8 118:9 121:16

**provide** 21:21 39:3,13 124:9 129:9

**provided** 13:19 14:9 27:11 28:4
55:22 60:15 71:17 80:4 124:8,24
125:3

**providing** 38:23 41:9 47:2 48:5

**Pud** 37:22,24 38:3

**purported** 130:16

**purpose** 107:18

**pursuant** 5:17 12:12 14:7 39:15
41:14

**put** 4:12 5:2 71:24 76:14,17 81:13
82:6 83:21

**putting** 69:8

---

## Q

**quality** 116:19,21

**question** 4:5 13:3,5 15:22 20:13
21:19 40:7,11 46:18,20 47:12,23 51:2

52:4,8 54:18 55:10 61:1,11 81:22
82:10 89:7,16,20 92:1,10 96:3,4 99:4
101:16 106:10,12 107:17 125:21
128:2

**questions** 11:17 12:24 13:10 46:24
56:13 101:24 130:22,23

**quick** 57:6

---

## R

**R-E-Y-N-O-L-D-S** 6:12

**radio** 68:2 72:1 88:22 91:20

**radioed** 57:1

**re-upped** 65:7,10

**read** 5:5 11:21 18:21 56:12 57:6 58:3
59:6 80:16 100:21 104:11

**reading** 20:22 23:4 55:12 58:19 63:8
68:1 94:22 95:1,12 102:19 105:5

**Ready** 6:7

**real** 57:6 74:9

**realize** 55:21 114:11

**reason** 32:18 33:4 90:6 115:21

**reassigned** 6:24 7:2

**recall** 10:12 11:19 12:3 21:7 23:12,18
24:10,13 26:4 27:14 29:3,22 31:18
32:1,3 34:6 36:5 40:8 42:12 43:4
44:12,19 49:10 52:10 71:20,23 73:16,
17 80:20,23 81:4,6,9 82:16,17 83:2
84:9,14,19 85:16,18,21 86:10,17
100:16 101:8,9,12,17,19 102:2,12,14,
. 17 103:2,11 104:18,23 109:2,15,17,22
110:4 111:18 112:18 117:7,13,14,15,
19 118:22 119:2,10,18,20 120:2
121:6,23 122:3,6,18,21 123:5,7,15
125:9,11,12,14 126:4,11,14 127:2,4,7
129:20

**receipt** 76:17 82:7 85:23

**receipts** 12:9 76:15 79:13,22 80:8,11
83:9

**receive** 5:11

**received** 13:23 14:2 19:1 69:13

**recollect** 53:15

**recollection** 12:14,20 14:6 50:2
102:22

KAREEM TORAIN - vs -
CITY OF PHILADELPHIA

BRIAN REYNOLDS Index: record..sit

**record** 4:12 5:2,17 6:10 7:20 10:4,6 13:8 14:23 18:1 53:23 54:5 80:1 120:9 124:20 129:8 130:9,11,13,15

**recovered** 33:1 73:22 75:19 110:7 118:7,8

**recovery** 37:13

**refer** 48:10

**reference** 21:8 101:3

**referring** 17:17 22:12 26:13 32:22 45:8 50:1,20 56:14 100:21

**refresh** 12:13 14:6 50:2

**registered** 56:19

**remain** 17:5 38:12

**remained** 67:6 69:19

**remember** 11:10,13 19:15 29:6,24 31:23 43:15 44:15 48:10 65:14 73:5 78:10,16,24 81:19 83:3 85:24 101:10 104:14 108:15 110:18,20,24 111:3,5 117:16 118:8 119:11,12 121:10,12,21, 24 122:1,4,13,22 123:20 125:6,22,23 126:2,8,12,16 127:15

**remembered** 89:14

**rented** 101:4

**repetitive** 47:15,20

**rephrase** 85:15 98:19

**report** 12:7,12 14:8 15:2,11,20 16:4,7 20:22 32:19,22 35:19,24 36:9,19 51:9, 10,12,23 52:3,6,18,20 53:20 54:7,24 57:23 58:3,4,11 59:6 67:10 69:14 77:13,15,18 88:17,18 104:9,12 115:24

**reported** 35:5

**REPORTER** 10:3 89:5

**represented** 4:20 52:14

**representing** 5:19 80:11

**reserved** 4:5

**respect** 4:15 14:14,21 36:22 42:1 67:8,9

**response** 50:19

**responsibility** 14:23

**retired** 11:6

**review** 11:23 12:9,12,19 14:2,4 51:23 53:14 58:3 74:4 129:24

**reviewed** 12:3,4,13 53:15

**reviewing** 104:21

**reward** 124:10

**Reynold's** 5:9

**Reynold's-1** 16:12

**Reynolds** 4:8,13,16 6:11 10:11 33:9, 11

**Reynolds-1** 16:14,17

**Reynolds-2** 79:6,8

**Reynolds-3** 113:9,11

**Reynolds-4** 129:11,13,17 130:16

**rifles** 117:24

**ring** 37:22 38:4 73:23 76:4,6 78:2,3

**role** 12:14 28:19 48:3

**Ronald** 17:1 19:3

**room** 100:11,12 101:4 103:12,16,19 105:19 106:5,18,24 107:5,6,8,10 108:20 109:17 111:11,14 112:8

**rooming** 98:3

**rooms** 98:9,12

**S**

**safe** 75:19 110:6,7,10,20 111:3,18 114:21

**sales** 13:20 14:19

**sat** 125:5

**satisfied** 81:23 82:2

**Saunders** 101:3 102:18

**scene** 24:5 31:22 34:18 58:6 68:3 91:21 92:20 98:19 101:6

**sealing** 4:2

**Sean** 9:8 28:13

**search** 8:4 16:19,20 22:1 24:24 25:2, 5 29:7 51:17 82:24 95:16 96:5,8,13 106:23 109:7 111:4,8 116:7,14

**searched** 25:2

**searches** 21:20 35:6 96:10

**searchs** 22:21 29:16

**secure** 87:6,8 91:1,15,24 97:9 101:1 102:9 106:21 108:24 110:17

**secured** 92:14 96:24 97:5 103:21 106:18

**securing** 88:1 114:24

**seized** 97:2

**seizure** 95:16

**seizures** 96:6 117:12

**sell** 65:12 124:14

**selling** 45:20

**send** 5:20

**sending** 5:8

**Sengoba** 4:21 72:5

**sense** 42:3

**Sentry** 114:21

**separate** 26:9 57:13 68:5 105:11,16

**separately** 57:17

**sergeant** 10:20,23 11:9

**set** 11:16 56:16 59:8 81:2 86:3

**sets** 92:3,4

**shlft** 116:3

**shooter** 124:19

**short** 8:9 10:8 72:6

**short-term** 8:8

**show** 39:21 45:13 48:7,16 58:7 79:2 96:7 120:22 123:18 124:20 126:8 129:16

**showed** 12:8 68:21

**showing** 16:16 32:23

**side** 94:20

**sight** 107:13,14

**sign** 5:5 116:5

**signed** 39:7,11 114:17 125:18,24 126:4,11 130:17

**signing** 125:14

**signs** 38:10

**silver** 78:2

**simply** 52:8 54:19

**Sinclaire** 10:21 11:3 102:5,16

**sit** 61:21 115:17 119:10 122:6 123:21

KAREEM TORAIN - vs -
CITY OF PHILADELPHIA

BRIAN REYNOLDS Index: site..time

**site** 46:9

**sitting** 62:11 129:8

**situated** 31:18 62:9

**size** 109:17,19

**skipping** 23:4

**small** 103:2,6

**Smaller** 109:18

**smart** 74:8

**sold** 37:20

**solely** 75:10

**solicitor's** 4:20

**sore** 60:1 62:13

**sound** 24:19 59:11 70:19

**source** 17:1,4,7,12,13 18:5,6 19:2,8, 22 20:7,9,15 37:18,19 38:8,20,22,24 39:5 42:15 44:3 46:8,21,22 47:17 120:5,20 121:4,6,10

**sources** 20:24 39:13,19 40:1,10,14 41:17 42:6,22 43:14 47:6

**southeast** 62:11

**speaking** 21:7 101:9,12 102:17

**speaks** 54:24

**special** 64:23

**specifically** 4:14 16:20 23:19 76:3 83:2 86:11

**spoke** 101:2 102:19

**sporting** 7:6

**squad** 9:4 10:12

**stamp** 114:9

**stand** 115:17

**standard** 115:16

**started** 9:19

**state** 6:9

**stated** 39:3 44:22 71:24 72:19 83:4 102:15 108:6

**states** 69:18 74:18 76:1 112:23

**stay** 106:22

**step** 108:1

**stepped** 106:5 108:6,11

**stick** 60:1 62:13

**stop** 12:24 30:1 36:2 56:23 57:1 73:8, 9,17 75:9 101:5

**stopped** 24:8 32:13 57:17 72:11,14, 23 73:22 112:8

**stopping** 24:10 30:17 34:23

**storage** 23:9

**straight** 93:23

**street** 12:23 13:17 14:20 22:17 37:21 41:21 50:11,13 56:17,20 57:5 58:6,22 59:1,4,7 60:3 61:4 62:9,21 63:12,14, 16,22 64:6 65:17 66:8,14,18 67:6,9 68:14,19,24 69:18 70:5,6,13,17,18 71:6 72:22 73:13,17 74:1 75:12,15,18 76:8 78:3 82:24 87:1,23,24 88:2,3,4,8, 13,24 90:5,6,11,24 91:22 92:15,20 93:2,9,10,15,20 94:1,12,13 95:18 96:14 100:24 105:12 113:19 117:13 118:22 119:6 121:17

**Street all** 66:23

**strike** 8:8 18:9 29:16,18,21 30:15 31:7 40:22 49:4 58:10 77:6

**stuff** 118:7

**submit** 36:17 99:2 129:17

**sudden** 122:20

**sufficient** 84:23

**suicide** 124:22

**supervising** 10:18 11:8

**supervisor** 91:4,24 102:4,7,8,12,14 108:12,16

**supervisors** 15:4 30:22

**supposed** 4:22 70:23

**surgey** 60:14 61:14

**surveil** 8:3 90:10

**surveillance** 13:16 23:13,15,20 24:2, 19 28:15 31:19 34:18 56:16 59:8 60:9, 11,23 127:3

**surveillances** 31:14

**surveilled** 16:22

**surveilling** 25:22 33:20 62:22 70:2 91:21

**suspected** 45:11

**sworn** 4:9

---

**T**

**tag** 50:17,22 56:19

**tail** 5:6

**taking** 43:1 85:16

**talk** 13:22 19:23 75:23

**talked** 19:10

**talking** 19:15 63:6,11 71:20 78:11 79:1 111:7,9

**taped** 81:24

**team** 16:22 17:15,22 21:11 25:1,14 27:15,22 28:6,10 29:7 31:9

**telephone** 127:16

**telling** 59:21 119:7 121:19 122:12 123:17 125:13,18 126:14,17

**Ten** 71:10

**tenure** 11:18

**term** 8:9,10

**testified** 4:9 14:8 19:13,15 40:6 42:15 48:9 57:4,18 58:14 100:19

**testify** 11:20 13:9 84:23 85:1

**testifying** 54:3 58:4 84:10,14 100:17

**testimony** 40:2 53:24 58:11 67:7 91:14 97:8 109:12 121:22 122:1,4 123:13 129:2

**thing** 33:12 37:3

**things** 70:8 71:3

**thinks** 130:24

**thought** 65:19

**three-day** 31:14 64:16

**three-story** 103:7

**threshold** 108:2,11

**thumb** 60:1 62:14

**tight** 94:6

**Tillman** 66:21

**time** 4:5 8:12 9:5 10:8,12,19 11:22 16:13 17:15 21:11 23:14 26:8 31:13 50:10 58:15 63:17,18,21 64:17 66:6 72:6 74:12 78:9 79:7 81:17,22 82:16,

KAREEM TORAIN - vs -
CITY OF PHILADELPHIA

BRIAN REYNOLDS Index: times..written

17 83:5,10 86:8 88:11 93:15 109:14
110:21 111:19 113:10,22 114:9
115:18 126:5,7 129:12 130:10

**times** 45:5,12 84:5 89:17 104:23

**timing** 53:13

**Tioga** 61:4

**today** 11:20 15:23 58:4 119:10 122:6
123:21

**today's** 5:21 53:15

**told** 14:7 37:19 65:4,13,15,21,23 73:8
75:10 77:22 78:1,8 88:15 89:14 90:7
91:19,20 112:2

**ton** 118:1

**Torain** 11:19 12:22 30:1,16 31:2 32:5,
10 50:7,10 58:14,22 59:3,9 62:18 63:4
64:23 65:5 67:1,8,14 68:18,20 69:10
70:5,24 71:6,21,22 72:16 75:17 76:14
78:9 80:12 82:8,19 83:20 85:4 87:7,22
88:19 92:15 93:3,7 94:8 99:24 100:11,
12 101:1 103:15 111:22 117:10
118:15,19 123:23 129:19

**Torain's** 48:21 72:11

**tow** 100:3

**traffic** 6:20,22

**trained** 41:11 128:18,20

**transaction** 88:12

**transcript** 4:3

**transpired** 71:4

**transpiring** 93:4

**transport** 76:24

**transported** 76:20 77:7 83:20

**travel** 58:24

**traveling** 56:20

**trial** 4:6 84:18 100:17 117:11,17
125:16

**truck** 7:8

**true** 124:4 125:20

**turned** 76:12,16 85:18,24 86:6,12,16,
19 92:13

**TV** 7:11

**Twenty** 67:2

**twisting** 46:17

**type** 82:24

**typed** 106:23 112:16

**types** 97:1

**typing** 109:7 112:19

**typo** 52:3,17,22 55:18

U

**unclear** 47:18,19

**understand** 11:9 21:19 23:18,23,24
29:12 47:4,23 51:11 52:2 53:5 99:4
106:10,11 126:24

**uniformed** 30:2 44:1

**unit** 7:18,20 9:13 29:20 35:1 43:7
49:23 58:16 59:10,13,16 67:9 75:16
87:2,20 90:24 91:8,10,15,19 94:1 96:2
97:5 103:2,6,7 115:1 124:1

**units** 13:21 16:21 22:18 25:3 29:16
31:20 33:22 35:7 118:2,21

**unlock** 108:8

**upscale** 119:21

**upstairs** 99:17

**USC** 74:2

**utilized** 21:16,18 22:20 61:14

V

**van** 28:16 60:10,12,14,15,18,19,21,
22,24 61:2,14,17,19,22,23 62:3,6,8,16
127:2,13 128:21

**vehicle** 30:18 32:14 56:23 57:1,2,4
59:3,18,19,21 72:11 73:3,12

**vehicles** 68:5

**verify** 45:18 46:4

**vests** 117:23

**video** 61:23

**videotape** 61:21

**Vincent** 101:3 102:18

**violating** 127:8

W

**wait** 9:24 78:14 87:17 116:3

**waited** 115:21

**waived** 4:3

**walk** 99:12,13

**Walker** 4:17,18 5:10,12,15,18,20 8:13
9:2,3 10:15 26:3,8 27:18 28:18 31:10
32:13 34:21 36:22 48:24 49:20 50:6
57:7,12,19 58:2,4,12 59:6 66:18,20
67:3,7,22,24 69:13,19 70:24 71:19,21
72:22 75:11 84:2 85:4 87:22 90:12
91:19 100:9,16,18 112:1,2 129:8,18,
20 130:17

**Walking** 41:20

**wanted** 50:7 67:19 127:19

**warrant** 16:19,20 82:24 87:15,17
96:18,22 97:2 106:23 109:7 111:8
112:21,23 113:18 114:15 115:18,24
116:11

**warrants** 8:4 25:1,2,5 35:5 95:17 96:8
119:13

**watched** 60:10

**watching** 69:19

**West** 23:6,8

**westbound** 58:24

**whatsoever** 27:23

**white** 60:6,8 114:23

**Whoa** 61:9 89:4

**witnessed** 98:15

**wording** 65:14

**words** 19:20 46:17 72:24 75:16 77:24
85:15 88:3 98:7 123:22

**work** 7:13 9:2,19,20 19:6,12,17 61:3
73:24 76:7 105:11

**worked** 8:13,16,18,21 9:6,8,15 15:15
28:10 43:10 78:3 92:15 99:23 103:21,
22,24

**working** 31:9

**works** 18:16

**would've** 76:16

**written** 41:24 112:15

KAREEM TORAIN - vs -
CITY OF PHILADELPHIA

BRIAN REYNOLDS Index: wrong..Yup

**wrong** 47:5 60:2

**wrote** 15:1

---

## Y

**year** 6:23 17:20 56:5,10

**years** 6:18 31:24 39:24 40:9 42:6,13
52:14 61:20 83:4 91:9 103:4

**yo** 79:9

**Yup** 80:5

| CONTINUATION (51) | YEAR | TOUR | DG NUMBER 698 | REPORT DATE 1/4/01 | Page 1 of 5 | |
|---|---|---|---|---|---|---|
| COMPLAINANT ?/O BRIAN MONAGHAN #6061 | | | CLASSIFICATION NARCOTICS | | | CODE 1807 |
| ORIGINATOR ?/O BRIAN MONAGHAN | | | BADGE NUMBER 6061 | PAYROLL NUMBER 201073 | | |

## CONTINUATION OF SEARCH AND SEIZURE WARRANT #99029

P/O Monaghan #6061, Received Detailed Information From A Confidential Source And 15ᵗʰ District Police Officers, P/O Ronald Cain #4959 & P/O Joseph Goglielmucci #2-60, Refering To Drug Activity Involving The 5600 Blk Of W. Master St. Listed Locations 5609 W. Master St, Abandoned Property Narcotics Being Packaged In This Location. 5607 W. Master St Being Used As A Stash House, Containing Marijuana, Crack, And Weapons. 5605 W. Master St, Narcotics Sold From Front Porch Area. Also A B/M Name "Al", And A B/M By The Name Of "Pud".

On Tuesday, 1-2-01,At Approximately 3:45 Pm, P/O Monaghan #6061 & P/O Kelly #7126, Set Up A Surveillance In The Area Of 5600 W. Master St. P/O Monaghan #6061 Observed #1 B/M (later I'd as Anthony Hodge) Wearing A Blk Down Jacket & Gray/Black B/B Cap 5'8 Med Compl 20's, And #2 B/M (Later I'd as Darnell DeLEE) Blk Jacket W/Fur Around Hood, 5'8 Med Compl 20's W/Red Wool Knit Skull Cap, Standing On The Porch Of 5605 W. Master St. At Approx: 3:45 Pm HODGE Knocked On The Front Door Of 5605 W. Master St, Unk B/M Opened The Door And Handed HODGE A Golf Ball Sieze Object, HODGE Then Handed DeLEE Objects From The Golf Ball Seize Object. Between 3:45 Pm & 5:30 Pm, HODGE and DeLEE On Different Occassions Would Accept Unk Amounts Of Usc From Unk B/M's & Unk B/F's In Exchanged For Small Packets They Retreived From Their Persons. At Approximately 5:12 Pm A Gray Olds Veh Stopped In The 5500 Blk Of W. Master St, And Passenger Exited The Veh And Walked Towards The N/W Corner Of 56 & Master St, After A Breif Conversation With Both HODGE and DeLEE They Walked The Unk B/M Into 5607 W. Master St. After About 10 Minutes The Unk B/M Exited The Location, P/O Monaghan #6061 Observed The B/M Place A Large Clear Bag Containg A Grn Weed Substance Into A Blk Bag He Was Carrying. At This Time #2 B/M Went To 5609 W. Master St Removed Usc From His Jacket Pocket, Opened The Front Door And Placed The Usc Into That Property. The Unk B/M Walked To The Corner Where The Olds Veh Picked Him Up And Then Left The area. The Veh Was Followed By Members From The Nfu To 4700 Blk Of Merion Ave. 2 Unk B/M Occupants Exited The Veh, Passenger Carrying The Blk Bag Then Entered 7:0 Merion Ave. HODGE Then Entered 5605 W. Master St.

On Wednesday, 1-3-01 At Approximately 11:00 Am, P/O Monaghan #6061 & P/O Kelly #7126, Set Up A Surveillance For The Locations Of 5605, 5607 & 5609 W. Master St. At Approx. 11:31am Police Observed A Dark Colored Buick Pa Tag Dkd2171 ( Which Is Registered To Glenn Lee 5607 Master St) Operated By A DeLEE Wearing Blk Gown Jkt, W/Red Wool Knit Skull Cap, Park In Front Of 5605 Master St. At Approx. 11:52 Am DeLEE Received A A Golf Ball Size Object Cont Dark Colored Objects Out The Front Door Of 5605 Master St. Between 11:30 Am And 11:58am B/M #2 Gives unumerous B/M/'s And Female Small Dark Objects From Inside Of A Clear Baggie That He Was Holding On His Person Inexchange For Usc.

At Approx.11:58am A B/M (Later I'd As Migel MOON PPN#817626) Wearing Dark Jacket, Blue & White Titans Ball Cap Exits 5605 Master St And Hands Small Objects To A B/M Wearing A Tan Jacket In Exchange For Usc. MOON Then Goes Onto The Porch Of 5607 And Counts Green Packets That Are Inside A Clear Baggie That Are Retrieved From His Person. MOON Then Gives Numerous Of These Packets To 2

| SIGNATURE | | SIGNATURE | |
|---|---|---|---|

Males And 1 Female In Ex nge For Usc.MOON Then Pl s The Bundle In His Right Pocket.

t Approx.2:22pm HODGE Wearing A Blk Averix Jkt Exited 5607 Master St.And Gives B/M Wearing Black Jacket , Blue And White Plaid Shirt Small Object In Exchange For Usc.

t Approx. 2:26pm MOON Takes From His Person The Clear Baggie Mentioned Earlier hat Cont Green Packets And Hands Them To B/M #2. MOON Then Gets Into The Passenger Side Of A Dark Colored Olds Pa Tag Bzr 4983( Which Comes Back To A azda) And Leave N/B On 56th St.

Between 2-3:00Pm Kabeyn DIGGS Wearing A Black Jacket , Red Shirt And Base Ball ap Parked A Older Model Subaru Staton Wagon Pa Tag CDP3580 On The N/W Corner Of 5th And Master. This B/M Exited Carring A Green Timberland Shoe Box And Went In 605 Master St. This B/M Exited A Short Ime Later And Left In The Subaru.

t Approx. 3:56pm DeLEE Was Observed Giving (2) B/F's Small Objects In Exchange or Usc In The Rear Of The Store On The N/E Corner Of 56th And Master St. t Approx. 3:58pm P/O Mitchell#4145 Went To That Corner To Attempt To Make A ontrolled Narcotics Purchase From DeLEE P/O Mitchell Met DeLEE Inside Of The tore And Engaged In Narcotics Related Conversation After Which DeLEE Told P/O itchell To Stay Inside . DeLEE Exited The Store Walked To The Rear Of The Store nd Removed Small Objects From His Person . DeLEE Then Opend The Backdoor Of The tore And Called P/O Mitchell#4145 Outsid. DeLEE Handed P/O Mitchell Theses mall Object In Exhcnage For 20.00 Pre-Recorded Buy Money. P/O Mitchell Left And urned Items Purchased(4 Black Tinted Heat Sealed Packets Cont A White Chunky ubstance) To Over To P/O Monaghan ..A Majority Of Observation On 1/3/01 Were ideo Taped By P/O Kelly #7126 And P/O Monaghan #6061.

n 1/4/00 P/O Kelly #7126 And P/O Monaghan Set Up A Surviellance Of 56th And aster St. At Approx. 1:41 Pm Police Observed A Green Bonneville Pa Tag Dkc3310 Registered Carolyn Gillis] Travel N/B On 56th St To The Intersection Of 56th nd Master. At This Time Delee Who Was Standing On Steps Of 5605 Master St Made Hand Gesture Toward The Bonneville And Yelled ,"Yo". At This Time The onneville Traveled W/B On Master St And Turned N/B Onto Ithan St.At This Time elee Ran W/B To Ithan St And Entered The Passenger Side Of The Bonneville. elee Exited After Approx 2-3 Mins And Ran Back To The Corner Of 56th And aster. The Bonneville Who Was Being Operated By A B/M Later I'd As Kareem orian Was Followed Back To 1621 N. Conestoga St By P/O Walker #3730 Where olice Observed Torain Exit His Vehicle And Enter 1621 Conestoga.Police Observed elee Go Immediately Go Back To The Corner Of 56th And Master And Give Small bjects Which He Retrieved From His Pocket To Numerous Males And Females In xchange For Usc.

t Approx. 1:43 Pm Police Observed The Sebring Travel W/B On Master St Being perated By Christina Brax Stop In Front Of 5607 Master St. Anthony Hodge Exited he Passenger Side And Entered Into 5607 Master St With A Key. Hodge.Was bserved On Numerous Occasions Entering And Exiting 5607 Master St With A Key On /4/01.

t Approx. 1:55pm P/O Kelly Overheard Delee Who Was Standing On The Southeast orner Of 56th And Master St Tell Kabeyn Diggs That Kareem ( Operator Of The reen Bonneville) Only Had A Bundle On Him And Would Call When The Rest Was eady.

t Approx. 2:00pm P/O Reynolds #4268 Observed Torain Exit 1621 St Bonestoga And ravel W/B On Hunter St In The Bonneville To The S/W Corner Of 55th And Hunter

SIGNATURE                                          SIGNATURE

lis Point Torain Exited H Vehicle And Entered Into 8 N 55th St With

c. 2:05pm Police Observed Delee Answer The Pay Phone On The N/W Corner
nd Master St The Jog To The Buick ( Mentioned On 1/3/00) Along With
l Athur Tilman. P/O Walker Followed Them To 55th And Hunter St. Where
ted The Car On 55th St. All These Males Exited The Buick And Were
Into 1628 S. 55th St By Torain. After Approx. 20 Mins All Three Males (
.llman,Diggs)Exited 55th St, With Delee Placing A Clear Bag Inside Of
et. All Three Males Go Into The Buick And Were Followed Back To 56th And
, P/O Reynolds. P/O Walker Remained At 55th And Hunter Watching 1628 55th

t. 2:35pm Police Observed Hodge Exit 5607 Master St And Go Into A Red
Breeze Delaware Tag D4398 And Take Unknown Objects From Inside Of The
the Trunk.Hodge Then Walked Back To Into 5607 Master St.
t. 2:37pm Police Observed The Buick Park On The East Side Of 56th St
:h Of Master. All Three Males Exited The Vehicle And Walked To The Porch
Master St.
t. 2:37pm Police Observed Delee Hand Bundles To Moon, Freeman,Hodge And

en Placed A Clear Baggie Cont Numerous Green Tinted Packets In His Right
ocket. Delee Then Was Observed Giving These Small Green Packets To
People In Exchange For Usc.Police Observed Moon, Freeman, Hodge, Diggs,
a Were Observed Giving Males And Females Small Objects In Exchange For

c. 2:58pm Torain Left 1628 N. 55th St And Left The Area In His
te. P/O Reynolds #4268 Followed This Vehicle Out Of The Area And With
Of Uniform Vehicles Stopped Torain At 61st And Nassau St And Placed Him
rest. Recovered From Him Was (1) Pager, (1) Nextel Cell Phone, (1)
ey Ring Cont 5 Keys, (1) Black Key Ring Cont 3 Keys( One Was Later
ed To Work The Door Of 1628 N. 55th St And Apt #2 Inside), 250.00 Usc.
c. 3:05pm A Green Bonneville Pa Tag Dnz7857 Operated By Raymond Howard
1e Passenger Seat Was A B/M Later I'd As Maurice Grey , Parked On The
e Of 56th St Just North Of Master St. Both Males Exited The Vehicle And
D The Porch Of 5605 Master St, Where Delee Handed Howard A Large Amount
All Males Walked To The N/W Corner Of 56th And Master St.
c. 3:13pm Delee, Freeman Got Into The Buick ( Mentioned Earlier )And
Area N/B On 56th St.
c. 3:17pm A Marked Police Vehicle Stopped In The Middle Of 56th And
: And Activated Lights And Sirens On The Vehicle . At This Time Grey,
Diggs Got Into The Bonneville And Left N/B At A High Rate Of Speed
i A B/F Got Into The Breeze And Left The Area S/B On 56th St At A High
Speed. P/O Kelly Notified Backup As To Description And Direction Of
nicles And Occupants. P/O Fitzgerald #2228 And P/O Francis #3981 Stopped
eville On 1400 N Alison St. Recovered From Howard Was (2) Bundles Of
e Was 585.00 Usc And The Other Was 553.00 Usc.Recovered From Diggs Was
Phone, 313.00 Usc, (14) Blue Oval Pills( Alleged Xanax), Recovered From
(1) Clear Bag Cont (112) Blue Oval Pills (Alleged Xanax); (1) Clear
Packet Cont (14) Yellow Tinted Ziplock Packets Cont A White Chunky
s, 68.00 Usc .
olds #4268 And P/O Walker #3730 Stopped The Breeze At 56th And Market
e Was Placed Under Arrest And Recovered From Him Was (5) Blue Tinted
Packets Cont A Green Weed Substance And (1) Key Ring With(3) Keys One Of
s Later Determined To Work The Door At 5607 Master St.

SIGNATURE

NFU 07478

At Approx. 3:27pm Darnel̃ Delee And Anthony Freeman 1 S/B Down 56ᵗʰ St From Media And Onto The Porch Of 560 Master St And Yelled "Yo The Cops Got Them And There Coming" At This Time Moon Bichonot And Tillman Ran Out The Front Door Of 605 Master St. All Five ( Moon, Bichonot,Tillman,Freeman,And Delee) Then Preceded To Run N/B On Ithan St P/O Kelly Notified Backup As To Description And

direction Of All 5 Males. P/O W lker #373Q Stopped Freeman And Bichonot At Frazier And Media St. Recovered From Freeman Was 106.00 Usc And His Black Jacket With Fur Collar, Recovered From Bichonot Was His Red Leather Jacket With Player" Written On The Front. /O Fitzgerald #2228 Stopped Tillman, And Delee in Frazier And Media St. Recovered From Delee Was (1) Key Ring That Cont (7) Keys, One Of Which Worked The Front Door Of 5705 Master St And Another Worked The Padlock On The Door Going Into The Second Floor Rear Bedroom And 2 Bundles Of Money One Cont 850.00, 20.00 Of which was pre-recorded buy money used by p/o Mitchell on 1/3/00 And The Other Cont 280.00 Usc.Moon Was Lost In Area.

At Approx. 3:50pm Members Of Narcotics Went To 1628 N. 55ᵗʰ St To Attempt To Secured The Apartment That Torain Went Into. P/O Kelly Spoke With The Manager Of The Property Vincent Saunders In Reference To A B/M Who Rented A Room Inside. Mr Saunders Stated That He Knew A B/M Light Complexion, Heavy Build And Light Beard Who Drove A Green Bonneville With Tinted Windows And Shinny Rims Lived In Apt 2. This Male Had Young Males Entering And Exiting His Room Frequently. At This Point The Owner Of The Property Vincent Saunders Showed Up And Stated That No One Had Rented Apt #2 And No One Had Permission To Be Inside Of The Property. P/O Monaghan #6061 Tried One Of The Keys From Torains Key Ring In The Lock At Apt #2 And It Opened The Lock. The Owner Again Stated That No One Had Rented The Apt And No One Had Permission To Be Inside. The Apt Was Secured Pending Search And Seizure Warrant.

On 1/4/00 at approx. 3:30PM members of narcotics executed search and seizure warrant #'s 99025,99026,99027 at 5605, 5607,5609 Master St AND HAD TO FORCEABLY MAIN ENTRY INTO ALL PROPERTIES.

Inside 5605 Master st Glenn LEE was stopped in the living room area and placed under arrest. Recovered from inside 5605 Master St second floor rear bedroom ( which had a padlock on the door in the closest (1) Blue Ballistic Vest, on the dresser (1) clear bag cont ,(1) clear baggie cont (63) green tinted ziplock packets cont a white chunky substance, (1) clear baggie cont (53) green tinted ziplock packets cont a white chunky substance, (1) clear baggie cont (31) clear tinted ziplock packets cont a white chunky substance, (1) clear baggie cont (30) clear tinted ziplock packets cont a white chunky substance ( a gram total of 17.7 packets and approx. weight 17.7 grams), (1) box cont numerous live 45.Cal.and 40 cal bullets, (1) clear baggie cont numerous new and unused green tinted packets, (1) receipt from first judical dist Pa, in name of Darnell DeLEE. Recovered from first floor numerous pieces of mail in name of glenn DeLEE and Darnell DeLEE.

Inside 5707 Master St Eileen hodges was stopped and placed under arrest by P/O Balazka #7481. recovered from inside a drawer in the living room was 268.00. recovered from the basement was (1) Black AR 15 ,.22cal Wesshult rifle , empty magizine serial #A774130,sawed off butt (1) black AR22 ,.22cal assult rifle , mpty magizine, serial#021088, sawed off butt (1) 12 gauge pump shotgun no serial # saw off barrel and butt sawed off, and (1) baggie cont various caliber ive rounds.recovered from Anthcny hodges second floor middle bedroom was (1) lear baggie cont (76) blue tinted heat sealed ziplock packets cont a green weed

| SIGNATURE | | | | SIGNATURE | |
|---|---|---|---|---|---|

NFU 07479

substance and (1) ziplo⬤ ag cont a white chunky ⬤ ance ( approx. 11.5 grams alleged crack cocaine)

Inside 5609 Master St. (5) green tinted ziplock packet heat sealed cont a green weed seed substance, numerous ne and unused black tinted packets, and 3 boxes cont various live rounds .

¬ 1/5/00 P/O Monaghan #6061 obtained search and seizure warrant #99028 approved ·· ada Albright and signed by bail commissioner Polkoff.

:side 1628 N. 55th St apt #2 at approx.1:00Am members of narcotics executed ·arch and seizure warrant #99028. recovered from inside in bed frame was .}sentry safe cont (2) amber pill bottles with white tops and (3) bags tied in ot on top cont a white chunky substance ( a total of approx. 17 grams of crack .caine).

:DITIONAL INFORMATION FOR SEARCH & SEIZURE WARRANT # 99029 FOR A 1986 BUICK :SABRE CP / BLK PA TAG (DKD-2171) VIN# 1G4HR37L0GH424098, OPERATOR (DARNELL :LEE) WAS OBSERVED BY POLICE OPERATING THE VEHICLE WITH KEYS. AT TIME OF ARREST ·YS NOT LOCATED. VEHICLE IN POLICE CUSTODY AT THIS TIME.

P/O Monaghan #6061, I Your Affiant REQUEST A DAYTIME SEARCH WARRANT ON THE :STED VEHICLE.

**PROPERTY RECEIPT**

FROM WHOM: KAREEM TURAIN

☐ LOST AND FOUND

☐ FOR INVESTIGATION

☐ PERSONAL PROPERTY FOR SAFEKEEPING

☒ EVIDENCE

N° 2308207

ADDRESS
1621 S. CONNESTOGA ST.
OWNER (if known)

GEN: M

DATE 1/4/01   TIME 3:30P M   DISTRICT NB   UNIT F2SW

LAB USER FEE REQUESTED  ☐ YES  ☐ NO   CN 00-19-698   PO NO.

SEIZURE NO.

DEFENDANT'S NAME: SAME TO 75749

BULK OF PROPERTY STORED AT: EVIDENCE CUST.

ITEMS OF PROPERTY AND CIRCUMSTANCES UNDER WHICH IT WAS RECEIVED INCLUDING THE EXACT LOCATION TAKEN FROM

1. EVIDENCE: ITEM #1-(1) KEY RING CONT. (3) SILVER KEYS-(1) KEY WORKED THE DOOR TO 1628 S. 55TH ST. APT. "2".
   ITEM #2-(1) CANCER KEY RING CONT. (5) KEYS.   ITEM #5-(1) COMMONWEALTH OF PA
   ITEM #3-(1) PHILIPS PAGE MART PAGER.   BOARD OF PROBATION & PA-
   ITEM #4-(1) MOTOROLA NEXTEL CELL PHONE.   ROLE IN THE NAME OF DEF.
2. CIRCUMSTANCES: ON 1/4/01 AT APPROX. 3:05PM THE ABOVE DEF. WAS ARRESTED FOR NARC. VIOLATIONS THAT OCCURRED OUTSIDE 5600 MASTER ST. CONFIS. WAS THE ABOVE ITEMS.
3. FIELD TEST: NONE
4. CASE#: SF-00-007.
   OI

If the person from whom the above amount of money and/or property was taken does not sign below, state reason why:

RECEIVED BY POLICE DEPARTMENT

Arresting or Receiving Officer: (If personal property for safekeeping Desk/Supervisor is the Receiving Officer)

PERSON FROM WHOM TAKEN (Signature) UUNABLE TO SIGN

WITNESS (Signature) SGT   BADGE NO. (Type) 8771

SIGNATURE PO MONAGHAN 201073

BADGE NO. (Type) 6061 6OC1

**TRANSFERRED TO EVIDENCE CUSTODIAN/COLLECTOR**

I hereby acknowledge receipt of the above listed items.

(Date)   (Time)   (Evidence Custodian/Collection)

**RELEASE FROM CUSTODY OF POLICE DEPARTMENT**

This will acknowledge the receipt from the Police Department of the City of Philadelphia of the amount of money and/or property listed above, and will constitute the release of the City of Philadelphia and its agencies from any and all future responsibility therefor.

RECEIVED BY (Owner or Agent)

☐ Returned to Owner or Agent
☐ Confiscated by Court

OWNER OR AGENT (Signature)

NFU 07462



**PROPERTY RECEIPT**

| | FROM WHOM TAKEN | | | SEX | N⁰ | 2308208 |

**FROM WHOM TAKEN** KAREEM TOBAIN

SEX m

N⁰ 2308208

☐ LOST AND FOUND

**ADDRESS** 1621 S. CONNESTOGA ST.

**DATE** 1/4/01 **TIME** 3:05PM

**DISTRICT** NB

**UNIT** F2SW

☐ FOR INVESTIGATION

**OWNER (If Known)**

**LAB USER FBI REQUESTED** ☐ YES ☐ NO

**DO NO.** 00-19-698

☐ PERSONAL PROPERTY FOR SAFEKEEPING

**ADDRESS**

**SEIZURE NO.**

**XXX** EVIDENCE

**DEFENDANT'S NAME** SAME

**BULK OF PROPERTY STORED AT** XXXXXXX EVIDENCE CUST.

ITEMS OF PROPERTY AND CIRCUMSTANCES UNDER WHICH IT WAS RECEIVED INCLUDING THE EXACT LOCATION TAKEN FROM

```
1. EVIDENCE: (7)............TWENTIES.............$140.00
             (4)............TENS................$40.00
             (10)...........FIVES...............$50.00
             (20)...........ONES................$20.00
             TOTAL......................$250.00
```

2. CIRCUMSTANCES: ON 1/4/01 AT APPROX. 3:05PM THE ABOVE DEF. WAS ARRESTED FOR NARC. VIOLATIONS THAT OCCURRED OUTSIDE 5600 MASTER ST. CONFIS. WAS THE ABOVE USC.

3. CASE#: SF-00-007.

If the person from whom the above amount of money and/or property was taken does not sign below, state reason why:

**RECEIVED BY POLICE DEPARTMENT**

Arresting or Receiving Officer: (If personal property for safekeeping, Desk Supervisor is the Receiving Officer)

**PERSON FROM WHOM TAKEN (Signature)** UNABLE TO SIGN

**WITNESSED BY** SGT/GESSNER 183065

**BADGE NO. (Type)** 8771 5771

**SIGNATURE** PO MONAGHAN 201073

**BADGE NO. (Type)** 6061

**TRANSFERRED TO EVIDENCE CUSTODIAN/COLLECTOR**

I hereby acknowledge receipt of the above listed items.

_____        _____        _____
        (Date)                         (Time)                  (Evidence Custodian/Collection)

**RELEASE FROM CUSTODY OF POLICE DEPARTMENT**

This will acknowledge the receipt from the Police Department of the City of Philadelphia of the amount of money and/or property listed above, and will constitute the release of the City of Philadelphia and its agencies from any and all future responsibility therefor.

**RECEIVED BY (Owner or Agent)**

☐ Returned to Owner or Agent
☐ Confiscated by Court

_____
OWNER OR AGENT (Signature)

| PROPERTY RECEIPT | FROM WHOM TAKEN KAREEM TORAIN | | | SEX | N° | 2308210 |
|---|---|---|---|---|---|---|
| ☐ LOST AND FOUND | ADDRESS 1621 S. CONNESTOGA ST. | | 23 | M | | |
| | | | DATE 1/4/01 | TIME 3:30P M | DISTRICT Nb | UNIT F2SW |
| ☐ FOR INVESTIGATION | OWNER (If Known) CAROLYN GILLIS | | LAB USER FEE REQUESTED ☐ YES ☒ NO | | DC NO. 01-19-698 | |
| ☐ PERSONAL PROPERTY FOR SAFEKEEPING | ADDRESS 107 VERLENDON AVE.     DARBY PA 19023 | | | | SEIZURE NO. | |
| ☒ EVIDENCE | DEFENDANT'S NAME REFER TO 75-49 | | BULK OF PROPERTY STORED AT AUTO POUND | | | |

ITEMS OF PROPERTY AND CIRCUMSTANCES UNDER WHICH IT WAS RECEIVED INCLUDING THE EXACT LOCATION TAKEN FROM

1. EVIDENCE: 1995 PONT. SDN. (PAINTED GREEN) PA #DKC3310 VI #1G2HX52K4S4240131.
2. CIRCUMSTANCES: ON 1/4/01 AT APPROX. 3:30PM THE ABOVE AUTO WAS CONFIS. FROM THE ABOVE DEF. DURING THE COURSE OF NARC. INVEST. AT 5600 MASTER ST,
3. CASE#: SF-01-007.

| If the person from whom the above amount of money and/or property was taken does not sign below, state reason why: | ☐ RECEIVED BY POLICE DEPARTMENT |
|---|---|
| PERSON FROM WHOM TAKEN (Signature) UNABLE TO SIGN | Arresting or Receiving Officer: (If personal property for safekeeping, Desk Supervisor is the Receiving Officer) |
| WITNESS (Signature) SGT. GESSNER 183065  8771 | SIGNATURE PO MONAGHAN 201073 | BADGE NO. (Type) 6061 |

TRANSFERRED TO EVIDENCE CUSTODIAN/COLLECTOR

I hereby acknowledge receipt of the above listed items.

| (Date) | (Time) | (Evidence Custodian/Collection) |
|---|---|---|

RELEASE FROM CUSTODY OF POLICE DEPARTMENT

This will acknowledge the receipt from the Police Department of the City of Philadelphia of the amount of money and/or property listed above, and will constitute the release of the City of Philadelphia and its agencies from any and all future responsibility therefor.

| ☐ Returned to Owner or Agent | RECEIVED BY (Owner or Agent) |
|---|---|
| ☐ Confiscated to Cit ... | OWNER OR AGENT (Signature) |

NFU 07464

CITY AND COUNTY OF PHILADELPHIA

AND AFFIDAVIT

being duly sworn (or affirmed) before me according to law, deposes and says that there is probable cause to believe that certain property is evidence of or the fruit of a crime or is contraband or is unlawfully possessed or otherwise subject to seizure, and is located at particular premises or in the possession of particular person as described below.

... U.S. 380 STREET CONTRABAND IDENTIFIED AS ILLEGAL NARCOTICS, ... IN, DOCUMENTS AND RECORDS OF A DRUG BUSINESS, OPERATIONS OWNERSHIP, ... IN RESIDENCE, JEWELRY, USC, WEAPONRY AMMUNITIONS AND PROCEEDS FROM ... TVITY.

1427 ... 9th St.    3 Story Corner Home Conv/Apt Bldg Masonry 1st Floor Apt #2

Wm R. Waites & Vincent K. Saunders

CONTROLLED SUBSTANCE ACT OF 1972

... IN CONTINUATION OF PROBABLE CAUSE ...

ATTACH ADDITIONAL PAPER (PAGES) IF NECESSARY    ☑ CHECK HERE IF ADDITIONAL PAPERS USED

P10    6061
        6061    Narcotics

PROPERTY SEIZED
☑ Yes  ☐ No
1- SCOTTY FIRE CAFE
3- CLEAR BAGGIE CONTAINING ... GAM CRACK
2- BROWN PLASTIC PILL STR W/WHT CAP

IF ADDITIONAL SPACE REQUIRED, USE REVERSE SIDE — INVENTORY MUST APPEAR ON ALL COPIES OF THE WARRANT

TO LAW ENFORCEMENT OFFICER: WHEREAS, facts have been sworn to or affirmed before me by written affidavit(s) attached hereto from which I have found probable cause, I do authorize you to search the above described premises or person, and to seize, secure, inventory, and make return according to the Pennsylvania Rules of Criminal Procedure, the above described items.

☐ This Warrant should be served as soon as practicable but in no event later than _____ ☐ A.M. ☐ P.M. _____, 19 ____ and shall be served only during daytime hours of 6 A.M. to 10 P.M.

☑ This Warrant should be served as soon as practicable but in no event later than 12 ____ later than ____

Court location _____

Date Commission Expires _____

REPORTS CONTROL

NFU 07470



I, Jeffrey Walker, being duly sworn depose and state that I give the following statement knowingly and under my own volition:

1. My name is Jeffrey Walker and my date of birth is October 6, 1968.

2. I reside at 6444 Woodcrest Avenue, Philadelphia, Pennsylvania, 19151.

3. I graduated from Overbrook High School located in Philadelphia, Pennsylvania in 1987.

4. I was employed with the Philadelphia Police Department from June 28, 1989 until my termination on May 21, 2013.

5. I was arrested on May 21, 2013 by the federal authorities for Hobbs Act Robbery and immediately began to cooperate with the federal government.

6. As a government witness, I testified against my codefendants, Philadelphia Police Officers Thomas Liciardello, Brian Reynolds, Perry Betts, John Speiser, Linwood Norman and Michael Spicer at their federal criminal trial in 2015.

7. Pursuant to Section 5K1.1 of the United States Sentencing Guidelines, I received a full downward departure from the Government for testifying truthfully and was sentenced to a 42-month term of imprisonment by the Honorable Eduardo Robreno.

8. On March 30, 2016, I was released from F.C.I. Lexington and began cooperating with the civil rights attorneys in hundreds of cases concerning the wrongful conviction civil lawsuits brought against me and members of my Narcotic Field Unit including Thomas Liciardello, Brian Reynolds, Lt. Robert Otto, Sgt. Joseph McCloskey, Sgt. Chester Malkowski, Brian Monaghan, Perry Betts, John



EXHIBIT

Reynolds 4

Speiser, Michael Spicer, Sean Kelly, et al. under the lead case of *McIntyre v Police Officer Liciardello*, C.A. No. 13-2773 (E.D. Pa., May 20, 2013).

9. I worked at the 16th Police District (Burglary/Narcotics Division) in Philadelphia, Pennsylvania from in or around 1991 until 1999.

10. In 1999, I transferred to the Narcotics Bureau of the Philadelphia Police Department.

11. I was personally involved in the facts leading to the execution of the search warrants, arrest and prosecution of Dennis Freeman and other individuals involved and associated with Dennis Freeman in the investigation against him in 2000.

12. I have recently had the opportunity to review the Affidavit of Probable Cause, as well as the trial testimony of myself and the testimony of Brian Reynolds given at the criminal trial of Dennis Freeman.

13. One of my partners in that investigation was Brian Reynolds. Brian Reynolds was the lead investigator in the investigation that lead to Dennis Freeman's arrest and subsequent prosecution and was also the police officer who initiated the investigation after obtaining information from a "concerned citizen".

14. Brian Reynolds gave false testimony about the "concerned citizen" because the "concerned citizen" was actually an individual that Brian Reynolds and I had used several times prior to the Freeman Investigation as an unregistered informant. Brian Reynolds also failed to disclose that this individual was personally involved with this investigation and several other investigations when he assisted us in conducting surveillances, permitted us to use his vehicle for stakeouts and gave

Brian Reynolds information on other drug dealers so that he could take over their drug locations when they were arrested.

15. Brian Reynolds and I used this unregistered informant who was known to us as "Al", described as a light skinned black male with curly dark hair wearing eye glasses and who resided in the 16th District in the area of 41st and Ogden Streets on numerous occasions while Officer Reynolds and I were detailed to the 16th District. Al assisted us in supplying information in order to set up drug dealers for arrest so that Al could take over that particular dealer's business. We rewarded Al for providing this information by giving him a free pass to continue to engage in his criminal activity. We also tipped Al off about other law enforcement investigations that he was a target in.

16. Al was known to us [Reynolds and myself] to have had a criminal history of drug dealing, robbing drug dealers, as well as being involved in shootouts with other drug dealers.

17. Brian Reynolds identified Al as a "concerned citizen" in the Freeman Investigation in order to make his information more reliable or credible and to appear that he was someone living in the neighborhood who was concerned about stopping drug activity.

18. Brian Reynolds and myself had no regard for Al's safety and we knew that using him as an unregistered informant was in violation of the Philadelphia Police Department Policies and Procedures in regards to the handling of informants and sources of information. We continued to use Al in this manner from the time

Reynolds and myself were assigned to the 16th District and then for several years after we were transferred to the Narcotics Field Unit.

19. During the Freeman Investigation, I was present in an unmarked vehicle when Brian Reynolds received a telephone call from Al informing Reynolds that he had information about narcotic sales near Al's mechanic shop in West Philadelphia. I was present later when Reynolds ordered Al to go to the area of Jefferson Street to identify Dennis Freeman.

20. I also witnessed Al's personal vehicle parked on Jefferson Street with Al inside waiting for Reynolds to come to the vehicle.

21. Our [Reynolds, other police officers involved in the investigation and myself] intention was to steal money located in these houses, if possible, and/or to articulate [fabricate] evidence to establish the probable cause needed to arrest and prosecute those individuals targeted in the investigation.

22. I was then also present when Brian Reynolds met with Al out of the area of Jefferson Street and discuss Dennis Freeman and other individuals involved in the investigation and heard Al tell Brian Reynolds that the individuals were selling a lot of drugs and that they had a lot of money in their houses.

23. I was present when Reynolds requested that Al drive Reynolds in Al's vehicle to the Jefferson Street location so that Reynolds could hide in Al's van and surveil the block.

24. I saw Reynolds get into the rear of Al's van while Al drove to the block of

Jefferson Street. Once on Jefferson Street, Al left the van leaving Reynolds alone inside of the van. After a period of time of surveillance, I saw Al come back to the van while Reynolds was still hiding in the van and drive away.

25. I witnessed Brian Reynolds violating Philadelphia Police Department Policy in the Freeman Investigation in handling sources of information, in using unregistered informants and in failing to corroborate information given to him by Al. Brian Reynolds violated these policies and procedures in order to fabricate the probable cause needed to arrest and prosecute Dennis Freeman and other individual involved in the Freeman Investigation.

26. During the pendency of Dennis Freeman's criminal trial, Al was signed up as a confidential informant by Brian Reynolds after questions were raised by Freeman's counsel at pretrial proceedings about the identity of the "concerned citizen", as well as the reliability and trustworthiness of the information given by Al.

27. I was present when Brian Reynolds signed Al up as a registered informant so that there would be no inquiry into Reynolds improper use of Al as a source of information.

28. Upon information and belief, sometime thereafter, Al committed suicide.

DATED: May 15, 2017

Jeffrey Walker

Sworn to and subscribed before me on 5/15/17

COMMONWEALTH OF PENNSYLVANIA
NOTARIAL SEAL
Sean J. Mundy, Notary Public
Lower Merion Twp., Montgomery County
My Commission Expires July 1, 2018
MEMBER, PENNSYLVANIA ASSOCIATION OF NOTARIES



# Compressed Transcript of the Testimony of
# POLICE OFFICER BRIAN REYNOLDS-VOLUME II, 9/23/21

**Case:** Torain v. City of Philadelphia, et al.

Summit Court Reporting, Inc.
Phone: 215.985.2400
Fax: 215.985.2420
Email: depo@summitreporting.com
Internet: www.summitreporting.com

Page 135

IN THE UNITED STATES DISTRICT COURT
FOR EASTERN DISTRICT OF PENNSYLVANIA

- - - - - - - - - - - - - - - -
                              )
KAREEM TORAIN,                )
        Plaintiff,            )  NO.: 2:14-cv-01643
                              )
    -vs-                      )
                              )
CITY OF PHILADELPHIA, et al., )
        Defendant.            )
- - - - - - - - - - - - - - - -

VOLUME II

Oral deposition of POLICE OFFICER BRIAN
REYNOLDS, was taken pursuant to Notice, held at The
United States Courthouse, 601 Market Street, 8th Floor,
Pennsylvania, 19106, on Thursday, September 23, 2021,
commencing at 10:13 a.m., before Ronald DeShields,
Registered Professional Reporter and Notary Public.

SUMMIT COURT REPORTING, INC.
Certified Court Reporters and Videographers
1500 Walnut Street, Suite 1610
Philadelphia, Pennsylvania 19102
424 Fleming Pike, Hammonton, New Jersey 08037
(215) 985-2400 * (609) 567-3315 * (800) 477-8648
www.summitreporting.com

Page 136

1
2   APPEARANCES:
3       MICHAEL PILEGGI ATTORNEY AT LAW
        BY:  MICHAEL PILEGGI, ESQUIRE
4            303 Chestnut Street
             Philadelphia, Pennsylvania 19106
5            (215) 627-8516
             pil423@aol.com
6       Appearing on behalf of the Plaintiff
7
    MARSHALL, DENNEHEY, WARNER
8   COLEMAN & GOGGIN
        BY:  JOHN P. GONZALES, ESQUIRE
9            2000 Market Street
             Suite 2300
10           Philadelphia, Pennsylvania 19103
             (215) 575-2871
11           jpgonzales@mdwcg.com
12      Appearing on behalf of the P/O Brian Reynolds

    CITY OF PHILADELPHIA LAW DEPARTMENT
13  BY:  ANNE TAYLOR, ESQUIRE
         CHIEF DEPUTY CITY SOLICITOR
14       1515 Arch Street
         15th Floor
15       Philadelphia, Pennsylvania 19102
         (215) 683-5381
16       annetaylor@phila.gov
    Appearing on behalf of City of Philadelphia
17
18
19
20
21
22
23
24

Page 137

1
2              I N D E X
       WITNESS                           PAGE
3      P/O Brian Reynolds
4      Examination
5      Mr. Pileggi                       140
6
7
8              E X H I B I T S
9      NUMBER      IDENTIFICATION         PAGE
10     Reynolds-5   Transcript            145
11     Reynolds-6   Search and Seizure Warrant  153
12     Reynolds-7   Concise Officer History  191
13     Reynolds-8   Transcript            192
14     Reynolds-9   Search and Seizure warrant  199
15     Reynolds-10  Affidavit             209
16     Reynolds-11  First Amended Complaint  233
17     Reynolds-12  Recorded phone conversation  246
18     Reynolds-13  Recorded phone conversation  248
19     Reynolds-14  Jeffery Walker Statement  256
20     Reynolds-15  FBI Document          290
21     Reynolds-16  Directive             302
22
23
24

Page 138

1              * * * *
2              (It is hereby stipulated and agreed
3   by and among counsel for the respective
4   parties that all objections, except to the form of
5   the questions, be reserved until the time of
6   trial.)
7              * * * *
8              P/O BRIAN REYNOLDS, having been called
9   as a witness, being first duly sworn, was
10  examined and testified as follows:
11             * * * *
12             MS. TAYLOR:  And if I could just note at
13  the beginning, this is a deposition continuation.
14  Counsel for the City in the first part of the
15  deposition was Joseph Zengova (ph).  Because
16  he has left the law department, my name is Anne
17  Taylor and I will be representing the City in this
18  case.
19             MR. GONZALES:  And also just note that
20  the witness is going to read and sign the
21  deposition transcript.
22             MR. PILEGGI:  I guess what I would like
23  to do is, and I don't even know how to do this,
24  since the last deposition was abruptly stopped, I

1 (Pages 135 to 138)

Case 2:14-cv-01643-RBS    Document 61-6    Filed 06/29/22    Page 67 of 128
Toraih v. City of Philadelphia, et al.

POLICE OFFICER BRIAN REYNOLDS-VOLUME II, 9/23/21

Page 139

1  would like to incorporate that deposition into
2  this record. I don't know -- I've never done this
3  before, so I'm --
4          MR. GONZALES: It's just a continuation
5  of the --
6          MS. TAYLOR: Yeah.
7          MR. GONZALES: -- first deposition.
8  We'll pick up with the same page numbering, it's
9  all the same.
10         MR. PILEGGI: Okay, but -- off the
11  record.
12                * * * *
13         (There was a discussion
14  had off the record.)
15                * * * *
16         MR. PILEGGI: So, let me just put this
17  on the record.
18         After the completion of this deposition
19  I will be sending you the first part -- your
20  agency the first part to incorporate into this
21  continued deposition.
22         Fair enough?
23         MR. GONZALES: Yes.
24         MR. PILEGGI: Good morning,

Page 140

1  Officer Reynolds. I'm going to go through the
2  instructions again.
3          Of course, this is your deposition.
4  This is a continuation of the deposition that we
5  had on July 28th that was ended before we
6  completed it. So, I'm going to be asking you
7  again a series of questions. If you know the
8  answer, just make sure your responses are verbal.
9  The court reporter on the right of me that is
10 taking down all the responses, a nod of the head
11 or shaking of the head, um, the court reporter
12 can't take that down. So, just make sure
13 everything's verbal.
14         If you want to take a break we could do
15 that, we just can't do that while there's a
16 pending question, you have to answer the question
17 first. And, lastly, you are under oath.
18         Do you have any questions for me before
19 we begin?
20         THE WITNESS: No.
21                * * * *
22         DIRECT EXAMINATION
23                * * * *
24 BY MR. PILEGGI:

Page 141

1          Q. All right. I want to pick up where we left
2  off in the last deposition. And I'm referring to the
3  deposition of July 28th, 2021.
4          Do you recall that?
5          A. Yes.
6          MR. PILEGGI: Okay. At the end of that
7  deposition -- and I'm going to refer to the page
8  numbers, so... Give me a second.
9  BY MR. PILEGGI:
10         Q. On Page 118... And by the way, this whole
11 issue ended on Page 133. On 118 we began discussing a
12 concerned citizen that you had used in the past named
13 Al.
14         Do you recall that?
15         A. Yes.
16         Q. And I asked you a series of questions about
17 your use of Al in criminal investigations.
18         Do you recall that?
19         A. (No audible response.)
20         Q. Generally.
21         A. Yeah, I don't -- I recall you asking me about
22 the Freeman case, I don't recall you asking me about
23 other cases.
24         Q. Okay. Now, let's go back. Al also is

Page 142

1  deceased, correct?
2          MR. GONZALES: Objection, asked and
3  answered.
4          You can answer it again.
5          THE WITNESS: Yes.
6  BY MR. PILEGGI:
7          Q. Do you know when Al died?
8          A. No.
9          Q. Do you know how he died?
10         A. I heard he hung himself in jail. I don't
11 know if that's true or not, though.
12         Q. Now, were you the one -- the officer that
13 deactivated Al once he was deceased?
14         A. I don't recall deactivating him.
15         Q. Do you know if anyone deactivated him?
16         A. I have no idea.
17         Q. There would be a Master file with regards to
18 Al, correct?
19         A. Correct. That should all be in the Integrity
20 Control Office.
21         Q. But there would be a Master file, correct?
22         A. There would be a file, yes. If he was signed
23 up as an informant, which I read some notes, and he
24 seems like he went from the concerned citizen to an

2 (Pages 139 to 142)

Page 143

1  informant, yes.
2      Q.  You read those notes because you actually did
3  that in conjunction with the case that you were lead
4  officer on.
5          MR. GONZALES:  Objection.  Objection to
6      the form of the question.
7              It's compound and you have a comment in
8      there, so can you rephrase the question, please.
9          MR. PILEGGI:  Yes.
10  BY MR. PILEGGI:
11      Q.  You were actually the one that, lack of a
12  better word, bumped up AI from a concerned citizen to a
13  confidential informant during the pendency of the
14  Freeman case.
15          MR. GONZALES:  Objection to -- you used
16      the term bumped up.
17              If the witness understands what that
18      term means I'll let him answer, but otherwise, um.
19              You can answer if you understand what
20      he means.
21          THE WITNESS:  I don't understand what
22      that term means, bumped up.
23  BY MR. PILEGGI:
24      Q.  In other words, during the pendency of the

Page 144

1  Freeman case, where you were lead -- lead officer, and
2  you were the one handling AI -- you understand
3  handling, what I mean by handling?
4      A.  I wasn't handling AI.  AI provided me with
5  information that I went out and then verified.
6      Q.  Okay.  In the pendency of that particular
7  case, the Freeman case, criminal trial, AI went from a
8  concerned citizen to a confidential informant, correct?
9      A.  I do believe he was signed up as an
10  informant, I don't know exactly when he was signed up.
11      Q.  Okay.  But you were the one that actually
12  provided that information to the court, aren't you?
13      A.  As I stated, I read some notes on there about
14  it -- about him going from a concerned citizen to an
15  informant, and then the notes stop.
16      Q.  Okay.
17      A.  There was only a -- several notes that
18  were -- that were given.  Or several pages of that
19  hearing that were provided to my attorney.
20      Q.  But you were the one that provided that
21  testimony at the Freeman trial.
22          MR. GONZALES:  Objection.  If you recall
23      providing the testimony that -- you can answer.
24      If you don't recall then you can answer.

Page 145

1          THE WITNESS:  I only recall what I
2      read on those several pages.  I don't recall
3      exactly what was said at that hearing.
4  BY MR. PILEGGI:
5      Q.  Well, I'm asking you your independent
6  recollection of the Freeman case.
7          Do you recall AI going from a concerned
8  citizen to a confidential informant?
9          MR. GONZALES:  Hold on.  Objection.  He
10      already answered that question.
11          MR. PILEGGI:  No, he -- John, please.
12          MR. GONZALES:  No, no, you please.
13          MR. PILEGGI:  All right.  Let's do it
14      this way --
15          MR. GONZALES:  Just ask a question.
16          MR. PILEGGI:  No, no, no that's fine.
17      That's fine.
18              We'll mark that as Reynolds-1.
19          MR. GONZALES:  We already marked four --
20      it looks like we marked four exhibits on day one,
21      so you want to pick up from the next one -- I'm
22      sorry.
23              *  *  *  *
24              (There was a discussion

Page 146

1  had off the record.)
2              *  *  *  *
3          (Reynolds Exhibit 5 was
4          marked for identification.)
5              *  *  *  *
6          MR. PILEGGI:  Officer Reynolds, I'm
7      showing you what's been marked as Reynolds-5.
8  BY MR. PILEGGI:
9      Q.  Obviously that's a transcript, correct?
10      A.  (No audible response.)
11      Q.  Is that a yes?
12      A.  Yes.
13      Q.  Okay.  And it's a transcript in the Freeman
14  case, correct?
15      A.  (No audible response.)
16      Q.  United States versus Freeman?
17      A.  Correct.  And Brian Johnson.
18      Q.  That was a case -- do you independently
19  recall testifying in that case as one of the officers
20  that -- involved in the investigation and the arrest of
21  Dennis Freeman?
22      A.  Correct, I testified in that case.
23      Q.  Okay.  In fact, you were the Affiant in that
24  case, am I correct?

3  (Pages 143 to 146)

Case 2:14-cv-01643-RBS    Document 61-6    Filed 06/29/22    Page 69 of 128
Torain v. City of Philadelphia, et al.

POLICE OFFICER BRIAN REYNOLDS-VOLUME II, 9/23/21

Page 147

1    A.  I was.

2    Q.  And that -- in particular that, um,

3  Reynolds-5 that I'm showing you, was a motion to

4  suppress.

5        Am I correct?

6        MR. GONZALES:  Well, do you not

7  want him to read it, or is it based on his

8  independent recollection?

9        MR. PILEGGI:  No, I want him to read it.

10        MR. GONZALES:  You want him to read it.

11        MR. PILEGGI:  Yes.

12        MR. GONZALES:  Because the record speaks

13  for itself.  I mean, you handed a court

14  transcript.  The transcript says:  Hearing before

15  the Honorable Robert F. Kelly, United States

16  District Court Judge.  Then it has a list of

17  appearances --

18        MR. PILEGGI:  I'd rather have him read

19  it, John, not you.  It's his deposition.

20        MR. GONZALES:  I understand.  But you're

21  using a court document --

22        MR. PILEGGI:  I asked him a simple

23  question, is that a transcript of a motion to

24  suppress?  And you can look on the front page.

Page 148

1  You can look on the front page.

2        MR. GONZALES:  It doesn't say on the

3  front page.

4        MR. PILEGGI:  Does it say a pretrial

5  hearing?

6        MR. GONZALES:  No, it does not.

7  BY MR. PILEGGI:

8    Q.  What does it say?

9        MR. GONZALES:  I just read it.

10        THE WITNESS:  It says:  A hearing before

11  the Honorable Robert F. Kelly, United States

12  District Court Judge.

13  BY MR. PILEGGI:

14    Q.  Okay.  Do you independently recollect

15  appearing at that hearing and testifying?

16    A.  No.

17    Q.  Okay.  Do you want to look -- do you want to

18  look through it generally and see if you were --

19  actually testified in there

20        * * * *

21        (There were comments

22        made off the record.)

23        * * * *

24        THE WITNESS:  There is some testimony

Page 149

1  from me in here, yes.  I see it on Page 12.

2  BY MR. PILEGGI:

3    Q.  And, again, generally, if you want to look

4  through there, was there testimony with regards to

5  information provided by the quote, unquote, concerned

6  citizen?

7    A.  I'm going to read it.  It would have probably

8  been nice to have this beforehand but --

9        MR. GONZALES:  Do you want -- I'm

10  confused here, Michael.

11        Do you want him to just read the

12  transcript and confirm what is already reflected

13  in the transcript?

14        MR. PILEGGI:  I'm asking him

15  generally --

16        MR. GONZALES:  Because he doesn't

17  recall.

18        MR. PILEGGI:  -- was there testimony

19  with regards to the concerned citizen.  If he

20  wants to leaf through it and look at it that's

21  fine.

22        MR. GONZALES:  I mean, I'm going to

23  object.  The record speaks for itself.  There was

24  a hearing, and if it was mentioned it was

Page 150

1  mentioned and would be reflected in transcript.

2        We can take a break and he can review

3  the 57 pages of the transcript if that would help,

4  but, you know.

5        MR. PILEGGI:  I asked him about his

6  independent recollection.  So, if he doesn't

7  recollect that's his answer.

8        THE WITNESS:  I don't recollect.

9        MR. PILEGGI:  Okay.

10  BY MR. PILEGGI:

11    Q.  So, during the pendency of the Freeman case,

12  do you ever recollect any issue with regards to your

13  confidential -- I'm sorry, your concerned citizen?

14    A.  As I stated, I read something that was turned

15  over, and there were some pages where mentioned a

16  concerned citizen going to the confidential informant

17  and then it stops.  That's all I remember reading those

18  pages, I did not -- this is the first time I'm seeing

19  this.

20    Q.  As that was --

21    A.  It would have been nice to have this prior to

22  coming today.

23    Q.  Okay.  But that was something that you

24  testified, correct?

Toraim v. City of Philadelphia, et al.

POLICE OFFICER BRIAN REYNOLDS-VOLUME II, 9/23/21

Page 151

1    A.  What do you mean it was something that I
2  testified? I don't recall --
3    Q.  About the concerned citizen -- going from a
4  concerned citizen to a confidential informant?
5    A.  Yes --
6    Q.  That was your testimony.
7    A.  -- in the pages that I read, yes.  There was
8  only like three to five pages of it that I read, and
9  then the transcript stopped.
10    Q.  Okay.  Now, do you recall the court
11  compelling Al to go in and speak with defense counsel
12  with regards to the information that he provided in the
13  Freeman case?
14    A.  You mentioned that at the last deposition, I
15  don't recall that independently.
16    Q.  Okay.  Do you recall speaking with Al, um,
17  during the pendency of the Freeman case with regards to
18  either his testimony or your own?
19    A.  I don't recall.
20    Q.  How many times did you use Al before the
21  Freeman case?
22    A.  I have no idea.
23    Q.  But as you testified previously, you used him
24  several times.

Page 152

1    A.  He provided information several times, yes.
2  Which we then -- which I then went out and verified.
3    Q.  Now, when he was made a confidential
4  informant, that means he signed up, correct?
5    A.  Correct.  There's a packet that has to be
6  filled out with him, and then it gets reviewed by the
7  Integrity Control, and then they give you the approval
8  for him to be an informant or not.
9    Q.  And that would be something that would be
10  contained in the Master file?
11    A.  That would be something the Integrity Control
12  Unit, or office should have, yes.
13    Q.  And they would maintain --
14    A.  I don't know what you mean by "Master file".
15    Q.  Well, there's a file --
16    A.  There's a file --
17    Q.  -- for a confidential informant.
18    A.  It's not called a master file.  Like you
19  said, there's forms that have to be filled out, certain
20  things have to be signed.  There's record checks that
21  have to be done.  Then everything is turned over to the
22  Integrity Control office, they're the ones that provide
23  the confidential informant number.  They're the ones
24  that approve the informant getting signed up.  They're

Page 153

1  the ones that give the okay.
2    Q.  Were you the one that -- I know you didn't
3  personally sign him up, but were you the one that
4  directed Al to the police department so that he could
5  be signed up?
6    A.  I don't recall that.  I don't even recall if
7  I was the one or not that signed him up.
8    Q.  Well, you were the one that got the
9  information from Al when he was a concerned citizen
10  with regards to Freeman, correct?
11    MR. GONZALES:  Objection, asked and
12  answered.
13    You can answer it again.
14    THE WITNESS:  Yes.
15  BY MR. PILEGGI:
16    Q.  And that was something that was memorialized
17  in the Affidavit of Probable Cause for the Freeman
18  case?
19    A.  Correct.
20    MR. PILEGGI:  Mark that Reynolds-6.
21    * * * *
22    (Reynolds Exhibit 6
23    was marked for identification.)
24    * * * *

Page 154

1  BY MR. PILEGGI:
2    Q.  You've been shown what's been marked as
3  Reynolds-6.
4    First of all, what is that?
5    A.  It's the Affidavit of Probable Cause.
6    Q.  For what case?
7    A.  For the Dennis Freeman case.
8    Q.  Okay.  By the way, and I know you testified
9  to this previously and it's part of the record, but
10  this was a case that Mr. Freeman complained about to
11  the Internal Affairs, correct?
12    A.  There was a complaint that was made to
13  Internal Affairs, yes.
14    Q.  Okay.  And you had to give a statement in
15  conjunction with that investigation?
16    A.  I believe I did, yes.
17    Q.  As well as Officer Kelly?
18    A.  I don't recall who else had to give
19  statements.
20    Q.  Okay.  But you did, right?
21    A.  I believe I did, yes.
22    MR. PILEGGI:  All right.  I just want to
23  read the first line and ask you a couple
24  questions.  It says: Police Officer Reynolds,

5  (Pages 151 to 154)

Page 155

1  Badge Number 43 --
2  MR. GONZALES: I'm going to stop right
3  there. You're referring to statements that were
4  given to Internal Affairs. Do you have copies of
5  those statements, because they were not produced.
6  MR. PILEGGI: I know. I'll get to it,
7  John.
8  MR. GONZALES: No, I'm asking you now,
9  do you have copies --
10  MR. PILEGGI: You can make the objection
11  when it comes up, John.
12  MR. GONZALES: No, no, no. I'm asking
13  you on the record do you have relevant documents
14  pertaining to statements --
15  MR. PILEGGI: No.
16  MR. GONZALES: -- given by my client to
17  Internal Affairs --
18  MR. PILEGGI: No.
19  MR. GONZALES: -- involving the Freeman
20  case?
21  MR. PILEGGI: No. And I'm going to put
22  on the record that I want those statements.
23  Okay. They should be produced in discovery.
24  Along with the Master file, if that's what it's

Page 156

1  called, by the way.
2  THE WITNESS: Okay. Thank you.
3  MR. PILEGGI: I'm going to put that on
4  the record. But we'll get to that.
5  MR. GONZALES: So, you don't have copies
6  of the Internal Affairs statements, is that what
7  you're saying?
8  MR. PILEGGI: I just said no.
9  I'm going to start again. Police
10  Officer Reynolds, badge number 4268, received
11  information from a concerned citizen regarding the
12  illegal sales of narcotics on the Highway of 5500
13  Lansdowne Avenue.
14  Do you see that?
15  THE WITNESS: Yes.
16  BY MR. PILEGGI:
17  Q. So, Al, we know now -- the concerned citizen
18  was Al, correct?
19  A. Yes.
20  Q. Okay. So Al gave you information with
21  regards to illegal drug sales on 5500 Lansdowne Avenue,
22  correct?
23  A. Yes.
24  Q. That's how this whole investigation started.

Page 157

1  A. Correct.
2  Q. Now, at the time that you received this
3  information -- and by the way, this is -- report dated
4  is August 30th, 2000, correct?
5  A. Yes.
6  Q. All right. At that point you were aware that
7  Al was a convicted felon.
8  A. I don't recall what Al was convicted for. If
9  you show me a criminal record I'd be able to tell you.
10  Q. Well, did you bother pulling his criminal
11  record when you -- doing several jobs with him?
12  A. You say "several jobs". I only remember
13  doing this job with Al. I don't remember what other
14  jobs were done with Al. And, no, there was -- I did
15  not do a criminal record check on Al.
16  Q. Okay. At any point did you do a records
17  check on him?
18  A. As I stated before, you'd have to do one if
19  he was signed up as an informant there would be one
20  done. There would also be done -- one done by the
21  Integrity Control Unit Office.
22  Q. So, based on this line, what exactly was so
23  concerning? How was he a concerned citizen, Al?
24  A. That was the wordage I used for the

Page 158

1  Affidavit.
2  Q. I know that you used it, it's in the report.
3  A. Okay.
4  Q. What does it mean?
5  A. It means he's a concerned citizen who told me
6  about illegal sales of narcotics.
7  Q. Now, you couldn't use that concerned citizen
8  status on other cases could you if -- before Al was
9  signed up as a confidential informant?
10  MR. GONZALES: Objection. I don't
11  understand that question at all. Can you please
12  rephrase.
13  MR. PILEGGI: You don't have to
14  understand.
15  MR. GONZALES: Do you understand the
16  question?
17  THE WITNESS: I do not.
18  MR. PILEGGI: Of course he doesn't.
19  BY MR. PILEGGI:
20  Q. Could you use Al as a concerned citizen on
21  other cases before or after Freeman?
22  A. If he provided me the information.
23  Q. You could. So, what -- exactly what is the
24  criteria that you have to follow with the police

Page 159

1  policies to make him from a concerned citizen to a
2  confidential informant?
3       A.  As I stated, there's paperwork that has to be
4  done for him to go from -- to be signed up as a
5  confidential informant.  There's a whole --
6       Q.  That's the procedure.
7       A.  There's a whole packet that has to be done,
8  yes.
9       Q.  I understand that, that's the procedure.
10      What is the policy?  In other words, why
11  is someone a concerned citizen as opposed to a
12  confidential informant?
13      A.  Because he was a concerned citizen at the
14  time, he wasn't a confidential informant.
15      Q.  Right.  I know that.
16      A.  Okay.
17      Q.  But what made him a confidential informant
18  later on in the Freeman case?
19      A.  Probably after this case he saw -- the
20  magnitude of it and the drugs that were recovered, he
21  probably wanted to be compensated for it, so then he
22  probably wanted to be -- I couldn't pay him being a
23  concerned citizen.  So, at that point he then would
24  have to be signed up as an informant to be paid for

Page 160

1  this case.
2       If he was paid.  I don't even know if he
3  was paid or not.
4       Q.  Let me ask you, I only want you to testify as
5  to your personal recollection.  You just said probably
6  this, probably that.  I don't want you to guess --
7       A.  I have -- I have no recollection.  I'd have
8  to see paperwork to say when he was signed up as an
9  informant, if he was paid as an informant.  That's
10  paperwork that I'd have to see in order to give you the
11  answer that you want.
12      Q.  So, you're saying you could not give him any
13  compensation as a concerned citizen, only as a
14  confidential informant.
15      A.  Correct.
16      Q.  Okay.  What about a confidential source,
17  what's the difference between a confidential source and
18  a concerned citizen?
19      A.  As I stated before, they're basically the
20  same.  It all depends on what wordage the officer wants
21  to use, who's doing the Affidavit of Probable Cause or
22  the paperwork.
23      Q.  Okay.  Now, we now know also that Al was also
24  a source of information in the Torain case, correct?

Page 161

1       MR. GONZALES:  Objection.  When you
2  say "now we know," what --
3       MR. PILEGGI:  Yeah, now we know.
4       MR. GONZALES:  How do --
5       MR. PILEGGI:  John, stop.
6       MR. GONZALES:  Well, you're making a
7  conclusion.
8       MR. PILEGGI:  This is my deposition.
9  Stop with the --
10      MR. GONZALES:  No, the question is
11  inappropriate --
12      MR. PILEGGI:  Well, then if he doesn't
13  understand --
14      MR. GONZALES:  Instead of saying a
15  conclusion say was -- you can ask an open-ended
16  question --
17      MR. PILEGGI:  John, stop.  Stop.
18      MR. GONZALES:  -- was this Al the same
19  as that Al.
20      MR. PILEGGI:  I'm requesting --
21      MR. GONZALES:  Instead of saying --
22      MR. PILEGGI:  -- that you stop
23  interrupting --
24      MR. GONZALES:  -- you know now, as if

Page 162

1  it's a true statement.
2       MR. PILEGGI:  John, I'm requesting that
3  you stop interrupting.  Let him answer.
4       THE WITNESS:  Repeat your question.
5  BY MR. PILEGGI:
6       Q.  Are you aware that Al was the same source of
7  information in the Freeman case as he was in the Torain
8  case?
9       A.  I'm not aware of that.  You'd have to ask
10  Monaghan that, he was the investigator in that case.
11      Q.  So, while you were working in the pendency of
12  the Torain case, you had no idea who the source of
13  information was.
14      A.  Correct.
15      Q.  Is that your testimony?
16      A.  Correct.  You'd have to ask Monaghan that.
17      Q.  So, let's go down.  Now, and I'm referring to
18  Reynolds-6, the Affidavit.
19      By the way, you were the eyes on this
20  investigation as well, correct?
21      MR. GONZALES:  Wait a minute.  Which
22  investigation, Torain or Freeman?
23      MR. PILEGGI:  I'm talking about 6.
24  Reynolds-6.

7  (Pages 159 to 162)

Case 2:14-cv-01643-RBS    Document 61-6    Filed 06/29/22    Page 73 of 128
Torain v. City of Philadelphia, et al.

POLICE OFFICER BRIAN REYNOLDS-VOLUME II, 9/23/21

Page 163

1          MR. GONZALES: Freeman, okay.
2          Sorry, go ahead.
3          THE WITNESS: Yes, I was. And there was
4   other officers --
5   BY MR. PILEGGI:
6          Q. You were the Affiant --
7          A. There was other officers that did
8   observations also.
9          Q. Right. But you were the Affiant as well as
10  the one surveilling Freeman at the very least, as well
11  as other individuals that were also arrested in that
12  case.
13         A. Correct.
14         Q. All right. And you were running the show,
15  you were the lead investigator, correct?
16         A. I was the assigned investigator in this case,
17  yes.
18         Q. All right. And you were the lead assigned
19  investigator because Al was your source of
20  information.
21         A. I was the investigator in this case, yes.
22         Q. Because Al was your source of --
23         A. I was given the information, I went out to
24  verify the information, yes.

Page 164

1          Q. Now, did Al participate in any way in this
2   investigation, other than giving information?
3          A. No.
4          Q. Nothing. He did nothing else.
5          A. Did nothing else.
6          Q. You independently recollect that?
7          A. Correct.
8          Q. Okay. If you look down at the bottom of the
9   first page. It says: On 8/31/2000, at approximately
10  3:30, Police Officer Reynolds, badge number 4268,
11  returned to 5412 Jefferson Street to conduct another
12  surveillance for illegal activity.
13         Let me just ask you this, what do you
14  mean another surveillance? You had been out there
15  before?
16         A. Yes. As you see, I was out there on the
17  30th.
18         Q. And is it fair to say you were out there the
19  day before?
20         A. Yes.
21         Q. Okay. How long of a time between the time
22  that Al gave you the information until you went up and
23  set up surveillance to independently corroborate what
24  he told you?

Page 165

1          A. I don't recall that.
2          Q. Would that be in some kind of notes?
3          A. I don't know.
4          Q. What do you mean you don't know?
5          A. (No audible response.)
6          Q. You take notes, right?
7          A. Take notes when?
8          Q. When you're doing a surveillance?
9          A. Correct. And then everything is put onto the
10  Affidavit of Probable Cause.
11         Q. Okay. So you take notes.
12         A. Correct.
13         MR. GONZALES: He just said yes. Asked
14  and answered.
15         Why are you arguing with the witness.
16  BY MR. PILEGGI:
17         Q. So, where are the notes with regards to the
18  Freeman job, do you know?
19         A. They're all put into the Affidavit.
20         Q. No. That's not what I asked you.
21         A. Where are the written notes?
22         Q. Where are the written notes that you took
23  during your surveillance that was later incorporated
24  into the Affidavit?

Page 166

1          A. Probably in the trash.
2          Q. Well, I don't want you to guess.
3          A. I don't -- I don't recall where the notes
4   are.
5          Q. Okay. Did you ever provide them to the US
6   Attorney that was trying the case?
7          A. I don't know if I was asked about that or
8   not. I don't recall.
9          Q. I didn't ask you that.
10         Did you ever provide --
11         MR. GONZALES: He said he doesn't
12  recall.
13         MR. PILEGGI: He said he didn't know if
14  he was asked that.
15         MR. GONZALES: And then he said he
16  didn't recall.
17         MR. PILEGGI: It was a good question.
18         MR. GONZALES: He answered the
19  question.
20  BY MR. PILEGGI:
21         Q. Do you recall giving those notes to the US
22  Attorney?
23         A. I do not recall that.
24         Q. Okay. So, I'm going to go back. This is

Page 167

Line 2: At approximately 3:45, this is about 15 minutes after you set up surveillance. At approximately 3:45 a black male, Number 5, wearing a blue T-shirt, blue jean shorts, with a beard and white sneakers, exited and got into a green Pontiac Bonneville, tag number DKC-3310.
Do you recall taking notes about that tag number?
A. I had to have, because it's in the Affidavit of Probable Cause.
Q. Okay. And they were notes that you later incorporated into this Affidavit.
A. Correct.
Q. And you were the one that actually observed the green Pontiac Bonneville, DKC-3310, right?
A. Correct.
Q. The next line: Black male, Number 5, then left the area and went to the area of Allison Street and Lansdowne Avenue at approximately 3:55 p.m.
Do you see that?
A. Yes.
Q. That's something you surveilled, right?
A. I don't know if I was the one that followed him over to Allison Street. I don't recall if I was or

Page 168

not.
Q. Well, if somebody else surveilled that you would have to incorporate that in the Affidavit, wouldn't you?
A. (No audible response.)
Q. If another officer surveilled that?
A. Yeah, but another officer's not mentioned -- but I don't recall if that was me or not, to be honest with you.
Q. But --
A. If it was another officer it would have indicated that, yes.
Q. So, we can all agree that the whole paragraph starts with you doing the surveillance, you alone.
A. Correct.
Q. All right. Were you partnered up that day?
A. I don't believe I was, no.
Q. Next page it says: The green Bonneville then returned to 5412 Jefferson Street, at which time black male beeped, and a black male, Number 1, ID'd as Dennis Freeman, exited 5412 Jefferson Street carrying a bundle of... It looks like crack cocaine, but it's cut off.
A. Crack cocaine.
Q. And got into his green Bonneville.

Page 169

A. Got into the green Bonneville.
Q. Right. Okay. So, you actually saw Mr. Freeman with crack cocaine?
A. Yes.
Q. Okay.
A. That's what it says.
Q. All right. And, again, we can all agree that that was you that observed that, correct, no other officer.
A. Correct.
Q. The green Bonneville then left the area. Police Officer Reynolds, 4268, gave a description and direction to back up officers.
Police Officer Kelly, Badge Number 7126, Police Officer Walker, 37, I think it's 30, but it's cut off, and Police Officer Norman, 5214, then conducted a roving surveillance of the green Bonne -- Pontiac Bonneville, correct?
A. Correct.
Q. All right. Now, let me ask you this, and this is based on -- I want you to base this on your independent recollection, it's nothing on the sheet that says this: Black male Number 5, who is driving that green Bonneville, got away in the Freeman case,

Page 170

correct?
A. Was never identified, yes.
Q. Was never apprehended.
A. Never apprehended. I don't know who -- to today who that person was.
Q. Everyone else was arrested, tried, and convicted, correct?
A. If it's what you're telling me. I don't recall the criminal status of it, but, yes.
MR. PILEGGI: Well, let's -- all right. Let's go down about the middle of the page.
BY MR. PILEGGI:
Q. It says: Black male Number 1. Do you see that in parentheses, it says Dennis Freeman.
A. Yes.
Q. All right. Black male Number 1, Dennis Freeman, then jogged back over to the green Pontiac Bonneville.
Now, you saw this green Pontiac Bonneville several times, you personally, correct?
A. Just on that -- on the 31st, yes.
Q. Okay. And that's something that, again, you personally observed --

Page 171

1      A. Correct.
2      Q. -- what I just read.
3      A. Correct.
4      Q. The roving surveillance officers then
5 followed the green Pontiac Bonneville back to 5412
6 Jefferson Street.
7      Correct?
8      A. Where does that say that at, sir.
9      Q. The next line. The roving surveillance
10 officers then followed the green Pontiac Bonneville
11 back to 5412 Jefferson Street.
12      A. Yes, I see that.
13      Q. Then it says: Police Officer Reynolds, 4268,
14 then observed black male Number 1, Dennis Freeman, and
15 black male Number 5, who's not identified, go into 5412
16 Jefferson Street.
17      Do you see that?
18      A. Yes.
19      Q. Black male Number 1, Dennis Freeman, was also
20 carrying the brown bag that he got in -- got from 5507
21 Master Street. At approximately 4:45 Police Officer
22 Reynolds, 4268, observed black male Number 5 exit 5412
23 Jefferson Street and leave the area in the green
24 Bonneville at approximately 4:50. Wait, I cut off that

Page 172

1 approximately 4:50, that's -- let me read it again.
2      Black male Number 5 exited 5412
3 Jefferson Street and leave the area in a green
4 Bonneville, period.
5      Do you see that?
6      A. Correct.
7      Q. That's something you observed again --
8      A. Yes.
9      Q. -- correct? That Bonneville was never seen
10 again, was it?
11      A. It was not.
12      Q. Until we get to the Torain case. Then you
13 observed that green Bonneville again, didn't you?
14      A. I seen a green Bonneville, yes.
15      Q. In fact, you arrested Mr. Torain in the green
16 Bonneville, correct?
17      A. I did.
18      Q. And you saw that green Bonneville after you
19 previously testified, and this is in the last
20 deposition that, um, he left his home at 1628 Conestoga
21 Street, and entered the unit at 5510
22 Mas -- I'm sorry -- strike that. 5510 North...
23      A. 1628 North 55th Street.
24      Q. Correct, thank you.

Page 173

1      MR. GONZALES: Can you just re-ask that
2 question.
3      MR. PILEGGI: Yeah, I will. I will.
4 BY MR. PILEGGI:
5      Q. You observed Mr. Torain leave 1628 Conestoga
6 Street and go down the street to...
7      To 1628 North 55th Street.
8      A. Correct. You said it was 1628 North
9 Conestoga, I believe the address is 1621.
10      Q. That's right.
11      A. North Conestoga.
12      Q. You're correct.
13      A. And anyone around there --
14      Q. And just for clarity's sake, he left 1621
15 Conestoga Street, went down the street, maybe a block
16 or so, and entered 1628 North 55th Street.
17      A. Yes.
18      Q. And that's something you actually observed.
19      A. Yes.
20      Q. All right. Did you observe him when he went
21 from Conestoga to 55th Street, did you observe him in
22 the green Bonneville?
23      A. Yes.
24      Q. You personally.

Page 174

1      A. Yes.
2      Q. Did you -- before he left Conestoga did you
3 see him -- personally see him drive the green
4 Bonneville from Master Street, where the surveillance
5 was set up, to Conestoga Street?
6      A. I believe that was another -- that was
7 another officer that did that.
8      Q. So, you were at the scene of Conestoga
9 Street, um, setting up surveillance when he left
10 Conestoga to go to 55th.
11      A. Correct. He was followed from Master over to
12 Conestoga. I then picked up the surveillance on
13 Conestoga Street.
14      Q. To 55th Street.
15      A. Yes.
16      Q. Okay. And he was in a green Bonneville?
17      A. Yes.
18      Q. How far was Conestoga from 55th Street?
19      A. I think it's right around the corner.
20      Q. Okay. Where did he park the car?
21      A. I don't recall.
22      Q. Do you think he parked it across the street
23 from the 55th Street?
24      A. I just said I don't recall.

10 (Pages 171 to 174)

POLICE OFFICER BRIAN REYNOLDS-VOLUME II, 9/23/21

Page 175

1    Q. Were you aware that his grandmother lived
2    at -- right in -- right across the street from 55th
3    Street?
4    A. I was not.
5    Q. Do you recall seeing Mr. Torain leave 55th
6    Street?
7    A. I don't believe I was the one that saw him
8    leave 55th Street, another officer did.
9    Q. But you saw him go in.
10    A. Correct.
11    Q. Did you see him go in with a key?
12    A. Correct.
13    Q. Did you see where he went into when he went
14    in there?
15    A. No.
16    Q. Sometime later though, you went back to 55th
17    Street with other officers and attempted to gain entry
18    into one of the apartments in that rooming house on
19    55th Street, correct?
20    A. There was an apartment that was secured
21    inside that building, yes.
22    Q. You tried to actually enter the premises.
23    When I say "premise," I mean the apartment.
24    MR. GONZALES: Objection. Mike, didn't

Page 176

1    we already cover all this. I thought we
2    covered all this already, you talked about going
3    over the threshold --
4    MR. PILEGGI: Yeah, but unfortunately we
5    stopped the deposition, so I got to backtrack so I
6    can ask questions based on that.
7    MR. GONZALES: Objection. It's asked
8    and answered, but...
9    THE WITNESS: Yes, we went back to
10    secure that property at some point.
11    BY MR. PILEGGI:
12    Q. Who was there with you?
13    A. Um, it would have been Monaghan, because it
14    was his investigation. I believe Kelly, I believe
15    Walker. I'm not sure of the other officers, if there
16    was other officers. And there would have been a
17    supervisor with us.
18    Q. Now, Walker testified -- are you aware that
19    Mr. Walker gave testimony with regards to the Torain
20    case, right?
21    A. I am.
22    Q. You were in the courtroom at the time,
23    correct?
24    A. Correct.

Page 177

1    Q. So you heard his testimony?
2    A. Correct.
3    Q. Do you recall Mr. Walker saying that
4    yourself, Walker, and Monaghan huddled up and discussed
5    how you were going to link Mr. Torain to the particular
6    apartment in 55th Street?
7    A. I remember there was testimony to that.
8    Q. And what's your response, did that happen?
9    A. Not at all.
10    Q. He's lying?
11    A. That's correct.
12    Q. Okay. Do you recall Mr. Walker testifying
13    that officers were inside the unit, before you arrived
14    with the key from Monaghan to open the door?
15    A. I don't recall that testimony, no.
16    Q. Okay. But you were at the scene correct,
17    after -- at some point after Mr. Torain was arrested?
18    A. Correct. As I stated, we went back there to
19    secure the property with other officers and Officer
20    Monaghan, because he --
21    Q. You were part of that group?
22    A. I was.
23    Q. Okay. You also made another arrest didn't
24    you, immediately following Mr. Torain's arrest?

Page 178

1    A. Correct.
2    Q. Do you remember that?
3    A. I do.
4    Q. Where was that -- where was the arrest?
5    A. In the area of 55th and Market.
6    Q. How far was that from the 55th Street
7    apartments?
8    A. Between one and thirty blocks, maybe.
9    Q. Okay. Was it closer to one or closer to
10    thirty?
11    A. I don't remember the exact -- how many blocks
12    it was. It was between one and thirty I'd say, give or
13    take.
14    Q. Do you recall when that arrest was in
15    conjunction with Mr. Torain's arrest? In other words,
16    was it five minutes later, ten minutes later?
17    A. It was after Torain's arrest, I don't know
18    the exact time.
19    Q. Why was that individual arrested?
20    A. He was one of Monaghan's targets I believe
21    that was out on Master Street.
22    Q. Were you directed to arrest him?
23    A. I was.
24    Q. By who?

11  (Pages 175 to 178)

Case 2:14-cv-01643-RBS    Document 61-6    Filed 06/29/22    Page 77 of 128
Torain v. City of Philadelphia, et al.

POLICE OFFICER BRIAN REYNOLDS-VOLUME II, 9/23/21

Page 179

1    A.  Officer Monaghan.
2    Q.  Was anyone with you at that arrest?
3    A.  I was by -- I was in my own car.  I believe
4  Officer Walker was in another car, and then I believe
5  there was a uniformed Sergeant that may have been
6  there.
7    Q.  Who was that sergeant?
8    A.  I have no idea.
9    Q.  Could it have been Corporal Sinclair?
10    A.  He wouldn't have been in uniform, so no.
11    Q.  Could it have been Sergeant Gesner?
12    A.  I just stated that person was in uniform.
13  Gesner and Sinclair wouldn't have been in uniform, to
14  the best of my recollection.
15    Q.  Okay.  So, all the officers that were worked
16  this investigation, meaning the Torain investigation,
17  were all plainclothes?
18    A.  Yes.  And then that day that we were doing
19  the warrants, I believe that there was uniform
20  assistance at some point.
21    Q.  When Mr. Torain was arrested, you testified
22  that you had two uniform officers transport him to, I
23  guess, 55th and Pine.
24        Is that correct?

Page 180

1    A.  There was a marked unit that assisted with
2  that arrest, yes.
3    Q.  Was there a uniform supervisor present during
4  Mr. Torain's arrest?
5    A.  Not that I recall.
6    Q.  Now, let's go back to -- when Mr. Torain was
7  arrested -- strike that.
8        When he left the unit, is that when you
9  picked up surveillance?  And when I say "the unit," I
10  mean 55th Street.
11    A.  That's when I followed him out of the area,
12  yes.
13    Q.  Where were you located when you first picked
14  up surveillance of him coming out?
15    A.  I don't recall.  I don't recall where I was.
16    Q.  You were in a plain -- an unmarked car,
17  correct?
18    A.  Correct.
19    Q.  So, you followed him approximately nine
20  blocks, ten blocks before he was arrested?
21    A.  I stated before, I think it was between one
22  and twenty blocks, yeah.  I don't know exactly how many
23  block it was.
24    Q.  Now, you knew the car he was driving, the

Page 181

1  green Pontiac Bonneville, plate number DKC-3310, when
2  you were following him, right?
3    A.  (No audible response.)
4    Q.  You remember that, don't you?
5    A.  I didn't remember it.
6        MR. GONZALES:  What do you mean do you
7  remember that?  Remember that from when?
8  BY MR. PILEGGI:
9    Q.  Do you remember that from the Freeman case,
10  the same car of the individual that got away?
11    A.  Not at all.
12    Q.  You didn't recall that at all.
13        MR. GONZALES:  Hold on.  Asked and
14  answered.
15        Now you're argumentative.
16  BY MR. PILEGGI:
17    Q.  You didn't recall that at all.
18    A.  Not at all.
19        THE WITNESS:  Sorry.
20        MR. GONZALES:  That's okay.
21  BY MR. PILEGGI:
22    Q.  Well, that was -- now that was -- the Freeman
23  investigation was about four months before this
24  investigation, correct?

Page 182

1    A.  Correct.
2    Q.  All right.  So, let's just recap a little
3  bit.
4        We have some of the same target houses
5  as in the Freeman investigation as is in the Torain
6  investigation, right?
7    A.  No.
8    Q.  You sure about that?  5507 Master.
9    A.  Monaghan was 5600 block.
10    Q.  Okay.  Wasn't there some 5600 block of Master
11  Street houses that were targeted in the Freeman?
12    A.  I don't believe so.  No, it was only 5412 and
13  55 -- 5412 Jefferson Street, and 5507 Master Street.
14    Q.  Okay.  We know we have -- well, potentially
15  we have the same person giving the information,
16  correct?
17    A.  (No audible response.)
18        MR. GONZALES:  Objection.  Same -- are
19  you talking about the source?
20        MR. PILEGGI:  Yes.
21        MR. GONZALES:  Okay.
22        Do you understand his question?
23        MR. PILEGGI:  -- concerned
24  citizen.

Case 2:14-cv-01643-RBS    Document 61-6    Filed 06/29/22    Page 78 of 128
Torain v. City of Philadelphia, et al.

POLICE OFFICER BRIAN REYNOLDS-VOLUME II, 9/23/21

Page 183

1        THE WITNESS: Right.

2        MR. GONZALES: He already asked that.

3    He already answered that. He said he didn't

4    know.

5        Asked and answered. Objection.

6        THE WITNESS: I know who the concerned

7    citizen was in the Freeman case, I don't know who

8    Officer Monaghan's confidential source was. You'd

9    have to ask Monaghan that.

10   BY MR. PILEGGI:

11       Q. And just so we're clear, Al was from the 16th

12   District, correct?

13       A. He was.

14       Q. So, we have the same car, but you just don't

15   recall that it was the same car, right?

16       A. I do not. I didn't recall.

17       Q. When did you become aware that that green

18   Pontiac Bonneville, tag number DKC-3310, was the same

19   car that was involved in the Freeman investigation?

20       A. Yesterday, when Mr. Gonzales showed me a PARS

21   Report.

22       Q. So, the whole time you tried this Torain case

23   it didn't dawn on you that it was the same car?

24       A. Correct.

Page 184

1        Q. And just for the record, the black male

2    Number 5 in the Freeman case was never apprehended,

3    correct?

4        MR. GONZALES: Objection, asked and

5    answered.

6        You can answer it again.

7        THE WITNESS: Correct.

8    BY MR. PILEGGI:

9        Q. Now, going back to the Freeman case, do you

10   recall going into the Defense Attorney's office with

11   Al, so that Al could speak with the defense attorneys?

12       A. I don't recall that.

13       Q. Did you hear from anyone, US Attorney,

14   defense attorneys, anyone involved in the case, that Al

15   went, gave his name, was there for two minutes and ran

16   out?

17       A. I don't recall that.

18       Q. And the US Attorney on that case was Curtis

19   Douglas, correct?

20       A. Correct.

21       Q. And you had discussions with Mr. Douglas with

22   regards to the investigation, correct?

23       A. I'm sure we did.

24       Q. And you had discussions with Mr. Douglas

Page 185

1    about the concerned citizen Al, correct?

2        A. I'm sure we did.

3        Q. Was there any concerns on Mr. Douglas' part

4    about using Al in this -- in this investigation,

5    Freeman investigation?

6        A. You'd have to ask Mr. Douglas that.

7        Q. No, I'm asking you.

8        A. I don't know what Mr. Douglas thought.

9        Q. Did he express any concerns to you that

10   perhaps Al needed to be made a confidential informant?

11       A. Not that I recall.

12       Q. Do you recall any concerns from the court,

13   the judge, when you were giving testimony about this

14   concerned citizen?

15       A. I don't recall.

16       Q. And you were aware, when you were using Al as

17   a concerned citizen, that he had already been convicted

18   of a criminal offense.

19       MR. GONZALES: Objection. You've asked

20   him --

21       MR. PILEGGI: -- asked and answered.

22       MR. GONZALES: Yeah, you did, you asked

23   him like three times.

24       MR. PILEGGI: Well, he can --

Page 186

1        THE WITNESS: I don't know what Al was

2    convicted of. As I say, you'd have to show me his

3    criminal record.

4        MR. PILEGGI: Okay. So, just at this

5    juncture, I'm going to ask for the Master file of

6    Al. We don't know what his name --

7    BY MR. PILEGGI:

8        Q. What was Al's name?

9        A. I don't even recall what his name at this

10   time.

11       Q. You don't recall. Did you just know Al? Was

12   it Alphonso?

13       A. I just said I don't recall his full name.

14       Q. Do you remember what Al's number was,

15   confidential number?

16       A. No.

17       Q. Okay. But you used Al after he was made a

18   confidential informant, correct?

19       A. I don't recall if I used him or not.

20       Q. And there would be vouchers -- when you made

21   him a confidential informant, when you said that he

22   probably wanted to get paid in the Freeman case, there

23   would be a voucher memorializing that, correct?

24       A. Correct. If he was indeed paid in the

Page 187

1  Freeman case.
2      MR. PILEGGI:  I would ask that the City
3  provide me with that file.
4      MS. TAYLOR:  If I could just note, do
5  you have Al's CI number?
6      MR. PILEGGI:  I'm sorry?
7      MS. TAYLOR:  Do you have Al's CI number?
8      MR. PILEGGI:  No, I don't
9  have anything, actually.
10     MS. TAYLOR:  I will see -- I don't know
11 what the retention period is on these documents.
12 I will certainly investigate and see if I can
13 locate anything.
14     MR. PILEGGI:  Well, I'm sure that the
15 City can find that out.  They have a Master
16 file -- according to the policies procedures
17 there's a Master file kept.
18     MS. TAYLOR:  So, I'm just saying I don't
19 know what the retention period is, but.  So,
20 subject to that, it's now 20 years later.
21     MR. PILEGGI:  I just ask that they make
22 an attempt.
23     MR. GONZALES:  It's 21 years later.
24     MR. PILEGGI:  Now, just for the record,

Page 188

1  there was a complaint filed by Mr. Freeman.  We
2  covered some of this --
3      MR. GONZALES:  21 years and one month,
4  just for the record.
5      MR. PILEGGI:  Say that again.
6      MR. GONZALES:  It's 21 years and one
7  month since this job, the Freeman job.
8      MR. PILEGGI:  All right.
9      MR. GONZALES:  Just wanted the record to
10 be clear.
11 BY MR. PILEGGI:
12     Q.  There was a complaint filed by Mr. Freeman
13 against you and other officers involved in his
14 investigation.
15     Do you recall that?
16     MR. GONZALES:  Objection.
17     That was your first question today.
18 Asked and answered.
19 BY MR. PILEGGI:
20     Q.  Do you recall that?
21     A.  Correct.
22     Q.  All right.  You had to give a statement to
23 IAD?
24     MR. GONZALES:  Objection, asked and

Page 189

1  answered.
2      You already asked him that question.
3      MR. PILEGGI:  No, I didn't.
4      MR. GONZALES:  Yes, you did.  Remember
5  we had a back and forth --
6      MR. PILEGGI:  John, would you stop --
7      MR. GONZALES:  -- and you argued --
8      MR. PILEGGI:  -- Asked and answered.
9      You can answer again.
10     THE WITNESS:  I believe I gave a
11 statement in it, yes.
12 BY MR. PILEGGI:
13     Q.  As well as the other officers involved in the
14 case.
15     MR. GONZALES:  Objection.  Asked and
16 answered.
17     You can answer that question again.
18     THE WITNESS:  Yes.
19     MR. PILEGGI:  Okay.  I would ask that
20 the City provide me with that -- those statements.
21 And this is -- I will tell you what the number
22 is... It is IA Number 05 -- well, there's two
23 numbers here.  I have 05, dash, 0640.  And then
24 it's 05, dash, 19, dash, 081989.

Page 190

1      MS. TAYLOR:  That second --
2      MR. PILEGGI:  It was a 2005.
3      MS. TAYLOR:  That second one sounds like
4  a DC number.  The first one sounds like an IA
5  file.
6      MR. PILEGGI:  You know what, this is
7  attached.  I'll attach this whole thing as an
8  exhibit, then you'll have it.
9      MS. TAYLOR:  So, just for the record,
10 this is a Concise Officer History.
11     MR. PILEGGI:  I think that was attached
12 to somebody else's.
13     MR. GONZALES:  Does it have a Bates
14 number?
15     MS. TAYLOR:  It does not have a Bates
16 number.
17     MR. PILEGGI:  I think it was Eric
18 Spade's maybe.
19     MS. TAYLOR:  It's the Concise Officer
20 History for Brian Reynolds.  And it was run and
21 it was printed on September 18th, 2013 by Armando
22 Bergandy (ph).
23     MR. PILEGGI:  Let's just -- I'm going to
24 mark it.  I'll mark it, and then this way we'll

Case 2:14-cv-01643-RBS    Document 61-6    Filed 06/29/22    Page 80 of 128
Torain v. City of Philadelphia, et al.
POLICE OFFICER BRIAN REYNOLDS-VOLUME II, 9/23/21

Page 191

1    have it.
2         MS. TAYLOR:  Just so you know, the IA
3    Number is 05-0640 and, um --
4         MR. PILEGGI:  So, I'm going to request
5    all the statements of all the officers in that
6    particular Complaint.
7         You know what, I'm just going to mark
8    this so we have it for the record.
9         Reynolds-7.
10                * * * *
11        (Reynolds Exhibit 7 was
12    marked for identification.)
13                * * * *
14        MR. PILEGGI:  And just for the record,
15    this is a list of all the IAD Complaints, Internal
16    Affairs Complaints made against Officer Reynolds.
17    Okay.  So moving on.
18    BY MR. PILEGGI:
19    Q.   So, now, you recall giving a statement in the
20    Freeman IAD matter.
21        So, at that time was there any questions
22    asked by the Internal Affairs with regards to the
23    concerned citizen in that case, Al?
24    A.   I don't recall what questions were asked.

Page 192

1    Q.   Now, again, because Al was made a
2    confidential informant during the pendency of a case
3    that you were lead investigator, you would have been
4    responsible for bringing him in so that he could
5    provide all the documentation that he needed to set up
6    the CI file, correct?
7    A.   If I was the one that signed him up, yes.
8    Q.   And you don't recall that independently.
9    A.   I don't recall that.
10    Q.   But we do know he was signed up.  There's no
11    dispute right, that he was signed up doing the Freeman
12    case?
13    A.   I don't know when he was signed up.
14        MR. PILEGGI:  Okay.  Well, let's look at
15    the transcript again.
16        THE WITNESS:  Is there a date?
17        MR. PILEGGI:  Take your time.
18        MS. TAYLOR:  Which page, Mike?
19        MR. PILEGGI:  Let's start with...
20        I'm sorry, I didn't mark this.  And
21    I'm -- strike that whole question.  I'm going to
22    go and give you a different transcript.  I'm going
23    to leave the tabs in here, we can take these off
24    to make it easier.

Page 193

1         If we could mark that as Reynolds-8.
2                * * * *
3         (Reynolds Exhibit 8 was
4    marked for identification.)
5                * * * *
6         MS. TAYLOR:  Can you just give me the
7    date of the transcripts, because I don't think
8    there's an extra copy.
9         MR. PILEGGI:  This is actually the
10    Pretrial Motions Hearing, and it's November 8th,
11    2001.
12        All right.  Officer, we'll
13    (unintelligible) I struck the question.
14        So, I want you to refer to Reynolds-8.
15    And then let's just discuss a little bit about Al.
16    If you could go to Page 34.
17        Page 34, am I correct, and I'll give you
18    a second to read it.  Well, go -- why don't you
19    read it first.
20                * * * *
21        (Document review.)
22                * * * *
23        THE WITNESS:  Okay.
24    BY MR. PILEGGI:

Page 194

1    Q.   Okay.  Now, I asked you previously whether
2    you recall when Al gave you -- provided you with the
3    information about what was contained in the Freeman
4    investigation.
5         Do you recall that?
6    A.   Correct.
7    Q.   Okay.  What you just read on Page 34, does
8    that refresh your recollection as to when Al contacted
9    you with this information?
10    A.   Yeah.  It says approximately a week, week and
11    a half prior.
12    Q.   And just so we're clear, about a week and a
13    half after he provided that information you and other
14    officers went up to set up surveillance?
15    A.   Correct.
16    Q.   And why did you set up surveillance on that
17    date?
18    A.   To verify the information that was given to
19    me.
20    Q.   On Page 35 -- and this is -- just, again, for
21    clarity sake, this was testimony before the court,
22    before Judge Kelly.  McGirk Kelly, correct?
23        MR. GONZALES:  I think it's Robert
24    Kelly.  Yeah, it's Robert F. Kelly.

15 (Pages 191 to 194)

Case 2:14-cv-01643-RBS    Document 61-6    Filed 06/29/22    Page 81 of 128
Torain v. City of Philadelphia, et al.

POLICE OFFICER BRIAN REYNOLDS-VOLUME II, 9/23/21

Page 195

1    THE WITNESS: Correct.
2    BY MR. PILEGGI:
3        Q. Correct?
4        A. Correct.
5            MR. PILEGGI: Page 35, there's a whole
6    discussion, if you want to take -- never mind.
7    Take a second to read that.
8                * * * *
9            (Document review.)
10               * * * *
11           THE WITNESS: Okay.
12   BY MR. PILEGGI:
13       Q. Now, am I correct it was a -- an issue about
14   the concerned citizen versus a confidential informant?
15       A. I don't know if it was an issue. They asked
16   me questions about it and they were answered.
17       Q. And the con -- you did use, in this
18   particular case, the Freeman case, you did use a
19   confidential informant to make a buy, correct?
20       A. Correct.
21       Q. All right. So, again, for clarity's sake,
22   Al as the concerned citizen, was separate and distinct
23   from the confidential informant at that point at
24   least --

Page 196

1        A. Yes.
2        Q. -- in the investigation. Okay.
3            And do you see there where it says he
4    later became a confidential informant?
5        A. I do see that.
6        Q. I'm sorry?
7        A. I do see that, yes.
8        Q. Okay. So, does that refresh your
9    recollection that he was made -- went from a concerned
10   citizen to a confidential informant during the pendency
11   of -- and in the infancy of the Freeman case?
12       A. It does.
13       Q. Okay. Do you recall now the circumstances
14   surrounding making Al a concern -- went from a
15   concerned citizen to a confidential informant?
16       A. He went from a concerned citizen to an
17   informant, yes.
18       Q. Do you recall your role in that?
19       A. I don't. As I stated, I'm not sure -- I
20   don't know if I was the one that signed him up or not.
21       Q. But it's your testimony, correct?
22       A. Correct, it is. So, I'm assuming -- I don't
23   know because I don't have the paperwork, that I would
24   have been the one to sign him up as an informant.

Page 197

1        Q. All right. So you were the lead
2    investigator, right?
3        A. Correct.
4        Q. Al was -- provided you the information,
5    correct?
6        A. Correct.
7        Q. You were the one giving the testimony at
8    court, right?
9        A. Correct.
10       Q. You don't recall whether you were the one
11   that signed him up or not?
12           MR. GONZALES: Objection, asked and
13   answered. That's argumentative. I mean, he
14   already testified.
15   BY MR. PILEGGI:
16       Q. By the way, did anyone else -- do you recall
17   any other officer in the investigation, I think it's
18   Reynolds-6, the Affidavit, any other officer give
19   testimony during the Freeman case?
20       A. I don't recall.
21           MR. PILEGGI: If you could go to Page
22   36. And let me just -- I'm going to summarize it
23   for you so we don't --
24   BY MR. PILEGGI:

Page 198

1        Q. Am I correct that you gave testimony that you
2    made notes with information provided by Al?
3        A. Correct.
4        Q. Contemporaneous notes, correct?
5        A. Correct.
6        Q. And then 37, Page 37 you said you threw the
7    notes in the trash?
8        A. Correct.
9        Q. Is that normal procedure?
10       A. Yeah, they're rough notes. And then like I
11   stated, you take those notes and everything's put into
12   the Affidavit. There's no procedure on keeping notes.
13       Q. And what if the information in the Affidavit
14   turns out to be incorrect, don't you have to refer to
15   your notes to make sure that you got it right?
16       A. Well, you would think everything in the
17   Affidavit is correct, so.
18       Q. You think. But we now know, from our last
19   session, that dates and names and other issues are all
20   incorrect in the Torain Affidavit, right?
21           MR. GONZALES: Objection.
22           Do you want him to go through the
23   Affidavit and find out what's right and what's
24   wrong?

16  (Pages 195 to 198)

Case 2:14-cv-01643-RBS    Document 61-6    Filed 06/29/22    Page 82 of 128
Torain v. City of Philadelphia, et al.

POLICE OFFICER BRIAN REYNOLDS-VOLUME II, 9/23/21

Page 199

1   MR. PILEGGI: If he'd like. If he
2   doesn't recall that testimony I'll be happy to --
3       MR. GONZALES: This is argumentative.
4   You're trying to get him to say that he should
5   keep notes, okay.
6       He's already testified that he doesn't
7   keep notes.
8       MR. PILEGGI: John --
9       MR. GONZALES: He takes them, he
10  transposes them to the report and he discards
11  them. End of story.
12      You can argue to the jury and to the
13  court about whether that's appropriate or not, but
14  it's not going to change the testimony or the
15  facts.
16      MR. PILEGGI: Mark that as Reynolds-9,
17  please.
18          * * * *
19      (Reynolds Exhibit 9 was
20  marked for identification.)
21          * * * *
22      MR. PILEGGI: Officer, I'm showing you
23  what's been marked as Reynolds-9 for
24  identification.

Page 200

1       Submit to you that that's the Affidavit
2   in the Torain case.
3   BY MR. PILEGGI:
4       Q. And I asked you questions at the last
5   deposition regarding this, correct?
6       A. Correct.
7       MR. PILEGGI: I'm going to ask you about
8   your recollection of the actual deposition that we
9   did on July 28th.
10      THE WITNESS: Okay.
11  BY MR. PILEGGI:
12      Q. Do you recall we went through some of the
13  dates, and the dates were all wrong?
14      A. There was mistakes with dates, yes.
15      Q. Do you recall that we went through some of
16  the incidences that were reported in the Affidavit of
17  Probable Cause that were wrong?
18      A. I don't understand what you mean by
19  "incidents".
20      Q. Some of the factual bases that they used to
21  get the probable cause in this Affidavit were wrong.
22      A. Some of the facts were wrong?
23      Q. Yeah.
24      A. I don't remember anything like that.

Page 201

1       Q. Do you recall that some of the information
2   that occurred was not put in this Affidavit of Probable
3   Cause?
4       A. I don't recall that, no.
5       Q. Okay. And I recognize that you did not --
6   you were not the one that drafted this Affidavit of
7   Probable Cause, it was Monaghan, right?
8       A. Correct.
9       Q. Do you recall when I asked you about what you
10  confiscated from Mr. Torain, and what was placed on the
11  property receipt?
12      A. Correct.
13      Q. All right. And you testified that whatever
14  you had -- whatever you confiscated from Mr. Torain you
15  provided to Officer Monaghan, correct?
16      A. Correct.
17      Q. But you made it a point during that testimony
18  to clarify that you did not confiscate a probation or a
19  parole card that was on the property receipt, as
20  provided in conjunction with the investigation in the
21  Torain case?
22      A. You made a point of it, and I said I don't
23  remember recovering that from Torain.
24      Q. Okay. But it was on the property sheet, we

Page 202

1   can agree to that, right?
2       A. It's on the property receipt, correct.
3       Q. And you don't recall that being confiscated
4   from the vehicle when you arrested him right, because
5   that would be the only place you could confiscate it,
6   wouldn't it?
7       A. Correct.
8       Q. In other words, you didn't confiscate it --
9   or another officer didn't confiscate it in 55 55th
10  Street, right?
11      A. I don't believe so. I don't know where that
12  document came from, I stated that to you.
13      Q. Okay. Let's talk about Conestoga. Now,
14  there was testimony provided by Mr. Walker, who was
15  your partner for years, correct?
16      A. We worked together, yes.
17      Q. And, in fact, you were notoriously known as
18  Batman and Robin, right?
19      A. Correct.
20      Q. Who was Batman and who was Robin?
21      A. You'd have to ask the street guys that.
22      Q. You don't know what role you played?
23      A. I believe I was Robin. They referred to me
24  as Robin.

Case 2:14-cv-01643-RBS    Document 61-6    Filed 06/29/22    Page 83 of 128
Torain v. City of Philadelphia, et al.

POLICE OFFICER BRIAN REYNOLDS-VOLUME II, 9/23/21

Page 203

1   Q. But you worked closely together, not only at
2   the time of the Torain investigation, but you -- prior
3   to that, years prior to that, right?
4   A. We were coworkers.
5   Q. In fact, you worked in the 16th District
6   together, correct?
7   A. Correct.
8   Q. With Monaghan, right?
9   A. No.
10  Q. Well, he was in the 16th District at the
11  time, wasn't he?
12  A. No.
13  Q. He was not?
14  A. Monaghan was in the 19th District.
15  Q. Where was Monaghan from, if you know, before
16  he came to the --
17  A. He went to the -- he started in the 19th
18  District, and then went to the Strike Force, and then
19  came to the Field Unit.
20  Q. Okay.
21  A. That's not the 16th.
22  Q. Now, you recall being present at Monaghan's
23  deposition, correct?
24  A. Correct.

Page 204

1   Q. And do you recall Monaghan testifying that
2   the confidential source that he received detailed
3   information from in the Torain case, and I'm referring
4   to, um, Reynolds -- what is it 9, the Affidavit, um, he
5   gleaned that information from an individual from the
6   16th District that he knew when he worked there?
7   A. I don't remember reading that.
8   Q. And it's your testimony that a confidential
9   source and a concerned citizen is one in the same.
10  A. Basically, yes.
11  Q. Well, no, what do you mean "basically"?
12  Well, where does it differ?
13  A. As I stated, it all depends on what wordage
14  that officer who's providing in the Affidavit wants to
15  use. They're basically the same. They're providing
16  you with information, the officers are going out there
17  and verifying the information that's provided. They're
18  basically one in the other.
19  Q. Okay. So, could an officer use a
20  confidential informant instead of a confidential
21  source?
22  A. For what purpose?
23  Q. It's one in the same. Or is it?
24  A. It's not the same. Confidential informant is

Page 205

1   registered with the police department, they know the
2   identity of that individual.
3       MR. GONZALES: I'm going to object.
4   We covered this for pages on the first
5   day of Mr. Reynold's deposition.
6   BY MR. PILEGGI:
7   Q. Now, Officer, so, you were also present
8   during Walker's deposition, correct?
9   A. Correct.
10  Q. Were you there all five days?
11  A. I believe I was, yes.
12  Q. You recall -- and you stated this previously,
13  you recalled Officer -- former Officer Walker
14  testifying that you, Monaghan, and Mr. Walker huddled
15  up and decided how you were going to write the job up,
16  right?
17      Something to that extent, I'm
18  paraphrasing the question.
19  A. I remember there was testimony to that, yes.
20  Q. Okay. And you recall Officer -- former
21  Officer Walker testifying that, um, before they ever --
22  Monaghan entered 55 55th Street with the key, there was
23  officers already in there securing in the hallway.
24      Do you recall that?

Page 206

1       MR. GONZALES: Objection. You said 55
2   55th Street, that's --
3       MR. GONZALES: No, 55th Street.
4       THE WITNESS: I don't recall that, no.
5   BY MR. PILEGGI:
6   Q. Were there any officers -- when you arrived
7   with the key to give it to Monaghan, were there any
8   officers in the unit already?
9   A. Not that I recall.
10  Q. Do you recall who was at the scene when you
11  gave the key to Officer Monaghan?
12  A. As I stated, myself, Walker, Kelly,
13  Monaghan. May have been other officers and a
14  supervisor. I stated that numerous times.
15  Q. So, then we now know that officers attempted
16  to get into the unit to secure it, right?
17  A. Correct.
18  Q. An individual showed up, said he was the
19  manager, said you could not enter without a warrant.
20      Do you recall that?
21  A. I don't know what that individual said, I
22  didn't speak to him.
23  Q. But you saw him talking, correct?
24  A. I saw Kelly talking to somebody, yes. I

18  (Pages 203 to 206)

Case 2:14-cv-01643-RBS    Document 61-6    Filed 06/29/22    Page 84 of 128
Torain v. City of Philadelphia, et al.

POLICE OFFICER BRIAN REYNOLDS-VOLUME II, 9/23/21

Page 207

1    don't know who --
2        Q.  Who was he talking to?
3            MR. GONZALES:  Wait.  Let the witness
4    answer the question.  You interrupted him.
5            Were you finished?
6            THE WITNESS:  No, I was not.
7            I don't know what they were talking
8    about, but I seen him talking to someone.
9    BY MR. PILEGGI:
10       Q.  Who's "they"?
11       A.  Kelly.
12       Q.  Kelly and this individual?
13       A.  Correct.
14       Q.  Was there any other officer involved in that
15   conversation?
16       A.  I don't recall if there was or not.
17       Q.  How far away were you when this discussion
18   occurred?
19       A.  I don't recall how far away I was.
20       Q.  Okay.  And after that, you do recall, though,
21   yourself looking into the unit, right?
22       A.  I do.
23       Q.  Into the apartment, I should say.
24       A.  I do.

Page 208

1        Q.  Okay.  And I believe I asked you this, but
2    I'm not sure, so bear with me.
3            What was the basis of going into that
4    particular apartment?
5            MR. GONZALES:  Objection, asked and
6    answered.
7            But you can answer it again.
8            THE WITNESS:  To secure the property.
9    BY MR. PILEGGI:
10       Q.  No.  I understand that, but why that
11   property?  Why Apartment 2 as opposed to Apartment 10
12   or?
13       A.  Because Monaghan determined that was where
14   Torain was.
15       Q.  Because Monaghan what, I'm sorry?
16       A.  Because that's where Monaghan wanted to go.
17   He determined that that was the apartment that Torain
18   was in.
19       Q.  Number 2?
20       A.  Correct.  The apartment that --
21       Q.  Monaghan told you that?
22       A.  Well, he had the key to it, the key fit the
23   door.  The door was opened and the apartment was
24   there.

Page 209

1        Q.  But he didn't tell you, you were actually
2    there, didn't he?
3        A.  I was there.  I was observing that, yes.
4        Q.  In fact, you gave him the key.
5        A.  Correct.
6        Q.  Going back to Walker's testimony, he
7    testified that you and him went back to 1621 Conestoga
8    Street, where Mr. Torain was seen leaving to go to 55th
9    Street earlier that day.
10       A.  I don't remember him testifying to that.
11       Q.  Well, I'm asking you, do you recall going to
12   1621 Conestoga Street and entering that unit without a
13   warrant?
14       A.  I did not go to 1621 Conestoga Street.
15       Q.  You did not.
16       A.  I did not.
17           MR. PILEGGI:  Okay.  Make this
18   Reynolds-10.
19               *  *  *  *
20           (Reynolds Exhibit 10 was
21   marked for identification.)
22               *  *  *  *
23           MR. PILEGGI:  All right.  Officer
24   Reynolds, I want to show you what's been marked as

Page 210

1    Reynolds-10 for identification.
2            And I will submit to you that that's an
3    Affidavit from Carolyn Torain, who is the mother
4    of, um, Kareem Torain, the individual you
5    arrested.
6            THE WITNESS:  Okay.
7            MR. PILEGGI:  Do you want to take a look
8    at it?
9            THE WITNESS:  I already read it.
10           MR. PILEGGI:  Time to review it.
11           THE WITNESS:  I already read it.
12           MR. PILEGGI:  You already read it.
13           THE WITNESS:  Yeah.  When you just
14   turned it over on Monday.
15           MR. GONZALES:  I'm just going to put
16   an objection on the record that this document
17   appears to be an Affidavit that was signed on
18   January 23rd, 2017 by plaintiff's mother.
19           It was never been produced by plaintiff
20   in -- as part of Rule 26, self-disclosures, nor
21   was it attached to any response to any request for
22   production of documents.
23           For the first time I was provided with
24   this Affidavit after day one of the deposition of

19  (Pages 207 to 210)

Case 2:14-cv-01643-RBS    Document 61-6    Filed 06/29/22    Page 85 of 128
Torain v. City of Philadelphia, et al.
POLICE OFFICER BRIAN REYNOLDS-VOLUME II, 9/23/21

Page 211

1   my client.
2       MR. PILEGGI:  When were you provided
3   it, though?  You were provided days ago, right?
4       MR. GONZALES:  Yes.  After you attempted
5   to take my client's deposition.
6       MR. PILEGGI:  And I would just submit to
7   you that there has been a stay in this case for, I
8   don't know, probably close to six years.  Let's
9   say, imposed by the defendants, not plaintiffs.
10  So, couldn't have been produced.
11      MR. GONZALES:  I'm sorry, the case was
12  lifted -- was it still in a stay when my client
13  was deposed?
14      MR. PILEGGI:  There was a stay --
15      MR. GONZALES:  You tried to depose my
16  client while the case was stayed?
17      MR. PILEGGI:  No.  It was a stay imposed
18  since 2015.
19      MR. GONZALES:  Right.  And then it came
20  out of stay and you didn't produce this document.
21      MR. PILEGGI:  Could not have provided
22  it though, that's I'm trying to explain to you.
23      MR. GONZALES:  You couldn't provide
24  this before my client's deposition in August.

Page 212

1       MR. PILEGGI:  I didn't ask him anything
2   about the deposition, he walked out.
3       MR. GONZALES:  It doesn't matter.  The
4   fact is you could have and you didn't.
5       MR. PILEGGI:  Go ahead.
6       MR. GONZALES:  And that will be a topic
7   for something later.
8       MR. PILEGGI:  Did I ask any questions
9   about Conestoga before he walked out?
10      MR. GONZALES:  It doesn't matter.
11      MR. PILEGGI:  Sure it does.
12      MR. GONZALES:  You had relevant evidence
13  in your possession that you failed to disclose.
14      MR. PILEGGI:  Okay.  I want to read you
15  some of this deposition.  I'm sorry, the
16  Affidavit.
17      It says on -- this is Paragraph 2.  On
18  Thursday, January 4th, 2001, I was present in my
19  home at 1621 North Conestoga Street, Philadelphia,
20  Pennsylvania, with my one child, Tameka Torain,
21  and her friend L.B.  Sometime in the afternoon my
22  son, Kareem Torain, came home and went upstairs to
23  his room.  He was in the room for about 20 minutes
24  before he went out of the house again.

Page 213

1   BY MR. PILEGGI:
2       Q.  Now, just -- let's put this in perspective.
3       Mr. Torain was followed from Master
4   Street in a green Pontiac Bonneville by Officer Walker,
5   correct?
6       A.  Correct.
7       Q.  At least according to the Affidavit.
8       A.  Correct.
9       Q.  All right.  Were you also part of that
10  surveillance?
11      A.  No, I stated I picked him up once he exited
12  Conestoga Street.
13      Q.  Where were you before you picked him up
14  coming out of Conestoga?
15      A.  I don't recall where I was.
16      Q.  So, the first time you spotted that green
17  Bonneville, or my client, was when he came out of
18  Conestoga Street?
19      A.  Yes.
20      Q.  Shortly thereafter my mother, Shirley Torain,
21  who resided across the street from 1628 North 55th
22  Street, called me and informed me that several police
23  officers were going into 1628 North 55th Street.
24      Does that sound like around the time

Page 214

1   when you had the key and went into 55th Street to try
2   to search?
3       A.  I have no idea.
4       Q.  Well, does that make sense that there was
5   several police officers, as you testified before, that
6   went into 55th Street to attempt to get into Apartment
7   2?
8       MR. GONZALES:  No, objection.  He's not
9   here to give his opinion about whether this
10  Affidavit --
11      MR. PILEGGI:  I'm asking him his
12  independent recollection, John.
13      MR. GONZALES:  No, no.
14      MR. PILEGGI:  Stop it.
15      MR. GONZALES:  Objection.  I'm
16  instructing him not to answer.
17      MR. PILEGGI:  Officer --
18      MR. GONZALES:  Whether --
19      MR. PILEGGI:  Are you instructing
20  him not to testify?
21      MR. GONZALES:  No.  He can answer
22  factual questions --
23      MR. PILEGGI:  No --
24      MR. GONZALES:  You can't ask him an

Case 2:14-cv-01643-RBS    Document 61-6    Filed 06/29/22    Page 86 of 128
Torain v. City of Philadelphia, et al.

POLICE OFFICER BRIAN REYNOLDS-VOLUME II, 9/23/21

Page 215

1  opinion about whether Mr. Torain's grandmom was
2  accurate in her -- in her description.
3          MR. PILEGGI: I didn't ask him that.
4          MR. GONZALES: That's exactly what you
5  asked.
6          MR. PILEGGI: I asked him isn't that
7  around the same time that police officers went to 55th
8  Street to try to gain entrance.
9          MR. GONZALES: Objection. There's no
10  time on here, other than sometime in the
11  afternoon.
12          MR. PILEGGI: He can say he doesn't
13  know.
14          John, please stop it.
15          MR. GONZALES: The question's
16  ridiculous.
17          MR. PILEGGI: Respectfully, stop.
18          MR. GONZALES: Yeah, respectfully.
19          MR. PILEGGI: You're being disruptive.
20          MR. GONZALES: I think producing an
21  Affidavit after -- you know, after day one of
22  my client's deposition --
23          MR. PILEGGI: Objection noted.
24          Officer, you want to answer that

Page 216

1  question.
2          THE WITNESS: Can you repeat it.
3          MR. PILEGGI: Yes.
4  BY MR. PILEGGI:
5      Q.  Is this around -- does this appear to be the
6  same time that you and other fellow officers, including
7  Monaghan, went to try to gain entrance into 55th Street
8  without a warrant?
9      A.  I have no idea.
10      Q.  Okay. Do you know if there was any other
11  activity at that house that day by police officers?
12          MR. GONZALES: At what house?
13          MR. PILEGGI: 55th Street.
14          THE WITNESS: I have no idea.
15          MR. PILEGGI: Okay. Approximately one
16  hour after that call I was in my kitchen and my
17  daughter, Tameka Torain, L.B., and another friend,
18  Wanda Saunders, were all in the dining room.
19          I walked out of my kitchen and saw two
20  plainclothes police officers standing in the
21  dining room. No one gave the officers consent
22  to be in my house.
23          One of the police officers was a white
24  male, and the other was a tall black male with

Page 217

1  twisties on his head. I later identified the
2  white police officer as Brian Reynolds, when I saw
3  a photograph of him in the newspaper when he was
4  later on trial.
5          I identified the black officer as
6  Jeffrey Walker, when I saw a photograph of him on
7  Fox news after he was arrested.
8  BY MR. PILEGGI:
9      Q.  By the way, Officer Walker at the time had
10  twisties or cornrows, or I don't know how to refer to
11  it. But he had the... Cornrows, correct?
12      A.  I don't recall what Walker had on his head.
13      Q.  You worked with him for years, you don't
14  recall him having dreads?
15          MR. GONZALES: Hold on. That's
16  argumentative, he answered the question he doesn't
17  recall.
18          MR. PILEGGI: And I'm asking him a
19  follow-up question.
20  BY MR. PILEGGI:
21      Q.  You don't recall Officer Walker ever having
22  dreadlocks?
23      A.  He had dreadlocks, I don't exactly recall
24  what kind of hair style he had back here 20 years ago.

Page 218

1          MR. PILEGGI: Okay. Paragraph 7.
2  Brian Reynolds was the first one to talk
3  to me, and he stated that he was going to search
4  my house. He did not state why he was going to
5  search my house.
6          8: Brian Reynolds then took me
7  upstairs, and I observed him search the middle
8  bedroom, which only had a desk with a computer on
9  it. I observed Reynolds open the desk drawer and
10  search the contents of the drawer. Nothing was
11  confiscated from that drawer.
12          We then proceeded into the front
13  bedroom, which is my bedroom, and I observed
14  Reynolds search my chest of drawers, and he pulled
15  out an envelope addressed to my son, Kareem
16  Torain. Reynolds confiscated the envelope. Why
17  he was still in my bedroom searching, Reynolds
18  observed a house arrest monitor box that was right
19  next to my bed.
20          When we walked down the hall to the back
21  bedroom, which was my daughter Margaret
22  Torain's bedroom. The bedroom door was locked,
23  and Reynolds informed me that the door would have
24  to be opened. I was afraid that he would break

Page 219

1  down the door, so I called my daughter Margaret,
2  who was at work, to come home and open her bedroom
3  door for the police.  Margaret informed me that
4  she would immediately leave work to come home.
5       Reynolds and I then went downstairs and
6  saw Officer Walker, my daughter Tameka, and her
7  friend Wanda talking in the dining room.  I did
8  not see L.B. at the time.
9       Reynolds then stated to me that my son
10  was going back to jail.  He also asked me how my
11  other son made out with his case with the girl.  I
12  knew he was referring to my first cousin's son,
13  Miguel Moon, who was charged with sexual assault
14  of a minor not too long after the search.  I'm
15  sorry, not long before this search.
16       Within minutes Reynolds received a
17  telephone call on his cell phone.  I heard
18  Reynolds talking on the cell phone, but I do not
19  remember what was discussed.  Within seconds he
20  terminated the call, and Reynolds and Walker then
21  abruptly walked out of my house.
22       My daughter Margaret Torain arrived
23  after the police left.  I never gave consent for
24  the police to search my house.  No one at my house

Page 220

1  that day gave consent for police to search.  I was
2  never shown or given a search warrant.
3       Reynolds confiscated the letter
4  addressed to my son, Kareem Torain.  Later that
5  evening a relative called to inform me that my son
6  Kareem Torain had been arrested earlier that day.
7       I want take you back to Paragraph 18.
8  It says: I was never shown or given an arrest
9  warrant.  Reynolds confiscated the letter
10  addressed to my son, Kareem Torain.
11  BY MR. PILEGGI:
12       Q.  Does that refresh your recollection as to
13  where you got that parole card?
14       A.  Not at all, because I was never in Conestoga
15  Street.
16       Q.  So, you don't recall the parole card, or
17  probation card being in the -- confiscated when you
18  arrested him in the car, you were the arresting
19  officer, right?
20       A.  Correct.
21       Q.  And you don't recall it being confiscated in
22  the house, right?
23       A.  Correct.
24       Q.  But you don't know where it was confiscated,

Page 221

1  even though it's on a property receipt.
2       A.  Correct.
3       Q.  Do you believe that another police officer
4  confiscated it somewhere along the way?
5       A.  I have no idea.
6       Q.  Okay.  And you were required, by the policies
7  and procedures, that anything that's confiscated, any
8  kind of contraband, or any kind of identification, has
9  to be placed on a property receipt, right?
10       A.  Correct.
11       Q.  You complied with that.  You made sure -- and
12  this was your arrest, you made sure that whatever was
13  confiscated was placed on the property sheet, right?
14       A.  Correct.  And the stuff that I confiscated --
15       Q.  Even though --
16            MR. GONZALES:  Wait.  Let him answer the
17  question.
18            MR. PILEGGI:  Okay.
19            THE WITNESS:  And the stuff that I
20  confiscated from Kareem Torain was placed on a
21  property receipt.
22  BY MR. PILEGGI:
23       Q.  Okay.  Even though before you placed it on
24  the property receipt, you took the key and you gave it

Page 222

1  to Monaghan so that you could go into the unit, right?
2            MR. GONZALES:  Wait a minute.  Wait a
3  minute, you lost me.
4            MR. PILEGGI:  Did I lose him?
5            MR. GONZALES:  I'm going to ask the
6  court reporter to just read back the question.
7                 * * * *
8            (The requested portion of
9  the record was read.)
10                 * * * *
11            MR. GONZALES:  Objection to the form of
12  the question.
13            You can answer it if you understand it.
14            THE WITNESS:  Correct.  At some point
15  the key was given to Monaghan for the property to
16  be secured on 55th Street.
17  BY MR. PILEGGI:
18       Q.  At what point?  Before it was placed on the
19  property receipt, correct?
20       A.  Correct.  We don't carry property receipts on
21  the street to type them up right there.
22       Q.  And at some point we know that a probation or
23  parole card was confiscated by someone, right?
24       A.  Correct.

22  (Pages 219 to 222)

Case 2:14-cv-01643-RBS    Document 61-6    Filed 06/29/22    Page 88 of 128
Torain v. City of Philadelphia, et al.

POLICE OFFICER BRIAN REYNOLDS-VOLUME II, 9/23/21

Page 223

1    Q.  And that was placed on the property sheet.
2    A.  Correct.
3    Q.  We just don't know who confiscated it.
4    A.  Correct.
5    Q.  And Ms. Torain -- according to Ms. Torain,
6    you were in her house and you confiscated that card.
7    A.  Well, she said an envelope.  What -- this
8    whole Affidavit is lies.  I never even went to
9    Conestoga Street.
10   Q.  Okay.  All right.  And Officer Walker, former
11   Officer Walker, also testified that he was with you
12   when you both went over to Conestoga Street to search,
13   correct?
14   A.  I don't remember testimony like that.  Do you
15   have it to show me?
16   Q.  But if he said that that would be a lie?
17   A.  Do you have it to show me?
18   Q.  Officer.
19   A.  You'd have to ask Officer Walker that.
20   Q.  If he testified to that would that be a lie?
21   A.  Yes.
22   Q.  Okay.  So, Ms. Mr. Torain lied and he lied.
23   A.  Correct.
24   Q.  All right.  But you don't know where you got

Page 224

1    the card.
2    A.  I don't know where that card came from.
3    MR. GONZALES:  He said he didn't even
4    know if he got the card.  He didn't get the card.
5    BY MR. PILEGGI:
6    Q.  Now...
7    THE WITNESS:  Can we take a bathroom
8    break?
9    MR. GONZALES:  Yes.
10   * * * *
11   (There was a break
12   taken in the deposition.)
13   * * * *
14   MR. GONZALES:  Before we go back, or
15   while we're back on the record, I spoke to the
16   witness.  I think something needs to be clarified,
17   because you keep saying when you prepared the
18   property receipt, as if the witness prepared the
19   property receipt.
20   Officer, did you physically prepare the
21   property receipt of the items that you recovered
22   from Mr. Torain?
23   THE WITNESS:  I don't believe I did, no.
24   MR. GONZALES:  Okay.

Page 225

1    BY MR. PILEGGI:
2    Q.  Officer, now there was a... There was a
3    Federal investigation with regards to your actions as a
4    police officer, um, some time ago, correct?
5    A.  There was.
6    Q.  Do you know if there's any pending
7    investigations?
8    A.  I have no idea.
9    Q.  Have you ever been notified that you're a
10   target of an investigation?
11   A.  I have not.
12   Q.  Are you sure?
13   A.  Positive.
14   Q.  You don't recall Judge Steinman opening up
15   investigation with the US Attorney's Office in
16   conjunction with witness intimidation?
17   A.  I have no idea.
18   Q.  Well, you were in the courtroom when we were
19   doing is Officer Walker's deposition, weren't you?
20   A.  I was.
21   Q.  As well as your fellow officers; Officer
22   Liciardello, Officer Norman, Spicer -- Spizer, right?
23   A.  Correct.
24   Q.  And you don't recall the judge opening up an

Page 226

1    investigation with the US Attorney's Office for
2    intimidation of witnesses?
3    A.  I remember something came up about an
4    intimidation of a witness.  I don't remember -- I don't
5    know if there's an investigation or not.
6    MR. GONZALES:  First of all, that was
7    not this witness.  And, second, that's not what
8    Judge Steinman said.
9    MR. PILEGGI:  Yes, it was.
10   MR. GONZALES:  No, it was not.
11   MR. PILEGGI:  It was all the
12   defendants.
13   MR. GONZALES:  No.
14   MR. PILEGGI:  All right.  Whatever -- I
15   asked him if he recalled.
16   MR. GONZALES:  Yeah, but you're
17   putting --
18   MR. PILEGGI:  He doesn't recall.
19   MR. GONZALES:  Yeah, but you're putting
20   stuff as if it's in a record somewhere that is
21   not accurate.
22   MR. PILEGGI:  It is.  There's a court
23   order, John.
24   BY MR. PILEGGI:

23  (Pages 223 to 226)

Case 2:14-cv-01643-RBS    Document 61-6    Filed 06/29/22    Page 89 of 128
Torain v. City of Philadelphia, et al.

POLICE OFFICER BRIAN REYNOLDS-VOLUME II, 9/23/21

Page 227

1  Q. Do you recall that?
2  A. I recall something about a witness
3  intimidation. I don't know if there's an investigation
4  or not.
5  Q. Okay. Do you recall the judge issuing an
6  order for the FBI to investigate all the defendants
7  potential intimidation of witnesses?
8  A. I don't recall that, no.
9  Q. Okay. But, nevertheless, there was an
10  investigation years ago which culminated into, um,
11  charges being brought by the Federal government against
12  yourself and fellow officers.
13  A. Correct.
14  Q. Do you recall if any of your co-defendants,
15  or any of the officers that were in Torain case?
16  A. I don't believe so.
17  Q. How about in the Kelly case -- I'm sorry, in
18  the Freeman case?
19  A. I don't believe so.
20  Q. Okay. Do you recall, or do you know if a
21  fellow officer that you worked with in the past,
22  Reginald Graham, was part of that investigation,
23  provided information to the Federal government with
24  regards to what he believed were some of the nefarious

Page 228

1  practices that you and your fellow officers were
2  engaged in?
3  A. I know he spoke to the Feds.
4  Q. You know he what?
5  A. I know he spoke to the Feds.
6  Q. Do you know if he wore a wire on you?
7  A. I believe at one point he did -- not on me,
8  he did wear a wire, though.
9  Q. Who did he wear a wire on?
10  A. I believe it was conversations he had with an
11  Officer Williams and Clahar (ph). To the best of my
12  recollection.
13  Q. Okay. And you learned that in the
14  conjunction of the prosecution against you by the
15  Federal government?
16  A. In the discovery that we got, yes, it was in
17  there.
18  Q. And some of that investigation was with
19  regards to what they believed was falsifying documents,
20  perjured testimony, et cetera?
21  A. Yes.
22  Q. And, of course, you beat that case, right?
23  MR. GONZALES: Objection.
24  When you say "beat that case," what

Page 229

1  do you mean, found innocent?
2  MR. PILEGGI: Okay, John.
3  BY MR. PILEGGI:
4  Q. You were exonerated by a jury.
5  A. I was found not guilty on a 48-count
6  indictment, yes.
7  Q. You did not testify in that case, did you?
8  A. I did not.
9  Q. Nor did any -- well, one of the officers did,
10  Officer Spicer?
11  A. Yes.
12  Q. Do you recall your fellow former officer,
13  Batman, Jeffrey Walker testifying against you?
14  A. I do.
15  Q. And he testified about all the money that not
16  only he stole, but you stole along with him, as well as
17  your fellow officers?
18  A. All his testimony was a bunch of lies.
19  Q. Yes. But do you recall him testifying that
20  as a group, as a working group on different cases, you
21  stole repeatedly?
22  A. I do.
23  Q. You lied repeatedly.
24  MR. GONZALES: The way that's going to

Page 230

1  come in the record is did he lie.
2  Does he recall Walker testifying
3  that he lied.
4  MR. PILEGGI: That's what I'm saying.
5  THE WITNESS: I do recall that, yes.
6  BY MR. PILEGGI:
7  Q. Okay. And you recall a parade of witnesses
8  coming forward and saying that? And when I say "you,"
9  I mean you and your co-defendants lied, stole, beat
10  people.
11  A. There was testimony to that, yes.
12  Q. Do you recall working with Reginald Graham?
13  A. At one point we did work together, yes.
14  Q. In fact, it was a case that I tried against
15  you, and I believe it was in 2004, against the
16  Randles.
17  Do you recall that case?
18  A. I recall the name, yeah. I don't remember
19  the particulars about the case.
20  Q. Do you recall there was a judgment against
21  you before it was reversed on appeal?
22  A. I don't remember. I don't recall.
23  Q. You did testify at that case, correct?
24  A. I don't recall if I did or not.

24  (Pages 227 to 230)

Case 2:14-cv-01643-RBS    Document 61-6    Filed 06/29/22    Page 90 of 128
Torain v. City of Philadelphia, et al.
POLICE OFFICER BRIAN REYNOLDS-VOLUME II, 9/23/21

Page 231

1    Q.  Anyway, Reginald Graham was involved in the
2  Randle case, along with yourself.
3         He was a co-defendant at that time,
4  correct?
5    A.  Okay.
6    Q.  Is that your --
7         MR. GONZALES:  Do you recall?
8         THE WITNESS:  I don't recall -- yeah, he
9         could have been.  I don't recall exactly who
10        was -- he was involved in case with me or not.
11  BY MR. PILEGGI:
12    Q.  He later provided the Federal government with
13  evidence, at least from his perspective, that you,
14  Walker, and Liciardello were dirty cops, and he didn't
15  want to work with you?
16    A.  I don't recall exactly what he told the
17  Federal government, but I do remember -- I think there
18  was a statement in there that he never saw us do
19  anything wrong.  I don't recall though, it's been a
20  while since I've looked at that Discovery or even read
21  it.
22    Q.  And it's your testimony --
23    A.  I don't recall exactly what he said -- told
24  the FBI.

Page 232

1    Q.  Okay.  Do you know when he went in to the FBI
2  and talked to them?
3    A.  I have no idea.
4    Q.  Was he ever called as a witness at the
5  Federal case against you?
6    A.  He was not.
7    Q.  At some point in 2005 you actually sued
8  myself.
9    A.  Correct.
10    Q.  You, Liciardello, Walker, and Reginald
11  Graham, right?
12    A.  I believe -- I know me and Liciardello.  I'm
13  not sure about the other two.
14    Q.  And at that time, doing that prosecution of
15  that civil case, that you were asking for money damages
16  against me as an attorney, someone was hired by your
17  defense team to wear a wire on me.
18    A.  There was an investigator that was hired,
19  yes.
20    Q.  And you sued me in the capacity as police
21  officers, correct?
22    A.  Yes.
23    Q.  In other words, you didn't sue me as a
24  civilian Brian Reynolds, you sued me as Police Officer

Page 233

1  Brian Reynolds, right?
2         MS. TAYLOR:  Objection.
3         MR. GONZALES:  I'm going to object.
4         MR. PILEGGI:  To what?
5         MR. GONZALES:  That's a legal
6  conclusion and --
7         MR. PILEGGI:  John.  All right --
8         MR. GONZALES:  It's a legal conclusion.
9  He may or he may not know.
10         MR. PILEGGI:  You're right.
11         MR. GONZALES:  That's a question for his
12  attorney, really.
13         MR. PILEGGI:  It's okay.  It's okay.
14  Do it this way.  Mark that as 11,
15  Reynolds-11.
16             * * * *
17        (Reynolds Exhibit 11 was
18        marked for identification.)
19             * * * *
20         MR. PILEGGI:  You've been shown what's
21  been marked as Reynolds-11.
22  BY MR. PILEGGI:
23    Q.  Do you know what that is?
24    A.  Correct.

Page 234

1    Q.  What is it?
2    A.  It's the lawsuit that was filed.
3    Q.  It's the Complaint that you filed against me,
4  correct?
5    A.  Yes.
6    Q.  And in that Complaint there's allegations
7  that I lied about cases that I brought against your
8  team where I said, on behalf of my clients, that you
9  were stealing, falsifying documents, beating people,
10  correct?
11    A.  Correct.
12    Q.  What's the caption say?
13    A.  (No audible response.)
14    Q.  In other words, what's your name?  What's it
15  say?
16    A.  Police Officer Brian Reynolds.
17    Q.  Okay.  So, you brought this case in the
18  capacity as police officer, not as Brian Reynolds
19  civilian, right?
20         MR. GONZALES:  Objection.
21         MS. TAYLOR:  Objection.
22         MR. GONZALES:  Just because the caption
23  says that it doesn't mean that that's how he's
24  suing you.

25  (Pages 231 to 234)

Case 2:14-cv-01643-RBS    Document 61-6    Filed 06/29/22    Page 91 of 128
Torain v. City of Philadelphia, et al.

POLICE OFFICER BRIAN REYNOLDS-VOLUME II, 9/23/21

Page 235

1.      You can laugh all you want.
2.          MR. PILEGGI: All right. Fine.
3.  BY MR. PILEGGI:
4.      Q.  There's allegations in that Complaint by the
5.  plaintiffs; yourself, Officer Liciardello, Officer
6.  Walker, and Officer Graham, that states that I was
7.  lying when I brought cases against you as a police
8.  officer because you were lying, stealing, and beating
9.  people, right?
10.         MR. GONZALES: What? Objection.
11.     You can answer if you understand that.
12.         THE WITNESS: I don't understand it.
13.     Remember, I don't even know what this
14.     thing says. I haven't seen that in years.
15.         MR. PILEGGI: So, it's --
16.         MR. GONZALES: Hold on a second. Mike,
17.     really, seriously, what is the point of all this?
18.         MR. PILEGGI: John, I'll get to the
19.     point if you let me.
20.         MR. GONZALES: That'd be great.
21.         MR. PILEGGI: Okay. Thank you.
22.  BY MR. PILEGGI:
23.     Q.  Is that correct, Officer?
24.     A.  If that's what it says.

Page 236

1       Q.  It says Police Officer Reynolds.
2           MR. GONZALES: He already admitted
3       that.
4   BY MR. PILEGGI:
5       Q.  Did you get permission to file a Complaint
6   against an attorney who was bringing civil rights
7   complaints against you for stealing, lying, and beating
8   people?
9       A.  Get permission from who?
10      Q.  From anybody.
11      A.  This was -- this was the lawsuit that was
12  filed.
13      Q.  Did you get any -- did you get any approval
14  from your supervisors?
15      A.  They were aware of it.
16      Q.  How do you know?
17      A.  We told them about it.
18      Q.  Who did you tell?
19      A.  I believe it was Officer Chester McCowski
20  (pH).
21      Q.  Okay. And was he your -- was he your
22  Sergeant at the time?
23      A.  I don't recall.
24      Q.  Okay. Well, I would submit to you wasn't

Page 237

1   he -- stopped being your sergeant when you were moved
2   out of the unit and Officer -- I mean, Sergeant
3   McCowski became your Sergeant at that time?
4       A.  I don't recall who my Sergeant was.
5       Q.  Well, let me ask you this. Am I correct
6   then, at some point they took you off the street.
7           When I say "took you off the street,"
8   meaning you could not do any police work. You were
9   confined to the headquarters to do administrative work.
10          MR. GONZALES: Objection. You already
11      asked him this in day one of his deposition.
12          MR. PILEGGI: No, I did not.
13          MR. GONZALES: You can answer it again,
14      but, yeah, you did.
15          THE WITNESS: Yes, I was taken off the
16      street.
17  BY MR. PILEGGI:
18      Q.  For how long?
19      A.  I don't recall.
20      Q.  And you were taken off the street, Officer
21  Liciardello was taken off the street, and Officer
22  Walker, right?
23      A.  No.
24      Q.  No?

Page 238

1       A.  It was just myself and Liciardello.
2       Q.  Officer Walker was not?
3       A.  Was not.
4       Q.  How about Officer Graham?
5       A.  Was not.
6       Q.  Okay. While you were off the street -- by
7   the way, how long was that for?
8       A.  I don't recall.
9       Q.  Over a year?
10      A.  I don't recall.
11      Q.  Okay. When were you put back on the street?
12      A.  I don't recall.
13      Q.  Where were you when you were off the street?
14      A.  We were assigned to our headquarters.
15      Q.  Which was where?
16      A.  7801 Essington Ave.
17      Q.  Okay. And what were you doing? What were
18  your duties at that time?
19      A.  We were just assigned to desk duty.
20      Q.  What does that mean, what were your duties?
21      A.  We would go to the office and sit at a desk
22  for eight hours.
23      Q.  Did you do any police work?
24      A.  If officers came in with jobs and they needed

26  (Pages 235 to 238)

Page 239

1    help processing paperwork, maybe we helped them process
2    paperwork or do in and odd jobs for them. Not exactly
3    sure what I did. Sat there.
4        Q. But you were not allowed to do any
5    Affidavits, right?
6        A. Correct.
7        Q. You were not allowed to testify, right?
8        A. I'm not sure if we testified or not during
9    that period. I don't recall if we did or not.
10       Q. Is it similar to what your duties are now, as
11   administrative?
12       A. Um, no, I'm just administrative personnel
13   now.
14       Q. Well, were you --
15       A. If I seen a crime in front of me, a robbery
16   per se, I can take action.
17       Q. Okay. Could you do that when you were taken
18   off the street back when you were suing me?
19       A. No.
20       Q. You could not make arrest.
21       A. No.
22       Q. Why?
23       A. I was assigned to desk duty.
24       Q. I understand that, but why?

Page 240

1        A. (No audible response.)
2        Q. There had to be a reason, right?
3        A. Well, I believe I still had my weapon, so it
4    was just assigned to desk duty while Internal Affairs
5    investigated all the complaints that you made.
6        Q. Okay. So, it's your testimony that you were
7    placed on desk duty while Internal Affairs
8    investigated?
9        A. Yes.
10       Q. Okay. Do you know if Internal Affairs was
11   the only one investigating?
12       A. I don't know that.
13       Q. How about IMPACT?
14       A. I heard through the grapevine later on that
15   there was IMPACTS that -- checks that were done on us,
16   which we passed, but I never got any paperwork saying
17   that.
18       Q. How about the Feds?
19       A. Feds did a check on us and we passed.
20       Q. And while you were --
21       A. Turned every -- every cent that was taken off
22   the undercover, was placed on a property receipt.
23       Q. So, as you were on desk duty, taken off the
24   street, that's when you hired a private investigator to

Page 241

1    wear a wire on me, right?
2        A. I don't recall at which point the
3    investigator was hired.
4        Q. Who hired him?
5            MR. GONZALES: Hold on for a second.
6    I'm going to object.
7            What relevance does this have --
8            MR. PILEGGI: John, stop. This is a
9    deposition.
10           MR. GONZALES: -- to Mr. Torain's --
11           MR. PILEGGI: Quit it, quit it, please.
12           MR. GONZALES: Don't tell me to quit it.
13           MR. PILEGGI: Yeah, I am.
14           MR. GONZALES: You got to give me
15   something here.
16           MR. PILEGGI: I don't have to give you
17   anything, I'm deposing someone. If he doesn't
18   understand, or if he doesn't think it's relevant,
19   then he can choose not to answer.
20           MR. GONZALES: Right. But Rule 30 says
21   it has to be -- it has to be relevant --
22           MR. PILEGGI: John, I'm not --
23           MR. GONZALES: -- and not --
24           MR. PILEGGI: I don't have to tell

Page 242

1    you --
2            MR. GONZALES: And not designed to
3    harass a witness.
4            MR. PILEGGI: Officer, okay.
5            MR. GONZALES: You're asking him
6    questions about --
7            MR. PILEGGI: Objection --
8            MR. GONZALES: -- a civil lawsuit from
9    2005.
10           MR. PILEGGI: Yes.
11           MR. GONZALES: Okay. That is not
12   related to Mr. Torain's case. I don't see the
13   link to a Menel Claim. I don't see a link to
14   this case, that's all. Other than you have a --
15   you know, there's some issue that you have with
16   the Off -- a personal issue, and it's -- and
17   you're trying to get in, you know, to question him
18   about.
19           But if there's something relevant, I'd
20   like you to ask the relevant questions so we can
21   be finished here.
22           MR. PILEGGI: Well, does he want to
23   answer that, or should we read back the
24   record.

27  (Pages 239 to 242)

Case 2:14-cv-01643-RBS    Document 61-6    Filed 06/29/22    Page 93 of 128
Torain v. City of Philadelphia, et al.

POLICE OFFICER BRIAN REYNOLDS-VOLUME II, 9/23/21

Page 243

1    THE WITNESS: Read back the record,
2  please.
3    MR. PILEGGI: Okay.
4        * * * *
5    (The requested portion of
6  the record was read.)
7        * * * *
8    MR. PILEGGI: You know what, strike that
9  question, I'll rephrase it.
10 BY MR. PILEGGI:
11   Q.  Officer, wasn't it about the time that you
12 were taken off the street that this investigator was
13 hired to wear a wire on me?
14   A.  I don't recall when the investigator was
15 hired.
16   Q.  Who hired the investigator?
17   A.  It would have been probably us, through our
18 attorneys.
19   Q.  No, I don't want probably --
20   A.  I don't recall.
21   Q.  Okay.  Was it -- do you recall if you did
22 that?
23   A.  I don't recall.
24   Q.  Who's Russell Coleman?

Page 244

1    A.  I believe that's the investigator.
2    Q.  How did you know him?
3    A.  I don't recall.
4    Q.  Who made the decision to wear a wire on an
5  attorney?
6    A.  I don't recall.
7    Q.  Okay.  And you did that in conjunction while
8  you were a police officer, right?
9    A.  I was a police officer at the time, yes.
10   Q.  And, in fact, this individual, this
11 Mr. Kolins, the investigator --
12   A.  I believe it was Russel Collins, too.
13   Q.  Russell Kolind.  He actually wore a wire
14 twice, right?
15   A.  I don't recall how many times he wore a
16 wire.
17   Q.  As a police officer, you know that, at least
18 in the State of Pennsylvania, that you have to have
19 permission of all parties to record a conversation,
20 right?
21   A.  Yeah.  But I believe the conversation he had
22 with you was in Jersey, correct, which is different.
23   Q.  No.  No.  Officer, I'm asking you a different
24 question.

Page 245

1    You know in the State of Pennsylvania,
2  in order to have a conversation and record it you must
3  have both parties consents -- or all party's consents.
4    A.  I believe there is something like that.  I
5  never had wire tap training to know the exact specifics
6  about it.
7    Q.  And am I correct that one of the wires that
8  was -- or one of the times that I was recorded was in
9  Pennsylvania, wasn't it?
10   A.  I don't know when you were recorded.
11   Q.  Okay.  Did you inform the investigator not
12 to -- not to wear a wire, or not to record somebody in
13 Pennsylvania unless you get their permission?
14   A.  I didn't inform the investigator nothing.
15   Q.  Was that information ever used in conjunction
16 with the lawsuit against me?
17   A.  I couldn't even tell you.
18   Q.  What do you mean, you don't recall?
19   A.  I don't recall.
20   Q.  But you were doing it to use it in
21 conjunction with the lawsuit against me, right?
22   A.  It was done.  I don't remember what it was
23 used for, though.
24   Q.  Do you know if the FOP was involved in this

Page 246

1  lawsuit? Bankrolled it?
2    A.  No, I don't believe they did.  But they
3  knew -- they were aware of it.
4    Q.  Who paid for the lawyer?
5    A.  Myself and Liciardello.  I'm not sure if
6  Graham or Walker paid any money.  But, yes, it was
7  myself and Liacardello.
8    Q.  And do you know when the recordings were
9  done?
10   A.  (No audible response.)
11   Q.  In other words, were you still off the
12 street, or were you back on the street?
13   A.  I don't recall when they were done.
14   MR. PILEGGI: Well, let's refresh your
15 recollection.  Okay.  I believe we're at 12.
16       * * * *
17   (Reynolds Exhibit 12 was
18 marked for identification.)
19       * * * *
20   MR. PILEGGI: I'm going to show you
21 what's been marked as --
22   MR. GONZALES: No, I'm going to read it
23 first.  This has never been produced in discovery
24 and -- it has been, I apologize.  This is from,

28  (Pages 243 to 246)

Page 247

1    um...
2         MR. PILEGGI: Did you really say that,
3    John?
4         MR. GONZALES: I just looked at the --
5         MR. PILEGGI: Saying I didn't produce
6    it?
7         MR. GONZALES: No. I looked at it for
8    the first time. I have not reviewed this. I have
9    not seen it. It bears a marking that says that
10   our firm produced it.
11        MR. PILEGGI: Thank you.
12        MR. GONZALES: But I have not reviewed
13   this, because it's not relevant to this case. But
14   I'm going to look at it now. And once I review
15   it, then you can ask questions to my client.
16        MR. PILEGGI: Why was it produced if it
17   wasn't relevant?
18             * * * *
19        (Document review.)
20             * * * *
21        MR. GONZALES: Let's step out.
22   We're going to take 10.
23        MR. PILEGGI: Wait a minute, there's a
24   pending question.

Page 248

1         MR. GONZALES: What's the question?
2         MR. PILEGGI: Are you kidding me?
3         MR. GONZALES: No, I'm not kidding you.
4    What's the question?
5         MR. PILEGGI: There's a pending
6    question.
7              * * * *
8         (The requested portion of
9         the record was read.)
10             * * * *
11        MR. GONZALES: So, we're going to take a
12   break.
13             * * * *
14        (There was a break taken
15        in the deposition.)
16             * * * *
17        MR. PILEGGI: Mark this 13.
18             * * * *
19        (Reynolds Exhibit 13 was
20        marked for identification.)
21             * * * *
22        MR. PILEGGI: Let's go back.
23        MS. TAYLOR: Can I just ask that these
24   be described, because I don't have them, either by

Page 249

1    reference to Bates range or contents, that would
2    be helpful.
3         MR. PILEGGI: Okay. All right.
4         I had marked, before we went on break,
5    two... Wires, for the lack of a better word, two
6    recordings where the investigator that you hired
7    for your -- you and your fellow plaintiffs hired
8    to record myself as, 12 and 13?
9         THE REPORTER: Yes.
10        MR. GONZALES: Reynolds-12 is Bates
11   Number MDWNFU 1040 thru 1052. And Exhibit
12   Reynolds-13 is Bates number MDWNFU 950 thru 968.
13        MS. TAYLOR: Are these dated?
14        MR. GONZALES: Yes.
15        MR. PILEGGI: And what are they, 12
16   and 13, respectively?
17        THE REPORTER: Yes.
18        MR. PILEGGI: Let's start with --
19        MR. GONZALES: For the record, so
20   that -- Reynolds-13 is dated 3/10/05.
21        MR. PILEGGI: And what's that, 12?
22        MR. GONZALES: And Reynolds-12 does not
23   appear to have a date on it.
24        MS. TAYLOR: Thank you.

Page 250

1         MR. GONZALES: Okay.
2         MR. PILEGGI: Let's go back to
3    Reynolds-13. Your attorney just stated the date.
4    BY MR. PILEGGI:
5    Q.   Just state the date for the record again.
6    A.   It's 3/10/05.
7    Q.   Okay. You were still off the street then,
8    weren't you?
9    A.   I don't recall if I was off the street or
10   not.
11   Q.   Well, let me refresh your recollection.
12        Do you recall going back on the street
13   in May?
14   A.   I don't recall when I was taken off the
15   street, the time frame, and when I went back on the
16   street.
17   Q.   But you were off for about a week, correct?
18   A.   I was off longer than a week.
19   Q.   Okay. I'm sorry, a year.
20   A.   Yeah. I'm not sure how long it was.
21   Q.   Are you aware that at some point doing this
22   litigation Officer Liciardello, your partner, one of
23   your partners, followed me to my home?
24   A.   I wasn't aware of that, no.

Case 2:14-cv-01643-RBS    Document 61-6    Filed 06/29/22    Page 95 of 128
Torain v. City of Philadelphia, et al.

POLICE OFFICER BRIAN REYNOLDS-VOLUME II, 9/23/21

Page 251

1    Q.  You never heard that.
2    A.  I may have heard it.
3    Q.  Okay.  Well --
4    A.  I had no personal knowledge if that was done
5    or not.
6    Q.  If that was the case, if he followed me to my
7    home, that would be illegal, wouldn't it?
8    A.  You'd have to ask Officer Liciardello that.
9    Q.  No, I'm asking you.
10   A.  I don't know.  You'd have to ask him that.
11   Q.  Are you aware that there was threats made to
12   myself during the pendency of that lawsuit?
13   A.  I'm aware of that.
14   Q.  You didn't make any threats, right?
15   A.  No, I had no need to.
16   Q.  Did you hear Officer Liciardello had an
17   encounter with me at the Criminal Justice Center?
18   Threatened me.
19   A.  I did not.
20   Q.  You never heard that?
21   A.  I may have.  I don't remember if I did or
22   not.
23   Q.  That would be illegal, won't it?
24   A.  You'd have to ask Officer Liciardello that.

Page 252

1    Q.  That would be intimidation of a witness,
2    wouldn't it?
3    A.  You'd have to ask Officer Liciardello that.
4    Q.  No, I'm asking you.  As a police officer can
5    you threaten a civilian, let alone an attorney, who is
6    on the other side of a lawsuit that you sued?
7    A.  I would never do that.
8    Q.  I know.  Of course you wouldn't, but would it
9    be illegal?
10   A.  I think there would be some problems with it,
11   yeah.
12   Q.  Okay.  And there was some evidence that
13   during the pendency of these NFU cases, 400 or so cases
14   against you and some of your co-defendants, when Judge
15   Diamond ordered an investigation that was based on,
16   again, witness intimidation, right?
17        MR. GONZALES:  I'm going to object again.
18   Judge Diamond did not order an
19   investigation.
20        MR. PILEGGI:  Are you sure about that,
21   John?
22        MR. GONZALES:  I am positive.  And I
23   talked to Joe Santarone, who was present at the
24   time.  I've read the transcript --

Page 253

1        MR. PILEGGI:  You weren't there, right?
2        MR. GONZALES:  I read the transcript,
3    and Judge Diamond warned the witnesses not to
4    engage in any threatening behavior, or he would
5    report that to the appropriate authorities.
6        And Mr. Santarone acknowledged it, and
7    said he would with speak to his clients to ensure
8    that it didn't happen, and said that he was not
9    aware of the incident in question.  So, yes.
10       MR. PILEGGI:  Since you were not there,
11   did you see the order that he issued?
12       THE WITNESS:  No.
13       MR. GONZALES:  There was no order
14   directing the FBI --
15       MR. PILEGGI:  There was an order, John.
16   Before you make an objection -- please,
17   I want you to state the facts right.  There was an
18   order.
19       MS. TAYLOR:  Do you have a copy?
20       MR. GONZALES:  Yeah.
21       MR. PILEGGI:  I do not with me, but I
22   will certainly get it to you.  I will get it to
23   you.  But the officer recalls, he was there.
24       MR. GONZALES:  No, he said he recalls

Page 254

1    portions of it, but he didn't recall the details.
2    And he didn't recall an order that directed the
3    FBI --
4        MR. PILEGGI:  All right.  Let me be --
5        MR. GONZALES:  -- to conduct an
6    investigation.
7        MR. PILEGGI:  Let me refresh his
8    recollection.
9        MR. GONZALES:  Whether he did or not, I
10   don't know what relevance it is to Mr. Torain's
11   lawsuit.
12   BY MR. PILEGGI:
13   Q.  You would agree that witness intimidation by
14   a police officer is a criminal offense.  Correct?
15   A.  Correct.  If it's investigated and that's
16   what they determine it to be, yes.
17   Q.  Okay.  Do you recall an incident that you
18   were disciplined for when you -- yourself, Officer
19   Reynolds, and Officer Liciardello jumped out of a
20   vehicle doing the pendency of a case that I represented
21   individuals against you, where they were threatened --
22   those individuals were threatened?
23   A.  I was disciplined for something like that,
24   yes.

30   (Pages 251 to 254)

Case 2:14-cv-01643-RBS    Document 61-6    Filed 06/29/22    Page 96 of 128
Torain v. City of Philadelphia, et al.

POLICE OFFICER BRIAN REYNOLDS-VOLUME II, 9/23/21

Page 255

1    Q. Or even an admon -- even if it was an oral
2 warning.
3    A. I don't recall anything like that. Not
4 saying that --
5    Q. Do you recall the incident?
6    A. I do not.
7    Q. Do you recall testifying at a hearing
8 where -- before the Honorable Norman Shapiro.
9        Do you recall that?
10   A. I do not.
11   Q. You don't recall any cases before Judge
12 Shapiro.
13   A. I recall cases, I don't recall testifying
14 about witness intimidation.
15   Q. You don't recall several individuals; Samuel
16 DePriest, there's a whole list of individuals who
17 testified?
18   A. I don't -- I recall --
19   Q. That they were threatened --
20   A. I recall something the DePriest case --
21   Q. -- by yourself -- let me finish the
22 question.
23        Do you recall several individuals, who I
24 represented, who were suing you who said they were

Page 256

1 threatened by you during the pendency of their case?
2    A. I remember something along sorts coming up.
3 I don't recall which individual, which cases they
4 were. If I testified or anything like that.
5    MR. PILEGGI: Okay. We already marked
6 this, but I'm going to mark it again. I know this
7 is a duplicate, but I think it was already marked
8 as Reynolds-4, but it was in the other
9 deposition.
10        So, let's mark this as -- also as
11 Reynolds-13. But I am putting on the record --
12    MR. GONZALES: You already have 13.
13    THE REPORTER: 13 or 14?
14    MR. PILEGGI: I'm sorry, 14. I'd also
15 place on the record that it's also Reynolds-4.
16    * * * *
17    (Reynolds Exhibit 14 was
18    marked for identification.)
19    * * * *
20    MR. PILEGGI: Officer, I'm showing you
21 what's been marked as Reynolds-14. Which, again,
22 is also marked as Reynolds-4.
23        This is an Affidavit from your former
24 co-defendant, former partner, Jeffrey Walker. And

Page 257

1 this was an Affidavit that I presented and
2 marked at the last deposition, and I attempted to
3 ask you questions on before you left.
4    MR. GONZALES: Well, you asked him and
5 then I adjourned the deposition because, again,
6 this had not been produced prior to his
7 deposition. Even though it appears to have been
8 signed back in 2017.
9    MR. PILEGGI: All right. Duly noted.
10 I want to you ask you some questions
11 about this.
12        According to former Police Officer
13 Walker, and I'm going to refer you to Page 2,
14 Paragraph 11.
15        By the way, this was an Affidavit that
16 was produced in conjunction with the Freeman
17 case. An appeal by Dennis Freeman.
18        Paragraph 11 says: I am personally
19 involved in the facts leading to the execution of
20 the search warrants, arrest, and prosecution of
21 Dennis Freeman and other individuals involved and
22 associated with Dennis Freeman in the
23 investigation (unintelligible) in 2000.
24        And just to refresh your recollection,

Page 258

1 this was the same Dennis Freeman where you were
2 lead investigator and where Al was used.
3        Correct?
4    THE WITNESS: Yes.
5    MR. PILEGGI: All right. Paragraph 12:
6 I have recently had the opportunity to review the
7 Affidavit of Probable Cause, as well as the trial
8 testimony of myself and the testimony of Brian
9 Reynolds given at the criminal trial of Dennis
10 Freeman. One of my partners in that investigation
11 was Brian Reynolds.
12 BY MR. PILEGGI:
13   Q. That's correct, right?
14   A. Yes.
15   Q. In other words, Officer -- former Officer
16 Walker was involved in that investigation, wasn't he?
17   A. He was.
18    MR. PILEGGI: Brian Reynolds was the
19 lead investigator in the investigation that led to
20 Dennis Freeman's arrest and subsequent
21 prosecution, and was also the police officer that
22 initiated the investigation after obtaining
23 information from a quote, concerned citizen, end
24 of quote.

31    (Pages 255 to 258)

Page 259

1    Brian Reynolds gave false testimony
2    about the concerned citizen, because the concerned
3    citizen was actually an individual that Brian
4    Reynolds and I had used several times prior to
5    the Freeman investigation as an unregistered
6    informant.
7    BY MR. PILEGGI:
8        Q.   Is that a true statement?
9        A.   I don't know if he was used prior to the
10   Freeman investigation or not. And he's not an
11   unregistered -- well, he is an unregistered informant,
12   because he's a concerned citizen at that time.
13       Q.   Well, you said you used him several times.
14   So, you just don't recall --
15       A.   I don't --
16       Q.   Let me finish the question. You just don't
17   recall whether he was used prior to the Freeman case or
18   subsequent.
19            Is that so?
20       A.   Correct. I don't know what cases he was
21   actually used on or not.
22       Q.   Okay. How about the fact that he said you
23   gave false testimony?
24       A.   I didn't give no false testimony.

Page 260

1        Q.   He's lying?
2        A.   Where's the false testimony at?
3        Q.   Is he lying?
4        A.   Yeah, I did not give false testimony. Yes,
5    he has to be lying.
6        Q.   Well, you did testify in the case, correct?
7        A.   I did.
8        Q.   In fact, that's marked as exhibits, right?
9        A.   Correct.
10       Q.   So he's lying?
11           MR. GONZALES:  Well, he already answered
12   that he is. And, secondly, I don't know -- what
13   you produced, I don't know if this is the entire
14   transcript of the trial. What you produced and
15   what has been marked as Reynolds-8 and Reynolds-5
16   appear to be just pretrial motions hearing, and
17   another hearing.
18           So, this -- this Affidavit that
19   you've produced, um, in which I think you were
20   representing Mr. Freeman at the time, you
21   haven't provided us with copies of the trial
22   transcript.
23           MR. PILEGGI:  You've said that five
24   times.

Page 261

1            MR. GONZALES:  That the, um -- the
2    Affiant allegedly reviewed prior to signing the
3    Affidavit that you attached to a pleading in a
4    case.
5            And I've asked you to produce it, and
6    you still have been produced it.
7            MR. PILEGGI:  You have it though,
8    correct?
9            MR. GONZALES:  No, I do not.
10           MR. PILEGGI:  You had it for --
11           MR. GONZALES:  No, you didn't produce
12   the transcript of the trial. You produced
13   yesterday --
14           MR. PILEGGI:  I asked -- I didn't
15   ask him that --
16           MR. GONZALES:  -- pretrial motions
17   here.
18           MR. PILEGGI:  I didn't ask if he lied at
19   the trial, John. Please listen to the questions.
20           MR. GONZALES:  That's what the Affidavit
21   says.
22           MR. PILEGGI:  I asked him if you
23   falsified any testimony at trial.
24           That would include a motion, wouldn't

Page 262

1    it, Officer. When you testify you testify under
2    oath, don't you?
3            THE WITNESS:  Correct. And I did not
4    provide false testimony.
5    BY MR. PILEGGI:
6        Q.   Did you give false testimony in the pretrial
7    motion?
8        A.   No.
9        Q.   That would be illegal wouldn't it?
10       A.   Correct.
11       Q.   That would be perjury.
12       A.   Correct.
13       Q.   That would be punishable by criminal offense,
14   wouldn't it?
15       A.   Correct.
16       Q.   By the way, I mentioned before that this case
17   was tried by Curtis Douglas, right?
18       A.   I believe he was the AUSA, yes.
19       Q.   And you had to meet with Douglas in prep,
20   correct, for the trial?
21       A.   I believe we met, yeah. I don't recall
22   exactly how many times.
23       Q.   And he had to deal with this issue about the
24   concerned citizen that's in the pretrial motion, right?

Torain v. City of Philadelphia, et al.

**POLICE OFFICER BRIAN REYNOLDS-VOLUME II, 9/23/21**

Page 263

1    A.  It came up. I don't know what you mean by he
2    had to deal with it.
3    Q.  Well, he had to deal with that issue with the
4    court, if there was an issue?
5    A.  Yeah. If there was an issue, yes, that would
6    be him that would deal with it.
7    Q.  And he was aware that you made Al a
8    confidential informant after the case -- during the
9    pendency of the case, right?
10    MR. GONZALES:  Objection to the form.
11    You can answer.
12    THE WITNESS:  I'm not sure what he was
13    aware of or not.
14   BY MR. PILEGGI:
15    Q.  You testified to that, didn't you?
16    A.  Correct. I did testify to it, so I'm pretty
17    sure he was aware of it then, yes.
18    Q.  And this is the same Curtis Douglas that also
19    dealt with Reginald Graham when he was wearing a wire
20    on you guys and saying that you were dirty cops and --
21    correct?
22    A.  I don't know what discussions him and
23    Reginald Graham.
24    Q.  Well, you were aware that Mr. Graham --

Page 264

1    former Police Officer Graham, went to Curtis Douglas,
2    who in turn took him to the FBI, and that's how
3    Mr. Graham started providing information to them,
4    correct?
5    A.  I heard he talked to Curtis Douglas. I don't
6    know exactly what they talked about or where he took
7    him.
8    Q.  Right. Curtis Douglas was also at some point
9    a District Attorney, correct?
10    A.  I believe so, yes.
11    Q.  And he was also the head of the
12    Accountability -- Integrity and Accountability, right?
13    Who investigates police officers.
14    A.  I'm not sure if he was or not. I know he was
15    a District Attorney, though, over there, as a boss, I'm
16    not sure what his title was.
17    Q.  You're aware that Mr. Douglas gave testimony
18    in another case, another NFU case, Narcotics Field Unit
19    case, that you may or may not have been involved in,
20    but your partners were, right?
21    A.  I don't recall what he gave testimony in.
22    MR. PILEGGI:  It says: I have recently
23    had the opportunity to review the Affidavit of
24    Probable Cause, as well as the trial testimony of

Page 265

1    myself, and the testimony of Brian Reynolds, given
2    at the criminal trial of Dennis Freeman. One of
3    my partners in that investigation was Brian
4    Reynolds.
5    Brian Reynolds was the lead investigator
6    in the investigation that led to Dennis Freeman's
7    arrest and subsequent prosecution. Was also the
8    police officer who initiated the investigation,
9    after obtaining information from a concerned
10    citizen. Brian Reynolds gave false testimony
11    about the concerned citizen, because the
12    concerned citizen was actually an individual that
13    Brian Reynolds and I had used several times prior
14    to Freeman's investigation as an unregistered
15    informant.
16   BY MR. PILEGGI:
17    Q.  So, does that refresh your recollection of
18    what Mr. Walker said, your ex-partner, said about the
19    use of Al while he was a concerned citizen in other
20    investigations?
21    A.  I have no idea what he means by that.
22    MR. PILEGGI:  Brian Reynolds also failed
23    to disclose that the individual was personally
24    involved in the investigation, and several other

Page 266

1    other investigations when he assisted us in
2    conducting surveillances, permitted us to use the
3    vehicle for stakeouts, and gave Brian Reynolds
4    information on other drug dealers so that he could
5    take over their drug locations when they were
6    arrested.
7   BY MR. PILEGGI:
8    Q.  Is that true?
9    A.  That's all false.
10    Q.  That's false. He lied.
11    A.  Yes.
12    MR. PILEGGI:  Brian Reynolds and I used
13    this unregistered informant, who was known to us
14    as Al, described as a light-skinned black male
15    with curly dark hair, wearing eye glasses, and who
16    resided at the 16 District in the area of 41th and
17    Ogden Streets on numerous occasions, while Officer
18    Reynolds and I were detailed to the 16th
19    District.
20   BY MR. PILEGGI:
21    Q.  Is that a fair description of Al?
22    A.  Best of my recollection Al wasn't black, Al
23    was Spanish.
24    Q.  Well, he said light-skinned.

33   (Pages 263 to 266)

POLICE OFFICER BRIAN REYNOLDS-VOLUME II, 9/23/21

Page 267

1      A.  He said light-skinned black.
2      Q.  Okay.  But other than that did he have curly
3  dark hair?
4      A.  I don't recall color.  It was dark hair,
5  yeah.  I don't remember it being curly, though.  It may
6  have been.
7      Q.  Did he wear glasses?
8      A.  He did wear glasses, yes.
9      Q.  Was he in -- from the 16th District?
10     A.  He was.
11     Q.  And did he -- did he live in the area, or
12  work in the area of 41st and Ogden Streets?
13     A.  He did.
14     Q.  In fact, he had like some kind of a car shop,
15  like where they fixed cars or something, or maybe
16  fender-benders, I'm not sure.
17         Is that correct?
18     A.  Yeah, he did -- he worked on cars, yes.
19     Q.  Okay.  So, what Mr. Walker just said was
20  correct.
21     A.  Some of it, yes
22         MR. PILEGGI:  All right.  We rewarded Al
23  for providing this information by giving him a
24  free pass to continue to engage in his criminal

Page 268

1  activity.
2  BY MR. PILEGGI:
3      Q.  Is that true?
4      A.  No.  I never saw Al engage in criminal
5  activity.  If I did I would have arrested him.
6      Q.  Well, you were aware that Al was -- you said
7  you were aware that he committed suicide while he was
8  in prison, right?
9      A.  Correct.
10     Q.  In fact, he was involved in beating up his
11  spouse or something?
12     A.  I wasn't sure -- I didn't know why Al was in
13  prison.
14         I said, if you'd show me his criminal
15  record -- if you'd show me his criminal record I'd be
16  able to tell you what he was arrested for.
17     Q.  We don't know what it is, because you
18  evidently don't know the name or anything about him,
19  right?
20     A.  I don't remember the name, yes.
21     Q.  Okay.  And you would have --
22         MR. GONZALES:  Just for the record, you
23  have an Affidavit from, um, Mr. Walker, who
24  allegedly knows Al very well.  So, you have access

Page 269

1  to get all the information you need on Al, with a
2  person that you got information from in an
3  Affidavit.  You keep -- I mean, you keep acting
4  like there's no way you can get this information.
5         MR. PILEGGI:  All right.
6  BY MR. PILEGGI:
7      Q.  Officer, but as the officer, if you were the
8  officer during the pendency of Freeman's case, that
9  signed Al up as a confidential informant, you
10  personally would have to do a background check and
11  bring that to whoever was signing him up, right?
12     A.  Correct.
13     Q.  Okay.
14     A.  It would have been done.  I don't have it
15  now, so I can't tell you what he was locked up for.  I
16  don't recall.
17     Q.  So, at your last deposition, on July 28th,
18  you did recall that Al had a criminal history.  You
19  said that.
20         Do you recall saying that?
21     A.  I believe he was arrested before, yes.  I
22  don't know for what.
23     Q.  Okay.  But you know that he had a criminal
24  past, right?

Page 270

1      A.  I believe he was arrested before, yes.
2      Q.  While you were using him in this case.  When
3  I say "this case," meaning the Freeman case.
4      A.  You mean while he provided me the
5  information, yes.
6      Q.  Yes.
7      A.  Yes.
8      Q.  Okay.
9      A.  I believe he was arrested prior to this
10  case.  I'm not a hundred percent sure though, I don't
11  recall.
12     Q.  And we know that he was arrested subsequent
13  to this case as well, right?
14     A.  Yeah, I don't -- I don't know when he was
15  arrested, excuse me.
16     Q.  Well, you said he was in jail.  We're going
17  to assume that he was arrested.
18     A.  Correct.  He had to be arrested if he was in
19  jail.  I don't know for what, though.
20         MR. PILEGGI:  Al was known to us,
21  Reynolds and myself, to have had a criminal
22  history of drug dealing, robbing drug dealers, as
23  well as being involved in shootouts with other
24  drug dealers.

34  (Pages 267 to 270)

POLICE OFFICER BRIAN REYNOLDS-VOLUME II, 9/23/21

Page 271

1    BY MR. PILEGGI:
2        Q.  Does that refresh your recollection?
3        A.  I never saw Al deal drugs.  I never saw him
4    rob drug dealers, and I never saw him involved in
5    shootouts.
6        Q.  So Walker made that up.
7        A.  I don't know what Walker made up, but I've
8    never seen Al commit any of those crimes.
9        Q.  Was that a lie?
10       A.  Yeah, I would say unless I saw -- I don't
11   know if it's a lie.  I'd have to see his criminal
12   record to see if he has a -- arrest record for drug
13   dealing, robbing drug dealers, or robberies, as well as
14   being involved in shootouts, which would be ag
15   assaults.
16       MR. PILEGGI:  Brian Reynolds identified
17   Al as a concerned citizen in the Freeman
18   investigation in order to make his information
19   more reliable or credible, and to appear that he
20   was someone living in the neighborhood who was
21   concerned about stopping drug activity.
22   BY MR. PILEGGI:
23       Q.  Is that a lie?
24       A.  They're his words.  I used him as a concerned

Page 272

1    citizen, yes.
2        Q.  I'm saying, is he -- is that incorrect?
3        A.  I don't understand what the investigation and
4    order make information more reliable or credible.  He
5    gave me information, I went out and I verified the
6    information he gave me.
7        Q.  If he had had a criminal history prior to
8    Freeman, that would have been -- that would have been
9    something that you would have to have informed Curtis
10   Douglas, who was prosecuting the case, correct?
11       A.  (No audible response.)
12       Q.  In other words, if you were using someone
13   that you deemed to be a concerned citizen who was
14   really just a criminal, they weren't concerned at all,
15   right?
16       MR. GONZALES:  Objection.  Are you
17   making a statement because he said he --
18       MR. PILEGGI:  No, I'm asking him a
19   question.
20       MR. GONZALES:  -- didn't know --
21       MR. PILEGGI:  I asked him a question.
22       MR. GONZALES:  And what's the question?
23       MR. PILEGGI:  I just said it, John.
24       MR. GONZALES:  It made no sense.

Page 273

1        Objection.  You can answer it if you
2    understand it.
3        THE WITNESS:  I don't understand it.
4        MR. PILEGGI:  Of course he doesn't.
5        All right.  I'll say it again.
6    BY MR. PILEGGI:
7        Q.  In other words, you were saying if you knew
8    that Al had a criminal history prior to using him in
9    the Freeman case, right?
10       Do you understand that part so far?
11       MR. GONZALES:  If he knew --
12       THE WITNESS:  If I knew.  I don't know if
13   he did or not.
14   BY MR. PILEGGI:
15       Q.  I'm just saying if you did, just keep it that
16   way.
17       A.  Okay.  Hypothetical, go ahead.
18       Q.  If you knew that he had a criminal history
19   prior to using him in the Freeman case, and you
20   informed the prosecutor that he was actually a
21   concerned citizen and not just a criminal, you
22   wouldn't --
23       A.  I don't understand that question.
24       Q.  All right.  I'll rephrase it.  Let me say it

Page 274

1    to you this way.
2        A concerned citizen could not be someone
3    who had a vast criminal background, could they?
4        A.  Sure they could.
5        Q.  They could.  Under what -- under what
6    policies is that?
7        A.  That's the wording I used, concerned
8    citizen.  It would either be a concerned citizen or a
9    confidential informant.
10       Q.  Officer, pursuant to the policies and
11   procedures of the police department, could you use a --
12   designate someone a concerned citizen if they had a
13   vast criminal history?
14       A.  If every -- listen, confidential sources get
15   locked up all the time.
16       Q.  I'm not asking that.  Answer the question.
17       MR. GONZALES:  Listen to his specific
18   question.
19       MR. PILEGGI:  Go ahead.
20       MR. GONZALES:  Can you use confidential
21   sources, identified that --
22       MR. PILEGGI:  No, I didn't say
23   confidential source.  I will ask the question.
24   BY MR. PILEGGI:

35  (Pages 271 to 274)

Case 2:14-cv-01643-RBS   Document 61-6   Filed 06/29/22   Page 101 of 128
Torain v. City of Philadelphia, et al.

POLICE OFFICER BRIAN REYNOLDS-VOLUME II, 9/23/21

Page 275

1    Q.  Could you designate someone a concerned
2    citizen if they have a long criminal history?
3        A.  Yes.
4        Q.  Okay.  You could.
5        A.  There's no --
6        Q.  Don't you have to sign that individual --
7            MR. GONZALES:  Wait a minute, he's still
8        asking you a question.
9            THE WITNESS:  -- policy on confidential
10       sources or concerned citizen, become then.
11   BY MR. PILEGGI:
12       Q.  So, you could use a confidential source, or a
13   concerned citizen -- in other words, someone who is not
14   signed up, who has a long criminal history.
15       A.  Correct.  If they're providing you with
16   information, yes.  And then you would go out and verify
17   that information.
18       Q.  Would you have to tell the prosecutor trying
19   that case that this person has a long criminal history?
20       A.  If the prosecutor ask you and it comes up in
21   prepping for that case, then yeah.
22       Q.  Did Curtis Douglas ask you?
23       A.  I don't recall.
24       Q.  But didn't the court ask you?

Page 276

1        A.  If they did and if it's in there I'd have to
2    see it.
3        Q.  Why do you have to see it, that's your
4    testimony, isn't it?
5        A.  I don't recall what I testified to back in
6    2000 --
7            MR. GONZALES:  His testimony was 20
8        years ago.  He doesn't remember.
9            THE WITNESS:  I don't recall.  If it's
10       in there it's in there.
11           MR. PILEGGI:  That's not what he said.
12       Okay.  But if you --
13           THE WITNESS:  If it's in there it's in
14       there.
15           MR. GONZALES:  Let him answer.
16           MR. PILEGGI:  I'm asking a
17       separate question, that's fine.
18   BY MR. PILEGGI:
19       Q.  If you testified to that, again, another
20   hypothetical, let's assume you testified to that.
21           MR. GONZALES:  To what?
22   BY MR. PILEGGI:
23       Q.  To the fact that this -- Al was designated as
24   a concerned citizen, but was actually a drug dealer, a

Page 277

1    robber, um, a wife beater, and whatever else, a drug
2    dealer, would that be something that you would have to
3    provide to the prosecutor?
4        A.  If it comes up during the prep sessions,
5    yes.
6        Q.  And if in that deposition, or in that -- I'm
7    sorry, transcript that there was a question about his
8    criminal past, meaning Al's, did you provide --
9    wouldn't you have to provide that information to the
10   court?
11       A.  If there was a question asked of me I'd have
12   to provide it, I'd have to see --
13       Q.  Isn't that why --
14           MR. GONZALES:  Wait.  Let him answer the
15       question.
16           MR. PILEGGI:  Okay.  He did.
17           THE WITNESS:  I'd have to see the notes
18       to see if there's a question asked of that.  I
19       don't recall what was asked of me or what I said
20       back then.
21   BY MR. PILEGGI:
22       Q.  And wouldn't you be required, if they had a
23   long criminal history, to make that person -- sign them
24   up, make them a confidential informant?

Page 278

1        A.  No.
2        Q.  So, why did you make Al a confidential
3    informant?
4        A.  I already told you, he probably wanted to --
5    and I don't know this --
6        Q.  No, don't say probably --
7        A.  I don't know this --
8            MR. GONZALES:  Don't interrupt him.  Let
9        the witness answer his question.
10           MR. PILEGGI:  I want his independent
11       recollection --
12           MR. GONZALES:  -- Because you asked a
13       question --
14           MR. PILEGGI:  I don't want him to
15       guess --
16           MR. GONZALES:  -- he started to answer
17       it, you interrupted him.  And you continuously
18       have interrupted him for like the last 15
19       minutes.
20       Let him answer the question.
21           MR. PILEGGI:  I want him to --
22           MR. GONZALES:  Let him answer the
23       question.
24           MR. PILEGGI:  -- guess, John, I want him

36  (Pages 275 to 278)

Page 279

1  to answer a question based on his personal
2  recollection.
3      THE WITNESS: I don't have any
4  recollection of why he was signed --
5      MR. PILEGGI: Okay. That's all I wanted
6  to know.
7      Paragraph 18: Brian Reynolds and myself
8  had no regard for Al's safety, and we knew that
9  using him as an unregistered informant was in
10 violation of the Philadelphia Police policies --
11 police department policies and procedures in
12 regards to handling of informants and sources of
13 information.
14     We continued to use Al in this manner,
15 from the time Reynolds and myself were assigned to
16 the 16th District, and then for several years
17 after we were transferred to the Narcotics Field
18 Unit.
19 BY MR. PILEGGI:
20     Q.  Just for clarification, the Freeman job was
21 while you were in the Narcotics Field Unit, right?
22     A.  Yes.
23     Q.  Okay. So, according to Walker, you used Al
24 on numerous occasions prior to the Freeman case.

Page 280

1      A.  I don't recall if we did or not. You'd have
2  to provide the jobs.
3      MR. PILEGGI: Okay. During the Freeman
4  investigation I was present in an unmarked
5  vehicle when Brian Reynolds received a telephone
6  call from Al informing Reynolds that he had
7  information about narcotic sales near Al's
8  mechanic shop in West Philadelphia.
9      I was present later when Reynolds
10 ordered Al to go to the area of Jefferson Street
11 to identify Dennis Freeman.
12 BY MR. PILEGGI:
13     Q.  Do you recall that?
14     A.  I do not recall that.
15     Q.  Well, it's in your Affidavit of Probable
16 Cause.
17     A.  I received the information yes. I don't
18 recall how I got the information. And I ordered him to
19 go to the area, why would I order him go to the area.
20     Q.  Do you recall Al -- telling Al to come out to
21 the -- to the location to identify Dennis Freeman?
22     A.  I don't recall that. And I wouldn't do that,
23 because I had the information --
24     Q.  Well, it's in your Affidavit.

Page 281

1      A.  Exactly. I had his name. I could go into
2  the photo imager and pull his image up.
3      Q.  You won't put it in the Affidavit if it
4  wasn't true, right?
5      A.  Correct.
6      Q.  And my question to you, do you know why
7  Walker would lie about any of this information?
8      A.  Walker lied during this whole investigation.
9  I have no idea why.
10     Q.  Okay.
11     A.  He lied all through the whole Federal
12 investigation, too.
13     Q.  He did.
14     A.  He did.
15     MR. GONZALES: Hence, he's the only
16 convicted felon out of all of these.
17     MR. PILEGGI: Is that a comment there,
18 John?
19     MR. GONZALES: Yep.
20     MR. PILEGGI: I also witnessed Al's
21 personal vehicle parked on Jefferson Street, with
22 Al inside waiting for Reynolds to come to the
23 vehicle.
24 BY MR. PILEGGI:

Page 282

1      Q.  Is that true?
2      A.  No.
3      Q.  That's a lie.
4      A.  Yes.
5      MR. PILEGGI: Our, Reynolds and other
6  police officers involved in the investigation, and
7  myself, intention was to steal money located
8  in these houses if possible, and/or articulate,
9  fabricate evidence to establish the probable cause
10 needed to arrest and prosecute those individuals
11 targeted in the investigation.
12 BY MR. PILEGGI:
13     Q.  Is that true or a lie?
14     A.  Lie.
15     Q.  It's a lie. So, Walker's admitting that he
16 stole money, along with yourself and other officers,
17 and you're saying he's lying about that.
18     A.  I never stole a thing.
19     Q.  Okay. And you're aware that Walker, um,
20 signed a K-5 letter, where he had to cooperate with the
21 Federal government in the pending prosecution of
22 yourself and other officers, correct?
23     A.  Correct.
24     Q.  That he had to tell the truth.

37  (Pages 279 to 282)

Case 2:14-cv-01643-RBS    Document 61-6    Filed 06/29/22    Page 103 of 128
Torain v. City of Philadelphia, et al.

POLICE OFFICER BRIAN REYNOLDS-VOLUME II, 9/23/21

Page 283

1       A. Correct.
2       Q. And if he didn't tell the truth he subjected
3  himself to perjury and incarceration, correct?
4       A. Correct.
5       MR. PILEGGI: I was also present when
6  Brian Reynolds met with Al out of the area of
7  Jefferson Street and discussed Dennis Freeman and
8  other individuals involved in the investigation,
9  and heard Al tell Brian Reynolds that the
10  individuals were selling a lot of drugs, and that
11  they had a lot of money in their houses.
12 BY MR. PILEGGI:
13      Q. Is that true or false?
14      A. I don't recall that happening.
15      MR. PILEGGI: Okay. I was present when
16  Reynolds requested that Al drive Reynolds, in Al's
17  vehicle, to the Jefferson Street location so that
18  Reynolds could hide in Al's van and surveil the
19  block.
20 BY MR. PILEGGI:
21      Q. True or false?
22      A. False.
23      Q. You were in a van though, right?
24      A. I don't remember what vehicle was. I was

Page 284

1  probably in one of our surveillance vehicles, so.
2       Q. Well, probably again. I want you to --
3       A. I don't recall what vehicle I was in.
4       Q. Well, is there anything in the -- in the
5  Affidavit of Probable Cause that would refresh your
6  recollection as to how you were surveilling the green
7  Pontiac, and the -- all the activity at Jefferson
8  Street?
9       A. No.
10      Q. But you were the surveilling officer,
11  correct?
12      A. I was.
13      Q. And you were the surveilling officer alone,
14  correct. You didn't have a partner that day.
15      A. Correct.
16      MR. PILEGGI: I saw Reynolds get into
17  the rear of Al's van, while Al drove to the block
18  of Jefferson Street. Once on Jefferson Street, Al
19  left the van, leaving Reynolds alone inside the
20  van.
21      After a period of time of surveillance,
22  I saw Al come back to the van while Reynolds was
23  still hiding in the van and driving away. And
24  drove away.

Page 285

1       MR. GONZALES: No, and drive away.
2       MR. PILEGGI: And drive away.
3       THE WITNESS: False.
4       MR. PILEGGI: False.
5       THE WITNESS: False.
6       MR. PILEGGI: I witnessed Brian Reynolds
7  violating Philadelphia Police Policy in the
8  Freeman investigation in handling sources of
9  information, in using unregistered informants, and
10  in failing to corroborate information given to him
11  by Al.
12      Brian Reynolds violated these policies
13  and procedures in order to fabricate the probable
14  cause needed to arrest and prosecute Dennis
15  Freeman and other individuals involved in the
16  Freeman investigation.
17 BY MR. PILEGGI:
18      Q. True or false?
19      A. False.
20      Q. You never fabricated anything, right?
21      A. Nothing.
22      Q. By the way, that was Freeman's Complaint
23  wasn't it, that you made up information?
24      A. I stated I don't know what Freeman complained

Page 286

1  about.
2       Q. You give a statement in there. They --
3       A. I did.
4       Q. I'm sure IAD told you what you were being
5  investigated for.
6       A. I'm sure they did too. I don't remember. I
7  don't recall what the Complaint or my answers were,
8  sir. Thank you.
9       MR. PILEGGI: During the pendency of
10  Dennis Freeman's criminal trial Al was signed up
11  as a confidential informant by Brian Reynolds,
12  after questions were raised by Freeman's counsel
13  at pretrial proceedings about the identity of the
14  concerned citizen. As well as the reliability and
15  trustworthiness of the information given by Al.
16 BY MR. PILEGGI:
17      Q. True or false?
18      A. He was signed up, we know that, right.
19      Q. Is that statement true or false?
20      A. He was signed up. He did go from a
21  confidential --
22      Q. He says that you signed him up.
23      Is that true or false?
24      A. They're his words on what he says. But, he

Case 2:14-cv-01643-RBS    Document 61-6    Filed 06/29/22    Page 104 of 128
Torain v. City of Philadelphia, et al.

POLICE OFFICER BRIAN REYNOLDS-VOLUME II, 9/23/21

Page 287

1  did go from a concerned citizen to a confidential
2  informant.
3      Q.  We know that.
4      A.  Okay.  Well, they're Walker's words.
5      Q.  Did you sign him up?  He says that you signed
6  him up.
7      A.  Because questions were raised --
8      Q.  After questions were raised --
9      A.  Not at all --
10     Q.  -- by Freeman's counsel at a pretrial
11  proceeding, about the identify of the concerned
12  citizen.
13     A.  Not at all.
14     Q.  And you don't remember Al going into the
15  Defense Attorney's office and running out?
16     A.  I don't remember that at all.
17         MR. PILEGGI:  Okay.  I was present when
18  Brian Reynolds signed Al up as a registered
19  informant so that there would be no inquiry into
20  Reynolds' improper use of Al as a source of
21  information.
22  BY MR. PILEGGI:
23     Q.  True or false?
24     A.  Well, he was signed up, we know that.  But I

Page 288

1  don't know about the -- I don't know what the improper
2  use of Al was, so.
3      Q.  How about the fact that you signed him up as
4  a registered informant?
5      A.  If you have paperwork to show me that I would
6  be able to see that.
7      Q.  I didn't ask you that.  Is it true or
8  false?
9         MR. GONZALES:  He already testified he
10  doesn't remember.
11         MR. PILEGGI:  He's arguing with me.
12         THE WITNESS:  I'm not arguing with you.
13  BY MR. PILEGGI:
14     Q.  Is it true or false?
15         MR. GONZALES:  He hasn't argued --
16         MR. PILEGGI:  He didn't say he didn't
17  remember, he said show me paperwork.
18         MR. PILEGGI:  You asked him this like
19  two hours ago.  And he said that he didn't
20  recall.
21         MR. PILEGGI:  And I'm asking him again,
22  after he sees Walker's Affidavit, very detailed
23  Affidavit, as to what his actions were, as well as
24  his own.

Page 289

1         MR. GONZALES:  Objection, asked and
2  answered.
3         You can answer it again.
4         THE WITNESS:  He did go from a concerned
5  citizen to a confidential informant.
6         MR. PILEGGI:  I know that, you said that
7  three times.
8         MR. GONZALES:  He wants to know did you
9  sign him up.
10        THE WITNESS:  I don't know if I signed
11  him up or not.  I would have to see the paperwork.
12  BY MR. PILEGGI:
13     Q.  And you're referring to what paperwork?
14     A.  The Master file you referred to it as.  That
15  paperwork.
16     Q.  But, again, clarity's sake, you were the lead
17  investigator, you were the one handling the information
18  with Al.  You were the one that was involved with Al.
19  Identifying Mr. Freeman, all that.  Right?
20        MR. GONZALES:  Objection.  First of all,
21  it's compound.
22        Second of all, it's asked and answered.
23        MR. PILEGGI:  Now I want to just -- a
24  couple things I want to attach.  Um, I want to go

Page 290

1  back to Reggie Graham's cooperation with the
2  Federal government, during the investigation of
3  you by the Federal government.  As well as your
4  fellow officers.
5      Let's mark that -- you know, why don't
6  we do it collectively.  I'm going to...
7      Do you have an objection there, John?
8         MR. GONZALES:  No, I'm just looking.  I
9  see there's no Bates numbers on these documents,
10  so I'm just curious where they came from.
11        MR. PILEGGI:  What are we at, 15?
12  I'm going to submit these collectively.
13         * * * *
14      (Reynolds Exhibit 15 was
15  marked for identification.)
16         * * * *
17        MR. PILEGGI:  You're being shown what's
18  been marked collectively as Reynolds-15.
19         * * * *
20      (There was a discussion
21  had off the record.)
22         * * * *
23        MR. PILEGGI:  And I will submit to you,
24  I understand you want to review them, but just

Torain v. City of Philadelphia, et al.

POLICE OFFICER BRIAN REYNOLDS-VOLUME II, 9/23/21

Page 291

1 generally speaking, I will submit to you that
2 these are what we call 302s, which you're aware of
3 what a 302 is?
4          THE WITNESS: Correct.
5 BY MR. PILEGGI:
6     Q. What is it?
7     A. It's when information is given to the FBI, an
8 interview.
9     Q. And, generally speaking, this is an interview
10 or series of interviews, um, by the FBI to, um,
11 Mr. Graham.
12    A. Correct.
13    Q. Former Police Officer Graham. Now, again,
14 you worked with Reginald Graham on several cases,
15 correct?
16    A. Correct.
17    Q. So to speak, you broke bread with him, didn't
18 you. I mean, you -- well, did you ever -- did you ever
19 meet with him socially?
20    A. (No audible response.)
21    Q. Maybe had a couple drinks or something?
22    A. Outside of work?
23    Q. Yes.
24    A. Not really.

Page 292

1     Q. Okay. But you've done on occasions?
2     A. I don't recall if I did or not.
3     Q. All right. But you certainly joined in the
4 lawsuit against me, he was one of your co-plaintiffs,
5 wasn't he?
6     A. He was.
7     Q. Okay. And in particular, in that lawsuit you
8 describe what you believe was abuse by myself on cases
9 that I brought against you on behalf of my clients who,
10 um, with allegations of civil rights violations, right?
11    A. Correct.
12    Q. And Reggie Graham was part of some of those
13 cases. Not all of them, but some of them, right?
14    A. Correct.
15    Q. And you also described that you were aware
16 that he wore a wire on you or other officers during the
17 pendency of this FBI investigation, right?
18    A. I believe he wore a wire. I don't think it
19 was on me, though.
20    Q. Okay. But he certainly provided information
21 about what he believed was misconduct by yourself,
22 Officer Walker, and Officer Liciardello, among other
23 officers.
24    A. Correct. If that's what it says in here.

Page 293

1 Like I said, I don't remember seeing this.
2     Q. In fact, I think at one point in there he
3 described you as dirty cops. And he didn't want to
4 work with you.
5          MR. GONZALES: Is there a page
6 reference?
7          THE WITNESS: Is it in here?
8          MR. PILEGGI: Yeah. I'm saying.
9 BY MR. PILEGGI:
10    Q. Well, did you ever see any of those 302s
11 before?
12    A. I believe I have. I don't remember the gist
13 of them.
14    Q. They're Bates stamped. They were part of the
15 trial against you, correct?
16    A. Correct.
17    Q. Okay. And, although he was never a witness,
18 was he?
19    A. He was not.
20    Q. Although Walker was, but he was not.
21       Do you know why?
22    A. You'd have to ask the FBI that.
23    Q. And in those 302s he describes different jobs
24 where you were stealing money, beating people up, and

Page 294

1 falsifying documents.
2     A. I believe that's in here, yes.
3     Q. In general. And in particular, am I correct
4 that he actually mentioned me with the lawsuits I was
5 bringing and saying, and I'll quote," Pileggi was right
6 on the money the way they were writing up the jobs.
7 And fabricating probable cause.
8          MR. GONZALES: You're quoting, so what
9 page are you quoting from?
10         MR. PILEGGI: If you look at the
11 highlighted --
12         MR. GONZALES: Oh, you want us to review
13 them. Okay.
14         MR. PILEGGI: You'll see.
15 BY MR. PILEGGI:
16    Q. Would you remember in the -- okay, I'll
17 strike that.
18       Do you remember in the pendency of your
19 criminal trial, where there was an issue about Reginald
20 Graham's information, they provided -- that he provided
21 to the Federal government?
22    A. I believe it was proven. I'm not a hundred
23 percent sure on this, so I'm not sure. But I believe
24 that he lied to the investigators.

40  (Pages 291 to 294)

Case 2:14-cv-01643-RBS    Document 61-6    Filed 06/29/22    Page 106 of 128
Torain v. City of Philadelphia, et al.

POLICE OFFICER BRIAN REYNOLDS-VOLUME II, 9/23/21

Page 295

1    Q.  So you do recall.
2    A.  Well, I recall bits and pieces of it.  I
3  don't remember exactly, but I remember something along
4  the gist of where he lied to the investigators.
5    Q.  About what?
6    A.  I have no idea.  I don't recall.  I just
7  remember that -- that briefly, though.  That that came
8  up at some point that he lied.
9    Q.  Okay.
10    A.  To the FBI.
11    Q.  Okay.  Were you ever provided with, um, you
12  believe there was a wire worn on somebody.
13        Were you ever provided with that -- that
14  conversation?
15    A.  I believe there is a recording, and I
16  believe, like I stated earlier, it's Graham, Williams,
17  and Clahar.  I don't remember exactly what the
18  recording said or says, or what they speak about.
19    Q.  But am I correct that what's -- he provided
20  to the investigators, focused a great deal on yourself,
21  Liciardello, and Walker about stealing, lying?
22    A.  I don't know what he provided to the
23  investigators.  I know he got caught in a lie.
24    Q.  Do you recall testimony about the Kushner

Page 296

1  job?
2        You recall Kushner, don't you?
3    A.  I do recall Kushner, yes.
4    Q.  And that was a job where Jeffrey Walker
5  testified that yourself, Officer Liciardello, and
6  Walker stopped Mr. Kushner, put him in a holding cell
7  without charging him, took his keys to his apartment --
8  let me finish the question.
9        Went to his apartment with the key, and
10  stole his safe with eighty thousand dollars in it?
11        MR. GONZALES:  Hold on.  Objection.
12        Is the question is that what happened,
13  or do you remember the allegations being --
14        MR. PILEGGI:  Yeah, do you recall the
15  allegations.
16        THE WITNESS:  They were the allegations,
17  yes.
18  BY MR. PILEGGI:
19    Q.  And they were allegations by Walker?
20    A.  No, they were allegations by him and
21  Kushner.  But then I remember during the trial
22  Kushner's girlfriend got on the stand and was
23  questioned about the safe.  And her exact words were
24  his safe wasn't in that apartment, it was in his other

Page 297

1  apartment.
2        That was from Kushner's girlfriend on
3  the stand.
4    Q.  What was her name?
5    A.  I have no idea.  It's all in discovery.
6    Q.  You recall that, but you don't recall
7  anything else.
8    A.  Well, I do recall that because it was a
9  pretty key piece in our trial.
10    Q.  So, Kushner lied and Walker lied.
11    A.  Correct.
12    Q.  Okay.  You didn't testify in that case,
13  correct?
14        MR. GONZALES:  Asked and answered.
15        You already asked him that.  You know
16  the answer.
17  BY MR. PILEGGI:
18    Q.  You didn't testify in that case, correct?
19    A.  In which case, the Federal case?
20        MR. GONZALES:  No, no, you're not
21  answering.
22        Next question.
23        * * * *
24        (There was a discussion

Page 298

1  had off the record.)
2        * * * *
3  BY MR. PILEGGI:
4    Q.  Do you know if, um -- is there any
5  documentation -- when you were taken off the street in
6  conjunction with, uh -- I guess it was 2004, 2005, was
7  there an investigation done by the Philadelphia Police?
8    A.  Yes.
9    Q.  In other words, Internal Affairs?
10    A.  It was done by Internal Affairs, to the best
11  of my recollection.
12    Q.  Okay.  And what did they investigate?
13    A.  All those cases where you filed lawsuits.
14    Q.  Right.  Okay.  But, are you saying you were
15  taken off the street because of my lawsuits?
16    A.  Yes.
17    Q.  And then a couple years later you were
18  arrested by the Federal government?
19    A.  That was four or five you said, '04 or '05.
20  I was arrested by the Federal government July 31st,
21  2014.  So, give or take nine or ten years.
22    Q.  Have you discussed any of your testimony
23  today, or any of the documents that you have received
24  in conjunction with this case, with any of your

Case 2:14-cv-01643-RBS    Document 61-6    Filed 06/29/22    Page 107 of 128
Torain v. City of Philadelphia, et al.

POLICE OFFICER BRIAN REYNOLDS-VOLUME II, 9/23/21

Page 299

1  co-defendants prior to your testimony?
2        MR. GONZALES: Outside the presence of
3  your attorney.
4        MR. PILEGGI: Yes.
5        THE WITNESS: No.
6  BY MR. PILEGGI:
7        Q. No. You had no discussions with Monaghan.
8        A. No, the only time I was -- during the first
9  deposition when I was going I called him to see if he
10 got notified by the City for anything. He's retired.
11 He said, no, I didn't hear nothing, I'm down the
12 shore. So, that was it.
13       Q. Were you aware that Monaghan's deposition's
14 under seal?
15       A. I'm not aware of that.
16       Q. Do you know how it got under seal?
17       A. I do not.
18       MR. GONZALES: Do you know how it got
19 under seal?
20       MS. TAYLOR: I don't know.
21       MR. PILEGGI: It's news to everybody.
22       MR. GONZALES: Do you know?
23       MR. PILEGGI: No idea. Woke up the next
24 day.

Page 300

1  BY MR. PILEGGI:
2        Q. Do you recall having a conversation with
3  Monaghan the day of his deposition, when you were
4  laughing about how old this case was?
5        A. I recall that in the deposition, yeah. We
6  talked about just how long the case was. And he just
7  laughed.
8        Q. And do you recall sitting in his deposition?
9  You were probably the only one present, right?
10       A. I believe I was, yeah, I'm not sure. I know
11 I was there, I don't know what other officers were
12 there.
13       Q. Do you recall an incident, during the
14 deposition, on the second day of the depositions, of
15 Walker where there was an allegation that Walker was
16 threatened at a luncheon that, um, I forget what it's
17 called. The sandwich shop, bay court?
18       A. I do recall yes, where he said he felt
19 threatened or something.
20       Q. And that was placed on the record, do you
21 recall that?
22       A. When we came back from lunch, yes, it was.
23       Q. Okay. And at that time you recall, because
24 you were in courtroom, right, um, the judge admonished

Page 301

1  the defendants not to go near Mr. Walker or try to
2  threaten him in any way or intimidation, right?
3        A. I believe that came up, yes.
4        Q. And then the last day when the deposition,
5  there was some allegations that your -- co-defendant,
6  Police Officer Liciardello, approached one of the
7  plaintiffs and was making threatening gestures, let me
8  say that.
9        A. I don't recall that.
10       Q. You don't recall the judge coming on the --
11       A. I don't recall that part of it, no.
12       MR. PILEGGI: I just want to put on the
13 record that I want the Master file, or any
14 information on AI. Any vouchers. Um, by the
15 way, just if we could go back on the record.
16 BY MR. PILEGGI:
17       Q. Officer, while he was a confidential
18 informant, if he did work for the police there would be
19 a voucher, correct?
20       A. There would be, yes.
21       Q. And it would be detailed, the circumstances,
22 if you say he made a buy or something, there would be
23 detailed as the circumstances of the buy, dates, times,
24 anything leading up to the buy itself.

Page 302

1        A. There would be, yes.
2        Q. And there would be vouchers as to how much
3  they were paid and et cetera, right?
4        A. The investigation location, case number and
5  all that.
6        Q. All right. And he would be assigned an
7  informant number, correct?
8        A. Correct.
9        Q. Would it always be a four-digit number?
10       A. It varies, I don't know.
11       MR. PILEGGI: All right. I would ask
12 that, and I don't know how we -- can you do it by
13 the name? I don't know -- we can go off the
14 record for this.
15             * * * *
16       (There was a discussion
17       had off the record.)
18             * * * *
19       MR. PILEGGI: One more thing I want to
20 move into the record. Reynolds-16.
21             * * * *
22       (Reynolds Exhibit 16 was
23       marked for identification.)
24             * * * *

42  (Pages 299 to 302)

Case 2:14-cv-01643-RBS     Document 61-6     Filed 06/29/22     Page 108 of 128
Torain v. City of Philadelphia, et al.

POLICE OFFICER BRIAN REYNOLDS-VOLUME II, 9/23/21

Page 303

1  MR. PILEGGI: Okay. I'm going to show
2  you what's been marked as Exhibit 16. This is
3  a -- and I'll submit to you this is part of
4  the Philadelphia Policies and Procedures. Um, and
5  in particular...
6              * * * *
7         (There was a discussion
8         had off the record.)
9              * * * *
10  MR. PILEGGI: I'll submit to you that
11  that's part of the policies and procedures of the
12  Philadelphia Police Department. And in
13  particular, the policies and procedures on
14  confidential informants.
15  THE WITNESS: Confidential informants,
16  yes.
17  MR. PILEGGI: Now, I asked you at the
18  last deposition, um, some questions about your
19  knowledge of the policies and procedures. And, in
20  particular, with informants.
21      You said you didn't know of any policies
22  and procedures.
23  BY MR. PILEGGI:
24  Q. Do you recall that?

Page 304

1  A. Sources, confidential sources.
2  Q. And I asked you about informants.
3  A. No, there's policy on confidential
4  informants, confidential sources there is not. There
5  was not back then.
6  Q. Okay. So, was there a policy on confidential
7  informants back in 2000? During the Freeman case and
8  the Torain case?
9  A. Yes.
10  Q. And were you familiar with that?
11  A. Somewhat.
12  Q. Now, you had to take MPO training and --
13  A. Yeah, but that doesn't deal with the
14  informants and all that.
15  Q. Well, how were you familiar with it?
16  A. Well, you would just get it and read it, and
17  if there's new amendments that come out you read them,
18  try to familiarize yourself with them.
19  Q. And is there anything -- is there any
20  guidelines that you recall, without looking at -- the
21  document obviously speaks for itself, is there any
22  guidelines that you recall with regards to what you
23  needed to do, um, when you're dealing with a
24  confidential informant?

Page 305

1  A. I remember there are certain steps that you'd
2  have to do to sign them up, and I don't remember
3  exactly what they are, but there is guidance.
4  Q. And did you follow those steps, or did
5  whatever officer who signed Al up follow those steps?
6  A. They would have to be, or the Integrity
7  Control Office wouldn't accept it. You had to have
8  certain information in order to -- in order to
9  sign someone up all this information had to be in
10  there. And if it wasn't, they would send it back to
11  you and say we need this or we need that, you know what
12  I mean.
13  Q. And there's got to be certain checks and
14  balances, right?
15  A. Correct.
16  Q. Okay. Now, pursuant to that policy, could
17  you use a confidential informant who was committing
18  criminal acts?
19  A. You'd have to know that they're committing
20  criminal acts.
21  Q. That's not my question.
22      Could you use a confidential informant,
23  under the policies and procedures of the police
24  department, if they were engaging in criminal acts?

Page 306

1  A. I'm not sure what the policy says on it. I'd
2  have to read it. But if someone's not in your presence
3  and they're a confidential informant, and they're
4  committing -- they're committing crimes, you don't know
5  that.
6  Q. Okay. Fair enough. But if you find out that
7  they're committing crimes --
8  A. You'd probably deactivate --
9  MR. GONZALES: Wait, let him finish the
10  question, asking the question.
11  THE WITNESS: Sorry.
12  BY MR. PILEGGI:
13  Q. You have to deactivate him, right?
14  A. You probably would deactivate them, yes.
15  Q. Who's responsible for deactivating him?
16  A. Whoever signed the informant up. I'm
17  assuming --
18  MR. GONZALES: Don't assume. If you
19  know.
20  THE WITNESS: I don't know.
21  BY MR. PILEGGI:
22  Q. So, here's my question. Again, a
23  hypothetical, if you were the one that signed him up as
24  a confidential informant, right, and then you find out

43   (Pages 303 to 306)

Case 2:14-cv-01643-RBS    Document 61-6    Filed 06/29/22    Page 109 of 128
Torain v. City of Philadelphia, et al.

POLICE OFFICER BRIAN REYNOLDS-VOLUME II, 9/23/21

Page 307

1    that he's engaged in criminal activity.
2         Is it then your responsibility to
3    deactivate them?
4         A.   Deactivate them, or just don't use them no
5    more.
6         Q.   But don't you have to formally --
7         A.   I don't --
8         Q.   -- deactivate them through the police
9    department?
10        A.   I don't know if it says that in the policy,
11   I'd have to read it.
12        Q.   I'm asking your independent recollection.
13        A.   I don't have an independent recollection.
14             MR. PILEGGI:  Okay.  Nothing further.
15             MR. GONZALES:  I just want to put
16   something on the record.
17             I'm sorry, do you have questions?
18             MS. TAYLOR:  No questions.
19             MR. GONZALES:  Earlier I made a
20   statement about -- in response to a comment you
21   made about whether Judge Diamond issued an actual
22   order.  And he did.  And, so, I was mistaken, I
23   want to correct the record.
24             And it's at document Number 140, um,

Page 308

1    case Number 13, dash, 27, um, 73.  And, so, an
2    order was entered and, um, I stand corrected.
3             MR. PILEGGI:  What's the order say?
4             MR. GONZALES:  The order says -- well,
5    it's a 6-page order, but the relevant portion of
6    it says, at Paragraph 3, Defendant Liciardello
7    and Spicer's alleged acts of intimidation are you
8    referred to the United States Attorney's office of
9    this District for investigation, um, so, end
10   quote.
11            So, I apologize to you for, um -- if
12   there was any indication that I misrepresented
13   anything.  I was not aware of the order, I don't
14   recall the order.  Obviously it was entered, and
15   I must have known about it at --
16            MR. PILEGGI:  Apology accepted.
17            MR. GONZALES:  Back in 2016 when it was
18   entered, but I did not recall that being of
19   record.
20            So, I want to correct that.
21            *  *  *  *
22            (The deposition concluded
23   at 1:31 p.m.)
24            *  *  *  *

Page 309

1
2              C E R T I F I C A T E
3              - - - -
4
5         I hereby certify that the testimony and
6    the proceedings in the aforegoing matter are
7    contained fully and accurately in the
8    stenographic notes taken by me, and that the
9    copy is a true and accurate transcript of the
10   same.
11
12
13
14
                  _____
15                Ronald DeShields, Notary Public
16
17
18
19        The foregoing certification does not
20   apply to any reproduction of the same by any
21   means unless under the direct control and/or
22   supervision of the certifying shorthand
23   reporter.
24

Page 310

1             INSTRUCTIONS TO THE WITNESS
2         Read your deposition over carefully
3    It is your right to read your deposition and make
4    changes in form or substance.  You should assign a
5    reason in the appropriate column on the errata
6    sheet for any change made.
7         After making any changes in form or
8    substance which have been noted on the following
9    errata sheet along with the reason for any change,
10   sign your name on the errata sheet and date it.
11        Then sign your deposition at the
12   end of your testimony in the space provided.  You
13   are signing it subject to the changes you have
14   made in the errata sheet, which will be attached
15   to the deposition before filing.  You must sign it
16   in front of a witness.  Have the witness sign in
17   the space provided.  The witness need not be a
18   notary public.  Any competent adult may witness
19   your signature.
20        Return the original errata sheet to
21   your counsel promptly.  Court rules require filing
22   within thirty days after you receive the
23   deposition.
24

44  (Pages 307 to 310)

Torain v. City of Philadelphia, et al.

**POLICE OFFICER BRIAN REYNOLDS-VOLUME II, 9/23/21**

Page 311

1
2    ERRATA SHEET
     Attach to Deposition of:  P/O Brian Reynolds
     Taken on: September 23, 2021
3    In the matter of:  Torain, v. City of Philadelphia,
          et al.
4    PAGE    LINE NO.    CHANGE    REASON
5    _____
6    _____
7    _____
8    _____
9    _____
10   _____
11   _____
12   _____
13   _____
14   _____
15   _____
16   _____
17   _____
18   _____
19   _____
20   _____
21   _____
22   _____
23   _____
24   _____

Page 312

1
2        SIGNATURE PAGE
3          - - -
4
5        I hereby acknowledge that I have
6    read the aforegoing transcript, dated September 23,
7    2021, and the same is a true and correct
8    transcription of the answers given by me to the
9    questions propounded, except for the changes, if
10   any, noted on the Errata Sheet.
11
12         - - -
13
14
15
16
17   SIGNATURE: _____
          P/O Brian Reynolds
18
19   DATE: _____
20
21   WITNESSED BY: _____
22
23
24

45  (Pages 311 to 312)

**A**

**a.m** 135:17
**able** 157:9 268:16
  288:6
**abruptly** 138:24
  219:21
**abuse** 292:8
**accept** 305:7
**accepted** 308:16
**access** 268:24
**Accountability**
  264:12,12
**accurate** 215:2
  226:21 309:9
**accurately** 309:7
**acknowledge** 312:5
**acknowledged**
  253:6
**acting** 269:3
**action** 239:16
**actions** 225:3
  288:23
**activity** 164:12
  216:11 268:1,5
  271:21 284:7
  307:1
**acts** 305:18,20,24
  308:7
**actual** 200:8 307:21
**address** 173:9
**addressed** 218:15
  220:4,10
**adjourned** 257:5
**administrative**
  237:9 239:11,12
**admitted** 236:2
**admitting** 282:15
**admon** 255:1
**admonished**
  300:24
**adult** 310:18
**Affairs** 154:11,13
  155:4,17 156:6
  191:16,22 240:4,7
  240:10 298:9,10
**Affiant** 146:23
  163:6,9 261:2
**Affidavit** 137:15
  153:17 154:5
  158:1 160:21
  162:18 165:10,19
  165:24 167:9,12
  168:3 197:18
  198:12,13,17,20
  198:23 200:1,16
  200:21 201:2,6

204:4,14 210:3,17
210:24 212:16
213:7 214:10
215:21 223:8
256:23 257:1,15
258:7 260:18
261:3,20 264:23
268:23 269:3
280:15,24 281:3
284:5 288:22,23
**Affidavits** 239:5
**aforegoing** 309:6
  312:6
**afraid** 218:24
**afternoon** 212:21
  215:11
**ag** 271:14
**agency** 139:20
**ago** 211:3 217:24
  225:4 227:10
  276:8 288:19
**agree** 168:13 169:7
  202:1 254:13
**agreed** 138:2
**ahead** 163:2 212:5
  273:17 274:19
**al** 135:6 141:13,17
  141:24 142:7,13
  142:18 143:12
  144:2,4,4,7 145:7
  151:11,16,20
  153:4,9 156:17,18
  156:20 157:7,8,13
  157:14,15,23
  158:8,20 160:23
  161:18,19 162:6
  163:19,22 164:1
  164:22 183:11
  184:11,11,14
  185:1,4,10,16
  186:1,6,11,17
  191:23 192:1
  193:15 194:2,8
  195:22 196:14
  197:4 198:2 258:2
  263:7 265:19
  266:14,21,22,22
  267:22 268:4,6,12
  268:24 269:1,9,18
  270:20 271:3,8,17
  273:8 276:23
  278:2 279:14,23
  280:6,10,20,20
  281:22 283:6,9,16
  284:17,18,22
  285:11 286:10,15

287:14,18,20
288:2 289:18,18
301:14 305:5
311:3
**Al's** 186:8,14 187:5
  187:7 277:8 279:8
  280:7 281:20
  283:16,18 284:17
**allegation** 300:15
**allegations** 234:6
  235:4 292:10
  296:13,15,16,19
  296:20 301:5
**alleged** 308:7
**allegedly** 261:2
  268:24
**Allison** 167:18,24
**allowed** 239:4,7
**Alphonso** 186:12
**Amended** 137:16
**amendments**
  304:17
**and/or** 282:8
  309:21
**Anne** 136:13
  138:16
**annetaylor@phil...**
  136:16
**answer** 140:8,16
  142:4 143:18,19
  144:23,24 150:7
  153:13 160:11
  162:3 184:6 189:9
  189:17 207:4
  208:7 214:16,21
  215:24 221:16
  222:13 235:11
  237:13 241:19
  242:23 263:11
  273:1 274:16
  276:15 277:14
  278:9,16,20,22
  279:1 289:3
  297:16
**answered** 142:3
  145:10 153:12
  165:14 166:18
  176:8 181:14
  183:3,5 184:5
  185:21 188:18
  189:1,8,16 195:16
  197:13 208:6
  217:16 260:11
  289:2,22 297:14
**answering** 297:21
**answers** 286:7

312:8
**anybody** 236:10
**Anyway** 231:1
**apartment** 175:20
  175:23 177:6
  207:23 208:4,11
  208:11,17,20,23
  214:6 296:7,9,24
  297:1
**apartments** 175:18
  178:7
**apologize** 246:24
  308:11
**Apology** 308:16
**appeal** 230:21
  257:17
**appear** 216:5
  249:23 260:16
  271:19
**appearances**
  147:17
**appearing** 136:5,11
  136:16 148:15
**appears** 210:17
  257:7
**apply** 309:20
**apprehended** 170:3
  170:4 184:2
**approached** 301:6
**appropriate** 199:13
  253:5 310:5
**approval** 152:7
  236:13
**approve** 152:24
**approximately**
  164:9 167:1,3,19
  171:21,24 172:1
  180:19 194:10
  216:15
**Arch** 136:14
**area** 167:18,18
  169:11 171:23
  172:3 178:5
  180:11 266:16
  267:11,12 280:10
  280:19,19 283:6
**argue** 199:12
**argued** 189:7
  288:15
**arguing** 165:15
  288:11,12
**argumentative**
  181:15 197:13
  199:3 217:16
**Armando** 190:21
**arrest** 146:20

177:23,24 178:4
178:14,15,17,22
179:2 180:2,4
218:18 220:8
221:12 239:20
257:20 258:20
265:7 271:12
282:10 285:14
**arrested** 163:11
  170:6 172:15
  177:17 178:19
  179:21 180:7,20
  202:4 210:5 217:7
  220:6,18 266:6
  268:5,16 269:21
  270:1,9,12,15,17
  270:18 298:18,20
**arresting** 220:18
**arrived** 177:13
  206:6 219:22
**articulate** 282:8
**asked** 141:16 142:2
  147:22 150:5
  153:11 165:13,20
  166:7,14 176:7
  181:13 183:2,5
  184:4 185:19,21
  185:22 188:18,24
  189:2,8,15 191:22
  191:24 194:1
  195:15 197:12
  200:4 201:9 208:1
  208:5 215:5,6
  219:10 226:15
  237:11 257:4
  261:5,14,22
  272:21 277:11,18
  277:19 278:12
  288:18 289:1,22
  297:14,15 303:17
  304:2
**asking** 140:6
  141:21,22 145:5
  149:14 155:8,12
  185:7 209:11
  214:11 217:18
  232:15 242:5
  244:23 251:9
  252:4 272:18
  274:16 275:8
  276:16 288:21
  306:10 307:12
**assault** 219:13
**assaults** 271:15
**assign** 310:4
**assigned** 163:16,18

Tofani v. City of Philadelphia, et al.

POLICE OFFICER BRIAN REYNOLDS-VOLUME II, 9/23/21

238:14,19 239:23
240:4 279:15
302:6
**assistance** 179:20
**assisted** 180:1
266:1
**associated** 257:22
**assume** 270:17
276:20 306:18
**assuming** 196:22
306:17
**attach** 190:7 289:24
311:2
**attached** 190:7,11
210:21 261:3
310:14
**attempt** 187:22
214:6
**attempted** 175:17
206:15 211:4
257:2
**attorney** 136:2
144:19 166:6,22
184:13,18 232:16
233:12 236:6
244:5 250:3 252:5
264:9,15 299:3
**Attorney's** 184:10
225:16 226:1
287:15 308:8
**attorneys** 184:11
184:14 243:18
**audible** 141:19
146:10,15 165:5
168:5 181:3
182:17 234:13
240:1 246:10
272:11 291:20
**August** 157:4
211:24
**AUSA** 262:18
**authorities** 253:5
**Ave** 238:16
**Avenue** 156:13,21
167:19
**aware** 157:6 162:6
162:9 175:1
176:18 183:17
185:16 236:15
246:3 250:21,24
251:11,13 253:9
263:7,13,17,24
264:17 268:6,7
282:19 291:2
292:15 299:13,15
308:13

---

**B**

**B** 137:8
**back** 141:24 166:24
169:13 170:18
171:5,11 175:16
176:9 177:18
180:6 184:9 189:5
209:6,7 217:24
218:20 219:10
220:7 222:6
224:14,15 238:11
239:18 242:23
243:1 246:12
248:22 250:2,12
250:15 257:8
276:5 277:20
284:22 290:1
300:22 301:15
304:5,7 305:10
308:17
**background** 269:10
274:3
**backtrack** 176:5
**badge** 155:1 156:10
164:10 169:14
**bag** 171:20
**balances** 305:14
**Bankrolled** 246:1
**base** 169:21
**based** 147:7 157:22
169:21 176:6
252:15 279:1
**bases** 200:20
**basically** 160:19
204:10,11,15,18
**basis** 208:3
**Bates** 190:13,15
249:1,10,12 290:9
293:14
**bathroom** 224:7
**Batman** 202:18,20
229:13
**bay** 300:17
**bear** 208:2
**beard** 167:4
**bears** 247:9
**beat** 228:22,24
230:9
**beater** 277:1
**beating** 234:9 235:8
236:7 268:10
293:24
**bed** 218:19
**bedroom** 218:8,13
218:13,17,21,22
218:22 219:2

---

**beeped** 168:20
**began** 141:11
**beginning** 138:13
**behalf** 136:5,11,16
234:8 292:9
**behavior** 253:4
**believe** 144:9
154:16,21 168:17
173:9 174:6 175:7
176:14,14 178:20
179:3,4,19 182:12
189:10 202:11,23
205:11 208:1
221:3 224:23
227:16,19 228:7
228:10 230:15
232:12 236:19
240:3 244:1,12,21
245:4 246:2,15
262:18,21 264:10
269:21 270:1,9
292:8,18 293:12
294:2,22,23
295:12,15,16
300:10 301:3
**believed** 227:24
228:19 292:21
**Bergandy** 190:22
**best** 179:14 228:11
266:22 298:10
**better** 143:12 249:5
**bit** 182:3 193:15
**bits** 295:2
**black** 167:3,17
168:19,20 169:23
170:14,17 171:14
171:15,19,22
172:2 184:1
216:24 217:5
266:14,22 267:1
**block** 173:15
180:23 182:9,10
283:19 284:17
**blocks** 178:8,11
180:20,20,22
**blue** 167:4,4
**Bonne** 169:17
**Bonneville** 167:6
167:15 168:18,24
169:1,11,18,24
170:19,21 171:5
171:10,24 172:4,9
172:13,14,16,18
173:22 174:4,16
181:1 183:18
213:4,17

---

**boss** 264:15
**bother** 157:10
**bottom** 164:8
**box** 218:18
**bread** 291:17
**break** 140:14 150:2
218:24 224:8,11
248:12,14 249:4
**Brian** 135:13
136:11 137:3
138:8 146:17
190:20 217:2
218:2,6 232:24
233:1 234:16,18
258:8,11,18 259:1
259:3 265:1,3,5
265:10,13,22
266:3,12 271:16
279:7 280:5 283:6
283:9 285:6,12
286:11 287:18
311:2 312:17
**briefly** 295:7
**bring** 269:11
**bringing** 192:4
236:6 294:5
**broke** 291:17
**brought** 227:11
234:7,17 235:7
292:9
**brown** 171:20
**building** 175:21
**bumped** 143:12,16
143:22
**bunch** 229:18
**bundle** 168:21
**buy** 195:19 301:22
301:23,24

---

**C**

**C** 136:1 309:2,2
**call** 216:16 219:17
219:20 280:6
291:2
**called** 138:8 152:18
156:1 213:22
219:1 220:5 232:4
299:9 300:17
**capacity** 232:20
234:18
**caption** 234:12,22
**car** 174:20 179:3,4
180:16,24 181:10
183:14,15,19,23
220:18 267:14
**card** 201:19 220:13

---

220:16,17 222:23
223:6 224:1,2,4,4
**carefully** 310:2
**Carolyn** 210:3
**carry** 222:20
**carrying** 168:21
171:20
**cars** 267:15,18
**case** 138:18 141:22
143:3,14 144:1,7
144:7 145:6
146:14,18,19,22
146:24 150:11
151:13,17,21
153:18 154:6,7,10
155:20 159:18,19
160:1,24 162:7,8
162:10,12 163:12
163:16,21 166:6
169:24 172:12
176:20 181:9
183:7,22 184:2,9
184:14,18 186:22
187:1 189:14
191:23 192:2,12
195:18,18 196:11
197:19 200:2
201:21 204:3
211:7,11,16
219:11 227:15,17
227:18 228:22,24
229:7 230:14,17
230:19,23 231:2
231:10 232:5,15
234:17 242:12,14
247:13 251:6
254:20 255:20
256:1 257:17
259:17 260:6
261:4 262:16
263:8,9 264:18,18
264:19 269:8
270:2,3,3,10,13
272:10 273:9,19
275:19,21 279:24
297:12,18,19,19
298:24 300:4,6
302:4 304:7,8
308:1
**cases** 141:23 158:8
158:21 229:20
234:7 235:7
252:13,13 255:11
255:13 256:3
259:20 291:14
292:8,13 298:13

Case 2:14-cv-01643-RBS    Document 61-6    Filed 06/29/22    Page 113 of 128
Torain v. City of Philadelphia, et al.

POLICE OFFICER BRIAN REYNOLDS-VOLUME II, 9/23/21

caught 295:23
cause 153:17 154:5
    160:21 165:10
    167:10 200:17,21
    201:3,7 258:7
    264:24 280:16
    282:9 284:5
    285:14 294:7
cell 219:17,18
    296:6
cent 240:21
Center 251:17
certain 152:19
    305:1,8,13
certainly 187:12
    253:22 292:3,20
certification 309:19
Certified 135:21
certify 309:5
certifying 309:22
cetera 228:20 302:3
change 199:14
    310:6,9 311:4
changes 310:4,7,13
    312:9
charged 219:13
charges 227:11
charging 296:7
check 157:15,17
    240:19 269:10
checks 152:20
    240:15 305:13
chest 218:14
Chester 236:19
Chestnut 136:3
CHIEF 136:13
child 212:20
choose 241:19
CI 187:5,7 192:6
circumstances
    196:13 301:21,23
citizen 141:12
    142:24 143:12
    144:8,14 145:8
    149:6,19 150:13
    150:16 151:3,4
    153:9 156:11,17
    157:23 158:5,7,20
    159:1,11,13,23
    160:13,18 182:24
    183:7 185:1,14,17
    191:23 195:14,22
    196:10,15,16
    204:9 258:23
    259:2,3,12 262:24
    265:10,11,12,19

271:17 272:1,13
    273:21 274:2,8,8
    274:12 275:2,10
    275:13 276:24
    286:14 287:1,12
    289:5
City 135:6 136:12
    136:13,16 138:14
    138:17 187:2,15
    189:20 299:10
    311:3
civil 232:15 236:6
    242:8 292:10
civilian 232:24
    234:19 252:5
Clahar 228:11
    295:17
Claim 242:13
clarification 279:20
clarified 224:16
clarify 201:18
clarity 194:21
clarity's 173:14
    195:21 289:16
clear 183:11 188:10
    194:12
client 155:16 211:1
    211:12,16 213:17
    247:15
client's 211:5,24
    215:22
clients 234:8 253:7
    292:9
close 211:8
closely 203:1
closer 178:9,9
co-defendant 231:3
    256:24 301:5
co-defendants
    227:14 230:9
    252:14 299:1
co-plaintiffs 292:4
cocaine 168:22,23
    169:3
Coleman 136:7
    243:24
collectively 290:6
    290:12,18
Collins 244:12
color 267:4
column 310:5
come 219:2,4 230:1
    280:20 281:22
    284:22 304:17
comes 155:11
    275:20 277:4

coming 150:22
    180:14 213:14
    230:8 256:2
    301:10
commencing
    135:17
comment 143:7
    281:17 307:20
comments 148:21
commit 271:8
committed 268:7
committing 305:17
    305:19 306:4,4,7
compelling 151:11
compensated
    159:21
compensation
    160:13
competent 310:18
complained 154:10
    285:24
complaint 137:16
    154:12 188:1,12
    191:6 234:3,6
    235:4 236:5
    285:22 286:7
complaints 191:15
    191:16 236:7
    240:5
completed 140:6
completion 139:18
complied 221:11
compound 143:7
    289:21
computer 218:8
con 195:17
concern 196:14
concerned 141:12
    142:24 143:12
    144:8,14 145:7
    149:5,19 150:13
    150:16 151:3,4
    153:9 156:11,17
    157:23 158:5,7,20
    159:1,11,13,23
    160:13,18 182:23
    183:6 185:1,14,17
    191:23 195:14,22
    196:9,15,16 204:9
    258:23 259:2,2,12
    262:24 265:9,11
    265:12,19 271:17
    271:21,24 272:13
    272:14 273:21
    274:2,7,8,12
    275:1,10,13

276:24 286:14
    287:1,11 289:4
concerning 157:23
concerns 185:3,9
    185:12
Concise 137:12
    190:10,19
concluded 308:22
conclusion 161:7
    161:15 233:6,8
conduct 164:11
    254:5
conducted 169:17
conducting 266:2
Conestoga 172:20
    173:5,9,11,15,21
    174:2,5,8,10,12
    174:13,18 202:13
    209:7,12,14 212:9
    212:19 213:12,14
    213:18 220:14
    223:9,12
confidential 143:13
    144:8 145:8
    150:13,16 151:4
    152:3,17,23 158:9
    159:2,5,12,14,17
    160:14,16,17
    183:8 185:10
    186:15,18,21
    192:2 195:14,19
    195:23 196:4,10
    196:15 204:2,8,20
    204:20,24 263:8
    269:9 274:9,14,20
    274:23 275:9,12
    277:24 278:2
    286:11,21 287:1
    289:5 301:17
    303:14,15 304:1,3
    304:4,6,24 305:17
    305:22 306:3,24
confined 237:9
confirm 149:12
confiscate 201:18
    202:5,8,9
confiscated 201:10
    201:14 202:3
    218:11,16 220:3,9
    220:17,21,24
    221:4,7,13,14,20
    222:23 223:3,6
confused 149:10
conjunction 143:3
    154:15 178:15
    201:20 225:16

228:14 244:7
    245:15,21 257:16
    298:6,24
consent 216:21
    219:23 220:1
consents 245:3,3
contacted 194:8
contained 152:10
    194:3 309:7
Contemporaneous
    198:4
contents 218:10
    249:1
continuation
    138:13 139:4
    140:4
continue 267:24
continued 139:21
    279:14
continuously
    278:17
contraband 221:8
control 142:20
    152:7,11,22
    157:21 305:7
    309:21
conversation
    137:17,18 207:15
    244:19,21 245:2
    295:14 300:2
conversations
    228:10
convicted 157:7,8
    170:7 185:17
    186:2 281:16
cooperate 282:20
cooperation 290:1
copies 155:4,9
    156:5 260:21
cops 231:14 263:20
    293:3
copy 193:8 253:19
    309:9
corner 174:19
cornrows 217:10
    217:11
Corporal 179:9
correct 142:1,18,19
    142:21 144:8
    146:9,14,17,22,24
    147:5 150:24
    152:4,5 153:10,19
    154:11 156:18,22
    157:1,4 160:15,24
    162:14,16,20
    163:13,15 164:7

Case 2:14-cv-01643-RBS    Document 61-6    Filed 06/29/22    Page 114 of 128
Toraln v. City of Philadelphia, et al.

POLICE OFFICER BRIAN REYNOLDS-VOLUME II, 9/23/21

165:9,12 167:13
167:16 168:15
169:8,10,18,19
170:1,7,21 171:1
171:3,7 172:6,9
172:16,24 173:8
173:12 174:11
175:10,12,19
176:23,24 177:2
177:11,16,18
178:1 179:24
180:17,18 181:24
182:1,16 183:12
183:24 184:3,7,19
184:20,22 185:1
186:18,23,24
188:21 192:6
193:17 194:6,15
194:22 195:1,3,4
195:13,19,20
196:21,22 197:3,5
197:6,9 198:1,3,4
198:5,8,17 200:5
200:6 201:8,12,15
201:16 202:2,7,15
202:19 203:6,7,23
203:24 205:8,9
206:17,23 207:13
208:20 209:5
213:5,6,8 217:11
220:20,23 221:2
221:10,14 222:14
222:19,20,24
223:2,4,13,23
225:4,23 227:13
230:23 231:4
232:9,21 233:24
234:4,10,11
235:23 237:5
239:6 244:22
245:7 250:17
254:14,15 258:3
258:13 259:20
260:6,9 261:8
262:3,10,12,15,20
263:16,21 264:4,9
267:17,20 268:9
269:12 270:18
272:10 275:15
281:5 282:22,23
283:1,3,4 284:11
284:14,15 291:4
291:12,15,16
292:11,14,24
293:15,16 294:3
295:19 297:11,13

297:18 301:19
302:7,8 305:15
307:23 308:20
312:7
**corrected** 308:2
**corroborate** 164:23
285:10
**counsel** 138:3,14
151:11 286:12
287:10 310:21
**couple** 154:23
289:24 291:21
298:17
**course** 140:3
158:18 228:22
252:8 273:4
**court** 135:1,21,21
140:9,11 144:12
147:13,16,21
148:12 151:10
185:12 194:21
197:8 199:13
222:6 226:22
263:4 275:24
277:10 300:17
310:21
**Courthouse** 135:15
**courtroom** 176:22
225:18 300:24
**cousin's** 219:12
**cover** 176:1
**covered** 176:2
188:2 205:4
**coworkers** 203:4
**crack** 168:22,23
169:3
**credible** 271:19
272:4
**crime** 239:15
**crimes** 271:8 306:4
306:7
**criminal** 141:17
144:7 157:9,10,15
170:9 185:18
186:3 251:17
254:14 258:9
262:13 265:2
267:24 268:4,14
268:15 269:18,23
270:21 271:11
272:7,14 273:8,18
273:21 274:3,13
275:2,14,19 277:8
277:23 286:10
294:19 305:18,20
305:24 307:1

**criteria** 158:24
**culminated** 227:10
**curious** 290:10
**curly** 266:15 267:2
267:5
**Curtis** 184:18
262:17 263:18
264:1,5,8 272:9
275:22
**cut** 168:22 169:16
171:24

---

### D

**D** 137:1
**damages** 232:15
**dark** 266:15 267:3,4
**dash** 189:23,24,24
308:1
**date** 192:16 193:7
194:17 249:23
250:3,5 310:10
312:19
**dated** 157:3 249:13
249:20 312:6
**dates** 198:19
200:13,13,14
301:23
**daughter** 216:17
218:21 219:1,6,22
**dawn** 183:23
**day** 145:20 164:19
168:16 179:18
205:5 209:9
210:24 215:21
216:11 220:1,6
237:11 284:14
299:24 300:3,14
301:4
**days** 205:10 211:3
310:22
**DC** 190:4
**deactivate** 306:8,13
306:14 307:3,4,8
**deactivated** 142:13
142:15
**deactivating**
142:14 306:15
**deal** 262:23 263:2,3
263:6 271:3
295:20 304:13
**dealer** 276:24 277:2
**dealers** 266:4
270:22,24 271:4
271:13
**dealing** 270:22
271:13 304:23

**dealt** 263:19
**deceased** 142:1,13
**decided** 205:15
**decision** 244:4
**deemed** 272:13
**Defendant** 135:7
308:6
**defendants** 211:9
226:12 227:6
301:1
**defense** 151:11
184:10,11,14
232:17 287:15
**DENNEHEY** 136:7
**Dennis** 146:21
154:7 168:20
170:15,17 171:14
171:19 257:17,21
257:22 258:1,9,20
265:2,6 280:11,21
283:7 285:14
286:10
**department** 136:12
138:16 153:4
205:1 274:11
279:11 303:12
305:24 307:9
**depends** 160:20
204:13
**depose** 211:15
**deposed** 211:13
**deposing** 241:17
**deposition** 135:13
138:13,15,21,24
139:1,7,18,21
140:3,4 141:2,3,7
147:19 151:4
161:8 172:20
176:5 200:5,8
203:23 205:5,8
210:24 211:5,24
212:2,15 215:22
224:12 225:19
237:11 241:9
248:15 256:9
257:2,5,7 269:17
277:6 299:9 300:3
300:5,8,14 301:4
303:18 308:22
310:2,3,11,15,23
311:2
**deposition's**
299:13
**depositions** 300:14
**DePriest** 255:16,20
**DEPUTY** 136:13

**describe** 292:8
**described** 248:24
266:14 292:15
293:3
**describes** 293:23
**description** 169:12
215:2 266:21
**DeShields** 135:17
309:14
**designate** 274:12
275:1
**designated** 276:23
**designed** 242:2
**desk** 218:8,9
238:19,21 239:23
240:4,7,23
**detailed** 204:2
266:18 288:22
301:21,23
**details** 254:1
**determine** 254:16
**determined** 208:13
208:17
**Diamond** 252:15,18
253:3 307:21
**died** 142:7,9
**differ** 204:12
**difference** 160:17
**different** 192:22
229:20 244:22,23
293:23
**dining** 216:18,21
219:7
**direct** 140:22
309:21
**directed** 153:4
178:22 254:2
**directing** 253:14
**direction** 169:13
**Directive** 137:21
**dirty** 231:14 263:20
293:3
**discards** 199:10
**disciplined** 254:18
254:23
**disclose** 212:13
265:23
**discovery** 155:23
228:16 231:20
246:23 297:5
**discuss** 193:15
**discussed** 177:4
219:19 283:7
298:22
**discussing** 141:11
**discussion** 139:13

SUMMIT COURT REPORTING, INC.
215.985.2400 * 609.567.3315 * 800.447.8648 * www.summitreporting.com

145:24 195:6
207:17 290:20
297:24 302:16
303:7
**discussions** 184:21
184:24 263:22
299:7
**dispute** 192:11
**disruptive** 215:19
**distinct** 195:22
**District** 135:1,1
147:16 148:12
183:12 203:5,10
203:14,18 204:6
264:9,15 266:16
266:19 267:9
279:16 308:9
**DKC-3310** 167:6,15
181:1 183:18
**document** 137:20
147:21 193:21
195:9 202:12
210:16 211:20
247:19 304:21
307:24
**documentation**
192:5 298:5
**documents** 155:13
187:11 210:22
228:19 234:9
290:9 294:1
298:23
**doing** 157:11,13
160:21 165:8
168:14 179:18
192:11 225:19
232:14 238:17
245:20 250:21
254:20
**dollars** 296:10
**door** 177:14 208:23
208:23 218:22,23
219:1,3
**Douglas** 184:19,21
184:24 185:6,8
262:17,19 263:18
264:1,5,8,17
272:10 275:22
**Douglas'** 185:3
**downstairs** 219:5
**drafted** 201:6
**drawer** 218:9,10,11
**drawers** 218:14
**dreadlocks** 217:22
217:23
**dreads** 217:14

**drinks** 291:21
**drive** 174:3 283:16
285:1,2
**driving** 169:23
180:24 284:23
**drove** 284:17,24
**drug** 156:21 266:4
266:5 270:22,22
270:24 271:4,12
271:13,21 276:24
277:1
**drugs** 159:20 271:3
283:10
**duly** 138:9 257:9
**duplicate** 256:7
**duties** 238:18,20
239:10
**duty** 238:19 239:23
240:4,7,23

_____ E _____

**E** 136:1,1 137:1,8
309:2,2
**earlier** 209:9 220:6
295:16 307:19
**easier** 192:24
**EASTERN** 135:1
**eight** 238:22
**eighty** 296:10
**either** 151:18
248:24 274:8
**else's** 190:12
**encounter** 251:17
**ended** 140:5 141:11
**engage** 253:4
267:24 268:4
**engaged** 228:2
307:1
**engaging** 305:24
**ensure** 253:7
**enter** 175:22 206:19
**entered** 172:21
173:16 205:22
308:2,14,18
**entering** 209:12
**entire** 260:13
**entrance** 215:8
216:7
**entry** 175:17
**envelope** 218:15,16
223:7
**Eric** 190:17
**errata** 310:5,9,10
310:14,20 311:1
312:10
**ESQUIRE** 136:3,8

136:13
**Essington** 238:16
**establish** 282:9
**et** 135:6 228:20
302:3 311:3
**evening** 220:5
**everybody** 299:21
**everything's**
140:13 198:11
**evidence** 212:12
231:13 252:12
282:9
**evidently** 268:18
**ex-partner** 265:18
**exact** 178:11,18
245:5 296:23
**exactly** 144:10
145:3 157:22
158:23 180:22
215:4 217:23
231:9,16,23 239:2
262:22 264:6
281:1 295:3,17
305:3
**Examination** 137:4
140:22
**examined** 138:10
**excuse** 270:15
**execution** 257:19
**exhibit** 146:3
153:22 190:8
191:11 193:3
199:19 209:20
233:17 246:17
248:19 249:11
256:17 290:14
302:22 303:2
**exhibits** 145:20
260:8
**exit** 171:22
**exited** 167:5 168:21
172:2 213:11
**exonerated** 229:4
**explain** 211:22
**express** 185:9
**extent** 205:17
**extra** 193:8
**eye** 266:15
**eyes** 162:19

_____ F _____

**F** 147:15 148:11
194:24 309:2
**fabricate** 282:9
285:13
**fabricated** 285:20

**fabricating** 294:7
**fact** 146:23 172:15
202:17 203:5
209:4 212:4
230:14 244:10
259:22 260:8
267:14 268:10
276:23 288:3
293:2
**facts** 199:15 200:22
253:17 257:19
**factual** 200:20
214:22
**failed** 212:13
265:22
**failing** 285:10
**fair** 139:22 164:18
266:21 306:6
**false** 259:1,23,24
260:2,4 262:4,6
265:10 266:9,10
283:13,21,22
285:3,4,5,18,19
286:17,19,23
287:23 288:8,14
**falsified** 261:23
**falsifying** 228:19
234:9 294:1
**familiar** 304:10,15
**familiarize** 304:18
**far** 174:18 178:6
207:17,19 273:10
**FBI** 137:20 227:6
231:24 232:1
253:14 254:3
264:2 291:7,10
292:17 293:22
295:10
**Federal** 225:3
227:11,23 228:15
231:12,17 232:5
281:11 282:21
290:2,3 294:21
297:19 298:18,20
**Feds** 228:3,5
240:18,19
**fellow** 216:6 225:21
227:12,21 228:1
229:12,17 249:7
290:4
**felon** 157:7 281:16
**felt** 300:18
**fender-benders**
267:16
**Field** 203:19 264:18
279:17,21

**file** 142:17,21,22
152:10,14,15,16
152:18 155:24
186:5 187:3,16,17
190:5 192:6 236:5
289:14 301:13
**filed** 188:1,12 234:2
234:3 236:12
298:13
**filing** 310:15,21
**filled** 152:6,19
**find** 187:15 198:23
306:6,24
**fine** 145:16,17
149:21 235:2
276:17
**finish** 255:21
259:16 296:8
306:9
**finished** 207:5
242:21
**firm** 247:10
**first** 137:16 138:9
138:14 139:7,19
139:20 140:17
150:18 154:4,23
164:9 180:13
188:17 190:4
193:19 205:4
210:23 213:16
218:2 219:12
226:6 246:23
247:8 289:20
299:8
**fit** 208:22
**five** 151:8 178:16
205:10 260:23
298:19
**fixed** 267:15
**Fleming** 135:23
**Floor** 135:15
136:14
**focused** 295:20
**follow** 158:24 305:4
305:5
**follow-up** 217:19
**followed** 167:23
171:5,10 174:11
180:11,19 213:3
250:23 251:6
**following** 177:24
181:2 310:8
**follows** 138:10
**FOP** 245:24
**Force** 203:18
**foregoing** 309:19

Case 2:14-cv-01643-RBS    Document 61-6    Filed 06/29/22    Page 116 of 128
Torain v. City of Philadelphia, et al.

POLICE OFFICER BRIAN REYNOLDS-VOLUME II, 9/23/21

forget 300:16
form 138:4 143:6
  222:11 263:10
  310:4,7
formally 307:6
former 205:13,20
  223:10 229:12
  256:23,24 257:12
  258:15 264:1
  291:13
forms 152:19
forth 189:5
forward 230:8
found 229:1,5
four 145:19,20
  181:23 298:19
four-digit 302:9
Fox 217:7
frame 250:15
free 267:24
Freeman 141:22
  143:14 144:1,7,21
  145:6 146:13,16
  146:21 150:11
  151:13,17,21
  153:10,17 154:7
  154:10 155:19
  158:21 159:18
  162:7,22 163:1,10
  165:18 168:21
  169:3,24 170:15
  170:18 171:14,19
  181:9,22 182:5,11
  183:7,19 184:2,9
  185:5 186:22
  187:1 188:1,7,12
  191:20 192:11
  194:3 195:18
  196:11 197:19
  227:18 257:16,17
  257:21,22 258:1
  258:10 259:5,10
  259:17 260:20
  265:2 270:3
  271:17 272:8
  273:9,19 279:20
  279:24 280:3,11
  280:21 283:7
  285:8,15,16,24
  289:19 304:7
Freeman's 258:20
  265:6,14 269:8
  285:22 286:10,12
  287:10
friend 212:21
  216:17 219:7

front 147:24 148:1
  148:3 218:12
  239:15 310:16
full 186:13
fully 309:7
further 307:14

### G

gain 175:17 215:8
  216:7
general 294:3
generally 141:20
  148:18 149:3,15
  291:1,9
Gesner 179:11,13
gestures 301:7
getting 152:24
girl 219:11
girlfriend 296:22
  297:2
gist 293:12 295:4
give 141:8 152:7
  153:1 154:14,18
  160:10,12 178:12
  188:22 192:22
  193:6,17 197:18
  206:7 214:9
  241:14,16 259:24
  260:4 262:6 286:2
  298:21
given 144:18 155:4
  155:16 163:23
  194:18 220:2,8
  222:15 258:9
  265:1 285:10
  286:15 291:7
  312:8
giving 164:2 166:21
  182:15 185:13
  191:19 197:7
  267:23
glasses 266:15
  267:7,8
gleaned 204:5
go 140:1 141:24
  151:11 159:4
  162:17 163:2
  166:24 170:11
  171:15 173:6
  174:10 175:9,11
  180:6 192:22
  193:16,18 197:21
  198:22 208:16
  209:8,14 212:5
  222:1 224:14
  238:21 248:22

250:2 273:17
  274:19 275:16
  280:10,19,19
  281:1 286:20
  287:1 289:4,24
  301:1,15 302:13
GOGGIN 136:7
going 138:20 140:1
  140:6 141:7
  144:14 145:7
  149:7,22 150:16
  151:3 155:2,21
  156:3,9 166:24
  176:2 177:5 184:9
  184:10 186:5
  190:23 191:4,7
  192:21,22 197:22
  199:14 200:7
  204:16 205:3,15
  208:3 209:6,11
  210:15 213:23
  218:3,4 219:10
  222:5 229:24
  233:3 241:6
  246:20,22 247:14
  247:22 248:11
  250:12 252:17
  256:6 257:13
  270:16 287:14
  290:6,12 299:9
  303:1
Gonzales 136:8
  138:19 139:4,7,23
  142:2 143:5,15
  144:22 145:9,12
  145:15,19 147:6
  147:10,12,20
  148:2,6,9 149:9
  149:16,22 153:11
  155:2,8,12,16,19
  156:5 158:10,15
  161:1,4,6,10,14
  161:18,21,24
  162:21 163:1
  165:13 166:11,15
  166:18 173:1
  175:24 176:7
  181:6,13,20
  182:18,21 183:2
  183:20 184:4
  185:19,22 187:23
  188:3,6,9,16,24
  189:4,7,15 190:13
  194:23 197:12
  198:21 199:3,9
  205:3 206:1,3

207:3 208:5
  210:15 211:4,11
  211:15,19,23
  212:3,6,10,12
  214:8,13,15,18,21
  214:24 215:4,9,15
  215:18,20 216:12
  217:15 221:16
  222:2,5,11 224:3
  224:9,14,24 226:6
  226:10,13,16,19
  228:23 229:24
  231:7 233:5,8
  233:11 234:20,22
  235:10,16,20
  236:2 237:10,13
  241:5,10,12,14,20
  241:23 242:2,5,8
  242:11 246:22
  247:4,7,12,21
  248:1,3,11 249:10
  249:14,19,22
  250:1 252:17,22
  253:2,13,20,24
  254:5,9 256:12
  257:4 260:11
  261:1,9,11,16,20
  263:10 268:22
  272:16,20,22,24
  273:11 274:17,20
  275:7 276:7,15,21
  277:14 278:8,12
  278:16,22 281:15
  281:19 285:1
  288:9,15,18 289:1
  289:8,20 290:8
  293:5 294:8,12
  296:11 297:14,20
  299:2,18,22 306:9
  306:18 307:15,19
  308:4,17
good 139:24 166:17
government 227:11
  227:23 228:15
  231:12,17 282:21
  290:2,3 294:21
  298:18,20
Graham 227:22
  230:12 231:1
  232:11 235:6
  238:4 246:6
  263:19,23,24
  264:1,3 291:11,13
  291:14 292:12
  295:16
Graham's 290:1

294:20
grandmom 215:1
grandmother 175:1
grapevine 240:14
great 235:20 295:20
green 167:5,15
  168:18,24 169:1
  169:11,17,24
  170:18,20 171:5
  171:10,23 172:3
  172:13,14,15,18
  173:22 174:3,16
  181:1 183:17
  213:4,16 284:6
group 177:21
  229:20,20
guess 138:22 160:6
  166:2 179:23
  278:15,24 298:6
guidance 305:3
guidelines 304:20
  304:22
guilty 229:5
guys 202:21 263:20

### H

H 137:8
hair 217:24 266:15
  267:3,4
half 194:11,13
hall 218:20
hallway 205:23
Hammonton
  135:23
handed 147:13
handling 144:2,3,3
  144:4 279:12
  285:8 289:17
happen 177:8 253:8
happened 296:12
happening 283:14
happy 199:2
harass 242:3
head 140:10,11
  217:1,12 264:11
headquarters 237:9
  238:14
hear 184:13 251:16
  299:11
heard 142:10 177:1
  219:17 240:14
  251:1,2,20 264:5
  283:9
hearing 144:19
  145:3 147:14
  148:5,10,15

SUMMIT COURT REPORTING, INC.
215.985.2400 * 609.567.3315 * 800.447.8648 * www.summitreporting.com

Case 2:14-cv-01643-RBS   Document 61-6   Filed 06/29/22   Page 117 of 128
Torain v. City of Philadelphia, et al.

POLICE OFFICER BRIAN REYNOLDS-VOLUME II, 9/23/21

149:24 193:10
255:7 260:16,17
**held** 135:14
**help** 150:3 239:1
**helped** 239:1
**helpful** 249:2
**hide** 283:18
**hiding** 284:23
**highlighted** 294:11
**Highway** 156:12
**hired** 232:16,18
240:24 241:3,4
243:13,15,16
249:6,7
**history** 137:12
190:10,20 269:18
270:22 272:7
273:8,18 274:13
275:2,14,19
277:23
**Hold** 145:9 181:13
217:15 235:16
241:5 296:11
**holding** 296:6
**home** 172:20
212:19,22 219:2,4
250:23 251:7
**honest** 168:8
**Honorable** 147:15
148:11 255:8
**hour** 216:16
**hours** 238:22
288:19
**house** 175:18
212:24 216:11,12
216:22 218:4,5,18
219:21,24,24
220:22 223:6
**houses** 182:4,11
282:8 283:11
**huddled** 177:4
205:14
**hundred** 270:10
294:22
**hung** 142:10
**hypothetical**
273:17 276:20
306:23

**I**

**IA** 189:22 190:4
191:2
**IAD** 188:23 191:15
191:20 286:4
**ID'd** 168:20
**idea** 142:16 151:22

162:12 179:8
214:3 216:9,14
221:5 225:8,17
232:3 265:21
281:9 295:6 297:5
299:23
**identification** 137:9
146:4 153:23
191:12 193:4
199:20,24 209:21
210:1 221:8
233:18 246:18
248:20 256:18
290:15 302:23
**identified** 170:2
171:15 217:1,5
271:16 274:21
**identify** 280:11,21
287:11
**Identifying** 289:19
**identity** 205:2
286:13
**II** 135:11
**illegal** 156:12,21
158:6 164:12
251:7,23 252:9
262:9
**image** 281:2
**imager** 281:2
**immediately** 177:24
219:4
**IMPACT** 240:13
**IMPACTS** 240:15
**imposed** 211:9,17
288:1
**improper** 287:20
288:1
**inappropriate**
161:11
**incarceration** 283:3
**incidences** 200:16
**incident** 253:9
254:17 255:5
300:13
**incidents** 200:19
**include** 261:24
**including** 216:6
**incorporate** 139:1
139:20 168:3
**incorporated**
165:23 167:12
**incorrect** 198:14,20
272:2
**independent** 145:5
147:8 150:6
169:22 214:12
278:10 307:12,13

**independently**
146:18 148:14
151:15 164:6,23
192:8
**indicated** 168:12
**indication** 308:12
**indictment** 229:6
**individual** 178:19
181:10 204:5
205:2 206:18,21
207:12 210:4
244:10 256:3
259:3 265:12,23
275:6
**individuals** 163:11
254:21,22 255:15
255:16,23 257:21
282:10 283:8,10
285:15
**infancy** 196:11
**inform** 220:5
245:11,14
**informant** 142:23
143:1,13 144:8,10
144:15 145:8
150:16 151:4
152:4,8,17,23,24
157:19 158:9
159:2,5,12,14,17
159:24 160:9,9,14
185:10 186:18,21
192:2 195:14,19
195:23 196:4,10
196:15,17,24
204:20,24 259:6
259:11 263:8
265:15 266:13
269:9 274:9
277:24 278:3
279:9 286:11
287:2,19 288:4
289:5 301:18
302:7 304:24
305:17,22 306:3
306:16,24
**informants** 279:12
285:9 303:14,15
303:20 304:2,4,7
304:14
**information** 144:5
144:12 149:5
151:12 152:1
153:9 156:11,20
157:3 158:22
160:24 162:7,13
163:20,23,24

164:2,22 182:15
194:3,9,13,18
197:4 198:2,13
201:1 204:3,5,16
204:17 227:23
245:15 258:23
264:3 265:9 266:4
267:23 269:1,2,4
270:5 271:18
272:4,5,6 275:16
275:17 277:9
279:13 280:7,17
280:18,23 281:7
285:9,10,23
286:15 287:21
289:17 291:7
292:20 294:20
301:14 305:8,9
**Informed** 213:22
218:23 219:3
272:9 273:20
**informing** 280:6
**initiated** 258:22
265:8
**innocent** 229:1
**inquiry** 287:19
**inside** 175:21
177:13 281:22
284:19
**instructing** 214:16
214:19
**instructions** 140:2
310:1
**Integrity** 142:19
152:7,11,22
157:21 264:12
305:6
**intention** 282:7
**Internal** 154:11,13
155:4,17 156:6
191:15,22 240:4,7
240:10 298:9,10
**interrupt** 278:8
**interrupted** 207:4
278:17,18
**interrupting** 161:23
162:3
**interview** 291:8,9
**interviews** 291:10
**intimidation** 225:16
226:2,4 227:3,7
252:1,16 254:13
255:14 301:2
308:7
**investigate** 187:12
227:6 298:12

**investigated** 240:5
240:8 254:15
286:5
**investigates** 264:13
**investigating**
240:11
**investigation**
146:20 154:15
156:24 162:20,22
164:2 176:14
179:16,16 181:23
181:24 182:5,6
183:19 184:22
185:4,5 188:14
194:4 196:2
197:17 201:20
203:2 225:3,10,15
226:1,5 227:3,10
227:22 228:18
252:15,19 254:6
257:23 258:10,16
258:19,22 259:5
259:10 265:3,6,8
265:14,24 271:18
272:3 280:4 281:8
281:12 282:6,11
283:8 285:8,16
290:2 292:17
298:7 302:4 308:9
**investigations**
141:17 225:7
265:20 266:1
**investigator** 162:10
163:15,16,19,21
192:3 197:2
232:18 240:24
241:3 243:12,14
243:16 244:1,11
245:11,14 249:6
258:2,19 265:5
289:17
**investigators**
294:24 295:4,20
295:23
**involved** 146:20
183:19 184:14
188:13 189:13
207:14 231:1,10
245:24 257:19,21
258:16 264:19
265:24 268:10
270:23 271:4,14
282:6 283:8
285:15 289:18
**involving** 155:19
**issue** 141:11

Case 2:14-cv-01643-RBS    Document 61-6    Filed 06/29/22    Page 118 of 128
Torain v. City of Philadelphia, et al.

POLICE OFFICER BRIAN REYNOLDS-VOLUME II, 9/23/21

150:12 195:13,15
242:15,16 262:23
263:3,4,5 294:19
**issued** 253:11
307:21
**issues** 198:19
**issuing** 227:5
**items** 224:21

---

**J**

**jail** 142:10 219:10
270:16,19
**January** 210:18
212:18
**jean** 167:4
**Jefferson** 164:11
168:19,21 171:6
171:11,16,23
172:3 182:13
280:10 281:21
283:7,17 284:7,18
284:18
**Jeffery** 137:19
**Jeffrey** 217:6
229:13 256:24
296:4
**Jersey** 135:23
244:22
**job** 157:13 165:18
188:7,7 205:15
279:20 296:1,4
**jobs** 157:11,12,14
238:24 239:2
280:2 293:23
294:6
**Joe** 252:23
**jogged** 170:18
**John** 136:8 145:11
147:19 155:7,11
161:5,17 162:2
189:6 199:8
214:12 215:14
226:23 229:2
233:7 235:18
241:8,22 247:3
252:21 253:15
261:19 272:23
278:24 281:18
290:7
**Johnson** 146:17
**joined** 292:3
**Joseph** 138:15
**jpgonzales@md...**
136:10
**judge** 147:16
148:12 185:13

194:22 225:14,24
226:8 227:5
252:14,18 253:3
255:11 300:24
301:10 307:21
**judgment** 230:20
**July** 140:5 141:3
200:9 269:17
298:20
**jumped** 254:19
**juncture** 186:5
**jury** 199:12 229:4
**Justice** 251:17

---

**K**

**K-5** 282:20
**Kareem** 135:4
210:4 212:22
218:15 220:4,6,10
221:20
**keep** 199:5,7
224:17 269:3,3
273:15
**keeping** 198:12
**Kelly** 147:15 148:11
154:17 169:14
176:14 194:22,22
194:24,24 206:12
206:24 207:11,12
227:17
**kept** 187:17
**key** 175:11 177:14
205:22 206:7,11
208:22,22 209:4
214:1 221:24
222:15 296:9
297:9
**keys** 296:7
**kidding** 248:2,3
**kind** 165:2 217:24
221:8,8 267:14
**kitchen** 216:16,19
**knew** 180:24 204:6
219:12 246:3
273:7,11,12,18
279:8
**know** 138:23 139:2
140:7 142:7,9,11
142:15 144:10
150:4 152:14
153:2 154:8 155:6
156:17 158:2
159:15 160:2,23
161:2,3,24 165:3
165:4,18 166:7,13
167:23 170:4

178:17 180:22
182:14 183:4,6,7
185:8 186:1,6,11
187:10,19 190:6
191:2,7 192:10,13
195:15 196:20,23
198:18 202:11,22
203:15 205:1
206:15,21 207:1,7
211:8 215:13,21
216:10 217:10
220:24 222:22
223:3,24 224:2,4
225:6 226:5 227:3
227:20 228:3,4,5
228:6 232:1,12
233:9,23 235:13
236:16 240:10,12
242:15,17 243:8
244:2,17 245:1,5
245:10,24 246:8
251:10 252:8
254:10 256:8
259:9,20 260:12
260:13 263:1,22
264:6,14 268:12
268:17,18 269:22
269:23 270:12,14
270:19 271:7,11
272:20 273:12
278:5,7 279:6
281:6 285:24
286:18 287:3,24
288:1,1 289:6,8
289:10 290:5
293:21 295:22,23
297:15 298:4
299:16,18,20,22
300:10,11 302:10
302:12,13 303:21
305:11,19 306:4
306:19,20 307:10
**knowledge** 251:4
303:19
**known** 202:17
266:13 270:20
308:15
**knows** 268:24
**Kolind** 244:13
**Kolins** 244:11
**Kushner** 295:24
296:2,3,6,21
297:10
**Kushner's** 296:22
297:2

---

**L**

**L.B** 212:21 216:17
219:8
**lack** 143:11 249:5
**Lansdowne** 156:13
156:21 167:19
**lastly** 140:17
**laugh** 235:1
**laughed** 300:7
**laughing** 300:4
**law** 136:2,12
138:16
**lawsuit** 234:2
236:11 242:8
245:16,21 246:1
251:12 252:6
254:11 292:4,7
**lawsuits** 294:4
298:13,15
**lawyer** 246:4
**lead** 143:3 144:1,1
163:15,18 192:3
197:1 258:2,19
265:5 289:16
**leading** 257:19
301:24
**leaf** 149:20
**learned** 228:13
**leave** 171:23 172:3
173:5 175:5,8
192:23 219:4
**leaving** 209:8
284:19
**led** 258:19 265:6
**left** 138:16 141:1
167:18 169:11
172:20 173:14
174:2,9 180:8
219:23 257:3
284:19
**legal** 233:5,8
**let's** 141:24 145:13
162:17 170:10,11
180:6 182:2
190:23 192:14,19
193:15 202:13
211:8 213:2
246:14 247:21
248:22 249:18
250:2 256:10
276:20 290:5
**letter** 220:3,9
282:20
**Liacardello** 246:7
**Liciardello** 225:22
231:14 232:10,12

235:5 237:21
238:1 246:5
250:22 251:8,16
251:24 252:3
254:19 292:22
295:21 296:5
301:6 308:6
**lie** 223:16,20 230:1
271:9,11,23 281:7
282:3,13,14,15
295:23
**lied** 223:22,22
229:23 230:3,9
234:7 261:18
266:10 281:8,11
294:24 295:4,8
297:10,10
**lies** 223:8 229:18
**lifted** 211:12
**light-skinned**
266:14,24 267:1
**line** 154:23 157:22
167:1,17 171:9
311:4
**link** 177:5 242:13
242:13
**list** 147:16 191:15
255:16
**listen** 261:19
274:14,17
**litigation** 250:22
**little** 182:2 193:15
**live** 267:11
**lived** 175:1
**living** 271:20
**locate** 187:13
**located** 180:13
282:7
**location** 280:21
283:17 302:4
**locations** 266:5
**locked** 218:22
269:15 274:15
**long** 164:21 219:14
219:15 237:18
238:7 250:20
275:2,14,19
277:23 300:6
**longer** 250:18
**look** 147:24 148:1
148:17,18 149:3
149:20 164:8
192:14 210:7
247:14 294:10
**looked** 231:20
247:4,7

looking 207:21
290:8 304:20
looks 145:20
168:22
lose 222:4
lost 222:3
lot 283:10,11
lunch 300:22
luncheon 300:16
lying 177:10 235:7
235:8 236:7 260:1
260:3,5,10 282:17
295:21

**M**

magnitude 159:20
maintain 152:13
making 161:6
196:14 272:17
301:7 310:7
male 167:3,17
168:20,20 169:23
170:14,17 171:14
171:15,19,22
172:2 184:1
216:24,24 266:14
manager 206:19
manner 279:14
Margaret 218:21
219:1,3,22
mark 145:18 153:20
190:24,24 191:7
192:20 193:1
199:16 233:14
248:17 256:6,10
290:5
marked 145:19,20
146:4,7 153:23
154:2 180:1
191:12 193:4
199:20,23 209:21
209:24 233:18,21
246:18,21 248:20
249:4 256:5,7,18
256:21,22 257:2
260:8,15 290:15
290:18 302:23
303:2
Market 135:15
136:8 178:5
marking 247:9
MARSHALL 136:7
Mas 172:22
master 142:17,21
152:10,14,18
155:24 171:21

174:4,11 178:21
182:8,10,13 186:5
187:15,17 213:3
289:14 301:13
matter 191:20
212:3,10 309:6
311:3
McCowski 236:19
237:3
McGirk 194:22
MDWNFU 249:11
249:12
mean 144:3 147:13
149:22 151:1
152:14 158:4
164:14 165:4
175:23 180:10
181:6 197:13
200:18 204:11
229:1 230:9
234:23 237:2
238:20 245:18
263:1 269:3 270:4
291:18 305:12
meaning 179:16
237:8 270:3 277:8
means 143:18,20
143:22 152:4
158:5 265:21
309:21
mechanic 280:8
meet 262:19 291:19
memorialized
153:16
memorializing
186:23
Menel 242:13
mentioned 149:24
150:1,15 151:14
168:7 262:16
294:4
met 262:21 283:6
Michael 136:2,3
149:10
middle 170:11
218:7
Miguel 219:13
Mike 175:24 192:18
235:16
mind 195:6
minor 219:14
minute 162:21
222:2,3 247:23
275:7
minutes 167:2
178:16,16 184:15

212:23 219:16
278:19
misconduct 292:21
misrepresented
308:12
mistaken 307:22
mistakes 200:14
Monaghan 162:10
162:16 176:13
177:4,14,20 179:1
182:9 183:9 201:7
201:15 203:8,14
203:15 204:1
205:14,22 206:7
206:11,13 208:13
208:15,16,21
216:7 222:1,15
299:7 300:3
Monaghan's
178:20 183:8
203:22 299:13
Monday 210:14
money 229:15
232:15 246:6
282:7,16 283:11
293:24 294:6
monitor 218:18
month 188:3,7
months 181:23
Moon 219:13
morning 139:24
mother 210:3,18
213:20
motion 147:3,23
261:24 262:7,24
motions 193:10
260:16 261:16
move 302:20
moved 237:1
moving 191:17
MPO 304:12

**N**

N 136:1 137:1
name 138:16
184:15 186:6,8,9
186:13 230:18
234:14 268:18,20
281:1 297:4
302:13 310:10
named 141:12
names 198:19
narcotic 280:7
narcotics 156:12
158:6 264:18
279:17,21

near 280:7 301:1
need 251:15 269:1
305:11,11 310:17
needed 185:10
192:5 238:24
282:10 285:14
304:23
needs 224:16
nefarious 227:24
neighborhood
271:20
never 139:2 170:2,3
170:4 172:9 184:2
195:6 210:19
219:23 220:2,8,14
223:8 231:18
240:16 245:5
246:23 251:1,20
252:7 268:4 271:3
271:3,4,8 282:18
285:20 293:17
nevertheless 227:9
new 135:23 304:17
news 217:7 299:21
newspaper 217:3
NFU 252:13 264:18
nice 149:8 150:21
nine 180:19 298:21
nod 140:10
normal 198:9
Norman 169:16
225:22 255:8
North 172:22,23
173:7,8,11,16
212:19 213:21,23
notary 135:18
309:14 310:18
note 138:12,19
187:4
noted 215:23 257:9
310:8 312:10
notes 142:23 143:2
144:13,15,17
165:2,6,7,11,17
165:21,22 166:3
166:21 167:7,11
198:2,4,7,10,11
198:12,15 199:5,7
277:17 309:8
Notice 135:14
notified 225:9
299:10
notoriously 202:17
November 193:10
number 137:9
152:23 155:1

156:10 164:10
167:3,6,8,17
168:20 169:14,23
170:14,17 171:14
171:15,19,22
172:2 181:1
183:18 184:2
186:14,15 187:5,7
189:21,22 190:4
190:14,16 191:3
208:19 249:11,12
302:4,7,9 307:24
308:1
numbering 139:8
numbers 141:8
189:23 290:9
numerous 206:14
266:17 279:24

**O**

oath 140:17 262:2
object 149:23 205:3
233:3 241:6
252:17
objection 142:2
143:5,5,15 144:22
145:9 153:11
155:10 158:10
161:1 175:24
176:7 182:18
183:5 184:4
185:19 188:16,24
189:15 197:12
198:21 206:1
208:5 210:16
214:8,15 215:9,23
222:11 228:23
233:2 234:20,21
235:10 237:10
242:7 253:16
263:10 272:16
273:1 289:1,20
290:7 296:11
objections 138:4
observations 163:8
observe 173:20,21
observed 167:14
169:8 170:24
171:14,22 172:7
172:13 173:5,18
218:7,9,13,18
observing 209:3
obtaining 258:22
265:9
obviously 146:9
304:21 308:14

Case 2:14-cv-01643-RBS   Document 61-6   Filed 06/29/22   Page 120 of 128
Toran v. City of Philadelphia, et al.
POLICE OFFICER BRIAN REYNOLDS-VOLUME II, 9/23/21

occasions 266:17
  279:24 292:1
occurred 201:2
  207:18
odd 239:2
offense 185:18
  254:14 262:13
office 142:20
  152:12,22 157:21
  184:10 225:15
  226:1 238:21
  287:15 305:7
  308:8
officer 135:13
  137:12 140:1
  142:12 143:4
  144:1 146:6
  154:17,24 156:10
  160:20 164:10
  168:6,11 169:9,12
  169:14,15,16
  171:13,21 174:7
  175:8 177:19
  179:1,4 183:8
  190:10,19 191:16
  193:12 197:17,18
  199:22 201:15
  202:9 204:14,19
  205:7,13,13,20,21
  206:11 207:14
  209:23 213:4
  214:17 215:24
  217:2,5,9,21
  219:6 220:19
  221:3 223:10,11
  223:18,19 224:20
  225:2,4,19,21,22
  227:21 228:11
  229:10,12 232:24
  234:16,18 235:5,5
  235:6,8,23 236:1
  236:19 237:2,20
  237:21 238:2,4
  242:4 243:11
  244:8,9,17,23
  250:22 251:8,16
  251:24 252:3,4
  253:23 254:14,18
  254:19 256:20
  257:12 258:15,15
  258:21 262:1
  264:1 265:8
  266:17 269:7,7,8
  274:10 284:10,13
  291:13 292:22,22
  296:5 301:6,17

  305:5
officer's 168:7
officers 146:19
  163:4,7 169:13
  171:4,10 175:17
  176:15,16 177:13
  177:19 179:15,22
  188:13 189:13
  191:5 194:14
  204:16 205:23
  206:6,8,13,15
  213:23 214:5
  215:7 216:6,11,20
  216:21,23 225:21
  227:12,15 228:1
  229:9,17 232:21
  238:24 264:13
  282:6,16,22 290:4
  292:16,23 300:11
Ogden 266:17
  267:12
Oh 294:12
okay 139:10 141:6
  141:24 144:6,11
  144:16 146:13,23
  148:14,17 150:9
  150:23 151:10,16
  153:1 154:8,14,20
  155:23 156:2,20
  157:16 158:3
  159:16 160:16,23
  163:1 164:8,21
  165:11 166:5,24
  167:11 169:2,5
  170:23 174:16,20
  177:12,16,23
  178:9 179:15
  181:20 182:10,14
  182:21 186:4,17
  189:19 191:17
  192:14 193:23
  194:1,7 195:11
  196:2,8,13 199:5
  200:10 201:5,24
  202:13 203:20
  204:19 205:20
  207:20 208:1
  209:17 210:6
  212:14 216:10,15
  218:1 221:6,18,23
  223:10,22 224:24
  227:5,9,20 228:13
  229:2 230:7 231:5
  232:1 233:13,13
  234:17 235:21
  236:21,24 238:6

238:11,17 239:17
  240:6,10 242:4,11
  243:3,21 244:7
  245:11 246:15
  249:3 250:1,7,19
  251:3 252:12
  254:17 256:5
  259:22 267:2,19
  268:21 269:13,23
  270:8 273:17
  275:4 276:12
  277:16 279:5,23
  280:3 281:10
  282:19 283:15
  287:4,17 292:1,7
  292:20 293:17
  294:13,16 295:9
  295:11 297:12
  298:12,14 300:23
  303:1 304:6
  305:16 306:6
  307:14
old 300:4
once 142:13 213:11
  247:14 284:18
ones 152:22,23
  153:1
open 177:14 218:9
  219:2
open-ended 161:15
opened 208:23
  218:24
opening 225:14,24
opinion 214:9
  215:1
opportunity 258:6
  264:23
opposed 159:11
  208:11
oral 135:13 255:1
order 160:10
  226:23 227:6
  245:2 252:18
  253:11,13,15,18
  254:2 271:18
  272:4 280:19
  285:13 305:8,8
  307:22 308:2,3,4
  308:5,13,14
ordered 252:15
  280:10,18
original 310:20
Outside 291:22
  299:2

---

**P**

P 136:1,1,8
p.m 167:19 308:23
P/O 136:11 137:3
  138:8 311:2
  312:17
packet 152:5 159:7
page 137:2,9 139:8
  141:7,10,11
  147:24 148:1,3
  149:1 164:9
  168:18 170:12
  192:18 193:16,17
  194:7,20 195:5
  197:21 198:6
  257:13 293:5
  294:9 311:4 312:1
pages 144:18 145:2
  150:3,15,18 151:7
  151:8 205:4
paid 159:24 160:2,3
  160:9 186:22,24
  246:4,6 302:3
paperwork 159:3
  160:8,10,22
  196:23 239:1,2
  240:16 288:5,17
  289:11,13,15
parade 230:7
paragraph 168:13
  212:17 218:1
  220:7 257:14,18
  258:5 279:7 308:6
paraphrasing
  205:18
parentheses
  170:15
park 174:20
parked 174:22
  281:21
parole 201:19
  220:13,16 222:23
PARS 183:20
part 138:14 139:19
  139:20 154:9
  177:21 185:3
  210:20 213:9
  227:22 273:10
  292:12 293:14
  301:11 303:3,11
participate 164:1
particular 144:6
  147:2 177:5 191:6
  195:18 208:4
  292:7 294:3 303:5
  303:13,20
particulars 230:19

parties 138:4
  244:19 245:3
partner 202:15
  250:22 256:24
  284:14
partnered 168:16
partners 250:23
  258:10 264:20
  265:3
party's 245:3
pass 267:24
passed 240:16,19
pay 159:22
pendency 143:13
  143:24 144:6
  150:11 151:17
  162:11 192:2
  196:10 251:12
  252:13 254:20
  256:1 263:9 269:8
  286:9 292:17
  294:18
pending 140:16
  225:8 247:24
  248:5 282:21
Pennsylvania
  135:1,16,22 136:4
  136:9,15 212:20
  244:18 245:1,9,13
people 230:10
  234:9 235:9 236:8
  293:24
percent 270:10
  294:23
period 172:4
  187:11,19 239:9
  284:21
perjured 228:20
perjury 262:11
  283:3
permission 236:5,9
  244:19 245:13
permitted 266:2
person 170:5
  179:12 182:15
  269:2 275:19
  277:23
personal 160:5
  242:16 251:4
  279:1 281:21
personally 153:3
  170:21,24 173:24
  174:3 257:18
  265:23 269:10
personnel 239:12
perspective 213:2

SUMMIT COURT REPORTING, INC.
215.985.2400 * 609.567.3315 * 800.447.8648 * www.summitreporting.com

Case: 2:14-cv-01643-RBS  Document 61-6  Filed 06/29/22  Page 121 of 128
To: ... City of Philadelphia, et al.
POLICE OFFICER BRIAN REYNOLDS-VOLUME II, 9/23/21

231:13
pertaining 155:14
ph 138:15 190:22
  228:11 236:20
Philadelphia 135:6
  135:22 136:4,9,12
  136:15,16 212:19
  279:10 280:8
  285:7 298:7 303:4
  303:12 311:3
phone 137:17,18
  219:17,18
photo 281:2
photograph 217:3
  217:6
physically 224:20
pick 139:8 141:1
  145:21
picked 174:12
  180:9,13 213:11
  213:13
piece 297:9
pieces 295:2
Pike 135:23
pil423@aol.com
  136:5
Pileggi 136:2,3
  137:5 138:22
  139:10,16,24
  140:24 141:6,9
  142:6 143:9,10,23
  145:4,11,13,16
  146:6,8 147:9,11
  147:18,22 148:4,7
  148:13 149:2,14
  149:18 150:5,9,10
  153:15,20 154:1
  154:22 155:6,10
  155:15,18,21
  156:3,8,16 158:13
  158:18,19 161:3,5
  161:8,12,17,20,22
  162:2,5,23 163:5
  165:16 166:13,17
  166:20 170:10,13
  173:3,4 176:4,11
  181:8,16,21
  182:20,23 183:10
  184:8 185:21,24
  186:4,7 187:2,6,8
  187:14,21,24
  188:5,8,11,19
  189:3,6,8,12,19
  190:2,6,11,17,23
  191:4,14,18
  192:14,17,19

193:9,24 195:2,5
  195:12 197:15,21
  197:24 199:1,8,16
  199:22 200:3,7,11
  205:6 206:5 207:9
  208:9 209:17,23
  210:7,10,12 211:2
  211:6,14,17,21
  212:1,5,8,11,14
  213:1 214:11,14
  214:17,19,23
  215:3,6,12,17,19
  215:23 216:3,4,13
  216:15 217:8,18
  217:20 218:1
  220:11 221:18,22
  222:4,17 224:5
  225:1 226:9,11,14
  226:18,22,24
  229:2,3 230:4,6
  231:11 233:4,7,10
  233:13,20,22
  235:2,3,15,18,21
  235:22 236:4
  237:12,17 241:8
  241:11,13,16,22
  241:24 242:4,7,10
  242:22 243:3,8,10
  246:14,20 247:2,5
  247:11,16,23
  248:2,5,17,22
  249:3,15,18,21
  250:2,4 252:20
  253:1,10,15,21
  254:4,7,12 256:5
  256:14,20 257:9
  258:5,12,18 259:7
  260:23 261:7,10
  261:14,18,22
  262:5 263:14
  264:22 265:16,22
  266:7,12,20
  267:22 268:2
  269:5,6 270:20
  271:1,16,22
  272:18,21,23
  273:4,6,14 274:19
  274:22,24 275:11
  276:11,16,18,22
  277:16,21 278:10
  278:14,21,24
  279:5,19 280:3,12
  281:17,20,24
  282:5,12 283:5,12
  283:15,20 284:16
  285:2,4,6,17

286:9,16 287:17
  287:22 288:11,13
  288:16,21 289:6
  289:12,23 290:11
  290:17,23 291:5
  293:8,9 294:5,10
  294:14,15 296:14
  296:18 297:17
  298:3 299:4,6,21
  299:23 300:1
  301:12,16 302:11
  302:19 303:1,10
  303:17,23 306:12
  306:21 307:14
  308:3,16
Pine 179:23
place 202:5 256:15
placed 201:10
  221:9,13,20,23
  222:18 223:1
  240:7,22 300:20
plain 180:16
plainclothes
  179:17 216:20
plaintiff 135:4
  136:5 210:19
plaintiff's 210:18
plaintiffs 211:9
  235:5 249:7 301:7
plate 181:1
played 202:22
pleading 261:3
please 143:8
  145:11,12 158:11
  199:17 215:14
  241:11 243:2
  253:16 261:19
point 157:6,16
  159:23 176:10
  177:17 179:20
  195:23 201:17,22
  222:14,18,22
  228:7 230:13
  232:7 235:17,19
  237:6 241:2
  250:21 264:8
  293:2 295:8
police 135:13 153:4
  154:24 156:9
  158:24 164:10
  169:12,14,15,16
  171:13,21 205:1
  213:22 214:5
  215:7 216:11,20
  216:23 217:2
  219:3,23,24 220:1

221:3 225:4
  232:20,24 234:16
  234:18 235:7
  236:1 237:8
  238:23 244:8,9,17
  252:4 254:14
  257:12 258:21
  264:1,13 265:8
  274:11 279:10,11
  282:6 285:7
  291:13 298:7
  301:6,18 303:12
  305:23 307:8
policies 159:1
  187:16 221:6
  274:6,10 279:10
  279:11 285:12
  303:4,11,13,19,21
  305:23
policy 159:10 275:9
  285:7 304:3,6
  305:16 306:1
  307:10
Pontiac 167:5,15
  169:18 170:18,20
  171:5,10 181:1
  183:18 213:4
  284:7
portion 222:8 243:5
  248:8 308:5
portions 254:1
positive 225:13
  252:22
possession 212:13
possible 282:8
potential 227:7
potentially 182:14
practices 228:1
premise 175:23
premises 175:22
prep 262:19 277:4
prepare 224:20
prepared 224:17,18
prepping 275:21
presence 299:2
  306:2
present 180:3
  203:22 205:7
  212:18 252:23
  280:4,9 283:5,15
  287:17 300:9
presented 257:1
pretrial 148:4
  193:10 260:16
  261:16 262:6,24
  286:13 287:10

pretty 263:16 297:9
previously 151:23
  154:9 172:19
  194:1 205:12
printed 190:21
prior 150:21 194:11
  203:2,3 257:6
  259:4,9,17 261:2
  265:13 270:9
  272:7 273:8,19
  279:24 299:1
prison 268:8,13
private 240:24
probable 153:17
  154:5 160:21
  165:10 167:10
  200:17,21 201:2,7
  258:7 264:24
  280:15 282:9
  284:5 285:13
  294:7
probably 149:7
  159:19,21,22
  160:5,6 166:1
  186:22 211:8
  243:17,19 278:4,6
  284:1,2 300:9
  306:8,14
probation 201:18
  220:17 222:22
problems 252:10
procedure 159:6,9
  198:9,12
procedures 187:16
  221:7 274:11
  279:11 285:13
  303:4,11,13,19,22
  305:23
proceeded 218:12
proceeding 287:11
proceedings
  286:13 309:6
process 239:1
processing 239:1
produce 211:20
  247:5 261:5,11
produced 155:5,23
  210:19 211:10
  246:23 247:10,16
  257:6,16 260:13
  260:14,19 261:6
  261:12
producing 215:20
production 210:22
Professional
  135:18

promptly 310:21
property 176:10
  177:19 201:11,19
  201:24 202:2
  208:8,11 221:1,9
  221:13,21,24
  222:15,19,20
  223:1 224:18,19
  224:21 240:22
propounded 312:9
prosecute 282:10
  285:14
prosecuting 272:10
prosecution 228:14
  232:14 257:20
  258:21 265:7
  282:21
prosecutor 273:20
  275:18,20 277:3
proven 294:22
provide 152:22
  166:5,10 187:3
  189:20 192:5
  211:23 262:4
  277:3,8,9,12
  280:2
provided 144:4,12
  144:19,20 149:5
  151:12 152:1
  158:22 194:2,13
  197:4 198:2
  201:15,20 202:14
  204:17 210:23
  211:2,3,21 227:23
  231:12 260:21
  270:4 292:20
  294:20,20 295:11
  295:13,19,22
  310:12,17
providing 144:23
  204:14,15 264:3
  267:23 275:15
public 135:18
  309:14 310:18
pull 281:2
pulled 218:14
pulling 157:10
punishable 262:13
purpose 204:22
pursuant 135:14
  274:10 305:16
put 139:16 155:21
  156:3 165:9,19
  198:11 201:2
  210:15 213:2
  238:11 281:3

296:6 301:12
  307:15
putting 226:17,19
  256:11

_____

Q

question 140:16,16
  143:6,8 145:10,15
  147:23 158:11,16
  161:10,16 162:4
  166:17,19 173:2
  182:22 188:17
  189:2,17 192:21
  193:13 205:18
  207:4 216:1
  217:16,19 221:17
  222:6,12 233:11
  242:17 243:9
  244:24 247:24
  248:1,4,6 253:9
  255:22 259:16
  272:19,21,22
  273:23 274:16,18
  274:23 275:8
  276:17 277:7,11
  277:15,18 278:9
  278:13,20,23
  279:1 281:6 296:8
  296:12 297:22
  305:21 306:10,10
  306:22
question's 215:15
questioned 296:23
questions 138:5
  140:7,18 141:16
  154:24 176:6
  191:21,24 195:16
  200:4 212:8
  214:22 242:6,20
  247:15 257:3,10
  261:19 286:12
  287:7,8 303:18
  307:17,18 312:9
quit 241:11,11,12
quote 149:5 258:23
  258:24 294:5
  308:10
quoting 294:8,9

_____

R

R 136:1 309:2
raised 286:12 287:7
  287:8
ran 184:15
Randle 231:2
Randles 230:16

range 249:1
re-ask 173:1
read 138:20 142:23
  143:2 144:13
  145:2 147:7,9,10
  147:18 148:9
  149:7,11 150:14
  151:7,8 154:23
  171:2 172:1
  193:18,19 194:7
  195:7 210:9,11,12
  212:14 222:6,9
  231:20 242:23
  243:1,6 246:22
  248:9 252:24
  253:2 304:16,17
  306:2 307:11
  310:2,3 312:6
reading 150:17
  204:7
really 233:12
  235:17 247:2
  272:14 291:24
rear 284:17
reason 240:2 310:5
  310:9 311:4
recall 141:4,14,18
  141:21,22 142:14
  144:22,24 145:1,2
  145:7 146:19
  149:17 151:2,10
  151:15,16,19
  153:6,6 154:18
  157:8 165:1 166:3
  166:8,12,16,21,23
  167:7,24 168:8
  170:9 174:21,24
  175:5 177:3,12,15
  178:14 180:5,15
  180:15 181:12,17
  183:15,16 184:10
  184:12,17 185:11
  185:12,15 186:9
  186:11,13,19
  188:15,20 191:19
  191:24 192:8,9
  194:2,5 196:13,18
  197:10,16,20
  199:2 200:12,15
  201:1,4,9 202:3
  203:22 204:1
  205:12,20,24
  206:4,9,10,20
  207:16,19,20
  209:11 213:15
  217:12,14,17,21

217:23 220:16,21
  225:14,24 226:18
  227:1,2,5,8,14,20
  229:12,19 230:2,5
  230:7,12,17,18,20
  230:22,24 231:7,8
  231:9,16,19,23
  236:23 237:4,19
  238:8,10,12 239:9
  241:2 243:14,20
  243:21,23 244:3,6
  244:15 245:18,19
  246:13 250:9,12
  250:14 254:1,2,17
  255:3,5,7,9,11,13
  255:13,15,18,20
  255:23 256:3
  259:14,17 262:21
  264:21 267:4
  269:16,18,20
  270:11 275:23
  276:5,9 277:19
  280:1,13,14,18,20
  280:22 283:14
  284:3 286:7
  288:20 292:2
  295:1,2,6,24
  296:2,3,14 297:6
  297:6,8 300:2,5,8
  300:13,18,21,23
  301:9,10,11
  303:24 304:20,22
  308:14,18
recalled 205:13
  226:15
recalls 253:23,24
recap 182:2
receipt 201:11,19
  202:2 221:1,9,21
  221:24 222:19
  224:18,19,21
  240:22
receipts 222:20
receive 310:22
received 156:10
  157:2 204:2
  219:16 280:5,17
  298:23
recognize 201:5
recollect 148:14
  150:7,8,12 164:6
recollection 145:6
  147:8 150:6 160:5
  160:7 169:22
  179:14 194:8
  196:9 200:8

214:12 220:12
  228:12 246:15
  250:11 254:8
  257:24 265:17
  266:22 271:2
  278:11 279:2,4
  284:6 298:11
  307:12,13
record 139:2,11,14
  139:17 146:1
  147:12 148:22
  149:23 152:20
  154:9 155:13,22
  156:4 157:9,11,15
  184:1 186:3
  187:24 188:4,9
  190:9 191:8,14
  210:16 222:9
  224:15 226:20
  230:1 242:24
  243:1,6 244:19
  245:2,12 248:9
  249:8,19 250:5
  256:11,15 268:15
  268:15,22 271:12
  271:12 290:21
  298:1 300:20
  301:13,15 302:14
  302:17,20 303:8
  307:16,23 308:19
recorded 137:17,18
  245:8,10
recording 295:15
  295:18
recordings 246:8
  249:6
records 157:16
recovered 159:20
  224:21
recovering 201:23
refer 141:7 193:14
  198:14 217:10
  257:13
reference 249:1
  293:6
referred 202:23
  289:14 308:8
referring 141:2
  155:3 162:17
  204:3 219:12
  289:13
reflected 149:12
  150:1
refresh 194:8 196:8
  220:12 246:14
  250:11 254:7

SUMMIT COURT REPORTING, INC.
215.985.2400 * 609.567.3315 * 800.447.8648 * www.summitreporting.com

Toran v. City of Philadelphia, et al.    Case 2:14-cv-01643-RBS    Document 61-6    Filed 06/29/22    Page 123 of 128

POLICE OFFICER BRIAN REYNOLDS-VOLUME II, 9/23/21

257:24 265:17
271:2 284:5
**regard** 279:8
**regarding** 156:11
200:5
**regards** 142:17
149:4,19 150:12
151:12,17 153:10
156:21 165:17
176:19 184:22
191:22 225:3
227:24 228:19
279:12 304:22
**Reggie** 290:1
292:12
**Reginald** 227:22
230:12 231:1
232:10 263:19,23
291:14 294:19
**registered** 135:18
205:1 287:18
288:4
**related** 242:12
**relative** 220:5
**relevance** 241:7
254:10
**relevant** 155:13
212:12 241:18,21
242:19,20 247:13
247:17 308:5
**reliability** 286:14
**reliable** 271:19
272:4
**remember** 150:17
157:12,13 177:7
178:2,11 181:4,5
181:7,7,9 186:14
189:4 200:24
201:23 204:7
205:19 209:10
219:19 223:14
226:3,4 230:18,22
231:17 235:13
245:22 251:21
256:2 267:5
268:20 276:8
283:24 286:6
287:14,16 288:10
288:17 293:1,12
294:16,18 295:3,3
295:7,17 296:13
296:21 305:1,2
**repeat** 162:4 216:2
**repeatedly** 229:21
229:23
**rephrase** 143:8

158:12 243:9
273:24
**report** 157:3 158:2
183:21 199:10
253:5
**reported** 200:16
**reporter** 135:18
140:9,11 222:6
249:9,17 256:13
309:23
**Reporters** 135:21
**REPORTING**
135:21
**represented** 254:20
255:24
**representing**
138:17 260:20
**reproduction**
309:20
**request** 191:4
210:21
**requested** 222:8
243:5 248:8
283:16
**requesting** 161:20
162:2
**require** 310:21
**required** 221:6
277:22
**reserved** 138:5
**resided** 213:21
266:16
**respectfully** 215:17
215:18
**respective** 138:3
**respectively** 249:16
**response** 141:19
146:10,15 165:5
168:5 177:8 181:3
182:17 210:21
234:13 240:1
246:10 272:11
291:20 307:20
**responses** 140:8
140:10
**responsibility**
307:2
**responsible** 192:4
306:15
**retention** 187:11,19
**retired** 299:10
**Return** 310:20
**returned** 164:11
168:19
**reversed** 230:21
**review** 150:2

193:21 195:9
210:10 247:14,19
258:6 264:23
290:24 294:12
**reviewed** 152:6
247:8,12 261:2
**rewarded** 267:22
**Reynold's** 205:5
**Reynolds** 135:14
136:11 137:3
138:8 140:1 146:3
146:6 153:22
154:24 156:10
164:10 169:12
171:13,22 190:20
191:11,16 193:3
199:19 204:4
209:20,24 217:2
218:2,6,9,14,16
218:17,23 219:5,9
219:16,18,20
220:3,9 232:24
233:1,17 234:16
234:18 236:1
246:17 248:19
254:19 256:17
258:9,11,18 259:1
259:4 265:1,4,5
265:10,13,22
266:3,12,18
270:21 271:16
279:7,15 280:5,6
280:9 281:22
282:5 283:6,9,16
283:16,18 284:16
284:19,22 285:6
285:12 286:11
287:18 290:14
302:22 311:2
312:17
**Reynolds'** 287:20
**Reynolds-1** 145:18
**Reynolds-10**
137:15 209:18
210:1
**Reynolds-11**
137:16 233:15,21
**Reynolds-12**
137:17 249:10,22
**Reynolds-13**
137:18 249:12,20
250:3 256:11
**Reynolds-14**
137:19 256:21
**Reynolds-15**
137:20 290:18

**Reynolds-16**
137:21 302:20
**Reynolds-4** 256:8
256:15,22
**Reynolds-5** 137:10
146:7 147:3
260:15
**Reynolds-6** 137:11
153:20 154:3
162:18,24 197:18
**Reynolds-7** 137:12
191:9
**Reynolds-8** 137:13
193:1,14 260:15
**Reynolds-9** 137:14
199:16,23
**ridiculous** 215:16
**right** 140:9 141:1
145:13 154:20,22
155:2 157:6
159:15 163:9,14
163:18 165:6
167:15,22 168:16
169:2,7,20 170:10
170:17 173:10,20
174:19 175:2,2
176:20 181:2
182:2,6 183:1,15
188:8,22 192:11
193:12 195:21
197:1,2,8 198:15
198:20,23 201:7
201:13 202:1,4,10
202:18 203:3,8
205:16 206:16
207:21 209:23
211:3,19 213:9
218:18 220:19,22
221:9,13 222:1,21
222:23 223:10,24
225:22 226:14
228:22 232:11
233:1,7,10 234:19
235:2,9 237:22
239:5,7 240:2
241:1,20 244:8,14
244:20 245:21
249:3 251:14
252:16 253:1,17
254:4 257:9 258:5
258:13 260:8
262:17,24 263:9
264:8,12,20
267:22 268:8,19
269:5,11,24
270:13 272:15

273:5,9,24 279:21
281:4 283:23
285:20 286:18
289:19 292:3,10
292:13,17 294:5
298:14 300:9,24
301:2 302:3,6,11
305:14 306:13,24
310:3
**rights** 236:6 292:10
**rob** 271:4
**robber** 277:1
**robberies** 271:13
**robbery** 239:15
**robbing** 270:22
271:13
**Robert** 147:15
148:11 194:23,24
**Robin** 202:18,20,23
202:24
**role** 196:18 202:22
**Ronald** 135:17
309:14
**room** 212:23,23
216:18,21 219:7
**rooming** 175:18
**rough** 198:10
**roving** 169:17
171:4,9
**Rule** 210:20 241:20
**rules** 310:21
**run** 190:20
**running** 163:14
287:15
**Russel** 244:12
**Russell** 243:24
244:13

---

**S**
**S** 136:1 137:8
**safe** 296:10,23,24
**safety** 279:8
**sake** 173:14 194:21
195:21 289:16
**sales** 156:12,21
158:6 280:7
**Samuel** 255:15
**sandwich** 300:17
**Santarone** 252:23
253:6
**Sat** 239:3
**Saunders** 216:18
**saw** 159:19 169:2
170:20 172:18
175:7,9 206:23,24
216:19 217:2,6

SUMMIT COURT REPORTING, INC.
215.985.2400 • 609.567.3315 • 800.447.8648 • www.summitreporting.com

219:6 231:18
268:4 271:3,3,4
271:10 284:16,22
**saying** 156:7
160:12 161:14,21
177:3 187:18
224:17 230:4,8
240:16 247:5
255:4 263:20
269:20 272:2
273:7,15 282:17
293:8 294:5
298:14
**says** 147:14 148:10
154:24 164:9
168:18 169:6,23
170:14,15 171:13
194:10 196:3
212:17 220:8
234:23 235:14,24
236:1 241:20
247:9 257:18
261:21 264:22
286:22,24 287:5
292:24 295:18
306:1 307:10
308:4,6
**scene** 174:8 177:16
206:10
**se** 239:16
**seal** 299:14,16,19
**search** 137:11,14
214:2 218:3,5,7
218:10,14 219:14
219:15,24 220:1,2
223:12 257:20
**searching** 218:17
**second** 141:8 190:1
190:3 193:18
195:7 226:7
235:16 241:5
289:22 300:14
**secondly** 260:12
**seconds** 219:19
**secure** 176:10
177:19 206:16
208:8
**secured** 175:20
222:16
**securing** 205:23
**see** 148:18 149:1
156:14 160:8,10
164:16 167:20
170:14 171:12,17
172:5 174:3,3
175:11,13 187:10

187:12 196:3,5,7
219:8 242:12,13
253:11 271:11,12
276:2,3 277:12,17
277:18 288:6
289:11 290:9
293:10 294:14
299:9
**seeing** 150:18
175:5 293:1
**seen** 172:9,14
207:8 209:8
235:14 239:15
247:9 271:8
**sees** 288:22
**Seizure** 137:11,14
**self-disclosures**
210:20
**selling** 283:10
**send** 305:10
**sending** 139:19
**sense** 214:4 272:24
**separate** 195:22
276:17
**September** 135:16
190:21 311:2
312:6
**sergeant** 179:5,7
179:11 236:22
237:1,2,3,4
**series** 140:7 141:16
291:10
**seriously** 235:17
**session** 198:19
**sessions** 277:4
**set** 164:23 167:2
174:5 192:5
194:14,16
**setting** 174:9
**sexual** 219:13
**shaking** 140:11
**Shapiro** 255:8,12
**sheet** 169:22
201:24 221:13
223:1 310:6,9,10
310:14,20 311:1
312:10
**Shirley** 213:20
**shootouts** 270:23
271:5,14
**shop** 267:14 280:8
300:17
**shore** 299:12
**shorthand** 309:22
**Shortly** 213:20
**shorts** 167:4

**show** 157:9 163:14
186:2 209:24
223:15,17 246:20
268:14,15 288:5
288:17 303:1
**showed** 183:20
206:18
**showing** 146:7
147:3 199:22
256:20
**shown** 154:2 220:2
220:8 233:20
290:17
**side** 252:6
**sign** 138:20 153:3
196:24 275:6
277:23 287:5
289:9 305:2,9
310:10,11,15,16
**signature** 310:19
312:1,17
**signed** 142:22
144:9,10 152:4,20
152:24 153:5,7
157:19 158:9
159:4,24 160:8
192:7,10,11,13
196:20 197:11
210:17 257:8
269:9 275:14
279:4 282:20
286:10,18,20,22
287:5,18,24 288:3
289:10 305:5
306:16,23
**signing** 261:2
269:11 310:13
**similar** 239:10
**simple** 147:22
**Sinclair** 179:9,13
**sir** 171:8 286:8
**sit** 238:21
**sitting** 300:8
**six** 211:8
**sneakers** 167:5
**socially** 291:19
**SOLICITOR** 136:13
**somebody** 168:2
190:12 206:24
245:12 295:12
**someone's** 306:2
**Somewhat** 304:11
**son** 212:22 218:15
219:9,11,12 220:4
220:5,10
**sorry** 145:22

150:13 163:2
172:22 181:19
187:6 192:20
196:6 208:15
211:11 212:15
219:15 227:17
250:19 256:14
277:7 306:11
307:17
**sorts** 256:2
**sound** 213:24
**sounds** 190:3,4
**source** 160:16,17
160:24 162:6,12
163:19,22 182:19
183:8 204:2,9,21
274:23 275:12
287:20
**sources** 274:14,21
275:10 279:12
285:8 304:1,1,4
**space** 310:12,17
**Spade's** 190:18
**Spanish** 266:23
**speak** 151:11
184:11 206:22
253:7 291:17
295:18
**speaking** 151:16
291:1,9
**speaks** 147:12
149:23 304:21
**specific** 274:17
**specifics** 245:5
**Spicer** 225:22
229:10
**Spicer's** 308:7
**Spizer** 225:22
**spoke** 224:15 228:3
228:5
**spotted** 213:16
**spouse** 268:11
**stakeouts** 266:3
**stamped** 293:14
**stand** 296:22 297:3
308:2
**standing** 216:20
**start** 156:9 192:19
249:18
**started** 156:24
203:17 264:3
278:16
**starts** 168:14
**state** 218:4 244:18
245:1 250:5
253:17

**stated** 144:13
150:14 157:18
159:3 160:19
177:18 179:12
180:21 196:19
198:11 202:12
204:13 205:12
206:12,14 213:11
218:3 219:9 250:3
285:24 295:16
**statement** 137:19
154:14 162:1
188:22 189:11
191:19 231:18
259:8 272:17
286:2,19 307:20
**statements** 154:19
155:3,5,14,22
156:6 189:20
191:5
**states** 135:1,15
146:16 147:15
148:11 235:6
308:8
**status** 158:8 170:9
**stay** 211:7,12,14,17
211:20
**stayed** 211:16
**steal** 282:7
**stealing** 234:9
235:8 236:7
293:24 295:21
**Steinman** 225:14
226:8
**stenographic** 309:8
**step** 247:21
**steps** 305:1,4,5
**stipulated** 138:2
**stole** 229:16,16,21
230:9 282:16,18
296:10
**stop** 144:15 155:2
161:5,9,17,17,22
162:3 189:6
214:14 215:14,17
241:8
**stopped** 138:24
151:9 176:5 237:1
296:6
**stopping** 271:21
**stops** 150:17
**story** 199:11
**street** 135:15,22
136:3,8,14 164:11
167:18,24 168:19
168:21 171:6,11

171:16,21,23
172:3,21,23 173:6
173:6,7,15,15,16
173:21 174:4,5,9
174:13,14,18,22
174:23 175:2,3,6
175:8,17,19 177:6
178:6,21 180:10
182:11,13,13
202:10,21 205:22
206:2,3 209:8,9
209:12,14 212:19
213:4,12,18,21,22
213:23 214:1,6
215:8 216:7,13
220:15 222:16,21
223:9,12 237:6,7
237:16,20,21
238:6,11,13
239:18 240:24
243:12 246:12,12
250:7,9,12,15,16
280:10 281:21
283:7,17 284:8,18
284:18 298:5,15
**Streets** 266:17
267:12
**strike** 172:22 180:7
192:21 203:18
243:8 294:17
**struck** 193:13
**stuff** 221:14,19
226:20
**style** 217:24
**subject** 187:20
310:13
**subjected** 283:2
**submit** 200:1 210:2
211:6 236:24
290:12,23 291:1
303:3,10
**subsequent** 258:20
259:18 265:7
270:12
**substance** 310:4,8
**sue** 232:23
**sued** 232:7,20,24
252:6
**suicide** 268:7
**suing** 234:24
239:18 255:24
**Suite** 135:22 136:9
**summarize** 197:22
**SUMMIT** 135:21
**supervision** 309:22
**supervisor** 176:17

180:3 206:14
**supervisors** 236:14
**suppress** 147:4,24
**sure** 140:8,12
176:15 182:8
184:23 185:2
187:14 196:19
198:15 208:2
212:11 221:11,12
225:12 232:13
239:3,8 246:5
250:20 252:20
263:12,17 264:14
264:16 267:16
268:12 270:10
274:4 286:4,6
294:23,23 300:10
306:1
**surrounding**
196:14
**surveil** 283:18
**surveillance** 164:12
164:14,23 165:8
165:23 167:2
168:14 169:17
171:4,9 174:4,9
174:12 180:9,14
194:14,16 213:10
284:1,21
**surveillances** 266:2
**surveilled** 167:22
168:2,6
**surveilling** 163:10
284:6,10,13
**sworn** 138:9

— T —

**T** 137:8 309:2,2
**T-shirt** 167:4
**tabs** 192:23
**tag** 167:6,8 183:18
**take** 140:12,14
150:2 165:6,7,11
178:13 192:17,23
195:6,7 198:11
210:7 211:5 220:7
224:7 239:16
247:22 248:11
266:5 298:21
304:12
**taken** 135:14
224:12 237:15,20
237:21 239:17
240:21,23 243:12
248:14 250:14
298:5,15 309:8

311:2
**takes** 199:9
**talk** 202:13 218:2
**talked** 176:2 232:2
252:23 264:5,6
300:6
**talking** 162:23
182:19 206:23,24
207:2,7,8 219:7
219:18
**tall** 216:24
**Tameka** 212:20
216:17 219:6
**tap** 245:5
**target** 182:4 225:10
**targeted** 182:11
282:11
**targets** 178:20
**Taylor** 136:13
138:12,17 139:6
187:4,7,10,18
190:1,3,9,15,19
191:2 192:18
193:6 233:2
234:21 248:23
249:13,24 253:19
299:20 307:18
**team** 232:17 234:8
**telephone** 219:17
280:5
**tell** 157:9 189:21
209:1 236:18
241:12,24 245:17
268:16 269:15
275:18 282:24
283:2,9
**telling** 170:8 280:20
**ten** 178:16 180:20
298:21
**term** 143:16,18,22
**terminated** 219:20
**testified** 138:10
146:22 148:19
150:24 151:2,23
154:8 172:19
176:18 179:21
197:14 199:6
201:13 209:7
214:5 223:11,20
229:15 239:8
255:17 256:4
263:15 276:5,19
276:20 288:9
296:5
**testify** 160:4 214:20
229:7 230:23

239:7 260:6 262:1
262:1 263:16
297:12,18
**testifying** 146:19
148:15 177:12
204:1 205:14,21
209:10 229:13,19
230:2 255:7,13
**testimony** 144:21
144:23 148:24
149:4,18 151:6,18
162:15 176:19
177:1,7,15 185:13
194:21 196:21
197:7,19 198:1
199:2,14 201:17
202:14 204:8
205:19 209:6
223:14 228:20
229:18 230:11
231:22 240:6
258:8,8 259:1,23
259:24 260:2,4
261:23 262:4,6
264:17,21,24
265:1,10 276:4,7
295:24 298:22
299:1 309:5
310:12
**thank** 156:2 172:24
235:21 247:11
249:24 286:8
**That'd** 235:20
**thing** 190:7 235:14
282:18 302:19
**things** 152:20
289:24
**think** 169:15 174:19
174:22 180:21
190:11,17 193:7
194:23 197:17
198:16,18 215:20
224:16 231:17
241:18 252:10
256:7 260:19
292:18 293:2
**thirty** 178:8,10,12
310:22
**thought** 176:1
185:8
**thousand** 296:10
**threaten** 252:5
301:2
**threatened** 251:18
254:21,22 255:19
256:1 300:16,19

**threatening** 253:4
301:7
**threats** 251:11,14
**three** 151:8 185:23
289:7
**threshold** 176:3
**threw** 198:6
**Thursday** 135:16
212:18
**time** 138:5 150:18
157:2 159:14
164:21,21 168:19
176:22 178:18
183:22 186:10
191:21 192:17
203:2,11 210:10
210:23 213:16,24
215:7,10 216:6
217:9 219:8 225:4
231:3 232:14
236:22 237:3
238:18 243:11
244:9 247:8
250:15 252:24
259:12 260:20
274:15 279:15
284:21 299:8
300:23
**times** 151:20,24
152:1 170:21
185:23 206:14
244:15 245:8
259:4,13 260:24
262:22 265:13
289:7 301:23
**title** 264:16
**today** 150:22 170:5
188:17 298:23
**told** 158:5 164:24
208:21 231:16,23
236:17 278:4
286:4
**topic** 212:6
**Torain** 135:4
160:24 162:7,12
162:22 172:12,15
173:5 175:5
176:19 177:5,17
179:16,21 180:6
182:5 183:22
198:20 200:2
201:10,14,21,23
203:2 204:3
208:14,17 209:8
210:3,4 212:20,22
213:3,20 216:17

Torato-2-21-cv-01643-RBS    Document 61-6    Filed 06/29/22    Page 126 of 128
City of Philadelphia, et al.
POLICE OFFICER BRIAN REYNOLDS-VOLUME II, 9/23/21

218:16 219:22
220:4,6,10 221:20
223:5,5,22 224:22
227:15 304:8
311:3
**Torain's** 177:24
178:15,17 180:4
215:1 218:22
241:10 242:12
254:10
**training** 245:5
304:12
**transcript** 137:10
137:13 138:21
146:9,13 147:14
147:14,23 149:12
149:13 150:1,3
151:9 192:15,22
252:24 253:2
260:14,22 261:12
277:7 309:9 312:6
**transcription** 312:8
**transcripts** 193:7
**transferred** 279:17
**transport** 179:22
**transposes** 199:10
**trash** 166:1 198:7
**trial** 138:6 144:7,21
217:4 258:7,9
260:14,21 261:12
261:19,23 262:20
264:24 265:2
286:10 293:15
294:19 296:21
297:9
**tried** 170:6 175:22
183:22 211:15
230:14 262:17
**true** 142:11 162:1
259:8 266:8 268:3
281:4 282:1,13
283:13,21 285:18
286:17,19,23
287:23 288:7,14
309:9 312:7
**trustworthiness**
286:15
**truth** 282:24 283:2
**try** 214:1 215:8
216:7 301:1
304:18
**trying** 166:6 199:4
211:22 242:17
275:18
**turn** 264:2
**turned** 150:14

152:21 210:14
240:21
**turns** 198:14
**twenty** 180:22
**twice** 244:14
**twisties** 217:1,10
**two** 179:22 184:15
189:22 216:19
232:13 249:5,5
288:19
**type** 222:21

---
**U**

**uh** 298:6
**um** 140:11 143:18
147:2 151:16
172:20 174:9
176:13 191:3
204:4,4 205:21
210:4 225:4
227:10 239:12
247:1 260:19
261:1 268:23
277:1 282:19
289:24 291:10,10
292:10 295:11
298:4 300:16,24
301:14 303:4,18
304:23 307:24
308:1,2,9,11
**undercover** 240:22
**understand** 143:19
143:21 144:2
147:20 158:11,14
158:15 159:9
161:13 182:22
200:18 208:10
222:13 235:11,12
239:24 241:18
272:3 273:2,3,10
273:23 290:24
**understands**
143:17
**unfortunately**
176:4
**uniform** 179:10,12
179:13,19,22
180:3
**uniformed** 179:5
**unintelligible**
193:13 257:23
**unit** 152:12 157:21
172:21 177:13
180:1,8,9 203:19
206:8,16 207:21
209:12 222:1

237:2 264:18
279:18,21
**United** 135:1,15
146:16 147:15
148:11 308:8
**unmarked** 180:16
280:4
**unquote** 149:5
**unregistered** 259:5
259:11,11 265:14
266:13 279:9
285:9
**upstairs** 212:22
218:7
**use** 141:17 151:20
158:7,20 160:21
195:17,18 204:15
204:19 245:20
265:19 266:2
274:11,20 275:12
279:14 287:20
288:2 305:17,22
307:4

---
**V**

**v** 311:3
**van** 283:18,23
284:17,19,20,22
284:23
**varies** 302:10
**vast** 274:3,13
**vehicle** 202:4
254:20 266:3
280:5 281:21,23
283:17,24 284:3
**vehicles** 284:1
**verbal** 140:8,13
**verified** 144:5 152:2
272:5
**verify** 163:24
194:18 275:16
**verifying** 204:17
**versus** 146:16
195:14
**Videographers**
135:21
**violated** 285:12
**violating** 285:7
**violation** 279:10
**violations** 292:10
**VOLUME** 135:11
**voucher** 186:23
301:19
**vouchers** 186:20
301:14 302:2
**vs-** 135:5

---
**W**

**Wait** 162:21 171:24
207:3 221:16
222:2,2 247:23
275:7 277:14
306:9
**waiting** 281:22
**walked** 212:2,9
216:19 218:20
219:21
**Walker** 137:19
169:15 176:15,18
176:19 177:3,4,12
179:4 202:14
205:13,14,21
206:12 213:4
217:6,9,12,21
219:6,20 223:10
223:11,19 229:13
230:2 231:14
232:10 235:6
237:22 238:2
246:6 256:24
257:13 258:16
265:18 267:19
268:23 271:6,7
279:23 281:7,8
282:19 292:22
293:20 295:21
296:4,6,19 297:10
300:15,15 301:1
**Walker's** 205:8
209:6 225:19
282:15 287:4
288:22
**Walnut** 135:22
**Wanda** 216:18
219:7
**want** 140:14 141:1
145:21 147:7,9,10
148:17,17 149:3,9
149:11 154:22
155:22 160:4,6,11
166:2 169:21
198:22 209:24
210:7 212:14
215:24 220:7
231:15 235:1
242:22 243:19
253:17 257:10
278:10,14,21,24
284:2 289:23,24
289:24 290:24
293:3 294:12
301:12,13 302:19

307:15,23 308:20
**wanted** 159:21,22
186:22 188:9
208:16 278:4
279:5
**wants** 149:20
160:20 204:14
289:8
**warned** 253:3
**WARNER** 136:7
**warning** 255:2
**warrant** 137:11,14
206:19 209:13
216:8 220:2,9
**warrants** 179:19
257:20
**wasn't** 144:4
159:14 182:10
203:11 236:24
243:11 245:9
247:17 250:24
258:16 266:22
268:12 281:4
285:23 292:5
296:24 305:10
**way** 141:10 145:14
154:8 156:1 157:3
162:19 164:1
190:24 197:16
217:9 221:4
229:24 233:14
238:7 257:15
262:16 269:4
273:16 274:1
285:22 294:6
301:2,15
**we'll** 139:8 145:18
156:4 190:24
193:12
**we're** 183:11
194:12 224:15
246:15 247:22
248:11 270:16
**weapon** 240:3
**wear** 228:8,9
232:17 241:1
243:13 244:4
245:12 267:7,8
**wearing** 167:3
263:19 266:15
**week** 194:10,10,12
250:17,18
**went** 142:24 144:5
144:7 152:2
163:23 164:22
167:18 173:15,20

SUMMIT COURT REPORTING, INC.
215.985.2400 * 609.567.3315 * 800.447.8648 * www.summitreporting.com

175:13,13,16
176:9 177:18
184:15 194:14
196:9,14,16
200:12,15 203:17
203:18 209:7
212:22,24 214:1,6
215:7 216:7 219:5
223:8,12 232:1
249:4 250:15
264:1 272:5 296:9
**weren't** 225:19
250:8 253:1
272:14
**West** 280:8
**white** 167:4 216:23
217:2
**wife** 277:1
**Williams** 228:11
295:16
**wire** 228:6,8,9
232:17 241:1
243:13 244:4,13
244:16 245:5,12
263:19 292:16,18
295:12
**wires** 245:7 249:5
**witness** 137:2
138:9,20 140:20
142:5 143:17,21
145:1 148:10,24
150:8 153:14
156:2,15 158:17
162:4 163:3
165:15 176:9
181:19 183:1,6
184:7 186:1
189:10,18 192:16
193:23 195:1,11
200:10 206:4
207:3,6 208:8
210:6,9,11,13
216:2,14 221:19
222:14 224:7,16
224:18,23 225:16
226:4,7 227:2
230:5 231:8 232:4
235:12 237:15
242:3 243:1 252:1
252:16 253:12
254:13 255:14
258:4 262:3
263:12 273:3,12
275:9 276:9,13
277:17 278:9
279:3 285:3,5

288:12 289:4,10
291:4 293:7,17
296:16 299:5
303:15 306:11,20
310:1,16,16,17,18
**witnessed** 281:20
285:6 312:21
**witnesses** 226:2
227:7 230:7 253:3
**Woke** 299:23
**word** 143:12 249:5
**wordage** 157:24
160:20 204:13
**wording** 274:7
**words** 143:24
159:10 178:15
202:8 232:23
234:14 246:11
258:15 271:24
272:12 273:7
275:13 286:24
287:4 296:23
298:9
**wore** 228:6 244:13
244:15 292:16,18
**work** 219:2,4
230:13 231:15
237:8,9 238:23
267:12 291:22
293:4 301:18
**worked** 179:15
202:16 203:1,5
204:6 217:13
227:21 267:18
291:14
**working** 162:11
229:20 230:12
**worn** 295:12
**wouldn't** 168:4
179:10,13 202:6
251:7 252:2,8
261:24 262:9,14
273:22 277:9,22
280:22 305:7
**write** 205:15
**writing** 294:6
**written** 165:21,22
200:13,17,21,22
231:19
**www.summitrep...**
135:20

**X**

**X** 137:1,8

**Y**

**yeah** 139:6 141:21
161:3 168:7 173:3
176:4 180:22
185:22 194:10,24
198:10 200:23
210:13 215:18
226:16,19 230:18
231:8 237:14
241:13 244:21
250:20 252:11
253:20 260:4
262:21 263:5
267:5,18 270:14
271:10 275:21
293:8 296:14
300:5,10 304:13
**year** 238:9 250:19
**years** 187:20,23
188:3,6 202:15
203:3 211:8
217:13,24 227:10
235:14 276:8
279:16 298:17,21
**Yep** 281:19
**yesterday** 183:20
261:13

**Z**

**Zengova** 138:15

**0**

**04** 298:19
**05** 189:22,23,24
298:19
**05-0640** 191:3
**0640** 189:23
**08037** 135:23
**081989** 189:24

**1**

**1** 168:20 170:14,17
171:14,19
**1:31** 308:23
**10** 208:11 209:20
247:22
**10:13** 135:17
**1040** 249:11
**1052** 249:11
**11** 233:14,17
257:14,18
**118** 141:10,11
**12** 149:1 246:15,17
249:8,15,21 258:5
**13** 248:17,19 249:8
249:16 256:12,13

308:1
**133** 141:11
**14** 256:13,14,17
**140** 137:5 307:24
**145** 137:10
**15** 167:1 278:18
290:11,14
**1500** 135:22
**1515** 136:14
**153** 137:11
**15th** 136:14
**16** 266:16 302:22
303:2
**1610** 135:22
**1621** 173:9,14
209:7,12,14
212:19
**1628** 172:20,23
173:5,7,8,16
213:21,23
**16th** 183:11 203:5
203:10,21 204:6
266:18 267:9
279:16
**18** 220:7 279:7
**18th** 190:21
**19** 189:24
**191** 137:14
**19102** 135:22
136:15
**19103** 136:9
**19106** 135:16 136:4
**192** 137:13
**199** 137:14
**19th** 203:14,17

**2**

**2** 167:1 208:11,19
212:17 214:7
257:13
**2:14-cv-01643**
135:4
**20** 187:20 212:23
217:24 276:7
**2000** 136:8 157:4
257:23 276:6
304:7
**2001** 193:11 212:18
**2004** 230:15 298:6
**2005** 190:2 232:7
242:9 298:6
**2013** 190:21
**2014** 298:21
**2015** 211:18
**2016** 308:17
**2017** 210:18 257:8

**2021** 135:16 141:3
311:2 312:7
**209** 137:15
**21** 187:23 188:3,6
**215** 135:23 136:4
136:10,15
**23** 135:16 311:2
312:6
**2300** 136:9
**233** 137:16
**23rd** 210:18
**246** 137:17
**248** 137:18
**256** 137:19
**26** 210:20
**27** 308:1
**28th** 140:5 141:3
200:9 269:17
**290** 137:20

**3**

**3** 308:6
**3/10/05** 249:20
250:6
**3:30** 164:10
**3:45** 167:1,3
**3:55** 167:19
**30** 169:15 241:20
**302** 137:21 291:3
**302s** 291:2 293:10
293:23
**303** 136:3
**30th** 157:4 164:17
**31st** 170:22 298:20
**34** 193:16,17 194:7
**35** 194:20 195:5
**36** 197:22
**37** 169:15 198:6,6

**4**

**4:45** 171:21
**4:50** 171:24 172:1
**400** 252:13
**41st** 267:12
**41th** 266:16
**424** 135:23
**4268** 156:10 164:10
169:12 171:13,22
**43** 155:1
**477-8648** 135:23
**48-count** 229:5
**4th** 212:18

**5**

**5** 146:3 167:3,17
169:23 171:15,22

172:2 184:2
**5214** 169:16
**5412** 164:11 168:19
168:21 171:5,11
171:15,22 172:2
182:12,13
**55** 182:13 202:9
205:22 206:1
**5500** 156:12,21
**5507** 171:20 182:8
182:13
**5510** 172:21,22
**55th** 172:23 173:7
173:16,21 174:10
174:14,18,23
175:2,5,8,16,19
177:6 178:5,6
179:23 180:10
202:9 205:22
206:2,3 209:8
213:21,23 214:1,6
215:7 216:7,13
222:16
**5600** 182:9,10
**567-3315** 135:23
**57** 150:3
**575-2871** 136:10

---
**6**
**6** 153:22 162:23
**6-page** 308:5
**601** 135:15
**609** 135:23
**627-8516** 136:4
**683-5381** 136:15

---
**7**
**7** 191:11 218:1
**7126** 169:14
**73** 308:1
**7801** 238:16

---
**8**
**8** 193:3 218:6
**8/31/2000** 164:9
**800** 135:23
**8th** 135:15 193:10

---
**9**
**9** 199:19 204:4
**950** 249:12
**968** 249:12
**985-2400** 135:23

SUMMIT COURT REPORTING, INC.
215.985.2400 * 609.567.3315 * 800.447.8648 * www.summitreporting.com