EXHIBIT "5"

# First Judicial District of Pennsylvania

*01101488*
*Kareem Torain*

*Trial (Jury) Volume 1*
*May 06, 2002*



*First Judicial District of Pennsylvania*
*100 South Broad Street, Second Floor*
*Philadelphia, PA 19110*
*(215) 683-8000   FAX:(215) 683-8005*

Original File 5602toho.v1, 96 Pages
CRS Catalog ID: 03052181

01101488
Kareem Torain

Trial (Jury) Volume 1
May 06, 2002

Page 1

[1]              IN THE COURT OF COMMON PLEAS
[2]        FIRST JUDICIAL DISTRICT OF PENNSYLVANIA
[3]              CRIMINAL TRIAL DIVISION
[4]
[5]  COMMONWEALTH        : OCTOBER TERM, 2001
[6]                     :
      vs.               :
[7]                     :
   KAREEM TORAIN        : NO. 1488 1/3
[8]              ----
[9]  COMMONWEALTH        : OCTOBER TERM, 2001
[10]                    :
      vs.               :
[11]                    :
   ANTHONY HODGES       : NO. 1488  2/3
[12]             ----
[13]
[14]         MOTION TO SUPPRESS
[15]          May 6, 2002
[16]
        Room 802, Criminal Justice Center
[17]         Philadelphia, PA
[18]
[19] BEFORE:  HONORABLE STEVEN R. GEROFF, JUDGE
[20]             ----
[21]
[22]
[23]
[24]
[25]

Page 2

[1]
[2]   PRESENT:
[3]        LOUISA ROBINSON, ESQ.
          Assistant District Attorney
[4]       For the Commonwealth
          EDWARD C. MEEHAN, JR., ESQ.
[5]       For Defendant Kareem Torain

          GIOVANNI CAMPBELL, ESQ.
[6]       For Defendant Anthony Hodges
[7]            ----
[8]
[9]
[10]
[11]
[12]
[13]
[14]
[15]
[16]
[17]
[18]
[19]
[20]
[21]
[22]
[23]
[24]
[25]

Page 3

[1]
[2]              INDEX
[3] WITNESS       DR.  CR.  REDR. RECR.
    OFF. BRIAN MONAGHAN
[4]   By Ms. Robinson    8    59
      By Mr. Meehan    48         61
[5]   By Mr. Campbell    55
[6] OFF. JEFFREY WALKER
      By Ms. Robinson    62
[7]   By Mr. Meehan    71
[8] OFF. BRIAN REYNOLDS
      By Ms. Robinson    75
[9]   By Mr. Meehan    78
      By Mr. Campbell    79
[10]
[11]
[12]
[13]
[14]       COMMONWEALTH'S EXHIBITS
[15] NO.      DESCRIPTION       PAGE
[16] C-1    Videotape        16
[17] C-2    Videotape        16
[18]
[19]
[20]
[21]
[22]
[23]
[24]
[25]

Page 4

[1]
[2]          (Discussion in chambers off the
[3]   record)
[4]        THE COURT:  All right.  We're going
[5]  to sequester all witnesses.  Any witnesses for
[6]  the Commonwealth.
[7]        MS. ROBINSON:  All witnesses are
[8]  outside, Your Honor.
[9]        THE COURT:  Any witness for either
[10] the defendant in the courtroom?
[11]       MR. CAMPBELL:  No.
[12]       MR. MEEHAN:  No.
[13]       THE COURT:  Ms. Robinson, I'm sorry.
[14]       MS. ROBINSON:  Judge, I've spoken to
[15] both counsel and my understanding of the Motion
[16] to Suppress is that my officers didn't have
[17] probable cause to stop and arrest these
[18] defendants who are Kareem Torain, sitting to
[19] the left of his counsel, Mr. Meehan, and
[20] Anthony Hodges to the left of his counsel, Mr.
[21] Campbell.
[22]       THE COURT:  Is that so, counsel?  Is
[23] that the basis for these motions?
[24]       MR. CAMPBELL:  Yes, Your Honor.
[25]       MR. MEEHAN:  Yes, Your Honor.

01101488
Kareem Torain

Page 5

[1]
[2]    MS. ROBINSON: My understanding is
[3] that there are no motions to suppress drugs
[4] which were recovered pursuant to search
[5] warrants from three observations, 5605, 5607
[6] Master Street, and 1628 North 55th Street.
[7]    THE COURT: Is that so, counsel, both
[8] counsel?
[9]    MR. CAMPBELL: That's correct, Your
[10] Honor.
[11]    MR. MEEHAN: Yes.
[12]    THE COURT: All right. So we're here
[13] with the one motion?
[14]    MS. ROBINSON: Right. So my
[15] understanding, the items that were recovered
[16] from Mr. Torain actually consisted of keys.
[17]    MR. MEEHAN: Yes.
[18]    MS. ROBINSON: To the location that
[19] fit 1628 North 55th Street as well as money.
[20]    MR. MEEHAN: That's correct.
[21]    THE COURT: All right.
[22]    MS. ROBINSON: And the same thing
[23] with Mr. Hodges, he also had keys on his
[24] person.
[25]    MR. CAMPBELL: For the property of

Page 6

[1]
[2] 5607.
[3]    MS. ROBINSON: So I have Officer
[4] Monaghan and Officer Reynolds I believe with
[5] respect to that motion as to whether or not
[6] they made sufficient observations and Officer
[7] Reynolds actually stopped. I just want to be
[8] clear. I have other officers.
[9]    THE COURT: Okay.
[10]    MS. ROBINSON: So I'm ready to
[11] proceed, Judge.
[12]    THE COURT: Okay. Thank you.
[13]    All right. Call your first witness.
[14]    MR. MEEHAN: I just wanted to put on
[15] the record just so we don't have any problems
[16] that consistent with what Ms. Robinson
[17] represented, that, yes, pursuant to Article 1,
[18] Section 8 of the Pennsylvania Constitution as
[19] well as the Fourth Amendment that I am moving
[20] on behalf of Mr. Kareem Torain to suppress
[21] items that were seized from his person on the
[22] 4th of January, 2001, because he was subjected
[23] to a stop, a search of his person.
[24]    THE COURT: Oh, is that a witness in
[25] the case?

Page 7

[1]
[2]    COURT CRIER: Police officers.
[3]    MR. MEEHAN: As well as a full
[4] custodial search and arrest of his person that
[5] was not supported by probable cause.
[6]    THE COURT: Okay.
[7]    MS. ROBINSON: Judge, there's a
[8] stipulation with respect to the testimony of
[9] one officer, I'm going to sign him out, and
[10] that would be Officer Fitzgerald. And Officer
[11] Monaghan is my first officer.
[12]    THE COURT: Okay.
[13]    ...OFFICER BRIAN MONAGHAN, Badge
[14] Number 6061, Narcotics Field Unit, sworn...
[15]    MS. ROBINSON: Judge, I just
[16] wondered, this individual walked in, I don't
[17] know if he's a defense witness.
[18]    THE WITNESS: No.
[19]    THE COURT: Is he connected with the
[20] case?
[21]    MR. MEEHAN: No.
[22]    THE COURT: Okay. Very well. You
[23] may proceed.
[24]    MS. ROBINSON: Thank you.
[25]

Page 8

[1]
[2]    DIRECT EXAMINATION
[3] BY MS. ROBINSON:
[4] Q.  Officer Monaghan, I'd like to direct your
[5] attention to January 2nd, 2001. On that date did
[6] you have occasion to begin an investigation into
[7] the illegal sale of narcotics in the area of 56th
[8] and Master Streets in Philadelphia?
[9] A.  Yes, I did.
[10] Q.  And specifically how long have you been a
[11] Philadelphia police officer?
[12] A.  At that time about 12 and a half years.
[13] Q.  And how long have you been assigned to
[14] investigate illegal narcotic sales?
[15] A.  I was assigned to narcotics bureau about two
[16] and a half years at that time.
[17] Q.  Now, on that date did you have occasion to set
[18] up surveillance by yourself or with any other
[19] individuals?
[20] A.  At that time I was with my partner, Police
[21] Officer Shawn Kelly, K E L L Y, Badge Number 7126.
[22] Q.  And on that date where did you set up
[23] surveillance?
[24] A.  I set up a surveillance in the 5600 block of
[25] West Master Street in the city of Philadelphia.

01101488
Kareem Torain

Trial (Jury) Volume 1
May 06, 2002

Page 9

[1]        Officer Monaghan - Direct
[2] Q.  Now, on that date how close to the target
[3] addresses of 5605, 5607, and 5609 West Master
[4] Street were you?
[5] A.  At that time I was directly right across the
[6] street from them three locations.
[7] Q.  Now, at approximately 3:45 p.m. did you have
[8] occasion to see any person or persons whom you see
[9] here today engaged in any kind of activity that you
[10] believe to be the sale of illegal narcotics?
[11] A.  Yes, I did.  Your Honor, about 3:40, I guess,
[12] I pulled onto the location.
[13]        THE COURT:  Is that a.m. or p.m.?
[14]        THE WITNESS:  That's what, Your
[15] Honor?
[16]        THE COURT:  A.m. or p.m.?
[17]        THE WITNESS:  P.m.  I observed it was
[18] two males, one male was in the blue shirt who
[19] later IDed himself on the 4th of January as
[20] Anthony Hodges and there is another male who on
[21] the 4th IDed himself as Darnell Delee.  Your
[22] Honor, they were standing on the porch of 5605
[23] West Master Street.  About 3:45 p.m., Your
[24] Honor, I observed the defendant in the blue
[25] shirt go to the door, at which time the door

Page 10

[1]        Officer Monaghan - Direct
[2] opened.
[3]        THE COURT:  For the record, is that
[4] Mr. Hodges?
[5]        THE WITNESS:  That's Mr. Hodges.
[6] Hodges went to the door, Your Honor, knocked on
[7] the door.
[8] BY MS. ROBINSON:
[9] Q.  Of which number?
[10] A.  5605 West Master Street.
[11] Q.  And can you describe what 5605 West Master
[12] Street looks like to His Honor?
[13] A.  Your Honor, I would say an open porch.  Just
[14] east of it is an enclosed porch and the front door
[15] would be closest to the enclosed porch.
[16] Q.  And then what happened once the defendant
[17] Hodges knocked on that door 5605 West Master
[18] Street?
[19] A.  Your Honor, out of that door an unknown black
[20] male handed him a golf ball size object.  Your
[21] Honor, based on my experience as a police officer
[22] and my knowledge of narcotics, I believed it to be
[23] a bundle of crack cocaine.
[24] Q.  And then what, if anything, did you see the
[25] defendant Hodges doing?

Page 11

[1]        Officer Monaghan - Direct
[2] A.  Your Honor, at that time Hodges opened up the
[3] golf ball size object, it was tied at the top, at
[4] which time he gave the other male Delee numerous
[5] small objects from that bundle, Your Honor.
[6] Q.  And where was Delee when he gave that to --
[7] A.  Standing right next to him on the porch right
[8] by the step area.
[9] Q.  And then what, if anything, did you see those
[10] two individuals doing, Hodges and Delee?
[11] A.  Your Honor, between the time like 3:45 and
[12] about 5:12 to 5:30 I observed both males involved
[13] in numerous narcotic transactions on the porch.
[14] Q.  When you say numerous narcotics transactions
[15] that's a conclusion.  What, if any, activity did
[16] you see them engaged in that led to you
[17] characterize it as a narcotics transaction?
[18] A.  Your Honor, individual people would walk up,
[19] males and females, at which time they would walk up
[20] to the top of the porch at the step area, have a
[21] brief conversation with either Hodges, the
[22] defendant in the blue shirt, or the other male,
[23] Delee.  Your Honor, after a brief conversation the
[24] individuals would hand them unknown amount of U.S.
[25] currency, at which time -- at that time Hodges

Page 12

[1]        Officer Monaghan - Direct
[2] would remove from that clear baggie small objects
[3] and hand them to the males and females.  Delee had
[4] the packets inside his pocket, Your Honor, he would
[5] hand them to the males.  Each individual would
[6] leave the area.
[7] Q.  And approximately how many buyers would you
[8] say you witnessed?
[9] A.  Numerous.  I would say more than 10.
[10] Q.  And then what happened at approximately 5:30
[11] p.m.?  Where, if anywhere, did you see this
[12] defendant and Delee go?
[13] A.  Your Honor, about 5:12 I observed a gray
[14] Oldsmobile pull up in the 5500 block of Master
[15] Street right at the corner of 56th and Master.
[16] Black male who was the passenger unknown to me at
[17] that time exited that vehicle, walked up and had a
[18] brief conversation with both males on the porch,
[19] Hodges and Delee.  After a brief conversation they
[20] went inside of that property.  Your Honor, that
[21] male was carrying a black, looked like a kind of a
[22] duffle bag or a knapsack in his hand.  It was
[23] rolled up in his hand, Your Honor.  Your Honor, as
[24] they went inside the property for about ten
[25] minutes, that male exited that property, at which

01101488
Kareem Torain

Trial (Jury) Volume 1
May 06, 2002

Page 13

Officer Monaghan - Direct

[1]
[2] time I observed that he had a clear ziplock baggie,
[3] pretty good size baggie, Your Honor. It was filled
[4] with a green weed substance which I believed to be
[5] marijuana. Your Honor, as he was exiting, he put
[6] the bag from the porch, he was on the porch, he put
[7] the bag inside the duffle bag and left the area.
[8] Your Honor, at that time Delee took out U.S.
[9] currency from his pants pocket, walked into 5609
[10] Master Street and put the money down right by the
[11] doorway. Your Honor, all three males, the house
[12] that they exited was 5607 West Master Street. Your
[13] Honor, at that time I notified my backup officers,
[14] I gave the description and the direction of that
[15] vehicle. That vehicle was observed going down into
[16] the 4700 block of Marion where that vehicle was
[17] lost in that area.
[18]     THE COURT: Marion Avenue?
[19]     THE WITNESS: Marion Avenue, Your
[20] Honor.
[21] BY MS. ROBINSON:
[22] Q. And what happened to Hodges? Where did he
[23] finally wind up?
[24] A. Your Honor, I believe they left -- I believe
[25] Hodges went back into 5607 and Delee just walked

Page 14

Officer Monaghan - Direct

[1]
[2] off of the porch.
[3] Q. Now, was that the extent of your surveillance
[4] on that day?
[5] A. Yes, it is.
[6] Q. Did you videotape any of the activity on that
[7] date?
[8] A. Not on that date, no.
[9] Q. Based on your observations of what you saw
[10] Hodges and Delee do, those two individuals, what
[11] did you believe was occurring in that area of 5605
[12] and 5607 West Master Street?
[13] A. In that area they were conducting illegal
[14] sales of narcotics.
[15] Q. Now, did you have occasion to return on
[16] Wednesday, January 3rd, 2001, and again set up a
[17] surveillance for the locations of 5605, 5607, and
[18] 5609 West Master Street?
[19] A. Yes, I did.
[20] Q. What time did you set up your surveillance on
[21] that date?
[22] A. It was about 11:00 a.m. in the morning.
[23] Q. On that date did you have occasion to
[24] videotape any of the activity you saw?
[25] A. Yes, I did.

Page 15

Officer Monaghan - Direct

[1]
[2] Q. Would you tell Judge Geroff what equipment you
[3] used on that date?
[4] A. Your Honor, we had a hand held video camera
[5] that we were videoing from our vehicle and I was
[6] able to look, sometimes my partner videoed,
[7] sometimes I was, it was kind of like a periscope
[8] that we have on our vehicle and I was able to see
[9] close to the area.
[10] Q. Did you make a copy of that videotape?
[11] A. Yes, I did.
[12]     MS. ROBINSON: At this time, Your
[13] Honor, and I believe in agreement with defense
[14] counsel who have been provided copies of the
[15] videotape of both January 3rd and January 4th,
[16] 2001, if Officer Monaghan relay his testimony
[17] at the same time that he plays the videotape.
[18]     THE COURT: Any objection?
[19]     MR. CAMPBELL: No objection.
[20]     THE COURT: Okay.
[21] BY MS. ROBINSON:
[22] Q. Do you have the January 3rd tape in front of
[23] you?
[24] A. Yes, I do.
[25]     MS. ROBINSON: At this time I just

Page 16

Officer Monaghan - Direct

[1]
[2] ask that this be marked as Commonwealth's
[3] Exhibit C-1A.
[4]     THE COURT: C-1A is?
[5]     MS. ROBINSON: January 3rd and I'll
[6] be marking January 4th as C-1B.
[7]     THE COURT: Why not C-1 and C-2? I
[8] think generally speaking court reporters prefer
[9] it that way. Whatever makes the court reporter
[10] happy is what I prefer. C-1 and C-2.
[11]     (Videotape marked Commonwealth's
[12] Exhibits C-1 for identification.)
[13]     (Videotape marked Commonwealth's
[14] Exhibits C-2 for identification.)
[15]     MS. ROBINSON: At this time I just
[16] ask Officer Monaghan to just start that.
[17]     THE COURT: If you can tilt it so
[18] that both the defendants and I can see them.
[19] Thanks. Okay. Can you guys see? Would it be
[20] better -- I think if you would close the
[21] drapes, draw the drapes because there is a
[22] glare from the windows.
[23]     Hold on. It's really a glare.
[24]     COURT CRIER: I think the light is
[25] doing that, Judge.

01101488
Kareem Torain

Trial (Jury) Volume 1
May 06, 2002

Page 17

[1]    Officer Monaghan - Direct
[2]      **THE COURT:** It might be the light,
[3] but I see the window.
[4]      All right. I think that's better.
[5] Can everybody see that? Okay.
[6] **BY MS. ROBINSON:**
[7] **Q.** Is that the beginning of the tape or was it
[8] all the way rewound?
[9] **A.** I believe it's the very beginning.
[10]      MS. ROBINSON: It's starts at 11:37,
[11] Judge.
[12]      Here we are, Judge.
[13]      (Tape played).
[14] **BY MS. ROBINSON:**
[15] **Q.** Officer Monaghan, can you explain to His Honor
[16] when you started recording and if you were
[17] recording continuously throughout your surveillance
[18] on January 3rd, 2001?
[19] **A.** Your Honor, we were trying to get the camera
[20] situated, so between 11:00 and 11:30 I was trying
[21] to get the camera situated. I'm going to have to
[22] fast forward just a little bit, Your Honor. We
[23] were trying to get the camera situated from our
[24] vehicle and trying to get it zoomed in.
[25] **Q.** And would you tell the judge what time this is

Page 18

[1]    Officer Monaghan - Direct
[2] and what exactly you're showing him.
[3] **A.** Your Honor, it's about 11:37 a.m. and we're
[4] kind of showing the corner of 56th and Master
[5] Street.
[6] **Q.** And what is the -- what did you record here?
[7] **A.** Your Honor, right there is the male Delee who
[8] got in his vehicle. He will return back to us.
[9]      Your Honor, 11:44 is when he comes
[10] back in the vehicle and this is Darnell Delee, Your
[11] Honor. This male gave us the address of 5605 West
[12] Master Street.
[13]      Your Honor, if I can fast forward
[14] some parts.
[15] **Q.** And what's Darnell Delee wearing that day?
[16] **A.** He's got a black puffy hooded jacket with a
[17] red skull cap on. At this time he gets up, grabs
[18] the bundle of crack cocaine with packets, there's
[19] people standing down at the bottom of the steps,
[20] Your Honor. It's 11:45 a.m., Your Honor, numerous
[21] males and females come up to the area where he
[22] makes narcotics transactions.
[23]      **THE COURT:** I realize that's a
[24] conclusion, I fully appreciate that.
[25]      **MR. MEEHAN:** Thank you, Judge.

Page 19

[1]    Officer Monaghan - Direct
[2] **BY MS. ROBINSON:**
[3] **Q.** Which porch front is he on?
[4] **A.** This is the porch of 5605 West Master Street.
[5] This is the address that he gave on the 4th when he
[6] was arrested.
[7] **Q.** Now, it's going black, can you explain to His
[8] Honor what's going on?
[9] **A.** Your Honor, we're trying to get a better
[10] picture, trying to zoom in better.
[11] **Q.** And who is on this screen at what time?
[12] **A.** Your Honor, this is still Darnell Delee, he's
[13] talking with two males. He was standing right in
[14] front of 5607.
[15]      Your Honor, being it was a hand
[16] held, we were having a hard time trying to keep it
[17] still.
[18] **Q.** Now, where is Delee at this time, it's 11:51?
[19] **A.** Right now he's standing on the corner of 56th
[20] and Master. He's now walking back to the property,
[21] Your Honor, and that is 5605.
[22]      Your Honor, that was what I believe
[23] to be the bundle that he just rolled up and put
[24] back into his pocket. He's now walking back to
[25] 56th and Master Street, Your Honor. This would be

Page 20

[1]    Officer Monaghan - Direct
[2] the northwest corner. At this time, Your Honor, he
[3] takes out the clear baggie that was in his left
[4] pocket. He removed small packets, Your Honor.
[5] After accepting U.S. currency he hands a packet to
[6] the males, I believe it's two males that came up.
[7]      Your Honor, certain times what he
[8] did was he would either hand the packets or he
[9] would lay the packets on the pillar and then he
[10] would pick up the packets after handing the U.S.
[11] currency to him.
[12] **Q.** And what just happened there?
[13] **A.** Your Honor, put couple of the packets back
[14] into his bag, put them back into his pocket.
[15] **Q.** If you can just make the time clear so the
[16] stenographer has it.
[17] **A.** It's 11:53 a.m. on January 3rd.
[18]      Your Honor, continuously the whole
[19] time we were filming he was counting the money,
[20] just walking back and forth counting the money.
[21] Now, he's out of our sight as you can tell by the
[22] doorway, but how we can tell the curtain moved that
[23] means the doorway went inside the house. Every
[24] time we saw the curtain moved he was either opening
[25] up the door or somebody was opening up saying

Page 21

[1]        Officer Monaghan - Direct
[2] something to him.
[3]        **MR. MEEHAN:** Judge --
[4]        **MR. CAMPBELL:** Objection.
[5]        **MR. MEEHAN:** I'm going to let a
[6] certain amount of conclusory stuff --
[7]        **THE COURT:** I understand that's a
[8] conclusion. I fully appreciate that.
[9]        **MR. MEEHAN:** Thank you.
[10]        **THE WITNESS:** Your Honor, again
[11] Anthony Delee, this man that just walked out of
[12] the house, Your Honor, he went by the name of
[13] McGill Moon.
[14]        Your Honor, it's tough to see. When
[15] he bent down, we could tell better from what
[16] the tape was, it was the packets he gave the
[17] guy.
[18]        Now he's over in front of 5607 and
[19] that's McGill Moon.
[20]        Your Honor, that's a bundle with
[21] green objects that he has in his hands, packets
[22] of crack cocaine that he's counting. He counts
[23] the packets inside the bundle, and this is on
[24] the porch of 5607.
[25]        Your Honor, again that's Darnell

Page 22

[1]        Officer Monaghan - Direct
[2]        Delee on the porch and also McGill Moon.
[3] **BY MS. ROBINSON:**
[4] **Q.** Do you know who the man is in the light blue
[5] jacket?
[6] A. No, I don't. That's at 12:00 p.m. Two males
[7] walked up to the porch area. McGill Moon handed
[8] the first guy in the red and white hat, then he
[9] hands the guy in the other hat after accepting U.S.
[10] currency small objects from that clear baggie that
[11] he had.
[12]        Your Honor, he just put that clear
[13] baggie into I believe it was his right jacket
[14] pocket, McGill Moon.
[15]        Your Honor, that's the defendant who
[16] is in the blue shirt went by the name of Anthony
[17] Hodges.
[18] **Q.** And what time is it, Officer Monaghan?
[19] A. 12:01 p.m. on January 3rd.
[20] **Q.** And where was the defendant when you first saw
[21] him?
[22] A. He's standing on the northwest corner of 56th
[23] and Master Street.
[24] **Q.** What's he wearing on that date?
[25] A. Black kind of a leather jacket Avirex jacket

Page 23

[1]        Officer Monaghan - Direct
[2] with a black and gray hooded sweat shirt and a
[3] black baseball cap.
[4]        Your Honor, Anthony Delee -- I mean
[5] Darnell Delee and McGill Moon both come to the
[6] corner at 12:01 and they converse with the person
[7] in the blue shirt over there, the defendant Anthony
[8] Hodges.
[9] **Q.** Do you know who that is in the yellow jacket?
[10] **A.** No, I do not. That was just I believe
[11] somebody waiting for the bus.
[12] **Q.** Your Honor, being their back was turned, I
[13] couldn't tell, I believe they just had a
[14] conversation, but we couldn't tell being their back
[15] was turned.
[16]        Your Honor, it's 2:11 p.m., 2:12
[17] p.m. , Darnell Delee is standing on the porch of
[18] 5605 West Master Street. Your Honor, the male put
[19] the money down on the concrete. Also that's where
[20] he put the drugs, Your Honor, on different
[21] occasions and they would pick up the packets there,
[22] Your Honor, at 2:12 he's selling to a black female.
[23]        **THE COURT:** I realize again that's a
[24] conclusion, the word sell.
[25]        THE WITNESS: Yes. 2:13, Your Honor,

Page 24

[1]        Officer Monaghan - Direct
[2] possibly another one. Delee walks off the
[3] porch. Your Honor.
[4]        Your Honor, being the car was in our
[5] way, you couldn't really tell what he was
[6] doing, so I tried to get the tag number of that
[7] vehicle.
[8]        2:17 possible another narcotics
[9] transaction, Your Honor, with the clear baggie.
[10] That's the clear bundle that he just put back
[11] into his pocket.
[12]        Your Honor, if you can see, he's
[13] smoking a blunt in his left hand. 2:19, again
[14] a possible sale with the same clear baggie.
[15] Passes the blunt to the unknown male that was
[16] on the porch.
[17]        2:20, again a possible sale to a
[18] black female.
[19]        Again he's counting the money.
[20] **BY MS. ROBINSON:**
[21] **Q.** Do you know who that male is on the porch with
[22] him?
[23] **A.** No, we never had him IDed. After he leaves
[24] that's the last I've seen of him.
[25]        Possibly sells to that black male,

Page 25

Officer Monaghan - Direct

[2] Your Honor, who came up on the steps of 5607.
[3]        Your Honor, that male that walked
[4] across, he was taking money out of his pocket.
[5] What he did, Your Honor, we can't tell, I wasn't
[6] the one on the camera right now, Your Honor, I was
[7] looking through the periscope and I could see him
[8] take the money out, he knocked on the front door.
[9]        Your Honor, that was the defendant
[10] over there in the blue shirt, he walked out of the
[11] house, Anthony Hodges. He still had the same
[12] jacket on, same hat.
[13]        Your Honor, if I can reverse it,
[14] what happened was when my partner had the scope on
[15] the person that came up in the red, I was observing
[16] Anthony Hodges. Anthony Hodges came out at the
[17] doorway, Your Honor, and he accepted U.S. currency from
[18] that guy in the black. At that time Anthony Hodges
[19] handed him small objects, that's why the guy left
[20] off the porch.
[21]        MR. CAMPBELL: Objection.
[22]        THE COURT: Sustained.
[23]        THE WITNESS: McGill Moon comes back
[24] into the area, Your Honor.
[25]        2:25, Your Honor, McGill is standing

Page 26

Officer Monaghan - Direct

[2] back there in the doorway. 2:25, two males
[3] come up, approach him, possibly two narcotics
[4] transactions. See he handed up to him in the
[5] bag because a car was coming by, they weren't
[6] sure.
[7]        McGill comes over and approaches, he
[8] has a conversation with the person in this
[9] vehicle.
[10]        At this time, Your Honor, he gets up,
[11] goes back up to the porch area, he hands the
[12] clear baggie with the green packets of crack
[13] cocaine in the baggie, he handed it over to
[14] Moon and he gets into the vehicle and leave the
[15] area.
[16]        Now, again, Darnell Delee at 3:08
[17] possibly conducts a narcotics transaction on
[18] the step of 5605.
[19]        Your Honor, right now I sent our
[20] undercover police officer up to purchase
[21] narcotics from one of the males. At that time,
[22] Your Honor, both males went inside the house, I
[23] believe. I lost sight of them. I instructed
[24] him to wait around until somebody comes out.
[25]

Page 27

Officer Monaghan - Direct

[2] BY MS. ROBINSON:
[3] Q.  Who was the officer?
[4] A.  Police Officer Brad Mitchell, Badge Number
[5] 4145.
[6] Q.  So where did he go then?
[7] A.  Walks off, he has a conversation with this guy
[8] that's walking across the street. He leaves the
[9] area. I asked him what happened, I call him back.
[10]        Now, Your Honor, 3:55 p.m. you have
[11] Anthony Hodges, Darnell Delee, and a couple other
[12] of the guys that were never IDed, Your Honor, out
[13] of the sight of the camera, Your Honor. He was
[14] approached by these two males and female, possibly
[15] could have been narcotics transaction, Your Honor.
[16] At this time my partner had the videotape, I was
[17] looking through the scope. Your Honor, undercover
[18] going into the store, the store is on the northeast
[19] corner of 56th and Master Street. He had a
[20] conversation with Delee. Delee walks back to the
[21] back of the store, at which time, Your Honor, from
[22] what he's doing, he's removing packets from that
[23] bundle. Calls Officer Mitchell out to the store,
[24] at which time he receives U.S. currency from
[25] Officer Mitchell and he hands officer Mitchell at

Page 28

Officer Monaghan - Direct

[2] that time, Your Honor, they were black tinted
[3] ziplock packs containing off-white chunky
[4] substance, alleged crack cocaine. This is Delee's
[5] father, his name is Glen Delee. He resided at 5605
[6] West Master Street. He's walking up the steps at
[7] 5605, Your Honor. Again, Your Honor, this is the
[8] corner of 56th and Master Street. Defendant
[9] Anthony Hodges, that's the northwest corner of 56th
[10] and Master. McGill Moon, 5605 Master. Your Honor,
[11] that's the end of the surveillance for that day.
[12]        THE COURT:  All right. I just have a
[13] -- that buy money, was that pre-recorded?
[14]        THE WITNESS:  Yes, it was, Your
[15] Honor.
[16]        MS. ROBINSON:  I'm going to be
[17] playing another tape.
[18] BY MS. ROBINSON:
[19] Q.  Officer Monaghan, do you have C-2 for
[20] identification purposes, January 4th, 2001?
[21] A.  Yes, I do.
[22] Q.  Officer Monaghan, while you're setting that
[23] up, did you have occasion to return to the 5600
[24] block of Master Street and again set up a
[25] surveillance of that area at approximately 1:40 in

01101488
Kareem Torain

Trial (Jury) Volume 1
May 06, 2002

Page 29

[1]    Officer Monaghan - Cross
[2] the afternoon?
[3] A.  Yes, I did.
[4] Q.  Actually what time did you set up the
[5] surveillance?
[6] A.  It was about 1:35 we pulled up, about 1:40 by
[7] the time we got situated.
[8] Q.  And what are you showing here on the tape?
[9] A.  Your Honor, this is the east side of 56th
[10] Street. That's Darnell Delee going up to the porch
[11] area of 5605 West Master Street, Your Honor,
[12] that's at 12:52. Your Honor, between --
[13]    THE COURT:  You set up at 1:35?
[14]    THE WITNESS:  No, Your Honor, they
[15]    were just there on the porch, nothing was going
[16]    on.
[17]    THE COURT:  So you arrived somewhere
[18]    around 12:50?
[19]    THE WITNESS:  I was there earlier in
[20]    the day.
[21]    THE COURT:  Looks like around 12:50
[22]    when you started.
[23] BY MS. ROBINSON:
[24] Q.  Now, just so the record is clear, there's no
[25] audio on this tape; is that correct?

Page 30

[1]    Officer Monaghan - Cross
[2] A.  No, there's not.
[3] Q.  Were you able to hear anything in your
[4] surveillance vehicle?
[5] A.  No, I couldn't hear any conversation that was
[6] going on on the porch. Your Honor, again it's
[7] Anthony -- Darnell Delee and McGill Moon is on the
[8] porch, Your Honor.
[9]    Now, I couldn't really tell what
[10] McGill pulled out of his pocket at that time.
[11]    Now, we were worried about our
[12] location, where we're parked at on that date. I
[13] believe they both Delee and McGill, they walked out
[14] of our sight, walked northbound on 56th Street up
[15] towards Media out of our sight. At that time, Your
[16] Honor, there was nobody in front of any of the
[17] houses on Master Street.
[18]    Your Honor, this male that was
[19] outside we were never able to get him IDed.
[20] Q.  What time is that?
[21] A.  At 12:58 p.m. on January 4th. That was
[22] Thursday afternoon.
[23]    Your Honor, that's Darnell Delee
[24] that came back into the area with the black jacket
[25] and the red hat on.

Page 31

[1]    Officer Monaghan - Cross
[2]    Darnell Delee, Your Honor, he goes
[3] back 5605 in that area.
[4]    Darnell Delee starts walking over
[5] towards that vehicle.
[6]    Your Honor, this store that's on the
[7] corner, it's on the northeast corner 56th and
[8] Master.
[9]    Darnell Delee going back to 5600
[10] block of Master Street.
[11]    Your Honor, dark green Bonneville
[12] that went by Darnell Delee gestured to it to pull
[13] over. He pulled over I guess on the 1400 block of
[14] than Street, Your Honor. That was Anthony Hodges
[15] just got out of that, I believe that was a
[16] Seabring. Your Honor, now I contacted Police
[17] Officer Walker to pull up, I said it's a dark green
[18] Bonneville and I couldn't tell who the driver was
[19] and I asked him to let me know what was going on
[20] and he followed the dark green Bonneville.
[21]    Your Honor, at this time I just
[22] watched the males, I see Darnell Delee come back to
[23] the area, he goes right to the corner, he goes to
[24] the house and he goes back to 56th and Master
[25] Street, Anthony Hodges goes back inside. This is

Page 32

[1]    Officer Monaghan - Cross
[2] Darnell Delee coming out, Your Honor. He was in
[3] the car for about maybe two to three minutes inside
[4] that vehicle.
[5] Q.  Which vehicle so the record is clear?
[6] A.  It was a dark green Bonneville, the tag on
[7] that vehicle was DKC3310. I later ascertained that
[8] the driver was a Kareem --
[9]    MR. MEEHAN:  I'm going to objection
[10] to that.
[11]    MS. ROBINSON:  It's a motion.
[12]    THE WITNESS:  -- Torain and that's
[13] the defendant in the red shirt over there.
[14]    Again, Your Honor, possibly narcotics
[15] transaction going on. Your Honor, I'm not sure
[16] if I just missed it, but he hollers to a male
[17] across the street standing right by our bumper
[18] of our car, almost leaning up against our
[19] vehicle. He hollers he only had a bundle, he's
[20] going to call me when the rest is done.
[21]    THE COURT:  When you say he
[22] hollers --
[23]    THE WITNESS:  Darnell Delee hollers
[24] over to the person standing right by our
[25] bumper.

01101488
Kareem Torain

Trial (Jury) Volume 1
May 06, 2002

Page 33

[1]      Officer Monaghan - Cross
[2] **BY MS. ROBINSON:**
[3] **Q.**  Did you ever identify that person?
[4] **A.**  That was Kabian Diggs. I believe that's when
[5] he's hollering that he only had a bundle, he'll
[6] call me when the rest is ready.
[7]      Again, Your Honor, Darnell Delee
[8] involved at 1:47 in possible narcotics transaction,
[9] just a little bit north of Master Street on 5th on
[10] the west side of the street.
[11]      Your Honor, 1:49, Darnell Delee
[12] standing on the step, I'm not sure of that address,
[13] possible narcotics transaction.
[14]      This will be the first house just
[15] north of Master Street on 56th on the west side of
[16] the street.
[17]      Again another possible narcotics
[18] transaction on 56th Street, 1:53 p.m.
[19]      Your Honor, that's the defendant in
[20] the blue shirt, Anthony Hodges, same clothes on as
[21] the day before, the jacket and the sweat shirt and
[22] the hat.
[23] **Q.**  Now, what's going on there?
[24] **A.**  That's Darnell Delee gets in a vehicle for
[25] about less than a minute where he exits, we

Page 34

[1]      Officer Monaghan - Redirect
[2] couldn't tell what was going on inside that
[3] vehicle.
[4]      Darnell Delee again standing in
[5] front of 5605 west Master Street.
[6]      Your Honor, that was Anthony Hodges
[7] back there, Your Honor conducting narcotics
[8] transaction on the highway 56th and Master Street.
[9]      **THE COURT:**  I realize that's a
[10]     conclusion.
[11]      **THE WITNESS:**  You see him handing
[12]     small packets, Your Honor, accepting U.S.
[13]     currency.
[14] **BY MS. ROBINSON:**
[15] **Q.**  And then where is Hodges going?
[16] **A.**  Just up to the porch area, 5607, the address
[17] that he gave us on the 229 that he lived there.
[18] **Q.**  How does he gain entrance?
[19] **A.**  With a key. He was observed numerous times
[20] throughout the 3rd, the 2nd, 3rd and 4th using a
[21] key to get into that property. Anthony Hodges
[22] walked out of our sight at that time, Your Honor.
[23]      Your Honor, this is when Darnell
[24] Delee was on a pay phone. He leaves the area.
[25] There is Anthony Hodges going back up to the

Page 35

[1]
[2] property 5607 with a key.
[3] **BY MS. ROBINSON:**
[4] **Q.**  When Delee left the area, did he learn by
[5] himself or other people?
[6] **A.**  He left with I believe it was three other
[7] males, Arthur Tilman and Kabian Diggs.
[8] **Q.**  And what's going on at the 5600 block of
[9] Master Street?
[10] **A.**  Right now this is McGill Moon, comes up to the
[11] property, knocks on the door. Anthony Hodges is
[12] inside the house at this time. Your Honor, at this
[13] time I'm having everybody come into the area.
[14]      **THE COURT:**  Everybody meaning.
[15]      **THE WITNESS:**  My members of narcotics
[16]     field unit to saturate the area. I am giving
[17]     out the description and locations of everybody.
[18]     Also at this time there was officers doing the
[19]     surveillance up at another property 1628 North
[20]     55th Street, Your Honor, and Officer Walker was
[21]     also doing surveillance in the area of -- if I
[22]     can refer to my notes, Your Honor.
[23]      **THE COURT:**  Yes.
[24]      **THE WITNESS:**  1628 North 55th it was,
[25]     Your Honor. It's on the corner of 55th and

Page 36

[1]      Officer Walker - Direct
[2]      Hunter.
[3]      **THE COURT:**  Corner of 55th and what?
[4]      **THE WITNESS:**  55th and Hunter street.
[5] **BY MS. ROBINSON:**
[6] **Q.**  Now, were you in communication with Officer
[7] Walker by phone, radio?
[8] **A.**  By radio, yes, I was. Again it's Anthony
[9] Hodges, Your Honor, the time is skipping back and
[10] forth, we're not filming the whole time. Your
[11] Honor, it's into -- I believe that was his -- I
[12] believe it was a Plymouth Breeze, a red Plymouth
[13] Breeze had a Delaware tag of D4398.
[14]      Again he enters with a key, Your
[15] Honor. Your Honor, that black car that came by, I
[16] believe that black car was the black Buick that
[17] Darnell Delee did pull up. Darnell Delee exits,
[18] Kabian Diggs and Arthur Tilman exits that vehicle,
[19] Your Honor.
[20] **Q.**  How long were they gone for?
[21] **A.**  About 20 minutes, I believe.
[22]      Police Officer Reynolds and Police
[23] Officer Walker had them on surveillance at that
[24] time. There was no video, Your Honor.
[25]      McGill on the porch of 5605, that's

Page 37

[1]        Officer Walker - Direct
[2] Darnell Delee on the porch of 5605. Puts the U.S.
[3] currency down, Your Honor, picks up small objects
[4] that was on the concrete. Again he has a bundle,
[5] Your Honor, with green objects inside that bundle
[6] which I believe to be crack cocaine. All the males
[7] come up on the porch, McGill Moon, Darnell Delee,
[8] Kabian Diggs is up there, Anthony Hodges goes back
[9] into 5607. Your Honor, we had a search warrant for
[10] 5605. I believe that was the 99025. 5607, 99026;
[11] and 5609, 99027 for them properties.
[12] Q.   And what time was the original takedown
[13] scheduled for?
[14] A.   Your Honor, we wanted to do it about 2
[15] o'clock, but being the officers were coming back
[16] from court, we had to prolong it a little bit
[17] longer.
[18] Q.   The male in the light blue jacket, have you
[19] seen him before, how many times?
[20] A.   Your Honor, I saw him once on the 3rd and
[21] twice on the 4th, same guy that bought -- he had
[22] the Oilers jacket, Houston Oilers football jacket.
[23]        I believe this male right there, he
[24] gave us a name of Ronald Freeman. Darnell Delee,
[25]        Anthony Hodges goes back to the

Page 38

[1]        Officer Walker - Direct
[2] Plymouth Breeze, he removed something from the back
[3] of the Plymouth Breeze. I wasn't sure what it was,
[4] Your Honor. He walks up into 5607.
[5]        MR. CAMPBELL:  Your Honor, I'm sorry,
[6]    I just wanted -- I'm going to object to that
[7]    portion of the testimony. I understand that
[8]    the officer is explaining the video, but maybe
[9]    I missed it, I didn't see my client going to
[10]    the Plymouth Breeze in this part of the
[11]    vehicle.
[12]        THE COURT:  He is saying that it did
[13]    happen at this time.
[14]        THE WITNESS:  Yes, Your Honor, it was
[15]    on there.
[16]        THE COURT:  All right. You want to
[17]    show it again so he can see.
[18]        (Tape rewound)
[19]        MR. CAMPBELL:  Okay.
[20]        THE COURT:  For the record we backed
[21]    it up.
[22]        THE WITNESS:  That was about 2:59 I
[23]    believe it was.
[24]        Darnell Delee, Your Honor, on the
[25]    steps at 3:02, possible narcotics. I believe

Page 39

[1]        Officer Walker - Direct
[2]    that was the end of our surveillance at that
[3]    time.
[4] BY MS. ROBINSON:
[5] Q.   Officer Monaghan, you indicated that you saw
[6]    the Bonneville pass you by and Darnell Delee make a
[7]    gesture and you directed Officer Jeffrey Walker to
[8]    surveil that vehicle; is that correct?
[9] A.   That's correct.
[10] Q.   And you also indicated that you were in
[11] communication with Officer Walker by radio. What
[12] did Officer Walker tell you about what he saw over
[13] radio that lead you to direct him to do anything
[14] further?
[15] A.   Your Honor, Police Officer Walker, I told him
[16] that the car is going to be parked in the 1400
[17] block of Ithan Street. As Police Officer Walker
[18] went right behind the vehicle he observed the
[19] defendant Darnell Delee exiting that passenger side
[20] of the vehicle, at which time he was exiting in his
[21] hand relayed back to me --
[22]        MR. MEEHAN:  I have to object at this
[23]    point. He's not even making these observations
[24]    himself.
[25]        THE COURT:  It's hearsay, but it's a

Page 40

[1]        Officer Walker - Cross
[2]    motion.
[3]        MR. MEEHAN:  Judge, but he's not even
[4]    making these observations himself, however. I
[5]    mean I certainly understand --
[6]        THE COURT:  Well, let me ask you, is
[7]    Officer Walker available?
[8]        MS. ROBINSON:  Yes, he is available,
[9]    but it also goes to the fact that Officer
[10]    Monaghan directed the arrest of the defendant
[11]    Kareem Torain.
[12]        THE COURT:  I'll permit it. So you
[13]    want to pick it up.
[14]        THE WITNESS:  If Your Honor please,
[15]    Officer Walker relayed back to me that Darnell
[16]    Delee was exiting passenger side of that
[17]    vehicle holding clear baggie which Officer
[18]    Walker believed to be bundle of narcotics.
[19] BY MS. ROBINSON:
[20] Q.   And then what did you --
[21]        MR. MEEHAN:  I'm going to object.
[22]        THE COURT:  I'm going to overrule the
[23]    objection, but I understand your objection.
[24]        MR. MEEHAN:  Thank you.
[25]

**Page 41**

Officer Walker - Cross

[1]
[2] BY MS. ROBINSON:
[3] Q.   And then what did you direct Officer Walker to
[4] do?
[5] A.   To follow the green Bonneville.
[6] Q.   And did he do so?
[7] A.   Yes, he did.
[8] Q.   And where did the green Bonneville go to?
[9] A.   I believe it went to the area of, I believe it
[10] was Conestoga Street.
[11] Q.   And based on your communication with Officer
[12] Walker did it stay there or did it proceed to
[13] another location?
[14] A.   It stayed there for a while and then the
[15] operator of that vehicle went to 1628 North 55th
[16] Street.
[17] Q.   And based on your observation -- your
[18] communication with Officer Walker what further
[19] information did you learn?
[20] A.   At that time a short time later I informed
[21] Police Officer Walker that a dark colored Buick was
[22] coming his way with three males and he observed the
[23] Buick pull up to in front of 1628 North 55th
[24] Street.
[25] Q.   When you say you told him a Buick was coming

**Page 42**

Officer Reynolds - Direct

[1]
[2] his way, what was -- was that just an educated
[3] guess?
[4] A.   Yes, it was.  Yes, it was.
[5] Q.   And who was in -- what did you believe to be
[6] in that Buick?
[7] A.   Darnell Delee was driving that vehicle, Arthur
[8] Tilman and Kabian Diggs.
[9] Q.   And based on your conversation with Officer
[10] Walker, did that come to be?
[11] A.   Yes, it did.
[12] Q.   And what further information did you learn
[13] from Officer Walker?
[14] A.   That all three males exit that vehicle and
[15] went into 1628 North 55th Street.
[16] Q.   And then based on that did you have occasion
[17] to direct that the defendant Kareem Torain should
[18] be arrested?
[19] A.   Yes, I did.
[20] Q.   And at what point in the activities that
[21] afternoon did you direct that?
[22] A.   About 2:58 p.m.  I notified Police Officer
[23] Reynolds and Police Officer Walker to stop the
[24] vehicle if they see it when it leaves the property
[25] and they stopped it in the 6100 block of Nassau

**Page 43**

Officer Reynolds - Cross

[1]
[2] street, N A S S A U, Street.
[3] Q.   Now, why did you direct that the defendant
[4] Kareem Torain should be arrested?
[5] A.   Based on the information I received back from
[6] Police Officer Walker.
[7] Q.   And specifically what was the information that
[8] you received that led you to believe that the
[9] defendant had engaged in criminal activity?
[10] A.   When the male Delee -- Darnell Delee exited
[11] that vehicle with the clear baggie in his hand and
[12] also Police Officer Walker notified me that the
[13] three males left the area Delee placed a clear
[14] baggie inside his jacket pocket when they left 1628
[15] North 55th Street.
[16] Q.   Now, how many people were in that Bonneville?
[17] A.   Three people.
[18] Q.   Who was driving the Bonneville?
[19] A.   Darnell Delee.
[20] Q.   No; the Bonneville.
[21] A.   Oh, the Bonneville he relayed back to me just
[22] one male.  That was Kareem Torain.
[23]          MR. MEEHAN:   Judge, again for the
[24] record I'll object.
[25]          THE COURT:   Overrule your objection.

**Page 44**

Officer Reynolds - Cross

[1]
[2] BY MS. ROBINSON:
[3] Q.   Now, was anything recovered from the defendant
[4] pursuant to his being arrested?
[5]          THE COURT:   Which defendant?
[6]          MS. ROBINSON:   Kareem Torain, I'm
[7] sorry.
[8]          THE WITNESS:   Your Honor, if I can
[9] refer to my notes in here.
[10]          THE COURT:   All right.
[11]          THE WITNESS:   He was stopped 6100
[12] block of Nassau, one pager, one Nextel cell
[13] phone, one cancer key ring containing five
[14] keys, one black key ring containing three keys.
[15] One of them keys, Your Honor, opened the front
[16] door of 1628 North 55th Street.  The another
[17] key opened up the middle room on the first
[18] floor of 1628 North 55th Street.
[19] BY MS. ROBINSON:
[20] Q.   And had you received any information from
[21] Officer Walker about the middle room of 1628 North
[22] 55th Street?
[23] A.   Yes, I did.  Your Honor, Police Officer Walker
[24] said he observed the defendant go towards the door
[25] and open that door with a key and as he went around

01101488
Kareem Torain

Trial (Jury) Volume 1
May 06, 2002

Page 45

[1]
[2] he saw the light come on in that middle room. Your
[3] Honor, there was also U.S. currency that was
[4] recovered from Kareem Torain, it was $250 U.S.
[5] currency.
[6] Q.   Did you learn where the defendant Kareem
[7] Torain said he resided?
[8] A.   I later found out he resided 1621 North
[9] Conestoga Street.
[10] Q.   Now, after the end of your surveillance did
[11] you have occasion to direct that the defendant
[12] Anthony Hodges be arrested?
[13] A.   Yes, I did.
[14] Q.   Would you tell His Honor what happened, how
[15] the takedown occurred?
[16] A.   Your Honor, about 3:17 I believe it was, a
[17] marked vehicle came to the intersection of 56th and
[18] Master Street with his lights on and a siren, made
[19] a U-turn in the middle 69th Street, went northbound
[20] on 56th Street. At that time, Your Honor, three
[21] males, Maurice Gray, Howard and Kabian Diggs, they
[22] got into a Bonneville, another Bonneville, Your
[23] Honor, and they left the area at a high rate of
[24] speed. Hodges got into the Plymouth Breeze with a
[25] black female. They left the area southbound on

Page 46

[1]
[2] 56th. I notified Police Officer Reynolds of that
[3] vehicle and which way he was traveling where Police
[4] Officer Reynolds stopped that Plymouth Breeze at
[5] 56th and Market Street and placed the defendant --
[6]       MR. CAMPBELL:   Just for the record,
[7] Your Honor, an objection unless it was in his
[8] presence.
[9]       THE COURT:   All right. Wait, excuse
[10] me, I'm going to rule on the objection. The
[11] objection is overruled.
[12]       Go ahead.
[13] BY MS. ROBINSON:
[14] Q.   Who was the driver?
[15] A.   I believe the female was the driver.
[16]       THE COURT:   You believe who?
[17]       THE WITNESS:   The female, a black
[18] female.
[19] BY MS. ROBINSON:
[20] Q.   And where was it stopped?
[21] A.   It was stopped at 56th and Market Street, and
[22] recovered from Anthony Hodges was five blue tinted
[23] ziplock packets containing a green weed and seed
[24] substance, alleged marijuana; one key with three
[25] keys on that key ring, Your Honor. Later we

Page 47

[1]
[2] determined that it worked the front door of 5607
[3] West Master Street.
[4] Q.   Now, and what was done with those keys, just
[5] that the record is clear, what was the property
[6] receipt for that?
[7] A.   The property receipt for the --
[8] Q.   Keys from Hodges.
[9] A.   The keys for the 5607 West Master, 2308222.
[10] Q.   And with respect to the keys from Kareem
[11] Torain, what was the number for that, do you have
[12] that?
[13] A.   Yes, 2308207.
[14] Q.   Now --
[15]       MS. ROBINSON:   Your Honor, based on
[16] the fact that counsel's represented to me
[17] they're not challenging the drugs and the
[18] narcotics recovered from the three locations,
[19] I'm not going to go into all those details at
[20] this time.
[21]       THE COURT:   Very good.
[22]       MS. ROBINSON:   So at this point the
[23] Commonwealth has no more questions of this
[24] witness.
[25]       THE COURT:   All right.

Page 48

[1]
[2]       MS. ROBINSON:   But I reserve the
[3] right to recall him in case something changes.
[4]       THE COURT:   I understand.
[5]       Cross-examine.
[6]       MR. MEEHAN:   Thank you.
[7]       CROSS-EXAMINATION
[8] BY MR. MEEHAN:
[9] Q.   Officer, just a few questions for you.
[10] A.   Sure.
[11] Q.   First off, good afternoon.
[12] A.   Good afternoon.
[13] Q.   You testified that you were not able to
[14] determine who the driver of the green Bonneville
[15] was; correct?
[16] A.   That's correct.
[17] Q.   And it also is correct that whoever that
[18] driver of the green Bonneville was, you did not see
[19] that person make any exchanges with Mr. Delee;
[20] correct?
[21] A.   No, I did not.
[22] Q.   Okay. You were watching, though; correct?
[23] A.   Once he pulled onto Ithan Street it was out of
[24] my view.
[25] Q.   Pardon me?

01101488
Kareem Torain

Trial (Jury) Volume 1
May 06, 2002

Page 49

[1]
[2] A.  Once the vehicle pulled onto Ithan Street and
[3] the defendant Delee got into the vehicle, it was
[4] out of my view.
[5] Q.  Now, correct me if I'm wrong, but over the
[6] couple days of taping, Mr. Delee had gotten into a
[7] couple different vehicles; correct?
[8] A.  Yes.
[9] Q.  Okay.  Did you tell officers to follow any of
[10] the other vehicles?
[11] A.  No, I did not.
[12] Q.  Okay.  And the green Bonneville again as you
[13] said already, you have not seen him give any money
[14] or receive any drugs from Mr. Delee; correct?
[15] A.  That's correct.
[16] Q.  The only time that you saw the green
[17] Bonneville during your surveillance was that brief
[18] period of time; correct?
[19] A.  That's correct.
[20] Q.  Okay.  You saw the green Bonneville leave the
[21] area; correct?
[22] A.  No, I didn't see it leave the area.
[23] Q.  Okay.  You didn't even see it leave the area?
[24] A.  No, I didn't.
[25] Q.  You just saw Mr. Delee exit the vehicle or

Page 50

[1]
[2] A.  No, Police Officer Walker observed that.  It
[3] was out of my view.
[4] Q.  Out of your sight?
[5] A.  Out of my sight.
[6] Q.  And that was I believe about 1:40, 1:45; is
[7] that about right?
[8] A.  About 1:42, in around 1:45.
[9] Q.  Okay.  Now, prior to that time it's your
[10] position that Mr. Delee had been making any number
[11] of transactions, not only on the 3rd, but also the
[12] 4th; correct?
[13] A.  That's correct.
[14] Q.  And following that brief time inside the green
[15] Bonneville, Mr. Delee again your belief is that he
[16] was making any number of transactions also;
[17] correct?
[18] A.  Inside the Bonneville?
[19] Q.  No, out on the street.
[20] A.  Out on the street?
[21] Q.  Yes.
[22] A.  Earlier he was and then he stopped for a
[23] period of time before he got in that car.
[24] Q.  He actually left that area; correct?
[25] A.  Yes, he did.

Page 51

[1]
[2] Q.  With some other males?
[3] A.  I think he walked off.
[4] Q.  Do you know the time where he actually got
[5] into the black vehicle and left the area?
[6] A.  I think he did for a few minutes and came
[7] back.
[8] Q.  And then he came back and then he made some
[9] more what you believed to be transactions also;
[10] correct?
[11] A.  That's correct.
[12] Q.  Okay.  All during the 2nd, the 3rd, and the
[13] 4th, you never saw my client out at that location?
[14] A.  No, I did not.
[15] Q.  Okay.  And you radioed Officer Walker to
[16] follow the green Bonneville; is that right?
[17] A.  That's correct.
[18] Q.  He's here to testify; correct?
[19] A.  Yes, he is.
[20] Q.  Now, he tells you over radio that it goes to
[21] 1621 North Conestoga; correct?
[22] A.  I believe he did, yes.
[23] Q.  It stays there, I would imagine you're still
[24] making surveillance of the 5600 block of Master
[25] Street and you're also probably getting information

Page 52

[1]
[2] from Officer Walker, maybe other officers also;
[3] correct?
[4] A.  Yes, I am.
[5] Q.  All right.  Now, when Officer Walker radios
[6] back to you, does he have an identification of the
[7] person who's driving the green Bonneville?
[8] A.  He doesn't have identification, no.
[9] Q.  Okay.  And he watches the person go into 1621,
[10] he tells you that; correct?
[11] A.  Correct.
[12] Q.  The person stays there any period of time
[13] and then leaves the location; correct?
[14] A.  That's correct.
[15] Q.  All right.  At this point again Officer Walker
[16] from what he's telling you, he hasn't seen the
[17] person who was in the green Bonneville selling
[18] drugs or getting drugs or carrying any drugs at
[19] this point, has he?
[20] A.  No, he has not.
[21] Q.  Okay.  We get to the person then goes in the
[22] green Bonneville, then goes to 1628 is it South
[23] 55th or North 55th Street?
[24] A.  It's North 55th.
[25] Q.  North 55th, okay.  The person then goes into

Page 53

[1]
[2] that location; correct?
[3] A. That's correct.
[4] Q. All right. Now, Officer Walker sees the
[5] person enter the location; correct?
[6] A. That's correct.
[7] Q. Okay. Is watching them from his car; is that
[8] correct?
[9] A. I'm not sure where he's watching them from.
[10] Q. Sees a person enter and then sees a light come
[11] on in a middle room at that location; is that
[12] right?
[13] A. I believe so, yes, that's what he related back
[14] to me.
[15] Q. I take it to mean that, and correct me if I'm
[16] wrong, but he didn't see the person enter a
[17] particular room, but he believed the person went
[18] onto that room that had the light go on?
[19] A. I believe so. I'm not sure what room he
[20] believes they went into at that time.
[21] Q. Okay. Now, the green Bonneville then leaves
[22] the location and leaves the area of 1628 South
[23] North 55th at approximately 2:55; is that right?
[24] A. After the green Bonneville leave -- left the
[25] area, it was about 2:55, 2:58 after the three males

Page 54

[1]
[2] left inside the dark color Buick.
[3] Q. Okay. Now, Officer Walker from what he tells
[4] you has not seen those three people who show up in
[5] the Buick who you testified as being Mr. Delee;
[6] right?
[7] A. Yes.
[8] Q. He didn't see him have any contact with
[9] anybody inside that location, did he?
[10] A. I saw him walk into the property, but other
[11] than that I'm not sure.
[12] Q. Okay. A person gets back in the green
[13] Bonneville, leaves the location; right?
[14] A. Yes.
[15] Q. Officer Walker is on the move again; correct?
[16] A. Yes, he is.
[17] Q. Okay. You tell Officer Walker to stop the
[18] person who is driving the green Bonneville; right?
[19] A. That's correct.
[20] Q. At this point again you've not seen that
[21] person in the green Bonneville have any drugs or
[22] receive any drugs or give any drugs or even receive
[23] or give any money at this point; correct?
[24] A. I did not, no.
[25] Q. And from what Officer Walker has told you at

Page 55

[1]
[2] this point, he hasn't seen that person receive any
[3] drugs either; correct?
[4] A. To the best of my knowledge, no, not at the
[5] time.
[6] Q. Well, it's fair to say he would have said
[7] something to you if he would have seen that?
[8] A. Yes, he would have.
[9] Q. Okay.
[10]       MR. MEEHAN: I have no other
[11]   questions.
[12]       THE COURT: Thank you.
[13]   Mr. Campbell.
[14]       MR. CAMPBELL: Thank you, Your Honor.
[15] BY MR. CAMPBELL:
[16] Q. Good afternoon, officer.
[17] A. Good afternoon.
[18] Q. Okay. The surveillance conducted on January
[19] 2nd, January 3rd, and January 4th, am I correct
[20] that on January 2nd there was no video recordings
[21] of what you surveilled?
[22] A. That's correct.
[23] Q. All right. And on January 2nd your testimony
[24] is that you observed this defendant Anthony Hodges
[25] along with defendant Delee exchanging U.S. currency

Page 56

[1]
[2] for objects with various people; correct?
[3] A. That's correct.
[4] Q. All right. And you've also testified that
[5] this was about ten times or so?
[6] A. Around there.
[7] Q. Around there?
[8] A. Yes. I'm not sure how many times each
[9] person --
[10] Q. Okay. And am I correct that you couldn't hear
[11] any conversation between my client and any other
[12] person from your location?
[13] A. No, our windows weren't open, we couldn't hear
[14] at that time either.
[15] Q. On either of the three days; right?
[16] A. All three days, no, that's correct.
[17] Q. Am I also correct that for all of the
[18] encounters that you observed that for none of them
[19] was anyone stopped?
[20] A. That's correct.
[21] Q. All right. In fact, no one, there were no
[22] alleged buyers stopped for day two or day three,
[23] either, January 3rd and January 4th?
[24] A. That's correct.
[25] Q. And am I also correct that what you saw at the

01101488
Kareem Torain

Page 57

[1]
[2] time exchanged were objects for what appeared to be
[3] U.S. currency; is that correct?
[4] A.  Small objects, yes.
[5] Q.  And I'm also correct that the video recordings
[6] that you just described to the Court also don't
[7] show anything more than objects exchanged for what
[8] appears to be U.S. currency?
[9] A.  Some of the video shows green objects in a
[10] baggie and everything, but --
[11] Q.  Okay.  Fair enough.  That would be the video
[12] of January --
[13] A.  3rd, I believe it was.
[14] Q.  -- 3rd, green objects, but always objects;
[15] right?
[16] A.  That's correct.
[17] Q.  Just to be sure, the video don't show
[18] denominations on any of the bills or anything like
[19] that; right?
[20] A.  No, it does not.
[21] Q.  All right.  And when my client was arrested,
[22] no drugs at all were recovered from him; correct?
[23] I'm sorry, let me strike that.  That's incorrect.
[24]      Five blue packets of marijuana; is
[25] that correct.

Page 58

[1]
[2] A.  That's correct.
[3] Q.  All right.  And one set of keys that you later
[4] determined were for the front door of 5607 West
[5] Master Street; right?
[6] A.  Yes.
[7] Q.  All right.  You recovered no pre-recorded buy
[8] money from my client; is that right?
[9] A.  That's correct.
[10] Q.  And you later came to know that my client
[11] resided at 5607 West Master Street; is that right?
[12] A.  That's correct.
[13] Q.  And with regard to the Plymouth, the red
[14] Plymouth Breeze that my client went into the trunk
[15] on two occasions, no drugs were recovered from that
[16] vehicle; is that right?
[17] A.  That's correct.
[18] Q.  Am I also correct that on January 3rd Anthony
[19] Hodges has an encounter with one person you
[20] described as a narcotics transaction?
[21] A.  That's correct.
[22] Q.  And that there is also one such transaction on
[23] January 4th?
[24] A.  I believe there was maybe two, two that was on
[25] film on 56th Street and then I observed one in my

Page 59

[1]
[2] view that wasn't on camera, that was right at the
[3] steps of 5607.
[4] Q.  Right.  I got the one at the steps.  The one,
[5] the other one that you're referring to, is that
[6] when he appears on the corner of the 5600 block?
[7] A.  Yes.
[8] Q.  Was there an actual exchange or did he just
[9] exchange words with someone?
[10] A.  No, there was actual exchange.
[11]      MR. CAMPBELL:  Thank you, officer.
[12] That's all I have.
[13]      THE COURT:  Any redirect?
[14]      MS. ROBINSON:  Just very briefly.
[15]      REDIRECT EXAMINATION
[16] BY MS. ROBINSON:
[17] Q.  Mr. Meehan brought up that you didn't have an
[18] identification of the defendant Kareem Torain.  Did
[19] you have a description, however?
[20] A.  Myself?
[21] Q.  Yes.
[22] A.  No, I did not.
[23] Q.  Did Officer Walker provide one to you?
[24] A.  Yes, he did.
[25] Q.  And was that before you had actually ordered

Page 60

[1]
[2] the arrest of the driver of the Bonneville?
[3] A.  Yes it was.
[4] Q.  And what was the description he was able to
[5] provide to you?
[6] A.  Tall male, light skinned.
[7] Q.  And when you ordered the takedown, Mr. Meehan
[8] said that at that point you didn't actually have
[9] knowledge that the defendant had delivered any
[10] narcotics.  What was your belief based on under all
[11] the circumstances of what you had seen about what
[12] had occurred that afternoon as to what conduct the
[13] defendant Kareem Torain engaged in?
[14]      MR. MEEHAN:  I'm going to object just
[15] for the record.
[16]      THE COURT:  Overruled.  Took a lot of
[17] thought to get that question out.  I got to
[18] congratulate her.
[19]      MS. ROBINSON:  Thank you.
[20]      THE COURT:  Grammatically correct,
[21] that's the amazing thing.
[22]      THE WITNESS:  Based on my experience
[23] as a narcotics officer and a police officer, I
[24] believe inside that vehicle there was narcotics
[25] passed to the defendant Darnell Delee as he

01101488
Kareem Torain

Trial (Jury) Volume 1
May 06, 2002

Page 61

[1]
[2]    exited. If he was just selling packets he
[3]    would have put it right in his pocket before he
[4]    walked out of the vehicle.
[5] BY MS. ROBINSON:
[6] Q.    And Mr. Campbell asked you about buy money.
[7] No buy money was recovered from the defendant
[8] Hodges. Was the buy money that Officer Brad
[9] Mitchell used on January 3rd recovered, do you
[10] remember or do you need to --
[11] A.    I don't believe so. I'm not really positive.
[12] Q.    And the --
[13]         MS. ROBINSON: At this time, Your
[14]    Honor, again having been advised that counsel
[15]    is not moving to suppress the narcotics that
[16]    were recovered from each of those locations,
[17]    the Commonwealth will now call its next
[18]    witness.
[19]         THE COURT: Well, there may be some
[20]    recross. We still have rules of procedure.
[21]         Recross.
[22]         RECROSS-EXAMINATION
[23] BY MR. MEEHAN:
[24] Q.    Officer, how late in the process was it that
[25] Officer Walker gave you this description?

Page 62

[1]
[2] A.    I believe it was when Torain exited that
[3] vehicle and walked into his house on Conestoga
[4] Street.
[5] Q.    Okay. And --
[6]         MR. MEEHAN: Actually I have no other
[7]    questions.
[8]         THE COURT: Thank you.
[9]         Anything else?
[10]         MR. CAMPBELL: I have nothing
[11]    further.
[12]         THE COURT: Okay. Officer, thank
[13]    you.
[14]         MS. ROBINSON: The Commonwealth calls
[15]    Officer Jeffrey Walker.
[16]         THE COURT: Very well.
[17]         ...OFFICER JEFFREY WALKER, Badge
[18]    Number 3730, Narcotics Field Unit, sworn...
[19]         THE COURT: You may proceed.
[20]         MS. ROBINSON: Thank you.
[21]         DIRECT EXAMINATION
[22] BY MS. ROBINSON:
[23] Q.    Officer Walker, how long have you been a
[24] Philadelphia police officer?
[25] A.    Thirteen years.

Page 63

[1]
[2] Q.    And how long have you been assigned to
[3] narcotics?
[4] A.    Two and a half years.
[5] Q.    Directing your attention to January 4th, 2001,
[6] did you have occasion to be working in a backup
[7] surveillance capacity to Officer Monaghan as he had
[8] set up a surveillance in the area of 56th and
[9] Master Streets?
[10] A.    That's correct.
[11] Q.    And in that afternoon did you have occasion to
[12] observe anyone whom you see here today in court?
[13] A.    That's correct.
[14] Q.    Would you point to that individual.
[15] A.    Defendant with the red shirt.
[16]         MS. ROBINSON: May the record reflect
[17]    that the witness has identified the defendant
[18]    Kareem Torain setting to the left of his
[19]    counsel.
[20]         THE COURT: Very well.
[21] BY MS. ROBINSON:
[22] Q.    Officer Walker, what time did you first
[23] observe the defendant and where was he?
[24] A.    When I first observed defendant, he was on
[25] Conestoga Street. He was coming out of a vehicle.

Page 64

[1]
[2] Q.    And what kind of vehicle was it?
[3] A.    A green Pontiac with a PA tag of DKC3310.
[4] Q.    And where had you first seen that Bonneville?
[5]         THE COURT: He said Pontiac, did you
[6]    not?
[7]         THE WITNESS: I said Bonneville.
[8]         THE COURT: Oh.
[9]         THE WITNESS: Green Bonneville.
[10]         THE COURT: I thought you said
[11]    Pontiac. I realize Pontiac and Bonneville is a
[12]    model, but, okay, all right.
[13] BY MS. ROBINSON:
[14] Q.    And, Officer Walker, where had you first seen
[15] that Bonneville during the course of your
[16] surveillance?
[17] A.    At Ithan and Master.
[18] Q.    And where is Ithan, what kind of street is
[19] that in relationship to the corner of 56th and
[20] Master?
[21] A.    It's a small street just west of 56th Street.
[22] Q.    And when you saw it where were you watching
[23] from?
[24] A.    My vehicle. I was pulling behind the vehicle.
[25] As a result of information from Police Officer

Page 65

[1]
[2] Monaghan to take the area, I was turning onto Ithan
[3] Street to Master Street and I observed the vehicle
[4] parked.
[5] **Q.** And it was parked?
[6] **A.** Yes.
[7] **Q.** Which side of the street?
[8] **A.** East side of Ithan.
[9] **Q.** And when you saw the car parked, did you see
[10] any other individual at or near the car?
[11] **A.** I observed another individual later identified
[12] as Darnell Delee exit the passenger side of that
[13] vehicle.
[14] **Q.** And what, if anything, did you see in Darnell
[15] Delee's possession at the time he exited?
[16] **A.** A clear plastic bag the size of a golf ball.
[17] **Q.** And what, if anything, did it appear to
[18] contain?
[19] **A.** I couldn't tell at that particular time.
[20] **Q.** And based upon your experience as a
[21] Philadelphia narcotics officer what did you believe
[22] it to contain?
[23] **A.** Narcotics.
[24] **Q.** And at that time could you tell how many
[25] occupants there were in the Bonneville?

Page 66

[1]
[2] **A.** No.
[3] **Q.** And then what happened to Delee, where did he
[4] go to?
[5] **A.** He walked, that would be south down Ithan
[6] passing me and I lost sight of him once he got onto
[7] Master Street.
[8] **Q.** Were you in communication with Officer
[9] Monaghan?
[10] **A.** Yes.
[11] **Q.** Did you relate that to him that you saw this
[12] individual later identified as Darnell Delee with
[13] the baggie that you believed to contain narcotics?
[14] **A.** That's correct.
[15] **Q.** And based on the way he came out of the car
[16] what, if anything, did you conclude about how he
[17] came to be in possession of it based on your
[18] experience?
[19]        **MR. MEEHAN:** I'm going to object.
[20]        **THE COURT:** I'm going to sustain that
[21] objection.
[22] **BY MS. ROBINSON:**
[23] **Q.** Well, what did you see Delee do with that
[24] baggie? Where did he put it, if anywhere, on his
[25] person?

Page 67

[1]
[2] **A.** At that time he had it in his hand, he was
[3] quickly walking around the corner.
[4] **Q.** And how much later did the Bonneville take
[5] off?
[6] **A.** Less than a minute. Maybe 10 seconds.
[7] **Q.** And what did you do?
[8] **A.** I continued following the vehicle.
[9] **Q.** And where did it go to?
[10] **A.** 1621 North Conestoga.
[11] **Q.** And at that time did the car park, stop, what
[12] happened?
[13] **A.** Parked. He entered the property with a key.
[14] **Q.** And was anyone else in the vehicle at that
[15] time?
[16] **A.** No.
[17] **Q.** And how far away were you when you saw the
[18] defendant go into 1621 Conestoga?
[19] **A.** About 30 feet. I was parked along Hunter
[20] Street.
[21] **Q.** And how long was the defendant inside that
[22] location?
[23] **A.** From 1:41 to maybe 2 o'clock, so 20 minutes.
[24] **Q.** And then what happened?
[25] **A.** He left the location, I followed him to 1628

Page 68

[1]
[2] North 55th Street.
[3] **Q.** And how far away is that from the address of
[4] 5605, 5607 Master Street?
[5] **A.** That street would be just west of it, it's
[6] like a park, I believe it's a park there,
[7] something, recreation area there, about a block
[8] away from it.
[9] **Q.** And then where did the defendant park his car?
[10] **A.** He parked it in front of the location.
[11] **Q.** And then what did you do? Did you see where
[12] he went?
[13] **A.** At that time when he parked I was still in my
[14] vehicle. I was still parked along Hunter Street.
[15] He exit the vehicle and entered the property with a
[16] key. I immediately exited my vehicle, began a foot
[17] surveillance of the property. I knew because the
[18] way the property was shaped it had to be apartment.
[19] I walked alongside of the property, I observed a
[20] light go on I believe to be the middle room, I
[21] found to be the middle apartment on the first
[22] floor. Once I found out the light came on, then I
[23] went back into my vehicle.
[24] **Q.** And how long did you wait there until you saw
[25] anyone else arrive?

01101488
Kareem Torain

Trial (Jury) Volume 1
May 06, 2002

Page 69

[1]
[2] A.  I stayed there the whole time until another
[3] vehicle pulled up.
[4] Q.  And had you received any further information
[5] from Officer Monaghan with respect to another
[6] vehicle might show up?
[7] A.  No.  I relayed information of description of
[8] the individual getting out of the Bonneville back
[9] to him.  From there, you know, I stayed at the
[10] location on 1620 North 55th Street.
[11] Q.  And then what happened, did you see anyone
[12] arrive?
[13] A.  Yes, a dark color Buick.
[14] Q.  And who got out of that?
[15] A.  A defendant by the last name of Delee, Diggs,
[16] and Tilman.
[17] Q.  And where did they go?
[18] A.  Into the property.
[19] Q.  And could you tell which room they went into?
[20] A.  No, at that time.  I was still sitting in my
[21] car.
[22] Q.  And then what was the next thing you heard or
[23] saw?
[24] A.  After 20 minutes later the two -- the
[25] individuals left the location.  I observed Delee

Page 70

[1]
[2] again carrying a clear plastic baggie the size of a
[3] golf ball.  He was coming out of the property.  He
[4] placed this item into his jacket and they got back
[5] into the Buick and left the location.
[6] Q.  And based upon your seeing him the second time
[7] with a golf ball size bag what did you believe had
[8] occurred?
[9] A.  Narcotics.
[10] Q.  And when you say narcotics what did you
[11] believe had occurred?
[12] A.  He was in possession of narcotics.
[13] Q.  And what did you believe about where he had
[14] gotten his narcotics from?
[15] A.  From that location.
[16] Q.  And did you relay that information to Officer
[17] Monaghan?
[18] A.  That's correct.
[19] Q.  And where did Delee and the other two males
[20] go?  Did they get back in the Buick?
[21] A.  All three males got back into the Buick.
[22] Q.  And where did they proceed to go, though?
[23] A.  They left the location.
[24] Q.  And then did you stay where you were?
[25] A.  Yes.

Page 71

[1]
[2] Q.  What happened next?
[3] A.  Approximately 2:58 p.m. I observed this
[4] defendant exit the property.
[5]        THE COURT:  This defendant meaning.
[6]        THE WITNESS:  Kareem.
[7]        MS. ROBINSON:  Kareem Torain.
[8]        THE COURT:  Thank you.
[9] BY MS. ROBINSON:
[10] Q.  And where did he go?
[11] A.  I stayed at the location.  I relayed
[12] information to Police Officer Reynolds, told him he
[13] was leaving that property
[14] Q.  And did you identify the defendant later on
[15] that afternoon as the individual you had seen going
[16] into that property?
[17] A.  That's correct.
[18] Q.  Did you have --
[19]        MS. ROBINSON:  I have no more
[20]    questions.
[21]        THE COURT:  Cross.
[22]        MR. MEEHAN:  Thank you, Judge.
[23]        CROSS-EXAMINATION
[24] BY MR. MEEHAN:
[25] Q.  First off, you never saw Mr. Torain actually

Page 72

[1]
[2] go into the middle room of that first floor, did
[3] you?
[4] A.  No.  I saw the light come on.
[5] Q.  Well, it was about 3 o'clock, 2:30, 3 o'clock
[6] when that happened; right?
[7] A.  That's correct.
[8] Q.  Okay.  And there were a number of apartments
[9] in the building; correct?
[10] A.  That's correct.
[11] Q.  Okay.  And at that location you never saw Mr.
[12] Delee or the other gentleman have any contact with
[13] my client, did you?
[14] A.  No.
[15] Q.  You never saw them enter that middle room that
[16] you believe my client had gone into; correct?
[17] A.  That's correct.
[18] Q.  When you were out at the location when you
[19] were making observations of the green Bonneville,
[20] you didn't see Mr. Torain exchange any money or
[21] receive any drugs or money from Mr. Delee, did you?
[22] A.  No, I didn't see it.
[23] Q.  Okay.  You saw Mr. Delee leave the car with
[24] a -- holding a plastic bag; correct?
[25] A.  That's correct.

01101488
Kareem Torain

Page 73

[1]
[2] Q.  With something approximately the size of a
[3] golf ball shape in it; correct?
[4] A.  That's correct.
[5] Q.  And you were unable to identify what, if
[6] anything, that item was; correct?
[7] A.  That's correct.
[8] Q.  Okay.  And then shortly thereafter you left
[9] that location because Officer Monaghan instructed
[10] you or asked you to follow the green Bonneville?
[11] A.  That's correct.
[12]        MR. MEEHAN:  Okay.  If I could just
[13]   have one moment.
[14]        THE COURT:  No problem.
[15] BY MR. MEEHAN:
[16] Q.  Now, when Mr. Torain leaves the location on
[17] 55th Street, you start following him again;
[18] correct?
[19] A.  Who leaves the location?
[20] Q.  Leaves the location on 55th Street.  Wasn't it
[21] on 55th Street?
[22] A.  No.
[23] Q.  Okay.  You initially started at Conestoga,
[24] right?
[25] A.  Following your client?

Page 74

[1]
[2] Q.  Right.
[3] A.  From Ithan and Master.
[4] Q.  Okay.  And where did he go?
[5] A.  He went to Conestoga.
[6] Q.  Did he stay at Conestoga?
[7] A.  He stayed there for a few minutes, about maybe
[8] 20 minutes.
[9] Q.  And then he left that location?
[10] A.  Left the location and went up to 1628 North
[11] 55th street.
[12] Q.  That's what I'm talking about, my apologies.
[13] Then when he left the North 55th Street location
[14] you then followed him; correct?
[15] A.  No, I stayed there.
[16] Q.  You stayed there?
[17] A.  Yes.
[18] Q.  Okay.  Were you present when my client was
[19] stopped and arrested?
[20] A.  No, I don't think so, no.
[21] Q.  So you weren't the individual who stopped and
[22] placed him under arrest?
[23] A.  No.
[24]        MR. MEEHAN:  Thank you.
[25]        THE COURT:  Mr. Campbell, do you have

Page 75

[1]
[2]   any questions?
[3]        MR. CAMPBELL:  I have no questions.
[4]        MS. ROBINSON:  Judge, I have no more
[5]   questions of this witness.  I have Officer
[6]   Reynolds who actually did the actual arrest
[7]   given that my understanding is that counsel is
[8]   moving to suppress the keys.
[9]        THE COURT:  Okay.  Officer Reynolds.
[10]        MS. ROBINSON:  Officer Reynolds.
[11]        ...OFFICER BRIAN REYNOLDS, Badge
[12]   Number 4268, Narcotics Field Unit, sworn...
[13]        MS. ROBINSON:  May I proceed?
[14]        THE COURT:  You may proceed.
[15]        DIRECT EXAMINATION
[16] BY MS. ROBINSON:
[17] Q.  Officer Reynolds, did you have occasion to
[18] participate in the arrest of any person or persons
[19] whom you see here today in court?
[20] A.  Yes, Kareem Torain and Anthony Hodges.
[21] Q.  And who did you participate in the arrest of
[22] first?
[23] A.  Kareem Torain.
[24] Q.  And at approximately what time did that occur?
[25] A.  Approximately 2:58 p.m., Your Honor, 3 o'clock

Page 76

[1]
[2] p.m. at 51st and Nassau Road.
[3] Q.  Would you tell His Honor what were the facts
[4] and circumstance surrounding your arresting the
[5] defendant?
[6] A.  Yes.  Based on him leaving the property at
[7] 55th Street, I followed him out of the area, he was
[8] inside the green Pontiac Bonneville.  I then went
[9] over police radio with the aid of marked units,
[10] followed the defendant to 61st Street and Nassau
[11] Road where we then stopped the car.  At this time
[12] myself and uniformed officers stopped him.  He was
[13] placed under arrest by myself.  Recovered from him
[14] was a pager, a Nextel cell phone, one cancer key
[15] ring with five keys on it, one black key ring with
[16] three keys on it.  One of those keys worked the
[17] front door to the apartment 1628 North 55th Street.
[18] Q.  What did you do with those keys?
[19] A.  Those were turned over to Officer Monaghan and
[20] placed on property receipt 2308207.  Also recovered
[21] from him was $250 USC and that was placed on
[22] property receipt 2308208.
[23] Q.  After you had uniform take the defendant into
[24] custody, at what time did you have or participate
[25] in the arrest of Anthony Hodges?

Page 77

[1]

[2] A.  That was approximately 3:20 p.m.

[3]        MS. ROBINSON:  And again may the

[4]  record reflect the witness has identified both

[5]  defendants.

[6] BY MS. ROBINSON:

[7] Q.  Would you tell His Honor what were the facts

[8] and circumstances surrounding arresting the

[9] defendant Anthony Hodges?

[10] A.  Yes, Your Honor, based on Officer Monaghan, he

[11] said that Anthony Hodges just left in maroon sedan

[12] vehicle going southbound on 56th Street.  Again

[13] once again with the aid of a marked unit, stopped

[14] that vehicle in the intersection of 56th and

[15] Market, at which time he was placed under arrest by

[16] myself.  Recovered from his jacket pocket was five

[17] blue tinted ziplock packets, each containing

[18] alleged marijuana, and also key ring containing

[19] three keys.  One of those keys worked the front

[20] door to 5607 Master Street, Your Honor.

[21] Q.  What did you do with those keys?

[22] A.  The narcotics, the keys were turned over to

[23] Officer Monaghan which were placed on a property

[24] receipt and the narcotics were placed on property

[25] receipt 2308205.

Page 78

[1]

[2]        MS. ROBINSON:  I have no more

[3]  questions of this witness.

[4]        THE COURT:  Cross-examine.

[5]        MR. MEEHAN:  Thank you.

[6] BY MR. MEEHAN:

[7] Q.  Just a few questions.  Officer, you had not

[8] made any observations of my client doing anything;

[9] correct?

[10] A.  Correct.

[11] Q.  Okay.  You were simply acting on the

[12] directions of Officer Monaghan?

[13] A.  Correct, and at times Officer Walker.

[14] Q.  And officer?

[15] A.  Officer Walker.

[16] Q.  Okay.  You pull my client's car over, correct,

[17] or -- are you in a marked unit?

[18] A.  I was in an unmarked unit in plain clothes.  I

[19] had marked units with me.

[20] Q.  They I guess by use of their domelights had

[21] him pull over, is that correct?

[22] A.  Actually he parked, I believe it was on

[23] northwest corner and exited and that's when myself

[24] and the other uniformed officers converged on him.

[25] Q.  Okay.  And you told him that he was under

Page 79

[1]

[2] arrest, I guess?

[3] A.  Correct.

[4] Q.  You started searching him at that time;

[5] correct?

[6] A.  Correct.

[7] Q.  To see if any of the drugs or money or weapons

[8] were on him; correct?

[9] A.  Correct.

[10] Q.  Okay.  You found some money?

[11] A.  Correct.

[12] Q.  Okay.  You didn't find any weapons or any

[13] narcotics or any drugs; correct?

[14] A.  Correct.

[15] Q.  Okay.  And just for the record, you didn't

[16] have a warrant to arrest him, correct, you were

[17] acting on the orders of Officer Monaghan?

[18] A.  Correct.

[19]        MR. MEEHAN:  Thank you.

[20]        THE COURT:  Thank you.

[21]        Mr. Campbell.

[22] BY MR. CAMPBELL:

[23] Q.  Officer, at the direction of Officer Monaghan

[24] you stated you stopped this defendant Anthony

[25] Hodges around 3:20; is that correct?

Page 80

[1]

[2] A.  Correct.

[3] Q.  And at the time that you first encountered him

[4] where was he?

[5] A.  The uniform sergeant stopped him at 56th and

[6] Market in the intersection, I believe cut in front

[7] of his vehicle.

[8] Q.  Okay.  So he had already been stopped, Mr.

[9] Hodges was already -- when you first saw Mr.

[10] Hodges, he was already stopped by one of your

[11] brother officers in uniform?

[12] A.  I was right there with the sergeant.  In other

[13] words, the sergeant pulled his vehicle in front of

[14] him, myself and other officers got out of our

[15] vehicle and got him out of his vehicle.

[16] Q.  Is it fair to say you stopped at the same time

[17] he stopped?

[18] A.  Correct.

[19] Q.  The description you got from Officer Monaghan

[20] was that he was in a maroon sedan, I believe that's

[21] what you said?

[22] A.  A maroon Plymouth sedan maroon in color.  He

[23] did give my me a clothing description.  I don't

[24] recall it off hand.

[25] Q.  All right.  On the maroon Plymouth sedan there

Page 81

[1]
[2] was no description of the number of occupants in
[3] the car?
[4] A.  The police said he was driving and there was a
[5] female also in the car with him.
[6] Q.  But this defendant was driving?
[7] A.  Correct.
[8] Q.  And so you with the help of your brother
[9] officers pulled him out of the car and recovered
[10] from him was a set of three keys; is that right?
[11] A.  Keys and five packets of marijuana.
[12] Q.  And the five packets of marijuana, that's
[13] right.  And there was no money on him; is that
[14] right?
[15] A.  Correct.
[16]         MR. CAMPBELL:  That's all I have.
[17]         THE COURT:  Any redirect?
[18]         MS. ROBINSON:  No.
[19]         THE COURT:  Officer.  Thank you very
[20] much.
[21]         MS. ROBINSON:  Your Honor, at this
[22] time the Commonwealth moves into evidence the
[23] two tapes which have been marked as
[24] Commonwealth's Exhibit C-1 and C-2 for
[25] identification purposes only.

Page 82

[1]
[2]         THE COURT:  They're admitted.
[3]         MS. ROBINSON:  Thank you.  And the
[4] Commonwealth rest for purposes of the Motion to
[5] Suppress the items that were recovered pursuant
[6] to the arrest.
[7]         THE COURT:  Mr. Meehan, do you have
[8] any evidence?
[9]         MR. MEEHAN:  No, Judge.
[10]         THE COURT:  You rest.
[11]         Mr. Campbell, you rest also?
[12]         MR. CAMPBELL:  Yes.
[13]         THE COURT:  Okay.  Argument.
[14]         MR. MEEHAN:  May I?
[15]         THE COURT:  Yes.
[16]         MR. MEEHAN:  Thank you.
[17]         Your Honor, this is a situation where
[18] the Commonwealth, Your Honor, they have to have
[19] probable cause to believe that my client has
[20] committed a crime.  They have three days of
[21] surveillance, two on videotape.  At most what
[22] they see is my client drive up to the location.
[23] Mr. Delee get into the car momentarily and then
[24] leave the car.
[25]         Officer Walker sees a baggie, but he

Page 83

[1]
[2] can't describe what's in it.  They then follow
[3] What my client do is he goes to Conestoga
[4] Street.  He then leaves Conestoga Street and
[5] goes to this other location.  They don't know
[6] where he goes in this location.  They believe
[7] he goes into this middle room, but nobody sees
[8] where he goes.
[9]         THE COURT:  They see a light go on.
[10]         MR. MEEHAN:  They see a light go on.
[11] There's other apartments in the building.  It's
[12] 3 o'clock in the afternoon.  You saw what the
[13] lighting was out there that day.  I would
[14] suggest to the Court you wouldn't necessarily
[15] need the light on, but be that as it may, what
[16] they don't see is they don't see my client ever
[17] receive or get anything or give anything to Mr.
[18] Delee or any of these other individuals.  They
[19] don't see Mr. Delee or any of these other
[20] gentlemen have any contact with my client on
[21] the North 55th Street.
[22]         I would concede that they might have
[23] some reasonable suspicion to stop, however, at
[24] this situation at this time because what they
[25] do is they conduct a full custodial search,

Page 84

[1]
[2] they need probable cause to believe that he's
[3] been involved in criminal activity and they
[4] don't have it based on these limited
[5] observations.
[6]         Again, maybe they have some
[7] reasonable suspicion based on the fact that he
[8] was out there, but because as I said this is
[9] not a situation where they ask him some
[10] questions and pat him down to see what's going
[11] on or see what he's doing, they don't do any of
[12] that, they just go in and they make the arrest,
[13] but they haven't seen him commit any crimes.
[14] In fact, they've seen him have some tangential
[15] contact with people, but they didn't see him do
[16] anything at all either at the location or at
[17] this other location.  They don't even know that
[18] he's even had any contact with Mr. Delee and
[19] these other people.
[20]         Again, I'm willing to concede that
[21] they have a reasonable suspicion, but that's
[22] not what they need to do.  They needed the
[23] probable cause and I would suggest to the Court
[24] that they don't have probable cause.  They
[25] don't have enough evidence to believe that he's

Page 85

[1]
[2] been involved in criminal activity so that it
[3] would enable them to go up and search him,
[4] place him under arrest and seize anything from
[5] him.
[6]         Reasonable suspicion, yes, quite
[7] possibly. A patdown may have been appropriate,
[8] but a full custodial search is beyond the
[9] evidence that they had at that point and
[10] therefore the Court should suppress the keys
[11] that they seized from him at that time as well
[12] as the money and the pagers and the phone.
[13]         Thank you.
[14]         THE COURT: Thank you.
[15]         Mr. Campbell.
[16]         MR. CAMPBELL: Yes, Your Honor, if I
[17] may. Well, unfortunately Mr. Hodges doesn't
[18] have it as well as the co-defendant for
[19] purposes of the motion, but I would submit to
[20] Your Honor under Malson and Banks and that
[21] whole line of cases certainly the fact that the
[22] evidence that you heard today fall within the
[23] ambit of that line of cases.
[24]         You have three full days of
[25] surveillance starting on the 2nd, which is the

Page 86

[1]
[2] day that would be the most incriminatory for
[3] Mr. Hodges. I find it sort of interesting that
[4] none of that evidence is on video, but that's
[5] fine because the Court is aware and we're all
[6] aware that video is never necessary for that
[7] kind of thing, but what is significant, Your
[8] Honor, is that none of the objects were
[9] observed. None of the denominations of the
[10] bills can be ascertain, so therefore we have an
[11] exchange of unidentified objects of what
[12] appears to be U.S. currency. Clearly Malson
[13] and Banks, that's part of it. There was no
[14] conversation heard, so what you have is a
[15] number of suspect encounters in the light most
[16] favorable to the Commonwealth.
[17]         What we have coupling this is one or
[18] two or three, at least one stop of a buyer so
[19] that there are drugs recovered so that one can
[20] conclude that the nature of the transactions
[21] were narcotics transactions, but here a buyer
[22] is never stopped at any time.
[23]         Now, that may be more of a trial
[24] issue, but the point of the matter, Your Honor,
[25] is that after three days of this surveillance

Page 87

[1]
[2] my client is stopped in this Breeze and then
[3] when he is stopped they still they don't find a
[4] significant amount of money on him which is
[5] something to be considered under these
[6] circumstances. What they do find are I think
[7] it was five packets of marijuana which I guess
[8] conceivably could have been for his personal
[9] use, but we won't go into that argument because
[10] that's not really relevant now. There's no
[11] large amount of cash that would indicate he was
[12] involved in anything.
[13]         Your Honor, basically the long and
[14] short of it is that under the circumstances I
[15] think that he was just barely more than merely
[16] present and the Commonwealth still even at this
[17] level has not met its burden of showing that
[18] probable cause existed for a full custodial
[19] arrest and I take it that there is no
[20] contention that he was not arrested, that he
[21] was not under arrest when he was stopped.
[22]         THE COURT: I think that's pretty
[23] much conceded. Yes, okay.
[24]         Ms. Robinson.
[25]         MS. ROBINSON: If I may, Judge,

Page 88

[1]
[2] certainly with respect to both of these
[3] defendants the officers are looking at this
[4] whole web of activity that takes place over
[5] three days and Anthony Hodges and Delee are
[6] seen on the 2nd sharing a golf ball size baggie
[7] of narcotics and are selling it and that golf
[8] ball size packaging is consistent with other
[9] golf ball size packages that are used as the
[10] stash to sell from over the course of the drug
[11] activity that's going forth from the porches
[12] and the blocks at 56th and Master Street.
[13]         Certainly Anthony Hodges is subject
[14] to arrest lawful, he is observed selling on
[15] several occasions. On the 2nd he's on tape
[16] selling on at least --
[17]         THE COURT: Counsel makes a point
[18] that they're just observed, it maybe could have
[19] been tootsie rolls.
[20]         MS. ROBINSON: You could say that if
[21] it was one person or you might say that if it
[22] was two.
[23]         THE COURT: How many sales were there
[24] in Banks? One?
[25]         MR. CAMPBELL: Two.

Page 89

[1]
[2]   THE COURT: I apologize.
[3]   MS. ROBINSON: Well, we're way past
[4]   that also with all of the interaction with all
[5]   the other individuals. Surely no one believes
[6]   they were selling tootsie rolls in the 5600
[7]   block of Master Street, Judge.
[8]        Certainly when you look at the kind
[9]   of activity that was going on and the
[10]  exchanges, the only rational conclusion is that
[11]  they're selling narcotics from that location.
[12]  You also get to see close up on several
[13]  occasions the kind of packaging and the green
[14]  tint of the packaging that's consistent over
[15]  different transactions that take place, the
[16]  same kind of similar shift when everybody seems
[17]  to wake up late in the morning around 11
[18]  o'clock and get into their round drug selling.
[19]       Judge, certainly under these
[20]  circumstances what you have here is that
[21]  Darnell Delee is calling to be reupped and you
[22]  can see there's a lot of activity and motion
[23]  down to the pay phone.
[24]  MR. CAMPBELL: Your Honor, I object
[25]  to facts not in evidence.

Page 90

[1]
[2]   MS. ROBINSON: Well, Judge, Officer
[3]   Monaghan testified he pointed out to you on
[4]   the tape the time that Darnell Delee calls over
[5]   to a co-defendant Kabian Diggs and said yeah,
[6]   Kareem only had a bundle at this time.
[7]   MR. MEEHAN: Objection. That was not
[8]   the testimony.
[9]   THE COURT: That is correct, it was
[10]  not -- that was not the testimony.
[11]  MS. ROBINSON: Well, he'll call over
[12]  when the rest -- he only had a bundle, he'll
[13]  call over when the rest is ready.
[14]  THE COURT: Okay.
[15]  MS. ROBINSON: And what you have are
[16]  the observations of Jeff Walker who sees
[17]  Darnell Delee with a bundle similar to other
[18]  bundles that we've seen Darnell Delee with and
[19]  have heard testimony about coming out of a car
[20]  that is later found to be occupied by one
[21]  person, Kareem Torain.
[22]  MR. MEEHAN: Judge, again, that's not
[23]  Officer Walker's testimony. He was unable to
[24]  identify what was inside.
[25]  MS. ROBINSON: Later on he identifies

Page 91

[1]
[2]   Kareem Torain getting out from it.
[3]   THE COURT: Excuse me. Mr. Meehan,
[4]   if you want to argue again, I will give you the
[5]   opportunity, but I'd ask you not to interrupt.
[6]   MR. MEEHAN: My apologies.
[7]   MS. ROBINSON: The reasonable
[8]   inference is that since nobody else is seen
[9]   getting out of the car, nobody else is seen
[10]  getting into the car, that the only person in
[11]  that car is Kareem Torain during the relevant
[12]  period of time and that when you see Darnell
[13]  Delee coming out with a bundle, the bundle
[14]  being referred to when he talks to Kabian Diggs
[15]  is this is the bundle I just got, and call us
[16]  when it's ready, and then sure enough some time
[17]  later about 20 minutes or so Delee and Diggs
[18]  and Freeman leave the block, Monaghan says keep
[19]  an eye out, look for them, and where do they
[20]  show up? 1628 North 55th Street at the same
[21]  location that you see this defendant go to
[22]  after he goes to the place that is his legal
[23]  residence and this defendant goes in, and keep
[24]  in mind it's the wintertime, people do turn
[25]  their lights on in the afternoon in the

Page 92

[1]   wintertime.
[2]        He goes into that property utilizing
[3]   the key. He goes in, Officer Walker gets out
[4]   of his surveillance vehicle, walks around, sees
[5]   the light going on. One needs to not check
[6]   one's common sense at the door, but realize
[7]   that if all that occurred, the person who is in
[8]   that room where the light just went on is this
[9]   defendant and when those individuals, Delee,
[10]  who he's just been in the car with within the
[11]  hour shows up with two other individuals, it
[12]  means that they're coming to get more narcotics
[13]  to sell.
[14]       They go in, they come out, Delee is
[15]  holding another golf ball size object that
[16]  Officer Walker testified he believed to be
[17]  narcotics, connecting all the dots, the
[18]  reasonable inference from all the circumstances
[19]  is that this defendant was supplying narcotics
[20]  to the other individuals who are in the
[21]  conspiracy to sell drugs and under all those
[22]  circumstances, it was appropriate to arrest
[23]  them and they did and what they recovered from
[24]  them were the keys and then pursuant to that

Page 93

[2] they obtained a warrant and searched that
[3] location, but the Commonwealth submits his
[4] arrest was lawful and so what was recovered
[5] from him was admissible as evidence and that
[6] the Commonwealth should be able to introduce
[7] those keys.
[8]         THE COURT: Thank you. Ms. Robinson.
[9]     Mr. Meehan, if you need to respond,
[10] I'll give you the opportunity.
[11]         MR. MEEHAN: Thank you, Judge.
[12]     You picked up on the one thing which
[13] was my client's name was never mentioned and
[14] again these are statements -- his statement is
[15] somehow missed when it's being made, somehow
[16] missed when being made off camera, and also I
[17] think it's important to point out that Officer
[18] Monaghan had previously testified that while
[19] inside he wasn't able to hear what, if any,
[20] conversation --
[21]         THE COURT: But this was not in
[22] conversation between people who were real close
[23] to each other.
[24]         MR. MEEHAN: That's right. There was
[25] a hollering.

Page 94

[1]
[2]         THE COURT: That's correct, so that's
[3] a different circumstance.
[4]         MR. MEEHAN: Yes. And also that
[5] Officer Walker specifically stated that while
[6] he saw a golf ball size item, he was unable to
[7] identify what, if anything, that was when he
[8] was inside the plastic bag.
[9]     Thank you.
[10]         THE COURT: All right. Thank you.
[11]     Do you feel a need to respond?
[12]         MR. CAMPBELL: I don't, Your Honor.
[13]         THE COURT: Okay. Well, let me just
[14] say first with respect to Mr. Hodges, his
[15] attorney is absolutely correct. Unfortunately
[16] for Mr. Hodges I think the Commonwealth has
[17] clearly made out -- this is not what counsel
[18] argued, but counsel argued that unfortunately
[19] he doesn't have the same strong argument that
[20] Mr. Meehan had, but I clearly feel as to Mr.
[21] Hodges there was probable cause in making the
[22] arrest and as to Mr. Hodges, the motion is
[23] denied.
[24]     As to Mr. Torain, I concede that it
[25] is close, but I think that in this circumstance

Page 95

[2] common sense does play a role in a judge's
[3] determination and it seems to me that there is
[4] certainly sufficient evidence to create
[5] probable cause that the defendant was involved
[6] in the conspiracy though he was never seen
[7] actually engaged in a transfer of drugs, but
[8] it's clear to me that there was probable cause
[9] to believe that he was a conspirator in that
[10] circumstance and I accordingly will deny the
[11] motion as to Mr. Torain.
[12]     All right. Let me see counsel in the
[13] back for a moment.
[14]     (Discussion in chambers off the
[15] record)
[16]         THE COURT: All right. According to
[17] our conversation we will recess at this point
[18] and adjourn until tomorrow morning this case at
[19] 10:30 and based on what counsel has represented
[20] about their obligations tomorrow, if you have a
[21] problem getting here by then, just call, let
[22] Michelle know, we'll accommodate all counsel in
[23] that respect.
[24]     Okay. Thank you very much.
[25]         MR. MEEHAN: Thank you, sir.

Page 96

[2]         COURT CRIER: This case is in recess
[3] until 10:30 tomorrow morning.
[4]     (Whereupon the Motion to Suppress was
[5] concluded)
[6]     (Court adjourned)
[7]     -----

Page 97

[1]
[2]
[3]
[4]      I hereby certify that the proceedings
[5]  and evidence are contained fully and accurately
[6]  in the notes taken by me on the trial of the
[7]  above cause, and that this copy is a correct
[8]  transcript of same.
[9]
[10]
[11]
[12]
[13]
[14]      Official Stenographer
[15]
[16]
[17]
[18]      Date
[19]
[20]
[21]
[22]
[23]
[24]
[25]
Court Reporting System (Generated 2003/07/21 08:31:56)

