EXHIBIT "7"



# Compressed Transcript of the Testimony of
# **JEFFREY WALKER, 9/15/16**

**Case:** McIntyre v. Liciardello, et al./Torain v. The City of Phila., et al.

Summit Court Reporting, Inc.
Phone: 215.985.2400
Fax: 215.985.2420
Email: depo@summitreporting.com
Internet: www.summitreporting.com

Case 2:14-cv-01643-RBS    Document 61-9    Filed 06/29/22    Page 3 of 159

McIntyre v. Liciardello, et al./Torain v. The City of Phila., et al.    JEFFREY WALKER, 9/15/16

Page 3

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

- - -

JAMES McINTYRE,          : CIVIL ACTION
   Plaintiff,  :
   VS.      : LEAD DOCKET
POLICE OFFICER      :
LICIARDELLO, et al.,    :
   Defendants. :   NO. 13-2773
- - -
KAREEM TORAIN,          : CIVIL ACTION
   Plaintiff,  :
   VS.      :
THE CITY OF      :
PHILADELPHIA,    :
PHILADELPHIA POLICE   :
OFFICER WALKER, BADGE  :
# 3730; PHILADELPHIA   :
POLICE OFFICER    :
REYNOLDS, BADGE # 4268;:
PHILADELPHIA POLICE   :
OFFICER MONAGHAN,   :
   BADGE # 6061,   :
   individually and in   :
   their capacity as   :
   police officer,   :
   Defendants. :   NO. 14-1643
- - -
ORAL DEPOSITION OF JEFFREY WALKER
SEPTEMBER 15, 2016
- - -
SUMMIT COURT REPORTING, INC.
Certified Court Reporters and Videographers
1500 Walnut Street, Suite 1610
Philadelphia, Pennsylvania 19102
424 Fleming Pike, Hammonton, New Jersey 08037
(215) 985-2400 * (800) 447-8648 * (609) 567-3315
www.summitreporting.com

APPEARANCES:
1
2    KRASNER & LONG, LLC
     BY: LAWRENCE S. KRASNER, ESQUIRE
3    BY: LIAM J. RILEY, ESQUIRE
     239 South Camac Street
4    Philadelphia, Pennsylvania 19107
     (215) 731-9500
5    krasner@krasnerlong.com
     Counsel for Plaintiff James McIntyre
6
     MICHAEL PILEGGI, ATTORNEY AT LAW
7    BY: MICHAEL PILEGGI, ESQUIRE
     303 Chestnut Street
8    Philadelphia, Pennsylvania 19106
     (215) 627-8516
9    pil423@aol.com
     Counsel for Plaintiff Kareem Torain
10
     POPPER & YATVIN
11   BY: HOWARD D. POPPER, ESQUIRE
     230 South Broad Street
12   Suite 503
     Philadelphia, Pennsylvania 19102
13   (215) 546-6700
     popper.yatvin@verizon.net
14   Counsel for Plaintiff Justin Miraglia and Helen
     Guyon
15
     LAW OFFICE OF MARGARET BOYCE FUREY
16   BY: MARGARET BOYCE FUREY, ESQUIRE
     Suite 400 Four Tower Bridge Center
17   200 Barr Harbor Drive
     West Conshohocken, Pennsylvania 19428
18   (610) 397-0125
     mboycep@aol.com
19   Counsel for Plaintiff Brittney Mills
20   WILLIAMS CUKER BEREZOFSKY LLC
     BY: GERALD J. WILLIAMS, ESQUIRE
21   CHRISTOPHER MARKOS, ESQUIRE
     1515 Market Street
22   Suite 1300
     Philadelphia, Pennsylvania 19102-1929
23   (215) 557-0099
     gwilliams@wcblegal.com
24   Counsel for Plaintiff Sylvester Wescott

Page 2

1              - - -
2
3         Oral deposition of JEFFREY WALKER, taken
4    at the James Byrne Courthouse, 601 Market Street,
5    Courtoom 6B, Philadelphia, Pennsylvania, on
6    Thursday, September 15, 2016, beginning at
7    approximately 10:20 a.m., before Robin Frattali,
8    Registered Professional Reporter and Notary Public
9    in and of the Commonwealth of Pennsylvania.
10
11              - - -
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 4

APPEARANCES:
1
2    JAY FEINSCHIL, ESQUIRE
     443 Green Lane
3    Philadelphia, Pennsylvania 19128
     (215) 869-5502
4    feinschillaw@comcast.net
     Counsel for Plaintiffs Warren Layre, Thomas Basara
5    and Michael Tierney
6    CITY OF PHILADELPHIA LAW DEPARTMENT
     BY: ARMANDO M. BRIGANDI, ESQUIRE
7    Chief Deputy City Solicitor
     BY: JONATHAN K. COOPER, ESQUIRE
8    Assistant City Solicitor
     1515 Arch Street
9    14th Floor
     Philadelphia, Pennsylvania 19102
10   (215) 683-5381
     armando.brigandi@phila.gov
11   Counsel for Defendant City of Philadelphia
12   JEFFREY WALKER, Pro Se
13   MARSHALL, DENNEHEY, WARNER, COLEMAN & GOGGIN
     BY: JOSEPH J. SANTARONE, JR., ESQUIRE
14   BY: JOHN P. GONZALES, ESQUIRE
     BY: DIANA P. CORTES, ESQUIRE
15   2000 Market Street
     Philadelphia, Pennsylvania 19103
16   (215) 575-2626
     jjsantarone@mdwcg.com
17   Counsel for Defendants Sergeant Michael Spicer,
     Police Officer John Speiser, Police Officer
18   Linwood Norman, Police Officer Brian Reynolds,
     Police Officer Thomas Liciardello and Police
19   Officer Perry Betts
20   CHRISTIE & YOUNG PC
     BY: JAMES W. CHRISTIE, ESQUIRE
21   1880 John F. Kennedy Boulevard
     10th Floor
22   Philadelphia, Pennsylvania 19103
     (215) 567-1678
23   jwchristie@christieyoung.com
     Counsel for Defendants Lieutenant Joseph McCloskey
24   and Lieutenant Robert Otto

1  (Pages  1  to  4)

McIntyre v. Liciardello, et al./Torain v. The City of Phila., et al.                    JEFFREY WALKER, 9/15/16

Page 5

1  ALSO PRESENT:
2  JOHN EDWARDS
   Assistant to Eric F. Spade, Esquire
3
   SERGEANT MICHAEL SPICER
4
   POLICE OFFICER JOHN SPEISER
5
   POLICE OFFICER LINWOOD NORMAN
6
   POLICE OFFICER THOMAS LICIARDELLO
7
   POLICE OFFICER BRIAN REYNOLDS
8
   MARK FAZLOLLAH
9  The Inquirer Staff Writer
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 7

1   DEPOSITION SUPPORT INDEX
2
3   DIRECTIONS NOT TO ANSWER:
4   PAGES:    None
5
6   REQUESTS FOR DOCUMENTS OR INFORMATION:
7   PAGES:    None
8
9   STIPULATIONS AND/OR STATEMENTS:
10  PAGES:    8
11
12  CERTIFIED QUESTIONS:
13  PAGES:    None
14
15
16
17
18
19
20
21
22
23
24

Page 6

1           I N D E X
2            - - -
3  WITNESS:                    PAGE
4  JEFFREY WALKER
5  EXAMINATION
6  By Mr. Pileggi                11
7
8           EXHIBITS
9
            PAGE FIRST
10 EXHIBIT NO.   DESCRIPTION    REFERENCED
11 Exhibit    Subpoena to Appear and Testify    12
   Walker-1    at a Hearing or Trial in a Civil
12             Action To: Jeffrey Walker
13 Exhibit    Kareem Torain Complaint      75
   Walker-2
14
   Exhibit    Property Receipt No. 22508224   110
15 Walker-3
16 Exhibit    Property Receipt No. 2308223    112
   Walker-4
17
   Exhibit    Search Warrant and related    113
18 Walker-5   documents
19 Exhibit    Investigation Report    127
   Walker-6
20
21
22
23
24

Page 8

1       THE REPORTER:  Usual
2  stipulations?
3       MR. PILEGGI:  Yes.
4            - - -
5       (By agreement of counsel, the
6  sealing, certification and filing are
7  waived; and all objections, except as to
8  the form of the question, are reserved
9  until the time of trial.)
10           - - -
11      JEFFREY WALKER, having been
12 first duly sworn to tell the truth, was
13 examined and testified as follows:
14           - - -
15      MR. PILEGGI:  Why don't we
16 start by let's identify everyone for the
17 record.
18      My name is Michael Pileggi.  I
19 represent in this case Kareem Torain, who is
20 the plaintiff.
21      MR. POPPER:  Howard Popper.  I
22 represent Justin Mirraglia and Helen Guyon.
23      MR. KRASNER:  Larry Krasner and
24 Liam Riley from Krasner & Long.  We

2 (Pages 5 to 8)

Page 9

1    represent McIntyre.
2              MS. FUREY: Margaret Furey here
3    on behalf of Brittney Mills.
4              MR. WILLIAMS: Gerald Williams
5    of the bellwether plaintiffs. I represent
6    Sylvester Wescott.
7              MR. FEINSCHIL: Jay Feinschil.
8    I represent Warren Layre, Michael Tierney
9    and Thomas Basara.
10             MR. BRIDANDI: Armando
11   Brigandi. I represent the City of
12   Philadelphia. I also will have an Assistant
13   City Solicitor joining us shortly. His name
14   is Jonathan Cooper, also representing the
15   City of Philadelphia.
16             MR. SANTARONE: Joe Santarone.
17   I represent Sargeant Speiser, Officers
18   Spicer, Reynolds, Betts, Reynolds, Walker,
19   Norman and Liciardello.
20             MR. CHRISTIE: James Christie.
21   I represent Lieutenant Robert Otto and
22   Lieutenant Joseph McCloskey.
23             MR. EDWARDS: My name is John
24   Edwards. I'm an assistant for Eric Spade,

Page 10

1    who is the attorney representing Petrina
2    Mitchell, who is one of the plaintiffs.
3              MR. GONZALES: John Gonzales.
4    I represent the same defendants that
5    Mr. Santarone represents.
6              MR. WILLIAMS: Could you -- I'm
7    sorry, for the record, because I was a
8    little unclear, could you say which
9    individual defendants you represent? I know
10   they're the same as Joe, but just go through
11   the list.
12             MR. GONZALES: Sure.
13             MR. SANTARONE: I don't think
14   that's necessary. He just went through it.
15             MR. GONZALES: Speiser, Spicer,
16   Liciardello, Norman and Reynolds.
17             MR. SANTARONE: Right, and
18   Betts.
19             MR. GONZALES: And Betts.
20             MR. WILLIAMS: But not Walker,
21   who you said?
22             MR. SANTARONE: I didn't say
23   Walker.
24             MR. WILLIAMS: Yes, you did.

Page 11

1              MR. SANTARONE: Oh, did I?
2              MR. WILLIAMS: Yes, you did.
3              - - -
4              (Whereupon a discussion was
5    held off the record.)
6              - - -
7              SERGEANT SPICER: Sergeant
8    Spicer, S-P-I-C-E-R.
9              OFFICER LICIARDELLO: Police
10   Officer Thomas Liciardello,
11   L-I-C-I-A-R-D-E-L-L-O.
12             OFFICER REYNOLDS: Police
13   Officer Reynolds, R-E-Y-N-O-L-D-S, Brian,
14   B-R-I-A-N.
15             OFFICER SPEISER: Police
16   Officer John Speiser, S-P-E-I-S-E-R.
17             OFFICER NORMAN: Police Officer
18   Linwood Norman, N-O-R-M-A-N.
19             - - -
20             EXAMINATION
21             - - -
22   BY MR. PILEGGI:
23       Q.   Could you state your full name for the
24   record, please.

Page 12

1        A.   Jeffrey L. Walker.
2        Q.   Mr. Walker, I'm going to give you some
3    instructions in how we're going to proceed today,
4    and at the end of these instructions if you have
5    any questions just stop me and ask whatever
6    questions you need.
7        A.   Will do.
8        Q.   First of all, you were subpoenaed to
9    appear today, correct?
10       A.   Yes, I was.
11             MR. PILEGGI: All right. And I
12   just want to mark this as Walker-1, please.
13             - - -
14             (Subpoena to Appear and Testify
15   at a Hearing or Trial in a Civil Action To:
16   Jeffrey Walker marked Plaintiff's Exhibit
17   Walker-1 for identification purposes.)
18             - - -
19   BY MR. PILEGGI:
20       Q.   Now, Mr. Walker -- and by the way, can
21   I call you Jeffrey for purposes of the deposition?
22       A.   That would be good.
23       Q.   Okay, thank you. Jeffrey, I'm going
24   to be asking you a series of questions, and as you

3  (Pages 9 to 12)

Page 13

1   can see, there's a room full of attorneys as well
2   as defendants and others. For purposes of my
3   deposition -- I will be asking you questions.
4           First of all, if you don't
5   understand a question, stop me. I'll either
6   repeat it or rephrase it or whatever I need to do
7   to get you to understand it. Okay?
8       A.   Okay.
9       Q.   I don't want you to guess, but if you
10  do, if you're going to guess about something, or
11  you may get a question where they're going to ask
12  you to approximate or guess, just make sure the
13  record's clear that you are approximating or
14  guessing. Okay?
15      A.   Will do.
16      Q.   All right. If at any time you want to
17  stop and take a break we can do so. You just
18  can't do it while there's a pending question.
19      A.   Yes.
20      Q.   Answer the question and then we can
21  stop now.
22          Now, I just want to note for
23  the record that it appears that you are here on
24  your own. You are not represented; is that

Page 14

1   correct?
2       A.   That's correct.
3       Q.   And is that something that you are
4   doing knowingly?
5       A.   Yes, I am.
6       Q.   Okay. You do understand that you have
7   a right to have an attorney represent you?
8       A.   Yes, I do.
9       Q.   And you are waiving that right and
10  you're going to represent yourself?
11      A.   That's correct.
12      Q.   Okay. Now, I guess to start -- well,
13  first of all, do you have any questions about
14  those instructions?
15      A.   No, I don't.
16      Q.   And of course you're under oath.
17      A.   Yes, I am.
18      Q.   Okay. Let's start from the beginning.
19  Why don't you start with high school. What's your
20  history of high school?
21      A.   Graduated Overbrook High School, 1987.
22      Q.   Okay. How long did you attend high
23  school for?
24      A.   Four years.

Page 15

1       Q.   Okay. Where was that?
2       A.   In West Philadelphia, 59th and
3   Lancaster.
4       Q.   All right. And what was the year you
5   graduated?
6       A.   '87.
7       Q.   What happened after you graduated high
8   school? Were you employed?
9       A.   Yes. I had small jobs, kitchen jobs.
10  I took the police test in '88. I was hired by the
11  police department in 6/28/89.
12      Q.   And I assume you went to the Academy?
13      A.   Yes, I did.
14      Q.   Okay. Do you know when you graduated
15  from the Academy?
16      A.   I'd say roughly about six months.
17      Q.   Okay. What were some of the things
18  that they taught you in the Academy?
19      A.   Policy. Police procedures, which is
20  actually policy. Crimes Code. As it got further
21  into it, it was basically identified narcotics.
22  Safety issues. Car stops. Ped stops.
23      Q.   So they taught you a wide range of
24  different police activities in order to prepare

Page 16

1   you to be a police officer, correct?
2       A.   Yes, they did.
3       Q.   All right. Now, tell us what happened
4   once you graduated from the Academy. Where were
5   you first employed as a police officer?
6       A.   I went down to the 9th District, which
7   I actually walked the Center City beat. It was a
8   Christmas beat. Walked it for maybe about three
9   to four months. Then I was transferred to the
10  16th District, which I did the majority of my time
11  with, about ten years at the 16th.
12      Q.   Okay. And what did you do -- when you
13  were at the 16th District, what was your -- some
14  of your duties?
15      A.   I started out as a patrol officer in
16  uniform in a police car, marked police car. Once
17  I left, I was in a plainclothes burglary team. It
18  was actually slash narcotics. We were doing a lot
19  of narcotics, too.
20      Q.   Okay. But you were still -- at that
21  point you were still a uniformed officer?
22      A.   Towards the tail end -- I was still
23  considered on patrol, on a patrol bureau. Even
24  when I was in plainclothes I was still considered

Page 17

1    patrol. I didn't get to the special patrol until
2    I came to the Narcotics Bureau.
3        Q.   And when was that?
4        A.   Roughly around '99.
5        Q.   Was that something -- did you have to
6    take a test or --
7        A.   No.
8        Q.   So how do you -- how do you become a
9    narcotics officer?
10       A.   Basically, you put your transfer
11   paperwork in. It goes through the supervisors,
12   eventually gets to narcotics, which you have an
13   interview. Then from there they decide if they
14   want to take you or not, approve or disapprove
15   you. Just wait on them -- for them to call and
16   then you go.
17       Q.   Do you recall your interviews in order
18   to become a narcotics officer?
19       A.   No. It's too far back.
20       Q.   Okay. But do you recall there being a
21   series of interviews, or was there one interview?
22       A.   I may get two. If I can remember, it
23   was probably two, preliminary and then the second
24   one.

Page 18

1        Q.   And then you became a narcotics
2    officer?
3        A.   Yes. From there you -- once you get
4    into the Bureau you go to a training course.
5    You're basically identifying the packaging of
6    drugs, a refresher course, so you know what you're
7    looking at when you actually go in.
8        Q.   Okay.
9        A.   This will be in the strike force.
10   Strike force has a class. In Philly you don't
11   have no class --
12       Q.   What do you --
13       A.   -- the strike force. The uniform part
14   has the class.
15       Q.   Could you explain the different
16   narcotic units before we go on to your history.
17       A.   Well, you have two types. You have
18   the uniform which is considered the strike force,
19   and then you have the plain -- the strike force is
20   basically dealing with surveillances. Sometimes
21   they do buys but they stopped, but that just
22   started -- when I was there we were doing -- they
23   wasn't doing search warrants and then they started
24   doing search warrants, but their main purpose is

Page 19

1    just to -- street level narcotics, which is
2    actually watching people on the street, calling a
3    team in to take them down.
4             Plainclothes would be more of
5    an investigation. You would actually do buys,
6    interviewing informants, getting sources of
7    information, doing arrest warrants. It's more in
8    detail, long-term jobs. That's -- investigation
9    work is plainclothes. It's like a detective but
10   you're not a detective.
11       Q.   Who determines which unit you're going
12   to go into with regards to the narcotics?
13       A.   Well, at times before I came in
14   narcotics some people would get transferred from
15   the district right to narcotics but as it -- when
16   I went through the steps to go into narcotics they
17   wanted us to go into uniform, which is the strike
18   force, then you went to the plainclothes
19   narcotics.
20            They basically wanted to wean
21   you through instead of just going from one point
22   to another and you're moving.
23       Q.   How long were you a uniformed
24   narcotics officer for; what period of time?

Page 20

1        A.   Oh, it was within a year. Five to six
2    months, something like that.
3        Q.   And I'm sorry, at what point did you
4    become a narcotics officer?
5        A.   Around '99.
6        Q.   Okay. So you worked about six months
7    as a uniformed narcotics officer in the strike
8    force, correct --
9        A.   Yes.
10       Q.   -- the strike unit, and then -- is
11   that a promotion? Did you become a
12   plainclothes --
13       A.   No, it's no promotion. It's just --
14   it's movement -- it's a lateral move. I mean,
15   it's no promotion.
16       Q.   Okay.
17       A.   It's motion in pay because it's
18   different, you know, your court time, overtime.
19       Q.   But your base pay is the same as the
20   uniformed officer?
21       A.   The base pay is the same.
22       Q.   Okay. And at that point, when you got
23   transferred into the -- that unit, you became a
24   plainclothes officer?

McIntyre v. Liciardello, et al./Torain v. The City of Phila., et al.                                    JEFFREY WALKER, 9/15/16

Page 21

1    A.   At what point? I'm telling you at --
2    Q.   After your six months in the strike
3  force.
4    A.   Yes.
5    Q.   Do you recall what unit you were
6  assigned to at that time?
7    A.   It wouldn't be unit, it would be
8  squad. I went to plainclothes.
9    Q.   Squad.
10   A.   It would be Genie Gessner's squad.
11 That was the very first squad I went to.
12   Q.   Okay. Who is Genie Gessner?
13   A.   She was -- if I remember, she was one
14 of the first female sergeants in the narcotics
15 unit.
16   Q.   Do you recall who was in your squad
17 with you at that time?
18   A.   Yes. It was Police Officer Norman,
19 Brian Reynolds, Sean Kelly, Monaghan, Brad
20 Mitchell, Jimmy Johnson, Carl Stubbs, Sylvia
21 Jones.
22   Q.   Okay. And they were all plainclothes?
23   A.   Yes.
24   Q.   Tell us what some of your duties in

Page 22

1  this squad were. In other words, I understand
2  it's narcotics, but was there different functions
3  in that squad as opposed to the strike force
4  squad?
5    A.   Yes, it's more detailed
6  investigations. You will actually the first time
7  will make buys.
8         It's more -- everything's in
9  detail. You're interviewing sources of
10 information, which is actually guys you lock up
11 end up telling you things and you checking out
12 what they told you, developing jobs, signing up
13 people who want to be informants, which is paid by
14 the City, which you have to go through a process
15 to do that. It's more in detail.
16   Q.   Would you -- would part of your
17 functions be being the affiants in --
18   A.   Yes.
19   Q.   -- affidavits of search warrants?
20   A.   Yes. You'd be -- an affiant is a
21 person who is actually -- is a lead investigator
22 of the job. It's like you do a job, you're the
23 lead investigator and you actually start your own
24 investigation, which would end up leading into a

Page 23

1  search warrant, which actually makes you an
2  affiant.
3    Q.   Now, when you say "a lead
4  investigator," explain that a little bit more in
5  detail.
6    A.   The person that's actually controlling
7  the job. All the responsibility falls on them.
8  If something ain't right it falls on them.
9    Q.   Is that -- was that a function that
10 was solely to a supervisor, or was that some --
11 another peer? In other words, in your group of
12 the individuals you just named, could you -- in
13 other words, could you be a lead investigator?
14   A.   Yes, you can. I mean, sometimes the
15 supervisor may assign you a job or you may --
16 during the course of your duties you may come upon
17 a job which you actually want to start an
18 investigation on.
19   Q.   Okay. So whose decision would it be
20 to designate, say, if you were the lead
21 investigator? Whose decision would it be?
22   A.   Sometimes it would be the supervisor.
23 If it's a job that comes down through a phone call
24 or comes down from up top, you know, and it would

Page 24

1  be a narcotics complaint, the supervisor may
2  assign it to you. If it doesn't get assigned
3  anything, then you're out doing your course of
4  duties, you come across a job that you actually
5  want to start investigating.
6    Q.   So at that time when you first started
7  in that position it was -- Sergeant Gessner was
8  the supervising officer?
9    A.   She is my first sergeant.
10   Q.   Who was her supervisor?
11   A.   I believe it was Lieutenant Dominick
12 was her supervisor. Yes, it was.
13   Q.   And who would -- at that time who
14 would Lieutenant Dominick report to?
15   A.   It would be the captain, but from my
16 memory it was Captain Tessa, who actually retired
17 a long time ago.
18   Q.   And then the captain would report to
19 whom?
20   A.   I can't even remember that.
21   Q.   All right. So you're working in this
22 unit, and you said you were in that unit for about
23 ten years?
24   A.   What, I was in the unit -- what, the

6  (Pages 21 to 24)

Case 2:14-cv-01643-RBS    Document 61-9    Filed 06/29/22    Page 9 of 159

McIntyre v. Liciardello, et al./Torain v. The City of Phila., et al.                    JEFFREY WALKER, 9/15/16

Page 25

1    Narcotics Bureau?
2       Q.   Yes.
3       A.   From '99 to my arrest, 2013.
4       Q.   Okay.
5       A.   So you can count how many that is.
6       Q.   And was that unit broken up into
7    different units?
8       A.   It would be different squads.
9       Q.   Okay.
10      A.   What you have is like this.  You have
11   a lieutenant, who is responsible for maybe three
12   to four squads.  I will call them like platoons.
13   That's his platoon.  What's in that platoon, you
14   have the squad.  You may have maybe three to four
15   lieutenants who has a platoon.  Again, within that
16   platoon you have squads, a number of squads.
17        What's in those squads, you
18   have a number of people in those squads.  Within
19   those squads you have supervisors who actually
20   report to a lieutenant, and then from the
21   lieutenants everybody report to the captain.
22      Q.   All right.  So let me -- I'm going to
23   give you a hypothetical.  And I didn't give you
24   this instruction before, but if I give a

Page 26

1    hypothetical that means I'm --
2       A.   Okay.
3       Q.   -- giving you a hypothetical.
4            If -- back then when you were
5    in that unit if you had, say, a job, you made a --
6    you had an investigation, a narcotic
7    investigation, tell us again in as much detail as
8    you can what the procedure would have been.
9            And let's assume you had a
10   source, a confidential source, give you
11   information.  What was the procedure back then as
12   to how you would proceed and who you would have to
13   report to?
14      A.   Okay.  The source, again, can be
15   anyone.  Confidential makes it to the point you
16   don't want no one to know who it is.  Someone
17   tells you something, they could still be a source.
18   It don't have to be confidential.
19            Basically that person, him or
20   her, will tell me something, and I will go out and
21   check it out and see if it's right.  That's as far
22   as they -- their part of this job is if you tell
23   me something, I'm going to go look at it.  If it's
24   right, we may communicate back and forth on a

Page 27

1    continuous basis but that's as far as you're going
2    with it.
3       Q.   Let me -- let me just stop you there.
4    When you say "check it out," what do you mean?
5       A.   Looking to corroborate it, checking
6    and make sure -- like if someone tells you
7    everything in detail about something you're going
8    to go out there and you're going to look at it and
9    make sure everything they told you is what it is.
10   That's what a source of information is.
11      Q.   Okay.  So you will go out there and
12   mount some kind of an investigation?
13      A.   You actually go out there and see what
14   they're telling you.
15      Q.   Okay.  Would you run checks?  In other
16   words, if they said that they were doing some drug
17   sales from a certain property, would you run a
18   property check?
19      A.   Everything.  You got to do a property
20   check, which is a real estate check.  You'll do a
21   check and see if any arrests has been in that
22   area.  You can identify some names through
23   complaints, disturbances.  You would do a voter's
24   registration check to see if you can get any

Page 28

1    identifying names through that.
2            And if you find any names on
3    anybody you do a criminal history check and see if
4    any of your people the source is identifying that
5    you know their criminal history and the area of
6    the address that may have been using and its
7    locations other than the location you're looking
8    at.
9       Q.   Now, let's assume that you go out and
10   things check out.  What's the next step?
11      A.   If things check out, you check out
12   with -- the source of information tell you
13   something, everything is in more in detail, and if
14   you have a chance to communicate back with the
15   informant, who is going to actually give you more
16   detail, which is good, because sometimes it's --
17   the informant -- the source of information is
18   giving you a one-time information.
19            Then you have to proceed with
20   either a police officer doing an undercover buy or
21   use a confidential informant, and that's the next
22   step after a source of information.
23            A confidential informant is
24   normally signed up.  In the process of a

Case 2:14-cv-01643-RBS    Document 61-9    Filed 06/29/22    Page 10 of 159

McIntyre v. Liciardello, et al./Torain v. The City of Phila., et al.                                    JEFFREY WALKER, 9/15/16

Page 29

1    confidential informant signing you're doing their
2    biographical information, which is a 229,
3    history -- you're doing a criminal history check.
4    You make sure you're getting the addresses, where
5    they living at, where you can find them, telephone
6    numbers.
7            Once you get that done, you're
8    giving it to your supervisor. He over -- he's
9    looking and making sure everything's correct.
10           Once that is done it's going to
11   a -- it's getting sealed in an envelope and it's
12   sent up to the ICO, which is the Integrity Control
13   Board, which is actually where all the
14   confidential informants' paperwork is at. It's
15   nowhere else but there. It's sealed.
16           Once they do their checks,
17   within a period of time they'll send you a CI
18   number, which is an identification of the
19   informant. Once you get that -- I forgot one more
20   other thing before you give it to your
21   supervisors.
22           The CI is actually informed on
23   what he can do and what he cannot do. He cannot
24   gather information during criminal activity. He

Page 30

1    cannot get any arrests, any things that can cause
2    him to be deactivated, and they also was told that
3    we'll try our best to try to keep your identity
4    concealed but it's not guaranteed, and then they
5    sign a form and then it's given to a supervisor.
6            The supervisor overlooks it and
7    makes sure it's right and it's sealed in an
8    envelope and he sends it up through the chain of
9    command and it end up with the ICO officer, and
10   within a few days they'll send you a CI number,
11   and from there you meet up with the informant,
12   which is actually on record now through the
13   department with the supervisor, and you basically
14   brief the informant on any information the
15   informant's going to give you or any jobs that you
16   want to send the informant on.
17       Q.   Jeffrey, you said you give this
18   information to the supervisor. Is this before,
19   during or after you're doing the initial
20   investigation with regards to the information that
21   was provided?
22       A.   This is all before you even do an
23   investigation. If you want to use an informant
24   you have to go through the process. I'm telling

Page 31

1    you the process of using an informant if you
2    choose to use an informant.
3            The other way you can skip past
4    all that and use a cop, meet up with a police
5    officer, who is also -- who is trained to do
6    undercover purchases, and that's all on the fly
7    anyway because there's no really course for that,
8    and he can go do the buy for you, and then you're
9    acting on the information he gives you, and you
10   establish your probable cause and it would lead
11   into a search warrant.
12       Q.   Now, after -- let's assume, again, a
13   hypothetical, you get all this information and you
14   give it to the supervisor, the supervisor approves
15   it, it goes all the way up the chain, it's
16   approved, do you then go out and set up some kind
17   of surveillance to determine whether there
18   actually is narcotics sales?
19       A.   Yeah, that's being -- it's different
20   ways you can do it. I mean, I'm telling you
21   from -- beginning from the source of information
22   tells you something, you go out, you always going
23   look at it. Now, if you're going and dealing with
24   an informant or a police officer you're going to

Page 32

1    go out there again and look at it.
2            You're going to do your
3    surveillance and watch the activity going on.
4    With the informant it be a controlled purchase.
5    With the cop it would be just basically watching
6    the cop's back if he falls into needing some type
7    of help getting to a location if, you know,
8    they're doing a buy and then coming back to where
9    he's going.
10       Q.   Okay. We're going to get into some of
11   these other issues in detail, but just generally,
12   once you complete your investigation, whether
13   that's including the sources of information, you
14   had to independently corroborate that, correct?
15       A.   Yes.
16       Q.   Through observations. Okay.
17           At some point is that
18   information included in either a search warrant or
19   an arrest warrant or whatever?
20       A.   It wouldn't get to an arrest warrant
21   yet, unless you're doing a job and you don't have
22   a search warrant and you're trying to arrest the
23   person that you did a buy from, then it go into an
24   arrest warrant.

8   (Pages 29 to 32)

Page 33

1    Q.   Okay.
2    A.   There's -- also there's formal
3  affidavit, too.
4    Q.   Okay. We'll get into that.
5         All right. So this is what you
6  did approximately for ten years up until your
7  arrest in 2013?
8    A.   A little over ten years it might have
9  -- from '99 to 2013.
10   Q.   This is where I'm going to ask you to
11  approximate. How many jobs, narcotics jobs, did
12  you do over that period of time?
13   A.   I can't even count, honestly.
14  Thousands.
15   Q.   And in those cases, were you lead
16  investigator in some of those cases?
17   A.   Towards the tail end I was, because
18  basically at the beginning part I was -- wasn't
19  doing too much of any jobs. I was actually a
20  person that was actually eyes. I wasn't lead
21  investigator, put it that way, I was part of a
22  group where it was other people that was lead
23  investigators. I was the help.
24   Q.   You say the eyes, what do you mean?

Page 34

1    A.   Sometime I go out and do
2  surveillances. I may use a CI. But there's
3  always a lead investigator. Like you may call me
4  for a job and I may help you with your job.
5    Q.   Did you ever -- in that period of time
6  did you ever personally make any buys?
7    A.   I think in my time I may have made one
8  buy, and I think I gave a guy -- I was so nervous
9  I gave a guy a dollar. It was supposed to have
10  been $10, and after that I was -- wasn't doing it
11  no more.
12   Q.   You ripped him off.
13   A.   No. He told me, yo over here, you
14  gave me a dollar, and I turned around and --
15  sorry. No more. I gave him $10.
16   Q.   Okay. Were you -- during that period
17  of time again, were you responsible for doing --
18  conducting searches, being on a search team?
19   A.   Yes.
20   Q.   How many searches did you participate
21  in, again, if you can approximate?
22   A.   I can't even count.
23   Q.   Thousands?
24   A.   Thousands.

Page 35

1    Q.   How would that work? Explain
2  generally how a search would work.
3    A.   You're talking about search for what?
4  You're talking a search of a house? A car? What?
5    Q.   I'm talking searching a house, yes,
6  where you believe there's narcotics or other
7  contraband.
8    A.   Okay. Once you get probable cause,
9  which is the affiant, you're going to do a search
10  warrant. Within that search warrant you're going
11  to do a raid plan. You're going to have a meeting
12  with the group, your group. We'll have the proper
13  amount of people to enter these houses.
14        Once you -- either you do a buy
15  or whatever -- how you would choose to do it with
16  the informant you will actually go in -- go to the
17  location. If they don't answer the door you're
18  going to do a knock and announce. Give them a
19  reasonable amount of time, some -- some people say
20  60 seconds, which is a minute, some people say
21  less than that. It's -- I don't know. Can't give
22  you an approximate time, I know it's a reasonable
23  amount of time, a short reasonable amount of time.
24        If they don't come to the door

Page 36

1  you're going to forcibly enter the door. Once you
2  go to -- enter the property, everyone within that
3  raid plan will have designated areas where they're
4  supposed to go. No one's going to go out of their
5  designated area until everything settles.
6        It's going to be -- within the
7  group someone's going to have control of the
8  prisoners, which is going to be a designated area
9  of the house. Normally that would be the living
10  room.
11        From that point you have your
12  search teams. Any time someone finds something
13  they're supposed to let the affiant know and the
14  supervisor know, especially when it come down to
15  money. When it's found we called the affiant, you
16  call the supervisor, you point it out. Some
17  people take pictures. Some people don't.
18        We put it in an evidence bag,
19  which actually has the officer who saw it, it
20  would say confiscated, but again, the affiant's
21  responsibility is to confiscate all evidence.
22  You're just pointing it out. Put it in an
23  evidence bag, the location where it was at and who
24  found it.

Case 2:14-cv-01643-RBS    Document 61-9    Filed 06/29/22    Page 12 of 159

McIntyre v. Liciardello, et al./Torain v. The City of Phila., et al.                    JEFFREY WALKER, 9/15/16

Page 37

1     Come down to money, again, the
2  affiant and the supervisor is responsible for
3  that. No money is counted in the houses. If you
4  find money on someone in a house, feel free to
5  count it in front of them. They can sign a 48
6  agreeing to that's how much was taken from them.
7  It's put in the evidence bag. With the evidence
8  bag, again, who took it, the location and the
9  time.
10     Once the searching is done, all
11  the evidence collected, it's all taken into
12  headquarters, and the affiant will prepare a
13  summary sheet, a handwritten summary sheet, who's
14  the arresting officers, the locations, the items
15  taken from each person, put it on the summary
16  sheet.
17     Next to the summary sheet will
18  be the property receipts. You sign the property
19  receipts out, and within those property receipts
20  wherever -- you categorize whatever is taken, the
21  time, you're putting those property receipt
22  numbers near there.
23     Once everything is looked --
24  looking over everything you have, make sure

Page 38

1  everything is correct, because we're doing it as a
2  group, then you make copies and you pass them out
3  to your people in your unit.
4     If an officer's name is on a
5  property receipt he's not asked -- the person --
6  if you're doing a summary sheet and if I give you
7  a property receipt and it's blank and I tell you
8  to help me out to fill it out you're going to
9  actually type my name on it. It doesn't mean I
10  filled it out, someone else filled it out, but
11  when it comes back to me it's my responsibility to
12  overlook and make sure everything is right.
13     And then from that point the
14  supervisor sees it, he makes sure everything is
15  right, too, and then it's signed and then it's
16  entered into the system on a date and time. If
17  you make a mistake you must contact the evidence
18  and take it out and re-enter it. If it's a
19  mistake and you entered on the property receipt
20  the wrong date you got to fix that.
21     Q.  How would you fix it?
22     A.  You call the evidence. It all depends
23  on what it is. You call the evidence or you call
24  the chemical lab and you say I entered something

Page 39

1  on the wrong date, correct it.
2     Q.  Is there a memo or anything required
3  to do that or you just make a phone call?
4     A.  No, you just make a phone call. I've
5  done -- I've made mistakes many times on entering
6  property receipts on the wrong date.
7     Q.  Will there be some kind of --
8  something memorializing that there was a mistake
9  made, whether it's in the computer --
10     A.  Yes, it will be. I mean, if you -- if
11  you enter a property receipt on the wrong date
12  it's got to get a printout of the property receipt
13  from the computer printout. It's going to come
14  over the teletype. And it says -- going to say
15  the time and date, and then you look at it, oh, I
16  entered this on the wrong date.
17     So what you got to do is wait
18  for the evidence to open up and then you tell
19  them, listen, take it out, I'm going to re-enter
20  it back in.
21     Q.  Now -- and again, we're going to get
22  into more detail on that later, but how about with
23  respect to were you ever an affiant in a search
24  warrant during that period of time?

Page 40

1     A.  Yes, I was.
2     Q.  Okay. Again, approximately.
3     A.  When I were the affiant?
4     Q.  Yes.
5     A.  How many times?
6     Q.  Yes.
7     A.  Thousands.
8     Q.  As the affiant in the search warrant,
9  are you responsible to ensure that the information
10  contained in the search warrant or in the
11  affidavit is correct?
12     A.  Yes. All responsibilities totally
13  falls on you.
14     Q.  Okay. As the affiant do you glean
15  other information from other police officers with
16  respect to what's going to be contained in that
17  affidavit?
18     A.  What do you mean by "glean"?
19     Q.  Do you -- in other words, do other
20  officers tell you their portion of the job that
21  they did and then that's something that you get --
22  you embody in the --
23     A.  Yeah. You gather information from
24  whoever is doing surveillances or any information

Page 41

1 you might have that need to be put into the story.
2  Q. Okay. But my question is, do you
3 know -- when you put it in the Affidavit of
4 Probable Cause you are -- as the affiant you're
5 the one responsible to ensure that that
6 information is correct?
7  A. That's correct.
8  Q. All right. Now, Jeff, you mentioned
9 that you were arrested in 2013. Why don't you
10 tell us, again, in as much detail as you can, what
11 happened.
12  A. I was arrested May 22nd, 2013. I
13 was using -- misusing confidential informants. I
14 was doing something that was custom for me to do.
15 I just got caught. I was helping another drug
16 dealer rob another drug dealer.
17  I falsely prepared an Affidavit
18 of Probable Cause, had it signed through the Bail
19 Commission. I planted drugs on a person I found
20 to be an informant that was given to me by another
21 drug dealer, and once that informant was arrested
22 I proceeded to go to, which I believed to be the
23 person that I arrested that was an informant,
24 house, and I entered the house with a key with the

Page 42

1 informant, came out of there with $15,000 in cash
2 and drugs and I was arrested.
3  Q. Who arrested you?
4  A. The FBI.
5  Q. Jeff, had you ever done that in the
6 past?
7  A. Numerous. It's custom to do it. What
8 I'm saying custom, it was natural.
9  Q. What do you mean by that?
10  A. Okay. I was -- I was known to, again,
11 use lies, confidential informants wrong, gathering
12 information, using them as informants. It was
13 actually sources of information. Not putting
14 houses in warrants, nor that should be in
15 warrants. Going to the houses, securing houses
16 without warrants, searching. If there's nothing
17 there move on and don't put it -- put it in the
18 story. Stealing.
19  Q. Again, if you can approximate how many
20 times prior to -- before the FBI arrested you did
21 you do that?
22  A. It was custom to do it. It was
23 natural. When I say it's natural, in my world
24 nothing was wrong with that. Locking up bad guys.

Page 43

1 Taking things that I feel as though they didn't
2 deserve it.
3  Q. Did you ever do that with any of your
4 partners?
5  A. Oh, most definitely.
6  Q. Do you recall any specifics prior to
7 being arrested where you actually did that with
8 someone else, another officer?
9  A. You mean specifics -- there's so many
10 times when -- you mean you're talking specific
11 jobs?
12  Q. Yes, if you can remember.
13  Well, let me -- strike that.
14  Let's -- when did you -- do you
15 recall when you first did that, the first time you
16 did that?
17  A. The first time I --
18  Q. Let's start with stealing.
19  A. Stealing.
20  Q. The first time you stole.
21  A. First it starts with lying.
22  Q. Okay. When was the first time you
23 lied?
24  A. It starts with articulating in the

Page 44

1 part where basically using reason of suspicion and
2 build it up to make it probable cause.
3  Q. Okay, wait. What do you mean by
4 articulation?
5  A. Lying. It's basically making --
6 making suspicion strong enough which gives you the
7 probable cause to arrest someone.
8  Q. And why would you do that?
9  A. Sometimes you didn't know how you
10 caught a person and you had to figure it out.
11 You're catching -- running a guy down -- chasing a
12 ~~guy down the street and he got drugs and guns and~~
13 from your observation you just saw the guy, he
14 looked at you and he took off running. Then you
15 caught him and you didn't know how to put it
16 together so you came up with a story, and I
17 learned that from working.
18  Q. And --
19  A. And then that -- from the stealing --
20 from the lying, the stealing comes in right behind
21 it.
22  Q. Is it -- is it fair to say that you
23 began lying and stealing when you first got into
24 the narcotics?

Case 2:14-cv-01643-RBS    Document 61-9    Filed 06/29/22    Page 14 of 159

McIntyre v. Liciardello, et al./Torain v. The City of Phila., et al.                    JEFFREY WALKER, 9/15/16

Page 45

1      A.   No, I became lying and stealing when I
2   was in the 16th District, but it wasn't -- it
3   didn't get out of hand until I came to the
4   Narcotics Field because it's -- more opportunity
5   presented itself.
6      Q.   Now, would you do that when you were
7   the affiant?  Remember I asked you about when you
8   were affiant of the search warrants or an arrest
9   warrant.  Would you lie on those --
10     A.   Yes, I would.
11     Q.   -- affidavits?
12     A.   Yes.
13     Q.   Okay.  When you were on the search
14   team -- now, you mentioned stealing.  When you
15   were on a search team searching a house would you
16   steal money?
17     A.   Yes, I would.
18     Q.   Did you ever do that with any other
19   police officers?
20     A.   Yes, I did.
21     Q.   Okay.  A couple times?  Once?  Many
22   times?
23     A.   Many times.
24     Q.   How would that work?  If you were in a

Page 46

1   house and you wanted to steal money how would you
2   do that?
3      A.   First of all, you want to see who
4   going to steal with you.  You're going to develop
5   a relationship with who's going to steal with you
6   first.  That comes way prior before you actually
7   start stealing in a group.  Even if it's someone
8   outside the group you want to know who he is, make
9   sure he's going -- if you steal somebody he ain't
10   going to tell on you.
11         In the group that I was part of
12   we stole -- I'm going to say some names here in my
13   group.  The leader of the group was Thomas
14   Liciardello.  That was the main group.  If you
15   stole something and he was there you made sure he
16   got something.  If he was with another group
17   within that group who we were with he got
18   something from that group.  But it got to the
19   point where he didn't have to be there.  He still
20   got what he got.
21         There was many ways we broke
22   money up.  Sometimes we broke money up, we all got
23   in the car together, we split it up in the car
24   going back to either another location or we going

Page 47

1   to headquarters.  Another way we split the money
2   up is where we met in an isolated area and made
3   sure there was no one looking at us.  We open up
4   the trunk of the car, and we had opportunities to
5   go into the evidence bag, we went into the
6   evidence bag.
7         We had extra evidence bags,
8   mind you, in our pockets where we took evidence
9   out the bags that were sealed, and we actually
10   took what we wanted to take and we resealed it.
11   We split the money in that -- in that area.
12         The next area, the next place
13   would be we went inside headquarters.  All the
14   money were given to the designated person.  A lot
15   of times it would have been Thomas Liciardello,
16   and go to the locker room, he make piles, and
17   whoever is helping him, get his money.  He would
18   text you.  You get a text on your phone and go to
19   the locker room and get your money, or the person
20   who got his money before you come tap you on the
21   shoulder and say go get your money.
22     Q.   Jeff, how much money are we talking
23   about?
24     A.   A few thousand.  Going to be -- in the

Page 48

1   cases where we were split the money up in the
2   houses small amounts of money would be a few
3   hundred to maybe 1,000, 2,000.  When you talk
4   about the real money, it was -- it would be -- it
5   would be some money.  I don't want to put numbers
6   on anything.  It would be a lot of money.
7         I mean -- I mean in most cases
8   I can -- I can tell you this.  On every thousand
9   that I had it was multiplied with them, because I
10   knew -- and I was -- and I knew because the
11   position I played in the early part of this whole
12   situation was I got a piece of the pie.  They had
13   the pie.  So I was grateful to get something.  So
14   it was a lot of money that was being moved around.
15     Q.   So more than 10,000?  More than
16   50,000?
17     A.   At times -- I made a statement earlier
18   in my testimony in court the best of my ability
19   was maybe -- at one occasion that I deal with
20   Thomas Liciardello was maybe 50,000.  That's the
21   most I ever stole, and I think I split the -- I
22   remember I split that up with just him.  He didn't
23   want me to tell no one else in the squad, because
24   again, we were in that situation where if I took

McIntyre v. Liciardello, et al./Torain v. The City of Phila., et al.

JEFFREY WALKER, 9/15/16

Page 49

1    something with him he didn't want to let -- there
2    was no loyalty when it comes to stealing in the
3    squad.
4            Some people in the squad, as
5    far as Perry, it was no loyalty with him. He
6    would steal something and won't let nobody know
7    until they find out that he stole something. And
8    you can't lie to people who you stole something
9    with that you didn't steal nothing. They're going
10   to know right then. Give it up. He did give it
11   up, but he won't give it all up and they find out
12   later that it was more than what it was. So they
13   really had a thing with him but he still stayed in
14   the group. You know what I mean?
15           I believe the person kept
16   saving his ass was his partner Spicer because they
17   had a relationship in the strike force. When --
18   Perry was the next one to be pushed out of the
19   squad and had to leave the squad but he kept being
20   saved. It was easier for me to go, but --
21       Q.   Jeff, let me see ask you, is this --
22   what you're describing now, is this something that
23   the supervisors knew?
24       A.   The only supervisor I knew that was

Page 50

1    stealing -- really knew I was stealing was Chet,
2    Chester Malkowski.
3        Q.   How do you know he knew?
4        A.   Because when I was stealing Tommy
5    would tell him. He was always telling me be
6    careful. Tommy made sure he tell him everything.
7        Q.   What -- when you say Tommy, who are
8    you referring to?
9        A.   Liciardello.
10       Q.   Now, who was in that group -- let's --
11   again, this is a hypothetical. When you had --
12   when you were going to chop up money, who was in
13   that group?
14       A.   The main group was -- we're going to
15   go from the beginning back to Genie. It was Sean
16   Kelly, myself, Brian, Norman. I can't put nothing
17   on Monaghan because he never stole nothing with
18   me. When we go into leaving Genie Gessner's
19   squad, we went into Chester Malkowski's squad. It
20   was basically me, Tommy, Brian, Chet that was
21   stealing, and periodically I would steal with
22   Cujdik, his father.
23           MR. KRASNER: Did you say Brian
24   or Bryant?

Page 51

1            THE WITNESS: Brian Reynolds.
2    Brian Reynolds.
3            MR. KRASNER:  Is that who you
4    meant before when you said Brian?
5            THE WITNESS: Yes. Yes. And I
6    would steal with Cujdik, the father. I was
7    steal with him, I would steal with Reggie
8    Graham, and that would be it. There was
9    stealing in that whole squad but these are
10   the people I was basically breaking bread
11   with and -- I'm not done yet.
12   BY MR. PILEGGI:
13       Q.   If -- go ahead. I'm sorry, go ahead.
14       A.   Left Chet squad. He retired. Went to
15   McCloskey's squad. It was basically me, Tommy --
16       Q.   Tommy who?
17       A.   Liciardello. Brian wasn't there, it
18   was Palmer. Me, Tommy and Palmer. Norman wasn't
19   around because he was -- he was fired and he
20   didn't even come back yet. Palmer left, made
21   detective. Brian came on board again and it was
22   just me, Tommy and Brian.
23           MR. KRASNER: Mr. Walker, I
24   hate to do it to you, but would you give us

Page 52

1    full names.
2            THE WITNESS: I'm sorry, sir.
3            MR. KRASNER:  Palmer's first
4    name, for example?
5            THE WITNESS: Lewis Palmer,
6    Tommy Liciardello, Brian Reynolds and
7    myself.
8    BY MR. PILEGGI:
9        Q.   And who was the sergeant?
10       A.   It would be -- they moved around the
11   sarge so much it would be between McCloskey and
12   Chet, because Chet went with us when we got split
13   up. We went to East Division. So at the
14   beginning Chet was with us when we went from West
15   Philly to East Division. That would be Northeast
16   Division, like North Philly. It's on the Spanish
17   part.
18           MR. KRASNER: Chet who?
19           THE WITNESS: Chet -- I'm
20   sorry, Chet McCloskey (sic), Chester
21   McCloskey, if I'm saying his name right.
22   BY MR. PILEGGI:
23       Q.   And was there a certain name of that
24   squad when you --

Case 2:14-cv-01643-RBS    Document 61-9    Filed 06/29/22    Page 16 of 159

McIntyre v. Liciardello, et al./Torain v. The City of Phila., et al.                    JEFFREY WALKER, 9/15/16

Page 53

1    A.    I wasn't done yet.  There's a lot and
2    I'm trying to wean it out to you.
3        Q.    Okay.
4        A.    When we got with Chet -- not Chet,
5    Sergeant McCloskey -- the names are different.
6    You got Malkowski and you got McCloskey.
7            MR. KRASNER:  Okay.
8            THE WITNESS:  Chet Malkowski.
9    Make sure you get his name right.  That was
10   the beginning part.  That's who I was
11   stealing with, so he knew I was stealing.
12   Malkowski never -- you know, he knew -- I
13   believe he knew things were going on but
14   never stole anything with him.
15           The people in the squad I was
16   stealing with there would be Thomas
17   Liciardello, Brian Reynolds.  Then with
18   Norman, Betts, John Speiser, Mike Spicer,
19   the regular group you see over there now.
20           MR. KRASNER:  Indicating for
21   the record the deponent has gestured with
22   his right hand in the direction of the five
23   defendants who are seated in the courtroom.
24   Is that correct?

Page 54

1            THE WITNESS:  Yes, and minus
2    Perry Betts.
3            MR. KRASNER:  Yes.
4            THE WITNESS:  Perry Betts was
5    there also.
6            MR. KRASNER:  And Mr. Betts is
7    not present today.
8            THE WITNESS:  Yeah, he's not
9    present today.
10           MR. KRASNER:  Okay.
11   BY MR. PILEGGI:
12       Q.    What was that squad called that you
13   just described, the one under Sergeant McCloskey?
14       A.    What were we called?
15       Q.    Yeah.  I mean, was it broken up
16   into -- there was a fields unit.  Was that how it
17   was --
18       A.    VRT, was actually some Violent
19   Response team.  We had several different names,
20   that we were -- they kept moving the names around,
21   but we were actually -- we were one of the
22   smallest squads in the whole entire building.
23       Q.    Were you the elite squad at that time?
24       A.    Yes.  We got -- elite means we did the

Page 55

1    biggest jobs.  We got the most attention.  That
2    required us to have the most overtime.  It was
3    more relaxed.
4        Q.    Who ran that squad?
5        A.    McCloskey.  I keep getting these
6    names -- I'm out -- I'm falling out of this loop.
7    McCloskey, my last -- one of my last supervisors.
8        Q.    Sergeant McCloskey.
9            MR. KRASNER:  First name?
10           THE WITNESS:  Sergeant
11   McCloskey.
12           MR. KRASNER:  What's his first
13   name, please?
14           THE WITNESS:  Man, I don't
15   remember.
16           MR. KRASNER:  You don't
17   remember?
18           THE WITNESS:  I'm throwing a
19   block in on half this crap.
20           MR. KRASNER:  Okay.
21   BY MR. PILEGGI:
22       Q.    And he was the sergeant, correct?
23       A.    Yes, he was.
24       Q.    Who was the lieutenant at that time?

Page 56

1        A.    Lieutenant Otto.
2        Q.    Just give us -- if you could give us
3    an idea what the hierarchy was.  In other words,
4    say there was a narcotics investigation.  Would
5    you have to report directly to the sergeant or
6    could you bypass that and go to the lieutenant?
7        A.    The only person do that was Thomas
8    Liciardello.  No one else could do that.
9        Q.    What do you mean by that?
10       A.    He was special.  He thought he was
11   above special.  He could call the bosses, Captain
12   Warner, Blackburn.  That's the ones I know mainly
13   he called all the time.
14       Q.    Could you do that?
15       A.    No.
16       Q.    How do you know he did that?  Were you
17   ever in his presence when he spoke to any of those
18   individuals?
19       A.    Yes.
20       Q.    Do you recall what the conversation
21   was about?
22       A.    Basically talking about jobs, just
23   going -- discussing jobs.  When he needed
24   something done, he needed to go outside his area,

14  (Pages 53 to 56)

Page 57

1    he had a specific job especially when the sergeant
2    said he couldn't go nowhere, stay where he was
3    supposed to stay at, and he was known to go to
4    Otto for that one.
5          The sergeant told him to stay
6    in South Philly, he's in Roxborough in somebody
7    house. The sergeant lost so much control he told
8    him listen, call the lieutenant and talk to the
9    lieutenant. And eventually everybody will meet up
10   out there. They're in the house and someone's
11   left and they go prepare the search warrant for
12   the location.
13   Q.   Do you know how -- well, at what point
14   did Tommy Liciardello come to the unit? You had
15   mentioned when you were in with Chet --
16   A.   He came and went straight to Chester
17   McCloskey. He came after -- right after I did he
18   came.
19   Q.   About what? What year, do you recall?
20   A.   I don't know.
21   Q.   2000?
22   A.   Somewhere around there.
23   Q.   Okay. Do you know how he got in that
24   unit?

Page 58

1    A.   He always bragging that Chitwood,
2    before he left he threw him a bone and got him
3    into narcotics before he left Chitwood. I don't
4    know his first name. The younger son, Chitwood,
5    the one who left.
6    Q.   Do you know if any of his family
7    members were police officers?
8    A.   His dad was a narcotics sergeant who
9    bragged about him, too.
10         MR. KRASNER: Who is the dad?
11         THE WITNESS: I don't know who
12   his dad is.
13         MR. KRASNER: No, whose dad
14   when you say "his dad"?
15         THE WITNESS: Tommy
16   Liciardello's father. He bragged about him.
17   I think when Tommy came aboard -- first
18   started working with Tommy with Chester
19   McCloskey we went to his father's CI store
20   and -- he was a bragger. He always bragged
21   about his father stealing money, how he
22   stole money from his dad's money he had
23   hidden.
24         You know, he always had -- he

Page 59

1    just -- he just had everything. He always
2    couldn't keep his mouth shut about what he
3    had and what he could do. He bragged a lot
4    and...
5    BY MR. PILEGGI:
6    Q.   Can I ask you, did you ever socialize
7    with Tom Liciardello?
8    A.   Yes. We were close. I mean, when his
9    kid was born I took him to the hospital. We were
10   close, man. We were like -- I'd like to say one
11   time we could put our lives on the line for each
12   other, really do it. Had no problem doing that.
13   Q.   Jeff, did you ever hang out with him
14   socially?
15   A.   Yes. We were close. We went out.
16   Q.   Where?
17   A.   A lot of times bars. We would drink.
18   Heavy drinkers, all of us. We were all drunks.
19   We went to bars like go-go bars. Didn't frequent
20   a lot of those toward the end. But we would go to
21   Atlantic City while we were working.
22         That was a big thing with
23   Chester McCloskey. I went a couple -- at least
24   once I can remember we went while we were working.

Page 60

1    Took my car. But they would always go before me.
2    Just doing a lot of hanging out, you know, DA
3    parties, defense attorneys parties, partying and
4    drinking, carrying on.
5    Q.   Did you ever drink on duty?
6    A.   Yes, we did. We had a beer -- I can
7    recall we had a refrigerator full of beer in
8    the -- we made sure we had our beer, wine,
9    coolers. Drank while we were working. Drank
10   while we was processing jobs. Drank when we were
11   in people houses, securing houses. It was a
12   party.
13   Q.   How about in court? Did you ever --
14   let me ask this. You said you went to Atlantic
15   City, I take it to gamble?
16   A.   Yeah. I wasn't a table guy, I was a
17   slot machine.
18   Q.   Oh. Did you ever go to Atlantic City
19   and gamble with some of the moneys that you
20   already testified that you stole?
21   A.   I can't tell you where they would
22   get -- what type of money they were gambling with
23   but they were gambling with lots of money. I
24   couldn't tell you how much money they would gamble

15   (Pages 57 to 60)

Page 61

1    with towards the tail end because I wasn't part of
2    them -- them gambling. They would go to the
3    SugarHouse. When SugarHouse opened up it was the
4    SugarHouse thing, everyone going down to Delaware
5    Avenue. I wasn't no part of that.
6             So I knew they had money going
7    down there, lots of money, but you know, going on
8    my assumption they was always stealing. I mean,
9    even when I left the squad, I mean, I know that it
10   was more of enticement -- when we get money and
11   you're not part of what we're doing. Like
12   there'll be times I be in the locker room and I'll
13   hear John and Tommy talking and they're --
14        Q.   You've got to say --
15        A.   John Speiser. Keep reminding me of
16   that.
17             MR. KRASNER: Continue. Tommy?
18             THE WITNESS: Liciardello, be
19   counting up money in the locker room and I
20   would know it, you know.
21             And as far as the gambling
22   part, yeah, they were -- they were gambling.
23   Now, the people that were gambling that I
24   knew of would be Brian Reynolds, Michael

Page 62

1    Spicer, Tommy Liciardello. That would be
2    the ones that ran the most. I'm not sure if
3    Perry Betts was a big gambler but he was
4    always close by with those guys.
5    BY MR. PILEGGI:
6        Q.   Did you ever do any gambling in the
7    courthouse?
8        A.   Yes, it was. There was gambling in
9    the side rooms. That would be dealing with other
10   officers. It would be mainly Thomas Liciardello,
11   Brian Reynolds, Michael Spicer. I don't know too
12   much John, I didn't really see him gamble, but it
13   would be with the other officers. I can't say
14   their full name. I know them by the -- a couple
15   black officers. They would be gambling with money
16   while the court is in session, while someone's on
17   the stand, someone be guarding the door, and
18   they'll come in and whoever's next they'll go in,
19   but the DA would never see the money. The money
20   would be off the tables. The only thing would be
21   on the table is the cards.
22        Q.   Jeff, could you explain a little
23   bit -- when you were in court, let's say you had a
24   case and you're one of the officers that worked a

Page 63

1    case and you know you have to provide testimony.
2    Tell us how there would be articulation with
3    regards to that particular -- the prosecution of
4    that particular case.
5        A.   Well, articulation would be done on
6    the paperwork before you even get to the case,
7    because once it's on that paper you're going to
8    stick to the story that you already have. So all
9    that's done prior to even going to court. You're
10   just sticking to the story that you're using when
11   you're going to court. So ain't no more
12   articulation after that, you're just sticking to
13   whatever you wrote.
14        Q.   But is there at some point before --
15   say you're going to testify. Obviously the other
16   officers are sequestered from the room. As a
17   group, do you get together and say this is -- this
18   is how we're going to present the case?
19        A.   Yes, we do, we have a discussion, but
20   again, everything goes back to that paperwork.
21   Stick to that paperwork.
22        Q.   Now, we're going to fast forward a
23   little bit. Let's get to your arrest. Now, you
24   were arrested. You were sentenced, correct?

Page 64

1        A.   Yes, I was.
2        Q.   Explain what your sentence was and
3    what happened after you were sentenced.
4        A.   I was sentenced to 42 months.
5        Q.   Incarceration?
6        A.   Yes. Out of forty-two months I spent
7    28 months in isolation.
8        Q.   Incarcerated?
9        A.   Yes. Then I was shipped out to
10   Oklahoma, which I stayed about three weeks. Then
11   I went to Kentucky, which I stayed for the
12   duration to March the 30th.
13        Q.   Now, Jeff, after -- well, before you
14   were sentenced but after you were arrested, am I
15   correct that you cooperated with the Federal
16   Government?
17        A.   Yes, I did.
18        Q.   Okay. What was -- in what capacity
19   did you cooperate?
20        A.   Cooperate fully.
21        Q.   What did you do? My question wasn't
22   clear.
23        A.   I gave information that I knew about
24   criminal activity.

16 (Pages 61 to 64)

Page 65

1        Q.    Okay.  And with regards to whom in
2   particular?
3        A.    Yes.  My squad I was with, amongst
4   other officers.
5        Q.    Okay -- can you name?
6        A.    Thomas Liciardello, Brian Reynolds,
7   Linwood Norman, John Speiser, Mike Spicer, Perry
8   Betts, Reggie Graham, Chester McCloskey.  That's
9   all I can remember right now.
10       Q.    Other than Chester McCloskey, do you
11   recall giving any information with regards to any
12   of the other supervisors?
13       A.    Yes.  The conduct that the supervisors
14   knew, the misconduct I was doing and the
15   misconduct done around me, where I knew the
16   supervisors knew what was going on, that would be
17   Chester McCloskey, Lieutenant Otto and Sergeant
18   Malkowski.  Sergeant Meehan.
19              MR. KRASNER:  I'm sorry, what
20   did you say?
21              THE WITNESS:  Sergeant Meehan.
22              MR. KRASNER:  Meehan.
23              THE WITNESS:  Yeah.
24              MR. KRASNER:  Do you know a

Page 66

1   first name?
2              THE WITNESS:  No.  Forgive me,
3   I'm just...
4              MR. KRASNER:  That's all right.
5              THE WITNESS:  About the
6   misconduct that was going on.
7   BY MR. PILEGGI:
8        Q.    When you say "misconduct," are you
9   referring to the lying, the stealing, the --
10       A.    Well, as far as the misconduct with
11   the informants, that would be the main part.
12   Collection of evidence, not being recorded.
13       Q.    And you --
14       A.    It don't have to be money, it just
15   would be property.
16       Q.    Jeff, am I correct that you entered a
17   guilty plea?
18       A.    Yes, I did.
19       Q.    Okay.  And prior to that plea -- well,
20   do you recall what part of the responsibilities
21   that you had obligations under that plea?
22       A.    The part I got clearly was tell the
23   truth, cooperate fully, and I continue to do it to
24   today.

Page 67

1        Q.    I was going to ask you that.  Now,
2   that was with the Government, correct?
3        A.    That's correct.
4        Q.    Now, you did your time in
5   incarceration, correct?
6        A.    Yes, I did.
7        Q.    And why are you testifying today?
8        A.    I just want to continue to tell the
9   truth, the full truth.  It's more than just me.
10       Q.    What do you mean?
11       A.    It's a bigger truth.  It's a bigger
12   picture.  I just want to move on with my life, put
13   this shit behind me.  Excuse me.  That's all I
14   want to do.  No matter how hard and crazy it
15   sounds it's the truth.  As far as if you want to
16   believe it or not, it's the truth.  I just want to
17   move on.
18       Q.    Now, Jeff, you're aware that some of
19   the information that you're providing today has
20   some pretty serious ramifications, right?
21       A.    Yeah.  My safety's always in jeopardy.
22   I'm concerned.
23       Q.    Let's talk about that.  Were there any
24   situations where you felt that your life was in

Page 68

1   jeopardy during this period of time when you were
2   in the Narcotics Field Unit?
3        A.    Yes.  Separation from the squad, and
4   there was a particular time I was in the car with
5   John Speiser there was concern I was communicating
6   with the FBI, which they were talking to me but I
7   was -- I wasn't giving them what they wanted, I
8   was spinning them, because I was sticking to the
9   group because I was just as dirty as they was.
10              I was in the car with John
11   and -- Speiser, and I remember going into a lot
12   and going to the bathroom.  My phone rang.  I get
13   back into the car and his gun is out pointed at
14   me.  I'm like what the hell's going on?  My first
15   intention is shoot him, but -- you know, but then
16   I wouldn't even look fucking right.  Excuse me.
17              I was a little disturbed about
18   that.  I told three people.  At first I told the
19   supervisor.  McCloskey told me -- he basically
20   brushed me off and told me to get out of the
21   squad.
22              MR. KRASNER:  Is that McCloskey
23   or Malkowski?  Chet or John?
24              THE WITNESS:  John.  He told me

17 (Pages 65 to 68)

McIntyre v. Liciardello, et al./Torain v. The City of Phila., et al.                    JEFFREY WALKER, 9/15/16

## Page 69

1  just to get out of the squad. Told Reggie
2  Graham, and I told the Federal Government
3  because I had their number before they gave
4  me their card.
5      So what had happened, I called
6  John Hess, which is an agent. He told me
7  listen, just be careful. That's all he
8  said.
9      MR. FEINSCHIL: Mr. Walker,
10  could you keep your voice up?
11      THE WITNESS: Yes.
12      MR. FEINSCHIL: It's a little
13  hard to hear you.
14      THE WITNESS: Get closer.
15      MR. FEINSCHIL: Yes, sir.
16      THE WITNESS: I told John Hess
17  right after it happened. Then I left --
18  soon after that I left the squad, not right
19  away, but eventually I left the squad.
20      Then I went to Sergeant
21  Gorman's squad, and I clearly knew that
22  information was given to the squad that I
23  was stealing, for them to separate
24  themselves from me, because I was already

## Page 70

1  separated from the squad I came from,
2  running the street by myself, using the
3  informant by myself.
4      The supervisors knew. They was
5  signing paperwork. When it was time to put
6  a second officer on the paperwork, they'll
7  tell me who to put on the paperwork and they
8  would sign it, because you have to have two
9  officers with the informant at all times.
10  When they couldn't do it, then the
11  supervisor put his name on the paperwork.
12  Lieutenant Otto, the sergeant, McCloskey,
13  they put their names on the paperwork.
14      When I went to Gorman's squad
15  the exact same thing carried on over there.
16  He would designate an officer to sign the
17  voucher -- there was a problem after the
18  while because when you tell another officer
19  to witness a body you witness you're
20  basically bringing him into his -- his
21  issues especially if they know I was
22  stealing. So it was always a problem with
23  that, you know.
24  BY MR. PILEGGI:

## Page 71

1      Q.   Jeff -- and we'll get -- again, we're
2  going to get into some specifics with regards to
3  informants and warrants and things like that, but
4  just generally speaking, was a supervisor -- did
5  the supervisor have to participate whenever you
6  had an informant, when you used the CI say to make
7  a buy?
8      A.   It had to be, but it's -- he has to be
9  there but some of these situations it's like a
10  gray area. He doesn't really have to be. He has
11  to be in the area but he don't have to be there
12  while you making a buy. In close proximity. You
13  know, you don't have to have eyes but he has to be
14  around. When it's doing an undercover buy he got
15  to be there.
16      Informant's buy, it is like a
17  gray area. He has to be around. Because you have
18  to meet with the informant with him there. Every
19  time you encounter these informants when it comes
20  down to the buy he has to be in the general area.
21      It has to be two officers with
22  the informant at all times. Even when it comes
23  down to the payment of the informant, the
24  supervisor has to witness the payment. The

## Page 72

1  voucher -- the payment is made. The informant --
2  the voucher -- after the payment is made -- first
3  of all, the voucher's filled out in pencil after
4  the -- or a pen, normally pen, after the buy is
5  made. The time is made. The informant actually
6  signs -- looks it over. They sign it. You sign
7  it. The witnessing officer signs it. The
8  supervisor signs it. It goes up. The lieutenant
9  doesn't have to be there to sign it. He sign it a
10  little later.
11      I lost the train of thought.
12      The buy is actually witnessed,
13  two officers. The supervisor's there. The
14  informant is always searched thoroughly prior --
15  before the buy. Again, with the supervisor, it's
16  a gray area, he has to be around but he doesn't
17  have to be over their shoulders watching it.
18      The CI is searched again after
19  the buy. Again, you have two officers that have
20  to witness it, gives the drugs, everything.
21  You're never alone with an informant if possible.
22  You never should be alone because things happen.
23      The person may say -- the
24  informant might say I have a female informant.

18  (Pages 69 to 72)

McIntyre v. Liciardello, et al./Torain v. The City of Phila., et al.                                JEFFREY WALKER, 9/15/16

Page 73

1  Somebody might say you touched her or something
2  must have happened and -- that's what the policy
3  for, basically to protect you and the issues --
4  whoever you're dealing with.
5          The misconduct that I was
6  doing, and I was doing it in several squads. When
7  I went to other squads, which was like Meehan's
8  squad, Sergeant Meehan's squad, Sergeant
9  Barrington's squad and the squad I left before
10 that, I forgot, Jones, John, the squad I was in
11 when I got arrested, I was never alone with the
12 informant. The one time when I got locked up, I
13 was alone with that informant that one time but I
14 believe that was a special case.
15         But the supervisors that I was
16 working with that I mentioned, I was with the
17 informants at all times, but there was still some
18 form of misconduct being done with the informants.
19         In these other squads where
20 they would not allow me to be by myself with the
21 informant it was -- the basic misconduct I was
22 part of was if an informant was going out
23 knowingly gathering information, committing
24 criminal activity, and that would be -- let's say

Page 74

1  I just bought from the house last night, you can
2  go buy from this house again, and I would go in
3  and make buys with them.
4      Q.   Jeff, you mentioned the policies.
5  What are you referring to when you say policies?
6      A.   It's the policies. It's the rules and
7  regulations of the police department. It's what
8  everyone goes by.
9      Q.   And those policies are something that
10 you're trained in annually?
11     A.   Yes. I mean, you go to your
12 in-service training and they go over basically
13 policies, they go over updates of Crimes Code,
14 yeah.
15     Q.   Did you ever violate the policies?
16     A.   Yes, I did.
17     Q.   Again, approximation.
18     A.   Thousands of times.
19     Q.   Did the supervisors know you were
20 violating the policies?
21     A.   Yeah. They were violating with me.
22     Q.   They were violating them with you?
23     A.   Yeah. It was allowing me to use the
24 informant by myself, you're violating with me.

Page 75

1  You're allowing me to go into a house without a
2  search warrant, you're violating with me.
3      Q.   Okay. I just -- and again, we're
4  going to get into more specifics but I want to get
5  into the specifics of my case, so let me do this.
6          MR. PILEGGI: I'm going to mark
7      this as I guess Walker-2.
8          MR. KRASNER: Let's take a
9      break. Give us ten.
10                 - - -
11         (Whereupon, a short recess was
12     taken, after which time the deposition
13     resumed.)
14                 - - -
15         (Kareem Torain Complaint marked
16     Plaintiff's Exhibit Walker-2 for
17     identification purposes.)
18                 - - -
19         MR. PILEGGI: Back on.
20 BY MR. PILEGGI:
21     Q.   Jeffrey, I'm showing you what's been
22 marked as Walker-2 for identification. First of
23 all, do you know what that is?
24     A.   No, explain it to me.

Page 76

1      Q.   All right. It's a Complaint. In
2  particular, this is a Complaint naming the City as
3  a defendant. It names Jeffrey Walker as a
4  defendant, Brian Monaghan as a defendant and Brian
5  Reynolds; is that correct?
6      A.   That's correct.
7      Q.   And it's the case of -- Kareem Torain
8  is the plaintiff.
9      A.   That's correct.
10     Q.   All right. This is one of the many
11 cases that were filed against the City in general
12 and where you are a defendant in particular with
13 regards to violations of individuals' civil
14 rights, generally.
15     A.   Yes.
16     Q.   Now, you're aware that I guess there's
17 probably a little bit more than 200 cases at this
18 point, and you're aware that you are a defendant
19 in many of those cases, correct?
20     A.   Yes, I am.
21     Q.   All right. And those cases all have a
22 common thread, they're all alleging violations of
23 individuals' civil and constitutional rights in
24 particular, with regards to executing searches

19 (Pages 73 to 76)

McIntyre v. Liciardello, et al./Torain v. The City of Phila., et al.

JEFFREY WALKER, 9/15/16

Page 77

1  without warrants, using CIs and just generally
2  violating the policies and procedures of the
3  Philadelphia Police Department, correct?
4      A.   That's correct.
5      Q.   Okay.  And in particular most of the
6  cases, if not all of the cases, are from the time
7  period of when you came to the narcotics unit,
8  narcotics squad.
9      A.   Yes.
10      Q.   Is that correct?
11           Okay.  Now, in this particular
12  case, Kareem Torain, the allegations are that
13  Mr. Torain was arrested and incarcerated for 13
14  years when police had no probable cause to arrest
15  or search in the particular circumstances of his
16  case.
17      A.   Yes.
18      Q.   Are you aware of that?
19      A.   I'm aware of that.
20      Q.   Generally speaking, this occurred in
21  2001.  Do you recall the Kareem Torain case, the
22  arrest?
23      A.   I was -- I recall parts of the job.
24      Q.   Okay.  You actually provided testimony

Page 78

1  in that case.  Do you recall that?
2      A.   Yes.
3      Q.   At both the preliminary hearing and
4  the trial.
5      A.   That's correct.
6      Q.   And ultimately after a trial
7  Mr. Torain was incarcerated, as I said, for 13
8  years.  Do you recall that?
9      A.   Yes.
10      Q.   All right.  Now, let me just give you
11  generally the circumstances of the job and then
12  we'll get into specifics.
13           This job started with a
14  confidential source.  Do you recall that?
15  Providing information.
16      A.   Yes.  Someone gave him information.  I
17  don't know if it was confidential or not, but
18  someone gave him information.
19      Q.   Well, let me ask you generally, what
20  is the information between a confidential source
21  and a confidential informant, if there's any
22  distinction?
23      A.   Yes, it is.  A confidential source,
24  again, source, the word confidential is you don't

Page 79

1  want to know who it is who is giving you
2  information, and sometimes you can tell who give
3  you the information so it don't make them
4  confidential.
5           When you get into the
6  confidential informant, that someone is getting
7  paid by the City and you don't want -- you want to
8  keep his identity from being known --
9      Q.   Okay.
10      A.   -- in most cases.
11      Q.   Now, you had already previously
12  testified that there was a misuse of confidential
13  informants, correct?
14      A.   It was a -- yes.  It was a misuse of
15  sources of information and confidential
16  informants.
17      Q.   I was just going to ask you that.  So
18  it's your testimony there was also a misuse with
19  respect to confidential sources?
20      A.   Yes.
21      Q.   How -- give us a general example of
22  how you would misuse a confidential source.
23           MR. SANTARONE:  I'm going to
24  make an objection.  You're not talking about

Page 80

1  the Torain case anymore.
2           MR. PILEGGI:  Yes, I am.
3           MR. SANTARONE:  Are you asking
4  does he -- what does he know about the
5  confidential informant that was used in the
6  Torain case?
7           MR. PILEGGI:  Not yet.
8           MR. SANTARONE:  Is that what
9  you're asking him?
10           MR. PILEGGI:  I will.  I'm
11  asking generally the difference between a
12  source and an informant, and now he's asking
13  if they misused sources.
14           Well, maybe we should -- what's
15  the basis of the objection?
16           MR. SANTARONE:  Well, I just
17  want to make sure we're not speaking
18  specifically about this particular
19  confidential source, looking at the
20  paperwork in the case.  I want to find out
21  what his involvement was, if that's what
22  you're asking him.
23           MR. PILEGGI:  Well, no, I'm not
24  there yet.

20  (Pages 77 to 80)

Case 2:14-cv-01643-RBS    Document 61-9    Filed 06/29/22    Page 23 of 159

McIntyre v. Liciardello, et al./Torain v. The City of Phila., et al.                    JEFFREY WALKER, 9/15/16

Page 81

1          MR. SANTARONE: Okay.
2          MR. PILEGGI: I'm just
3     generally getting background.
4     BY MR. PILEGGI:
5     Q.    Do you want me to rephrase?
6     A.    Yeah, rephrase it.
7     Q.    Yeah.
8          You had mentioned that there
9     was a misuse of confidential sources in the past.
10    A.    Yes, there was.
11    Q.    Okay. Give me a general example of
12    how you would misuse a source.
13    A.    The source would interact with the
14    job, either making a phone call to the target,
15    making a buy, those things.
16    Q.    Why would that be a misuse of the
17    source?
18    A.    Because that's not what a source is
19    supposed to be doing.
20    Q.    What is a source supposed to be doing?
21    A.    The source is supposed to be just
22    giving information. That's as far as you're
23    supposed to do, giving information. That's it.
24    Q.    And is there a distinction between

Page 82

1     whether the person's paid or not?
2     A.    If the source wants to get paid then
3     he's bumped up to a confidential informant.
4     Q.    Okay. Was there --
5     A.    And that's only at the discretion of
6     the supervisors if he wants to go that route with
7     them.
8     Q.    Okay. So that's -- in other words,
9     that's a decision --
10    A.    Once you get --
11    Q.    -- that has to be made by a
12    supervisor?
13    A.    Yes. The supervisor's always involved
14    with using these confidential informants. I'm
15    sorry, we're talking about sources, these sources
16    of information.
17    Q.    Was there ever a time that a source
18    was used in the capacity of a confidential
19    informant, in other words, in a paid capacity?
20    A.    I don't know that to be exact like
21    that type of way, but I know the sources was being
22    used in the capacity as informants but I don't
23    know if they were being paid or not.
24    Q.    Okay. All right. So once you get

Page 83

1     information from a source, then as a police
2     officer assigned to this particular assignment you
3     have to go out and verify that source's
4     information?
5     A.    That's correct.
6     Q.    And how do you do that?
7     A.    Just go out just using observations,
8     surveillances, descriptions of vehicles, houses.
9     Gather the information. If the information is
10    proved right then you can use the confidential
11    informant or a police officer to actually start to
12    get your probable cause to establish your
13    affidavit and execute a warrant.
14    Q.    In this particular case, the Torain
15    case, there was information provided by a source
16    that there was several properties being used for
17    narcotic distribution. Do you recall that?
18    A.    I'm aware of that.
19    Q.    Okay. What would you have to do if
20    there was multiple properties given that are part
21    of this assignment? What would you do then?
22    A.    I would actually get together with my
23    squad and we'd discuss the matter because I'm the
24    lead investigator, and I will give them the

Page 84

1     information that was given to me by the source,
2     and we will go out and do the surveillances, and
3     once we see some type of drug activity we will
4     actually utilize the informant or a police officer
5     in starting to establish the probable cause.
6     Q.    Now, in this case you were not the
7     lead investigator.
8     A.    No.
9     Q.    It was Brian Monaghan?
10    A.    Yes, he was.
11    Q.    Okay. But you participated in the
12    surveillance, correct?
13    A.    Yes, I did.
14    Q.    Okay. When there is -- and again, in
15    this case, as this case, there is multiple players
16    where there was multiple individuals identified.
17    What do you do? In other words, how do you
18    ascertain that these individuals are actually part
19    of this narcotics distribution network?
20    A.    By the activity that we see them
21    engaged in.
22    Q.    Okay. If you do not see someone
23    engaged in activity that was identified by the
24    source as a person that was participating in this,

Page 85

1    what would you do?
2        A.   Exclude them.
3        Q.   I'm sorry?
4        A.   Exclude them from the investigation.
5             Like if a guy comes up and he's
6    talking to a guy that you know is selling drugs or
7    something like that and nothing's being
8    transferred, it don't get your suspicion that
9    something is going out, you just exclude them out
10   of there.
11       Q.   Okay.  So in other words, am I correct
12   that only those people that you actually
13   personally observe engaged in drug activity are
14   ones that can be included in this narcotics
15   network?
16       A.   Yes.
17       Q.   All right.  If someone just went up
18   and say they were talking to someone that was a
19   target of this narcotics network but you didn't
20   see them participate in anything, would you put
21   that in the Affidavit of Probable Cause?
22       A.   No.  The only thing you would put --
23   that I would put into the affidavit is just mere
24   talking to someone and a conversation engages but

Page 86

1    the person comes backs repeatedly and if he's --
2    and he's engaged in criminal -- what you believe
3    to be criminal activity, then I will put them in.
4             If it's just someone comes up
5    on a mere encounter, just talking to somebody and
6    they just walk away and they're not seen on a
7    constant basis, no, I would not put them in, into
8    the investigation, because it can go from the
9    neighbors, the guy's family members can come up.
10            It's just -- you're trying to
11   narrow it down to the people close to what the
12   information is provided for you to establish the
13   warrant.
14       Q.   If --
15       A.   You don't want to have a whole bunch
16   of people in it.  You know, you talking to Joe and
17   all the other people.  You got to narrow it down
18   to the meat of everything and -- so when you send
19   your officers in and the -- an informant's in
20   there they know who to actually go after.
21       Q.   Now, Jeff, have you ever fabricated --
22   when you were the affiant, did you ever fabricate
23   information in order to provide probable cause?
24       A.   Yes.  It was very known by me and my

Page 87

1    squad members.  The source of information gives
2    you something, like say four, five houses and some
3    targets.  We'll go out there and we'll see it and
4    we'll -- again, we're -- everything starts from
5    lying.  We'll put the job together in
6    articulation.
7             One of the common things that
8    we used to joke about in the squad, we didn't have
9    too much respect for the Federal Government.  This
10   one person, Thomas Liciardello, would always say
11   feds are stupid.  What takes them months to do we
12   can do in days.
13            And I knew that very clearly we
14   can put it together -- we're good liars.  We put
15   things together.  The only thing we need was
16   locations and a little bit of activity, and if a
17   CI is sent to a location and you knew it was a
18   house involved, if the CI -- no matter if the CI
19   made a buy from the street, that target individual
20   went to the house.
21            When you start hearing cops
22   say -- you know, we're talking about when a police
23   officer is known in a location for years.  They
24   know us.  They know what kind of cars we drive.

Page 88

1    It's their business to watch us and their
2    business -- our business to watch them.  When you
3    have white officers sitting on a block 20 feet
4    away, guys leaning on cars, guys yelling things
5    out, listen, the only fool is the person that's
6    believing the story.
7             Guys have known to see cars and
8    will not go out and do any type of criminal
9    activity because, again, it's not just the cops
10   looking at them, there's other people trying to
11   rob them.
12            So when you get stories like --
13   overembellished story I'll say, where you have
14   police officers sitting so close to a location and
15   seeing activities, I'm not saying -- sometimes it
16   does happen but a lot of times it doesn't because
17   articulation's lying.  It's basically making the
18   reasonable suspicion turn into probable cause.
19            It's been done for years, I've
20   been taught that way, but again, it's hard to
21   prove because the credibility of the officer is
22   very high.  So in most of these cases when you
23   see -- I take that back.  In some of the cases
24   that you see where you have multiple locations,

Page 89

1    defendants, you got to look at the time period.
2    You got to look at how many days it is.
3                   You're talking about a four,
4    five house investigation taking three days, two
5    days? You're talking about a major drug
6    operation. I mean, it's a lot of storytelling in
7    that. It's a lie. You know, you look at it, a
8    proper investigation takes sometimes months. A
9    shorter investigation takes a week.
10                   You're telling me you told a
11   guy -- he went to five houses in one day? You
12   know, he went to the stash house -- you might get
13   a guy going to a stash house, if he's lucky enough
14   we might get him the first day or we might get him
15   the last day. You don't get him going every day.
16   It's just one of those things.
17        Q.   So are you saying that if the police
18   believed that there was narcotics dealing in
19   certain areas or properties by individuals and
20   they couldn't prove that then they would just --
21        A.   Just put it together.
22        Q.   -- articulate the facts?
23        A.   It start from the beginning. It
24   starts from articulation. I'll say this again.

Page 90

1    When you don't know how you did something, you got
2    to put a story together and then it grows. As
3    long as you be on the job it gets better and
4    better and you get better at it until it sounds
5    like the truth, to the point where when you do
6    tell the truth no one can tell the difference.
7         Q.   Was there a reason why you would hit
8    certain houses? Like say -- you mentioned the
9    stash house. Would there be a reason to do that?
10        A.   Yes, yeah, because you know there's
11   going to be drugs there, you're going -- it's
12   going to be money there, but it got to the point
13   where we --
14        Q.   When you say "we," who do you mean?
15        A.   Me and my squad members.
16        Q.   Okay. Go ahead.
17        A.   We're excluding the stash houses
18   because we were going in them. If something was
19   found worthy of reporting we will actually do a
20   secondary warrant. That means a warrant is done
21   after the warrant that you do.
22                   If it was something -- in my
23   case what I was arrested on I wanted to exclude
24   it, because when the guy got out of jail the only

Page 91

1    thing he know is someone told on him, set him up,
2    and then they robbed him. The last thing in their
3    mind is thinking that the police came in their
4    house and took their stuff.
5         Q.   Okay. Let me just clarify it. When
6    you say excluding, what do you mean? Excluding
7    from what?
8         A.   From anyone knowing but you.
9         Q.   From paperwork?
10        A.   Even if it's paperwork, defendants
11   you're locking up, anybody to know that you went
12   in this house and took something, but if you
13   decided to take something and you seen something
14   in there worthy of reporting you just basically do
15   another warrant and you put together a story how
16   you got there.
17        Q.   And Jeffrey, in your particular case
18   when you were arrested, am I correct that you took
19   a key off the individual you stopped, his house
20   key, and then went into the house?
21        A.   Yes.
22        Q.   Did you ever do that prior to your
23   arrest?
24        A.   Yes.

Page 92

1         Q.   Often or --
2         A.   I did it.
3         Q.   Any other squad members do that?
4         A.   Yes. Members of my squad. I observed
5    a supervisor, that would be Joe McCloskey, give
6    keys to either Brian Reynolds, Mike Spicer, Perry
7    Betts, sometimes they all be in a group, give them
8    the keys and they go check the houses, then
9    they'll come back.
10                   We're never going back to
11   the -- we'll never go to those houses. Sometimes
12   we do go to those houses. That means I give you
13   the keys. Go check them houses out. You come
14   back, nothing's worth taking or whatever the
15   situation is, that house is excluded. Well,
16   sarge, get over here, we got something over there,
17   and we'll all go over there and secure that house.
18        Q.   So in other words, are you saying that
19   you would go into those houses before there was a
20   search warrant approved and executed?
21        A.   Yes. Sometimes we call it securing,
22   where we will actually wait out front and the guy
23   come out, we stop them either in front of the
24   house or we stop them around the corner, and we

23  (Pages 89 to 92)

Case 2:14-cv-01643-RBS   Document 61-9   Filed 06/29/22   Page 26 of 159

McIntyre v. Liciardello, et al./Torain v. The City of Phila., et al.                    JEFFREY WALKER, 9/15/16

Page 93

1    will just go into the house, and then whoever is
2    in charge, a lot of the times it's Tommy
3    Liciardello, will actually call the sergeant and
4    then the sergeant will do his own famous words of
5    what are you doing there, call the lieutenant.
6              And eventually everyone will be
7    there and me or Norman would be the designated to
8    stay at the location while Tommy Liciardello or
9    whoever is the affiant of the warrant would go and
10   do the warrant at the headquarters.
11        Q.   What was the reason to go into that
12   house before you actually executed a warrant?
13        A.   Stealing.
14        Q.   Steal what?
15        A.   Money, and in some cases I found -- I
16   was introduced by Norman to steal drugs, steal the
17   drugs and re-sell it to his family members.
18        Q.   Okay. Could you be a little bit more
19   detailed about that. What do you mean?
20        A.   Well, while we were stealing, it means
21   Thomas Liciardello, Brian Reynolds, Mike Spicer,
22   Perry Betts, John Speiser, occasionally Norman --
23   because he was the one out of the group a lot they
24   didn't -- they feared Norman but they respected

Page 94

1    him. I found out he was stealing drugs.
2              He brought me into that group,
3    because once the group got divided because they
4    wanted to leave me and Norman out of it, a lot of
5    stuff, they were going to start really getting a
6    lot of money, we decided to -- or I decided with
7    him to start stealing drugs, so he brought me into
8    his group. That's where I got the drugs from when
9    I got arrested was his family member, where he
10   introduced me to them, but he made it very clear
11   to me to not bring no heat to his family.
12        Q.   What was the biggest job you ever did
13   with regards to stealing drugs and who were you
14   with?
15        A.   Linwood Norman, the four brick job,
16   the four kilos of cocaine.
17        Q.   Did you get any of those drugs?
18        A.   Yes, I did.
19        Q.   How much did you get?
20        A.   A kilo of cocaine.
21        Q.   Do you know if Officer Norman got any
22   of those?
23        A.   I believe so because -- I'm going to
24   explain the job was he came to my house, discussed

Page 95

1    he had a job. When it was time to do the job I
2    had four bricks. The plan was the guy that was
3    targeting gets one, I get one, he get one, his
4    family member get one.
5              The plan went right until he
6    came to me later and said his family member ripped
7    him off out of a brick, which I didn't believe
8    that at all because I know how Linwood Norman is.
9    He wasn't a guy that actually you can just take
10   something from, especially if he did something
11   like this. So I didn't give him any money of what
12   I had.
13              When I was going to call
14   another source that I had that I was dealing with
15   other drug dealers, I called him when I had my
16   brick repeatedly. Norman told me don't deal with
17   him, deal with us. So he did not get what I had,
18   and this was all prior to after having the bricks
19   that I had. I had control of the four bricks.
20              When the guy was arrested he
21   made sure he got one, I got mine, and I held onto
22   three bricks, but when I got off of work
23   everything was given -- after I made my phone
24   calls and he said don't mess with them, they were

Page 96

1    his folks, I said okay. We met out in the park.
2    I never saw his folks. He came down with I
3    believe $17,000, somewhere around that, gave me my
4    money and I gave him three bricks.
5              He came back to me a day later
6    or so and came with his concocted story that his
7    family ripped him off out of his brick, which I
8    had -- could have told me something else other
9    than that. I know that wasn't true at all, and I
10   wasn't about to give him none of my money.
11        Q.   Jeff, something I didn't ask before,
12   and again, I'm going to ask you to approximate.
13   Over the years, the squad itself, could you
14   estimate how much money was stolen, not counting
15   drugs, just money?
16        A.   They say about 500,000, but it was way
17   more than that.
18        Q.   Would you say millions?
19        A.   I wouldn't go and say millions. I
20   would say over a million.
21        Q.   And do you know if any of the members
22   of your squad would steal drugs for their own
23   personal use?
24        A.   Well, I know people had issues. Like

Page 97

1    Palmer had an issue with pills. He used to go
2    with a bag and make a phone call to his wife or
3    whoever was on the phone discussing what he was
4    going to take out of the house. I know he was
5    talking to a Judge Fleisher. She was a pill head,
6    too.
7              MR. KRASNER: Palmer's first
8        name?
9              THE WITNESS: Lewis Palmer.
10   And the judge was Fleisher. She was a pill
11   head, too.
12             I knew of other officers that
13   had drinking issues, but I was very
14   surprised when I found out later people were
15   doing coke in there and Perry was smoking
16   weed. That was very supervising to me, that
17   he would be smoking weed, but I knew
18   every -- we were heavy drunks, and we drank
19   like a fish all day long.
20   BY MR. PILEGGI:
21       Q.   Okay. Now, I got off track a little
22   bit. Let's get to the specifics of this case.
23             In this case there was, and I'm
24   referring to the Torain case, there was some

Page 98

1    information provided that there was a -- two
2    individuals, Al and Pud, who were operating a
3    narcotics network out of three properties.
4        A.   See, this is the part that I vaguely
5    remember, but I know we were doing it as an
6    investigation out of a group of individuals.
7    Again, I wasn't the head investigator. The only
8    thing I can recall is my part in the investigation
9    as far as one of the locations and that's all I
10   can tell you.
11             I can also tell you that when
12   it was time to do the warrants I frequented a lot
13   of these locations but when the -- on the
14   executing of the search warrant of a number of
15   houses that was involved. That's all I can
16   remember is that.
17       Q.   All right. Let me just tell you
18   basically the facts of the -- I think probably the
19   quickest way to do this, the facts as recorded in
20   the police reports and then you tell me your role.
21   Okay?
22       A.   Okay.
23       Q.   All right. They get a source of
24   information. The police go out, Monaghan,

Page 99

1    Reynolds, yourself, and Kelly, Officer Kelly,
2    badge number 7126, go out, set up surveillance.
3    Allegedly there was some observations of
4    individuals engaged in narcotic activity. Do you
5    recall that?
6        A.   I believe I recall the investigation.
7        Q.   Okay. And in fact, there was a report
8    that there was a videotape made of some of these
9    narcotic activities by Officers Monaghan and
10   Kelly?
11       A.   I'm aware of that but I never saw a
12   videotape. Not to say there wasn't a videotape, I
13   never -- I'm aware of conversation of a videotape
14   I don't know between court or during the
15   investigation, but I'm aware of a videotape.
16       Q.   Now, at some point you're assigned by
17   Officer Monaghan to follow my client, Kareem
18   Torain, who is driving a Pontiac Bonneville, a
19   green Pontiac Bonneville.
20       A.   Yes.
21       Q.   Do you recall that?
22       A.   Yes.
23       Q.   All right. You followed him to 1621
24   Conestoga Street. Do you recall that?

Page 100

1        A.   I don't recall that.
2        Q.   Okay.
3        A.   Not to say it didn't happen, but I
4    only remember going to 55th Street.
5        Q.   Okay. All right. I'll get to that.
6              From -- again, according to the
7    police report, from Conestoga Street you followed
8    him to 55th Street, North 55th Street. Do you
9    recall that?
10       A.   Yes.
11       Q.   Okay. And specifically the address is
12   1628 North 55th Street.
13             From there you set up
14   surveillance. You saw him enter the premises and,
15   according to the police report, you saw a light go
16   on in that building that you believed he was in.
17       A.   That's what I -- that's what I said,
18   yes.
19       Q.   Okay. You then saw three individuals
20   enter that same building and about 20 minutes
21   later come out again. As reported in the police
22   reports and your testimony, you stated that you
23   saw one of the individuals hand a golf ball size
24   what you believed to be narcotics to put in his

Case 2:14-cv-01643-RBS    Document 61-9    Filed 06/29/22    Page 28 of 159

McIntyre v. Liciardello, et al./Torain v. The City of Phila., et al.                    JEFFREY WALKER, 9/15/16

Page 101

1  jacket or something like that.
2      A.   That's correct.
3      Q.   Do you recall that?
4      A.   Yes, I believe I said that.
5      Q.   Okay. Those individuals leave. They
6  were never stopped. About 20 minutes later my
7  client leaves. You radio to Officer Reynolds to
8  stop that individual. Do you recall that?
9      A.   I recall him leaving and I recall him
10  being stopped.
11      Q.   Okay. But just so we're clear, you
12  weren't at the stop, correct?
13      A.   No, I was not.
14      Q.   Okay. But you do recall, am I
15  correct, that he was arrested -- my client was
16  arrested when he was stopped?
17      A.   Yes.
18      Q.   Do you recall if any contraband were
19  confiscated from him at that time?
20      A.   No drugs. He had personal items,
21  money.
22      Q.   How much money, do you know?
23      A.   I don't know. He had money and keys.
24  That's all I can remember.

Page 102

1      Q.   Okay. At some point were you aware
2  that Officer Monaghan and Officer Kelly went back
3  to the 1628 North 55th Street and entered the
4  premises without a warrant with a set of keys that
5  were taken off my client?
6      A.   Yes.
7      Q.   Okay. First of all, was that pursuant
8  to policy? I mean, were they allowed to enter
9  that premises with the keys?
10      A.   In the way that was stopped? No, that
11  was against policy. Securing of a house is based
12  on preventing destruction of evidence. He was
13  stopped from that location. The officers were
14  with him. If they had any -- believed that drugs
15  were being destroyed at a location they could have
16  easily put an officer at the location to sit and
17  wait until they seen any additional activities,
18  someone coming from a house carrying a bag or --
19          Again, if I said I believed the
20  light was on, the light -- someone had come to the
21  location, the light pops on and a guy quickly
22  exits out with a bag, then I would have stopped
23  him and then I would have informed the supervisor
24  and the backup officers I had to stop the guy

Page 103

1  running out of the house, and I would have
2  immediately had him secured and I would have went
3  into the house with backup officers. That's the
4  proper way to secure a house.
5          Exigent circumstances has to be
6  there. Just because you stop somebody far from a
7  location doesn't -- you don't have to go back to
8  his location and secure a property to gather any
9  additional evidence. That's what we were doing
10  constantly, and it was -- nothing was spoken on
11  it.
12      Q.   Now, just so we're clear, did you
13  observe at any time my client engage in any
14  criminal activity?
15      A.   No.
16      Q.   And -- all right. So at some point
17  the case goes to trial, right?
18      A.   Yes.
19      Q.   And you provide testimony.
20      A.   Yes, I do.
21      Q.   Did you have any discussions with any
22  of the officers that were involved in that job
23  with regards to what your testimony would be and
24  why?

Page 104

1      A.   Yes, I had a discussion with Monaghan.
2          To go back to when they were
3  stopped, I remembered all the houses -- search
4  warrants were prepared for the houses. This house
5  was not in the loop, and I mean not in the loop
6  was not mentioned in the Affidavit of Probable
7  Cause when they got the execution of the warrant.
8  This came on the day of the warrant when he was
9  stopped. Again, I don't recall exactly what was
10  taken from him. I know they needed to go back to
11  the house.
12          Once they ascertained where he
13  came from, Monaghan needed me to say he seen a
14  light come on, because that ties a knot from the
15  street to the room. Also I had to articulate the
16  drug activity coming from the house with the
17  bundle.
18          A golf ball size object relates
19  to drug activity, that's another knot, males
20  coming out of the house that were seen prior doing
21  some type of activity while I was in observation
22  of that, these are the two main things they needed
23  for me to do to actually obtain the search warrant
24  for the location after they had gone in there.

26 (Pages 101 to 104)

McIntyre v. Liciardello, et al./Torain v. The City of Phila., et al.                    JEFFREY WALKER, 9/15/16

Page 105

1    Q.   So essentially, your role in this was
2  to perpetrate this probable cause so that you
3  could substantiate the arrest of Mr. Torain.
4    A.   Yes.
5    Q.   Were you aware that there was a search
6  warrant obtained and executed after the police
7  actually searched that day, after he was arrested?
8    A.   Yes.
9    Q.   Okay.  Do you know why?
10   A.   Why?  We went to the location,
11  obviously, for what we're known to do, steal.
12   Q.   Well, why do you say that's obvious?
13   A.   Because we went to the location
14  immediately after they stopped him without any
15  type of exigent circumstances.
16   Q.   So are you referring to when they went
17  back with the key?
18   A.   Yes.  There's no need to go to a
19  location with exigent circumstances.  You just put
20  somebody out front.  You're going to do a warrant,
21  man, just sit out front to see if you see
22  anything.  Let us know.  If somebody come out,
23  just run up in there and let us know you were in
24  there.  That's it.

Page 106

1    Q.   So just so I'm clear with this, so no
2  one on your squad saw Mr. Torain engage in any
3  criminal activity at any time.
4    A.   See, I can't say no one seen him.  I
5  know I didn't see him engage in any criminal
6  activity from my observations.  I see a man going
7  into a house.  I see a man come out of a house.  I
8  just know he was arrested.  I know they went back
9  there.  That's all I can tell you.
10   Q.   Now, were you aware that there was
11  actually a property receipt for the period of time
12  right after his arrest?  He was arrested
13  approximately 3 p.m., after you saw him leave, by
14  Officer Reynolds.
15         Were you aware that when
16  Officer Monaghan and Kelly went back to the unit
17  at about 3:30 and used the key that they actually
18  went in and seized items out of that house?
19   A.   Yes, I'm aware of that.
20   Q.   And they seized a safe and an empty
21  pill bottle with nothing -- containing nothing it
22  in.
23   A.   I'm aware that things were placed on
24  the property receipts prior to doing a warrant

Page 107

1  based on how the property receipt was prepared at
2  the time it was prepared.
3         Again, when we do a job we come
4  in, we do a summary sheet.  The summary sheet goes
5  to who was arrested, the location where it was
6  taken from them.  That's put in a summary sheet.
7  It's handwritten.  Next to the items that you
8  record you put the property receipt with numbers
9  right after that, specific numbers, specific
10  items, the date and time.
11         Once you overlook it and make
12  sure it's right you actually photocopy it and give
13  it to the members of the unit, because you have to
14  remember that we had other properties at the time
15  we were executing the search and seizure warrant.
16         So if a guy is the affiant he's
17  going to start at the beginning to prepare his
18  paperwork.  He's not going to wait until the end
19  of the night to do this, he's going to wait to the
20  chance -- the best chance he gets.  So being as
21  though we already had a house secured, we still
22  had houses before that that you had to start
23  processing the paperwork for.
24         So that starts in with the

Page 108

1  summary sheet, the handwritten summary sheets.
2  So, again, when it goes into the person arrested,
3  items taken from them, it's written down, you go
4  to the supervisor, he hands you the property
5  receipts or he hands you the property receipt book
6  with the property receipts, and your job as an
7  assigned -- or you go designate somebody to take
8  those property receipts and record them on the
9  paper next to the items taken.
10         Now, I'm aware in this job that
11  items from me looking at the property receipt
12  clearly shows that the items were taken prior to
13  the warrant.  Now we go into this.  If you made a
14  mistake you have to, because, again, you're
15  entering the property receipts in the computer,
16  you have to rectify the mistake.
17         You got to contact the evidence
18  and have them delete it and re-enter it under the
19  date and then you can make your corrections
20  because it's already corrected.  If it's
21  questioned, if you say you made a mistake, you can
22  always go back to the evidence and get a copy or
23  you can print it out yourself by -- I think, if I
24  remember, P -- you can bring up the property

27  (Pages 105 to 108)

Case 2:14-cv-01643-RBS   Document 61-9   Filed 06/29/22   Page 30 of 159

McIntyre v. Liciardello, et al./Torain v. The City of Phila., et al.                    JEFFREY WALKER, 9/15/16

Page 109

1    receipt using a code and you can actually see when
2    the property receipt number was entered, and you
3    can use that as evidence to show that you made a
4    mistake writing the location -- not the location
5    but the date and the time on the property receipt.
6           If you're making that mistake
7    that's one way to clearly say listen, I made -- I
8    clearly made a mistake on this. I'm going to give
9    you the printout of the property receipt when it
10   was entered, the date and time, that has to be
11   corrected, and that basically shows listen, I made
12   a mistake, I didn't correct it on the property
13   receipt, and that's a mistake.
14          Q.   Jeff, let's do this. I'm going to
15   show you some -- let's look at the property
16   receipts, and there's two properties receipts
17   actually in this case -- well, there's more than
18   two, but two that actually cover what was
19   confiscated, and I want you to explain what you're
20   referring to?
21          MR. PILEGGI: And let me just
22       give copies to everyone.
23          Let me just mark these Walker-3
24       and 4.

Page 110

1           (Property Receipt No. 22508224
2    marked Plaintiff's Exhibit Walker-3 for
3    identification purposes.)
4                  - - -
5           (Property Receipt No. 2308223
6    marked Plaintiff's Exhibit Walker-4 for
7    identification purposes.)
8                  - - -
9           (Whereupon, a discussion was
10   held off the record.)
11                 - - -
12   BY MR. PILEGGI:
13          Q.   All right. Jeffrey, I'm showing --
14   let's start with 3, I'm showing you what's been
15   marked as Walker-3. Generally, what is that?
16          A.   It says at the top inside -- I can't
17   see it here.
18          Q.   Is that a property receipt?
19          A.   The property receipt -- that's
20   property receipt number 22 -- my eyes are bad,
21   22508224. It actually shows inside. The first
22   address is kind of deleted out because of the way
23   it was photographed, and it say 55th Street, and
24   then go into body of the property receipt it says

Page 111

1    evidence, 2 amber pill bottles with white caps and
2    one safe, Serenity (sic) safe. I think they also
3    got the model of the safe is 1150 and it says
4    safe.
5           Q.   What's the date and the time?
6           A.   The time is -- the date is 1 -- I
7    can't really see it clear, but it says 3:30 on
8    here. It's 1-4 -- I see the 4.
9           Q.   Okay.
10          A.   It says 3:30 on it.
11          Q.   All right. 3:30 is the time?
12          A.   Yes.
13          Q.   1-4 is the date --
14          A.   Yeah.
15          Q.   -- you just don't know the year?
16          A.   Yeah.
17          Q.   Okay. Now, is that the property
18   receipt --
19          A.   I'm sorry -- go ahead.
20          Q.   Is that the property receipt
21   describing the items that were seized when Officer
22   Monaghan and Kelly went over with the key?
23          A.   Yes, because the property receipt
24   clearly says in the circumstances above items was

Page 112

1    confiscated at the time of execution of warrant,
2    but again, the property receipt says the date and
3    the time at 3:30. So if you're reading this, you
4    are basically reading it and the interpretation is
5    the items were taken on 1/4/01 at 3:30, if I'm
6    reading what the circumstances says in the
7    property receipt.
8           Q.   We'll get to that.
9               Now, if you look at Walker-4,
10   that is also a property receipt, correct?
11          A.   Yes.
12          Q.   And what's the date and time on that?
13          A.   It's 1/5/01 and it's 1:00, I believe.
14   1:00.
15          Q.   A.m. or p.m.?
16          A.   A.m.
17          Q.   Now, does that cover the same items at
18   the same address that were confiscated the prior
19   day?
20          A.   This is -- this says the date after.
21   Three ripped clear plastic bags which contained
22   alleged crack cocaine.
23          Q.   Anything else on that property
24   receipt?

                                    28  (Pages 109 to 112)

Page 113

1    A.  You're talking about alleged crack
2  cocaine, approximately -- they got abbreviations
3  in this, approximately of all three clear baggies
4  are 17 grams.  Then they go into the
5  circumstances, on 1/5/01 at approximately
6  1:00 a.m. the above item were confiscated from
7  above locations after narcotics -- narcotics is
8  abbreviated again -- execute search and seizure
9  warrant 99028.
10    Q.  Okay.  Now --
11        MR. PILEGGI:  All right.  Let
12  me have this marked as Walker-5.
13        - - -
14        (Search Warrant and related
15  documents marked Plaintiff's Exhibit
16  Walker-5 for identification purposes.)
17        - - -
18  BY MR. PILEGGI:
19    Q.  All right.  Officer, I want to -- I'm
20  sorry, Jeff, I want to show you what's been marked
21  as Walker-5.
22    A.  Yes.
23    Q.  Do you know what that is?
24    A.  This is a copy of a search warrant,

Page 114

1  the affidavit part -- not the affidavit, but
2  actually the face of the search warrant.
3    Q.  Okay.  And there's other documents
4  attached to that.  Is that the affidavit?
5    A.  Yes, this would be the affidavit.
6    Q.  Okay.  And that's describing the
7  circumstances giving rise to the probable cause to
8  even search, correct?
9    A.  Yes.
10    Q.  All right.  Now, first of all, can you
11  tell the date from that search warrant?
12    A.  The search warrant was 1/4/01.
13    Q.  1/4/01, that's when it was approved or
14  that's --
15    A.  I'm looking right here.
16    Q.  -- when it was executed?
17    A.  I'm looking right here.  That's the
18  application of the date, 1 -- I believe -- no.  I
19  can't see that.  I don't know what that is.
20    Q.  All right.  Let me ask you this.
21    A.  Okay.  I got it.  I got it.
22    Q.  If you go to the middle of the search
23  warrant --
24    A.  Yeah.

Page 115

1    Q.  -- is there a date on there?  It says
2  result of search.  Do you see that?
3    A.  Yes, 1/5.
4    Q.  So that was on January 5th --
5    A.  Yes.
6    Q.  -- 2000?
7    A.  Yes, 2000.
8    Q.  First of all, this job was done in
9  2001, correct?
10    A.  Yes.
11    Q.  All right.  And underneath that does
12  it say what was confiscated?
13    A.  Yes.  Serenity fire safe, three clear
14  baggies containing 17 grams of cocaine -- I mean
15  crack, it says crack, two amber pill bottles with
16  white tops.
17    Q.  And it's signed by whom?
18    A.  The affiant at the bottom, Monaghan,
19  Police Officer Monaghan.
20    Q.  Okay.  Now --
21    A.  That would be Brian Monaghan.  I'll
22  give his first name.
23    Q.  Now, first of all, it's -- obviously
24  police executed this warrant the day after they

Page 116

1  seized items out of that house when they had the
2  key, correct?
3    A.  Yes.
4    Q.  All right.  And it appears at least
5  two of the items are the same items that they
6  confiscated the day before, the safe and the two
7  amber pill bottles, correct?
8    A.  Yes.
9    Q.  All right.  Obviously they have
10  additional narcotics, correct?  As seized that
11  day.
12    A.  I'm looking at the property receipts
13  and I'm looking at this, they're saying it would
14  be more narcotics than what they already have,
15  because if I'm looking at the property receipts
16  that you showed me before on 1/4 it shows -- let
17  me correct -- look at this stuff again.
18        I'm talking about the pill
19  bottle, the two amber pill bottles, on 1/4/01
20  confiscated at 3:30, and then I go to the search
21  warrant and it says two amber -- plastic pill
22  bottles, white top, and when you're looking at
23  that receipt it would be more pill bottles.  You
24  know what I mean?  Do you understand what I'm

Case 2:14-cv-01643-RBS    Document 61-9    Filed 06/29/22    Page 32 of 159

McIntyre v. Liciardello, et al./Torain v. The City of Phila., et al.                    JEFFREY WALKER, 9/15/16

Page 117

1    saying?
2          It would seem it shows more
3    things or something was confiscated prior to doing
4    the warrant, specifying that particular thing.
5          Q.    Let me ask you this. Is there
6    anything wrong with this warrant?
7          A.    There's a few things.
8          Q.    And the circumstances? Go ahead, why
9    don't you explain.
10          A.    There's a few things wrong with it.
11          One, the main thing, if you
12    stop someone and you already know who they are you
13    kind of want -- and you want to attach them to
14    location, you want to put their name as occupant
15    on the warrant to show some type of connection to
16    the warrant. If you do not know their name, you
17    can put description of the person and that goes in
18    with owner.
19          You always want to put the real
20    estate, the owner of the property, because you're
21    always questioning that, but if you have a target
22    and you know who the target is and the name, you
23    already stopped this person, you want to put them
24    on the warrant because you got connection to him

Page 118

1    to the location, because I seen him coming from
2    the location. That's what the affiant -- that's
3    what the -- what the story is in the affidavit.
4          Q.    Now, let me -- let me ask you a
5    question. In there it says name of owner, it
6    says -- I can't read it. It says something Wades,
7    Carl Wades and Vincent Saunders?
8          A.    Yes. That would be done out of a real
9    estate check from the computer.
10          Q.    All right. Do you know if they were
11    present when this search warrant was executed?
12          A.    I don't know.
13          Q.    Okay. On the side it says it looks
14    like Gessner, is that correct, and there's a badge
15    number there.
16          A.    That's the supervisor. She -- when
17    you get it like this on the side here -- when you
18    ask a supervisor for a warrant they normally will
19    sign a side of the form, but normally when they're
20    looking at it before they send it over they will
21    put it the side, too, approved by such and such.
22    They put it on the side of the face, top of the
23    warrant, or they put it in the -- they definitely
24    put it in the body at the bottom approved by

Page 119

1    Gessner, such and -- you know, normally.
2          Because when it goes -- it goes
3    to three people. The supervisor looks at it, it
4    goes to the charge unit, they look at it, and
5    finally it goes to either the municipal judge or
6    it goes to the Bail Commission, they look at. So
7    you got three chances of people looking at the
8    warrant prior to you executing the warrant.
9          Q.    Now, also it appears that this was
10    executed at 1 a.m. in the morning.
11          A.    Yes.
12          Q.    Is there anything unusual about that?
13          A.    The second problem you got is this --
14    and this is a major problem that I see, is if you
15    claiming that you secured the house you want to
16    have somebody already in the body already,
17    there's -- one or two people, in this part where
18    you supposed to fill out the officers at. Someone
19    got to be in there because you're saying you
20    secured that location. That's missing.
21          And the final thing is the
22    supervisor, the witness, who is supposed to sign
23    the warrant, the witness you collecting the
24    evidence, ain't even signed on it.

Page 120

1          So when these issues come up --
2    so you understand what a warrant is, the
3    supervisor views everything. Everything goes up.
4    It goes -- eventually the warrant goes to the
5    Integrity Control Board. They look and sometimes
6    they see issues with these warrants, they'll send
7    them back down and say this ain't signed or
8    something going on.
9          The reason why I know that
10    because happened to me before. I witnessed it
11    happened to other officers. Someone forgets to
12    sign something, not too much of the badge numbers,
13    but like if the supervisor forgets to sign
14    something or something's not right with this
15    warrant, they look at it and they send it back
16    down and correct it.
17          You know, they deal with
18    property receipts, too, but that normally comes
19    from -- if it's drug issues on a property receipt
20    that comes from the chem lab, but someone normally
21    catches the mistake, if it is a mistake,
22    especially when you're dealing with affidavits,
23    which is very important, you have people who look
24    at the stuff and they'll send it back down if it

30  (Pages 117 to 120)

Case 2:14-cv-01643-RBS    Document 61-9    Filed 06/29/22    Page 33 of 159

McIntyre v. Liciardello, et al./Torain v. The City of Phila., et al.                    JEFFREY WALKER, 9/15/16

Page 121

1    ain't right, and something like this, as far as
2    the supervisor not signing it, and I don't know if
3    they'd get into the affidavit part of reading the
4    probable cause.
5            If I'm looking at this I'll
6    say, okay, they confiscated some stuff. This is
7    the witness officer that confiscated but the
8    supervisor's name is missing, but if I read the
9    affidavit it showed I'm securing the location, I'm
10   going to get more into it, I'm going to say, well,
11   where is the officer's name in the -- as the
12   searching and securing of the property, where is
13   that, and that's where I would see the issues at.
14           But again, I couldn't tell you
15   on this one why it's not in there, it should be in
16   there, and that's what I'm saying.
17       Q.   Jeff, generally speaking, do you think
18   there was anything done illegally in this job?
19       A.   Yeah. They went to the house before
20   the warrant and -- what I do. That's because I
21   did it.
22       Q.   What did you do?
23       A.   I basically fabricated to strengthen
24   the warrant of probable cause for me going to the

Page 122

1    house, knowingly from the -- giving the
2    information to the affiant who we had a
3    discussion, and that was based on them going to a
4    location which they believed they had probable
5    cause to secure a house without a warrant, and
6    there is no exigent circumstances in this
7    situation.
8        Q.   So is it your testimony that you
9    actually fabricated information in this case in
10   order to make -- in order to prosecute my client?
11       A.   Yes.
12       Q.   Okay. Do you know if the other
13   officers were aware that you fabricated
14   information?
15       A.   Yes. The most important person was
16   the affiant.
17       Q.   Which was who?
18       A.   Police Officer Brian Monaghan.
19       Q.   Do you know if Officer Reynolds had
20   any involvement in the fabrication of information
21   in this case?
22       A.   I believe we had a discussion on --
23   again, it's the second not tying someone coming
24   out of the location, the second not being tied to

Page 123

1    someone coming out of the location with drugs,
2    okay, the golf ball size object. That clearly
3    strengthens it even more besides the light coming
4    on in the property and now saying I think I
5    believe -- I remember that I did question 3:00 in
6    the afternoon.
7            That means after 3 in the
8    afternoon it was still daylight, and I remember
9    questioning that, if they're going to believe
10   that, because normally -- in the afternoon
11   normally probably you don't click no lights on if
12   the window's up for me to even see into the
13   property. You know what I mean?
14           So common -- again, the only
15   person being fooled was the person believing the
16   story and that's the person who was approving the
17   warrant and the person who is sitting across the
18   table, you know what I mean, putting the job on,
19   and that would be the DA in this situation.
20   That's how blank some of our lives were.
21           Again, go back to the drugs
22   coming out of the location. Again, you had to
23   have it stronger for -- to believe some type of
24   criminal activity is being done at a house,

Page 124

1    someone coming out of a house with drugs, and then
2    place them into their -- into their jacket or
3    pocket and then proceed to get into their cars and
4    leave the location. That makes it more believable
5    that something is going on at these houses.
6        Q.   Were you aware that this was a rooming
7    house occupied by many individuals?
8        A.   Yes, it was. Yes, I was. Not at the
9    time we walked in it, no.
10       Q.   Did you ever visit that location after
11   the arrest but before your testimony?
12       A.   Yes, I did.
13       Q.   Why?
14       A.   Eventually I went to the location and
15   Monaghan was there and that's when the discussion
16   came about, because they was there before I was
17   there. Eventually the whole squad was there, but
18   no one stayed there.
19           I can't recall if anything was
20   taken out of there that I would tell you right
21   now, but I know looking at the property receipt
22   something was taken out of there, and it wouldn't
23   be the first time we done things like this
24   especially with the supervisors, current

31 (Pages 121 to 124)

McIntyre v. Liciardello, et al./Torain v. The City of Phila., et al.                JEFFREY WALKER, 9/15/16

---

Page 125

1    supervisors that I was using with this squad,
2    where we went into a location, beat a guy up, took
3    all his stuff out of the house, did the property
4    receipts, don't put a time on there, don't enter
5    them, wait until that warrant come back, wait a
6    little bit, then put the time on the property
7    receipt and then enter it, and we had to actually
8    go back and leave the blue copy. I had did that
9    with two supervisors, and that would be Lieutenant
10   Otto and Sergeant Joe McCloskey.
11               So it was very common for us to
12   do these things. So when I say to you what I was
13   known to do and it was custom and practices, I did
14   a lot of things with supervisors, and I felt there
15   was nothing wrong with that because we were doing
16   them, too.
17       Q.   In retrospect today, do you believe
18   that it was -- what you did was wrong with regards
19   to the violations of policies or laws?
20       A.   Listen, after sitting in a cell for 28
21   months you kind of realize a whole lot of things,
22   you know what I mean, but I came to the conclusion
23   that I was out of my damn mind doing a lot of this
24   shit.

---

Page 126

1        Q.   Jeff, you testified previously that
2    you were taught this. Did anyone -- do you recall
3    anyone specifically teaching you this, or was it
4    more the atmosphere? Give us a little detail as
5    to how you came about being able to fabricate and
6    steal.
7        A.   Again, everything starts with patrol,
8    lying, stopping people, trying to fill in the
9    blanks. Older cops tell you this stuff. People
10   say it all the time and no one believes it. It
11   happens. It's a -- it's a world that it's like
12   taboo.
13               Some people will go and be
14   lying but they won't steal. I mean, it all
15   depends on how far you want to go with it. You be
16   around long enough you're going to steal. But it
17   starts with coming on the job. It's the
18   atmosphere. Stealing comes when you take the
19   choice.
20               Everything I've done I made a
21   choice to do, but the choice was available for me
22   to do. That's all I'm saying. It was available
23   for me.
24       MR. PILEGGI: I want to just

---

Page 127

1    wrap up this as far as my individual case,
2    but I do want to mark for the record the
3    investigation report, 6.
4               - - -
5               (Investigation Report marked
6    Plaintiff's Exhibit Walker-6 for
7    identification purposes.)
8               - - -
9               MR. KRASNER: Off the record.
10              - - -
11              (Whereupon, a discussion was
12   held off the record.)
13              - - -
14   BY MR. PILEGGI:
15       Q.   All right. Jeffrey, I'm showing you
16   what's been marked as Walker-6 for identification.
17   What is that?
18       A.   It's the 49.
19       Q.   You've got to describe that. What
20   does that mean?
21       A.   The 49 is an investigation report.
22   It's actually gives more detail of events that
23   happened during the investigation --
24       Q.   Okay.

---

Page 128

1        A.   -- detail of facts, and it mentioned
2    the defendants who are arrested, the addresses,
3    and it goes into actually the detailed events that
4    happened into your investigation.
5        Q.   All right. By the way, Jeffrey, I'm
6    sorry, and I did miss this, back on Walker-3 and
7    4, the two property receipts, it appears that one
8    of the property receipts is signed off by Sergeant
9    Gessner and that is the one that's dated on the
10   5th, the day that the warrant was executed. Do
11   you see that?
12       A.   That would be -- yes.
13       Q.   Okay. And then the other one, which
14   was dated the day before on the 4th with the
15   items of the two amber pill bottles and the safe,
16   was signed off by Corporal Sinclair?
17       A.   Yes.
18       Q.   Why is that?
19       A.   You're asking my opinion?
20       Q.   Yes. I mean, unless if you have -- if
21   you don't have personal knowledge and you're going
22   to give us your opinion, just make sure it's
23   clear. Yes, I'm asking your opinion.
24       A.   Genie didn't want to be involved. It

---

                                    32  (Pages 125 to 128)

Page 129

1    was taken prior before and she felt comfortable
2    taking -- signing the warrant and signing the
3    property receipt for the drugs.
4        Q.    When you say Genie, who are you
5    referring to?
6        A.    Sergeant Gessner, because you got both
7    supervisors there in the same room.
8        Q.    So this is, again, your opinion.
9              Based on the paperwork and your
10   recollection of what occurred, your testimony, do
11   you believe that Mr. Torain was illegally arrested
12   and prosecuted?
13       A.    That's correct.
14       Q.    Now, Jeff, you did about three years
15   in jail?
16       A.    Yes.
17       Q.    He did 13.
18       A.    I know how he feel.
19       Q.    What do you think about that?
20       A.    It ain't good, but I know how he feel.
21       Q.    I'm sorry, what was --
22       A.    It ain't good, but I know how he
23   feels.  I did three little years, he did 13, and I
24   know what it took me through by being in an

Page 130

1    environment that I wasn't accustomed to being
2    involved with, being a target 24/7.
3              So I know how someone
4    sitting -- and I know I did it.  So I can imagine
5    someone sitting in jail for 13 years who didn't --
6    in his mind know he didn't do the things that
7    these people -- or I said or the people involved
8    with me said.  What goes through his mind, trying
9    to get home to his family -- I mean, put it this
10   way.  I can understand.
11       Q.    Okay.  Generally speaking, do you know
12   if anyone else is sitting in jail illegally --
13       A.    I don't know.
14       Q.    -- just because of either your actions
15   or the actions of your squad?
16       A.    As far as I know it's a possibility
17   they could be sitting in jail, but I couldn't tell
18   you right then and there, but it's -- I believe
19   things should be relooked at and decisions should
20   be made.  That's what I believe.
21             Because I can't remember every
22   job, but if I could see it I could recall from
23   just on the behavior because you're accustomed to
24   doing the exact same thing, the exact same

Page 131

1    articulation, misconduct of the informant on
2    levels where sometimes if I sent an informant to a
3    location and it's too hot for me to be in that
4    location I actually rely on the informant to give
5    me all the information of the purchase.
6              And the reason why you can sell
7    that is if you have a cop sitting across the
8    street allegedly watching something, knowing he
9    been in that area for so long it's impossible for
10   you to do this.  It's impossible, you know, and
11   these are how -- ways you can tell.
12             And when you go into like what
13   I did, and I worked with other squads, where an
14   informant was let out of the car, and even if
15   we're eyes on the informant, the informant would
16   disappear and we will call them on the cell phone
17   and they'll come back and we'll find them three,
18   four blocks down the line and get back into the
19   car.  Misconduct of an informant.  You're supposed
20   to watch the informant constantly.
21             When the informant gives you
22   information and you found out that informant gets
23   that -- obtained that information through criminal
24   activity, you're immediately supposed to release

Page 132

1    him because they have no more information to give
2    you.  We still keep them aboard.  The way you can
3    tell that is see how long the informant's been
4    there and how much information that informant
5    applied to you.
6              There's a limited amount of
7    information an informant can give you without
8    still being involved in criminal activity.  When
9    an informant runs out of information you can use
10   that informant as a purchaser.  That's it.  When
11   an informant is working for years and he's giving
12   you all these drug houses and situations like
13   that, he's doing -- he's buying drugs.  He's
14   continuing to buy drugs.
15             Once you know that you supposed
16   to deactivate him.  That's it.  They're not
17   reliable anymore.  You can't believe what they're
18   saying.  That's all.  I mean, that's it.  I mean,
19   we got informants we've used for years.
20             We got cars.  The City of
21   Philadelphia's paying for it.  They didn't know
22   that, car payments.  When you look at that
23   voucher -- look at the vouchers and it show
24   they're receiving information and doing buys.

Case 2:14-cv-01643-RBS   Document 61-9   Filed 06/29/22   Page 36 of 159

McIntyre v. Liciardello, et al./Torain v. The City of Phila., et al.                    JEFFREY WALKER, 9/15/16

Page 133

1   Just call the informant. Talk to them. You don't
2   have to believe me, talk to the informant. You
3   don't believe I been in the car by myself, talk to
4   the informant. They ain't cops. That's how you
5   can tell. I mean, it's the truth.
6          Pull an informant. He'll be --
7   pull an informant. Pull them up. Walker been in
8   the car by hisself? Yes. Walker search you? No.
9   Have you ever met with a supervisor with -- the
10  informant, have you ever met with Walker and a
11  supervisor? No. Don't ask me, ask the informant,
12  that's all.
13         JUDGE DIAMOND: Excuse me for
14  interrupting.
15             - - -
16         (Whereupon, a discussion was
17  held off the record.)
18             - - -
19         THE WITNESS: When you look at
20  the voucher, and I said the officer was not
21  there and he signs a voucher, just look at
22  it and see what the officer was doing. At
23  the time I was doing a buy. Can't be in two
24  places at one time.

Page 134

1   BY MR. PILEGGI:
2      Q.   So Jeff, let me just -- so I think,
3   correct me if I'm wrong, you're obviously
4   discussing confidential informants, correct?
5      A.   Just talking the vouchers and
6   confidential informants.
7      Q.   And when you say -- you mention the
8   vouchers you go to remember --
9      A.   These things.
10     Q.   -- not everybody knows what you're
11  talking about?
12     A.   Okay.
13     Q.   When you have a confidential informant
14  accompanying any buy that they make, that you're
15  steering them to a certain buy, you have to have a
16  voucher, correct?
17     A.   Yes. That's a payment, service.
18     Q.   And that voucher has the confidential
19  informant's number to keep their anonymity,
20  correct?
21     A.   Yes.
22     Q.   And on the voucher -- is the voucher
23  written out or is it typed?
24     A.   It's supposed to be written out. We

Page 135

1   were to the point where we were typing them
2   because we were doing what we wanted to do.
3      Q.   Okay, well, wait. Why do they have to
4   be written out as opposed to typed?
5      A.   Because it's like a receipt. If I
6   take you to a location, you do a buy, I write it
7   out after the buy in front of you. You review it,
8   you know what you bought, and you sign.
9      Q.   So you're saying if it's typed out --
10     A.   If it's typed you're signing a blank
11  piece of paper.
12     Q.   Okay. It's just not done
13  simultaneously, correct?
14     A.   Repeat that.
15     Q.   It's not done simultaneously. In
16  other words, you're supposed to write it out at
17  the time so you can put down when the buy was
18  made, where the buy was made --
19     A.   Yes. You're supposed to write all the
20  stuff down.
21     Q.   Okay.
22     A.   You're supposed to write it down.
23  It's a receipt. No one's going to sign a blank
24  piece of paper.

Page 136

1      Q.   And then where do they get paid, at
2   the scene?
3      A.   Yes, you can pay them at the scene.
4   Not at -- when I'm saying the scene I'm not saying
5   if a guy bought it here you're paying them here,
6   I'm saying in the area.
7      Q.   On the street.
8      A.   Or on the street.
9      Q.   Okay. Does a supervisor have to be
10  there when the CI is -- either makes a buy or paid
11  or --
12     A.   Yeah, and that's -- that's a gray
13  area. He doesn't have to be physically -- yes, he
14  be in the area. He don't have to physically be
15  there watching and all that other stuff, and we're
16  getting into a gray area for paying. Some
17  supervisors say I want to be there when you pay
18  him, some supervisors say I want to be in the area
19  that you pay them.
20         Just like when you meet up
21  doing checks with them, quarterly checks with
22  them. A supervisor has to be there with you when
23  you check with them. They want -- sometimes they
24  get out the car, tell you to get out the car, and

McIntyre v. Liciardello, et al./Torain v. The City of Phila., et al.          JEFFREY WALKER, 9/15/16

Page 137

1    the supervisor get in the car with the informant
2    and they'll be talking to him.  What they talking
3    about, I don't know.
4         Q.    So -- but it's clear that a supervisor
5    has to be aware that you're using a CI for a
6    certain buy in a certain area, correct?
7         A.    Yes.
8         Q.    Does that have to be approved by the
9    supervisor?
10        A.    Yes.
11        Q.    Okay.  Does there have to be more than
12   one officer dealing with that particular
13   transaction?
14        A.    What do you mean -- there needs to be
15   two officers with an informant, two.
16        Q.    Why?
17        A.    Again, to safeguard the cop and the
18   CI.  It's policy.
19        Q.    Okay.
20        A.    If you have a female CI, you can't
21   take a female, which I've been known to do, by
22   yourself.
23             MR. KRASNER:  Off the record.
24             MR. PILEGGI:  Let's take a

Page 138

1    break.
2                  - - -
3             (Whereupon, a luncheon recess
4    was taken, after which time the deposition
5    resumed.)
6                  - - -
7             MR. PILEGGI:  Back on the
8    record.
9    BY MR. PILEGGI:
10        Q.    Okay.  Jeffrey, something I neglected
11   to ask in the very beginning was whether you would
12   prefer to read and sign, which -- which let me
13   just explain how that works.  You would have 30
14   days to look the deposition over and make any
15   corrections that you need to make.  If there's no
16   corrections made then the court reporter will then
17   go ahead and certify it and --
18        A.    Yes.
19        Q.    Or the other option is no read and
20   sign and you don't get an opportunity to do that.
21   What would you prefer?
22        A.    I can read and sign.
23        Q.    Okay.  Now, I want to switch gears a
24   little bit.  I don't think there's any secret.  We

Page 139

1    have a little bit of a history, correct?
2         A.    Yes, we do.
3         Q.    Okay.  Do you want to explain what
4    that history is.
5         A.    In the early part of 2000 we were
6    being sued.  We had a number of suits against us.
7         Q.    When you say "us," who are you
8    referring to?
9         A.    My squad.  It would be Police Officer
10   Reynolds, Police Officer Thomas Liciardello and
11   myself, Police Officer Reggie Graham.  That's all
12   I can remember right now.  That's the main people.
13   We were being sued in a civil action against -- by
14   you of individuals that we arrested.
15        Q.    Well, let me just make this clear.  I
16   didn't sue you personally, I was suing on behalf
17   of individuals?
18        A.    You were suing on behalf of
19   individuals that we were arresting.
20        Q.    Okay.  Do you remember what -- well,
21   first of all, what was the first lawsuit that you
22   recall?
23        A.    I believe it was Dupriest, maybe the
24   Samuel Dupriest case.

Page 140

1         Q.    Do you recall what year that was?
2         A.    No, I don't.  I don't know exactly
3    what year that was.
4         Q.    Does 2001 refresh your recollection?
5         A.    Somewhere around there.  I know it was
6    the early part of 2000.
7         Q.    And the allegations in those cases or
8    that case was that you violated Mr. Dupriest's
9    civil rights as an unlawful arrest and false
10   imprisonment, as well as malicious prosecution.
11   Do you recall that?
12        A.    Yes.
13        Q.    Some of the same similar allegations
14   that are in the over 200 cases that are presently
15   pending in this court.
16        A.    Yes.
17        Q.    All right.  Were there other cases
18   that followed the Samuel Dupriest case that I
19   filed on behalf of other clients?
20        A.    Yes.  Another one was the Randalls and
21   the Blaylock.
22        Q.    Okay.  When you say the Randalls, was
23   it a -- you say it with an S, plural.  Was it a
24   group of Randalls?

35  (Pages 137 to 140)

Page 141

1        A.    I know -- I don't know how many it was
2    but I know it was at least one.
3        Q.    Okay. Am I correct that there was
4    probably close to 20 cases in all prior to your
5    arrest where I sued on behalf of clients?
6        A.    Yes.
7        Q.    Okay. And that stemmed back to
8    approximately 2001?
9        A.    Somewhere around that.
10       Q.    They all were -- in the same vein,
11   civil rights violations --
12       A.    Civil rights.
13       Q.    -- for unlawful arrest, excessive
14   force. Do you remember any cases that I filed --
15       A.    Yes.
16       Q.    -- where there was allegations that
17   you or your squad beat people up --
18       A.    Yes.
19       Q.    -- during the arrest, prior to the
20   arrest?
21       A.    Yes, prior to the arrest and during.
22       Q.    And by the way, did that happen often
23   in your years in the narcotics squad?
24       A.    Yes.

Page 142

1        Q.    What would be the circumstances where
2    you would beat someone up?
3        A.    Extracting information during an
4    arrest. Any time we felt as though it was an
5    issue with the person we was arresting we put our
6    hands on them. Mainly I was putting hands on
7    people. That was my job at the time, I was
8    putting hands on guys to extract information.
9            Later Norman was involved in
10   that, extracting information, putting hands on
11   people to get information from them. Tommy
12   Liciardello was -- just beat people because he
13   feel they didn't like him or there was an issue,
14   some type of crazy issue. Everyone had their own
15   reason, but I know my reason was to extract
16   information.
17       Q.    Now, obviously, police officers can
18   use some kind of force when they feel threatened
19   or there's the threatened safety of others. Was
20   that the reason for using force in these cases?
21       A.    No, it was mainly extracting
22   information and just beating them because
23   something wasn't going according to the way we
24   wanted it to go.

Page 143

1        Q.    And when that happened, did you do
2    anything to cover up these beatings?
3        A.    Yeah, we would protect each other on
4    reports. One report I can remember was when --
5    when Tommy pistol whipped a guy because -- after
6    he chased him, and I guess he felt as though he
7    had to do that. That would be Thomas Liciardello.
8    It was myself and Norman was there, Linwood
9    Norman.
10           And I got in a discussion with
11   Thomas Liciardello, listen, I'm not going to do no
12   use of force on that guy. He said I'll take it.
13   And Otto came to the location and we had another
14   supervisor who came also to that location. I
15   can't remember his name. I know he was with
16   his -- he got shot later down the line with one of
17   the shootings I had, he was there.
18           And there was a discussion that
19   Tommy had with Otto, where in the discussion
20   myself and Norman had taken the defendant to the
21   hospital where he received his treatment and then
22   later he was arrested. Use of force was done. It
23   was viewed by Otto and we moved on. We moved
24   along past that job.

Page 144

1        Q.    Did you ever use force in a situation
2    and then fabricate the need to use force in court?
3        A.    Yes. Yes. The reason would be the
4    guy was resisting, he swung a punch at me or he
5    kicked me. That would be more, you know, your
6    physical punching. Or if I chased a guy and he
7    got -- and I punched him and I said I chased him
8    and I pushed him and he fell.
9            There was different reasons you
10   could use -- well, let's say not reasons, but
11   different excuses you could use per injury with
12   each defendant. You don't want to be the exact
13   same way all the time because they seem to pick up
14   on that. We came to be good at that and we know
15   what to use and what time in whatever situation it
16   was.
17       Q.    Would you --
18       A.    There was a lot of trying and failing.
19   Let's put it this way.
20       Q.    Would you ever use -- like over-charge
21   these individuals in court in order to cover up
22   the beatings?
23       A.    I don't think over-charge as far as
24   abuse. Any time when we laid hands on someone and

36   (Pages 141 to 144)

## Page 145

1    they got hurt it would be under resisting arrest,
2    not too much assault on police unless, you know --
3    that -- I'm not saying it didn't happen, but we
4    knew that if you locked someone up on assault of
5    police it normally would bump down to resisting
6    arrest anyway.
7            We basically was using when we
8    put hands on a guy to actually show -- because we
9    couldn't say we didn't use no force if the guy
10   went to the hospital with some type of visible
11   injuries on him. So we had -- we knew the
12   qualifications you have to do a use of force, and
13   we knew that the sergeant was going back,
14   Lieutenant Otto was going back, and if we knew if
15   there was any type of complaint how it was going
16   to be handled.
17       Q.   Now, Jeff, when these cases were being
18   filed against you and Officer Liciardello and
19   Officer Reynolds, do you know if Internal Affairs
20   ever did any investigations with regard to
21   allegations in the complaint?
22       A.   Yes, I mean, they did the job because
23   when the person complains they have to take a
24   complaint. So it's not like it never took the

## Page 146

1    complaint, it's how we received the information
2    from the complaint.
3            Normally, a typical complaint
4    is if someone files a complaint you get a court
5    notice saying you got to report to Internal
6    Affairs, you got so many hours to get a lawyer.
7    If you want one to represent you, you go up to --
8    your lawyer will meet you up there and you'll
9    discuss what's going on.
10           In fact, what we were doing
11   was -- there's several ways that we were doing it,
12   was the investigator may have reached out to Otto,
13   Otto discuss it -- Lieutenant Otto discuss it with
14   us about what's going on. All -- we felt free to
15   call there and find out who was an investigator
16   and he would explain the whole job to us on the
17   phone.
18           Once we knew what was going on,
19   if it was involving other officers, we had a
20   meeting about what was going to be said. So when
21   each one of us go up there, make sure you bring
22   back that -- your interview, what you said, and we
23   compare it to what everyone else said in their
24   interview, so by the time the target officer gets

## Page 147

1    up there it's already orchestrated. The
2    pressure's not on him to be asked any
3    out-of-the-way questions because these questions
4    already been answered to the people -- potential
5    witnesses prior to you going up there.
6        Q.   So are you saying that Internal
7    Affairs pretty much tipped you off as to what the
8    complaints were, and then you got together with
9    the rest of the squad or whoever was involved in
10   the job, discussed it, how you were going to
11   explain it to Internal Affairs?
12       A.   Yes, because it's -- any time I can
13   call Internal Affairs and speak to one of the
14   investigators, the guy investigating, he explain
15   the whole job to me and what the accusation is,
16   what the guy's doing, everything in daily, of
17   course he's letting me know what's going on. I'm
18   getting my story together before I go up there.
19       Q.   Does that violate the policies and
20   procedures with regards to IAD investigations?
21       A.   I don't know how their -- their policy
22   is with their investigations, but I will tell you
23   this. If they let me know what's going on before
24   I get up there it's basically helping me out a

## Page 148

1    whole lot, especially if I did something wrong.
2        Q.   In other words, did you feel that IAD
3    was protecting you?
4        A.   Yes. I was in the group. We all were
5    being protected. We had no -- we knew if we got
6    in trouble Otto was also there for us.
7        Q.   All right. Now, there's these series
8    of lawsuits. At some point you and some of the
9    other squad members filed a lawsuit against me as
10   the attorney, correct?
11       A.   Yes.
12       Q.   Tell us about that. What happened?
13   And be as detailed as you can.
14       A.   Okay. It all starts from Thomas
15   Liciardello. Thomas had this thing about him,
16   when you piss him off, he got to get you back. We
17   were taken off the street for a whole entire year.
18   It hurt his pockets. So he had a vendetta. And
19   on top of that we had to make sure we had no more
20   other lawsuits coming down the line, just feel our
21   credibility's back up if we could say he was
22   caught doing something he had no business doing.
23           So Tommy came up -- I don't
24   know who was with him, but he came up with a

Case 2:14-cv-01643-RBS    Document 61-9    Filed 06/29/22    Page 40 of 159

McIntyre v. Liciardello, et al./Torain v. The City of Phila., et al.

JEFFREY WALKER, 9/15/16

## Page 149

1  private investigator. The private investigator's
2  job was to catch you in some type of lie. The
3  private investigator was going to wear a wire on
4  you but he didn't want to do it in Pennsylvania
5  because it got wiretapping laws, so let's go ahead
6  and do it in Jersey.
7        So somehow you met up with him.
8  I don't know what was said. I know after that
9  point in, somewhere between that, we had filed a
10  lawsuit, and again, that was all orchestrated by
11  Tommy and whoever else was involved. We signed
12  some paperwork and basically was doing everything
13  that was asked for us to do, even to the point
14  where it came when the lawsuit was settled and we
15  signed off on the lawsuit.
16     Q.   Let me ask you this. First of all,
17  what were the allegations of the lawsuit that --
18  do you know who was involved in the lawsuit, first
19  of all?
20     A.   Reggie Graham, myself, Reynolds,
21  Police Officer Brian Reynolds. I don't know who
22  else was involved in that, but I know we're the
23  main people that was involved.
24     Q.   Tommy Liciardello?

## Page 150

1     A.   Tommy Liciardello, yes.
2     Q.   Okay. And do you know what the
3  allegations in the lawsuit were?
4     A.   I don't know exactly in detail. I
5  don't want to say something that's not right.
6     Q.   Generally do you know what the --
7     A.   That you were targeting basically good
8  cops and we were just making things up that
9  wasn't right.
10     Q.   Okay. You actually filed a
11  verification that everything in the lawsuit was
12  correct?
13     A.   Yes, I did.
14     Q.   All right. Was everything in the
15  lawsuit, the allegations in the Complaint,
16  correct?
17     A.   In the allegation that you made
18  against us or the allegations we made against you?
19     Q.   No, no, no, the allegations you made
20  against me as an attorney.
21     A.   Were they correct? No, they wasn't.
22  I mean, we knew we were doing what you said, to
23  answer your question. We knew we were --
24  everything you said about what we were doing, we

## Page 151

1  were doing it.
2     Q.   When you say what I said --
3     A.   I'm talking about --
4     Q.   -- on behalf of clients?
5     A.   -- on behalf of the clients and stuff
6  like that. We -- and we had to get you off our
7  backs.
8     Q.   Why?
9     A.   Because lawsuits started mounting up
10  and we had to slow you down. Every -- it was like
11  when one lawsuit came, another lawsuit came, and
12  they started building up. Guys got taken off the
13  street for a year, a couple lawsuits. A few
14  lawsuits we won, some we lost.
15        It was -- Tommy just had a
16  thing what I'm about -- you know, going to get you
17  back for what you did, and we had to get you off
18  our backs, and it worked, and when we separated we
19  knew we were coming back together again.
20     Q.   That's what I wanted to ask you. All
21  right. At some point you were separated?
22     A.   We were separated sometime after the
23  lawsuits but we got back together. We were told
24  because it was -- again, Tommy's running the

## Page 152

1  squad, Liciardello's running the squad, you're
2  messing with his money, and he liked the people
3  around him.
4        And I remember it was like what
5  do you call it, a draft, when they separated us
6  and made it -- Tommy made it clear I'll take Jeff
7  Walker, I'm going with Chester McCloskey --
8  Malkowski. He made it very clear who he wanted
9  his supervisor to be and who he wanted with him.
10        He knew he couldn't take Brian.
11  Brian went in another part of the City, North
12  Philadelphia. I don't know what division that is
13  but he went over there. I went with Tommy
14  Liciardello. We were told listen, just lay low,
15  when things cool down and we'll come back
16  together.
17        When we came back together
18  eventually we did Kushner's job and we stole
19  again, and that's where the safe comes into play
20  with the money, and that's when I took the safe
21  and we met in the lot and opened it up, Tommy
22  shook Brian Reynolds' hand and said welcome to
23  East and we went back at it again.
24     Q.   Now, Jeff, a couple things. Let's go

Page 153

1  back. First of all, the cases that were filed
2  against you and your squad starting in 2001, they
3  were all -- cases also involving the City,
4  correct?
5      A.  I can't understand. Involving the
6  City?
7      Q.  Yeah. In other words, the City was
8  named as a defendant for allowing you officers to
9  violate --
10     A.  For the crimes, yes.
11     Q.  -- people's civil rights.
12     A.  Yes. Yes.
13     Q.  Okay. At that time am I correct that
14 the City had actually hired outside counsel to
15 represent you as an individual officer, you and
16 Officer Liciardello and Reynolds and Graham?
17     A.  Yes.
18     Q.  Okay. And they were what we call
19 separate conflict counsel, correct?
20     A.  Yes, outside counsel.
21     Q.  Okay. Do you recall who that counsel
22 was?
23     A.  Kolansky. I don't know his first
24 name.

Page 154

1      Q.  All right. You say Kolansky. He's
2  from what firm, do you know?
3      A.  I don't know the firm. I know he was
4  outside.
5      Q.  Okay. Actually, Mr. Kolansky was
6  actually a former FOP attorney?
7      A.  I have no idea. I just know he was
8  outside. He was -- he was to assist us. He
9  had -- we had a few meetings with him. We
10 discussed our jobs with him.
11         Basically remind us we all got
12 to stick together. That's the only way you catch
13 a cop is separation, so stick together.
14 Regardless of what, stick together.
15     Q.  Now, was Mr. Kolansky or his firm
16 involved in the lawsuit against me?
17     A.  What do you mean "involved"?
18     Q.  Did he represent you, do you know?
19     A.  He represented us, yes.
20     Q.  Okay. When you filed the lawsuit
21 against -- against me, were there any discussions
22 as to the allegations that were going to be pled
23 in the Complaint?
24     A.  You're talking about allegations that

Page 155

1  you made against us?
2      Q.  No, no, allegations that you made
3  against me.
4      A.  Was it discussed about that?
5      Q.  Yes.
6      A.  I don't remember a discussion. Again,
7  Thomas Liciardello was leading the whole thing. I
8  mean, basically my job was, here, sign this
9  paperwork, we suing, and follow everything that I
10 do. When we meet up with the lawyer, come to the
11 lawyer. He constructed everything. He was the --
12 he was the boss.
13     Q.  Now, let me ask you, am I correct --
14 were you aware that there's a policy that if a
15 police officer is involved in a civil action that
16 there has to be some kind of memorialization of
17 that, in other words, that they either have to
18 send a memo or you have to inform a supervisor,
19 get clearance, approval --
20     A.  Yes, I'm aware of that.
21     Q.  -- in order to sue?
22     A.  Yes.
23     Q.  Do you recall getting approval from
24 anyone to sue me?

Page 156

1      A.  No.
2      Q.  Do you recall if Mr. Liciardello got
3  any approval to sue me?
4      A.  I don't recall him -- how he did it.
5      Q.  Do you know if anybody -- any of the
6  supervisors or any of the powers that be knew
7  before you filed suit that there was an intention
8  to file suit against me?
9      A.  Again, I don't know how he did it. I
10 mean, I was still puzzled about the private
11 investigator. I just was okay, he did it. I
12 follow along suit with what was going on.
13     Q.  Now, in one of the lawsuits do you
14 recall the Commissioner testifying? It was
15 Commissioner Johnson, Sylvester Johnson.
16     A.  Yes.
17     Q.  Okay. Do you recall -- you were at
18 that trial, correct?
19     A.  Yes, I was.
20     Q.  You were a defendant in that trial, so
21 you were at the defense table, correct?
22     A.  Yes.
23     Q.  All right. Do you recall the
24 substance of the Commissioner's testimony with

Case 2:14-cv-01643-RBS    Document 61-9    Filed 06/29/22    Page 42 of 159

McIntyre v. Liciardello, et al./Torain v. The City of Phila., et al.                                    JEFFREY WALKER, 9/15/16

Page 157

1    regards to your actions? And when I say "you," I
2    mean you and the other squad members.
3        A.  Yes. It was a discussion on -- one
4    thing I clearly remember amongst other things is
5    discussion on the use of the vouchers, how the
6    vouchers were filled out, why they're typed up,
7    why they're not handwritten, is that custom and
8    policy to do that, is it custom and policy to sign
9    a blank piece of paper for an informant that made
10   a buy. That's what a lot of the topic was on it.
11       And he said it was from -- my
12   interpreting was it was custom, his policy, that
13   it was done. He didn't speak on the police
14   policy, he spoke on what he -- what his thing was,
15   and that he didn't know us, had no knowledge of
16   who we were.
17       We needed for him to say that.
18   Now, how -- why did he say it? I don't know why
19   he said it because I wasn't part of the
20   conversation that was going on with Kolansky and
21   him, but I know he said it, and it helped us out
22   in the civil actions where it basically said it
23   was okay for us to give an informant a blank
24   voucher, an informant to sign a voucher, and us go

Page 158

1    back into headquarters and type up whatever the
2    hell we wanted to type up in the voucher to do an
3    investigation.
4        Q.  Do you think he knew that you were
5    doing illegal -- violating people's constitutional
6    rights on the street?
7        A.  I think at that time we were just
8    picking up steam, so it wasn't like it is
9    now. But I can't tell you if he -- honestly tell
10   you that he knew or not, only what he said and I
11   was a witness -- you know, what he said out of his
12   mouth.
13       But as the time went on we
14   started stealing more and more, and I believe one
15   of the questions asked to me later down the line
16   when I was arrested, did anyone know you all were
17   stealing, and the question -- I said it was a
18   refrainment, did anyone know we wasn't stealing
19   because it's the way we were doing things. It was
20   out in the open.
21       You know, we were untouchable.
22   I believed that, too, until I left the squad and
23   got arrested, you know what I mean, and even at
24   that point, even though I was caught I still

Page 159

1    didn't think I was doing anything wrong until I
2    spent some time in my incarceration, but even to
3    this point now is -- I believe now what I was a
4    part of was totally wrong, and but I understand
5    now it's still acceptable behavior.
6        And I'm just here to just tell
7    the truth, man. You know what I mean? Doing my
8    part. That's all I'm going to do, man, is do my
9    part. I'm not -- I have no vendetta. I thank
10   them. I thank them every day.
11       Yeah, man, it's just -- it's
12   acceptable behavior. They knew we were stealing.
13   I mean, they, the supervisors, knew. All
14   paperwork goes up, everything. When you make more
15   than one accusation, someone looks at it.
16   Regardless of what the situation is somebody's
17   looking at that paperwork.
18       If you're saying that you're
19   stealing out of this particular unit that we was
20   involved in, eventually to protect you they going
21   to move you. We never was moved no matter what we
22   did. We were separated, but we were brought back
23   together again with the exact same group of
24   people, and that's what happened. That's it.

Page 160

1        Q.  Jeff, let's go back to when you were
2    moved. Do you recall how long of a period you
3    were moved?
4        A.  It wasn't that long. A year. Not --
5    I can't be exact but it was a period of time. It
6    wasn't long enough because we still communicated
7    with each other. We still had jobs with each
8    other. We still had to make sure that we stuck to
9    the script. If we got any type of complaints we
10   always met up.
11       No one would go up to any type
12   of Internal Affairs without letting somebody know
13   what was going on. We had checked on each other,
14   what you doing over there, we fine, we're doing
15   whatever, and then eventually, you know, we got
16   back together again and we came back together.
17       Q.  Were you able to steal during that
18   period of time that you were separated?
19       A.  Yes. I stole with Thomas Liciardello,
20   Louis Palmer. That was the main -- that was the
21   main group that I was stealing with. We were
22   close in the car.
23       Q.  Jeff, to stick on point with this
24   case, with the case against me, are you saying

McIntyre v. Liciardello, et al./Torain v. The City of Phila., et al.                                    JEFFREY WALKER, 9/15/16

Page 161

1    that the allegations were a mere ploy to back me
2    off?
3         A.    You had to go. You got to go. You
4    were too close. You were the first. Too close.
5    You had to go.
6         Q.    Jeff, I want to go into now -- if we
7    can talk a little bit about the policies and
8    procedures, and I guess the first one that I'd
9    like to talk about is the CIs, the use of a CI,
10   confidential informant.
11              Now, you already testified that
12   when you have a confidential informant who makes a
13   buy you have to have a corresponding voucher,
14   correct?
15        A.    Yes.
16        Q.    Okay. And you mentioned that the
17   voucher should be written out because otherwise
18   you could just get the CI to sign a blank piece of
19   paper --
20        A.    You can put anything you want --
21        Q.    -- and type it in later, correct?
22        A.    Sorry. That's correct.
23        Q.    Okay. But so what? What's the matter
24   with that?

Page 162

1         A.    Well, one, you're signing a blank
2    piece of paper. The CI know he getting paid but
3    don't know what he getting paid for, only what he
4    did, who said he did it.
5              And two, when you type it up,
6    it looks like -- in their time it looked like an
7    official document because it's typed up. We had
8    something in our mind like we'd make it official,
9    let's type it up.
10             No one's going to go into
11   headquarters, type up a piece of paper, go all the
12   way back and find a CI and say sign this voucher,
13   ain't nobody doing that. Because we were
14   sometimes stationed up the far Northeast and
15   you're talking about going all the way down
16   Southwest Philly. I know I wasn't doing it. I
17   know they wasn't doing it.
18             And the CI voucher had to be
19   signed that day. If you made a mistake on the
20   voucher, you hooked up with a CI the next day and
21   they signed it.
22        Q.    Now, Jeff, I see on the vouchers,
23   isn't a supervisor required to sign off on the
24   vouchers also?

Page 163

1         A.    Yes.
2         Q.    Why is that?
3         A.    It's policy. He has to witness it,
4    the payment and the buy.
5         Q.    So were the supervisors informed --
6    let's assume you typed it up -- they signed a
7    blank piece of paper, you went back, typed it up.
8    Would the supervisor know that the voucher was
9    fabricated, I guess, for lack of a better word?
10        A.    I wouldn't know if he know exactly. I
11   can't tell if he's thinking if it was fabricated
12   or not because, you know, that was too far early
13   in the game for me, but I know he knew the CI
14   signed a blank voucher because we will type it up
15   and give it to him.
16             Clearly he'll look at it and
17   say, well, you know, he must have signed it, it's
18   blank, because you ain't go nowhere to get it
19   signed because the signature's already on it, and
20   he's reading it, okay, well, we'll just sign it
21   and keep -- let's go on to the next.
22        Q.    Now, Jeff, going back to one of the
23   cases that I had against you, do you recall there
24   being a CI involved that was sent to another state

Page 164

1    to hide him out because they were part of the
2    lawsuit?
3         A.    Yes, I remember that.
4         Q.    Tell us what happened and who made the
5    decision to secrete this individual.
6         A.    Well, I know the individual was told
7    to leave because the lawsuits were piling up. I
8    don't recall exactly who, but I know it was -- it
9    was given to her to disappear for a while and come
10   on back.
11             I mean, I'm not going to tell
12   you, you know, we were doing something wrong -- a
13   specific person who was -- actually told me that.
14   I don't remember who exactly told me that, but I
15   know the person was told to -- listen, disappear
16   for a minute and come on back.
17        Q.    And am I correct that to justify that
18   deactivating that -- that person was deactivated,
19   correct, as a CI?
20        A.    They would be deactivated because
21   you're not in use of them anymore.
22        Q.    Do you know who approved deactivating
23   this individual to send them away?
24        A.    I have no idea.

41 (Pages 161 to 164)

Case 2:14-cv-01643-RBS    Document 61-9    Filed 06/29/22    Page 44 of 159

McIntyre v. Liciardello, et al./Torain v. The City of Phila., et al.                    JEFFREY WALKER, 9/15/16

Page 165

1     Q.    But this individual was somebody that
2  was part of the investigation that led to this
3  lawsuit, correct?
4     A.    Yes.
5     Q.    And am I correct that there was also
6  another CI that was involved in some of the
7  lawsuits that was that person's partner or
8  boyfriend or husband or --
9     A.    Boyfriend, husband, something like
10  that.
11     Q.    Okay.  That person was also
12  deactivated; am I correct?
13     A.    I don't recall if they was or wasn't.
14     Q.    All right.  Do you know if any of
15  those CIs -- either of those CIs were committing
16  criminal acts while they were acting as
17  confidential informants for you?
18     A.    Yes.  One used to carry a knife.  I
19  said why don't you carry a knife on you just in
20  case I can't get out and -- all right.  Go make a
21  buy and come on back.  You know, we're hoping he
22  wouldn't stab nobody.  But he came on back with
23  the buy.  We gave him money, go on the buy, and
24  come on back.

Page 166

1     Q.    So in other words, you were violating
2  the law as police officers in order to prosecute
3  someone else for violating the law.  Is that fair
4  to say?
5     A.    Yes, it is.
6     Q.    And did that happen often, when you
7  would use a CI illegally?
8     A.    Use a CI illegally.  The only way you
9  use a CI illegally is use a source of information.
10     Q.    Well, use a CI who you knew was
11  committing a criminal act.
12     A.    Yeah, that was common.  That was done
13  throughout the unit, and I can say that because
14  that be in my presence working with different
15  squads.  I only can say what I know when I was
16  part of what was going on.
17     Q.    Was that something that if -- if there
18  was such an act, would that be something that
19  would have to be brought to the attention of the
20  supervisors?
21     A.    It would be brought.  It should be
22  brought to the attention of the immediate officer
23  to the supervisor, but again, we be using these
24  CIs for so long, and you got a question that when

Page 167

1  the CI is supplying you with countless information
2  and within that information doing buys, you gotta
3  question how are you getting this information.
4  You know what I mean?
5          And that's anybody's question,
6  but we already knew what the question was, the CI
7  was committing crimes to gather information to
8  give to us, and we took that information and we
9  established warrants and we locked people up and
10  in some cases we stole.
11     Q.    Now, again, going back to these cases
12  and then I'm -- specifically do you recall if I --
13  an investigation with regard to the allegations in
14  some of the complaints that you brought against
15  you and Officer Liciardello and Reynolds and
16  others, whether the City initiated investigations
17  to IAD in looking into these complaints?
18     A.    Repeat that.
19     Q.    That was an unclear question, but --
20     A.    Repeat that again for me.
21     Q.    Yes, it was unclear.
22          Do you know if IAD did any
23  investigations as to the allegations in some of
24  the complaints that I brought against you from

Page 168

1  2001 on?
2     A.    I believe they did, but I don't
3  know -- I can't tell you what the outcome of it
4  was.
5     Q.    Do you know who initiated -- normally
6  IAD investigations are initiated through the
7  complainant, the person that gets arrested or --
8  or neighbors, somebody who is involved in the
9  arrest; am I correct --
10     A.    Yes.
11     Q.    -- that the complainant --
12          MR. SANTARONE:  I just want to
13       make a general objection here, Mike, because
14       it's not your deposition.  You're making
15       your statements and then are asking
16       questions and I'll just note that.
17          MR. PILEGGI:  Okay.  Fair
18       enough.
19  BY MR. PILEGGI:
20     Q.    Was there -- do you know who initiated
21  the investigations the IAD conducted with regard
22  to the cases that I brought?
23     A.    You're talking who I know as far as
24  the initial investigator?

Case 2:14-cv-01643-RBS    Document 61-9    Filed 06/29/22    Page 45 of 159

McIntyre v. Liciardello, et al./Torain v. The City of Phila., et al.                JEFFREY WALKER, 9/15/16

Page 169

1    Q.    Yes.
2    A.    No, I don't.
3    Q.    Okay. Now, let's talk about IAD a
4    little bit. What's -- do you feel like IAD
5    protected you guys, or how did that work?
6    A.    They protected us, period.
7    Q.    I mean, you had already testified that
8    they would tip you off as to what the allegations
9    were. Do you know if they protected you in any
10   other way?
11   A.    Let us know what's going on is good
12   enough for me. It covers everything. When you
13   get the court notice, talk to Otto or Otto will
14   tell you or we'll call up there. They give us the
15   whole investigation on the phone so we're prepared
16   to know what's going on before we go up there.
17   Some investigations they be
18   calling and telling us the accusations they
19   saying. You know what? I think I'm going to get
20   a lawyer on that one. Okay. But still nothing
21   happens. We already know. No surprises. No
22   trick questions, we know, and if I know, the guy
23   that's a target, I'll bring my paperwork and I'll
24   show him. Or if it gets -- one of the

Page 170

1    investigations gets deep we all sit down and we
2    talk who is supposed to do what, who did this, who
3    did that, and that's it.
4    I think there was one issue
5    towards the tail end where I had spoken out and
6    inform the government on -- it was a text. I
7    broke the rules regardless of what was going on.
8    I did not tell Thomas Liciardello what -- one, I
9    went up there to talk to somebody, and two, what
10   was said when I got back. That was a problem.
11   And that's it.
12   Q.    Were you aware -- well, strike that.
13   IAD's investigative powers are
14   only to investigate police officers, correct?
15   A.    I couldn't answer that question.
16   They're investigators. Again, that's a whole
17   different department. The only thing I know,
18   they're investigating cops.
19   Q.    Okay. Well, have you ever heard of a
20   situation where they investigate citizens?
21   A.    I mean, again, my assumption is
22   they're -- again, they're investigators who want
23   to investigate everything as part of the
24   situation. So you're going to talk to people on

Page 171

1    the street. Anybody who's involved in the
2    allegation made against the police officer.
3    Q.    Okay. Let's talk about some safety
4    issues. First of all, do you feel threatened
5    today? I don't mean today, I mean presently.
6    A.    Listen, I know how the game is played.
7    I talked and I told. Something could happen to me
8    at any given moment, home, walking, whatever. I'm
9    more concerned of my family, not being there for
10   my family.
11   Since I've been home my
12   neighbor -- I was walking somewhere. My neighbor
13   pulled me to the side. I'm walking. Come here
14   for a second, let me talk to you. I said what?
15   What's up, man? He said be careful bro, be
16   careful. He said I don't know what you're doing
17   but be careful.
18   I said what? What's going on
19   now? He was like listen, a policeman stopped me.
20   I said who? He was like somebody in a uniform.
21   First he thought he was some type of boss or
22   something. I said white shirt? Yeah. He was
23   like listen, he thought I was you. Now, he has
24   long dreads and they knew I don't have no dreads

Page 172

1    no more.
2    And he was like calling his
3    name out -- me, Jeff, and he pulled him over. He
4    said -- he said to him -- he said are you -- he
5    said I thought you was Jeff. He said no, I ain't
6    Jeff. He said do you know Jeff? I said yeah, I
7    know Jeff, he's my brother. He's not my brother
8    but he concerned about my well-being.
9    He said why? What's going on
10   with you? Why? What did you do? What's going
11   on? He was like well, I'm just asking about it,
12   just making sure, you know, we all right, you
13   know, and he just rubbed it off and kept going.
14   That's -- my guy did. He just left the
15   neighborhood.
16   So he told me that. I was a
17   little concerned. You know, I told my PO, but
18   again, I don't trust anybody because I know how I
19   was, and I don't trust nobody in law enforcement
20   no more because I know the world I came from. So
21   I said -- I said -- I said all right, I'm just
22   going to just make sure I'm more leery when I go
23   out the door.
24   So I seen him again and he says

Page 173

1  yo, you cool? I said yeah. I said who was that?
2  And he said it was lieutenant, because he had
3  thought about what he saw. So I was like all
4  right. He said listen, I'm not trying to -- I
5  told him, I said listen, I'm not trying to bring
6  you into nothing. I don't want nobody coming to
7  you asking you nothing because, you know, you kind
8  of know my situation if someone come asking about
9  me.
10        They already know I done told
11  on some cops. Regardless if they feel they were
12  right or wrong I done told on some folks and they
13  got their jobs back and I'm out here on the
14  street. So I said -- they don't want no parts of
15  it, in that situation. So they just basically
16  giving me the heads up letting me know, listen,
17  just be careful, which I took it and I said okay,
18  I appreciate it, and that's it.
19        Who the cop was? I don't know.
20  Who I suspect it is? I'm not putting nobody's
21  name in something that I don't know. But I know
22  he had no reason to lie to me about nothing. I
23  mean, he came to me. I ain't look for him, he
24  came to me. I'm walking, he came to me. So I

Page 174

1  took it as I was concerned. I said okay, I'll
2  keep that in mind.
3        Q.   Prior to your arrest, were you ever
4  threatened by any of the other members of your
5  squad?
6        A.   Yeah. John pulled a gun on me.
7        Q.   When you say John, John who?
8        A.   Speiser pulled a gun on me, which I
9  thought it was -- he had to be out of his mind
10  to -- I mean, it got that deep to the point where,
11  you know, you pulling a gun on someone. I knew he
12  was in a bad place at that time and I knew it was
13  time for me to go and I said you know what, maybe
14  if I could talk to the sergeant, let the sergeant
15  know, he would put a stop to things. He basically
16  told me get out of the squad. Leave. I said
17  okay. I still stayed around a little bit. That
18  would be McCloskey.
19        MR. KRASNER: First name?
20        THE WITNESS: John. Joe.
21  Whoever. Joe McCloskey.
22        And then when I didn't get no
23  response out of him I definitely called the
24  agent because I had his card. Then I told

Page 175

1  Reggie Graham. I said these folks is crazy,
2  man. You know what I mean? It just --
3  these people knew what was going on. Reggie
4  knew what was going on about -- about --
5  with the situation we were stealing and --
6  because he was -- he was stealing too and I
7  know it was time for me to go.
8        Eventually I got out of the
9  squad and I went to Gorman's squad, but it
10  wasn't over yet. That carried on -- the
11  separation carried that I had -- the
12  separation from me and the group of people
13  carried on to the next squad. I verified
14  where it is coming from. Thomas
15  Liciardello, they tell us don't -- stay away
16  from him. I'm hot. You talking to the feds
17  and you're stealing. So I'm like okay.
18        Yeah, I was stealing. The feds
19  were talking to me but I wasn't talking to
20  the feds. I didn't want to give these dudes
21  up. All right? Regardless what the
22  situation looked like, I was stealing with
23  them and I knew if I talked and told them
24  that the folks I was with was stealing I was

Page 176

1  going to jail, too, and I wasn't doing it.
2        I was spinning these guys,
3  telling them whatever they wanted to hear,
4  what they thought they was hearing, but they
5  was never getting to what they needed to get
6  done, and that was it until I was arrested.
7  BY MR. PILEGGI:
8        Q.   Did you ever receive any threatening
9  texts from anyone before your arrest?
10        A.   Yes, that was Thomas Liciardello sent
11  me some texts because -- that resulted from the
12  conversation that we had about them gambling when
13  they were working, and the question was asked of
14  me about that, and I guess he found out some type
15  of way, and he was mad because I didn't discuss it
16  with him.
17        Q.   And who did you say -- who did you
18  interview with --
19        A.   One of the --
20        Q.   -- about the gambling?
21        A.   One of the -- no, it wasn't -- it was
22  a conversation that we had with the investigator,
23  and the investigator made a statement, not knowing
24  I was just as dirty as they were, you better get

44  (Pages 173 to 176)

Case 2:14-cv-01643-RBS    Document 61-9    Filed 06/29/22    Page 47 of 159

McIntyre v. Liciardello, et al./Torain v. The City of Phila., et al.                    JEFFREY WALKER, 9/15/16

Page 177

1    out of the squad, you're walking on eggshells,
2    these dudes -- they know these dudes are stealing,
3    and I just took it like okay.
4            But it was a discussion that I
5    had with an investigator about -- I forgot how it
6    came -- went down, but it was about gambling at
7    the SugarHouse, and I think the conversation got
8    back to Thomas Liciardello, and he texted me and
9    we got into an argument match over the texts, and
10   it was -- it was very clear that listen, I'm going
11   to let everybody know you're ratting, hope you
12   die, just back -- like a bunch of childish stuff
13   going back and forth. I'm going to let Norman
14   know what you said.
15           But that was only about, you
16   know, the situation I used to always crack jokes
17   on Norman and -- to them, and it was nothing -- it
18   was nothing serious with that situation, but he
19   used that over my head to separate me and Norman,
20   but it was very clear to me that in those texts it
21   showed that I'm by myself. No one's going to work
22   with you. You're on your own.
23           And I know at that point it
24   was -- it was -- it was heading out. I had to go.

Page 178

1    It was time for me to go. I was no need -- I was
2    all right working by myself, so, you know, I know
3    if I was stealing I can have the ability to steal
4    on my own, do the exact same tactics they were
5    doing. I can survive on my own, and that's
6    exactly what I did until I was arrested.
7            MR. WILLIAMS: Mike, I'm sorry
8    to jump in but just to clarify. I'm Jerry
9    Williams.
10           What investigator were you
11   talking to?
12           THE WITNESS: I can't recall.
13   I know it was a female investigator from
14   Impact.
15           MR. WILLIAMS: Okay, that's
16   where, from Impact.
17           THE WITNESS: They wasn't --
18   nothing I knew was changing. They weren't
19   investigating us no more out of regular
20   Internal Affairs, we was going to Impact,
21   which is a totally different investigator --
22   actually you don't walk out of there with
23   your -- with your statements. The Internal
24   Affairs, you walk out with your statement.

Page 179

1    Impact you don't.
2            And that was -- the issue was I
3    didn't tell Thomas Liciardello that I was
4    going up there, and I definitely didn't tell
5    him when I was coming back.
6    BY MR. PILEGGI:
7        Q.   Do you know if any of the other
8    officers in your squad or yourself had made
9    threats to any citizens? And let's -- aside from
10   arrests, during the -- during someone's arrest or
11   investigation, was there any other threats made to
12   the public citizens?
13       A.   I mean, we was threatening them. You
14   call them citizens, we was threatening everybody.
15   We was threatening guys we were locking up. We
16   were -- the thing was guys we see on the street
17   and we dealt with them.
18           As far as arresting them, we
19   would pull them off to the side and get them in
20   the car and then basically threaten them all types
21   of ways, and one of the common ways we're doing it
22   is we're going to kick your ass and do all types
23   of stuff to you and situation is you're not going
24   to deal with your family, some situation dealing

Page 180

1    with your family. It was a whole bunch of
2    childish things that was going on in the cars
3    riding around with these guys, and it was letting
4    these guys out and they go about their business.
5            One guy speak -- from South
6    Philly was a deaf guy, some guy -- he was deaf, we
7    always used to harass, and the guy worked -- hung
8    out at a bar on Oregon Avenue or Passyunk,
9    somewhere down in South Philly, and they used to
10   call the bar all the time and just harass this
11   dude constantly all day long. I mean, they used
12   to tell the people that he was snitching and all
13   the time -- kind of childish things and -- but it
14   was like kids, you know what I mean, running
15   around with badges just doing whatever we wanted
16   to do.
17       Q.   Jeff, was there ever an incident where
18   you ever informed known drug dealers that someone
19   was snitching on them?
20       A.   See, that's a dangerous field for me.
21   Even if I tried to do that, I wouldn't do it. If
22   I threatened something of that, I wouldn't do it.
23           See, Tommy was -- Tommy
24   Liciardello was known for that. His thing was

45  (Pages 177 to 180)

McIntyre v. Liciardello, et al./Torain v. The City of Phila., et al.                    JEFFREY WALKER, 9/15/16

Page 181

1  he'll rob you, and he feels as though you a
2  threat, he told other drug dealers you told on
3  that you snitched. That was his whole MO.
4          He used to ride around -- we
5  went from -- one particular guy, his name was King
6  Kong, and we went from chasing this man all up and
7  down Roxborough, sitting on him, and we couldn't
8  catch him. Next thing you know he hanging with
9  him, going on vacation with this guy, breaking
10 bread at his table with his family with his guy,
11 bringing him to bar, bragging about how much money
12 this guy got in his tree business.
13         I'm looking at him like he had
14 two heads. Even the sergeant was looking at him
15 like he had two heads. He -- that one person
16 made Sergeant McCloskey more nervous when he
17 started hanging out with him.
18         I remember the incident we was
19 in the house and they were walking around wearing
20 King Kong shirts, and the guy in the incident's in
21 the house. Guy said how you locking me up for
22 drugs? You walking around wearing a shirt of one
23 of the biggest drug dealers in Roxborough. How is
24 that going? He -- Tommy picks his phone up and he

Page 182

1  dials King Kong and then he said what did you say
2  else about him? Then he's just sitting there just
3  running his mouth, running his mouth, running his
4  mouth.
5          MR. KRASNER: I'm sorry. He
6  said -- what did you say?
7          THE WITNESS: He -- what did
8  you say about King Kong? And Tommy -- the
9  guy sitting there just running his mouth and
10 Tommy got his phone. I just looked at him
11 and said man, that ain't good at all.
12         There was one incident a little
13 bit further back where Tommy told on a guy
14 and the guy was killed and he felt it was
15 okay to do that. You know what I mean? It
16 was like dude, man, people out here dying,
17 man. You know what I mean? I would draw
18 the line on certain things. I would steal,
19 I would beat people up, but I'm not going to
20 go out and be telling on somebody and say
21 listen, man, people just told on you, but I
22 know it was a tactic they was using to cover
23 the tracks, but it was a dangerous tactic
24 because people get hurt and get killed. You

Page 183

1  know what I mean?
2          The thing was we robbed this
3  guy, we come out rough with these guys. We
4  get them to communicate with us, beat them
5  up, whatever we got to do. One guy was
6  Kushner, you know. We made that guy tell
7  where he lived at. We had no idea where
8  that guy lived at. Once we got him on board
9  he started talking. We were playing
10 basketball with the guy. Now he's your best
11 friend and they talking about family, all
12 like -- it was crazy. You know what I mean?
13         You go from threatening the guy
14 and his family, next thing you know you're
15 best buddies. He's giving you jobs. He's
16 doing this and this and that. The only
17 thing that guy will be going to do was stay
18 out of the way, and the thing was you give
19 me a green light, you do whatever you want
20 to do.
21         That was another thing that was
22 held over our head, too, by Thomas
23 Liciardello was you get a green light. You
24 do whatever you want to do, man. You know

Page 184

1  what I mean? Just throwing something back
2  here and there, we'll give you a green
3  light, you do whatever you want to do.
4  BY MR. PILEGGI:
5      Q.   What do you -- what do you mean by a
6  "green light"?
7      A.   Green light means you go ahead and
8  sell drugs and we won't mess with you. Ain't
9  nobody going to mess with us. If anybody -- if
10 anybody going to mess with you it's going to be
11 us, so you go ahead and do whatever you want to
12 do.
13         And a lot of those dudes, you
14 know, they went from us chasing them to them
15 calling his phone and giving him information to
16 being best friends. Sources of information, here,
17 I got a job for you, calling the guy up for him.
18 The guy's supposed to bring you something. It was
19 common. It was a regular basis. That's where all
20 the real money come from, where the guys is
21 already plugged in with other guys and they would
22 call these guys up and deal with them.
23         That's how we got the guy I
24 hung off the railing. Kushner called him. Brian

46  (Pages 181 to 184)

Case 2:14-cv-01643-RBS    Document 61-9    Filed 06/29/22    Page 49 of 159
McIntyre v. Liciardello, et al./Torain v. The City of Phila., et al.
JEFFREY WALKER, 9/15/16

Page 185

1  said he called him. Kushner called him.
2          MR. KRASNER: Brian who?
3          THE WITNESS: Reynolds. Brian
4  Reynolds said I called him. No, you didn't,
5  Kushner called him. Because that guy don't
6  deal with nobody but me know. He dealing
7  with large quantities of drugs, and you
8  ain't dealing with nobody you don't know on
9  the outside. You're going to call my phone
10  and ask for whatever and you don't know me?
11  BY MR. PILEGGI:
12      Q.  Jeff --
13      A.  I'm sorry, I'm getting rattled. Go
14  ahead.
15      Q.  Wait, wait, wait, wait, Jeff. Why
16  don't you tell us about the Kushner job and then
17  that leads to the next job.
18      A.  All right. Kushner's job was one of
19  the very first jobs we did with Brian Reynolds.
20      Q.  And that was -- let me just stop you.
21  That was after they brought you back together?
22      A.  After they brought us back together.
23      Q.  Okay. All right.
24      A.  I don't know who was assigned. I

Page 186

1  believe it was Thomas Liciardello was assigned the
2  investigation job. I don't know how he got it,
3  where it came from. I knew that information that
4  I gathered about being in the car with them was
5  Thomas -- not Thomas, Kushner was a heavy
6  marijuana dealer.
7          The old saying was them good
8  guys who liked to entourage, young white dudes,
9  with cargo pants, Polo shirts and Rolex watches.
10  Don't know nothing about cops, know nothing. They
11  scared to death. They making money. Perfect guys
12  for us.
13          We seen -- we've been following
14  Kushner around for a period of time and got lucky.
15  One day it was me, Brian Reynolds and Thomas
16  Liciardello in the car. Kushner was in his Hummer
17  smoking marijuana. Somebody would say hey, you
18  can smell marijuana in the car. Listen, you can
19  smell marijuana, the guy got his window down,
20  we're following right behind him.
21          We cut him over, we pull over
22  in front of him. Immediately Tommy jumps in the
23  car, Kushner's car, and I jump in right behind
24  him. Kushner's quickly put into our car. Kushner

Page 187

1  got a big bag of marijuana in the car, some bags
2  of marijuana, he got some money. Tommy
3  immediately shoots for the money.
4          But before we get to that
5  part -- that did happen but when we switched cars
6  we went to another area, a dark area, where we
7  started interrogating Kushner, find out where he
8  lived at, what's going on. Even if we had any
9  information that he lived at where we went,
10  Kushner confirmed it. He confirmed the apartment.
11  He confirmed the apartment number. He took his
12  keys.
13          We decided that we were going
14  to go to the apartment. Brian Reynolds was in --
15  I get a little mixed up what car we was in, but
16  we -- me and Tommy was in Kushner's car splitting
17  up Kushner's money. Brian took Kushner to the 5th
18  District, where before he did that Tommy made a
19  phone call to whoever that he was going to the
20  5th.
21          Me, Thomas Liciardello closely
22  followed behind Brian Reynolds, went to Kushner's
23  apartment. Tommy went inside the apartment
24  building with me. We talked to the person at the

Page 188

1  desk, which was an ex-cop that I knew in the 16th
2  District who retired some years ago. He knew me
3  very well. He knew I was a good dude. But we had
4  to get past him to get to the manager, which was a
5  female, white female.
6          She actually guided us where
7  the apartment was. We said we had it from there.
8  We opened the door with a key. Kushner has a
9  poster in there, and Tommy makes a smart comment
10  he ain't no gangster -- a poster of a gangster, I
11  don't know, John Gatti or something in his
12  apartment. He said he ain't no gangster.
13          We're walking around in his
14  apartment. We see a safe in the closet. It's a
15  nice safe. I don't know, it's probably about a
16  foot high, a foot wide -- a foot high, you know,
17  two -- about two and a half feet high, maybe a
18  foot wide, metal safe. We both look at it. Tommy
19  says take that safe out of there. Take that safe.
20          I looked at him crazy like.
21  How am I going to get this out? We all the way up
22  on the floor. Listen, I'm going to check and
23  look. We knew the elevators had cameras. We knew
24  they had cameras in the hallway, but where

Page 189

1    Kushner's apartment was there was no cameras. So
2    I said listen, I'm going to go scout out. No one
3    there. Picked the safe up, carried the safe
4    downstairs.
5            When I carried the safe
6    downstairs I had to stop because it was heavy.
7    When I got out I met them outside. I mean "them"
8    was Brian Reynolds and Tommy Liciardello. Took
9    the safe and put it in the car, the car we were
10   driving. I forget what car, but we put them in
11   car. No way if we get that safe out of there --
12   put it in the car.
13           When I got the safe back to
14   headquarters, I took the safe out of the car we
15   were driving and put it in my car. Once I put it
16   in my car, we started processing the work, and
17   somehow the sergeant appeared later down the line.
18   He was saying at the -- he was not there at the
19   location at all. Sergeant McCloskey was in
20   headquarters when we were doing all this stuff.
21   And eventually when he came out there -- I
22   couldn't tell you if he eventually came out or
23   not, but we done did all we did already before he
24   even got out there.

Page 190

1            When we actually did the
2    warrant, we went back there again, did some more
3    searching around. Whatever was in there, we took
4    some stuff. We confiscated whatever was in there
5    because of the warrant. We got what we wanted.
6    We had the safe.
7            When the job was over, we all
8    met. Me, Brian Reynolds and Tom Liciardello met
9    at headquarters. We were getting ready to get
10   pulled off. We took the safe in a big lot near
11   Roosevelt Boulevard just before you get on the
12   Expressway. It's where -- I don't know -- where
13   that sunken house used to be at the bottom of the
14   Boulevard.
15           We took the safe over there far
16   from -- from the Boulevard. That whole area was
17   sunken in, so we took it to one of those areas
18   right there that was isolated. I opened the safe
19   with a crowbar and then the -- it was full of
20   money. We reached out and -- it wasn't nobody
21   counting no money because I said it was a lot of
22   money, and here it was more than that, but listen,
23   we don't -- when you got money like that bagged up
24   you ain't sitting out in the middle of nowhere

Page 191

1    counting who getting what.
2            Everybody just grabbing. If I
3    got four piles, you got four piles. The thing
4    about I found out later, if I got fours piles of
5    twenties and fifties and you got four piles of
6    hundreds and fifties, that's not -- that's not an
7    equal split.
8            So the point of this is he
9    said -- they shook hands, welcome to East. Tommy
10   shook his hand. They smiled. Jeff, get rid of
11   the safe. I remember taking the safe to the
12   bridge off of Ridge Avenue near the East Falls
13   Bridge. I don't know, that's two -- several
14   bridges up there but it's like a train trestle
15   bridge. I took it and threw it in there and I
16   went about my business.
17           We hooked up with Kushner
18   later, and this guy was scared to death. He
19   immediately started talking. He questioned two
20   things. I had a safe in there, where is that at?
21   We said listen -- we denied it. We said it ain't
22   no safe in there, you know, we didn't see no safe
23   in there, maybe the security took it out of there,
24   and he complained about a Rolex watch being gone

Page 192

1    out of there.
2            I think he was more scared of
3    what we was doing because he said I Googled you
4    guys, because he Googled us and your complaints
5    came up, the lawsuit came up that you had. So he
6    talked -- we had a discussion about that. So he
7    didn't want -- he already knew he didn't want no
8    problems with us.
9            Then the job with the Costa
10   Rica guy comes up. That was the supplier. He
11   brought either mushrooms -- I remember mushrooms.
12   I don't know too much of marijuana but I know he
13   had boxes of mushrooms. He said set him up. He
14   made a phone call.
15           Now, it could have been --
16   there could have been a warrant already done up
17   based on information he gave us. If we had gotten
18   the -- the drugs we were going to do the warrant.
19   It could have been one of those type of warrants,
20   I'm not clear, but I know we went in his house --
21   this apartment.
22           First of all, he came down.
23   The deputy came down. Blackburn was there. My
24   sergeant was there.

48  (Pages 189 to 192)

Page 193

1  Q.  Who was your sergeant?
2  A.  McCloskey, I believe it was.
3      MR. KRASNER:  First name?
4      THE WITNESS:  Joe.
5      MR. KRASNER:  Who is the
6  deputy?
7      THE WITNESS:  Blackburn, drunk,
8  drunk as well.  He had a black -- a driver,
9  a skinny black girl.  Captain Warren was
10  there and -- yeah, Captain Warren was there.
11      Brian made the phone call.  I
12  said Brian, Kushner made the phone call.
13  The paperwork said Brian made the phone
14  call.  I know for a fact Kushner made it
15  because they had a discussion about that
16  prior, before, and he was the one that made
17  the phone call.
18      A guy comes down off the
19  stairway and Blackburn tackles him, amongst
20  other people tackled him too.  He made a
21  comment because Blackburn almost fell
22  because he was drunk when he grabbed him.
23  He did fall.  He actually fell on top of
24  him.  And they handcuffed him, took him

Page 194

1  upstairs, and there was a black guy sitting
2  in the apartment -- in the apartment, a
3  black guy was sitting there, boxes full of
4  mushrooms all over the place.
5      Somehow he was sitting there,
6  his phone was on.  I picked up his phone.
7  They didn't notice to look at it, but he
8  was -- the defendant was looking at it
9  first, but I believe Tommy grabbed it and it
10  was unlocked, and then he put it down not
11  even going through it yet because so much
12  was going on in the apartment.
13      The guy picked it up, the
14  defendant, and he locked it.  Tommy picks it
15  up again and said why is this thing locked?
16  Unlock this.  And the defendant refused to.
17  Jeff, Norman, basically do what you do.  And
18  we took him out -- normally we take them to
19  an area where we can do some work on them
20  and beat them up, whatever.
21      As soon as we took him to the
22  balcony, Norman grabs him and lifts him
23  over.  He quickly gave up the code of that
24  phone, and that's how I got all the

Page 195

1  information.  When I had a chance to read
2  the documents and the paperwork and it
3  clearly said oh, the guy fully let you go in
4  his phone and pull out his -- all his
5  additional information that's incriminating
6  towards him.
7      And I said right now I was
8  there.  That man got hung over the balcony,
9  not by me, by Norman, and he freely gave up
10  the information, because he didn't know what
11  was going to happen to him, and he gave it
12  up, and that's how they got more additional
13  information based on what the house was, and
14  we made a phone call and a guy came down
15  from New York and all that other stuff.
16  BY MR. PILEGGI:
17  Q.  Jeff, was anything stolen in that --
18  the Costa Rican job?
19  A.  Well, not to my knowledge.  I found
20  out something was stolen.
21  Q.  What do you mean, later?
22  A.  Later, a suitcase full of money,
23  $210,000, but I had no knowledge of that because
24  we went to the house twice -- the apartment twice.

Page 196

1  We went the first time during the warrant and the
2  second time we went the day after going around
3  again with the supervisor.
4      And I already -- I'll tell you
5  this.  I already know once a warrant is executed
6  and you leave that property you basically -- if
7  you're going back into that property again you
8  need another warrant.
9      We were freely doing that, too.
10  If we feel that we forgot something and had to
11  look around again we go freely search it again,
12  but we already had the first covering warrant
13  already, and we had keys already, and the guy was
14  already in custody, so we can do whatever we want
15  at that point.  So we went to the location twice.
16  Q.  When you said you found out later that
17  $210,000 in a suitcase was stolen, how did you
18  find that out?
19  A.  The Federal Government, because they
20  actually asked did I have something to do with it
21  and I told him no.  I said it ain't -- it ain't
22  surprising to me something was taken and I had no
23  knowledge of it.  Again, if I had took every
24  thousand, it was multiplied what they took because

49 (Pages 193 to 196)

Case 2:14-cv-01643-RBS    Document 61-9    Filed 06/29/22    Page 52 of 159

McIntyre v. Liciardello, et al./Torain v. The City of Phila., et al.

JEFFREY WALKER, 9/15/16

Page 197

1  I was not part of everything that they did. I
2  only was part of extracting information. If I was
3  there -- if something was taken and I was there I
4  got part of it.
5          It wasn't no oh, Jeff, we just
6  found this money and, you know, we'll give it to
7  you. That wasn't happening with me and it
8  definitely wasn't happening with Norman. You had
9  to be there. You had to be on their heels.
10         A lot of time they did a
11 warrant -- that's why the squad was so small, so
12 small. We had the smallest squad in the whole
13 unit. You're talking about six, seven cops in the
14 whole unit. You got squads for 13, 12 people, the
15 standard amount of people running in these houses.
16 No one questioned it.
17         And we were securing these
18 houses with three people, two people, taking --
19 going into the houses without supervisors and
20 securing these houses. No one would question it,
21 what we were doing, and if anyone came to the
22 squad we didn't like, Tommy was the one that said
23 they weren't supposed to be here.
24         That's why we didn't -- we

Page 198

1  could have had a bigger squad but it was all
2  like -- when people would come into our squad
3  Tommy always had something to say. They ain't
4  coming. They ain't coming to the squad. That's
5  why the squad stayed small.
6          Q.   Jeff, did you ever have anybody in the
7  squad that wasn't participating in these thefts?
8          A.   Somebody in the squad that wasn't
9  participating in what we were doing?
10         Q.   Correct. I mean, do you recall any
11 specific examples.
12         A.   I can go all the way back to Chester
13 McCloskey. The only person I'd say wasn't
14 stealing something was Myra Hawkins. She wasn't
15 stealing nothing. We dogged her out because she
16 was the only female in the squad. She was going
17 to school, and her biggest thing was to get some
18 slide time and leave early so she can go take her
19 real estate classes, and we gave her a hard time
20 even doing that.
21         Q.   How long did she last in the squad?
22         A.   She was from the beginning, though.
23 She left somewhere at the beginning. She was --
24 she was there for a little bit but I don't know --

Page 199

1  I couldn't tell you how long she was there. She
2  was working under Chet, Chester McCloskey --
3  Malkowski.
4          Q.   Jeff, I'm going to ask you just
5  generally about search warrants -- or about
6  searches, I'm sorry, not warrants. Did you ever
7  search a house without a warrant?
8          A.   Yes.
9          Q.   Okay. Again, just an approximation.
10         A.   Hundreds of times.
11         Q.   How would that go? First of all, why
12 would you do that?
13         A.   To steal.
14         Q.   Okay. But am I correct that even when
15 there were warrants executed you stole under those
16 circumstances, too?
17         A.   We stole either way. If it was there,
18 we stole it. If we wanted to take it, we took it.
19 We didn't take all the time because we had to give
20 some money up. We had to turn some stuff in. We
21 didn't steal everything we put hands on, we had to
22 put something up.
23         I think there was a rumor, and
24 they used to joke about it and say oh, you're the

Page 200

1  guys that gets the most drugs and less money. We
2  got more drugs than anybody in the building. We
3  got less money than anybody in the building. It
4  was a joke. I mean, it was a joke about
5  everything we were doing, but we knew we had to
6  turn some money in.
7          Q.   So am I correct -- and I don't want to
8  sound stupid but maybe that's a foregone
9  conclusion, but -- so when you went in without
10 warrants, you could steal pretty much anything and
11 everything, whereas when you went in with warrants
12 you would have to report something?
13         A.   The reason we go in without warrants
14 because we the first ones to steal something.
15 Sometimes the supervisor don't want to know
16 everything we're doing regardless of if he knows
17 what we're doing.
18         Sergeant McCloskey, Joe -- is
19 that right -- Joe McCloskey, I had no full
20 knowledge of his stealing anything. The only
21 thing I had knowledge of when Tommy said -- we did
22 a house, that he stole something and he went and
23 told everybody that he stole something. He never
24 confronted Tommy on that, so that was up in the

Case 2:14-cv-01643-RBS   Document 61-9   Filed 06/29/22   Page 53 of 159

McIntyre v. Liciardello, et al./Torain v. The City of Phila., et al.                JEFFREY WALKER, 9/15/16

Page 201

1    air.
2              But I knew at times we wanted
3    to be there before the supervisor was there
4    because if we were stealing something -- we were
5    stealing lots of money, and you couldn't put this
6    money in your pocket, so you want to get there and
7    get it out of there before you -- the supervisor
8    got in there to do some searching with you
9    regardless if he gave you the green light to run
10   in these houses or not. You know what I mean?
11             I don't think they were playing
12   with them too much as far as them knowing he was
13   stealing. That's the only sergeant I know that I
14   don't know for a fact that he knew we were
15   stealing. That was Joe McCloskey. But I know for
16   a fact he was allowing us to do the behavior that
17   he was allowing us to do.
18       Q.   So are you saying he turned a blind
19   eye?
20       A.   A blind eye. Oh, God, he's a dog. He
21   didn't care about nothing unless it was -- all
22   depends on who it was. If it was me -- put it
23   this way.
24             If it was me, if I ran into

Page 202

1    somebody house and he knew, he'd ream me out. I
2    mean, he -- really. Even if I knew it was exigent
3    circumstances and I had backup with me and had
4    reason to be in there and he was nowhere to be
5    around he still reamed me out. What are you doing
6    running in these houses by yourself or whoever
7    you're running with? And I'm just looking at him
8    like we do this all the damn time, and why are you
9    targeting me?
10             But I knew it was something
11   more to what it is and I just left it alone. It's
12   nothing I could complain about. It's like I'm
13   doing things that they're doing. I can't point a
14   finger on what they're doing and I'm doing the
15   exact same thing. So I just sucked it up and just
16   kept it moving.
17             I was getting money. If I was
18   lucky enough to be with these dudes that made the
19   squad I was with I got money. If I wasn't, okay,
20   I made out lucky by myself and I did something I
21   stole all myself and I got money that way, too,
22   but I know it was easier with them to get money,
23   and them is the squad I was with.
24       Q.   Jeff, did you just steal money? I

Page 203

1    mean, was there any incidents where you stole
2    clothes or jewelry or --
3        A.   Oh, we stole clothes, jewelry. Brian
4    used to wear people clothes in their houses.
5    Tommy -- they just -- we were just stealing
6    everything. I mean, it didn't matter. I mean,
7    whatever it was, it was stolen.
8              Jerseys, it was times where one
9    guy, we just -- he had a bunch of throwback
10   jerseys, they came up missing. It was just a
11   mess. It was just stealing.
12       Q.   Jeff, did you ever participate in
13   proceedings where -- forfeiture proceedings, where
14   they're attempting to seize houses or cars or --
15       A.   I mean, I attended forfeiture
16   hearings. That's based on we know is activity
17   done at the houses, but even if the person did win
18   their case on accusation of them selling drugs you
19   still had a forfeiture hearing, and somehow they
20   just use our testimony to -- to proceed with the
21   forfeiture hearing.
22             But I don't know if anyone
23   actually had the house taken under something I
24   testified or they testified and they took it.

Page 204

1        Q.   Did you ever fabricate testimony with
2    regard to those proceedings?
3        A.   Well, we fabricated a warrant and it
4    goes into forfeiture, so that would be yes to the
5    question.
6        Q.   So do you know people's houses were
7    seized based on fabricated testimony?
8        A.   I can't tell you whose house was being
9    seized because I wasn't -- I mean, I don't
10   remember being a witness to that, but I can tell
11   you if we did -- if I did with them or amongst
12   myself fabricate a warrant and got probable cause
13   and somehow they're getting -- they're getting
14   their house seized and I testified at a forfeiture
15   hearing, I don't remember if they got their house
16   seized or not.
17       Q.   Okay. Now, I just want to -- because
18   I know we've all agreed to only go to 4:00 but I
19   just wanted to -- we probably should have done it
20   in the beginning -- go over some of your history
21   as a police officer.
22             First of all, generally, did
23   you -- how was your history as a police officer?
24   Were you ever disciplined?

51 (Pages 201 to 204)

McIntyre v. Liciardello, et al./Torain v. The City of Phila., et al.

JEFFREY WALKER, 9/15/16

Page 205

1      A.   Not so much.
2      Q.   For what?  And this is aside from,
3   obviously, your arrest.
4      A.   I believe I was driving a car and I
5   had a wagon and my partner didn't get out and I
6   hit someone's car, or if a sergeant gave me an
7   order like -- and they gave me a reprimand, and
8   that's normally they type up something and say
9   sign this.  A reprimand is you -- because you
10   didn't do what I tell you to do.  And that's it as
11   far as discipline that I can remember.
12      Q.   Okay.  Were you ever disciplined for
13   stealing money?
14      A.   No.  I would be fired.
15      Q.   Or fined?
16      A.   No.  I would be fired.
17      Q.   How was your performance evaluations
18   generally as a police officer?  And just keep it
19   limited to the time you were in the narcotics
20   squad.
21      A.   I always had good ones.  We were
22   getting -- we were highly decorated cops.  I mean,
23   we were out there doing the job, and not to say
24   every job we did was bad.  We did a lot of good

Page 206

1   jobs and we did them right, but we were stealing,
2   and when the accusation was made against us we
3   stood on them good jobs, and that's just the way
4   it was.
5          I mean, we were stealing, but
6   we did a lot of good out there, too, a lot of
7   good but it doesn't take --
8      Q.   Jeff -- oh, I'm sorry.
9      A.   -- but it doesn't take it of what we
10   were doing -- it doesn't take it from the fact of
11   what we were doing was wrong.
12      Q.   Jeff, in fact, you were -- you were
13   shot at a couple times, weren't you?
14      A.   At least three.
15      Q.   Why don't you tell us what happened
16   there.  And this was while you were acting in the
17   capacity as a police officer, right?
18      A.   The first time I was shot at I was by
19   myself.  I was working with Chester Malkowski.  I
20   was going out by myself doing surveillances,
21   trying to get some drug activity, locations.  He
22   gave me a complaint form, go out there and look
23   for some jobs.  I said okay.
24          I encountered a guy that was

Page 207

1   double parked in the street.  I blew the horn.  He
2   didn't move.  I blew the horn again.  He didn't
3   move.  He got out the passenger -- the driver's
4   side of the car and -- I'm sorry, he got out the
5   passenger side of the car and he said -- and he
6   met me.  I didn't feel something right with him so
7   I met him out in front of the car.
8          Once he knew I was police he
9   kind of like backed down and he was like, well,
10   you not the driver anyway, where's the pass --
11   where's the driver at?  And he was in there
12   pissing, he was urinating in a field, and he came
13   back and -- over and he got in the car.
14          He left.  I thought it was over
15   with but it wasn't.  I pulled past him.  I pulled
16   down two blocks and up two more blocks,
17   approximately four blocks away from where it
18   happened at.  I'm on the phone.  The next thing
19   you know I'm being fired at multiple times.  He
20   shoots out the driver's window, hits the door
21   several times, hits the front of the car.
22          I found out later he was firing
23   on me -- as he got out the car and got to the
24   front of the car he was still shooting at me.  We

Page 208

1   ended up catching him a week later with the squad.
2   We caught him, roughed him up.  He got hit by a
3   car.  He paid for what he did to me.  He was
4   arrested.
5          The second shooting was when
6   the sergeant was shot.  It was 66th and Hubert.
7   There was a buy made by Police Officer Billips.
8   He did a buy and came back with drugs.  We went
9   down.  It was me, Tommy in the car and the
10   supervisor.  I keep forgetting what his name was.
11   He got shot between the legs.
12          I actually got out the car
13   before they pulled up on him and lo and behold I
14   seen them shoot the sergeant and get into a gun
15   battle.  The guy ended up dying.  Another guy came
16   out with a gun.  He was arrested, shot over --
17   hundreds of times.  There was so many shell
18   casings out there it was -- it was -- it didn't
19   make no sense.
20          The last shooting I got in with
21   Norman where it was Tommy Liciardello's job using
22   a CI.  The CI's name was -- I forget the CI's
23   name.  It was orchestrated that he was going to
24   get some drugs but he didn't have no money and the

52   (Pages 205 to 208)

McIntyre v. Liciardello, et al./Torain v. The City of Phila., et al.                    JEFFREY WALKER, 9/15/16

Page 209

1    guy was supposed to bring drugs to a location.
2    This is defendants. Two guys pulled -- two guys
3    walk up to where me and Norman was going to do the
4    takedown.
5                As the guys walked towards us,
6    I was starting to grab one guy and Norman said
7    something isn't right. He had this thing about
8    him that something didn't look right. He -- don't
9    do it. He tried to pull me back, and when he
10   pulled me back the guy lifted his arm and he fired
11   a shot almost hitting me.
12               Norman tackles the guy and the
13   guy's still trying to fire the gun. We're
14   fighting the guy to get the gun from him. We take
15   the gun from the guy and again, rightfully he paid
16   for it. Basically I told him you got -- you have
17   a right to defend yourself at this point and we
18   basically beat the guy to a pulp, handcuffed the
19   guy, and that job was over with.
20               So what I'm saying, a lot of
21   these things -- we've been together for a long
22   time. We've been through the thick of things with
23   each other. This is the worst that it really had
24   gotten, but we've been through some issues and we

Page 210

1    made it through them. So it's impossible for me
2    to do all this by myself and not let these guys
3    who have been shoulder to shoulder with me not
4    know what I was doing.
5                We were all stealing. We all
6    knew what each other was doing. We all knew each
7    other's families. And we made money. We got the
8    same overtime. We hung out together on duty, off
9    duty. We drank together on duty, off duty. We
10   did everything together. You know what I mean?
11   So everyone knew what everybody was doing, you
12   know.
13       Q.   Jeff, I'm going to ask you about --
14   and I have about 15 more minutes -- about
15   overtime. Tell us how that works.
16       A.   That was beautiful. Besides the
17   stealing, stole overtime and court time. The
18   supervisors got off of work at 12:00, he paid
19   until 6:00 in the morning.
20               It was good. Court time, you
21   hung out in court, got paid. Everyone wanted to
22   come to the Field Unit because they knew it was a
23   money -- it was the money train. The court time,
24   kind of pulled back off of that because they --

Page 211

1    too many people started doing it and they started
2    focusing on people hanging out in court. That
3    stopped.
4                But the overtime, our squad had
5    the most. Six or seven of us in the squad
6    compared to 12 people. Other squads used to get
7    mad at us because we made the most money. We made
8    a lot of money in our squad as far as the
9    overtime-wise.
10       Q.   If you had to guess at how much a year
11   you made in overtime, just in overtime.
12       A.   I can remember this, looking at the
13   overtime sheet that comes out I think in the
14   Fortune 500, something like -- some crazy list
15   they come out with with the overtime.
16               John Speiser was the highest
17   paid cop in the whole entire city besides
18   homicide, the highest paid cop. When we was in
19   the field we got paid more than the bosses, the
20   boss of all the captains and stuff like that. The
21   only people that got paid more than us is homicide
22   detectives, you know.
23       Q.   If you could -- over 100,000 in
24   overtime a year?

Page 212

1        A.   No. You're talking about the most --
2    no one made two hundred something thousand dollars
3    on their taxed. We were making like 134.
4    Somewhere close to, you know, in the 30 range,
5    mid-30 range we were making. I made 119.
6                We had the highest paid squad.
7    I mean, you talking about the guys in the Field
8    Unit were making -- happily were making 80, 90,000
9    a year and we was making 134, 120 -- at the
10   highest some people were making 134 when I was in
11   there. You know, we wasn't even working for that
12   overtime. You know what I mean? When you
13   got a -- per pay period you got a -- your
14   supervisor's throwing you extra hours here and
15   there that builds up. So it was -- it was great.
16   It was good.
17               MR. PILEGGI: I would prefer
18       breaking now but if anybody --
19                       - - -
20               (Whereupon, a discussion was
21       held off the record.)
22                       - - -
23               (Whereupon, at 3:50 p.m., the
24       deposition was adjourned.)

53 (Pages 209 to 212)

McIntyre v. Liciardello, et al./Torain v. The City of Phila., et al.                    JEFFREY WALKER, 9/15/16

---

Page 213

1    C E R T I F I C A T E

2

3    COMMONWEALTH OF PENNSYLVANIA :

4                    :    SS

5    COUNTY OF PHILADELPHIA        :

6

7

8            I, ROBIN FRATTALI, Registered

9    Professional Reporter - Notary Public, within and

10   for the Commonwealth of Pennsylvania, do hereby

11   certify that the proceedings, evidence, and

12   objections noted are contained fully and

13   accurately in the notes taken by me of the

14   preceding deposition, and that this copy is a

15   correct transcript of the same.

16

17

18

19

20            _____

              ROBIN FRATTALI

21            Registered Professional

22            Reporter - Notary Public

23

24

---

Page 214

1         INSTRUCTIONS TO THE WITNESS

2         Read your deposition over carefully

3    It is your right to read your deposition and make

4    changes in form or substance.  You should assign a

5    reason in the appropriate column on the errata

6    sheet for any change made.

7         After making any changes in form or

8    substance which have been noted on the following

9    errata sheet along with the reason for any change,

10   sign your name on the errata sheet and date it.

11        Then sign your deposition at the

12   end of your testimony in the space provided.  You

13   are signing it subject to the changes you have

14   made in the errata sheet, which will be attached

15   to the deposition before filing.  You must sign it

16   in front of a witness.  Have the witness sign in

17   the space provided.  The witness need not be a

18   notary public.  Any competent adult may witness

19   your signature.

20        Return the original errata sheet to

21   Summit Court Reporting promptly.  Court rules require

22   filing within 30 days after you receive the

23   deposition.  Summit will distribute copies of your

24   changes, if any, to all counsel in the case.

---

Page 215

1                    ERRATA SHEET

2    Attach to Deposition of:  Jeffrey Walker

     Taken on:  September 15, 2016

3    In the matter of:  McIntyre vs. Liciardello,

     Torain vs. City

4

5    PAGE    LINE NO.    CHANGE      REASON

6    _____

7    _____

8    _____

9    _____

10   _____

11   _____

12   _____

13   _____

14   _____

15   _____

16   _____

17   _____

18   _____

19   _____

20   _____

21   _____

22   _____

23   _____

24   _____

---

Page 216

1              SIGNATURE PAGE

2

3              - - -

4

5         I hereby acknowledge that I have

6    read the aforegoing transcript, dated September

7    15, 2016, and the same is a true and correct

8    transcription of the answers given by me to the

9    questions propounded, except for the changes, if

10   any, noted on the Errata Sheet.

11

12              - - -

13

14

15

16

17   SIGNATURE:  _____

              Jeffrey Walker

18

19   DATE:  _____

20

21   WITNESSED BY:  _____

22

23

24

---

54  (Pages 213 to 216)

Case 2:14-cv-01643-RBS   Document 61-9   Filed 06/29/22   Page 57 of 159

McIntyre v. Liciardello, et al./Torain v. The City of Phila., et al.                                        JEFFREY WALKER, 9/15/16

## A

a.m 2:7 112:15,16
113:6 119:10
abbreviated 113:8
abbreviations
113:2
ability 48:18 178:3
able 126:5 160:17
aboard 58:17 132:2
abuse 144:24
Academy 15:12,15
15:18 16:4
acceptable 159:5
159:12
accompanying
134:14
accurately 213:13
accusation 147:15
159:15 203:18
206:2
accusations 169:18
accustomed 130:1
130:23
acknowledge 216:5
act 166:11,18
acting 31:9 165:16
206:16
action 1:3,8 6:12
12:15 139:13
155:15
actions 130:14,15
157:1,22
activities 15:24
88:15 99:9 107:2
activity 29:24 32:3
64:24 73:24 84:3
84:20,23 85:13
86:3 87:16 88:9
99:4 103:14
104:16,19,21
106:3,6 123:24
131:24 132:8
203:16 206:21
acts 165:16
additional 102:17
103:9 116:10
195:5,12
address 28:6
100:11 110:22
112:18
addresses 29:4
128:2
adjourned 212:24
adult 214:18
Affairs 145:19
146:6 147:7,11,13

160:12 178:20,24
affiant 22:20 23:2
35:9 36:13,15
37:2,12 39:23
40:3,8,14 41:4
45:7,8 86:22 93:9
107:16 115:18
118:2 122:2,16
affiant's 36:20
affiants 22:17
affidavit 33:3 40:11
40:17 41:3,17
83:13 85:21,23
104:6 114:1,1,4,5
118:3 121:3,9
affidavits 22:19
45:11 120:22
aforegoing 216:6
afternoon 123:6,8
123:10
agent 69:6 174:24
ago 24:17 188:2
agreed 204:18
agreeing 37:6
agreement 8:5
ahead 51:13,13
90:16 111:19
117:8 138:17
149:5 184:7,11
185:14
ain't 23:8 46:9
63:11 119:24
120:7 121:1
129:20,22 133:4
162:13 163:18
172:5 173:23
182:11 184:8
185:8 188:10,12
190:24 191:21
196:21,21 198:3,4
air 201:1
al 1:5 98:2
allegation 150:17
171:2
allegations 77:12
140:7,13 141:16
145:21 149:17
150:3,15,18,19
154:22,24 155:2
161:1 167:13,23
169:8
alleged 112:22
113:1
allegedly 99:3
131:8
alleging 76:22
allow 73:20

allowed 102:8
allowing 74:23 75:1
153:8 201:16,17
amber 111:1
115:15 116:7,19
116:21 128:15
amount 35:13,19
35:23,23 132:6
197:15
amounts 48:2
AND/OR 7:9
announce 35:18
annually 74:10
anonymity 134:19
answer 7:3 13:20
35:17 150:23
170:15
answered 147:4
answers 216:8
anybody 28:3 91:11
156:5 171:1
172:18 184:9,10
198:6 200:2,3
212:18
anybody's 167:5
anymore 80:1
132:17 164:21
anyway 31:7 145:6
207:10
apartment 187:10
187:11,14,23,23
188:7,12,14 189:1
192:21 194:2,2,12
195:24
appear 6:11 12:9,14
APPEARANCES
3:1 4:1
appeared 189:17
appears 13:23
116:4 119:9 128:7
application 114:18
applied 132:5
appreciate 173:18
appropriate 214:5
approval 155:19,23
156:3
approve 17:14
approved 31:16
92:20 114:13
118:21,24 137:8
164:22
approves 31:14
approving 123:16
approximate 13:12
33:11 34:21 35:22
42:19 96:12
approximately 2:7

33:6 40:2 106:13
113:2,3,5 141:8
207:17
approximating
13:13
approximation
74:17 199:9
Arch 4:8
area 27:22 28:5
36:5,8 47:2,11,12
56:24 71:10,11,17
71:20 72:16 131:9
136:6,13,14,16,18
137:6 187:6,6
190:16 194:19
areas 36:3 89:19
190:17
argument 177:9
arm 209:10
Armando 4:6 9:10
armando.brigand...
4:10
arrest 19:7 25:3
32:19,20,22,24
33:7 44:7 45:8
63:23 77:14,22
91:23 105:3
106:12 124:11
140:9 141:5,13,19
141:20,21 142:4
145:1,6 168:9
174:3 176:9
179:10 205:3
arrested 41:9,12,21
41:23 42:2,3,20
43:7 63:24 64:14
73:11 77:13 90:23
91:18 94:9 95:20
101:15,16 105:7
106:8,12 107:5
108:2 128:2
129:11 139:14
143:22 158:16,23
168:7 176:6 178:6
208:4,16
arresting 37:14
139:19 142:5
179:18
arrests 27:21 30:1
179:10
articulate 89:22
104:15
articulating 43:24
articulation 44:4
63:2,5,12 87:6
89:24 131:1
articulation's 88:17

ascertain 84:18
ascertained 104:12
aside 179:9 205:2
asked 38:5 45:7
147:2 149:13
158:15 176:13
196:20
asking 12:24 13:3
80:3,9,11,12,23
128:19,23 168:15
172:11 173:7,8
ass 49:16 179:22
assault 145:2,4
assign 23:15 24:2
214:4
assigned 21:6 24:2
83:2 99:16 108:7
185:24 186:1
assignment 83:2
83:21
assist 154:8
assistant 4:8 5:2
9:12,24
assume 15:12 26:9
28:9 31:12 163:6
assumption 61:8
170:21
Atlantic 59:21
60:14,18
atmosphere 126:4
126:18
attach 117:13 215:2
attached 114:4
214:14
attempting 203:14
attend 14:22
attended 203:15
attention 55:1
166:19,22
attorney 3:6 10:1
14:7 148:10
150:20 154:6
attorneys 13:1 60:3
available 126:21,22
Avenue 61:5 180:8
191:12
aware 67:18 76:16
76:18 77:18,19
83:18 99:11,13,15
102:1 105:5
106:10,15,19,23
108:10 122:13
124:6 137:5
155:14,20 170:12

## B

B-R-I-A-N 11:14

Case 2:14-cv-01643-RBS    Document 61-9    Filed 06/29/22    Page 58 of 159

McIntyre v. Liciardello, et al./Torain v. The City of Phila., et al.                              JEFFREY WALKER, 9/15/16

**back** 17:19 26:4,11
  26:24 28:14 32:6
  32:8 38:11 39:20
  46:24 50:15 51:20
  63:20 68:13 75:19
  88:23 92:9,10,14
  96:5 102:2 103:7
  104:2,10 105:17
  106:8,16 108:22
  120:7,15,24
  123:21 125:5,8
  128:6 131:17,18
  138:7 141:7
  145:13,14 146:22
  148:16,21 151:17
  151:19,23 152:15
  152:17,23 153:1
  158:1 159:22
  160:1,16,16 161:1
  162:12 163:7,22
  164:10,16 165:21
  165:22,24 167:11
  170:10 173:13
  177:8,12,13 179:5
  182:13 184:1
  185:21,22 189:13
  190:2 196:7
  198:12 207:13
  208:8 209:9,10
  210:24
**backed** 207:9
**background** 81:3
**backs** 86:1 151:7
  151:18
**backup** 102:24
  103:3 202:3
**bad** 42:24 110:20
  174:12 205:24
**badge** 1:11,12,14
  99:2 118:14
  120:12
**badges** 180:15
**bag** 36:18,23 37:7,8
  47:5,6 97:2
  102:18,22 187:1
**bagged** 190:23
**baggies** 113:3
  115:14
**bags** 47:7,9 112:21
  187:1
**Bail** 41:18 119:6
**balcony** 194:22
  195:8
**ball** 100:23 104:18
  123:2
**bar** 180:8,10 181:11
**Barr** 3:17

**Barrington's** 73:9
**bars** 59:17,19,19
**Basara** 4:4 9:9
**base** 20:19,21
**based** 102:11 107:1
  122:3 129:9
  192:17 195:13
  203:16 204:7
**basic** 73:21
**basically** 15:21
  17:10 18:5,20
  19:20 26:19 30:13
  32:5 33:18 44:1,5
  50:20 51:10,15
  56:22 68:19 70:20
  73:3 74:12 88:17
  91:14 98:18
  109:11 112:4
  121:23 145:7
  147:24 149:12
  150:7 154:11
  155:8 157:22
  173:15 174:15
  179:20 194:17
  196:6 209:16,18
**basis** 27:1 80:15
  86:7 184:19
**basketball** 183:10
**bathroom** 68:12
**battle** 208:15
**beat** 16:7,8 125:2
  141:17 142:2,12
  182:19 183:4
  194:20 209:18
**beating** 142:22
**beatings** 143:2
  144:22
**beautiful** 210:16
**beer** 60:6,7,8
**began** 44:23
**beginning** 2:6
  14:18 31:21 33:18
  50:15 52:14 53:10
  89:23 107:17
  138:11 198:22,23
  204:20
**behalf** 9:3 139:16
  139:18 140:19
  141:5 151:4,5
**behavior** 130:23
  159:5,12 201:16
**behold** 208:13
**believable** 124:4
**believe** 24:11 35:6
  49:15 53:13 67:16
  73:14 86:2 94:23
  95:7 96:3 99:6

101:4 112:13
114:18 122:22
123:5,9,23 125:17
129:11 130:18,20
132:17 133:2,3
139:23 158:14
159:3 168:2 186:1
193:2 194:9 205:4
**believed** 41:22
  89:18 100:16,24
  102:14,19 122:4
  158:22
**believes** 126:10
**believing** 88:6
  123:15
**bellwether** 9:5
**BEREZOFSKY** 3:20
**best** 30:3 48:18
  107:20 183:10,15
  184:16
**better** 90:3,4,4
  163:9 176:24
**Betts** 4:19 9:18
  10:18,19 53:18
  54:2,4,6 62:3 65:8
  92:7 93:22
**big** 59:22 62:3
  187:1 190:10
**bigger** 67:11,11
  198:1
**biggest** 55:1 94:12
  181:23 198:17
**Billips** 208:7
**biographical** 29:2
**bit** 23:4 62:23 63:23
  76:17 87:16 93:18
  97:22 125:6
  138:24 139:1
  161:7 169:4
  174:17 182:13
  198:24
**black** 62:15 193:8,9
  194:1,3
**Blackburn** 56:12
  192:23 193:7,19
  193:21
**blank** 38:7 123:20
  135:10,23 157:9
  157:23 161:18
  162:1 163:7,14,18
**blanks** 126:9
**Blaylock** 140:21
**blew** 207:1,2
**blind** 201:18,20
**block** 55:19 88:3
**blocks** 131:18
  207:16,16,17

**blue** 125:8
**board** 29:13 51:21
  120:5 183:8
**body** 70:19 110:24
  118:24 119:16
**bone** 58:2
**Bonneville** 99:18
  99:19
**book** 108:5
**born** 59:9
**boss** 155:12 171:21
  211:20
**bosses** 56:11
  211:19
**bottle** 106:21
  116:19
**bottles** 111:1
  115:15 116:7,19
  116:22,23 128:15
**bottom** 115:18
  118:24 190:13
**bought** 74:1 135:8
  136:5
**Boulevard** 4:21
  190:11,14,16
**boxes** 192:13 194:3
**BOYCE** 3:15,16
**boyfriend** 165:8,9
**Brad** 21:19
**bragged** 58:9,16,20
  59:3
**bragger** 58:20
**bragging** 58:1
  181:11
**bread** 51:10 181:10
**break** 13:17 75:9
  138:1
**breaking** 51:10
  181:9 212:18
**Brian** 4:18 5:7
  11:13 21:19 50:16
  50:20,23 51:1,2,4
  51:17,21,22 52:6
  53:17 61:24 62:11
  65:6 76:4,4 84:9
  92:6 93:21 115:21
  122:18 149:21
  152:10,11,22
  184:24 185:2,3,19
  186:15 187:14,17
  187:22 189:8
  190:8 193:11,12
  193:13 203:3
**brick** 94:15 95:7,16
  96:7
**bricks** 95:2,18,19
  95:22 96:4

**BRIDANDI** 9:10
**bridge** 3:16 191:12
  191:13,15
**bridges** 191:14
**brief** 30:14
**Brigandi** 4:6 9:11
**bring** 94:11 108:24
  146:21 169:23
  173:5 184:18
  209:1
**bringing** 70:20
  181:11
**Brittney** 3:19 9:3
**bro** 171:15
**Broad** 3:11
**broke** 46:21,22
  170:7
**broken** 25:6 54:15
**brother** 172:7,7
**brought** 94:2,7
  159:22 166:19,21
  166:22 167:14,24
  168:22 185:21,22
  192:11
**brushed** 68:20
**Bryant** 50:24
**buddies** 183:15
**build** 44:2
**building** 54:22
  100:16,20 151:12
  187:24 200:2,3
**builds** 212:15
**bump** 145:5
**bumped** 82:3
**bunch** 86:15 177:12
  180:1 203:9
**bundle** 104:17
**bureau** 16:23 17:2
  18:4 25:1
**burglary** 16:17
**business** 88:1,2,2
  148:22 180:4
  181:12 191:16
**buy** 28:20 31:8 32:8
  32:23 34:8 35:14
  71:7,12,14,16,20
  72:4,12,15,19
  74:2 81:15 87:19
  132:14 133:23
  134:14,15 135:6,7
  135:17,18 136:10
  137:6 157:10
  161:13 163:4
  165:21,23,23
  208:7,8
**buying** 132:13
**buys** 18:21 19:5

Case 2:14-cv-01643-RBS Document 61-9 Filed 06/29/22 Page 59 of 159

McIntyre v. Liciardello, et al./Torain v. The City of Phila., et al.                JEFFREY WALKER, 9/15/16

22:7 34:6 74:3
132:24 167:2
**bypass** 56:6
**Byrne** 2:4

**C**

**C** 213:1,1
**call** 12:21 17:15
23:23 25:12 34:3
36:16 38:22,23,23
39:3,4 56:11 57:8
81:14 92:21 93:3
93:5 95:13 97:2
131:16 133:1
146:15 147:13
152:5 153:18
169:14 179:14
180:10 184:22
185:9 187:19
192:14 193:11,12
193:14,17 195:14
**called** 36:15 54:12
54:14 56:13 69:5
95:15 174:23
184:24 185:1,1,4
185:5
**calling** 19:2 169:18
172:2 184:15,17
**calls** 95:24
**Camac** 3:3
**cameras** 188:23,24
189:1
**capacity** 1:15 64:18
82:18,19,22
206:17
**caps** 111:1
**captain** 24:15,16,18
25:21 56:11 193:9
193:10
**captains** 211:20
**car** 15:22 16:16,16
35:4 46:23,23
47:4 60:1 68:4,10
68:13 131:14,19
132:22 133:3,8
136:24,24 137:1
160:22 179:20
186:4,16,18,23,23
186:24 187:1,15
187:16 189:9,9,10
189:11,12,14,15
189:16 205:4,6
207:4,5,7,13,21
207:23,24 208:3,9
208:12
**card** 69:4 174:24
**cards** 62:21

**care** 201:21
**careful** 50:6 69:7
171:15,16,17
173:17
**carefully** 214:2
**cargo** 186:9
**Carl** 21:20 118:7
**carried** 70:15
175:10,11,13
189:3,5
**carry** 165:18,19
**carrying** 60:4
102:18
**cars** 87:24 88:4,7
124:3 132:20
180:2 187:5
203:14
**case** 8:19 62:24
63:1,4,6,18 73:14
75:5 76:7 77:12
77:16,21 78:1
80:1,6,20 83:14
83:15 84:6,15,15
90:23 91:17 97:22
97:23,24 103:17
109:17 122:9,21
127:1 139:24
140:8,18 160:24
160:24 165:20
203:18 214:24
**cases** 33:15,16
48:1,7 76:11,17
76:19,21 77:6,6
79:10 88:22,23
93:15 140:7,14,17
141:4,14 142:20
145:17 153:1,3
163:23 167:10,11
168:22
**cash** 42:1
**casings** 208:18
**catch** 149:2 154:12
181:8
**catches** 120:21
**catching** 44:11
208:1
**categorize** 37:20
**caught** 41:15 44:10
44:15 148:22
158:24 208:2
**cause** 30:1 31:10
35:8 41:4,18 44:2
44:7 77:14 83:12
84:5 85:21 86:23
88:18 104:7 105:2
114:7 121:4,24
122:5 204:12

**cell** 125:20 131:16
**Center** 3:16 16:7
**certain** 27:17 52:23
89:19 90:8 134:15
137:6,6 182:18
**certification** 8:6
**Certified** 1:21 7:12
**certify** 138:17
213:11
**chain** 30:8 31:15
**chance** 28:14
107:20,20 195:1
**chances** 119:7
**change** 214:6,9
215:5
**changes** 214:4,7,13
214:24 216:9
**changing** 178:18
**charge** 93:2 119:4
**chased** 143:6 144:6
144:7
**chasing** 44:11
181:6 184:14
**check** 26:21 27:4
27:18,20,20,21,24
28:3,10,11,11
29:3 92:8,13
118:9 136:23
188:22
**checked** 160:13
**checking** 22:11
27:5
**checks** 27:15 29:16
136:21,21
**chem** 120:20
**chemical** 38:24
**Chester** 50:2,19
52:20 57:16 58:18
59:23 65:8,10,17
152:7 198:12
199:2 206:19
**Chestnut** 3:7
**Chet** 50:1,20 51:14
52:12,12,14,18,19
52:20 53:4,4,8
57:15 68:23 199:2
**Chief** 4:7
**childish** 177:12
180:2,13
**Chitwood** 58:1,3,4
**choice** 126:19,21
126:21
**choose** 31:2 35:15
**chop** 50:12
**Christie** 4:20,20
9:20,20
**Christmas** 16:8

**CHRISTOPHER**
3:21
**CI** 29:17,22 30:10
34:2 58:19 71:6
72:18 87:17,18,18
136:10 137:5,18
137:20 161:9,18
162:2,12,18,20
163:13,24 164:19
165:6 166:7,8,9
166:10 167:1,6
208:22
**CI's** 208:22,22
**circumstances**
77:15 78:11 103:5
105:15,19 111:24
112:6 113:5 114:7
117:8 122:6 142:1
199:16 202:3
**Cls** 77:1 161:9
165:15,15 166:24
**citizens** 170:20
179:9,12,14
**city** 1:9 4:6,7,8,11
9:11,13,15 16:7
22:14 59:21 60:15
60:18 76:2,11
79:7 132:20
152:11 153:3,6,7
153:14 167:16
211:17 215:3
**civil** 1:3,8 6:11
12:15 76:13,23
139:13 140:9
141:11,12 153:11
155:15 157:22
**claiming** 119:15
**clarify** 91:5 178:8
**class** 18:10,11,14
**classes** 198:19
**clear** 13:13 64:22
94:10 101:11
103:12 106:1
111:7 112:21
113:3 115:13
128:23 137:4
139:15 152:6,8
177:10,20 192:20
**clearance** 155:19
**clearly** 66:22 69:21
87:13 108:12
109:7,8 111:24
123:2 157:4
163:16 195:3
**click** 123:11
**client** 99:17 101:7
101:15 102:5

103:13 122:10
**clients** 140:19
141:5 151:4,5
**close** 59:8,10,15
62:4 71:12 86:11
88:14 141:4
160:22 161:4,4
212:4
**closely** 187:21
**closer** 69:14
**closet** 188:14
**clothes** 203:2,3,4
**cocaine** 94:16,20
112:22 113:2
115:14
**code** 15:20 74:13
109:1 194:23
**coke** 97:15
**COLEMAN** 4:13
**collected** 37:11
**collecting** 119:23
**Collection** 66:12
**column** 214:5
**come** 23:16 24:4
35:24 36:14 37:1
39:13 47:20 51:20
57:14 62:18 86:9
92:9,13,23 100:21
102:20 104:14
105:22 106:7
107:3 120:1 125:5
131:17 152:15
155:10 164:9,16
165:21,24 171:13
173:8 183:3
184:20 198:2
210:22 211:15
**comes** 23:23,24
38:11 44:20 46:6
49:2 71:19,22
85:5 86:1,4
120:18,20 126:18
152:19 192:10
193:18 211:13
**comfortable** 129:1
**coming** 32:8 102:18
104:16,20 118:1
122:23 123:1,3,22
124:1 126:17
148:20 151:19
173:6 175:14
179:5 198:4,4
**command** 30:9
**comment** 188:9
193:21
**Commission** 41:19
119:6

**Commissioner**
156:14,15
**Commissioner's**
156:24
committing 73:23
165:15 166:11
167:7
**common** 76:22
87:7 123:14
125:11 166:12
179:21 184:19
**Commonwealth**
2:9 213:3,10
**communicate**
26:24 28:14 183:4
**communicated**
160:6
**communicating**
68:5
**compare** 146:23
**compared** 211:6
**competent** 214:18
**complain** 202:12
**complainant** 168:7
168:11
**complained** 191:24
**complains** 145:23
**complaint** 6:13
24:1 75:15 76:1,2
145:15,21,24
146:1,2,3,4
150:15 154:23
206:22
**complaints** 27:23
147:8 160:9
167:14,17,24
192:4
**complete** 32:12
**computer** 39:9,13
108:15 118:9
**concealed** 30:4
**concern** 68:5
**concerned** 67:22
171:9 172:8,17
174:1
**conclusion** 125:22
200:9
**concocted** 96:6
**conduct** 65:13
**conducted** 168:21
**conducting** 34:18
**Conestoga** 99:24
100:7
**confidential** 26:10
26:15,18 28:21,23
29:1,14 41:13
42:11 78:14,17,20

78:21,23,24 79:4
79:6,12,15,19,22
80:5,19 81:9 82:3
82:14,18 83:10
134:4,6,13,18
161:10,12 165:17
**confirmed** 187:10
187:10,11
**confiscate** 36:21
**confiscated** 36:20
101:19 109:19
112:1,18 113:6
115:12 116:6,20
117:3 121:6,7
190:4
**conflict** 153:19
**confronted** 200:24
**connection** 117:15
117:24
**Conshohocken**
3:17
**considered** 16:23
16:24 18:18
**constant** 86:7
**constantly** 103:10
131:20 180:11
**constitutional**
76:23 158:5
**constructed** 155:11
**contact** 38:17
108:17
**contained** 40:10,16
112:21 213:12
**containing** 106:21
115:14
**continue** 61:17
66:23 67:8
**continuing** 132:14
**continuous** 27:1
**contraband** 35:7
101:18
**control** 29:12 36:7
57:7 95:19 120:5
**controlled** 32:4
**controlling** 23:6
**conversation** 56:20
85:24 99:13
157:20 176:12,22
177:7
**cool** 152:15 173:1
**coolers** 60:9
**Cooper** 4:7 9:14
**cooperate** 64:19,20
66:23
**cooperated** 64:15
**cop** 31:4 32:5 131:7
137:17 154:13

173:19 211:17,18
**cop's** 32:6
**copies** 38:2 109:22
214:23
**cops** 87:21 88:9
126:9 133:4 150:8
170:18 173:11
186:10 197:13
205:22
**copy** 108:22 113:24
125:8 213:14
**corner** 92:24
**Corporal** 128:16
**correct** 12:9 14:1,2
14:11 16:1 20:8
29:9 32:14 38:1
39:1 40:11 41:6,7
53:24 55:22 63:24
64:15 66:16 67:2
67:3,5 76:5,6,9,19
77:3,4,10 78:5
79:13 83:5 84:12
85:11 91:18 101:2
101:12,15 109:12
112:10 114:8
115:9 116:2,7,10
116:17 118:14
120:16 129:13
134:3,4,16,20
135:13 137:6
139:1 141:3
148:10 150:12,16
150:21 153:4,13
153:19 155:13
156:18,21 161:14
161:21,22 164:17
164:19 165:3,5,12
168:9 170:14
198:10 199:14
200:7 213:15
216:7
**corrected** 108:20
109:11
**corrections** 108:19
138:15,16
**corresponding**
161:13
**corroborate** 27:5
32:14
**CORTES** 4:14
**Costa** 192:9 195:18
**counsel** 3:5,9,14,19
3:24 4:4,11,17,23
8:5 153:14,19,20
153:21 214:24
**count** 25:5 33:13
34:22 37:5

**counted** 37:3
**counting** 61:19
96:14 190:21
191:1
**countless** 167:1
**COUNTY** 213:5
**couple** 45:21 59:23
62:14 151:13
152:24 206:13
**course** 14:16 18:4,6
23:16 24:3 31:7
147:17
**court** 1:1,21,21
20:18 48:18 60:13
62:16,23 63:9,11
99:14 138:16
140:15 144:2,21
146:4 169:13
210:17,20,21,23
211:2 214:21,21
**courthouse** 2:4
62:7
**Courtoom** 2:5
**courtroom** 53:23
**cover** 109:18
112:17 143:2
144:21 182:22
**covering** 196:12
**covers** 169:12
**crack** 112:22 113:1
115:15,15 177:16
**crap** 55:19
**crazy** 67:14 142:14
175:1 183:12
188:20 211:14
**credibility** 88:21
**credibility's** 148:21
**crimes** 15:20 74:13
153:10 167:7
**criminal** 28:3,5
29:3,24 64:24
73:24 86:2,3 88:8
103:14 106:3,5
123:24 131:23
132:8 165:16
166:11
**crowbar** 190:19
**Cujdik** 50:22 51:6
**CUKER** 3:20
**current** 124:24
**custody** 196:14
**custom** 41:14 42:7
42:8,22 125:13
157:7,8,12
**cut** 186:21

━━━━━━━━━━
**D**
━━━━━━━━━━

**D** 3:11 6:1
**DA** 60:2 62:19
123:19
**dad** 58:8,10,12,13
58:14
**dad's** 58:22
**daily** 147:16
**damn** 125:23 202:8
**dangerous** 180:20
182:23
**dark** 187:6
**date** 38:16,20 39:1
39:6,11,15,16
107:10 108:19
109:5,10 111:5,6
111:13 112:2,12
112:20 114:11,18
115:1 214:10
216:19
**dated** 128:9,14
216:6
**day** 89:11,14,15,15
96:5 97:19 104:8
105:7 112:19
115:24 116:6,11
128:10,14 159:10
162:19,20 180:11
186:15 196:2
**daylight** 123:8
**days** 30:10 87:12
89:2,4,5 138:14
214:22
**deactivate** 132:16
**deactivated** 30:2
164:18,20 165:12
**deactivating**
164:18,22
**deaf** 180:6,6
**deal** 48:19 95:16,17
120:17 179:24
184:22 185:6
**dealer** 41:16,16,21
186:6
**dealers** 95:15
180:18 181:2,23
**dealing** 18:20 31:23
62:9 73:4 89:18
95:14 120:22
137:12 179:24
185:6,8
**dealt** 179:17
**death** 186:11
191:18
**decide** 17:13
**decided** 91:13 94:6
94:6 187:13
**decision** 23:19,21

Case 2:14-cv-01643-RBS   Document 61-9   Filed 06/29/22   Page 61 of 159

McIntyre v. Liciardello, et al./Torain v. The City of Phila., et al.                                      JEFFREY WALKER, 9/15/16

82:9 164:5
decisions 130:19
decorated 205:22
deep 170:1 174:10
defend 209:17
defendant 4:11
   76:3,4,4,12,18
   143:20 144:12
   153:8 156:20
   194:8,14,16
defendants 1:6,16
   4:17,23 10:4,9
   13:2 53:23 89:1
   91:10 128:2 209:2
defense 60:3
   156:21
definitely 43:5
   118:23 174:23
   179:4 197:8
Delaware 61:4
delete 108:18
deleted 110:22
denied 191:21
DENNEHEY 4:13
department 4:6
   15:11 30:13 74:7
   77:3 170:17
depends 38:22
   126:15 201:22
deponent 53:21
deposition 1:18 2:3
   7:1 12:21 13:3
   75:12 138:4,14
   168:14 212:24
   213:14 214:2,3,11
   214:15,23 215:2
deputy 4:7 192:23
   193:6
describe 127:19
described 54:13
describing 49:22
   111:21 114:6
description 6:10
   117:17
descriptions 83:8
deserve 43:2
designate 23:20
   70:16 108:7
designated 36:3,5
   36:8 47:14 93:7
desk 188:1
destroyed 155:22
destruction 102:12
detail 19:8 22:9,15
   23:5 26:7 27:7
   28:13,16 32:11
   39:22 41:10 126:4

127:22 128:1
   150:4
detailed 22:5 93:19
   128:3 148:13
detective 19:9,10
   51:21
detectives 211:22
determine 31:17
determines 19:11
develop 46:4
developing 22:12
dials 182:1
DIAMOND 133:13
DIANA 4:14
die 177:12
difference 80:11
   90:6
different 15:24
   18:15 20:18 22:2
   25:7,8 31:19 53:5
   54:19 144:9,11
   166:14 170:17
   178:21
direction 53:22
DIRECTIONS 7:3
directly 56:5
dirty 68:9 176:24
disappear 131:16
   164:9,15
disapprove 17:14
discipline 205:11
disciplined 204:24
   205:12
discretion 82:5
discuss 83:23
   146:9,13,13
   176:15
discussed 94:24
   147:10 154:10
   155:4
discussing 56:23
   97:3 134:4
discussion 11:4
   63:19 104:1 110:9
   122:3,22 124:15
   127:11 133:16
   143:10,18,19
   155:6 157:3,5
   177:4 192:6
   193:15 212:20
discussions 103:21
   154:21
distinction 78:22
   81:24
distribute 214:23
distribution 83:17
   84:19

district 1:1,1 16:6
   16:10,13 19:15
   45:2 187:18 188:2
disturbances 27:23
disturbed 68:17
divided 94:3
division 52:13,15
   52:16 152:12
DOCKET 1:4
document 162:7
documents 6:18
   7:6 113:15 114:3
   195:2
dog 201:20
dogged 198:15
doing 14:4 16:18
   18:22,23,24 19:7
   24:3 27:16 28:20
   29:1,3 30:19 32:8
   32:21 33:19 34:10
   34:17 38:1,6
   40:24 41:14 59:12
   60:2 61:11 65:14
   71:14 73:6,6
   81:19,20 93:5
   97:15 98:5 103:9
   104:20 106:24
   117:3 125:15,23
   130:24 132:13,24
   133:22,23 135:2
   136:21 146:10,11
   147:16 148:22,22
   149:12 150:22,24
   151:1 158:5,19
   159:1,7 160:14,14
   162:13,16,17
   164:12 167:2
   171:16 176:1
   178:5 179:21
   180:15 183:16
   189:20 192:3
   196:9 197:21
   198:9,20 200:5,16
   200:17 202:5,13
   202:13,14,14
   205:23 206:10,11
   206:20 210:4,6,11
   211:1
dollar 34:9,14
dollars 212:2
Dominick 24:11,14
door 35:17,24 36:1
   62:17 172:23
   188:8 207:20
double 207:1
downstairs 189:4,6
draft 152:5

drank 60:9,9,10
   97:18 210:9
draw 182:17
dreads 171:24,24
drink 59:17 60:5
drinkers 59:18
drinking 60:4 97:13
drive 3:17 87:24
driver 193:8 207:10
   207:11
driver's 207:3,20
driving 99:18
   189:10,15 205:4
drug 27:16 41:15
   41:16,21 84:3
   85:13 89:5 95:15
   104:16,19 120:19
   132:12 180:18
   181:2,23 206:21
drugs 18:6 41:19
   42:2 44:12 72:20
   85:6 90:11 93:16
   93:17 94:1,7,8,13
   94:17 96:15,22
   101:20 102:14
   123:1,21 124:1
   129:3 132:13,14
   181:22 184:8
   185:7 192:18
   200:1,2 203:18
   208:8,24 209:1
drunk 193:7,8,22
drunks 59:18 97:18
dude 180:11 182:16
   188:3
dudes 175:20 177:2
   177:2 184:13
   186:8 202:18
duly 8:12
Dupriest 139:23,24
   140:18
Dupriest's 140:8
duration 64:12
duties 16:14 21:24
   23:16 24:4
duty 60:5 210:8,9,9
   210:9
dying 182:16
   208:15

E

E 6:1 213:1,1
earlier 48:17
early 48:11 139:5
   140:6 163:12
   198:18
easier 49:20 202:22

easily 102:16
East 52:13,15
   152:23 191:9,12
EASTERN 1:1
Edwards 5:2 9:23
   9:24
eggshells 177:1
either 13:5 28:20
   32:18 35:14 46:24
   81:14 92:6,23
   119:5 130:14
   136:10 155:17
   165:15 192:11
   199:17
elevators 188:23
elite 54:23,24
embody 40:22
employed 15:8 16:5
empty 106:20
encounter 71:19
   86:5
encountered
   206:24
ended 208:1,15
enforcement
   172:19
engage 103:13
   106:2,5
engaged 84:21,23
   85:13 86:2 99:4
engages 85:24
ensure 40:9 41:5
enter 35:13 36:1,2
   39:11 100:14,20
   102:8 125:4,7
entered 38:16,19
   38:24 39:16 41:24
   66:16 102:3 109:2
   109:10
entering 39:5
   108:15
enticement 61:10
entire 54:22 148:17
   211:17
entourage 186:8
envelope 29:11
   30:8
environment 130:1
equal 191:7
Eric 5:2 9:24
errata 214:5,9,10
   214:14,20 215:1
   216:10
especially 36:14
   57:1 70:21 95:10
   120:22 124:24
   148:1

**Esquire** 3:2,3,7,11
  3:16,20,21 4:2,6,7
  4:13,14,14,20 5:2
**essentially** 105:1
**establish** 31:10
  83:12 84:5 86:12
**established** 167:9
**estate** 27:20 117:20
  118:9 198:19
**estimate** 96:14
**et** 1:5
**evaluations** 205:17
**events** 127:22
  128:3
**eventually** 17:12
  57:9 69:19 93:6
  120:4 124:14,17
  152:18 159:20
  160:15 175:8
  189:21,22
**everybody** 25:21
  57:9 134:10
  177:11 179:14
  191:2 200:23
  210:11
**everything's** 22:8
  29:9
**evidence** 36:18,21
  36:23 37:7,7,11
  38:17,22,23 39:18
  47:5,6,7,8 66:12
  102:12 103:9
  108:17,22 109:3
  111:1 119:24
  213:11
**ex-cop** 188:1
**exact** 70:15 82:20
  130:24,24 144:12
  159:23 160:5
  178:4 202:15
**exactly** 104:9 140:2
  150:4 163:10
  164:8,14 178:6
**EXAMINATION** 6:5
  11:20
**examined** 8:13
**example** 52:4 79:21
  81:11
**examples** 198:11
**excessive** 141:13
**exclude** 85:2,4,9
  90:23
**excluded** 92:15
**excluding** 90:17
  91:6,6
**Excuse** 67:13 68:16
  133:13

**excuses** 144:11
**execute** 83:13
  113:8
**executed** 92:20
  93:12 105:6
  114:16 115:24
  118:11 119:10
  128:10 196:5
  199:15
**executing** 76:24
  98:14 107:15
  119:8
**execution** 104:7
  112:1
**Exhibit** 6:10,11,13
  6:14,16,17,19
  12:16 75:16 110:2
  110:6 113:15
  127:6
**EXHIBITS** 6:8
**exigent** 103:5
  105:15,19 122:6
  202:2
**exits** 102:22
**explain** 18:15 23:4
  35:1 62:22 64:2
  75:24 94:24
  109:19 117:9
  138:13 139:3
  146:16 147:11,14
**Expressway**
  190:12
**extra** 47:7 212:14
**extract** 142:8,15
**extracting** 142:3,10
  142:21 197:2
**eye** 201:19,20
**eyes** 33:20,24
  71:13 110:20
  131:15

---

**F**

**F** 4:21 5:2 213:1
**fabricate** 86:22
  126:5 144:2 204:1
  204:12
**fabricated** 86:21
  121:23 122:9,13
  163:9,11 204:3,7
**fabrication** 122:20
**face** 114:2 118:22
**fact** 99:7 146:10
  193:14 201:14,16
  206:10,12
**facts** 89:22 98:18
  98:19 128:1
**fair** 44:22 166:3

**168:17**
**fall** 193:23
**falling** 55:6 144:18
**falls** 23:7,8 32:6
  40:13 191:12
**false** 140:9
**falsely** 41:17
**families** 210:7
**family** 58:6 86:9
  93:17 94:9,11
  95:4,6 96:7 130:9
  171:9,10 179:24
  180:1 181:10
  183:11,14
**famous** 93:4
**far** 17:19 26:21 27:1
  49:5 61:21 66:10
  67:15 81:22 98:9
  103:6 121:1
  126:15 127:1
  130:16 144:23
  162:14 163:12
  168:23 179:18
  190:15 201:12
  205:11 211:8
**fast** 63:22
**father** 50:22 51:6
  58:16,21
**father's** 58:19
**FAZLOLLAH** 1:18
**FBI** 42:4,20 68:6
**feared** 93:24
**Federal** 64:15 69:2
  87:9 196:19
**feds** 87:11 175:16
  175:18,20
**feel** 37:4 43:1
  129:18,20 142:13
  142:18 148:2,20
  169:4 171:4
  173:11 196:10
  207:6
**feels** 129:23 181:1
**feet** 88:3 188:17
**Feinschil** 4:2 9:7,7
  69:9,12,15
**feinschillaw@co...**
  4:4
**fell** 144:8 193:21,23
**felt** 67:24 125:14
  129:1 142:4 143:6
  146:14 182:14
**female** 21:14 72:24
  137:20,21 178:13
  188:5,5 198:16
**field** 45:4 68:2
  180:20 207:12

**210:22 211:19**
  212:7
**fields** 54:16
**fifties** 191:5,6
**fighting** 209:14
**figure** 44:10
**file** 156:8
**filed** 76:11 140:19
  141:14 145:18
  148:9 149:9
  150:10 153:1
  154:20 156:7
**files** 146:4
**filing** 8:6 214:15,22
**fill** 38:8 119:18
  126:8
**filled** 38:10,10 72:3
  157:6
**final** 119:21
**finally** 119:5
**find** 28:2 29:5 37:4
  49:7,11 80:20
  131:17 146:15
  162:12 187:7
  196:18
**finds** 36:12
**fine** 160:14
**fined** 205:15
**finger** 202:14
**fire** 115:13 209:13
**fired** 51:19 205:14
  205:16 207:19
  209:10
**firing** 207:22
**firm** 154:2,3,15
**first** 6:9 8:12 12:8
  13:4 14:13 16:5
  21:11,14 22:6
  24:6,9 43:15,15
  43:17,20,21,22
  44:23 46:3,6 52:3
  55:9,12 58:4,17
  66:1 68:14,18
  72:2 75:22 89:14
  97:7 102:7 110:21
  114:10 115:8,22
  115:23 124:23
  139:21,21 149:16
  149:18 153:1,23
  161:4,8 171:4,21
  174:19 185:19
  192:22 193:3
  194:9 196:1,12
  199:11 200:14
  204:22 206:18
**fish** 97:19
**five** 20:1 53:22 87:2

**89:4,11**
**fix** 38:20,21
**Fleisher** 97:5,10
**Fleming** 1:23
**floor** 4:9,21 188:22
**fly** 31:6
**focusing** 211:2
**folks** 96:1,2 173:12
  175:1,24
**follow** 99:17 155:9
  156:12
**followed** 99:23
  100:7 140:18
  187:22
**following** 186:13
  186:20 214:8
**follows** 8:13
**fool** 88:5
**fooled** 123:15
**foot** 188:16,16,16
  188:18
**FOP** 154:6
**force** 18:9,10,13,18
  18:19 19:18 20:8
  21:3 22:3 49:17
  141:14 142:18,20
  143:12,22 144:1,2
  145:9,12
**forcibly** 36:1
**foregone** 200:8
**forfeiture** 203:13,15
  203:19,21 204:4
  204:14
**forget** 189:10
  208:22
**forgets** 120:11,13
**forgetting** 208:10
**Forgive** 66:2
**forgot** 29:11 73:10
  177:5 196:10
**form** 8:8 30:5 73:18
  118:19 206:22
  214:4,7
**formal** 33:2
**former** 154:6
**forth** 26:24 177:13
**Fortune** 211:14
**forty-two** 64:6
**forward** 63:22
**found** 36:15,24
  41:19 90:19 93:15
  94:1 97:14 131:22
  176:14 191:4
  195:19 196:16
  197:6 207:22
**four** 3:16 14:24
  16:9 25:12,14

87:2 89:3 94:15
94:16 95:2,19
131:18 191:3,3,5
207:17
**fours** 191:4
**Frattali** 2:7 213:8
213:20
**free** 37:4 146:14
**freely** 195:9 196:9
196:11
**frequent** 59:19
**frequented** 98:12
**friend** 183:11
**friends** 184:16
**front** 37:5 92:22,23
105:20,21 135:7
186:22 207:7,21
207:24 214:16
**fucking** 68:16
**full** 11:23 13:1 52:1
60:7 62:14 67:9
190:19 194:3
195:22 200:19
**fully** 64:20 66:23
195:3 213:12
**function** 23:9
**functions** 22:2,17
**Furey** 3:15,16 9:2,2
**further** 15:20
182:13

_____ G _____
**gamble** 60:15,19,24
62:12
**gambler** 62:3
**gambling** 60:22,23
61:2,21,22,23
62:6,8,15 176:12
176:20 177:6
**game** 163:13 171:6
**gangster** 188:10,10
188:12
**gather** 29:24 40:23
83:9 103:8 167:7
**gathered** 186:4
**gathering** 42:11
73:23
**Gatti** 188:11
**gears** 138:23
**general** 71:20 76:11
79:21 81:11
168:13
**generally** 32:11
35:2 71:4 76:14
77:1,20 78:11,19
80:11 81:3 110:15
121:17 130:11

150:6 199:5
204:22 205:18
**Genie** 21:10,12
50:15,18 128:24
129:4
**Gerald** 3:20 9:4
**Gessner** 21:12 24:7
118:14 119:1
128:9 129:6
**Gessner's** 21:10
50:18
**gestured** 53:21
**getting** 19:6 29:4
29:11 32:7 55:5
79:6 81:3 94:5
136:16 147:18
155:23 162:2,3
167:3 176:5
185:13 190:9
191:1 202:17
204:13,13 205:22
**girl** 193:9
**give** 12:2 25:23,23
25:24 26:10 28:15
29:20 30:15,17
31:14 35:18,21
38:6 49:10,10,11
51:24 56:2,2 75:9
78:10 79:2,21
81:11 83:24 92:5
92:7,12 95:11
96:10 107:12
109:8,22 115:22
126:4 128:22
131:4 132:1,7
157:23 163:15
167:8 169:14
175:20 183:18
184:2 197:6
199:19
**given** 30:5 41:20
47:14 69:22 83:20
84:1 95:23 164:9
171:8 216:8
**gives** 31:9 44:6
72:20 87:1 127:22
131:21
**giving** 26:3 28:18
29:8 65:11 68:7
79:1 81:22,23
114:7 122:1
132:11 173:16
183:15 184:15
**glean** 40:14,18
**go** 10:10 17:16 18:4
18:7,16 19:12,16
19:17 22:14 26:20

26:23 27:8,11,13
28:9 30:24 31:8
31:16,22 32:1,23
34:1 35:16,16
36:2,4,4 41:22
47:5,16,18,21
49:20 50:15,18
51:13,13 56:6,24
57:2,3,11 59:20
60:1,18 61:2
62:18 74:2,2,11
74:12,13 75:1
82:6 83:3,7 84:2
86:8,20 87:3 88:8
90:16 92:8,11,12
92:13,17,19 93:1
93:9,11 96:19
97:1 98:24 99:2
100:15 103:7
104:2,10 105:18
108:3,7,13,22
110:24 111:19
113:4 114:22
116:20 117:8
123:21 125:8
126:13,15 131:12
134:8 138:17
142:24 146:7,21
147:18 149:5
152:24 157:24
160:1,11 161:3,3
161:5,6 162:10,11
163:18,21 165:20
165:23 169:16
172:22 174:13
175:7 177:24
178:1 180:4
182:20 183:13
184:7,11 185:13
187:14 189:2
195:3 196:11
198:12,18 199:11
200:13 204:18,20
206:22
**go-go** 59:19
**God** 201:20
**goes** 17:11 31:15
63:20 72:8 74:8
103:17 107:4
108:2 117:17
119:2,2,4,5,6
120:3,4,4 128:3
130:8 159:14
204:4
**GOGGIN** 4:13
**going** 12:2,3,23
13:10,11 14:10

19:11,21 25:22
26:23 27:1,7,8
28:15 29:10 30:15
31:22,23,24 32:2
32:3,9,10 33:10
35:9,10,11,18
36:1,4,6,7,8 38:8
39:13,14,19,21
40:16 42:15 46:4
46:4,5,9,10,12,24
46:24 47:24 49:9
50:12,14 53:13
56:23 61:4,6,7
63:7,9,11,15,18
63:22 65:16 66:6
67:1 68:11,12,14
71:2 73:22 75:4,6
79:17,23 85:9
89:13,15 90:11,11
90:12,18 92:10
94:5,23 95:13
96:12 97:4 100:4
105:20 106:6
107:17,18,19
109:8,14 120:8
121:10,10,24
122:3 123:9 124:5
126:16 128:21
135:23 142:23
143:11 145:13,14
145:15 146:9,14
146:18,20 147:5
147:10,17,23
149:3 151:16
152:7 154:22
156:12 157:20
159:8,20 160:13
162:10,15 163:22
164:11 166:16
167:11 169:11,16
169:19 170:7,24
171:18 172:9,10
172:13,22 175:3,4
176:1 177:10,13
177:13,21 178:20
179:4,22,23 180:2
181:9,24 182:19
183:17 184:9,10
184:10 185:9
187:8,13,19
188:21,22 189:2
192:18 194:11,12
195:11 196:2,7
197:19 198:16
199:4 206:20
208:23 209:3
210:13

**golf** 100:23 104:18
123:2
**Gonzales** 4:14 10:3
10:3,12,15,19
**good** 12:22 28:16
87:14 129:20,22
144:14 150:7
169:11 182:11
186:7 188:3
205:21,24 206:3,6
206:7 210:20
212:16
**Googled** 192:3,4
**Gorman's** 69:21
70:14 175:9
**gotta** 167:2
**gotten** 192:17
209:24
**government** 64:16
67:2 69:2 87:9
170:6 196:19
**grab** 209:6
**grabbed** 193:22
194:9
**grabbing** 191:2
**grabs** 194:22
**graduated** 14:21
15:5,7,14 16:4
**Graham** 51:8 65:8
69:2 139:11
149:20 153:16
175:1
**grams** 113:4
115:14
**grateful** 48:13
**gray** 71:10,17 72:16
136:12,16
**great** 212:15
**green** 4:2 99:19
183:19,23 184:2,6
184:7 201:9
**group** 23:11 33:22
35:12,12 36:7
38:2 46:7,8,11,13
46:13,14,16,17,18
49:14 50:10,13,14
53:19 63:17 68:9
92:7 93:23 94:2,3
94:8 98:6 140:24
148:4 159:23
160:21 175:12
**grows** 90:2
**guaranteed** 30:4
**guarding** 62:17
**guess** 13:9,10,12
14:12 75:7 76:16
143:6 161:8 163:9

Case 2:14-cv-01643-RBS    Document 61-9    Filed 06/29/22    Page 64 of 159

McIntyre v. Liciardello, et al./Torain v. The City of Phila., et al.                    JEFFREY WALKER, 9/15/16

176:14 211:10
guessing 13:14
guided 188:6
guilty 66:17
gun 68:13 174:6,8
174:11 208:14,16
209:13,14,15
guns 44:12
guy 34:8,9 44:11,12
44:13 60:16 85:5
85:6 89:11,13
90:24 92:22 95:2
95:9,20 102:21,24
107:16 125:2
136:5 143:5,12
144:4,6 145:8,9
147:14 169:22
172:14 180:5,6,6
180:7 181:5,9,10
181:12,17,20,21
182:9,13,14 183:3
183:5,6,8,10,13
183:17 184:17,23
185:5 186:19
191:18 192:10
193:18 194:1,3,13
195:3,14 196:13
203:9 206:24
208:15,15 209:1,6
209:10,12,14,15
209:18,19
guy's 86:9 147:16
184:18 209:13
Guyon 3:14 8:22
guys 22:10 42:24
62:4 88:4,4,7
142:8 151:12
169:5 176:2
179:15,16 180:3,4
183:3 184:20,21
184:22 186:8,11
192:4 200:1 209:2
209:2,5 210:2
212:7
gwilliams@wcbl...
3:23

**H**

half 55:19 188:17
hallway 188:24
Hammonton 1:23
hand 45:3 53:22
100:23 152:22
191:10
handcuffed 193:24
209:18
handled 145:16

hands 108:4,5
142:6,6,8,10
144:24 145:8
191:9 199:21
handwritten 37:13
107:7 108:1 157:7
hang 59:13
hanging 60:2 181:8
181:17 211:2
happen 72:22 88:16
100:3 141:22
145:3 166:6 171:7
187:5 195:11
happened 15:7
16:3 41:11 64:3
69:5,17 73:2
120:10,11 127:23
128:4 143:1
148:12 159:24
164:4 206:15
207:18
happening 197:7,8
happens 126:11
169:21
happily 212:8
harass 180:7,10
Harbor 3:17
hard 67:14 69:13
88:20 198:19
hate 51:24
Hawkins 198:14
he'll 133:6 163:16
181:1
head 97:5,11 98:7
177:19 183:22
heading 177:24
headquarters 37:12
47:1,13 93:10
158:1 162:11
189:14,20 190:9
heads 173:16
181:14,15
hear 61:13 69:13
176:3
heard 170:19
hearing 6:11 12:15
78:3 87:21 176:4
203:19,21 204:15
hearings 203:16
heat 94:11
heavy 59:18 97:18
186:5 189:6
heels 197:9
held 11:5 95:21
110:10 127:12
133:17 183:22
212:21

Helen 3:14 8:22
hell 158:2
hell's 68:14
help 32:7 33:23
34:4 38:8
helped 157:21
helping 41:15 47:17
147:24
Hess 69:6,16
hey 186:17
hidden 58:23
hide 164:1
hierarchy 56:3
high 14:19,20,21,22
15:7 88:22 188:16
188:16,17
highest 211:16,18
212:6,10
highly 205:22
hired 15:10 153:14
hisself 133:8
history 14:20 18:16
28:3,5 29:3,3
139:1,4 204:20,23
hit 90:7 205:6 208:2
hits 207:20,21
hitting 209:11
home 130:9 171:8
171:11
homicide 211:18,21
honestly 33:13
158:9
hooked 162:20
191:17
hope 177:11
hoping 165:21
horn 207:1,2
hospital 59:9
143:21 145:10
hot 131:3 175:16
hours 146:6 212:14
house 35:4,5 36:9
37:4 41:24,24
45:15 46:1 57:7
57:10 74:1,2 75:1
87:18,20 89:4,12
89:13 90:9 91:4
91:12,19,20 92:15
92:17,24 93:1,12
94:24 97:4 102:11
102:18 103:1,3,4
104:4,11,16,20
106:7,7,18 107:21
116:1 119:15
121:19 122:1,5
123:24 124:1,7
125:3 181:19,21

190:13 192:20
195:24 199:7
200:22 202:1
203:23 204:8,14
204:15
houses 35:13 37:3
42:14,15,15 48:2
60:11,11 83:8
87:2 89:11 90:8
90:17 92:8,11,12
92:13,19 98:15
104:3,4 107:22
124:5 132:12
197:15,18,19,20
201:10 202:6
203:4,14,17 204:6
Howard 3:11 8:21
Hubert 208:6
Hummer 186:16
hundred 48:3 212:2
hundreds 191:6
199:10 208:17
hung 180:7 184:24
195:8 210:8,21
hurt 145:1 148:18
182:24
husband 165:8,9
hypothetical 25:23
26:1,3 31:13
50:11

**I**

IAD 147:20 148:2
167:17,22 168:6
168:21 169:3,4
IAD's 170:13
ICO 29:12 30:9
idea 56:3 154:7
164:24 183:7
identification 12:17
29:18 75:17,22
110:3,7 113:16
127:7,16
identified 15:21
84:16,23
identify 8:16 27:22
identifying 18:5
28:1,4
identity 30:3 79:8
illegal 158:5
illegally 121:18
129:11 130:12
166:7,8,9
imagine 130:4
immediate 166:22
immediately 103:2
105:14 131:24

186:22 187:3
191:19
Impact 178:14,16
178:20 179:1
important 120:23
122:15
impossible 131:9
131:10 210:1
imprisonment
140:10
in-service 74:12
incarcerated 64:8
77:13 78:7
incarceration 64:5
67:5 159:2
incident 180:17
181:18 182:12
incident's 181:20
incidents 203:1
included 32:18
85:14
including 32:13
incriminating 195:5
independently
32:14
**INDEX** 7:1
Indicating 53:20
individual 10:9
87:19 91:19 101:8
127:1 153:15
164:5,6,23 165:1
individually 1:14
individuals 23:12
56:18 84:16,18
89:19 98:2,6 99:4
100:19,23 101:5
124:7 139:14,17
139:19 144:21
individuals' 76:13
76:23
inform 155:18
170:6
informant 28:15,17
28:21,23 29:1,19
30:11,14,16,23
31:1,2,24 32:4
35:16 41:20,21,23
42:1 70:3,9 71:6
71:18,22,23 72:1
72:5,14,21,24,24
73:12,13,21,22
74:24 78:21 79:6
80:5,12 82:3,19
83:11 84:4 131:1
131:2,4,14,15,15
131:19,20,21,22
132:4,7,9,10,11

Case 2:14-cv-01643-RBS    Document 61-9    Filed 06/29/22    Page 65 of 159

McIntyre v. Liciardello, et al./Torain v. The City of Phila., et al.                          JEFFREY WALKER, 9/15/16

133:1,2,4,6,7,10
133:11 134:13
137:1,15 157:9,23
157:24 161:10,12
informant's 30:15
71:16 86:19 132:3
134:19
informants 19:6
22:13 41:13 42:11
42:12 66:11 71:3
71:19 73:17,18
79:13,16 82:14,22
132:19 134:4,6
165:17
informants' 29:14
information 7:6
19:7 22:10 26:11
27:10 28:12,17,18
28:22 29:2,24
30:14,18,20 31:9
31:13,21 32:13,18
40:9,15,23,24
41:6 42:12,13
64:23 65:11 67:19
69:22 73:23 78:15
78:16,18,20 79:2
79:3,15 81:22,23
82:16 83:1,4,9,9
83:15 84:1 86:12
86:23 87:1 98:1
98:24 122:2,9,14
122:20 131:5,22
131:23 132:1,4,7
132:9,24 142:3,8
142:10,11,16,22
146:1 166:9 167:1
167:2,3,7,8
184:15,16 186:3
187:9 192:17
195:1,5,10,13
197:2
informed 29:22
102:23 163:5
180:18
initial 30:19 168:24
initiated 167:16
168:5,6,20
injuries 145:11
injury 144:11
Inquirer 5:9
inside 47:13 110:16
110:21 187:23
instruction 25:24
instructions 12:3,4
14:14 214:1
Integrity 29:12
120:5

intention 68:15
156:7
interact 81:13
Internal 145:19
146:5 147:6,11,13
160:12 178:20,23
interpretation
112:4
interpreting 157:12
interrogating 187:7
interrupting 133:14
interview 17:13,21
146:22,24 176:18
interviewing 19:6
22:9
interviews 17:17,21
introduced 93:16
94:10
investigate 170:14
170:20,23
investigating 24:5
147:14 170:18
178:19
investigation 6:19
19:5,8 22:24
23:18 26:6,7
27:12 30:20,23
32:12 56:4 85:4
86:8 89:4,8,9 98:6
98:8 99:6,15
127:3,5,21,23
128:4 158:3 165:2
167:13 169:15
179:11 186:2
investigations 22:6
145:20 147:20,22
167:16,23 168:6
168:21 169:17
170:1
investigative
170:13
investigator 22:21
22:23 23:4,13,21
33:16,21 34:3
83:24 84:7 98:7
146:12,15 149:1,3
156:11 168:24
176:22,23 177:5
178:10,13,21
investigator's
149:1
investigators 33:23
147:14 170:16,22
involved 82:13
87:18 98:15
103:22 128:24
130:2,7 132:8

142:9 147:9
149:11,18,22,23
154:16,17 155:15
159:20 163:24
165:6 168:8 171:1
involvement 80:21
122:20
involving 146:19
153:3,5
isolated 47:2
190:18
isolation 64:7
issue 97:1 142:5,13
142:14 170:4
179:2
issues 15:22 32:11
70:21 73:3 96:24
97:13 120:1,6,19
121:13 171:4
209:24
item 113:6
items 37:14 101:20
106:18 107:7,10
108:3,9,11,12
111:21,24 112:5
112:17 116:1,5,5
128:15

J

J 3:3,20 4:13
jacket 101:1 124:2
jail 90:24 129:15
130:5,12,17 176:1
James 1:3 2:4 3:5
4:20 9:20
January 115:4
Jay 4:2 9:7
Jeff 41:8 42:5 47:22
49:21 59:13 62:22
64:13 66:16 67:18
71:1 74:4 86:21
96:11 109:14
113:20 121:17
126:1 129:14
134:2 145:17
152:6,24 160:1,23
161:6 162:22
163:22 172:3,5,6
172:6,7 180:17
185:12,15 191:10
194:17 195:17
197:5 198:6 199:4
202:24 203:12
206:8,12 210:13
Jeffrey 1:18 2:3
4:12 6:4,12 8:11
12:1,16,21,23

30:17 75:21 76:3
91:17 110:13
127:15 128:5
138:10 215:2
216:17
jeopardy 67:21
68:1
Jerry 178:8
Jersey 1:23 149:6
jerseys 203:8,10
jewelry 203:2,3
Jimmy 21:20
jjsantarone@md...
4:16
job 22:22,22 23:7
23:15,17,23 24:4
26:5,22 32:21
34:4,4 40:20 57:1
77:23 78:11,13
81:14 87:5 90:3
94:12,15,24 95:1
95:1 103:22 107:3
108:6,10 115:8
121:18 123:18
126:17 130:22
142:7 143:24
145:22 146:16
147:10,15 149:2
152:18 155:8
184:17 185:16,17
185:18 186:2
190:7 192:9
195:18 205:23,24
208:21 209:19
jobs 15:9,9 19:8
22:12 30:15 33:11
33:11,19 43:11
55:1 56:22,23
60:10 154:10
160:7 173:13
183:15 185:19
206:1,3,23
Joe 9:16 10:10
86:16 92:5 125:10
174:20,21 193:4
200:18,19 201:15
John 4:14,17,21 5:2
5:4 9:23 10:3
11:16 53:18 61:13
61:15 62:12 65:7
68:5,10,23,24
69:6,16 73:10
93:22 174:6,7,7
174:20 188:11
211:16
Johnson 21:20
156:15,15

joining 9:13
joke 87:8 199:24
200:4,4
jokes 177:16
Jonathan 4:7 9:14
Jones 21:21 73:10
Joseph 4:13,23
9:22
JR 4:13
judge 97:5,10 119:5
133:13
jump 178:8 186:23
jumps 186:22
justify 164:17
Justin 3:14 8:22
jwchristie@chris...
4:23

K

K 4:7
Kareem 1:8 3:9
6:13 8:19 75:15
76:7 77:12,21
99:17
keep 30:3 55:5 59:2
61:15 69:10 79:8
132:2 134:19
163:21 174:2
205:18 208:10
Kelly 21:19 50:16
99:1,1,10 102:2
106:16 111:22
Kennedy 4:21
Kentucky 64:11
kept 49:15,19 54:20
172:13 202:16
key 41:24 91:19,20
105:17 106:17
111:22 116:2
188:8
keys 92:6,8,13
101:23 102:4,9
187:12 196:13
kick 179:22
kicked 144:5
kid 59:9
kids 180:14
killed 182:14,24
kilo 94:20
kilos 94:16
kind 27:12 31:16
39:7 87:24 110:22
117:13 125:21
142:18 155:16
173:7 180:13
207:9 210:24
King 181:5,20

Case 2:14-cv-01643-RBS Document 61-9 Filed 06/29/22 Page 66 of 159

McIntyre v. Liciardello, et al./Torain v. The City of Phila., et al.

JEFFREY WALKER, 9/15/16

182:1,8
kitchen 15:9
knew 48:10,10
49:23,24 50:1,3
53:11,12,13 61:6
61:24 64:23 65:14
65:15,16 69:21
70:4 87:13,17
97:12,17 145:4,11
145:13,14 146:18
148:5 150:22,23
151:19 152:10
156:6 158:4,10
159:12,13 163:13
166:10 167:6
171:24 174:11,12
175:3,4,23 178:18
186:3 188:1,2,3
188:23,23 192:7
200:5 201:2,14
202:1,2,10 207:8
210:6,6,11,22
knife 165:18,19
knock 35:18
knot 104:14,19
know 10:9 15:14
18:6 20:18 23:24
26:16 28:5 32:7
35:21,22 36:13,14
41:3 44:9,15 46:8
49:6,10,14 50:3
53:12 56:12,16
57:13,20,23 58:4
58:6,11,24 60:2
61:7,9,20,20
62:11,14 63:1
65:24 68:15 70:21
70:23 71:13 74:19
75:23 78:17 79:1
80:4 82:20,21,23
85:6 86:16,20
87:22,24,24 89:7
89:12 90:1,10
91:1,11 94:21
95:8 96:9,21,24
97:4 98:5 99:14
101:22,23 104:10
105:9,22,23 106:5
106:8,8 111:15
113:23 114:19
116:24 117:12,16
117:22 118:10,12
119:1 120:9,17
121:2 122:12,19
123:13,18 124:21
125:22 129:18,20
129:22,24 130:3,4

130:6,11,13,16
131:10 132:15,21
135:8 137:3 140:2
140:5 141:1,1,2
142:15 143:15
144:5,14 145:2,19
147:17,21,23
148:24 149:8,8,18
149:21,22 150:2,4
150:6 151:16
152:12 153:23
154:2,3,3,7,18
156:5,9 157:15,18
157:21 158:11,16
158:18,21,23
159:7 160:12,15
162:2,3,16,17
163:8,10,10,12,13
163:17 164:6,8,12
164:15,22 165:14
165:21 166:15
167:4,22 168:3,5
168:20,23 169:9
169:11,16,19,21
169:22,22 170:17
171:6,16 172:6,7
172:12,13,17,18
172:20 173:7,8,10
173:16,19,21,21
174:11,13,15
175:2,7 177:2,11
177:14,16,23
178:2,2,13 179:7
180:14 181:8
182:15,17,22
183:1,6,12,14,24
184:14 185:6,8,10
185:24 186:2,10
186:10 188:11,15
188:16 190:12
191:13,22 192:12
192:12,20 193:14
195:10 196:5
197:6 198:24
200:15 201:10,13
201:14,15 202:22
203:16,22 204:6
204:18 207:19
210:4,10,12
211:22 212:4,11
212:12
knowing 91:8 131:8
176:23 201:12
knowingly 14:4
73:23 122:1
knowledge 128:21
157:15 195:19,23

196:23 200:20,21
known 42:10 57:3
79:8 86:24 87:23
88:7 105:11
125:13 137:21
180:18,24
knows 134:10
200:16
Kolansky 153:23
154:1,5,15 157:20
Kong 181:6,20
182:1,8
Krasner 3:2,2 8:23
8:23,24 50:23
51:3,23 52:3,18
53:7,20 54:3,6,10
55:9,12,16,20
58:10,13 61:17
65:19,22,24 66:4
68:22 75:8 97:7
127:9 137:23
174:19 182:5
185:2 193:3,5
krasner@krasner...
3:5
Kushner 183:6
184:24 185:1,5,16
186:5,14,16,24
187:7,10,17 188:8
191:17 193:12,14
Kushner's 152:18
185:18 186:23,24
187:16,17,22
189:1

_____

**L**

**L** 12:1
**L-I-C-I-A-R-D-E-L...**
11:11
lab 38:24 120:20
lack 163:9
laid 144:24
Lancaster 15:3
Lane 4:2
large 185:7
Larry 8:23
lateral 20:14
law 3:6,15 4:6
166:2,3 172:19
**LAWRENCE** 3:2
laws 125:19 149:5
lawsuit 148:9
148:9 149:10,14
149:15,17,18
150:3,11,15
151:11,11 154:16
154:20 164:2

165:3 192:5
lawsuits 148:8,20
151:9,13,14,23
156:13 164:7
165:7
lawyer 146:6,8
155:10,11 169:20
lay 152:14
Layre 4:4 9:8
lead 1:4 22:21,23
23:3,13,20 31:10
33:15,20,22 34:3
83:24 84:7
leader 46:13
leading 22:24 155:7
leads 185:17
leaning 88:4
learned 44:17
leave 49:19 94:4
101:5 106:13
124:4 125:8 164:7
174:16 196:6
198:18
leaves 101:7
leaving 50:18 101:9
led 165:2
leery 172:22
left 16:17 51:14,20
57:11 58:2,3,5
61:9 69:17,18,19
73:9 158:22
172:14 198:23
202:11 207:14
legs 208:11
let's 8:16 14:18
26:9 28:9 31:12
43:14,18 50:10
62:23 63:23 67:23
73:24 75:8 97:22
109:14,15 110:14
137:24 144:10,19
149:5 152:24
160:1 162:9 163:6
163:21 169:3
171:3 179:9
letting 147:17
160:12 173:16
180:3
level 19:1
levels 131:2
Lewis 52:5 97:9
Liam 3:3 8:24
liars 87:14
Liciardello 1:5 4:18
5:6 9:19 10:16
11:9,10 46:14
47:15 48:20 50:9

51:17 52:6 53:17
56:8 57:14 59:7
61:18 62:1,10
65:6 87:10 93:3,8
93:21 139:10
142:12 143:7,11
145:18 148:15
149:24 150:1
152:14 153:16
155:7 156:2
160:19 167:15
170:8 175:15
176:10 177:8
179:3 180:24
183:23 186:1,16
187:21 189:8
190:8 215:3
Liciardello's 58:16
152:1 208:21
lie 45:9 49:8 89:7
149:2 173:22
lied 43:23
lies 42:11
lieutenant 4:23,24
9:21,22 24:11,14
25:11,20 55:24
56:1,6 57:8,9
65:17 70:12 72:8
93:5 125:9 145:14
146:13 173:2
lieutenants 25:15
25:21
life 67:12,24
lifted 209:10
lifts 194:22
light 100:15 102:20
102:20,21 104:14
123:3 183:19,23
184:3,6,7 201:9
lights 123:11
liked 152:2 186:8
limited 132:6
205:19
line 59:11 131:18
143:16 148:20
158:15 182:18
189:17 215:5
Linwood 4:18 5:5
11:18 65:7 94:15
95:8 143:8
list 10:11 211:14
listen 39:19 57:8
69:7 88:5 109:7
109:11 125:20
143:11 152:14
164:15 171:6,19
171:23 173:4,5,16

Case 2:14-cv-01643-RBS   Document 61-9   Filed 06/29/22   Page 67 of 159

McIntyre v. Liciardello, et al./Torain v. The City of Phila., et al.      JEFFREY WALKER, 9/15/16

177:10 182:21
186:18 188:22
189:2 190:22
191:21
**little** 10:8 23:4 33:8
62:22 63:23 68:17
69:12 72:10 76:17
87:16 93:18 97:21
125:6 126:4
129:23 138:24
139:1 161:7 169:4
172:17 174:17
182:12 187:15
198:24
**lived** 183:7,8 187:8
187:9
**lives** 59:11 123:20
**living** 29:5 36:9
**LLC** 3:2,20
**lo** 208:13
**location** 28:7 32:7
35:17 36:23 37:8
46:24 57:12 87:17
87:23 88:14 93:8
102:13,15,16,21
103:7,8 104:24
105:10,13,19
107:5 109:4,4
117:14 118:1,2
119:20 121:9
122:4,24 123:1,22
124:4,10,14 125:2
131:3,4 135:6
143:13,14 189:19
196:15 209:1
**locations** 28:7
37:14 87:16 88:24
98:9,13 113:7
206:21
**lock** 22:10
**locked** 73:12 145:4
167:9 194:14,15
**locker** 47:16,19
61:12,19
**locking** 42:24 91:11
179:15 181:21
**long** 3:2 8:24 14:22
19:23 24:17 90:3
97:19 126:16
131:9 132:3 160:2
160:4,6 166:24
171:24 180:11
198:21 199:1
209:21
**long-term** 19:8
**look** 26:23 27:8
31:23 32:1 39:15

68:16 89:1,2,7
109:15 112:9
116:17 119:4,6
120:5,15,23
132:22,23 133:19
133:21 138:14
163:16 173:23
188:18,23 194:7
196:11 206:22
209:8
**looked** 37:23 44:14
162:6 175:22
182:10 188:20
**looking** 18:7 27:5
28:7 29:9 37:24
47:3 80:19 88:10
108:11 114:15,17
116:12,13,15,22
118:20 119:7
121:5 124:21
159:17 167:17
181:13,14 194:8
202:7 211:12
**looks** 72:6 118:13
119:3 159:15
162:6
**loop** 55:6 104:5,5
**lost** 57:7 72:11
151:14
**lot** 16:18 47:14 48:6
48:14 53:1 59:3
59:17,20 60:2
68:11 88:16 89:6
93:2,23 94:4,6
98:12 125:14,21
125:23 144:18
148:1 152:21
157:10 184:13
190:10,21 197:10
205:24 206:6,6
209:20 211:8
**lots** 60:23 61:7
201:5
**Louis** 160:20
**low** 152:14
**loyalty** 49:2,5
**lucky** 89:13 186:14
202:18,20
**luncheon** 138:3
**lying** 43:21 44:5,20
44:23 45:1 66:9
87:5 88:17 126:8
126:14

___

**M**

**M** 4:6
**machine** 60:17

**mad** 176:15 211:7
**main** 18:24 46:14
50:14 66:11
104:22 117:11
139:12 149:23
160:20,21
**major** 89:5 119:14
**majority** 16:10
**making** 29:9 44:5,6
71:12 81:14,15
88:17 109:6 150:8
168:14 172:12
186:11 212:3,5,8
212:8,9,10 214:7
**males** 104:19
**malicious** 140:10
**Malkowski** 50:2
53:6,8,12 65:18
68:23 152:8 199:3
206:19
**Malkowski's** 50:19
**man** 55:14 59:10
105:21 106:6,7
159:7,8,11 171:15
175:2 181:6
182:11,16,17,21
183:24 195:8
**manager** 188:4
**March** 64:12
**Margaret** 3:15,16
9:2
**marijuana** 186:6,17
186:18,19 187:1,2
192:12
**mark** 5:8 12:12 75:6
109:23 127:2
**marked** 12:16
16:16 75:15,22
110:2,6,15 113:12
113:15,20 127:5
127:16
**Market** 2:4 3:21
4:15
**MARKOS** 3:21
**MARSHALL** 4:13
**match** 177:9
**matter** 67:14 83:23
87:18 159:21
161:23 203:6
215:3
**mboycep@aol.c...**
3:18
**McCloskey** 4:23
9:22 52:11,20,21
53:5,6 54:13 55:5
55:7,8,11 57:17
58:19 59:23 65:8

65:10,17 68:19,22
70:12 92:5 125:10
152:7 174:18,21
181:16 189:19
193:2 198:13
199:2 200:18,19
201:15
**McCloskey's** 51:15
**McINTYRE** 1:3 3:5
9:1 215:3
**mean** 20:14 23:14
27:4 31:20 33:24
38:9 39:10 40:18
42:9 43:9,10 44:3
48:7,7 49:14
54:15 56:9 59:8
61:8,9 67:10
74:11 89:6 90:14
91:6 93:19 102:8
104:5 115:14
116:24 123:13,18
125:22 126:14
127:20 128:20
130:9 132:18,18
133:5 137:14
145:22 150:22
154:17 155:8
156:10 157:2
158:23 159:7,13
164:11 167:4
169:7 170:21
171:5,5 173:23
174:10 175:2
179:13 180:11,14
182:15,17 183:1
183:12 184:1,5
189:7 195:21
198:10 200:4
201:10 202:2
203:1,6,6,15
204:9 205:22
206:5 210:10
212:7,12
**means** 26:1 54:24
90:20 92:12 93:20
123:7 184:7
**meant** 51:4
**meat** 86:18
**Meehan** 65:18,21
65:22
**Meehan's** 73:7,8
**meet** 30:11 31:4
57:9 71:18 136:20
146:8 155:10
**meeting** 35:11
146:20
**meetings** 154:9

**member** 94:9 95:4
95:6
**members** 58:7 86:9
87:1 90:15 92:3,4
93:17 96:21
107:13 148:9
157:2 174:4
**memo** 39:2 155:18
**memorialization**
155:16
**memorializing** 39:8
**memory** 24:16
**mention** 134:7
**mentioned** 41:8
45:14 57:15 73:16
74:4 81:8 90:8
104:6 128:1
161:16
**mere** 85:23 86:5
161:1
**mess** 95:24 184:8,9
184:10 203:11
**messing** 152:2
**met** 47:2 96:1 133:9
133:10 149:7
152:21 160:10
189:7 190:8,8
207:6,7
**metal** 188:18
**Michael** 3:6,7 4:5
4:17 5:3 8:18 9:8
61:24 62:11
**mid-30** 212:5
**middle** 114:22
190:24
**Mike** 53:18 65:7
92:6 93:21 168:13
178:7
**million** 96:20
**millions** 96:18,19
**Mills** 3:19 9:3
**mind** 47:8 91:3
125:23 130:6,8
162:8 174:2,9
**mine** 95:21
**minus** 54:1
**minute** 35:20
164:16
**minutes** 100:20
101:6 210:14
**Mirraglia** 3:14 8:22
**misconduct** 65:14
65:15 66:6,8,10
73:5,18,21 131:1
131:19
**missing** 119:20
121:8 203:10

Case 2:14-cv-01643-RBS   Document 61-9   Filed 06/29/22   Page 68 of 159

McIntyre v. Liciardello, et al./Torain v. The City of Phila., et al.                    JEFFREY WALKER, 9/15/16

mistake 38:17,19
  39:8 108:14,16,21
  109:4,6,8,12,13
  120:21,21 162:19
mistakes 39:5
misuse 79:12,14,18
  79:22 81:9,12,16
misused 80:13
misusing 41:13
Mitchell 10:2 21:20
mixed 187:15
MO 181:3
model 111:3
moment 171:8
Monaghan 1:13
  21:19 50:17 76:4
  84:9 98:24 99:9
  99:17 102:2 104:1
  104:13 106:16
  111:22 115:18,19
  115:21 122:18
  124:15
money 36:15 37:1,3
  37:4 45:16 46:1
  46:22,22 47:1,11
  47:14,17,19,20,21
  47:22 48:1,2,4,5,6
  48:14 50:12 58:21
  58:22,22 60:22,23
  60:24 61:6,7,10
  61:19 62:15,19,19
  66:14 90:12 93:15
  94:6 95:11 96:4
  96:10,14,15
  101:21,22,23
  152:2,20 165:23
  181:11 184:20
  186:11 187:2,3,17
  190:20,21,22,23
  195:22 197:6
  199:20 200:1,3,6
  201:5,6 202:17,19
  202:21,22,24
  205:13 208:24
  210:7,23,23 211:7
  211:8
moneys 60:19
months 15:16 16:9
  20:2,6 21:2 64:4,6
  64:7 87:11 89:8
  125:21
morning 119:10
  210:19
motion 20:17
mount 27:12
mounting 151:9
mouth 59:2 158:12

182:3,3,4,9
move 20:14 42:17
  67:12,17 159:21
  207:2,3
moved 48:14 52:10
  143:23,23 159:21
  160:2,3
movement 20:14
moving 19:22 54:20
  202:16
multiple 83:20
  84:15,16 88:24
  207:19
multiplied 48:9
  196:24
municipal 119:5
mushrooms 192:11
  192:11,13 194:4
Myra 198:14

_____
N
_____

N 6:1
N-O-R-M-A-N 11:18
name 8:18 9:13,23
  11:23 38:4,9 52:4
  52:21,23 53:9
  55:9,13 58:4
  62:14 65:5 66:1
  70:11 97:8 115:22
  117:14,16,22
  118:5 121:8,11
  143:15 153:24
  172:3 173:21
  174:19 181:5
  193:3 208:10,22
  208:23 214:10
named 23:12 153:8
names 27:22 28:1,2
  46:12 52:1 53:5
  54:19,20 55:6
  70:13 76:3
naming 76:2
narcotic 18:16 26:6
  83:17 99:4,9
narcotics 15:21
  16:18,19 17:2,9
  17:12,18 18:1
  19:1,12,14,15,16
  19:19,24 20:4,7
  21:14 22:2 24:1
  25:1 31:18 33:11
  35:6 44:24 45:4
  56:4 58:3,8 68:2
  77:7,8 84:19
  85:14,19 89:18
  98:3 100:24 113:7
  113:7 116:10,14

141:23 205:19
narrow 86:11,17
natural 42:8,23,23
near 37:22 190:10
  191:12
necessary 10:14
need 12:6 13:6 41:1
  87:15 105:18
  138:15 144:2
  178:1 196:8
  214:17
needed 56:23,24
  104:10,13,22
  157:17 176:5
needing 32:6
needs 137:14
neglected 138:10
neighbor 171:12,12
neighborhood
  172:15
neighbors 86:9
  168:8
nervous 34:8
  181:16
network 84:19
  85:15,19 98:3
never 50:17 53:12
  53:14 62:19 72:21
  72:22 73:11 92:10
  92:11 96:2 99:11
  99:13 101:6
  145:24 159:21
  176:5 200:23
New 1:23 195:15
nice 188:15
night 74:1 107:19
nobody's 173:20
normally 28:24
  36:9 72:4 118:18
  118:19 119:1
  120:18,20 123:10
  123:11 145:5
  146:3 168:5
  194:18 205:8
Norman 4:18 5:5
  9:19 10:16 11:17
  11:18 21:18 50:16
  51:18 53:18 65:7
  93:7,16,22,24
  94:4,15,21 95:8
  95:16 142:9 143:8
  143:9,20 177:13
  177:17,19 194:17
  194:22 195:9
  197:8 208:21
  209:3,6,12
North 52:16 100:8

100:12 102:3
  152:11
Northeast 52:15
  162:14
notary 2:8 213:9,22
  214:18
note 13:22 168:16
noted 213:12 214:8
  216:10
notes 213:13
nothing's 85:7
  92:14
notice 146:5 169:13
  194:7
number 25:16,18
  29:18 30:10 69:3
  98:14 99:2 109:2
  110:20 118:15
  134:19 139:6
  187:11
numbers 29:6
  37:22 48:5 107:8
  107:9 120:12
Numerous 42:7

_____
O
_____

oath 14:16
object 104:18 123:2
objection 79:24
  80:15 168:13
objections 8:7
  213:12
obligations 66:21
observation 44:13
  104:21
observations 32:16
  83:7 99:3 106:6
observe 85:13
  103:13
observed 92:4
obtain 104:23
obtained 105:6
  131:23
obvious 105:12
obviously 63:15
  105:11 115:23
  116:9 134:3
  142:17 205:3
occasion 48:19
occasionally 93:22
occupant 117:14
occupied 124:7
occurred 77:20
  129:10
OFFICE 3:15
officer 1:5,11,12,13
  1:15 4:17,17,18

4:18,19 5:4,5,6,7
  11:9,10,12,13,15
  11:16,17,17 16:1
  16:5,15,21 17:9
  17:18 18:2 19:24
  20:4,7,20,24
  21:18 24:8 28:20
  30:9 31:5,24
  36:19 43:8 70:6
  70:16,18 72:7
  83:2,11 84:4
  87:23 88:21 94:21
  99:1,17 101:7
  102:2,2,16 106:14
  106:16 111:21
  113:19 115:19
  121:7 122:18,19
  133:20,22 137:12
  139:9,10,11
  145:18,19 146:24
  149:21 153:15,16
  155:15 166:22
  167:15 171:2
  204:21,23 205:18
  206:17 208:7
officer's 38:4
  121:11
officers 9:17 37:14
  40:15,20 45:19
  58:7 62:10,13,15
  62:24 63:16 65:4
  70:9 71:21 72:13
  72:19 86:19 88:3
  88:14 97:12 99:9
  102:13,24 103:3
  103:22 119:18
  120:11 122:13
  137:15 142:17
  146:19 153:8
  166:2 170:14
  179:8
official 162:7,8
oh 11:1 20:1 39:15
  43:5 60:18 195:3
  197:5 199:24
  201:20 203:3
  206:8
okay 12:23 13:7,8
  13:14 14:6,12,18
  14:22 15:1,14,17
  16:12,20 17:20
  18:8 20:6,16,22
  21:12,22 23:19
  25:4,9 26:2,14
  27:11,15 32:10,16
  33:1,4 34:16 35:8
  40:2,14 41:2

McIntyre v. Liciardello, et al./Torain v. The City of Phila., et al.                    JEFFREY WALKER, 9/15/16

42:10 43:22 44:3
45:13,21 53:3,7
54:10 55:20 57:23
64:18 65:1,5
66:19 75:3 77:5
77:11,24 79:9
81:1,11 82:4,8,24
83:19 84:11,14,22
85:11 90:16 91:5
93:18 96:1 97:21
98:21,22 99:7
100:2,5,11,19
101:5,11,14 102:1
102:7 105:9 111:9
111:17 113:10
114:3,6,21 115:20
118:13 121:6
122:12 123:2
127:24 128:13
130:11 134:12
135:3,12,21 136:9
137:11,19 138:10
138:23 139:3,20
140:22 141:3,7
148:14 150:2,10
153:13,18,21
154:5,20 156:11
156:17 157:23
161:16,23 163:20
165:11 168:17
169:3,20 170:19
171:3 173:17
174:1,17 175:17
177:3 178:15
182:15 185:23
199:9,14 202:19
204:17 205:12
206:23
**Oklahoma** 64:10
**old** 186:7
**Older** 126:9
**once** 16:4,16 18:3
29:7,10,16,19
32:12 35:8,14
36:1 37:10,23
41:21 45:21 59:24
63:7 82:10,24
84:3 94:3 104:12
107:11 132:15
146:18 183:8
189:15 196:5
207:8
**one's** 36:4 135:23
162:10 177:21
**one-time** 28:18
**ones** 56:12 62:2
85:14 200:14

205:21
**open** 39:18 47:3
158:20
**opened** 61:3 152:21
188:8 190:18
**operating** 98:2
**operation** 89:6
**opinion** 128:19,22
128:23 129:8
**opportunities** 47:4
**opportunity** 45:4
138:20
**opposed** 22:3
135:4
**option** 138:19
**Oral** 1:18 2:3
**orchestrated** 147:1
149:10 208:23
**order** 15:24 17:17
86:23 122:10,10
144:21 155:21
166:2 205:7
**Oregon** 180:8
**original** 214:20
**other's** 210:7
**Otto** 4:24 9:21 56:1
57:4 65:17 70:12
125:10 143:13,19
143:23 145:14
146:12,13,13
148:6 169:13,13
**out-of-the-way**
147:3
**outcome** 168:3
**outside** 46:8 56:24
153:14,20 154:4,8
185:9 189:7
**over-charge** 144:20
144:23
**Overbrook** 14:21
**overembellished**
88:13
**overlook** 38:12
107:11
**overlooks** 30:6
**overtime** 20:18
55:2 210:8,15,17
211:4,11,11,13,15
211:24 212:12
**overtime-wise**
211:9
**owner** 117:18,20
118:5

---

**P**

**P** 4:14,14 108:24
**p.m** 106:13 112:15

212:23
**packaging** 18:5
**PAGE** 6:3,9 215:5
216:1
**PAGES** 7:4,7,10,13
**paid** 22:13 79:7
82:1,2,19,23
136:1,10 162:2,3
208:3 209:15
210:18,21 211:17
211:18,19,21
212:6
**Palmer** 51:18,18,20
52:5 97:1,9
160:20
**Palmer's** 52:3 97:7
**pants** 186:9
**paper** 63:7 108:9
135:11,24 157:9
161:19 162:2,11
163:7
**paperwork** 17:11
29:14 63:6,20,21
70:5,6,7,11,13
80:20 91:9,10
107:18,23 129:9
149:12 155:9
159:14,17 169:23
193:13 195:2
**park** 96:1
**parked** 207:1
**part** 18:13 22:16
26:22 33:18,21
44:1 46:11 48:11
52:17 53:10 61:1
61:5,11,22 66:11
66:20,22 73:22
83:20 84:18 98:4
98:8 114:1 119:17
121:3 139:5 140:6
152:11 157:19
159:4,8,9 164:1
165:2 166:16
170:23 187:5
197:1,2,4
**participate** 34:20
71:5 85:20 203:12
**participated** 84:11
**participating** 84:24
198:7,9
**particular** 63:3,4
65:2 68:4 76:2,12
76:24 77:5,11,15
80:18 83:2,14
91:17 117:4
137:12 159:19
181:5

**parties** 60:3,3
**partner** 49:16 165:7
205:5
**partners** 43:4
**parts** 77:23 173:14
**party** 60:12
**partying** 60:3
**pass** 38:2 207:10
**passenger** 207:3,5
**Passyunk** 180:8
**patrol** 16:15,23,23
17:1,1 126:7
**pay** 20:17,19,21
136:3,17,19
212:13
**paying** 132:21
136:5,16
**payment** 71:23,24
72:1,2 134:17
163:4
**payments** 132:22
**PC** 4:20
**Ped** 15:22
**peer** 23:11
**pen** 72:4,4
**pencil** 72:3
**pending** 13:18
140:15
**Pennsylvania** 1:1
1:22 2:5,9 3:4,8
3:12,17,22 4:3,9
4:15,22 149:4
213:3,10
**people** 19:2,14
22:13 25:18 28:4
33:22 35:13,19,20
36:17,17 38:3
49:4,8 51:10
53:15 60:11 61:23
68:18 85:12 86:11
86:16,17 88:10
96:24 97:14 119:3
119:7,17 120:23
126:8,9,13 130:7
130:7 139:12
141:17 142:7,11
142:12 147:4
149:23 152:2
159:24 167:9
170:24 175:3,12
180:12 182:16,19
182:21,24 193:20
197:14,15,18,18
198:2 203:4 211:1
211:2,6,21 212:10
**people's** 153:11
158:5 204:6

**Perfect** 186:11
**performance**
205:17
**period** 19:24 29:17
33:12 34:5,16
39:24 68:1 77:7
89:1 106:11 160:2
160:5,18 169:6
186:14 212:13
**periodically** 50:21
**perpetrate** 105:2
**Perry** 4:19 49:5,18
54:2,4 62:3 65:7
92:6 93:22 97:15
**person** 22:21 23:6
26:19 32:23 33:20
37:15 38:5 41:19
41:23 44:10 47:14
47:19 49:15 56:7
72:23 84:24 86:1
87:10 88:5 108:2
117:17,23 122:15
123:15,15,16,17
142:5 145:23
164:13,15,18
165:11 168:7
181:15 187:24
198:13 203:17
**person's** 82:1
165:7
**personal** 96:23
101:20 128:21
**personally** 34:6
85:13 139:16
**Petrina** 10:1
**Philadelphia** 1:10
1:10,11,13,22 2:5
3:4,8,12,22 4:3,6
4:9,11,15,22 9:12
9:15 15:2 77:3
152:12 213:5
**Philadelphia's**
132:21
**Philly** 18:10 52:15
52:16 57:6 162:16
180:6,9
**phone** 23:23 39:3,4
47:18 68:12 81:14
95:23 97:2,3
131:16 146:17
169:15 181:24
182:10 184:15
185:9 187:19
192:14 193:11,12
193:13,17 194:6,6
194:24 195:4,13
195:14 207:18

McIntyre v. Liciardello, et al./Torain v. The City of Phila., et al.                    JEFFREY WALKER, 9/15/16

photocopy 107:12
photographed
  110:23
physical 144:6
physically 136:13
  136:14
pick 144:13
picked 189:3 194:6
  194:13
picking 158:8
picks 181:24
  194:14
picture 67:12
pictures 36:17
pie 48:12,13
piece 48:12 135:11
  135:24 157:9
  161:18 162:2,11
  163:7
Pike 1:23
pil423@aol.com
  3:9
Pileggi 3:6,7 6:6 8:3
  8:15,18 11:22
  12:11,19 51:12
  52:8,22 54:11
  55:21 59:5 62:5
  66:7 70:24 75:6
  75:19,20 80:2,7
  80:10,23 81:2,4
  97:20 109:21
  110:12 113:11,18
  126:24 127:14
  134:1 137:24
  138:7,9 168:17,19
  176:7 179:6 184:4
  185:11 195:16
  212:17
piles 47:16 191:3,3
  191:4,5
piling 164:7
pill 97:5,10 106:21
  111:1 115:15
  116:7,18,19,21,23
  128:15
pills 97:1
piss 148:16
pissing 207:12
pistol 143:5
place 47:12 124:2
  174:12 194:4
placed 106:23
places 133:24
plain 18:19
plainclothes 16:17
  16:24 19:4,9,18
  20:12,24 21:8,22

plaintiff 1:4,8 3:5,9
  3:14,19,24 8:20
  76:8
Plaintiff's 12:16
  75:16 110:2,6
  113:15 127:6
plaintiffs 4:4 9:5
  10:2
plan 35:11 36:3
  95:2,5
planted 41:19
plastic 112:21
  116:21
platoon 25:13,13
  25:15,16
platoons 25:12
play 152:19
played 48:11 171:6
players 84:15
playing 183:9
  201:11
plea 66:17,19,21
please 11:24 12:12
  55:13
pled 154:22
ploy 161:1
plugged 184:21
plural 140:23
PO 172:17
pocket 124:3 201:6
pockets 47:8
  148:18
point 16:21 19:21
  20:3,22 21:1
  26:15 32:17 36:11
  36:16 38:13 46:19
  57:13 63:14 76:18
  90:5,12 99:16
  102:1 103:16
  135:1 148:8 149:9
  149:13 151:21
  158:24 159:3
  160:23 174:10
  177:23 191:8
  196:15 202:13
  209:17
pointed 68:13
pointing 36:22
police 1:5,10,12,13
  1:15 4:17,17,18
  4:18,18 5:4,5,6,7
  11:9,12,15,17
  15:10,11,19,24
  16:1,5,16,16
  21:18 28:20 31:4
  31:24 40:15 45:19
  58:7 74:7 77:3,14

83:1,11 84:4
  87:22 88:14 89:17
  91:3 98:20,24
  100:7,15,21 105:6
  115:19,24 122:18
  139:9,10,11
  142:17 145:2,5
  149:21 155:15
  157:13 166:2
  170:14 171:2
  204:21,23 205:18
  206:17 207:8
  208:7
policeman 171:19
policies 74:4,5,6,9
  74:13,15,20 77:2
  125:19 147:19
  161:7
policy 15:19,20
  73:2 102:8,11
  137:18 147:21
  155:14 157:8,8,12
  157:14 163:3
Polo 186:9
Pontiac 99:18,19
Popper 3:10,11
  8:21,21
popper.yatvin@v...
  3:13
pops 102:21
portion 40:20
position 24:7 48:11
possibility 130:16
possible 72:21
poster 188:9,10
potential 147:4
powers 156:6
  170:13
practices 125:13
preceding 213:14
prefer 138:12,21
  212:17
preliminary 17:23
  78:3
premises 100:14
  102:4,9
prepare 15:24
  37:12 57:11
  107:17
prepared 41:17
  104:4 107:1,2
  169:15
presence 56:17
  166:14
present 5:1 54:7,9
  63:18 118:11
presented 45:5

presently 140:14
  171:5
pressure's 147:2
pretty 67:20 147:7
  200:10
preventing 102:12
previously 79:11
  126:1
print 108:23
printout 39:12,13
  109:9
prior 42:20 43:6
  46:6 63:9 66:19
  72:14 91:22 95:18
  104:20 106:24
  108:12 112:18
  117:3 119:8 129:1
  141:4,19,21 147:5
  174:3 193:16
prisoners 36:8
private 149:1,1,3
  156:10
Pro 4:12
probable 31:10
  35:8 41:4,18 44:2
  44:7 77:14 83:12
  84:5 85:21 86:23
  88:18 104:6 105:2
  114:7 121:4,24
  122:4 204:12
probably 17:23
  76:17 98:18
  123:11 141:4
  188:15 204:19
problem 59:12
  70:17,22 119:13
  119:14 170:10
problems 192:8
procedure 26:8,11
procedures 15:19
  77:2 147:20 161:8
proceed 12:3 26:12
  28:19 124:3
  203:20
proceeded 41:22
proceedings
  203:13,13 204:2
  213:11
process 22:14
  28:24 30:24 31:1
processing 60:10
  107:23 189:16
Professional 2:8
  213:9,21
promotion 20:11,13
  20:15
promptly 214:21

proper 35:12 89:8
  103:4
properties 83:16,20
  89:19 98:3 107:14
  109:16
property 6:14,16
  27:17,18,19 36:2
  37:18,18,19,21
  38:5,7,19 39:6,11
  39:12 66:15 103:8
  106:11,24 107:1,8
  108:4,5,6,8,11,15
  108:24 109:2,5,9
  109:12,15 110:1,5
  110:18,19,20,24
  111:17,20,23
  112:2,7,10,23
  116:12,15 117:20
  120:18,19 121:12
  123:4,13 124:21
  125:3,6 128:7,8
  129:3 196:6,7
propounded 216:9
prosecute 122:10
  166:2
prosecuted 129:12
prosecution 63:3
  140:10
protect 73:3 143:3
  159:20
protected 148:5
  169:5,6,9
protecting 148:3
prove 88:21 89:20
proved 83:10
provide 63:1 86:23
  103:19
provided 30:21
  77:24 83:15 86:12
  98:1 214:12,17
providing 67:19
  78:15
proximity 71:12
public 2:8 179:12
  213:9,22 214:18
Pud 98:2
pull 133:6,7,7
  179:19 186:21
  195:4 209:9
pulled 171:13 172:3
  174:6,8 190:10
  207:15,15 208:13
  209:2,10 210:24
pulling 174:11
pulp 209:18
punch 144:4
punched 144:7

Page 230

Case 2:14-cv-01643-RBS    Document 61-9    Filed 06/29/22    Page 71 of 159

McIntyre v. Liciardello, et al./Torain v. The City of Phila., et al.                                      JEFFREY WALKER, 9/15/16

punching 144:6
purchase 32:4
  131:5
purchaser 132:10
purchases 31:6
purpose 18:24
purposes 12:17,21
  13:2 75:17 110:3
  110:7 113:16
  127:7
pursuant 102:7
pushed 49:18 144:8
put 17:10 33:21
  36:18,22 37:7,15
  41:1,3 42:17,17
  44:15 48:5 50:16
  59:11 67:12 70:5
  70:7,11,13 85:20
  85:22,23 86:3,7
  87:5,14,14 89:21
  90:2 91:15 100:24
  102:16 105:19
  107:6,8 117:14,17
  117:19,23 118:21
  118:22,23,24
  125:4,6 130:9
  135:17 142:5
  144:19 145:8
  161:20 174:15
  186:24 189:9,10
  189:12,15,15
  194:10 199:21,22
  201:5,22
putting 37:21 42:13
  123:18 142:6,8,10
  173:20
puzzled 156:10

              Q
qualifications
  145:12
quantities 185:7
quarterly 136:21
question 8:8 13:5
  13:11,18,20 41:2
  64:21 118:5 123:5
  150:23 158:17
  166:24 167:3,5,6
  167:19 170:15
  176:13 197:20
  204:5
questioned 108:21
  191:19 197:16
questioning 117:21
  123:9
questions 7:12
  12:5,6,24 13:3

14:13 147:3,3
  158:15 168:16
  169:22 216:9
quickest 98:19
quickly 102:21
  186:24 194:23

              R
R 213:1
R-E-Y-N-O-L-D-S
  11:13
radio 101:7
raid 35:11 36:3
railing 184:24
ramifications 67:20
ran 55:4 62:2
  201:24
Randalls 140:20,22
  140:24
rang 68:12
range 15:23 212:4,5
ratting 177:11
rattled 185:13
re-enter 38:18
  39:19 108:18
re-sell 93:17
reached 146:12
  190:20
read 118:6 121:8
  138:12,19,22
  195:1 214:2,3
  216:6
reading 112:3,4,6
  121:3 163:20
ready 190:9
real 27:20 48:4
  117:19 118:8
  184:20 198:19
realize 125:21
really 31:7 49:13
  50:1 59:12 62:12
  71:10 94:5 111:7
  202:2 209:23
ream 202:1
reamed 202:5
reason 44:1 90:7,9
  93:11 120:9 131:6
  142:15,15,20
  144:3 173:22
  200:13 202:4
  214:5,9 215:5
reasonable 35:19
  35:22,23 88:18
reasons 144:9,10
recall 17:17,20 21:5
  21:16 43:6,15
  56:20 57:19 60:7

65:11 66:20 77:21
  77:23 78:1,8,14
  83:17 98:8 99:5,6
  99:21,24 100:1,9
  101:3,8,9,9,14,18
  104:9 124:19
  126:2 130:22
  139:22 140:1,11
  153:21 155:23
  156:2,4,14,17,23
  160:2 163:23
  164:8 165:13
  167:12 178:12
  198:10
receipt 6:14,16
  37:21 38:5,7,19
  39:11,12 106:11
  107:1,8 108:5,11
  109:1,2,5,9,13
  110:1,5,18,19,20
  110:24 111:18,20
  111:23 112:2,7,10
  112:24 116:23
  120:19 124:21
  125:7 129:3 135:5
  135:23
receipts 37:18,19
  37:19 39:6 106:24
  108:5,6,8,15
  109:16,16 116:12
  116:15 120:18
  125:4 128:7,8
receive 176:8
  214:22
received 143:21
  146:1
receiving 132:24
recess 75:11 138:3
recollection 129:10
  140:4
record 8:17 10:7
  11:5,24 13:23
  30:12 53:21 107:8
  108:8 110:10
  127:2,9,12 133:17
  137:23 138:8
  212:21
record's 13:13
recorded 66:12
  98:19
rectify 108:16
REFERENCED
  6:10
referring 50:8 66:9
  74:5 97:24 105:16
  109:20 129:5
  139:8

refrainment 158:18
refresh 140:4
refresher 18:6
refrigerator 60:7
refused 194:16
regard 145:20
  167:13 168:21
  204:2
regardless 154:14
  159:16 170:7
  173:11 175:21
  200:16 201:9
regards 19:12
  30:20 63:3 65:1
  65:11 71:2 76:13
  76:24 94:13
  103:23 125:18
  147:20 157:1
Reggie 51:7 65:8
  69:1 139:11
  149:20 175:1,3
Registered 2:8
  213:8,21
registration 27:24
regular 53:19
  178:19 184:19
regulations 74:7
related 6:17 113:14
relates 104:18
relationship 46:5
  49:17
relaxed 55:3
release 131:24
reliable 132:17
relooked 130:19
rely 131:4
remember 17:22
  21:13 24:20 43:12
  45:7 48:22 55:15
  55:17 59:24 65:9
  68:11 98:5,16
  100:4 101:24
  107:14 108:24
  123:5,8 130:21
  134:8 139:12,20
  141:14 143:4,15
  152:4 155:6 157:4
  164:3,14 181:18
  191:11 192:11
  204:10,15 205:11
  211:12
remembered 104:3
remind 154:11
reminding 61:15
repeat 13:6 135:14
  167:18,20
repeatedly 86:1

95:16
rephrase 13:6 81:5
  81:6
report 6:19 24:14
  24:18 25:20,21
  26:13 56:5 99:7
  100:7,15 127:3,5
  127:21 143:4
  146:5 200:12
reported 100:21
reporter 2:8 8:1
  138:16 213:9,22
Reporters 1:21
reporting 1:21
  90:19 91:14
  214:21
reports 98:20
  100:22 143:4
represent 8:19,22
  9:1,5,8,11,17,21
  10:4,9 14:7,10
  146:7 153:15
  154:18
represented 13:24
  154:19
representing 9:14
  10:1
represents 10:5
reprimand 205:7,9
REQUESTS 7:6
require 214:21
required 39:2 55:2
  162:23
resealed 47:10
reserved 8:8
resisting 144:4
  145:1,5
respect 39:23 40:16
  79:19 87:9
respected 93:24
response 54:19
  174:23
responsibilities
  40:12 66:20
responsibility 23:7
  36:21 38:11
responsible 25:11
  34:17 37:2 40:9
  41:5
rest 147:9
result 115:2
resulted 176:11
resumed 75:13
  138:5
retired 24:16 51:14
  188:2
retrospect 125:17

McIntyre v. Liciardello, et al./Torain v. The City of Phila., et al.                                    JEFFREY WALKER, 9/15/16

**Return** 214:20
**review** 135:7
**Reynolds** 1:12 4:18
5:7 9:18,18 10:16
11:12,13 21:19
51:1,2 52:6 53:17
61:24 62:11 65:6
76:5 92:6 93:21
99:1 101:7 106:14
122:19 139:10
145:19 149:20,21
153:16 167:15
185:3,4,19 186:15
187:14,22 189:8
190:8
**Reynolds'** 152:22
**Rica** 192:10
**Rican** 195:18
**rid** 191:10
**ride** 181:4
**Ridge** 191:12
**riding** 180:3
**right** 10:17 12:11
13:16 14:7,9 15:4
16:3 19:15 23:8
24:21 25:22 26:21
26:24 30:7 33:5
38:12,15 41:8
44:20 49:10 52:21
53:9,22 57:17
65:9 66:4 67:20
68:16 69:17,18
76:1,10,21 78:10
82:24 83:10 85:17
95:5 98:17,23
99:23 100:5
103:16,17 106:12
107:9,12 110:13
111:11 113:11,19
114:10,15,17,20
115:11 116:4,9
118:10 120:14
121:1 124:20
127:15 128:5
130:18 139:12
140:17 148:7
150:5,9,14 151:21
154:1 156:23
165:14,20 172:12
172:21 173:4,12
175:21 178:2
185:18,23 186:20
186:23 190:18
195:7 200:19
206:1,17 207:6
209:7,8,17 214:3
**rightfully** 209:15

**rights** 76:14,23
140:9 141:11,12
153:11 158:6
**Riley** 3:3 8:24
**ripped** 34:12 95:6
96:7 112:21
**rise** 114:7
**rob** 41:16 88:11
181:1
**robbed** 91:2 183:2
**Robert** 4:24 9:21
**Robin** 2:7 213:8,20
**role** 98:20 105:1
**Rolex** 186:9 191:24
**room** 13:1 36:10
47:16,19 61:12,19
63:16 104:15
129:7
**rooming** 124:6
**rooms** 62:9
**Roosevelt** 190:11
**rough** 183:3
**roughed** 208:2
**roughly** 15:16 17:4
**route** 82:6
**Roxborough** 57:6
181:7,23
**rubbed** 172:13
**rules** 74:6 170:7
214:21
**rumor** 199:23
**run** 27:15,17 105:23
201:9
**running** 44:11,14
70:2 103:1 151:24
152:1 180:14
182:3,3,3,9
197:15 202:6,7
**runs** 132:9

**S**

**S** 3:2 140:23
**S-P-E-I-S-E-R**
11:16
**S-P-I-C-E-R** 11:8
**safe** 106:20 111:2,2
111:3,4 115:13
116:6 128:15
152:19,20 188:14
188:15,18,19,19
189:3,3,5,9,11,13
189:14 190:6,10
190:15,18 191:11
191:11,20,22,22
**safeguard** 137:17
**safety** 15:22 142:19
171:3

**safety's** 67:21
**sales** 27:17 31:18
**Samuel** 139:24
140:18
**Santarone** 4:13
9:16,16 10:5,13
10:17,22 11:1
79:23 80:3,8,16
81:1 168:12
**sarge** 52:11 92:16
**Sargeant** 9:17
**Saunders** 118:7
**saved** 49:20
**saving** 49:16
**saw** 36:19 44:13
96:2 99:11 100:14
100:15,19,23
106:2,13 173:3
**saying** 42:8 52:21
88:15 89:17 92:18
116:13 117:1
119:19 121:16
123:4 126:22
132:18 135:9
136:4,4,6 145:3
146:5 147:6
159:18 160:24
169:19 186:7
189:18 201:18
209:20
**says** 39:14 110:16
110:24 111:3,7,10
111:24 112:2,6,20
115:1,15 116:21
118:5,6,6,13
172:24 188:19
**scared** 186:11
191:18 192:2
**scene** 136:2,3,4
**school** 14:19,20,21
14:23 15:8 198:17
**scout** 189:2
**script** 160:9
**Se** 4:12
**sealed** 29:11,15
30:7 47:9
**sealing** 8:6
**Sean** 21:19 50:15
**search** 6:17 18:23
18:24 22:19 23:1
31:11 32:18,22
34:18 35:2,3,4,9
35:10 36:12 39:23
40:8,10 45:8,13
45:15 57:11 75:2
77:15 92:20 98:14
104:3,23 105:5

107:15 113:8,14
113:24 114:2,8,11
114:12,22 115:2
116:20 118:11
133:8 196:11
199:5,7
**searched** 72:14,18
105:7
**searches** 34:18,20
76:24 199:6
**searching** 35:5
37:10 42:16 45:15
121:12 190:3
201:8
**seated** 53:23
**second** 17:23 70:6
119:13 122:23,24
171:14 196:2
208:5
**secondary** 90:20
**seconds** 35:20
**secret** 138:24
**secrete** 164:5
**secure** 92:17 103:4
103:8 122:5
**secured** 103:2
107:21 119:15,20
**securing** 42:15
60:11 92:21
102:11 121:9,12
197:17,20
**security** 191:23
**see** 13:1 26:21
27:13,21,24 28:3
46:3 49:21 53:19
62:12,19 84:3,20
84:22 85:20 87:3
88:7,23,24 98:4
105:21,21 106:4,5
106:6,7 109:1
110:17 111:7,8
114:19 115:2
119:14 120:6
121:13 123:12
128:11 130:22
132:3 133:22
162:22 179:16
180:20,23 188:14
191:22
**seeing** 88:15
**seen** 86:6 91:13
102:17 104:13,20
106:4 118:1
172:24 186:13
208:14
**sees** 38:14
**seize** 203:14

**seized** 106:18,20
111:21 116:1,10
204:7,9,14,16
**seizure** 107:15
113:8
**sell** 131:6 184:8
**selling** 85:6 203:18
**send** 29:17 30:10
30:16 86:18
118:20 120:6,15
120:24 155:18
164:23
**sends** 30:8
**sense** 208:19
**sent** 29:12 87:17
131:2 163:24
176:10
**sentence** 64:2
**sentenced** 63:24
64:3,4,14
**separate** 69:23
153:19 177:19
**separated** 70:1
151:18,21,22
152:5 159:22
160:18
**separation** 68:3
154:13 175:11,12
**September** 1:19 2:6
215:2 216:6
**sequestered** 63:16
**Serenity** 111:2
115:13
**sergeant** 4:17 5:3
11:7,7 24:7,9 52:9
53:5 54:13 55:8
55:10,22 56:5
57:1,5,7 58:8
65:17,18,21 69:20
70:12 73:8,8 93:3
93:4 125:10 128:8
129:6 145:13
174:14,14 181:14
181:16 189:17,19
192:24 193:1
200:18 201:13
205:6 208:6,14
**sergeants** 21:14
**series** 12:24 17:21
148:7
**serious** 67:20
177:18
**service** 134:17
**session** 62:16
**set** 31:16 91:1 99:2
100:13 102:4
192:13

Case 2:14-cv-01643-RBS   Document 61-9   Filed 06/29/22   Page 73 of 159

McIntyre v. Liciardello, et al./Torain v. The City of Phila., et al.                    JEFFREY WALKER, 9/15/16

settled 149:14
settles 36:5
seven 197:13 211:5
sheet 37:13,13,16
  37:17 38:6 107:4
  107:4,6 108:1
  211:13 214:6,9,10
  214:14,20 215:1
  216:10
sheets 108:1
shell 208:17
shipped 64:9
shirt 171:22 181:22
shirts 181:20 186:9
shit 67:13 125:24
shook 152:22 191:9
  191:10
shoot 68:15 208:14
shooting 207:24
  208:5,20
shootings 143:17
shoots 187:3
  207:20
short 35:23 75:11
shorter 89:9
shortly 9:13
shot 143:16 206:13
  206:18 208:6,11
  208:16 209:11
shoulder 47:21
  210:3,3
shoulders 72:17
show 109:3,15
  113:20 117:15
  132:23 145:8
  169:24
showed 116:16
  121:9 177:21
showing 75:21
  110:13,14 127:15
shows 108:12
  109:11 110:21
  116:16 117:2
shut 59:2
sic 52:20 111:2
side 62:9 118:13,17
  118:19,21,22
  171:13 179:19
  207:4,5
sign 30:5 37:5,18
  70:8,16 72:6,6,9,9
  118:19 119:22
  120:12,13 135:8
  135:23 138:12,20
  138:22 155:8
  157:8,24 161:18
  162:12,23 163:20

205:9 214:10,11
  214:15,16
signature 214:19
  216:1,17
signature's 163:19
signed 28:24 38:15
  41:18 115:17
  119:24 120:7
  128:8,16 149:11
  149:15 162:19,21
  163:6,14,17,19
signing 22:12 29:1
  70:5 121:2 129:2
  129:2 135:10
  162:1 214:13
signs 72:6,7,8
  133:21
similar 140:13
simultaneously
  135:13,15
Sinclair 128:16
sir 52:2 69:15
sit 102:16 105:21
  170:1
sitting 88:3,14
  123:17 125:20
  130:4,5,12,17
  131:7 181:7 182:2
  182:9 190:24
  194:1,3,5
situation 48:12,24
  92:15 122:7
  123:19 144:1,15
  159:16 170:20,24
  173:8,15 175:5,22
  177:16,18 179:23
  179:24
situations 67:24
  71:9 132:12
six 15:16 20:1,6
  21:2 197:13 211:5
size 100:23 104:18
  123:2
skinny 193:9
skip 31:3
slash 16:18
slide 198:18
slot 60:17
slow 151:10
small 15:9 48:2
  197:11,12 198:5
smallest 54:22
  197:12
smart 188:9
smell 186:18,19
smiled 191:10
smoking 97:15,17

186:17
snitched 181:3
snitching 180:12
  180:19
socialize 59:6
socially 59:14
solely 23:10
Solicitor 4:7,8 9:13
somebody 46:9
  57:6 73:1 86:5
  103:6 105:20,22
  108:7 119:16
  160:12 165:1
  168:8 170:9
  171:20 182:20
  186:17 198:8
  202:1
somebody's 159:16
someone's 36:7
  57:10 62:16
  179:10 205:6
something's
  120:14
son 58:4
soon 69:18 194:21
sorry 10:7 20:3
  34:15 51:13 52:2
  52:20 65:19 82:15
  85:3 111:19
  113:20 128:6
  129:21 161:22
  178:7 182:5
  185:13 199:6
  206:8 207:4
sound 200:8
sounds 67:15 90:4
source 26:10,10,14
  26:17 27:10 28:4
  28:12,17,22 31:21
  78:14,20,23,24
  79:22 80:12,19
  81:12,13,17,18,20
  81:21 82:2,17
  83:1,15 84:1,24
  87:1 95:14 98:23
  166:9
source's 83:3
sources 19:6 22:9
  32:13 42:13 79:15
  79:19 80:13 81:9
  82:15,15,21
  184:16
South 3:3,11 57:6
  180:5,9
Southwest 162:16
space 214:12,17
Spade 5:2 9:24

Spanish 52:16
speak 147:13
  157:13 180:5
speaking 71:4
  77:20 80:17
  121:17 130:11
special 17:1 56:10
  56:11 73:14
specific 43:10 57:1
  107:9,9 164:13
  198:11
specifically 80:18
  100:11 126:3
  167:12
specifics 43:6,9
  71:2 75:4,5 78:12
  97:22
specifying 117:4
Speiser 4:17 5:4
  9:17 10:15 11:15
  11:16 53:18 61:15
  65:7 68:5,11
  93:22 174:8
  211:16
spent 64:6 159:2
Spicer 4:17 5:3
  9:18 10:15 11:7,8
  49:16 53:18 62:1
  62:11 65:7 92:6
  93:21
spinning 68:8
  176:2
split 46:23 47:1,11
  48:1,21,22 52:12
  191:7
splitting 187:16
spoke 56:17 157:14
spoken 103:10
  170:5
squad 21:8,9,10,11
  21:16 22:1,3,4
  25:14 48:23 49:3
  49:4,19,19 50:19
  50:19 51:9,14,15
  52:24 53:15 54:12
  54:23 55:4 61:9
  65:3 68:3,21 69:1
  69:18,19,21,22
  70:1,14 73:8,8,9,9
  73:10 77:8 83:23
  87:1,8 90:15 92:3
  92:4 96:13,22
  106:2 124:17
  125:1 130:15
  139:9 141:17,23
  147:9 148:9 152:1
  152:1 153:2 157:2

158:22 174:5,16
  175:9,9,13 177:1
  179:8 197:11,12
  197:22 198:1,2,4
  198:5,7,8,16,21
  202:19,23 205:20
  208:1 211:4,5,8
  212:6
squads 25:8,12,16
  25:16,17,18,19
  54:22 73:6,7,19
  131:13 166:15
  197:14 211:6
SS 213:4
stab 165:22
Staff 5:9
stairway 193:19
stand 62:17
standard 197:15
start 8:16 14:12,18
  14:19 22:23 23:17
  24:5 43:18 46:7
  83:11 87:21 89:23
  94:5,7 107:17,22
  110:14
started 16:15 18:22
  18:23 24:6 58:18
  78:13 151:9,12
  158:14 181:17
  183:9 187:7
  189:16 191:19
  211:1,1
starting 84:5 153:2
  209:6
starts 43:21,24 87:4
  89:24 107:24
  126:7,17 148:14
stash 89:12,13 90:9
  90:17
state 11:23 163:24
stated 100:22
statement 48:17
  176:23 178:24
statements 7:9
  168:15 178:23
STATES 1:1
stationed 162:14
stay 57:2,3,5 93:8
  175:15 183:17
stayed 49:13 64:10
  64:11 124:18
  174:17 198:5
steal 45:16 46:1,4,5
  46:9 49:6,9 50:21
  51:6,7,7 93:14,16
  93:16 96:22
  105:11 126:6,14

Case 2:14-cv-01643-RBS    Document 61-9    Filed 06/29/22    Page 74 of 159

McIntyre v. Liciardello, et al./Torain v. The City of Phila., et al.                    JEFFREY WALKER, 9/15/16

126:16 160:17
178:3 182:18
199:13,21 200:10
200:14 202:24
**stealing** 42:18
43:18,19 44:19,20
44:23 45:1,14
46:7 49:2 50:1,1,4
50:21 51:9 53:11
53:11,16 58:21
61:8 66:9 69:23
70:22 93:13,20
94:1,7,13 126:18
158:14,17,18
159:12,19 160:21
175:5,6,17,18,22
175:24 177:2
178:3 198:14,15
200:20 201:4,5,13
201:15 203:5,11
205:13 206:1,5
210:5,17
**steam** 158:8
**steering** 134:15
**stemmed** 141:7
**step** 28:10,22
**steps** 19:16
**stick** 63:8,21
154:12,13,14
160:23
**sticking** 63:10,12
68:8
**stipulations** 7:9 8:2
**stole** 43:20 46:12
46:15 48:21 49:7
49:8 50:17 53:14
58:22 60:20
152:18 160:19
167:10 199:15,17
199:18 200:22,23
202:21 203:1,3
210:17
**stolen** 96:14 195:17
195:20 196:17
203:7
**stood** 206:3
**stop** 12:5 13:5,17
13:21 27:3 92:23
92:24 101:8,12
102:24 103:6
117:12 174:15
185:20 189:6
**stopped** 18:21
91:19 101:6,10,16
102:10,13,22
104:3,9 105:14
117:23 171:19

211:3
**stopping** 126:8
**stops** 15:22,22
**store** 58:19
**stories** 88:12
**story** 41:1 42:18
44:16 63:8,10
88:6,13 90:2
91:15 96:6 118:3
123:16 147:18
**storytelling** 89:6
**straight** 57:16
**street** 1:22 2:4 3:3,7
3:11,21 4:8,15
19:1,2 44:12 70:2
87:19 99:24 100:4
100:7,8,8,12
102:3 104:15
110:23 131:8
136:7,8 148:17
151:13 158:6
171:1 173:14
179:16 207:1
**strengthen** 121:23
**strengthens** 123:3
**strike** 18:9,10,13,18
18:19 19:17 20:7
20:10 21:2 22:3
43:13 49:17
170:12
**strong** 44:6
**stronger** 123:23
**Stubbs** 21:20
**stuck** 160:8
**stuff** 91:4 94:5
116:17 120:24
121:6 125:3 126:9
135:20 136:15
151:5 177:12
179:23 189:20
190:4 195:15
199:20 211:20
**stupid** 87:11 200:8
**subject** 214:13
**Subpoena** 6:11
12:14
**subpoenaed** 12:8
**substance** 156:24
214:4,8
**substantiate** 105:3
**sucked** 202:15
**sue** 139:16 155:21
155:24 156:3
**sued** 139:6,13
141:5
**SugarHouse** 61:3,3
61:4 177:7

**suing** 139:16,18
155:9
**suit** 156:7,8,12
**suitcase** 195:22
196:17
**Suite** 1:22 3:12,16
3:22
**suits** 139:6
**summary** 37:13,13
37:15,17 38:6
107:4,4,6 108:1,1
**Summit** 1:21
214:21,23
**sunken** 190:13,17
**supervising** 24:8
97:16
**supervisor** 23:10
23:15,22 24:1,10
24:12 29:8 30:5,6
30:13,18 31:14,14
36:14,16 37:2
38:14 49:24 68:19
70:1 71:4,5,24
72:8,15 82:12
92:5 102:23 108:4
118:16,18 119:3
119:22 120:3,13
121:2 133:9,11
136:9,22 137:1,4
137:9 143:14
152:9 155:18
162:23 163:8
166:23 196:3
200:15 201:3,7
208:10
**supervisor's** 72:13
82:13 121:8
212:14
**supervisors** 17:11
25:19 29:21 49:23
55:7 65:12,13,16
70:4 73:15 74:19
82:6 124:24 125:1
125:9,14 129:7
136:17,18 156:6
159:13 163:5
166:20 197:19
210:18
**supplier** 192:10
**supplying** 167:1
**SUPPORT** 7:1
**supposed** 34:9
36:4,13 57:3
81:19,20,21,23
119:18,22 131:19
131:24 132:15
134:24 135:16,19

135:22 170:2
184:18 197:23
209:1
**sure** 10:12 13:12
27:6,9 29:4,9 30:7
37:24 38:12,14
46:9,15 47:3 50:6
53:9 60:8 62:2
80:17 95:21
107:12 128:22
146:21 148:19
160:8 172:12,22
**surprised** 97:14
**surprises** 169:21
**surprising** 196:22
**surveillance** 31:17
32:3 84:12 99:2
100:14
**surveillances** 18:20
34:2 40:24 83:8
84:2 206:20
**survive** 178:5
**suspect** 173:20
**suspicion** 44:1,6
85:8 88:18
**switch** 138:23
**switched** 187:5
**sworn** 8:12
**swung** 144:4
**Sylvester** 3:24 9:6
156:15
**Sylvia** 21:20
**system** 38:16

――――――――
**T**
――――――――

**T** 213:1,1
**table** 60:16 62:21
123:18 156:21
181:10
**tables** 62:20
**taboo** 126:12
**tackled** 193:20
**tackles** 193:19
209:12
**tactic** 182:22,23
**tactics** 178:4
**tail** 16:22 33:17
61:1 170:5
**take** 13:17 17:6,14
19:3 36:17 38:18
39:19 47:10 60:15
75:8 88:23 91:13
95:9 97:4 108:7
126:18 135:6
137:21,24 143:12
145:23 152:6,10
188:19,19 194:18

198:18 199:18,19
206:7,9,10 209:14
**takedown** 209:4
**taken** 2:3 37:6,11
37:15,20 75:12
102:5 104:10
107:6 108:3,9,12
112:5 124:20,22
129:1 138:4
143:20 148:17
151:12 196:22
197:3 203:23
213:13 215:2
**takes** 87:11 89:8,9
**talk** 48:3 57:8 67:23
133:1,2,3 161:7,9
169:3,13 170:2,9
170:24 171:3,14
174:14
**talked** 171:7 175:23
187:24 192:6
**talking** 35:3,4,5
43:10 47:22 56:22
61:13 68:6 79:24
82:15 85:6,18,24
86:5,16 87:22
89:3,5 97:5 113:1
116:18 134:5,11
137:2,2 151:3
154:24 162:15
168:23 175:16,19
175:19 178:11
183:9,11 191:19
197:13 212:1,7
**tap** 47:20
**target** 81:14 85:19
87:19 117:21,22
130:2 146:24
169:23
**targeting** 95:3
150:7 202:9
**targets** 87:3
**taught** 15:18,23
88:20 126:2
**taxed** 212:3
**teaching** 126:3
**team** 16:17 19:3
34:18 45:14,15
54:19
**teams** 36:12
**telephone** 29:5
**teletype** 39:14
**tell** 8:12 16:3 21:24
26:7,20,22 28:12
38:7 39:18 40:20
41:10 46:10 48:8
48:23 50:5,6

McIntyre v. Liciardello, et al./Torain v. The City of Phila., et al.                    JEFFREY WALKER, 9/15/16

60:21,24 63:2
66:22 67:8 70:7
70:18 79:2 90:6,6
98:10,11,17,20
106:9 114:11
121:14 124:20
126:9 130:17
131:11 132:3
133:5 136:24
147:22 148:12
158:9,9 159:6
163:11 164:4,11
168:3 169:14
170:8 175:15
179:3,4 180:12
183:6 185:16
189:22 196:4
199:1 204:8,10
205:10 206:15
210:15
**telling** 21:1 22:11
27:14 30:24 31:20
50:5 89:10 169:18
176:3 182:20
**tells** 26:17 27:6
31:22
**ten** 16:11 24:23
33:6,8 75:9
**Tessa** 24:16
**test** 15:10 17:6
**testified** 8:13 60:20
79:12 126:1
161:11 169:7
203:24,24 204:14
**testify** 6:11 12:14
63:15
**testifying** 67:7
156:14
**testimony** 48:18
63:1 77:24 79:18
100:22 103:19,23
122:8 124:11
129:10 156:24
203:20 204:1,7
214:12
**text** 47:18,18 170:6
**texted** 177:8
**texts** 176:9,11
177:9,20
**thank** 12:23 159:9
159:10
**thefts** 198:7
**they'd** 121:3
**thick** 209:22
**thing** 29:20 49:13
59:22 61:4 62:20
70:15 85:22 87:15

91:1,2 98:8 117:4
117:11 119:21
130:24 148:15
151:16 155:7
157:4,14 170:17
179:16 180:24
181:8 183:2,14,17
183:18,21 191:3
194:15 198:17
200:21 202:15
207:18 209:7
**things** 15:17 22:11
28:10,11 30:1
43:1 53:13 71:3
72:22 81:15 87:7
87:15 88:4 89:16
104:22 106:23
117:3,7,10 124:23
125:12,14,21
130:6,19 134:9
150:8 152:15,24
157:4 158:19
174:15 180:2,13
182:18 191:20
202:13 209:21,22
**think** 10:13 34:7,8
48:21 58:17 98:18
108:23 111:2
121:17 123:4
129:19 134:2
138:24 144:23
158:4,7 159:1
169:19 170:4
177:7 192:2
199:23 201:11
211:13
**thinking** 91:3
163:11
**Thomas** 4:4,18 5:6
9:9 11:10 46:13
47:15 48:20 53:16
56:7 62:10 65:6
87:10 93:21
139:10 143:7,11
148:14,15 155:7
160:19 170:8
175:14 176:10
177:8 179:3
183:22 186:1,5,5
186:15 187:21
**thoroughly** 72:14
**thought** 56:10
72:11 171:21,23
172:5 173:3 174:9
176:4 207:14
**thousand** 47:24
48:8 196:24 212:2

**Thousands** 33:14
34:23,24 40:7
74:18
**thread** 76:22
**threat** 181:2
**threaten** 179:20
**threatened** 142:18
142:19 171:4
174:4 180:22
**threatening** 176:8
179:13,14,15
183:13
**threats** 179:9,11
**three** 16:8 25:11,14
64:10 68:18 89:4
95:22 96:4 98:3
100:19 112:21
113:3 115:13
119:3,7 129:14,23
131:17 197:18
206:14
**threw** 58:2 191:15
**throwback** 203:9
**throwing** 55:18
184:1 212:14
**Thursday** 2:6
**tied** 122:24
**Tierney** 4:5 9:8
**ties** 104:14
**time** 8:9 13:16
16:10 19:24 20:18
21:6,17 22:6 24:6
24:13,17 29:17
33:12 34:5,7,17
35:19,22,23,23
36:12 37:9,21
38:16 39:15,24
43:15,17,20,22
54:23 55:24 56:13
59:11 67:4 68:1,4
70:5 71:19 72:5
73:12,13 75:12
77:6 82:17 89:1
95:1 98:12 101:19
103:13 106:3,11
107:2,10,14 109:5
109:10 111:5,6,11
112:1,3,12 124:9
124:23 125:4,6
126:10 133:23,24
135:17 138:4
142:4,7 144:13,15
144:24 146:24
147:12 153:13
158:7,13 159:2
160:5,18 162:6
174:12,13 175:7

178:1 180:10,13
186:14 196:1,2
197:10 198:18,19
199:19 202:8
205:19 206:18
209:22 210:17,20
210:23
**times** 19:13 39:5
40:5 42:20 43:10
45:21,22,23 47:15
48:17 59:17 61:12
70:9 71:22 73:17
74:18 88:16 93:2
199:10 201:2
203:8 206:13
207:19,21 208:17
**tip** 169:8
**tipped** 147:7
**today** 12:3,9 54:7,9
66:24 67:7,19
125:17 171:5,5
**told** 22:12 27:9 30:2
34:13 57:5,7
68:18,18,19,20,24
69:1,2,6,16 89:10
91:1 95:16 96:8
151:23 152:14
164:6,13,14,15
171:7 172:16,17
173:5,10,12
174:16,24 175:23
181:2,2 182:13,21
196:21 200:23
209:16
**Tom** 59:7 190:8
**Tommy** 50:4,6,7,20
51:15,16,18,22
52:6 57:14 58:15
58:17,18 61:13,17
62:1 93:2,8
142:11 143:5,19
148:23 149:11,24
150:1 151:15
152:6,13,21
180:23,23 181:24
182:8,10,13
186:22 187:2,16
187:18,23 188:9
188:18 189:8
191:9 194:9,14
197:22 198:3
200:21,24 203:5
208:9,21
**Tommy's** 151:24
**top** 23:24 110:16
116:22 118:22
148:19 193:23

**topic** 157:10
**tops** 115:16
**Torain** 1:8 3:9 6:13
8:19 75:15 76:7
77:12,13,21 78:7
80:1,6 83:14
97:24 99:18 105:3
106:2 129:11
215:3
**totally** 40:12 159:4
178:21
**touched** 73:1
**Tower** 3:16
**track** 97:21
**tracks** 182:23
**train** 72:11 191:14
210:23
**trained** 31:5 74:10
**training** 18:4 74:12
**transaction** 137:13
**transcript** 213:15
216:6
**transcription** 216:8
**transfer** 17:10
**transferred** 16:9
19:14 20:23 85:8
**treatment** 143:21
**tree** 181:12
**trestle** 191:14
**trial** 6:11 8:9 12:15
78:4,6 103:17
156:18,20
**trick** 169:22
**tried** 180:21 209:9
**trouble** 148:6
**true** 96:9 216:7
**trunk** 47:4
**trust** 172:18,19
**truth** 8:12 66:23
67:9,9,11,15,16
90:5,6 133:5
159:7
**try** 30:3,3
**trying** 32:22 53:2
86:10 88:10 126:8
130:8 144:18
173:4,5 206:21
209:13
**turn** 88:18 199:20
200:6
**turned** 34:14
201:18
**twenties** 191:5
**twice** 195:24,24
196:15
**two** 17:22,23 18:17
70:8 71:21 72:13

Page 235

McIntyre v. Liciardello, et al./Torain v. The City of Phila., et al.                    JEFFREY WALKER, 9/15/16

72:19 89:4 98:1
104:22 109:16,18
109:18 115:15
116:5,6,19,21
119:17 125:9
128:7,15 133:23
137:15,15 162:5
170:9 181:14,15
188:17,17 191:13
191:19 197:18
207:16,16 209:2,2
212:2
**tying** 122:23
**type** 32:6 38:9
60:22 82:21 84:3
88:8 104:21
105:15 117:15
123:23 142:14
145:10,15 149:2
158:1,2 160:9,11
161:21 162:5,9,11
163:14 171:21
176:14 192:19
205:8
**typed** 134:23 135:4
135:9,10 157:6
162:7 163:6,7
**types** 18:17 179:20
179:22
**typical** 146:3
**typing** 135:1

_____ **U** _____

**ultimately** 78:6
**unclear** 10:8 167:19
167:21
**undercover** 28:20
31:6 71:14
**underneath** 115:11
**understand** 13:5,7
14:6 22:1 116:24
120:2 130:10
153:5 159:4
**uniform** 16:16
18:13,18 19:17
171:20
**uniformed** 16:21
19:23 20:7,20
**unit** 19:11 20:10,23
21:5,7,15 24:22
24:22,24 25:6
26:5 38:3 54:16
57:14,24 68:2
77:7 106:16
107:13 119:4
159:19 166:13
197:13,14 210:22

212:8
**UNITED** 1:1
**units** 18:16 25:7
**unlawful** 140:9
141:13
**Unlock** 194:16
**unlocked** 194:10
**untouchable**
158:21
**unusual** 119:12
**updates** 74:13
**upstairs** 194:1
**urinating** 207:12
**use** 28:21 30:23
31:2,4 34:2 42:11
74:23 83:10 96:23
109:3 132:9
142:18 143:12,22
144:1,2,10,11,15
144:20 145:9,12
157:5 161:9
164:21 166:7,8,9
166:9,10 203:20
**Usual** 8:1
**utilize** 84:4

_____ **V** _____

**vacation** 181:9
**vaguely** 98:4
**vehicles** 83:8
**vein** 141:10
**vendetta** 148:18
159:9
**verification** 150:11
**verified** 175:13
**verify** 83:3
**Videographers**
1:21
**videotape** 99:8,12
99:12,13,15
**viewed** 143:23
**views** 120:3
**Vincent** 118:7
**violate** 74:15
147:19 153:9
**violated** 140:8
**violating** 74:20,21
74:22,24 75:2
77:2 158:5 166:1
166:3
**violations** 76:13,22
125:19 141:11
**Violent** 54:18
**visible** 145:10
**visit** 124:10
**voice** 69:10
**voter's** 27:23

**voucher** 70:17 72:1
72:2 132:23
133:20,21 134:16
134:18,22,22
157:24,24 158:2
161:13,17 162:12
162:18,20 163:8
163:14
**voucher's** 72:3
**vouchers** 132:23
134:5,8 157:5,6
162:22,24
**VRT** 54:18
**vs** 1:4,9 215:3,3

_____ **W** _____

**W** 4:20
**Wades** 118:6,7
**wagon** 205:5
**wait** 17:15 39:17
44:3 92:22 102:17
107:18,19 125:5,5
135:3 185:15,15
185:15,15
**waived** 8:7
**waiving** 14:9
**walk** 86:6 178:22
178:24 209:3
**walked** 16:7,8
124:9 209:5
**Walker** 1:11,18 2:3
4:12 6:4,12 8:11
9:18 10:20,23
12:1,2,16,20
51:23 69:9 76:3
133:7,8,10 152:7
215:2 216:17
**Walker-1** 6:11
12:12,17
**Walker-2** 6:13 75:7
75:16,22
**Walker-3** 6:15
109:23 110:2,15
128:6
**Walker-4** 6:16
110:6 112:9
**Walker-5** 6:18
113:12,16,21
**Walker-6** 6:19
127:6,16
**walking** 171:8,12
171:13 173:24
177:1 181:19,22
188:13
**Walnut** 1:22
**want** 12:12 13:9,16
13:22 17:14 22:13

23:17 24:5 26:16
30:16,23 46:3,8
48:5,23 49:1 67:8
67:12,14,15,16
75:4 79:1,7,7
80:17,20 81:5
86:15 109:19
113:19,20 117:13
117:13,14,19,23
119:15 126:15,24
127:2 128:24
136:17,18,23
138:23 139:3
144:12 146:7
149:4 150:5 161:6
161:20 168:12
170:22 173:6,14
175:20 183:19,24
184:3,11 192:7,7
196:14 200:7,15
201:6 204:17
**wanted** 19:17,20
46:1 47:10 68:7
90:23 94:4 135:2
142:24 151:20
152:8,9 158:2
176:3 180:15
190:5 199:18
201:2 204:19
210:21
**wants** 82:2,6
**Warner** 4:13 56:12
**warrant** 6:17 23:1
31:11 32:18,19,20
32:22,24 35:10,10
39:24 40:8,10
45:9 57:11 75:2
83:13 86:13 90:20
90:20,21 91:15
92:20 93:9,10,12
98:14 102:4 104:7
104:8,23 105:6,20
106:24 107:15
108:13 112:1
113:9,14,24 114:2
114:11,12,23
115:24 116:21
117:4,6,15,16,24
118:11,18,23
119:8,8,23 120:2
120:4,15 121:20
121:24 122:5
123:17 125:5
128:10 129:2
190:2,5 192:16,18
196:1,5,8,12
197:11 199:7

204:3,12
**warrants** 18:23,24
19:7 22:19 42:14
42:15,16 45:8
71:3 77:1 98:12
104:4 120:6 167:9
192:19 199:5,6,15
200:10,11,13
**Warren** 4:4 9:8
193:9,10
**wasn't** 18:23 33:18
33:20 34:10 45:2
51:17,18 53:1
60:16 61:1,5
64:21 68:7 95:9
96:9,10 98:7
99:12 130:1
142:23 150:9,21
157:19 158:8,18
160:4,6 162:16,17
165:13 175:10,19
176:1,21 178:17
178:18 190:20
197:5,7,8,23
198:7,8,13,14
202:19 204:9
207:15 212:11
**watch** 32:3 88:1,2
131:20 191:24
**watches** 186:9
**watching** 19:2 32:5
72:17 131:8
136:15
**way** 12:20 31:3,15
33:21 46:6 47:1
82:21 88:20 96:16
98:19 102:10
103:4 109:7
110:22 128:5
130:10 132:2
141:22 142:23
144:13,19 154:12
158:19 162:12,15
166:8 169:10
176:15 183:18
188:21 189:11
198:12 199:17
201:23 202:21
206:3
**ways** 31:20 46:21
131:11 146:11
179:21,21
**we'll** 30:3 33:4
35:12 71:1 78:12
87:3,3,4,5 92:11
92:17 112:8
131:17 152:15

McIntyre v. Liciardello, et al./Torain v. The City of Phila., et al.                                                     JEFFREY WALKER, 9/15/16

163:20 169:14
184:2 197:6
we're 12:3 32:10
38:1 39:21 50:14
61:11 63:18,22
71:1 75:3 80:17
82:15 87:4,14,22
90:17 92:10
101:11 103:12
105:11 131:15
136:15 149:22
160:14 165:21
169:15 179:21,22
186:20 188:13
200:16,17 209:13
we've 132:19
186:13 204:18
209:21,22,24
wean 19:20 53:2
wear 149:3 203:4
wearing 181:19,22
weed 97:16,17
week 89:9 208:1
weeks 64:10
welcome 152:22
191:9
well-being 172:8
went 10:14 15:12
16:6 19:16,18
21:8,11 47:5,13
50:19 51:14 52:12
52:13,14 57:16
58:19 59:15,19,23
59:24 60:14 64:11
69:20 70:14 73:7
85:17 87:20 89:11
89:12 91:11,20
95:5 102:2 103:2
105:10,13,16
106:8,16,18
111:22 121:19
124:14 125:2
145:10 152:11,13
152:13,23 158:13
163:7 170:9 175:9
177:6 181:5,6
184:14 187:6,9,22
187:23 190:2
191:16 192:20
195:24 196:1,2,15
200:9,11,22 208:8
weren't 101:12
206:13
Wescott 3:24 9:6
West 3:17 15:2
52:14
whipped 143:5

white 88:3 111:1
115:16 116:22
171:22 186:8
188:5
whoever's 62:18
wide 15:23 188:16
188:18
wife 97:2
Williams 3:20,20
9:4,4 10:6,20,24
11:2 178:7,9,15
win 203:17
window 186:19
207:20
window's 123:12
wine 60:8
wire 149:3
wiretapping 149:5
witness 6:3 51:1,5
52:2,5,19 53:8
54:1,4,8 55:10,14
55:18 58:11,15
61:18 65:21,23
66:2,5 68:24
69:11,14,16 70:19
70:19 71:24 72:20
97:9 119:22,23
121:7 133:19
158:11 163:3
174:20 178:12,17
182:7 185:3 193:4
193:7 204:10
214:1,16,16,17,18
witnessed 72:12
120:10 216:21
witnesses 147:5
witnessing 72:7
won 151:14
word 78:24 163:9
words 22:1 23:11
23:13 27:16 40:19
56:3 82:8,19
84:17 85:11 92:18
93:4 135:16 148:2
153:7 155:17
166:1
work 19:9 35:1,2
45:24 95:22 169:5
177:21 189:16
194:19 210:18
worked 20:6 62:24
131:13 151:18
180:7
working 24:21
44:17 58:18 59:21
59:24 60:9 73:16
132:11 166:14

176:13 178:2
199:2 206:19
212:11
works 138:13
210:15
world 42:23 126:11
172:20
worst 209:23
worth 92:14
worthy 90:19 91:14
wouldn't 21:7 32:20
68:16 96:19
124:22 163:10
165:22 180:21,22
wrap 127:1
write 135:6,16,19
135:22
Writer 5:9
writing 109:4
written 108:3
134:23,24 135:4
161:17
wrong 38:20 39:1,6
39:11,16 42:11,24
117:6,10 125:15
125:18 134:3
148:1 159:1,4
164:12 173:12
206:11
wrote 63:13
www.summitrep...
1:24

_____

**X**

X 6:1

_____

**Y**

YATVIN 3:10
yeah 31:19 40:23
54:8,15 60:16
61:22 65:23 67:21
74:14,21,23 81:6
81:7 90:10 111:14
111:16 114:24
121:19 136:12
143:3 153:7
159:11 166:12
171:22 172:6
173:1 174:6
175:18 193:10
year 15:4 20:1
57:19 111:15
140:1,3 148:17
151:13 160:4
211:10,24 212:9
years 14:24 16:11
24:23 33:6,8

77:14 78:8 87:23
88:19 96:13
129:14,23 130:5
132:11,19 141:23
188:2
yelling 88:4
yo 34:13 173:1
York 195:15
young 4:20 186:8
younger 58:4

_____

**Z**

_____

**0**

08037 1:23

_____

**1**

1 111:6 114:18
119:10
1-4 111:8,13
1,000 48:3
1/4 116:16
1/4/01 112:5 114:12
114:13 116:19
1/5 115:3
1/5/01 112:13 113:5
1:00 112:13,14
113:6
10 34:10,15
10,000 48:15
10:20 2:7
100,000 211:23
10th 4:21
11 6:6
110 6:14
112 6:16
113 6:17
1150 111:3
119 212:5
12 6:11 197:14
211:6
12:00 210:18
120 212:9
127 6:19
13 77:13 78:7
129:17,23 130:5
197:14
13-2773 1:6
1300 3:22
134 212:3,9,10
14-1643 1:16
14th 4:9
15 1:19 2:6 210:14
215:2 216:7
15,000 42:1
1500 1:22
1515 3:21 4:8

1610 1:22
1621 99:23
1628 100:12 102:3
16th 16:10,11,13
45:2 188:1
17 113:4 115:14
17,000 96:3
1880 4:21
19102 1:22 3:12 4:9
19102-1929 3:22
19103 4:15,22
19106 3:8
19107 3:4
19128 4:3
19428 3:17
1987 14:21

_____

**2**

2 111:1
2,000 48:3
20 88:3 100:20
101:6 141:4
200 3:17 76:17
140:14
2000 4:15 57:21
115:6,7 139:5
140:6
2001 77:21 115:9
140:4 141:8 153:2
168:1
2013 25:3 33:7,9
41:9,12
2016 1:19 2:6 215:2
216:7
210,000 195:23
196:17
215 1:23 3:4,8,13
3:23 4:3,10,16,22
22 110:20
22508224 6:14
110:1,21
229 29:2
22nd 41:12
230 3:11
2308223 6:16 110:5
239 3:3
24/7 130:2
28 64:7 125:20

_____

**3**

3 106:13 110:14
123:7
3:00 123:5
3:30 106:17 111:7
111:10,11 112:3,5
116:20
3:50 212:23

McIntyre v. Liciardello, et al./Torain v. The City of Phila., et al.                    JEFFREY WALKER, 9/15/16

---

**30** 138:13 212:4
  214:22
**303** 3:7
**30th** 64:12
**3730** 1:11
**397-0125** 3:18

---
**4**

**4** 109:24 111:8
  128:7
**4:00** 204:18
**400** 3:16
**42** 64:4
**424** 1:23
**4268** 1:12
**443** 4:2
**447-8648** 1:23
**48** 37:5
**49** 127:18,21
**4th** 128:14

---
**5**

**50,000** 48:16,20
**500** 211:14
**500,000** 96:16
**503** 3:12
**546-5700** 3:13
**557-0099** 3:23
**55th** 100:4,8,8,12
  102:3 110:23
**567-3315** 1:23
**575-2626** 4:16
**587-1678** 4:22
**59th** 15:2
**5th** 115:4 128:10
  187:17,20

---
**6**

**6** 127:3
**6/28/89** 15:11
**6:00** 210:19
**60** 35:20
**601** 2:4
**6061** 1:14
**609** 1:23
**610** 3:18
**627-8516** 3:8
**66th** 208:6
**683-5381** 4:10
**6B** 2:5

---
**7**

**7126** 99:2
**731-9500** 3:4
**75** 6:13

---
**8**

**8** 7:10
**80** 212:8
**800** 1:23
**869-5502** 4:3
**87** 15:6
**88** 15:10

---
**9**

**90,000** 212:8
**985-2400** 1:23
**99** 17:4 20:5 25:3
  33:9
**99028** 113:9
**9th** 16:6

---

SUMMIT COURT REPORTING, INC.
215.985.2400 * 609.567.3315 * 800.447.8648 * www.summitreporting.com



# Compressed Transcript of the Testimony of
# **JEFFREY WALKER- CONTINUED, 9/16/16**

**Case:** McIntyre v. Liciardello, et al./Torain v. The City of Phila., et al.

Summit Court Reporting, Inc.
Phone: 215.985.2400
Fax: 215.985.2420
Email: depo@summitreporting.com
Internet: www.summitreporting.com

Page 219

```
 1    APPEARANCES:
 2    KRASNER & LONG, LLC
      BY: LAWRENCE S. KRASNER, ESQUIRE
 3    BY: LIAM J. RILEY, ESQUIRE
      239 South Camac Street
 4    Philadelphia, Pennsylvania  19107
      (215) 731-9500
 5    krasner@krasnerlong.com
      Counsel for Plaintiff James McIntyre
 6
      MICHAEL PILEGGI, ATTORNEY AT LAW
 7    BY: MICHAEL PILEGGI, ESQUIRE
      303 Chestnut Street
 8    Philadelphia, Pennsylvania  19106
      (215) 627-8516
 9    pil423@aol.com
      Counsel for Plaintiff Kareem Torain
10
      POPPER & YATVIN
11    BY: HOWARD D. POPPER, ESQUIRE
      230 South Broad Street
12    Suite 503
      Philadelphia, Pennsylvania  19102
13    (215) 546-5700
      popper.yatvin@verizon.net
14    Counsel for Plaintiff Justin Miraglia and Helen
      Guyen
15
      LAW OFFICE OF MARGARET BOYCE FUREY
16    BY: MARGARET BOYCE FUREY, ESQUIRE
      Suite 400 Four Tower Bridge Center
17    200 Barr Harbor Drive
      West Conshohocken, Pennsylvania  19428
18    (610) 397-0125
      mboyce@aol.com
19    Counsel for Plaintiff Brittney Mills
20    WILLIAMS CUKER BEREZOFSKY LLC
      BY: GERALD J. WILLIAMS, ESQUIRE
21    CHRISTOPHER MARKOS, ESQUIRE
      1515 Market Street
22    Suite 1300
      Philadelphia, Pennsylvania  19102-1929
23    (215) 557-0099
      gwilliams@wcblegal.com
24    Counsel for Plaintiff Sylvester Wescott
```

---

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

- - -

JAMES McINTYRE,          : CIVIL ACTION
     Plaintiff,  :
     VS.          : LEAD DOCKET
POLICE OFFICER          :
LICIARDELLO, et al.,  :
     Defendants.  : NO. 13-2773
          - - -
KAREEM TORAIN,          : CIVIL ACTION
     Plaintiff,  :
     VS.          :
THE CITY OF          :
PHILADELPHIA,          :
PHILADELPHIA POLICE  :
OFFICER WALKER, BADGE  :
# 3730; PHILADELPHIA  :
POLICE OFFICER          :
REYNOLDS, BADGE # 4268;:
PHILADELPHIA POLICE  :
OFFICER MONAGHAN,  :
BADGE # 6061,          :
individually and in  :
their capacity as  :
police officer,          :
     Defendants.  : NO. 14-1643

ORAL DEPOSITION OF JEFFREY WALKER
SEPTEMBER 16, 2016
- - -

SUMMIT COURT REPORTING, INC.
Certified Court Reporters and Videographers
1500 Walnut Street, Suite 1610
Philadelphia, Pennsylvania  19102
424 Fleming Pike, Hammonton, New Jersey  08037
(215) 985-2400 * (800) 447-8648 * (609) 567-3315
www.summitreporting.com

Page 218

```
 1              - - -
 2
 3         Continued oral deposition of JEFFREY
 4    WALKER, taken at the James Byrne Courthouse, 601
 5    Market Street, Courtroom 6B, Philadelphia,
 6    Pennsylvania, on Friday, September 16, 2016,
 7    beginning at approximately 10:20 a.m., before
 8    Robin Frattali, Registered Professional Reporter
 9    and Notary Public in and of the Commonwealth of
10    Pennsylvania.
11
12              - - -
13
14
15
16
17
18
19
20
21
22
23
24
```

Page 220

```
 1    APPEARANCES:
 2    JAY FEINSCHIL, ESQUIRE
      443 Green Lane
 3    Philadelphia, Pennsylvania  19128
      (215) 869-5502
 4    feinschillaw@comcast.net
      Counsel for Plaintiffs Warren Layre, Thomas Basara
 5    and Michael Tierney
 6    ERIC J. SPADE, ESQUIRE
      One South Broad Street
 7    Suite 1830
      Philadelphia, Pennsylvania  19107
 8    (215) 772-0500
      espade@gmail.com
 9    Counsel for Plaintiff Petrina Mitchell
10    CITY OF PHILADELPHIA LAW DEPARTMENT
      BY: ARMANDO BRIGANDI, ESQUIRE
11    Chief Deputy City Solicitor
      BY: JONATHAN K. COOPER, ESQUIRE
12    Assistant City Solicitor
      1515 Arch Street
13    14th Floor
      Philadelphia, Pennsylvania  19102
14    (215) 683-5381
      armando.brigandi@phila.gov
15    Counsel for Defendant City of Philadelphia
16    JEFFREY WALKER, Pro Se
17    MARSHALL, DENNEHEY, WARNER, COLEMAN & GOGGIN
      BY: JOSEPH J. SANTARONE, ESQUIRE
18    BY: DIANA P. CORTES, ESQUIRE
      2000 Market Street
19    Philadelphia, Pennsylvania  19103
      (215) 575-2626
20    jjsantarone@mdwcg.com
      Counsel for Defendants Sergeant Michael Spicer,
21    Police Officer John Speiser, Police Officer
      Linwood Norman, Police Officer Brian Reynolds,
22    Police Officer Thomas Liciardello and Police
      Officer Perry Betts
23
24
```

1  (Pages 217 to 220)

Case 2:14-cv-01643-RBS    Document 61-9    Filed 06/29/22    Page 81 of 159

McIntyre v. Liciardello, et al./Torain v. The City of Phila., et al.

JEFFREY WALKER- CONTINUED, 9/16/16

### Page 221

```
 1   APPEARANCES:
 2   CHRISTIE & YOUNG PC
     BY: JAMES W. CHRISTIE, ESQUIRE
 3   1880 John F. Kennedy Boulevard
     10th Floor
 4   Philadelphia, Pennsylvania  19103
     (215) 587-1678
 5   jwchristie@christieyoung.com
     Counsel for Defendants Lieutenant Joseph McCloskey
 6   and Lieutenant Robert Otto
 7   ALSO PRESENT:
 8   JOHN EDWARDS
     Assistant to Eric F. Spade, Esquire
 9
     SERGEANT MICHAEL SPICER
10
     POLICE OFFICER JOHN SPEISER
11
     POLICE OFFICER LINWOOD NORMAN
12
     POLICE OFFICER THOMAS LICIARDELLO
13
     POLICE OFFICER BRIAN REYNOLDS
14
     MARK FAZLOLLAH
15   The Inquirer Staff Writer
16   DUSTIN SLAUGHTER
     Freelance Journalist
17
18
19
20
21
22
23
24
```

### Page 222

```
 1              I N D E X
 2              - - -
 3   WITNESS:                      PAGE
 4   JEFFREY WALKER
 5   EXAMINATION
 6   By Mr. Pileggi             224
 7   By Mr. Santarone             301
 8   By Mr. Christie              402
 9   By Mr. Brigandi              412
10
11
12           EXHIBITS
13
                 PAGE FIRST
14   EXHIBIT NO.   DESCRIPTION   REFERENCED
15   Exhibit   Philadelphia Police Department   362
     Walker-7   Arrest Report
16
17
18
19
20
21
22
23
24
```

### Page 223

```
 1          DEPOSITION SUPPORT INDEX
 2
 3   DIRECTIONS NOT TO ANSWER:
 4   PAGES:    None
 5
 6   REQUESTS FOR DOCUMENTS OR INFORMATION:
 7   PAGES:    None
 8
 9   STIPULATIONS AND/OR STATEMENTS:
10   PAGES:    224
11
12   CERTIFIED QUESTIONS:
13   PAGES:    None
14
15
16
17
18
19
20
21
22
23
24
```

### Page 224

```
 1          (By agreement of counsel, the
 2   sealing, certification and filing are
 3   waived; and all objections, except as to
 4   the form of the question, are reserved
 5   until the time of trial.)
 6          - - -
 7          JEFFREY WALKER, having been
 8   first duly sworn to tell the truth, was
 9   examined and testified as follows:
10          - - -
11          EXAMINATION
12          - - -
13   BY MR. PILEGGI:
14   Q.   Jeff, this is day two of your
15   deposition.  I gave you instructions at the
16   beginning of the deposition, and of course they
17   still apply.
18          Jeff, before we begin, is there
19   anything you want to say on the record with
20   regards to the previous day's deposition?
21   A.   Yes.  I forgot to mention yesterday I
22   am representing myself in these -- all these
23   lawsuits, and being as though I'm representing
24   myself I need to have documents, any and all
```

Page 225

1    documents from all parties, so I can review these
2    documents.
3        Q.    Okay.  All right.  Jeff, let's --
4    today I want to focus on the claims against the
5    City, primarily the claims against the City.
6    Okay?  First of all, I guess let's start
7    generally.  You're aware that the Philadelphia
8    Police Department is governed by a set of policies
9    and procedures, correct?
10        A.    Yes.
11        Q.    Okay.  And just how long have you been
12    a police officer?
13        A.    Twenty-four years.
14        Q.    Okay.  Am I correct that you have to
15    undergo training annually, at least annually, with
16    respect to the policies and procedures?
17        A.    Yes.
18        Q.    How would that work?
19        A.    You have training from the -- it's
20    actually located on Spring Garden Street, and it's
21    called in-service training.  They basically train
22    you on updates, reminder courses.  They go into
23    case law, go into the Crimes Code, and then we
24    touch on policies, the policies that have been

Page 226

1    changed, extensive policy, and you need to
2    actually take tests which you're actually graded
3    on pass or fail so you fully understand what
4    they're teaching you.
5        Q.    And what are some of the curriculum
6    that they teach in these courses?
7        A.    From what I can remember, it was car
8    stops, ped stops, search warrants, various things,
9    probable cause mainly.  We go into ethics
10    training.  We go into basic -- touch basically on
11    civil rights.
12        Q.    Okay.  Now, and am I correct that at
13    the very least each year you have to undergo MPO
14    training?
15        A.    Yes.
16        Q.    Do you know what MPO means?
17        A.    Yes, it's in-service training which
18    you're actually graded.  After every course the
19    instructor gets up there and he reviews any
20    updates and I guess, again, reminder of the
21    policies, and at the end of the course, that would
22    be the course for the day, and then you get -- you
23    get a test which you're actually graded on pass or
24    fail.

Page 227

1        Q.    Now, is that limited to certain police
2    officers or is that --
3        A.    The whole department.
4        Q.    Okay.  All right.  Now, you don't get
5    graded in the same PO training, correct?
6        A.    It's a pass or fail.  If you take a
7    test they instruct -- they give you instructions,
8    they teach you, and if you fail you have to take
9    the course over again.
10        Q.    Okay.  What is the purpose of the
11    policies and procedures?
12        A.    To safeguard the police officer and
13    the persons actually that are conducting the
14    policy on us, mainly your arrests.  Basically if
15    something happens everything go back to the
16    policy.  You need a ground base where the policy
17    begins at so one knows the rules what actually was
18    going on.
19        Q.    Now, who ultimately enforces the
20    policies?
21        A.    It goes from the top, the Police
22    Commissioner.  He reviews everything.  It stops on
23    him.
24        Q.    Over the course of the years since

Page 228

1    you've been a police officer, have the policies
2    and procedures changed?
3        A.    Some of them change and we get updates
4    where we -- every officer has to sign and come
5    down and the supervisor hands you a signature
6    board with the policy, the change in the policy,
7    and you actually sign for it and he gives you a
8    copy of the policy and he tells you review the
9    policy.
10            But a lot of times you don't
11    review the policy.  We take it and toss it to the
12    side and keep it going.
13        Q.    Now, generally if a police officer
14    violates the policies and procedures, what are the
15    ramifications, if any?
16        A.    He's disciplined by --
17            MR. BRIGANDI:  I just have an
18    ongoing objection to this line of
19    questioning based on lack of foundation.  I
20    mean, he's not the 30(b)(6), but to the
21    extent that he knows the answers to these
22    questions he can certainly answer them.  I
23    just think there's a lack of foundation, but
24    he can answer what he knows.

3 (Pages 225 to 228)

Case 2:14-cv-01643-RBS    Document 61-9    Filed 06/29/22    Page 83 of 159

McIntyre v. Liciardello, et al./Torain v. The City of Phila., et al.

JEFFREY WALKER- CONTINUED, 9/16/16

Page 229

1          MR. PILEGGI:  All right.
2    BY MR. PILEGGI:
3       Q.   You can answer.
4       A.   Repeat the question.
5       Q.   That's a good one.
6          MS. FUREY:  Have the court
7    reporter read it back.
8          THE WITNESS:  He's disciplined,
9    and that's the supervisor's responsibility.
10   BY MR. PILEGGI:
11      Q.   Well, what do you mean?  Let's --
12   again I'm going to give you a hypothetical.  Let's
13   assume an officer's out on the street and he
14   violates the search warrant policy, the policy
15   that embodies search warrants.
16      A.   He's written up by the supervisor, it
17   goes up the chain of command, and whatever
18   disciplinary is due to him.  In fact, it would --
19   according to policy, sometimes it could be a
20   reprimand and sometimes it go as far as charges.
21   It all depends on what the -- what the violation
22   was.
23      Q.   You said charges.  What do you mean?
24      A.   It can go up to criminal charges.  I

Page 230

1    mean, it can go to the point where Internal
2    Affairs does an investigation and if any criminal
3    charge is found on you, you can get charged, and
4    to the point it's something small you can get
5    disciplined through a reprimand, through a loss of
6    days.  You can go to the point and get 30 days --
7    there's something you can do -- get 30 days with
8    intent to dismiss or get fired.
9       Q.   What is the PBI?
10      A.   I don't know in detail.  I know it's a
11   review board that actually reviews all the
12   complaints of the officers, and they basically
13   give their opinion of the fact if he's guilty or
14   not guilty, but it -- more thing in detail, I
15   don't -- I'm -- again, I'm losing touch with --
16   being out of the department so long.
17      Q.   Is the PBI a separate department --
18   that's Police Board of Inquiry, correct?
19      A.   Yes, I know.
20      Q.   Is that separate and distinct from the
21   Internal Affairs?
22      A.   It's a separate entity but it's --
23   work in conjunction with Internal Affairs.
24      Q.   When an officer's going to be

Page 231

1    disciplined, and if you know, when an officer
2    is -- when an officer is going to be disciplined,
3    who actually decides, number one, whether they
4    will be disciplined and what the recommended
5    disciplinary action is going to be?
6       A.   I believe it all ends with the Police
7    Commissioner.  It starts with the supervisor
8    during the complaint and it ends with the Police
9    Commissioner.
10      Q.   So are you saying that if there's a
11   complaint against a police officer, the supervisor
12   initiates it, it goes up the chain of command to
13   the Police Commissioner?
14      A.   Yeah.  It all depends on where the
15   complaint comes from.  Sometimes it can be a
16   civilian.  The complaint starts somewhere.  The
17   supervisor takes -- it's -- if it's from a
18   civilian, the police officer -- if someone files a
19   complaint -- if it's a civilian and he files a
20   complaint through Internal Affairs or whatever, it
21   goes to the -- it goes through the chain of
22   command through Internal Affairs.  Especially if
23   it's a person it goes through Internal Affairs.
24          If it's a situation where they

Page 232

1    go to the immediate supervisor, like we may be
2    doing a warrant or maybe a patrol cop will
3    actually -- gets into a situation and the person
4    comes into the district.  The supervisor takes the
5    complaint.  He gives them -- he gives them a form,
6    he takes the complaint and eventually the
7    paperwork -- everything goes up, and when it goes
8    up then it involves Internal Affairs.  They do
9    their investigation.
10          It depends on the
11   investigation.  At the conclusion of the
12   investigation, it goes from a person being
13   reprimanded, it can be 30 days dismissal or he can
14   be charged.
15      Q.   Now, and when you say "charged," you
16   mean criminally charged or charged through the
17   Police Board of Inquiry?
18      A.   He can be -- when I'm talking about
19   charged, he could be criminally charged if they
20   found that he done something that was criminal.
21      Q.   Okay.  And was that the process that
22   was followed when you were arrested?
23      A.   When I was arrested I was arrested by
24   the FBI, so I bypassed all that.  I was

McIntyre v. Liciardello, et al./Torain v. The City of Phila., et al.

JEFFREY WALKER- CONTINUED, 9/16/16

Page 233

1    immediately charged from the government and I
2    believe from the state with the police department,
3    but the government actually took the charges over.
4        Q.    Okay.  All right.  Now, let's just
5    generally talk about some policies and procedures.
6    Let's start with -- well, first of all -- strike
7    that.
8             Jeff, do you recall a case that
9    I brought years ago, close to 2000, maybe 2002,
10   where an individual was beat up by you and other
11   squad members, Officer Liciardello and Officer
12   Reynolds?
13       A.    Yes.
14       Q.    Alfonzo Edwards?  Do you recall that
15   case?
16       A.    Yes.
17       Q.    All right.  Why don't you tell us what
18   happened in that case, and then I want to ask you
19   some questions about Internal Affairs and other
20   supervisors.
21            MR. WILLIAMS:  Mike, I'm sorry,
22   in the lawsuit?  When you say in the case,
23   you mean the lawsuit or just the events?
24            MR. PILEGGI:  No, with regards

Page 234

1    to the job.
2             THE WITNESS:  This job was a
3    street job.  We call it jump-out jobs.
4    Where an officer sees something, arises
5    suspicion on something as far as your drug
6    activity or any type of activity he
7    immediately takes action.  A lot of these
8    jobs we were doing, even when we find a
9    conclusion of something had something or we
10   were locking them up, a lot of articulation,
11   again lying, comes into play, building that
12   bridge getting to probable cause.
13            This was a situation where it
14   was myself, Police Officer Liciardello and
15   Brian Reynolds were in an unmarked police
16   vehicle.  We were in the -- it may have been
17   the 41 or the 4000 block of Reno Street
18   going west when we observed the defendant
19   mentioned at the time, this complainant
20   mentioned, seated in the driver's side of
21   the vehicle, and we took notice that he was
22   doing something worthy for us to stop him on
23   a reasonable suspicion.
24            I opened the -- we pulled just

Page 235

1    past him.  I opened up -- because I was in
2    the back on the right side of the rear
3    passenger seat.  When I opened up the door
4    to approach him he took off in the car and
5    he damaged the door.  He pushed the door
6    forward, where the door was -- he basically
7    smashed into the door when he took off in
8    his vehicle.  He pulled past us.
9             And Police Officer Liciardello
10   was driving.  Thomas Liciardello was
11   driving.  We got into a brief pursuit, where
12   Police Officer Liciardello was ramming him
13   from the back in his unmarked police car,
14   caused him to crash into a pole.  When he
15   crashed into the pole he got out and started
16   running.
17            Myself, Police Officer
18   Reynolds, Police Officer Thomas Liciardello
19   proceeded to chase him.  We caught him
20   within a block.  It was basically 41st and
21   Mantua.  We proceeded to beat him.
22   Liciardello was kicking him when he was
23   injured.  His foot was injured.  He beat him
24   so bad that we had to actually drag him out

Page 236

1    of the street because the car -- because you
2    know on 41st Street going south it's a hill,
3    it's a bridge there, and once you go -- you
4    can't look down from the other side of that
5    bridge.
6             So when I actually dragged him
7    out of the street a car -- soon after I
8    dragged him a car was coming down in the
9    street, and from that point he was --
10   received medical treatment, and I believe he
11   was arrested, but the disposition of the
12   case, I couldn't recall exactly what it was.
13   I remember being investigated from that.
14            Again, we all got together and
15   come up with a story of his injuries.  A lot
16   of his injuries we say came from the car
17   accident that he hit the pole, because he
18   did crash into an electrical pole that was
19   on the east side of the street.
20   BY MR. PILEGGI:
21       Q.    How bad was he beaten?
22       A.    Oh, he was pretty bad.
23       Q.    And were you aware that he was in the
24   hospital for about a week?

5 (Pages 233 to 236)

Page 237

1    A.  Yes, I was aware.
2        I was also aware we had an
3    Internal Affairs investigation. Again, a lot of
4    the injuries that he -- occurred to him we blamed
5    on the accident because he smashed a pole, but how
6    he hit the pole was Liciardello was hitting him
7    from the back of his vehicle and he basically
8    forced him to lose control of the vehicle and he
9    hit the pole. Then once he hit the pole he got
10   out and he started running.
11       Q.  Now, you had an -- Internal Affairs
12   had an investigation with regard to that case,
13   correct?
14       A.  Yes.
15       Q.  And am I correct that when you -- when
16   there's any force used, whether there's a
17   complaint or not, and someone requires medical
18   treatment you're required to notify Internal
19   Affairs, correct?
20       A.  Yes. This all just start with the
21   initial officer notifying the immediate
22   supervisor. You have to do a use of force form.
23   It's actually done by the initial officer. A lot
24   of times Lieutenant Otto was doing ours because we

Page 238

1    got in so many different situations, the ways you
2    would have to articulate and explain the stuff
3    that we was doing -- because it was so out there,
4    I mean out there. It was -- you really had to put
5    some talent to what you were writing for what we
6    were doing.
7        And once it's prepared, use of
8    force is prepared, it's actually sent to the --
9    actually, we did them paper, now you can actually
10   do them on the computer, but again, eventually it
11   end up going to Internal Affairs and they review
12   them. Any questions they might send them back.
13   Supervisor may have to redo them again and they
14   send them back, and then at that point you get an
15   interview from Internal Affairs if they're doing
16   their investigation.
17       Q.  Do you recall in that case whether
18   Internal Affairs tipped you off? That you had
19   testified yesterday that there was times that
20   Internal Affairs would inform you as to why you
21   were being brought in to be interviewed.
22       A.  I don't -- I don't recall on that
23   particular case, but a lot of other cases I've
24   called there plenty of times and the investigator

Page 239

1    who was handling the job basically explained the
2    whole entire job to me on the phone, and it got
3    better than that. When it went to Lieutenant Otto
4    he sat us down and we basically talked about the
5    situation and who was going to say what and who
6    was going to go up first, and we made sure we all
7    brought back those interview paperwork and we all
8    passed them around. Even the supervisor looked at
9    them and says okay.
10       So by time it went to the
11   target he was prepared when he went up there to
12   any questions that was asked to him in the
13   situation. But it started to change on Impact,
14   where that's more, again, of an extensive
15   investigation of Internal Affairs. It work
16   outside of Internal Affairs when we could not
17   bring that paperwork back but we still had a way
18   around that.
19       The person had to remember
20   everything he said and come back and refer -- let
21   the target know who was the target. Sometimes we
22   didn't know who the target was but as we were
23   talking to them some of the investigators told us
24   who the target was. Some investigators didn't,

Page 240

1    they just basically explained the job.
2        MR. CHRISTIE: Objection. Move
3    to strike. It's not responsive to the
4    question that was asked.
5    BY MR. PILEGGI:
6        Q.  When you say "target," what are you
7    referring to?
8        A.  The person who the initial complaint
9    was. It starts with the person with the initial
10   complaint and then you have the witnesses, the
11   people around. The witnesses will go first, the
12   target will go last. By the time it got to the
13   target he already knew what was going on.
14       Q.  Now, Jeff, am I correct that you and
15   the rest of -- well, Officer Liciardello and
16   Officer Reynolds, at the very least, had many,
17   many IAD investigations over the years, correct?
18       A.  Yes.
19       Q.  If you had to guess, how many IADs?
20       A.  It was a lot. It was -- we were
21   frequent flyers. I mean, we knew just about
22   everybody up there in the situation.
23       Q.  When you said "everybody up there,"
24   what do you mean?

6 (Pages 237 to 240)

McIntyre v. Liciardello, et al./Torain v. The City of Phila., et al.

JEFFREY WALKER- CONTINUED, 9/16/16

Page 241

1    A.   As far as the investigators,
2  supervisors.  We just knew.  We knew who they
3  were.
4    Q.   Did -- oh, I'm sorry.
5    A.   We spoke to them in just casual
6  conversation and we -- that was it.
7    Q.   Did you feel like you were protected
8  when you went to IAD or during your investigation?
9    A.   Very much.  If I did feel like I
10  wasn't protected I made sure I had a lawyer with
11  me if I wasn't protected.  All of us thought that.
12  You know, if it was a situation where it got kind
13  of close to what we were doing we made sure we had
14  a lawyer when we went up there.  The majority of
15  times we didn't have a lawyer when we went up
16  there.
17    Q.   Would the supervisors get the results
18  of any IAD investigation and then their
19  conclusions?
20          MR. SANTARONE:  Objection.  If
21  you can clarify "the supervisors."
22          MR. PILEGGI:  All right, fair
23  enough.
24  BY MR. PILEGGI:

Page 242

1    Q.   Would your sergeant -- if there was an
2  investigation against you say for in this case
3  where you beat the guy, did your sergeant at the
4  time -- and I guess it was Malkowski?  Maybe not.
5  McCloskey.
6    A.   I don't remember.  That was so far.
7    Q.   Right.  Right.
8    A.   I mean, it could have been McCloskey.
9    Q.   Whatever.
10          Would your sergeant then get
11  the results of that investigation?
12    A.   When, at the conclusion of the
13  investigation?
14    Q.   Yes.
15    A.   I don't believe so, but I don't know.
16  I'm not certain.
17    Q.   What if there was charges brought?
18    A.   Again, it wouldn't be charged.  All
19  that stuff would be internal.  Once Internal
20  Affairs has it, if any charges are brought against
21  you your supervisor's aware of it but he
22  doesn't -- I don't think he gets -- he don't get
23  no copy of that.  It goes above his -- above him.
24  It goes into another department.

Page 243

1          Again, Internal Affairs, once
2  they have it and they're doing their thorough
3  investigation the only thing the supervisor might
4  know is the outcome.  They might tell them, but I
5  don't know the procedure how they will tell him.
6    Q.   Now, with regards to all the
7  investigations that IAD did against you and
8  Officer Liciardello and Officer Reynolds, were any
9  of them ever sustained?
10    A.   Wait, can I go back to that last
11  question, something I remember?
12    Q.   Yes.
13    A.   Any outcome of the investigation from
14  the officer that's conducting the -- he does get
15  something from Internal Affairs letting him know
16  that either he was exonerated, sustained or
17  unsustained.  So he is aware.  So going back to
18  the last question, if the supervisor -- if the
19  officer knows, the supervisor knows.  Something
20  does come down from Internal Affairs.
21    Q.   Okay.  Do you need me to ask you that
22  question again?
23    A.   Yes, I do.
24    Q.   Through all the investigations that

Page 244

1  were conducted against you, Officer Liciardello
2  and Officer Reynolds, were any of them ever
3  sustained?
4    A.   The serious ones, no.  The small ones,
5  yes.  Like one we had where we entered a location
6  without probable cause to do an arrest warrant,
7  that was sustained but we was reprimanded with I
8  believe a letter and a copy of a directive.  No
9  one lost any days in that situation.
10    Q.   So there was no -- other than reading
11  the policy, there was no other disciplinary action
12  taken?
13    A.   I don't believe it was, no.
14    Q.   All right.  Let's -- again, let's get
15  to the directives, but before I get to specific
16  directives, Jeff, and I'm going to -- maybe this
17  is your opinion, I don't know, or maybe you have
18  personal knowledge and whatever -- whichever the
19  case is I want you to state that.
20          Do you believe the --
21  Commissioner Ramsey knew about your actions,
22  Officer Liciardello -- your squad's actions when
23  you were out on the street during this period of
24  time when you've testified yesterday all the

Page 245

1    stealing and robbing and fabrications?
2          MR. BRIGANDI: Objection.
3    Foundation.
4          THE WITNESS: So you got to
5    understand this.
6          MS. FUREY: It's his opinion --
7    maybe I should have asked this yesterday.
8    Usually you waive objections, and I didn't
9    hear the court reporter ask about that.
10         MR. PILEGGI: Yes, she did.
11         THE WITNESS: The usual
12   stipulations --
13         MS. FUREY: Usually the
14   stipulations --
15         MR. BRIGANDI: The form of the
16   question.
17         MS. FUREY: Yeah, the form of
18   the question.
19         MR. KRASNER: Unless we're
20   getting an expert report from him.
21         MS. FUREY: It's just his
22   opinion.
23         MR. BRIGANDI: The objection's
24   noted for the record. Thank you.

Page 246

1    BY MR. PILEGGI:
2       Q.   Go ahead, Jeff, you can answer.
3       A.   This would -- this would be my
4    opinion, because I'm involved in a lot of these
5    things. When you're doing something wrong as a
6    corrupt police officer you know other corrupt
7    police officers. We all work together. We all
8    may not know each other. We indirectly know each
9    other. We protect each other.
10              So whoever is outside the
11   circle don't know, but there are people who do
12   know that the power is so strong they're terrified
13   to say anything what we're doing because they
14   don't want no repercussions. I'm not saying death
15   threats, I'm just saying issues, where unwanted
16   attention, harassment. It could be anything,
17   small.
18              But then you have people like
19   me involved in -- around a bunch of crooked police
20   officers. So there are police officers on this
21   job that has a clue what's actually going on, and
22   if they do know they don't even know how to
23   identify it, because the guy next to him may just
24   be as crooked as the guy that he's dealing with.

Page 247

1    It goes up all different levels.
2              We be doing our dumb things
3    with bosses, and they knew what we were doing and
4    we were protected. That's why we were so arrogant
5    about everything that we were doing, and when we
6    got in trouble it was a joke. We laughed because
7    we knew we were going to be protected in the end,
8    and then the result, it's a joke. Everything's
9    funny until you're not protected anymore. That's
10   the seriousness of everything.
11              When I was arrested I was so
12   arrogant I believed that I didn't do anything
13   wrong. You know what I mean? Even when the
14   charges were brought against me I still didn't
15   understand that I did something truly wrong and
16   what I was doing was truly wrong until I sat for
17   48 months and was reminded by the people who I
18   arrested that was in there with me that I was
19   doing something wrong every day.
20              So that's to the point when you
21   asked your question did the Commissioner know,
22   it's a possible strong fact that he did not know.
23   Because the corruption is so well protected and
24   goes underground and is cultured, no one knows but

Page 248

1    the people that's involved.
2       Q.   Okay. Jeff, let's start with the
3    search warrant policy. Are you familiar with
4    that?
5              I'm sorry, strike that.
6              We're going to start with the
7    CI policy, confidential informant. Are you
8    familiar with -- generally with the confidential
9    informant policies?
10      A.   Yes.
11      Q.   Okay. How are you familiar with the
12   policy?
13      A.   For using confidential informant
14   hundreds of times.
15      Q.   Okay. Well, how do you know you
16   weren't using a confidential informant improperly
17   a hundred times?
18      A.   Because to do something wrong you got
19   to know how to do it right.
20      Q.   Okay. Do you ever recall being --
21   having a course on confidential informants or
22   having some kind of instructions from supervisors
23   with regards to that?
24      A.   We have some type of training courses

8 (Pages 245 to 248)

Case 2:14-cv-01643-RBS    Document 61-9    Filed 06/29/22    Page 88 of 159

McIntyre v. Liciardello, et al./Torain v. The City of Phila., et al.

JEFFREY WALKER- CONTINUED, 9/16/16

Page 249

1  because, again, it come through the Narcotics
2  Field Unit, but I don't recall exactly what the
3  course was, but it's not -- when you come to the
4  field a lot of stuff is hands on. You're
5  instructed by other officers who have been using
6  the informant before you when you even got there.
7         So -- and then they -- you
8  know, you review, again, everything's with a
9  policy. Any question, pick up the directive and
10  look at it, ask the supervisor, and then he may,
11  you know, make sure you're doing things right, and
12  then it starts from that point. That's the right
13  way. When you using the confidential informant
14  any question, review the policy or ask the
15  supervisor or listen to the officer before you
16  that has experience using the confidential
17  informant.
18         Q.  Now, and I believe you testified to
19  this yesterday, you've used hundreds of
20  confidential informants?
21         A.  I wouldn't say hundreds, I've used --
22  I've -- I've used confidential informants hundreds
23  of times, and I can't count them, but I had to use
24  hundreds of confidential informants.

Page 250

1         Q.  Okay. All right. Now, why don't you
2  take us through as detailed as you can from start
3  to finish say when you sign up a confidential
4  informant, how does that work and then what steps
5  have to be taken to do that.
6         A.  Well, once you get someone who
7  actually wants to be a confidential informant
8  regardless it's from the source of information not
9  who wants to get paid, you actually fill out a
10  form, a confidential informant form. Once you
11  fill out a form getting their biographic
12  information, which you actually within that form
13  you have to do a 229.
14         Within that form you would have
15  instructions, and the instructions very clearly
16  you read to the confidential informant is you
17  cannot commit any criminal activity, cannot have
18  any, you know, open cases, we'll protect you, we
19  will try to protect as much as our ability,
20  nothing's guaranteed, and a few other more
21  instructions.
22         Q.  All right. Let me stop you there.
23  I'm going to stop you along the way.
24         Have you had occasions where

Page 251

1  you either used a confidential informant yourself
2  or your squad members used and you participated in
3  a confidential informant activity where this
4  individual was engaging in criminal activity?
5         A.  Yes. It went all the way through
6  several squads. Again, it was like taboo in the
7  Field Unit where people will feel comfortable
8  doing certain levels of things they should not do.
9  Like some people might start lying and they may
10  feel as though little, little lies here and there,
11  call them little white lies, only lied about
12  certain things but it really didn't happen.
13         And then you get into the
14  misusing of a confidential informant, where you
15  send a confidential informant to a location and
16  you don't keep eyes on a confidential informant
17  and you're relying on what the confidential
18  informant tells you when they come back. So
19  basically you're basing your probable cause on the
20  observation of the confidential informant.
21         And then it's times when we've
22  used a confidential informant multiple times and
23  they've run out of information. Because they know
24  they're getting paid for it, so they know they're

Page 252

1  getting paid $20 a buy and that maybe not the only
2  job they got, or they may be still on drugs, and
3  you're basically fueling a habit of them being on
4  drugs. So you basically put them in a situation
5  where you're giving them money for the buys that
6  they do and it's supporting their drug habits.
7         And when the confidential
8  informant comes to you and says I got another
9  house over here, another house over here, and it
10  clearly shows information -- CI paid for
11  information, PI paid for services, a lot of my
12  vouchers said that. When they pay for information
13  it means they supplied information to me. A lot
14  of times that information came from continued
15  criminal activity that the confidential informant
16  has done.
17         So it shows when you look at
18  these vouchers they basically -- if you looking at
19  it the right way you can understand how many
20  times -- when you've used a confidential informant
21  when it says paid for information a lot of times
22  that confidential informant is committing criminal
23  activity to give you that information, and we know
24  that.

9  (Pages 249 to 252)

Case 2:14-cv-01643-RBS    Document 61-9    Filed 06/29/22    Page 89 of 159

McIntyre v. Liciardello, et al./Torain v. The City of Phila., et al.

JEFFREY WALKER- CONTINUED, 9/16/16

Page 253

1      See, everyone is benefiting
2  from this. The confidential informant is
3  benefiting from it, the officer -- the handling
4  officer is benefiting from it because when the
5  confidential informant is doing the buy, establish
6  the warrant, it's multiples. Now you have an
7  opportunity to steal, you have an opportunity to
8  go to court and make money.
9      It goes on and on. Opportunity
10  for overtime, investigations, large
11  investigations. Everyone's benefiting from this
12  situation using a confidential informant. A
13  confidential informant is money. The guy go out
14  and do a buy, it's continuous money in the
15  situation.
16      Q.   Was there any way to police that
17  situation where the confidential informant was
18  engaging in criminal activity, in other words,
19  internally police it?
20      A.   I mean, it could be questioned by the
21  immediate supervisor. Where is he getting the
22  information from, how long you been using this
23  informant, because, again, if you do quarterlies
24  he meets up with the confidential informant. The

Page 254

1  immediate supervisor knows how long you had these
2  confidential informants.
3      So nothing's -- no question --
4  if a supervisor asked me a question about a
5  particular job where the information come from
6  because he seen the voucher, it come from the CI.
7  He never asked you -- and you're repeatedly doing
8  it over and over again the question never arises
9  do you think this guy is doing some type of
10  criminal activity. Never no -- they don't ask it,
11  it just keep moving.
12      Q.   Is there -- well, first of all, is
13  that a violation of the policies and procedures to
14  let a CI engage in continued criminal activity?
15      A.   It's a violation of the instructions
16  and it's a violation of the policy. The
17  instruction they get that they sign for is a
18  violation. They automatically know what they're
19  getting into by reading the instructions.
20      You're reading -- you're
21  verbally reading the instructions to them and
22  they're hearing it, what to do and what not to do,
23  and they sign it. We make it very clear they
24  understand it, and then the policy we all should

Page 255

1  understand because that's the rules and regs -- of
2  the policy, so everyone understands what the rules
3  are.
4      Q.   Now, Jeff, are you allowed -- as the
5  handler, the person that's handling this CI, are
6  you entitled to be the only officer when you send
7  a CI in for a controlled buy?
8      A.   No.  If it's my CI, I sign them up
9  working as a group, a squad I may have been in.
10  They're my squad.  It's my CI and say my partner
11  wants to use it, Jeff, can I use your CI to do a
12  buy.  Sure.  He's signed up.  He already has a
13  number.  I am the control officer but you can use
14  him.
15      He still has to follow the
16  exact same policy and procedure as if I was using
17  the CI, always searching them with a supervisor
18  present, dealing with a CI everything exactly what
19  I do, and it's the exact same course that I would
20  do, he would do, he or she would do.  Two officers
21  with the confidential informant, exact same rules.
22      Q.   Jeff, over the years when you were in
23  the narcotics squad did you ever have an occasion
24  where a supervising officer was not there when

Page 256

1  this individual was allegedly searched?
2      A.   Again, that's -- a lot of times.  It
3  was like a format.  I have met the CI in the
4  district and the supervisor be in the
5  headquarters, and I'm always doing my warrants,
6  the supervisor -- I met with the confidential
7  informant along with a supervisor.  All that is
8  lies.  It's a format.  It's follow a format.
9      Because again, the gray area is
10  where the supervisor doesn't have to be over your
11  shoulder but it has to be close proximity if
12  you're with the CI at all times.  But all that
13  stuff is a format.  It been done multiple times,
14  done with different officers.  It was a common
15  practice for the years I've been in Narcotics
16  Field Unit where the supervisor was never there.
17  It's like when we do buys and the supervisor is
18  inside, especially with my squad, Sergeant Joe
19  McCloskey, he was always in the office.  The only
20  time he came out of the office is if something was
21  big out there or occasionally he might come out
22  there and we're use -- I'm using these CIs.  With
23  Chet Malkowski, the exact same thing.  If he been
24  out there he'll be out there with Brian or Tommy

10  (Pages 253 to 256)

Case 2:14-cv-01643-RBS    Document 61-9    Filed 06/29/22    Page 90 of 159
McIntyre v. Liciardello, et al./Torain v. The City of Phila., et al.
JEFFREY WALKER- CONTINUED, 9/16/16

Page 257

1  and I'll be using the CI by myself at times in a
2  different location.
3          One of the times I can recall
4  is when I was shot at the very first time. I was
5  sent out there by myself to investigate and
6  conduct investigations. Normally I would grab a
7  CI by myself, but before I even grabbed the CI I
8  was shot at in a situation by myself in the car,
9  and they all came out there because I was on the
10  street by myself when all the stuff was going on,
11  and that was never brought to anyone's attention,
12  why was I out there by myself when I was shot at.
13      Q.   Jeff, did you ever -- over the years
14  when you were handling the CI, a particular CI,
15  did you -- was there ever an occasion where you
16  did not search them before sending them in to make
17  a buy?
18      A.   It was -- it was a lot of occasions I
19  did not search the CI. If I did search a CI it
20  was basically empty your pockets out, put them --
21  whatever you got in the car, whatever the
22  situation was, and only thing I know I did was
23  give them money -- was supposed to give them money
24  to do the buy in situations, and even in that

Page 258

1  situation where I fabricated purchases they was
2  never given any money, it was they signed the
3  voucher.
4          And that was -- again, that was
5  done with me using CIs but also it was done --
6  mentioning to the Federal Government it was done
7  where I allegedly made a buy, which did I not, and
8  I said to sign a voucher saying I did make a buy,
9  and the witnesses was the Sergeant Joe McCloskey,
10  the Officers Liciardello, Mike Spicer, Brian
11  Reynolds, who actually filled out the voucher.
12          And I remember seeing a
13  conversation between Thomas Liciardello and the
14  Sergeant Joe McCloskey, and Tommy said very
15  clearly -- because me and Thomas Liciardello was
16  on the outs at the time. He said let Jeff do the
17  buy, get Jeff doing the buy, and the sergeant came
18  over to me and just handed me the voucher and said
19  you just did a buy.
20          So it's times that --
21      Q.   Which sergeant was that?
22      A.   Sergeant Joe McCloskey. It was -- and
23  this is a situation where it was a source of
24  information and it was actually the target, and

Page 259

1  neither one of them knew me until at least when I
2  went to trial and had to -- and I lied at trial,
3  where the defendant looked at me in puzzlement of
4  who I was and I was saying that I had bought drugs
5  from him in a situation.
6          I was nowhere in contact with
7  either one of them, the source or the person that
8  sold the drugs to the source, but I can -- I do
9  remember the source, which was actually a female
10  got out of one of their cars --
11      Q.   When you say "their cars", who are
12  you --
13      A.   Thomas Liciardello, Brian Reynolds,
14  one of their cars, one of their cars. I don't
15  know which one of their cars they got out because
16  it was in a gas station lot, and I clearly see the
17  female approach the target and buy drugs and went
18  back and get back into either Thomas Liciardello
19  or Brian Reynolds' car with those drugs. Again, i
20  never came in contact with any of these people.
21          You know, I still was willing
22  to do it because I wanted to be a team player, I
23  wanted to be back in, because, you know, we had a
24  lot of things going on in the squad in the

Page 260

1  situation, but, you know, I was trying to
2  alleviate the issues by cooperating and doing what
3  was needed for me to do, and the supervisor was
4  very aware of exactly what was going on because he
5  was there watching what was going on.
6          MR. POPPER:  Who was the
7  supervisor?
8          THE WITNESS:  Sergeant Joe
9  McCloskey.
10  BY MR. PILEGGI:
11      Q.   Can -- as a male officer are you
12  permitted to search a female CI?
13      A.   No, you're not, because a lot of times
14  I was using a female and I was saying I was
15  thoroughly searching the confidential informant,
16  but again, these questions was never brought up
17  even through -- if the defense attorney brought it
18  up we were not allowed to say or we played games
19  with them saying we can't -- a male or female, so
20  they would never know if it was a male or a
21  female.
22          We used that out of protection
23  of the identity of the informant. It was all --
24  it was all games. And again, if they knew it was

McIntyre v. Liciardello, et al./Torain v. The City of Phila., et al.                    JEFFREY WALKER- CONTINUED, 9/16/16

Page 261

1    a female a question was never brought up well, did
2    you have a female officer with you searching the
3    informant.
4          Q.   Now, Jeff, explain -- you had
5    mentioned that you would pay these CIs.  Explain
6    the voucher system.  How does that work?
7          A.   The voucher system is actually a
8    receipt of the payment that's made.
9                If I go out there with an
10   informant, the informant makes them -- give them
11   the money.  You could record a $20 bill or
12   whatever you're buying.  The informant makes the
13   purchase.  The informant comes back.  The
14   informant is giving me drugs and I begin to fill
15   out the voucher once I receive the drugs.
16               Once I fill out the voucher, I
17   be handing the voucher to the informant and the
18   informant looks -- they don't want to look -- a
19   lot of them don't look it over, they just happy to
20   get the money, but I gave it to them, they're
21   supposed to look it over, and then they sign at
22   the bottom of the voucher.
23               The payment money is not given
24   to them until the end of the course of the day

Page 262

1    when you release them.  That's how it's supposed
2    to be done.
3          Q.   Okay.  Now, let me ask you, you say
4    you actually take the voucher out to the -- out to
5    the site, wherever -- wherever you're going to
6    make the buy?
7          A.   Yes.
8          Q.   Okay.  Is that voucher already
9    drafted?
10         A.   No, it's always a blank voucher.  I
11   know at one time what I was doing, and I witnessed
12   other officers do it, where we were actually
13   giving a stack of vouchers to the CI and had the
14   CI sign a number of vouchers that were blank so if
15   the CI did a buy and we forgot to fill the voucher
16   out we knew we had the signature -- we had the
17   CI's signature.
18               And we were actually go in --
19   like the case where these vouchers were typed up,
20   they're already signed by the CI and the CI makes
21   the buy, or whatever we choose to do, we knew we
22   had a voucher with the CI's signature on it and at
23   that time at the beginning of it we were typing
24   them up, but we were told no more -- not to type

Page 263

1    them up anymore but we were writing them after the
2    buy.
3          Q.   How would you know -- if you typed
4    them up before you took it out to the site, how
5    would you know the circumstances?  I mean, there's
6    information there as to where the buy is made,
7    when it's made.
8          A.   We controlled all that, the situation,
9    whatever we chose to put on the vouchers at the
10   time.
11               When we were typing them up,
12   again, we were going against policy.  Where we
13   wasn't filling them out the street, the CI would
14   basically sign a blank voucher, or it was a
15   voucher already previously signed by the CI and we
16   took that voucher in and we typed it up, whatever
17   the situation we felt -- what the buy was.
18               Sometimes it happened the way
19   it happened, sometimes it didn't, but you couldn't
20   tell what was what because we were breaking the
21   policy.  We were going in and we were typing them
22   up.
23         Q.   Now, Jeff, a lot of the search
24   warrants in particular there's either a source

Page 264

1    involved a confidential source or a confidential
2    informant, correct?  Is that usually how the job
3    usually starts?
4          A.   Yes.  It starts -- again, it starts
5    various ways.  It starts from a source of
6    information, either confidential or not, and then
7    goes from -- with an informant.  You could use a
8    source, confidential or not, and gather
9    information, go out and check it out and, once you
10   know it's good you can use a confidential
11   informant.
12         Q.   And then that's -- that information is
13   embodied in the affidavit of probable cause,
14   correct?
15         A.   Yes.
16         Q.   Okay.  Are you aware -- and again,
17   this is dating all the way back since you got into
18   narcotics, are you aware of any incidents where
19   there was a nonexistent source, confidential
20   source or a non-confidential source or informant,
21   confidential informant, was that put in the
22   affidavit of probable cause that actually did not
23   exist?
24         A.   Yes.  I remember this from Thomas

12 (Pages 261 to 264)

McIntyre v. Liciardello, et al./Torain v. The City of Phila., et al.

JEFFREY WALKER- CONTINUED, 9/16/16

Page 265

1   Liciardello.  He always -- if you look at his
2   paperwork and he always says a reliable
3   confidential source, and when he's questioned he's
4   put into a corner, he's forced to reveal who it
5   is, it's a cop.  The two don't match up.  How can
6   a confidential source be a uniformed police
7   officer?  He could have easily said I received the
8   information from so and so or the police
9   department.
10         A lot of times I worked with
11  Thomas Liciardello, Brian Reynolds, Michael
12  Spicer, who was the main officers doing a lot of
13  these jobs.  They will use these source -- they
14  will use these confidential sources, which they
15  say they have to protect.  They either be a person
16  who they arrested prior to the person they're
17  getting ready to arrest, and when they're
18  questioned they're saying they're police
19  officers -- mainly police officers or someone they
20  just can't reveal, but a lot of times it's just
21  people who they arrested already who was giving up
22  their buddies, and they're given multiple jobs and
23  they're told -- they tell these people that
24  they're using that they're giving them a green

Page 266

1   light, and a green light means you can do whatever
2   you want to do, and it carried on for years until
3   the point where they got questioned in the end.
4         A lot of them, these
5   individuals were put into arrest warrant status in
6   the PARS.  They sat there dormant for a while
7   until the tail end.  They were told -- I remember
8   that they told Sergeant Joe McCloskey that you
9   better go round these guys up and prepare arrest
10  warrants for them, and they -- and I remember they
11  were very highly upset with that.
12         They had to go out and gather
13  all these sources up.  They were -- they promised
14  them they wasn't -- was not being arrested.  So
15  these guys had a green light, and they had to
16  promise them that they was not going to be
17  arrested for whatever they have done from the
18  situation.
19      Q.   So let me ask you, when you say "a
20  green light," you mean these are individuals
21  engaging in criminal activity, that these officers
22  knew were engaging in criminal activity yet were
23  using them as sources.
24      A.   Yes.

Page 267

1       Q.   Okay.  Was there situations where they
2   would work with one drug dealer to get at a
3   competitor?
4       A.   All the time.
5       Q.   How would that work?
6       A.   It was known.  Anyone there -- that we
7   were known for it.  Even if we lock a guy up no
8   matter who it is -- a lot of times it was in South
9   Philly.  We'll ride along, we see the guy out
10  there, we might grab him, drive him around in the
11  car, interrogate him.
12         Once we get them on board
13  Thomas Liciardello -- they become our friends now.
14  It's like a -- go from one motion to another.  You
15  went from being -- beating the guy up and
16  threatening the guy, the next you know you're
17  buddies.  You know, everyone -- everyone's happy,
18  best of friends.
19         There's a guy, I remember where
20  we chased him and we caught him and threatened
21  them, we put hands on him, and eventually at the
22  end of the day we were friends.  One of the guys I
23  remember the most was Kushner, where we robbed
24  him, threatened him, I threatened him, and we

Page 268

1   were -- when -- as time went on we were friends,
2   playing games, basketball.  It was all a joke.
3   But he know at the end of the day that he was
4   getting a green light to do whatever he wanted to
5   do and we will not target him anymore.
6       Q.   Now, Jeff, I want to show you --
7            MR. PILEGGI:  And I'm not going
8   to mark this yet.
9   BY MR. PILEGGI:
10      Q.   These are -- well, first of all, do
11  you recall in 2011, 2011, whether you were
12  handling CIs at that point?
13      A.   Yes, I was.
14      Q.   All right.  Were you with that squad?
15  At some point you left the squad, correct?
16      A.   Yes.
17      Q.   You told us yesterday that one of the
18  officers put a gun on you and that's when you
19  decided that you had to leave.
20      A.   Yeah, he put a gun on me because it
21  was a lot going on, and I remember, I didn't
22  mention this yesterday, a statement he made and I
23  said what the hell are you doing.  He said man, a
24  lot of stuff going on.  We don't know what you --

13  (Pages 265 to 268)

Case 2:14-cv-01643-RBS   Document 61-9   Filed 06/29/22   Page 93 of 159

McIntyre v. Liciardello, et al./Torain v. The City of Phila., et al.

JEFFREY WALKER- CONTINUED, 9/16/16

---

Page 269

1   what's up with you and, you know, he felt
2   threatened. I was surprised that he pointed a
3   gun. It did happen.
4        I mentioned it to three
5   individuals, mainly the FBI. I mentioned it to
6   Police Officer Reggie Graham and I mentioned it to
7   the supervisor who told me get out of squad.
8        MR. POPPER: Who was the
9   supervisor?
10       THE WITNESS: Sergeant Joe
11  McCloskey, get out of the squad. At that
12  point I knew I had no friends. I eventually
13  continued on -- I stayed by myself. After
14  that eventually I left. That's when I
15  maintained using the CI by myself and the
16  supervisor knew.
17       I will come to work and I would
18  say sarge, I need $200. He said for what.
19  I said I'm using a CI. I'm going down West
20  Philadelphia. That would be the bottom
21  located at 39th and Lancaster. He said who
22  you taking. I said I'm taking Angie. He
23  said okay. He gave me the $200. Let me
24  know if you got a problem. We always talk

---

Page 270

1   on the phone. I said fine.
2        I would go to Southwest
3   Philadelphia, pick up Angie. Would not
4   search her. We would talk. We would talk
5   about where we were going to do the buy at.
6   We will do the buy. The sergeant might call
7   me what are you doing. I said I just did a
8   buy at these two different locations. Okay.
9   Well, we over here. Come over here or we'll
10  meet you back at headquarters.
11       When -- he spend a lot of his
12  time running around with Thomas Liciardello,
13  Brian Reynolds, Mike Spicer, John Speiser
14  and Perry all in -- all in the car
15  together -- not in the car, they were in two
16  different cars but he also always floating
17  around with them.
18  BY MR. PILEGGI:
19  Q.   Perry Betts?
20  A.   Perry Betts. Always floating around
21  with them, doing whatever they were doing, but a
22  lot of times he was not out there with them. He
23  spent a lot of time in headquarters, Joe
24  McCloskey. I was out there by myself.

---

Page 271

1        Now, when I came back in from
2   headquarters, again, I had the voucher already
3   filled out. The sergeant said take it to one of
4   the guys, have them sign it. I said all right.
5   Either -- one of the individuals would sign it.
6   It all depends who it was in the squad, who I was
7   working with. Then he would review it and he'll
8   sign it. Then the lieutenant will sign it.
9        Then it got to the point where
10  I couldn't go to the individuals in the squad
11  anymore because they didn't want no parts of me.
12  The supervisor would sign it. It's Joe McCloskey,
13  Lieutenant Otto, and then it went to -- after I
14  left the squad I went to Gorman squad because I
15  was told --
16  Q.   Do you know --
17  A.   Sergeant Gorman.
18  Q.   Do you know his first name?
19  A.   I'm out of the loop with the --
20  falling out with these guys' name. Sergeant
21  Gorman, his squad didn't want to work with me
22  neither because information from my other squad
23  that kept me to be by myself, they gave them the
24  information. Listen, he's stealing, don't work

---

Page 272

1   with him.
2        MR. WILLIAMS: I'm sorry to
3   interrupt. Who is "they" that said that?
4        THE WITNESS: Thomas
5   Liciardello. Mainly it came from him. He
6   was running everything, because I even
7   inquired who is telling you all this stuff.
8   Individuals in Gorman's squad was telling me
9   Thomas Liciardello was telling us this
10  stuff, and I said my -- it's the pot calling
11  the kettle black on that one.
12       But I was by myself. I always
13  complained about not having a supervisor. I
14  would go -- not supervisor, not having a
15  partner. Even when I went home I told my
16  family listen, I'm out there by myself.
17  They questioned why are you out there by
18  yourself. You know, they knew. Because I
19  was playing low. I didn't tell them I was
20  stealing but I told them listen, I had
21  issues with the squad. No one wants to work
22  with me.
23       So I would -- carried on at
24  Gorman -- Sergeant Gorman's squad by myself

---

14 (Pages 269 to 272)

Case 2:14-cv-01643-RBS    Document 61-9    Filed 06/29/22    Page 94 of 159

McIntyre v. Liciardello, et al./Torain v. The City of Phila., et al.

JEFFREY WALKER- CONTINUED, 9/16/16

Page 273

1    used a confidential informant. We do the
2    exact same thing that Sergeant Joe McCloskey
3    did. I would come in. He would tell me to
4    have a particular officer sign it saying
5    they were there, because they knew they had
6    to have two officers there on the vouchers.
7            There was times it was covered
8    by Lieutenant Otto saying he was in the car
9    with me, because it got to a point in
10   Gorman's squad no one would sign my vouchers
11   because I was not there -- they was not
12   there. Don't sign the man's vouchers. You
13   know what I mean? Don't sign them. So
14   Lieutenant Otto, I remember him signing a
15   couple, just carrying on, but it stopped
16   when I left Gorman's squad.
17           When I got to Sergeant
18   Barrington's squad, the rule was he's a
19   rogue cop, he's running with CI by myself --
20   by hisself, and I said no, I wasn't. I
21   mean, I was -- I said I was but I was
22   allowed to do it. So the point of me being
23   a rogue cop, I was only doing what was
24   allowed for me to do.

Page 274

1            You cannot go out with a CI by
2    yourself and use them without the supervisor
3    knowing it. If you do that you got
4    disciplinary actions on you. He's not even
5    letting it go as far as you doing an
6    affidavit, he's going to cut you right
7    there. You're going to get punished.
8    BY MR. PILEGGI:
9        Q.   Jeff, did -- do you recall how many --
10           MR. FEINSCHIL: I'm sorry,
11   Mike, I didn't -- Mr. Walker, who pointed
12   the gun at you? I didn't hear that.
13           THE WITNESS: That would be
14   Speiser, John.
15           MR. FEINSCHIL: Thank you.
16   BY MR. PILEGGI:
17       Q.   Jeff, are you saying that the reason
18   why you left that squad or the reason why you got
19   forced out of that squad was because you were
20   stealing? Is that what you're saying?
21       A.   No, I'm not saying that. I got forced
22   out of that squad because I was not part of the
23   group anymore. The gun was enough for me. It was
24   time for me to go. I know I was heading out the

Page 275

1    door.
2            I was on the street by myself
3    using other officers with my cell phone that had
4    no idea what I was doing, but they just wanted to
5    make some court time. They saw a narcotics cop by
6    hisself needing some assistance. They gave it to
7    me.
8            As far as they did, I had none
9    of them doing any eyes on anything. I would say
10   listen -- I had these backup officers, uniform
11   officers, not doing any eyes. All their
12   responsibility was to arrest, and they were happy
13   with that. So they got court time and they knew I
14   was out there by myself.
15           One of the jobs I can recall
16   was Michael Hall's job back in 2010.
17       Q.   Tell us about that job.
18       A.   I did that whole entire job by myself.
19   I did that whole entire job by myself. You can
20   look at the paperwork and see Officer Walker met
21   with the confidential informant. I had one
22   paragraph where I said I met with Police Officer
23   Norman. That's a typo. I was using sources of
24   information and a confidential informant to do

Page 276

1    that whole entire job.
2            The source of information would
3    give me the information. The only thing I had to
4    do was go around and see these individuals
5    standing in front of the house. I would have the
6    confidential informant make buys. I was going by
7    what they told me and I would do a drive by and
8    see these individuals, and the only thing I did
9    was articulate the whole entire job together and
10   that's how I got all the drugs in the houses.
11           One of the houses I articulated
12   a BD team. I believe the 16th District ran into
13   one of the houses. One of the burglary teams ran
14   into one of the houses during a narcotic arrest,
15   and the majority of the guns and stuff was in the
16   house.
17           I had to actually -- was called
18   out to secure that location, and I did a warrant
19   on that location based on what they had, and I
20   took what they had and added it to all the
21   warrants -- probable -- PC that I had already, and
22   I was able to do the warrants the following day.
23           It was multiple houses, again,
24   but no one was -- no one questioned me of how can

15 (Pages 273 to 276)

Case 2:14-cv-01643-RBS   Document 61-9   Filed 06/29/22   Page 95 of 159

McIntyre v. Liciardello, et al./Torain v. The City of Phila., et al.

JEFFREY WALKER- CONTINUED, 9/16/16

Page 277

1   one cop do all that work, but it took a number of
2   squads to actually effect the warrants on the
3   locations, and every night I did a buy I walked in
4   there and the supervisor had someone sign or he
5   signed in the area where a secondary officer is
6   supposed to sign.
7       Q.   The witnessing signature?
8       A.   The witness signature and at the
9   bottom.
10      Q.   Now, Jeff, I have a stack of probably
11  about 60 vouchers that you handled in 2011.
12  Actually, it appears to be all your CIs' vouchers
13  for the full year of 2011.  Do you recall that?
14      A.   Yes.
15      Q.   All right.  Were you with the squad at
16  that point or were you on your own?
17      A.   I was on the way out.
18      Q.   Okay.  So half in, half out or were
19  you all the way out?
20      A.   I was all the way out with them but I
21  was still in the squad.
22      Q.   So, you had mentioned that you would
23  have supervisors sign off on your CI vouchers as
24  witnessing a witness without being present,

Page 278

1   correct?
2       A.   Yes.
3       Q.   Okay.  And again, I have a stack here.
4   I'm not going to mark them, but if you want to
5   look through them and if you could tell me -- and
6   again, maybe you're just guessing --
7       A.   It's an estimation.
8       MR. CHRISTIE:  Do you have
9   copies of these, Mike?
10      MR. PILEGGI:  No, I'm -- he
11  wanted to say something.
12      I do not, but you do.
13      MR. SANTARONE:  Can you tell us
14  the NFU numbers.
15      MR. PILEGGI:  Yeah, the NFU
16  numbers.
17      MR. CHRISTIE:  Can you identify
18  them?
19      MR. PILEGGI:  Well, I want him
20  to review them first.  I may not even --
21      MR. SANTARONE:  I still want to
22  know the number, what you're showing him.
23      MR. PILEGGI:  It's 2011 --
24  here, I'll give you.  Wait a minute, here's

Page 279

1   the other one, too, another copy.
2       MR. KRASNER:  Indicating for
3   the record that documentation of which
4   documents are being reviewed has been passed
5   to defense counsel.
6       MR. SANTARONE:  And for the
7   record, it's USA079364 and 365.
8       THE WITNESS:  Go through the
9   documents?
10  BY MR. PILEGGI:
11      Q.   Yeah.  My general question, without
12  getting into the specifics of what's on those
13  documents, is there a number of those vouchers
14  that were signed as a witnessing supervisor where
15  the supervisor actually did not witness?
16      A.   Yes, it's a few of them there with the
17  supervisors who was not there but they're acting
18  as a secondary officer.  It's also officers that
19  the supervisor instructed me to have them put
20  their names on the vouchers to show that it was a
21  secondary officer with me.
22      Q.   Let's start with the supervisor.  What
23  supervisors' names are on there that actually did
24  not witness?

Page 280

1       A.   From my memory, a lot of them should
2   be Sergeant Joe McCloskey, Lieutenant Otto and
3   Sergeant Gorman.
4       Q.   Okay.  How about the officers, the
5   line officers?
6       A.   Mike Spicer, Perry Betts -- I haven't
7   went through all these, but from what I see on the
8   top, Mike Spicer and Perry Betts.  The rest of
9   them are supervisors.
10      Q.   Okay.
11      A.   Yeah, when we get into Gorman's squad
12  it's different officers.
13      Q.   Now, Jeff, I want to talk a little bit
14  about search warrants.  Generally speaking, was
15  there ever an occasion where your squad executed a
16  search without probable cause and absent a search
17  warrant?
18      A.   Yes.
19      Q.   All right.  Is there -- under the
20  policies and procedures and the law, is there
21  incidents where an officer can go into a property
22  without a search warrant?
23      A.   Is there incidents?
24      Q.   Yes.  Is there a --

16 (Pages 277 to 280)

McIntyre v. Liciardello, et al./Torain v. The City of Phila., et al.

JEFFREY WALKER- CONTINUED, 9/16/16

Page 281

1    A.    There's exigent circumstances.  Hot
2    pursuit.  Chasing someone in a house.  Fear of
3    obstruction of evidence.  A person coming out the
4    house where it revealed that the person --
5    secondary person or co-defendant knows the arrest
6    of another individual and they attempt to destroy
7    evidence and we -- knowingly they're trying to
8    destroy evidence and we secure the house.  That's
9    the two main ones there.
10    Q.    Now, was there ever an occasion where
11    you and/or your squad conducted a search without a
12    warrant?
13    A.    Numerous times.
14    Q.    Okay.  Did they all occur when there
15    was either hot pursuit or exigent circumstances or
16    when you believed there was going to be
17    destruction of property?
18    A.    Yeah.  A lot of times we made exigent
19    circumstances.  We put ourselves in positions
20    where if a person came out the house we stopped
21    them.  We didn't follow them out the area, but it
22    didn't matter.  Once we stopped them out the area
23    we still went back to the house, opened the door
24    with the keys.  We locked people up in other

Page 282

1    locations and we took them back to the location
2    and got into the location.
3    Q.    Let me ask you, are you permitted to
4    do that as a police officer?
5    A.    No.
6    Q.    Okay.  Go ahead.
7    A.    Once we inside these houses either --
8    one of the individuals I was involved with, Thomas
9    Liciardello, Michael Spicer, Brian Reynolds, Perry
10    Betts is with us, John Speiser is with us,
11    everyone is there but a supervisor.  Tommy will
12    make a call to Joe McCloskey and sometime you hear
13    him screaming at him how you even get there or
14    what's going on, to the point where he got tired.
15    He got so tired.  He had no power.
16    Q.    Who is he?
17    A.    Sergeant Joe McCloskey.  Call Otto.
18    Don't call me, call Otto.  I've witnessed that
19    situation next to Thomas Liciardello talking to
20    him on the phone and I witnessed it when I went to
21    other squads, where Joe McCloskey got so tired he
22    didn't even want to be involved with him and he
23    was actually running with another squad I was in,
24    and he would receive a call and I know it's Tommy

Page 283

1    on the line because Tommy be yelling, and Joe
2    McCloskey would say what you calling me for, call
3    Lieutenant Otto.
4    Either in the squad or outside
5    the squad, Joe McCloskey had no control over what
6    was going on in that squad.  It was Thomas
7    Liciardello's squad.  He made it very clear that
8    he was the boss of the squad.  I even jokingly
9    said Joe is Tommy's puppet.  Tommy was the puppet
10    master.
11    And when it was -- when -- he
12    always put Joe McCloskey on the spot even when he
13    made accusations that Joe McCloskey took something
14    in one of these houses we were in, and he told
15    every -- he told certain people in the unit, and
16    he made a velcro sound because Joe McCloskey wore
17    a vest, and he was in the basement with the money,
18    and so there was a lot of disrespect.
19    Tommy was very disrespectful to
20    not only other individuals in the unit when they
21    felt that they was not doing what he wanted them
22    to do but he was also very disrespectful to the
23    supervisors.  He can do anything and everything he
24    wanted, and he was protected.  He actually told --

Page 284

1    Q.    Who was he protected by, Jeff?
2    A.    He was protected by the Lieutenant
3    Otto.  The cap at the time we were using -- I keep
4    forgetting his name -- he was mainly protected by
5    Blackburn.  There was times where -- when Joe used
6    to scream -- Joe McCloskey used to scream at him
7    and Tommy will say your balls are in my hand.  And
8    Joe didn't do nothing but put his hands together
9    and twiddle his thumbs and say nothing.
10    It was a lot of disrespect
11    coming from Thomas Liciardello dealing with Joe
12    McCloskey.
13    Q.    Jeff, other than -- was there ever
14    times where you went into a house without a search
15    warrant and then waited at the house to go get a
16    search warrant?
17    A.    A lot of times within those -- that's
18    where a lot of the childish play occurred.  Brian
19    Reynolds used to wear the defendant's clothes.  We
20    used to drink in the houses, when the people were
21    in the houses.  It was Brian Reynolds, Thomas
22    Liciardello, Michael Spicer, Perry Betts, Norman,
23    Linwood Norman.  Other -- sometimes other members
24    of the squad, Reggie Graham, Williams, Barry

17 (Pages 281 to 284)

Case 2:14-cv-01643-RBS    Document 61-9    Filed 06/29/22    Page 97 of 159

McIntyre v. Liciardello, et al./Torain v. The City of Phila., et al.

JEFFREY WALKER- CONTINUED, 9/16/16

Page 285

1    Clahar be in these houses.
2            Brian used to joke around
3    when -- people used -- all depends who it was who
4    left, wear clothes, eat the people's food, cook
5    their food while they sitting there waiting,
6    ordering pizzas with the money that they took from
7    them. It was just -- we used to just ruin these
8    people's houses. Tommy -- I witnessed Tommy
9    pissing on people's personal property. It was --
10   it was just very childish, the things that we were
11   doing in these houses.
12            Searching -- I was part of it,
13   too. I'm not excluding myself. I was -- put
14   hands on people, I was searching, I was stealing,
15   and when it was time to lie, I was lying. You
16   know what I mean? I was part of the destruction.
17   I was still in clothes. I was part of the group
18   that was doing it. I witnessed it.
19            When the supervisor came in,
20   Brian used to come in -- Brian used to come to the
21   door with the man's clothes on, the man's shoes
22   on. Took all his clothes and put this man's hat
23   and shirt and shoes and -- looking like a pimp.
24   You know what I mean? The supervisor's sitting

Page 286

1    there just looking at him like man, you crazy.
2    The guy sitting there just not saying nothing. It
3    was very childish what we did. You know what I
4    mean? It was -- we were untouchable. That's the
5    truth.
6       Q.   Jeff, did they ever take -- did
7    anybody ever take any jewelry?
8            MR. SANTARONE: What's so
9    funny, his ridiculous story or --
10           THE WITNESS: The story is
11   true.
12           MR. KRASNER: Objection.
13           MR. SANTARONE: I mean --
14           MR. KRASNER: Would you like me
15   to answer that?
16           MR. SANTARONE: No, I think
17   it's unprofessional for you to be laughing
18   while the witness is testifying. I just
19   wanted that --
20           MR. KRASNER: As compared to
21   stealing people's clothes and wearing them
22   to the door dressed like a pimp? Is that
23   what you mean?
24           MR. SANTARONE: According to

Page 287

1    the story we're hearing.
2            MR. KRASNER: Yeah, I
3    understand.
4            THE WITNESS: The story's true.
5            MR. KRASNER: I understand your
6    position.
7            THE WITNESS: You may find it
8    hard to believe but it is true.
9            MR. KRASNER: Go ahead, sir.
10           MR. SANTARONE: You'd be the
11   first to point out if my clients were
12   laughing or reacting in any way, wouldn't
13   you?
14           MR. WILLIAMS: Well, they have
15   been, Joe.
16           MR. KRASNER: Is this about
17   something other than the deponent?
18           MR. SANTARONE: No, I'm just
19   asking --
20           MR. KRASNER: Okay. Well, why
21   don't we proceed with the deposition, if
22   that's okay with you.
23           MR. SANTARONE: Fine.
24           MR. KRASNER: Good.

Page 288

1    BY MR. PILEGGI:
2       Q.   Jeff, do you recall anyone stealing
3    any jewelry when they were in any of these houses?
4       A.   Yes. Norman stole jewelry. I was
5    mainly stealing clothes. Tommy would steal
6    anything and everything he put his hands on,
7    jewelry, clothes, just personal items that the
8    person complained about that I witnessed, and I
9    participated in that also.
10           Some stuff was resold. I
11   remember Brian used to be big -- Brian Reynolds
12   was big on stealing jerseys. I said who you
13   giving those jerseys to. He was giving them to
14   his nephew. Whatever ones he wanted he was
15   selling them on eBay. There was a lot of
16   stealing.
17      Q.   Do you know --
18      A.   Liquor. I remember defendant Herb
19   Price we ransacked his apartment. We were
20   stealing liquor out of there. There was a lot of
21   things going on.
22      Q.   Jeff, how do you know that they --
23   some of the officers were selling items on eBay?
24      A.   Brian Reynolds told me. I know he had

18 (Pages 285 to 288)

Case 2:14-cv-01643-RBS    Document 61-9    Filed 06/29/22    Page 98 of 159

McIntyre v. Liciardello, et al./Torain v. The City of Phila., et al.

JEFFREY WALKER- CONTINUED, 9/16/16

Page 289

1  a nephew and he was -- what are you doing with the
2  jerseys. He said that ones that they wanted he'd
3  give them to him and they was selling them, and I
4  never met his nephew before.
5      Q.  Do you recall when that was, when he
6  told you that?
7      A.  I remember the time of Herb Price. We
8  did Herb Price. He was living in the Executive
9  House. They were actually one of the first --
10  when I first started going into the Executive
11  House way before Kushner with the rest of them
12  guys we were locking up.
13      Q.  Now, Jeff, when you were sitting in
14  the houses waiting for the warrant, what would you
15  do with the occupants? Would they be in the
16  house, too? Would they be outside?
17      A.  No, sometimes they'd be in the --
18  they'd be in the house with us watching things go
19  on and sometimes they would not be there. It
20  depends what the situation was.
21      Q.  Would you search that house during the
22  period of time before the warrant was actually
23  obtained?
24      A.  Always, especially when we were

Page 290

1  securing it. If we had information a guy had a
2  lot of money in the house, we made sure we be
3  there prior to doing the warrant. Once -- if it
4  was money in there, we took it. The supervisor
5  was notified. It was never questioned why we were
6  in there. It wasn't our -- the only question was
7  where Joe had an issue where he told Tommy to go
8  in another location and he went to -- he just
9  totally disregarded what he was saying and went to
10  secure another house.
11           But I also knew, again,
12  misconduct that the supervisor allowed, where they
13  had multiple houses and they didn't have warrants
14  on some of these houses. I watched Joe McCloskey
15  give Police Officer Mike Spicer, Thomas
16  Liciardello keys, a defendant's keys, and they
17  will leave and they will come back, and that
18  behavior carried on to me because it was okay to
19  do.
20           I have walked in houses with
21  Police Officer Norman by myself. He had an issue
22  where we walked into a location, Norman damaged
23  the door, and Police Officer Perry Betts seen that
24  we were in there prior to the execution of the

Page 291

1  warrant. He made a joke out of it. He told
2  Thomas Liciardello.
3           And I can remember later that
4  evening the sergeant questioned me and said
5  listen -- he didn't question me on being there
6  prior to the warrant, but he questioned -- listen,
7  I'm going to separate you and Norman. I'm going
8  to put you in the car with Thomas Liciardello and
9  Norman was going to be in the car with whoever, I
10  think Michael Spicer or Perry Betts, but that
11  didn't work.
12           We went back -- me and Norman
13  were working back together until Norman left the
14  squad because when Norman left the squad because
15  he was disgruntled with the disrespect that was
16  done -- conducted towards him, but again, they
17  would not -- they had limits on how they were
18  dealing with Norman because Norman -- like me, I
19  was passive to a certain point, but Norman was not
20  passive at all.
21           So he end up leaving the squad
22  and went to Sergeant Meehan's squad. Prior to
23  getting to Sergeant Meehan's squad me and Norman
24  used to always talk. We're close. And he said --

Page 292

1  I said how you making out in Sergeant Meehan's
2  squad? Man, you got to get over here with me.
3  Just his thing was the white boys are getting
4  money over here. And I said who is that. That
5  would be Jeff Galazka, Mike Brown. There's
6  another individual I forgot, which after I got
7  over there I actually stole with them, stole with
8  these individuals I just mentioned.
9           So once Norman left I was
10  trying to work back to getting back working with
11  Norman. Once I met with Norman, I still was not
12  happy in that situation. The pressure was on me
13  again. I left and went to the last squad I was
14  with, and that's when I was arrested.
15           So the only thing I learned by
16  going to these individual squads was picking up on
17  the misconduct of the squads on whatever level it
18  was before I got to the very last squad, which
19  there was misconduct in that squad. An officer
20  lost his job for stealing and then shortly after I
21  was arrested.
22      Q.  Jeff, let me ask you, were you aware
23  that Officer Norman was terminated at some point?
24      A.  Yeah, at one point he was

19 (Pages 289 to 292)

McIntyre v. Liciardello, et al./Torain v. The City of Phila., et al.                    JEFFREY WALKER- CONTINUED, 9/16/16

Page 293

1    terminated -- he was terminated twice. One, he
2    had a domestic issue, a personal domestic issue
3    with his -- his girlfriend, and another issue he
4    was terminated for property receipts, missing
5    property receipts. Money was -- made an
6    accusation that he stole money off of one of his
7    own property receipts. This is the way it had
8    came out and he end up losing his job, but he
9    ended up getting his job back on arbitration and
10   we were witnesses to protect him.
11             I still to this day don't know
12   if he -- the man stole it or not, but I know it
13   didn't look right how he stole it because it
14   was -- he had a bad year that year, where so much
15   personal things were happening to him, and we had
16   an issue where they -- a family member took his
17   gun, he broke his uncle's ribs. He got his gun
18   back and then he got into problems -- it was a
19   terrible year for Norman.
20             He end up losing his job, but
21   again, he got his job back, and we actually were
22   at his arbitration, myself, Police Officer
23   Reynolds, I don't believe Tom was there, may have
24   been -- not -- been there or not -- no, I don't

Page 294

1    think Thomas Liciardello was there. It was
2    earlier. We were working under Genie Gessner when
3    this stuff was going down.
4        Q.   Jeff, one more policy I want to
5    discuss is when there's a search and there -- it
6    may not even be pursuant to a search. When
7    there's evidence confiscated from an individual,
8    is there certain policies and procedures that have
9    to be followed with respect to taking that
10   property into evidence?
11       A.   Yes. It's all -- again, policies are
12   to safeguard the officers in case something
13   happens, especially when you're dealing with
14   money, any type of evidence. A person says that
15   the officer did, so it rest on the policy. The
16   policy has to be followed especially when
17   collecting evidence.
18             A lot of times we were not
19   using evidence bags. We was throwing it in the
20   boxes. A lot of times the officer was
21   confiscating it, regardless of who it is -- like
22   Perry will take some money unknowingly and then it
23   will reappear at headquarters and was questioned.
24   Thomas Liciardello will control all the money, all

Page 295

1    the evidence, and we would meet in a lot and we
2    would go through -- if the evidence were bagged
3    we'd go through the bag and we'd bag it up so we
4    had control of whatever we want.
5             But at times where -- I believe
6    because we were doing so much stealing that the
7    supervisors taking control of the evidence, mainly
8    Otto and a lot of times Joe McCloskey, but
9    prior -- before that at times Thomas Liciardello
10   had control of the evidence in a situation, but
11   there was a lot of misconduct of collecting the
12   evidence, counting money in houses, large amounts
13   of money.
14             Again, it's a policy of
15   collecting evidence. Everything's bagged up with
16   the sign out investigator and the supervisor and
17   it's taken and recounted. It's protected in case
18   a person says listen, I had a large amount of
19   money and -- and accuse the officer and they say
20   well, how did you bag the money up. Well, the
21   sergeant grabbed it off of me and then gave it to
22   me and we went into headquarters. So it rests on
23   the supervisor.
24       Q.   Jeff, lastly for me I want to -- could

Page 296

1    you explain what a jump-out job is. You had
2    mentioned that.
3        A.   A jump-out job is streets jobs. It
4    got so funny that the people we were jumping out
5    at said jump-out Wednesdays or jump-out Thursdays.
6    You know what I mean? We would come down the
7    block sometimes in two cars. We'd bypass somebody
8    and they did the first car, they don't see the
9    second car.
10             They do something we believe to
11   be some type of drug activity and we jump out on
12   them. Once we jump out and get something worthy
13   of arresting these people, we make up the probable
14   cause, and sometimes we do actually see criminal
15   activity, but again, at times these jobs are made
16   up.
17             You have the evidence. We make
18   up the observations saying someone did something,
19   and they didn't do it but they had the evidence,
20   and it's never questioned, because at the end it's
21   you have a defendant and you have evidence. So it
22   was not questioned.
23       Q.   Jeff, do you recall a case that I was
24   involved in that I brought on behalf of a client

20  (Pages 293 to 296)

Page 297

1    where there was actually a hearing with respect to
2    yourself, Officer Liciardello and Officer Reynolds
3    jumping out on clients that I was representing and
4    making statements?  Do you recall that?
5         A.   Yes, I recall that incident.  It was
6    the Andre Blaylock.  I know things were said that
7    didn't actually happen the way they did and --
8         Q.   Explain that.  What was said?
9         A.   I know the accusations was said that
10   we jumped out on him and we said a whole lot of
11   the things to him.  This is actually what happened
12   because I was in the car.  We were being sued by a
13   number of individuals down in that area.  We were
14   in that area.  We did see Andre Blaylock.
15            We never jumped out the car but
16   words were exchanged.  It was exchanged from
17   Police Officer Liciardello, Andre Blaylock.  No
18   one pointed a gun at him.  I joined in on the
19   talking to Andre Blaylock.  You were spoken up as
20   being a raggedy ass lawyer and he wasn't going to
21   do nothing.
22            MR. KRASNER:  Gentlemen, no
23   laughing.
24            MS. FUREY:  That part was true.

Page 298

1            THE WITNESS:  You know what I'm
2    saying?  There was a lot of disrespect.
3            And when the information came
4    down that this man had filed a complaint we
5    had -- we were known -- Thomas Liciardello
6    was known for driving fast anyway, so we can
7    get from one part of the city to another
8    part of the city within a short period of
9    time, and when the issue came down we was in
10   Southwest Philly, so it was impossible for
11   this man that said he saw us and we sitting
12   in Southwest Philadelphia and we got a
13   regular assignment, or something happened.
14            We were there, down there,
15   again, maybe in a jump-out.  There was
16   something that was there that recorded that
17   showed we were down there at the time he
18   said it.  Because we would move around kind
19   of fast.  Couldn't follow us for nothing.
20   When we were working and you wanted us,
21   couldn't follow us because we -- we were
22   driving fast.  Couldn't catch us.
23   BY MR. PILEGGI:
24        Q.   Jeff, you mentioned the Andre Blaylock

Page 299

1    case.  Do you recall that case?
2         A.   Yes, I do.
3         Q.   That's a case that I'm correct that
4    went all the way up to the Third Circuit?
5         A.   It went up there.
6         Q.   Okay.  That was a case where you and
7    your squad claimed that there was
8    misidentification -- of course I'm being
9    sarcastic, that you misidentified Mr. Blaylock.
10        A.   Yeah, I can explain it if you want me
11   to.
12        Q.   Please.
13        A.   I did an investigation.  I was the
14   affiant.  I was utilizing an informant I believe
15   by myself.  I observed which I believed at the
16   time there was an individual who was not there
17   when I believe him to be there, and I questioned
18   my observation and discussed it with Police
19   Officer Brian Reynolds.
20            It was two brothers, Omar and
21   Andre.  Reynolds said listen, man, pick one,
22   choose to pick Andre.  At the end of things, it
23   was not Andre, it was his brother Omar, and this
24   was after the fact that the warrant was executed.

Page 300

1    People were arrested.  I was actually doing the
2    paperwork.  I think I did the preliminary hearing
3    that the defense attorney proved that he was in
4    custody at the time and I was in a situation.
5            So I brought it to my
6    supervisor, Joe -- not Joe McCloskey, Chet
7    Malkowski, and it end up being as a result of that
8    conversation I took and I just start whiting it
9    out, and then furthermore we continued to lie.  It
10   was questioned by us that he was out there with a
11   photograph of the individuals, which never
12   happened.
13            I was out there with an
14   informant and I misidentified someone, but I kind
15   of owned it up toward the end.  I was put into a
16   corner that I made a mistake, but I tried to cover
17   the mistake up, but I did bring it to a
18   supervisor, too, and the result of that was white
19   it out, no additional -- or go to court and tell
20   the DA you made a mistake, but the damage was
21   already done.
22            We had to make it look like an
23   honest mistake, and with an honest mistake Brian
24   had a picture, and the two brothers look alike,

McIntyre v. Liciardello, et al./Torain v. The City of Phila., et al.                    JEFFREY WALKER- CONTINUED, 9/16/16

Page 301

1    because they resemble each other to a certain
2    degree, and that's it.
3        Q.    So am I correct that you whited out
4    one name and put the other name in?
5        A.    Yes.  That was a result of talking to
6    the supervisor, the conclusion of what that
7    conversation was.
8        Q.    And what was the result of that case?
9    Did you lose or win?
10       A.    We lost.  I lost.
11             MR. PILEGGI:  I have nothing
12   further.
13             - - -
14             (Whereupon, Michael Pileggi,
15   Esquire left the deposition room.)
16             - - -
17             (Whereupon, a short recess was
18   taken, after which time the deposition
19   resumed.)
20             - - -
21   BY MR. SANTARONE:
22       Q.    Mr. Walker, you were released from
23   jail in March of 2016?
24       A.    Yes, I was, March the 30th.

Page 302

1        Q.    And are you currently on probation?
2    Parole?
3        A.    Probation.
4        Q.    And how long is that going to last?
5        A.    Three years.
6        Q.    And I'm not going to ask you where
7    you're living, but what do you do for a living?
8        A.    Nothing right now.
9        Q.    You're unemployed?  What's your source
10   of income?
11       A.    My sister's inheritance.  She had
12   passed during my arrest, of cancer.
13       Q.    Okay.  And you're living off of that
14   money from your sister?
15       A.    Yes.
16       Q.    Are you looking for employment?
17       A.    Eventually I will find employment.
18       Q.    Is part of your probation that you're
19   supposed to seek employment?
20       A.    That's what they say, but again,
21   situations arise where I am looking for
22   employment.  They know I'm trying to find
23   employment.
24       Q.    That's my question.  Have you been

Page 303

1    looking?
2        A.    Yes, I have been.
3        Q.    Where have you been looking?  What
4    kind of work are you looking for?
5        A.    Through family that may have jobs for
6    me, as far as odd jobs.  Starting this summer I
7    was working with my mother to do some landscaping
8    work, working with a company, but that didn't pan
9    out.  I'm still searching.
10             There's a lot going on right
11   now where I'm just taking one issue at that time.
12   One of my main issues is handling my
13   responsibilities as far as these depositions, and
14   when I have time I'll find employment.
15       Q.    You were asked a lot of questions.  I
16   just want to clarify.  You were asked -- generally
17   asked questions about squads.  Can you go through
18   the squads that you were in, and maybe we can come
19   up with a way to name them and the dates that you
20   were in those squads.
21       A.    Okay.
22       Q.    You started in narcotics in 2001?
23       A.    Probably 2000.
24       Q.    Okay.

Page 304

1        A.    2000.
2        Q.    And you named -- who was in that
3    squad.  What was that squad called?
4        A.    I don't know the names of that.  I
5    mean, I know the -- I remember the individuals
6    that were in the squad, but you're talking about
7    the names of the squad, no, that's too far --
8        Q.    Was that the Genie Gessner's squad?
9        A.    You could say that, Gessner.
10       Q.    Was she the sergeant the entire time
11   you were there?
12       A.    In the squad, yes, until she retired,
13   and then I went over to Chet McCloskey.
14       Q.    Is that McCloskey or Malkowski?
15       A.    I'm sorry, Malkowski.  I got to go
16   back with these names.  Malkowski.  That's why I
17   say the first name first, Chet.
18       Q.    And when --
19       A.    Chester.
20       Q.    And when Genie retired and -- was that
21   still the same squad just with a new sergeant or
22   was it a different squad?
23       A.    I don't recall exactly.  I know I left
24   the squad with certain members and it was a new

McIntyre v. Liciardello, et al./Torain v. The City of Phila., et al.                    JEFFREY WALKER- CONTINUED, 9/16/16

Page 305

1    squad at that point. Certain -- more individuals
2    came different than was in Genie Gessner's squad.
3         Q.   Okay. And when was the squad -- how
4    long were you in that squad?
5         A.   I can't pinpoint the number of years,
6    but one -- more than two, somewhere around there,
7    because we carried on from Chet Malkowski's squad
8    and we carried on that squad until we were
9    actually broken up.
10        Q.   And why were you broken up?
11        A.   From allegations of misconduct, and
12   they decided to break us up. They did a lot with
13   us and I actually went with Chet Malkowski and
14   Tommy Liciardello, Thomas Liciardello, and we went
15   to another division, and that's when we hooked up
16   with Louis Palmer and we had other members. I
17   believe -- I'm not certain of the individuals. We
18   had other individuals in the squad with us.
19        Q.   And who was the sergeant of that
20   squad?
21        A.   It was still Chester Malkowski.
22        Q.   And Louis Palmer was a member of that
23   squad?
24        A.   I believe so, yes.

Page 306

1         Q.   And do you remember what year it was
2    you went into that squad?
3         A.   Not to be exact, no.
4         Q.   When did you move into Joe McCloskey's
5    squad?
6         A.   When Chet McCloskey -- Malkowski left.
7    Chester Malkowski left. He retired.
8         Q.   And do you remember what year that
9    was?
10        A.   No, I do not.
11        Q.   You -- the squad that you've been
12   talking about with Tom Liciardello, that was -- do
13   you remember what years you were in that squad?
14        A.   If I had to do a broad it would
15   probably be ending of 2011, beginning of -- we've
16   been with each other for the majority of my career
17   in narcotics field, so we can go all the way back
18   to maybe 2001 when we was working with -- the main
19   people were Thomas Liciardello and Brian Reynolds.
20   Everyone else filtered in from time to time, but I
21   can't give you the exact years.
22        Q.   You gave a number of statements to the
23   FBI, right?
24        A.   Yes.

Page 307

1         Q.   How many times did you meet with them
2    to give them statements?
3         A.   Occasionally. Sometimes twice a week.
4    We talked for a period of time over a year or so.
5         Q.   A total of 20, 50 times?
6         A.   No, more than that.
7         Q.   Okay. And you testified in grand
8    jury?
9         A.   Yes, I did.
10        Q.   And if you had said there that the
11   times that you were in the squad was 2006 to April
12   of 2011, does that sound right?
13        A.   Repeat that.
14        Q.   If you had said that you were in the
15   squad from 2006 to April of 2011 --
16        A.   What particular squad?
17        Q.   The squad with Sergeant McCloskey.
18        A.   That could be true, I mean, but that's
19   individuals in the squad I was with. I mean,
20   certain -- like I said before, certain
21   individuals, like Thomas Liciardello and Brian
22   Reynolds, I was with these guys longer.
23        Q.   Before McCloskey.
24        A.   Yes. We stayed together until we were

Page 308

1    broken up and got back together again.
2         Q.   And in April of 2011, what squad did
3    you go to then?
4         A.   April -- after Sergeant McCloskey's
5    squad?
6         Q.   Yes.
7         A.   I went to Sergeant Gorman's squad.
8         Q.   And did you remain in Sergeant
9    Gorman's squad until you were arrested on
10   May 21st, 2013?
11        A.   No, I did not, I bounced around. I
12   went from Sergeant Gorman's squad to Sergeant
13   Barrington's squad, from Sergeant Barrington squad
14   I went to Sergeant Meehan's squad, then I end up
15   another squad, I don't -- I can't remember the
16   sergeant's, and then I was arrested.
17        Q.   So between April of 2011 and your
18   arrest on May 21st, 2013, you were in four
19   different squads during that time frame?
20        A.   Yes, I was.
21        Q.   What squad -- you were in a squad
22   where you because of drinking had lost your gun.
23   What squad were you in?
24        A.   That was with Sergeant Gorman's squad.

McIntyre v. Liciardello, et al./Torain v. The City of Phila., et al.    JEFFREY WALKER- CONTINUED, 9/16/16

Page 309

1    Q.    So that would have been after Sergeant
2    McCloskey, then.
3    A.    Yes.
4    Q.    And you talked about the number of
5    people that were in the squad and you said there
6    were only six in your squad.  What were the
7    numbers that were in other squads?
8    A.    It was a lot more.
9    Q.    How many more?  When you were in those
10    squads, how many were in those squads?
11    A.    More than we had.
12    Q.    More than --
13    A.    I can't give -- yeah, way more than --
14    there was a reason why we were six.
15    Q.    Okay.  Seven is more than six.  Was it
16    more than that?
17    A.    Way more than that.  I would say
18    maybe -- maybe ten.
19    Q.    Okay.
20    A.    More.  It was obviously way more.  We
21    went from several people to I was working with a
22    group.
23    Q.    The problems that you talked about --
24    you talked about everybody drinking.  You were the

Page 310

1    one who was treated because of your drinking
2    problem, correct?
3    A.    What do you mean by "treated"?
4    Q.    Were you sent to Employee Assistance
5    because of your drinking?
6    A.    I went to Employee Assistance because
7    of personal problems that I had, some marital
8    problems that I had.
9    I was only sent to Employee
10    Assistance towards the end where it was mainly
11    allegations the FBI was around.  So it was
12    basically clearly that they wanted to make it look
13    like I had issues, which I did have issues.  It
14    was the -- it was put on me that I was the drunk,
15    which I was drinking amongst a lot of other
16    people.  You know what I mean?
17    A lot of my alcoholism came
18    from constantly drinking with the squad.  We
19    had -- again, I go back to we always had beer on
20    hand at all times.  We had refrigerators full of
21    alcohol.  We drank while we were working.  We
22    drank after work, when we supposed to have been
23    working.  So it was -- it was a party, so it was
24    easy to become an alcoholic working in the squad I

Page 311

1    had.
2    Q.    When was it that you were -- felt like
3    you were on the outs with the squad that you were
4    in with Liciardello?
5    A.    It came before -- it was -- see, at
6    the beginning we were all tight.  It was me,
7    Thomas Liciardello and Brian Reynolds.  We were
8    like brothers.  We were tight.
9    As the squad started changing,
10    more -- it got more visible when Sergeant
11    McCloskey -- got in Sergeant McCloskey's squad.
12    It count as a little division there, but what I
13    was going through, personal issues, was dealing
14    with support and family issues, I knew I had to
15    work a little bit more because at the beginning of
16    my career in the narcotics field unit I was
17    basically a follower.
18    I was following Thomas
19    Liciardello.  I was basically doing everything he
20    asked me to do, but once I got into -- my personal
21    issues changed I started doing more jobs on my
22    own.  I had to do more jobs on my own because that
23    was the separation there.  It was a feud, and it
24    was not my feud with him, it was his -- Thomas

Page 312

1    Liciardello's feud with me.  I was not following
2    everything he commanded me to do and it implicated
3    a problem.
4    I remember one incident we had
5    at court where I guided -- my job was guided away
6    from doing what they wanted to do because we had a
7    smaller squad.  So if I had to go do something, it
8    stopped them from doing whatever they had to do.
9    So it was an issue that me and
10    Thomas Liciardello had at court, at CJC, and he
11    had a group of guys around him, and it was a
12    discussion of me saying to him listen, I need to
13    do jobs, too, and it ended in a discussion with me
14    saying listen, I guess you my -- guess you Santa
15    Claus and you guys my little tiny reindeers, go
16    out and make me some money then, and they took it
17    as a joke the way I said it, and Tommy came back
18    at me, said okay, motherfucker, you on your own.
19    You know what I mean?  And that's when the feuding
20    started, really started going back and forth with
21    each other.
22    Q.    In your testimony earlier in the grand
23    jury you said that in the summer of 2010 you were
24    on the outs with the group.  Do you agree that

McIntyre v. Liciardello, et al./Torain v. The City of Phila., et al.          JEFFREY WALKER- CONTINUED, 9/16/16

Page 313

1  that that's around the time?
2       A.   Yeah, I was -- that was -- I was on
3  the outs, but it was --
4       Q.   And at that -- at that time you're
5  talking about --
6       A.   Are you going to let me answer the
7  question?
8       Q.   But I just asked you that -- that was
9  the only question I asked you.
10      A.   Well...
11      Q.   And at the time --
12           MR. KRASNER:  Sir, you can
13      answer the question fully.  You were
14      interrupted.
15           THE WITNESS:  Well, I'd like to
16      finish answering the question.  You throw me
17      a part question and it's not a -- it's not
18      a -- I have a --
19  BY MR. SANTARONE:
20      Q.   Did you say -- well, the question was
21  did you testify that you were on the outs in the
22  summer of 2010.  I didn't ask you why, I just
23  asked you is that what you testified to.
24      A.   That's the --

Page 314

1           MS. FUREY:  Can you show it to
2      him?
3           MR. SANTARONE:  He admits.
4           MR. KRASNER:  Okay.  That's
5      fine.
6           MS. FUREY:  Usually you show
7      the witness --
8           MR. KRASNER:  But he should be
9      able to answer it and answer it fully.
10          MS. FUREY:  Yeah.
11          THE WITNESS:  The question how
12      I interpret it was you -- was I on the outs.
13      Yes, I was on the outs with -- that wasn't
14      the beginning of the outs in 2010.  It came
15      before that.  That's how I -- because when
16      you asked the question, how I interpreted
17      the question when it was asked to me at the
18      time.
19  BY MR. SANTARONE:
20      Q.   Okay.
21      A.   It didn't start in 2010.
22      Q.   And at the time you talked about your
23  personal problems, you were having serious
24  drinking problems?

Page 315

1       A.   I was drinking.  Yes, I was --
2       Q.   Were you having marital problems at
3  the time?
4       A.   Yes.
5       Q.   Were you suffering from depression at
6  the time?
7       A.   Yes, I was suffering from depression.
8       Q.   And did you have money issues, too?
9       A.   Yes, I had money issues.
10      Q.   What had you gotten involved in that
11  caused you to have money issues?
12      A.   Well, it started from my divorce.
13      Q.   What year were you divorced?
14      A.   It was before 2010.
15      Q.   Okay.
16      A.   You can say that.  I don't know a
17  specific year.  But I had money issues and --
18      Q.   How many times have you been married?
19      A.   Twice.
20      Q.   Had you been divorced twice?
21      A.   Yes.
22      Q.   Okay.  When was the second divorce,
23  then?  What year was that?
24      A.   Again, it was before 2010.

Page 316

1       Q.   Okay.
2       A.   A year or two before 2010.  You want
3  me to be exact with numbers, I don't know.  I
4  don't recall the exact numbers --
5       Q.   No, I guess I'm asking what--
6       A.   -- before 2010.
7       Q.   -- what years were you married.  You
8  had two different marriages that ended in divorce?
9       A.   Yeah, I was --
10      Q.   What years were you married?
11      A.   Again, you're asking a question I
12  can't be specific with the answers you're asking
13  me.  Me to be specific with --
14      Q.   Okay.
15      A.   -- years and I may be wrong and I'm
16  not going to guess.  I'm going to give you
17  everything that you tell me as exactly what I
18  know.
19           So I've been married twice, but
20  before 2010 I was going through my second divorce.
21  I had money issues going on in the situation.  I
22  had division of the squad situation going on.  I
23  got into another issue where I was conned out of a
24  lot of my money with individuals that I --

25 (Pages 313 to 316)

McIntyre v. Liciardello, et al./Torain v. The City of Phila., et al.    JEFFREY WALKER- CONTINUED, 9/16/16

Page 317

1  actually was my close friends and I actually
2  brought them into a bad situation that I believed
3  it was something else but it wasn't and I lost
4  money, too, in that situation.
5      Q.   Was that -- was that an issue
6  involving some housing?
7      A.   Yes.  It was -- the situation was I
8  had an old friend that was a police officer who
9  had a brother.  He had a Comcast business that was
10 located somewhere on Oregon Avenue.  I met him as
11 I was drinking.  We got to get to know each other,
12 and I found out I was -- I was in my early years
13 with his brother.
14          So we got to talking and I was
15 in the -- I had a somewhat foot into real estate
16 also, and what he did -- he explained to me was he
17 had a number of properties and he wanted some
18 investors, did I know any investors that would
19 invest in him to fix his properties up and he
20 would take out a second mortgage on his
21 properties, and he mentioned -- made it very
22 convincing to me he had a number of properties.
23          So I went to close friends of
24 mines and said would you like to invest some

Page 318

1  money, because once he took out the second
2  mortgage on these properties these people would
3  invest with him and make some -- a little bit of
4  money on top.  The would have got their money back
5  and made a little bit of money on the top.
6          At the end of it I found out it
7  was nothing but a pyramid scheme, and I was
8  going -- and that was one of the main reasons I
9  was trying to get my coworkers' money back from
10 him, and some people got their money back, but in
11 the course of -- before I got arrested a few
12 others did not get their money back including me.
13 I didn't get money that I was invested with him.
14     Q.   And when you were first involved in
15 this housing scheme, you talked about some people
16 that you had got involved in the investments.
17 Were any of them police officers?
18     A.   Yes.
19     Q.   Were any of them police officers in
20 any of the squads?
21     A.   I believe no one in my squad.  I mean,
22 it was Sergeant Gorman got involved in it.  It was
23 another officer Sergeant Harding but he wasn't in
24 my squad at the time.

Page 319

1      Q.   Did you have any falling out with Tom
2  Liciardello over who said -- who told you not to
3  get involved in this, who said you were stupid to
4  do this?
5      A.   No, it was not -- that was none of
6  their personal business.  Again, that's lies on
7  their part.  I was on the outs.  I was not sharing
8  my personal business with them.  Then at the
9  endpoint, in fact, I was only involved with the
10 people that I was dealing with who gave me money
11 other than them.
12     Q.   And was there another -- any other
13 scheme you were involved in, another Ponzi scheme,
14 or is that the --
15     A.   First of all --
16     Q.   -- same one?
17     A.   -- you're saying a scheme.  To me it
18 was a business deal.  I don't get in schemes.
19 These were my friends.  Okay?  I'd rather steal
20 money from other people, drug dealers, before I
21 involve my friends, taking money from my
22 coworkers.
23          I was scammed out of my money,
24 and other people that were with me were scammed

Page 320

1  also, because some -- some people did meet him.
2  Like Sergeant Gorman met him and he got his money
3  back.  Because I made -- they would not give me
4  money unless they met him.  Some people did not
5  meet him, they went on what I was saying, but some
6  people did meet him, like Sergeant Gorman met him.
7          And we're going into -- it got
8  as far as the owner of the Post Office Bar was
9  also scammed out of his money because of the fact
10 that he was told the exact same thing.  He
11 invested maybe 10 or 20,000 of his own money
12 believing the exact same thing I was believing,
13 because this person was going around doing it not
14 just to me, he did it to another person that I was
15 friends with, and we compared stories and it
16 sounded very convincing, and at the end of the day
17 it was a big scam and I was not part of it, I was
18 a victim of that situation.
19     Q.   But you had gotten other people
20 involved in it.
21     A.   Yeah, as a business deal.  It was not
22 a scam.  To me -- a scam to me -- if I'm involved
23 in a scam, I know it as a scam.  It was a business
24 deal.  I was scammed.  I was a victim along with

26 (Pages 317 to 320)

Page 321

1    the people that I got involved into a deal were
2    victims, too, because I never got my money back.
3    Certain people got their money back. Certain
4    people that I -- I was able to get their money
5    back through him they got their money back.
6        Q.    We talked about your -- you mentioned
7    your depression. Are you currently under any
8    psychological counseling?
9        A.    No, I'm fine. I'm free to bullshit.
10       Q.    I mean, are you going to any
11   counseling therapist now?
12       A.    I'm free to bullshit. I'm fine.
13       Q.    All right. Is this what this is,
14   bullshit?
15       A.    This whole situation I -- I chose to
16   put myself involved in prior to my arrest -- when
17   I was arrested that's the first time I was moving
18   in the right direction. I was so happy after a
19   while when I was arrested to get away from all
20   that shit I was putting myself through.
21       Q.    Have you had any psychiatric treatment
22   while you were in prison?
23       A.    I talked to counselors, and again, I
24   want to -- at the bottom I went to God for my

Page 322

1    answers and I got them. I'm fine. I have no
2    stress.
3        Q.    In the years 2006 to April 2011, were
4    you undergoing any counseling then?
5        A.    2011?
6        Q.    2006 to April 2011.
7        A.    I think I went there -- again, I had
8    issues. Again, it was maybe marital issues that I
9    was going through.
10       Q.    And who were you going to?
11       A.    Who was I going to?
12       Q.    Who were you seeing?
13       A.    I don't know. I know I went to the
14   Employees Assistance and then from there they sent
15   me to a therapist. I went there to discuss -- it
16   was marital issues that I was going through.
17       Q.    Did the therapist discuss at all your
18   drinking problem?
19       A.    I told him I had problems with
20   drinking, but again, I was part of a group of
21   people that was drinking constantly over and over
22   again, so it was easy to be an alcoholic. It was
23   always drinking. It was -- my issues that I had,
24   it was easy for me to go to work, if at the time I

Page 323

1    had an issue I'd drink a beer and move on. We
2    were -- I was part of a whole group of people
3    drinking.
4        Q.    Do you know --
5        A.    I was --
6        Q.    Do you know anybody else in your squad
7    that went to the Employee Assistance Program
8    because of drinking --
9        A.    No, they didn't have the issues I had.
10       Q.    -- because of your drinking problem?
11       A.    No, they didn't have the issues like I
12   had because I had money issues. They had
13   issues -- their money issues were different from
14   mine because they was doing the majority of the
15   stealing. They didn't have money issues. I was
16   separated from the group and my money issues got
17   worse, not theirs.
18       Q.    And are you saying that after the --
19   around the time of the summer of 2010 they no
20   longer trusted you?
21       A.    After 2010?
22       Q.    Yes.
23       A.    I think they stopped trusting -- fully
24   trusting me was when the feds came around, when

Page 324

1    the feds was questioning me about Thomas
2    Liciardello, and I wasn't communicating with these
3    guys about what the -- the conversation I was
4    having with the Federal Government. That's where
5    the serious mistrust came from, and the guns start
6    coming out and all the other crap came behind that
7    and I left the squad.
8        Q.    Do you remember when it was you went
9    to -- when you spoke to the feds about that?
10       A.    I didn't go to the feds, they came to
11   me.
12       Q.    Okay. And when you went to them, did
13   you talk at all about --
14       A.    Again, you said I went to them.
15       Q.    Yeah.
16       A.    They came to me. They came to me,
17   knocked on my door, discussing Thomas Liciardello.
18       Q.    And did you talk to them at all about
19   the allegations that individuals were gambling,
20   that were going to SugarHouse on duty?
21       A.    I was part of the group regardless of
22   what situation we had, and I was just as dirty as
23   they was, and I wasn't about to give these guys
24   up.

27 (Pages 321 to 324)

McIntyre v. Liciardello, et al./Torain v. The City of Phila., et al.                    JEFFREY WALKER- CONTINUED, 9/16/16

Page 325

1    Q.   So you never mentioned that to anybody
2    from the FBI or Impact?
3        A.   Well, later I did.
4        Q.   Okay.  I'm not talking about this --
5        A.   -- when I was arrested.
6        Q.   The first visit.
7        A.   The first visit?
8        Q.   Yes.
9        A.   No, it was -- they were talking to me
10   about stealing, and I looked at them like they had
11   two heads.  Tommy stealing?  I don't know about
12   that.  That was a clear enough lie, because I knew
13   I was stealing right along with them.
14       Q.   And when was it you -- you talked to
15   them in March of 2011?
16       A.   I don't know what -- you playing with
17   these years again.  I don't know what year I
18   talked to them.  I know I talked to them prior to
19   my arrest.
20       Q.   Okay.  So you're claiming at the time
21   you talked to them you were still stealing with
22   Tommy even though you were on the outs?
23       A.   When I was talking to them?  No, I
24   don't think I was stealing with Tommy at that

Page 326

1    time.
2        Q.   Was it Lieutenant Otto who told you to
3    go to EPA?  EAP rather.
4        A.   Yeah, he told me again that was -- the
5    feds was around, no one would trust me, and I
6    thought I had some other issues going on that I
7    may have been out of control and slipped up and
8    told some secrets that I had no business telling
9    because I remember having a conversation with Otto
10   and he thought that I was talking to the feds.  He
11   said listen, you know you got to go through us
12   before you start talking to the Federal
13   Government, and I knew that was a lie.
14       Q.   And do you know how the Federal
15   Government reached out to you in the first place?
16       A.   That's a good question.  I don't even
17   remember how that happened, but I know I was
18   talking to -- yeah, I was talking to an U.S.
19   Attorney, forgot his name, and he just asked me
20   some questions about Thomas Liciardello, and from
21   that point, the result of that conversation, the
22   Federal Government come knocking on my door.
23       Q.   Was that -- do you remember where you
24   were talking about that?  Was that at an FOP

Page 327

1    party?
2        A.   Yeah.  He came to me, yes.
3        Q.   And you had been drinking heavily at
4    that time?
5        A.   I don't know about drinking heavily,
6    but I understood the conversation he was having
7    with me, and I know when I -- I have a -- my voice
8    carries when I'm talking with people, and someone
9    over -- I found out later someone overheard that
10   conversation, and they let Otto know and Otto
11   called me yelling at me about some craziness.  I
12   looked at him.  I said what are you talking about.
13            The question of the
14   conversation we had at the FOP was the U.S.
15   Attorney asking about misconduct from Thomas
16   Liciardello, and again, I was not being truly
17   honest with him in the situation.  It was -- first
18   of all, I was wondering why is he talking to me
19   about Thomas Liciardello, but I know Thomas
20   Liciardello's activity was not quiet.  People knew
21   exactly what we were doing.  They knew what type of
22   issue we were in.
23            But I was very surprised at the
24   time of why was he coming to me with the -- with

Page 328

1    that type of conversation.
2        Q.   At the FOP party, was it Curtis
3    Douglas you talked to?
4        A.   There you go, Curtis Douglas.
5        Q.   And when Ott called you, did Ott say
6    it was because that it had been said that you were
7    saying things about Lieutenant Ott at this party?
8        A.   I don't -- I don't believe I was
9    saying anything about --
10           MR. KRASNER:  Otto.
11           THE WITNESS:  Otto.
12   BY MR. SANTARONE:
13       Q.   Yeah, you don't --
14       A.   I don't recall that --
15       Q.   Did Lieutenant Otto say it was because
16   you were talking about him at the party?
17       A.   First of all, I didn't talk about
18   Lieutenant Otto at the time.  Lieutenant Otto
19   pulled my ass out of the fire a lot of times, so
20   me talking bad mouth about Lieutenant Otto, that
21   never happened.
22       Q.   You talked about the financial
23   troubles that you were in.  At the time of the
24   arrest in May of 2013, you had been out of the

28   (Pages 325 to 328)

Case 2:14-cv-01643-RBS    Document 61-9    Filed 06/29/22    Page 108 of 159

McIntyre v. Liciardello, et al./Torain v. The City of Phila., et al.    JEFFREY WALKER- CONTINUED, 9/16/16

Page 329

1    squad, the McCloskey squad, for two years?
2        A.    What, in May 2013?
3        Q.    At the time when you were arrested.
4        A.    Yes, I was out of the squad.  I was
5    with another squad.
6        Q.    And no one from your old squad was
7    involved at all in that sting operation that the
8    FBI had set up against you, correct?
9        A.    No.
10        Q.    Was anybody from your then current
11    squad involved at all in that sting that was set
12    up against you?
13        A.    My current squad?  What do you mean?
14        Q.    The squad that you were in --
15        A.    No.
16        Q.    -- in May of 2013.
17        A.    No.  I think -- I believe I was the
18    target at the time in that squad.
19        Q.    You talked about in your grand jury
20    testimony about drinking at a bar and a bartender
21    named Heather.  Do you remember talking about
22    that?
23        A.    Yes.
24        Q.    And that you couldn't afford to even

Page 330

1    pay for your drinks and you had to wait until
2    Friday to come back --
3        A.    Yeah.  That -- again, I at times -- I
4    was -- my -- it was called a -- it's called a tab,
5    if you don't know.  I had a tab with Heather, and
6    if I did not have the money and Heather was a --
7    it was a relationship with Heather.  Listen Jeff,
8    you know, you can drink and you pay me when you
9    pay me, and when I paid her I tipped her.
10            And it was -- it was a
11    temporary situation I had with her, and she said
12    no problem.  Because I was a little short -- like
13    say I was short $20, I'd say I'm short.  She was
14    like all right, well -- I said, you know, when I
15    get paid I'll pay you Friday, and then I'll pay
16    her.  I'll meet her.  I say Heather, I'm back,
17    here, here's $20 and here's a tip on top of that
18    for looking out for me.
19        Q.    I guess the question is if you're --
20    you know, you're making a six figure salary,
21    you're making overtime in court, and you allege
22    you're stealing this money, how you cannot afford
23    to pay a bar bill?
24        A.    Again, if I ain't got the money, I

Page 331

1    ain't got money.
2        Q.    What were you doing with the money?
3    What were you doing with your salary, the money
4    you allege you stole?
5        A.    I was paying bills.  I'm sorry, I
6    wasn't stealing the majority of time with them
7    where I didn't have a problem with paying my bills
8    when I was on the out and my money was short.  I
9    was out of the group, so I was stealing on my own
10    at this point, and I wasn't stealing as
11    successfully as I was with them.  So I didn't have
12    an issue of not paying a tab when I was with them,
13    I had issues of not paying when I was not with
14    them.
15        Q.    And what time frame are we talking
16    about, then, with this issue with Heather?
17        A.    Well -- when what?
18        Q.    What time frame are you talking about
19    when you couldn't afford to pay your bar tab on a
20    Friday?
21        A.    With -- the time frame --
22            MS. FUREY:  I'm going to
23    object.  He said he would pay on Friday.
24            MR. SANTARONE:  No, until

Page 332

1    Friday.
2            THE WITNESS:  I would pay.  No
3    one -- I -- no one did not get paid if I was
4    drinking.  If I didn't pay that day I paid
5    when I said I would pay and I paid the tab.
6    BY MR. SANTARONE:
7        Q.    And I'm just asking what time
8    frame was that that you couldn't pay --
9        A.    I don't know the time.
10        Q.    -- the tab.
11        A.    I mean, it's no time frame.  I can't
12    tell you if I walked into a bar within a year and
13    when I didn't pay.  If you asked me a question
14    about that I'll tell you yes, I did, but I don't
15    know have no time frame on that.
16            You asking a question about did
17    I not pay Heather on a particular day.  No, I did
18    not pay Heather, but I paid Heather on a Friday.
19    The time frame, I can't give you that because I
20    don't be --
21        Q.    Was it between 2006 and 2011?
22        A.    Yeah, you can be honest -- yeah, you
23    can say that.
24        Q.    Okay.

29  (Pages 329 to 332)

Page 333

1      A.   That could be any day, but yeah, you
2   can -- I can agree with that.
3      Q.   In your -- in your grand injury
4   testimony, did you tell them that you didn't steal
5   at all until you got into narcotics?
6      ·A.   Yes.  I was going through -- yes, I
7   did, to answer the question, but I was in a lot of
8   denial in the situation because what was going on.
9   It took a lot for me to talk to these
10  investigators because a lot of things, it was --
11  that I didn't want to speak about.  It was -- it
12  was a process for me to be truthful.
13          I was still telling them things
14  towards the end of the investigation that I had
15  forgotten.  It was so much stuff that I was
16  involved in and so much stuff that I had to admit.
17  It was a process.  Like I didn't tell them about
18  Norman at the beginning part, but eventually I had
19  to break and tell them.  I had to be fully honest,
20  not partially honest, fully honest.  Some things I
21  got back to my cell I had to write down because I
22  know I will forget when I was talking to these --
23  these agents, so for me to remember.
24      Q.   But when you told them that you hadn't

Page 334

1   stolen until you got in narcotics, that was not
2   true.  You were lying, right?
3      A.   Yes, sir.  I wasn't being truthful --
4   fully truthful for everybody but at the end it was
5   also -- I was being truthful as I could possibly
6   be over my memory of what I knew.  It was a
7   process.  It wasn't easy to tell the truth.  It
8   was new to me when I got locked up because I did
9   so much lying.  So it was a process that I had to
10  retrain myself to say listen, tell the truth, man,
11  tell the truth completely.  Reveal everything that
12  you did.  And it was a process, and I got it out
13  to the best of my ability.
14      Q.   And because of your cooperation with
15  the FBI, you -- you were facing a life sentence,
16  right?
17      A.   I was facing some time, but I knew
18  that I can spend the majority of my youth in jail.
19  It was -- it was -- I knew how the system is, and
20  I knew I had a choice.  Like I had a choice prior
21  before this, but at some point in my life I wanted
22  to make the right choice.
23      Q.   So your choice was life -- possible
24  life in imprisonment or you're going back and

Page 335

1   you're writing down things in your jail cell?
2      A.   The choice was --
3      Q.   And then you got fours years, correct?
4      A.   No, I didn't get four, I got three and
5   a half, but the choice was --
6      Q.   Three and a half.
7      A.   Are you going to let me answer the
8   question or are you going to --
9      Q.   I'm just asking you.
10      A.   -- overtalk me?
11          The choice was do the right
12  thing or do not do the right thing.  That was the
13  choice.  I've been doing the wrong thing prior to
14  my arrest.  So the choice that I had again was are
15  you going to tip to do the wrong thing or are you
16  going to do the right thing.  That's the choice
17  that I had, and I chose to do the right thing, and
18  it was a process that I had to go through.
19      Q.   And because of your, quote, right
20  thing, your sentence was greatly reduced, correct?
21      A.   It was a consideration was -- nothing
22  was guaranteed to me.  You know what I mean?  They
23  told me it could be lenient on my -- at the time
24  and it would be the judge's responsibility, not

Page 336

1   mine's, not the agents'.  They couldn't promise me
2   anything.  They just wanted me -- you had a
3   choice, do the right thing or do the wrong thing,
4   and nothing's guaranteed to you.  So I didn't know
5   what I was going to get when I got sentenced.
6      Q.   You talked about money not being
7   counted in a house, and then you talked about how
8   money was transported back, and you said that the
9   policy was changed to where a supervisor
10  transported evidence, correct?
11      A.   Repeat that.
12      Q.   You said that -- at one point you said
13  that evidence was carried back to headquarters by
14  Mr. Liciardello or Officer Liciardello or anyone
15  else --
16      A.   Yes.
17      Q.   -- but then you said that policy was
18  changed --
19      A.   I'm going to stop you right there.  No
20  policies changed.  The policy is what it is.
21          Thomas Liciardello was known to
22  take money and transport it on his own.  As it
23  went on and it got -- at one point, for whatever
24  reason at all -- whatever reason it was the

McIntyre v. Liciardello, et al./Torain v. The City of Phila., et al.          JEFFREY WALKER- CONTINUED, 9/16/16

Page 337

1    supervisors started doing it, but at times --
2    periodic times Tommy would still be doing it by
3    hisself, and it wasn't just Tommy and Perry Betts
4    also.
5         Q.    Was -- do you know the time frame --
6    so it would be either McCloskey or Otto that was
7    transporting the evidence?
8         A.    Again, it was no policy -- it's only
9    one policy.  There's times when Tommy or Perry
10   Betts or Mike Spicer or whoever it was in the
11   squad will take money and transport it in the car
12   they were using, and then we had control of the
13   money.  That's why we were stealing.  It was
14   easier for us to steal the money.
15              At some point without -- for
16   whatever reason at all the supervisor started
17   taking it and bringing it in.  But we were still
18   stealing before the supervisor got their hands on
19   it.
20        Q.    And I guess what I'm asking is do you
21   know when that changed --
22        A.    No, I don't know.
23        Q.    -- the procedure?
24        A.    I don't -- when you going -- it's

Page 338

1    not -- yeah, if you're going to say your procedure,
2    but it's not policy.  It's just one way or the
3    other -- I don't -- I can't tell you the reason of
4    why.  I can't be exact on the reasons of why.
5         Q.    Do you know if there was a written
6    policy as to how that evidence was supposed to be
7    transported?
8         A.    I'm sure there's a written policy.
9    There's a policy with everything in the department
10   of everything that we do.
11              From my understanding of the
12   policy is the assigned investigator and the
13   supervisor is responsible for taking the money
14   inside headquarters, not someone other than the
15   assigned investigator and then throwing the money,
16   listen, I just confiscated $5,000 and come out of
17   nowhere and he didn't even know we took it in the
18   house.  That's not a policy, that's our policy.
19        Q.    The narcotics squads, do you know how
20   many of them there were in the City?
21        A.    No, man, it's impossible for me -- I
22   mean, I've been out of this job and I can't give
23   you an exact answer to that.  I can give you the
24   structure of the Narcotics Field Unit, but you're

Page 339

1    talking about squads --
2         Q.    The number of squads, you don't know?
3         A.    You're talking about the Field Unit
4    squads.  You can go from the net teams, with the
5    addition of the narc -- the narcotics --
6         Q.    The Field Units?
7         A.    Are you talking about the Field Units
8    or are you taking about district level?
9         Q.    Field Unit.
10        A.    How many squads in it?  No, I don't
11   know to be exact.
12        Q.    Okay.  Where was your headquarters
13   when you were in narcotics?
14        A.    We moved around a lot, so it was kind
15   of hard to determine -- for me to remember where
16   we were and what different years.  We moved around
17   a lot.  We moved from Essington Avenue, we moved
18   from Bridge Street, and we moved in G and Hunting
19   Park.
20        Q.    Do you know where you were during the
21   time frame 2006 to April of 2011?
22        A.    2006 to April -- we moved around a few
23   times.  You talking about '6 and '11, that's a
24   big -- that's some years in there.

Page 340

1         Q.    Okay.
2         A.    So we may have moved from Southwest
3    Philly to G and Hunting Park to Bridge Street.  So
4    that time we moved around a whole lot.  When we
5    got separated because of our misconduct Brian
6    Reynolds went to North Philly and we went to
7    Northeast.  That would be myself, Thomas
8    Liciardello and Chet McCloskey -- Chester
9    Malkowski.
10        Q.    And what's the -- where was the
11   Arsenal?
12        A.    The Arsenal was at Bridge Street.
13        Q.    And was that one of the places --
14        A.    That was one of my -- that was one of
15   my final spots before I was arrested.
16        Q.    Okay.  Do you know how long you were
17   at the Arsenal before you were arrested?
18        A.    No, I can't be exact because we
19   were -- we were slipping back and forth from
20   G Street to the Arsenal.
21        Q.    Okay.  And was that particular
22   location -- was that shared by other -- any kind
23   of units or police officers besides just you?
24        A.    Uniformed strike force was there also.

31  (Pages 337 to 340)

Page 341

1    We shared a building with them.
2        Q.   Okay.  And would they share a locker
3    room?
4        A.   Yes.
5             I don't -- no, we -- yeah, we
6    might have shared a locker room.  It was the same
7    building.
8        Q.   Okay.  In preparation for this
9    deposition today, we'll start first with just
10   Mr. Pileggi for now, how many times did you meet
11   with Mr. Pileggi?
12       A.   Several times just because I reached
13   out to him.  That was one of my courses of doing
14   the right thing, moving in the right direction and
15   cooperating, because I knew I had to deal with
16   these civil cases.  I had his paperwork, his
17   lawsuits, and it had his office number on it, so
18   once I got out of jail I reached out to him and
19   told him I wanted to basically admit to my
20   actions, what was going on, and cooperate with
21   him.
22            So we met several times just
23   talking.  It wasn't a whole lot.  Just maybe once
24   or twice I met with him and he would ask me

Page 342

1    some -- some jobs that I had with them and I
2    admitted to the jobs.  That's basically what we
3    discussed.
4        Q.   So I'm just confused.  I thought you
5    said you met several times and then you said --
6        A.   Well --
7        Q.   -- once or twice.  How many times did
8    you meet?
9        A.   No.  We met maybe twice.  Twice --
10   yeah, about twice.  I can remember twice.
11       Q.   And you --
12       A.   About two or three times.  I would
13   say -- not a whole lot, but sporadically we
14   met.
15       Q.   At his office?
16       A.   No, I never went to his office.  He
17   came -- I asked him -- I said listen, I can't move
18   around a lot, can you come to my house and he said
19   no, I can't really -- I mean, I'll come to your
20   house.  At the most maybe two or three times he
21   may have came to the house.  Then I'll talk to him
22   on the phone and -- when he couldn't come by out
23   of the times.
24            Because -- the only reason why

Page 343

1    he came to my house because I couldn't leave the
2    house, I was under house arrest, and when the
3    times I could leave I had no transportation.  So
4    it was convenient for him the times he did come to
5    see me he came by the house, and that was maybe
6    two to three times.  Anything but that -- besides
7    that point we talked on phone.
8        Q.   How long did the house arrest last
9    after March of 2016?
10       A.   I stopped June the 9th.
11       Q.   Of -- June -- so you were on house
12   arrest about three months or so?
13       A.   Yes.
14       Q.   And did you review documents with
15   Mr. Pileggi?
16       A.   He showed me some documents because he
17   asked me questions about the particular jobs and I
18   asked to see the -- I demanded to see the
19   documents before -- I wouldn't admit to anything
20   until I saw it in front of me, and then I picked
21   out the mistakes within the documents that were
22   shown to me and I went from there.
23       Q.   But you went over the Torain case
24   then, right?

Page 344

1        A.   He showed me documents of the Torain
2    case, but I -- first I just -- you know, he asked
3    me about the Torain case and I told him things
4    that I remembered in the Torain case.  Then he
5    showed me documents and I said I don't remember
6    that, I was no part of that, but I remember I was
7    part of this and this happened.
8        Q.   And he was asking you about something
9    that happened 16 years ago, correct?
10       A.   Some cases I remember.  I mean, this
11   is how my memory is.  I think when I was talking
12   to the Federal Government they were amazed at my
13   memory in, how my memory was and a lot of detail
14   in a lot of things that were going on.
15       Q.   Did the Federal Government provide you
16   with documents to look at also?
17       A.   Yes, they provided me a lot of
18   documents, and again, some documents I put to the
19   side and I said that job was done right, there was
20   no issue with this job, this was a good job, we
21   had issues with -- we had issues with this job, we
22   had issues with this job.  So it was like picking
23   the ones out that I could remember.
24       Q.   The Torain case -- there were

Case 2:14-cv-01643-RBS    Document 61-9    Filed 06/29/22    Page 112 of 159

McIntyre v. Liciardello, et al./Torain v. The City of Phila., et al.        JEFFREY WALKER- CONTINUED, 9/16/16

Page 345

1 documents marked the other day including Walker-6.
2                    - - -
3          (Whereupon, a discussion was
4 held off the record.)
5                    - - -
6 BY MR. SANTARONE:
7      Q.   In this case -- this is primarily --
8 this is Officer Monaghan's job?
9      A.   Yes.
10     Q.   And how did you work -- how were you
11 working with Officer Monaghan?
12     A.   He was part of the squad I was in.
13          MR. KRASNER:  Mr. Santarone,
14 I'm sorry to interrupt.  It is 1:00 now.
15          MR. SANTARONE:  Oh, sure.
16          MR. KRASNER:  Since we are
17 ending at 3:30, can we do a 45 minute lunch
18 now?
19          MR. SANTARONE:  Absolutely.
20                   - - -
21          (Whereupon, a luncheon recess
22 was taken, after which time the deposition
23 resumed.)
24          (Whereupon, Judge Diamond

Page 346

1 entered the courtroom.)
2                    - - -
3          MR. KRASNER:  Your Honor,
4 the -- I and Mr. Popper and some of the
5 other plaintiffs' counsel just returned from
6 lunch.  When we went to lunch, we went to
7 the lunch in the company of Jeffrey Walker.
8 We did this essentially because Mr. Walker
9 has expressed, and is his own counsel, on a
10 number of occasions that he was concerned
11 about his safety and because he was concerned about
12 being intimidated, and in fact, that was the
13 reason why he asked the depositions be
14 conducted here.
15          When we left, we all went to
16 Pagano's, which, as the Court knows, is a
17 rather familiar watering hole for lunch in
18 the federal system, and the plaintiffs'
19 attorneys essentially sat together at one
20 end of the restaurant.  We noted after we
21 arrived that the defense attorneys and the
22 defendants in particular went to the same
23 place, and there was really no issue with
24 anyone except for one of the defendants, and

Page 347

1 that issue was the following:
2          While the whole group of them
3 went and sat at a location that was on the
4 opposite side of the restaurant, Michael
5 Spicer, Sergeant Spicer in the white shirt,
6 walked away from them, came alone and went
7 by several -- I shouldn't say several, he
8 went by at least two or three empty tables
9 that were there and sat immediately next
10 to -- when I say next to, sat at the table
11 closest to where Mr. Walker was.
12          I, frankly, saw it.  I was
13 facing it, and I took it as being
14 intimidating behavior, and Mr. Walker, who
15 is his own counsel, said to me that he would
16 like some kind of a protective order, and
17 perhaps he should go to 34 South 11th to try
18 to get some kind of protective order.
19          At that point I said look, if
20 you want me to convey that to the Court I
21 will do so.  I did, by the way, take a
22 photograph from my position so that if the
23 Court cares to see it you can see how close
24 Mr. Spicer was.  You can see that there was

Page 348

1 no particular reason why tables that were
2 empty behind the spot where he was sitting
3 could not have been used, and I do think it
4 presents an ongoing issue in a case where,
5 for example, Thomas Liciardello was actually
6 denied bail based upon allegations of
7 intimidating witnesses in a criminal matter.
8          So I do think it's a matter of
9 some significance, and I believe that it
10 would be Mr. Walker's request that there
11 would be some sort of specific protective
12 order aiming at preventing any sort of
13 proximity that might be intimidating.
14          JUDGE DIAMOND:  Mr. Santarone?
15          MR. SANTARONE:  I wasn't there.
16 I stayed in this room the entire time.  This
17 is the first I'm hearing about it.
18          JUDGE DIAMOND:  Do you want to
19 speak to your clients before you address me.
20          MR. SANTARONE:  Oh, okay.  I
21 mean, I will tell you that I will do
22 whatever you say.  I will tell them -- I
23 will instruct them to stay -- not to sit
24 near him.  I will instruct them not to look

33 (Pages 345 to 348)

McIntyre v. Liciardello, et al./Torain v. The City of Phila., et al.          JEFFREY WALKER- CONTINUED, 9/16/16

Page 349

1    at him. I'll instruct them --
2        JUDGE DIAMOND: You need to
3    instruct them that if I think a witness in a
4    Federal proceeding is being interfered with
5    I will refer it to the appropriate law
6    enforcement agency. Please. And so
7    instruct them. Tell them to stay away from
8    the witnesses in this case. Can I be
9    clearer than that, sir?
10       MR. SANTARONE: No, Your Honor.
11       JUDGE DIAMOND: Thank you.
12           - - -
13       (Whereupon, Judge Diamond left
14   the courtroom.)
15           - - -
16   BY MR. SANTARONE:
17       Q.   Mr. Walker, did you ever speak to the
18   FBI about the Torain case?
19       A.   No.
20       Q.   And you didn't testify --
21       A.   But -- I take that back. I don't
22   recall if I spoke to them about that. We spoke
23   about a lot of things, a lot of jobs, but when I
24   was talking to Michael Pileggi and he asked me

Page 350

1    about a Torain case, it refreshed my recollection.
2    I knew it by him -- just having the discussion
3    that I had with him, and I remember before seeing
4    the paperwork specific things that I remember
5    about the case that I had done misappropriately.
6        Q.   Okay. But to your -- to your
7    recollection, and I think the record would show,
8    you didn't talk to the FBI about the Torain case.
9        A.   I'm telling you I don't recall if I
10   did or did not.
11       Q.   And the Torain case was never brought
12   up in the criminal trial where you testified for
13   three days, correct?
14       A.   I don't believe it was, no.
15       Q.   So the first time that the Torain case
16   came to your mind was after you spoke with
17   Mr. Pileggi 16 years after these incidents? Is
18   that the first time you thought about the Torain
19   case, was 16 years after --
20       A.   No, when I would be -- when he -- I
21   reached out to Mr. Pileggi and he -- and we had a
22   discussion. I said listen -- I discussed with him
23   what I was trying to accomplish, and he says okay,
24   do you remember this case and the specifics about

Page 351

1    the case briefly, and I added more to what I did,
2    because I have a good memory of remembering
3    things, especially in most cases that I've done
4    things, about that case.
5        I told him, and then when he
6    came to my home, because I instructed him to come
7    to my house because I could not leave, and he
8    showed me the Torain case, the basic paperwork and
9    the property receipt, and I looked at stuff and I
10   basically pointed out what was wrong in the cases
11   that I was -- participated in.
12       Q.   So at some point after March 2016, is
13   that the first time you thought of the Torain
14   case?
15       A.   I thought about it a whole lot,
16   Counselor. Again, I don't know --
17       Q.   When did you --
18       A.   Can I finish answering the question?
19       Q.   I'm just asking when you thought about
20   it.
21       A.   I thought about it a lot after I was
22   arrested. I had plenty of time. Again, I can't
23   recall if I remember I discussed it with the
24   Federal Government because a lot of cases we went

Page 352

1    over, a lot of cases involving the group that I
2    was with, and -- but I know when I got out of
3    prison, reached out to Michael Pileggi.
4        Like I said, before I told him
5    what I was -- wanted to accomplish and I had --
6    his return conversation with me, listen, I have a
7    case that you were involved in, do you remember
8    it, and he said the name and I said yeah, I
9    remember that job. I remember what I did wrong.
10       Then I said well, listen -- I
11   gave him the option, it was never him telling me,
12   listen, I need for you to come see me, come see my
13   house, because I cannot leave the house, I don't
14   feel safe leaving the house. At the time I was
15   talking to him I couldn't leave the house anyway,
16   but when I could I told him -- I said I don't feel
17   safe leaving the house. He said okay, I'll come
18   by, and before he said okay for me to come by, and
19   I said yeah, come by, and -- and he showed me the
20   case and I pointed out things within this
21   investigation that I done.
22       Q.   And you thought about it before 2016
23   but you don't remember that you raised it with the
24   FBI as a case that you were talking about.

34  (Pages 349 to 352)

Page 353

1    A.  I discussed a lot of things with the
2 FBI. Okay? And I could have discussed the Torain
3 case with the FBI but I don't remember exactly in
4 detail, but I know when someone brings something
5 to my attention regardless if it's then or now, if
6 I remember it's part of me being very truthful --
7 truth-worthy, I'm going to remember it and I'm
8 going to tell you what I know about the case.
9    Q.  The -- in the time that you were in
10 narcotics, how many cases do you think you were
11 involved in? Hundreds? Thousands?
12    A.  Hundreds.
13    Q.  And this wasn't your case, right, this
14 was --
15    A.  No, I was part of that case but I
16 wasn't the assigned on that case.
17    Q.  Looking at I think what was marked as
18 6, it's the investigative report, do you have that
19 in front of you?
20    A.  Yeah, it's the 75-49.
21    Q.  Look at page four.
22    A.  Yes.
23    Q.  If you look at that, if you look at
24 the second full paragraph it talks about a search

Page 354

1 warrant that was executed on January 4th. Do
2 you see that?
3    A.  Yes.
4    Q.  And it says 2000. Do you see that?
5    A.  The second?
6    Q.  It says 1/4/2000?
7    A.  Yes. That's a typo because it was
8 2001, but go ahead.
9    Q.  That's a typo, right?
10    A.  Yes.
11    Q.  And if you go down to -- a couple of
12 paragraphs it says 1/5/2000. It talks about the
13 execution of another search warrant. They're
14 different locations, correct?
15    A.  Yes.
16    Q.  And on the search -- the 1/5 on the
17 report it talks about what was recovered from 1628
18 North 55th Street, correct?
19    A.  Yes.
20.    Q.  You said that Officer Monaghan -- I
21 think you said Officer Monaghan never stole
22 anything?
23    A.  Not in my presence. That don't mean
24 he hasn't stole anything.

Page 355

1    Q.  Okay.
2    A.  I'm being honest who I stole with.
3    Q.  You never saw him doing it?
4    A.  No.
5    Q.  Do you know if he had any --
6    A.  But I -- go ahead.
7    Q.  What?
8    A.  Go ahead. That's okay.
9    Q.  Do you know if he had any prior
10 dealings with Kareem Torain before this particular
11 job?
12    A.  Not that I know of.
13    Q.  Did you have any prior dealings with
14 Kareem --
15    A.  No.
16    Q.  -- Torain before this particular job?
17    A.  No.
18    Q.  Officer Monaghan directed that you
19 follow the Bonneville, correct?
20    A.  I don't know who directed, but I was
21 participating in the investigation, so I would
22 agree with you, yes --
23    Q.  Okay.
24    A.  -- follow the Bonneville and see where

Page 356

1 it's going.
2    Q.  Did Officer Monaghan direct that you
3 arrest Kareem Torain?
4    A.  No, he did not.
5    Q.  And who made that decision?
6    A.  I don't know who made the decision. I
7 know he was stopped. I was not there, so I can't
8 tell you who made that decision.
9    Q.  Okay.
10    A.  I was sitting on the location -- the
11 55th Street address, 1628. Never left.
12    Q.  So the details about what happened at
13 that stop or what information Officer Monaghan may
14 have had when he directed the Bonneville be
15 stopped, you don't have any of that information,
16 right?
17    A.  The information that I had I gave to
18 Monaghan, and again, the information that he was
19 leaving, the articulation didn't come in until
20 after he got there and he was securing the
21 location after the stop, and that's when the lie
22 came up with the light and the males exiting the
23 location and one seen with the golf ball size
24 object in their hand placing it in their jacket

35 (Pages 353 to 356)

McIntyre v. Liciardello, et al./Torain v. The City of Phila., et al.          JEFFREY WALKER- CONTINUED, 9/16/16

Page 357

1    pocket as they're walking out the door.
2        Q.   The seeing somebody walk out with a
3    golf ball size object, did that never happen or
4    that did happen?
5        A.   No, that's one of the lies we use all
6    the time.
7        Q.   Do you have a specific recollection of
8    getting out of the car at that apartment house
9    when Mr. Torain went into it, to walk along the
10   side of the building?
11       A.   Walk alongside of the building?  No, I
12   have no recollection of that.  I know I walked
13   alongside the building when we was orchestrating
14   the lie to make sure when they were in the
15.  apartment that I could see the apartment from the
16   street.
17       Q.   Okay.
18       A.   You can't just say you see a light
19   come on and you found out later where you see a
20   light come on it's impossible for you to see it
21   from the street.  So I can remember walking
22   alongside with Monaghan and the other officers to
23   orchestrate the lie that we was used to make sure
24   it was more believable for me to see a light that

Page 358

1    come on 3:30 in the afternoon.
2        Q.   Do you remember walking along the side
3    of that building, whether you did or not 16 years
4    ago, walked along that side of that building
5    before you walked along with Monaghan and showed
6    him --
7        A.   I don't think I did.
8        Q.   -- where the apartment was?
9        A.   I showed him -- he knew where the
10.  apartment was because he came to the location
11   because the information was going back and forth
12   for where they went, where Mr. Torain went.  When
13   it came to secure the location, they accessed
14   inside the location and they -- from being inside
15   the location they found out what the apartment
16   was, and then me and him had a discussion of
17   fabricating how I knew -- he knew this was the
18   apartment.
19       So that's when I got -- I
20   remember getting out, looking at the window where
21   I could be parked at to see this light come on,
22   and then after that part came in I said okay, we
23   got that part together, let's get into the part
24   where we believe there's drugs in here.  That's

Page 359

1    where the golf ball size object what I believe to
2    be narcotics come from.
3        Q.   Do you know why Officer Monaghan
4    directed that Kareem Torain be stopped?
5        A.   I don't -- I can't -- I can't be in an
6    officer's mind other than -- I'm not the assigned
7    investigator.
8        When Monaghan was with Police
9    Sergeant Kelly they went back to the location, and
10   you talk about stealing, I have stole with Police
11   Officer Kelly and the point of this is when
12   Monaghan went back to that location with Police
13   Officer Kelly, we're doing an operation, and
14   within an operation we know it was -- it's money
15   involved.
16       So from -- since we were going
17   to steal it, for me on the outside looking even
18   though I did not go into the house at the time
19   they went in there, that something was going to be
20   taken or something was going to go on that was not
21   right.  I believe that.
22       And that's where the lie came
23   across of listen, we need to connect these dots
24   because we are in this house and from the street,

Page 360

1    okay, you can see the light come on.  All right,
2    that's good, now what's next.  Well, you need to
3    see some type of drug activity coming from this
4    location.
5        Q.   The -- so you don't know -- you
6    weren't involved -- you don't know what was found
7    in the house, or you don't know that anything was
8    stolen from the house, correct, this is your
9    speculation?
10       A.   Yes.  Yes.
11       Q.   And you don't know what Monaghan might
12   have known that led him to have Kareem Torain
13   arrested when he was pulled over, correct?
14       A.   I don't know what he may have had, but
15   I believe if he -- if he stopped him for something
16   of drugs that gave him probable cause to go in the
17   house, my assumptions was, you asking my opinion,
18   that's why at the time I believe he went back to
19   the house and went in the house, because I was not
20   there when he got stopped.  You know what I mean?
21       So my belief was he must have
22   something because he went back to the location and
23   found out where he came from, and that's where the
24   lie came in, the part where, listen, I need for to

36 (Pages 357 to 360)

McIntyre v. Liciardello, et al./Torain v. The City of Phila., et al.                    JEFFREY WALKER- CONTINUED, 9/16/16

Page 361

1   say I seen the light come on and this guy came out
2   with drugs.
3        Q.   Did you ever discuss with Monaghan,
4   hey, why do you -- why do you want to arrest this
5   guy?
6        A.   Listen, we were stealing.  I don't ask
7   nobody how they do their investigations.
8        Q.   You didn't steal anything on this job,
9   though --
10       A.   No.
11       Q.   -- right?
12       A.   No.  If somebody going wrong --
13  talking about corrupt cops you got to understand
14  this, if something wrong you ain't questioning
15  that.
16       Q.   Do you know whether Monaghan -- you
17  don't know whether Monaghan had some kind of
18  personal issue with Torain?
19       A.   I know Monaghan -- well, a personal
20  issue with Torain?  No, I don't know that part.
21       Q.   Okay.  The -- if you look at the PARS
22  report -- do you see that?  Do you have that
23  marked as an exhibit?
24       A.   No, I don't have PARS, I got the

Page 362

1   75-49.
2        Q.   Okay.  This is NFU 5401 to 5422.
3            MR. SANTARONE:  Do you want to
4   mark that whatever the next one is.
5                    - - -
6            (Philadelphia Police Department
7   Arrest Report marked Plaintiff's Exhibit
8   Walker-7 for identification purposes.)
9                    - - -
10  BY MR. SANTARONE:
11       Q.   If you look at the top of it, it talks
12  about Police Officer Monaghan received detailed
13  information from a confidential source and 19th
14  District Officers P/O Ronald Cain and Joseph
15  Goglielmucci --
16       A.   Goglielmucci.
17       Q.   Were you involved in that at all?
18       A.   No.  I could have been in that -- I
19  could have been there but no.  I know where it --
20  I remember where the information came from.  It
21  came from someone Goglielmucci arrested.  That
22  would probably be the source, and he's giving him
23  stuff that was going on, and Monaghan wants to be
24  an investigator in that.

Page 363

1        Q.   And it says Monaghan and Kelly set up
2   surveillance in the area of 5600 West Master
3   Street.  Were you involved in that surveillance?
4        A.   No.
5        Q.   The first mention of you in that -- in
6   this is on the -- page three of the PARS.  It
7   talks about a stop that you had made and Hodge was
8   placed under arrest.  Do you see in the middle of
9   it?
10       A.   This is all bunched up.  What are you
11  talking about?
12       Q.   Just about the middle if you look it
13  says -- starts out with Reynolds and then PO
14  Walker.
15       A.   Can you do the approximate?  I can --
16  if you narrow it down.
17       Q.   I'm sorry, what?
18       A.   Do the approximate time on it.  It
19  got -- it says approximate time -- it would say
20  approximate time officers did whatever.
21       Q.   Yeah.  The approximate time I think is
22  3:17 if you go up.  It's in that paragraph.
23           MS. FUREY:  We should all have
24  copies.

Page 364

1            THE WITNESS:  Yeah, I see it,
2   it's 3:17.
3   BY MR. SANTARONE:
4        Q.   What is that stop?  What do you --
5   what's that refer to?
6        A.   I don't know.  You got me at 3:17.
7        Q.   Well, go down to where it says PO
8   Reynolds and Walker.  Do you see that?  Do you
9   want me to show it to you?
10       A.   Yeah, show it to me.
11       Q.   Okay.  We're on 3, right?
12       A.   Uh-huh, right here.  You're up here.
13  17.  3:17.
14       Q.   See this right here?
15       A.   Uh-huh.
16       Q.   Okay.  Do you see where I've indicated
17  it talks about your involvement?  I think that's
18  the first time you're listed on this PARS report.
19       A.   Yes.
20       Q.   What's occurring there?
21       A.   Somebody getting arrested.
22       Q.   Okay.  And how was it that you were
23  involved in that arrest, do you remember?
24       A.   Probably information given from the

37 (Pages 361 to 364)

Case 2:14-cv-01643-RBS    Document 61-9    Filed 06/29/22    Page 117 of 159
McIntyre v. Liciardello, et al./Torain v. The City of Phila., et al.

JEFFREY WALKER- CONTINUED, 9/16/16

Page 365

1  assigned to stop him, because I know these
2  individuals -- I can remember these individuals
3  were stopped prior to doing the warrant.
4        Q.   And who gave you the information to
5  stop them?
6        A.   Could have been Kelly, could have been
7  Monaghan, I don't know exactly who.
8        Q.   Okay.
9        A.   Because whoever was doing the
10 surveillance is seeing them, following them,
11 stopping them.
12       Q.   Under that it says -- if you go down
13 to the end of that paragraph it says PO Monaghan
14 tried one of the keys from Torain's ring in the
15 lock at apartment two and he opened the lock.
16       MS. FUREY:  I have an
17 objection.  None of us have copies of what
18 you're -- what you're reading, and usual and
19 customary is that you bring copies for the
20 other attorneys, which you don't seem to
21 have.
22       MR. SANTARONE:  I know.  Look,
23 Mr. Pileggi should be most concerned about
24 it.

Page 366

1        MS. FUREY:  I know, but it's
2  still nice to -- you're asking questions
3  about something and I don't have a copy of
4  it.
5        THE WITNESS:  Where are you at
6  with this?
7  BY MR. SANTARONE:
8        Q.   Do you see where I am?
9        A.   No.
10       Q.   Okay.
11       A.   Come and show me.  It will be good,
12 you stay here with me.
13       Q.   This one?
14       A.   Yeah, I got you.
15       Q.   Do you know where Monaghan had gotten
16 the keys from Kareem's key ring?  Do you know how
17 he secured it?
18       A.   I believe he was stopped and he came
19 to the location with keys.
20       Q.   Okay.
21       A.   Where he got them from, again, I was
22 not there.  I can't tell you where -- exactly
23 where he got them from besides if it's missing in
24 his report, but my observations, I was not

Page 367

1  there --
2        Q.   Okay.
3        A.   -- so I can't confirm that.
4        Q.   It says the owner stated that no one
5  had rented the apartment, no one had permission to
6  be inside.  The apartment was secured pending
7  search and seizure.  Were you there when that
8  discussion was held or where anybody talked to the
9  owner of the apartment?
10       A.   I was not there during that
11 discussion.  Again, if I can refer back to the
12 report, his name was not mentioned.  It was a
13 description of a black male was named, and
14 that's -- the owner made that statement.
15       But again, why would you give a
16 description of someone if you have the person's
17 name already?  He could have easy came in the door
18 and said listen, do you know Kareem Torain living
19 at this location.  He's the owner and he knows
20 who's in and out there, or at least know them by
21 face --
22       Q.   I guess my question is --
23       A.   -- or face.
24       No.

Page 368

1        Q.   Okay.  Do you know whether the key
2  that --
3        A.   I don't know.
4        Q.   -- Officer Monaghan got from Torain's
5  key ring opened the door to this apartment?
6        A.   First of all, I don't know where the
7  keys came from.
8        Q.   Okay.
9        A.   I wasn't there during the stop, so I
10 can't answer that question if I not there --
11       Q.   Okay.
12       A.   -- how he came in with keys, and he
13 was inside the property and then he came back and
14 then we had that discussion.
15       Q.   Okay.  So what's in here about the
16 key -- where that key came from, that Torain had a
17 key that opened this apartment and that the owner
18 said no one had rented it and no one had
19 permission to be inside, you don't know anything
20 about that.
21       A.   I don't know nothing about that.
22       Q.   Okay.  And Torain was charged with
23 some weapon offense also?  Are you familiar with
24 that?

38  (Pages 365 to 368)

Page 369

1    A.   Know nothing about that.
2    Q.   Do you know whether or not that
3  happened?
4    A.   Know nothing about that.
5    Q.   You don't remember that he was charged
6  with a weapons offense?
7    A.   I know nothing about that. I'm not
8  the assigned investigator. Everything rests on
9  the assigned investigator. He's aware of all the
10  charges or anything. That's his responsibility.
11    Q.   Okay.
12    A.   My responsibility is to tell him what
13  happened. He puts that in the report.
14    Q.   You talked about an individual that
15  had to go to the hospital and the person had been
16  involved in an accident where he ran into a pole?
17    A.   No. We made -- the Police Officer
18  Liciardello caused the accident.
19    Q.   Was there damage to the vehicle that
20  the individual was in?
21    A.   Yeah, smashed the whole front of the
22  car at a -- in an electrical pole.
23    Q.   There -- are -- have there been times
24  in your job where force was required to apprehend

Page 370

1  a suspect and the suspect ended up going to the
2  hospital, where it was -- you were justified in
3  the use of force?
4    MR. KRASNER: Objection to the
5    form of question. It's compound.
6  BY MR. SANTARONE:
7    Q.   Were there times that you had to use
8  force that was justified to make an arrest?
9    A.   Yes.
10    Q.   And as a result of that the person
11  needed medical attention?
12    A.   All depends on the situation.
13    Q.   Are you able to say how many times
14  that somebody went to the hospital that you
15  arrested when your use of force wasn't justified?
16    A.   Countless. I can't remember.
17    Q.   Do you remember any --
18    A.   That was our normal for putting hands
19  on people when I feel I had to or --
20    Q.   Do you remember the names of anybody?
21    A.   Not off -- no. If you showed me you
22  have someone I can say yes, I did or yes, I
23  didn't.
24    Q.   But right now you can't name anyone.

Page 371

1    A.   No.
2    Q.   You talked about the relationship that
3  you had with Internal Affairs, and that you would
4  call over there -- you said you called over there
5  many times and they would tell you hey, this is
6  what the investigation's about so that people
7  could start preparing their stories?
8    A.   Yes.
9    Q.   Who at Internal Affairs gave you this
10  information?
11    A.   When you asking me something about
12  names, I'm just talking about what I've done. If
13  you want to look at the assigned investigator's
14  name who is handling the job, and I actually
15  called there and asked for the assigned
16  investigator -- well, whoever name is on there I
17  know he's the assigned investigator, and he has
18  reviewed the job and it's his job and I call and
19  discuss him -- he freely gives me information
20  about the job.
21    So if you want to find out who
22  that is, any job I have with a complaint, the
23  assigned investigator's assigned to the job and I
24  don't talk to no one but the assigned

Page 372

1  investigator.
2    Q.   Right, and I'm asking you is -- give
3  me the name of the assigned investigator. You
4  said you called them --
5    A.   I can't remember.
6    Q.   -- that many times.
7    A.   I can't remember. I moved them
8  multiple times and --
9    Q.   Give me anybody's name, then.
10    A.   I have no one's name.
11    Q.   You have no name of these people that
12  you called multiple times at --
13    A.   No. Look at the --
14    Q.   -- Internal Affairs?
15    A.   If you give me the report and I can
16  remember the job and see the assigned
17  investigator's name on there I can tell you that's
18  the guy I talked to.
19    Q.   Okay. But today you can't tell me one
20  name.
21    A.   No.
22    You realize I can't even
23  remember half the people's name in my squad and
24  you're talking about an assigned investigator on

Page 373

1    the jobs I've done way prior to my arrest. I
2    can't remember my sergeant's first name half the
3    time, and you're asking me about an assigned
4    investigator? Come on.
5        Q.   Well, then, this is somewhat -- talk
6    about your memory. Your memory's not good, then.
7        A.   My memory's good on certain events and
8    it's keyed by actions that sticks out in my mind.
9    Like, again, we talk about the time where me,
10   Thomas Liciardello, Brian Reynolds beat a guy and
11   Tommy rammed the guy's car into a telephone
12   pole -- not a telephone pole, it was a -- it could
13   have been a telephone pole, and these events will
14   spark my memory of exactly the course of the
15   events that happened.
16           It takes certain things to
17   spark my memory. You know what I mean? So it all
18   depends on what the conversation is and the person
19   name. It could be the location. It could be
20   anything could spark my memory but, you know, I'm
21   not perfect, you know what I mean, on certain
22   names. I'm more of events and -- events and the
23   situation.
24       Q.   Has talking to the attorneys in this

Page 374

1    case sparked your memory about certain cases?
2        A.   The only thing they -- if I ever
3    talked to an attorney, if they showed me something
4    and I remember it's cases they have shown me I
5    don't remember. I don't know nothing about it.
6    Only thing -- that's when dealing with CIs. You
7    might show me a case with -- about a situation
8    that I may have done something or may have not and
9    I'm going to give you an honest answer. Do you
10   know what I mean?
11           All depends on what I'm
12   reading. I can go on procedure. Procedure is --
13   okay. If you give me a location by the house I
14   can say okay, at that location I probably was
15   acting on information given to me by the CI. I
16   mean, it's impossible for me to see how I wrote
17   that up and give an honest answer that I could see
18   the person come into the door. You know what I
19   mean?
20           But the CI comes back at me and
21   told me listen, I sold it to a female -- I mean
22   it's a female I bought drugs from -- I bought
23   drugs from a female, and I didn't see that. I'm
24   acting on information. Just situations that I see

Page 375

1    if I don't remember the job know I did something
2    wrong.
3        Q.   After April 11th, 2011 you no
4    longer -- you moved to another squad. We've
5    established that, correct?
6        A.   Repeat that.
7        Q.   After April of 2011 you moved to
8    another squad or -- you moved to another squad?
9        A.   I chose another squad because of
10   situations, yes.
11       Q.   Okay. Did you have any cases that you
12   worked on after that date with any of the officers
13   involved in this case?
14       A.   I don't know if I did or didn't.
15       Q.   Okay.
16       A.   I may have been -- I don't know if I
17   did or didn't. New investigations or no?
18       Q.   Well, after April -- I guess what I'm
19   looking for is after April of 2011 what contact
20   and jobs did you work on with Officer Liciardello,
21   Spicer, Speiser, Norman, Betts or --
22       A.   Well, Norman ain't doing no jobs. I
23   can tell you that.
24       Q.   Okay.

Page 376

1        A.   So put him out of the way.
2        Q.   Okay.
3        A.   Tommy Liciardello, I wasn't allowed in
4    any of their jobs because it was isolated. They
5    isolated me. They didn't want me in no parts of
6    what was going on. I was on -- sorry. I was on
7    the outs. So I was doing jobs and they were part
8    of my jobs.
9        Q.   Okay. And first let's start with you
10   didn't work on any of their jobs. What specific
11   jobs did you have that they were part of, then,
12   after April of 2011?
13       A.   After? I don't think there was any,
14   but if I can understand the question more clearly,
15   nothing that I was working on that they was part
16   of.
17       Q.   Okay.
18       A.   But -- go ahead.
19       Q.   Were you involved in any of their jobs
20   that were going on after April of 2011 for the
21   individuals that I named?
22       A.   I don't know. You're saying April and
23   I can say 2011.
24       Q.   Well, and you --

40  (Pages 373 to 376)

McIntyre v. Liciardello, et al./Torain v. The City of Phila., et al.

JEFFREY WALKER- CONTINUED, 9/16/16

Page 377

1      A.    I mean, you're narrowing it down to
2   months. I can say 2011 I know I was in a
3   situation where they said I allegedly made a buy,
4   which was a total lie. So I didn't -- that could
5   have been 2011. That was close for me getting out
6   of there.
7      Q.    Okay. And the reason I'm using
8   April 2011 is because that's the date you've
9   testified to at the criminal trial at the grand
10  jury as when you left that unit, that squad.
11     A.    Okay.
12     Q.    Okay? That's why I'm using that date.
13     A.    Oh, okay.
14     Q.    So -- and just to make sure we're
15  clear, after April of 2011, you had no involvement
16  in any of the jobs that squad, your former
17  squad, was working?
18     A.    I don't believe so, no.
19     Q.    And they had no involvement in any of
20  your jobs.
21     A.    I don't believe so, no. Once I left
22  the squad I don't believe they had any involvement
23  with me or any of my jobs.
24     Q.    The lawsuit that was referred to by

Page 378

1   Mr. Pileggi that was filed -- he had filed a
2   series of lawsuits and it said you said -- you
3   said you were taken off the street for an entire
4   year?
5      A.    Not me. They were.
6      Q.    Who was?
7      A.    Thomas Liciardello and Brian Reynolds.
8      Q.    Okay.
9      A.    They were infuriated about that.
10     Q.    Were you involved with them at all
11  during that year that they were off the street?
12     A.    What do you mean involvement? We're
13  in the same squad.
14     Q.    Were they working cases?
15     A.    They were going to court. They were
16  off the street.
17     Q.    Okay.
18     A.    They couldn't lock anybody up.
19     Q.    Okay.
20     A.    We were still going to court for
21  cases.
22     Q.    So what would they -- what did they
23  do, spend the entire day in the office or --
24     A.    Yes, all going out drinking, whatever.

Page 379

1      Q.    Okay. But they weren't involved in
2   going to people's houses or doing work out in the
3   street.
4      A.    They couldn't do that.
5      Q.    Okay. Do you remember roughly when
6   that was?
7      A.    A little after 2001.
8      Q.    Where was your --
9      A.    During the lawsuits.
10     Q.    Where was your headquarters or your
11  locker room, or where were you stationed out of at
12  the time that was going on?
13     A.    Essington Avenue.
14     Q.    Essington Avenue?
15     A.    Yes.
16     Q.    The lawsuit that you -- that was
17  brought against Mr. Pileggi, that ended up -- it
18  was settled on behalf of Mr. Pileggi, correct?
19     A.    I don't know how -- what the
20  disposition of it. I know how it began.
21           Against Mr. Pileggi?
22     Q.    Yes.
23     A.    Yeah, that was a result of what he
24  done to us.

Page 380

1      Q.    And it settled, that case.
2      A.    I don't know -- I believe -- yeah, I
3   think I got money out of that.
4      Q.    Yeah, you got a little money out of
5   it.
6      A.    A little bit of the money.
7      Q.    The individuals that he had been
8   bringing cases against maybe -- against you -- the
9   civil lawsuits --
10     A.    Uh-huh.
11     Q.    -- were those individuals all drug
12  dealers?
13     A.    They were drug dealers. We were doing
14  them wrong. That's why I'm here now. It was on
15  my belief. They drug dealers.
16     Q.    The allegation regarding John Speiser
17  pulling a gun on you or pointing a gun at you --
18     A.    Pointed it at me.
19     Q.    -- where did that happen?
20     A.    When we were working.
21     Q.    In a car or --
22     A.    An unmarked car.
23           See, towards the tail end of
24  that they got frustrated. Somebody got to work

41 (Pages 377 to 380)

Page 381

1    with this man, and that would be me. And one day
2    I worked with Brian Reynolds. We got to talking.
3    The next day I worked with John Speiser. He
4    clearly did not want to work with me and I clearly
5    did not want to work with him.
6              We drove around and he said
7    listen, what these guys doing, let's go see what
8    these guys are doing. Listen, I'm going to do our
9    own thing. My phone rang. Went to the exclusive
10   lot and had to go to the bathroom. I went to the
11   bathroom. The phone rang -- I get back to the car
12   and he got a gun out.
13             I'm like what are you doing,
14   man? What's going on? He said I don't know
15   what's going on with you, you know. I just -- I
16   don't know what you're doing. And I said, you
17   know -- I forget what I said. I wanted to shoot
18   his ass but that wouldn't look good.
19             So what I did was we went into
20   headquarters. I was done. Not today. I brought
21   it to the sergeant attention. He basically said
22   get out of the squad. I brought it to Reggie
23   Graham's attention. He was another person in the
24   unit. We discussed -- he didn't really like Tommy

Page 382

1    at all. He said his choice words.
2              And then as I was in line
3    getting ready -- I don't know if I was getting
4    ready to leave but I know I was going to my
5    personal car and call John Hess at the time. I
6    had to call somebody. And his result was listen,
7    just be careful. Because I had told him I don't
8    know what's going on. You know what I mean? You
9    call me, come to me with all this, and now I got
10   people pulling guns on me. I don't know what's
11   going on.
12       Q.   And you said that when you got in the
13   car he had his gun out, and I guess did -- was the
14   gun pointing at you?
15       A.   It's like this. I'm going to point --
16   you know. That little hole right there pointing
17   at you, or is it pointed at you?
18             MR. KRASNER: Indicating for
19   the record the deponent has held up his
20   right hand in the position one would --
21   well, all right, with his pinky toward the
22   floor and with his index finger --
23             THE WITNESS: Up. I mean,
24   talking about thumb up --

Page 383

1              MR. KRASNER: -- pointed
2    horizontal to the floor in the same posture
3    as the traditional position of a pistol.
4    BY MR. SANTARONE:
5        Q.   Why wasn't it -- why was it that you
6    didn't want to work with John Speiser?
7        A.   I just didn't want to work with him.
8        Q.   Why?
9        A.   I can say if I don't want to work with
10   somebody. I don't have a personal reason, I don't
11   want to work with the guy.
12       Q.   Okay.
13       A.   I was working by myself anyway, and I
14   knew it was just a -- just work with this dude, he
15   complained about not having no partner. And
16   somebody had to get in the car with me, because I
17   was actually complaining, sarge, I need a partner.
18   You can't have me out there running around by
19   myself.
20       Q.   And you told Sergeant McCloskey
21   specifically that a gun was pointed at you?
22       A.   I said Sarge, he pointed a gun on me.
23   He said who? I says John. He got real quiet.
24   Listen, you got issues, just get out of the squad.

Page 384

1    Leave the squad.
2        Q.   And you called Agent Hess?
3        A.   Yeah, I did.
4        Q.   And told him?
5        A.   Yes.
6        Q.   Did you and Agent Hess ever discuss
7    that at any time after that one phone call?
8        A.   When I was arrested we was talking. I
9    said listen, guy pulling guns on me, had a lot
10   going on. Discussed it with Reggie Graham, people
11   I thought was close to me at the time.
12       Q.   And I guess, you know, you'd said you
13   didn't want to give anybody up, but telling a
14   federal agent that an officer pulled a gun on you
15   is a very serious --
16       A.   It was desperate.
17       Q.   -- accusation.
18       A.   I wasn't thinking clearly. If I was
19   thinking about it now I wouldn't have never called
20   him but when somebody pulls a gun on you, I don't
21   know -- I've been shot at before and I have a cop
22   that you working with pulling a gun on you, that's
23   kind of dramatic to me.
24       Q.   But you did report that to the FBI.

42 (Pages 381 to 384)

Page 385

1      A.   Yeah.
2      Q.   You mentioned yesterday that there was
3   informant or someone who --
4           MR. KRASNER:   It goes on and on
5           and on.
6   BY MR. SANTARONE:
7      Q.   -- ended up being killed because --
8           MR. KRASNER:   He just won't
9           quit.  He just keeps going on.
10  BY MR. SANTARONE:
11     Q.   -- with Tommy Liciardello giving his
12  name up?
13     A.   Yes.
14          MR. KRASNER:   For the record,
15          Mr. Spicer is sitting in the second row of
16          this courtroom.  He is staring directly at
17          me eye to eye and has been doing it so for
18          about two consecutive minutes.  This is not
19          the first time he's done it.  It falls
20          within a pattern of harassment and
21          intimidation that he engaged in as recently
22          as lunch, and if he does it again I'm going
23          to the Judge.
24          You may proceed.

Page 386

1           MR. SANTARONE:   Could you read
2           back that question.
3                    - - -
4           (Whereupon, a discussion was
5           held off the record.)
6                    - - -
7   BY MR. SANTARONE:
8      Q.   You mentioned an informant or someone
9   who ended up being killed?
10     A.   Yes.
11     Q.   Who was that?
12     A.   Who was what, who died?
13     Q.   Yeah.
14     A.   The guy that lived in the area of the
15  4200 block of Styles and who -- very irritating to
16  Thomas Liciardello.  Always had words with him.
17  Every time we were up that way they were shouting
18  back and forth.
19          And an investigation that we
20  had that started from that area carried onto the
21  2900 block -- off of 49th and Haverford.  During
22  that investigation these individuals was arrested.
23  Tommy took it behind hisself to tell these folks
24  that he arrested that this individual that lived

Page 387

1   in 4200 block of Styles gave them up.
2      Q.   Do you know that individual's name?
3      A.   No.
4      Q.   You talked about the safe that you
5   carried down the steps.  Was that the Kushner
6   case?
7      A.   Yes, it was.
8      Q.   And you said you threw it off a
9   bridge.  The Falls Bridge?
10     A.   One of those bridges.  It's right off
11  of Ridge Avenue.  It's actually -- the East Falls
12  are right -- homes are right there and there's a
13  bridge right there.
14     Q.   Okay.  Because you said -- you said a
15  train bridge.
16     A.   Well, that's why I looked -- what it
17  looked like, it looked like a train trestle
18  bridge, the metal bridges -- the steel bridges,
19  I'm sorry.
20     Q.   Okay.  There weren't train tracks on
21  the bridge.
22     A.   No.  No.  No.
23     Q.   Okay.
24     A.   I'm just using it as an example just

Page 388

1   what the bridge looks like so if you go in the
2   area you know it looks like one of those train
3   trestle bridges but it don't have -- it looked a
4   train trestle -- it looked like a train trestle
5   bridge, but it doesn't, it's cars go across it.
6      Q.   Regarding the Casciollo case, you said
7   that someone told you -- the FBI told you $210,000
8   was stolen from a suitcase?
9      A.   Casciollo?  I referred to him as the
10  Costa Rica guy.  If that's his name, that's the
11  one where Norman hung the guy up.  Is that
12  Casciollo?
13     Q.   Were you -- did you know at that
14  time --
15     A.   Is that Casciollo?
16     Q.   -- that there was a suitcase --
17     A.   Is that Casciollo?
18     Q.   Yeah, that's Casciollo.
19          Is that the one where --
20     A.   It is?
21     Q.   Yes.
22     A.   Okay.
23     Q.   It's -- I'm trying to determine -- you
24  said the FBI told you that someone had stolen

McIntyre v. Liciardello, et al./Torain v. The City of Phila., et al.    JEFFREY WALKER- CONTINUED, 9/16/16

Page 389

1    $210,000.
2        A.   No, they asked me are you aware of any
3    money taken from that location, or did you
4    participate in any money taken from the location.
5    I said no, I didn't get any money from that
6    location.
7            How this information came out,
8    I don't know if they told me, but I know it was --
9    it was a suitcase full of money that was taken
10   from that -- allegedly taken from that location,
11   and I was surprised to even hear that and where it
12   was and where I was in the apartment because it
13   was a lot of us in there, but it's not uncommon
14   for me not to know a lot of what goes on in these
15   houses or these I guess -- in a house or
16   apartments that I've been in.
17       Q.   But where did you get that figure,
18   $210,000?
19       A.   That's the number I heard.
20       Q.   From the FBI?
21       A.   I don't know where I heard it from. I
22   know I heard a Calvin Klein brief -- a Calvin
23   Klein suitcase with $210,000. I forgot where I
24   heard it from, but I know I heard it around the

Page 390

1    time -- I know the FBI told me are you aware of
2    any money, or did you participate in any money
3    taken from that job.
4        Q.   But you have no personal knowledge of
5    that.
6        A.   No.
7        Q.   And in the -- in the search of the
8    Casciollo residence, you were involved in the
9    actual search?
10       A.   I -- my job was beating up on --
11   trying to beat up on Casciollo when Norman hung
12   him off the railing, but I didn't do too much
13   search because he was watching him.
14       Q.   You said yesterday that Myra Hawkins
15   never stole anything.
16       A.   She never stole nothing.
17       Q.   Who was Myra Hawkins?
18       A.   She was a black -- the only female we
19   had in the squad at the time under Chet, Chester
20   Malkowski, and they dogged her out every chance
21   they got. That means Tommy Liclardello, Brian
22   Reynolds, they just dogged her out.
23       Q.   You talked about testimony -- you were
24   asked questions about testimony at forfeiture

Page 391

1    hearings. Can you name anyone who you testified
2    or anyone that you know testified falsely at a
3    forfeiture hearing and they lost their house?
4        A.   I watched them again in this. I can
5    go back from when the Affidavits are prepared, any
6    type of false statements or fabricated statements
7    that got the affidavit, the probable cause to do
8    an execution of a search warrant, what goes into
9    someone eventually losing their house, I don't
10   know if someone lost their house, but I know
11   affidavits that we have -- may have lied on may
12   have -- go into forfeiture court, and I can't give
13   you the disposition if they lost their house or
14   not.
15       Q.   Can you give me the name of anyone who
16   you knew that went to forfeiture proceedings?
17       A.   No, I can't give you that.
18       Q.   How about anybody who lost a vehicle?
19       A.   I know Kushner complained about not
20   having his car for a long time. That's the only
21   one I can remember. I don't know if he got it
22   back or not, but he took his car. Thomas
23   Liciardello took his car and held onto it for a
24   long time.

Page 392

1        Q.   You were asked about the Alfonzo
2    Edwards case by Mr. Pileggi? Do you remember
3    that? Alfonzo Edwards. Do you remember that?
4        A.   I don't remember that. The name rings
5    a bell, you got to -- the job and I can go for the
6    rest.
7        Q.   Well, you had said that you, Reynolds
8    and Liciardello were in the same car. Was it
9    unusual for three of you to be in a car at one
10   time?
11       A.   Oh, you're talking about the guy who
12   was beat, Alfonzo Edwards?
13       Q.   Yes.
14       A.   Yeah.
15       Q.   Was it --
16       A.   We always worked together.
17       Q.   So three of you would be in the car --
18       A.   Yes.
19       Q.   -- at the same time?
20       A.   Yes.
21            At the time I left it was --
22   the category was -- the squad was so small it
23   was -- it was Tommy, Brian in the car together
24   with John, and there was Perry and Mike together,

44 (Pages 389 to 392)

Case 2:14-cv-01643-RBS    Document 61-9    Filed 06/29/22    Page 124 of 159

McIntyre v. Liciardello, et al./Torain v. The City of Phila., et al.                    JEFFREY WALKER- CONTINUED, 9/16/16

Page 393

1    but as Tommy and Spicer got close it was Mike
2    Spicer and Tommy in the car with Reynolds and John
3    Speiser was in car with Perry, but when Kapusniak
4    came I can remember him being in the car with
5    Perry.
6              But this is from the outside
7    looking, but when I was there it was Tommy and
8    Brian in the car together and it was Mike Spicer
9    and Perry together.  John Speiser was always with
10   Tommy.  He's with Tommy in the car with him.
11        Q.    And who was the third person in their
12   car?
13        A.    In whose car?
14        Q.    Tommy's car, Thomas Liciardello.
15        A.    That was -- that would be -- that
16   would be John.  It was always three.  It would be
17   three, two --
18        Q.    Okay.
19        A.    -- three, two, and then when I was
20   working it would be probably me and Norman.  It
21   was -- you know, with -- towards the tail end
22   sometimes they had me in the car with them.  If it
23   was no car available I was in the car with them,
24   but most times I was in the car separate by myself

Page 394

1    or I was with Norman.
2        Q.    You said that some Internal Affairs
3    investigations were sustained that you were
4    involved in?
5        A.    Yeah, but it wasn't nothing about no
6    stealing and it wasn't nothing about no beating
7    nobody.
8        Q.    You talked about Kushner then becoming
9    friends and playing basketball.  Where did that
10   happen?
11        A.    Yeah.  That happened -- well, that
12   happened around a train station, Belmont train
13   station near Kushner's house, where after we
14   finished robbing him and Kushner was willing to
15   give us information they became friends.
16             And I can see from the outside
17   looking Kushner was scared to death of us, and he
18   was doing everything we -- he wanted us to do --
19   that we wanted him to do, and he stayed on the
20   good side.
21             It was like one of those
22   Dr. Jekyll, Mr. Hyde things.  We were -- you
23   were -- we came at you real hard, put hands on
24   you, threatened you, but once you started giving

Page 395

1    us information you never knew that ever happened
2    because we were best of friends and Tommy would
3    call you and he would have all different types of
4    conversations and stuff like that.
5        Q.    Did Kushner provide information that
6    was valuable in arresting other drug dealers?
7        A.    Yes.  He involved the Costa Rica --
8    the guy that got hung off the railing.
9        Q.    Casciollo?
10       A.    Yes.
11       Q.    If someone is arrested for drugs and
12   they are willing to give information about other
13   drug dealers or where they get their source of
14   drugs from, is that something that's commonly
15   done?
16       A.    Well, if a person is arrested he's
17   interrogated extensively.  That means you threaten
18   him and you put hands on him.  He has a choice,
19   you can give up or keep getting your ass kicked.
20   Excuse me.  And eventually a lot of times that
21   worked.  The guys gave up other guys.
22             And then when they were giving
23   up guys, from me witnessing them, they were being
24   used as sources of information, providing

Page 396

1    information on other drug dealers, and sometimes
2    these sources of information was used to call
3    other drug dealers to bring things to a location.
4        Q.    You mentioned the Michael Hall case,
5    and you said you did that job entirely by
6    yourself?
7        A.    Yes, I did.
8        Q.    Did you steal anything on that job?
9        A.    No, I did not.
10       Q.    And that was in 2010?
11       A.    Yes.
12       Q.    So you would still have been in this
13   -- in --
14       A.    Yes.
15       Q.    -- McCloskey's squad?
16       A.    I was on my way out, heading out the
17   door.
18       Q.    And you talked about McCloskey would
19   give keys to a house or a residence to go -- for
20   you to check it out or for the squad to check it
21   out --
22       A.    For who to check who out?
23       Q.    -- before a warrant was issued?
24       A.    Never gave me nothing.

McIntyre v. Liciardello, et al./Torain v. The City of Phila., et al.                    JEFFREY WALKER- CONTINUED, 9/16/16

Page 397

1      Q.   Okay.
2      A.   He gave it to Thomas Liciardello,
3  Michael Spicer.  That's the main ones I seen
4  giving it to them, go check them houses out, or
5  they -- they'll -- they controlled -- Tommy
6  controlled the squad.  Tommy's controlling the
7  squad.  So he'll go to the sarge and say listen,
8  sarge, we're going to check this spot out, and
9  he'll give them keys.
10     Q.   Who would give him the keys?
11     A.   The sergeant would give him the keys,
12  but if he had hold -- holding on anything that
13  they need, he would give it to them.
14     Q.   So what are the instances, then, where
15  you're saying McCloskey would call and yell at
16  Liciardello and the squad because you were in a
17  house?
18     A.   The sergeant wouldn't call and yell at
19  Liciardello, Liciardello would call the sergeant
20  and the sergeant would be yelling at him, but it
21  didn't -- Tommy was still doing what Tommy do, and
22  the sergeant would say call Otto, what are you
23  calling me for.
24          And that was -- I was only

Page 398

1  witnessing that part because I was out of the
2  squad in another squad and the sergeant was
3  hanging with us, and I was wondering why he
4  hanging with us and he got a squad, and they was
5  out there in the street by themselves.
6      Q.   So after April of 2011, you had no
7  involvement with anyone from your former squad but
8  you did have involvement with McCloskey?
9      A.   Who?  Who had involvement with
10  McCloskey, me?
11     Q.   You, after April of 2011.
12     A.   Why would I have involvement -- no, I
13  was --
14     Q.   Well, you said he was on the jobs you
15  were on.
16     A.   He was hanging out with another squad.
17  I was working with Sergeant Barrington's squad.  I
18  was wondering why this man was hanging out with
19  our squad when we had a job.  You have a squad,
20  what are you doing with us?
21     Q.   Yeah, that's what I'm saying.
22     A.   I'm not done.
23     Q.   After April of 2011, there were
24  times when your squad --

Page 399

1          MR. KRASNER:  Please finish
2  your answer.
3  BY MR. SANTARONE:
4      Q.   -- your squad had a job --
5          MR. KRASNER:  Please finish
6  your answer.  He's been cut off repeatedly.
7  Please finish your answer.
8          THE WITNESS:  I was working
9  with Sergeant Barrington.  That was after
10  Sergeant Gorman's squad.  I remember
11  distinctly.  We had a weed job, another weed
12  job, at 40th and Poplar.  Our squad was the
13  only squad there.  Sergeant Joe McCloskey
14  came and he clearly looked like he was
15  visibly disturbed, and I'm saying -- looking
16  at him like why is this man with us at this
17  job without them.
18          His phone rings and it clearly
19  was Tommy on the other end saying he was in
20  the house, and in my presence Joe McCloskey
21  said what are you calling me for, call Otto,
22  and I said nothing changed, and that's it.
23  BY MR. SANTARONE:
24      Q.   Were there any other instances other

Page 400

1  than that one instance where you were on -- either
2  working by yourself or with your squad and --
3      A.   Yeah, and --
4      Q.   -- Sergeant McCloskey was involved
5  after April of 2011?
6      A.   You keep on -- after April of 2011.
7  That's the time I left.  I'm --
8      Q.   Yeah.
9      A.   I was not involved with the squad
10  after that.
11     Q.   Okay.
12     A.   Okay?  In that situation.  I'm telling
13  you what happened before when I was in the squad.
14  That happened -- only time that it happened I was
15  gone from the squad.  It was after April 2011 when
16  I heard -- saw that incident happen.
17          Any time before that if I had a
18  chance to be with them in the house without a
19  warrant, Tommy would call the sergeant and you can
20  clearly hear the sergeant is telling us what are
21  you doing out there, and Tommy -- and Tommy will
22  say what Tommy wanted to say, and then he'll talk
23  to Otto, and then the sergeant will come out to
24  the location with Otto, and then everything -- as

46 (Pages 397 to 400)

McIntyre v. Liciardello, et al./Torain v. The City of Phila., et al.   JEFFREY WALKER- CONTINUED, 9/16/16

Page 401

1    the day course goes on, I guess everybody kissed
2    and made up and we move on.
3          Repeatedly we were always told
4    to go to South Philly. The sergeant would sit us
5    down, do not go to Roxborough, and we end up in
6    Roxborough. No matter where -- what the sergeant
7    did we did what we wanted to do, or at least Tommy
8    did what he wanted to do and we followed him.
9    That man had no control over our squad.
10         Q.   And the instance where you --
11   instances where you say that Sergeant McCloskey
12   would give you keys to a house where there wasn't
13   a warrant?
14         A.   Sergeant McCloskey didn't give me
15   nothing.
16         Q.   Okay. Did you see him do that --
17         A.   I wasn't special.
18         Q.   Did you see him give the keys to
19   someone?
20         A.   Yes.
21         Q.   And why -- what were the circumstances
22   that he gave the keys, do you know?
23         A.   Because they were going to another
24   house. Because they asked for them.

Page 402

1          Q.   And did Lieutenant Otto ever give them
2    keys?
3          A.   No, not that -- not that I can recall,
4    no. I don't think Otto was as dumb as McCloskey
5    was. Otto just -- I believe Otto just turned a
6    blind eye to what was going on because he was
7    constantly being called by Tommy saying they were
8    in a house and the sergeant was directing him to
9    talk to him.
10         MR. SANTARONE: Okay. That
11   ends my questioning for this phase.
12         MR. WILLIAMS: All right. Now,
13   did we say 3 or 3:30?
14         MR. KRASNER: 3:30 I believe.
15         - - -
16         (Whereupon, a discussion was
17   held off the record.)
18         - - -
19   BY MR. CHRISTIE:
20         Q.   I understand that we do not have and
21   we will not have your home address on this record;
22   is that correct?
23         A.   That's correct.
24         Q.   And you don't currently have a

Page 403

1    business address; is that right?
2          A.   No. I live in the City and County of
3    Philadelphia.
4          Q.   Where -- and I also understand that
5    hereafter you want to be served with papers that
6    are served by lawyers in this and the other cases
7    that are in front of Judge Diamond.
8          A.   Give them to me here.
9          Q.   How are we going to give them to you
10   if we don't have an address?
11         A.   I'm here right in front of you --
12         MS. FUREY: Do you have an
13   email?
14         THE WITNESS: I got an email
15   address.
16         MS. FUREY: Well, you put it
17   with the clerk and you'll get notice just
18   like we all do.
19         THE WITNESS: Okay.
20         MS. FUREY: Everything filed
21   you'll get notice of it through --
22         THE WITNESS: Yeah, I'm going
23   to do that. I'm talking about additional
24   paperwork as I'm asking for discovery, you

Page 404

1    can hand them to me here if you choose to,
2    but you can email them also.
3    BY MR. CHRISTIE:
4          Q.   I'd like to ask a couple points of
5    clarification.
6          A.   Yes.
7          Q.   When you testified yesterday and today
8    about Chet --
9          A.   Chester McCloskey?
10         Q.   Is that Chester --
11         A.   Chester Malkowski.
12         Q.   Malkowski. Can you spell Malkowski?
13         A.   It's killing me with these names.
14         Can I spell Malkowski?
15         Q.   Yes.
16         MS. FUREY: Chester is with the
17   Polish name. The Irish guy would never have
18   Chester. No Irish guy has a first name
19   Chester, so...
20         THE WITNESS: Chester
21   Malkowski.
22   BY MR. CHRISTIE:
23         Q.   Okay. When you use the word
24   Chester --

47 (Pages 401 to 404)

McIntyre v. Liciardello, et al./Torain v. The City of Phila., et al.                    JEFFREY WALKER- CONTINUED, 9/16/16

Page 405

1    A.    Chet is short for Chester.
2    Q.    And when you use Chet --
3    A.    Chet is short for Chester.
4    Q.    When you testified yesterday and today
5    about Chester, you were talking about Chester
6    Malkowski, correct?
7    A.    That's what I -- and we keep saying --
8    at times I say Chet I'm talking about Chester
9    Malkowski.
10   Q.    And when you testified yesterday and
11   today about Chet, you were talking about Chet
12   Malkowski, correct?
13   A.    No, I'm talking about the exact same
14   person, Chester. Everything's Chester. We
15   abbreviating each other's names.
16   Q.    You called him Chet, too, didn't you?
17   A.    I call him -- yes, we call him Chet,
18   Chester. I know him as -- mainly as Chet. It's
19   all one person. Anything with Chet in it is --
20   Chester or Chet, anything that sound like that is
21   Chester.
22   Q.    And he was one of the sergeants who
23   supervised you, correct?
24   A.    Yes.

Page 406

1    Q.    And you also were supervised at some
2    points in time by Sergeant Meehan?
3    A.    Meehan.
4    Q.    Meehan. Were you ever -- you were
5    also surprised by Sergeant Gorman; is that
6    correct?
7    A.    Yes.
8    Q.    And you were supervised by a Sergeant
9    Barrington?
10   A.    Yes.
11   Q.    And you were supervised by a Sergeant
12   Torpey, correct?
13   A.    Torpey?
14   Q.    Torpey, T-O-R-P-E-Y?
15   A.    The only thing I -- at times he
16   covered for us.
17   Q.    I'm sorry?
18   A.    He covered for us at times but he was
19   never my supervisor, immediate supervisor.
20   Q.    And in the Torain case you were
21   supervised by a Sergeant Genie was her name?
22   A.    Gessner.
23   Q.    Gessner.
24   A.    Genie Gessner.

Page 407

1    Q.    A female.
2    A.    Yes.
3    Q.    And is it your testimony that all of
4    these sergeants knew that you were regularly lying
5    as part of your job as a police officer?
6    A.    All these sergeants knew I was
7    regularly lying? The only person I can honestly
8    say that knew I was regularly lying was Chester
9    Malkowski.
10   Q.    And --
11   A.    The next sergeant that knew I was
12   doing some misconduct, I was doing it with other
13   members of my unit, was Joe McCloskey.
14   Q.    Were they the only two sergeants among
15   those who were supervising you who knew that you
16   were lying?
17   A.    That knew I was lying?
18   Q.    That's the question.
19   A.    I just told you, Chester Malkowski,
20   that I was lying and stealing with him. Who I was
21   doing something wrong, misconduct, as far as CIs
22   and all besides stealing was Joe McCloskey.
23   Q.    Okay. And did any of these other
24   sergeants that you've testified were supervising

Page 408

1    you, did they know about your criminal misconduct?
2    A.    I just told you.
3          The rest of them other than
4    those two?
5    Q.    Yes.
6    A.    I forgot. I did something with
7    Sergeant Meehan where something was taken out of a
8    house by Norman and he knew about it. It was
9    someone's property. It was actually a video box,
10   I guess a brain box of a video camera system, and
11   it was -- never had a property receipt. It was
12   actually taken from headquarters and put in
13   Norman's car and he left with it.
14   Q.    Now, you have in front of you the
15   Torain Complaint Mr. Pileggi showed you.
16   A.    Yes.
17   Q.    And you understand, do you not, that
18   that's one of the hundreds of cases in which you
19   are a defendant that are in front of Judge
20   Diamond?
21   A.    Yes.
22   Q.    What paperwork did Mr. Pileggi show
23   you concerning that Torain case when you met with
24   him privately?

48  (Pages 405 to 408)

Page 409

1    A.  Once he told me about the case and I
2    said I remember it I was shown the 49, what we see
3    here now, the search warrant.
4    Q.  Exhibit -- what number?
5    A.  6.
6    Q.  6.
7    A.  I was showed property receipts to
8    actually refresh my recollection.  The only thing
9    I told him what was wrong with them because
10   visibly something was wrong with them, and I asked
11   to see the search warrant, the one -- the house
12   that I set up on because I was part of that, and I
13   looked at it and I seen issues wrong with it and I
14   told him why I believe things were wrong with it
15   in the paperwork that I was part of doing.
16   Q.  And --
17   A.  Anyone else was part of, I have no
18   recollection of any of that.
19   Q.  And did Mr. Pileggi show you any other
20   Complaints that are in front of Judge Diamond
21   where you are a defendant?
22   A.  No.
23   Q.  Did Mr. Pileggi show you any other
24   paperwork from any of the other cases?

Page 410

1    A.  No.
2    Q.  You testified yesterday about a buy
3    that you did not make but where you were asked to
4    sign a voucher or paperwork stating --
5    A.  A voucher.
6    Q.  -- that you made it.
7    A.  It was a voucher.
8    Q.  A voucher?
9    A.  Yes.
10   Q.  And as I recall from your testimony,
11   the -- what you did witness was that a female
12   source bought drugs from the target?
13   A.  It was a female that I believe to be a
14   source.
15   Q.  And when did this occur where you
16   signed a voucher saying you bought drugs but did
17   not?
18   A.  Well, that came out in the trial.  I'm
19   sure you have that in the paperwork, where I said
20   I made a buy and I didn't, and it was involving a
21   female and the target male, and I admitted that I
22   lied and I went to court and lied, and I was given
23   a voucher by the sergeant who was there at the
24   location who seen the action.

Page 411

1    At the court I lied.  I said I
2    was with her, which I was never with her.  I was
3    at least 2 -- 2 to 300 yards away looking at them
4    where she got out the car and approached him
5    because she knew him.  She was the one setting him
6    up but they needed an officer to do a direct buy
7    from him and I was chosen to do that.
8    Q.  And when did that happen?
9    A.  Before I left the squad.
10   Q.  Before 2011?
11   A.  Before I left the squad.
12   Q.  Which squad?
13   A.  Joe McCloskey's squad.
14   Q.  That was in 2011, correct?
15   A.  Before I left the squad.  I mean, I
16   can't tell you what month it was.  It could have
17   been -- yeah, I believe it could have been 2011
18   but I have to see the paperwork -- I have to see
19   it.
20   Q.  How far before you left the squad did
21   this happen?
22   A.  Listen, before I left the squad.  I
23   can't tell you that.  Before I left the squad.
24   Q.  Was it ten years before?

Page 412

1    A.  No.  Let's be realistic.  Before --
2    after 2010, before I left the squad in 2011.
3    Let's narrow it down like that.
4    Q.  All right.
5    MR. CHRISTIE:  No further
6    questions at this time.
7    MR. BRIGANDI:  Are we in
8    agreement that I'm going to keep my
9    questioning limited to Torain and not go
10   into to the ML, the municipal liability
11   claim?
12   MR. KRASNER:  Please.
13   BY MR. BRIGANDI:
14   Q.  Good afternoon, Mr. Walker.
15   A.  Good afternoon, sir.
16   Q.  My name is Armando Brigandi.  In this
17   particular case, the Torain case, I represent the
18   City of Philadelphia as well as Officer Monaghan.
19   I'm going to limit my questions for now to the
20   underlying Torain case as well as Officer
21   Monaghan.
22   Just one additional rule that
23   I'll put out there is that if you let me finish my
24   question before you start your answer I'll do my

Case 2:14-cv-01643-RBS    Document 61-9    Filed 06/29/22    Page 129 of 159

McIntyre v. Liciardello, et al./Torain v. The City of Phila., et al.                JEFFREY WALKER- CONTINUED, 9/16/16

Page 413

1    best to let you finish your answer before I start
2    my next question so that she can record -- she
3    can't record two voices at once. Is that fair?
4        A.    That's very fair.
5        Q.    You mentioned yesterday that -- at one
6    point yesterday you mentioned that a lot of your
7    work, the work that you did with the squad, was
8    legitimate.
9        A.    Yes.
10       Q.    What percentage would you say -- over
11   the course of the years that you worked with the
12   Liciardello squad, what percentage of those jobs
13   in your mind were legitimate jobs?
14              MR. KRASNER: I'm going to
15       respectfully object to the form of the
16       question in that "legitimate" is a very
17       vague term.
18              However, you can answer.
19              THE WITNESS: A fair statement
20       would probably be, percentage-wise, like 70
21       percent.
22   BY MR. BRIGANDI:
23       Q.    Okay. Well, I —
24       A.    70, 75 percent.

Page 414

1        Q.    And the objection that Mr. Krasner
2    made is a fair one, and when I say legitimate I
3    mean that you guys aren't lying, aren't planting
4    stuff, aren't stealing stuff, and that what you
5    put on the paperwork is the truth. That's what I
6    mean by legitimate.
7        A.    I know what it is.
8        Q.    So 70 to 75 percent? Is that --
9        A.    70, 75 percent good jobs.
10       Q.    Okay. I'm trying to understand, what
11   is your basis -- well, first of all, let me ask
12   you this. The Torain job that we have in front of
13   us that Monaghan was the assigned, in your mind,
14   is that a legitimate job?
15       A.    No.
16       Q.    Okay. And can you explain to me why
17   it isn't a legitimate job specifically --
18       A.    My part in it --
19       Q.    -- based on your knowledge.
20       A.    Based on my knowledge, my part in it,
21   our discussion I had with the assigned of how we
22   can tie the apartment in that they enter prior to
23   doing the warrant, that is not legit, because we
24   already discussing something that ain't right.

Page 415

1    Regardless of what they stopped and got from him,
2    there's a discussion that we had.
3        Q.    Okay.
4        A.    Because my assumptions was, without
5    looking through the whole job, that they stopped
6    him with drugs. That's what brought them back to
7    the apartment to secure the house.
8              Once they had the drugs
9    already, we needed to tie it in from what we had
10   to what was in the apartment because they went in
11   the apartment before the warrant, and they needed
12   the light to come on and they needed to have the
13   belief of drugs was coming from the location from
14   what I saw with who came out of the location.
15   That's why I believe the job is not right.
16       Q.    And the discussion that you had,
17   you're talking about a discussion that you had
18   with Monaghan.
19       A.    Yes.
20       Q.    Okay. I believe you said earlier that
21   you didn't -- you didn't have previous occasions
22   where you and Monaghan were stealing together; is
23   that correct?
24       A.    I can't tell I stole anything with

Page 416

1    Monaghan. I never stole nothing with Monaghan but
2    I know I stole things with Sean Kelly.
3        Q.    Okay. Looking at the paperwork in
4    this particular case, what I'm referring to is
5    what's been previously marked as Walker-5 and the
6    PARS, which I believe we marked as -- was it
7    marked as Walker-2?
8              MR. BRIGANDI: Anyone remember?
9              THE WITNESS: The PARS?
10             MR. KRASNER: 6, I think.
11             THE WITNESS: It's Walker-7.
12   BY MR. BRIGANDI:
13       Q.    Walker-7.
14             All right. I want to refer to
15   Walker-5 which is the Affidavit of Probable Cause
16   that I believe was completed by Officer Monaghan.
17   Are you with me?
18             Okay, sir, do you have the
19   Affidavit of Probable Cause in front of you?
20       A.    Yes.
21       Q.    And I'm looking at -- what I'm looking
22   at is Bates stamped at the bottom 7471. You've
23   got that page?
24             MR. BRIGANDI: Thank you,

McIntyre v. Liciardello, et al./Torain v. The City of Phila., et al.                    JEFFREY WALKER- CONTINUED, 9/16/16

Page 417

1      Howard.
2            THE WITNESS: Yes.
3    BY MR. BRIGANDI:
4        Q.   In the first line there it says
5    Officer Monaghan received detailed information
6    from a confidential source. Do you have any
7    information, personal knowledge, that that
8    information that he received was not legitimate?
9        A.   No.
10       Q.   Okay. And without giving up -- and
11   please don't give up any -- the identification of
12   any confidential --
13       A.   Stop.
14       Q.   -- source --
15       A.   Stop.
16       Q.   -- or informant. Okay?
17       A.   Okay.
18       Q.   But sitting here now, do you know who
19   the identity of his confidential source is?
20       A.   No.
21       Q.   Okay. Going to the second paragraph
22   it appears that Officer Monaghan along with
23   Officer Kelly set up a surveillance of the area of
24   5600 Master Street on January 2nd, 2001. Do you

Page 418

1    see that?
2        A.   Yes.
3        Q.   Okay. Is it fair to say that you were
4    not a part of that surveillance?
5        A.   That's fair.
6        Q.   Okay. So you were not there, and
7    whatever they saw you don't know if they saw it or
8    didn't see it; is that correct?
9        A.   That is correct.
10       Q.   Okay. Now, going further down where
11   it says Wednesday, January 3rd, 2001, at
12   approximately 11 a.m. Monaghan and Kelly set up
13   surveillance for the locations of 5605, 5607 and
14   5609 West Master Street. Were you part of that
15   surveillance?
16       A.   No.
17       Q.   Okay. Is it fair to say that you did
18   not become involved in this particular
19   surveillance until the 4th of January; is that
20   correct?
21       A.   Yes.
22       Q.   Okay. And did you have a partner that
23   day?
24       A.   No.

Page 419

1        Q.   Were you in plainclothes or uniform?
2        A.   Plainclothes.
3        Q.   And I'm assuming since you're in
4    plainclothes you would have been in an unmarked
5    car.
6        A.   Yes.
7        Q.   Do you remember -- I know this was
8    many years ago. Do you remember the car you had?
9        A.   No.
10       Q.   Do you remember the color of the car
11   you had?
12       A.   No.
13       Q.   But you were in the car yourself.
14       A.   Yes.
15       Q.   I assume you have a radio?
16       A.   Yes. I believe so, yes. Yes, I have
17   a radio.
18       Q.   That's the only way you could
19   communicate with --
20       A.   I could communicate with cell phone,
21   too.
22       Q.   Okay. And in this particular
23   surveillance, do you recall who was giving you the
24   orders to do things such as follow cars and things

Page 420

1    like that or going to different locations?
2        A.   Exactly who?
3        Q.   Yeah.
4        A.   No, but I -- my assumption, but you
5    don't want that, but I don't know who -- exactly
6    who. My assumption is it could have been Police
7    Officer Monaghan or Police Officer Kelly because
8    there were working together.
9        Q.   You're assuming that but you're not
10   sure.
11       A.   I'm not sure.
12       Q.   Okay. I'm looking now at Bates
13   stamped page 7472. Are you there, sir?
14       A.   Yes.
15       Q.   Okay. Do you see at about the middle
16   paragraph where it begins on January 4th, 2000
17   Police Officer Kelly and Police Officer Monaghan
18   set up surveillance?
19       A.   Hold on.
20            Yes, got you.
21       Q.   Okay. Now, I want you to go about
22   halfway down that paragraph where the sentence
23   says the Bonneville who was being operated by a
24   black male. Do you see that sentence?

51 (Pages 417 to 420)

McIntyre v. Liciardello, et al./Torain v. The City of Phila., et al.

JEFFREY WALKER- CONTINUED, 9/16/16

Page 421

1    A.   Hold on.  I don't see that yet.  I
2  have to read the whole paragraph.
3              MR. POPPER:  The Bonneville.
4              THE WITNESS:  The Bonneville --
5  yes.
6  BY MR. BRIGANDI:
7    Q.   Okay.  So I'll read it to you.  The
8  Bonneville that was being operated by a black male
9  later identified as Kareem Torain was followed
10  back to 1621 North Conestoga Street by Police
11  Officer Walker where police observed Torain exit
12  his vehicle and enter 1621 Conestoga.
13              So the part that I just read,
14  sitting here today -- and I'm assuming Officer
15  Walker, that's you, correct?
16    A.   Uh-huh.
17    Q.   Did that happen?
18              MR. POPPER:  Yes or no.
19              THE WITNESS:  I'm sorry.
20              Yes.  That happened.
21  BY MR. BRIGANDI:
22    Q.   The next sentence says, Police
23  observed, and the name is cut off -- oh.  Police
24  observed Delee go immediately back to the

Page 422

1  corner of 56th and Master and get small objects
2  which he retrieved from his pocket to numerous
3  males and females in exchange for USC.
4              The part that I just read
5  there, do you know if that happened or not?
6    A.   I don't know because it was not me.  I
7  don't know.
8    Q.   Going to the very bottom of that page
9  it reads, At approximately 2 p.m. Police Officer
10  Reynolds observed Torain exit 1621 South Conestoga
11  and travel westbound on Hunter Street in a
12  Bonneville to the southwest corner of 55th and
13  hunter.  At this point Torain exited his vehicle
14  and entered into 1628 North 55th Street with --
15  and there's a name that I can't -- I can't read
16  because it's blocked out.
17              Were you privy to this
18  information that's contained in this paragraph
19  that I just read?
20    A.   That will be -- let me go back.  Can
21  you go back again?
22    Q.   Yeah.  It says at approximately 2 p.m.
23  Police Officer Reynolds observed Torain exit 1621
24  South Conestoga and travel westbound on Hunter

Page 423

1  Street in a Bonneville to the southwest corner of
2  55th and Hunter.  At this point Torain exited his
3  vehicle and entered into 1628 North 55th Street.
4  Do you see that?
5    A.   Yes.
6    Q.   Okay.  Do you know if that happened or
7  not?
8    A.   I don't know if the first part
9  happened, but the second part happened.
10    Q.   The second part where he entered into
11  1628 North 55th Street happened?
12    A.   Yes.
13    Q.   You saw that yourself?
14    A.   Yes.
15    Q.   Okay.  The next paragraph, At
16  approximately 2:05 p.m. police observed Delee
17  answer the pay phone on the northwest corner of
18  56th and Master Street and jog to the Buick
19  mentioned on January 3rd, 2000 along with Diggs
20  and Arthur Tillman.  Police Officer Walker
21  followed them to 55th and Hunter Street where they
22  parked the car on 55th Street.
23              All these males exited the
24  Buick and were admitted into the 1628 South 55th

Page 424

1  Street by Torain.  After approximately 20 minutes
2  all three males, Delee, Tillman, Diggs exited 55th
3  Street, with Delee placing a clear bag inside of
4  his jacket.  All three males go into the Buick and
5  were followed back to 55th -- 56th Street and
6  Master by Police Officer Reynolds.  Police
7  Officer Walker remained at 55th and Hunter watching 1628
8  55th Street.
9              Now, I know that's a long
10  paragraph I read, but is any of that information
11  contained in what I just read to your knowledge
12  inaccurate?
13    A.   Yes, the bundle, the bundle bag.
14  Everything else is accurate.
15    Q.   Okay.  And the bundle bag --
16    A.   Coming out of the house.
17    Q.   Okay.  And who gave that information?
18  Was that you?
19    A.   I believe I did, yes.
20    Q.   Okay.  I guess my question is, and
21  I'll cut this short, is there any inaccurate
22  information contained in this Affidavit of
23  Probable Cause that didn't come from you?
24    A.   That did not -- anything else other

52  (Pages 421 to 424)

Page 425

1    than what I said?
2        Q.   Anything else that's inaccurate
3    contained in this affidavit that didn't come from
4    you that you're aware of?
5        A.   No.
6        Q.   And I believe you mentioned yesterday
7    that one of the reasons -- and Michael Pileggi
8    asked you a question yesterday, one of the reasons
9    why you believe Torain was wrongfully convicted
10   was, one, because you put inaccurate information
11   on affidavit, but secondly, because the officers
12   entered the property before the search?
13       A.   Yes, on exigent -- they had -- I
14   believe they had exigent circumstances based on
15   the stop to go into this house and secure this
16   house.
17       Q.   Okay.  Now, if you look at this -- if
18   you go to the last page of this affidavit, and
19   it's Bates stamped 7474 --
20       A.   Yes.
21       Q.   -- you would agree with me that in the
22   middle paragraph there where it starts at
23   approximately 3:50 p.m. members of narcotics went
24   to 1658 North 55th Street to attempt to secure the

Page 426

1    apartment that Torain went into, you would agree
2    with me that it describes in there that they spoke
3    with the manager of a building who said that the
4    apartment was not rented and that should not have
5    been occupied.  That's contained in this
6    affidavit, correct?
7        A.   Yes.  Who said that's true?
8        Q.   I'm sorry?
9        A.   Who's saying that's true?
10       Q.   Okay.  Do you have any information
11   that that's not true?
12       A.   I was lying in there.  Who said it's
13   not true?  Who said it's true?  Other than -- if
14   I'm lying in this affidavit who is saying the rest
15   of this that I don't know about, is you're asking
16   me questions about, is true?
17       Q.   I guess my question might be unclear.
18       A.   You asked me about a question that I
19   have no knowledge and saying if it's true because
20   it's written down there.  What I say in this
21   affidavit is also written down and it's a lie.  So
22   you asked about a question about something else
23   that's written down and saying it possibly could
24   be true.

Page 427

1        Q.   Okay.
2        A.   I'm telling you, who could -- what
3    makes it true?
4        Q.   And I apologize because my question
5    was unclear.
6        A.   Okay.
7        Q.   You would agree with me that the fact
8    that the officers, including Monaghan, entered --
9    entered the residence at 1628 North 55th Street
10   with a key the day before the search warrant.  You
11   would agree with me that that information is
12   contained on the Affidavit of Probable Cause.
13       A.   Yes.
14       Q.   Okay.  And this affidavit is
15   approved -- well, let me ask you, who approves
16   Affidavits of Probable Cause for search warrants?
17       A.   It could be the Bail Commissioner, it
18   was a master judge -- a municipal judge -- it
19   could be a Bail Commissioner or a judge.
20       Q.   And whose job is it to present it to
21   the Bail Commissioner or judge, would that have
22   been Monaghan's?
23       A.   Yes.
24       Q.   Did Monaghan know that the information

Page 428

1    you put in this affidavit was false?
2        A.   Yeah, he knew.  Yes, he knew.
3        Q.   How did he know that?
4        A.   We had a discussion on it from my
5    part.
6        Q.   Okay.  And what exactly did you tell
7    him that was false?
8        A.   We had the discussion that he need --
9    he had a discussion with me he needed for the
10   light to be on, the observations about me, and
11   what was coming out of the house, the males coming
12   out of the house and drugs or any type of
13   situation like the bundle bag situation, the guys
14   coming out, placing a bundle bag into their jacket
15   pocket, whatever the 49 says, which never
16   happened.  The males did exit, but it, none of
17   that, ever happened.
18       Q.   Do you remember where this
19   conversation took place?
20       A.   On the scene.
21       Q.   When you say "the scene," what was the
22   address?
23       A.   Of 1628 North 55th Street.  North 55th
24   Street?  Yes, the house that they were -- went

53 (Pages 425 to 428)

McIntyre v. Liciardello, et al./Torain v. The City of Phila., et al.                JEFFREY WALKER- CONTINUED, 9/16/16

Page 429

1  into -- the apartment -- room they went into.
2        Yes, North, 1628 North 55th
3  Street.
4        Q.    So just so I'm clear, the two facts
5  that you fabricated and gave to Monaghan were the
6  fact that the light had to be on at 1628 North
7  55th Street --
8        A.    Yes.
9        Q.    -- and that the -- one of the males
10 came out with a bundle of -- again, a bundle.
11       A.    A golf ball size object believed to be
12 drugs.
13       Q.    Okay.  As a result of this job, to
14 your knowledge, was any money stolen?
15       A.    No, not from -- from my knowledge, no.
16       Q.    As a result of this job, were any
17 drugs planted?
18       A.    Not from my knowledge, no.
19       Q.    As a result of this job, were any
20 drugs illegally taken --
21       A.    And resold?
22       Q.    -- and resold by -- by --
23       A.    No, I didn't get to that part yet.
24 No.  No.

Page 430

1        Q.    About five more minutes, I promise
2  I'll finish.
3              When you and your unit -- and
4  the unit I'm speaking of is when you were with the
5  Liciardello unit --
6        A.    Yes, you're right about that.
7        Q.    Okay.
8              -- when you went out and did
9  jobs, who were you targeting?
10       A.    Mid-level and up.  Mid-level and up.
11 That means -- I'll put it in other terms because
12 people are not drug dealers.  A person who is
13 actually a caseworker and the caseworker actually
14 gets bundles to the street sellers, he would be
15 mid-level.  The caseworker goes to the boss, goes
16 to the boss, then you get the supplier.  We were
17 trying to always get the supplier.
18       Q.    All right.  Just so I understand your
19 question, you were targeting mid-level drug
20 dealers?
21       A.    And up, and to get to mid-levels we
22 had to get the street sellers.  That would be the
23 jump-out jobs.  The jump-out jobs we were actually
24 doing, they would talk and then they would give up

Page 431

1  the caseworkers.  Then from the -- we get enough
2  of the caseworkers, then we'll get the boss, and
3  then sometimes we get closer -- we can get the
4  boss, we can get the supplier.
5              Kushner was an example.
6  Kushner will probably be a boss, and he's
7  basically giving up who the people who he is
8  supplying to, the other suppliers.
9        Q.    So the ultimate goal was to get the
10 boss.
11       A.    No, to get the supplier.
12       Q.    Supplier.
13       A.    Yes.
14       Q.    Okay.  And in order to do that, you
15 had to target the mid-level drug dealers --
16       A.    Yeah.  Sometimes we target -- we
17 couldn't get the mid-level, we went down to the
18 bottom and got the street workers.
19       Q.    Okay.  Did you believe that when you
20 were involved in this particular job, the Kareem
21 Torain job -- and I realize that there were other
22 targets in this job -- did you believe that you
23 were targeting mid-level drug dealers in this
24 particular job?

Page 432

1        A.    I couldn't tell what we were targeting
2  because it wasn't my investigation.  Monaghan
3  could tell you that.  Evidently he went to a house
4  without a search warrant, so only he knows those
5  questions, not me.
6        Q.    Did you ever ask him who we were
7  targeting?
8        A.    I don't see -- when you're doing
9  something wrong and you know we have a
10 conversation doing something wrong you don't
11 critique no one else's job.  You keep your mouth
12 shut and you basically follow what's going on.  He
13 needed for me to do something and I did it.
14       Q.    Were you ever involved in a
15 surveillance or drug job where you knew that you
16 were targeting an innocent law abiding citizen?
17       A.    No.  Our target was to lock up drug
18 dealers.
19       Q.    Other than this particular job where
20 Monaghan -- where you worked with Monaghan, did
21 you work with Monaghan on other drug jobs?
22       A.    I don't know if I can recall that.  I
23 mean, he's worked in our squad with us.  There
24 could be other jobs out there, I don't know.  We

54  (Pages 429 to 432)

Page 433

1    all worked together in the squad.
2        When you say working with,
3    yeah, I worked with Monaghan in the car before,
4    but I'm sure Monaghan did other jobs that I'm not
5    clear if I was on any of those jobs.
6        Q.    Sitting here today, can you ever
7    recall -- other than this particular job, can you
8    ever recall feeding Monaghan false information and
9    then him going and creating an Affidavit of
10    Probable Cause other than this job?
11        A.    You're talking about information that
12    I received -- I don't remember if I did or I
13    didn't.  I don't know how many -- again, I don't
14    know how many jobs he may have been involved in
15    that he needed me to do that.
16        Q.    Sitting here today, can you ever
17    recall Monaghan providing you what you knew to be
18    false information?
19        A.    Providing me?
20        Q.    Yeah.
21        A.    He never provided me anything, I
22    provided for him.  We had a discussion.  He asked
23    me to do something and I did it.
24        Q.    So the answer to my question would be

Page 434

1    no?
2        A.    I'm sorry?
3        Q.    The answer to my question would be no?
4        A.    I told -- explained it to you.  So we
5    can get it clear, he needed for me to do something
6    and I did it.
7        Q.    Understood.
8            How many times over the years
9    have you testified in court, and specifically the
10    CJC?
11        A.    How many times I've testified in
12    court?
13        Q.    Yeah.  And, you know, I understand
14    it's not going to be an exact number but --
15        A.    I'm not going to give you an exact
16    number.
17        Q.    Yeah.
18        A.    I was in court every -- almost every
19    day.  Testifying?  Maybe a handful of times,
20    because a lot of times we went to court every day
21    and cases got continued or whatever the
22    disposition was, but I'd say let's go in a week.
23    I may have testified at the most twice, twice a
24    week.

Page 435

1        Q.    Out of your entire career?
2        A.    No, listen.
3            MS. FUREY:  A week he said.
4            THE WITNESS:  A week.  I'm
5    going by a week.
6    BY MR. BRIGANDI:
7        Q.    Oh, I'm sorry.  All right.
8        A.    A week.  I'm in court every day.
9        Q.    You were a narcotics officer for 14
10    years?
11        A.    Yes.
12        Q.    Is it fair to say that you testified
13    in court -- Criminal Court thousands of times?
14        A.    Yes.
15        Q.    Okay.  Of those thousands of times,
16    percentage-wise, what percentage involved perjured
17    testimony by yourself?
18        A.    You're talking percentage.  Like I
19    said, we did -- 75 percent of the jobs we did was
20    good -- 70, 75 percent was good.  So I fall into
21    the exact same situation with them because I
22    worked with them.
23            We did a lot of good jobs.  We
24    did a lot of good jobs out there.  So I can't sit

Page 436

1    here and tell you I lied on 80 percent of my jobs,
2    which was not true.  I mean, I did a lot of good
3    jobs where I told the truth, and there are some
4    jobs I did where I lied and I stole.
5        Q.    So if 70 to 75 percent of your jobs
6    were legitimate, is it fair to say that if you had
7    to come and testify in the other jobs, 20 to 25
8    would --
9        A.    Yes.
10        Q.    -- would involve perjury?
11        A.    Yes.  Perjury, stealing, beating.
12        Q.    The last question, other than
13    Mr. Pileggi, were there any other attorneys
14    involved in this matter that you met with prior to
15    your deposition both yesterday and today?
16        A.    I met with a group of them.  I went to
17    the office.  I don't know -- I forget whose office
18    it was.  We all sitting and I basically informed
19    them I was representing myself and I was going to
20    cooperate with cases that would be presented to
21    me.
22            Nothing was given to me in
23    writing or showed do you remember this case.  No,
24    none of that happened.  It was -- I was giving my

55 (Pages 433 to 436)

Page 437

1 introduction, telling them listen, I'm
2 representing myself and I'm here to cooperate and
3 be truth-worthy of what I am a defendant in the
4 cases with.
5     Q.   And you don't remember whose law
6 office it was?
7     A.   No, I don't remember who exactly law
8 office it was.
9     Q.   When did this meeting take place?
10    A.   I can't tell you when. It was -- I
11 don't know exactly when, but I know it was before
12 this. About a month, a month before this.
13    Q.   About a month before this dep?
14    A.   A month or two, yes. Yes.
15    Q.   Was Mr. Krasner present?
16    A.   Krasner?
17    Q.   Yeah.
18    A.   Who is that?
19         Him? Yeah.
20    Q.   Was Mr. Williams present at the --
21    A.   Yeah, the whole -- the group -- the
22 group of whoever is involved in the lawsuits
23 against me. I'm a defendant. We all got
24 together. I told Mike listen, I'll get together

Page 438

1 with your colleagues because I want to cooperate
2 on these incidents. I know I'm a defendant. No
3 one's promising me anything. I just want to make
4 it very clear what my intentions are so I can move
5 on with my life.
6     Q.   Understood.
7     A.   So I had to meet with everybody so
8 everybody can be on the exact same page.
9     Q.   Understood.
10         How many times did those
11 meetings take place?
12    A.   Once.
13    Q.   Okay. And did anyone --
14    A.   And I signed a form for that.
15    Q.   What kind of form did you sign?
16    A.   To show that I understand that I'm a
17 defendant in these cases, and I can't word for
18 word what it says but it's just -- you know, I'm
19 a -- clearly I'm a defendant in these cases and
20 I'm being sued and I said okay, I'm going to sign
21 it. I read it thoroughly and I signed it.
22    Q.   Who set that meeting up, if you know?
23    A.   I don't know. I know I asked Mike and
24 Mike was working with whoever he was talking to

Page 439

1 and next thing you know I was at the meeting.
2     Q.   Did any of the attorneys indicate that
3 they would release you from their case, meaning
4 they'll drop the claim against you?
5     A.   No. I'm being sued.
6         MR. BRIGANDI:  Sir, I
7 appreciate your time. I have nothing
8 further.
9         THE WITNESS:  Thank you.
10
11
12
13         - - -
14
15         (Whereupon, at 3:35 p.m. the
16 deposition was adjourned.)
17
18         - - -
19
20
21
22
23
24

Page 440

1         C E R T I F I C A T E
2
3 COMMONWEALTH OF PENNSYLVANIA  :
4                 :  SS
5 COUNTY OF PHILADELPHIA      :
6
7
8         I, ROBIN FRATTALI, Registered
9 Professional Reporter - Notary Public, within and
10 for the Commonwealth of Pennsylvania, do hereby
11 certify that the proceedings, evidence, and
12 objections noted are contained fully and
13 accurately in the notes taken by me of the
14 preceding deposition, and that this copy is a
15 correct transcript of the same.
16
17
18
19
20 ROBIN FRATTALI
21 Registered Professional
22 Reporter - Notary Public
23
24

56 (Pages 437 to 440)

McIntyre v. Liciardello, et al./Torain v. The City of Phila., et al.                JEFFREY WALKER- CONTINUED, 9/16/16

Page 441

1      INSTRUCTIONS TO THE WITNESS
2           Read your deposition over carefully
3      It is your right to read your deposition and make
4      changes in form or substance.  You should assign a
5      reason in the appropriate column on the errata
6      sheet for any change made.
7           After making any changes in form or
8      substance which have been noted on the following
9      errata sheet along with the reason for any change,
10     sign your name on the errata sheet and date it.
11          Then sign your deposition at the
12     end of your testimony in the space provided.  You
13     are signing it subject to the changes you have
14     made in the errata sheet, which will be attached
15     to the deposition before filing.  You must sign it
16     in front of a witness.  Have the witness sign in
17     the space provided.  The witness need not be a
18     notary public.  Any competent adult may witness
19     your signature.
20          Return the original errata sheet to
21     your counsel promptly.  Court rules require filing
22     within thirty days after you receive the
23     deposition.
24

Page 443

1      SIGNATURE PAGE
2
3           - - -
4
5      I hereby acknowledge that I have
6      read the aforegoing transcript, dated September
7      16, 2016, and the same is a true and correct
8      transcription of the answers given by me to the
9      questions propounded, except for the changes, if
10     any, noted on the Errata Sheet.
11
12          - - -
13
14
15
16
17     SIGNATURE: _____
18          Jeffrey Walker
19     DATE: _____
20
21     WITNESSED BY: _____
22
23
24

Page 442

1      ERRATA SHEET
2      Attach to Deposition of:  Jeffrey Walker
       Taken on:  September 16, 2016
3      In the matter of:  McIntyre vs. Liciardello,
       Torain vs. City
4
5      PAGE    LINE NO.    CHANGE      REASON
6      _____
7      _____
8      _____
9      _____
10     _____
11     _____
12     _____
13     _____
14     _____
15     _____
16     _____
17     _____
18     _____
19     _____
20     _____
21     _____
22     _____
23     _____
24     _____

57 (Pages 441 to 443)

**A**

a.m 218:7 418:12
abbreviating
405:15
abiding 432:16
ability 250:19
334:13
able 276:22 314:9
321:4 370:13
absent 280:16
Absolutely 345:19
accessed 358:13
accident 236:17
237:5 369:16,18
accomplish 350:23
352:5
accurate 424:14
accurately 440:13
accusation 293:6
384:17
accusations 283:13
297:9
accuse 295:19
acknowledge 443:5
acting 279:17
374:15,24
action 217:3,8
231:5 234:7
244:11 410:24
actions 244:21,22
274:4 341:20
373:8
activity 234:6,6
250:17 251:3,4
252:15,23 253:18
254:10,14 266:21
266:22 296:11,15
327:20 360:3
actual 390:9
added 276:20 351:1
addition 339:5
additional 300:19
403:23 412:22
address 348:19
356:11 402:21
403:1,10,15
428:22
adjourned 439:16
admit 333:16
341:19 343:19
admits 314:3
admitted 342:2
410:21 423:24
adult 441:18
Affairs 230:2,21,23
231:20,22,23

232:8 233:19
237:3,11,19
238:11,15,18,20
239:15,16 242:20
243:1,15,20 371:3
371:9 372:14
394:2
affiant 299:14
affidavit 264:13,22
274:6 391:7
416:15,19 424:22
425:3,11,18 426:6
426:14,21 427:12
427:14 428:1
433:9
affidavits 391:5,11
427:16
afford 329:24
330:22 331:19
aforegoing 443:6
afternoon 358:1
412:14,15
agency 349:6
agent 384:2,6,14
agents 333:23
agents' 336:1
ago 233:9 344:9
358:4 419:8
agree 312:24 333:2
355:22 425:21
426:1 427:7,11
agreement 224:1
412:8
ahead 246:2 282:6
287:9 354:8 355:6
355:8 376:18
aiming 348:12
ain't 330:24 331:1
361:14 375:22
414:24
al 217:5
alcohol 310:21
alcoholic 310:24
322:22
alcoholism 310:17
Alfonzo 233:14
392:1,3,12
alike 300:24
allegation 380:16
allegations 305:11
310:11 324:19
348:6
allege 330:21 331:4
allegedly 256:1
258:7 377:3
389:10
alleviate 260:2

allowed 255:4
260:18 273:22,24
290:12 376:3
alongside 357:11
357:13,22
amazed 344:12
amount 295:18
amounts 295:12
and/or 223:9
281:11
Andre 297:6,14,17
297:19 298:24
299:21,22,23
Angie 269:22 270:3
annually 225:15,15
answer 223:3
228:22,24 229:3
246:2 286:15
313:6,13 314:9,9
333:7 335:7
338:23 368:10
374:9,17 399:2,6
399:7 412:24
413:1,18 423:17
433:24 434:3
answering 313:16
351:18
answers 228:21
316:12 322:1
443:8
anybody 286:7
323:6 325:1
329:10 367:8
370:20 378:18
384:13 391:18
anybody's 372:9
anymore 247:9
263:1 268:5
271:11 274:23
anyone's 257:11
anyway 298:6
352:15 383:13
apartment 288:19
357:8,15,15 358:8
358:10,15,18
365:15 367:5,6,9
368:5,17 389:12
414:22 415:7,10
415:11 426:1,4
429:1
apartments 389:16
apologize 427:4
APPEARANCES
219:1 220:1 221:1
appears 277:12
417:22
apply 224:17

appreciate 439:7
apprehend 369:24
approach 235:4
259:17
approached 411:4
appropriate 349:5
441:5
approved 427:15
approves 427:15
approximate
363:15,18,19,20
363:21
approximately
218:7 418:12
422:9,22 423:16
424:1 425:23
April 307:11,15
308:2,4,17 322:3
322:6 339:21,22
375:3,7,18,19
376:12,20,22
377:8,15 398:6,11
398:23 400:5,6,15
arbitration 293:9,22
Arch 220:12
area 256:9 277:5
281:21,22 297:13
297:14 363:2
386:14,20 388:2
417:23
arises 234:4 254:8
Armando 220:10
412:16
armando.brigand...
220:14
arrest 222:15 244:6
265:17 266:5,9
275:12 276:14
281:5 302:12
308:18 321:16
325:19 328:24
335:14 343:2,8,12
356:3 361:4 362:7
363:8 364:23
370:8 373:1
arrested 232:22,23
232:23 236:11
247:11,18 265:16
265:21 266:14,17
292:14,21 300:1
308:9,16 318:11
321:17,19 325:5
329:3 340:15,17
351:22 360:13
362:21 364:21
370:15 384:8
386:22,24 395:11

395:16
arresting 296:13
395:6
arrests 227:14
arrived 346:21
arrogant 247:4,12
Arsenal 340:11,12
340:17,20
Arthur 423:20
articulate 238:2
276:9
articulated 276:11
articulation 234:10
356:19
asked 239:12 240:4
245:7 247:21
254:4,7 303:15,16
303:17 311:20
313:8,9,23 314:16
314:17 326:19
332:13 342:17
343:17,18 344:2
346:13 349:24
371:15 389:2
390:24 392:1
401:24 409:10
410:3 425:8
426:18,22 433:22
438:23
asking 287:19
316:5,11,12
327:15 332:7,16
335:9 337:20
344:8 351:19
360:17 366:2
371:11 372:2
373:3 403:24
426:15
ass 297:20 328:19
381:18 395:19
assign 441:4
assigned 338:12,15
353:16 359:6
365:1 369:8,9
371:13,15,17,23
371:23,24 372:3
372:16,24 373:3
414:13,21
assignment 298:13
assistance 275:6
310:4,6,10 322:14
323:7
Assistant 220:12
221:8
assume 229:13
419:15
assuming 419:3

SUMMIT COURT REPORTING, INC.
215.985.2400 • 609.567.3315 • 800.447.8648 • www.summitreporting.com

420:9 421:14
assumption 420:4
420:6
assumptions
360:17 415:4
Attach 442:2
attached 441:14
attempt 281:6
425:24
attention 246:16
257:11 353:5
370:11 381:21,23
attorney 219:6
260:17 300:3
326:19 327:15
374:3
attorneys 346:19
346:21 365:20
373:24 436:13
439:2
automatically
254:18
available 393:23
Avenue 317:10
339:17 379:13,14
387:11
aware 225:7 236:23
237:1,2 242:21
243:17 260:4
264:16,18 292:22
369:9 389:2 390:1
425:4

___ B ___
back 227:15 229:7
235:2,13 237:7
238:12,14 239:7
239:17,20 243:10
243:17 251:18
259:18,18,23
261:13 264:17
270:10 271:1
275:16 281:23
282:1 290:17
291:12,13 292:10
292:10 293:9,18
293:21 304:16
306:17 308:1
310:19 312:17,20
318:4,9,10,12
320:3 321:2,3,5,5
330:2,16 333:21
334:24 336:8,13
340:19 349:21
358:11 359:9,12
360:18,22 367:11
368:13 374:20

381:11 386:2,18
391:5,22 415:6
421:10,24 422:20
422:21 424:5
backup 275:10
bad 235:24 236:21
236:22 293:14
317:2 328:20
BADGE 217:11,12
217:14
bag 295:3,3,20
424:3,13,15
428:13,14
bagged 295:2,15
bags 294:19
bail 348:6 427:17
427:19,21
ball 356:23 357:3
359:1 429:11
balls 284:7
bar 320:8 329:20
330:23 331:19
332:12
Barr 219:17
Barrington 308:13
399:9 406:9
Barrington's
273:18 308:13
398:17
Barry 284:24
bartender 329:20
Basara 220:4
base 227:16
based 228:19
276:19 348:6
414:19,20 425:14
basement 283:17
basic 226:10 351:8
basically 225:21
226:10 227:14
230:12 235:6,20
237:7 239:1,4
240:1 251:19
252:3,4,18 257:20
263:14 310:12
311:17,19 341:19
342:2 351:10
381:21 431:7
432:12 436:18
basing 251:19
basis 414:11
basketball 268:2
394:9
Bates 416:22
420:12 425:19
bathroom 381:10
381:11

BD 276:12
beat 233:10 235:21
235:23 242:3
373:10 390:11
392:12
beaten 236:21
beating 267:15
390:10 394:6
436:11
becoming 394:8
beer 310:19 323:1
began 379:20
beginning 218:7
224:16 262:23
306:15 311:6,15
314:14 333:18
begins 227:17
420:16
behalf 296:24
379:18
behavior 290:18
347:14
belief 360:21
380:15 415:13
believable 357:24
believe 231:6 233:2
236:10 242:15
244:8,13,20
249:18 276:12
287:8 293:23
295:5 296:10
299:14,17 305:17
305:24 318:21
328:8 329:17
348:9 350:14
358:24 359:1,21
360:15,18 366:18
377:18,21,22
380:2 402:5,14
409:14 410:13
411:17 415:15,20
416:6,16 419:16
424:19 425:6,9,14
431:19,22
believed 247:12
281:16 299:15
317:2 429:11
believing 320:12,12
bell 392:5
Belmont 394:12
benefiting 253:1,3
253:4,11
BEREZOFSKY
219:20
best 267:18 334:13
395:2 413:1
better 239:3 266:9

Betts 220:22
270:19,20 280:6,8
282:10 284:22
290:23 291:10
337:3,10 375:21
big 256:21 288:11
288:12 320:17
339:24
bill 261:11 330:23
bills 331:5,7
biographic 250:11
bit 280:13 311:15
318:3,5 380:6
black 272:11
367:13 390:18
420:24 421:8
Blackburn 284:5
blamed 237:4
blank 262:10,14
263:14
Blaylock 297:6,14
297:17,19 298:24
299:9
blind 402:6
block 234:17
235:20 296:7
386:15,21 387:1
blocked 422:16
board 228:6 230:11
230:18 232:17
267:12
Bonneville 355:19
355:24 356:14
420:23 421:3,4,8
422:12 423:1
boss 283:8 430:15
430:16 431:2,4,6
431:10
bosses 247:3
bottom 261:22
269:20 277:9
321:24 416:22
422:8 431:18
bought 259:4
374:22,22 410:12
410:16
Boulevard 221:3
bounced 308:11
box 408:9,10
boxes 294:20
BOYCE 219:15,16
boys 292:3
brain 408:10
break 305:12
333:19
breaking 263:20
Brian 220:21

221:13 234:15
256:24 258:10
259:13,19 265:11
270:13 282:9
284:18,21 285:2
285:20,20 288:11
288:11,24 299:19
300:23 306:19
307:21 311:7
340:5 373:10
378:7 381:2
390:21 392:23
393:8
bridge 219:16
234:12 236:3,5
339:18 340:3,12
387:9,9,13,15,18
387:21 388:1,5
bridges 387:10,18
387:18 388:3
brief 235:11 389:22
briefly 351:1
Brigandi 220:10
222:9 228:17
245:2,15,23 412:7
412:13,16 413:22
416:8,12,24 417:3
421:6,21 435:6
439:6
bring 239:17
300:17 365:19
396:3
bringing 337:17
380:8
brings 353:4
Brittney 219:19
broad 219:11 220:6
306:14
broke 293:17
broken 305:9,10
308:1
brother 299:23
317:9,13
brothers 299:20
300:24 311:8
brought 233:9
238:21 239:7
242:17,20 247:14
257:11 260:16,17
261:1 296:24
300:5 317:2
350:11 379:17
381:20,22 415:6
Brown 292:5
buddies 265:22
267:17
Buick 423:18,24

Case 2:14-cv-01643-RBS   Document 61-9   Filed 06/29/22   Page 139 of 159

McIntyre v. Liciardello, et al./Torain v. The City of Phila., et al.

JEFFREY WALKER- CONTINUED, 9/16/16

424:4
building 234:11
    341:1,7 357:10,11
    357:13 358:3,4
    426:3
bullshit 321:9,12,14
bunch 246:19
bunched 363:10
bundle 424:13,13
    424:15 428:13,14
    429:10,10
bundles 430:14
burglary 276:13
business 317:9
    319:6,8,18 320:21
    320:23 326:8
    403:1
buy 252:1 253:5,14
    255:7,12 257:17
    257:24 258:7,8,17
    258:17,19 259:17
    262:6,15,21 263:2
    263:6,17 270:5,6
    270:8 277:3 377:3
    410:2,20 411:6
buying 261:12
buys 252:5 256:17
    276:6
bypass 296:7
bypassed 232:24
Byrne 218:4

C

C 440:1,1
Cain 362:14
call 234:3 251:11
    270:6 282:12,17
    282:18,18,24
    283:2 371:4,18
    382:5,6,9 384:7
    395:3 396:2
    397:15,18,19,22
    399:21 400:19
    405:17,17
called 225:21
    238:24 276:17
    304:3 327:11
    328:5 330:4,4
    371:4,15 372:4,12
    384:2,19 402:7
    405:16
calling 272:10
    283:2 397:23
    399:21
Calvin 389:22,22
Camac 219:3
camera 408:10

cancer 302:12
cap 284:3
capacity 217:15
car 226:7 235:4,13
    236:1,7,8,16
    257:8,21 259:19
    267:11 270:14,15
    273:8 291:8,9
    296:8,9 297:12,15
    337:11 357:8
    369:22 373:11
    380:21,22 381:11
    382:5,13 383:16
    391:20,22,23
    392:8,9,17,23
    393:2,3,4,8,10,12
    393:13,14,22,23
    393:23,24 408:13
    411:4 419:5,8,10
    419:13 423:22
    433:3
career 306:16
    311:16 435:1
careful 382:7
carefully 441:2
cares 347:23
carried 266:2
    272:23 290:18
    305:7,8 336:13
    386:20 387:5
carries 327:8
carrying 273:15
cars 259:10,11,14
    259:14,15 270:16
    296:7 388:5
    419:24
Casciollo 388:6,9
    388:12,15,17,18
    390:8,11 395:9
case 225:23 233:8
    233:15,18,22
    236:12 237:12
    238:17,23 242:2
    244:19 262:19
    294:12 295:17
    296:23 299:1,1,3
    299:6 301:8
    343:23 344:2,3,4
    344:24 345:7
    348:4 349:8,18
    350:1,5,8,11,15
    350:19,24 351:1,4
    351:8,14 352:7,20
    352:24 353:3,8,13
    353:15,16 374:1,7
    375:13 380:1
    387:6 388:6 392:2

396:4 406:20
    408:23 409:1
    412:17,17,20
    416:4 436:23
    439:3
cases 238:23
    250:18 341:16
    344:10 351:3,10
    351:24 352:1
    353:10 374:1,4
    375:11 378:14,21
    380:8 403:6
    408:18 409:24
    434:21 436:20
    437:4 438:17,19
caseworker 430:13
    430:13,15
caseworkers 431:1
    431:2
casual 241:5
catch 298:22
category 392:22
caught 235:19
    267:20
cause 226:9 234:12
    244:6 251:19
    264:13,22 280:16
    296:14 360:16
    391:7 416:15,19
    424:23 427:12,16
    433:10
caused 235:14
    315:11 369:18
cell 275:3 333:21
    335:1 419:20
Center 219:16
certain 227:1
    242:16 251:8,12
    283:15 291:19
    294:8 301:1
    304:24 305:1,17
    307:20,20 321:3,3
    373:7,16,21 374:1
certainly 228:22
certification 224:2
Certified 217:21
    223:12
certify 440:11
chain 229:17
    231:12,21
chance 390:20
    400:18
change 228:3,6
    239:13 441:6,9
    442:5
changed 226:1
    228:2 311:21

336:9,18,20
    337:21 399:22
changes 441:4,7,13
    443:9
changing 311:9
charge 230:3
charged 230:3
    232:14,15,16,16
    232:19,19 233:1
    242:18 368:22
    369:5
charges 229:20,23
    229:24 233:3
    242:17,20 247:14
    369:10
chase 235:19
chased 267:20
Chasing 281:2
check 264:9 396:20
    396:20,22 397:4,8
Chester 304:19
    305:21 306:7
    340:8 390:19
    404:9,10,11,16,18
    404:19,20,24
    405:1,3,5,5,8,14
    405:14,18,20,21
    407:8,19
Chestnut 219:7
Chet 256:23 300:6
    304:13,17 305:7
    305:13 306:6
    340:8 390:19
    404:8 405:1,2,3,8
    405:11,11,16,17
    405:18,19,20
Chief 220:11
childish 284:18
    285:10 286:3
choice 334:20,20
    334:22,23 335:2,5
    335:11,13,14,16
    336:3 382:1
    395:18
choose 262:21
    299:22 404:1
chose 263:9 321:15
    335:17 375:9
chosen 411:7
Christie 221:2,2
    222:8 240:2 278:8
    278:17 402:19
    404:3,22 412:5
CHRISTOPHER
    219:21
CI 248:7 252:10
    254:6,14 255:5,7

255:8,10,11,17,18
    256:3,12 257:1,7
    257:7,14,14,19,19
    260:12 262:13,14
    262:15,20,20
    263:13,15 269:15
    269:19 273:19
    274:1 277:23
    374:15,20
CI's 257:17,22
circle 246:11
Circuit 299:4
circumstances
    263:5 281:1,15,19
    401:21 425:14
Cls 256:22 258:5
    261:5 268:12
    374:6 407:21
Cls' 277:12
citizen 432:16
city 217:9 220:10
    220:11,12,15
    225:5,5 298:7,8
    338:20 403:2
    412:18 442:3
civil 217:3,8 226:11
    341:16 380:9
civilian 231:16,18
    231:19
CJC 312:10 434:10
Clahar 285:1
claim 412:11 439:4
claimed 299:7
claiming 325:20
claims 225:4,5
clarification 404:5
clarify 241:21
    303:16
Claus 312:15
clear 254:23 283:7
    325:12 377:15
    424:3 429:4 433:5
    434:5 438:4
clearer 349:9
clearly 250:15
    252:10 258:15
    259:16 310:12
    376:14 381:4,4
    384:18 399:14,18
    400:20 438:19
clerk 403:17
client 296:24
clients 287:11
    297:3 348:19
close 233:9 241:13
    256:11 291:24
    317:1,23 347:23

377:5 384:11
393:1
**closer** 431:3
**closest** 347:11
**clothes** 284:19
285:4,17,21,22
286:21 288:5,7
**clue** 246:21
**co-defendant** 281:5
**Code** 225:23
**COLEMAN** 220:17
**colleagues** 438:1
**collecting** 294:17
295:11,15
**color** 419:10
**column** 441:5
**Comcast** 317:9
**come** 228:4 236:15
239:20 243:20
249:1,3 251:18
254:5,6 256:21
269:17 270:9
273:3 285:20,20
290:17 296:6
303:18 326:22
330:2 338:16
342:18,19,22
343:4 351:6
352:12,12,17,18
352:19 356:19
357:19,20 358:1
358:21 359:2
360:1 361:1
366:11 373:4
374:18 382:9
400:23 415:12
424:23 425:3
436:7
**comes** 231:15
232:4 234:11
252:8 261:13
374:20
**comfortable** 251:7
**coming** 236:8 281:3
284:11 324:6
327:24 360:3
415:13 424:16
428:11,11,14
**command** 229:17
231:12,22
**commanded** 312:2
**Commissioner**
227:22 231:7,9,13
244:21 247:21
427:17,19,21
**commit** 250:17
**committing** 252:22

**common** 256:14
**commonly** 395:14
**Commonwealth**
218:9 440:3,10
**communicate**
419:19,20
**communicating**
324:2
**company** 303:8
346:7
**compared** 286:20
320:15
**competent** 441:18
**competitor** 267:3
**complainant**
234:19
**complained** 272:13
288:8 383:15
391:19
**complaining**
383:17
**complaint** 231:8,11
231:15,16,19,20
232:5,6 237:17
240:8,10 298:4
371:22 408:15
**complaints** 230:12
409:20
**completed** 416:16
**completely** 334:11
**compound** 370:5
**computer** 238:10
**concerned** 346:10
346:11 365:23
**concerning** 408:23
**conclusion** 232:11
234:9 242:12
301:6
**conclusions**
241:19
**conduct** 257:6
**conducted** 244:1
281:11 291:16
346:14
**conducting** 227:13
243:14
**Conestoga** 421:10
421:12 422:10,24
**confidential** 248:7
248:8,13,16,21
249:13,16,20,22
249:24 250:3,7,10
250:16 251:1,3,14
251:15,16,17,20
251:22 252:7,15
252:20,22 253:2,5
253:12,13,17,24

254:2 255:21
256:6 260:15
264:1,1,6,8,10,19
264:21 265:3,6,14
273:1 275:21,24
276:6 362:13
417:6,12,19
**confirm** 367:3
**confiscated** 294:7
338:16
**confiscating**
294:21
**confused** 342:4
**conjunction** 230:23
**connect** 359:23
**conned** 316:23
**consecutive** 385:18
**Conshohocken**
219:17
**consideration**
335:21
**constantly** 310:18
322:21 402:7
**contact** 259:6,20
375:19
**contained** 422:18
424:11,22 425:3
426:5 427:12
440:12
**continued** 218:3
252:14 254:14
269:13 300:9
434:21
**continuous** 253:14
**control** 237:8
255:13 285:5
294:24 295:4,7,10
326:7 337:12
401:9
**controlled** 255:7
263:8 397:5,6
**controlling** 397:6
**convenient** 343:4
**conversation** 241:6
258:13 300:8
301:7 324:3 326:9
326:21 327:6,10
327:14 328:1
352:6 373:18
428:19 432:10
**conversations**
395:4
**convey** 347:20
**convicted** 425:9
**convincing** 317:22
320:16
**cook** 285:4

**COOPER** 220:11
**cooperate** 341:20
436:20 437:2
438:1
**cooperating** 260:2
341:15
**cooperation** 334:14
**cop** 232:2 265:5
273:19,23 275:5
277:1 384:21
**copies** 278:9
363:24 365:17,19
**cops** 361:13
**copy** 228:8 242:23
244:8 279:1 366:3
440:14
**corner** 265:4
300:16 422:1,12
423:1,17
**correct** 225:9,14
226:12 227:5
230:18 237:13,15
237:19 240:14,17
264:2,14 268:15
278:1 299:3 301:3
310:2 329:8 335:3
335:20 336:10
344:9 350:13
354:14,18 355:19
360:8,13 375:5
379:18 402:22,23
405:6,12,23 406:6
406:12 411:14
415:23 418:8,9,20
421:15 426:6
440:15 443:7
**corrupt** 246:6,6
361:13
**corruption** 247:23
**CORTES** 220:18
**Costa** 388:10 395:7
**counsel** 219:5,9,14
219:19,24 220:4,9
220:15,20 221:5
224:1 279:5 346:5
346:9 347:15
441:21
**counseling** 321:8
321:11 322:4
**Counselor** 351:16
**counselors** 321:23
**count** 249:23
311:12
**counted** 336:7
**counting** 295:12
**Countless** 370:16
**County** 403:2 440:5

**couple** 273:15
354:11 404:4
**course** 224:16
226:18,21,22
227:9,24 248:21
249:3 255:19
261:24 299:8
318:11 373:14
401:1 413:11
**courses** 225:22
226:6 248:24
341:13
**court** 217:1,21,21
229:6 245:9 253:8
275:5,13 300:19
312:5,10 330:21
346:16 347:20,23
378:15,20 391:12
410:22 411:1
434:9,12,18,20
435:8,13,13
441:21
**Courthouse** 218:4
**courtroom** 218:5
346:1 349:14
385:16
**cover** 300:16
**covered** 273:7
406:16,18
**coworkers** 319:22
**coworkers'** 318:9
**crap** 324:6
**crash** 235:14
236:18
**crashed** 235:15
**craziness** 327:11
**crazy** 286:1
**creating** 433:9
**Crimes** 225:23
**criminal** 229:24
230:2 232:20
250:17 251:4
252:15,22 253:18
254:10,14 266:21
266:22 296:14
348:7 350:12
377:9 408:1
435:13
**criminally** 232:16
232:19
**critique** 432:11
**crooked** 246:19,24
**CUKER** 219:20
**cultured** 247:24
**current** 329:10,13
**currently** 302:1
321:7 402:24

McIntyre v. Liciardello, et al./Torain v. The City of Phila., et al.                    JEFFREY WALKER- CONTINUED, 9/16/16

**curriculum** 226:5
**Curtis** 328:2,4
**custody** 300:4
**customary** 365:19
**cut** 274:6 399:6
    421:23 424:21

---
**D**
---

**D** 219:11 222:1
**DA** 300:20
**damage** 300:20
    369:19
**damaged** 235:5
    290:22
**date** 375:12 377:8
    377:12 441:10
    443:19
**dated** 443:6
**dates** 303:19
**dating** 264:17
**day** 224:14 226:22
    247:19 261:24
    267:22 268:3
    276:22 293:11
    320:16 332:4,17
    333:1 345:1
    378:23 381:1,3
    401:1 418:23
    427:10 434:19,20
    435:8
**day's** 224:20
**days** 230:6,6,7
    232:13 244:9
    350:13 441:22
**deal** 319:18 320:21
    320:24 321:1
    341:15
**dealer** 267:2
**dealers** 319:20
    380:12,13,15
    395:6,13 396:1,3
    430:12,20 431:15
    431:23 432:18
**dealing** 246:24
    255:18 284:11
    291:18 294:13
    311:13 319:10
    374:6
**dealings** 355:10,13
**death** 246:14
    394:17
**decided** 268:19
    305:12
**decides** 231:3
**decision** 356:5,6,8
**defendant** 220:15
    234:18 259:3

288:18 296:21
    408:19 409:21
    437:3,23 438:2,17
    438:19
**defendant's** 284:19
    290:16
**defendants** 217:6
    217:16 220:20
    221:5 346:22,24
**defense** 260:17
    279:5 300:3
    346:21
**degree** 301:2
**Delee** 421:24
    423:16 424:2,3
**demanded** 343:18
**denial** 333:8
**denied** 348:6
**DENNEHEY** 220:17
**dep** 437:13
**department** 220:10
    222:15 225:8
    227:3 230:16,17
    233:2 242:24
    265:9 338:9 362:6
**depends** 229:21
    231:14 232:10
    271:6 285:3
    289:20 370:12
    373:18 374:11
**deponent** 287:17
    382:19
**deposition** 217:18
    218:3 223:1
    224:15,16,20
    287:21 301:15,18
    341:9 345:22
    436:15 439:16
    440:14 441:2,3,11
    441:15,23 442:2
**depositions** 303:13
    346:13
**depression** 315:5,7
    321:7
**Deputy** 220:11
**describes** 426:2
**description** 222:14
    367:13,16
**desperate** 384:16
**destroy** 281:6,8
**destruction** 281:17
    285:16
**detail** 230:10,14
    344:13 353:4
**detailed** 250:2
    362:12 417:5
**details** 356:12

**determine** 339:15
    388:23
**Diamond** 345:24
    348:14,18 349:2
    349:11,13 403:7
    408:20 409:20
**DIANA** 220:18
**died** 386:12
**different** 238:1
    247:1 256:14
    257:2 270:8,16
    280:12 304:22
    305:2 308:19
    316:8 323:13
    339:16 354:14
    395:3 420:1
**Diggs** 423:19 424:2
**direct** 356:2 411:6
**directed** 355:18,20
    356:14 359:4
**directing** 402:8
**direction** 321:18
    341:14
**DIRECTIONS** 223:3
**directive** 244:8
    249:9
**directives** 244:15
    244:16
**directly** 385:16
**dirty** 324:22
**disciplinary** 229:18
    231:5 244:11
    274:4
**disciplined** 228:16
    229:8 230:5 231:1
    231:2,4
**discovery** 403:24
**discuss** 294:5
    322:15,17 361:3
    371:19 384:6
**discussed** 299:18
    342:3 350:22
    351:23 353:1,2
    381:24 384:10
**discussing** 324:17
    414:24
**discussion** 312:12
    312:13 345:3
    350:2,22 358:16
    367:8,11 368:14
    386:4 402:16
    414:21 415:2,16
    415:17 428:4,8,9
    433:22
**disgruntled** 291:15
**dismiss** 230:8
**dismissal** 232:13

**disposition** 236:11
    379:20 391:13
    434:22
**disregarded** 290:9
**disrespect** 283:18
    284:10 291:15
    298:2
**disrespectful**
    283:19,22
**distinct** 230:20
**distinctly** 399:11
**district** 217:1,1
    232:4 256:4
    276:12 339:8
    362:14
**disturbed** 399:15
**division** 305:15
    311:12 316:22
**divorce** 315:12,22
    316:8,20
**divorced** 315:13,20
**DOCKET** 217:4
**documentation**
    279:3
**documents** 223:6
    224:24 225:1,2
    279:4,9,13 343:14
    343:16,19,21
    344:1,5,16,18,18
    345:1
**dogged** 390:20,22
**doing** 232:2 234:8
    234:22 237:24
    238:3,6,15 241:13
    243:2 246:5,13
    247:2,3,5,16,19
    249:11 251:8
    253:5 254:7,9
    256:5 258:17
    260:2 262:11
    265:12 268:23
    270:7,21,21
    273:23 274:5
    275:4,9,11 283:21
    285:11,18 289:1
    290:3 295:6 300:1
    311:19,21 312:6,8
    320:13 323:14
    327:21 331:2,3
    335:13 337:1,2
    341:13 355:3
    359:13 365:3,9
    375:22 376:7
    379:2 380:13
    381:7,8,13,16
    385:17 394:18
    397:21 398:20

400:21 407:12,12
    407:21 409:15
    414:23 430:24
    432:8,10
**domestic** 293:2,2
**door** 235:3,5,5,6,7
    275:1 281:23
    285:21 286:22
    290:23 324:17
    326:22 357:1
    367:17 368:5
    374:18 396:17
**dormant** 266:6
**dots** 359:23
**Douglas** 328:3,4
**Dr** 394:22
**drafted** 262:9
**drag** 235:24
**dragged** 236:6,8
**dramatic** 384:23
**drank** 310:21,22
**dressed** 286:22
**drink** 284:20 323:1
    330:8
**drinking** 308:22
    309:24 310:1,5,15
    310:18 314:24
    315:1 317:11
    322:18,20,21,23
    323:3,8,10 327:3
    327:5 329:20
    332:4 378:24
**drinks** 330:1
**drive** 219:17 267:10
    276:7
**driver's** 234:20
**driving** 235:10,11
    298:6,22
**drop** 439:4
**drove** 381:6
**drug** 234:5 252:6
    267:2 296:11
    319:20 360:3
    380:11,13,15
    395:6,13 396:1,3
    430:12,19 431:15
    431:23 432:15,17
    432:21
**drugs** 252:2,2
    259:4,8,17,19
    261:14,15 276:10
    358:24 360:16
    361:2 374:22,23
    395:11,14 410:12
    410:16 415:6,8,13
    428:12 429:12,17
    429:20

SUMMIT COURT REPORTING, INC.
215.985.2400 * 609.567.3315 * 800.447.8648 * www.summitreporting.com

drunk 310:14
dude 383:14
due 229:18
duly 224:8
dumb 247:2 402:4
**DUSTIN** 221:16
duty 324:20

**E**

E 222:1 440:1,1
**EAP** 326:3
earlier 294:2
312:22 415:20
early 317:12
easier 337:14
easily 265:7
east 236:19 387:11
**EASTERN** 217:1
easy 310:24 322:22
322:24 334:7
367:17
eat 285:4
eBay 288:15,23
**Edwards** 221:8
233:14 392:2,3,12
effect 277:2
either 243:16 251:1
259:7,18 263:24
264:6 265:15
271:5 281:15
282:7 283:4 337:6
400:1
electrical 236:18
369:22
else's 432:11
email 403:13,14
404:2
embodied 264:13
embodies 229:15
**Employee** 310:4,6
310:9 323:7
**Employees** 322:14
employment
302:16,17,19,22
302:23 303:14
empty 257:20 347:8
348:2
ended 293:9 312:13
316:8 370:1
379:17 385:7
386:9
endpoint 319:9
ends 231:6,8
402:11
enforcement 349:6
enforces 227:19
engage 254:14

engaged 385:21
engaging 251:4
253:18 266:21,22
enter 414:22 421:12
entered 244:5
346:1 422:14
423:3,10 425:12
427:8,9
entire 239:2 275:18
275:19 276:1,9
304:10 348:16
378:3,23 435:1
entirely 396:5
entitled 255:6
entity 230:22
**EPA** 326:3
**Eric** 220:6 221:8
errata 441:5,9,10
441:14,20 442:1
443:10
espade@gmail.c...
220:8
especially 231:22
256:18 289:24
294:13,16 351:3
**Esquire** 219:2,3,7
219:11,16,20,21
220:2,6,10,11,17
220:18 221:2,8
301:15
essentially 346:8
346:19
**Essington** 339:17
379:13,14
establish 253:5
established 375:5
estate 317:15
estimation 278:7
et 217:5
ethics 226:9
evening 291:4
events 233:23
373:7,13,15,22,22
eventually 232:6
238:10 267:21
269:12,14 302:17
333:18 391:9
395:20
everybody 240:22
240:23 309:24
334:4 401:1 438:7
438:8
everyone's 253:11
267:17
everything's 247:8
249:8 295:15
405:14

evidence 281:3,7,8
294:7,10,14,17,19
295:1,2,7,10,12
295:15 296:17,19
296:21 336:10,13
337:7 338:6
440:11
**Evidently** 432:3
exact 255:16,19,21
256:23 273:2
306:3,21 316:3,4
320:10,12 338:4
338:23 339:11
340:18 405:13
434:14,15 435:21
438:8
exactly 236:12
249:2 255:18
260:4 304:23
316:17 327:21
353:3 365:7
366:22 373:14
420:2,5 428:6
437:7,11
**EXAMINATION**
222:5 224:11
examined 224:9
example 348:5
387:24 431:5
exchange 422:3
exchanged 297:16
297:16
excluding 285:13
exclusive 381:9
**Excuse** 395:20
executed 280:15
299:24 354:1
execution 290:24
354:13 391:8
**Executive** 289:8,10
exhibit 222:14,15
361:23 362:7
409:4
**EXHIBITS** 222:12
exigent 281:1,15,18
425:13,14
exist 264:23
exit 421:11 422:10
422:23 428:16
exited 422:13 423:2
423:23 424:2
exiting 356:22
exonerated 243:16
experience 249:16
expert 245:20
explain 238:2 261:4
261:5 296:1 297:8

299:10 414:16
explained 239:1
240:1 317:16
434:4
expressed 346:9
extensive 226:1
239:14
extensively 395:17
extent 228:21
eye 385:17,17
402:6
eyes 251:16 275:9
275:11

**F**

F 221:3,8 440:1
fabricated 258:1
391:6 429:5
fabricating 358:17
fabrications 245:1
face 367:21,23
facing 334:15,17
347:13
fact 229:18 230:13
247:22 299:24
319:9 320:9
346:12 427:7
429:6
facts 429:4
fail 226:3,24 227:6
227:8
fair 241:22 413:3,4
413:19 414:2
418:3,5,17 435:12
436:6
fall 435:20
falling 271:20 319:1
falls 385:19 387:9
387:11
false 391:6 428:1,7
433:8,18
falsely 391:2
familiar 248:3,8,11
346:17 368:23
family 272:16
293:16 303:5
311:14
far 229:20 234:5
241:1 242:6 274:5
275:8 303:6,13
304:7 320:8
407:21 411:20
fast 298:6,19,22
**FAZLOLLAH**
221:14
FBI 232:24 269:5
306:23 310:11

325:2 329:8
334:15 349:18
350:8 352:24
353:2,3 384:24
388:7,24 389:20
390:1
Fear 281:2
federal 258:6 324:4
326:12,14,22
344:12,15 346:18
349:4 351:24
384:14
feds 323:24 324:1,9
324:10 326:5,10
feeding 433:8
feel 241:7,9 251:7
251:10 352:14,16
370:19
**FEINSCHIL** 220:2
274:10,15
feinschillaw@co...
220:4
felt 263:17 269:1
283:21 311:2
female 259:9,17
260:12,14,19,21
261:1,2 374:21,22
374:23 390:18
407:1 410:11,13
410:21
females 422:3
feud 311:23,24
312:1
feuding 312:19
field 249:2,4 251:7
256:16 306:17
311:16 338:24
339:3,6,7,9
figure 330:20
389:17
filed 298:4 378:1,1
403:20
files 231:18,19
filing 224:2 441:15
441:21
fill 250:9,11 261:14
261:16 262:15
filled 258:11 271:3
filling 263:13
filtered 306:20
final 340:15
financial 328:22
find 234:8 287:7
302:17,22 303:14
371:21
fine 270:1 287:23
314:5 321:9,12

322:1
**finger** 382:22
**finish** 250:3 313:16
  351:18 399:1,5,7
  412:23 413:1
  430:2
**finished** 394:14
**fire** 328:19
**fired** 230:8
**first** 222:13 224:8
  225:6 233:6 239:6
  240:11 254:12
  257:4 268:10
  271:18 278:20
  287:11 289:9,10
  296:8 304:17,17
  318:14 319:15
  321:17 325:6,7
  326:15 327:17
  328:17 341:9
  344:2 348:17
  350:15,18 351:13
  363:5 364:18
  368:6 373:2 376:9
  385:19 404:18
  414:11 417:4
  423:8
**five** 430:1
**fix** 317:19
**Fleming** 217:23
**floating** 270:16,20
**floor** 220:13 221:3
  382:22 383:2
**flyers** 240:21
**focus** 225:4
**folks** 386:23
**follow** 255:15 256:8
  281:21 298:19,21
  355:19,24 419:24
  432:12
**followed** 232:22
  294:9,16 401:8
  421:9 423:21
  424:5
**follower** 311:17
**following** 276:22
  311:18 312:1
  347:1 365:10
  441:8
**follows** 224:9
**food** 285:4,5
**foot** 235:23 317:15
**FOP** 326:24 327:14
  328:2
**force** 237:16,22
  238:8 340:24
  369:24 370:3,8,15

**forced** 237:8 265:4
  274:19,21
**forfeiture** 390:24
  391:3,12,16
**forget** 333:22
  381:17 436:17
**forgetting** 284:4
**forgot** 224:21
  262:15 292:6
  326:19 389:23
  408:6
**forgotten** 333:15
**form** 224:4 232:5
  237:22 245:15,17
  250:10,10,11,12
  250:14 370:5
  413:15 438:14,15
  441:4,7
**format** 256:3,8,8,13
**former** 377:16
  398:7
**forth** 312:20 340:19
  358:11 386:18
**forward** 235:6
**found** 230:3 232:20
  317:12 318:6
  327:9 357:19
  358:15 360:6,23
**foundation** 228:19
  228:23 245:3
**four** 219:16 308:18
  335:4 353:21
**fours** 335:3
**frame** 308:19
  331:15,18,21
  332:8,11,15,19
  337:5 339:21
**frankly** 347:12
**Frattali** 218:8 440:8
  440:20
**free** 321:9,12
**Freelance** 221:16
**freely** 371:19
**frequent** 240:21
**Friday** 218:6 330:2
  330:15 331:20,23
  332:1,18
**friend** 317:8
**friends** 267:13,18
  267:22 268:1
  269:12 317:1,23
  319:19,21 320:15
  394:9,15 395:2
**front** 276:5 343:20
  353:19 369:21
  403:7,11 408:14
  408:19 409:20

414:12 416:19
  441:16
**frustrated** 380:24
**fueling** 252:3
**full** 277:13 310:20
  353:24 389:9
**fully** 226:3 313:13
  314:9 323:23
  333:19,20 334:4
  440:12
**funny** 247:9 286:9
  296:4
**FUREY** 219:15,16
  229:6 245:6,13,17
  245:21 297:24
  314:1,6,10 331:22
  363:23 365:16
  366:1 403:12,16
  403:20 404:16
  435:3
**further** 301:12
  412:5 418:10
  439:8
**furthermore** 300:9

---

**G**

**G** 339:18 340:3,20
**Galazka** 292:5
**gambling** 324:19
**games** 260:18,24
  268:2
**Garden** 225:20
**gas** 259:16
**gather** 264:8
  266:12
**general** 279:11
**generally** 225:7
  228:13 233:5
  248:8 280:14
  303:16
**Genie** 294:2 304:8
  304:20 305:2
  406:21,24
**Gentlemen** 297:22
**GERALD** 219:20
**Gessner** 294:2
  304:9 406:22,23
  406:24
**Gessner's** 304:8
  305:2
**getting** 234:12
  245:20 250:11
  251:24 252:1
  253:21 254:19
  265:17 268:4
  279:12 291:23
  292:3,10 293:9

357:8 358:20
  364:21 377:5
  382:3,3 395:19
**girlfriend** 293:3
**give** 227:7 229:12
  230:13 252:23
  257:23,23 261:10
  276:3 278:24
  289:3 290:15
  306:21 307:2
  309:13 316:16
  320:3 324:23
  332:19 338:22,23
  367:15 372:2,9,15
  374:9,13,17
  384:13 391:12,15
  391:17 394:15
  395:12,19 396:19
  397:9,10,11,13
  401:12,14,18
  402:1 403:8,9
  417:11 430:24
  434:15
**given** 258:2 261:23
  265:22 364:24
  374:15 410:22
  436:22 443:8
**gives** 228:7 232:5,5
  371:19
**giving** 252:5 261:14
  262:13 265:21,24
  288:13,13 362:22
  385:11 394:24
  395:22 397:4
  417:10 419:23
  431:7 436:24
**go** 225:22,23 226:9
  226:10 227:15
  229:20,24 230:1,6
  232:1 236:3 239:6
  240:11,12 243:10
  246:2 253:8,13
  261:9 262:18
  264:9 266:9,12
  267:14 270:2
  271:10 272:14
  274:1,5,24 276:4
  279:8 280:21
  282:6 284:15
  287:9 289:18
  290:7 295:2,3
  300:19 303:17
  304:15 306:17
  308:3 310:19
  312:7,15 322:24
  324:10 326:3,11
  328:4 335:18

339:4 347:17
  354:8,11 355:6,8
  359:18,20 360:16
  363:22 364:7
  365:12 369:15
  374:12 376:18
  381:7,10 388:1,5
  391:5,12 392:5
  396:19 397:4,7
  401:4,5 412:9
  420:21 421:24,24
  422:20,21 424:4
  425:15,18 434:22
**goal** 431:9
**God** 321:24
**goes** 227:21 229:17
  231:12,21,21,23
  232:7,7,12 242:23
  242:24 247:1,24
  253:9 264:7 385:4
  389:14 391:8
  401:1 430:15,15
**GOGGIN** 220:17
**Goglielmucci**
  362:15,16,21
**going** 227:18
  228:12 229:12
  230:24 231:2,5
  234:18 236:2
  238:11 239:5,6
  240:13 243:17
  244:16 246:21
  247:7 248:6
  250:23 257:10
  259:24 260:4,5
  262:5 263:12,21
  266:16 268:7,21
  268:24 269:19
  270:5 274:6,7
  276:6 278:4
  281:16 282:14
  283:6 288:21
  289:10 291:7,7,9
  292:16 294:3
  297:20 302:4,6
  303:10 311:13
  312:20 313:6
  316:16,16,20,21
  316:22 318:8
  320:7,13 321:10
  322:9,10,11,16
  324:20 326:6
  331:22 333:6,8
  334:24 335:7,8,15
  335:16 336:5,19
  337:24 338:1
  341:20 344:14

353:7,8 356:1
358:11 359:16,19
359:20 361:12
362:23 370:1
374:9 376:6,20
378:15,20,24
379:2,12 381:8,14
381:15 382:4,8,11
382:15 384:10
385:9,22 397:8
401:23 402:6
403:9,22 412:8,19
413:14 417:21
418:10 420:1
422:8 432:12
433:9 434:14,15
435:5 436:19
438:20
**golf** 356:23 357:3
359:1 429:11
**good** 229:5 264:10
287:24 326:16
344:20 351:2
360:2 366:11
373:6,7 381:18
394:20 412:14,15
414:9 435:20,20
435:23,24 436:2
**Gorman** 271:14,17
271:21 272:24
280:3 318:22
320:2,6 406:5
**Gorman's** 272:8,24
273:10,16 280:11
308:7,9,12,24
399:10
**gotten** 315:10
320:19 366:15
**governed** 225:8
**government** 233:1
233:3 258:6 324:4
326:13,15,22
344:12,15 351:24
**grab** 257:6 267:10
**grabbed** 257:7
295:21
**graded** 226:2,18,23
227:5
**Graham** 269:6
284:24 384:10
**Graham's** 381:23
**grand** 307:7 312:22
329:19 333:3
377:9
**gray** 256:9
**greatly** 335:20
**green** 220:2 265:24

266:1,15,20 268:4
**ground** 227:16
**group** 255:9 274:23
285:17 309:22
312:11,24 322:20
323:2,16 324:21
331:9 347:2 352:1
436:16 437:21,22
**guaranteed** 250:20
335:22 336:4
**guess** 225:6 226:20
240:19 242:4
312:14,14 316:5
316:16 330:19
337:20 367:22
375:18 382:13
384:12 389:15
401:1 408:10
424:20 426:17
**guessing** 278:6
**guided** 312:5,5
**guilty** 230:13,14
**gun** 268:18,20
269:3 274:12,23
293:17,17 297:18
308:22 380:17,17
381:12 382:13,14
383:21,22 384:14
384:20,22
**guns** 276:15 324:5
382:10 384:9
**guy** 242:3 246:23
246:24 253:13
254:9 267:7,9,15
267:16,19 286:2
290:1 361:1,5
372:18 373:10
383:11 384:9
386:14 388:10,11
392:11 395:8
404:17,18
**guy's** 373:11
**Guyon** 219:14
**guys** 266:9,15
267:22 271:4
289:12 307:22
312:11,15 324:3
324:23 381:7,8
395:21,21,23
414:3 428:13
**guys'** 271:20
**gwilliams@wcbl...**
219:23

---

**H**

**habit** 252:3
**habits** 252:6

**half** 277:18,18
335:5,6 372:23
373:2
**halfway** 420:22
**Hall** 396:4
**Hall's** 275:16
**Hammonton**
217:23
**hand** 284:7 310:20
356:24 382:20
404:1
**handed** 258:18
**handful** 434:19
**handing** 261:17
**handled** 277:11
**handler** 255:5
**handling** 239:1
253:3 255:5
257:14 268:12
303:12 371:14
**hands** 228:5 249:4
267:21 284:8
285:14 288:6
337:18 370:18
394:23 395:18
**hanging** 398:3,4,16
398:18
**happen** 251:12
269:3 297:7 357:3
357:4 380:19
394:10 400:16
411:8,21 421:17
**happened** 233:18
263:18,19 297:11
298:13 300:12
326:17 328:21
344:7,9 356:12
369:3,13 373:15
394:11,12 395:1
400:13,14,14
421:20 422:5
423:6,9,9,11
428:16,17 436:24
**happening** 293:15
**happens** 227:15
294:13
**happy** 261:19
267:17 275:12
292:12 321:18
**harassment** 246:16
385:20
**Harbor** 219:17
**hard** 287:8 339:15
394:23
**Harding** 318:23
**hat** 285:22
**Haverford** 386:21

**Hawkins** 390:14,17
**he'll** 256:24 271:7
397:7,9 400:22
**heading** 274:24
396:16
**headquarters** 256:5
270:10,23 271:2
294:23 295:22
336:13 338:14
339:12 379:10
381:20 408:12
**heads** 325:11
**hear** 245:9 274:12
282:12 389:11
400:20
**heard** 389:19,21,22
389:24,24 400:16
**hearing** 254:22
287:1 297:1 300:2
348:17 391:3
**hearings** 391:1
**Heather** 329:21
330:5,6,7,16
331:16 332:17,18
332:18
**heavily** 327:3,5
**held** 345:4 367:8
382:19 386:5
391:23 402:17
**Helen** 219:14
**hell** 268:23
**Herb** 288:18 289:7
289:8
**Hess** 382:5 384:2,6
**hey** 361:4 371:5
**highly** 266:11
**hill** 236:2
**hisself** 273:20
275:6 337:3
386:23
**hit** 236:17 237:6,9,9
**hitting** 237:6
**Hodge** 363:7
**hold** 397:12 420:19
421:1
**holding** 397:12
**hole** 346:17 382:16
**home** 272:15 351:6
402:21
**homes** 387:12
**honest** 300:23,23
327:17 332:22
333:19,20,20
355:2 374:9,17
**honestly** 407:7
**Honor** 346:3 349:10
**hooked** 305:15

**horizontal** 383:2
**hospital** 236:24
369:15 370:2,14
**hot** 281:1,15
**house** 252:9,9
276:5,16 281:2,4
281:8,20,23
284:14,15 289:9
289:11,16,18,21
290:2,10 336:7
338:18 342:18,20
342:21 343:1,2,2
343:5,8,11 351:7
352:13,13,14,15
352:17 357:8
359:18,24 360:7,8
360:17,19,19
374:13 389:15
391:3,9,10,13
394:13 396:19
397:17 399:20
400:18 401:12,24
402:8 408:8
409:11 415:7
424:16 425:15,16
428:11,12,24
432:3
**houses** 276:10,11
276:13,14,23
282:7 283:14
284:20,21 285:1,8
285:11 288:3
289:14 290:13,14
290:20 295:12
379:2 389:15
397:4
**housing** 317:6
318:15
**Howard** 219:11
417:1
**hundred** 248:17
**hundreds** 248:14
249:19,21,22,24
353:11,12 408:18
**hung** 388:11 390:11
395:8
**hunter** 422:11,13
422:24 423:2,21
424:7
**Hunting** 339:18
340:3
**Hyde** 394:22
**hypothetical**
229:12

---

**I**

**IAD** 240:17 241:8

McIntyre v. Liciardello, et al./Torain v. The City of Phila., et al.                    JEFFREY WALKER- CONTINUED, 9/16/16

241:18 243:7
**IADs** 240:19
**idea** 275:4
**identification** 362:8
  417:11
**identified** 421:9
**identify** 246:23
  278:17
**identity** 260:23
  417:19
**illegally** 429:20
**immediate** 232:1
  237:21 253:21
  254:1 406:19
**immediately** 233:1
  234:7 347:9
  421:24
**Impact** 239:13
  325:2
**implicated** 312:2
**impossible** 298:10
  338:21 357:20
  374:16
**imprisonment**
  334:24
**improperly** 248:16
**in-service** 225:21
  226:17
**inaccurate** 424:12
  424:21 425:2,10
**incident** 297:5
  312:4 400:16
**incidents** 264:18
  280:21,23 350:17
  438:2
**including** 318:12
  345:1 427:8
**income** 302:10
**index** 223:1 382:22
**indicate** 439:2
**indicated** 364:16
**Indicating** 279:2
  382:18
**indirectly** 246:8
**individual** 233:10
  251:4 256:1 281:6
  292:6,16 294:7
  299:16 369:14,20
  386:24
**individual's** 387:2
**individually** 217:14
**individuals** 266:5
  266:20 269:5
  271:5,10 272:8
  276:4,8 282:8
  283:20 292:8
  297:13 300:11

304:5 305:1,17,18
  307:19,21 316:24
  324:19 365:2,2
  376:21 380:7,11
  386:22
**inform** 238:20
**informant** 248:7,9
  248:13,16 249:6
  249:13,17 250:4,7
  250:10,16 251:1,3
  251:14,15,16,18
  251:20,22 252:8
  252:15,20,22
  253:2,5,12,13,17
  253:23,24 255:21
  256:7 260:15,23
  261:3,10,10,12,13
  261:14,17,18
  264:2,7,11,20,21
  273:1 275:21,24
  276:6 299:14
  300:14 385:3
  386:8 417:16
**informants** 248:21
  249:20,22,24
  254:2
**information** 223:6
  250:8,12 251:23
  252:10,11,12,13
  252:14,21,23
  253:22 254:5
  258:24 263:6
  264:6,9,12 265:8
  271:22,24 275:24
  276:2,3 290:1
  298:3 356:13,15
  356:17,18 358:11
  362:13,20 364:24
  365:4 371:10,19
  374:15,24 389:7
  394:15 395:1,5,12
  395:24 396:1,2
  417:5,7,8 422:18
  424:10,17,22
  425:10 426:10
  427:11,24 433:8
  433:11,18
**informed** 436:18
**infuriated** 378:9
**inheritance** 302:11
**initial** 237:21,23
  240:8,9
**initiates** 231:12
**injured** 235:23,23
**injuries** 236:15,16
  237:4
**injury** 333:3

**innocent** 432:16
**inquired** 272:7
**Inquirer** 221:15
**Inquiry** 230:18
  232:17
**inside** 256:18 282:7
  338:14 358:14,14
  367:6 368:13,19
  424:3
**instance** 400:1
  401:10
**instances** 397:14
  399:24 401:11
**instruct** 227:7
  348:23,24 349:1,3
  349:7
**instructed** 249:5
  279:19 351:6
**instruction** 254:17
**instructions** 224:15
  227:7 248:22
  250:15,15,21
  254:15,19,21
  441:1
**instructor** 226:19
**intent** 230:8
**intentions** 438:4
**interfered** 349:4
**internal** 230:1,21
  230:23 231:20,22
  231:23 232:8
  233:19 237:3,11
  237:18 238:11,15
  238:18,20 239:15
  239:16 242:19,19
  243:1,15,20 371:3
  371:9 372:14
  394:2
**internally** 253:19
**interpret** 314:12
**interpreted** 314:16
**interrogate** 267:11
**interrogated**
  395:17
**interrupt** 272:3
  345:14
**interrupted** 313:14
**interview** 238:15
  239:7
**interviewed** 238:21
**intimidated** 346:12
**intimidating** 347:14
  348:7,13
**intimidation** 385:21
**introduction** 437:1
**invest** 317:19,24
  318:3

**invested** 318:13
  320:11
**investigate** 257:5
**investigated**
  236:13
**investigation** 230:2
  232:9,11,12 237:3
  237:12 238:16
  239:15 241:8,18
  242:2,11,13 243:3
  243:13 299:13
  333:14 352:21
  355:21 386:19,22
  432:2
**investigation's**
  371:6
**investigations**
  240:17 243:7,24
  253:10,11 257:6
  361:7 375:17
  394:3
**investigative**
  353:18
**investigator** 238:24
  295:16 338:12,15
  359:7 362:24
  369:8,9 371:16,17
  372:1,3,24 373:4
**investigator's**
  371:13,23 372:17
**investigators**
  239:23,24 241:1
  333:10
**investments**
  318:16
**investors** 317:18
  317:18
**involve** 319:21
  436:10
**involved** 246:4,16
  248:1 264:1 282:8
  282:22 296:24
  315:10 318:14,16
  318:22 319:3,9,13
  320:20,22 321:1
  321:16 329:7,11
  333:16 352:7
  353:11 359:15
  360:6 362:17
  363:3 364:23
  369:16 375:13
  376:19 378:10
  379:1 390:8 394:4
  395:7 400:4,9
  418:18 431:20
  432:14 433:14
  435:16 436:14

437:22
**Involvement**
  364:17 377:15,19
  377:22 378:12
  398:7,8,9,12
**involves** 232:8
**involving** 317:6
  352:1 410:20
**Irish** 404:17,18
**irritating** 386:15
**isolated** 376:4,5
**issue** 290:7,21
  293:2,2,3,16
  298:9 303:11
  312:9 316:23
  317:5 323:1
  327:22 331:12,16
  344:20 346:23
  347:1 348:4
  361:18,20
**issued** 396:23
**issues** 246:15
  260:2 272:21
  303:12 310:13,13
  311:13,14,21
  315:8,9,11,17
  316:21 322:8,8,16
  322:23 323:9,11
  323:12,13,13,15
  323:16 326:6
  331:13 344:21,21
  344:22 383:24
  409:13
**items** 288:7,23

_____

          **J**

**J** 219:3,20 220:6,17
**jacket** 356:24 424:4
  428:14
**jail** 301:23 334:18
  335:1 341:18
**James** 217:3 218:4
  219:5 221:2
**January** 354:1
  417:24 418:11,19
  420:16 423:19
**JAY** 220:2
**Jeff** 224:14,18
  225:3 233:8
  240:14 244:16
  246:2 248:2 255:4
  255:11,22 257:13
  258:16,17 261:4
  263:23 268:6
  274:9,17 277:10
  280:13 284:1,13
  286:6 288:2,22

McIntyre v. Liciardello, et al./Torain v. The City of Phila., et al.                JEFFREY WALKER- CONTINUED, 9/16/16

289:13 292:5,22
294:4 295:24
296:23 298:24
330:7
**Jeffrey** 217:18
218:3 220:16
222:4 224:7 346:7
442:2 443:18
**Jekyll** 394:22
**Jersey** 217:23
**jerseys** 288:12,13
289:2
**jewelry** 286:7 288:3
288:4,7
**jjsantarone@md...**
220:20
**job** 234:1,2,3 239:1
239:2 240:1
246:21 252:2
254:5 264:2
275:16,17,18,19
276:1,9 292:20
293:8,9,20,21
296:1,3 312:5
338:22 344:19,20
344:20,21,22
345:8 352:9
355:11,16 361:8
369:24 371:14,18
371:18,20,22,23
372:16 375:1
390:3,10 392:5
396:5,8 398:19
399:4,11,12,17
407:5 414:12,14
414:17 415:5,15
427:20 429:13,16
429:19 431:20,21
431:22,24 432:11
432:15,19 433:7
433:10
**jobs** 234:3,8 265:13
265:22 275:15
296:3,15 303:5,6
311:21,22 312:13
342:1,2 343:17
349:23 373:1
375:20,22 376:4,7
376:8,10,11,19
377:16,20,23
398:14 413:12,13
414:9 430:9,23,23
432:21,24 433:4,5
433:14 435:19,23
435:24 436:1,3,4
436:5,7
**Joe** 256:18 258:9

258:14,22 260:8
266:8 269:10
270:23 271:12
273:2 280:2
282:12,17,21
283:1,5,9,12,13
283:16 284:5,6,8
284:11 287:15
290:7,14 295:8
300:6,6 306:4
399:13,20 407:13
407:22 411:13
**jog** 423:18
**John** 220:21 221:3
221:8,10 270:13
274:14 282:10
380:16 381:3
382:5 383:6,23
392:24 393:2,9,16
**joined** 297:18
**joke** 247:6,8 268:2
285:2 291:1
312:17
**jokingly** 283:8
**JONATHAN** 220:11
**Joseph** 220:17
221:5 362:14
**Journalist** 221:16
**judge** 345:24
348:14,18 349:2
349:11,13 385:23
403:7 408:19
409:20 427:18,18
427:19,21
**judge's** 335:24
**jump** 296:11,12
**jump-out** 234:3
296:1,3,5,5
298:15 430:23,23
**jumped** 297:10,15
**jumping** 296:4
297:3
**June** 343:10,11
**jury** 307:8 312:23
329:19 377:10
**justified** 370:2,8,15
**Justin** 219:14
**jwchristie@chris...**
221:5

___**K**___

**K** 220:11
**Kapusniak** 393:3
**Kareem** 217:8
219:9 355:10,14
356:3 359:4
360:12 367:18

421:9 431:20
**Kareem's** 366:16
keep 228:12 251:16
254:11 284:3
395:19 400:6
405:7 412:8
432:11
**keeps** 385:9
**Kelly** 359:9,11,13
363:1 365:6 416:2
417:23 418:12
420:7,17
**Kennedy** 221:3
**kept** 271:23
**kettle** 272:11
**key** 366:16 368:1,5
368:16,16,17
427:10
**keyed** 373:8
**keys** 281:24 290:16
290:16 365:14
366:16,19 368:7
368:12 396:19
397:9,10,11
401:12,18,22
402:2
**kicked** 395:19
**kicking** 235:22
**killed** 385:7 386:9
**killing** 404:13
**kind** 241:12 248:22
298:18 300:14
303:4 339:14
340:22 347:16,18
361:17 384:23
438:15
**kissed** 401:1
**Klein** 389:22,23
**knew** 240:13,21
241:2,2 244:21
247:3,7 259:1
260:24 262:16,21
266:22 269:12,16
272:18 273:5
275:13 290:11
311:14 325:12
326:13 327:20,21
334:6,17,19,20
341:15 350:2
358:9,17,17
383:14 391:16
395:1 407:4,6,8
407:11,15,17
408:8 411:5 428:2
428:2 432:15
433:17
**knocked** 324:17

**knocking** 326:22
**know** 226:16
230:10,10,19
231:1 236:2
239:21,22 241:12
242:15 243:4,5,15
244:17 246:6,8,8
246:11,12,22,22
247:13,21,22
248:15,19 249:8
249:11 250:18
251:23,24 252:23
254:18 257:22
259:15,21,23
260:1,20 262:11
263:3,5 264:10
267:16,17 268:3
268:24 269:1,24
271:16,18 272:18
273:13 274:24
278:22 282:24
285:16,24 286:3
288:17,22,24
293:11,12 296:6
297:6,9 298:1
302:22 304:4,5,23
310:16 312:19
315:16 316:3,18
317:11,18 320:23
322:13,13 323:4,6
325:11,16,17,18
326:11,14,17
327:5,7,10,19
330:5,8,14,20
332:9,15 333:22
335:22 336:4
337:5,21,22 338:5
338:17,19 339:2
339:11,20 340:16
344:2 351:16
352:2 353:4,8
355:5,9,12,20
356:6,7 357:12
359:3,14 360:5,6
360:7,11,14,20
361:16,17,19,20
362:19 364:6
365:1,7,22 366:1
366:15,16 367:18
367:20 368:1,3,6
368:19,21 369:1,2
369:4,7 371:17
373:17,20,21
374:5,10,18 375:1
375:14,16 376:22
377:2 379:19,20
380:2 381:14,15

381:16,17 382:3,4
382:8,8,10,16
384:12,21 387:2
388:2,13 389:8,8
389:14,21,22,24
390:1 391:2,10,10
391:19,21 393:21
401:22 405:18
408:1 414:7 416:2
417:18 418:7
419:7 420:5 422:5
422:6,7 423:6,8
424:9 426:15
427:24 428:3
432:9,22,24
433:13,14 434:13
436:17 437:11,11
438:2,18,22,23,23
439:1
**knowing** 274:3
**knowingly** 281:7
**knowledge** 244:18
390:4 414:19,20
417:7 424:11
426:19 429:14,15
429:18
**known** 267:6,7
298:5,6 336:21
360:12
**knows** 227:17
228:21,24 243:19
243:19 247:24
254:1 281:5
346:16 367:19
432:4
**Krasner** 219:2,2
245:19 279:2
286:12,14,20
287:2,5,9,16,20
287:24 297:22
313:12 314:4,8
328:10 345:13,16
346:3 370:4
382:18 383:1
385:4,8,14 399:1
399:5 402:14
412:12 413:14
414:1 416:10
437:15,16
**krasner@krasner...**
219:5
**Kushner** 267:23
269:11 387:5
391:19 394:8,14
394:17 395:5
431:5,6
**Kushner's** 394:13

**L**

lack 228:19,23
Lancaster 269:21
landscaping 303:7
Lane 220:2
large 253:10 295:12
  295:18
lastly 295:24
laughed 247:6
laughing 286:17
  287:12 297:23
law 219:6,15
  220:10 225:23
  280:20 349:5
  432:16 437:5,7
LAWRENCE 219:2
lawsuit 233:22,23
  377:24 379:16
lawsuits 224:23
  341:17 378:2
  379:9 380:9
  437:22
lawyer 241:10,14
  241:15 297:20
lawyers 403:6
Layre 220:4
LEAD 217:4
learned 292:15
leave 268:19
  290:17 343:1,3
  351:7 352:13,15
  382:4 384:1
leaving 291:21
  352:14,17 356:19
led 360:12
left 268:15 269:14
  271:14 273:16
  274:18 285:4
  291:13,14 292:9
  292:13 301:15
  304:23 306:6,7
  324:7 346:15
  349:13 356:11
  377:10,21 392:21
  400:7 408:13
  411:9,11,15,20,22
  411:23 412:2
legit 414:23
legitimate 413:8,13
  413:16 414:2,6,14
  414:17 417:8
  436:6
lenient 335:23
let's 225:3,6 229:11
  229:12 233:4,6
  244:14,14 248:2

279:22 358:23
  376:9 381:7 412:1
  412:3 434:22
letter 244:8
letting 243:15 274:5
level 292:17 339:8
levels 247:1 251:8
liability 412:10
LIAM 219:3
Liciardello 217:5
  220:22 221:12
  233:11 234:14
  235:9,10,12,18,22
  237:6 240:15
  243:8 244:1
  258:10,13,15
  259:13,18 265:1
  265:11 267:13
  270:12 272:5,9
  282:9,19 284:11
  284:22 290:16
  291:2,8 294:1,24
  295:9 297:2,17
  298:5 305:14,14
  306:12,19 307:21
  311:4,7,19 312:10
  319:2 324:2,17
  326:20 327:16,19
  336:14,14,21
  340:8 348:5
  369:18 373:10
  375:20 376:3
  378:7 385:11
  386:16 390:21
  391:23 392:8
  393:14 397:2,16
  397:19,19 413:12
  430:5 442:3
Liciardello's
  244:22 283:7
  312:1 327:20
lie 285:15 300:9
  325:12 326:13
  356:21 357:14,23
  359:22 360:24
  377:4 426:21
lied 251:11 259:2
  391:11 410:22,22
  411:1 436:1,4
lies 251:10,11
  256:8 319:6 357:5
lieutenant 221:5,6
  237:24 239:3
  271:8,13 273:8,14
  280:2 283:3 284:2
  326:2 328:7,15,18
  328:18,20 402:11

life 334:15,21,23,24
  438:5
light 266:1,1,15,20
  268:4 356:22
  357:18,20,24
  358:21 360:1
  361:1 415:12
  428:10 429:6
limit 412:19
limited 227:1 412:9
limits 291:17
line 228:18 280:5
  283:1 382:2 417:4
  442:5
Linwood 220:21
  221:11 284:23
liquor 288:18,20
listed 364:18
listen 249:15
  271:24 272:16,20
  275:10 291:5,6
  295:18 299:21
  312:12,14 326:11
  330:7 334:10
  338:16 342:17
  350:22 352:6,10
  352:12 359:23
  360:24 361:6
  367:18 374:21
  381:7,8 382:6
  383:24 384:9
  397:7 411:22
  435:2 437:1,24
little 251:10,10,11
  280:13 311:12,15
  312:15 318:3,5
  330:12 379:7
  380:4,6 382:16
live 403:2
lived 386:14,24
living 289:8 302:7,7
  302:13 367:18
LLC 219:2,20
located 225:20
  269:21 317:10
location 244:5
  251:15 257:2
  276:18,19 282:1,2
  290:8,22 340:22
  347:3 356:10,21
  356:23 358:10,13
  358:14,15 359:9
  359:12 360:4,22
  366:19 367:19
  373:19 374:13,14
  389:3,4,6,10
  396:3 400:24

410:24 415:13,14
locations 270:8
  277:3 282:1
  354:14 418:13
  420:1
lock 267:7 365:15
  365:15 378:18
  432:17
locked 281:24
  334:8
locker 341:2,6
  379:11
locking 234:10
  289:12
long 219:2 225:11
  230:16 253:22
  254:1 302:4 305:4
  340:16 343:8
  391:20,24 424:9
longer 307:22
  323:20 375:4
look 236:4 249:10
  252:17 261:18,19
  261:21 265:1
  275:20 278:5
  293:13 300:22,24
  310:12 344:16
  347:19 348:24
  353:21,23,23
  361:21 362:11
  363:12 365:22
  371:13 372:13
  381:18 425:17
looked 239:8 259:3
  325:10 327:12
  351:9 387:16,17
  387:17 388:3,4
  399:14 409:13
looking 252:18
  285:23 286:1
  302:16,21 303:1,3
  303:4 330:18
  353:17 358:20
  359:17 375:19
  393:7 394:17
  399:15 411:3
  415:5 416:3,21,21
  420:12
looks 261:18 388:1
  388:2
loop 271:19
lose 237:8 301:9
losing 230:15 293:8
  293:20 391:9
loss 230:5
lost 244:9 292:20
  301:10,10 308:22

317:3 391:3,10,13
  391:18
lot 228:10 234:7,10
  236:15 237:3,23
  238:23 240:20
  246:4 249:4
  252:11,13,21
  256:2 257:18
  259:16,24 260:13
  261:19 263:23
  265:10,12,20
  266:4 267:8
  268:21,24 270:11
  270:22,23 280:1
  281:18 283:18
  284:10,17,18
  288:15,20 290:2
  294:18,20 295:1,8
  295:11 297:10
  298:2 303:10,15
  305:12 309:8
  310:15,17 316:24
  328:19 333:7,9,10
  339:14,17 340:4
  341:23 342:13,18
  344:13,14,17
  349:23,23 351:15
  351:21,24 352:1
  353:1 381:10
  384:9 389:13,14
  395:20 413:6
  434:20 435:23,24
  436:2
Louis 305:16,22
low 272:19
lunch 345:17 346:6
  346:6,7,17 385:22
luncheon 345:21
lying 234:11 251:9
  285:15 334:2,9
  407:4,7,8,16,17
  407:20 414:3
  426:12,14

**M**

main 265:12 281:9
  303:12 306:18
  318:8 397:3
maintained 269:15
major 399:11
majority 241:14
  276:15 306:16
  323:14 331:6
  334:18
making 292:1 297:4
  330:20,21 441:7
male 260:11,19,20

McIntyre v. Liciardello, et al./Torain v. The City of Phila., et al.                                    JEFFREY WALKER- CONTINUED, 9/16/16

367:13 410:21
420:24 421:8
**males** 356:22 422:3
423:23 424:2,4
428:11,16 429:9
**Malkowski** 242:4
256:23 300:7
304:14,15,16
305:13,21 306:6,7
340:9 390:20
404:11,12,12,14
404:21 405:6,9,12
407:9,19
**Malkowski's** 305:7
**man** 268:23 286:1
292:2 293:12
298:4,11 299:21
334:10 338:21
381:1,14 398:18
399:16 401:9
**man's** 273:12
285:21,21,22
**manager** 426:3
**Mantua** 235:21
**March** 301:23,24
325:15 343:9
351:12
**MARGARET**
219:15,16
**marital** 310:7 315:2
322:8,16
**mark** 221:14 268:8
278:4 362:4
**marked** 345:1
353:17 361:23
362:7 416:5,6,7
**Market** 218:5
219:21 220:18
**MARKOS** 219:21
**marriages** 316:8
**married** 315:18
316:7,10,19
**MARSHALL** 220:17
**master** 283:10
363:2 417:24
418:14 422:1
423:18 424:6
427:18
**match** 265:5
**matter** 267:8
281:22 348:7,8
401:6 436:14
442:3
**mboycep@aol.c...**
219:18
**McCloskey** 221:5
242:5,8 256:19

258:9,14,22 260:9
266:8 269:11
270:24 271:12
273:2 280:2
282:12,17,21
283:2,5,12,13,16
284:6,12 290:14
295:8 300:6
304:13,14 306:6
307:17,23 309:2
311:11 329:1
337:6 340:8
383:20 396:18
397:15 398:8,10
399:13,20 400:4
401:11,14 402:4
404:9 407:13,22
**McCloskey's** 306:4
308:4 311:11
396:15 411:13
**McINTYRE** 217:3
219:5 442:3
**mean** 228:20
229:11,23 230:1
232:16 233:23
238:4 240:21,24
242:8 247:13
253:20 263:5
266:20 273:13,21
285:16,24 286:4
286:13,23 296:6
304:5 307:18,19
310:3,16 312:19
318:21 321:10
329:13 332:11
335:22 338:22
342:19 344:10
348:21 354:23
360:20 373:17,21
374:10,16,19,21
377:1 378:12
382:8,23 411:15
414:3,6 432:23
436:2
**meaning** 439:3
**means** 226:16
252:13 266:1
390:21 395:17
430:11
**medical** 236:10
237:17 370:11
**Meehan** 406:2,3,4
408:7
**Meehan's** 291:22
291:23 292:1
308:14
**meet** 270:10 295:1

307:1 320:1,5,6
330:16 341:10
342:8 438:7
**meeting** 437:9
438:22 439:1
**meetings** 438:11
**meets** 253:24
**member** 293:16
305:22
**members** 233:11
251:2 284:23
304:24 305:16
407:13 425:23
**memory** 280:1
334:6 344:11,13
344:13 351:2
373:6,14,17,20
374:1
**memory's** 373:6,7
**mention** 224:21
268:22 363:5
**mentioned** 234:19
234:20 261:5
269:4,5,6 277:22
292:8 296:2
298:24 317:21
321:6 325:1
367:12 385:2
386:8 396:4 413:5
413:6 423:19
425:6
**mentioning** 258:6
**met** 256:3,6 275:20
275:22 289:4
292:11 317:10
320:2,4,6 341:22
341:24 342:5,9,14
408:23 436:14,16
**metal** 387:18
**Michael** 219:6,7
220:5,20 221:9
265:11 275:16
282:9 284:22
291:10 301:14
347:4 349:24
352:3 396:4 397:3
425:7
**mid-level** 430:10,10
430:15,19 431:15
431:17,23
**mid-levels** 430:21
**middle** 363:8,12
420:15 425:22
**Mike** 233:21 258:10
270:13 274:11
278:9 280:6,8
290:15 292:5

337:10 392:24
393:1,8 437:24
438:23,24
**Mills** 219:19
**mind** 350:16 359:6
373:8 413:13
414:13
**mine** 323:14
**mine's** 336:1
**mines** 317:24
**minute** 278:24
345:17
**minutes** 385:18
424:1 430:1
**Mirraglia** 219:14
**misappropriately**
350:5
**misconduct** 290:12
292:17,19 295:11
305:11 327:15
340:5 407:12,21
408:1
**misidentification**
299:8
**misidentified** 299:9
300:14
**missing** 293:4
366:23
**mistake** 300:16,17
300:20,23,23
**mistakes** 343:21
**mistrust** 324:5
**misusing** 251:14
**Mitchell** 220:9
**ML** 412:10
**Monaghan** 217:13
345:11 354:20,21
355:18 356:2,13
356:18 357:22
358:5 359:3,8,12
360:11 361:3,16
361:17,19 362:12
362:23 363:1
365:7,13 366:15
368:4 412:18,21
414:13 415:18,22
416:1,1,16 417:5
417:22 418:12
420:7,17 427:8,24
429:5 432:2,20,20
432:21 433:3,4,8
433:17
**Monaghan's** 345:8
427:22
**money** 252:5 253:8
253:13,14 257:23
257:23 258:2

261:11,20,23
283:17 285:6
290:2,4 292:4
293:5,6 294:14,22
294:24 295:12,13
295:19,20 302:14
315:17 316:21,24
317:4 318:1,4,4,5
318:9,10,12,13
319:10,20,21,23
320:2,4,9,11
321:2,3,4,5
323:12,13,15,16
330:6,22,24 331:1
331:2,3,8 336:6,8
336:22 337:11,13
337:14 338:13,15
359:14 380:3,4,6
389:3,4,5,9 390:2
390:2 429:14
**month** 411:16
437:12,12,13,14
**months** 247:17
343:12 377:2
**mortgage** 317:20
318:2
**mother** 303:7
**motherfucker**
312:18
**motion** 267:14
**mouth** 328:20
432:11
**move** 240:2 298:18
306:4 323:1
342:17 401:2
438:4
**moved** 339:14,16
339:17,17,18,22
340:2,4 372:7
375:4,7,8
**moving** 254:11
321:17 341:14
**MPO** 226:13,16
**multiple** 251:22
256:13 265:22
276:23 290:13
372:8,12
**multiples** 253:6
**municipal** 412:10
427:18
**Myra** 390:14,17

**N**

**N** 222:1
**name** 271:18,20
284:4 301:4,4

Case 2:14-cv-01643-RBS    Document 61-9    Filed 06/29/22    Page 149 of 159

McIntyre v. Liciardello, et al./Torain v. The City of Phila., et al.        JEFFREY WALKER- CONTINUED, 9/16/16

303:19 304:17
326:19 352:8
367:12,17 370:24
371:14,16 372:3,9
372:10,11,17,20
372:23 373:2,19
385:12 387:2
388:10 391:1,15
392:4 404:17,18
406:21 412:16
421:23 422:15
441:10
**named** 304:2
329:21 367:13
376:21
**names** 279:20,23
304:4,7,16 370:20
371:12 373:22
404:13 405:15
**narc** 339:5
**narcotic** 276:14
**narcotics** 249:1
255:23 256:15
264:18 275:5
303:22 306:17
311:16 333:5
334:1 338:19,24
339:5,13 353:10
359:2 425:23
435:9
**narrow** 363:16
412:3
**narrowing** 377:1
**near** 348:24 394:13
**need** 224:24 226:1
227:16 243:21
269:18 312:12
349:2 352:12
359:23 360:2,24
383:17 397:13
428:8 441:17
**needed** 260:3
370:11 411:6
415:9,11,12 428:9
432:13 433:15
434:5
**needing** 275:6
**neither** 259:1
271:22
**nephew** 288:14
289:1,4
**net** 339:4
**never** 254:7,8,10
256:16 257:11
258:2 259:20
260:16,20 261:1
289:4 290:5

296:20 297:15
300:11 321:2
325:1 328:21
342:16 350:11
352:11 354:21
355:3 356:11
357:3 384:19
390:15,16 395:1
396:24 404:17
406:19 408:11
411:2 416:1
428:15 433:21
**new** 217:23 304:21
304:24 334:8
375:17
**NFU** 278:14,15
362:2
**nice** 366:2
**night** 277:3
**non-confidential**
264:20
**nonexistent** 264:19
**normal** 370:18
**Normally** 257:6
**Norman** 220:21
221:11 275:23
284:22,23 288:4
290:21,22 291:7,9
291:12,13,14,18
291:18,19,23
292:9,11,11,23
293:19 333:18
375:21,22 388:11
390:11 393:20
394:1 408:8
**Norman's** 408:13
**North** 340:6 354:18
421:10 422:14
423:3,11 425:24
427:9 428:23,23
429:2,2,6
**Northeast** 340:7
**northwest** 423:17
**notary** 218:9 440:9
440:22 441:18
**noted** 245:24
346:20 440:12
441:8 443:10
**notes** 440:13
**nothing's** 250:20
254:3 336:4
**notice** 234:21
403:17,21
**notified** 290:5
**notify** 237:18
**notifying** 237:21
**number** 231:3

255:13 262:14
277:1 278:22
279:13 297:13
305:5 306:22
309:4 317:17,22
339:2 341:17
346:10 389:19
409:4 434:14,16
**numbers** 278:14,16
309:7 316:3,4
**numerous** 281:13
422:2

_____

**O**

**object** 331:23
356:24 357:3
359:1 413:15
429:11
**objection** 228:18
240:2 241:20
245:2 286:12
365:17 370:4
414:1
**objection's** 245:23
**objections** 224:3
245:8 440:12
**objects** 422:1
**observation** 251:20
299:18
**observations**
296:18 366:24
428:10
**observed** 234:18
299:15 421:11,23
421:24 422:10,23
423:16
**obstruction** 281:3
**obtained** 289:23
**obviously** 309:20
**occasion** 255:23
257:15 280:15
281:10
**occasionally**
256:21 307:3
**occasions** 250:24
257:18 346:10
415:21
**occupants** 289:15
**occupied** 426:5
**occur** 281:14
410:15
**occurred** 237:4
284:18
**occurring** 364:20
**odd** 303:6
**offense** 368:23
369:6

**office** 219:15
256:19,20 320:8
341:17 342:15,16
378:23 436:17,17
437:6,8
**officer** 217:5,11,12
217:13,15 220:21
220:21,21,22,22
221:10,11,12,13
225:12 227:12
228:1,4,13 231:1
231:2,11,18
233:11,11 234:4
234:14 235:9,12
235:17,18 237:17
237:23 240:15,16
243:8,8,14,19
244:1,2,22 246:6
249:15 253:3,4
255:6,13,24
260:11 261:2
265:7 269:6 273:4
275:20,22 277:5
279:18,21 280:21
282:4 290:15,21
290:23 292:19,23
293:22 294:15,20
295:19 297:2,2,17
299:19 317:8
318:23 336:14
345:8,11 354:20
354:21 355:18
356:2,13 359:3,11
359:13 362:12
368:4 369:17
375:20 384:14
407:5 411:6
412:18,20 416:16
417:5,22,23 420:7
420:7,17,17
421:11,14 422:9
422:23 423:20
424:6,6 435:9
**officer's** 229:13
230:24 359:6
**officers** 227:2
230:12 246:7,20
246:20 249:5
255:20 256:14
258:10 262:12
265:12,19,19
266:21 268:18
273:6 275:3,10,11
279:18 280:4,5,12
288:23 294:12
318:17,19 340:23
357:22 362:14

363:20 375:12
425:11 427:8
**oh** 236:22 241:4
345:15 348:20
377:13 392:11
421:23 435:7
**okay** 225:3,6,11,14
226:12 227:4,10
232:21 233:4
239:9 243:21
248:2,11,15,20
250:1 262:3,8
264:16 267:1
269:23 270:8
277:18 278:3
280:4,10 281:14
282:6 287:20,22
290:18 299:6
302:13 303:21,24
305:3 307:7
309:15,19 312:18
314:4,20 315:15
315:22 316:1,14
319:19 324:12
325:4,20 332:24
339:12 340:1,16
340:21 341:2,8
348:20 350:6,23
352:17,18 353:2
355:1,8,23 356:9
357:17 358:22
360:1 361:21
362:2 364:11,16
364:22 365:8
366:10,20 367:2
368:1,8,11,15,22
369:11 372:19
374:13,14 375:11
375:15,24 376:2,9
376:17 377:7,11
377:12,13 378:8
378:17,19 379:1,5
383:12 387:14,20
387:23 388:22
393:18 397:1
400:11,12 401:16
402:10 403:19
404:23 407:23
413:23 414:10,16
415:3,20 416:3,18
417:10,16,17,21
418:3,6,10,17,24
419:22 420:12,15
420:21 421:7
423:6,15 424:15
424:17,20 425:17
426:10 427:1,6,14

428:6 429:13
430:7 431:14,19
435:15 438:13,20
**old** 317:8 329:6
**Omar** 299:20,23
**once** 236:3 237:9
238:7 242:19
243:1 250:6,10
261:15,16 264:9
267:12 281:22
282:7 290:3 292:9
292:11 296:12
311:20 318:1
341:18,23 342:7
377:21 394:24
409:1 413:3 415:8
438:12
**one's** 372:10 438:3
**ones** 244:4,4 281:9
288:14 289:2
344:23 397:3
**ongoing** 228:18
348:4
**open** 250:18
**opened** 234:24
235:1,3 281:23
365:15 368:5,17
**operated** 420:23
421:8
**operation** 329:7
359:13,14
**opinion** 230:13
244:17 245:6,22
246:4 360:17
**opportunity** 253:7
253:7,9
**opposite** 347:4
**option** 352:11
**oral** 217:18 218:3
**orchestrate** 357:23
**orchestrating**
357:13
**order** 347:16,18
348:12 431:14
**ordering** 285:6
**orders** 419:24
**Oregon** 317:10
**original** 441:20
**other's** 405:15
**Ott** 328:5,5,7
**Otto** 221:6 237:24
239:3 271:13
273:8,14 280:2
282:17,18 283:3
284:3 295:8 326:2
326:9 327:10,10
328:10,11,15,18

328:18,20 337:6
397:22 399:21
400:23,24 402:1,4
402:5,5
**outcome** 243:4,13
**outs** 258:16 311:3
312:24 313:3,21
314:12,13,14
319:7 325:22
376:7
**outside** 239:16
246:10 283:4
289:16 359:17
393:6 394:16
**overheard** 327:9
**overtalk** 335:10
**overtime** 253:10
330:21
**owned** 300:15
**owner** 320:8 367:4
367:9,14,19
368:17

---
**P**
---

**P** 220:18
**p.m** 422:9,22
423:16 425:23
439:15
**P/O** 362:14
**Pagano's** 346:16
**page** 222:3,13
353:21 363:6
416:23 420:13
422:8 425:18
438:8 442:5 443:1
**PAGES** 223:4,7,10
223:13
**paid** 250:9 251:24
252:1,10,11,21
330:9,15 332:3,4
332:5,18
**Palmer** 305:16,22
**pan** 303:8
**paper** 238:9
**papers** 403:5
**paperwork** 232:7
239:7,17 265:2
275:20 300:2
341:16 350:4
351:8 403:24
408:22 409:15,24
410:4,19 411:18
414:5 416:3
**paragraph** 275:22
353:24 363:22
365:13 417:21
420:16,22 421:2

422:18 423:15
424:10 425:22
**paragraphs** 354:12
**Park** 339:19 340:3
**parked** 358:21
423:22
**Parole** 302:2
**PARS** 266:6 361:21
361:24 363:6
364:18 416:6,9
**part** 274:22 285:12
285:16,17 297:24
298:7,8 302:18
313:17 319:7
320:17 322:20
323:2 324:21
333:18 344:6,7
345:12 353:6,15
358:22,23,23
360:24 361:20
376:7,11,15 398:1
407:5 409:12,15
409:17 414:18,20
418:4,14 421:13
422:4 423:8,9,10
428:5 429:23
**partially** 333:20
**participate** 389:4
390:2
**participated** 251:2
288:9 351:11
**participating**
355:21
**particular** 238:23
254:5 257:14
263:24 273:4
307:16 332:17
340:21 343:17
346:22 348:1
355:10,16 412:17
416:4 418:18
419:22 431:20,24
432:19 433:7
**parties** 225:1
**partner** 255:10
272:15 383:15,17
418:22
**parts** 271:11 376:5
**party** 310:23 327:1
328:2,7,16
**pass** 226:3,23
227:6
**passed** 239:8 279:4
302:12
**passenger** 235:3
**passive** 291:19,20
**patrol** 232:2

**pattern** 385:20
**pay** 252:12 261:5
330:1,8,9,15,15
330:23 331:19,23
332:2,4,5,8,13,17
332:18 423:17
**paying** 331:5,7,12
331:13
**payment** 261:8,23
**PBI** 230:9,17
**PC** 221:2 276:21
**ped** 226:8
**pending** 367:6
**Pennsylvania**
217:1,22 218:6,10
219:4,8,12,17,22
220:3,7,13,19
221:4 440:3,10
**people** 240:11
246:11,18 247:17
248:1 251:7,9
259:20 265:21,23
281:24 283:15
284:20 285:3,14
296:4,13 300:1
306:19 309:5,21
310:16 318:2,10
318:15 319:10,20
319:24 320:1,4,6
320:19 321:1,3,4
322:21 323:2
327:8,20 370:19
371:6 372:11
382:10 384:10
430:12 431:7
**people's** 285:4,8,9
286:21 372:23
379:2
**percent** 413:21,24
414:8,9 435:19,20
436:1,5
**percentage** 413:10
413:12 435:16,18
**percentage-wise**
413:20 435:16
**perfect** 373:21
**period** 244:23
289:22 298:8
307:4
**periodic** 337:2
**perjured** 435:16
**perjury** 436:10,11
**permission** 367:5
368:19
**permitted** 260:12
282:3
**Perry** 220:22

270:14,19,20
280:6,8 282:9
284:22 290:23
291:10 294:22
337:3,9 392:24
393:3,5,9
**person** 231:23
232:3,12 239:19
240:8,9 255:5
259:7 265:15,16
281:3,4,5,20
288:8 294:14
295:18 320:13,14
369:15 370:10
373:18 374:18
381:23 393:11
395:16 405:14,19
407:7 430:12
**person's** 367:16
**personal** 244:18
285:9 288:7 293:2
293:15 310:7
311:13,20 314:23
319:6,8 361:18,19
382:5 383:10
390:4 417:7
**persons** 227:13
**Petrina** 220:9
**phase** 402:11
**Philadelphia**
217:10,10,11,13
217:22 218:5
219:4,8,12,22
220:3,7,10,13,15
220:19 221:4
222:15 225:7
269:20 270:3
298:12 362:6
403:3 412:18
440:5
**Philly** 267:9 298:10
340:3,6 401:4
**phone** 239:2 270:1
275:3 282:20
342:22 343:7
381:9,11 384:7
399:18 419:20
423:17
**photograph** 300:11
347:22
**PI** 252:11
**pick** 249:9 270:3
299:21,22
**picked** 343:20
**picking** 292:16
344:22
**picture** 300:24

McIntyre v. Liciardello, et al./Torain v. The City of Phila., et al.    JEFFREY WALKER- CONTINUED, 9/16/16

Pike 217:23
pil423@aol.com
  219:9
Pileggi 219:6,7
  222:6 224:13
  229:1,2,10 233:24
  236:20 240:5
  241:22,24 245:10
  246:1 260:10
  268:7,9 270:18
  274:8,16 278:10
  278:15,19,23
  279:10 288:1
  298:23 301:11,14
  341:10,11 343:15
  349:24 350:17,21
  352:3 365:23
  378:1 379:17,18
  379:21 392:2
  408:15,22 409:19
  409:23 425:7
  436:13
pimp 285:23 286:22
pinky 382:21
pinpoint 305:5
pissing 285:9
pistol 383:3
pizzas 285:6
place 326:15
  346:23 428:19
  437:9 438:11
placed 363:8
places 340:13
placing 356:24
  424:3 428:14
plainclothes 419:1
  419:2,4
Plaintiff 217:4,8
  219:5,9,14,19,24
  220:9
Plaintiff's 362:7
Plaintiffs 220:4
plaintiffs' 346:5,18
planted 429:17
planting 414:3
play 234:11 284:18
played 260:18
player 259:22
playing 268:2
  272:19 325:16
  394:9
please 299:12
  349:6 399:1,5,7
  412:12 417:11
plenty 238:24
  351:22
PO 227:5 363:13

364:7 365:13
pocket 357:1 422:2
  428:15
pockets 257:20
point 230:1,4,6
  236:9 238:14
  247:20 249:12
  266:3 268:12,15
  269:12 271:9
  273:9,22 277:16
  282:14 287:11
  291:19 292:23,24
  305:1 326:21
  331:10 334:21
  336:12,23 337:15
  343:7 347:19
  351:12 359:11
  382:15 413:6
  422:13 423:2
pointed 269:2
  274:11 297:18
  351:10 352:20
  380:18 382:17
  383:1,21,22
pointing 380:17
  382:14,16
points 404:4 406:2
pole 235:14,15
  236:17,18 237:5,6
  237:9,9 369:16,22
  373:12,12,13
police 217:5,10,12
  217:13,15 220:21
  220:21,21,22,22
  221:10,11,12,13
  222:15 225:8,12
  227:1,12,21 228:1
  228:13 230:18
  231:6,8,11,13,18
  232:17 233:2
  234:14,15 235:9
  235:12,13,17,18
  246:6,7,19,20
  253:16,19 265:6,8
  265:18,19 269:6
  275:22 282:4
  290:15,21,23
  293:22 297:17
  299:18 317:8
  318:17,19 340:23
  359:8,10,12 362:6
  362:12 369:17
  407:5 420:6,7,17
  420:17 421:10,11
  421:22,23 422:9
  422:23 423:16,20
  424:6,6

policies 225:8,16
  225:24,24 226:21
  227:11,20 228:1
  228:14 233:5
  248:9 254:13
  280:20 294:8,11
  336:20
policy 226:1 227:14
  227:16,16 228:6,6
  228:8,9,11 229:14
  229:14,19 244:11
  248:3,7,12 249:9
  249:14 254:16,24
  255:2,16 263:12
  263:21 294:4,15
  294:16 295:14
  336:9,17,20 337:8
  337:9 338:2,6,8,9
  338:12,18,18
Polish 404:17
Ponzi 319:13
Poplar 399:12
Popper 219:10,11
  260:6 269:8 346:4
  421:3,18
popper.yatvin@v...
  219:13
position 287:6
  347:22 382:20
  383:3
positions 281:19
possible 247:22
  334:23
possibly 334:5
  426:23
Post 320:8
posture 383:2
pot 272:10
power 246:12
  282:15
practice 256:15
preceding 440:14
preliminary 300:2
preparation 341:8
prepare 266:9
prepared 238:7,8
  239:11 391:5
preparing 371:7
presence 354:23
  399:20
present 221:7
  255:18 277:24
  427:20 437:15,20
presented 436:20
presents 348:4
pressure 292:12
pretty 236:22

preventing 348:12
previous 224:20
  415:21
previously 263:15
  416:5
Price 288:19 289:7
  289:8
primarily 225:5
  345:7
prior 265:16 290:3
  290:24 291:6,22
  295:9 321:16
  325:18 334:20
  335:13 355:9,13
  365:3 373:1
  414:22 436:14
prison 321:22
  352:3
privately 408:24
privy 422:17
Pro 220:16
probable 226:9
  234:12 244:6
  251:19 264:13,22
  276:21 280:16
  296:13 360:16
  391:7 416:15,19
  424:23 427:12,16
  433:10
probably 277:10
  303:23 306:15
  362:22 364:24
  374:14 393:20
  413:20 431:6
probation 302:1,3
  302:18
problem 269:24
  310:2 312:3
  322:18 323:10
  330:12 331:7
problems 293:18
  309:23 310:7,8
  314:23,24 315:2
  322:19
procedure 243:5
  255:16 337:23
  338:1 374:12,12
procedures 225:9
  225:16 227:11
  228:2,14 233:5
  254:13 280:20
  294:8
proceed 287:21
  385:24
proceeded 235:19
  235:21
proceeding 349:4

proceedings
  391:16 440:11
process 232:21
  333:12,17 334:7,9
  334:12 335:18
Professional 218:8
  440:9,21
Program 323:7
promise 266:16
  336:1 430:1
promised 266:13
promising 438:3
promptly 441:21
properties 317:17
  317:19,21,22
  318:2
property 280:21
  281:17 285:9
  293:4,5,7 294:10
  351:9 368:13
  408:9,11 409:7
  425:12
propounded 443:9
protect 246:9
  250:18,19 265:15
  293:10
protected 241:7,10
  241:11 247:4,7,9
  247:23 283:24
  284:1,2,4 295:17
protection 260:22
protective 347:16
  347:18 348:11
proved 300:3
provide 344:15
  395:5
provided 344:17
  433:21,22 441:12
  441:17
providing 395:24
  433:17,19
proximity 256:11
  348:13
psychiatric 321:21
psychological
  321:8
public 218:9 440:9
  440:22 441:18
pulled 234:24 235:8
  328:19 360:13
  384:14
pulling 380:17
  382:10 384:9,22
pulls 384:20
punished 274:7
puppet 283:9,24
purchase 261:13

purchases 258:1
purpose 227:10
purposes 362:8
pursuant 294:6
pursuit 235:11
  281:2,15
pushed 235:5
put 238:4 252:4
  257:20 263:9
  264:21 265:4
  266:5 267:21
  268:18,20 279:19
  281:19 283:12
  284:8 285:13,22
  288:6 291:8
  300:15 301:4
  310:14 321:16
  344:18 376:1
  394:23 395:18
  403:16 408:12
  412:23 414:5
  425:10 428:1
  430:11
puts 369:13
putting 321:20
  370:18
puzzlement 259:3
pyramid 318:7

**Q**

quarterlies 253:23
question 224:4
  229:4 240:4
  243:11,18,22
  245:16,18 247:21
  249:9,14 254:3,4
  254:8 261:1
  279:11 290:6
  291:5 302:24
  313:7,9,13,16,17
  313:20 314:11,16
  314:17 316:11
  326:16 327:13
  330:19 332:13,16
  333:7 335:8
  351:18 367:22
  368:10 370:5
  376:14 386:2
  407:18 412:24
  413:2,16 424:20
  425:8 426:17,18
  426:22 427:4
  430:19 433:24
  434:3 436:12
questioned 253:20
  265:3,18 266:3
  272:17 276:24

290:5 291:4,6
  294:23 296:20,22
  299:17 300:10
questioning 228:19
  324:1 361:14
  402:11 412:9
questions 223:12
  228:22 233:19
  238:12 239:12
  260:16 303:15,17
  326:20 343:17
  366:2 390:24
  412:6,19 426:16
  432:5 443:9
quiet 327:20 383:23
quit 385:9
quote 335:19

**R**

R 440:1
radio 419:15,17
raggedy 297:20
railing 390:12 395:8
raised 352:23
ramifications
  228:15
rammed 373:11
ramming 235:12
Ramsey 244:21
ran 276:12,13
  369:16
rang 381:9,11
ransacked 288:19
reached 326:15
  341:12,18 350:21
  352:3
reacting 287:12
read 229:7 250:16
  386:1 421:2,7,13
  422:4,15,19
  424:10,11 438:21
  441:2,3 443:6
reading 244:10
  254:19,20,21
  365:18 374:12
reads 422:9
ready 265:17 382:3
  382:4
real 317:15 383:23
  394:23
realistic 412:1
realize 372:22
  431:21
really 238:4 251:12
  312:20 342:19
  346:23 381:24
reappear 294:23

rear 235:2
reason 274:17,18
  309:14 336:24,24
  337:16 338:3
  342:24 346:13
  348:1 377:7
  383:10 441:5,9
  442:5
reasonable 234:23
reasons 318:8
  338:4 425:7,8
recall 233:8,14
  236:12 238:17,22
  248:20 249:2
  257:3 268:11
  274:9 275:15
  277:13 288:2
  289:5 296:23
  297:4,5 299:1
  304:23 316:4
  328:14 349:22
  350:9 351:23
  402:3 410:10
  419:23 432:22
  433:7,8,17
receipt 261:8 351:9
  408:11
receipts 293:4,5,7
  409:7
receive 261:15
  282:24 441:22
received 236:10
  265:7 362:12
  417:5,8 433:12
recess 301:17
  345:21
recollection 350:1
  350:7 357:7,12
  409:8,18
recommended
  231:4
record 224:19
  245:24 261:11
  279:3,7 345:4
  350:7 382:19
  385:14 386:5
  402:17,21 413:2,3
recorded 298:16
recounted 295:17
recovered 354:17
redo 238:13
reduced 335:20
refer 239:20 349:5
  364:5 367:11
  416:14
REFERENCED
  222:14

referred 377:24
  388:9
referring 240:7
  416:4
refresh 409:8
refreshed 350:1
refrigerators
  310:20
regard 237:12
regarding 380:16
  388:6
regardless 250:8
  294:21 324:21
  353:5 415:1
regards 224:20
  233:24 243:6
  248:23
Reggie 269:6
  284:24 381:22
  384:10
Registered 218:8
  440:8,21
regs 255:1
regular 298:13
regularly 407:4,7,8
reindeers 312:15
relationship 330:7
  371:2
release 262:1 439:3
released 301:22
reliable 265:2
relying 251:17
remain 308:8
remained 424:7
remember 226:7
  236:13 239:19
  242:6 243:11
  258:12 259:9
  264:24 266:7,10
  267:19,23 268:21
  273:14 288:11,18
  289:7 291:3 304:5
  306:1,8,13 308:15
  312:4 324:8 326:9
  326:17,23 329:21
  333:23 339:15
  342:10 344:5,6,10
  344:23 350:3,4,24
  351:23 352:7,9,9
  352:23 353:3,6,7
  357:21 358:2,20
  362:20 364:23
  365:2 369:5
  370:16,17,20
  372:5,7,16,23
  373:2 374:4,5
  375:1 379:5

391:21 392:2,3,4
  393:4 399:10
  409:2 416:8 419:7
  419:8,10 428:18
  433:12 436:23
  437:5,7
remembered 344:4
remembering
  351:2
reminded 247:17
reminder 225:22
  226:20
Reno 234:17
rented 367:5
  368:18 426:4
Repeat 229:4
  307:13 336:11
  375:6
repeatedly 254:7
  399:6 401:3
repercussions
  246:14
report 222:15
  245:20 353:18
  354:17 361:22
  362:7 364:18
  366:24 367:12
  369:13 372:15
  384:24
reporter 218:8
  229:7 245:9 440:9
  440:22
Reporters 217:21
REPORTING
  217:21
represent 412:17
representing
  224:22,23 297:3
  436:19 437:2
reprimand 229:20
  230:5
reprimanded
  232:13 244:7
request 348:10
REQUESTS 223:6
require 441:21
required 237:18
  369:24
requires 237:17
resemble 301:1
reserved 224:4
residence 390:8
  396:19 427:9
resold 288:10
  429:21,22
respect 225:16
  294:9 297:1

respectfully 413:15
responsibilities
  303:13
responsibility
  229:9 275:12
  335:24 369:10,12
responsible 338:13
responsive 240:3
rest 240:15 280:8
  289:11 294:15
  392:6 408:3
  426:14
restaurant 346:20
  347:4
rests 295:22 369:8
result 247:8 300:7
  300:18 301:5,8
  326:21 370:10
  379:23 382:6
  429:13,16,19
results 241:17
  242:11
resumed 301:19
  345:23
retired 304:12,20
  306:7
retrain 334:10
retrieved 422:2
return 352:6 441:20
returned 346:5
reveal 265:4,20
  334:11
revealed 281:4
review 225:1 228:8
  228:11 230:11
  238:11 249:8,14
  271:7 278:20
  343:14
reviewed 279:4
  371:18
reviews 226:19
  227:22 230:11
Reynolds 217:12
  220:21 221:13
  233:12 234:15
  235:18 240:16
  243:8 244:2
  258:11 259:13
  265:11 270:13
  282:9 284:19,21
  288:11,24 293:23
  297:2 299:19,21
  306:19 307:22
  311:7 340:6
  363:13 364:8
  373:10 378:7
  381:2 390:22

392:7 393:2
  422:10,23 424:6
Reynolds' 259:19
ribs 293:17
Rica 388:10 395:7
ride 267:9
Ridge 387:11
ridiculous 286:9
right 225:3 227:4
  229:1 233:4,17
  235:2 241:22
  242:7,7 244:14
  248:19 249:11,12
  250:1,22 252:19
  268:14 271:4
  274:6 277:15
  280:19 293:13
  302:8 303:10
  306:23 307:12
  321:13,18 325:13
  330:14 334:2,16
  334:22 335:11,12
  335:16,17,19
  336:3,19 341:14
  341:14 343:24
  344:19 353:13
  354:9 356:16
  359:21 360:1
  361:11 364:11,12
  364:14 370:24
  372:2 382:16,20
  382:21 387:10,12
  387:12,13 402:12
  403:1,11 412:4
  414:24 415:15
  416:14 430:6,18
  435:7 441:3
rights 226:11
RILEY 219:3
ring 365:14 366:16
  368:5
rings 392:4 399:18
robbed 267:23
robbing 245:1
  394:14
Robert 221:6
Robin 218:8 440:8
  440:20
rogue 273:19,23
Ronald 362:14
room 301:15 341:3
  341:6 348:16
  379:11 429:1
roughly 379:5
round 266:9
row 385:15
Roxborough 401:5

401:6
ruin 285:7
rule 273:18 412:22
rules 227:17 255:1
  255:2,21 441:21
run 251:23
running 235:16
  237:10 270:12
  272:6 273:19
  282:23 383:18

---

**S**

S 219:2
safe 352:14,17
  387:4
safeguard 227:12
  294:12
safety 346:11
salary 330:20 331:3
Santa 312:14
Santarone 220:17
  222:7 241:20
  278:13,21 279:6
  286:8,13,16,24
  287:10,18,23
  301:21 313:19
  314:3,19 328:12
  331:24 332:6
  345:6,13,15,19
  348:14,15,20
  349:10,16 362:3
  362:10 364:3
  365:22 366:7
  370:6 383:4 385:6
  385:10 386:1,7
  399:3,23 402:10
sarcastic 299:9
sarge 269:18
  383:17,22 397:7,8
sat 239:4 247:16
  266:6 346:19
  347:3,9,10
saw 275:5 298:11
  343:20 347:12
  355:3 400:16
  415:14 418:7,7
  423:13
saying 231:10
  246:14,15 258:8
  259:4 260:14,19
  265:18 273:4,8
  274:17,20,21
  286:2 290:9
  296:18 298:2
  312:12,14 319:17
  320:5 323:18
  328:7,9 376:22

397:15 398:21
  399:15,19 402:7
  405:7 410:16
  426:9,14,19,23
says 239:9 252:8
  252:21 265:2
  295:18 350:23
  354:4,6,12 363:1
  363:13,19 364:7
  365:12,13 367:4
  383:23 417:4
  418:11 420:23
  421:22 422:22
  428:15 438:18
scam 320:17,22,22
  320:23,23
scammed 319:23
  319:24 320:9,24
scared 394:17
scene 428:20,21
scheme 318:7,15
  319:13,13,17
schemes 319:18
scream 284:6,6
screaming 282:13
Se 220:16
sealing 224:2
Sean 416:2
search 226:8
  229:14,15 248:3
  257:16,19,19
  260:12 263:23
  270:4 280:14,16
  280:16,22 281:11
  284:14,16 289:21
  294:5,6 353:24
  354:13,16 367:7
  390:7,9,13 391:8
  409:3,11 425:12
  427:10,16 432:4
searched 256:1
searching 255:17
  260:15 261:2
  285:12,14 303:9
seat 235:3
seated 234:20
second 296:9
  315:22 316:20
  317:20 318:1
  353:24 354:5
  385:15 417:21
  423:9,10
secondary 277:5
  279:18,21 281:5
secondly 425:11
secrets 326:8
secure 276:18

281:8 290:10
  358:13 415:7
  425:15,24
secured 366:17
  367:6
securing 290:1
  356:20
see 253:1 259:16
  267:9 275:20
  276:4,8 280:7
  296:8,14 297:14
  311:5 343:5,18,18
  347:23,23,24
  352:12,12 354:2,4
  355:24 357:15,18
  357:19,20,24
  358:21 360:1,3
  361:22 363:8
  364:1,8,14,16
  366:8 372:16
  374:16,17,23,24
  380:23 381:7
  394:16 401:16,18
  409:2,11 411:18
  411:18 418:1,8
  420:15,24 421:1
  423:4 432:8
seeing 258:12
  322:12 350:3
  357:2 365:10
seek 302:19
seen 254:6 290:23
  356:23 361:1
  397:3 409:13
  410:24
sees 234:4
seizure 367:7
sellers 430:14,22
selling 288:15,23
  289:3
send 238:12,14
  251:15 255:6
sending 257:16
sent 238:8 257:5
  310:4,9 322:14
sentence 334:15
  335:20 420:22,24
  421:22
sentenced 336:5
separate 230:17,20
  230:22 291:7
  393:24
separated 323:16
  340:5
separation 311:23
September 217:19
  218:6 442:2 443:6

McIntyre v. Liciardello, et al./Torain v. The City of Phila., et al.                    JEFFREY WALKER- CONTINUED, 9/16/16

sergeant 220:20
  221:9 242:1,3,10
  256:18 258:9,14
  258:17,21,22
  260:8 266:8
  269:10 270:6
  271:3,17,20
  272:24 273:2,17
  280:2,3 282:17
  291:4,22,23 292:1
  295:21 304:10,21
  305:19 307:17
  308:4,7,8,12,12
  308:13,14,24
  309:1 311:10,11
  318:22,23 320:2,6
  347:5 359:9
  381:21 383:20
  397:11,18,19,20
  397:22 398:2,17
  399:9,10,13 400:4
  400:19,20,23
  401:4,6,11,14
  402:8 406:2,5,8
  406:11,21 407:11
  408:7 410:23
sergeant's 308:16
  373:2
sergeants 405:22
  407:4,6,14,24
series 378:2
serious 244:4
  314:23 324:5
  384:15
seriousness
  247:10
served 403:5,6
services 252:11
set 225:8 329:8,11
  363:1 409:12
  417:23 418:12
  420:18 438:22
setting 411:5
settled 379:18
  380:1
Seven 309:15
share 341:2
shared 340:22
  341:1,6
sharing 319:7
sheet 441:6,9,10,14
  441:20 442:1
  443:10
shirt 285:23 347:5
shit 321:20
shoes 285:21,23
shoot 381:17

short 298:8 301:17
  330:12,13,13
  331:8 405:1,3
  424:21
shortly 292:20
shot 257:4,8,12
  384:21
shoulder 256:11
shouting 386:17
show 268:6 279:20
  314:1,6 350:7
  364:9,10 366:11
  374:7 408:22
  409:19,23 438:16
showed 298:17
  343:16 344:1,5
  351:8 352:19
  358:5,9 370:21
  374:3 408:15
  409:7 436:23
showing 278:22
shown 343:22
  374:4 409:2
shows 252:10,17
shut 432:12
side 228:12 234:20
  235:2 236:4,19
  344:19 347:4
  357:10 358:2,4
  394:20
sign 228:4,7 250:3
  254:17,23 255:8
  258:8 261:21
  262:14 263:14
  271:4,5,8,8,12
  273:4,10,12,13
  277:4,6,23 295:16
  410:4 438:15,20
  441:10,11,15,16
signature 228:5
  262:16,17,22
  277:7,8 441:19
  443:1,17
signed 255:12
  258:2 262:20
  263:15 277:5
  279:14 410:16
  438:14,21
significance 348:9
signing 273:14
  441:13
sir 287:9 313:12
  334:3 349:9
  412:15 416:18
  420:13 439:6
sister 302:14
sister's 302:11

sit 348:23 401:4
  435:24
site 262:5 263:4
sitting 285:5,24
  286:2 289:13
  298:11 348:2
  356:10 385:15
  417:18 421:14
  433:6,16 436:18
situation 231:24
  232:3 234:13
  239:5,13 240:22
  241:12 244:9
  252:4 253:12,15
  253:17 257:8,22
  258:1,23 259:5
  260:1 263:8,17
  266:18 282:19
  289:20 292:12
  295:10 300:4
  316:21,22 317:2,4
  317:7 320:18
  321:15 324:22
  327:17 330:11
  333:8 370:12
  373:23 374:7
  377:3 400:12
  428:13,13 435:21
situations 238:1
  257:24 267:1
  302:21 374:24
  375:10
six 309:6,14,15
  330:20
size 356:23 357:3
  359:1 429:11
SLAUGHTER
  221:16
slipped 326:7
slipping 340:19
small 230:4 244:4
  246:17 392:22
  422:1
smaller 312:7
smashed 235:7
  237:5 369:21
sold 259:8 374:21
Solicitor 220:11,12
somebody 296:7
  357:2 361:12
  364:21 370:14
  380:24 382:6
  383:10,16 384:20
someone's 408:9
somewhat 317:15
  373:5
soon 236:7

sorry 233:21 241:4
  248:5 272:2
  274:10 304:15
  331:5 345:14
  363:17 376:6
  387:19 406:17
  421:19 426:8
  434:2 435:7
sort 348:11,12
sound 283:16
  307:12 405:20
sounded 320:16
source 250:8
  258:23 259:7,8,9
  263:24 264:1,5,8
  264:19,20,20
  265:3,6,13 276:2
  302:9 362:13,22
  395:13 410:12,14
  417:6,14,19
sources 265:14
  266:13,23 275:23
  395:24 396:2
south 219:3,11
  220:6 236:2 267:8
  347:17 401:4
  422:10,24 423:24
southwest 270:2
  298:10,12 340:2
  422:12 423:1
space 441:12,17
Spade 220:6 221:8
spark 373:14,17,20
sparked 374:1
speak 333:11
  348:19 349:17
speaking 280:14
  430:4
special 401:17
specific 244:15
  315:17 316:12,13
  348:11 350:4
  357:7 376:10
specifically 383:21
  414:17 434:9
specifics 279:12
  350:24
speculation 360:9
Speiser 220:21
  221:10 270:13
  274:14 282:10
  375:21 380:16
  381:3 383:6 393:3
  393:9
spell 404:12,14
spend 270:11
  334:18 378:23

spent 270:23
Spicer 220:20
  221:9 258:10
  265:12 270:13
  280:6,8 282:9
  284:22 290:15
  291:10 337:10
  347:5,5,24 375:21
  385:15 393:1,2,8
  397:3
spoke 241:5 324:9
  349:22,22 350:16
  426:2
spoken 297:19
sporadically
  342:13
spot 283:12 348:2
  397:8
spots 340:15
Spring 225:20
squad 233:11 251:2
  255:9,10,23
  256:18 259:24
  268:14,15 269:7
  269:11 271:6,10
  271:14,14,21,22
  272:8,21,24
  273:10,16,18
  274:18,19,22
  277:15,21 280:11
  280:15 281:11
  282:23 283:4,5,6
  283:7,8 284:24
  291:14,14,21,22
  291:23 292:2,13
  292:18,19 299:7
  304:3,3,6,7,8,12
  304:21,22,24
  305:1,2,3,4,7,8,18
  305:20,23 306:2,5
  306:11,13 307:11
  307:15,16,17,19
  308:2,5,7,9,12,13
  308:13,14,15,21
  308:21,23,24
  309:5,6 310:18,24
  311:3,9,11 312:7
  316:22 318:21,24
  323:6 324:7 329:1
  329:1,4,5,6,11,13
  329:14,18 337:11
  345:12 372:23
  375:4,8,8,9
  377:10,16,17,22
  378:13 381:22
  383:24 384:1
  390:19 392:22

396:15,20 397:6,7
397:16 398:2,2,4
398:7,16,17,19,19
398:24 399:4,10
399:12,13 400:2,9
400:13,15 401:9
411:9,11,12,13,15
411:20,22,23
412:2 413:7,12
432:23 433:1
**squad's** 244:22
**squads** 251:6 277:2
282:21 292:16,17
303:17,18,20
308:19 309:7,10
309:10 318:20
338:19 339:1,2,4
339:10
**SS** 440:4
**stack** 262:13
277:10 278:3
**Staff** 221:15
**stamped** 416:22
420:13 425:19
**standing** 276:5
**staring** 385:16
**start** 225:6 233:6
237:20 248:2,6
250:2 251:9
279:22 300:8
314:21 324:5
326:12 341:9
371:7 376:9
412:24 413:1
**started** 235:15
237:10 239:13
289:10 303:22
311:9,21 312:20
312:20 315:12
337:1,16 386:20
394:24
**Starting** 303:6
**starts** 231:7,16
240:9 249:12
264:3,4,4,5
363:13 425:22
**state** 233:2 244:19
**stated** 367:4
**statement** 268:22
367:14 413:19
**statements** 223:9
297:4 306:22
307:2 391:6,6
**STATES** 217:1
**stating** 410:4
**station** 259:16
394:12,13

**stationed** 379:11
**status** 266:5
**stay** 348:23 349:7
366:12
**stayed** 269:13
307:24 348:16
394:19
**steal** 253:7 288:5
319:19 333:4
337:14 359:17
361:8 396:8
**stealing** 245:1
271:24 272:20
274:20 285:14
286:21 288:2,5,12
288:16,20 292:20
295:6 323:15
325:10,11,13,21
325:24 330:22
331:6,9,10 337:13
337:18 359:10
361:6 394:6
407:20,22 414:4
415:22 436:11
**steel** 387:18
**steps** 250:4 387:5
**sticks** 373:8
**sting** 329:7,11
**stipulations** 223:9
245:12,14
**stole** 288:4 292:7,7
293:6,12,13 331:4
354:21,24 355:2
359:10 390:15,16
415:24 416:1,2
436:4
**stolen** 334:1 360:8
388:8,24 429:14
**stop** 234:22 250:22
250:23 336:19
356:13,21 363:7
364:4 365:1,5
368:9 417:13,15
425:15
**stopped** 273:15
281:20,22 312:8
323:23 343:10
356:7,15 359:4
360:15,20 365:3
366:18 415:1,5
**stopping** 365:11
**stops** 226:8,8
227:22
**stories** 320:15
371:7
**story** 236:15 286:9
286:10 287:1

**story's** 287:4
**street** 217:22 218:5
219:3,7,11,21
220:6,12,18
225:20 229:13
234:3,17 236:1,2
236:7,9,19 244:23
257:10 263:13
275:2 339:18
340:3,12,20
354:18 356:11
357:16,21 359:24
363:3 378:3,11,16
379:3 398:5
417:24 418:14
421:10 422:11,14
423:1,3,11,18,21
423:22 424:1,3,5
424:8 425:24
427:9 428:23,24
429:3,7 430:14,22
431:18
**streets** 296:3
**stress** 322:2
**strike** 233:6 240:3
248:5 340:24
**strong** 246:12
247:22
**structure** 338:24
**stuff** 238:2 242:19
249:4 256:13
257:10 268:24
272:7,10 276:15
288:10 294:3
333:15,16 351:9
362:23 395:4
414:4,4
**stupid** 319:3
**Styles** 386:15 387:1
**subject** 441:13
**substance** 441:4,8
**successfully**
331:11
**sued** 297:12 438:20
439:5
**suffering** 315:5,7
**SugarHouse**
324:20
**suitcase** 388:8,16
389:9,23
**Suite** 217:22 219:12
219:16,22 220:7
**summer** 303:6
312:23 313:22
323:19
**SUMMIT** 217:21
**supervised** 405:23

406:1,8,11,21
**supervising** 255:24
407:15,24
**supervisor** 228:5
229:16 231:7,11
231:17 232:1,4
237:22 238:13
239:8 243:3,18,19
249:10,15 253:21
254:1,4 255:17
256:4,6,7,10,16
256:17 260:3,7
269:7,9,16 271:12
272:13,14 274:2
277:4 279:14,15
279:19,22 282:11
285:19 290:4,12
295:16,23 300:6
300:18 301:6
336:9 337:16,18
338:13 406:19,19
**supervisor's** 229:9
242:21 285:24
**supervisors** 233:20
241:2,17,21
248:22 277:23
279:17 280:9
283:23 295:7
337:1
**supervisors'**
279:23
**supplied** 252:13
**supplier** 430:16,17
431:4,11,12
**suppliers** 431:8
**supplying** 431:8
**support** 223:1
311:14
**supporting** 252:6
**supposed** 257:23
261:21 262:1
277:6 302:19
310:22 338:6
**sure** 239:6 241:10
241:13 249:11
255:12 290:2
338:8 345:15
357:14,23 377:14
410:19 420:10,11
433:4
**surprised** 269:2
327:23 389:11
406:5
**surveillance** 363:2
363:3 365:10
417:23 418:4,13
418:15,19 419:23

420:18 432:15
**suspect** 370:1,1
**suspicion** 234:5,23
**sustained** 243:9,16
244:3,7 394:3
**sworn** 224:8
**Sylvester** 219:24
**system** 261:6,7
334:19 346:18
408:10

| T |
| --- |

**T** 440:1,1
**T-O-R-P-E-Y**
406:14
**tab** 330:4,5 331:12
331:19 332:5,10
**table** 347:10
**tables** 347:8 348:1
**taboo** 251:6
**tail** 266:7 380:23
393:21
**take** 226:2 227:6,8
228:11 250:2
262:4 271:3 286:6
286:7 294:22
317:20 336:22
337:11 347:21
349:21 437:9
438:11
**taken** 218:4 244:12
250:5 295:17
301:18 345:22
359:20 378:3
389:3,4,9,10
390:3 408:7,12
429:20 440:13
442:2
**takes** 231:17 232:4
232:6 234:7
373:16
**talent** 238:5
**talk** 233:5 269:24
270:4,4 280:13
291:24 324:13,16
328:17 333:9
342:21 350:8
359:10 371:24
373:5,9 400:22
402:9 430:24
**talked** 239:4 307:4
309:4,23,24
314:22 318:15
321:6,23 325:14
325:18,18,21
328:3,22 329:19
336:6,7 343:7

367:8 369:14
371:2 372:18
374:3 387:4
390:23 394:8
396:18
**talking** 232:18
239:23 282:19
297:19 301:5
304:6 306:12
313:5 317:14
325:4,9,23 326:10
326:12,18,18,24
327:8,12,18
328:16,20 329:21
331:15,18 333:22
339:1,3,7,23
341:23 344:11
349:24 352:15,24
361:13 363:11
371:12 372:24
373:24 381:2
382:24 384:8
392:11 403:23
405:5,8,11,13
415:17 433:11
435:18 438:24
**talks** 353:24 354:12
354:17 362:11
363:7 364:17
**target** 239:11,21,21
239:22,24 240:6
240:12,13 258:24
259:17 268:5
329:18 410:12,21
431:15,16 432:17
**targeting** 430:9,19
431:23 432:1,7,16
**targets** 431:22
**teach** 226:6 227:8
**teaching** 226:4
**team** 259:22 276:12
**teams** 276:13 339:4
**telephone** 373:11
373:12,13
**tell** 224:8 233:17
243:4,5 263:20
265:23 272:19
273:3 275:17
278:5,13 300:19
316:17 332:12,14
333:4,17,19 334:7
334:10,11 338:3
348:21,22 349:7
353:8 356:8
366:22 369:12
371:5 372:17,19
375:23 386:23

411:16,23 415:24
428:6 432:1,3
436:1 437:10
**telling** 272:7,8,9
326:8 333:13
350:9 352:11
384:13 400:12,20
427:2 437:1
**tells** 228:8 251:18
**temporary** 330:11
**ten** 309:18 411:24
**term** 413:17
**terminated** 292:23
293:1,1,4
**terms** 430:11
**terrible** 293:19
**terrified** 246:12
**test** 226:23 227:7
**testified** 224:9
238:19 244:24
249:18 307:7
313:23 350:12
377:9 391:1,2
404:7 405:4,10
407:24 410:2
434:9,11,23
435:12
**testify** 313:21
349:20 436:7
**testifying** 286:18
434:19
**testimony** 312:22
329:20 333:4
390:23,24 407:3
410:10 435:17
441:12
**tests** 226:2
**Thank** 245:24
274:15 349:11
416:24 439:9
**theirs** 323:17
**therapist** 321:11
322:15,17
**they'd** 289:17,18
**thing** 230:14 243:3
256:23 257:22
273:2 276:3,8
292:3,15 320:10
320:12 335:12,12
335:13,15,16,17
335:20 336:3,3
341:14 374:2,6
381:9 406:15
409:8 439:1
**things** 226:8 246:5
247:2 249:11
251:8,12 259:24

285:10 288:21
289:18 293:15
297:6,11 299:22
328:7 333:10,13
333:20 335:1
344:3,14 349:23
350:4 351:3,4
352:20 353:1
373:16 394:22
396:3 409:14
416:2 419:24,24
**think** 228:23 242:22
254:9 286:16
291:10 294:1
300:2 322:7
323:23 325:24
329:17 344:11
348:3,8 349:3
350:7 353:10,17
354:21 358:7
363:21 364:17
376:13 380:3
402:4 416:10
**thinking** 384:18,19
**third** 299:4 393:11
**thirty** 441:22
**Thomas** 220:4,22
221:12 235:10,18
258:13,15 259:13
259:18 264:24
265:11 267:13
270:12 272:4,9
282:8,19 283:6
284:11,21 290:15
291:2,8 294:1,24
295:9 298:5
305:14 306:19
307:21 311:7,18
311:24 312:10
324:1,17 326:20
327:15,19,19
336:21 340:7
348:5 373:10
378:7 386:16
391:22 393:14
397:2
**thorough** 243:2
**thoroughly** 260:15
438:21
**thought** 241:11
326:6,10 342:4
350:18 351:13,15
351:19,21 352:22
384:11
**thousands** 353:11
435:13,15
**threaten** 395:17

**threatened** 267:20
267:24,24 269:2
394:24
**threatening** 267:16
**threats** 246:15
**three** 269:4 302:5
335:4,6 342:12,20
343:6,12 347:8
350:13 363:6
392:9,17 393:16
393:17,19 424:2,4
**threw** 387:8
**throw** 313:16
**throwing** 294:19
338:15
**thumb** 382:24
**thumbs** 284:9
**Thursdays** 296:5
**tie** 414:22 415:9
**Tierney** 220:5
**tight** 311:6,8
**Tillman** 423:20
424:2
**time** 224:5 234:19
239:10 240:12
242:4 244:24
256:20 257:4
258:16 262:11,23
263:10 267:4
268:1 270:12,23
274:24 275:5,13
284:3 285:15
289:7,22 298:9,17
299:16 300:4
301:18 303:11,14
304:10 306:20,20
307:4 308:19
313:1,4,11 314:18
314:22 315:3,6
318:24 321:17
322:24 323:19
325:20 326:1
327:4,24 328:18
328:23 329:3,18
331:6,15,18,21
332:7,9,11,15,19
334:17 335:23
337:5 339:21
340:4 345:22
348:16 350:15,18
351:13,22 352:14
353:9 357:6
359:18 360:18
363:18,19,20,21
364:18 373:3,9
379:12 382:5
384:7,11 385:19

386:17 388:14
390:1,19 391:20
391:24 392:10,19
392:21 400:7,14
400:17 406:2
412:6 439:7
**times** 228:10
237:24 238:19,24
241:15 248:14,17
249:23 251:21,22
252:14,20,21
256:2,12,13 257:1
257:3 258:20
260:13 265:10,20
267:8 270:22
273:7 281:13,18
284:5,14,17
294:18,20 295:5,8
295:9 296:15
307:1,5,11 310:20
315:18 328:19
330:3 337:1,2,9
339:23 341:10,12
341:22 342:5,7,12
342:20,23 343:3,4
343:6 369:23
370:7,13 371:5
372:6,8,12 393:24
395:20 398:24
405:8 406:15,18
434:8,11,19,20
435:13,15 438:10
**tiny** 312:15
**tip** 330:17 335:15
**tipped** 238:18 330:9
**tired** 282:14,15,21
**today** 225:4 341:9
372:19 381:20
404:7 405:4,11
421:14 433:6,16
436:15
**told** 239:23 262:24
265:23 266:7,8
268:17 269:7
271:15 272:15,20
276:7 283:14,15
283:24 288:24
289:6 290:7 291:1
319:2 320:10
322:19 326:2,4,8
333:24 335:23
341:19 344:3
351:5 352:4,16
374:21 382:7
383:20 384:4
388:7,7,24 389:8
390:1 401:3

407:19 408:2
409:1,9,14 434:4
436:3 437:24
**Tom** 293:23 306:12
319:1
**Tommy** 256:24
258:14 282:11,24
283:1,9,19 284:7
285:8,8 288:5
290:7 305:14
312:17 325:11,22
325:24 337:2,3,9
373:11 376:3
381:24 385:11
386:23 390:21
392:23 393:1,2,7
393:10,10 395:2
397:5,21,21
399:19 400:19,21
400:21,22 401:7
402:7
**Tommy's** 283:9
393:14 397:6
**top** 227:21 280:8
318:4,5 330:17
362:11
**Torain** 217:8 219:9
343:23 344:1,3,4
344:24 349:18
350:1,8,11,15,18
351:8,13 353:2
355:10,16 356:3
357:9 358:12
359:4 360:12
361:18,20 367:18
368:16,22 406:20
408:15,23 412:9
412:17,20 414:12
421:9,11 422:10
422:13,23 423:2
424:1 425:9 426:1
431:21 442:3
**Torain's** 365:14
368:4
**Torpey** 406:12,13
406:14
**toss** 228:11
**total** 307:5 377:4
**totally** 290:9
**touch** 225:24
226:10 230:15
**Tower** 219:16
**tracks** 387:20
**traditional** 383:3
**train** 225:21 387:15
387:17,20 388:2,4
388:4 394:12,12

**training** 225:15,19
225:21 226:10,14
226:17 227:5
248:24
**transcript** 440:15
443:6
**transcription** 443:8
**transport** 336:22
337:11
**transportation**
343:3
**transported** 336:8
336:10 338:7
**transporting** 337:7
**travel** 422:11,24
**treated** 310:1,3
**treatment** 236:10
237:18 321:21
**trestle** 387:17 388:3
388:4,4
**trial** 224:5 259:2,2
350:12 377:9
410:18
**tried** 300:16 365:14
**trouble** 247:6
**troubles** 328:23
**true** 286:11 287:4,8
297:24 307:18
334:2 426:7,9,11
426:13,13,16,19
426:24 427:3
436:2 443:7
**truly** 247:15,16
327:16
**trust** 326:5
**trusted** 323:20
**trusting** 323:23,24
**truth** 224:8 286:5
334:7,10,11 414:5
436:3
**truth-worthy** 353:7
437:3
**truthful** 333:12
334:3,4,5 353:6
**try** 250:19 347:17
**trying** 260:1 281:7
292:10 302:22
318:9 350:23
388:23 390:11
414:10 430:17
**turned** 402:5
**Twenty-four** 225:13
**twice** 293:1 307:3
315:19,20 316:19
341:24 342:7,9,9
342:10,10 434:23
434:23

**twiddle** 284:9
**two** 224:14 255:20
265:5 270:8,15
273:6 281:9 296:7
299:20 300:24
305:6 316:2,8
325:11 329:1
342:12,20 343:6
347:8 365:15
385:18 393:17,19
407:14 408:4
413:3 429:4
437:14
**type** 234:6 248:24
254:9 262:24
294:14 296:11
327:21 328:1
360:3 391:6
428:12
**typed** 262:19 263:3
263:16
**types** 395:3
**typing** 262:23
263:11,21
**typo** 275:23 354:7,9

## U

**U.S** 326:18 327:14
**Uh-huh** 364:12,15
380:10 421:16
**ultimate** 431:9
**ultimately** 227:19
**uncle's** 293:17
**unclear** 426:17
427:5
**uncommon** 389:13
**undergo** 225:15
226:13
**undergoing** 322:4
**underground**
247:24
**underlying** 412:20
**understand** 226:3
245:5 247:15
252:19 254:24
255:1 287:3,5
361:13 376:14
402:20 403:4
408:17 414:10
430:18 434:13
438:16
**understanding**
338:11
**understands** 255:2
**understood** 327:6
434:7 438:6,9
**unemployed** 302:9

**uniform** 275:10
419:1
**uniformed** 265:6
340:24
**unit** 249:2 251:7
256:16 283:15,20
311:16 338:24
339:3,9 377:10
381:24 407:13
430:3,4,5
**UNITED** 217:1
**units** 339:6,7
340:23
**unknowingly**
294:22
**unmarked** 234:15
235:13 380:22
419:4
**unprofessional**
286:17
**unsustained**
243:17
**untouchable** 286:4
**unusual** 392:9
**unwanted** 246:15
**updates** 225:22
226:20 228:3
**upset** 266:11
**USA079364** 279:7
**USC** 422:3
**use** 237:22 238:7
249:23 255:11,11
255:13 256:22
264:7,10 265:13
265:14 274:2
357:5 370:3,7,15
404:23 405:2
**usual** 245:11
365:18
**usually** 245:8,13
264:2,3 314:6
**utilizing** 299:14

## V

**vague** 413:17
**valuable** 395:6
**various** 226:8 264:5
**vehicle** 234:16,21
235:8 237:7,8
369:19 391:18
421:12 422:13
423:3
**velcro** 283:16
**verbally** 254:21
**vest** 283:17
**victim** 320:18,24
**victims** 321:2

**video** 408:9,10
**Videographers**
217:21
**violates** 228:14
229:14
**violation** 229:21
254:13,15,16,18
**visible** 311:10
**visibly** 399:15
409:10
**visit** 325:6,7
**voice** 327:7
**voices** 413:3
**voucher** 254:6
258:3,8,11,18
261:6,7,15,16,17
261:22 262:4,8,10
262:15,22 263:14
263:15,16 271:2
410:4,5,7,8,16,23
**vouchers** 252:12
252:18 262:13,14
262:19 263:9
273:6,10,12
277:11,12,23
279:13,20
**vs** 217:4,9 442:3,3

## W

**W** 221:2
**wait** 243:10 278:24
330:1
**waited** 284:15
**waiting** 285:5
289:14
**waive** 245:8
**waived** 224:3
**walk** 357:2,9,11
**walked** 277:3
290:20,22 332:12
347:6 357:12
358:4,5
**Walker** 217:11,18
218:4 220:16
222:4 224:7
274:11 275:20
301:22 346:7,8
347:11,14 349:17
363:14 364:8
412:14 421:11,15
423:20 424:7
442:2 443:18
**Walker's** 348:10
**Walker-2** 416:7
**Walker-5** 416:5,15
**Walker-6** 345:1
**Walker-7** 222:15

Page 464

362:8 416:11,13
**walking** 357:1,21
  358:2
**Walnut** 217:22
**want** 224:19 225:4
  233:18 244:19
  246:14 261:18
  266:2 268:6
  271:11,21 278:4
  278:19,21 280:13
  282:22 294:4
  295:4,24 299:10
  303:16 316:2
  321:24 333:11
  347:20 348:18
  361:4 362:3 364:9
  371:13,21 376:5
  381:4,5 383:6,7,9
  383:11 384:13
  403:5 416:14
  420:5,21 438:1,3
**wanted** 259:22,23
  268:4 275:4
  278:11 283:21,24
  286:19 288:14
  289:2 298:20
  310:12 312:6
  317:17 334:21
  336:2 341:19
  352:5 381:17
  394:18,19 400:22
  401:7,8
**wants** 250:7,9
  255:11 272:21
  362:23
**WARNER** 220:17
**warrant** 229:14
  232:2 244:6 248:3
  253:6 266:5
  276:18 280:17,22
  281:12 284:15,16
  289:14,22 290:3
  291:1,6 299:24
  354:1,13 365:3
  391:8 396:23
  400:19 401:13
  409:3,11 414:23
  415:11 427:10
  432:4
**warrants** 226:8
  229:15 256:5
  263:24 266:10
  276:21,22 277:2
  280:14 290:13
  427:16
**Warren** 220:4
**wasn't** 241:10,11

263:13 266:14
273:20 290:6
297:20 314:13
317:3 318:23
324:2,23 331:6,10
334:3,7 337:3
341:23 348:15
353:13,16 368:9
370:15 376:3
383:5 384:18
394:5,6 401:12,17
432:2
**watched** 290:14
  391:4
**watching** 260:5
  289:18 390:13
  424:7
**watering** 346:17
**way** 239:17 249:13
  250:23 251:5
  252:19 253:16
  263:18 264:17
  277:17,19,20
  287:12 289:11
  293:7 297:7 299:4
  303:19 306:17
  309:13,17,20
  312:17 338:2
  347:21 373:1
  376:1 386:17
  396:16 419:18
**ways** 238:1 264:5
**we'll** 250:18 267:9
  270:9 341:9 431:2
**we're** 245:19
  246:13 248:6
  256:22 287:1
  291:24 320:7
  359:13 364:11
  377:14 378:12
  397:8
**we've** 251:21
  306:15 375:4
**weapon** 368:23
**weapons** 369:6
**wear** 284:19 285:4
**wearing** 286:21
**Wednesday** 418:11
**Wednesdays** 296:5
**weed** 399:11,11
**week** 236:24 307:3
  434:22,24 435:3,4
  435:5,8
**went** 239:3,10,11
  241:8,14,15 251:5
  259:2,17 267:15
  268:1 271:13,14

272:15 280:7
281:23 282:20
284:14 290:8,9
291:12,22 292:13
295:22 299:4,5
304:13 305:13,14
306:2 308:7,12,14
309:21 310:6
317:23 320:5
321:24 322:7,13
322:15 323:7
324:8,12,14
336:23 340:6,6
342:16 343:22,23
346:6,6,15,22
347:3,6,8 351:24
357:9 358:12,12
359:9,12,19
360:18,19,22
370:14 381:9,10
381:19 391:16
410:22 415:10
425:23 426:1
428:24 429:1
430:8 431:17
432:3 434:20
436:16
**weren't** 248:16
  360:6 379:1
  387:20
**Wescott** 219:24
**west** 219:17 234:18
  269:19 363:2
  418:14
**westbound** 422:11
  422:24
**what--** 316:5
**whichever** 244:18
**white** 251:11 292:3
  300:18 347:5
**whited** 301:3
**whiting** 300:8
**Williams** 219:20,20
  233:21 272:2
  284:24 287:14
  402:12 437:20
**willing** 259:21
  394:14 395:12
**win** 301:9
**window** 358:20
**witness** 222:3
  229:8 234:2 245:4
  245:11 260:8
  269:10 272:4
  274:13 277:8,24
  279:8,15,24
  286:10,18 287:4,7

298:1 313:15
314:7,11 328:11
332:2 349:3 364:1
366:5 382:23
399:8 403:14,19
403:22 404:20
410:11 413:19
416:9,11 417:2
421:4,19 435:4
439:9 441:1,16,16
441:17,18
**witnessed** 262:11
  282:18,20 285:8
  285:18 288:8
  443:21
**witnesses** 240:10
  240:11 258:9
  293:10 348:7
  349:8
**witnessing** 277:7
  277:24 279:14
  395:23 398:1
**wondering** 327:18
  398:3,18
**word** 404:23 438:17
  438:18
**words** 253:18
  297:16 382:1
  386:16
**wore** 283:16
**work** 225:18 230:23
  239:15 246:7
  250:4 261:6 267:2
  267:5 269:17
  271:21,24 272:21
  277:1 291:11
  292:10 303:4,8
  310:22 311:15
  322:24 345:10
  375:20 376:10
  379:2 380:24
  381:4,5 383:6,7,9
  383:11,14 413:7,7
  432:21
**worked** 265:10
  375:12 381:2,3
  392:16 395:21
  413:11 432:20,23
  433:1,3 435:22
**workers** 431:18
**working** 255:9
  271:7 291:13
  292:10 294:2
  298:20 303:7,8
  306:18 309:21
  310:21,23,24
  345:11 376:15

377:17 378:14
380:20 383:13
384:22 393:20
398:17 399:8
400:2 420:8 433:2
438:24
**worse** 323:17
**worthy** 234:22
  296:12
**wouldn't** 242:18
  249:21 287:12
  343:19 381:18
  384:19 397:18
**write** 333:21
**Writer** 221:15
**writing** 238:5 263:1
  335:1 436:23
**written** 229:16
  338:5,8 426:20,21
  426:23
**wrong** 246:5
  247:13,15,16,19
  248:18 316:15
  335:13,15 336:3
  351:10 352:9
  361:12,14 375:2
  380:14 407:21
  409:9,10,13,14
  432:9,10
**wrongfully** 425:9
**wrote** 374:16
**www.summitrep...**
  217:24

_____
**X**
_____
**X** 222:1

_____
**Y**
_____
**yards** 411:3
**YATVIN** 219:10
**yeah** 231:14 245:17
  268:20 278:15
  279:11 280:11
  281:18 287:2
  292:24 299:10
  309:13 313:2
  314:10 316:9
  320:21 324:15
  326:4,18 327:2
  328:13 330:3
  332:22,22 333:1
  338:1 341:5
  342:10 352:8,19
  353:20 363:21
  364:1,10 366:14
  369:21 379:23
  380:2,4 384:3

SUMMIT COURT REPORTING, INC.
215.985.2400 * 609.567.3315 * 800.447.8648 * www.summitreporting.com

385:1 386:13
388:18 392:14
394:5,11 398:21
400:3,8 403:22
411:17 420:3
422:22 428:2
431:16 433:3,20
434:13,17 437:17
437:19,21
**year** 226:13 277:15
293:14,14,19
306:1,8 307:4
315:13,17,23
316:2 325:17
332:12 378:4,11
**years** 225:13
227:24 233:9
240:17 255:22
256:15 257:13
266:2 302:5 305:5
306:13,21 316:7
316:10,15 317:12
322:3 325:17
329:1 335:3
339:16,24 344:9
350:17,19 358:3
411:24 413:11
419:8 434:8
435:10
**yell** 397:15,18
**yelling** 283:1
327:11 397:20
**yesterday** 224:21
238:19 244:24
245:7 249:19
268:17,22 385:2
390:14 404:7
405:4,10 410:2
413:5,6 425:6,8
436:15
**YOUNG** 221:2
**youth** 334:18

_____

**Z**

_____

**0**

**08037** 217:23

_____

**1**

**1/4/2000** 354:6
**1/5** 354:16
**1/5/2000** 354:12
**1:00** 345:14
**10** 320:11
**10:20** 218:7
**10th** 221:3
**11** 339:23 418:12

**11th** 347:17 375:3
**13-2773** 217:6
**1300** 219:22
**14** 435:9
**14-1643** 217:16
**14th** 220:13
**1500** 217:22
**1515** 219:21 220:12
**16** 217:19 218:6
344:9 350:17,19
358:3 442:2 443:7
**1610** 217:22
**1621** 421:10,12
422:10,23
**1628** 354:17 356:11
422:14 423:3,11
423:24 424:7
427:9 428:23
429:2,6
**1658** 425:24
**16th** 276:12
**17** 364:13
**1830** 220:7
**1880** 221:3
**19102** 217:22
219:12 220:13
**19102-1929** 219:22
**19103** 220:19 221:4
**19106** 219:8
**19107** 219:4 220:7
**19128** 220:3
**19428** 219:17
**19th** 362:13

_____

**2**

**2** 411:3,3 422:9,22
**2:05** 423:16
**20** 252:1 261:11
307:5 330:13,17
424:1 436:7
**20,000** 320:11
**200** 219:17 269:18
269:23
**2000** 220:18 233:9
303:23 304:1
354:4 420:16
423:19
**2001** 303:22 306:18
354:8 379:7
417:24 418:11
**2002** 233:9
**2006** 307:11,15
322:3,6 332:21
339:21,22
**2010** 275:16 312:23
313:22 314:14,21
315:14,24 316:2,6

316:20 323:19,21
396:10 412:2
**2011** 268:11,11
277:11,13 278:23
306:15 307:12,15
308:2,17 322:3,5
322:6 325:15
332:21 339:21
375:3,7,19 376:12
376:20,23 377:2,5
377:8,15 398:6,11
398:23 400:5,6,15
411:10,14,17
412:2
**2013** 308:10,18
328:24 329:2,16
**2016** 217:19 218:6
301:23 343:9
351:12 352:22
442:2 443:7
**210,000** 388:7
389:1,18,23
**215** 217:23 219:4,8
219:13,23 220:3,8
220:14,19 221:4
**21st** 308:10,18
**224** 222:6 223:10
**229** 250:13
**230** 219:11
**239** 219:3
**25** 436:7
**2900** 386:21
**2nd** 417:24

_____

**3**

**3** 364:11 402:13
**3:17** 363:22 364:2,6
364:13
**3:30** 345:17 358:1
402:13,14
**3:35** 439:15
**3:50** 425:23
**30** 230:6,7 232:13
**30(b)(6)** 228:20
**300** 411:3
**301** 222:7
**303** 219:7
**30th** 301:24
**34** 347:17
**362** 222:15
**365** 279:7
**3730** 217:11
**397-0125** 219:18
**39th** 269:21
**3rd** 418:11 423:19

_____

**4**

**400** 219:16
**4000** 234:17
**402** 222:8
**40th** 399:12
**41** 234:17
**412** 222:9
**41st** 235:20 236:2
**4200** 386:15 387:1
**424** 217:23
**4268** 217:12
**443** 220:2
**447-8648** 217:23
**45** 345:17
**48** 247:17
**49** 409:2 428:15
**49th** 386:21
**4th** 354:1 418:19
420:16

_____

**5**

**5,000** 338:16
**50** 307:5
**503** 219:12
**5401** 362:2
**5422** 362:2
**546-5700** 219:13
**557-0099** 219:23
**55th** 354:18 356:11
422:12,14 423:2,3
423:11,21,22,24
424:2,5,7,8
425:24 427:9
428:23,23 429:2,7
**5600** 363:2 417:24
**5605** 418:13
**5607** 418:13
**5609** 418:14
**567-3315** 217:23
**56th** 422:1 423:18
424:5
**575-2626** 220:19
**587-1678** 221:4

_____

**6**

**6** 339:23 353:18
409:5,6 416:10
**60** 277:11
**601** 218:4
**6061** 217:14
**609** 217:23
**610** 219:18
**627-8516** 219:8
**683-5381** 220:14
**6B** 218:5

_____

**7**

**70** 413:20,24 414:8

414:9 435:20
436:5
**731-9500** 219:4
**7471** 416:22
**7472** 420:13
**7474** 425:19
**75** 413:24 414:8,9
435:19,20 436:5
**75-49** 353:20 362:1
**772-0600** 220:8

_____

**8**

**80** 436:1
**800** 217:23
**869-5502** 220:3

_____

**9**

**985-2400** 217:23
**9th** 343:10