EXHIBIT “1”

JOSEPH A. POLLINI

POLICE EXPERT, INC.

107-24 71 ROAD-PH2C

FOREST HILLS, NEW YORK 11375

917-969-1711

December 17, 2021

Michael Pileggi, Esq.

303 Chestnut Street

Philadelphia, Pa 19106

Re: Kareem Torain v. City of Philadelphia, et al, No.: C.A. 14-1643.

Dear Mr. Pileggi,

1. Pursuant to Plaintiff's request. I am submitting a summary of my opinions, within a reasonable degree of professional certainty, regarding the actions and procedures employed by members of the Philadelphia Police Department in connection with this matter. This summary is based on:

a. A review of the documents provided, and

b. My experience, training, education and professional background, which are described below.

2. I am a retired member of the NYPD, having served on the force for more than 33 years. During my tenure, I held the ranks of Police Officer, Investigator, Sergeant, Lieutenant, and Lieutenant Squad Commander. I served in numerous capacities including patrol officer; detective investigator; patrol sergeant; detective squad sergeant, Lieutenant Squad Commander of the Brooklyn Robbery Squad, 81 Detective Squad, and the Cold Case Homicide Squad. Over the years I have responded to, investigated and made arrests in connection with more than a thousand cases of assault, robbery, narcotics kidnapping, homicides and other crimes. I served as a member of the Hostage Negotiating Team for 17 years and I trained members of the FBI on kidnapping investigations tactics. I assisted the United States Marine Corps in developing a community policing program that was used by the Marines in Afghanistan. I testified in court numerous times, which included testimony pertaining to criminal matters and proper police

procedures. My curriculum vitae, which provides further detail about my experience, training and education, is appended to this report.

3. The following is a list of materials pertaining to the incident and individuals involved that have been provided for my review thus far;

a. Brian Reynolds - Depositions 7/28/21 & 9/23/21
b. Letter from Michael Pileggi to Anne Taylor 11/1/21
c. Brian Monaghan - Deposition 1/17/17
d. Ellen Green-Ceisler, Expert Report 9/9/05
e. Memo to Chief Inspector Black, Office of Professional Responsibility, from Lieutenant William Donahue, Internal Affairs
f. Ellen Ceiser Deposition – Deposition 1/14/06
g. Fourth Report-Narcotics, Ellen Ceisler – July 2002
h. Enforcement of Narcotics Laws, 7/2002
i. Investigative Report-Plaintiff's Exhibit- Reynolds 6 9/23/21, Continuation of Search and Seizure Warrant-#97334
j. Plaintiff's Exhibit Reynolds 8, 9/23/21, Freeman Pretrial Motion
k. Freeman Transcript, Reynolds 9/23/21, Plaintiff's Exhibit 5
l. Freeman Investigation Report
m. Philadelphia Police Department, Directive, Subject-Informants
n. Integrity and Accountability Office, Philadelphia Police Department, Disciplinary System, December 2003
o. Kareem Torain-Arrest Report
p. R. Paul McCauley, Phd, Report, 5/30/19
q. James McIntyre v. Thomas Liciardello, Plaintiff Brief In opposition to Defendant's Motive for Summary Judgement
r. Sylvester M. Johnson, Deposition, 6/17/05
s. Court of Common Pleas-Manuscript
t. Bryan Reynolds, Concise Officer History
u. Continuation of Search and Seizure Warrant, #99025, #99026, #99027, #99028.
v. Torain Investigative Report-Sinclair-5
w. Torain Property Receipt
x. Torain Search Warrant
y. Torain Plaintiff's Motion to Compel
z. Walker Affidavit, Plaintiff's Exhibit 14-Reynolds
aa. Walker Depositions, 9/15/16 & Walker Deposition 9/16/16

4. My rate is $300.00 per hour for preparing reports and consulting with attorneys. My rate for court testimony or deposition testimony, is $3,000.00 per day, or part of day, plus travel and lodging expenses.

5. During the past four years, I have provided deposition or trial testimony in the following cases;

a. Brian Pettford v. The City of Yonkers, et al., S.D.N.Y., Docket no. 14-cv-06271 (JCM). Testified at a deposition.

b. Hanson Cuthbert v. The State of New York, New York State Court of Claims. Qualified as a police procedures expert and testified at trial on 06/18/19.

c. Jamar Smythe v. City of Yonkers, et al., S.D.N.Y., Docket No.: 16-cv-02451 (CS) (JM). Testified at a deposition on 9/17/18.

d. Ahmad Manzoor v. City of New York, New York State Supreme Court, New York, New York. Qualified as a police-procedures expert and testified at trial on 3/10/17.

e. Francisco Suriel v. Port Authority of New York and New Jersey et al, No.: 1:19-cv-03867 (E.D.N.Y.). Testified at deposition. 12/3/2021.

6. Since my retirement from the NYPD, I have been a member of the full time faculty at John Jay College of Criminal Justice, where I have taught undergraduate and graduate level Police Science and Criminal Justice courses. I have served as the Police Studies Coordinator and Deputy Chairperson, of the Law/Police Science and Criminal Justice Administration Department, at John Jay College for over 16 years.

## SUMMARY OF FACTS

7. The following information was recorded on a Philadelphia Police Department, Investigation Report, (Sinclair 5, 10/25/21)

(1) **Origin and details of complaint:** On Thursday, 1/04/01 at approx. 3:30 PM the below defendant's were arrested for narcotics violations.

A. Darnell Delee 19 B/M 5605 W. Master St. DOB 7-13-81
B. Anthony Hodges 19 B/M 5605 W. Master Street, DOB 7/9/80
C. Kabiyan Diggs 19 B/M5531 Osage Ave. DOB/ 5-25-81
D. Ronald Freeman 16 B/M 135 N. 61th St. DOB 5-10-84
E. Arthur Tillman 21 B/M 1513 N. Frazier St. DOB 12-19-79
F. Mark Pinchonot 15 B/M #19 N. 52nd St. DOB 5-1-85
G. Kareen Torain 23 B/M 1621 N. Conestoga St. DOB 6/28/77
H. Raymond Howard 26 B/M 1752 Aberdeen St. DOB 11-18-74
I. Maurice Grey 20 B/M 5256 Parkside Ave. DOB 1-2-81
J. Glen Delee 45 B/M 5605 W. Master St. DOB 11-8-57
K. Eileen Hodges 54 5607 W. Master St. DOB 1-15-46
L. Migel Moon 21 B/M 1143 E. Price Street, DOB 8-29-79 (arrested 1-10-01)

**ASSIGNED:** P/O BRIAN MONAGHAN #6061 PR#201073M B/DY/SW, 2 PLTN (NFU 07423)

(2) **INTERVIEW AND INTERROGATIONS:**

8. a. P/O MONAGHAN #6061, received detailed information from a confidential source and 19th District. Police Officers, P/O Ronald Cain, #4959 & P/O Joseph Goglielmucci, #2460, referring to drug activity involving the 5600 Blk of W. Master St. Listed locations 5609 W. Master St. abandoned property narcotics being packaged in this location. 5607 W. Master St. being used as a stash house, containing marijuana, crack, and weapons. 5605 W. Master St. narcotics sold from front porch area. Also a B/M name "Al", and a B/M by the name of "Pud". (NFU 07423)

b. On Tuesday, 1-2-01, at approximately 3:45 PM, P/O Monaghan #6061 & P/O Kelly #7126, set up a surveillance in the area of 5600 W. Master St. P/O Monaghan #6061 observed #1 B/M (later I'd as Anthony Hodges) wearing a black down jacket and gray/black b/b cap, 5'8", med compl, 20's. And #2 B/M (later I'd as Darnell Delete) elk jacket, w/fur around hood, 5'8", med compl, 20's w/red wool knit skull cap, standing on the porch of 5605 W. Master St. At approx 3:45 Hodge knocked on the front door of 5605 W. Master St, unk B/M opened the door and handed Hodge a golf ball size object. Hodges then handed Delee objects from the golf ball size object. Between 3:45 pm & 5:30 pm, Hodge and Delee on different occasions would accept ink amounts of USC from ink B/M & ink B/F's in exchanged for small packets they retrieved from their persons. At approximately 5:12 pm a grey olds vehicle stopped in the 5500 elk of W. Master St. and passenger exited the vehicle and walked towards the N/W corner of 56 & Master St. After a brief conversation with both Hodges and Delee they walked the unk B/M into 5607 Master St. After about 10 minutes the unk B/M exited the location, P/O Monaghan #6061 observed the B/M place a large clear bag containing a green weed substance into a bulk bag he was carrying. At this time #2 B/M went to 5409 W. Master St. removed USC from his jacket pocket, opened the front door and placed the USC into that property. The unk B/M walked to the corner where the olds veh picked him up and then left the area. The vet was followed by members from the NFU. To 4700 Blk of Marion Ave. 2 Unk B/M occupants exited the veh Passenger carrying the elk bag then entered 4710 Marion Ave, Hodge then entered 5605 W Master St. (NFU 07423)

c. On Wednesday, 1-3-01 at approximately 11:00 AM, P/O Monaghan #6061 & P/O Kelly #7126, set up surveillance for the locations of 5605, 5607 & 5609 W. Master St. At approx. 11:31 AM police observed a dark colored Buick Pa tag DKD2171 (which is registered to Glenn Lee 5607 Master), operated by a Delee, wearing elk down jet, w/red wool knit skull cap, park in front of 5609 Master St. At approximately 11:52 AM Delee received a golf ball size object containing dark colored objects out the front door of 5605 Master St. Between 11:30 AM and 11:58 AM B/M #2 gives numerous B/M's and female small dark objects from inside of a clear baggie that he was holding on his person in exchange for USC.
(NFU 07424)

d. At approx. 11:58 AM a B/M (later I'd as Miguel Moon PPN#817626) wearing dark jacket, blue and white Titans Ball Cap, exits 5605 Master Street and hands small objects to a B/M wearing a tan jacket in exchange for USC. Moon then goes onto the Porch of 5607 and counts green packets that are inside a clear baggie that he retrieved from his person. Moon then

gives numerous of these packets to 2 males and 1 female in exchange for USC the places the bundle in his right pocket.
(NFU 07424)

e. At approximately 2:22 pm Hodge wearing a bulk Averix jacket exited 5607 Master St and gives a B/M wearing black jacket, blue and white plaid shirt small object in exchange for USC.
(NFU 07424)

f. At approximately 2:26 PM, Moon takes from his person the clear baggie mentioned earlier that cont green packets and hands them to B/M #2. Moon then gets into the passenger side of a dark colored auto, Pa Tag BZR 4983 (which comes back to a Mazda) and leave M/B on 56th Street.
(NFU 07424)

g. Between 2-3:00 pm Kabiyan Driggs, wearing a black jacket, red shirt and baseball cap parked an older model Subaru station wagon Pa tag, CDP3580 on the N/W corner of 56th and Master. This B/M exited carrying a green Timberland shoe box and went in 5605 Master St. This B/M exited a shc Ima and left the Subaru. (NFU07424)

h. At approximately 3:56 pm Delee was observed giving (2) B/F's small objects in exchange for USC in the rear of store on the N/E corner of 56th and Master St.

i. At approximately 3:58 P/O Mitchell #4145 went to that corner to attempt to make a controlled narcotics purchase from Delee P/O Mitchell met Delee inside of the store and engaged in narcotics related conversation after which Delee told P/O Mitchell to stay inside. Delee exited the store, walked to the rear of the store and removed small objects from his person. Delee then opened the backdoor of the store and called P/O Mitchell #4145 outside. Delee handed P/O Mitchel the small objects in exchange for 20.00 pre-recorded buy money. P/O Mitchell left and turned items purchased (4 black tinted goat sealed packets cont a white chunky substance) over to P/O Monaghan. A majority of observation on 1/3/01 were videotaped by P/O Kelly #712 and P/O Monaghan #6061. (NFU07424)

j. On 1/4/01 P/O Kelly #7126 and P/O Monaghan set up a surveillance of 56th and Master St. At approximately 1:41 PM police observed a green Bonneville Pa tag DKC 3310 (registered Carolyn Gillis travel N/B on 56th St. to the intersection of 56th and Master. At this time Delee who was standing on steps of 5605 Master St. made a hand gesture toward the Bonneville and yelled, "Yo". At this time the Bonneville traveled W/B on Master St. and turned N/B onto Ithan St. At this time the Bonneville W/B on Master St. and turned N/B onto Ithan St. At this time Delee ran W/B to Ithan St. and entered the passenger side of the Bonneville. Delee exited after approximately 2-3 minutes and ran back to the corner of 56th and Master. The Bonneville who was being operated by a B/M later I'd as Kareem Torain was followed back to 1611 W. Conestoga Street by P/O Walker #3730 where police observed Torain exit his vehicle and enter 1621 Conestoga. Police observed Delee go immediately go back to the corner of 56th and Master and give small objects which he retrieved from his pocket to numerous males and

females in exchange for USC. At approximately 1:43 PM Police observed the Sebring travel W/B on Master St. being operated by Christina Braxton stop in front of 5607 Master St. Anthony Hodge exited the passenger side and entered into 5607 Master St. with a key. Hodge was observed on numerous occasions entering and exiting 5607 Master St. with a key on 1/4/01. At approximately 3:55 PM, P/O Kelly overheard Delee who was standing on the Southeast corner of 56th and Master Street tell Kabiyan Diggs that Kareem (operator of the green Bonneville) only had a bundle on him and would call when the rest was ready. At approximately 2:00 PM, P/O Reynolds #4268 observed Torain Exit 1621 S. Conestoga and travel W/B on Hunter St. in the Bonneville to the S/W corner of 55th and Hunter St. At this point Torain exited his vehicle and entered into 1628 N 55th St. with a key.
(NFU 07425)

k. At approximately 2:05 pm, police observed Delee answer the key pad phone on the N/W corner of 56th and Master St. The jog to the Buick (mentioned on 1/3/00) along with Diggs and Arthur Tillman. P/O/ Walker followed them to 55th and Hunter St. where they parked the car on 55th St. All these males exited the Buick and were admitted into 1628 S. 55th Street by Torain. After approximately 30 minutes all three males (Delee, Tillman and Diggs) exited 55th St. with Delee placing a clear bag inside of his jacket. All three males go into the Buick and were followed back to 56th and Master by P/O Reynolds. P/O Walker remained at 53th and Hunter watching 1628 55th St. At approx. 2:35 pm Police observed Hodge exit 5607 Master St. and go into a red Plymouth Breeze, Delaware tag, D4398 and take unknown objects from inside of the car and the trunk. Hodge then walked back to into 5607 Master St.
(NFU07425).

l. At approx. 2:37 pm, Police observed the Buick park on the east side of 56th St., just north of Master. All three males exited the vehicle and walked to the porch of 5605 Master Street. At approx. 2:37 police observed Delee hand bundles to Moon, Freeman, Hodge and Diggs. Delee then placed a clear baggie containing numerous green tinted packets. In his right jacket pocket Delee then was observed giving these small green packets to numerous people in exchange for USC. Police observed Moon, Freeman, Hodge, Diggs, and Delee were observed giving males and females small objects in exchange for USC.
(NFU 07425)

m. At approx. 2:58 pm, Torain left 1628 W. 55th Street and left the area in his Bonneville. P/O Reynolds #4260 followed this vehicle out of the area and with the aid of uniform vehicles stopped Torain at 41st and Nassau St. and placed him under arrest. Recovered from him was (1) pager, (1) Nextel cell phone, (1) Cancer Key Ring containing 5 keys, (1) black key ring containing 3 keys (one was later determined to work the door of 1628 N. 55th St and apt #2 inside), (2308207) 250.00 USC, (2308208). (NFU07425)

n. At approximately 3:50 pm, members of narcotics went to 1628 N. 55thb Street to attempt to secure the apartment that Torain went into. P/O Kelly spoke with the manager of the property, Vincent Saunders, in reference to a B/M who rented a room inside. Mr. Saunders stated that he knew a B/M, light complexion, heavy build who drove a green Bonneville with tinted windows Shinny Rims lived in apartment #2. This male had young males entering and

exiting his room frequently. At this point the owner of the property Vincent Saunders showed up and stated that no one had rented apt #2 and no one had permission to be inside of the property. P/O Monaghan #6061 tried one of the keys from Torain's key ring in the lock at apt. #2 and it opened the lock. The owner again stated that no one had rented the apt and no one had permission to be inside. The apt was secured pending search seizure warrant. (NFU 07426)

o, On 1/5/00 P/O Monaghan #6061 obtained a search and seizure warrant #99028, approved by Ada Albright and signed by Bail Commissioner Polkoff. (NFU07426)

p. Inside 1628 N. 55 St., apt. #2, at approx. 1:00 am, members of Narcotics excited search and seizure warrant #99028. Recovered from inside in bed frame was (1) Sentry Safe Cont, (2) amber fill bottles with white tops (2308224) and bags tied in a knot on top containing a white chunky substance (a total of approx. 17 grams of crack cocaine). (2308223).

9. On September 16, 2016, Jeffery Walker was deposed regarding narcotics investigations by the Philadelphia Police Department. Mr. Walker was asked the following questions and provided the following responses;

a. Officer Walker stated during his deposition that he was familiar with the Philadelphia Police Department's policy regarding the use of confidential informants, (Walker, page 248). He said the he received some type of training courses regarding the use of informants, but did not recall exactly what the course entailed, (Walker, pages 248-249). He said that his training, regarding the use of informants, was hands on and that you would get instruction by other officers that had prior knowledge. Officer Walker stated that he used confidential informants on hundreds of occasions. (Walker, page 249).

b. Officer Walker was asked during his deposition, what steps must be taken to register and use a confidential informant. He said you must first prepare a confidential informant form (229), which would include the potential informant's biographic information. Officer Walker said that during the registration process, to register an informant, the officer would read the potential informant instructions. Part of the instructions to the potential informant state that an informant cannot commit any criminal activity and cannot have any open cases. (Walker, page 250)

c. Officer Walker was asked during his deposition if he ever utilized the services of a confidential informant where he either used a confidential informant for himself of if his squad members used an informant where he participated in a confidential informants activity where the informant was engaging in criminal activity. Officer Walker responded;

"Yes. It went all the way through several squads. Again, it was like taboo in the Field Unit where people will feel comfortable doing certain levels of things they should not do. Like some people might start lying and they may feel as though little, little lies here and there, call them little white lies, only lied about certain things but it really didn't happen. And then you get into the misusing of confidential informants, where you send a confidential informant to a location and you don't keep eyes on a confidential informant and you're relying on what the

confidential informant tells you when they come back. So basically you're basing your probable cause on the observation of the confidential informant." (Walker, deposition, pages 250-251).

c. Officer Walker said that when he pays for information it means they suppled information to him. He said, "A lot of times that information came from continued criminal activity that the confidential informant had done." (Walker, page 252). He went on to say, "So it shows when you look at these vouchers they basically - - if you looking at it the right way you can understand how many times - - when you've used a confidential informant when it says paid for information a lot of times that confidential informant is committing criminal activity to give you that information, and we know that." (Walker, deposition, page 252). Officer Walker stated that not only does the confidential informant benefit from it, but the handling officer benefits as well. He said when a confidential informant does a buy, he establishes the basis for a warrant and it further gives the officer an opportunity to steal and also, go to court and make money. (Walker, deposition page 253).

e. Officer Walker went on to say that the process of using a confidential informant, "goes on and on". "Opportunity for overtime, investigations, large investigations. Everyone's benefiting from this situation using a confidential informant. A confidential informant is money. The guy go out and do a buy, it's continuous money in the situation." (Walker, deposition page 253).

f. Officer Walker was asked during his deposition if there was any way to internally police a situation where the confidential informant was engaged in criminal activity. Officer Walker replied, "So nothing's - - no question - - if a supervisor asked me a question about a particular job where the information come from because he seen the voucher, it come from the C.I. He never asked you - - and you're repeatedly doing it over and over again the question never arises do you think this guy is doing some type of criminal activity. Never no - - they don't ask it, it just keep moving." (Walker, deposition, page 254). Officer Walker was asked if it was a violation of the Philadelphia Police Department's policy and procedures to let a confidential informant engaged in continued criminal activity. Officer Walker replied, "It's a violation of the instructions and it's a violation of the policy." (Walker, deposition, page 254).

g. Officer Walker was asked during his deposition if he ever had an occasion where a supervising officer was not there when a confidential informant was allegedly searched. Officer Walker said; "Again, that's - - a lot of times. It was like a format. I have met the CI in the district and the supervisor be in the headquarters, and I'm always doing my warrants, the supervisor - - I met with the confidential informant along with a supervisor. All that is lies. It's a format. It's follow a format." Walker went on to say, "It was a common practice for the years I've been in Narcotics Field Unit where the supervisor was never there. It's like we do buys and the supervisor is inside, especially with my squad, Sergeant Joe McCloskey, he was always in the office. The only time he came out of the office is if something was out there or occasionally he might come out there and we're use - - I'm using these C.I.'s. With Chet Malkowski, the exact same thing. If he been out there he'll be out there with Brian and Tommy and I'll be using the CI by myself at times in a different location. (Walker, deposition, pages 255, 257).

h. Officer Walker was asked during his deposition if there was ever an occasion where he did not search a confidential informant before sending them in to make a buy, and he replied, "It was - - a lot of occasions I did not search the CI. If I did search a CI it was basically empty your pockets out, put them - - whatever you got in the car, whatever the situation was, and only thing I know I did was give them money - - was supposed to give them money to do the buy in situations, and even at that situation where I fabricated purchases they was never given any money, it was they signed the voucher." (Walker, deposition, pages 257-258). Officer Walker went on to say, "And that was - - that was done with me using CIs but also it was done - - mentioning to the Federal Government it was done where I allegedly made a buy, which I did not, and I said to sign a voucher saying I did make a buy, and the witnesses was the Sergeant Joe McCloskey, the Officers Liciardello, Mike Spicer, Brian Reynolds, who actually filled out the voucher". (Walker, deposition, page 258).

i. Officer Walker was asked during his deposition if it was permissible for a male officer to search a female informant, and he replied, "No, you're not, because a lot of times I was using a female and I was saying I was thoroughly searching the confidential informant, but again, these questions was never brought up even though - - if the defense attorney brought it up we were not allowed to say or we played games with them saying we can't - - a male or female, so they would never know if it was a male or a female." (Walker, deposition, page 260).

j. Officer Walker was asked the following questions and provided the following responses, during his deposition, regarding the voucher system;

Q. Now, Jeff, explain - - you had mentioned that you would pay these CIs. Explain the voucher system. How does it work?

A. The voucher system is actually a receipt of the payment that's made. If I go out there with an informant, the informant makes them - - give them the money. You could record a $20 bill or whatever you're buying. The informant makes the purchase. The informant comes back. The informant is giving me drugs and I begin to fill out the voucher once I receive the drugs. Once I fill out the voucher, I be handing the voucher to the informant and the informant looks - - they don't want to look - - a lot of them don't look it over, they just happy to get the money, but I gave to them, they're supposed to look it over, and then they sign it the bottom of the voucher. The payment money is not given to them until the end of the course of the day when you release them. That's how it's supposed to be done.

Q. Okay. Now, let me ask you, you say you actually take the voucher out to the - - out to the site, wherever - - wherever you're going to make the buy?

A. Yes.

Q. Okay. Is that voucher already drafted?

A. No, it's always a blank voucher. I know at one time what I was doing, and I witnessed other officers do it, where we were actually giving a stack of vouchers to the CI and had the CI sign a number of vouchers that were blank so if the CI did a buy and we forgot to fill the voucher out we knew we had the signature - - we had the CI's signature. And we were actually to in - - like the case where these vouchers were typed up, they're already signed by the CI and the CI makes the buy, or whatever we choose to do, we knew we had a voucher with the CI's signature on it and at that time at the beginning of it we were typing them up, but we were told no more - - not to type them up anymore but we were writing them after the buy.

Q. How would you know - - if you typed them up before you took it out to the site, how would you know the circumstances? I mean, there's information there as to where the buy is made, when it's made.

A. We controlled all that, the situation, whatever we chose to put on the vouchers at the time. When we were typing them up, again, we were going against policy. Where we wasn't filling them out the street, the CI would basically sign a blank voucher, or it was a voucher already previously signed by the CI and we took that voucher in and we typed it up, whatever the situation we felt - - what the buy was. Sometimes it happened the way it happened, sometimes it didn't but you couldn't tell what was what because we were breaking the policy. We were going in and we were typing them up.

(Walker, deposition, pages 261-263)

k Officer Walker was asked the following questions and provide the following response during his deposition, regarding probable cause:

Q. Okay. Are you aware - - and again, this is dating all the way back since you got into narcotics, are you aware of any incidents where there was a nonexistent source, confidential source or a non-confidential source or informant, confidential informant, was that put in the affidavit of probable cause that actually did not exist?

A. Yes.

(Walker, deposition, page 264)

l. Officer Walker was asked the following question and provided the following response during his deposition, regarding "a green light";

Q. So let me ask you, when you say "a green light," you mean these are individuals engaging in criminal activity, that these officers knew were engaging in criminal activity yet were using them as sources.

A. Yes.

Q. Okay. Was there situations where they would work with one drug dealer to get at a competitor?

A. All the time.

Q. How would that work?

A. It was known. Anyone there - - that we were known for it. Even if we lock a guy up no matter who it is - - a lot of time it was in South Philly. We'll ride along, we see the guy out there, we might grab him, drive him around in the car, interrogate him. Once we get them on board Thomas Liciardello - - they become our friends now. It's like a - - go from one motion to another. You went from being - - beating the guy up and threatening the guy, the next you know you're buddies. You know, everyone - - everyone's happy, best of friends.

(Walker deposition, pages 266-267)

m. During Officer Walker's deposition, he described an incident where Officer John Speiser, pointed a gun at him. As a result, Officer Walker felt it was the right time to leave his narcotics squad. (Walker, deposition, pages 268, 274). Officer Walker subsequently mention the gun pointing incident to a number of people, one of which was Sgt. McCloskey. Sgt. McCloskey told Officer Walker to, "get out of the squad." At this point Officer Walker realized he no

longer had any friends. Officer Walker subsequently, "continued on" and stayed to himself. He eventually left the squad. That's when he maintained using the CI by himself and the supervisor knew this. (Walker, deposition, page 269).

n. Officer Walker said that he would come to work and inform the sergeant he needed $200 for using a CI. Officer Walker told the sergeant that he was going to West Philadelphia with Angie. The sergeant said it would be okay. The sergeant provided Officer Walker with the $200 and told him, "Let me know if you got a problem." (Walker, deposition, page 269). Officer Walker said he would go to Southwest Philadelphia, and pick up Angie. Walker said he would not search her. Walker said that he and Angie would discuss where they were going to make a narcotics buy. Walker said they would then make the buy. The sergeant might call him to see what he was doing and he informed the sergeant that he made buys at two locations. The sergeant would tell Walker to either meet him where they were located or he would meet up with him at headquarters. (Walker, deposition, pages 269-270).

o. Officer Walker was subsequently transferred to Sgt. Gorman's squad. (Walker, deposition, page 271). While assigned to Sgt. Gorman's squad, Officer Walker continued to work by himself, with a confidential informant. Officer Walker did the same exact thing that he did when he was assigned to Sgt. McCloskey. Walker said, "He would tell me to have a particular officer sign it saying they were there, two officers there on the vouchers." (Walker, deposition, page 272-273).

p. Officer Walker said that the Narcotics Field Unit of the Philadelphia Police Department misused sources of information, confidential informants, confidential sources and/or concerned citizens. (Walker, deposition, pages 79, 81-84).

q. Officer Walker said that the Torain investigation and prosecution were illegal. He further testified at deposition that he, Officers Monaghan and Reynolds fabricated the facts to strengthen the warrant of probable cause. (Walker, deposition 121-124).

r. Based on the police paperwork, his recollection of what occurred and his testimony at trial, Officer Walker believes that Torain was illegally arrested and prosecuted. (Walker, deposition, page 129)

10. The following is an affidavit sworn to by Officer Jeffrey Walker, on May 15, 2017.

(1) My name is Jeffrey Walker and my date of birth is October 6, 1968.

(2) I reside at 6444 Woodcrest Avenue, Philadelphia, Pennsylvania, 19151.

(3) I graduated from Overbrook High School located in Philadelphia, Pennsylvania in 1987.

(4) I was employed with the Philadelphia Police Department from June 28, 1989 until my termination on May 21, 2013.

(5) I was arrested on May 21, 2013 by the federal authorities for Hobbs Act Robbery and immediately began to cooperate with the federal government.

(6) As a government witness, I testified against my codefendants, Philadelphia Police Officers, Thomas Liciardello, Brian Reynolds, Perry Betts, John Speiser, Linwood Norman and Michal Spicer at their federal criminal trial 2015.

(7) Pursuant to Section 5K1.1 of the United States Sentencing Guidelines, I received a full downward departure from the Government for testifying truthfully and was sentenced to a 42 month term of imprisonment by the Honorable Eduardo Robreno.

(8) On March 30, 2016 I was released from F.C.I. Lexington and began cooperating with the civil rights attorneys in hundreds of cases concerning the wrongful conviction civil lawsuits brought against me and members of my Narcotics Field Unit including Thomas Liciardello, Brian Reynolds, Lt. Robert Otto, Sgt. Joseph McCloskey, Sgt. Chester Malkowski, Brian Monaghan, Perry Betts, John Speiser, Michael Spicer, Sean Kelly, et al. under the lead case of McIntyre v. Police Officer Liciardello, C.A. No. 13-2773 (E.D Pa, May 20, 2013.

(9) I worked at the 16th Police District (Burglary /Narcotics Division) in Philadelphia, Pennsylvania from in or around 1991 until 1999.

(10) In 1999, I transferred to the Narcotics Bureau of the Philadelphia Police Department.

(11) I was personally involved in the facts leading to the execution of the search warrants, arrest and prosecution of Dennis Freeman and other individuals involved and associated with Dennis Freeman in the investigation against him in 2000.

(12) I have recently had the opportunity to review the Affidavit of Probable Cause, as well as the trial testimony of myself and testimony of Brian Reynolds given at the criminal trial of Dennis Freeman.

(13) One of my partners in that investigation was Brian Reynolds. Brian Reynolds was the lead investigator in the investigation that led to Dennis Freeman's arrest and subsequent prosecution and was also the police officer who initiated the investigation after obtaining information from a "concerned citizen."

(14) Brian Reynolds gave false testimony about the "concerned citizen" because the "concerned citizen was actually an individual that Brian Reynolds and I had used several times prior to the Freeman Investigation as an unregistered informant. Brian Reynolds also failed to disclose that this individual was personally involved with this investigation and several other investigations when he assisted us in coordinating surveillances, permitted us to use his vehicle for stakeouts and gave Brian Reynolds information on other drug dealers so that he could take over their drug locations when they were arrested.

(15) Brian Reynolds and I used this unregistered informant who was known to us as "Al", described as a light skinned black male with curly dark hair wearing eye glasses and who resided in the 16th District in the area of 41st and Ogden Streets on numerous occasions while Officer Reynolds and I were detailed to the 16th District. Al assisted us in supplying information in order to set up drug dealers for arrest so that Al could take over that particular dealer's business. We rewarded Al for providing this information by giving him a free pass to continue to engage in his criminal activity. We also tipped Al off about other law enforcement investigations that he was a target in.

(16) Al was known to us [Reynolds and myself] to have had a criminal history of drug dealing, robbing drug dealers, as well as being involved in shootouts with other drug dealers.

(17) Brian Reynolds identified Al as a "concerned citizen" in the Freeman Investigation in order to make his information more reliable or credible and to appear that he was someone living in the neighborhood who was concerned about stopping drug activity.

(18) Brian Reynolds and myself had no regard for Al's safety and we knew that using him as an unregistered informant was in violation of the Philadelphia Police Department Policies and Procedures in regards to the handling of informants and sources of information. We continue to use Al in this manner from the time Reynolds and myself were assigned to the 16th District and then for several years after we were transferred to the Narcotics Field Unit.

(19) During the Freeman Investigation, I was present in an unmarked vehicle when Brian Reynolds received a telephone call from Al, informing Reynolds that he had information about narcotic sales near Al's mechanic shop in West Philadelphia. I was present later when Reynolds ordered Al to go to the area of Jefferson Street to identify Dennis Freeman.

(20) I also witnessed Al's personal vehicle parked on Jefferson Street with Al inside waiting for Reynolds to come to the vehicle.

(21) Our [Reynolds, other police officers involved in the investigation and myself] intention was to steal money located in these houses, if possible and/or to articulate [fabricate] evidence to establish the probable cause needed to arrest and prosecute those individuals targeted in the investigation.

(22) I was then also present when Brian Reynolds met with Al out of the area of Jefferson Street and discuss Dennis Freeman and other individuals involved in the investigation and heard Al tell Brian Reynolds that the individuals were selling a lot of drugs and that they had a lot of money in their houses.

(23) I was present when Reynolds requested that Al drive Reynolds in Al's vehicle to the Jefferson Street location so that Reynolds could hide in Al's van and surveil the block.

(24) I saw Reynolds get into the rear of Al's van while Al drove to the block of

Jefferson Street. Once on Jefferson Street, Al left the van leaving Reynolds alone inside of the van. After a period of time of surveillance, I saw Al come back to the van while Reynolds was still hiding in the van and drive away.

(25) I witnessed Brian Reynolds violating Philadelphia Police Department Policy in the Freeman Investigation in handling sources of information, in using unregistered informants and in failing to corroborate information given to him by Al. Brian Reynolds violate these policies and procedures in order to fabricate the probable cause needed to arrest and prosecute Dennis Freeman and other individual involved in the Freeman Investigation.

(26) During the pendency of Dennis Freeman's criminal trial, Al was signed up as a confidential informant by Brian Reynolds after questions were raised by Freeman's counsel at pretrial proceedings about the identity of the "concerned citizen", as well as the reliability and trustworthiness of the information given by Al.

(27) I was present when Brian Reynolds signed Al up as a registered informant so that there would be no inquiry into Reynolds improper use of Al as a source of information.

(28) Upon information and belief, sometime thereafter, Al committed suicide.

Dated May 15, 2017
(Plaintiff's Exhibit - Reynolds 14 - 9-23-14)

11. During the deposition of Officer Brian Monaghan, which was held on January 17, 2017, Officer Monaghan stated that he was the supervisor in charge of the Torain Investigation. (Monaghan, deposition, page 29). Officer Monaghan said that he had received some detailed information, about drug dealing, from Officer Cain, Officer Goglielmucci and a confidential source. They told him that the location of the illicit drugs was in the 5600 block of Master Street. It included 5605, 5607 and 5609. Officer Monaghan said that the confidential source was someone he knew from the neighborhood. (Monaghan, deposition, pages 29-30). Officer Monaghan said that during his 10 year assignment with the 19th District, he had prior contacts with this confidential source and the source provided him with information on illicit drug dealing. (Monaghan, deposition, page 30-31). Officer Monaghan said that either Officer Cain or Officer Goglielmucci provide him with the names, Al and Pud, who were involved in the drug dealing. (Monaghan, deposition, page 32).

12. During Officer Monaghan's deposition he was asked about an affidavit of probable cause (Monaghan-14, which stated in part, "Police Officer Monaghan, 6061, received detailed information from a confidential source and 19th District police officers Cain and Goglielmucci". Officer Monaghan said that although he knew the confidential source from the neighborhood, he did not know his name. Officer Monaghan implied that the source of information had provided information about this area previously when the confidential source stated that there were a lot of narcotics "out there still". Officer Monaghan was asked the following questions, during his deposition, and provided the following responses, regarding information acquired from the confidential source;

Q. Now my understanding from your testimony is that you — this confidential source, although you know the person from the neighborhood, you don't know a name or anything?

A. Yes

Q. Wouldn't you have — when you interviewed the individual and got the detailed information, wouldn't that be information that you would write down?

A. I didn't interview this person. We had a general conversation who stated drug sales — there's drug sales being conducted at 56th and Master. All the other information came from the police officers from the 19th District.

Q. But that is an interview, isn't it?

A. No. No. Nothing was memorialized in writing. It was just face-to-face saying — It could have been like a captain's complaint or a roll call complaint.

Q. But it wasn't? It was somebody from the neighborhood.

A. Yes. I was talking to somebody. They said at 56th and Master there's drugs being sold.

. . .

A. The source just said, yo, you know 56th and Master there's a lot of drugs out there still.

(Monaghan, deposition, pages 235-237, 240).

13. Officer Monaghan was asked during his deposition if he ever documented his conversations with Officer Cain or Officer Goglielmucci. Officer Monaghan said that he may have documented the interview on a piece of paper. (Monaghan, deposition, page 239)

14. During Officer Brian Reynolds deposition, he was asked the following questions and provided the following responses regarding a "concerned citizen" v. "confidential source";

Q. So you recall Mr. Freeman because he filed a complaint, right? Internal Affairs.

A. I recall Mr. Freeman because he it was a largely upscale investigation that was done.

Q. Okay. You were the assigned investigator on that case, right?

A. I was.

Q. You recall that case because that involved a "concerned citizen", in fact, the same individual who was identified by Officer Monaghan as the confidential informant source, right?

A. I don't know what Officer Monaghan did. I don't know who that concerned citizen is.

(Reynolds, deposition, page 119-120)

15. Officer Reynolds was asked the following questions and provided the following responses during his deposition, regarding the "concerned citizen";

Q. In the Monaghan Job it was a confidential source, right?
A. That's what Monaghan said, yes.
Q. Do you recall the confidential source in the Monaghan's job being the same person as the concerned citizen in your job?
A. I don't know who Monaghan's confidential source is. You'd have to ask him. But I remember that Freeman job.
Q. Do you remember the concerned citizen in the Freeman job?
A. I do.
(Reynolds, deposition, page 121)

16. Officer Reynolds was asked the following questions at his deposition regarding the concerned citizen and Al;

Q. Okay. In that case, do you recall that concerned citizen during the whole proceedings all of a sudden became a confidential informant? Do you recall that?
A. I don't remember that, no.
Q. You were the assigned investigator, right?
A. I was.
Q. Okay. And you were the one handling the information from the concerned citizen, correct?
A. Correct
Q. You recall that?
A. Correct.
Q. Do you recall the concerned citizen being Al?
A. Correct
Q. Al is deceased now, correct?
A. I believe so, yes.
(Reynolds, deposition, page 122-123)

17. During Officer Reynolds deposition, he was asked the following questions and provided the following responses, regarding Al, being converted from a "concerned citizen" to a confidential informant;

Q. In other words, during the pendency of the Freeman case, where you were lead — lead officer, and you were the one handling Al — you understand — you understand handling, what I mean by handling?
A. I wasn't handling Al. Al provided me with information that I went out and then verified.
Q. Okay. In the pendency of that particular case, the Freeman case, criminal trial, Al went from a concerned citizen to a confidential informant, correct?
A. I do believe he was signed up as an informant, I don't know exactly when he was signed up.
Q. Okay. But you were the one that actually provided that information to the court, aren't you?
A. As I stated, I read some notes on there about it — about him going from a concerned citizen to an informant, and then the notes stop.
(Reynolds, deposition, page 144)

18. Officer Reynolds was asked the following questions and provided the following responses during his deposition, regarding registering Al as a confidential informant;

Q. Could you use Al as a concerned citizen on other cases before or after Freeman?
A. If he provided me the information.
Q. You could. So, what — exactly what is the criteria that you have to follow with the police policies to make him from a "concerned citizen" to a confidential informant?
A. As I stated there's paperwork that has to be done for him to go from — to be signed up as a confidential informant. There's a whole —
Q. That's the procedure?
A. There's a whole packet that has to be done. Yes.
Q. I understand that that's the procedure. What is the policy? In other words, why is someone a concerned citizen as opposed to a confidential informant?
A. Because he was a concerned citizen at the time, he wasn't a confidential informant.
Q. Right. I know that.
A. Okay
Q. But what made him a confidential informant later on in the Freeman case?
A. Probably after his case he saw - - the magnitude of it and the drugs that were recovered, he probably wanted to be compensated for it, so then he probably wanted to be - - I couldn't pay him being a concerned citizen. So, at that point he then would have to be signed up as an informant to be paid for the case. If he was paid. I don't even know if he was paid or not. (Reynolds, deposition, pages, 159-160).

19. Q. So, where are the notes with regards to the Freeman job, do you know"
A. They're all put into the Affidavit.
Q. No. That's not what I asked you.
A. Where are the written notes?
Q. Where are the written notes that you took during your surveillance that was later incorporated into the Affidavit?
A. Probably in the trash.
(Reynolds, deposition, pages, 165-166)

20. Officer Reynolds was asked the following questions and provided the following responses during his deposition, regarding the identity of "Al";

Q. What was Al's name?
A. I don't even recall what his name at this time.
Q. You don't recall. Did you just know Al? Was it Alphonso?
A. I just said I don't recall his full name.
Q. Do you remember what Al's number was, confidential number?
A. No
Q. Okay. But you used Al after he was made a confidential informant, correct?
A. I don't recall if I used him or not.
(Reynolds deposition, page 186)

21. Officer Reynolds was asked the following questions and provided the following responses during his deposition, regarding "Al" becoming a confidential informant;

Q. Okay. So, does that refresh your recollection that he was made - - went from a concerned citizen to a confidential informant during the pendency of - - and in the infancy of the Freeman case?
A. it does.
Q. Okay. Do you recall now the circumstances surrounding making Al a concern - - went from a concerned citizen to a confidential informant?
A. He went from a concerned citizen to an informant, yes.
Q. Do you recall your role in that?
A. I don't. As I stated, I'm not sure - - I don't know if I was the one that signed him up or not.
Q. But it's your testimony, correct?
A. Correct, it is. So, I'm assuming - - I don't know because I don't have the paperwork, that I would have been the one to sign him up as an informant.
Q. All right. So you were the lead investigator, right?
A. Correct.
Q. Al was - - provided you the information correct?
A. Correct
Q. You were the one giving the testimony at court, right?
A. Correct.
Q. You don't recall whether you were the one that signed him up or not?
By the way, did anyone else - - do you recall any other officer in the investigation, I think it's Reynolds-6, the Affidavit, any other officer give testimony during the Freeman case?
A. I don't recall.
Q. Am I correct that you gave testimony that you made notes with information provided by Al?
A. Correct
Q. Contemporaneous notes, correct?
A. Correct
Q. And then 37, Page 37 you said you threw the notes in the trash?
A. Correct
Q. Is that normal procedure?
A. Yeah, they're rough notes. And then like I stated, you take those notes and everything's put into the affidavit. There's no procedure on keeping notes.
Q. And what if the information in the Affidavit turns out to be incorrect, don't you have to refer to your notes to make sure that you got it right?
A. Well, you would think everything in the Affidavit is correct, so.
Q. You think. But we now know, from our last session, that dates and names and other issues are all incorrect in the Torain Affidavit, right?
(Reynolds, deposition, pages 196-198).

22. It was discovered that the Torain investigation and arrest was a continuation of the

Freeman investigation which occurred 4 months before Mr. Torain was arrested. "Al" *a.k.a.* Robert Morris was the same source of information in both cases. Officer Reynolds, the affiant in Freeman observed a Green Bonneville, license plate number DKC 3310 being driven by an unknown black male and was also the arresting officer of Mr. Torain, who happened to be driving the same Green Bonneville, license plate number DKC 3310. Officers Monaghan, Reynolds, Kelly, Sinclair and Walker were also the police officers that misused Mr. Morris in both cases. Mr. Morris was utilized by police to make numerous narcotics buys (275 buys) before he was signed up as a confidential informant. Officers Monaghan, Reynolds and Walker never saw Mr. Torain involved in any illegal activity and should have known that no reasonable suspicion or probable cause existed to arrest and prosecute him.

(Torain Investigation Report – Sinclair-5)
(Freeman Investigation Report)
(Letter from Michael Pileggi to Anne Taylor 11/1/21)

## SUMMARY AND OPINION

**The following is a list of violations that will be discussed in the Summary and Opinion section of this report:**

**Failure to not use confidential informants that are involved in criminal activity, failure to properly use confidential informants, confidential sources and/or concerned citizens, failure of supervisors to monitor the distribution of overtime payments, failure of supervisors to be present and monitor investigations, especially when confidential informants are involved and failure to control operations, especially during control buys, failure of supervisor to oversee monetary payments to confidential sources, failure of supervisors to oversee the preparation of court affidavits and that those officers are not perjuring themselves, failure to oversee the proper handling of informants, failure of supervisors to oversee interactions of investigators and ensure that investigators do not work alone, failure of supervisors to properly control and dispense confidential informant payments, failure to confirm and record the identities of confidential informants and concerned citizens, failure to properly register an informant and monitor his/her activities, failure of supervisor to monitor and maintain control over all investigations, failure to properly oversee the recording and maintenance of investigator information, failure to determine the distinction of a confidential informant v. a concerned citizen/confidential source.**

23. **Failure to not use a confidential informant that is engaged in criminal activity.** Officer Walker stated during his deposition that all confidential informants may not commit any criminal activity and cannot have any open cases. (Walker, deposition, page 250). The Philadelphia Police Department, Directive 5.9 - 4, Informants, #4 Regulations, C, states in part;

Confidential informants shall not be authorized, permitted or otherwise encouraged to: "4. Participate in any criminal activity outside the scope of the Philadelphia Police Department's supervised investigations."

The use of informants that engage in criminal activity is a violation of proper and acceptable police practice and procedure.

24. Failure to properly use confidential informants, confidential sources and/or concerned citizens and be guided by Department Policies.

Officer Walker stated during his deposition that narcotics investigators would engage in lying about events that would occur during an investigation. He also stated that confidential informants would be misused when making controlled narcotics buys. This would occur when the investigator would send a confidential informant to a location and the investigator fails to keep eyes on the confidential informant. In this type of situation, the investigator is relying on what the confidential informant tells him/her when they come back from the narcotics buy. "So basically you're basing your probable cause on the observation of the confidential informant." (Walker, deposition, pages 250-251). The Philadelphia Police Department's, Directive, 5.9 - 9, states in part the following;

"9. CONTROLLED PURCHASES USING INFORMANTS

D. Whenever feasible, the confidential informant shall be kept under constant surveillance from the time he/she is thoroughly searched, until the time he/she returns to the same officer who conducted the pre-purchase search after the completion of the controlled purchase."

A failure to maintain constant observation of an informant during a controlled narcotics buy is a violation of proper and acceptable police practice and procedure.

25. **Failure of supervisors to monitor and control investigatory and court overtime.**

Officer Walker stated during his deposition, "that the process of using a confidential informant, goes on and on. Opportunity for overtime, investigations, large investigations. Everyone's benefiting from this situation using a confidential informant. A confidential informant is money. The guy goes out and do a buy, it's continuous money in the situation." (Walker, deposition, page 253).

Overtime pay to narcotics investigators, is a constant source of corruption. It opens the door for investigators to fabricate information in order to generate overtime. Overtime must be constantly monitored by immediate and upper level supervisors to ensure that investigators are not creating situations to illegally bolster their police income.

26. **Failure of supervisors to be present and monitor investigations and control buys.**

Officer Walker was asked during his deposition if there were any occasions where a supervisor was not present during the search of a confidential informant prior to and subsequent to the purchase of narcotics and he replied, "Again, that's - - a lot of times". He went on to say, "It was a common practice for the years I've been in Narcotics Filed Unit, where the supervisor was never there." Officer Walker said there were occasions where he would be conducting a narcotics investigation by himself, with the informant. (Walker, deposition, pages 255-257).

Philadelphia Police Department Directive 5.9 - 9, Informants, states in part;

"9. Controlled Purchases Using Informants"

"C. Immediately before providing buy money to a confidential informant, the confidential informant shall be thoroughly searched by the officer providing the buy money and witnessed by at least on (1) other officer. Whenever feasible, the search of a confidential informant shall also be witnessed by a supervisor and in accordance with Directive 5.7, Appendix A, entitled "Consent to Search".

"1. The name and payroll number of the officer conducting the search of the informant before "buy money" is provided and after the buy is completed shall be recorded on the Investigation Report (75-49). Also, the name and payroll number of any witnessing supervisor, if present shall also be recorded on the 75-49."

"D. Whenever feasible, the confidential informant shall be kept under constant surveillance from the time he/she is thoroughly searched, until the time he/she returns to the same officer who conducted the pre-purchase search after the completion of the controlled purchase."

"E. The confidential informant shall be thoroughly searched at the completion of the controlled purchase by the same officer who conducted the pre-purchase search and shall be witnessed by at least one (1) other officer. Whenever feasible, this post purchase search of a confidential informant shall also be witnessed by a supervisor."

"F. Controlled purchase payments to a confidential informant shall be witnessed by at least one (1) other officer, in addition to the officer conducting the payment. Whenever feasible, controlled purchase payments to a confidential informant shall also be witnessed by a supervisor."

Office Wagner stated there were no provisions to have a female officer present to search a female confidential informant, prior to and subsequent to a narcotics control buy. Officer Wagner said he would just complete the buy without searching a female informant. (Walker, deposition, page 260).

Failing to search a confidential informant (male or female) and maintain constant observation of an informant during narcotics buy, is a violation of proper police practice and procedure.

27. **Failure of supervisors to monitor and oversee the payment of funds to confidential informants.**

Officer Walker stated in his deposition that narcotics investigators would violate the policy regarding the preparation and submission of vouchers, in connection with narcotics buys. He stated that the investigators would give the informant a stack of unsigned vouchers, and had the informant sign them prior to completing a buy. Officer Walker said; "We controlled all that, the situation, whatever we chose to put on the vouchers at the time. When we were typing them up, again, we were going against policy. Where we wasn't filling them out the street, the CI would basically sign a blank voucher, or it was voucher already previously signed by the CI and

we took that voucher in and we typed it up, whatever the situation we felt - - what the buy was. Sometimes it happened the way it happened, sometimes it didn't but you couldn't tell what was what because we were breaking policy. We were going in and we were typing them up." (Walker, deposition, pages 261-263)

The Philadelphia Police Department Directive, 5.9 - 11 and 5.9 - 12, states in part;
"12. COMPENSATING INFORMANTS

A. Payment for information given will be made through Department funds with the pre-approval from the pertinent on-duty supervisor in writing.

B. Payments in U.S. Currency for information given, services rendered or expenses incurred will be made as follow:

1. In addition to the investigative officer, all confidential informant payments shall be witnessed by a supervisor (Sergeant or higher)

b. The amount determining the supervisory rank required to witness the payment is determined by the total amount the confidential informant is given in a single payment.

2. The investigating officer will fill in the confidential informant control number and the amount of the payment on the voucher.

3. The voucher/contact form shall then be signed by the informant, the investigating officer, witnessing officer and supervisor.

4. The investigative unit's Commanding Officer or designee shall review, approve and sign the confidential informant voucher/contact form.

5. All confidential informant vouchers/contact forms must be hand-delivered to the Integrity Control Officer within seven (7) working days."

A failure to properly follow the proper procedure for making confidential informant payments, is a violation of proper police practice and procedure.

28. **Failure of supervisors to oversee and confirm that investigators are not perjuring themselves on documents, especially on court affidavits.**

Officer Walker stated that there were occasions when there were non-existent sources, confidential sources or a non-confidential source or informant, confidential informant that was put in an affidavit of probable cause that actually did not exist. (Walker, deposition, page 264) Not only is this a violation of proper and acceptable police practice and procedure, but could also constitute perjury, which is a criminal offense.

29. **Failure of supervisors to ensure that confidential informants are being properly handled by investigators.**

Officer Walker described what was known as a "green light", which was when officers knew informants were engaged in criminal activity. He stated that it happened all the time. Officer Walker said that the investigators would do a ride along, spot a suspected dealer and grab him off the street. The investigators would then drive around and interrogate the subject.

Officer Walker said that during the initial encounter, the officers would subject the suspect to beatings and threats and then the next thing you know, everyone is happy and best of friends. (Walker, deposition, pages 266-267)

This type of conduct would not only violate proper police practice and procedure, but would also constitute a violation of the law, including unlawful imprisonment and assault.

30. Officer Walker described an incident where he was confronted by Officer John Speiser, where Speiser pointed a gun at Officer Walker. Officer Walker informed Sgt. McCloskey of the incident and the sergeant advised Officer Walker, "to get out of the squad". As a result of this incident, Officer Walker realized he had no friends and left the squad. He subsequently decided to work alone with his confidential informant. (Walker, deposition, page 269).

Failure of supervisors to not identify, monitor and control disputes within the squad. Also supervisors failed to stop investigators from working alone.

31. **Failure of supervisors and investigators to properly use female informants.**

Officer Walker said that he would acquire $200 dollars from his sergeant and meet with his informant Angie. Once Walker met with Angie, both set out to make narcotic buys, without the assistance of additional police officers. At some point he would advise his sergeant that he made buys and meet with him, either on the street or at headquarters. (Walker, deposition, pages 269-270). It is a violation of proper police practice and procedure for an investigator to conduct a narcotics investigation alone or in the company of a confidential informant, especially if the informant is a female and there are no female investigators present. Walker was subsequently transferred to Sgt. Corman's team and continued to work alone, as he did under McCloskey. (Walker, pages 272-273).

32. **Failure to not disclose the identity of a source of information and a failure to not register an informant in a timely manner and monitor his/her actions.**

a. On May. 15, 2017, Officer Walker submitted an Affidavit in connection with the case. Officer Walker said that Officer Brian Reynolds was the lead investigator in the investigation that led to Dennis Freeman's arrest and subsequent prosecution. Walker said Reynolds initiated the investigation after obtaining information from a "concerned citizen". (Walker affidavit, paragraph 13).

d. Officer Walker said that Officer Reynolds gave false testimony about the "concerned citizen", because the "concerned citizen" was actually an individual that Brian Reynolds and he had used several times prior to the Freeman Investigation as an unregistered informant. Brian Reynolds also failed to disclose that this individual was personally involved with this investigation and several other investigations when he assisted them in coordinating surveillance, permitted him to use his vehicle for stakeouts and Officer Reynolds information on other drug dealers, so that he could take over their drug locations when they were arrested. (Walker affidavit, paragraph 14). It's was apparent that Officer Reynolds knew the identity of the informant Al. Reynolds had used this informant on several occasions prior to the Freeman case. Al should have been registered as a confidential informant prior to the Freeman case and prior to Reynolds using him for information on other cases.

c. Officer Walker said that he and Officer Reynolds used this unregistered informant who was known as "Al", on numerous occasions. Walker said that Al would supply the officers with information in order to set up drug dealers for arrest so that Al could take over that particular dealer's business. Walker said that they rewarded Al for providing this information by giving him a free pass to continue to engage in his criminal activity. Walker said that they also tipped Al off about other law enforcement investigations that he was a target in. (Walker, affidavit, paragraph 15).

Officer Reynolds should have properly registered Al as a confidential informant, based on his history and use by Reynolds. The fact that Reynolds gave Al a free pass to conduct illegal business, was not only a violation of department policy, but also a violation of the law.

d. Officer Walker said that "Al" was known to him and Reynolds as having a criminal history of drug dealing, robbing drug dealers, as well as being involved in shootouts with other drug dealers, (Walker, affidavit, paragraph 16).

Officer Reynolds violated department policy by using an informant that was committing criminal acts.

e. Officer Walker said the reason Brian Reynolds identified Al as a "concerned citizen in the Freeman investigation in order to make his information more reliable or credible and to appear that he was someone living in the neighborhood who was concerned about stopping drug activity. (Walker, affidavit, paragraph 17)

This was a violation of proper and acceptable police practice and procedure. Al should have been designated as a confidential informant from the onset of his involvement in this investigation.

f. Officer Walker knew that using Al as an unregistered informant was a violation of the Philadelphia Police Department Policies and Procedures. Walker said that he and Reynolds used Al as an unregistered informant from the time Reynolds and Walker were assigned to the 16th District and then for several years after they were transferred to the Narcotics Field Unit. (Walker, affidavit, paragraph 18).

Officer Walker and Reynolds were using Al as a source that provided them with narcotics intelligence for a substantial amount of time. Based on this, they should have registered him as a confidential informant, early on in his tenure as an informant. Failing to properly register Al before he was used to work for Walker and Reynolds was a violation of proper and acceptable police practice and procedure.

g. Officer Walker said that during the Freeman investigation, he was present in an unmarked vehicle, when Reynolds received a telephone call from Al informing Reynolds that he had information about narcotic sales near Al's mechanic shop in West Philadelphia. Walker said he was present later when Reynolds ordered Al to go to the area of Jefferson Street to identify Dennis Freeman. (Walker, affidavit, paragraph 19)

There is no indication or documentation that Reynolds received the information from Al and there is no indication that a supervisor was notified of the events. A failure to do so is a violation of proper and acceptable police practice and procedure.

h. Walker also witnessed Al's personal vehicle parked on Jefferson Street with Al inside waiting for Reynolds to come to the vehicle. (Walker affidavit, paragraph 20)

i. Walker said, he, Reynolds and the other police officers involved in the investigation intention was to steal money located in the houses, if possible and/or to articulate [fabricate] evidence to establish the probable cause needed to arrest and prosecute those individual's targeted in the investigation. (Walker, affidavit, paragraph 21). In this case the officers were conspiring to commit criminal acts of robbery and perjury. They also violated proper and acceptable police practice and procedure.

j. Officer Walker said that he overheard Al tell Reynolds that the individuals had a lot of drugs and money in their house.
(Walker, affidavit, paragraph 22)

k. Walker said that he heard Reynolds tell Al to drive him to Jefferson Street, in Al's vehicle, so that Reynolds could hide in Al's van and surveil the block. (Walker, affidavit, paragraph 23)

Using property and equipment belonging to known criminals for a police related operation is a violation of proper and acceptable police practice and procedure.

l Officer Walker said that he saw Reynolds get into the rear of Al's van, while Al drove to the block of Jefferson Street. Once on Jefferson Street, Al left the van leaving Reynolds alone inside the van. After a period of time of surveillance, I saw Al come back to the van while Reynolds was still hiding in the van and drive away. (Walker, affidavit, paragraph 24).

This is a violation of proper and acceptable police practice and procedure.

m. Walker said that he witnessed Brian Reynolds violating Philadelphia Police Department Policy in the Freeman investigation in handling sources of information, in using unregistered informants and in failing to corroborate information given to him by Al. Walker said that Brian Reynolds violated these policies and procedures in order to fabricate the probable cause needed to arrest and prosecute Dennis Friedman and other individuals involved in the Freeman Investigation. (Walker, affidavit, paragraph 25)

Police Officer Reynolds violated proper and accepted police practice and procedure by improperly using a confidential informant and by attempting to develop evidence, to fabricate probable cause, for the purpose of arresting and prosecuting individuals involved in the Freeman Investigation.

n. During the pendency of Dennis Freeman's criminal trial, Al was signed up as a confidential informant by Brian Reynolds after questions were raised by Freeman's counsel at pretrial proceedings about the identity of the "concerned citizen", as well as the reliability and the trustworthiness of the information given by Al. (Walker, affidavit, paragraph 26).

This was a violation of proper and acceptable police practice and procedure.

o. Walker said he was present when Brian Reynolds signed Al up as a registered informant so that there would be no inquiry into Reynolds improper use of Al as a source of information. (Walker, affidavit, paragraph 27)

AI should have been designated as a confidential informant from the onset of his involvement in this case. A failure to do so, was a violation of proper and acceptable police practice and procedure.

33. **Failure of supervisors to properly control and oversee an investigation.**

a. Officer Brian Monaghan, stated during his deposition, that he was the supervisor in charge of the Torain Investigation. The following are questions that were asked and responses that were given, by Officer Monaghan, during his deposition;

Q. So you're running the show on this investigation?
A. Pretty much, yes.
Q. You're the supervisor. Is it part of your duties to insure that whoever is involved in this, whatever other officers are involved in this, are following your directions, correct?
A. Correct.
(Monaghan, deposition, page 29)

b. At the time of this investigation, Brian Monaghan held the rank of Police Officer. (Monaghan, deposition, page 12). This rank is not considered to be a supervisory rank. Generally, the rank of sergeant is the first level of supervision. The supervisory ranks of sergeant, lieutenant, captain, etc. play an integral role in the investigation of illicit drugs. The Philadelphia Police Department, Directive-5.9 - 12, "Informants", defines the "Supervisory Responsibilities", when dealing with informants. The following are excerpts from this procedure;

**(13) SUPERVISOR RESPONSIBILITIES**

A. Informant Supervisors will:

1. Ensure that all confidential informants are thoroughly debriefed and will be responsible for assuring the proper handling of confidential informants is in accordance with this directive.

. . .

5. Supervisors shall meet in person with the confidential informants of their respective personnel on a quarterly basis to ensure adherence to this directive. This meeting will be documented on the confidential informant contact form.

It is apparent that Officer Monaghan was not a designated supervisor for this investigation. It was a violation of proper and acceptable police practice and procedure for Officer Monaghan to designate himself as the supervisor of this investigation.

c. Officer Monaghan stated during his deposition that he received some detailed information, about drug dealing, from Officer Cain, Officer Goglielmucci and a confidential source. Monaghan said that the confidential source was someone he knew from the neighborhood. (Monaghan, deposition, pages 29-30). Officer Monaghan said that during his 10 year assignment with the 19th District, he had prior contacts with this confidential source and the source provided him with information on illicit drug dealing. (Monaghan, deposition, pages 30-31). Officer Monaghan said that he did not know the sources' name. Officer Monaghan was asked during his deposition why he did not record the name of the source and he responded, "I

didn't interview the person. We had a general conversation who stated drug sales - - there's drug sales being conducted at 56th and Master." (Monaghan, deposition, 23-237).

Officer Monaghan was further asked the following questions and gave the following responses during his deposition;

Q. But that is an interview, isn't it?

A. No. No. Nothing was memorialized in writing. It was just face-to-face saying — it could have been like a captain's complaint or a roll call complaint.

Q. But it wasn't? It was somebody from the neighborhood.

A. Yes. I was talking to somebody. They said 56th and Master there's drugs being sold.

(Monaghan, deposition, pages 237-237)

d. It is apparent that Officer Monaghan knew the identity of the informant but failed to disclose the information to anyone during the investigation. This is a violation of proper and acceptable police practice and procedure.

34. **Failure to properly record, document and maintain information that is relevant to an investigation.**

Officer Monaghan stated during his deposition that, "he may have documented the interview with Officer Cain and Goglielmucci on a piece of paper". (Monaghan, deposition, page 239).

Officer Monaghan should have documented his interview with the two officers and the source. The notes of the interview and subsequent report, should have been included in the case file. A failure to perform these investigative steps was a violation of proper and acceptable police practice and procedure.

35. **Failure to properly classify a source of information as a concerned citizen v a confidential source.**

a. Officer Reynolds was asked during his deposition if he knew who the concerned citizen was in the Freeman job and he replied, "I do". (Reynolds, deposition, page 121).

b. Officer Reynolds was asked the following questions during his deposition and provided the following responses, regarding the concerned citizen/confidential informant;

Q. Okay. In that case, do you recall that the concerned citizen during the whole proceedings all of a sudden became a confidential informant? Do you recall that?

A. I don't remember that, no.

Q. You were the assigned investigator, right?

A. I was.

Q. Okay. And you were the one handling the information from the concerned citizen, correct?

A. Correct.

Q. You recall that?

A. Correct.

Q. Do you recall the concerned citizen being Al?

A. Correct.

c. The fact that Officer Reynolds was the assigned investigator for the Freeman case, he should have known the actual identity of the "concerned citizen", (Reynolds, deposition, pages 121), Officer Reynolds should have also known that the "concerned citizen", was the same person as the "confidential informant" in Officer Monaghan's case.

d. Officer Reynolds said that although "Al" was providing him with information, he did not carry him as a confidential informant. Officer Reynolds indicated that he was aware that Al went from being a "concerned citizen" to a confidential informant, but did not know when it occurred. (Reynolds, deposition, page 144). Officer Reynolds should have documented when "Al's" status changed from being a concerned citizen to being a confidential informant. The failure to do so is a violation of proper police practice and procedure.

e. Officer Reynolds stated that "Al" probably became an informant in the Freeman case, because he wanted to be compensated for his information. Officer Reynolds said that he did not even know if he paid him or not. (Reynolds, deposition, page 158-160).

f. During Officer Reynolds deposition he was asked if he knew where the notes were for the Freeman case. Officer Reynolds said that he probably threw the notes in the trash. (Reynolds, deposition, page 165-166). Officer Reynolds was asked the following questions during his deposition and provided the following response, regarding the retention of investigatory notes;

Q. Am I correct that you gave testimony that you made notes with information, provided by Al?
A. Correct.
Q. Contemporaneous notes, correct?
A. Correct
Q. And then 37, page 37 you said you threw the notes in the trash?
A. Correct
Q. Is that normal procedure?
A. Yeah, they're rough notes. And then like I stated, you take those notes and everything's put into the affidavit. There's no procedure on keeping notes.
Q. And what if the information in the Affidavit turns out to be incorrect, don't you have to refer to your notes to make sure that you got it right?
A. Well, you would think everything in the Affidavit is correct, so.
Q. You think. But we now know, from our last session, that dates and names and other issues are all incorrect in the Torain Affidavit, right?
(Reynolds, deposition, pages 196-198)

g. Investigators are taught to maintain and keep all investigatory notes that are prepared during the course of an investigation. Note taking is of the upmost importance in an investigation. The investigator's notebook will eventually accumulate vast amounts of information, which may later be instrumental in providing or disproving a specific point or fact in question. Because note taking is essential to a good investigation, it is imperative that the

investigators notes be comprehensive, accurate, and reflective of a proper chronological time frame. In fact, on each separate notation, the investigator should record the time and date of the event. These notes must be preserved for later review and/or admission into evidence. Discarding or destroying investigator notes is a violation or proper police practice and procedure. It can also become a Brady violation.

h. On November 1, 2021, Mr. Torain's counsel sent a letter to Chief Deputy City Solicitor providing detailed information as to the identity of "Al" and requesting discovery in the form of the full confidential informant file and confidential informant vouchers. Through the discovery Mr. Torain discovered that "Al" *a.k.a* Robert Morris had worked with police, including Brian Reynolds and Jeffrey Walker since 1998. Mr. Morris was the "concerned citizen' who provided information and participated in the Freeman case as well as the Torain case. It was discovered that Mr. Morris had made 275 narcotic buys before being registered as a confidential informant in 2002 by Officer Reynolds. He was paid by police $4,000. Moreover, Mr. Morris was wanted on an outstanding bench warrant at the time of his participation in the Freeman and Torain cases. He also had prior arrest for narcotic violations.[1] Officer Reynolds and other police officers should have signed Mr. Morris up as a confidential informant before utilizing him in making narcotic buys in violation of Philadelphia Police Department, Directive 5.9.

36. In July, 2002, Ms. Ellen Green-Ceisler, Director, Integrity & Accountability Office, for the Philadelphia Police Department, submitted a report (4th Report), titled <u>Enforcement of Narcotics Laws.</u> Ms. Green-Ceisler began complying her information for the report when she became Director in 2000. (Ceisler, deposition, pages 13-15, 51, 66). The following are excerpts (pages 53 - 59) from her report, which deals with confidential informants;

a. Director Ceisler stated in her report that confidential informants ("CI's") are an integral investigative tool who are regularly utilized by the Narcotics Bureau. However, because a CI's identity must be carefully guarded for his or her safety, their existence and credibility are not easily subject to independent verification. Therefore, it is absolutely essential that there are stringent regulations guiding the use of CI's and that they are rigorously enforced. (Fourth Report-Narcotics, Ellen Ceisler – July 2002, page 53)

b. During 2000, at the request of the IAO, the Integrity Control Unit of the IAB conducted a preliminary audit of Narcotics Bureau CI files which represents the only independent audit/study of CI's that the IAO could locate. The following deficiencies regarding the management and oversight of CI's were noted in the audit:

1. The maintenance of some CI files were haphazard and sloppy.

2. Some CI's had never been properly identified.

3. Some Active CI's did not appear in the ICO database and were thus not properly registered with and monitored by the Department.

---

[1] At the time of the submission of this report, Plaintiff's Motion to Compel the production of the identity of the concerned citizen/confidential source/confidential informant is pending.

4. Police contacts with the CI's were not always listed in the CI database. In fact, the IAO discovered that the ICO was never provided the reports of nearly three hundred CI/officer contacts. Despite repeated and futile efforts of the ICO to enforce policies regarding the timely submission of these reports, no narcotics officer or supervisor has been disciplined for failing to comply with Department CI reporting policies.

5. Some CI initiation forms did not have the commanding officer's authorizing signatures as is required by Departmental policy, thereby making it impossible to determine whether a commanding officer actually approved of the use of the CI.

6. Numerous active CI's had outstanding criminal bench warrants (one CI had five outstanding bench warrants). In one Field Unit alone, twenty-seven of the active CI's had outstanding warrants for narcotics offenses, theft, robbery, aggravated assault, and prostitution.

7. Despite the fact that Departmental guidelines mandate Quarterly Reviews of the CI files, none had been conducted prior to the Integrity Control Unit audit.

(Fourth Report-Narcotics, Ellen Ceisler, pages 53-54).

c. When a CI is first activated, he/she is required to provide two signature cards that are maintained in his/her confidential CI file. Upon completion of services for which the CI is compensated, he/she is required to sign the Payment Voucher Forms. This enables comparison of both the CI's voucher and file signatures to insure that the CI's are actually providing the services and being compensated as reported by the narcotics officer. With the exception of the officer's word, this signature therefore represents the main evidence that the CI was utilized as stated.
(Fourth Report-Narcotics, Ellen Ceisler, page 54).

d. In several of the files audited by the IAO, the CI's file signature cards were in script and the CI's payment voucher signatures were printed and so dissimilar as to preclude verification. Additionally, some Voucher Forms signatures appeared to be very different from the file signature cards. The IAO is not suggesting that improper conduct occurred in these cases, however, these dissimilar signatures are problematic and also raise questions regarding the degree of meaningful supervisory review of the confidential informants.
(Fourth Report-Narcotics, Ellen Ceisler, page 55).

e. This problem of script signatures versus printed names would be easily avoided by requiring that newly activated CI's provide both on the signature cards for future comparison purposes. CI files and the vouchers should also be reviewed on a regular basis to ensure compliance. Additionally CI payment voucher forms are not monitored and can be freely obtained in bulk by narcotics officers. This would allow an officer to ask a CI to simultaneously sign several blank voucher forms. While the IAO has no evidence that such practice is actually occurring, the Department should devise procedural safeguards with regard to the dissemination of these forms.

(Fourth Report-Narcotics, Ellen Ceisler, page 55).

f. Quarterly reviews of CI files are being conducted as of 2001. However, the IAO found these reviews to be inadequate. Various supervisors within each Narcotics Field Unit are charged with completing the Quarterly Reviews, and each supervisor follows a different format. The Quarterly Review consist, in their entirety, of a criminal record check of active CI's to ensure that they have not been arrested or are wanted on outstanding bench warrants. (One narcotics supervisor took the added step of checking for outstanding "Protection from Abuse Orders" against active CI's). Some field Units maintain the Quarterly Reviews reports in a separate file, while another Field Unit maintain each CI review in each CI's individual file which precluded easy access and review of these report.
(Fourth Report-Narcotics, Ellen Ceisler, page 55).

g. Departmental policy requires that immediate supervisors met, when practical, at least once with each CI utilized by narcotics officers under their command. The IAO could find no evidence that these meetings occur. (DEA policy requires that one-third of all active CI's and ten percent of inactive CI's are independently interviewed every eighteen months by IAB investigators). These practices are further evidence of lax monitoring and oversight of CI's.
(Fourth Report-Narcotics, Ellen Ceisler, page 56).

h. In accordance with Departmental policy: "Where a CI is to participate in an undercover purchase in which he/she may come in contact with either official funds, controlled substances . . . .he/she will be thoroughly searched by two officers of the same sex, both before and after the undercover encounters and where possible, kept under continuous observation to preclude questions as to the validity or integrity of the evidence. The approval of the supervisor, of the officer operating the CI, will be obtained prior to participation in an undercover operation."
(Fourth Report-Narcotics, Ellen Ceisler, page 56).

i. It is difficult to assess the degree to which these procedural safeguards are actually followed. Most police reports reviewed by the IAO that documented the use of CI's contained "boilerplate" and imprecise language that virtually mirrored the Directive language and provided no specific facts regarding the circumstances of the undercover operation. Important fats such as how, when, where, and who conducted the "before and after searches" of the CI, approximate locations of officers during their "continual observation" of the CI and which supervisor approved of the undercover operation were notably absent. For these reasons, it is virtually impossible to independently verify whether the officers in fact followed Department policies.
(Fourth Report-Narcotics, Ellen Ceisler, page 56).

j. Since the CI regulations are designed to insure the integrity and credibility of evidence provided by CI's, they must be strictly enforced and the officers and supervisors should be held strictly accountable to failures to follow protocol. The latter does not always occur. In an important IAB investigation described earlier in this report, nearly every procedural safeguard required for using a CI was intentionally ignored, and the circumstances surrounding the incident

were falsified. The involved officers and supervisors received minimal discipline and are still assigned to the Narcotic Bureau.
(Fourth Report-Narcotics, Ellen Ceisler, page 56).

k. In another incident described earlier, a narcotics supervisor surreptitiously met with and compensated a civilian who was providing information on narcotics sales. This alleged "confidential informer" was never registered or approved by the Department, nor were any of the contacts and payments documented or approved. This supervisor has not been disciplined and remains in the Bureau.
(Fourth Report-Narcotics, Ellen Ceisler, page 57).

l. Director Ceisler examined the motivational and/or attitudinal factors which may contribute to officers "cutting constitutional corners" in the enforcement of narcotics laws.

(1) Philadelphia police officers are rewarded in a variety of different ways, based on an officer's "activity/arrests" statistics. For example, the number of arrests an officer makes is positively correlated with the amount of overtime pay an officer can accumulate. This approach encourages the vigorous pursuit of possible suspects for arrest and, at the same time, increases the likelihood of carelessness or the tendency to "cut corners". It is therefore important to eliminate officers' personal financial gain as an incentive to enforcing narcotics laws. (DEA agents beginning salaries are $45,000 to 46,000 plus guaranteed twenty-five percent overtime.)

Additionally, assignments in the Department, including the Narcotics Bureau, are also based in large part on an officer's "activity/arrest" statistics. However, this is a quantitative versus qualitative assessment. Thus officers with higher rates of arrests that are problematic, weak, and ultimately thrown out in the courts, are evaluated more favorably and have a greater chance of obtaining desirable assignments than officers whose arrest rates are significantly lower, but the quality of the investigation and arrest, and the rate of conviction are more successful. Such heavy reliance on a simplistic quantitative incentive system may have the unintended effect of causing officers to become careless or prompting officers to cut corners.
(Fourth Report-Narcotics, Ellen Ceisler, page 58).

(2) The dysfunctional nature of the criminal justice system, and perceived inequities in the bureaucracy of the Department, weakens officer morale and their commitment to the organizational values. Some officers with sincere desires to improve the quality of life in communities eventually feel justified in deviating from Departmental guidelines and legal standards to compensate for, and circumvent, a system that they perceive as unfair, capricious, hypocritical, and unsupportive of legitimate police work.
(Fourth Report-Narcotics, Ellen Ceisler, page 58).

(3) The social, economic, psychological, and health issues surrounding drug trafficking and substance abuse are extraordinarily complex and cannot be resolved by law enforcement efforts alone. IAO interviews with police personnel have revealed that incessant and unrealistic political and community demands on the police to "solve" the drug problem compel officers to "do what it takes" to meet these demands and expectations — even if that requires circumventing the law or Departmental policies.
(Fourth Report-Narcotics, Ellen Ceisler, page 59).

(4) Given the subtle nuances of the laws pertaining to search and seizure, and the continually evolving legal standards pertaining to these legal issues, some narcotics officers and supervisors may not even be aware that some of their actions violate current legal standards due to inadequate training.
(Fourth Report-Narcotics, Ellen Ceisler, page 59).

(5) The Department's failure to consistently and effectively address identified violations of policies designed to safeguard citizen's civil rights sends the message that such misconduct is not regarded as serious and may in fact be tolerable.
(Fourth Report-Narcotics, Ellen Ceisler, page 59).

37. a. On January 14, 2006, Ms. Ellen Geisler, former Director of the Philadelphia Police Departments, Integrity and Accountability Office, was deposed and asked, "whether the Philadelphia Police Department narcotics units were properly utilizing confidential informants and she said the following;

"What my audit found was that policies that had been established to guard against abuses of the use of confidential informants were being violated - - well, not being violated, but that there was very little oversight and review of confidential informants. Confidential informants, because of the fact that they are providing information of criminal activities, their - - their safety, their personal safety, could be pretty severely affected. And so they have to remain confidential."

"Because of that, in litigation people aren't usually Plaintiffs' attorneys and whatever and Defense attorneys, they're not aware of who these people are. And so there have to be really rigorous safeguards to ensure that the use of these confidential - - exist and that they're being used properly because there's a tremendous amount of room for abuse. That's what happened in the 39th Police District scandal."

"So what I did is I looked at the policies and guidelines to protect against abuses in the use of confidential informants, and I found a lot of problems."
(Ceisler, deposition, pages 26-27).

b. Director Ceisler went on to say in her deposition the following;

"So what I did in reviewing the files of the confidential informants, I was actually given access to the confidential informant files. I was actually able to - - I was actually able to know who the confidential informants were. What I found was, for example, they were supposed to conduct quarterly reviews of the use of confidential informants. And these quarterly reviews were either not being conducted, or they were being conducted in such a shallow way that really no clear information was coming out of it. A lot of the - - some of the confidential informant files were haphazard. Some of the confidential informants had never been identified. Some of the confidential informants that were being used were not even properly registered and not in the database that was maintained to keep track of these confidential informants. Some of the confidential informants did not have signatures of commanding officers. Therefore, you couldn't - - actually whether - - you couldn't actually determine whether they had been approved by the Department."

"So as a general matter, there was - - the Department was doing - - the Narcotics Bureau was doing virtually nothing in terms of monitoring the use of these confidential informants to be sure that they were being used properly or that they were actually - - you know, that's important because when they fill out their voucher forms, when they get their money, they sign for it. That's really the only truth that you have that that confidential informant was actually - - you know, had received money and was part of the process. That's the real only direct proof except for the statements of the officers."

"And what I did is I compared voucher forms signed by confidential informants with the actual signature cards that were maintained in the confidential informant files to make sure that they looked the same."

"I found some examples where they - - the signatures did not appear to look the same at all."

(Ceisler, deposition, pages 30-33).

## CONCLUSION

38. For the above reasons, it is my opinion within a reasonable degree of professional certainty that the defendants violated standard police training, policy, procedures and practices in connection with the investigation and arrest of Kareem Torain.

39. The defendants, in this case, were not properly disciplined for committing acts that violated the policies and procedures of the Philadelphia Police Department.

40. There were inadequate corruption controls, oversight and monitoring of narcotics operations.

41. There were no routine integrity tests implemented to test the integrity of narcotic investigators. Investigators were permitted to remain in narcotics enforcement assignments for extended periods of time (more than 5 years).

42. The defendants failed to follow established guidelines regarding the use and monitoring of confidential informants.

43. The supervisors failed to monitor the dispositions of narcotics arrests.

44. The harm suffered by Kareem Torain was the foreseeable consequence of defendants' actions/inactions as well as the prior deficient investigations, supervision, and discipline, as discussed in this report.

45. Mr. Torain's unlawful arrest was the foreseeable consequence of the misuse of Robert Morris by the defendants in providing information about illegal activity without signing him up as an informant.

46. Defendants' actions/inactions, including the misuse of the source of information in both the Torain investigation and prosecution and the Freeman investigation and prosecution was

contrary to accepted police practices, and constitute a violation of accepted municipal practices and a deliberate disregard of the legal protections of suspects and citizens generally.

47. The Philadelphia Police Department's failure to adhere to Brady requirements and properly supervise, monitor, and take corrective actions, including discipline, under the circumstances, were substantial factors that lead to the arrest, prosecution, and harm suffered by Mr. Torain.

48. The City of Philadelphia's failure to have appropriate training, operational directives, remedial measures, and supervision regarding reasonable suspicion, probable cause, use of confidential informants, confidential sources and concerned citizens and search warrants represent a violation of generally accepted police and municipal practices.

49. The Philadelphia Police Department's actions/inactions, as discussed in this report, were contrary to accepted police practice and procedures, including Philadelphia Police Department Directive D-9, and reflect a deliberate indifference and disregard for the legal protections of suspects and citizens generally.

50. The Philadelphia Police Department's longstanding failures to reasonably direct, supervise, investigate, discipline, and correct police misconduct were contrary to accepted police practices and procedures and were substantial factors causing the violations of Mr. Torain's civil rights.

51. the above-described policies, practices, and customs in the Philadelphia Police Department relating to fabrication, unlawful searches and seizures, misuse of informants and a deficient disciplinary system were widespread in the 1990s and 2000s and known to the Philadelphia Police Department and City officials as well as the general public. The failure of responsible officials to remedy these improper policies, practices, and customs were contrary to generally accepted police and municipal practices and caused the improper arrest and prosecution of Kareem Torain.

This report is signed under penalty of perjury that the foregoing is true and correct.

Joseph Pollini