EXHIBIT "3"



City of Philadelphia

# PHILADELPHIA POLICE DEPARTMENT

# INTEGRITY AND ACCOUNTABILITY OFFICE

## ENFORCEMENT OF NARCOTICS LAWS

### July 2002

Ellen Green-Ceisler
Director, Integrity & Accountability Office
Author

# TABLE OF CONTENTS

<u>SUBJECT</u>                                                    <u>PAGE</u>

OVERVIEW . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  1

BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  3

    The Integrity and Accountability Office . . . . . . . . . . . . . . .  3

    Basis for Findings . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  5

    Aftermath of the 39th District Scandal . . . . . . . . . . . . . . .  7

    Narcotics Bureau Mission and Organizational Structure . . . 8


TRENDS AND PATTERNS IN EXISTING DATA . . . . . . . . .  10

    Information Sources . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  10

    Litigation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  10

        Interpretation and Analysis of Litigation Data . . . .  14

    IAB Investigations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  15

        Analysis of IAB Data . . . . . . . . . . . . . . . . . . . . . . . . .  17

    Use of Force . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  20

    Court Attendance . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  24

    Narcotics Arrests Dispositions . . . . . . . . . . . . . . . . . . . . . . .  25

    Departmental Studies and Audits of Narcotics Operations .  30

        Integrity Control Office – Narcotics Bureau . . . . . .  31

        Integrity Control Unit – Internal Affairs Bureau. . .  32

        Quality Assurance Bureau . . . . . . . . . . . . . . . . . . . .  34

        Drug Testing . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  34

Summary Analysis of Information Sources . . . . . . . . . . . .    35

NARCOTICS BUREAU PERSONNEL AND MANAGEMENT
    POLICIES, PRACTICES AND PROCEDURES . . . . . . . . . .    36

    Personnel Selection Process . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    36

    Narcotics Enforcement Training . . . . . . . . . . . . . . . . . . . . . . . . .    39

    Transfer Policies, Practices and Procedures . . . . . . . . . . . . . . . . .    40

        Recommendations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    42

    Supervisory Oversight and Accountability . . . . . . . . . . . . . .    42

    Discipline . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    47

    Evidence Control . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    50

CONFIDENTIAL INFORMANTS . . . . . . . . . . . . . . . . . . . . . . . . . .    53

    CI's and Controlled Narcotics Buys . . . . . . . . . . . . . . . . . . . . .    56

THE ENFORCEMENT OF NARCOTICS LAWS AND
    CIVIL RIGHTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    57

# OVERVIEW

This study by the Integrity and Accountability Office examines the policies and practices of the narcotics enforcement operations of the Philadelphia Police Department to insure that these efforts are conducted legally, ethically, and within Departmental guidelines. In light of the vastly increased drug enforcement operations undertaken by the Department over the past five years, a comprehensive examination and assessment of the integrity and effectiveness of these efforts is timely and necessary.

The IAO's review and analysis of a variety of objective information sources indicates that the Department's narcotics enforcement operations are largely conducted within the boundaries established by law and Departmental policies – as it relates to serious corruption and excessive force. However, the IAO identified important policy, operational, and management weaknesses that have created conditions conducive to breeding corruption and decreasing the detection of misconduct or corruption.

Based on the findings of this study, the Department is in the process of implementing certain policies and practices to remedy some of the problems most directly under its control. These remedial measures, which are in their initial stages, have been incorporated into this Report. It is not reasonable to speculate as to the future impact of these changes and subsequent follow-up will be necessary to evaluate their effectiveness.   Other problems identified in this Report have labor and/or budgetary implications, or require the cooperation and coordination of other governmental agencies, and are therefore not conducive to easy or quick resolution.

The following is a brief synopsis of the IAO's findings.  The factual bases for these general statements are detailed in the body of the report:

**1.** The Philadelphia Police Department does not collect some critical Information that would enable it to monitor the integrity and effectiveness of its narcotics enforcement operations. Some relevant information/data that is collected is not consistently and effectively utilized by the Department.

**2.** The Department's internal auditing functions of narcotics enforcement operations are sporadic and at times ineffective.   In some instances, the Department did not take appropriate steps to rectify problems identified in audits that had been conducted.  The Department lacks established and enforceable policies and protocols regarding management obligations and responses to internal audits and investigations, particularly those in which problems are noted.

**3.** The Narcotics Bureau personnel selection process is inadequate and ineffective, increasing the likelihood that officers ill suited for these duties are assigned to narcotics enforcement operations.  Considering the numerous opportunities for corruption that exist in narcotics enforcement, it is imperative that

1

officers and supervisors assigned to the Narcotics Bureau undergo a rigorous screening process to ensure a proven track record of integrity.

    **4.** Officer training in critical aspects of narcotics law enforcement is inconsistent and sporadic.

    **5.** Narcotics Bureau supervisors are not consistently experienced, screened, trained, evaluated, monitored, held accountable, disciplined, or afforded appropriate resources with which to effectively fulfill their duties. These problems raise questions regarding the effectiveness of supervisory oversight in narcotics enforcement operations which is a critical component in ensuring the integrity of such corruption prone operations.

    **6.** Systematic transfers and rotations of narcotics officers and supervisors do not occur which raises potentially serious integrity problems. It is critical that term limits be initiated and enforced on a regular basis.

    **7.** Disciplinary practices in the Narcotics Bureau are lax and inconsistent.

    **8.** The Narcotics Bureau does not strictly enforce or monitor compliance with applicable Department regulations regarding the handling of evidence seized in narcotics investigations.

    **9.** Prior to the recent implementation of remedial procedures, supervision and monitoring of confidential informants has been marginal. It is too early to determine the effectiveness of these changes.

    **10.** There are a variety of conditions that may encourage narcotics officers to "cut constitutional corners" in the enforcement of narcotics laws. Such factors include the following:

- Narcotics officers receive compensation and other considerations based on their activity/arrest statistics.
- Inefficiencies and inequities in the Department and criminal justice system as a whole adversely impact officer morale and their commitment to organizational and legal standards.
- Extreme and unrealistic pressures are placed on officers to "solve" the drug problem.
- Officers receive inadequate training as to the applicable legal standards.
- Enforcement of the Department's policies created to ensure that citizens' civil rights are protected is not consistent.

2

# BACKGROUND

In the late 1980's a squad of 39th District police officers responsible for enforcing narcotics laws systematically violated citizens civil rights, stole money and drugs, planted evidence on suspects, fabricated the legal basis for search and seizure warrants, committed perjury, and used excessive force on suspects.

The revelations of this ongoing corruption erupted into one of the most damaging scandals in the history of the Philadelphia Police Department. In 1995, six 39th District officers were jailed. Several hundred criminal convictions resulting from these officer's activities were overturned and thousands more scrutinized. Millions of dollars were spent settling civil rights lawsuits stemming from these unlawful activities. Intense media coverage of this scandal severely eroded public confidence in the integrity of its police force and hindered law enforcement and prosecution efforts in the city.

The repercussions of the 39th District scandal persist. The city continues to settle civil rights lawsuits initiated as a result of the corrupt actions of the 39th District officers, prior criminal convictions involving these officers continue to be scrutinized and challenged, and residual public wariness of the integrity of its police force still exists.

In the aftermath of the 39th District scandal, in 1996 the American Civil Liberties Union (ACLU), the National Association for the Advancement of Colored People (NAACP), and the Police-Barrio Relations Project filed a lawsuit in federal court alleging that widespread and pervasive systemic deficiencies in the Philadelphia Police Department contributed to the ongoing cycle of scandals that plagued the Department.

Rather than litigate, the City of Philadelphia entered into a Settlement Agreement with the Plaintiffs that set forth a comprehensive plan for reform in the Philadelphia Police Department. The goal of this Agreement is to minimize and deter police corruption and misconduct to the greatest extent possible, and thereby enhance public confidence in the Philadelphia Police Department.

## The Integrity and Accountability Office

To assist in meeting this goal, the Agreement created a permanent Integrity & Accountability Office to monitor and audit Departmental policies, practices, and operations as they relate to the detection and control of misconduct and corruption in the Department and if necessary, to make recommendations for change. In order to effectuate the broad duties of the Office, the IAO at its discretion, can initiate studies and audits, has access to virtually all Department records and personnel, and can make its findings public.

3

Since its inception, the IAO has had the access and independence necessary to carry out its responsibilities. has released several reports covering a broad range of issues, and has presented recommendations – some of which have been implemented by the Police Department.

By virtue of its essential function to monitor and audit the Police Department, and in order to remain effective and credible, the IAO must exercise independent judgment in reporting findings and making recommendations. This independence also means that the IAO analyses, critiques, and recommendations are solely those of the IAO. This report should not be interpreted as expressing the policies or positions of the government of the City of Philadelphia, or the opinions, views or beliefs of the Mayor, the Police Commissioner, the City Solicitor, or any other official of the City of Philadelphia.

Section VI of the Settlement Agreement charges the IAO with oversight and auditing functions related to the Department's narcotics enforcement operations. (See Appendix A). Particular emphasis on oversight of this area of law enforcement is based on a broad range of misconduct that has historically been associated with narcotics enforcement including, but not limited to, violating civil rights, theft, excessive force, drug use, perjury, planting evidence, accepting bribes, cooperating with drug dealers, or violating any number of Departmental directives and policies*

To fulfill the mandate of the Settlement Agreement the IAO spent much of the past year (in conjunction with its other ongoing monitoring functions) conducting a comprehensive audit and assessment of the policies, practices, and operations of the Narcotics Bureau** and other interrelated units of the Philadelphia Police Department. This report presents the findings and recommendations pertaining to that study.

---

*The 39th District scandal was only one of several scandals arising from the enforcement of narcotics laws. In 1989, officers from the Department's elite 5-Squad narcotics unit were involved in widespread theft of money and drugs and extortion. Four 5-Squad officers were eventually convicted of federal racketeering and conspiracy charges.

**After the 39th District scandal, individual districts were banned from enforcing narcotics laws. In 1999, the Department re-established district level enforcement of narcotics laws through Narcotics Enforcement Teams (NETS) which are comprised of approximately five to seven officers and a supervisor who focus on open street sales. NETS are not authorized to conduct long-term drug investigations, utilize search and seizure warrants or confidential informants, conduct direct buys or reversal stings or other more complex investigative techniques such as those used in the Narcotics Bureau.

The original scope of this audit included NETS operations. As this project progressed, however, it became apparent that the scope of the study was unwieldy in light of IAO resources. The IAO's preliminary findings, along with its ongoing monitoring of Internal Affairs investigations, identified problems related to record keeping practices and other integrity issues with some district NETS. The IAO intends to conduct a separate in-depth study of district NETS operations.

**Basis for Findings**

The findings and recommendations contained in this report are based upon the IAO's review and analysis of the following:

1. Written Departmental policies and directives which guide the Narcotics Bureau operations;

2. Departmental policies and practices related to the personnel selection process for the Narcotics Bureau, and review of the Internal Affairs Bureau ("IAB"), discipline, and other pertinent employment records of Narcotics Bureau personnel;

3. Training provided to Narcotics Bureau personnel;

4. All completed IAB investigations generated as a result of Narcotics Bureau activities from 1997 through July 1, 2002;

5. Review of all internally generated audits and reports and other internal Departmental monitoring practices related to narcotics enforcement activities since 1997 that the IAO was able to identify.

6. Narcotics Bureau supervisory oversight policies and practices;

7. Internal Affairs use of force and firearms discharge databases for all reported force incidents generated as a result of Narcotics Bureau activities from January 1, 1997 to May, 2002;

8. Disciplinary actions initiated against Narcotics Bureau personnel in general, and specifically in cases where the IAB investigations sustained allegations of misconduct;

9. Lawsuits generated as a result of narcotics enforcement activities from January 1, 1993 to July 1, 2002;

10. Review of databases maintained by the Narcotics Bureau Management Information Systems Unit;

11. Review of the operations, databases, and reports of the Narcotics Bureau Integrity Control Office (ICO) including the confidential informant and search warrant databases, and the annual ICO search and seizure warrant reports from January 1, 1998 to December 31, 2001;

12. Review of approximately two hundred and fifty search and seizure warrants and supporting affidavits of probable cause executed in 1999, 2000, and 2001 by the Narcotics Field Units;

13. Records of targeted and random urinalysis tests results conducted on Narcotics Bureau personnel from January 1, 1996 to December 31, 2001;

14. Municipal Court databases for all 1999 and 2000 disposed municipal level narcotics cases and review of approximately five hundred Municipal Court case files in which the narcotics arrests were dismissed/discharged;

15. Review of Common Pleas Court case records to determine the disposition of nearly 1,800 narcotics arrests;

16. Review of approximately three hundred and fifty arrest/discovery files maintained by the Narcotics Strike Force and Narcotic Field Units;

17. Departmental policies and practices related to the use and management of confidential informants and an audit of approximately one hundred confidential informant files maintained by the Narcotics Field Units;

18. Direct observation of the execution of numerous search and seizure warrants, undercover surveillances, arrests, and vehicle and pedestrian investigations conducted by Narcotics Bureau officers and supervisors.

19. More than two dozen interviews with Philadelphia Police Department Narcotics Bureau personnel, narcotics officers and agents from other state and Federal drug enforcement agencies, and experts in the area of narcotics enforcement not affiliated with the Philadelphia Police Department.

20. An extensive interview with a former Philadelphia police officer who was dismissed from the force and jailed for criminal activities related to narcotics enforcement.

Assessing the extent to which narcotics enforcement operations are conducted legally, ethically, and within the Philadelphia Police Department guidelines is hindered by the obvious fact that only in the most unusual of circumstances do officers intentionally reveal or document their misdeeds. To overcome this hurdle, the IAO undertook a three-prong approach to this study:

1. First, to find evidence of existing or emerging patterns indicative of improper or illegal narcotics enforcement practices we reviewed available information sources, records, and databases documenting Narcotics Bureau activities, investigations by the IAB into specific allegations of misconduct arising from narcotics enforcement activities, and other internal studies and

audits initiated by the Department to assess the integrity of the Narcotics Bureau.

2. Second, the IAO examined written Department policies related to narcotics enforcement operations to determine whether they reflected best practices. The IAO then conducted extensive study and observation of Narcotics Bureau operations to determine the extent to which these policies are actually practiced. Formal written policies, no matter how ideal they may appear on their face, are meaningless if they are ignored or circumvented.

3. Third, the IAO conducted dozens of interviews and spent considerable time in the field with officers, supervisors, and commanders responsible for narcotics enforcement efforts to better understand the realities and complexities of their jobs. Due to the unique issues surrounding narcotics enforcement, we found it necessary to expand the scope of our interviews to include other local agencies in the criminal justice system as well as other State and Federal law enforcement agencies responsible for enforcing narcotics laws.

## Aftermath of the 39th District Scandal

In the aftermath of the 39th District scandal, Departmental efforts to combat drug trafficking in Philadelphia were significantly curtailed. Police districts were banned from narcotics enforcement activities and exclusive jurisdiction for narcotics enforcement was centralized in what was then called the Special Investigations Bureau (SIB). The SIB was understaffed and ill equipped to dismantle the hundreds of open air drug markets that were operating around the clock. Years of lax enforcement enabled drug trafficking organizations to develop strongholds in Philadelphia neighborhoods and established Philadelphia as a narcotics "source" city with some of the purest and cheapest narcotics in the nation. Philadelphia experienced an alarming increase in drug related homicides and other crimes at a time when other major cities in the nation were reporting decreases in their crime rates.

In 1997, significant community and political pressure was brought to bear on the Department for its lack of focus on the drug problem and its devastating impact on individuals and communities throughout the city. In response, the Department dramatically increased its narcotics enforcement efforts. In 1997, SIB was renamed the Narcotics Bureau and over the next five years experienced a 140% increase in sworn personnel. Narcotics arrests increased Department-wide by nearly 200%. (See Table 1)

**Table 1**

| Year | # Officers assigned to Narcotics Bureau | # Narcotics Arrests by Narcotics Bureau | Total Narcotics Arrests Department-Wide |
|------|------------------------------------------|-----------------------------------------|------------------------------------------|
| 1996 | 250 | not available | not available |
| 1997 | 251 | not available | 8,682 |
| 1998 | 415 | 6,224 | 19,210 |
| 1999 | 451 | 7,901 | 22,613 |
| 2000 | 577 | 9,837 | 23,852 |
| 2001 | 601* | 11,229 | 24,845 |

*Approximately seventy officers assigned to the Narcotics Bureau are detailed out to various interagency drug task forces which include, among others, the Drug Enforcement Agency, and the Philadelphia District Attorney's Office. While these officers are still under the jurisdiction of the Philadelphia Police Department, they are not under the direct supervision of the Department on a daily basis. The Narcotics Bureau also has a City Wide Vice Unit that is responsible for enforcing laws related to gambling, prostitution, and liquor sales. An average of thirty sworn personnel who are currently assigned to the Narcotics Bureau are detailed to the Vice Unit. For purposes of this study we focused solely on the narcotics enforcement operations of the Bureau.

Some of this upsurge in activity was attributable to "Operation Sunrise" - a coordinated effort by several city agencies beginning in 1998 to address drug trafficking and other quality of life issues in some of the city's most drug besieged communities. In May 2002, the Department rolled out "Operation Safe Streets"- another major narcotics enforcement initiative in which hundreds of uniformed officers were redeployed to the city's drug dealing hot spots in an attempt to disrupt narcotics trafficking. Arrests and seizures have significantly increased since the inception of Operation Safe Streets.

## Narcotics Bureau Mission and Organizational Structure

The Mission Statement of the Narcotics Bureau stipulates that its objective is:

"**To aggressively enforce City and State laws related to narcotics through overt and covert investigations designed to identify, disrupt and eliminate the activities of criminal organizations specifically engaged in drug trafficking. The Narcotics Bureau employs uniformed and non-uniformed officers as well as local, state and federal task force personnel in both short and long term investigations. The objective is to secure intelligence information, gather evidence, effect arrests, and assist in the successful prosecution of offenders. It is the goal of the Bureau to aggressively attack the purveyors of these illegal activities on a daily basis through a comprehensive approach in an effort to stabilize and secure our neighborhoods and enhance the quality of life for members of the community"**

The Narcotics Bureau has undergone several reorganizations since 1997. Currently, the Narcotics Bureau is comprised of the following units located at facilities throughout the city:

**Narcotics Strike Force ("NSF")** – The purpose of the NSF is to eradicate open street sales of narcotics using both uniform patrol with covert surveillance operations, and to assist other Narcotics Bureau units and agencies with a uniformed presence in narcotics investigations.

**Narcotics Field Units ("NFU")** –There are currently three NFU's that concentrate on specified geographic areas in the City. The NFU's are comprised of plainclothes/undercover personnel who focus on indoor sales locations. NFU's are authorized to conduct longer term investigations than the district Narcotics Enforcement Teams and the Narcotics Strike Force, and to utilize a variety of investigative techniques such as acting as narcotics buyers (so-called "buy-busts" and sellers (so-called "reverse stings"), surveillances, confidential informants, and search and seizure warrants. In 2000, each NFU established a Violence Response Team (VRT) comprised of approximately seven to nine undercover officers who are deployed to locations experiencing a surge of violent incidents believed to be drug related.

**Narcotics Intelligence and Investigation Unit (NIIU)** - The NIIU gathers, analyzes, and disseminates intelligence regarding drug-related criminal organizations, conducts investigations leading to the forfeiture of criminal proceeds, provides specialized technical support to other Narcotics Bureau units, and coordinates Philadelphia police resources in federal, state and local task force initiatives combating drug trafficking.

## TRENDS AND PATTERNS IN
## EXISTING DATA

### Information Sources

The IAO reviewed and analyzed the following six major sources of data to assess the existence or extent of improper or illegal narcotics enforcement practices:

1. Records of lawsuits and Settlement Recommendations prepared by the Law Department of the City of Philadelphia ("Litigation").

2. IAB investigations of the activities of the Narcotics Bureau.

3. The Philadelphia Police Department's records regarding "Use of Force" and "Shootings".

4. Court attendance records of narcotics officers maintained by the Police Department.

5. Philadelphia Municipal and Common Pleas Court records regarding the disposition of narcotics arrests.

6. Departmental studies and audits of Narcotics Bureau operations.

### Litigation

The IAO examined lawsuits filed against the Police Department by individuals who claimed that their rights were in some way violated as a result of narcotics enforcement activities. These litigation records offer valuable insight and evidence into the extent to which narcotics officers are operating within the bounds of the law and Departmental policy. The IAO analyzed all cases that were settled between January 1, 1993 and December 31, 2001, in which the City incurred financial liability as a result of Department wide narcotics enforcement activities, and not just those lawsuits which were the result of Narcotics Bureau activities. This review and analysis also did not include active/open lawsuits, or suits that were closed without payment or dismissed for a variety of reasons.

The IAO's attempts to identify all lawsuits resulting from narcotics enforcement activities proved to be problematic. First, the Department does not maintain consistent, detailed, and centralized records regarding civil rights litigation involving police personnel. Therefore it was necessary to rely upon a computerized case management system maintained by the Civil Rights Unit of the City's Law Department.

Second, the IAO conducted a more detailed review of all Settlement Recommendations prepared by the Law Department, which set forth the facts of the case and the reasons for settlement. In both the databases and Recommendations of Settlement, information provided was frequently vague. These records did not always contain the involved officer's name, payroll number, and district/unit of assignment at the time of the alleged misconduct. As demonstrated in Table 2, factual descriptions of the alleged misconduct were also extremely vague. This made it extremely difficult to determine whether some lawsuits were the result of narcotics enforcement activities. (The IAO identified over thirty narcotics related lawsuits that were not provided to us by the Law Department in our request for this information.)

For these reasons, the statistics included in Tables 3 through 6* cannot be considered to be comprehensive. However the IAO is confident that they do represent the vast majority of lawsuits initiated as a result of narcotics activities over the time period studied.

## Table 2

| EXAMPLES OF VAGUE CASE DESCRIPTIONS IN CIVIL RIGHTS DATABASE |
|---|
| • "Plaintiff claims police subjected him to excessive force". |
| • "Plaintiff claims police threw him to the ground then kicked him in the face as they entered his residence to serve a search and seizure warrant." |
| • "Plaintiff claims police falsely arrested and improperly searched her and seized her money." |
| • "Plaintiff claims he was subjected to excessive force and illegal search and seizure. |
| • "Plaintiff claims he was sitting on the steps of his home when, without cause or justification, he was stopped and seized by police officers." |
| • "Plaintiff claims police forced their way into his home, handcuffed him and falsely arrested him." |
| • "Plaintiff was arrested during an incident" |
| • "Plaintiff was stopped in his car by plainclothes police in an unmarked car and beaten." |
| • "Plaintiff's house was searched by Police." |
| • "Plaintiff states the police caused him to be the recipient of civil rights violations and property damage because of false arrest." |
| • "Plaintiff states he received injuries during an incident with police" |

*These Tables were originally compiled by Law Department personnel and subsequently modified by the IAO.

Table 3

| Year | # of Narcotics Cases Settled | Total Amount of Settlements |
|---|---|---|
| 1993 | 3 | $571,000.00 |
| 1994 | 2 | $147,000.00 |
| 1995 | 8 | $323,500.00 |
| 1996* | 39 | $4,143,048.00 |
| 1997 | 17 | $812,000.00 |
| 1998 | 10 | $682,000.00 |
| 1999 | 15 | $363,500.00 |
| 2000 | 7 | $313,500.00 |
| 2001 | 14 | $350,000.00 |
| 9 years | 115 cases | $7,706,048** |

*Many of the 39th District lawsuits were settled this year.
**$4,025,440 (52%) of the total settlement costs resulted from 39th District cases.

Table 4

| Nature of complaint* | # of Times Alleged |
|---|---|
| Excessive Force/Assault/Battery | 53 |
| False arrest | 49 |
| Illegal search and seizure/illegal entry | 19 |
| False imprisonment | 16 |
| Failure to train, discipline, and supervise | 14 |
| Malicious prosecution | 12 |
| Fabrication of evidence (incl. Planting drugs)/false police reports | 7 |
| Theft | 5 |
| Damage to Property | 3 |
| Fabrication of probable cause to support affidavit for search warrant | 4 |
| Improper strip search | 3 |
| Intentional infliction of emotional distress | 2 |
| Lack of probable cause to support affidavit for search warrant | 2 |
| Failure to provide necessary medical care | 1 |
| Perjury | 1 |
| Freedom of speech violation | 1 |
| Violation of PA. Unfair Trade Practices Consumer Protection Law | 1 |
| Loss of consortium | 1 |

* Many cases set forth more than one complaint.

Table 5



**Total number of officers involved and the number of suits in which each officer was a named defendant.**

2 officers were defendants in 18 cases each (39th District officers)
1 officer was a defendant in 10 cases (39th District officer)
2 officers were defendants in 6 cases each (39th District officers)
3 officers were defendants in 4 cases each
3 officers were defendants in 3 cases each
8 officers were defendants in 2 cases each
126 officers were defendants in 1 case each

**Total 145 officers**

Table 6

| Reasons for Settlement* | No. |
|---|---|
| Too costly to proceed to trial | 34 |
| Officer(s) had prior IAD complaints and/or convictions | 27 |
| Strong evidence of physical/mental injury of plaintiff/s | 19 |
| Plausible plaintiff(s)/ strong witnesses | 17 |
| Evidence of officer(s) misconduct | 9 |
| Inconsistent statements/versions of officer(s) | 8 |
| Difficulty obtaining evidence/witnesses to support City's defense | 7 |
| Concern that publicity surrounding 39th District would affect outcome | 6 |
| Concern of malicious prosecution claim | 6 |
| Plaintiff(s) had no or insignificant prior criminal history | 6 |
| Lack of police paperwork for case | 5 |
| Concern that jury would award large amount because of length of incarceration | 4 |
| Weak affidavit of probable cause | 4 |
| Police reports do not corroborate with officer(s) account(s) | 3 |
| Excessive property damage | 2 |
| Officer(s) admission of lack of probable cause to arrest | 2 |
| Significant number of convictions involving an officer were discarded | 2 |
| Concern that jury would find officer(s) did not insure appropriate medical care | 1 |
| Lack of reasonable suspicion to frisk | 1 |
| Officer(s) repeated failure to appear to testify | 1 |
| Repeated arrests by same officer – evidence of harassment | 1 |
| Officer's failure to obtain search warrant weakened City's defense | 1 |
| Plaintiff not criminally charged | 1 |
| Finding of exculpatory evidence in favor of Plaintiff | 1 |
| Concern of appearance/accusation of racial bias | 1 |

\* **Many cases set forth more than one reason for settlement**

## Interpretation and Analysis of Litigation Data

Litigation data must be interpreted with caution. Whether a lawsuit is settled does not necessarily mean that the police action was improper. Various factors impact on the decision to settle a case, including the cost of trial and trial preparation. In our society, litigation costs are unavoidable. It would be impossible as a practical matter to completely eliminate settlement or verdict costs; the point is to analyze information to try to minimize those costs.

With the exception of the 39th District cases, the IAO review of the litigation records did not indicate any patterns or trends of police misconduct in narcotics enforcement activities either by unit or officer. In a few cases, important policy and integrity issues were implicated and serious injuries/damages were sustained which justified significant settlements. In a large percentage of the cases however, the circumstances surrounding the allegations, and the subsequent settlement amounts, indicated that many of the claims were relatively minor.

This study underscores the need for improved coordination between the Law Department and the Police Department related to lawsuits filed against police personnel. Additionally, the Department would benefit from the creation of its own litigation database involving police personnel that should include necessary data fields such as the officer(s) name and payroll number(s), the date of incident, the unit/district/squad to which the involved officer(s) were assigned at the time of the alleged incidents, the allegations, and in physical abuse claims - the type of force used and a description of the injuries sustained. This information would enable the Police Department to identify emerging patterns or problems related to a particular officer, squad, or unit which could trigger proactive responses and prevent potential litigation - at great savings to the taxpayers of this City.*

Additionally, such information would be readily accessible when an officer is being considered for assignment to specialized and sensitive units, such as the Narcotics Bureau. We identified two lawsuits against officers for actions taken prior to their assignment to the Narcotics Bureau which would have been relevant in assessing these officers' suitability for the Narcotics Bureau.**

---

* For example, one lawsuit involved several narcotics officers who used force against a civilian who was injured but not arrested. The injured person's name does not appear anywhere in the police reports, IAB was never notified of the force incident as required by Departmental policy, and no IAB investigation into the incident occurred. The injured civilian filed a civil rights lawsuit and the case settled for $12,500. In this case numerous Departmental policies were violated, yet none of the involved officers or supervisors were held accountable.

**Because judicial economy and avoidance of costs may be factors in the decision to settle a lawsuit, settlement does not in and of itself mean that the officer committed any wrongdoing. In light of the fact that a record of lawsuits may appear in an officer's employment history, an explanation of the reason for the settlement should be made part of the officer's record so that the officer is not unfairly stigmatized or penalized.

**IAB Investigations**

In addition to the IAO's ongoing review of all IAB investigations, for this study a detailed examination was conducted of all IAB investigations, arising from Narcotics Bureau activities that were completed between January 1, 1999 and July 1, 2002. Since newly completed investigations are regularly reviewed by the IAO, these statistics were updated throughout the duration of this study. At the time of this writing IAB had approximately fourteen active/open Complaints Against Police ("CAP's") and eleven active/open "internal"* investigations arising from Narcotics Bureau activities.

A statistical breakdown of these investigations is presented in Tables 7 and 8.

**Table 7**

| IAB Investigations of the Narcotics Bureau Completed in 1999-2001 | | |
|---|---|---|
| | CAP's | INTERNAL's |
| 1999 | 27 | 19 |
| 2000 | 30 | 20 |
| 2001 | 9 | 13 |
| Total | 66 | 52 |

---

*"CAP" investigations are initiated when a citizen files a complaint alleging some type of police misconduct. These investigations may be reviewed by the public. "Internal" investigations are initiated by the IAB and they are not available for public review.

Table 8
Allegations and Conclusions/Completed IAB Investigations 1999- July 2001

| Allegations* | Total | Exonerated | Unfounded | Not Sustained | Sustained | Closed Without finding | Other Conclusion |
|---|---|---|---|---|---|---|---|
| Excessive Force | 30 | 13 | 3 | 10 | 0 | 2 | 2-within guidelines |
| Verbal Abuse | 17 | 2 | 2 | 11 | 1 | 1 | 0 |
| Off Duty (see below) | 16 | 0 | 1 | 3 | 7 | 0 | 2- w/drawn by CW. 1-w/drawn by IAD. 2 -Dept. violations. |
| Other (see below) | 31 | 1 | 3 | 7 | 14 | 1 | 1-closed w/out merit 1-no wrongdoing found 2-referred to FBI 1-Field test reliable |
| Illegal/Improper Detention/search/seizure | 17 | 11 | 0 | 4 | 2 | 0 | 0 |
| False Arrest | 17 | 8 | 1 | 1 | 2 | 3 | 2-w/drawn by IAD |
| Theft | 10 | 3 | 2 | 3 | 2 | | 0 |
| Improper Search and Seizure Warrant | 3 | 1 | 1 | 0 | 1 | 0 | 0 |
| Property Damage | 5 | 2 | 0 | 2 | 0 | 1 | 0 |
| Associating with drug dealers/criminals | 8 | 0 | 4 | 3 | 0 | 0 | 1- refer to FBI |
| Releasing Confidential Information | 4 | 2 | 0 | 2 | 0 | 0 | 0 |
| Lack of Service | 3 | 2 | 1 | 0 | 0 | 0 | 0 |
| Total Allegations | 161 | 45 | 18 | 46 | 29 | 8 | 15 |

*Numerous investigations contain more than one allegation of misconduct

## Internal Affairs Conclusion Definitions

**SUSTAINED** – The investigation proved that the complainant's allegations occurred and that officer's actions were inconsistent with Departmental policy, directives, disciplinary code, or applicable local, state, or federal law.

**NOT SUSTAINED** - IAB investigation can neither prove nor disprove the allegation.

**UNFOUNDED** - The alleged incident did not occur.

**EXONERATED** - The acts alleged did in fact occur, but the officer's actions were proper, lawful, and in accordance with Departmental policy.

**WITHDRAWN** - The complainant voluntarily withdraws complaint.

**DEPARTMENTAL VIOLATIONS** - The investigation uncovered infractions of Departmental rules, directives, or procedures.

**REFERRED TO** - Internal Affairs completed their investigation and referred the information to another unit or agency (city, state, or federal) for further investigation.

**INACTIVE STATUS** - The complainant will not consent to an IAB interview due to a pending court proceeding. The investigation will be reopened when the court proceedings are concluded.

**CLOSED WITHOUT FINDINGS** - The complainant does not cooperate with the investigation and the investigator made reasonable efforts to obtain cooperation.

A more detailed breakdown of the **"off-duty"** allegations/incidents is provided below:

> 5 - Domestic violence - **2** not sustained, 1 frivolous, **2** sustained
>
> **2** - Unprofessional conduct by officer after auto accidents – Departmental violations on both
>
> 1 - Unauthorized outside employment - sustained
>
> 1 - Hit and run – sustained
>
> 1 - Officer family member selling drugs from officer's home – unfounded
>
> 1 - Theft – withdrawn by complainant
>
> 1 - Insurance fraud - sustained
>
> 1 - Threats – not sustained
>
> 1 - Harassment – withdrawn by complainant
>
> 1 - Allegation that officer is a drug dealer – Withdrawn by the IAB. Complainant clearly unstable.
>
> 1 - Violation of Department use of force policy – sustained
>
> 1 – Allegations of verbal abuse, threats, associating with known criminals, and failing to cooperate and lying during Departmental investigation against one officer - all allegations sustained.

Allegations classified as **"other"** in Table 8 include the following:

> 5 - Harassment – **2** not sustained, 1 closed without merit, **2** unfounded
>
> **2** - Improper issuance of traffic tickets – 1 exonerated, 1 sustained
>
> **2** - Excessive payments to confidential informants – 1 not sustained, 1 sustained
>
> **2** Failure to cooperate with and lying during Departmental investigation - **2** sustained
>
> **2** - Criminal activity- referred to FBI (due to extreme sensitivity of these investigations, the allegations cannot be disclosed)
>
> **2** - Threats – 1 unfounded, 1 sustained
>
> **2** - Abuse of authority – 1 sustained, 1 not sustained
>
> 1 - False entry on Daily Attendance Report – sustained
>
> 1 - Failure to patrol – sustained
>
> 1 - Sudden death of civilian during search of home– no wrongdoing by officers involved
>
> 1 - False overtime requests – not sustained
>
> 1 - Impersonating an IAB officer - sustained
>
> 1 - Leaving scene of accident – not sustained
>
> 1 - Narcotics use by officer – not sustained
>
> 1 - Loss of seized narcotic evidence - sustained
>
> 1 - Watching pornography during execution of a search warrant - sustained
>
> 1 - Failure to prepare property receipt - sustained
>
> 1 - Failure of supervisor to review strip search reports – sustained
>
> 1 - Investigation into reliability of field test
>
> 1 – Allegation that narcotics officer is selling stolen firearms – Complainant fails to cooperate. Investigation is "Closed without findings".

## Analysis of IAB Data

Overall, the IAB investigations appear to be thorough and unbiased. With few exceptions, IAB investigators conducted complete investigations regardless of

the source of the complaint (i.e. complainant was anonymous, incarcerated, a convicted felon, a chronic complaint filer, etc.), obtained the necessary evidence and records, conducted interviews with relevant witnesses, and reached conclusions that were reasonable and consistent with the evidence.

No persistent patterns of misconduct by any particular unit, squad, or officer were identified. However, some investigations revealed serious integrity issues related to particular officers, and violations of specific Departmental policies, particularly as it relates to confidential informants, evidence control, supervisory oversight, and execution of search warrants, that will be addressed in greater detail later in the Report.

The IAO remains satisfied that, overall, the IAB continues to effectively fulfill its critical role as the Department's internal investigator of specified allegations of misconduct and corruption. However, the following weaknesses should be noted:

> • Some of the IAB investigations indicated that violations of Departmental policies regarding the proper execution of search and seizure warrants, questionable or poorly articulated legal basis for detentions and arrests, or possible improprieties in the scope of some searches may have occurred, yet these issues were not always examined or addressed in the investigations.

These oversights indicate a need for the IAB investigators to receive additional training in legal and Departmental standards related to searches and seizures, and/or stronger emphasis on the IAB investigators' responsibility to fully explore these issues.

> • Extensive delays exist in completing IAB investigations. Executive Order 9-93, (a 1993 Mayoral decree that establishes Departmental guidelines for investigations into citizen complaints against police) requires that IAB complete CAP investigations within seventy-five days after receipt of the complaint. We reviewed only five out of approximately sixty-five Narcotics Bureau CAP investigations that were completed within the mandated time period. Some investigations took over a year, and others, several years, to complete. Most troubling were those investigations in which serious corruption allegations against active narcotics officers and supervisors remain unresolved for months.

IAB backlogs have been and continue to be a serious problem. The IAO has addressed this issue in prior reports and noted that numerous factors contribute to delays, some of which are beyond the control of the IAB. (See: IAO First Monitoring Report, November 1997). Regardless of the causes, these delays have widespread negative implications and are stressful for the officers against whom investigations are pending. The

backlog decreases public confidence in the Department as months elapse without any resolution of complaints. Finally, extensive delays threaten to adversely impact the integrity of the investigation process as evidence and witnesses can be lost to time or indifference.

It is imperative that the IAB investigation requirements, established nearly a decade ago, be re-evaluated and that the Department, in conjunction with other relevant agencies, such as the District Attorney's Office*, devise solutions to get a handle on the critical backlog problem.

• The following inconsistencies, ambiguities, and errors were identified in both investigative conclusions and the IAB database:

1. As indicated in Table 8, the majority of "sustained" allegations are classified into the ambiguous and catchall category of "other". These investigations tend to implicate more serious integrity allegations. Yet, because the IAB's categorical breakdown of allegations is limited, the database is not particularly useful in assessing the types of misconduct that the IAB has investigated without review of the investigative files.

2. Citizens initiating complaints against police may subsequently refuse to cooperate in the ensuing IAB investigations. In some of these cases, the IAB terminated the investigation as "closed without findings" due to lack of cooperation by the complainant. In other investigations involving non-cooperative complainants, the IAB either concluded that the allegations were "not-sustained" "exonerated" or "unfounded". The IAO could not identify standards or guidelines for determining the IAB's course of action in these circumstances.

3. In several "internally" generated use of force investigations*, the IAB reached conclusions about whether the officer used

---

*IAB cannot interview the target officer until the District Attorney' Office has formally informed the Department that it does not intend to pursue criminal charges against the target officer. Many active IAB investigations languish for months waiting for the District Attorney's determination in these cases.

**Use of force investigations are initiated in at least two ways. In the first instance, a civilian files a complaint against police (CAP) alleging physical abuse. The IAB is mandated to fully investigate every CAP, regardless of the allegation. In other cases, Departmental policy requires that the IAB be notified of specified force incidents. After review of a force notification, the IAB may unilaterally decide to initiate an "internal" force investigation into the incident to determine whether the use of force was reasonable and justified. In 2001 for example, the IAB initiated approximately 37 internal use of force investigations. Injured suspects rarely cooperate with "internal" force investigations.

19

excessive force despite the fact that no excessive force allegation was made. In these cases, the IAB investigation should determine whether or not the use of force was reasonable, justified, and within Departmental guidelines. For example, after being notified per Departmental policy that a suspect sustained a head injury during a narcotics arrest, the IAB initiated an investigation to assess whether the force used was warranted, reasonable and within Departmental guidelines. The IAB investigation concluded, "The allegation that the [officers] used excessive force is 'Unfounded'. The defendant's attempts to resist arrest, by fleeing and then assaulting the officer, caused himself and the officer to receive injuries". Since there was no allegation of excessive force, this conclusion is inappropriate and unfairly stigmatizes the officer.

4. The IAB investigated a narcotics officer for associating with, and tipping off, a known drug dealer about the dealer's impending arrest for aggravated assault. During his interview with the IAB, the drug dealer admitted to being informed by the narcotics officer that the he was wanted for the assault. The IAB investigative conclusion was "closed without findings", and the IAB database entry indicated that the officer was "Exonerated" of these allegations.

5. In a CAP alleging illegal arrest and search, the investigation was both "closed without finding" due to lack of cooperation by complainant and the targeted officers "exonerated" of the allegations. The IAB database entry for this same investigation indicates that the allegation of an illegal search was "sustained". In another CAP alleging excessive force the investigation was <u>both</u> "Closed without Findings Due to Lack of Cooperation by Complainant" and "Not Sustained".

## Use of Force

To assess the extent to which force has been used by Narcotics Bureau officers, the IAO examined the Department's "use of force" and "shooting" databases, which are summarized in Tables 9 and 10, and the "use of force" investigations, including shootings, completed by the IAB from 1998-2001. In a 1999 report issued by the IAO, numerous deficiencies in the Department's use of force reporting, tracking, and investigative policies and practices were documented. Since that time, the Department has undertaken numerous reforms to improve the problems identified. However, the following examples are evidence that under-reporting, inaccuracies, and ambiguities in use of force reporting and monitoring persist:

- The IAO identified several IAB investigations in which force was used against a suspect who required medical treatment, yet these force incidents did not appear on the officer's use of force history.

- Two audits conducted by the IAB found that in a two month period in 2000 and 2001, eighty-one force incidents had not been reported to the IAB per Departmental policy. The IAO was unable to ascertain from these audits precisely which units in the Department failed to report the force incidents. These audits confirm that the force database is incomplete.

- In some force incidents, several officers may be present, but only one officer actually used the force. In these situations, the database indicates that each officer present used the force indicated. In one case for example, three narcotics officers were on the scene when OC (pepper) Spray was used on a suspect, yet only one narcotics officer actually used the spray. The database entry for this incident indicates that all three officers used OC Spray. Conversely, there were several cases in which more than one narcotics officer was directly involved in a force incident, yet the database entries identified only one of the involved officers as using force.

- The types of force used most frequently by Philadelphia police officers, including narcotics officers, include pushing, shoving, tackling, punching, kicking, grabbing etc. However, these different forms of force are subsumed under the catchall category of "other". Thus the existing force database does not reflect the reality and particularities of the force used by narcotics officers.

- The IAO identified data base entries where descriptions of the force used were too vague (i.e. "passive restraint" "control holds" "subdue" "physically subdued"). In some cases the IAO could not ascertain the severity of the injuries because of uninformative descriptions (i.e. "injuries to arm and face" "injury to mouth" "injured face" "injury rib-stomach" "laceration to head").

- In each of the following examples the database indicated that "no force" was used, yet the suspect sustained injuries that appear to be force related:
    -"Suspect injured when he "scraped head on brick wall while being frisked."

    -"Defendant transported to hospital for rib injury sustained while being helped to feet."

-"Defendant "struggled" with police and sustained stitches over left eye."

-Defendant "tried to escape and sustained lacerations to face and head."

-Defendant exited vehicle with box cutter and was "put to the ground" sustaining injuries to lip and eye.

-Defendant "acted aggressively and OC Spray was used".

-Defendant fled police, cut right arm and "received injury when officer put handcuffs on defendant."

-Defendant "attempted to strike officer and received a cut to the head."

-Defendant was tackled while fleeing and suffered sprained ankle.

-Defendant "received injury during arrest"

Therefore it is not possible to conclude that the use of force statistics presented in Table 10 are either comprehensive or accurate. However, there is a system of checks and balances within the Department which, along with citizen accessibility to the civilian complaint process and the legal system, offer assurances that serious force incidents do not escape detection with any regularity.

### Table 9
### Firearms Discharges-Narcotics Bureau

| Year | # shootings | # officers involved | NHU | NSF | NFU North | NFU East | NFU South | Special Invest. | Violations Found | No Violations | Miscellaneous |
|------|------------|---------------------|-----|-----|-----------|----------|-----------|-----------------|------------------|---------------|---------------|
| 1999 | 14 | 20 | 2 | 3 | 2 | 3 | 2 | 2 | 3 | 15 | 2 -unfounded |
| 2000 | 10 | 13 | 2 | 1 | 4 | 1 | 1 | 1 | 4 | 9 | 0 |
| 2001 | 11 | 15 | 1 | 4 | 5 | 0 | 0 | 0 | 0 | 5 | 7-open investigations |
| Total | 35 | 48 | 5 | 8 | 11 | 4 | 3 | 3 | 7 | 29 | 9 |

### Table 10
### Reported Use of Force Incidents – Narcotics Bureau 1998-2001*

| Unit/Year | Total use of force incidents Reported to IAD | "Other" (includes tackles, punches, kicks, struggles, etc.) | OC Spray | Baton | Not Indicated | Taser | Blackjack |
|-----------|---------------------------------------------|-------------------------------------------------------------|----------|-------|---------------|-------|-----------|
| NSF | | | | | | | |
| 1998 | 9 | 3 | 1 | 1 | 2 | 0 | 2 |
| 1999 | 24 | 1 | 9 | 2 | 12 | 0 | 0 |
| 2000 | 28 | 15 | 9 | 2 | 2 | 0 | 0 |
| 2001 | 60 | 46 | 10 | 3 | 0 | 1 | 0 |
| | | | | | | | |
| NFU North | | | | | | | |
| 1998 | 2 | 0 | 0 | 0 | 1 | 0 | 1 |
| 1999 | 4 | 0 | 0 | 2 | 2 | 0 | 0 |
| 2000 | 13 | 6 | 5 | 0 | 2 | 0 | 0 |
| 2001 | 16 | 13 | 1 | 0 | 0 | 2 | 0 |
| | | | | | | | |
| NFU East | | | | | | | |
| 1998 | 2 | 2 | 0 | 0 | 0 | 0 | 0 |
| 1999 | 2 | 0 | 2 | 0 | 0 | 0 | 0 |
| 2000 | 4 | 1 | 2 | 0 | 0 | 1 | 0 |
| 2001 | 22 | 19 | 3 | 0 | 0 | 0 | 0 |
| | | | | | | | |
| NFU South | | | | | | | |
| 1998 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 1999 | 1 | 0 | 0 | 0 | 0 | 1 | 0 |
| 2000 | 6 | 0 | 5 | 0 | 0 | 1 | 0 |
| 2001 | 14 | 11 | 2 | 0 | 0 | 1 | 0 |
| | | | | | | | |
| DEA Task Force | | | | | | | |
| 1998 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 1999 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 2000 | 1 | 0 | 1 | 0 | 0 | 0 | 0 |
| 2001 | 3 | 1 | 2 | 0 | 0 | 0 | 0 |

*In some force incidents, more than one type of force was used.

**Court Attendance**

As the 39th District scandal unfolded it became evident that the officers who were implicated repeatedly failed to appear in court to testify in drug cases in which they had participated in the arrests or secured search warrants. This behavior was identified as a key indicator of misconduct and corruption. It can be inferred that these officers disregarded their court notices to avoid being effectively cross-examined in cases where they knew they had broken the law, or violated civil rights or Departmental policies. A pattern of failures to appear in court may also indicate that an officer is cooperating with drug dealers.

To assess whether any similar patterns or practices related to court appearances were occurring in the Narcotics Bureau, the IAO obtained information maintained by the Department in a "Court Attendance" database. Philadelphia police officers are provided identification cards with a bar code identifier unique to each officer. Whenever officers receive court notices to appear in court they are required to "swipe" the card at the court attendance office to document their arrival and departure times. This enables the Department to monitor officers' court attendance and overtime costs. Supervisors are responsible for monitoring officer compliance with court notices and ensuring that legitimate reasons for not appearing (such as being on an "on-call" status, on vacation, sick, on funeral leave, or injured on duty), are properly coded and entered into the database. Should an officer fail to appear in court and there is no documented explanation in the database, then the officer's absence is deemed unauthorized.

At the IAO's request, the Department extracted from the Court Attendance database a list of all Narcotics Bureau officers who failed to appear in court from January 1, 1999 through June 30, 2002 - with no documented excuse. This inquiry found that in that time period **there were 7,269 instances in which officers assigned to the Narcotics Bureau failed to appear in court with no authorized or documented explanation for their absences.**

In discussing these findings with pertinent Department personnel, the IAO was advised that this problem is endemic to the entire Department and not simply the Narcotics Bureau. One contributing factor is that Philadelphia Court and Police Department databases operate independent of each other. This results in countless police subpoenas being issued by the courts where officers are not timely notified, or on dates that officers are unable to appear. According to police personnel, this results in excessive and unnecessary police overtime costs, and inefficiencies in the court dockets as criminal cases are repeatedly continued. Serious consideration should be given to coordinating and integrating these related databases.

However, the entire problem cannot be attributed to technology. In a significant percentage of the above referenced cases, narcotics officers were allegedly on "on-call" status and were not required to sign in at court attendance unless they were notified that their court case was actually going forward that day.

Rather than idle around the courthouse for hours to attend court hearings that were never going to occur, these officers were presumably conducting police business instead. While this may be a laudable use of resources, the failure of supervisors to monitor and document court attendance of Narcotics Bureau officers now precludes the Department from determining the legitimacy of over 7,000 cases in which officers failed to appear.

**This is a critical oversight that should be immediately rectified.** (Note: See Appendix B which documents remedial measures recently undertaken by the Department to address problems related to court attendance identified in this study.)

### Narcotics Arrest Dispositions

Tracking the disposition of narcotics arrests is another means of determining whether there are patterns or trends indicative of police misconduct. For example, integrity "red flags" should rise if the same officer has a record of case dismissals for failing to appear in court, motions to suppress on similar grounds, and so forth. **However, the Philadelphia Police Department does not track the status and disposition of its narcotics arrests - or any arrests for that matter.**

Apart from identifying misconduct or corruption, tracking arrest dispositions would enable the Department to evaluate the quality and efficacy of its operations, identify training and management issues, and provide objective and meaningful information with which to evaluate personnel for assignments and promotions. In discussing this issue with Department managers, the prevailing attitude was that it is the Police Department's responsibility to enforce the laws and make arrests - after that the matter is out of the Department's hands and not their concern.  Such compartmentalizing seriously diminishes the effectiveness of law enforcement efforts.

To circumvent this problem the IAO obtained a database from the Philadelphia Municipal Courts containing a list of all narcotics cases disposed of by the Municipal Courts during 1999 and 2000. This information was of limited value to our inquiry for several reasons. First, the courts do not collect data regarding case dispositions for the purpose of identifying trends or patterns related to police misconduct and some of the needed information was not in this database. Second, the database does not identify the arresting officer(s) or the unit or Bureau to which the arresting officer(s) were assigned at the time of the arrest.  Thus, it was impractical to examine trends or patterns related specifically to the Narcotics Bureau. The database does provide the District Control number (DC#) for each arrest which facilitated identifying the police district in which the arrest occurred. Since the Narcotics Bureau was integrally connected with "Operation Sunrise," which resulted in a significant number of narcotics arrests, the IAO concentrated on arrests that occurred in police districts where "Operation Sunrise" was focused.

In addition, the database was in some instances inaccurate. In numerous instances the database and actual "Quarter Sessions files" ("court files") listed different dispositions for the same case. The following examples were the most frequently noted discrepancies:

- The court's database indicated "Dismissed/Discharged Lack of Evidence" ("LOE") while the court files indicated "Discharged Lack of Prosecution" ("LOP").

- The court's database indicated "Prosecution Withdrawn" or "Prosecution Withdrawn/LOE", while the court files indicated that the defendant performed community service.

- The court's database indicated "Prosecution Withdrawn LOE" or "Discharged/Dismissed" while the court files indicated that the felony narcotics charges were dismissed and the defendant pled guilty to the misdemeanor drug charges.

Despite these limitations, the statistics are illuminating. During 1999, the Municipal Courts disposed of 17,501 narcotics arrests. Of these, 3,841 (20%) of the narcotics cases are listed as discharged, dismissed, or withdrawn. During 2000, the Municipal Courts disposed of 11,873 narcotics arrests. Of these, 1,233 (10%) of the narcotics cases were discharged, dismissed, or withdrawn. The lower statistics for the year 2000 are most likely attributable to the fact that the arrests were more recent and were still winding their way through the courts.

In light of the fact that the court database does not specify the precise reasons for the dismissals, the IAO examined the court files of over five hundred of the discharged cases. (See Table 11). In 263 (51%) of the court files reviewed, the reasons for the discharges were inadequate, uninformative, or different from the database entries for the same case. The Department's failure to monitor and track the disposition of narcotics arrests and the ambiguities and errors identified in both the court's database and files precludes determining the precise reasons for the dismissals of a significant percentage of narcotics cases.

The Municipal Court database only provides a partial picture of the disposition of narcotics cases in the Philadelphia courts. Under the Pennsylvania Rules of Criminal Procedure, a defendant who is charged with a felony first has a "preliminary hearing" in Municipal Court. At this hearing, a prosecutor must present a "preponderance of evidence" that the defendant did in fact commit the felony charged. If the prosecutor meets this legal burden, the defendant is held over for trial ("Held For Court") in the Court of Common Pleas.

In 1999, the Municipal Courts, after conducting preliminary hearings, "Held for Court" 4,890 felony narcotics arrests that were sent off to the Courts of Common Pleas for final disposition. In 2000, the Municipal Courts, after conducting preliminary hearings, "Held for Court" 3,644 felony narcotics arrests

that were sent off to the Courts of Common Pleas for final disposition.    The IAO was unable to obtain a database from the Court of Common Pleas to determine the disposition of these 8,534 felony narcotics cases that were sent to the Common Pleas Courts, and locating the individual court files for review proved too cumbersome.    Therefore it became necessary to rely on a police database that is linked to the court computer system to ascertain the disposition of a portion of these felony narcotics cases. The statistics of that review are presented in Table 12.

**Table 11**
**Review of Discharged/Disposed Narcotics Cases by Municipal Courts**

| Total no. | Reason for Discharge/Dismissal |
|---|---|
| 263 | No clear explanation.  Final disposition simply listed as Discharged "Lack of Prosecution" or "Lack of Evidence", "Prosecution Withdrawn by Commonwealth" or "Commonwealth Not Ready" |
| 91 | Community Service (listed as "Withdrawn" on court database) |
| 48 | Guilty Plea (listed as either "Discharged Lack of Evidence", "Dismissed", or "Prosecution Withdrawn" on database) |
| 31 | Motion to Suppress Granted |
| 25 | Motion to Suppress per Rule 6013 Granted (Speedy trial) |
| 19 | Discharged after preliminary hearing – insufficient evidence |
| 16 | Officer failed to appear |
| 12 | Discovery incomplete |
| 4 | Defendant not transported from prison to court |
| 2 | Defense deminimis – motion granted |
| 1 | Commonwealth could not produce confidential informant |
| 1 | Withdrawn and consolidated |
| **Total 513** | |

Table 12
**Common Pleas Court Dispositions of Narcotics Cases "Held for Court"**

| # of Cases | Disposition |
|---|---|
| 331 | Less than 1 year to 2 years |
| 241 | Probation* |
| 219 | Nolle Pros. disch./dism, Disch.LOP, Prosecution withdrawn |
| 156 | No Record Found |
| 143 | Sentence Indeterminate** |
| 121 | Bench Warrant Issued |
| 101 | Less than 6 months to max 1 year |
| 88 | Active/open |
| 80 | Less than 2 years to max 3 years |
| 50 | Section 17/ARD |
| 40 | Less than 3 years to max 4 years |
| 40 | Not Guilty |
| 32 | Less than 4 years to max 6 years |
| 34 | Less than 3 years to max 5 years |
| 14 | Less than 2 years to max 4 years |
| 14 | Less than 2 years to max 5 years |
| 14 | Pre-sentence Investigation |
| 10 | Less than 1 year to max 3 years |
| 9 | Abated (defendant died) |
| 8 | Discharged/ LOE after hearing |
| 6 | Less than 6 years to max 10 years |
| 6 | Sentence Suspended |
| 4 | Guilty – Sentence Deferred |
| 4 | Disposition unclear |
| 4 | Less than 5 years to max 8 years |
| 3 | Less than 4 years to max 7 years |
| 3 | Less than 5 years to max 10 years |
| 3 | Less than 10 years to max 20 years |
| 2 | 0 to 11 months |
| 2 | Less than 3 years to max 10 years |
| 2 | Less than 1 year to max 5 years |
| 1 | Less than 6 years to max 15 years |
| 1 | Less than 8 years to max 14 years |
| 1 | Waiver, demurrer sustained |
| 1 | Transfer to Family Court |

Total 1788

*Philadelphia probation officers are currently over-burdened with caseloads of up to <u>250</u> probationers per officer. The degree of meaningful oversight, and the deterrent effect of a sentence of probation, is questionable in light of the magnitude of such a caseload. The IAO reviewed hundreds of cases where drug dealers were repeatedly arrested for narcotics offenses while on probation for narcotics convictions.

**Court administration advised the IAO that the disposition "sentence indeterminate" is no longer used by the courts and that these entries were incorrect. We were unable therefore to identify the specific dispositions of these cases.

These findings show that 12% of the nearly 1,800 cases reviewed were discharged/dismissed without adequate explanation and that the disposition of 17%

of the cases reviewed were either inaccurate or unavailable. Since the Department does not monitor the status or disposition of cases, it is impossible to determine whether, or the extent to which, officer misconduct contributed to these dismissals.

Apart from dismissals and discharges, the court databases revealed thousands of additional narcotics cases in which no satisfactory disposition was obtained. For example during 1999 and 2000, nearly 6,000 bench warrants were issued against defendants who failed to appear in court. Dismissals and bench warrants alone accounted for nearly 11,056 (38%) of the narcotics cases. These statistics do not include dismissals and bench warrants for the narcotics cases that were sent to Common Pleas Courts, nor do they include cases that were dismissed for other reasons such as motions to suppress, violation of speedy trial rules, death of defendants awaiting trial (the IAO identified nearly twenty-five cases where this occurred), and so forth. Based on the Municipal Court statistics, and the IAO review of the disposition of nearly 1,800 narcotics cases by the Courts of Common Pleas, it appears that as many as 50% of the narcotics arrests by the Philadelphia police have failed to reach any legitimate or effective resolution in the courts.

Even narcotics cases which resulted in convictions were problematic. The IAO reviewed hundreds of cases where drug dealers were repeatedly arrested and released on bail – in some cases within weeks. In one of the cases a drug dealer had been arrested on felony narcotics charges thirteen times in six years (not including additional arrests for theft, assault, and burglary). In another case a defendant was out on bail after his sixth narcotics arrest when he was arrested for homicide.

In these cases the courts consolidated several narcotics cases against a defendant for one guilty plea and imposed identical concurrent sentences on each case. Court statistics reflect that numerous jail sentences were imposed when, in reality, only one jail term was imposed. In numerous cases reviewed, dealers served minimal jail time. This was evidenced by the fact that certain convicted drug dealers were arrested again for narcotics offenses within weeks of being sentenced to jail for prior narcotics convictions.

While this practice may be an expeditious means of reducing case backlogs and improving disposition statistics, this process would appear to do nothing to deter drug dealers from continuing their illegal activities.

Narcotics arrests disposition statistics are stark illustrations of the futility of a significant portion of the Department's narcotics enforcement efforts and of the fact that the criminal justice system – from the police to probation/parole, is not prepared for, or equipped to handle, the onslaught of narcotics arrests flooding the system.

Legally effectuating arrests for narcotics offenses requires extensive resources. The most basic of narcotics operations – disruption of outdoor narcotics sales - may require as many as five to eight officers to devote an entire day developing the requisite probable cause to arrest the dealer (this does not include

29

the pre-operation investigations including covert surveillance and use of confidential informants, and the time spent processing and prosecuting the arrests). In two years, more than **5,000** narcotics arrests, many of which involved the same, or greater, level of resources described here and which passed scrutiny by the District Attorneys Office. apparently did not even warrant a preliminary court hearing for reasons which are now unknown. From the perspective of the Police Department alone. this represents a significant waste of resources. Nor does it factor in the costs imposed on the prisons, courts, prosecutors and defenders office's to shepherd these cases through the system.

The dysfunctional nature of the overall system has a pernicious effect on the morale of narcotics officers. Some of the officers and supervisors that the IAO interviewed viewed the "war on drugs", and the criminal justice system, as fundamentally flawed, ineffectual, and unfair; and their efforts essentially meaningless. Some officers and supervisors expressed cynicism, resignation, disgust, and anger with the process. The integrity implications of these attitudes should not be underestimated. Over time such attitudes deplete the enthusiasm of officers who begin to regard the system as inherently "stacked against them," particularly when their legitimate hard won narcotics arrests are dismissed on tenuous grounds, and notorious drug dealers are repeatedly released from jail despite their best efforts. As was clearly evidenced in the 39th District and other police scandals, officers eventually feel justified in cutting corners and developing their own set of rules on the street to compensate for and circumvent a system that officers perceive as unsupportive of legitimate police work.

### Departmental Studies and Audits of Narcotics Operations

Detailed, meaningful. and regular audits of the Narcotics Bureau operations by trained, objective. and independent personnel outside the Bureau are essential to insure that narcotics enforcement activities are conducted within Departmental, legal, and constitutional guidelines.

After extensive review of the record keeping practices at the Narcotics Field Units and the Narcotics Strike Force. the IAO has concluded that these units are methodical and organized in the maintenance of records and reports such as search warrants, property receipts, arrest reports, and so forth. When it became necessary to review the particulars of a specific narcotics arrest, search warrant, confidential informant, disposition of property, and so forth. the records tended to be easily accessible.

Additionally. the Narcotics Bureau has an Integrity Control Office ("ICO"), staffed by a Lieutenant and a police officer, that maintains data on confidential informants, search and seizure warrants, and *Vehicle and Pedestrian Investigation Forms* (75-48A's). The ICO also reviews daily summary sheets that document the activities of narcotics officers..

The problem identified then, is not whether the Department is collecting data regarding narcotics enforcement operations, but rather the extent to which this information is being consistently and effectively examined and analyzed to detect problems, patterns, or trends, or to improve narcotics enforcement operations. Many of the Department's studies/audits simply offer raw statistics with virtually no analysis of their meaning, value, or any underlying issues and problems that may exist.

**This study has found that while the Department radically expanded its narcotics enforcement operations, it failed to adequately expand its internal auditing functions to monitor the integrity of these operations.** With the exception of the limited studies and audits listed below, the Department lacks an adequately staffed unit that is responsible for regularly auditing corruption-prone operations such as the Narcotics Bureau. Furthermore, the IAO determined that the Department failed to take appropriate steps to rectify problems identified in some of these audits.

### Integrity Control Office ("ICO") – Narcotics Bureau

1.   Since 1998, the ICO has submitted annual reports regarding Narcotics Bureau search warrants. These reports track the number of warrants obtained and executed, the number of warrants voided or expired, and the evidence confiscated. However, these reports are simply raw statistics and do not offer substantive analysis of the data such as the legitimacy of the affidavits, the nature of the confiscations, or the justifications for the voided or expired warrants.

For example, between 1997 and 2001 no evidence was seized (so-called "negative warrants") in three hundred and thirty-two of the search warrants executed. While there are numerous legitimate explanations for negative warrants, it is possible that in some of these cases the subjects of the warrants had been alerted in advance by the police, or that the warrants could have been based on stale, inaccurate, or fabricated information. These and other possible explanations implicate important integrity, supervisory accountability, and resource concerns that should have been carefully evaluated. Narcotics Bureau commanders allege that every negative warrant is carefully reviewed by the pertinent supervisors, yet these investigations are informal and undocumented, and thus not subject to independent review.

The data describing evidence confiscations also lacks specificity regarding the quantity and types of drugs and paraphernalia and the amount of money confiscated. This does not permit evaluation of the quality or success of the narcotics investigations. Statistically, the majority of warrants indicate the confiscation of narcotics, money, or weapons. However, the IAO's examination of the various reports prepared in connection with narcotics arrests revealed that in a large percentage of the cases, the evidence seized was minimal (i.e. a gram of cocaine, an ounce or two of marijuana, a few dollars, or in many cases, the only evidence seized was a document establishing residency - such as a utility bill). The

IAO recognizes that despite the best investigative efforts it is not possible for every narcotics investigation to yield significant evidence. However, considering the extensive time, effort, and resources spent obtaining the warrants, and the dangers and intrusions inherent in their execution, it would benefit the Narcotics Field Units to re-evaluate the efficacy of its efforts.

2.    The ICO audited *Vehicle and Pedestrian Investigation Forms* (75-48A's) submitted by Narcotics Bureau personnel in the year 2000 for completeness, as well as the legitimacy of the reasons listed for the stop, frisk, or search. This report indicated that during 2000, the Narcotics Field Units and the Narcotics Intelligence and Investigation Unit submitted a total of twelve 75-48A's. In light of the significant level of activity of these units, this low number of recorded stops seems highly improbable and should have prompted further inquiry into the operations of these units.

In that same year, the Narcotics Strike Force submitted seven thousand two hundred ninety-seven 75-48A's. The audit found that 14% of the forms had not been fully completed and contained omissions. **The audit also found that 77% of the reported stops and 57% of the reported frisks listed "boiler plate" language such as "High Drug Area" or "Narcotics Activity" as the basis for these actions - without any additional information justifying these intrusions. The Department should be aware that these are not legally sufficient bases for detaining citizens. Despite such a high incidence, the IAO could find no evidence that the Department took any action to either understand the reason why this occurred, or to rectify the situation.**

### Integrity Control Unit – Internal Affairs Bureau

During 1999, the Integrity Control Unit ("ICU") was established within the IAB to conduct proactive integrity audits and investigations of issues and problems that emerged in the course of conducting investigations into specific allegations of misconduct.* The ICU was originally staffed with one Staff Inspector, one corporal and eleven lieutenants. Since 2001, the ICU staffing level decreased to three lieutenants, which has obviously diminished the effectiveness of this essential and important unit. The Integrity Control Unit has conducted the following audits of Narcotics Bureau operations:

1. During 2001, the ICU audited property receipts and evidence handling practices for the Narcotics Strike Force and Field Units. These were the first external audits of evidence handling practices in years, and we have not identified any subsequent audits. Several problems were noted that will be discussed at

*To a certain extent, the ICU assumed functions similar to the Management Review Bureau (MRB) which was established in mid-1980's to conduct regular and proactive audits of Departmental operations to insure adherence to Departmental policies. Over time, the MRB became an internal "dumping ground" for supervisors and commanders who fell out of favor or committed some wrongdoing, and eventually lost its credibility and effectiveness. The MRB was essentially dissolved in 1997.

greater length in the "Evidence Control" section of this Report.

2. During 2001, ICU audited overtime accrual and search warrants of one of the Narcotics Field Units. This audit provided information regarding the frequency with which overtime was accrued as a result of court attendance, investigations, or arrests. Yet the ICU conducted no investigation into, or analysis of, the legitimacy or justification of the overtime. The data revealed several cases where literally hundreds of overtime hours arose out of specific investigations that never led to arrests, yet there was no further analysis as to why this occurred.

The warrant review provided data regarding the number of warrants executed that resulted in seizures, and the number of warrants obtained that were expired or voided. However, there was no further investigation into the legitimacy of the affidavits, the nature of the confiscations, or the justifications for the voided or expired warrants.

3. During 2001, the ICU audited *Vehicle and Pedestrian Investigation Forms* (75-48A's) of the Narcotics Strike Force from September 11, 2001 to September 17, 2001 to insure that they were "free of material misstatements or errors". Four 75-48A's out of seventy-two were found to have errors. One of the four forms was missing. The remaining three, which were completed by Strike Force supervisors, failed to state the basis for a frisk or search.

4. During 2000, the ICU conducted an audit of voided search warrants to determine the reasons therefore and whether any patterns indicative of misconduct existed.

Per Departmental policy, a warrant has been approved and signed by a judge or Bail Commissioner becomes an Order of the Court and thus, every attempt to execute the approved warrant should be undertaken. Legitimate and compelling reasons for non-execution should be properly documents and approved. The audit found that numerous narcotics search warrants that had been reviewed by the District Attorney's officer and approved by the courts, were voided or not executed with no or inadequate documented explanations.

The IAO's subsequent review of voided warrants revealed little improvement in the Bureau's efforts to document or investigate the reasons for warrants being voided.

5. During 2000, an ICU preliminary audit of active confidential informant (CI) files revealed numerous serious deficiencies that will be discussed at greater length in the "Confidential Informants" section of this Report.

**Quality Assurance Bureau**

During 1997, after the Department was determined to have employed deceptive practices in categorizing and reporting crime statistics, the "Quality Assurance Bureau" was created to audit departmentally generated crime statistics to ensure accuracy. The Quality Assurance Bureau has since undertaken additional audits including monthly audits of Narcotics Bureau confidential informants' expenditures, to insure reconciliation of the funds utilized for these purposes.

**Drug Testing**

An important proactive integrity tool used by the Department is drug screening urinalysis testing. Drug screening tests are mandatory for all officers prior to transfer to the Narcotics Bureau and upon their return to duty from medical leave. All other drug tests are ordered by a random selection process which has resulted in many narcotics officers never being selected to be tested, while other officers are repeatedly selected. As Table 13 indicates, it was not uncommon to find some officers who were randomly selected for testing up to three times in one year, while other officers were never tested despite being assigned to the Bureau for years.

Drug testing records from 1996 through 2001 indicate that thirteen officers assigned to the Narcotics Bureau tested positive for drug use. Eleven of these officers tested positive for prescription medication and were eventually cleared by the Medical Review Officer. Two officers tested positive for marijuana and were separated from the Department.

**Table 13**
**Random Drug Screening - Narcotics Bureau Personnel**

| Year | # Random Tests Performed | # of sworn employees in Narcotics Bureau | % of Narcotics Bureau Officers Tested |
|------|--------------------------|------------------------------------------|----------------------------------------|
| 1996 | 76 | 250 | 30% |
| 1997 | 104 | 251 | 41% |
| 1998 | 168 | 415 | 40% |
| 1999 | 162 | 451 | 35% |
| 2000 | 169 | 577 | 29% |
| 2001 | 199 | 601 | 33% |

**Recommendations Regarding Internal Monitoring Practices**

1. The Department should establish regular and meaningful proactive audits of Narcotics Bureau operations by an independent, objective, and adequately resourced entity outside the Bureau. There should be meaningful and timely follow up of the findings of any of the audits, documentation of efforts to effectuate necessary changes, and strict accountability for insuring that the weaknesses and problems are rectified.

2. Implement a policy mandating unannounced yearly drug screening tests for all narcotics officers and require the use of hair drug screening testing, as opposed to urinalysis testing, which is considerably more effective in detecting drug use over a longer period of time

## Summary Analysis of Information Sources

Based on the review of the preceding information sources, there appears to be no evidence of systemic or widespread corruption in the Narcotics Bureau. Serious incidents of corruption and misconduct that were documented tended to be isolated and individualistic. Objective indicators such as use of force notifications (even assuming a degree of underreporting), lawsuits, and citizen complaints against police, filed as a result of Narcotics Bureau activities, were relatively low when compared to the dramatic increase in narcotics arrests over the same time period. Thus it appears that the Department's narcotics enforcement operations are largely conducted within the boundaries established by law and Departmental policies – as it relates to serious corruption and excessive force.

Despite this generally positive assessment, the IAO has identified important weaknesses in the Narcotics Bureau personnel screening, training, transfer policies, supervisory oversight, personnel evaluation, discipline, and internal monitoring practices that have created conditions conducive to breeding corruption and decreasing the likelihood of detection should misconduct or corruption occur.

This observation does not imply that misconduct is widespread in the Narcotics Bureau. Most of the officers and supervisors in the Bureau appear to be ethical and committed professionals who work under dangerous, frustrating, and physically challenging conditions. Yet, as the 39th District and other scandals have demonstrated, a few corrupt officers can taint the entire Department's reputation, call into question the validity of every narcotics arrest, erode public confidence in the integrity of its force, diminish the Department's ability to combat crime, and cost the city's taxpayers millions of dollars in litigation settlements.

, Nor does the IAO's observation suggest that the Department has been altogether lax in implementing necessary reforms and safeguards. Since the 39th District scandal the Department has implemented a number of reforms designed to prevent and detect corruption, particularly in the area on narcotics enforcement.

Finally, the IAO recognizes that the underlying causes of some of the problems, including budgetary, labor, Civil Service, and Home Rule Charter constraints and restrictions, impede the Department's ability to establish effective safeguards against corruption. However, not all the problems identified can be attributed to factors beyond the Department's control. **It is apparent that increased narcotics enforcement efforts were undertaken without appropriate and effective controls, oversight, and monitoring mechanisms to curb and detect potential abuses.**

These issues will be the focus of the remainder of this Report.

## NARCOTICS BUREAU PERSONNEL AND MANAGEMENT POLICIES, PRACTICES AND PROCEDURES

### Personnel Selection Process

In light of the numerous opportunities for corruption, it is imperative that officers assigned to the Narcotics Bureau have a proven track record of integrity. The Department's Organized Crime and Intelligence Unit (OCIU) is currently responsible for conducting the investigations into officers applying for transfer to the Narcotics Bureau. According to OCIU personnel (there are no formal Department directives outlining Narcotics Bureau transfer screening guidelines) the transfer background checks consist of the following:

- Officers must complete a transfer questionnaire form. The IAO review of Narcotics Bureau personnel transfer files indicates no attempts to confirm the accuracy of the applicant's answers to many essentially meaningless questions.

- The officers disciplinary, IAB, and sick leave databases are checked. There is no indication that the actual IAB investigation files or disciplinary records are reviewed.

- Computer inquiries with the National Crime Information Center (NCIC) are made to determine whether the officer has a criminal record.

- The officer's driver's license is checked to insure that it is valid.

As the IAO has documented in a prior study (See: IAO Second Monitoring Report, September 1998), the initial background investigation process for being hired by the Department entails minimal independent investigation into an applicant's character and integrity. A criminal record check is done, however prior employment history and character assessment interviews are virtually meaningless, educational records are not reviewed, and the results of the financial background checks are ignored. In 2002, the Department omitted the polygraph as a means of determining an applicant's involvement with illegal narcotics as part of its routine recruit screening process.

As the IAO has further documented in prior reports (See: IAO Second Monitoring Report, September 1998 and IAO Report on the Disciplinary System, March 2000) the Department's personnel evaluations are virtually useless tools for assessing on officer's work record and suitability for assignment to a sensitive unit such as narcotics. (Personnel evaluations are regarded as so non-essential by the Department that none were completed for three years in the past decade). Thus, the information gathered by the OCIU regarding an officer's employment history, work record, economic status, or degree of integrity is relatively shallow and uninformative.

Applicants deemed appropriate based on the OCIU initial cursory check are then interviewed by two Narcotics Strike Force lieutenants. (Department policy requires that officers transferred to the Narcotics Bureau must first rotate through the Narcotics Strike Force before assignment to the Narcotics Field Units.)

As part of this study, the IAO directly observed several transfer interviews. Each interview lasted an average of ten minutes and the interviewers did not have copies of the applicant's IAB investigations or disciplinary records. Instead, they relied on the explanations of the officers regarding the nature of these investigations.

If the applicant is deemed acceptable by the Narcotics Strike Force interviewers, the transfer request is forwarded through the chain of command for review and a final determination is made by the Police Commissioner. (Records reviewed by the IAO indicate that in the past several years, only twenty-one officers and two supervisors, out of several hundred, were disapproved for transfer to the Bureau.) Once approved, the officer must undergo a scheduled drug screening urinalysis test. This minimal screening process has been circumvented altogether when a transfer is directly ordered at the request of the Police Commissioner.*

In light of the sensitivity of a Narcotics Bureau assignment, this background check is simply not adequate.

After conducting a survey of other law enforcement agencies** we recommend that the additional following qualifications and steps be included in the transfer investigation and screening process:

1. Narcotics officers, particularly those working in an undercover capacity, operate relatively independently for sustained time periods, under conditions that can be far more dangerous than uniformed patrol functions. Law enforcement agencies around the country that we surveyed therefore require a minimum of three to four years patrol experience before assignment into a sensitive, specialized unit such as narcotics.

---

*This practice, which is referred as "parachuting" in the Department, negatively impacts on officer morale who regard assignments to desirable units as dependent on "who you know" as opposed to legitimate and hard earned qualifications. Additionally, circumventing a thorough screening process increases the risk of unqualified officers being assigned into sensitive, corruption prone units such as narcotics.

**Applicants to the Federal Drug Enforcement Agency (DEA), with no prior law enforcement experience, must undergo a nearly nine-month background investigation. Per DEA standards, applicants must be at least twenty-three years old, have a college degree, and be fluent in another language. An intensive field investigation is conducted which includes review of the applicant's educational and employment records and history. Complete medical, psychiatric, criminal, protection from abuse orders, and financial checks are conducted and the applicant must undergo a polygraph to determine past involvement with narcotics.

Our review of the Narcotics Bureau revealed that nearly 17% of the officers assigned to the Bureau had significantly less patrol experience than is deemed prudent by law enforcement agencies nationwide (twenty-one officers had less than one year on the force, thirty-two officers had less than two years on the force, and forty-eight officers had less than three years on the force).

It is imperative that the Department establish and adhere to a policy requiring a minimum of three full years patrol experience as a prerequisite for transfer into the Narcotics Bureau.

2. Implement a policy requiring full financial disclosure statements as condition of assignment to the Narcotics Bureau. It is essential that an initial financial baseline be established in order to identify questionable or problematic changes in an officer's means, lifestyle, and income. Detailed and meaningful financial disclosures that are carefully reviewed should then be required on an annual basis. Any necessary follow-up investigations should be handled by IAB.

3. Review any lawsuits in which the officer was a named defendant, protection from abuse orders, delinquent support orders, and vehicle/scofflaw records, as part of the background investigation process.

4. Require that the actual IAB investigations and disciplinary records be reviewed where applicable, particularly if the allegations seem serious, or a questionable behavioral pattern is evident.

5. Require transfer applicants to submit to polygraphs to detect possible involvement with illegal drugs or other criminal activities.

6. Establish and enforce a formal written policy regarding the retention of Narcotics Bureau transfer/background investigation files, to be incorporated in the officer's personnel files for as long as the officer remains on the force. Until two years ago, these records were discarded by the Department. For this reason, the IAO was unable to review the transfer records of any officer who was assigned to the Bureau prior to that time to determine whether legitimate background investigations had ever been conducted.

7. Conduct full background investigations on all civilian personnel assigned to narcotics related functions in the Department due to their proximity and access to sensitive information, investigations, and evidence. A recent occurrence in which a civilian employee assigned to the Police Chemistry Lab was arrested during the execution of a search warrant in which significant amounts of narcotics and cash were seized illustrates the need for such a policy.

8. Improve the Department's personnel evaluations so that they are meaningful and useful performance and integrity assessment tools.

**Narcotics Enforcement Training**

Continually evolving laws and law enforcement strategies and techniques required to combat increasingly sophisticated trafficking operations point to the need for ongoing and relevant training to insure the professionalism and effectiveness of narcotics enforcement efforts.

The IAO was able to identify the following training programs offered to Narcotics Bureau officers.

- A two-week training course was apparently provided several years ago to large group of officers who were simultaneously transferred into Narcotics Bureau. However, the IAO was unable to locate and review the pertinent course curriculum.

- Some Narcotics Bureau officers who are transferred in isolated circumstances may not undergo formal training with the exception of a required two-day course to be certified in the testing and processing of narcotics.

- A four/five day narcotics enforcement course that is mandated for officer's who are assigned to the district Narcotic Enforcement Teams ("NET's") has been randomly offered to Narcotics Bureau officers. Two NET's training courses were apparently offered in the past year, however, the IAO was unable to locate or review records related to this training.

The Department justifies such sporadic and limited narcotics training by referring to an unwritten policy which states that the Narcotics Bureau will cull potential officers to the Bureau from the district NET's - the assumption being that these officers will have had NET's training and narcotics enforcement experience. However, this policy does not always translate into practice as it is not uncommon for officers and supervisors to be transferred directly into the Narcotics Bureau with no'prior district NET's, or other narcotics enforcement experience.*

The IAO is sensitive to the fact that proper training requires considerable resources which are difficult to obtain in light of the budgetary constraints facing the Department. However adequate and consistent training will improve the morale, professionalism, and effectiveness of the Narcotics Bureau.

---

*Newly hired agents of the Federal Drug Enforcement Agency ("DEA") must undergo an eighteen week training program and receive consistent in-service training. DEA supervisors receive an additional fourteen to fifteen weeks training. Newly appointed narcotics investigators to the State's Bureau of Narcotics Investigations (BNI) undergo a six to seven week training course.

**Transfer Policies and Practices**

Ensuring that management can freely transfer officers out of narcotics should an officers' integrity or ability to do the job become an issue is as important as assigning qualified officers to this sensitive unit. However, current labor contract terms prevent transfers except for formally documented disciplinary reasons or "for purposes of essential manpower requirements". These limitations on management's ability to transfer narcotics officers on a regular basis has made an assignment to the Narcotics Bureau essentially an employment "entitlement," which carries with it negative integrity implications.

For many officers, an assignment to the Narcotics Bureau is highly desirable. Narcotics officers are not responsible for responding to 9-11 calls, are generally more independent, and do not work the same rotating shifts required by patrol. Most important, narcotics officers have a greater opportunity to make numerous arrests and accrue ample overtime in processing the arrests and attending court to testify in their prosecutions. The longer narcotics officers remain in this assignment, the more dependent they become on this overtime income to accommodate their adjusted lifestyles. For these reasons, many narcotics officers are reluctant to relinquish this assignment.

Law enforcement agencies around the country require regular rotations and transfers of narcotics officers every three to four years. (In accordance with DEA policy, a narcotics agent can stay in an undercover assignment for a maximum of three years. "Deep" undercover assignments last no more than thirteen months.) This practice is regarded as an important and necessary integrity control tool to prevent narcotics officers from identifying too closely with the individuals they are investigating; becoming too insular, self-protective and burnt-out; and from becoming dependent on additional "overtime" income that is neither predictable nor guaranteed.

Regular transfers and rotations of narcotics officers do not occur in the Narcotics Bureau. Table 14 shows that one hundred and thirty-two (22%) of the officers have been assigned to the Narcotics Bureau well over the time period deemed prudent. Many of these officers have worked closely together for many years. Experts with whom we spoke regarded this situation as a potentially serious integrity threat.

Table 14
Number of Officers in Narcotics Bureau for Five or More Years

| # Years assigned to Narcotics | # officers |
|---|---|
| 16 | 2 |
| 15 | 2 |
| 14 | 16 |
| 13 | 9 |
| 12 | 23 |
| 11 | 6 |
| 10 | 7 |
| 9 | 6 |
| 8 | 16 |
| 7 | 9 |
| 6 | 9 |
| 5 | 27 |

Some commanders interviewed by the IAO expressed concern about the difficulties in transferring problem officers once integrity issues surface.    The following examples reflect and validate their concerns:

• An off-duty narcotics officer was involved in an incident in which the officer and several others, armed with handguns, harassed and threatened a civilian who had reported illegal activities. The IAB investigation sustained allegations of verbal abuse, failing to cooperate and making false statements during the IAB investigation, and fraternizing with known criminals. In the ensuing disciplinary action, the officer's commander requested that the officer be transferred to a less sensitive assignment. The officer received a five-day suspension but remains in the Narcotics Bureau.

• An IAB investigation of two narcotics officers sustained allegations of verbal abuse, and failing to cooperate and making false statements during the IAB investigation. In the ensuing disciplinary actions, the commanding officer recommended that both officers receive a ten day suspension and a transfer to a less sensitive assignment within the Department because "As a member of the Narcotics Bureau, honesty and integrity are an absolute priority, and the fact that [these officers] were not truthful during this incident jeopardizes their abilities to be productive members of the Narcotics Bureau." These officers each forfeited four vacation days and are still assigned to the Narcotics Bureau.

• An IAB investigation discovered that a narcotics officer had made false statements on her Police Data Questionnaire (the Department's initial employment application), and was not truthful about the nature and extent of her involvement with a family member who was a known drug dealer. The investigation sustained allegations of fraternizing with known criminals, knowingly making false entries in departmental reports and records, and failing to cooperate and making false statements during an administrative investigation. In light of the IAB findings, the officer's Commanding officer recommended that "Based on the above facts, it does not appear to be in the best interest of the Department for the [officer] to remain assigned to the Narcotics Bureau". This officer was never formally disciplined and is still assigned to the Narcotics Bureau.

• A narcotics officer was disciplined for failing to appear in court on numerous occasions which resulted in the discharge of several narcotics cases. The supervisor's disciplinary evaluation of the officer revealed that the officer has a "bad attitude" and has "displayed little or no regard for

his position as a police officer.  It is requested th⸱t [this officer] be transferred out of [Narcotics Field Unit]".  This officer is still assigned to the Narcotics Bureau.

 • A narcotics officer was involved in an on-d⸱⸱ auto accident, left the scene, never informed a supervisor about the incident, provided false information when questioned about the accident, and falsified police records prepared in connection with the accident.  This officer was never formally disciplined.  This same officer had an IAB and disciplinary history that included another unreported auto accident in which the officer left the scene (this accident occurred off-duty), and an incident in which the officer grossly mishandled narcotics evidence.  Only one of these cases resulted in formal disciplinary action (a one day suspension), and this officer was only recently transferred out of the Narcotics Bureau despite earlier efforts by the officer's commanding officer to have the officer reassigned.

 • During the execution of a search warrant at the home of a reputed drug dealer, narcotics officers discovered incriminating evidence against another officer in the Department and never notified a supervisor as required by Departmental policy.  One of the narcotics officers who had been part of the raid tipped off the discovery of the evidence to the officer incriminated by the evidence.  Several of the involved officers had been assigned to the Narcotics Bureau for over a decade (one officer had been in the Bureau for fifteen years).
 An ensuing IAB investigation into this incident revealed serious and ongoing personnel problems between the supervisor and the officers in his squad.  In one of numerous memos by this supervisor documenting the escalating personnel problems, the supervisor stated "This squad is burned out and also does not want to conform to the new way of addressing crime".  These officers were never disciplined and are still assigned to the Narcotics Bureau.

### Recommendations

It is critical that term limits in the Narcotics Bureau be initiated and enforced on a regular basis. The Department should advise all transfer applicants of the rotation policy prior to being transferred into the unit.  Critics of this recommendation point to the resultant loss of experienced officer's.  However, in light of the fact that officers and supervisors generally receive minimal formal training, this argument seems spurious at best.  Furthermore, the reputation of the Department, which would be seriously harmed in the advent of another scandal, is far more important than any loss of experience that may result.  Finally, implementing a regular rotation policy in the Narcotics Bureau creates a far more equitable situation in the Department whereby other qualified officers are given the opportunity to enrich and diversify their law enforcement careers.  This would improve the morale and enthusiasm of the force overall.

### Supervisory Oversight and Accountability

Police scandals in Philadelphia and throughout the nation have identified weak supervisory oversight as a key ingredient in corruption scandals.  In the 39th District scandal and others, corrupt officers co-opted, ignored, circumvented, or lied to their supervisors and commanders — some of whom did not have adequate experience, training, integrity, interest, or common-sense to detect or prohibit the improper activities of their subordinates.

Effective supervisory oversight is therefore a critical component in maintaining the integrity of narcotics enforcement operations. Supervisors and commanders are expected to enforce all Departmental policies, and to monitor and evaluate the integrity and quality of their subordinate's activities. Supervisors selected for the Narcotics Bureau must therefore be appropriately experienced and trained, carefully screened, evaluated, monitored, afforded appropriate resources, and supported by the Department's leadership. For the reasons described below, these are not consistent practices in the Narcotics Bureau.

1. The supervisor selection process is inadequate and incomplete for the same reasons described earlier in this report.    Little meaningful information regarding a supervisor's employment history and personal background is available or analyzed in determining a supervisor's suitability for this sensitive assignment.

Transfer evaluations prepared by a supervisor's superior are largely pro forma and devoid of any objective facts or data that can be confirmed or evaluated. For example, a Lieutenant's evaluation of a Sergeant under his command who was seeking transfer to the Narcotics Bureau consisted, in its entirety, of the following: "When given an assignment, [the Sergeant] will see that it gets done".    This evaluation was deemed acceptable.   In another case the following supervisory evaluation of a Sergeant applying to the Narcotics Bureau was considered "excellent" by Narcotics Strike Force interviewers: "The Sergeant has proven himself to be a very competent supervisor. His presence here has been a real asset to the daily operations of his squad.   He is a very valuable member of my supervisory team."

2. An officer can become a front line supervisor in narcotics with as little as three years on the force and little or no narcotics enforcement experience or training.   Narcotics supervisors training may only consist of the four-day NET training course offered to district narcotic officers. (In the DEA, agents promoted into a supervisory capacity receive an additional fourteen to fifteen weeks of training.) This has created the unbalanced situation where inexperienced corporals, sergeants, or lieutenants may be supervising narcotics officers with vastly more narcotics experience.

3. The Department has no formal or consistent policy regarding the rotation of narcotics supervisors.   Law enforcement agencies around the country require regular supervisory rotations to prevent supervisors from becoming too close to their subordinates, adversely affecting their ability to remain neutral or objective in their interactions with subordinates. (DEA supervisors are rotated every year.)   In one narcotics supervisor evaluation we reviewed, a Sergeant's only positive attribute noted was that the Sergeant was "well liked, having endeared himself to his subordinates".

4. According to records provided to the IAO by the Narcotics Bureau, officer/supervisor ratios in the Narcotics Field Units consist of one corporal and one sergeant for every seven to eleven undercover officers. In the Narcotics Strike

Force. the officer/supervisor ratios consist of one lieutenant. two sergeants and one corporal for every twenty-three to twenty-four narcotics officers. (The DEA supervisor/agent ratio consists of one lieutenant and three sergeants for every twelve agents).

However. these supervisor/officer ratios are not a consistent reality. Narcotics supervisors are frequently on vacation, in training, out sick or injured-on-duty, attending funerals, and so forth. In some cases. supervisors are out on extended military leave, are detailed out of the Bureau for various reasons, or they retire, resign, or are dismissed. In these cases. replacements may not always be secured in a timely manner, leaving gaps in the supervisory slots.

This can and has led to situations where narcotics officers are ineffectively supervised. In one IAB investigation, a narcotics squad was conducting a surveillance and vehicle and pedestrian stops at a drug trafficking location. A citizen who was detained during this operation filed a complaint alleging harassment. In the ensuing investigation. IAB found that the involved officers neither informed police radio of the investigations nor submitted pedestrian and vehicle investigation forms as required by Departmental policy. One explanation for these oversights was that only one corporal was overseeing the entire squad that day.

Since supervisor's names do not appear on the arrest reports and they are not required to maintain activity/patrol logs. it is virtually impossible to monitor the degree of supervisory interaction with their squads and platoons. Furthermore, in light of the vast increase in narcotics enforcement operations that have occurred without a corresponding increase in supervisory personnel and resources, one has to question the degree of consistent and meaningful supervisory oversight that is actually occurring. Thus, while inadequate and ineffective levels of supervision exist, the extent of the problem is difficult to assess.

5. Since supervisors set the tone. impart the values of the organization. and serve as role models and authority figures. they must be held to the highest standards.     However, the IAO found that supervisors are not always held accountable for misconduct in which they participated, or did not properly detect despite obvious signs and signals. As the following examples illustrate, disciplinary actions against supervisors who failed to properly supervise or violated Departmental policies are inconsistent and lax.*

---

*When supervisors in the same chain of command face disciplinary actions arising from the same incident, they are required to submit disciplinary evaluations of each other. Needless to say, we have never reviewed a critical evaluation in these circumstances, despite highly questionable conduct.

• A narcotics supervisor intentionally used improper overtime codes to obtain overtime. This supervisor was neither disciplined for this incident nor transferred out of the Bureau.

• IAB conducted an investigation into the theft of jewelry which occurred during a major narcotics arrest in which hundreds of pounds of marijuana and firearms were confiscated. According to the IAB investigative summary, the supervising Lieutenant was unable to reconstruct the manner in which evidence was seized and disposed because "he relies on his personnel to do what they should do. He said that he did not give them any direction as to what should be done with the confiscated items, nor did he check to ensure that everything was properly marked and secured" The Lieutenant was asked to conduct interviews with officers who participated in the operation. When the IAB requested copies of these interviews, the Lieutenant was unable to locate all of them. This supervisor is still assigned to narcotics.

• A narcotics supervisor failed to properly review a deficient search warrant which resulted in the execution of a warrant at an improper location. In another incident, this same supervisor was notified of, yet made no effort to ascertain how narcotics evidence that had been seized during the execution of a search warrant was ultimately reported missing. The supervisor was disciplined for the latter incident only (a reprimand) and is still assigned to narcotics.

• During the course of an IAB investigation it was revealed that a narcotics officer had been regularly driving to and from work in cars that were uninsured, unregistered, and displaying counterfeit inspection stickers. This narcotics officer had twelve address changes and numerous phone number changes in a relatively short time period. At some point, this officer was living in his car. The officer was eventually fired for impersonating an IAB investigator and failing to cooperate and lying during the IAB investigation.

This officer's supervisors were never questioned nor held accountable for their failure to recognize and intervene in what could have been a serious security and integrity risk, or to report the officer for driving illegal cars. (Curiously, in this case, the District Attorney's Office declined to prosecute this officer despite the fact that the IAB proved that the officer knowingly displayed counterfeit inspection and emission stickers on his cars in violation of sections of Pennsylvania Crimes Code pertaining to Forgery, Tampering with Public Records or Information, Motor Vehicle Insurance Fraud. Despite this declination, the D.A.'s Office advised the Department that they would no longer call this officer to testify in any criminal cases.)

• An IAB investigation found that a narcotics supervisor deliberately ignored numerous Departmental policies and safeguards regarding the use of confidential informants, which resulted in the arrest of an elderly, sick, and innocent woman. The investigation also revealed that the supervisor ordered several constitutionally impermissible searches during the execution of a warrant obtained based solely on the informant's fabricated information. This supervisor forfeited five vacation days as a result of this incident and is still assigned to the Narcotics Bureau.

In an unrelated incident, this same supervisor failed to document an arrangement wherein he permitted a subordinate officer to leave work early on numerous occasions (this was discovered during an IAB surveillance of the narcotics officer on unrelated allegations). In this case the officer, and not the supervisor, was reprimanded.

• A narcotics supervisor was involved in a narcotics arrest in which he assaulted the suspect with his portable radio, yet failed to notify the IAB regarding the force incident as required per Departmental policy. While the use of force was found to be within Departmental guidelines, the supervisor was never disciplined for failing to properly report the force incident. This supervisor was eventually arrested and fired for domestic violence.

• A narcotics supervisor had three IAB investigations in which Departmental violations against him were sustained. None of these cases resulted in formal discipline. The same supervisor has a total of ten IAB investigations into excessive force (3-not sustained, 4-exonerated, 1-

unfounded, 2 shootings – no violations found) and nine additional use of force entries in use of force database. This supervisor is still assigned to the Narcotics Bureau.

- An IAB investigation sustained allegations against a narcotics supervisor for abuse of authority, yet this supervisor was never disciplined. This supervisor's IAB history consists of one sustained allegation of "misconduct" which did not result in discipline, a sustained allegation of improper use of a firearms and giving false statements during an official investigation which resulted in a lengthy suspension, six allegations of physical abuse (all not sustained), one allegation of theft (not sustained), and three shootings (no violations). This supervisor is still assigned to the Narcotics Bureau.

- A narcotics supervisor violated several Departmental policies by meeting and compensating a civilian who was providing information on narcotics sales. The alleged "confidential informant" was never registered or approved by the Department, nor were any of the contacts and payments documented or approved. This supervisor was never formally disciplined and remains in the Bureau.

- During the execution of a search warrant at the home of a reputed drug dealer, narcotics officers discovered incriminating evidence against another officer in the Department who was not assigned to the Narcotics Bureau. This evidence was never reported to the IAB by the narcotics supervisor. During the IAB investigation, the supervisor in charge of this squad gave contradictory and evasive statements regarding the circumstances surrounding the discovery of the incriminating evidence. The IAB investigation further revealed that the supervisor discussed with his squad the details of his interview with the IAB investigator in violation of Departmental policy. This supervisor is still in the Narcotics Bureau.

Most of the narcotics supervisors and commanders that were interviewed by the IAO as part of this study were ethical and dedicated professionals. Furthermore, the IAO reviewed several important investigations in which narcotics supervisors and commanders took it upon themselves to report integrity problems to the IAB – problems that most likely would have remained undetected were it not for the commander's voluntary disclosure. For example, in one case, when cash seized during the execution of a warrant was subsequently reported missing, a commander referred the matter to IAB. In another case, a commander informed IAB of a narcotics officer whom he had reason to suspect was leaking sensitive information to drug dealers. This matter was investigated and the officer was arrested and fired.

However, weaknesses in the supervisor selection process and transfer practices, inadequate supervisory resources, training, monitoring, evaluating, and inconsistencies and deficiencies in supervisory accountability described above, raise troublesome questions regarding the overall effectiveness of supervisory oversight in the Narcotics Bureau.

## Discipline

Insuring integrity and enforcing Departmental values requires that the Department address inappropriate conduct swiftly and appropriately. Failure to do so results in a dysfunctional organization where the values and expectations are inconsistent and confusing and morale is weakened. Our study has found that disciplinary practices in the Narcotics Bureau are lax and ineffective.

To evaluate disciplinary practices in the Bureau, the IAO reviewed records maintained by the Departments Police Board Of Inquiry (PBI)* from 1997-2001 to see what, if any, disciplinary actions were initiated against narcotics personnel as a result of IAB investigations that sustained allegations of misconduct or departmental violations, as well as for general misconduct not arising from IAB investigations.

Collection of disciplinary records pertaining to narcotics officers by the Narcotics Bureau is not required and, it would appear, is done only at the discretion of the Bureau's commanding officer. The disciplinary database maintained by the PBI is incomplete and, at times, inaccurate.* The absence of consistent standards in the collection of disciplinary data prevents the timely and accurate assessment of existing or emerging disciplinary problems or issues. Therefore, the IAO cannot assure the accuracy or completeness of the following Narcotics Bureau disciplinary statistics:

### 1997 – Twenty-four disciplinary actions identified
- Two allegations of verbal abuse each resulting in a three-day suspension.
- One auto accident resulting in a two-day suspension.
- Nineteen allegations of officers failing to appear in court each resulting in a Reprimand.
- Two allegations of "Failure to fully cooperate in a Departmental Investigation" each resulting in a finding of "not guilty".

### 1998 – Six disciplinary actions identified
- Four auto accidents each resulting in a reprimand.
- Officer tested positive for illegal drugs - officer resigned
- One allegation of "Failure to comply with Commissioner's Orders, Regulations etc." resulting in a reprimand.

---

*The PBI is the unit in the Department responsible for processing formal disciplinary actions, conducting internal administrative hearings at which disciplinary charges against officers are presented, and maintaining disciplinary records and data.

** The IAO released a report in March 2001 which presented a detailed examination of the Department's disciplinary system. Some of the problems and deficiencies identified in that study were still evident in this audit.

**1999 – Four disciplinary actions identified**
- Two allegations of "Failure to cooperate fully in a Departmental investigation" each resulting in a four-day suspension. (The Department's Disciplinary Code penalty guidelines mandate a ten-day suspension to dismissal for this offense.)
- One allegation of "Damage or loss to Police property" resulting in a reprimand.
- One allegation of "Absence without leave" resulting in a reprimand.

**2000 – Seven disciplinary actions identified**
- One allegation of "Failure to fully cooperate in a Departmental investigation" resulting in a dismissal.
- One allegation of insubordination resulting in a fifteen day suspension and transfer.
- One allegation of "Loss or damage to police property" resulting in a reprimand.
- One allegation of "Failure to comply with any Commissioner's orders, regulations etc." resulting in a five day suspension.
- One allegation of associating and/or fraternizing with known criminals resulting in a verdict of "not guilty"
- Two allegations of "Failure to properly collect and preserve evidence" each resulting in a reprimand.

**2001 - Four disciplinary actions identified**
- One allegation of failing to appear in court resulting in a eight day suspension.
- One allegation of "Failure to take police action" resulting in a eight day suspension and transfer.
- One allegation of "Loss or damage to police property" resulting in a reprimand.
- One allegation of "Failure to comply with any Commissioner's Orders, regulations, etc." resulting in a one-day suspension.

The above statistics reflect that 68% of the forty-four disciplinary actions instituted against narcotics officers over the past five years resulted in reprimands. Additionally, since 1999, the IAB has sustained over twenty-nine allegations of misconduct against narcotics officers. However, only fifteen formal disciplinary actions have been brought against narcotics officers since 1999, several of which are unrelated to the IAB investigations. The following are additional examples of inconsistent and poor disciplinary practices:

- Since 1997, there has only been ONE disciplinary action against a narcotics officer or supervisor for failure to appear in court, despite records which indicated that in more than 7,000 instances narcotics officers failed to appear in court without legitimate or documented explanations.

- There was not a single disciplinary action against narcotics officers or supervisors for failing to complete necessary reports such as 75-48A's, use of force notifications etc., despite several IAB investigations noting these violations.

- An IAB investigation sustained allegations of verbal and physical abuse against a narcotics officer who was never disciplined for these offenses.

In this same investigation, the IAB cited a second narcotics officer with several Departmental violations that resulted in a reprimand. This officer's IAB history includes nine excessive force investigations (one was sustained yet no disciplinary action was initiated, four were not-sustained; one is still open; two were shootings where no violations were found, two were exonerated), and one verbal abuse allegation that was sustained and resulted in a reprimand.

- Several narcotics officers who deliberately concealed incriminating evidence against another Philadelphia police officer that was found during the execution of a search warrant at the residence of a known drug dealer were never formally disciplined and are still assigned to the Narcotics Bureau.

- An off-duty narcotics officer accidentally discharged a gun in a bar causing injuries to an innocent bystander. The officer never reported, and attempted to conceal, the shooting. The officer's commander recommended that the officer receive a five-day suspension and not be transferred out of the Narcotics Bureau. This officer received a twenty-day suspension and was ultimately transferred out of the Narcotics Bureau.

- A narcotics officer lost narcotics evidence that had been confiscated during a raid and the ensuing felony charges were discharged. The officer was reprimanded. The same officer had a prior firearms discharge violation that did not result in formal discipline.

- A narcotics officer failed to do a proper investigation before obtaining a search warrant, resulting in the execution of the warrant at the residence of an innocent family. The officer forfeited two vacation days. This disciplinary action is not listed in the discipline database. This officer's direct supervisor was charged with "Failure to properly supervise" which resulted in a reprimand. This disciplinary action is also not listed in the discipline database.

- A narcotics officer who repeatedly left work early and failed to truthfully document this conduct was charged with four counts of "Unauthorized absence from assignment" and received a one-day suspension. The Disciplinary Code penalty guidelines mandate progressive discipline under these circumstances which did not occur.

- A narcotics officer had disciplinary charges of "Failure to comply with Commissioner's Orders etc." and "Insubordination" filed against him in December 1996. To date no action has been taken on this matter and the officer is still

49

assigned to the Narcotics Bureau. This same officer has a prior disciplinary record that includes "Fighting with members of the Department while one or both are on duty" that resulted in ten-day suspension.

- An officer accumulated the following IAB history since being assigned to the Narcotics Bureau in 1996: two sustained allegations of physical abuse that did not result in disciplinary actions, a sustained allegation of violating an emergency Protection From Abuse Order that did not result in any disciplinary action, three open investigations for missing money, physical abuse, and domestic violence. This officer was not disciplined and remained in the Narcotics Bureau until the spring of 2002 when he was dismissed.

- A narcotics officer was the subject of two IAB investigations involving allegations of illegal detentions and searches. In both cases, the officer indicated on the Vehicle and Pedestrian Investigation Forms (75-48A) that searches had not been conducted, yet the IAB investigation proved that in both cases, both the occupants and the vehicles were searched. This officer was never disciplined, nor was there any evidence that the officer received counseling or training.

- A narcotics officer with a sustained allegation of "excessive force" was never disciplined.

## Evidence Control

Departmental Directive 91 sets forth detailed guidelines and procedures regarding the handling of evidence seized in criminal investigations. The integrity of evidence handling in narcotics enforcement operations must receive the highest priority and the slightest deviations from these guidelines should raise suspicions and be immediately and thoroughly investigated. The following examples reveal that the Narcotics Bureau does not strictly enforce or monitor compliance with the applicable Department regulations.

1. The IAB audit of the Narcotics Bureau property receipts described earlier in this Report revealed that narcotics officers were inconsistent in turning in evidence within the Departmental guidelines. This practice was particularly disturbing as it related to confiscated cash. The audits identified numerous instances where narcotics officers retained possession of confiscated cash ranging from several hundred to several thousand dollars for a number of weeks before turning it in to the evidence custodian. In two instances cash totaling $1,254 was never submitted to the Evidence Custodian, and in one instance a vehicle that had been confiscated had never been submitted to the appropriate storage agency.

2. A Narcotics Bureau Memorandum 88-07 dated 9/2/92 entitled "Narcotics

Raid Operations Policies" explicitly describes the procedural guidelines that must be followed during the execution of warrants to insure the integrity of seized evidence and to protect the Department from allegations of theft. Per this memo, during the execution of a warrant:

> *"A search team will be comprised of a supervisor, recording officer, inventory officer and any additional officers needed.*
>
> *The owner of the property or person in charge of the property will be present in each room when it is searched.*
>
> *Only one room at a time will be searched.*
>
> *When a member of the search team locates evidence, the supervisor will be notified and the evidence will be left in place. The inventory officer will then take the evidence into custody.*
>
> *When money, jewelry, or other valuables are taken into custody, they will be accounted for in the presence of the person in control of the property. When large amounts of money are taken into custody and it is highly impractical to count it on the scene, the money will be bagged and kept in the presence of the defendant during transportation to the Narcotics Unit. The money will be in possession of the inventory officer and a supervisor.*
>
> *All money, jewelry and other valuables will be bagged and heat-sealed closed for transportation into the Narcotics Unit.*
>
> *Any person who denies that money or certain personal property belongs to him/her will be requested to write out a statement to that effect right on the property receipt.*
>
> *When search warrants result in negative searched, a memorandum will be prepared to the Commanding Officer, Narcotics Unit outlining the facts of the case.*
>
> *Upon return to the Narcotics Unit, the supervisor, assigned investigator, and the inventory officer will weigh all controlled substances that were confiscated.*
>
> *FAILURE TO COMPLY WITH THIS POLICY WILL RESULT IN DISCIPLINARY ACTION OF THE PERSONNEL INVOLVED.*

Several important IAB investigations revealed a lack of adherence to virtually all of the procedural safeguards described above. No formal search teams existed and officers generally fanned out throughout the premises and conducted simultaneous searches of several rooms – sometimes individually. Supervisors were not summoned to locations where evidence was found, occupants were not present in the rooms being searched, several officers handled and processed seized evidence, some evidence was not heat sealed on location, and no suspect was ever required to review or sign a property receipt. In fact, of the nearly 1,200 property receipts reviewed by the IAO as part of this audit, not a single property receipt was signed. Approximately five dozen of the property receipts indicated that the Defendant was "unavailable" or that the property owner "refused to sign" the property receipt.

In discussing these findings with narcotics personnel, the prevailing attitude was that the procedural guidelines described above are unrealistically burdensome.

The Department should consider using video cameras to record the execution of warrants, and developing video review and storage policies and procedures. This would serve as an excellent deterrent of improper conduct and at the same time protect the Department from unwarranted allegations of theft and other civil rights violations.

3.   The IAB investigated an incident where hundreds of dollars seized during The execution of a search warrant were subsequently reported "missing". The investigation revealed haphazard and sloppy practices in both the search and evidence handling that precluded IAB from assessing what happened to the money.

The narcotics supervisor responsible for overseeing this operation was cited by the IAB for failing to properly supervise the officers involved in the execution of the warrant. This same supervisor was also the subject of a prior IAB investigation initiated by a citizen who alleged that narcotics officers illegally entered and searched his home and stole several hundred dollars.    The allegations were ultimately not sustained, however, the IAB investigation concluded that the supervisor failed to follow proper procedures in raid operations by allowing the officers to search each room individually without supervision. This supervisor remains in the Narcotics Bureau.

4.   A package of crack cocaine was discovered in the personal jacket of a narcotics officer while the officer was off-duty.   When questioned about this discovery, the officer claimed that numerous packs of cocaine had been seized during the execution of a warrant, (the officer was unable to recall from which operation it may have been seized) that he placed the drugs in his jacket for "safekeeping" while he went to the bathroom and that the package of crack must have inadvertently separated from the rest of the drugs. The manner in which this evidence was handled violated numerous regulations, yet neither the officer, nor the supervisors overseeing the operation, were disciplined or transferred out of the Narcotics Bureau as a result of this incident.

5.   A narcotics officer lost several hundred dollars worth of cocaine that had been seized and placed on a property receipt, resulting in the discharge of the felony narcotics arrest. The officer's supervisor was notified that the drugs had not been submitted to the Department's Chemistry Lab the day after the arrest and seizure. Several months elapsed and the supervisor made no further efforts to follow up on the missing narcotics.   The officer and supervisor were reprimanded.

## CONFIDENTIAL INFORMANTS

Confidential Informants ("CI's") are integral investigative tools who are regularly utilized by the Narcotics Bureau.* However, because a CI's identity must be carefully guarded for his or her safety, their existence and credibility are not easily subject to independent verification. Therefore it is absolutely essential that there are stringent regulations guiding the use of CI's and that they are rigorously enforced.

In the 39th District scandal, officers routinely fabricated the information allegedly provided by CI's regarding illegal drug activities as the basis for establishing probable cause to obtain search warrants. The illegal acts of these officers went undetected, in part, because the Department did not have the necessary procedural safeguards in place to guard against such abuses.

Since the 39th District scandal, the Department devised numerous policies to ensure the integrity of CI's in narcotics enforcement operations. For example, the use of CI's in narcotics is restricted to the Narcotics Field Units, thereby allowing greater control and oversight. Monthly audits of the funds used to compensate CI's are conducted by the Quality Assurance Bureau to assure that the money utilized is properly reconciled. Additionally, the Integrity Control Office ("ICO") of the Narcotics Bureau is required to collect information regarding CI activities.

Despite these important oversight measures, the IAO has found that, until very recently, supervision and monitoring of CI's has been marginal.

During 2000, at the request of the IAO, the Integrity Control Unit of the IAB conducted a preliminary audit of Narcotics Bureau CI files which represents the only independent audit/study of CI's that the IAO could locate. The following deficiencies regarding the management and oversight of CI's were noted in that audit:

- The maintenance of some CI files were haphazard and sloppy.

- Some CI's had never been properly identified.

- Some active CI's did not appear in the ICO database and were thus not properly registered with and monitored by the Department.

- Police contacts with the CI's were not always listed in the CI database. In fact, the IAO discovered that the ICO was never provided the reports of

---

* Confidential Informants are generally individuals engaged in a lifestyle that gives them access to criminal activities, evidence, and/or persons that would otherwise be difficult for police to access and are used and compensated by law enforcement agencies to assist in investigating certain criminal activities.

nearly three hundred CI/officer contacts. Despite repeated and futile efforts of the ICO to enforce policies regarding the timely submission of these reports, no narcotics officer or supervisor has been disciplined for failing to comply with Departmental CI reporting policies.

- Some CI initiation forms did not have the commanding officer's authorizing signatures as is required by Departmental policy, thereby making it impossible to determine whether a commanding officer actually approved of the use of the CI.

- Numerous active CI's had outstanding criminal bench warrants (one CI had five outstanding bench warrants). In one Field Unit alone, twenty-seven of the active CI's had outstanding warrants for narcotics offenses, theft, robbery, aggravated assault, and prostitution.

- In numerous cases, active CI's were on probation/parole yet their probation/parole officers had not been notified of their CI status as required per Departmental policy. Some of these CI's were on probation/parole for narcotics convictions and were not permitted to associate or interact, in any manner, with criminals and drug dealers. Their cooperation with the Narcotics Bureau thus constituted a material violation of the conditions of their probation/parole.

- Despite the fact that Departmental guidelines mandate Quarterly Reviews of the CI files, none had been conducted prior to the Integrity Control Unit audit.

As part of this study, the IAO reviewed approximately seventy-five search warrants and supporting affidavits that documented the use of CI's as the basis for establishing the requisite "probable cause" to obtain the warrant. Pertinent CI records, contact sheets, and signed informant fee voucher forms were then examined to ensure that the facts and allegations described in the affidavits of probable cause were supported by CI records. In general the CI records and reports supported and confirmed the statements in the affidavits of probable cause. However the following issues should be noted:

When a CI is first activated, he/she is required to provide two signature cards that are maintained in his/her confidential CI file. Upon completion of services for which the CI is compensated, he/she is required to sign the Payment Voucher Forms. This enables comparison of both the CI's voucher and file signatures to insure that the CI's are actually providing the services and being compensated as reported by the narcotics officer. With the exception of the officer's word, this signature therefore represents the main evidence that the CI was utilized as stated.

54

In several of the files audited by the IAO, the CI's file signature cards were in script and the CI's payment voucher signatures were printed and so dissimilar as to preclude verification. Additionally, some Voucher Form signatures appeared to be very different from the file signature cards. The IAO is not suggesting that improper conduct occurred in these cases. However, these dissimilar signatures are problematic and also raise questions regarding the degree of meaningful supervisory review of confidential informants.

This problem of script signatures versus printed names would be easily, avoided by requiring that newly activated CI's provide both on the signature cards for future comparison purposes. CI files and the vouchers should also be reviewed on a regular basis to ensure compliance. Additionally CI payment voucher forms are not monitored and can be freely obtained in bulk by narcotics officers. This would allow an officer to ask a CI to simultaneously sign several blank voucher forms. While the IAO has no evidence that such a practice is actually occurring, the Department should devise procedural safeguards with regard to the dissemination of these forms.

Since the Internal Affairs audit, the Narcotics Bureau has implemented some remedial measures related to management of CI's. More rigorous procedures for activating CI's have been adopted. Narcotics officers and supervisors continue to conduct the initial background investigation and debriefing as mandated per Directive 15. However, there is now a subsequent review by the Narcotics Bureau Integrity Control Office to ensure total compliance with pertinent Directives.

Additionally, Quarterly Reviews of CI files are being conducted as of 2001. However, the IAO found these reviews to be inadequate. Various supervisors within each Narcotics Field Unit are charged with completing the Quarterly Reviews, and each supervisor follows a different format. The Quarterly Reviews consist, in their entirety, of a criminal record checks of active CI's to ensure that they have not been arrested or are wanted on outstanding bench warrants. (One narcotics supervisor took the added step of checking for outstanding "Protection from Abuse Orders" against active CI's.) Some Field Units maintain the Quarterly Reviews reports in a separate file, while another Field Unit maintain each CI review in each CI's individual file which precluded easy access and review of these reports.

If a CI was terminated, the reasons provided were generally vague and uninformative. For example, the most commonly stated reason for a CI's termination consisted, in its entirety, of the following: "As a result of my assessment, I request the following CI be terminated". This explanation is of little use if consideration is given to reactivating the CI at some future time, or in assessing the credibility of the CI's prior services.

The Department stipulates that "Sign out logs will be maintained indicating the date, CI folder #, time in and out, and signature of the individual reviewing the

file". CI review logs were only implemented this year and, in the majority of the files reviewed by the IAO, the logs were blank.

Additionally, Departmental policy also requires that immediate supervisors meet, when practical, at least once with each CI utilized by narcotics officers under their command. The IAO could find no evidence that these meetings occur. (DEA policy requires that one-third of all active CI's, and ten percent of inactive CI's are independently interviewed every eighteen months by IAB investigators.) These practices are further evidence of lax monitoring and oversight of CI's.

(Note: See Appendix C which documents remedial measures initiated by the Department to address problems pertaining to confidential informants identified in this study)

## Confidential Informant's and Controlled Narcotics Buys

In accordance with Departmental policy: "Where a CI is to participate in an undercover purchase in which he/she may come in contact with either official funds, controlled substances . . . he/she will be thoroughly searched by two officers of the same sex, both before and after the undercover encounter and where possible, kept under continuous observation to preclude questions as to the validity or integrity of the evidence. The approval of the supervisor of the officer operating the CI will be obtained prior to participation in an undercover operation."

It is difficult to assess the degree to which these procedural safeguards are actually followed. Most police reports reviewed by the IAO that documented the use of CI's contained "boilerplate" and imprecise language that virtually mirrored the Directive language and provided no specific facts regarding the circumstances of the undercover operation. Important facts such as how, when, where, and who conducted the "before and after searches" of the CI, approximate locations of officers during their "continual observation" of the CI, and which supervisor approved of the undercover operation were notably absent. For these reasons, it is virtually impossible to independently verify whether the officers in fact followed Department policies.

Since these CI regulations are designed to insure the integrity and credibility of evidence provided by CI's, they must be strictly enforced and the officers and supervisors should be held strictly accountable to failures to follow protocol. The latter does not always occur. In an important IAB investigation described earlier in this report, nearly every procedural safeguard required for using a CI was intentionally ignored, and the circumstances surrounding the incident were falsified. The involved officers and supervisors received minimal discipline and are still assigned to the Narcotics Bureau.

In another incident described earlier, a narcotics supervisor surreptitiously met with and compensated a civilian who was providing information on narcotics sales. This alleged "confidential informant" was never registered or approved by the Department, nor were any of the contacts and payments documented or approved. This supervisor has not been disciplined and remains in the Bureau.

## THE ENFORCEMENT OF NARCOTICS LAWS AND CIVIL RIGHTS

Assessing the degree to which narcotics officers adhere to legal and constitutional standards when conducting detentions, frisks, searches, seizures, and arrests is critical to any study of narcotics enforcement activities. It is incontrovertible that officers do violate civil rights in the enforcement of narcotics laws (or any laws for that matter). Evidence of such misconduct is found in the IAB investigations and civil rights lawsuits where allegations of excessive force, and illegal detentions, searches, and arrests are documented and proven.

As part of this audit, the IAO reviewed several hundred randomly selected arrest files from the Narcotic Field Units and the Narcotics Strike Force to determine whether they articulated sufficient facts and the proper legal basis to justify the police actions. Overall, the arrests reports and search and seizure warrants contained in these files presented sufficient legal basis for the police actions.* The IAO discerned no evidence of commonly employed phrases or language, or frequently repeated and similar fact patterns which would be indicative of questionable police practices.

---

\* **One area of concern that became evident during this review pertained to "Consent Searches". The consent to search is one of the few legally recognized exceptions permitting law enforcement personnel to search a person or property without a search warrant. However, extremely strict procedural guidelines have been established by both the Courts and the Department to ensure officers do not use consent searches as an expedient means of circumventing the warrant process.**

**The IAO reviewed several arrest files where suspects allegedly consented to a search of his/her person, vehicle, or home - however only one of the files contained a consent search form that had been signed by the suspect. None of these files or reports detailed the circumstances surrounding the consent, or whether the numerous procedural safeguards were followed.**

**The Narcotics Bureau does not maintain copies of executed consent search forms in any centralized location, does not collect data regarding consent searches, does not enforce the requirement that consent forms be attached to the arrest report, and does not conduct investigations or inquiries into alleged consent searches to determine whether the consents to search were obtained within legal and Departmental guidelines.**

**The issue of consent searches warrants full review by the Department. (Note: See Appendix D which documents remedial measures implemented by the Department to address problems related to consent searches.)**

The IAO recognizes that this method of evaluating the legitimacy and constitutionality of officers' actions is of limited value. Many officer/citizen interactions occur with little or no oversight or independent observation, and civil rights violations are generally not documented and therefore not subject to review or scrutiny unless the affected citizen files a complaint or a lawsuit. It is therefore impossible for the IAO, or any monitor for that matter, to compile reliable or verifiable statistics documenting the extent to which civil rights violations occur.

A more productive avenue of inquiry then is to examine the motivational and/or attitudinal factors which may contribute to officers "cutting constitutional corners" in the enforcement of narcotics laws. The IAO does not regard the following inventory to be exhaustive as it relates to this inquiry:

1. Philadelphia police officers are rewarded in a variety of different ways, based on an officer's "activity/arrest" statistics. For example, the number of arrests an officer makes is positively correlated with the amount of overtime pay an officer can accumulate. This approach encourages the vigorous pursuit of possible suspects for arrest and, at the same time, increases the likelihood of carelessness or the tendency to "cut corners". It is therefore important to eliminate officers' personal financial gain as an incentive to enforcing narcotics laws. (DEA agents beginning salaries are $45,000 to $46,000 plus guaranteed twenty-five percent overtime.)

Additionally, assignments in the Department, including the Narcotics Bureau, are also based in large part on an officer's "activity/arrest" statistics. However this is a quantitative versus qualitative assessment. Thus officers with higher rates of arrests that are problematic, weak, and ultimately thrown out in the courts, are evaluated more favorably and have a greater chance of obtaining desirable assignments than officers whose arrest rates are significantly lower, but the quality of the investigation and arrest, and the rate of conviction are more successful. Such heavy reliance on a simplistic quantitative incentive system may have the unintended effect of causing officers to become careless or prompting officers to cut corners.

2. The dysfunctional nature of the criminal justice system, and perceived inequities in the bureaucracy of the Department, weakens officer morale and their commitment to the organizational values. Some officers with sincere desires to improve the quality of life in communities eventually feel justified in deviating from Departmental guidelines and legal standards to compensate for, and circumvent, a system that they perceive as unfair, capricious, hypocritical, and unsupportive of legitimate police work.

3. The social, economic, psychological, and health issues surrounding drug trafficking and substance abuse are extraordinarily complex and cannot be resolved by law enforcement efforts alone. IAO interviews with police personnel have revealed that incessant and unrealistic political and community demands on

the police to "solve" the drug problem compel officers to "do what it takes" to meet these demands and expectations – even if that requires circumventing the law or Departmental policies.

    4. Given the subtle nuances of the laws pertaining to search and seizure, and the continually evolving legal standards pertaining to these legal issues, some narcotics officers and supervisors may not even be aware that some of their actions violate current legal standards due to inadequate training.

    5. The Department's failure to consistently and effectively address identified violations of policies designed to safeguard citizens' civil rights sends the message that such misconduct is not regarded as serious, and may in fact be tolerable.

16

## VI.    Supervision/Monitoring of Narcotics Squads and Details

### Proposal:

#### Supervision

A.    All officers assigned to narcotics squads, any special narcotics investigation, or any district-based detail significantly involved in drug enforcement should receive special integrity review and training prior to this assignment.

### *City Response:*

*The City accepts this proposal and notes that is reflects the current policy of the Police Department. Currently, all personnel assigned to narcotics in the Special Investigations Bureau (SIB) must undergo a separate transfer review and background check. They also receive 40 hours training by SIB personnel at the beginning of the assignment.*

### Proposal:

B.    All police records and other paperwork generated by narcotics officers should, in accord with the computer database system described in Section V, be maintained by officer and by unit.

### *City Response:*

*The City accepts this proposal.*

### Proposal:

C.    There should be periodic reviews and audits of the following aspects of the work of narcotics squads by a ranking supervisor who shall be held accountable for his or her supervision by the IAAO:

1.    The relevant paperwork of narcotics officers, including applications for search and arrest warrants, 75-49s, reports concerning drug raids or other searches and seizures of drugs or related items, surveillance records, and records pertaining to informants.

2.    The search and seizure activities of all squads, including random interviews with subjects of searches, informants, and others with knowledge, to determine whether officers are adhering to rules and regulations concerning searches. In particular, the audits should cover probable cause requirements, directives regulating execution of warrants, use of force and compulsion during searches, and treatment of individuals in places searched. The audits should also include pedestrian and vehicle stops, arrests for possessory offenses, and charges of resisting arrest, to determine whether patterns of illegal police activity are developing.

17

3. All affidavits in support of search or arrest warrants prior to their submission to a judicial officer.

4. The use of informants and the enforcement of Directive 15. This should include regular review and interviews of informants to determine whether they are being used according to Department policy and whether allegations in warrant applications or testimony concerning their past activities are accurate. Further, copies of warrants and other related paperwork that relate to specific informants should be placed in the informant's file.

5. All investigations, arrests, searches (raids), in which (a) abuse is alleged, (b) the search or arrest warrant fails to disclose evidence or persons subject to the search, or (c) other information provides grounds to believe that improper police actions may be involved.

D. There should be regular proactive use of field associates and undercover officers to monitor, investigate and report on any corrupt or illegal actions of narcotics officers.

E. There should be use of "sting" operations wherever misconduct is suspected and as a preventive device.

F. Requests should be made to all judges and prosecutors to report all cases of suspected perjury or serious misconduct-to the Police Commissioner (applicable to all police officers).

G. There should be regular transfer of all narcotics officers and supervisory officials.

*City Response*

*The City accepts these proposals.*

Exhibit "B"

**MEMORANDUM**

POLICE
City of Philadelphia
Date: June 20, 2002

TO            : Commanding Officers, Narcotics Bureau

FROM          : Chief Inspector, Narcotics Bureau

SUBJECT       : **COURT NOTICES**

The results of a recent audit of all court notices issued to members of the Narcotics Bureau, from 01-01-02 to 05-31-02, determined that Bureau officers failed to scan in or out of their assigned court rooms 10,233 times during this period. There were no absence/lateness excuse codes entered into the KTNQ system excusing these absences as mandated by P.D.#13 and P.D.13#, Appendix A. This situation is unacceptable and will be rectified by division and unit commanders.

The Narcotics Bureau Integrity Control Officer conducted a summary analysis of this audit and determined that the majority of the violations cited, involved officers with multiple court appearances, some of whom were subpoenaed to multiple locations (i.e. CJC, 1801 Vine, Divisional Hearing, etc). In all the of these instances the officer(s) failed to scan in at each court location, and no absence or lateness code was entered into the KTNQ court system by their unit supervisor in compliance with P.D.#13 and P.D.#13 Appendix A.

Not scanning into court and/or not entering a multiple court code (U), *on-call* code (O), or other absence, lateness or excuse code will result in a subpoenaed officer being recorded as having failed to appear for court. For example, if an officer is subpoenaed for a divisional hearing, two (2) cases at the CJC and one (1) case at 1801 Vine Street, he/she must physically scan in at all three locations and/or the U code must be entered into the KTNQ system for that officer on that date, indicating multiple court appearances. Commanders must stress to all of their subordinate personnel that utilization of the U code does *NOT* relieve officers of their responsibility to turn in a busy slip at each courtroom they have been subpoenaed for as per P.D.#13.

Commanders will ensure the following steps and procedures are followed on a DAILY basis to ensure full compliance with PD#13:

1. A designated unit supervisor will review all court notices for the following court day to ensure that:

   - Subpoenaed officers have been properly notified
   - Notifications have been properly documented

- Officers with multiple court notices or excused absences have been identified and the appropriate absence/lateness code has been entered into the KTNQ system

**Note: The "U" code can be entered immediately after reception of a second court notice for the same officer on the same day.**

2. Monday thru Friday, prior to 9:30 a.m., with the exception of those days when court is not in session, a designated unit supervisor will:

- Access the KTNQ system and verify that all officers subpoenaed for court that day have checked into court or the appropriate lateness, absence or on-call message has been sent along with the necessary remarks (i.e., vacation, military, sick etc.)
- Check for late court notices sent on the previous tours to ensure that:
    - ➢ Subpoenaed officers have been properly notified
    - ➢ Notifications have been properly documented
    - ➢ Officers with multiple court notices, excused absences or placed in *on-call* status, have been identified and the proper lateness/absence code has been entered into KTNQ system along with the necessary remarks (i.e., vacation, military, sick etc.)

3. Monday thru Friday, after 1 p.m., with the exception of those days when court is not in session, a designated unit supervisor will again access the KTNQ and:

- Verify that all subpoenaed officers have checked into court
- Verify that an absence or lateness code has been entered for all officers who
    - ➢ Were late for court due to an unforeseen exigent circumstance after notifying a unit supervisor
    - ➢ Were subpoenaed for multiple court appearances
    - ➢ Had excused absence from court, i.e. scheduled vacation etc.

- Notify the unit commander of instances where a unit member failed to scan in for court for which no absence/lateness code was entered.

4. Commanders will ensure that all court notices are completely filled out according to P.D. 13 Para III – Sec.B.

## ON CALL STATUS

Commanders are reminded that *on-call* court status is a privilege that must not be abused. As such the following restrictions will apply to placing personnel in *on-call* status:

- ▶ Personnel must be working a day work tour of duty (7x3, 8x4, 9x5) to be placed in *on-call* status.
- ▶ Personnel on other tours will **not** be placed in *on-call* status for court without the permission of the pertinent divisional inspector.

Commanders will be held strictly accountable for ensuring that the *on-call* code (O) is entered into the Computerized Court Notice system for all officer(s) approved for *on-call* status.

Personnel will **not** be placed in *on-call* status, regardless of their tour of duty when any of the following circumstances exist:

- ▶ Officer has more that three court subpoenas for that day
- ▶ Officer has a subpoena marked final listing or must be tried
- ▶ Officer has been subpoenaed to courtroom 506 CJC

Officers in *on-call* status must remain at one police location or submit a cell phone or pager number by which they can be immediately reached. It is the responsibility of the officer in *on-call* status and their supervisor, to ensure that frequent phone contact is maintained between themselves and the courtroom(s) they are subpoenaed for.

When an officer in *on-call* status is summoned to a court, he/she without exception will report to the appropriate court attendance clerk and scan in to document their appearance.

Incidents of Narcotics Bureau Personnel failing to appear for court, without excused absences, will be all but eliminated as long as Bureau commanders hold their subordinate supervisors strictly accountable for ensuring that their personnel scan in at each court location and utilize the appropriate absence codes, especially "U" and "O".

Commanders are expected to take immediate action against anyone found in violation of P.D. #13 and /or this order.

**WILLIAM BLACKBURN**
Chief Inspector
Narcotics Bureau

Exhibit "C"

# *MEMORANDUM*

POLICE
CITY OF PHILADELPHIA
DATE: 6-24-02

TO      :   All Narcotics Bureau Commanders

FROM    :   Chief Inspector, Narcotics Bureau

SUBJECT :   **QUARTERLY REVIEWS**

1.  Directive #15, Informants, Section D-9 specifies that all Active
    Informants Files will be reviewed quarterly by the controlling
    police officer. The review will amend information that is no
    longer correct, and include all new information that is appropriate.
    Commanding Officers will ensure that the quarterly reviews are
    being completed, and placed in each active informant's file folder.

2.  Effective July 2002, a copy of the quarterly review will be
    submitted to the Chief Inspector of the Narcotics Bureau. Reviews
    of the confidential informant folders will include the name and
    payroll number of the controlling officer for each active informant.
    Controlling officer **must** be currently assigned to the Narcotics
    Bureau. In situations when an officer has been transferred,
    promoted or retired the informant must be under the control of an
    active sworn officer of the Narcotics Bureau.

    The following is a sample of the information to be checked on the
    quarterly review of the informant folders.

    - Whether informant should remain active or be terminated.
    - Whether informants are being properly targeted and utilized.
    - Whether debriefings have been complete and fully reported.
    - Whether the informant is currently on parole or probation.
    - Whether the informant is currently wanted on any outstanding
      warrants.
    - Whether the informant relocated/change of address. (Provide
      telephone number as a method to contact informant).
    - Whether the informant is under the control of another officer or
      agency.
    - Whether the informant has been arrested; provide PPN number
      if appropriate.

Page 2
SUBJECT :   QUARTERLY REVIEWS

3.   If the informant's status has changed in any way this information
will be documented on the quarterly review.

**The first quarterly review will be due July 10, 2002 and every
three (3) months thereafter.**

*W.C. Blackl*

**William C. Blackburn**
Chief Inspector
Narcotics Bureau

WCB:lm

Cc:   Inspector Narcotics Field Division
Inspector Narcotics Division
Commanding Officer, N.I.I.U.
Commanding Officer, NFU-East
Commanding Officer, NFU-North
Commanding Officer, NFU-South

*MEMORANDUM*

POLICE
CITY OF PHILADELPHIA
DATE: 8/05/02

**TO**        : All Commanding Officers, Narcotics Bureau

**FROM**    : Chief Inspector, Narcotics Bureau

**SUBJECT**  : <u>CONSENT SEARCHES</u>

1. The Consent to Search is one of the few legally recognized exceptions permitting law enforcement personnel to search a person or property without a search warrant. Consequently, there are strict procedural guidelines that have been established by both the Courts and the Philadelphia Police Department to ensure Officers do not use consent searches as an expedient means of circumventing the warrant process.

2. Effective immediately, whenever a consent search is performed, a **copy** of the consent to search form will be forwarded to my office. The following procedures **must** be followed when a consent search is part of an investigation/arrest.

   (a) Police Officers must consult with a supervisor before requesting a consent search. Consent for a strip or body cavity search requires the written approval of a supervisor. A 75-48 and a Consent Search Form must be completed for these two types of consent searches.

   (b) Sworn personnel should only use the consent to search when there exists less than the requisite probable cause to conduct a warrantless search or to secure a search warrant.

   © Any investigation involving a consent search that leads to an arrest, a copy of the Consent to Search Form **must** be submitted for discovery and remain part of the investigative file.

   (d) Consent to search will not be used as a substitute for a valid search warrant. If probable cause has been established and there are no exigent circumstances, which require an immediate search, a search warrant **must** be obtained.

**CONSENT SEARCHES**            -2-          8/5/02

3. Commanding Officers **will** review all Consent Forms for compliance with legal and Departmental guidelines.

4. Commanders are also to **ensure** that supervisory personnel under their Command understand the contents of Police Directive #7, Appendix A, "Consent Searches".

*W. C. Black*

**WILLIAM C. BLACKBURN**
Chief Inspector
Narcotics Bureau

WCB/lt