EXHIBIT "4"

# INTEGRITY AND ACCOUNTABILITY OFFICE

# PHILADELPHIA POLICE DEPARTMENT

## DISCIPLINARY SYSTEM

## DECEMBER 2003

x

**Ellen Green-Ceisler**
**Director**
**Author**

**Edwin Pace**
**Deputy Director**



# TABLE OF CONTENTS

Page

INTRODUCTION . . . . . . . . . . . 1

    Principal Findings . . . . . . . . . 1

    Conclusion . . . . . . . . . . 3

DISCIPLINE IN A NUTSHELL . . . . . . . 6

CONCLUSIONS OF IAO AND TASK FORCE IN PRIOR REPORTS . . 10

    Key Findings of Prior Reports . . . . . . . 10

    Actions Taken . . . . . . . . . 11

        Tracking of Disciplinary Actions . . . . . 11
        Training for PBI Boards . . . . . . 12

    Conclusion . . . . . . . . 12

PRINCIPAL FINDINGS OF CURRENT IAO REPORT . . . . 14

    Excessive and Chronic Delays in Resolving Disciplinary Actions. . 14
    Inadequately Selected PBI Boards . . . . . . 16
    Inadequate Disciplinary Follow-up of Sustained IAB Investigations 17

CASE STUDIES . . . . . . . . . 20

## INTRODUCTION

This report on the Philadelphia Police Department's disciplinary system by the Integrity and Accountability Office ("IAO")* follows two extensive investigations of the same subject - including a report submitted by the IAO during March 2001, followed by Mayor John Street's Task Force on Police Discipline which was completed during November 2001.

Both studies cited serious shortcomings in the Department's disciplinary practices and procedures that compromised the overall integrity of the force. Both reports contained similar recommendations to improve the problems identified.

For this Report, the IAO examined the Department's responses to these earlier investigations and its current policies and practices regarding the disciplinary system.

### Principal Findings

The principal findings of this most recent examination by the IAO include the following:

- In the two and one-half years that have elapsed since the first IAO investigation, and the Task Force report, the only recommendations that have been adopted are those dealing with information and tracking systems related to the disciplinary process. Minimal effort has been made to implement the more substantive recommendations focusing on the actual **imposition** of discipline. No meaningful attempt has been made to eliminate the possibility for manipulating the outdated and ineffective Disciplinary Code, to expedite the

*The IAO is an independent monitor and auditor of Departmental policies, practices, and operations as they relate to the detection and control of corruption, misconduct, and the excessive use of force. The goal of the IAO is to minimize and deter police corruption and misconduct to the greatest extent possible, and thereby enhance public confidence in the integrity of its police force.

In order to effectuate the broad duties of the Office, the IAO, at its discretion, can initiate studies and audits and make recommendations for change. The IAO has access to virtually all Department records and personnel and is mandated to make its findings public.

By virtue of its essential function to monitor and audit the Police Department, and in order to remain effective and credible, the IAO must exercise independent judgment in reporting findings and making recommendations. This independence also means that the analyses, critiques, and recommendations are solely those of the IAO.

disciplinary process, to enforce appropriate and consistent penalties, or to increase the overall professionalism of the operations and resources of the Police Board of Inquiry*.

• The Department lacks uniform and rational standards for assessing penalties and therefore penalties are imposed in a haphazard and inscrutable manner. The disciplinary system is neither transparent nor accountable. In many cases, inconsistent penalties were imposed for similar infractions - where officers who had clean records received harsher penalties than did officers with extensive disciplinary and IAB histories - for the same or similar offenses. The Department does not document the rationale for penalty determinations which is particularly troublesome in numerous cases where the penalty appears patently inadequate in light of the nature of the infraction.

• Excessive and unexplained delays in resolving disciplinary actions are commonplace. High ranking Departmental officials allow disciplinary actions to languish, sometimes for years, without resolution. These delays have resulted in the loss of witnesses and evidence critical to proving allegations of misconduct and enabled officers to avoid any consequences for their misconduct. Unexplained delays fuel the widespread perception that select officers are immune from disciplinary action. Extensive delays in, and lax adherence to, disciplinary procedures also contribute to unreliable and problematic record keeping practices at the Police Board of Inquiry. At the time of this audit, the records and files pertaining to over one hundred disciplinary actions could not be located. In most of these cases the IAO was unable to ascertain the nature of the disciplinary charges or the seriousness of the allegations.**

• Since 2000, **close to one-half** of the officers, supervisors, and commanders who were found by the Internal Affairs Bureau ("IAB") to have violated Departmental policies, or engaged in serious misconduct, were never formally disciplined. In numerous cases where disciplinary actions were taken in response to sustained IAB investigations, the penalties imposed were patently inadequate in light of the severity of the offenses. This chronic failure to adequately address sustained IAB investigations diminishes the IAB's critical role in monitoring the integrity of the police force, wastes expensive and limited investigative resources, and lowers the morale of conscientious IAB investigators, some of whom have begun to regard their efforts as futile.

*The Police Board of Inquiry ("PBI") is the Departmental unit responsible for maintaining all disciplinary files and databases and for processing and conducting internal administrative hearings at which the disciplinary charges against officers are presented.

**Since a draft of this report was given to the Department for review, a number of these missing files were located. The IAO would need to conduct a follow-up audit of these files in order to independently verify the disposition of these cases – a process that involves several steps for each file to insure complete accuracy.

2

**Conclusion**

The following conclusions and the main recommendation are based on the findings of this review, the Department's responses to an earlier draft of this report, the two earlier studies of the same subject, and the IAO's seven years of full-time and intensive study of this Department that has included unprecedented access to, review, and analysis of Departmental personnel, records, files, and databases.

The disciplinary system in the Philadelphia Police Department remains fundamentally ineffective, inadequate, and unpredictable. There are simply too many ways to manipulate the system and too little accountability at each step of this inscrutable process to engender confidence in the integrity of the system. Within the Department, the disciplinary system is almost universally perceived as inherently inequitable, and that "who you are" or "who you know" influences disciplinary outcomes. Many of the current problems and practices existing in the disciplinary system validate and perpetuate this perception.

The harms resulting from this dysfunctional system on the integrity and effectiveness of the Department, and on the confidence of the citizens served by the Department, while unquantifiable, are profoundly significant.

When the leadership fails to swiftly and meaningfully sanction identified misconduct and corruption, it sends a clear message that such behavior is acceptable, thereby encouraging similar behavior by other officers.

When the leadership fails to effectively respond to violations of Departmental rules and regulations, the unmistakable message is sent that such policies are really not important and can be circumvented.

When dedicated officers and supervisors who play by the rules observe others breaking the same rules with impunity, they become cynical and resentful. Their enthusiasm for, and commitment to, their jobs and the Department flounder.

When citizens fail to see timely, tangible, and reasonable responses to their complaints of mistreatment by police, they become increasingly mistrustful, cynical, fearful and antagonistic toward the police.

In order to establish a proper disciplinary system, and regain the trust and confidence of police officers and the public, the Department and its leadership must be willing to

confront and resolve this problem in a comprehensive and sustained manner. The fundamental and core values of the organization must be explicitly defined, solid, and able to transcend the vagaries of politics and personalities.

Unfortunately, the conditions necessary for meaningful and lasting reforms do not exist in the Department. Organizational values and disciplinary practices are too easily influenced by the constantly changing personalities, predilections, and politics of those occupying the top leadership positions in the Department and the City. What is tolerated under one administration may be expressly prohibited in the next. Those who work within this unpredictable environment become preoccupied with trying to determine the attitudes of those in power. This fosters confusion and cynicism.

The inherent fraternity that exists among those enforcing discipline, and those for whom discipline is warranted, is yet another intractable impediment to reform. The incestuous nature of these relationships frequently prevents the impartial and objective functioning of the disciplinary system. This became abundantly clear during the IAO discussions with Department officials regarding the case studies contained in this report.* Attempts were made to justify inadequate disciplinary responses to violations of Departmental policy with such statements as: "We were street cops and we know what was really going on" and "We can read between the lines about what happened" and "We know what its like out on the streets." In other case studies, these Departmental officials could only offer vague, in some cases inaccurate and misleading assertions,

---

*The IAO and senior Department officials held two extensive meetings to discuss the findings and cases studies that were included in the original draft of this report. Discussions were also held with city attorneys representing the Department on labor matters, and other labor law experts, regarding certain case studies and issues related to contract negotiations and the arbitration process. As a result of these discussions, the IAO re-examined all available documents pertaining to each of the cases. After careful consideration, the IAO determined that in seven of the case studies, the Department offered what might possibly be reasonable explanations to justify what the IAO had initially perceived as inadequate disciplinary responses. Those case studies were removed from this report.

The IAO is mindful of the pressures and difficulties that officers face in the line of duty. However, these challenges were carefully considered by the IAO in selecting the cases to illustrate the situation that currently exists.

4

about the particulars of individual cases. Some of the rationalizations and explanations clearly indicated that key Departmental personnel have limited ability to understand the broader ramifications of officer misconduct and violations of Departmental Directives.

The conclusions of the earlier IAO report and the Mayor's Task Force have proven to be absolutely correct. Simply changing the individuals involved in the disciplinary process will not cure the problems.

For all these reasons, the IAO does not believe that the disciplinary system will ever be adequately reformed as long as it remains solely within the prerogative of the Police Department.

**Therefore, to ensure the enforcement of a code of conduct that guarantees the integrity of its police force to the greatest extent possible, and to restore and maintain the trust and confidence of dedicated and law-abiding officers, as well as the citizen's of Philadelphia, the IAO recommends that an entity, independent of the Philadelphia Police Department, be established and empowered to review disciplinary matters, determine penalties, and enforce disciplinary system guidelines.**

## DISCIPLINE IN A NUTSHELL

### The Police Board of Inquiry ("PBI")

The PBI is the Departmental unit responsible for maintaining all disciplinary files and databases and for processing and conducting internal administrative hearings at which the disciplinary charges against officers are presented.

### The PBI "Charging Unit"

A Captain assigned to the PBI Charging Unit is responsible for reviewing completed IAB investigations and commander requests for disciplinary action to determine whether or not formal disciplinary actions should be taken. To assure appropriate and consistent charging, the Captain of the Charging Unit is also responsible for determining what sections of the Discipline Code should be invoked and preparing the "Approval of Charges" which commanders use as the framework in preparing the formal disciplinary reports (designated as the 75-18's).

### The Disciplinary Code

The Disciplinary Code for the Philadelphia Police Department sets forth the charges and the penalties to be imposed when an officer is found guilty of violating Departmental Directives and policies. Penalties range from a written reprimand to dismissal. Between these two extremes are transfers, demotions, and suspensions ranging from 1 to 30 days.

The Disciplinary Code also establishes the "**reckoning periods**" for each Code provision which is the period of time during which, if the officer is guilty of the same or similar offense, "**progressive disciplinary penalties**"(i.e. more severe penalties) are to be imposed.

### Initiation of Disciplinary Actions

Disciplinary actions can be initiated in one of two ways. The first involves a completed IAB investigation that sustains allegations of misconduct. In these cases, the completed IAB investigation is sent to the PBI Charging Unit where it is reviewed by the

6

Captain for a determination of whether formal charges should be filed. If the Captain determines that formal disciplinary action is warranted, an "Approval of Charges" report is prepared that identifies the Disciplinary Code provisions to be charged and the factual basis for the charges. This report is then forwarded to the pertinent commanding officer who is required to prepare the formal disciplinary reports (designated the "75-18's"). The 75-18's are reviewed through the chain of command for approval (Inspector 4 Chief Inspector 4 Deputy Commissioner 4 Executive Officer 4 Police Commissioner) and then returned to the PBI for processing. Only the Police Commissioner has the authority to terminate the process and thereby stop the disciplinary action.

In the second method, commanders can directly request disciplinary actions against subordinate personnel. A substantial number of disciplinary actions initiated in this manner involve officers who were involved in such actions as auto accidents, being insubordinate, being late for work, and being Absent Without Leave "AWOL".

In these cases, a commanding officer sends a written request to the PBI Charging Unit requesting formal disciplinary charges against the officer and providing the factual basis in support of this request. The Charging Unit Captain reviews the commander's request and determines whether formal charges should be filed. If charges are to be filed, the "Approval of Charges" report is prepared and sent to the commander who prepares the 75-18's where it is reviewed through the chain of command to the Police Commissioner's Office and then returned to the PBI for processing.

In both of these scenarios, there is a mandated 27 day deadline from the time the "Approval of Charges" leave the PBI until the "75-18's should be returned to the PBI for further action. However, as will be described later in this report, woefully inadequate enforcement of this deadline enables anyone in the chain of command to let a disciplinary file languish on his or her desk without repercussions.

**Methods of Imposing Discipline**

An officer can be disciplined in one of three ways. The first, and most efficient, is when the Commissioner directly imposes the penalty which is called a **"Commissioner's Direct Action".**

7

In the second method, an officer pleads guilty to the charges in return for a penalty that has been determined by the officer's direct commander. This is called **"Command Level Discipline"**. The use of Command Level Discipline must be pre-approved by the PBI and is limited to cases where the charges are extremely minor and the officer has no significant disciplinary record. If Command Level Discipline is deemed to be inappropriate because the infraction is deemed to be too serious, an officer can still plead guilty to the charges. In these situations, a penalty is recommended by the commanding officer or the PBI, but must be approved by the Police Commissioner.

The third method is the PBI hearing. At a PBI hearing, the disciplinary matter is presented to a panel, or **"PBI Board"**, of three sworn members of the Department. One Board member must be of equal rank of the accused, and the other two of higher rank. Officers are represented by attorneys provided by their labor union and the Department is represented by an "Advocate" who may or may not be an attorney. The current Advocate is an attorney. At the PBI hearing, the officer has the opportunity to rebut the charges and present evidence and witnesses in his or her defense.

After evidence is presented by both sides, the Board considers the case in private, makes a determination of "guilty" or "not guilty" for each Disciplinary Code provision charged and recommends a penalty for each charge in which there is a finding of guilt. The majority vote of the Board is determinative. The Board's recommendations are then sent to the Police Commissioner who can override the PBI Board penalty recommendations.

### Types of Discipline

**"Formal Discipline"** includes disciplinary actions in which charges pursuant to the Disciplinary Code (as discussed above) are filed against an officer. Formal disciplinary actions that result in the imposition of a penalty are recorded in the officer's personnel file. Reckoning periods and progressive discipline pursuant to the Disciplinary Code are applicable to formal disciplinary actions.

In some cases, the nature of the infraction(s), evaluated in conjunction with an officer's disciplinary and IAB histories, suggest that re-training and/or counseling may be an appropriate response to the misconduct, as opposed to the penalties outlined as

8

"formal discipline". In these cases the Department orders what is typically referred to as **"Review and Advise"** or **"Review and Training".**

A "Review and Advise" is not recorded in an officer's personnel file. Reckoning periods and progressive discipline pursuant to the Disciplinary Code are not applicable in the event of a subsequent similar infraction.

Unfortunately, it is virtually impossible to determine the nature and efficacy of any particular "Review and Advise". Commanders charged with this responsibility typically submit an uninformative, barebones, boilerplate memorandum to the PBI indicating that they have "reviewed" the matter with the officer. This extremely informal approach to discipline does not allow independent verification of whether an officer actually received meaningful and appropriate training, counseling, or other necessary interventions to address the problems noted. Without greater accountability in the "Review and Advise" process the IAO is unable to determine whether this disciplinary response was appropriate or adequate in many cases.

## CONCLUSIONS OF IAO AND TASK FORCE IN PRIOR REPORTS

As previously indicated, two and one-half years ago, the IAO undertook an extensive investigation of the Philadelphia Police Department's disciplinary system. The IAO report, which was submitted during March 2001, was followed by the appointment of a Task Force on Police Discipline by Mayor John Street. That Task Force was comprised of seven highly respected professionals in the fields of law and law enforcement.* The Task Force completed its work and submitted its findings during November 2001. These reports delineated serious shortcomings and a series of recommendations.

**Key findings of Prior Reports**

The most serious shortcomings highlighted in the two prior reports included:

- **An outdated and ineffective Disciplinary Code;**
- Inadequately selected, screened, and trained PBI Board members;
- A failure to hold the PBI Boards and commanders accountable for deviating from the Disciplinary Code penalty provisions without rational explanation, or for failing to submit memorandums to justify incomprehensible "not guilty" verdicts;
- A failure to devise and enforce standards necessary to assess rational, appropriate, and consistent penalties or to effectively document the rationale for penalties.
- Excessive delays in resolving disciplinary matters and a lack of accountability for deviations from policy in the disciplinary process.
- Poor tracking of disciplinary actions through the system which resulted in the inexplicable "disappearance" of disciplinary actions;
- An incomplete, unreliable, uninformative disciplinary database; and
- Inadequate staffing and facilities allocated to the PBI that undermines the professionalism and importance of the PBI process and function;

**\*Members of the Mayors Task Force on Police discipline included the Task Force Chair JoAnne Epps, Esq., Honorable Nelson A. Diaz, James Eisenhower, Esq., Glenn F. Hing, Esq., Gregory Miller, Esq., Richard Negrin, Esq., and Carolyn Short, Esq.**

**Actions Taken**

Since the issuance of the IAO and Task Force Reports, the Department has undertaken the following remedial measures to address problems identified in those reports.

### Tracking of Disciplinary Actions

In January 2003, the PBI Charging Unit created a database to monitor all "Approval of Charges" reports that are forwarded through the chain of command for action and review, to insure that they do not "disappear" but are in fact returned to the PBI for disposition. In 2003, the Charging Unit also began documenting cases that were approved for informal "Review and Advise".

In 2004, after much planning, the Department will begin operating a new and improved disciplinary database that will enable the Department to more efficiently monitor the disciplinary outcomes of sustained IAB investigations, as well as officers' disciplinary histories.

The usefulness of this new database will be compromised by an ineffective and outdated Disciplinary Code that forces the Department to rely upon a small number of Code sections that are vague and overly broad, encompass a wide range of misconduct, and carry penalties ranging from a reprimand to dismissal. For example, officers are charged under section 4.20, the most frequently utilized code provision, ("Failure to comply with any Commissioner's Orders, Directives, Regulations etc.") if they are late for work, involved in automobile accidents, violate citizen's civil rights, fail to properly supervise, lose evidence, or any number of minor and major infractions.

Unless the Disciplinary Code is thoroughly overhauled to more accurately and comprehensively reflect the types of misconduct prohibited by the Department, the new discipline database will be of limited use in assessing disciplinary trends and emerging problems in the Department, and will not be an informative management tool in assessing the disciplinary histories of individual officers.

### Training for PBI Boards

In 2002 and 2003 the Department conducted four separate full-day training sessions on the disciplinary system and the operations of the PBI to officers, supervisors, and commanders who were randomly selected to serve as PBI Board members.*

### Conclusion

These reform measures are necessary and commendable. However they do not address more fundamental issues and problems that compromise the integrity and effectiveness of the disciplinary system. Tracking systems, while absolutely necessary, do not capture those significant cases that should, but never make it into the disciplinary system in the first place. Databases are useless if data contained therein are ambiguous or inaccurate. And data tracking does not ensure that the disciplinary functions are staffed with capable personnel who are authorized and empowered to ensure that the disciplinary policies, guidelines, and deadlines are rigorously enforced.

In discussing these findings with Police and City officials, limitations imposed by the labor arbitration system and the Collective Bargaining Agreement were cited as critical factors in the Department's inability to implement many of the IAO's and Task Force's recommendations.

The IAO clearly recognizes that labor realities hamstring reform efforts. However, during the last round of Fraternal Order of Police contract negotiations with the City, the City focused its attention on wages and benefits, while placing minimal and insufficient emphasis on the reform recommendations to give them a reasonable chance of adoption.

Additionally, in certain critical areas, the Department can implement reforms without running afoul of the Collective Bargaining Agreement - or necessitating additional

---

*Since the Department did not consistently maintain training attendance or completion records (in the one session where attendance records were kept, a significant number of officers and supervisors were absent), the IAO was unable to independently verify whether the officers who were assigned to the training courses did in fact attend and complete the sessions. The IAO recommends that if any future sessions are held, such records are collected, maintained, and easily accessible for review.

resources. The Collective Bargaining Agreement does not prohibit the Department from imposing consistent and rational penalties, documenting the rationale for penalty determinations, enforcing suspense dates and expediting the disciplinary process, and selecting, training, and closely monitoring PBI Board members whose professionalism, objectivity, integrity, and commitment to the overriding values of the organization are undisputed. The fact that none of these steps have been taken is clear indication that the Department is simply not interested in achieving true reform.

## PRINCIPAL FINDINGS OF CURRENT IAO REPORT

**Basis for Findings**

The findings and recommendations contained in this report are based upon the IAO's review and analysis of the following:

- Every IAB investigation completed between January 2000 through May 2002 in which allegations of misconduct were sustained and violations of Departmental policies were cited;

- Disciplinary records for every completed IAB investigation from January 2000 through May 2002 in which allegations of misconduct against police personnel were sustained;

- PBI records, databases, and operations.

- Approximately 150 disciplinary actions initiated by district commanders (not as a result of IAB investigations);

- Personnel records, and prior disciplinary and IAB records in selected cases;

- Interviews with sworn personnel of all ranks regarding the Department's disciplinary practices and policies, and experts in the field of labor law.

**Excessive and Chronic Delays in Resolving Disciplinary Actions**

The IAO has found excessive delays at each step of the disciplinary process that undermine effective discipline and engender distrust in the disciplinary process.

Under current Departmental guidelines, once a matter has been approved for disciplinary action by the PBI Charging Unit, the disciplinary reports (75-18's) must be prepared, reviewed through the chain of command, and returned to the PBI within 27 days. Table 1 below indicates that out of a total of 1,237* disciplinary actions reviewed by the IAO, only 355 (29%) were returned to the PBI for disposition within the 27 day deadline. The Department lacks any policy that gives enforcement rights to the PBI if a

*The IAO reviewed an additional 123 cases where there was insufficient information to determine when, or whether, the files had been returned to the PBI for disposition. These 123 cases are not included in the statistics presented in Table 1.

14

disciplinary file is not returned in a timely fashion. Furthermore, PBI personnel are not empowered to take punitive actions against Department officials who violate mandated deadlines since the offending personnel are of higher rank than PBI personnel.

After the 75-18's are returned to the PBI, several months to more than a year can elapse before a PBI hearing is conducted. While various factors account for delays, the most frequent are requests for continuances by the Fraternal Order of Police attorney's and the unavailability of officers. The Department has made no meaningful attempts to address the chronic problem of PBI hearing delays, which contribute to the backlog of unresolved disciplinary actions.

Once the PBI has disposed of a case either through a hearing or a guilty plea, further delays result from the subsequent review process by the Executive Officer and Police Commissioner. There are no deadlines for this step of the review process and the IAO has identified numerous cases that remain in limbo for months, and in some cases years, without final disposition. At the time of this audit, the IAO identified 56 open disciplinary actions dating back to 1998 in which matters that the PBI had resolved were languishing in a filing cabinet of "pending cases" awaiting approval by the Police Commissioner or the imposition of the penalty. The IAO could find no justification for the Department's failure to promptly act on these unresolved disciplinary actions, some of which involved serious misconduct.

Delays in the resolution of disciplinary actions have resulted in the loss of witnesses and evidence critical to proving allegations of misconduct and enabled officers to avoid any consequences for their misconduct. Additionally, unexplained and excessive delays reinforce the widespread perception that certain officers, because of who they are or who they know, are immune from disciplinary action.

In response to these findings, a key Departmental official has advised the IAO that the Department is actually considering extending the only mandated deadline that currently exists in the disciplinary process. This reaction dramatically underscores the failure of the Department to recognize the critical importance of a swift and effective disciplinary process. In light of the excessive delays that currently exist, and their profoundly detrimental effect on the integrity and effectiveness of the disciplinary system, the IAO is

15

opposed to any attempts to further increase the time period for resolution of disciplinary matters.

## Table 1

| Time period which elapsed before discipline files were returned to the PBI | 2001 | 2002 | 1/1/03-11/10/03 | Total |
|---|---|---|---|---|
| Within mandated 27 days | 110 | 156 | 89 | 355 (29%) |
| Up to 2 weeks delinquent | 129 | 111 | 84 | 315 (25%) |
| 15 to 30 days delinquent | 110 | 67 | 58 | 222 (18%) |
| 31 to 60 days delinquent | 81 | 62 | 43 | 155 (12%) |
| 61 to 90 days delinquent | 53 | 18 | 20 | 87 (7%) |
| 91 to120 days delinquent | 14 | 12 | 4 | 26 (2%) |
| 121 to 150 days delinquent | 10 | 12 | 5 | 25 (2%) |
| 151 days and above | 36 | 26 | 10 | 52 (4%) |
| Total | 460 | 464 | 313 | 1,237 |

## Inadequately Selected PBI Boards

With the exception of the four training sessions described earlier, there has been virtually no improvement in the PBI Board selection process which contributes to inconsistent, and in some cases indefensible, PBI Board decisions and penalty determinations.

> In its earlier report, the IAO noted that:
>
> "A haphazard and unmonitored selection process for the PBI Board members diminishes the value and effectiveness of this important role in the Department, and contributes to chronic inconsistency in case dispositions. Potential Board members are not objectively evaluated, nor do they receive training or instruction in the expectation and policies of the Department regarding the role and responsibilities of a Board member."

When the IAO conducted its first study of the PBI, the PBI Advocate was responsible for recruiting personnel to serve on PBI Boards. This responsibility was subsequently shifted to the Department's Executive Officer. In its report, the Mayor's Task Force on Police Discipline expressed concerns about this selection method:

> "With respect to the selection of PBI panel members, we are concerned that the present system, in which the Executive Officer unilaterally selects panel members, remains susceptible to the same concerns of <u>actual</u> or <u>perceived</u>

manipulation as the previous system in which members were selected by the Advocate. Discretion has simply shifted. Perhaps more importantly, the current panel selection process cannot achieve consistent findings and penalties for similar offenses, as the panels hearing comparable cases on different dates have no way of knowing whether they are treating accused officers consistently." *(Emphasis added)*.

According to the Department's Executive Officer, the process for selecting Board members has once again been revised. Under current procedures, personnel chosen to serve as PBI Board members are **randomly** selected from the Department's Personnel Database. This random selection process is extremely problematic in that it still fails to establish rational and objective standards for assessing the capacity of those selected to serve in this difficult role. The fact is that there is still no way of determining whether those chosen to serve on the PBI Board are competent or whether they were selected to insure a specific outcome.

Imposing discipline is not an easy or comfortable task for most people, either professionally or personally. Police officers are no different. Most officers and supervisors have no interest in judging or penalizing their fellow officers. Most lack the objectivity, fortitude, and perspective and understanding of the overriding goals and values of the organization necessary to make difficult disciplinary decisions. This reality emphasizes the critical need for the careful and informed selection of individuals chosen to serve in this highly sensitive and stressful role.

Additionally, the IAO has found that some of the officers and supervisors "randomly" selected to serve on PBI Boards have troubling IAB records themselves. This brings to mind the phrase of "the blind leading the blind" and raises obvious concerns about capacity of these officers and supervisors to serve as effective PBI Board members.

**Inadequate Disciplinary Follow-Up of Sustained IAB Investigations**

From January 2000 through May 2002 the IAB sustained allegations of misconduct against 851 officers, supervisors and commanders*. These allegations, which involved a

---

*These statistics do not include the IAB investigations into police shootings that were found to be in violation of Departmental policies. The disciplinary dispositions of shooting violations will be addressed in a separate IAO report on police shootings.

17

wide array of misconduct, including criminal activities, were the result of citizen Complaints Against Police ("CAP's"), or internally initiated investigations ("Internals") into officer misconduct. Table 2 presents the disciplinary outcomes of the completed IAB investigations that were reviewed as part of this study.

Of the 851 officers, 427 officers were never formally disciplined. According to Department officials, a significant number of these cases were resolved through the informal "Review and Advise" process. However, after fully reviewing these investigations, and taking into account the officer's records and the nature of the infractions, it is the opinion of the IAO that this minimal response was only appropriate for, at the most, no more than 60 officers.

After eliminating the 60 officers, of the remaining 791 who clearly warranted formal discipline, 367 (46%) received none. **In other words, in close to one-half of the sustained IAB investigations that were completed between January 2000 and May 2002, where allegations of corruption and misconduct were proven and Departmental policies were found to have been violated, no formal disciplinary action has ever been taken.**

As will be demonstrated in the case studies presented below, in a number of serious cases where disciplinary actions <u>were</u> taken, the IAO identified penalties that were astonishingly lenient considering the gravity of the offenses.

**This chronic failure to appropriately, coherently, and consistently address officer misconduct contributes to a disciplinary system that is inherently and chronically flawed and is indicative of a Police Department that is unable to effectively police itself.**

**Table 2: Disciplinary Outcomes of Sustained IAB Investigations**

| | 1/1/00 to 12/31/00 | 1/1/01 to 12/31/01 | 1/1/02 to 5/16/02 | Total |
|---|---|---|---|---|
| Total # of officers with sustained allegations of misconduct | 253 | 342 | 255 | 850 |
| # of officers against whom NO formal disciplinary actions were taken despite sustained IAB investigations | 199 | 145 | 83 | 427 |
| Reprimand | 30 | 46 | 8 | 84 |
| 1-day suspension | 3 | 14 | 4 | 21 |
| 2-day suspension | 11 | 15 | 4 | 30 |
| 3-day suspension | 6 | 8 | 4 | 18 |
| 4-day suspension | | 3 | 2 | 5 |
| 5-day suspension | 9 | 14 | 4 | 27 |
| 6-day suspension | 1 | | | 1 |
| 7-day suspension | | 3 | 2 | 5 |
| 8-day suspension | | 1 | | 1 |
| 10-day suspension | 9 | 1 | | 10 |
| 11-day suspension | 1 | | | 1 |
| 12-day suspension | 1 | 1 | | 2 |
| 15-day suspension | 5 | 1 | 2 | 8 |
| 18-day suspension | | | 1 | 1 |
| 20-day suspension | 4 | 1 | | 5 |
| 30-day suspension | 4 | 4 | 1 | 9 |
| Officers dismissed and/or arrested | 26 | 25 | 11 | 62 |
| Open Disciplinary Actions | 0 | 2 | 1 | 4 |
| Officer found not guilty by PBI | 13 | 14 | 4 | 31 |
| Officer retired or resigned | 18 | 17 | 10 | 45 |
| Officer deceased/unknown | 3 | 6 | 3 | 15 |
| Total | | | | 850 |

*The imposition of 30 days suspension is misleading. Civil service regulation 17.04 only permits a maximum suspension of 30 consecutive calendar days. A suspension of 30 actual working days would necessitate a suspension of nearly 45 calendar days - which would violate regulation 17.04. In reality, a 30-day suspension only nets 22 to 23 days suspension. For the remainder of this report, the penalty cited will reflect the actual working days lost and not the penalty imposed. Thus, in any case cited where the suspension days totaled 22 or 23 days, the penalty actually imposed was 30-days suspension.

**These open cases, some dating back several years, are stark indication of the excessive delays that exist in resolving disciplinary actions.

## CASE STUDIES

The following case studies, the majority of which were culled from completed IAB investigations, are examples of the inadequate, in some cases, incomprehensible, disciplinary resolutions for serious misconduct by Philadelphia police officers. More specifically, these case studies reveal a failure to properly discipline officers, supervisors, and commanders who:

*Illegally detained, searched, and arrested citizens;

*Used excessive force on citizens;

*Were rude, unprofessional, and verbally abusive towards citizens;

*Engaged in deliberate cover-ups of police misconduct;

*Falsified police records and reports;

*Mishandled, and in some cases, stole evidence confiscated during criminal investigations;

*Falsified attendance and activity records to obtain wages, including overtime, for hours not worked;

*Failed to cooperate, lied, and intentionally obstructed IAB investigations;

*Routinely associated with convicted felons actively involved in criminal activities;

*Sexually harassed female citizens;

*Accepted improper gratuities from members of the public;

*Were grossly insubordinate to superior officers;

*Violated various Departmental policies that involved important integrity issues such as a failure to follow procedures pertaining to use of force reporting, the handling of evidence, and so forth; and

*Conducted grossly inadequate and incomplete investigations, resulting in inconvenience and stress for the citizens who were the victims of crimes or in need of police services.

20

## Case Study # 1

Late one evening in the summer of 2001, female Officer "A" and male Officer "B" were attending a party with numerous other officers and supervisors who were all assigned to the same special Detail. Officer A left the party and was driving home when she realized that Officer B was following her in his car. After several unsuccessful attempts to elude him, Officer A arrived at her home where Officer B sexually assaulted her as she tried to get into her house.

The next morning, Officer A reported the assault to "Sergeant 1"(S-1) – a squad supervisor who had also attended the party. Rather than immediately conduct an investigation, S-1 and his commanding officer, "Lieutenant 1" (L-1), engaged in a concerted effort to conceal the assault.

The IAB eventually learned of this assault and initiated an investigation. During the course of this investigation, the IAB discovered that the ranking supervisors and the officers assigned to this Detail routinely abused their authority, misled management, and violated numerous Departmental rules and regulations. More specifically, the IAB found that:

- The police officers and supervisors attending the party on the night in question were all on-duty at the time – a serious violation of Departmental policy.

- The unauthorized party was being held in honor of L-1. At roll call earlier that day, S-1 encouraged the officers to attend the party, knowing full well that the officers would be leaving their patrol assignments. As a result, the Detail's area of patrol was significantly under-manned during important evening hours.

- The party was held at a restaurant/bar located within the confines of the Detail's area of patrol. Despite Departmental policy prohibiting the acceptance of gratuities, much of the food and liquor consumed by the police personnel was provided free of charge by the restaurant's proprietor.

- The proprietor and staff of this restaurant/bar had previously been provided with special considerations by the supervisors of this Detail - such as police parking passes that were at a premium in this congested commercial area.

- A significant amount of alcohol was consumed during the party, and several officers, including Officer B, engaged in unprofessional antics that reflected poorly on the Department.

- L-1, S-1 and "Sergeant 2"(S-2), another supervisor assigned to this Detail, concealed the improper absences of the officers who attended the party, and insured that everyone would receive full pay. This was accomplished by falsifying the attendance and activity records of the officers who were at the party to reflect that they worked the full shift.

21

- S-1 retaliated against Officer A after she reported the assault – engaging in intimidating behavior that created an uncomfortable work environment for Officer A. This behavior was witnessed and confirmed by other personnel.

- Problematic and unprofessional relationships developed between the supervisors and some of the officers that clearly impacted on the effectiveness and objectivity of the supervisory oversight of this Detail. The following two incidents illustrate this problem:

    In one incident, the IAB had obtained sufficient credible evidence that Officer B was using illegal drugs and received authorization to administer a reasonable suspicion urinalysis on Officer B. L-1 learned of the drug screening test in advance and improperly alerted Officer B who then took action to avoid being tested. L-1's actions amounted to an intentional obstruction of an official investigation.

    In another incident, L-1 improperly interfered with and prevented the lawful off-duty arrest of Officer B for drunken driving, disorderly conduct, and terroristic threats. L-1 subsequently took steps to conceal the incident. Several Philadelphia police officers who were involved in the arrest were offended and angered by L-1's improper actions.

- **L-1 authorized S-1 and S-2 and the officers to routinely falsify attendance records to reflect officer participation in arrests for which they were in no way involved. This was done to enable his officers to collect unauthorized overtime wages.**

- L-1, and "Lieutenant 2" (L-2), another supervisor with oversight responsibilities for this Detail, authorized officers to routinely falsify their activity and attendance logs to indicate that they worked complete shifts and collect full pay, when they actually left work hours before the end of a shift. (this is referred to as "slide time" in the Department).

- In response to management inquiries regarding this Detail's rising overtime costs, L-1 provided his Captain with false and misleading information to conceal the improper reporting and coding practices.

- Neither the Sergeants nor Lieutenants reviewed or signed the officer's daily patrol/activity logs either during or after each shift - as required by Departmental policy. This indicates that supervision of the officers' daily activities was virtually non-existent.

- Although the Captain of this Detail denied knowledge of the actions of his subordinates, there was no rational explanation for his failure to comprehend the nature and extent of the wrongdoing under his command. The IAB investigation concluded that the Captain was negligent in his duties in failing to properly supervise the Detail.

22

The IAB completed this investigation in February 2003. Despite conduct by police personnel that amounted to a major breakdown in the administration, supervision, and operations of this Detail, no one involved has ever been disciplined - with the exception of Officer B who was fired, arrested, and convicted of the assault. In fact, L-1 is still in command of this same Detail and the Captain was transferred to another highly sensitive special unit in the Department. The failure of the Department to immediately strip these supervisors of their command and impose severe discipline is incomprehensible.

## Case Study # 2

Several officers and a Sergeant ("S-1") assigned to a special unit were involved in the diversion and sale of evidence that they had recovered in an ongoing criminal investigation. An officer assigned to this unit, who was aware of and extremely troubled by this incident, reported the matter to the IAB. In the ensuing investigation, the IAB exposed an organized and methodical attempt by the Unit's supervisors and officers to cover-up their improper and illegal activities.

During the investigation, the IAB discovered that S-1 had taken other official equipment for his personal use. They also found that S-1 was intermittently working, and getting paid, at another job while he was ostensibly on-duty as a police supervisor.

The investigation found overwhelming and irrefutable evidence that the commanding officer, "Lieutenant 1" (L-1), of this special unit:

- Knew about the theft of the evidence and failed to take appropriate action,

- Was fully aware of and sanctioned S-1's unauthorized and illegal employment,

- Covered for S-1's improper absences by falsifying S-1's attendance records,

- Lied to the IAB investigators in an attempt to cover for the illegal behavior of S-1,

- Intentionally impeded and obstructed the IAB's criminal investigation by making numerous false statements during the investigation, and specifically instructing his subordinates to lie to, and not cooperate with, the IAB investigators, and

- Openly mocked and ridiculed the IAB investigators and investigation in front of his subordinates.

Similar allegations were sustained against two other sergeants and several officers assigned to this unit.

The IAB completed this investigation in January 2002. Astoundingly, L-1 was not immediately dismissed from the Department. In fact, two years have elapsed and he has yet to be disciplined for his egregious misconduct.

23

The Department reassigned the officers who participated in the theft and the cover up. However, these officers subsequently filed a grievance challenging the transfers. In spite of the overwhelming evidence gathered during the IAB investigation, the Department agreed to transfer the officers back to the special unit, not take any disciplinary action against the officers, and expunge all officer records of reference to this investigation. The only benefit derived by the Department for agreeing to these terms was a pledge by the involved officers not to arbitrate or sue the City over the transfers.

In a disturbing epilogue to this already troubling case, before the investigation into the stolen evidence was concluded, the officer who initially reported the theft to IAB was tragically killed in the line of duty. This occurred during an operation involving several of the same officers who were the subjects of the initial investigation.

In light of the suspicious timing of these events, both the IAB and Homicide Unit began a joint investigation into the circumstances of the Officer's death. While the joint investigation determined that there was insufficient evidence to prove criminal misconduct, the investigation did conclude that the involved officers made several tactical mistakes and deviated from fundamental and established safety policies and practices that may have contributed to the Officers death. The investigation also cited failures in the supervisory oversight of this operation that went awry.

None of the involved officers or supervisors were ever disciplined - or reassigned - despite the fact that their significant deviations from policy, and errors in judgement, may well have contributed to the death of a fellow officer.

In light of the severity of the conduct of these officers in both investigations, it defies belief that these officers and supervisors were never disciplined or reassigned.

## Case Study # 3

During an IAB targeted integrity test, three Officers assigned to a sensitive and specialized undercover unit were caught making an illegal arrest and fabricating the facts to support the improper detention and arrest. Further investigation by the IAB revealed that the improper and illegal actions evidenced during this integrity test were not an isolated event, but that these Officers had routinely prepared and submitted falsified police reports to support other illegal arrests.

The IAB investigation also found that two supervisors assigned to this unit had, on a number of occasions, been advised of illegal and improper activities of one of the officers, but failed to take any action or document the complaints.

As a result of these findings, the Philadelphia District Attorneys Office was forced to withdraw prosecution on a substantial number of criminal cases in the court system which involved these three officers.

24

The ongoing course of serious misconduct exhibited by these officers, the near complete failure in supervisory oversight of this corruption prone unit, and the resulting impact on the criminal justice system, should have immediately prompted the Department to undertake a complete review and overhaul of the operations of this unit. Instead, two of the involved officers and one of the supervisors received a reprimand and, astoundingly, are **still assigned to the same unit.** The third Officer received a two day suspension and was eventually transferred out of this unit. The second Sergeant was found not guilty by a PBI Board.

## Case Study # 4

An exhaustive IAB investigation found that an Officer utilized a Police Department computer to illegally access, download, and print child pornography. Despite the gravity and illegality of this offense (the District Attorney's Office declined prosecution), the Officer was not dismissed, but suspended for 22 days.

## Case Study # 5

A citizen filed a complaint with the IAB alleging that her parked car was struck by an uninsured car owned by Philadelphia Police "Officer A". The investigation uncovered the following:

Officer "A's" boyfriend was driving Officer A's privately owned and uninsured car - in the company of a prostitute and under the influence of drugs or alcohol - when he hit several cars that were parked along the curb of a residential neighborhood. The collision resulted in serious damage to several of the cars.

Several Philadelphia police officers arrived on the accident scene and quickly ascertained that Officer A owned the uninsured car driven by the suspect. Officer A, who was off-duty at the time, was summoned to the accident scene by one of the responding officers. Officer A refused to provide any insurance information to the citizens whose cars had been damaged, but rather, engaged in a heated shouting match with her boyfriend.

The responding officers took the following actions to protect Officer A and conceal the circumstances of the accident:

- The prostitute was allowed to leave the accident scene without being identified or questioned despite the fact that she was a material eyewitness to the accident;

- No supervisor was summoned to the scene and no sobriety test was conducted despite the fact that several witnesses, including officers, believed the suspect to be under the influence of drugs or alcohol;

- None of the officers requested the suspect's driver's license, which would have revealed that the suspect's license was suspended for prior DUI offenses and that he was in scofflaw status for numerous unpaid traffic citations

- The suspect was not arrested nor cited for traffic violations despite ample evidence that he had broken several laws. Officer A was not issued a ticket for failing to have her car properly insured.

- To further assure the cover-up, the officers ordered a rookie officer - with no experience whatsoever in investigating vehicle accidents - to prepare the accident reports. The officers then deliberately misled this newly assigned officer as to Departmental policies pertaining to the proper investigation of serious automobile accidents and provided him with incomplete and inaccurate information regarding the circumstances of the accident.

The IAB investigation also revealed that the Sergeant in charge failed to review any of the reports (albeit inaccurate and misleading) prepared in connection with this accident or to monitor his subordinates' activities throughout the entire shift. Additionally, two other district sergeants who were monitoring the accident on police radio failed to respond to the accident scene. These violations are indicative of a serious breakdown in the supervisory oversight of these officers.

This IAB investigation was completed in May 2001. Neither Officer A, the responding officers, nor the Sergeants have ever been disciplined for this incident.

## Case Study # 6

The IAB conducted an investigation into a complaint by a female recruit who alleged that an Officer assigned to conduct pre-employment polygraph examinations made sexually inappropriate, and outrageously vulgar remarks to her prior to administering the polygraph test.

Not only were the allegations of this recruit sustained, but the IAB investigation also discovered several additional female recruits who were subjected to the same offensive conduct by this same Officer.

This Officer received only a reprimand for his highly unprofessional and offensive behavior.

## Case Study # 7

An IAB investigation proved that an Officer attempted to use, for his personal needs, several prepaid calling cards that had been confiscated as evidence in a criminal investigation. This Officer also violated Departmental policy when he failed to submit this evidence in a timely manner. The IAB completed this investigation in November

2001. Despite conduct that amounted to "attempted theft" and violation of an important Departmental regulation, no record of the imposition of any penalty could be located.

## Case Study # 8

A federal law enforcement agency informed the IAB that while they were conducting an investigation into a large drug trafficking organization, they discovered that the main target of the investigation (a convicted drug dealer) was the live-in boyfriend of a Philadelphia Police Officer and that the Officer regularly socialized with other convicted felons who had recently been indicted in a federal drug trafficking conspiracy.

During the IAB investigation of these allegations, the Officer denied any knowledge of the criminal activities of any of these individuals. However, irrefutable evidence proved that the Officer was fully aware of her boyfriend's criminal activities since the inception of their relationship. The IAB investigation cited the Officer for numerous violations of the most serious provisions of the Disciplinary Code.

The IAB investigation was completed in September 2002. Five months later, a PBI hearing was conducted and the officer was found guilty of all the charges, including associating with known criminals and lying during an official Departmental investigation. The PBI Board recommended that the Officer be dismissed. The Police Commissioner subsequently reduced the recommendation to a 20-day suspension. However even this reduced penalty has never been imposed.

## Case Study # 9

An 18 year old female filed a complaint with the IAB alleging that officers from a district Narcotics Enforcement Team (NET) illegally arrested her for possession of marijuana. She further alleged that while she was handcuffed and being transported in the officers' unmarked car, she was improperly interrogated and physically abused - sustaining injuries to her neck and lip that required medical treatment.

An exhaustive IAB investigation concluded that the NET officers did not have a legal basis for the arrest and that the NET officers and their Lieutenant lied to investigators and falsified documents in a coordinated effort to conceal the circumstances surrounding this improper arrest.

The IAB investigator discovered that all the arrest reports omitted the names of the involved officers and the correct arrest location. These omissions and errors precluded the assigned detective from identifying and interviewing necessary police and civilian witnesses regarding the arrest and use of force. (The IAB investigator independently determined the actual arrest address and identified and interviewed several independent eyewitnesses who contradicted the accounts of the arresting officers). The IAB investigation also discovered that the written entry of the arrest in the police district

Arrest Log was subsequently obliterated with "white out" and another arrest entry written over it.

The Lieutenant sent a use of force notification to the IAB indicating that the injured female rejected medical treatment and was never treated for her injuries. However, it was later determined that the Lieutenant never saw or spoke to the female and that his version of events was false.   The IAB investigator also found sufficient credible evidence to support the conclusion that the Lieutenant's explanations for the omissions on the arrest reports were a "gross distortion intent on furthering a cover-up of wrongdoing by [the Officers]."

The Medical Examiner conducted an independent review of the records to ascertain the manner in which this female sustained her injuries.  His opinion was that the injuries sustained were inconsistent with the officer's version of the events and completely consistent with the female's version of events.

The investigation also uncovered the fact that other citizens had been detained and searched as part of this narcotics operation. However the NET officers violated policy when they failed to properly document these pedestrian investigations on the required 75-48A forms.   Other lax record keeping practices by this NET and poor supervisory oversight of the NET officers were cited.

The IAB investigation concluded that the multiple and contradictory accounts given by the officers and supervisors, the serious omissions and errors on all the pertinent arrest reports, the differing accounts of the civilian eyewitnesses, and the expert opinion of the Medical Examiner, demonstrated the lengths to which these officers went to conceal this improper narcotics operation, arrest, and use of force.

One of officers received a reprimand for his part in the cover up.  This officer had an active Protection from Abuse Order lodged against him, and two CAP's alleging physical abuse – one was sustained with no follow up disciplinary action, and the second is still open.  A second officer received a one-day suspension. This officer has a prior physical abuse CAP that was sustained and a second physical abuse CAP where Departmental violations were cited.   Two additional officers involved in this cover-up were never disciplined.

For his part in the cover up, the Lieutenant received a one-day suspension for failing to properly supervise. The Lieutenant's IAB record reveals a prior sustained "hampering an investigation" charge, two prior physical abuse investigations that cited violations of Departmental policies, and sustained allegations of illegal search and entry. Interestingly, the IAB investigation described in this case study is not listed on the Lieutenant's IAB history and is thus hidden from anyone who would review his IAB record.

Despite a problematic IAB history and his disturbing conduct in this investigation, this Lieutenant was subsequently reassigned to a more sensitive narcotics enforcement unit.

28

**Case Study # 10**

An Officer received a radio call to investigate reports of a "fight on the highway". Without going to the location, the Officer falsely reported the assignment as being "unfounded" to police radio and his supervisors. The Officer then ignored several direct orders from his supervisor to reinvestigate the same location.

When his Sergeant later confronted the Officer about his inappropriate behavior, the Officer erupted into an angry outburst that was, by all accounts, unprofessional, threatening, confrontational, and disrespectful.    The Officer further ignored his Sergeant's direct orders to be relieved of his assignment.

Disciplinary charges were filed in October 2002. At the end of May 2003, nearly seven months later, the Officer had a PBI hearing and was found guilty of three counts of insubordination, three counts of neglect of duty, making a false entry in a Departmental report, and other charges. The PBI Board recommended a dismissal, however, the PBI's recommendation has never been approved by the Police Commissioner. This Officer has yet to be dismissed or disciplined for this incident.

It is astonishing that no disciplinary action was taken for this incident in light of the Officers following disciplinary record:

- This Officer was previously dismissed from the force after he was arrested for DUI, Resisting Arrest, and possession of counterfeit inspection and emission stickers.    The officer was subsequently reinstated and received 30 days suspension. The IAO was unable to find any evidence that these suspension dates were actually imposed.

- In another disciplinary matter, a PBI Board found the Officer guilty of two counts of insubordination and failing to properly patrol or respond to radio calls and recommended 20 days suspension that was subsequently reduced to 10 days by the Commissioner.

- This Officer has several additional disciplinary actions for violations of various Departmental policies that resulted in minor suspensions.

**Case Study # 11**

An IAB investigation found that an Officer violated Departmental policy by routinely associating with convicted felons who were still engaged in criminal activities and disregarding written and verbal orders from her superiors to discontinue these associations. Throughout the investigation, the Officer made numerous false and misleading statements in an attempt to conceal these relationships.

At the time of the investigation the Officer was still in her probationary period. The IAB recommended that the Officer be rejected during probation and specifically noted that *"the officer's association with known criminals and her inability to tell the truth while still in training at the Police Academy indicates that she lacks the moral character and personal integrity to be a Philadelphia Police Officer. Her actions also indicate that she has no regard for her duty and responsibility as a member of the Police Department"*.

The IAB investigation was completed in March 2000. The IAB's recommendation was ignored and the Officer faced no disciplinary action whatsoever despite these troubling and serious findings.

This Officer has since been the subject of two additional IAB investigations. In one case, the Officer was again investigated for her involvement with a known criminal. The investigation proved that the Officer's latest "friend" was involved in criminal activities; however it could not firmly establish the Officer's knowledge of his criminal background.

In the second IAB case, the Officer responded to the scene of an automobile accident involving another off-duty officer who was responsible for causing the collision. The car driven and owned by the off-duty officer had an expired registration. The Officer ignored direct orders from her supervisor to include the off-duty officer's insurance status on the accident report or to issue her a traffic ticket for expired registration. As a result of these deliberate omissions, the innocent victim of the accident faced significant delays and difficulties in filing an insurance claim. The Officer only received a reprimand for failing to conduct a proper investigation*, and failing to comply with Departmental Directives.

## Case Study # 12

An IAB investigation proved that an Officer deliberately provided false information on her employment application to conceal her live-in relationship with a male who had an extensive criminal record and was still involved in criminal activities. Despite the fact that this Officer intentionally falsified Police Department records and was associating with known criminals – both of which are serious violations of the Disciplinary Code - disciplinary charges that had been initiated against this Officer were withdrawn by the Police Commissioner without explanation.

---

*The IAO identified numerous sustained IAB investigations in which officers were found to have conducted incomplete, inadequate, and inaccurate investigations of auto accidents. Despite the fact that in each of these cases, the officer's improper actions seriously inconvenienced the citizens and hindered their efforts to resolve insurance claims, few cases resulted in formal disciplinary actions. The few that did, usually resulted in a reprimand.

**Case Study # 13**

The IAB received an anonymous letter alleging that a high ranking police official, his administrative sergeant, and a female officer with whom the high ranking official was romantically involved, were routinely absent from the police district during working hours and engaged in personal activities. The ensuing IAB investigation sustained these allegations and further discovered that in several instances the Commander, the officer, and Sergeant were collecting **overtime** while they were involved in their personal activities.

The IAB interviews with police personnel assigned to this district revealed widespread resentments and deteriorating morale because of the preferential treatment afforded the Commander's girlfriend and his administrative aide.

No disciplinary action was ever taken against the Commander, the Sergeant, or the officer.

**Case Study # 14**

An Officer filed a police report alleging that she was the victim of a sexual assault by a former boyfriend. An investigation conducted by the Department's Special Victims Unit discovered that the Officer fabricated the allegation against her former boyfriend because he was threatening to provide the IAB with evidence that she was harassing him.

The IAB investigation, which was completed in December 2002, sustained the charges of filing a false police report and lying during an official investigation. Nearly 17 months later, the Officer pled guilty to several of the most serious charges and a 22/23 day suspension was recommended. This suspension has never been carried out.

**Case Study # 15**

Two plainclothes officers were driving an unmarked car when they initiated an unauthorized, improper vehicle pursuit in an attempt to stop a suspect who they believed was driving a stolen vehicle. The vehicle pursuit ended in a five-car collision in which several innocent citizens were seriously injured – one citizen was admitted to hospital in critical condition.

In the aftermath of this collision the officers and the supervising Sergeant and Lieutenant attempted to cover-up their involvement in the pursuit and to transfer the blame of the accident to another officer who had witnessed, but was not involved in, the pursuit.

The officers and supervisors insisted that a pursuit never occurred and thus never reported it as such, despite evidence that the officers were speeding down one way

31

streets, in the wrong direction, when the crashes occurred. An officer who witnessed the pursuit was ordered by the Sergeant and Lieutenant to change his original incident and accident reports to omit any reference to the two plainclothes officers or the pursuit and not to prepare a pursuit memorandum. The officers and supervisors later placed blame for the entire incident on this unsuspecting officer.

The IAB sustained serious allegations of misconduct including falsifying records, lying and failing to cooperate during an official investigation (Sections 1.11 and 1.12 of the Disciplinary Code*), and numerous violations of Departmental policies related to vehicle pursuits, against all the officers involved.

Despite the attempted cover-up and the devastating consequences of their improper actions on innocent citizens, these officers and supervisors received only reprimands.

### Case Study # 16

An off-duty Officer observed a woman yelling at several children who were inside of a van that was parked directly in front of a store that the Officer was about to enter. The Officer was offended by the woman's behavior and summoned the police after the woman went inside the store. Within minutes, the woman came out of the store and was surprised to find police on the scene. The woman explained that she was yelling because her children had locked the doors to the van and were refusing to open them. The woman then criticized the off-duty Officer for calling the police and intruding in her business.

At that point, the Officer erupted into an angry tirade, yelling obscenities and racial slurs at the woman such as "f ---- white bitch" and "white trash". When the investigating officers intervened, the Officer directed similar obscenities and racial slurs at them. The Officer threatened to harm the officers and the woman and ignored multiple requests by the officers to calm down, causing a crowd of curious onlookers to gather.

According to one officer at the scene, the Officer's behavior was so offensive and out of control that, had she not been a police officer, she would have been arrested for Disorderly Conduct, Terroristic Threats, and Ethnic Intimidation. During the IAB

*There are serious ramifications that stem from findings of guilt pursuant to sections 1.11 and 1.12. The penalty guidelines for these Disciplinary Code provisions are harsh. A first offense mandates 10-days suspension to dismissal. A second offense mandates dismissal. The reckoning period is for the entire duration of employment. Furthermore a finding of guilt under either section 1.11 and 1.12 can profoundly affect an officer's reputation and his/her ability to perform the duties of a law enforcement official, particularly in the context of the judicial system where an officer's integrity and veracity are constantly examined and challenged. As a practical matter, when officers have been found guilty of 1.11 and 1.12, they may need to be removed from patrol duties because their credibility in any arrest in which they are involved becomes tainted and suspect.

investigation, the Officer completely denied acting in the manner reported, despite the statements of numerous citizens and officers who witnesses the entire incident.

The Officer was cited for several serious Disciplinary Code violations, including failing to cooperate and lying during an official investigation. This Officer has never been disciplined.

Furthermore, Department records indicate that at the time of this incident, the Officer was assigned to the unit in the Department responsible for investigating discrimination claims made by other police officers. Despite the fact that her conduct in this incident seriously called into question her fitness for this sensitive position, she remains assigned to this unit.

## Case Study # 17

A male suspect was arrested for operating a stolen car. When the vehicle was searched, numerous items of police equipment belonging to a Philadelphia police officer were discovered inside. A subsequent IAB investigation found that the Officer was personally involved with the suspect - who had a lengthy criminal record - and that she violated Departmental policy by failing to report that her equipment was missing.

The Officer's disciplinary evaluation submitted by her supervisor indicated that the Officer *"consistently displays hostility towards police supervisors and supervision"* and that she had violated Departmental sick leave policies. The Officer has never been disciplined for these violations.

## Case Study # 18

Narcotics evidence that had been confiscated during a narcotics arrest and was later discovered missing, prompted an IAB investigation into the activities of a District Narcotics Enforcement Team ("NET"). IAB found that the officers assigned to this NET violated numerous fundamental policies regarding the handling and processing of the narcotics evidence. The IAB investigation further discovered several additional and unrelated instances in which narcotics evidence was improperly handled by this NET. None of the officers or the supervisor of this NET were formally disciplined for these serious Departmental violations.*

*The IAO identified several IAB investigations in which officers and supervisors were found in violation of Departmental policies regarding the proper handling of evidence. In some of these cases, failure to follow proper procedures adversely impacted the prosecution of cases. In other cases, officers' deviations from these policies raised troubling integrity red flags. Not one of these investigations resulted in discipline for the offending officers or supervisors.

33

## Case Study # 19

An internal IAB investigation found that an Officer routinely referred and recommended the towing services of a private towing company during his investigation of auto accidents. This practice is expressly prohibited per Departmental Directives. The investigation also determined that the Officer repeatedly failed to properly complete accident reports. This IAB investigation was completed nearly one year ago. Despite the troubling integrity implications of the Officer's ongoing course of misconduct, the Officer has never been disciplined. Department officials have stated that based on these findings by the IAO, formal disciplinary action will be initiated against this officer.

## Case Study # 20

A former girlfriend of an Officer filed a complaint with the IAB alleging that the Officer had been harassing her since the termination of the relationship. The IAB sustained the harassment allegations, yet this Officer was never formally disciplined but allegedly received a "Review and Advise". This minimal response is particularly disturbing in light of IAB's records indicating that this Officer has been the subject of several harassment investigations involving different women.

## Case Study # 21

Two Officers illegally detained two juveniles, placed them in the rear of their police car, drove them to another section of the city, forced them out of the car, and then drove away leaving them to fend for themselves.

To conceal these improper actions, the Officers violated numerous Departmental Directives including leaving their assigned area of patrol without permission, failing to notify police radio of their actions, failing to document the encounter on their patrol/activity logs, and failing to submit the required pedestrian investigation form (called the "75-48A")* to document the incident. The Officers' misconduct only came to light when one of juvenile's parents filed a complaint with the IAB.

One of the involved officers' has an **extensive** IAB and disciplinary record –including two previous dismissals. In both cases, the Officer had been reinstated to the Department.

**\*IAO identified numerous IAB investigations that cited officers for failing to properly prepare vehicle/pedestrian investigation reports ("75-48A's") documenting significant contacts with citizens. The purpose of these 75-48A's, which are a fundamental reform provision of the earlier mentioned Settlement Agreement, is to insure the legality and reasonableness of officer contacts with citizens, and to spot trends and patterns indicative of civil rights violations. Except for a few rare exceptions, the Department does not formally discipline officers or supervisors for violating this important policy and hard fought reform effort.**

34

This investigation was completed in April 2003. Half a year later, a PBI Board found the officers guilty. Despite the serious misconduct and the officer's extensive disciplinary record, the Board recommended that each officer receive only a reprimand. (The IAO has been advised that these reprimands may be changed to a three-day suspension. To date, neither penalty has been imposed.)

### Case Study # 22

An Officer was the subject of two separate IAB investigations in which citizens alleged that the Officer illegally arrested them when they questioned his authority to detain them. In both investigations, IAB sustained allegations of improper detention.

Despite a pattern of abusing his authority and violating citizen's civil rights, this Officer was not formally disciplined for either IAB investigation.

### Case Study # 23

A citizen filed a complaint alleging that an Officer illegally arrested him for Disorderly Conduct and was verbally abusive during the incident. According to police eyewitnesses, the Officer's basis for the questionable arrest was the citizen's "big mouth". Since a "bad attitude" is not a legal basis for a Disorderly Conduct arrest, the IAB investigation concluded that the arrest was improper and that the Officer had violated the citizen's civil rights. This IAB investigation was completed in April 2001.

It was not until a draft of this report was presented to the Department in December 2003 that disciplinary charges were filed against this Officer. The Department's failure to aggressively pursue this matter is particularly disturbing in light of the Officer's extensive IAB and disciplinary record which includes one prior dismissal (he was subsequently reinstated per an arbitrator) and seven sustained IAB investigations - three for physical abuse, one for a shooting found to be in violation of Departmental policy, one for "Conduct Unbecoming an Officer", one for "fighting on duty", and one for "threats".

### Case Study # 24

A Detective, offended by the driving skills of a female motorist, pulled his car up next to hers, flashed his police badge, called her a "bitch", and made several sexually explicit and offensive gestures. The woman was so shaken, insulted, and disgusted by this Detective's behavior that she recorded the Detective's license plate number and immediately filed a complaint. The IAB investigation, which was completed November 2002 sustained the allegation of "Conduct Unbecoming an Officer".

In May 2003, a PBI hearing was conducted, the Detective was found guilty, and a three-day suspension was recommended. Over eight months have elapsed and this penalty has never been carried out.

## Case Study # 25

A Sergeant arrived at a police district to begin his shift and was about to address the officers at roll call when it became apparent to all present that he was intoxicated. The Sergeant was ordered to submit to two Blood Alcohol Content Tests, both of which indicated that the Sergeant was legally intoxicated.

In June 2003, the sergeant pled guilty and received a 5-day suspension. Over six months have elapsed and this penalty has never been carried out.

## Case Study # 26

The IAB conducted an investigation into the theft of jewelry which occurred during a narcotics arrest in which hundreds of pounds of marijuana and several firearms were confiscated.

The IAB investigation found a complete breakdown in the supervisory oversight of this narcotics squad. The Lieutenant in charge admitted that he relied on his officers "to do what they should do" and did not find it necessary to provide "any direction as to what should be done with the confiscated items". The Lieutenant did not regularly review the reports prepared by his officers. Additionally, after the theft was discovered, the Lieutenant failed to interview all the involved officers to ascertain what happened.

As a result of extremely poor supervisory oversight, and numerous violations of Departmental policies regarding the proper handling of evidence, the IAB was unable to reconstruct the events to determine who was responsible for the theft of the jewelry.

This investigation was completed in May 2002. Charges were filed against the Lieutenant in June 2002. Nearly 18 months have elapsed and there has been no further action on this matter.

## Case Study # 27

An IAB integrity test was designed to test whether randomly selected officers properly responded to situations in which undercover IAB investigators posing as citizens advised an officer of street corner drug trafficking activities and then directed the officer to a narcotics stash that had been planted by the IAB.

36

In such a scenario, an officer should investigate the situation, document the investigation, and when the narcotics were recovered, immediately place them on a property receipt and submit the narcotics into evidence.

One of the randomly targeted Officers was observed retrieving the narcotics that had been planted by the IAB. However, this Officer failed to document the seizure, prepare a property receipt, or submit the narcotics into evidence. Despite the disturbing implications of this Officers' integrity test failure, the Officer received only a reprimand.

Other officers failed the integrity test when they completely ignored the information provided by the undercover IAB investigator and then left the area without conducting any investigation whatsoever. These officers were never disciplined.

**Case Study # 28**

A physically handicapped male filed a complaint alleging that an Officer illegally arrested him for "obstructing the highway" and then verbally and physically abused him during the arrest.

The IAB investigation found that the Officer violated the citizen's civil rights because there was an insufficient legal basis for the arrest. The IAB investigation also found that while being arrested, the Officer grabbed the man's crutches and threw them to the ground, dragged him to his unmarked police car and forcefully pushed him inside. When the man objected to the Officer's rough treatment, the Officer retorted "I don't give a "f--- about the handicapped" and "you're crippled ass ain't going nowhere".

Rather than transport the male directly to a police district headquarters, the Officer violated Departmental policy and continued patrolling the area. The Officer than improperly arrested a second man on the same charges. During the transport of both men to the police district, the second male was forced to sit on the legs of the disabled male. When the man again complained about the pain, the Officer responded "If you weren't crippled I would beat you up right now". The Officer further violated Departmental policy when he failed to log these arrests into the District arrest book, increasing the likelihood that this incident would escape the scrutiny of his supervisors.

The IAB investigation sustained allegations of physical abuse, verbal abuse, lying during an official investigation, conduct unbecoming an officer, and violations of various Departmental policies. Despite what can only be described as degrading and vicious behavior, this Officer received only five days suspension. (The charge of lying during an official police investigation alone carries a minimum penalty of 10 days suspension.).

This lenient penalty is especially troubling in light of this Officer's extensive IAB and disciplinary record which includes a **prior** IAB investigation in which similar allegations of verbal abuse, physical abuse, and lying during an official investigation were sustained.

37

In another investigation, the IAB found that this Officer took money from a suspect incarcerated in a police district cellblock in return for the use of the Officer's personal cell phone. The IAB investigation revealed that the Officer was not authorized to be in the district cell block and that he had ignored direct orders from his supervisors to stay clear of the cell block area because of prior problems. The Officer received a seven-day suspension for these offenses.

In yet another investigation, the IAB discovered that this Officer removed several hundred dollars from the pocket of a male during a vehicle investigation. The Officer then released the male without returning the money, submitting the cash as evidence, or documenting the encounter. The male immediately went to a police district to report the theft. When the Officer learned that the theft had been reported, he immediately tried to cover his tracks, offering implausible and contradictory explanations that were completely refuted by overwhelming evidence proving that the Officer intended to steal the money. This investigation was completed May 2003. This Officer remained active on the force for another half year until he was finally dismissed in October 2003.

**Case Study # 29**

An investigation was initiated by a Captain to assess the quality of investigations assigned to a particular Detective. The review revealed that on numerous occasions the Detective failed to take any investigative actions into serious crimes including thefts, robberies, and burglaries.

In order to conceal the fact that he had done nothing to further these investigations, the Detective routinely falsified his Investigative Reports, specifically noting that he had personally contacted the victims of each these crimes and that they had no additional information to provide. The investigation revealed that the Detective had never once contacted any of these victims and that his notations were pure fiction.

The Captain interviewed the aggrieved citizens. They all expressed anger and frustration at the Department's failure to respond to their needs when they had been victimized, or to make any effort to solve the crimes. In several of these unresolved cases, the victims had important information and evidence to share that could have assisted in the investigation of the crimes. However, because of the Detective's failure to contact the victims, such information and evidence was never obtained.

A performance evaluation of this Detective revealed that he "did not get along with his fellow employees", was often "insulting and abusive", had "little initiative", and showed "little interest in his duties".

After a PBI hearing, the PBI Board found the Detective guilty of one count of 1.11 (Failure to cooperate fully in a departmental administrative investigation); **ten counts of 1.12** (Making a false response statement in response to an official departmental investigation); and **twenty-two counts of 1.75** (Repeated violations of departmental rules

and regulations and/or any other course of conduct indicating that a member has little or no regard for his responsibility as a member of the Police Department. The Disciplinary Code mandates a 30-day suspension to dismissal for the first offense.).

If progressive discipline had been applied per the Disciplinary Code, the Department was mandated to dismiss the Detective after a finding of guilt on just **two** of the 33 counts for which he was found guilty.

Instead, the PBI Board recommended a 30-day suspension and a demotion. The Commissioner rejected the demotion recommendation and the Detective was suspended for only 23 days.

This Detective has recently been promoted to a supervisory position in the Department.

### Case Study # 30

An off-duty Officer was an eyewitness to an aggravated assault instigated by two of her friends, one of whom was her boyfriend. (A prior IAB investigation revealed that this Officer was well aware of the fact that her boyfriend/assailant had a criminal record and a history of violence.)

As a result of this assault, two people were seriously injured. Rather than call 9-1-1 to report the crime, the officer instructed the attackers to get into her car, and she fled the scene with the assailants in tow. The Officer subsequently lied about the incident to the IAB investigators claiming that her ability to observe the assault was extremely limited. However, several eyewitnesses placed the Officer directly at the scene of the altercation and observed her urge the assailants to get into her car and flee before the police arrived.

The IAB investigation uncovered sufficient credible evidence that this officer deliberately hindered a police investigation into a felony, engaged in conduct that amounted to aiding and abetting criminals, and lied during an official investigation.

This investigation was completed in August 2002. Ten months later, in June 2003, the officer pled guilty and received an insignificant one day suspension. Nearly five months later, in November 2003, the one day suspension was finally imposed.

### Case Study # 31

Three officers assigned to an elite special unit were caught trying to obtain official Bravery/Heroism Commendations under false pretenses. At the direction of two of the officers, the third officer falsified various arrest reports and forged signatures to make it appear that the two officers were responsible for rescuing an elderly citizen from a burning building when, in fact, they were not. During the IAB investigation, two of the

officers were caught in several lies denying and minimizing their participation in the scam.

The IAB investigation sustained the charges of falsifying police records (Section 1.15 of the Disciplinary Code), and lying and failing to cooperate during an official investigation (Sections 1.11 and 1.12 of the Disciplinary Code).

The officer who falsified and forged the reports pled guilty and received a 5-day suspension.

The two officers who conceived and organized the scheme opted for a PBI hearing. On the day of the scheduled hearing, last minute negotiations between the FOP and the Department's Executive Officer resulted in 15-day suspensions and transfers for both officers. Per the Disciplinary Code, the penalty guidelines for these charges should have resulted in a minimum of 25 days suspension to a dismissal. In light of the serious nature of the charges, and the fact that the credibility and effectiveness of these officers in the courts are now tainted, the appropriate penalty would have been dismissals.

The last minute negotiations are also difficult to comprehend since the disciplinary charges had been outstanding for nearly four months. If a settlement had been negotiated early in the process, the limited time, resources, and facilities expended by the PBI Advocate in preparing for the hearing could have been more effectively utilized to dispose of one of the many open disciplinary matters awaiting a hearing date. Additionally, several commanders and numerous witnesses were forced to waste hours at the PBI for while the last minute deal was negotiated.

## Case Study # 32

In November 2000, an Officer was driving her private vehicle when she hit an unoccupied-parked car. The Officer than fled the scene of the accident and subsequently filed a false accident report alleging that her car was the subject of a hit and run in order to recover for the damage that she had caused to her car in the earlier hit and run.

Formal disciplinary action was initiated against the Officer. **Over three years later,** there was a PBI hearing and the Officer was found guilty of violating section 1.15 of the Disciplinary Code ("Knowingly and willfully making a false entry in any Departmental report or record") and a 30 day suspension was recommended (which will only result in a 23 day suspension).

This Officer's disciplinary records reveal a prior disciplinary conviction under the same provision of the Disciplinary Code (Section 1.15) that resulted in a 5-day suspension. The second offense occurred several weeks after the end of the reckoning period.

This Officer's disciplinary record also contains two additional disciplinary actions that resulted in a reprimand and a 3-day suspension and **three additional** open disciplinary actions.

This Officer was also rated unsatisfactory on her performance evaluation and was cited for excessive lateness, sick leave abuses, unauthorized use of vacation time and an overall poor work attitude. This Officer should no longer be on the force.

### Case Study # 33

Off-duty Officer A rear-ended another motorist causing the car to drive off the road and into a wooded area. Officer A then unlawfully fled the scene. The victim driving the other car was able to provide the responding officer with a description of Officer A's car. Officer A was spotted a short time later by an on-duty Philadelphia police officer and pulled over for questioning. Officer A was caught providing patently false and misleading information to the officer regarding the accident.

Departmental policy mandates that any time an off-duty officer has some type of run-in with the law, the Officer must report the incident to the IAB. Officer A never reported this incident to the IAB, but rather was alerted as the result of an anonymous letter.

Despite the serious nature of this incident, and a disciplinary record that includes a prior 15 day suspension for lying during an official investigation (Section 1.12 of the Disciplinary code) and knowingly and willfully making a false entry in a Departmental record or report (Section 1.15 of the Disciplinary Code), this Officer only received a patently inadequate one-day suspension.

### Case Study # 34

An off-duty officer was intoxicated in a bar when he instigated a physical altercation with several patrons. The Officer and several others sustained serious injuries requiring hospitalization.

An IAB investigation found that the Officer violated several policies related to off-duty conduct. The Officer pled guilty to the offenses and received a 20-day suspension. The plea agreement specifically noted that the Officer was bound by a two-year reckoning period that was effective from the date of the signing of the Agreement of Suspension.

Within the two years, this Officer was involved in another off-duty brawl while he was intoxicated at a bar in New Jersey. The Officer was arrested for Disorderly Conduct and Creating a Disturbance. While in custody, the Officer's behavior was described by the arresting officers as belligerent, uncooperative, insulting, and disrespectful. The Officer further violated policy by failing to notify the Department of his arrest.

Despite the fact that the Officer committed the same offense a second time within the reckoning period, the officer received a 5-day suspension the second time – far less than the first incident.

### Case Study # 35

While conducting a vehicle search during the lawful arrest of a male, the arresting officers recovered a firearm, 30 credit cards not owned by the suspect, a ski mask, and police equipment and a uniform.

Several months later, police again detained this same male because of his involvement in a recent shooting. During this second vehicle investigation, the investigating officers discovered off-duty Officer "A" sitting inside the car – in full uniform. (During the stop, the male provided the officers with an alias and was issued a traffic ticket for driving with a suspended license.)

The IAB conducted an investigation into Officer A's relationship with this known felon. Officer A claimed total ignorance of this male's extensive criminal record, his involvement in criminal activities, and his numerous aliases. She further denied any personal relationship with him.

IAB surveillances of Officer A revealed that a personal and intimate relationship existed between the two. The IAB investigation also uncovered that fact that prior to the IAB investigation, Office A utilized the Department's confidential computer databases to conduct several unauthorized searches of the suspect's criminal record and was thus fully aware of his criminal history and aliases.

Officer A was found in violation of Section 1.25 of the Disciplinary Code (Associating with known a criminal), Sections 1.11 and 1.12 (Failing to cooperate and lying during an official investigation), and unauthorized use of police databases for personal uses. The combined penalties for these violations should have resulted in a dismissal.

The Officer was only charged under an ambiguous Disciplinary Code section 4.20 (Failure to comply with any Commissioner's Orders, Directives, Regulations, etc) and received a 2-day suspension.

### Case Study # 36

A female citizen filed a complaint with the IAB alleging that she was sexually harassed by a Philadelphia Police Officer.

The investigation revealed that the Officer in question was patrolling the Veteran's Stadium parking lot when he was flagged down by the woman, who was intoxicated, because she could not locate her car. The Officer told the woman to get into his car and they drove around for nearly 40 minutes, ostensibly searching for the car. During this time, the Officer made several vulgar and sexually explicit remarks to the woman. The investigation further revealed that the women found her car, got out of the officer's vehicle, and drove away. Despite the Officer's assessment that the woman was intoxicated, he did not prevent her from driving. The woman was shaken and outraged by the officer's offensive conduct and immediately filed a complaint.

In violation of numerous Departmental policies, the Officer never notified police radio that an unauthorized civilian was in his police vehicle, failed to document this encounter in his patrol log, or to prepare a pedestrian investigation form (75-48A) to document this significant encounter. The complete failure to document this significant encounter is persuasive evidence that the Officer was trying to conceal his actions from the Department.

Despite numerous violations of Departmental policy and the Disciplinary Code that could have resulted in an extensive suspension, the Officer was only required to forfeit two vacation days.

**Case Study # 37**

An IAB investigation of a Sergeant assigned to a highly sensitive unit discovered that the Sergeant had violated every Departmental policy governing the use of confidential informants. Specifically, the IAB found that:

- The Sergeant established a relationship with the Confidential Informant (an admitted prostitute and drug user) without the prior review or approval of his commanding officer. The Sergeant became sexually involved with the Confidential Informant

- The Sergeant met with the Confidential Informant on numerous occasions without notifying a supervisor or fully documenting each contact as required by Departmental Directives.

- The Sergeant compensated the Confidential Informant with his own money, without approval or documentation, in violation of numerous Departmental Directives.

The IAB investigation further revealed that several of the narcotics officers under this Sergeant's supervision were aware of, and uneasy about, the questionable and problematic relationship between the Sergeant and the Confidential Informant.

In its conclusion the IAB noted that the Sergeant *"had an obligation to conduct himself in a manner that would not bring discredit or shame to himself or the Department. By failing to document his actions, the Sergeant opened not only himself, but also the Department to critique and review."*

43

Despite numerous and serious violations involving important integrity issues, this Sergeant only received a 3-day suspension and a transfer. Additionally, the ongoing course of misconduct that was exhibited by this supervisor, and that was apparent to the officers under his command, should have immediately prompted the Department to conduct an extensive review of the operations and supervisory accountability and effectiveness of this unit. Such a review never occurred.

### Case Study # 38

The IAB conducted vehicle integrity checks of cars owned and operated by Philadelphia police officers that were parked in police district parking lots. This integrity check was done to ensure that officers' cars were being operated in compliance with the Motor Vehicle Laws. The IAB found 55 cars that had expired inspections and registrations and were therefore in violation of the Motor Vehicle Laws.

Of these 55 officers found to be in violation of the law, 39 of the officers were never disciplined. Several of the 39 officers who were not disciplined had prior disciplinary records that included driving with lapsed and suspended driver's licenses and expired registrations and inspections. Of the remaining 55 officers in who were found in violation of the law, 11 officers received reprimands, 2 officers received one-day suspensions, and 3 officers were ticketed and fined.

Philadelphia police officers are apparently held to lower standards than citizens for violating the same laws for which citizens are penalized are.

### Case Study # 39

A Captain was found guilty of violating Departmental policy regarding the proper use of a Mobile Data Terminal ("MDT"). This official was caught transmitting, via an MDT, unprofessional messages that contained inappropriate racial overtones. As a result of this misconduct, the Captain received a 3-day suspension.

This same Captain was found guilty of the same offense a second time – within the reckoning period. In this case, the official was caught transmitting crude and unprofessional messages via an MDT.

Disciplinary charges were filed against the Captain for this second violation of the same Departmental policy. Rather than impose **progressive discipline** as mandated by the Disciplinary Code, the charges were withdrawn by the Police Commissioner without explanation.

## Case Study # 40

A Detective was caught drinking alcohol while on duty, and utilizing Departmental databases to obtain confidential information for personal use.

The Detective received only a reprimand for both offenses. This Detective's IAB history includes sustained allegations of harassment and lack of service, and an open physical abuse claim.

## Case Study # 41

An Officer was driving to work when he rear ended the car of another motorist causing considerable damage to her car. The Officer, who was in partial uniform, identified himself as a Philadelphia Police Officer and provided his name, license number, and an outdated home address. The Officer did not have his insurance and registration records and offered to provide them to her as soon as he arrived at work. He assured the other driver that he would not back out of paying the damages. Before the other motorist could write down all the information, call the police, or voice her objections, the Officer drove off.

The motorist eventually located the Officer's correct home address and contacted him there in an attempt to properly resolve the matter. The Officer accused her of framing him for an accident in which he was not involved and threatened to have her arrested if she contacted him again. The victim filed a complaint with the IAB.

During the investigation, the Officer denied any involvement in, or knowledge of, the accident. However, the IAB investigation uncovered overwhelming evidence proving that the Officer in fact caused the accident and then tried to avoid financial responsibility by improperly leaving the accident scene, providing false information to the victim, and then intimidating the victim to prevent her from pursuing the matter.

The officer received an 18-day suspension. However, in light of the Officer's egregious behavior and the violation of several extremely serious Disciplinary Code provisions, a dismissal was the only appropriate response.

## Case Study # 42

An Officer ignored a subpoena and failed to appear in court to testify in a criminal matter. Throughout the day, Police Radio and the officer's supervisor unsuccessfully attempted to locate the on-duty Officer.

This Officer's disciplinary records reveal that he had been disciplined for similar offenses in four separate disciplinary actions - some within the same reckoning period. Pursuant to the Disciplinary Code, and the mandated progressive disciplinary provisions,

45

this Officer should have been dismissed.   The Officer received only a reprimand for his latest offenses.

## Case Study # 43

An IAB investigation revealed that an officer was engaged in unauthorized outside employment while the officer was on restricted duty.  The IAB investigation further revealed that the officer's Sergeant knew about and in fact recommended the unauthorized employment situation to the officer.   The Officer was disciplined for violating Departmental policy. The Sergeant was never disciplined.

## Case Study # 44

The IAB conducted an investigation into a vehicle pursuit involving over thirty officers that ended in a two car collision and an allegation of physical abuse by the suspect who was the target of the pursuit.

In the investigation, the IAB found that the Sergeant who was in charge of the Police Radio room, and who was monitoring the pursuit over police radio, intentionally failed to transmit/relay the orders of a commanding officer to limit the pursuit to two cars. Despite the fact that the Sergeant ignored direct orders from a superior officer, he was never disciplined.

The IAB investigation found that the Lieutenant in charge of the Police Radio Unit at the time of the pursuit, was unaccountably absent from his post during critical time period of the pursuit.  The Lieutenant's explanations for his absence were found by the IAB to be suspect and contradictory to objective evidence.  The IAB investigation concluded that the Lieutenant was *"unaware of what was transpiring, where it was transpiring, and when it was transpiring"* and therefore found the Lieutenant in violation of the Disciplinary Code for failing to properly supervise.  The Lieutenant was never disciplined.

The IAB found that one of the Officers involved in the pursuit and apprehension pulled the suspect from the car, threw him face down onto the ground, and repeatedly kicked the suspect despite the fact that the suspect was not resisting or presenting a risk of harm to the officers.  When a supervisor arrived on the scene, the officer stopped his beating and immediately left the area. The IAB investigation found sufficient credible evidence against this Officer to sustain the allegation of physical abuse. The Officer was never disciplined.

The IAB investigation found that many of the officers involved in the pursuit violated Departmental policy for leaving their assigned patrol areas without authorization. Despite being the least culpable participants in this pursuit, these officers were disciplined and received penalties ranging from reprimands to a 3-day suspension.

46

**Case Study # 45**

A Detective was assigned to investigate criminal activity resulting from an ongoing and tense neighborhood feud. The IAB investigation revealed that the Detective ignored the assignment and failed to conduct even a minor semblance of an investigation. Despite the fact that this Detective showed a complete lack of regard for his responsibilities to the Department and the public, he was never formally disciplined.

**Case Study # 46**

A citizen filed a complaint alleging that he was physically and verbally abused by an Officer who cursed at him, threw him to the ground, dragged him across the parking lot, and threw him against a wall. Several police officers who observed this arrest confirmed the complainant's version of events. The IAB investigation concluded that the suspect never presented any risk of harm to the Officer and that the Officer's use of force was therefore unjustified and excessive. The citizen's allegations of physical and verbal abuse were both sustained.

This investigation was completed in April 2003. Five months later, the Officer had a PBI hearing, was found guilty, and a 2-day suspension was recommended. This suspension has yet to be imposed.

**Case Study # 47**

An IAB investigation sustained allegations of verbal abuse and "Conduct Unbecoming an Officer" against an Officer for cursing at, and spitting on, a citizen during a vehicle investigation.

Despite this highly offensive and unprofessional conduct, the Officer only received a reprimand.

**Case Study # 48**

A citizen filed a complaint with the IAB alleging that Officer "A" physically abused him while he was being arrested for a minor family disturbance.

The IAB investigator interviewed each of the numerous officers that were involved in and present during this apprehension. These interviews revealed that the citizen did in fact resist arrest and struggled with the police. However, according to the other officers, the citizen's resistance did not involve aggressively attacking the officers, but rather consisted of resisting attempts by Officer A to handcuff him by kicking and squirming from a prone and curled up position with his hands interlocked. In making the arrest, Officer A punched the citizen between 10 to 15 times. Three of the punches were

47

intentionally directed to the man's face resulting in injuries to the man's eye. None of the other officer's felt that the suspect presented a serious risk of harm warranting even one punch, let alone 10 to 15 punches.

The IAB investigation concluded that the force used by Officer A was excessive and in violation of Departmental guidelines. The investigation also found that the Officer A and his Sergeant violated Departmental policy when they failed to provide the citizen with medical treatment or to properly document or notify the IAB of this force incident.*  It was not until the citizen filed a Complaint Against Police that Officer A's Commanding Officer or the IAB became aware of this incident.

Officer A's IAB record reveals two prior Complaint's Against Police in which allegations of physical abuse, verbal abuse and false arrest were sustained. In another IAB investigation, allegations of failing to provide proper services were sustained. Officer A's IAB record also indicates an open physical abuse investigation and 13 reported use of force incidents.

For this latest incident, Officer A only received a reprimand.


### Case Study # 49

An employee for a large retailer filed a complaint alleging lack of proper service by Officers "A" and "B".

The IAB investigation into this incident found that the employee was at work and monitoring the exit doors when a male customer who was leaving the store caused the merchandise sensor alarm to ring. As the employee attempted to investigate, the suspect and two of his friends suddenly attacked the employee. According to the employee, one the assailant's used a key to stab him and as a result, he sustained several scratches and lacerations. A customer and several store employees witnessed the assault and immediately came to the employee's aid. The three suspects were detained in the store's security office and the police were called. This key, which allegedly had the victim's blood and skin on it, was recovered by one of the eyewitness to this incident.

Officers "A" and "B" arrived on the scene and, for reasons unknown, immediately concluded that the three suspects, rather than the employee, were in fact the aggrieved parties.


*The IAO identified several IAB investigations in which supervisors and officers were cited for violating Departmental policy pertaining to the proper documentation and reporting of police use of force incidents. This case study was the only one identified during this audit that resulted in formal discipline.

Specifically, the IAB investigation found that Officers A and B:

- Failed to search the suspects, identify or question any of the witnesses, or preserve and submit the recovered key as evidence of the assault;

- While assisting the suspects in completing the store "Apprehension Reports", Officer A was overheard saying to the female suspect "Sister, this is what you have to say. You can beat this". Several of the employees then observed Officers A and B join hands with the three suspects and begin to pray aloud!

- Allowed the female suspect to walk to her car, unescorted and not handcuffed.

- At the Police district, Officer A ignored direct orders from his Sergeant to discuss the matter with a district detective to determine how the case should proceed. Rather than comply with this direct supervisory order, Officer A lied to his Sergeant by stating that he in fact conferred with a detective and was advised that no arrests were warranted under the circumstances. However not a single detective or detective supervisor who was on duty that day had any record or recollection of such a conversation with Officer A.

The victim and other store employees who had been waiting at the police district for some action to be taken on the matter were eventually advised by Officer A that no arrests were warranted at that time. They left the district in disgust and later filed a lack of service complaint against Officers A and B.

The IAB investigation sustained allegations of failing to provide proper services, failing to conduct thorough and proper investigation, insubordination, unprofessional conduct, failing to cooperate fully in a departmental investigation, and making false statements during an official investigation.

Despite these numerous and serious charges, Officers A and B received only a reprimand.


**Case Study # 50**

While off-duty, an Officer and two of his friends were involved in an altercation with several males in the parking lot of a shopping mall. One of the males was knocked unconscious and suffered a serious head wound. During the altercation, the Officer's friend fired his gun, causing several innocent bystanders to scramble for cover.

The Officer called 911. However, he failed to inform police radio that his friend had discharged his weapon or that a person was seriously injured. After calling the police, the Officer immediately told his cohorts to leave the area.

When police arrived on the scene, the Officer claimed that he had observed a fight between several males and that he identified himself as a police officer in an attempt to stop the fight. The Officer denied seeing a gun or hearing a gun shot. He also denied having any knowledge of the identities of the two perpetrators who had fled the scene.

However, several independent eyewitnesses, including a mall security officer, refuted the Officer's version of the facts. According to these credible witnesses, prior to the assault, they had observed the Officer and his two cohorts chasing the males across the parking lot. When they caught the fleeing males, the Officer's friend pistol-whipped one of the men in the forehead and then fired his weapon. The security guard who witnessed the incident directed the investigating officers to a spent bullet round on the ground as evidence that a gun had been fired.

The IAB concluded that the Officer:

- Lied about the circumstances of the incident to conceal his involvement in the assault.

- Failed to properly and fully inform police radio of the circumstances thereby jeopardizing the safety of the responding officers and delaying necessary medical treatment for the injured male.

- Violated Departmental policy and hindered the Department's criminal investigation of the aggravated assault when he told his cohorts to leave the crime scene and failed to provide their identities.

- Committed perjury when he later testified in court that he did not see a weapon or hear a gun shot during the assault which was incredulous in light of the police radio and eyewitness accounts, and the physical evidence that proved a gun had been fired.

Nearly one year after the IAB completed the investigation, the officer was found guilty of section 1.75 of the Disciplinary Code (A course of conduct indicating that an officer has little or no regard for his responsibility as a member of the Police Department), section 1.12 (lying during an official investigation), and other Departmental violations. The PBI recommended a 30 day suspension that, if actually imposed, will result in a maximum suspension of 22/23 days, however, the suspension dates have yet to be imposed.

Under the Disciplinary Code, the penalties for these offenses should have resulted in a dismissal. In light of this Officer's record, his presence on the force is now extremely problematic. As stated earlier, a finding of guilt under section 1.12 of the Disciplinary Code will profoundly affect this Officer's ability to perform the duties of a law enforcement official, particularly in the context of the judicial system since his integrity and veracity will now be constantly examined and challenged by defense attorneys. As a practical matter, this Officer may need to be removed from patrol duties because his credibility in any arrest in which he was involved becomes tainted and suspect.

50