IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| KAREEM TORAIN | : | |
| | : | CIVIL ACTION |
| v. | : | |
| | : | NO. 14-1643 |
| CITY OF PHILADELPHIA, ET AL. | : | |

## MEMORANDUM

**SURRICK, J.**                                                         **JANUARY 12, 2023**

This matter is one of many civil rights cases against the City of Philadelphia (the "City") and officers of the City Police Department's Narcotics Field Unit (NFU) alleging that NFU officers made false statements and fabricated observations in order to manufacture probable cause.  In this case, Plaintiff Kareem Torain alleges that Officers Jeffrey Walker[1], Brian Monaghan, Sean Kelly, Gary Sinclair, and Brian Reynolds (collectively, the "Officers") did so to substantiate his arrest and prosecution in 2001.  Plaintiff asserts that due to the Officers' falsehoods, he was wrongly imprisoned for 13 years.  Plaintiff's operative pleading alleges—in a single count—a multitude of constitutional claims against the Officers and the City.  However, Plaintiff subsequently withdrew or dismissed several of his claims.  Currently before the Court are two motions for summary judgment as to Plaintiff's remaining claims:[2] one by Reynolds (ECF No. 58) and the other by Monaghan, Kelly, Sinclair, and the City (ECF No. 59).[3]  For the

---

[1] In August of 2021, Walker, acting *pro se*, filed an appearance in this action and a document designated as an Answer to Plaintiff's Amended Complaint.  (ECF Nos. 41, 42.)  Walker has not filed any further submissions.

[2] Since the filing of these Motions, Plaintiff has withdrawn and voluntarily dismissed the following claims as to all Defendants: false arrest, false imprisonment, access to courts, and equal protection.  (Notice of Voluntary Dismissal, ECF no. 74; Plf. Br. in Opp., ECF No. 61, at 4 n.1.)  We will omit any reference to these claims in this Memorandum for the sake of clarity.

[3] Because the two Motions overlap factually and because Plaintiff filed a single opposition to both, we address the motions jointly herein.

following reasons, we will grant summary judgment on all claims against Kelly and Sinclair.
We will also grant summary judgment in favor of Reynolds on Plaintiff's 14th Amendment 42
U.S.C. § 1983 claim predicated on a fabrication of evidence theory.  Finally, we will grant
summary judgment in favor of the City on the municipal liability claim as to the failure to train
theory, but deny it as to the custom theory and failure to supervise or discipline theory.  For
clarity purposes, the below chart summarizes the status of all claims against all Defendants
following this Order and Memorandum.

| **Defendants & Claims** | **False Arrest/ Imprisonment** | **Access to Courts / Equal Protection** | **14th Amendment Due Process / Section 1983** |
|---|---|---|---|
| **Walker** | Voluntarily Dismissed | Voluntarily Dismissed /Withdrawn | Did not move for summary judgment – Remains in case |
| **Reynolds** | Voluntarily Dismissed | Voluntarily Dismissed /Withdrawn | Summary judgment granted based on fabrication of evidence theory – Dismissed |
| **Monaghan** | Voluntarily Dismissed | Voluntarily Dismissed /Withdrawn | Did not move for summary judgment – Remains in case[4] |
| **Sinclair** | Voluntarily Dismissed | Voluntarily Dismissed /Withdrawn | Summary judgment granted – Dismissed |
| **Kelly** | Voluntarily Dismissed | Voluntarily Dismissed /Withdrawn | Summary judgment granted – Dismissed |
| **City of Philadelphia** | Voluntarily Dismissed | Voluntarily Dismissed /Withdrawn | Municipal Liability: *Custom theory* – Summary judgment denied, remains in case *Failure to Supervise or Discipline theory* – Summary judgment denied, remains in case *Failure to Train theory* – Summary judgment granted, dismissed |

---

[4] In their motion, Defendants assert that "this case should proceed to a jury only as a malicious prosecution action against only Officer Monaghan."  (Defs. Br. in Supp., ECF No. 59, at 6.)  We construe this statement, along with the fact that Defendants do not address any fabrication of evidence arguments as to Monaghan in their reply brief, to mean that Defendants do not move for summary judgment on Plaintiff's 14th Amendment Section 1983 claim against Defendant Monaghan on either the malicious prosecution or the fabrication of evidence theory.

I.      **BACKGROUND**

The following facts are drawn from the Parties' statements of undisputed facts and from exhibits, depositions, and other record documents.  Most of the factual background is disputed by the Parties.  Therefore, for purpose of summary judgment, we construe any factual disputes and the record evidence in Plaintiff's favor.  *Hugh v. Butler Cty. Family YMCA*, 418 F.3d 265, 267 (3d Cir. 2005).

A.      **Plaintiff's Arrest and Subsequent Search and Seizure**

Two days before Plaintiff's arrest, Monaghan and Kelly set up surveillance in the area of 5600 West Master Street in Philadelphia ("5600 Block").  (Philadelphia Police Department Arrest Report ("PARS Report"), ECF No. 59-2, Ex. A, at 2.)  The surveillance was initiated pursuant to information received from a confidential source about narcotics activity on this block.  (*Id*; Monaghan Dep., ECF No. 61-5, Ex. 3, at 29:10-24, 30:1.)  Defendants surveilled the 5600 Block on January 2nd, 3rd, and 4th of 2001.  (PARS Report at 2.)  On January 4th, 2001, Monaghan and Kelly observed Plaintiff driving by the 5600 Block in a green Pontiac Bonneville. (Investigation Report, ECF No. 61-4, Ex. 2, at 2.)

Monaghan observed Darnell Delee, an individual who had been seen engaging in narcotics activity at the 5600 Block properties, shout "yo" to Plaintiff and get into the Bonneville.[5]  (*Id*.)  Delee exited shortly thereafter and put a clear baggie in his pocket.  (*Id*; Monaghan Dep. at 70:3-8.)  Monaghan radioed Walker, who was in a separate vehicle, with a description of Plaintiff's vehicle.   (Monaghan Dep. at 74:20-24.)  Walker then followed the

_____

[5] The following facts are heavily disputed by Plaintiff, as the very basis of his case is that the Officers fabricated all of this information which is reflected in the record evidence.  Plaintiff's theory of the case is supported by Walker's deposition testimony.  (Walker Dep., ECF No. 61-9, Ex. 7 at 104:12-25, 105:1-4.)

Bonneville to 1621 N. Conestoga Street and watched Plaintiff enter the building. (PARS Report at 2.) Later, Reynolds observed Plaintiff travel to 1628 South 55th Street. (Investigation Report at 2; Reynolds Dep., ECF No. 61-6, Ex. 4, at 86:11-18.) Defendants then observed Plaintiff use a key to enter the front door of the property at 1628 South 55th Street. (Reynolds Dep. at 86:11-18). Three individuals, including Delee, entered that same building shortly thereafter and exited the building twenty minutes later, with Delee placing a clear bag inside of his jacket. (Investigation Report at 3.) Plaintiff then left the building and Reynolds pulled him over and arrested him. (*Id*.) Reynolds admits that he did not observe Plaintiff doing anything illegal, but said he was ordered by Monaghan to arrest him based on Walker's observations. (Reynolds Dep. at 67:7-22.) No narcotics or contraband were confiscated from Plaintiff. (*Id*. at 74:11-19.)

During a search of Plaintiff, Reynolds confiscated a key from him which fit the front door to apartment #2 located at 1628 North 55th Street. (*Id*. at 86:2-4; 105:7-13.) While en route to 1628 North 55th Street, Monaghan asserts that Walker "came over the radio and said . . . he saw a light come on in [] apartment" #2. (Monaghan Dep. at 146:4-19.) With this information, Reynolds gave the confiscated key to Monaghan and he, with approval of a supervisor, entered apartment #2 at 3:50 pm on January 4th in order to "secure" it "pending [a] search and seizure warrant." (*Id*. at 90:21-42, 91:1-5, 92:1-24; Investigation Report at 4.) The Property Receipt indicates that the Defendants seized two amber pill bottles with white caps and one Sentry 1150 safe from apartment #2 at 3:30 pm on January 4th, 2001 pursuant to Warrant #99028. (Property Receipt, ECF No. 61-11, Ex. 9.) However, Warrant #99028 indicates that it was executed at 1:00 am on January 5, 2001. (Warrant, ECF No. 12, Ex. 10; Monaghan Dep at 181-186.)

Walker asserts that he and the other Defendant Officers "articulated"—meaning, fabricated—probable cause to substantiate Plaintiff's arrest. (Walker Dep., ECF No. 61-9, Ex. 7

at 104:12-25, 105:1-4.)  Walker specifically claims that he and the other Officers lied in the paperwork that they observed the individuals with narcotics interacting with Plaintiff and that they had seen a light go on in the apartment that was eventually searched.  (*Id*. at 356:12-24, 357:1-24, 358:1.)  Reynolds, Monaghan, Kelly, Sinclair, and the City dispute Walker's assertions.

      **B.**      **The City's Involvement and History of Misconduct in the NFU**

In the late 1980s and early 1990s, the NFU of the Philadelphia Police Department (PPD) systemically violated citizens' civil rights, stole money and drugs, planted evidence on suspects, fabricated the legal basis for search and seizure warrants, and committed perjury.  (PPD Integrity and Accountability Office (IAO) Enforcement of Narcotics Laws Report, ECF No. 61-25, at 3.) In 1995, six NFU officers were jailed, several hundred criminal convictions were overturned, and dozens of lawsuits were commenced against the City of Philadelphia.  (*Id*.)  As a result of a settlement of a class action lawsuit, the City created the IAO to monitor and audit PPD policies, practices, and operations as they relate to the detection of misconduct and corruption.  (*Id*. at 3-4.)  The IAO conducted a comprehensive audit and assessment of the NFU between the years of 1997 and 2002, with its findings summarized in the 2002 Enforcement of Narcotics Laws Report.  It also investigated the PPD's disciplinary system between the years of 2000 and 2002, with its findings summarized in the 2003 Disciplinary Systems Report.  However, the effectiveness of the IAO in deterring police corruption and misconduct is disputed, and there is some evidence in the record of corruption, or at the very least, ineffectiveness of the IAO and Integrity and Accountability Board (IAB).  (*See, e.g.*, Walker Dep. at 169:3-24 (testifying that the IAB frequently protected NFU officers, tipped them off as to any allegations against them, and prepared them for any potential investigations).)

### C.        Bench Trial and Post-Conviction Proceedings

Following a bench trial, Plaintiff was convicted of various drug crimes and criminal conspiracy.  Plaintiff asserts that the outcome of his trial hinged on false and misleading information contained in the search warrant and supporting affidavit of probable cause, drafted and attested to by the officers, and the testimony of the officers at trial.  Following his sentencing, Plaintiff filed several post-sentencing motions asserting that his counsel was ineffective.  These were denied.  *Torain v. Gavin*, No. 12-3308, 2013 U.S. Dist. LEXIS 92114, at *2 (E.D. Pa. June 28, 2013).  He then filed a direct appeal in the Superior Court of Pennsylvania asserting that the trial court erred in several respects.  This was also denied.  *Id*.  Defendant then filed a petition under the Post-Conviction Relief Act (PCRA) in 2006, which was subsequently amended by new counsel in 2007, followed by two supplemental PCRA petitions in 2008 and 2009.  *Id*. at 2-3.  The PCRA court denied Defendant's PCRA petition without a hearing in 2010. *Id*. at 3.  Defendant then filed a notice of appeal to the Superior Court, which affirmed the PCRA court's dismissal in 2011.  *Id*. at 4.  He then filed a request of allowance of appeal to the Pennsylvania Supreme Court, which was denied a few months later.  *Id*.

In 2012, Defendant filed a 2254 petition seeking habeas corpus relief claiming various defects in his trial, including insufficient evidence, a wrongfully denied suppression motion, and ineffective assistance of trial counsel.  *Id*.  In early 2013, Defendant filed a motion for leave to supplement his 2254 petition, which addressed new reports that the Philadelphia District Attorney had decided not to prosecute new cases requiring the testimony of Officer Reynolds and several other officers, not involved in this matter.  *Id*. at 4-5.  Several months later, Defendant filed a motion for judgment on the pleadings based on newly discovered evidence; specifically, that Officer Walker was arrested based on allegations that he had made false arrests,

planted drugs on suspects, and stolen money from suspects.  *Id.* at 5.  Plaintiff's conviction was ultimately reversed as a result of this newly discovered evidence regarding Officer Reynolds and Officer Walker.  Plaintiff was released from custody on February 28, 2014.

      **D.**      **The Instant Lawsuit and Motions for Summary Judgment**

Plaintiff instituted this lawsuit on March 20, 2014, naming the City, Walker, Reynolds, and Monaghan as Defendants.  On September 15, 2016, Plaintiff was granted leave to file his Amended Complaint, which added Sinclair and Kelly as Defendants.  (*See* Am. Compl, ECF No. 18-1; ECF No. 19.)  Plaintiff's Amended Complaint asserts—in a single count—undifferentiated claims of "false arrest, false imprisonment, malicious prosecution, [4[th] Amendment], [] access to the Courts, [] due process and equal protection" claims against the Officers.  (Am. Compl. at ¶¶ 60, 62-72.)  He also asserts claims against City for municipal liability pursuant to *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978).  (*Id.*)  Plaintiff has since voluntarily dismissed his claims of false arrest, false imprisonment, denial of access to the courts, and violation of equal protection.  (Notice of Voluntary Dismissal; Plf. Br. in Opp. at 4 n.1.)  Now, Reynolds moves for summary judgment on Plaintiff's 14th Amendment due process claim.  Kelly and Sinclair seek summary judgment on all of the claims against them.  The City seeks summary judgment on Plaintiff's *Monell* claim.

## II.     LEGAL STANDARD

A party is entitled to summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) ("Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.  Factual disputes that are irrelevant or

unnecessary will not be counted."). The presence of "a scintilla of evidence in support of the [non-moving party] will be insufficient" to carry the case to trial. *Id*. at 252. Where the nonmoving party bears the burden of proof at trial, the moving party may identify an absence of a genuine issue of material fact by showing the court that there is no evidence in the record supporting the nonmoving party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *UPMC Health Sys. v. Metro. Life Ins. Co.*, 391 F.3d 497, 502 (3d Cir. 2004). If the moving party carries this initial burden, the nonmoving party must set forth specific facts showing that there is a genuine issue for trial. *See* Fed. R. Civ. P. 56(c)(1) ("A party asserting that a fact is genuinely . . . disputed must support the assertion by . . . citing to particular parts of materials in the record."); *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (noting that the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts"). "Where the record taken as a whole could not lead a reasonable trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita*, 475 U.S. at 587 (citations omitted). When deciding a motion for summary judgment, courts must view facts and inferences in the light most favorable to the nonmoving party. *Anderson*, 477 U.S. at 255. Courts must not resolve factual disputes or make credibility determinations. *Siegel Transfer, Inc. v. Carrier Express, Inc.*, 54 F.3d 1125, 1127 (3d Cir. 1995).

## III.   DISCUSSION

Defendant Reynolds and Defendants Monaghan, Kelly, Sinclair, and the City of Philadelphia all move for summary judgment on the majority of Plaintiff's claims. Kelly and Sinclair seek summary judgment on all of the remaining claims against them due to the statute of limitations. We agree that all claims against them are time barred and will grant summary

judgment.  Reynolds moves for summary judgment on the 14th Amendment due process claim, which Plaintiff identifies in his opposition as being predicated on a Section 1983 stand-alone fabrication of evidence theory.  We will grant summary judgment in favor of Reynolds due to a lack of proper notice of the claim.  Finally, the City of Philadelphia moves for summary judgment on Plaintiff's *Monell* claim under both a custom theory and a failure to train, supervise, and discipline theory.  For the reasons stated herein, we will grant summary judgment on the failure to train theory, but will deny it as to the custom theory and failure to supervise or discipline theory.

### A.    Time Bar as to Defendants Kelly and Sinclair

Kelly and Sinclair assert in their Motion for Summary Judgment that several claims in this action were filed after the applicable statute of limitations and are therefore time barred.  For the reasons stated below, we agree that the statute of limitations bars the malicious prosecution and fabrication of evidence claims against Kelly and Sinclair.  We will therefore grant summary judgment in favor of Defendants on these claims.

In Pennsylvania, the statute of limitations for a Section 1983 claim is two years. *Bartholomew v. Fischl*, 782 F.2d 1148, 1155 (3d Cir. 1986); 42 Pa. C.S.A. § 5524.  For malicious prosecution and fabrication of evidence claims, the two-year statute of limitations begins to run when the criminal proceedings terminate favorably for the accused.  *Coello v. Dileo*, 43 F.4th 346 (3d Cir. 2022) (citing *McDonough v. Smith*, 139 S. Ct. 2149, 2159 (2019)). Here, Plaintiff's criminal proceedings terminated favorably and he was released from custody on February 28, 2014.  While he filed his initial Complaint on March 20, 2014, he did not name Kelly and Sinclair as Defendants until his Amended Complaint—filed on August 8, 2016— nearly five months after the statute of limitations for these claims expired.  However, Plaintiff

argues that the Amended Complaint relates back to the original Complaint for the added Defendants and is therefore timely.

For an amendment adding a new party to relate back to the original complaint, it must satisfy the conditions set out in Federal Rule of Civil Procedure 15(c)(1)(C).  Specifically, parties added by amendment after the statute of limitations has expired must have received notice of the institution of the action within 90 days following the filing of the action.  Fed. R. Civ. P. 15(c)(1)(C); Fed. R. Civ. P. 4(m); *Garvin v. City of Phila.*, 354 F.3d 215, 220 (3d Cir. 2003).  If the newly added parties did not receive actual notice of the institution of the action, the plaintiff must demonstrate that the parties received constructive notice.  *Garvin*, 354 F.3d at 222. Constructive notice can be imputed to newly added parties by two methods:  the "shared attorney" method and the "identity of interest" method.  *Id*. at 222-223 (citing *Singletary v. Pa. Dep't of Corr.*, 266 F.3d 186, 196 (3d Cir. 2001)).  Plaintiff asserts that the amended complaint relates back under both methods.  We disagree.

i.   <u>Shared Attorney</u>

The "shared attorney" method of imputing notice to newly named defendants is based on the idea that "when an originally named party and the party who is sought to be added are represented by the same attorney, the attorney is likely to have communicated to the latter party that he may very well be joined in the action."  *Singletary*, 266 F.3d at 196.  The key question under this method is whether notice of the institution of the action can be imputed to the new defendants within the 90-day period by virtue of their representation by the same counsel they shared with the original defendants.  *Id*.  More specifically, the applicable test is not whether new defendants *will be* represented by the same attorney, but whether they *are* being represented by the same attorney.  *Garvin v. City of Phila.*, 354 F.3d 215, 223 (3d Cir. 2003).  To be successful

10

under this method, plaintiff must show either representation by shared counsel or some communication between the attorney and the new defendants within the 90-day period. *Id.* at 225. An allegation that counsel "must have" interviewed the new parties is insufficient. *Id.* at 223.

Here, Plaintiff gives no details about any relationship or communications between City Solicitor Armando Brigandi and Kelly and Sinclair within the 90-day period. Instead, Plaintiff asserts communication between the new parties and counsel can be inferred where the pleadings make factual averments including facts only known by the newly added defendants. *See Moreno v. City of Pittsburgh*, No. 12-615, 2013 U.S. Dist. LEXIS 101754, at *12 (W.D. Pa. July 22, 2013) (presuming communication between new defendants and counsel where the answer contained information only known by the new defendants). Plaintiff argues that Kelly's participation in the investigation leading to Plaintiff's arrest and prosecution and Sinclair's role as a supervisor in the arrest, prosecution, and the execution of the search warrant allow such an inference to be made here. However, Plaintiff points to no specific facts which were *only* known by Kelly or Sinclair. Simply alleging that the defendants were involved in the actions that form the basis for the lawsuit (i.e., the investigation, arrest, and prosecution of Plaintiff) is insufficient to show a relationship or communication with Mr. Brigandi within the 90-day window. Because Plaintiff has proffered no evidence to support any inference of communication or relationship between Kelly and Sinclair and Mr. Brigandi, the shared attorney method of imputing notice fails.

ii.    <u>Identity of Interest</u>

The "identity of interest" method of imputing notice to new defendants asks whether the parties "are so closely related in their business operations or other activities that the institution of

the action against one serves to provide notice of the litigation to the other." *Singletary*, 266 F.3d at 197.  Here, Plaintiff asserts that because Sinclair held a "supervisory position" he has the same identity of interest with the City.  He further argues that Kelly shares "essentially the same interests" as the other officers in the case.  These arguments are unpersuasive.

Defendant Sinclair retired from his position with the City in 2007, many years before this Complaint was filed.  This Court has consistently held that where an official once served in a supervisory role, but no longer held that position at the time a Complaint was filed, imputation of notice under the identity of interest method fails.  *See, e.g.*, *Smith v. City of Phila.*, 363 F. Supp. 2d 795, 802 (E.D. Pa. 2005) (holding that because the newly-named defendant "was no longer Police Commissioner at the time [plaintiff's] suit was filed" that he "did not share an identity of interest with the police department at that time and notice c[ould] not be imputed to him in this manner"); *Huertas v. City of Phila.*, No. 02-cv-7955, 2003 WL 21250551, at *9 (E.D. Pa. May 5, 2003) (same).  The same is true with Kelly, who retired in 2008.  The identity of interest method of imputing notice fails for both defendants.

**B.    14th Amendment Due Process (Fabrication of Evidence) as to Reynolds**

Reynolds moves for summary judgment on Plaintiff's 14th Amendment due process claims against him, making a variety of arguments for dismissal.  In his opposition, Plaintiff asserts for the first time that his 14th Amendment claim is premised on a stand-alone fabrication of evidence theory.  It is true that fabrication of evidence can stand alone as a due process claim under Third Circuit case law; however, because Plaintiff asserts this cause of action for the first time in opposition to summary judgment, it is untimely and improper.  Accordingly, we will grant summary judgment in favor of Reynolds on Plaintiff's 14th Amendment fabrication of evidence claim.

A defendant has a stand-alone 14th Amendment claim for fabrication of evidence under Section 1983 if there is a reasonable likelihood that, without the use of fabricated evidence at his criminal trial, the defendant would not have been convicted. *Halsey v. Pfeiffer*, 750 F. 3d 273, 294 (3d Cir. 2014). In holding that fabrication of evidence can be a stand-alone claim, the Court in *Halsey* also distinguished that case from those in which "a plaintiff did not clearly advance a claim predicated on fabrication alone." *Id*. at 294. For example, in *Golden v. Tully*, the plaintiff submitted, on the eve of trial, a proposed jury instruction for a stand-alone 14th Amendment fabrication of evidence claim, which had never been raised before in the case. No. 14-3858, 2018 U.S. Dist. LEXIS 183385, at *15 (E.D. Pa. Oct. 25, 2018). The court rejected the plaintiff's argument that the claim had been properly raised in the complaint, explaining that the complaint "specifically and clearly identified her false arrest, excessive force, and malicious prosecution claims," but never mentioned a fabrication of evidence claim. *Id*. The mere mention of "false testimony" and "false charges" in the complaint was not enough to state a stand-alone fabrication claim. *Id*. at *13, 17. Ultimately, the court held that the plaintiff had not clearly articulated a fabrication of evidence claim separately from her malicious prosecution claim and, thus, that plaintiff failed to put defendants on notice of the claim. *Id*. at *17-18.

The same is true here. Without any explanation or justification for this eleventh-hour addition, Plaintiff simply opposes summary judgment on his 14th Amendment claim by adding a completely new theory of liability—fabrication of evidence—rather than the malicious prosecution theory alleged in the Complaint. Failing to address Defendant's arguments for summary judgment, Plaintiff instead dedicates nearly the entire argument section of his opposition to supporting this newly asserted claim. It is improper to raise a new claim for the first time at summary judgment (or in opposition to summary judgment) without properly

13

pleading it in the complaint. *Josey v. John R. Hollingsworth Corp.*, 996 F.2d 632, 641-42 (3d Cir. 1993) (affirming rejection of unpled claim raised after the close of discovery); *Burgos v. City of Philadelphia*, 439 F. Supp. 3d 470, 488 n.86 (E.D. Pa. 2020) ("This claim appears to be raised for the first time in Plaintiff's Brief in Opposition to [Defendant's] Motion for Summary Judgment.  However, [Plaintiff] 'cannot raise a new claim in his brief that he has not already pleaded.'"); *Dewees v. Haste*, 620 F. Supp. 2d 625, 635 n.7 (M.D. Pa. 2009), *aff'd*, 386 F. App'x 133 (3d Cir. 2010) ("Federal pleading standards do not allow a party 'to raise new claims at the summary judgment stage . . .  Liberal pleading does not require that, at the summary judgment stage, defendants must infer all possible claims that could arise out of the facts set forth in the complaint.'").  Plaintiff did not plead a stand-alone 14th Amendment fabrication of evidence claim in his Amended Complaint.  The Complaint, while not a model of clarity, identifies his claims as "false arrest, false imprisonment, malicious prosecution, [4th Amendment], [] access to the Courts, [] due process and equal protection."  (Am. Compl. at ¶ 60.)  Nowhere in the Amended Complaint does Plaintiff plead a stand-alone fabrication of evidence claim.

Mere reference to fabrication of evidence as a means of supporting Plaintiff's alleged malicious prosecution claim is insufficient to state a stand-alone fabrication claim.  (*Id*. at ¶ 48, 56, 63, 64.)  Defendants cannot be expected to "infer all possible claims that could arise out of the facts set forth in the complaint."  *Dewees*, 620 F. Supp. at 635 n.7.  Although complaints are to be construed favorably to the plaintiff, courts should not read causes of action into a complaint when they are not present, as defendants must be given "fair notice" of intent to pursue particular claims.  *See, e.g., Krouse v. Am. Sterilizer Co.*, 126 F.3d 494, 499 n.1 (3d Cir. 1997) ("The ADA is one statutory scheme, but it provides more than one cause of action.  Where, as here, a plaintiff asserts a cause of action for retaliation under 42 U.S.C. § 12203(a), we will not find an implicit

cause of action for failure to accommodate under 42 U.S.C. § 12112(a).  This is true even when

the complaint's background section makes a brief reference to failure to accommodate.  AMSCO

was not placed on 'fair notice' that Krouse intended to pursue a failure to accommodate claim.").

Reynolds did not receive full and fair notice of this claim, and he is entitled to summary

judgment on the fabrication of evidence claim.

### C.    Municipal Liability

A plaintiff may sustain a Section 1983 claim against a municipal entity in two ways: (1)

an unconstitutional custom or policy that is the moving force behind plaintiff's injuries, or (2) a

failure by the municipality to adequately train, supervise, or discipline that reflects deliberate

indifference.  *Forrest v. Parry*, 930 F.3d 93, 105 (3d Cir. 2019).  While these two theories of

liability have a "close relationship," they are distinct and must be treated accordingly.  *McIntyre*

*v. Liciardello*, No. 13-2773, 2020 U.S. Dist. LEXIS 21137, at *52 (E.D. Pa. Feb. 7, 2020).

Although Plaintiff conflates the two theories, (Plf. Opp'n Br., ECF No. 61, at 57.), we construe

Plaintiff's arguments under both and will address each separately.  For the reasons stated below,

we will deny summary judgment on the custom theory and the failure to supervise or discipline

theory, and grant summary judgment on the failure to train theory.

#### 1.    Custom

To bring a Section 1983 claim against a municipality under a policy or custom theory, a

plaintiff must identify a policy or custom and demonstrate that it was the "moving force" behind

plaintiff's injury.  *Forrest*, 930 F.3d at 105.  Because Plaintiff does not argue that the City's

written policies were deficient, he is proceeding on the "custom" track.  Custom may be shown

where "policymakers were aware of similar unlawful conduct in the past, but failed to take

precautions against future violations, and [] this failure, at least in part, led to [plaintiff's]

injury." *Bielevicz v. Dubinon*, 915 F.2d 845, 851 (3d Cir. 1990).  If a plaintiff can show that the City "tolerated known misconduct by police officers, the issue [of] whether the City's inaction contributed to the individual officers' decision to arrest the plaintiffs unlawfully in this instance is a question of fact for the jury."  *Id*.

Here, Plaintiff alleges that the City was aware of officers concealing exculpatory evidence and fabricating evidence to support arrests and prosecutions in the past, and failed to take precautions against such violations in the future, which in part led to his injury.[6]  (Plf. Opp'n Br. at 54.)  Plaintiff is correct that there is evidence in the record of widespread misconduct with regard to fabrication of evidence by NFU officers to support arrests and prosecutions before, during, and after the time period of Plaintiff's arrest.  For example, Walker testified multiple times that it was well known that he and his squad members would frequently lie or overembellish in order to "articulate" or "build [] up" probable cause.  (Walker Dep. at 43:24; 44:1-7; 86:21-24; 87:3-6; 88:12-18, 89:6-9, 23-24; 90:1-6.)  He further testified that this had "been done for years" and that he had "been taught that way."  (*Id*. at 88:19-20.)  Walker's

---

[6] Plaintiff also alleges that the City had a custom of misusing confidential informants or sources. However, even if Plaintiff could make out such a custom, he cannot show that misuse of informants was the "moving force" behind Plaintiff's injury here.  Simply, the use of confidential informants is not relevant to Plaintiff's claims or alleged injuries.  We first discussed this in our Order on Plaintiff's Motion to Compel the Confidential Informant File, explaining that "[t]here is no evidence that Defendants relied on R.M.'s information to identify Plaintiff or effectuate his arrest.  There is no evidence suggesting that Defendants relied on any confidential informant in making Plaintiff's arrest."  (Order on Plaintiff's Motion to Compel, ECF No. 55, at 3.)  This remains true, and we have found nothing in the record to indicate that the misuse of confidential informants was a moving force behind Plaintiff's injury.  For a further discussion of the relevance—or lack thereof—of the use of confidential informants in this case, see our Order on Defendants' Motion in Limine to Preclude the Testimony and Report of Plaintiff's Expert Joseph A. Pollini.  (Order on Motion in Limine to Preclude Plaintiff's Expert, filed concurrently herewith.)

testimony implicated many other officers, including supervisors, who were allegedly involved in the fabrication of evidence and "articulation" of probable cause.  (*Id.* at 92:3-9; 247:1-10.)

This is further supported by the PPD IAO's Enforcement of Narcotics Laws report issued in July of 2002 and Disciplinary System report issued in December of 2003.[7]  Initially, it is

---

[7] In opposition to summary judgment on his municipal liability claims, Plaintiff cites to several reports including the IAO Reports (Enforcement of Narcotics Laws and Disciplinary System), Ellen Green-Ceisler's expert report in *Randall v. City of Philadelphia*, No. 04-2983, Joseph Pollini's expert report in this matter, and the deposition of Ellen Green-Ceisler from *Randall v. City of Philadelphia*.  Defendants assert that these reports are inadmissible.  However, they give few reasons for inadmissibility and do not formally submit motions in limine on the admissibility of these reports (other than for Mr. Pollini's expert report).  Rather, they simply assert that the IAO Reports and Ms. Green-Ceisler's reports and deposition are inadmissible because they were not "properly explored," "sufficiently developed," or "properly the subject of discovery."  (*See* Defs.' Mot. to Preclude, ECF No. 60, at 6-7, 18; Defs.' MSJ Reply, ECF No. 64, at 12; Defs.' Resp. to Pl.'s Additional Facts, ECF No. 61-4, ¶¶ 206-16, 231-35.)  The City has not cited, nor is the Court aware of, any rule or other authority making evidence inadmissible or less admissible simply because it was not "explored" in discovery or because a party elected not to challenge it by expert or other evidence.  Nevertheless, there are valid admissibility concerns related to these reports that must be addressed to rely on them at summary judgment.  Fed. R. Evid. 104(a).  These concerns are addressed below.

Green-Ceisler Expert Report and Deposition: The deposition testimony and expert report of Ms. Green-Ceisler submitted in the *Randall* matter are hearsay.  "The testimony of an expert witness called to testify on behalf of a party in one case [cannot] later be used against that same party in unrelated litigation, unless there is a finding that the expert witness is an agent of the party[.]"  *Kirk v. Raymark Indus., Inc.*, 61 F.3d 147, 164 (3d Cir. 1995).  There is no evidentiary basis here from which we can conclude that Ms. Green-Ceisler, acting as an expert witness, was an agent.  Therefore, because Plaintiff has not produced any evidence to show that these documents are admissible under any hearsay exception, we refuse to consider them at summary judgment.

IAO Reports – The PPD IAO Reports are also hearsay.  However, they fall into the public records exception, which exempts "factual findings from a legally authorized investigation" in a civil case so long as "the opponent does not show that the source of the information or other circumstances indicate a lack of trustworthiness."  Fed. R. Evid. 803(8).  The IAO Reports satisfy this criterion—they contain factual findings from an investigation carried out by the IAO at the PPD's request.  Defendants also suggest that the reports may be inadmissible because they were produced over 20 years ago.  However, the Reports were produced in 2002 and 2003, and reviewed data from 1997 to 2002.  The facts alleged in this case occurred in 2001.  The time period examined in these reports encompasses that of the allegations of the case.  Therefore, the IAO Reports are admissible.

important to note that the IAO was created by the City pursuant to a settlement of a class action lawsuit against the City following a series of police misconduct incidents in the 1980s-1990s—including hundreds of arrests and prosecutions based on fabricated evidence—in order to monitor and audit the PPD policies, practices, and operations as they relate to the detection of misconduct and corruption.  (Enforcement Report at 3-4.)  The Enforcement Report relies on a review of evidence of improper or illegal narcotics enforcement practices between 1997 and 2002.  (*Id*. at 5-6.)  The Disciplinary Report relies on IAB investigations, disciplinary records and actions, and interviews between 2000 and 2002.  (PPD IAO Disciplinary System Report, ECF No. 62-4, at 14.)  Plaintiff was arrested in January of 2001.  Thus, these reports are relevant both in regard to the timeframe and the substance.

Beginning with the Enforcement Report, it initially states that "[i]t is incontrovertible that officers do violate civil rights in the enforcement of narcotics laws. . . Evidence of such misconduct is found in the IAB investigations and civil rights lawsuits where allegations of . . . illegal detentions, searches, and arrests are documented and proven."  (*Id*. at 61.)  While the Enforcement Report lacks any specific findings regarding fabrication of evidence in arrests and prosecutions during this timeframe, it does suggest that certain discrepancies in the IAO's review of data could be due, at least in part, to fabricated information.  (*See e.g.*, *id*. at 35 (explaining that between 1997 and 2001 no evidence was seized in 332 executed search warrants and that this could be due to fabricated information).)  In addition, there is evidence in the record that the IAO and IAB—the entities created to investigate misconduct in the NFU—were corrupt or, at

---

Expert Report of Joseph Pollini – The City has separately moved to preclude the report and testimony of Plaintiff's expert Joseph A. Pollini.  For the reasons set forth in our Order on Defendants' Motion to Preclude, the expert report of Mr. Pollini is inadmissible and will therefore not be considered on summary judgment.  (*See* Order on Motion to Preclude.)

the very least, ineffective.  For example, Walker testified that the IAB frequently protected the NFU officers, tipped them off as to any allegations against them, and prepared them for any potential investigations.  (Walker Dep. at 169:3-24.)

The Disciplinary Report also serves as evidence that narcotics officers were engaged in fabricating evidence to support illegal arrests and prosecutions, which was tolerated by the City. Case Study #9 in the Report gives the following example:  the Narcotics Enforcement Team arrested a woman for possession of marijuana.  (Disciplinary Report at 27.)  Following an IAB investigation, the IAB concluded that the narcotics officers did not have a legal basis for the arrest and that the narcotics officers and their lieutenant lied to investigators and falsified documents in a coordinated effort to conceal the circumstances surrounding this improper arrest. (*Id*.)  Further, the investigator discovered that all the arrest reports omitted the names of the involved officers and the correct arrest location, and the arrest log was subsequently altered with "white out" with another arrest entry written over it.  (*Id*. at 27-28.)  The IAB concluded that the lieutenant's explanations for the omissions in the arrest reports were a "gross distortion intent on furthering a cover-up of wrongdoing by [the officers]."  (*Id*. at 28.)  The lieutenant received a one-day suspension for his involvement, and was subsequently reassigned to a more sensitive narcotics enforcement unit.  (*Id*.)

This evidence suggests that the City knew of officers regularly fabricating probable cause in order to substantiate illegal arrests and that it failed to take precautions against such actions in the future.  Further, this custom was the "moving force" behind Plaintiff's injury as fabrication of evidence and probable cause by the Officers is the conduct Plaintiff alleges caused him to be falsely prosecuted and wrongly imprisoned for 13 years.  For these reasons, summary judgment

is denied as to the custom theory of municipal liability on the issue of fabrication of evidence to support arrest and probable cause.

### 2.   Failure to Train, Discipline, or Supervise

To bring a Section 1983 claim against a municipality under a failure to train, discipline, or supervise theory, a plaintiff must show that the municipality's failure in these areas is the result of a purposeful decision that "reflects deliberate indifference to constitutional rights." *City of Canton v. Harris*, 489 U.S. 378, 288 (1989).  Here, Plaintiff asserts that the City failed to properly train and supervise NFU officers in the following areas:  the fabrication and concealment of evidence and the intentional suppression of evidence that negates probable cause to arrest and prosecute.  (Plf. Opp'n Br. at 54.)

### i.   Failure to Train

When asserting failure to train, Plaintiff "must identify a failure to provide *specific* training that has a causal nexus with their injuries and must demonstrate that the absence of that *specific* training can reasonably be said to reflect a deliberate indifference to whether the alleged constitutional deprivations occurred."  *Gilles v. Davis*, 427 F.3d 197, 207 (3d Cir. 2005) (emphasis added).  Plaintiff identifies no specific training that the City failed to provide, but rather generically asserts that the City "fail[ed] to provide adequate training . . . to Narcotics officers on the proper exercise of investigative powers and in making lawful arrest."  (Plf. Opp'n Br. at 58.)  Moreover, there is evidence in the record that the City did, in fact, provide training to NFU officers on warrants and probable cause.  (*See, e.g.*, Walker Dep. at 225:14-24; 226:1-11.)  Plaintiff fails to present evidence of how, if at all, such trainings were inadequate.

Additionally, taking Plaintiff's allegations as true, the Officers were committing criminal conduct (and violating PPD policy).  There is "no obligation to specifically train police officers not to engage in criminal conduct that is obviously illegal[,]" including fabricating evidence and

probable cause.  *Freeman v. McGorry*, No. 20-3354, 2022 U.S. Dist. LEXIS 135863, at *13

(E.D. Pa. Aug. 1, 2022) (citing *Hernandez v. Borough of Palisades Park Police Dep't*, 58 F.

App'x 909, 915 (3d Cir. 2003); *Hunter v. City of Philadelphia*, No. 15-2737, 2015 U.S. Dist.

LEXIS 160730, *11 (E.D. Pa. Dec. 1, 2015); *Lamac v. Buchanan*, No. 13-1338, 2016 U.S. Dist.

LEXIS 94388, *3 (M.D. Pa. July 20, 2016); *Romano v. Young*, No. 07-1708, 2011 U.S. Dist.

LEXIS 10986, *15 (E.D. Pa. Feb. 2, 2011)).  The evidence does not suggest that the officers

were confused as to whether their alleged misconduct was illegal, and there is no evidence from

which we can infer that any new or different training would have made their conduct less likely.

*See Forrest*, 930 F.3d at 109; *McIntyre*, 2020 U.S. Dist. LEXIS 21137, at *49-50.  For these

reasons, summary judgment will be granted on municipal liability under the failure to train

theory.

ii.    Failure to Supervise and Discipline

We now address the failure to supervise and discipline theories.  When asserting a failure

to supervise or discipline theory, plaintiff must show that the failure amounted to deliberate

indifference, which consists of showing: (1) municipal policymakers know that employees will

confront a particular situation, (2) the situation involves a difficult choice or history of

employees mishandling, and (3) the wrong choice by an employee will frequently cause a

deprivation of constitutional rights.  *Forrest*, 930 F.3d at 105-06.

In this case, there is sufficient evidence in the record demonstrating a genuine issue of

material fact as to whether the City failed to adequately supervise or discipline NFU officers.

First, Defendant Walker testified on multiple occasions that supervisors knew NFU officers were

violating policies regarding fabrication of probable cause and "were violating with [them]."

(Walker Dep. at 74:21-24; 75:1-2; 247:1-10; 290:11-19.)  In addition, the Enforcement Report

identifies "supervisory oversight" and "discipline" as "practices [in the Narcotics Bureau] that have created conditions conducive to breeding corruption." (Enforcement Report at 5.) The Report also states that "increased narcotics enforcement efforts were undertaken without appropriate and effective controls, oversight, and monitoring mechanisms to curb and detect potential abuses." (*Id*. at 35.)

Moreover, the Disciplinary Report comprehensively analyzes the PPD's shortcomings in disciplinary practices and procedures, and concludes that "[t]he disciplinary system . . . remains fundamentally ineffective, inadequate, and unpredictable." (Disciplinary Report at 2.) The Report goes on to state that "there are simply too many ways to manipulate the system and too little accountability at each step of this inscrutable process to engender confidence in the integrity of the system." (*Id*.) The Report's key findings include that there were excessive delays in resolving disciplinary matters, a lack of accountability for deviations from policy in the disciplinary process, poor tracking of disciplinary actions, and incomplete, unreliable, and uninformative disciplinary databases. (*Id*. at 10.) The Report specifically states that, from 2000 to 2002, nearly half of all the officers, supervisors, and commanders who were found by the IAB to have violated Departmental policies or engaged in serious misconduct were never formally disciplined. (*Id*. at 2.) The Report also identifies "falsification of evidence" as an area in which these deficiencies of discipline and supervision of officers occurred. (*See, e.g.*, *id*. at 20, 27-28 (presenting Case Study #9, discussed above).) This evidence creates a genuine issue of material fact as to whether there was adequate supervision and discipline of NFU officers with regard to fabrication of evidence or probable cause.

In addition, there is evidence that these failures amount to deliberate indifference. First, municipal policymakers knew that employees would confront situations where they would need

to establish probable cause in order to secure a warrant or make an arrest; this is simply a part of the job.  The City was also on notice that there had been a history of employees mishandling such situations in the past, as litigation against the City due, in part, to fabrication of evidence and probable cause, was the very purpose of the creation of the IAO and the IAO Reports.  (IAO Report at 1, 3-4.)  Finally, the City knew that the misconduct by NFU officers—fabricating evidence or probable cause—would frequently deprive individuals of constitutional rights, as this conduct is illegal and was the source of much litigation against them.

For these reasons, we will deny summary judgment on Plaintiff's failure to supervise or discipline theory as there are genuine issues of fact created by the evidence in the record.

## IV.    CONCLUSION

For the foregoing reasons, summary judgment will be granted on all claims brought against Kelly and Sinclair and the 14th Amendment Section 1983 claim predicated on a fabrication of evidence theory against Reynolds.  Summary judgment will also be granted in favor of the City of Philadelphia on the municipal liability claim as to the failure to train theory, but will be denied as to the custom theory and failure to supervise or discipline theory.  An appropriate Order follows.


BY THE COURT:


*/s/ R. Barclay Surrick*
R. BARCLAY SURRICK, J.

23