IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| KAREEM TORAIN | : | |
| | : | CIVIL ACTION |
| v. | : | |
| | : | NO. 14-1643 |
| CITY OF PHILADELPHIA, ET AL. | : | |

**MEMORANDUM**

**SURRICK, J.**                                                                                                    **AUGUST 18, 2023**

In this civil rights action, Plaintiff Kareem Torain alleges that Defendants Jeffrey Walker, Brian Reynolds, and Brian Monaghan—current and former Philadelphia Police Officers—maliciously prosecuted him without probable cause, in violation of Section 1983 and the Fourteenth Amendment. He also claims that the City of Philadelphia's custom of municipal acquiescence in the alleged misconduct and failure to discipline the misconduct, caused this violation of his constitutional rights. In advance of trial, the City has filed a Motion *in Limine* asking the Court to preclude testimony of several witnesses[1]—Theresa Levins, Seth Williams, Curtis Douglas, Edward McCann, Reginald Graham, and John Delaney—and 21 exhibits. The testimony of each of these witnesses, and the majority of the exhibits, relate to a letter sent by Williams—then the Philadelphia District Attorney—in December of 2012, which stated that the Philadelphia District Attorney's Office ("DA's Office") would no longer call six Narcotics Field Unit (NFU) officers—including Brian Reynolds, a defendant in this case—as witnesses in narcotics cases ("the Williams Letter"). We find that the Williams Letter, the bases for the

---

[1] The City also includes Francis Healy as one of the witnesses whose testimony it seeks to have precluded. However, the Court has already ruled that Mr. Healy will be permitted to testify at trial. (Order and Memo. Denying Mot. Quash Healy, ECF No. 144-145.) For this reason, we will not address Mr. Healy further in this Memorandum and any reference to "the witnesses" in this memorandum and accompanying order does not include Mr. Healy.

Letter, the investigation that resulted from the Letter, and all related testimony and exhibits are not relevant to this case, as they involve incidents in different time periods and of a different nature than those at issue here. We also find several of the proposed witnesses' testimony to be based on hearsay, rather than personal knowledge and find that presenting this testimony at trial would be confusing to the jury. For these reasons, the Motion will be granted.

I.      BACKGROUND

Plaintiff asserts individual liability claims against Defendant Officers and a municipal liability claim against the City of Philadelphia under Section 1983 and the Fourteenth Amendment. At issue in this Motion is only the municipal liability claim. For this reason, we will forego a factual recitation regarding the individual liability claims. A complete recitation of the facts as to the individual Defendants can be found in our Memorandum dealing with summary judgment. (Memo. on Motions for Summary Judgment, ECF No. 79, at 3-5.) The relevant factual summary for the municipal liability claim follows.

In the late 1980s and early 1990s, officers in the NFU of the Philadelphia Police Department (PPD) systemically violated citizens' civil rights, stole money and drugs, planted evidence on suspects, fabricated the legal basis for search and seizure warrants, and committed perjury. (PPD Integrity and Accountability Office (IAO) Enforcement of Narcotics Laws Report, ECF No. 61-25, at 3.) In 1995, six NFU officers were jailed, several hundred criminal convictions were overturned, and dozens of lawsuits were commenced against the City. (*Id*.) As a result of the settlement of a class action lawsuit, the City created the IAO to monitor and audit PPD policies, practices, and operations as they relate to the detection of misconduct and corruption. (*Id*. at 3-4.) The IAO conducted a comprehensive audit and assessment of the NFU between the years of 1997 and 2002, with its findings summarized in the 2002 Enforcement of

Narcotics Laws Report. It also investigated the PPD's disciplinary system between the years of 2000 and 2002, with its findings summarized in the 2003 Disciplinary Systems Report. These facts and reports form the basis of Plaintiff's municipal liability claim.[2] Specifically, Plaintiff alleges that the City was aware of NFU officers repeatedly concealing exculpatory evidence and fabricating evidence to support arrests and prosecutions and that it failed to take precautions against such violations in the future, which in part led to his injury.

In further support of his municipal liability claim, Plaintiff has recently identified several witnesses—Levins, Williams, Douglas, McCann, Graham, and Delaney—and many related exhibits. He proffers that these witnesses will testify as to facts and events surrounding the 2012 Williams Letter, the basis for the Letter, the investigation prompted by the Letter, and allegations regarding various officers in the NFU committing theft and other misconduct in the mid-2000s. The City now moves to preclude the testimony of these witnesses and the supporting exhibits.

## II. DISCUSSION

In support of its Motion, the City makes several arguments in favor of precluding Plaintiff's proposed exhibits 22-28, 30-37, and 41-46 and testimony of Levins, Williams, Douglas, McCann, Graham, and Delaney at trial. Specifically, the City argues that this evidence is irrelevant and based on hearsay rather than personal knowledge. We agree. All of this evidence is inadmissible at trial.

### A. Relevance of Williams Letter and Related Witnesses and Documents

One of the City's main arguments in support of precluding the witnesses' testimony is that it is not relevant to the claims at issue here. In opposition, Plaintiff asserts that the testimony

---

[2] Plaintiff's remaining theories for municipal liability in this matter are limited to the custom theory and failure to supervise or discipline theory. (*See* Memo. on Motions for Summary Judgment at 15-23.)

is relevant to proving his *Monell* claim. We disagree. Evidence is only admissible at trial if it is relevant. Fed. R. Evid. 401, 402. The bar for what constitutes relevant evidence is low. *Forrest v. Parry*, 930 F.3d 93, 114 (3d Cir. 2019). A matter is relevant if "it has any tendency to make a fact [of consequence] more or less probable than it would be without the evidence." Fed. R. Evid. 401. Testimony which fails to prove or disprove any material fact at issue is irrelevant. *Brancha v. Raymark Indus.*, 972 F.2d 507, 514 (3d Cir. 1992).

The proffered testimony of the witnesses at issue here centers around the Williams Letter, the bases for the Letter, and the investigation that resulted from the Letter.[3] In short, we find that

---

[3] For the sake of clarity, we will explain the connection between the Williams Letter, the resulting Investigation Report, the various witnesses' testimonies, and the exhibits in question. While certainly not a model of clarity, the Parties' briefs reflect that the central issue underlying all of the witnesses and most of the exhibits in dispute in this Motion relates to the Williams Letter, the basis for the letter, and the subsequent investigation and Report that was conducted due to the Letter. They are connected as follows:

In December of 2012, Williams—the District Attorney at that time—sent a letter to the PPD stating that the DA's Office would no longer call six NFU Officers—including Brian Reynolds, a defendant in this case—as witnesses in narcotics cases. Plaintiff proffers that Williams would testify to the bases of the letter and any information or knowledge the DA's Office had of NFU officer misconduct predating the letter. (Pl. Br. Opp., ECF No. 141, at 11.) Plaintiff also asserts that Williams, Douglas, Graham, McCann, and Delaney would provide testimony that "shows that knowledge of the misconduct of the NFU officers was both widespread and longstanding." (*Id.*) Plaintiff also proffers that McCann and Douglas would both testify that the Williams Letter was motivated by a desire of the DA's Office to protect itself from a potential scandal involving their knowledge of NFU misconduct. (*Id.* at 4.) Plaintiff asserts that McCann, Douglas, and Graham would also testify to their personal concerns of specific NFU officer misconduct from 2003-2005 and in 2011 (more on this below, in section B).

The Williams Letter sparked an investigation by the PPD into the bases for the Letter and, specifically, any misconduct by the officers listed. (Pl. Ex. 22, ECF No. 128-8, at 2.) The Investigation Report was signed by Levins, who was the "investigator of record." Plaintiff proffers that Levins would testify to the Report and any potential confusion as to who actually conducted the investigation, as well as allegations that the Report wrongly attempted to present the City as having clean hands.

Because Plaintiff's proffered testimony of each of these witnesses (and the supporting exhibits) all relate to the Williams Letter, any reference herein to "the Williams Letter and supporting evidence" refers to the conjunction of evidence, including the Letter itself, the

4

the Williams Letter and supporting evidence are not relevant to Plaintiff's *Monell* claim. Plaintiff's *Monell* claim centers around "whether the City knew of officers regularly fabricating probable cause in order to substantiate illegal arrests and that it failed to take precautions against such actions in the future and/or whether the City failed to adequately supervise or discipline NFU officers and those failures amount to deliberate indifference." (Pl. Br. Opp. at 10.)  Both the nature of the incidents involved in the Williams Letter and the timeframe during which they occurred make it, and all supporting evidence, irrelevant here.

While the Williams Letter itself is vague and provides little information from which the Court could determine whether it is relevant to the claim at issue in this case, the Investigation Report, which was initiated based on the Letter, does provide us with this essential information. The Investigation Report found that the Letter was based on NFU officers "engaging in plea bargaining with defendants without the DA [Office's] knowledge and/or consent," "talk[ing] to defendants and/or their attorneys prior to trial in an attempt to gain information in exchange for considerations," and "[failing] to appear at . . . hearing[s] or [leaving] prior to hearing[s]." (Pl. Ex. 22 at 2.)  In addition, the Report states that the "tipping point" for the DA's Office was "allegations of theft of money and drugs" by NFU Officers. (*Id.*)  Attached to the Report are many documents upon which it was based.  In review of these documents, none of the alleged misconduct investigated in connection with the Letter occurred before 2006.

Based on this information, there are two important reasons why the Williams Letter and supporting evidence are not relevant to the case at bar.  First, the Report demonstrates that it involved alleged misconduct of an entirely different nature.  At issue here is whether the City

---

proffered testimonies of Williams, Douglas, Graham, McCann, Delaney, and Levins, and all supporting exhibits.

5

was on notice of NFU officers fabricating probable cause in order to substantiate arrests and prosecutions of defendants.  The alleged misconduct underlying the Williams Letter was NFU Officers stealing money or drugs from arrestees, engaging in unauthorized plea bargains with defendants, and failing to appear for hearings.  (Pl. Ex. 22 at 2.)  Whether the City was on notice of NFU officer misconduct in these areas has no bearing on whether the City was on notice of NFU officers fabricating probable cause.

Second, the alleged misconduct occurred in a significantly different time period than the misconduct at issue in this case.  Plaintiff was arrested in 2001.  As stated above, the Letter, subsequent investigation, and related witness testimony involve misconduct occurring from 2006 through 2012.  Plaintiff argues that the Third Circuit cases of *Forrest* and *Beck* support his proposition that evidence of his *Monell* claim is not limited to the actions of NFU members in and around January 2001 alone.  This proposition is generally correct; however, the evidence of misconduct at issue here is far too temporally removed to be relevant.  In *Beck v. City of Pittsburgh*, the Third Circuit considered the sufficiency of the evidence supporting a municipal liability claim for excessive force.  89 F.3d 966, 967 (3d Cir. 1996).  The evidence deemed relevant by Third Circuit in that matter included four excessive force complaints against the responding officer that were filed before the arrest at issue, and one that was filed two months later.  *Id*. at 969-70.  The Circuit specifically noted that "[b]ecause the complaints, especially those during the year 1991, *came in a narrow period of time and were of similar nature*, a reasonable jury could have inferred that the Chief of Police knew, or should have known, of [the officer's] propensity for violence when making arrests."  *Id*. at 973 (emphasis added).

Again, in *Forrest v. Perry*, the Third Circuit considered whether it was appropriate for a district court to preclude "post-arrest evidence" which included the plaintiff's complaint, a

follow up letter he sent to internal affairs, and three other internal affairs complaints regarding similar misconduct by the officers at issue. 930 F.3d 93, 115 (3d Cir. 2019). The similar complaints were all filed either shortly before or within six months after the plaintiff's arrest. *Id*. The Third Circuit, consistent with *Beck*, held that the district court abused its discretion in precluding the post-arrest evidence, as the incidents at issue were similar in nature and came within a narrow period of time to the plaintiff's arrest. *Id*.

Applying that logic, the post-arrest evidence at issue here did not involve incidents of similar nature (as discussed above), nor did they occur "within a narrow period of time" after Plaintiff's arrest. Plaintiff was arrested in 2001, and the incidents prompting the Williams Letter occurred between 2006 and 2012. While the Third Circuit has certainly allowed evidence of similar incidents that occurred within six months of a plaintiff's arrest, incidents several years after the events at issue far exceed the limit of what post-arrest evidence is relevant.[4] For these reasons, all testimony and evidence relating to the Williams Letter, including the testimony of Williams, McCann, Douglas, Graham, Levins, and Delaney and all supporting exhibits (Plaintiff's proposed exhibits 22-28, 30-34, and 41-46) shall not be presented at trial.[5]

---

[4] We acknowledge the City's observation that the Court already ruled that the Integrity and Accountability Office Reports (ECF Nos. 61-25, 62-4) are admissible in this matter, even though they "significantly post-dat[e] this arrest." (Def. Br. Reply, ECF No. 143, at 4.) However, we disagree with this characterization of the Reports and find that those Reports are distinguishable from the evidence Plaintiff seeks to introduce here. Though those Reports were published in 2002 and 2003, they reviewed evidence from 1997 to 2002 and included allegations of fabrication of probable cause. These Reports occurred in the years leading up to, during, and slightly following Plaintiff's arrest. This evidence is clearly relevant and not dissimilar in nature or time period to the issues involved in this case, unlike the evidence at issue in this Motion.

[5] Defendant also argues that Plaintiff's Exhibits 35 through 37, which appear to be related to the Freeman investigation, should be limited in accordance with our March 8, 2023 Order. In that Order, we held that "[e]vidence regarding the Freeman Investigation—*limited to the relevant portions of that investigation discussed above*—will also be admissible." (March 8, 2023 Order, ECF No. 115, at 3.) Therefore, these exhibits will be admissible insofar as they comply with the

### B. Hearsay and Lack of Personal Knowledge

The City's other main argument for preclusion of these witnesses and exhibits at trial is that the testimony of several of the witnesses is hearsay and not based on personal knowledge. Plaintiff fails to address the hearsay argument in his opposition. As to the personal knowledge argument, Plaintiff asserts that the witnesses have personal knowledge of evidence relevant to the *Monell* claim, specifically the reputation of the NFU officers in the DA's Office and the community. However, we find that all of the alleged "personal knowledge" of these witnesses is based on rumors and hearsay. Therefore, it will be precluded at trial.

Under Federal Rule of Evidence 602, "a [non-expert] witness may testify to a matter only if evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter." In addition, any out-of-court statement offered to prove the truth of the matter asserted is inadmissible unless it meets one of the exceptions to the general rule against hearsay. Fed. R. Evid. 801(c), 802.

Here, two of Plaintiff's proposed witnesses present issues related to lack of personal knowledge and hearsay: Douglas and Graham. Beginning with Douglas, Plaintiff proffers that he would testify that he had information in 2003 and 2004 that led him to conclude that Reynolds was stealing money from arrestees. (Pl. Br. Opp. at 5.) However, it is clear that all of Douglas' information about Reynolds and other NFU officers' misconduct was based solely on rumors, not on his own personal knowledge. (Pl. Ex. 28, ECF No. 128-4, at 31:12-19, 32:1-12.) In fact, Douglas admitted as such in his deposition: "You just hear the rumors . . . Other police say things . . . I didn't have any concrete proof of evidence that they were doing it. I just heard

---

parameters of the admissibility of facts and evidence surrounding the Freeman investigation as laid out in that Order.

certain people say." (*Id*. at 33:7-13.) This testimony is inadmissible under both Rule 601 and 802, as it shows that Graham has no personal knowledge of the alleged misconduct and corruption of NFU officers, and that all of his information about their alleged misconduct is based on hearsay. For both of these reasons, his testimony is inadmissible.

      As to Graham, Plaintiff proffers that he would testify that he "heard from 'people from the neighborhoods [] saying that these guys are robbing them and stealing their money or setting them up' and 'would constantly hear complaints about stealing and planting of evidence on Liciardello jobs.'" (Pl. Br. Opp. at 5 (citing Pl. Ex. 30, ECF No. 128-6, at 41:9-13).) Like Douglas, Graham's knowledge on this subject is based on what he heard from other people, not from personal knowledge. Again, he explicitly states this in his deposition: "For me when I use the word shady, like I said, I've never seen them steal anything or set anybody up. But [] I'm getting word from the street from defendants that . . . [these officers are] setting them up[.]" (Pl. Ex. 30 at 41:7-11.) As with Douglas, this testimony violates Rules 601 and 802 and is therefore inadmissible.

      **C.    Confusion to the Jury**

      While not explicitly raised by the Parties, we also find the proposed testimony of these witnesses is inadmissible under Federal Rule of Evidence 403, as it would be substantially confusing to the jury. A trial court has discretion to "exclude relevant evidence if its probative value is substantially outweighed by a danger of . . . confusing the issues [or] misleading the jury[.]" Fed. R. Evid. 403. The proposed testimony at issue in this Motion is extremely broad and encompasses many subject matters which are either not related or tangentially related to this case. For example, much of the proposed testimony involves officers stealing drugs and money from arrestees, planting evidence, and failing to appear for Court—none of which is at issue

here. It also includes and references an entirely different litigation, *McIntyre v. Liciardello*. No. 13-2773, 2020 WL 605717, at *1 (E.D. Pa. Feb. 7, 2020), as well as allegations against specific officers who are not defendants in this case and did not even work in the NFU at the time of Plaintiff's arrest (i.e., Officer Liciardello). As discussed above, these witnesses' testimony involves incidents of a different nature and a different time period than the alleged misconduct in this case. Even if we could glean any relevant evidence from the proposed witnesses and proffered testimony, we find that any probative value of that evidence is substantially outweighed by the risk of misleading the jury by confusing the issues. Fed. R. Evid. 403.

### III. CONCLUSION

For the foregoing reasons, the Motion will be granted. The evidence discussed herein will not be permitted at trial. An appropriate Order follows.

**BY THE COURT:**

**/s/ R. Barclay Surrick**
**R. BARCLAY SURRICK, J.**